IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal No.: 9:22-cr-658 |
| vs. ) | |
| ) | |
| RUSSELL LUCIUS LAFFITTE ) | |
| ) | |
| Defendant ) | |
| _____ ) | |

### **DEFENDANT'S FIRST MOTION FOR BOND MODIFICATION**

The Defendant, RUSSELL LUCIUS LAFFITTE, by and through his undersigned attorneys, E. Bart Daniel and Marshall "Matt" Austin, hereby respectfully moves for modification of the conditions of his pretrial release. Specifically, Mr. Laffitte asks that the Court amend the conditions of his pre-trial release to discontinue electronic monitoring and home confinement for the following reasons:

(1) This Court imposed excessive conditions of bail that are wholly unwarranted and unnecessary to assure Mr. Laffitte will appear in court when necessary;

(2) Neither this Court nor the State Court applied the appropriate analysis when imposing the current conditions of bond on Mr. Laffitte;

(3) There is no legitimate reason to force a presumptively innocent defendant charged with non-violent crimes, no criminal history, and who has voluntarily appeared numerous times to be limited to home confinement or to wear even one GPS ankle monitor, let alone two; and

(4) The unprecedented media focus on this case is impairing Mr. Laffitte's ability to receive a fair trial and have resulted in the excessive conditions of bail imposed upon him. Recent reports have included credible allegations by counsel for Alex Murdaugh that grand jury information has been leaked to media outlets by members of the State prosecution team.

Mr. Laffitte finds himself in the center of an unprecedented media firestorm. Amidst the explosion of coverage, several individuals have found themselves the subject of intense scrutiny

for no other reason than their connection with one man – Alex Murdaugh. The same can be said for Mr. Laffitte.

Despite signing and filing the majority of the documents likely to be used by both the State and the Government in their cases against him, complying with all conditions of his state bond since May 6, 2022, repeatedly appearing in court and at multiple debriefings with the South Carolina Law Enforcement Division ("SLED"), the Federal Bureau of Investigation ("FBI"), the Attorney General's Office, the United States Attorney's Office, and the South Carolina Supreme Court's Office of Disciplinary Action ("ODC")[1], and having been fully aware of potential charges for nearly a year prior to first being indicted by the State, Mr. Laffitte has been on home confinement with GPS ankle monitors for the past month. As set forth below, these conditions are unnecessary and clearly excessive, as they have no bearing on the only question before the Court – What are the *least restrictive conditions of pretrial release necessary* to ensure Mr. Laffitte appears at trial?

**I.     Legal Standards**

The Bail Reform Act, 18 U.S.C. § 3142, defines the manner in which courts impose conditions of pretrial release. The Act allows courts to impose conditions ranging from personal recognizance all the way to pretrial detention. *Id*. § 3142(a). The guiding principle of the Act is that courts must impose the *least restrictive condition or combination of conditions necessary to*

---

[1] At ODC's request, Mr. Laffitte has been interviewed on three separate occasions in July and August 2022, well after he was interviewed by SLED, FBI, the Attorney General's Office, and the United States Attorney's Office in February 2022. At no point in the interim did anyone with the State or the Government indicate that Mr. Laffitte breached his proffer agreements by failing to tell the truth. Mr. Laffitte met with ODC for two day-long interviews held on back-to-back days in July 2022. He was asked to come back for yet another day-long interview with ODC in August 2022. The undersigned counsel is unaware of any indicia of dishonesty by Mr. Laffitte, calling into question several comments the lead State prosecutor made in Mr. Laffitte's State bond hearing suggesting that he lied during his February 2022 proffer interview.

*reasonably assure the defendant's appearance* as required and *to reasonably assure the safety of any other person or the community. Id*. § 3142(c) (emphasis added).

In determining whether there are any conditions of release that will satisfy this standard, Section 3142(g) directs courts to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

But the statute itself indicates that these factors are used to assess "whether there are conditions of release that will reasonably assure the appearance of the person as required," not what those conditions ought to be. *Id*. Once one concedes, as the state and the government have here, that pretrial detention is not necessary, the operative inquiry becomes what are the least restrictive conditions that will reasonably assure the defendant's appearance. *Id*. § 3142(c)(1)(B). The government cannot substitute analysis of the Section 3142(g) factors for a more precise assessment of how and why this Court should reinstitute more restrictive release conditions.

The "least restrictive condition" requirement is rooted in the Eighth Amendment to the United States Constitution, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend VIII. "Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is excessive under the Eighth Amendment." *Stack v. Boyle*, 342 U.S. 1, 5 (1951). "[T]o determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response.... [B]ail must be set by a court at a sum designed to ensure that goal, and no more." *United States v. Salerno*, 481 U.S. 739, 754 (1987); *See also*, *United States v. Polouizzi*, 697 F. Supp. 2d 381 (E.D.N.Y. 2010) (Excessive bail

3

conditions are those that "impose restraints that are more than necessary to achieve the government's interest."); *United States v. Karper*, 847 F. Supp. 2d 350, 363 (N.D.N.Y. 2011) ("Therefore, the relinquishment of constitutionally protected rights... on conditions that are more than necessary to satisfy legitimate governmental interests would constitute excessive bail in violation of the Eighth Amendment.")

When defendants establish that they will abide by their obligation to appear in court, logic dictates that the justification for imposing the existing release conditions lessens. Put differently, if the Bail Reform Act requires no more than the least restrictive conditions needed to reasonably assure the defendant's appearance, then consistent compliance with existing conditions counsels in favor of reducing their severity on the theory that lesser conditions will suffice.

## II.    Factual and Procedural Background

### A.  State bond conditions imposed on May 6, 2022.

Mr. Laffitte was charged in three indictments by the South Carolina Attorney General's Office on April 11, 2022. The indictments contain allegations that Mr. Laffitte conspired with Alex Murdaugh to commit financial crimes. Mr. Laffitte surrendered his passport, and he was thereafter placed on GPS monitoring and home confinement. Mr. Laffitte filed a motion to modify the conditions of his state bond on May 17, 2022. To date, the state court presiding over his case has not held a hearing or ruled on his motion. (Ex. 1)

The Assistant Attorney General handling Mr. Laffitte's state case indicated that he would be willing to consent to modifying the conditions of his pretrial release if Mr. Laffitte "behaved himself" for 90 days. As of August 4, 2022, 90 days after Mr. Laffitte's arrested and release, Mr. Laffitte has not had a single instance in which he failed to comply with the conditions of his release. Nonetheless, despite multiple attempts by Mr. Laffitte's attorneys to discuss making reasonable

modifications to Mr. Laffitte's conditions of release, the state prosecutor has not agreed to any modifications, and the court has yet to schedule a hearing.

### B. Federal bond conditions imposed on July 27, 2022.

On July 27, 2022, Mr. Laffitte appeared before this court for an initial appearance and arraignment on federal charges. Like the state indictments, the Government alleged in its indictment (the "Federal Indictment") that Mr. Laffitte conspired with Alex Murdaugh and others to commit financial crimes related to a scheme to defraud Mr. Murdaugh's personal injury clients and Palmetto State Bank, where Mr. Laffitte was previously employed as the CEO. Curiously, while Mr. Murdaugh has not been charged federally, he is nonetheless featured prominently in the federal indictment, which refers to him as the "Bank Customer" a total of 64 times.

After Mr. Laffitte pled not guilty to the Federal Indictment [ECF. 13], the Court instructed him on the Government's duties to disclose all exculpatory evidence in accordance with the Due Process Protections Act and Rule 5(f) of the Federal Rules of Criminal Procedure, explaining that such evidence includes "evidence that favors the defendant or cast doubt on the government's case as required by Brady versus Maryland and its progeny." The Court then explained that "[f]ailure to do so in a timely manner may result in serious consequences including but not limited to exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action, or sanctions by the Court." Tr. p. 4.

The Court then asked for the government's position on bond. The Government explained that Mr. Laffitte's federal charges related to conduct also charged by the South Carolina State Grand Jury, stating the amount of bond along with the amount posted by Mr. Laffitte. The Government then asked that the Court "impose a relatively nominal secured bond in addition to the state bond with some special conditions that we would review with Your Honor." Tr. p. 5. The

5

Government added the following reservation in the event of a reduction of Mr. Laffitte's state bond, requesting "the opportunity to acknowledge that there may be a change in circumstances, should his bond be reduced on the state side" and stating the Government "might want to revisit the bond imposed by Your Honor." *Id.*

Without offering any arguments addressing the underlying facts of the case or whether Mr. Laffitte posed even the slightest risk of non-appearance for court hearings, the Government appeared to follow the same playbook used by the State during the State Bond Hearing, turning the floor over to attorneys representing Mr. Murdaugh's alleged victims to advocate for the Court to take a tough stance on Mr. Laffitte's conditions of bond. Attorneys Eric Bland and Ronnie Richter, attorneys for Alania Plyler Spohn and Hannah Plyler, both former clients of Mr. Murdaugh and for whom Mr. Laffitte served as conservator, addressed the Court.

Accompanied by Ms. Spohn at the lectern, Mr. Bland began by drawing a distinction between Mr. Murdaugh and Mr. Laffitte. He explained that while he believed Mr. Laffitte should get bond, it was still a serious case as he cautioned that "this is not a parking ticket case." Tr. p. 6.1-7. Mr. Bland and Mr. Richter each addressed the Court, offering the only statements during the Government's presentation that addressed the facts and circumstances of the case.

Rather than call a law enforcement agent or witness to the stand to offer testimony relevant to the first question for the Court to consider – whether it was appropriate to release Mr. Laffitte on personal recognizance or an unsecured appearance bond – the Government apparently decided it would be better to rely on counsel for Mr. Murdaugh's victims. Unsurprisingly, Mr. Bland and Mr. Richter did their jobs, describing the undeniably horrific set of circumstances that led their clients first to Mr. Murdaugh as their attorney and eventually Mr. Laffitte as conservator after losing their mother and brother in a horrific car accident.

6

Also not surprising was the fact that the Plyler sisters' attorneys passionate advocacy repeatedly blurred the line between conjecture and fact, in several instances leaving out critical information. For example, the attorneys repeatedly referred to their clients collectively, giving the impression that Mr. Murdaugh and Mr. Laffitte's alleged scheme involved defrauding a shared conservatorship. Mr. Bland stated that "Mr. Laffitte as a conservator, borrowed money for himself from the conservator funds without any approval from the probate court, not an order for the probate court. In addition, he loaned these girls' funds to Alex Murdaugh." Tr. p. 6.

Absent from this explanation was the fact that his clients had separate, individual conservatorships and that none of the loans he mentioned involved Ms. Spohn's conservatorship. As he well knew, Mr. Laffitte did not make a single loan from Mrs. Spohn's conservatorship. Equally important, Mr. Laffitte has consistently and emphatically asserted that he did indeed receive approval from the probate court to make the loans at issue in this case. As much as Mr. Bland would like to believe that is not true, cavalierly making factual assertions about the conduct at issue in a criminal case with a defendant's liberty at stake is reckless and completely unnecessary in a hearing to determine what bail conditions are most likely to assure appearance in court. The issue of whether Mr. Laffitte did or did not take specific actions will be a question of fact for a jury to decide.

Mr. Bland went on, characterizing Mr. Laffitte as an officer of the court and offering the following admonishment:

> You need to look at him the same way you would look at a lawyer standing before you who misappropriated and stole money. He's an officer of the court.[2] He swore an oath that he was going to follow the rule of law, that he would come to the Court and ask permission from the Court to do these things. It was not done.

---

[2] It is worth noting that attorney Corey Fleming, who is charged in relation to Mr. Murdaugh's alleged schemes in the State Indictments, received a $200,000 bond without any comparable conditions of release such as electronic monitoring or home confinement.

7

Tr. 7.

Mr. Bland addressed the amount of bond to be imposed, urging the Court to impose bond beyond the Government's request for a bond in a "nominal amount." Without offering specifics, he effectively asked the Court to consider the optics of its decision by imposing "a significant bond" that would "send a message to people who take the oath before the Court that they're going to honor the law." *Id.*

Mr. Bland concluded by asking the Court to "impose that type of bond that sends the message to everybody who is going to be a personal representative, who's going to be a conservator that when you take the oath, it's not your money. It belongs to the people who lost family members, people who are suffering. And that's what I would ask Your Honor." *Id.*

The Court then heard from Mr. Richter, who unsurprisingly echoed Mr. Bland's conclusory statements that Mr. Laffitte did not receive approval from the probate court in carrying out his role as conservator. Finally, after offering nothing more than conjecture as to the propriety of Mr. Laffitte's actions, Mr. Richter ironically concluded, stating that "we just want the Court to be aware of the full context of the behavior here in this setting." *Id.* at 9.

**III.     Argument**

Mr. Laffitte has been compliant with all the terms of release since he was arraigned in state court and on released on bail May 6, 2022. When he was indicted on federal charges and released on bail on July 27, 2022, he was ordered to wear a second GPS ankle monitor. Home confinement was also imposed. To date, he has complied with the terms of both bond orders without incident. He has never made any effort to flee. He has not been implicated in any additional criminal conduct. He has remained in constant contact with United States Probation and the undersigned

counsel. He has focused on working to support his family and prepare for what he is eagerly awaiting – to prove his innocence at trial.

**A. The conditions for considering release of a defendant do not lead to the conclusion that GPS monitoring or home confinement are warranted in this case.**

  **1. Nature of the Offense**

While Mr. Laffitte is charged with serious crimes, they are not crimes of violence (see 18 U.S.C. § 3156(a)(4)), nor do they fall into any of the other categories enumerated in 18 U.S.C. § 3142(g)(1). Therefore, the nature of the offenses does not statutorily justify GPS monitoring or home confinement. Turning to the specific facts underlying both the indictments filed both by the Government as well as the State, imposition of these conditions is also not warranted.

Mr. Laffitte is charged in the Federal Indictment with conspiring (18 U.S.C. §1349) with Alex Murdaugh from July 2011 through October 2021 to commit wire fraud (18 U.S.C. §1343) and bank fraud (18 U.S.C. §§1344(2) and (2)). [Doc. 2]. He is also charged with two substantive counts of wire and bank fraud in addition to two Misapplication of Bank Funds (18 U.S.C. §§ 656 and 2). *Id.*

The Federal Superseding Indictment filed on August 17, 2022 mirrors the factual recitation in the Federal Indictment, alleging that Mr. Laffitte used "his position as director and employee…while serving as the personal representative and conservator for the personal injury clients, to obtain money in the care, custody, and control of the bank, belonging to the personal injury clients." [Doc. 25].

The allegations within the Federal Superseding Indictment describe how Alex Murdaugh "asked [Mr. Laffitte] to serve as personal representative and conservator for various personal injury clients of the law firm; specifically [Mr. Murdaugh's] personal injury clients." *Id.* Using

9

what the Superseding Federal Indictment alleged that the two men, and other unnamed coconspirators, defrauded Mr. Murdaugh's personal injury clients as well as Palmetto State Bank.

All told, the Federal Superseding Indictment alleges Mr. Laffitte "collected $391,781.07 in fees as personal representative and conservator for" Mr. Murdaugh's personal injury clients. By contrast, his alleged co-conspirator Mr. Murdaugh is accused of stealing a total of $8,789,447.77.

At the Federal Bond hearing, the Government did not elaborate any argument of danger to the community of the electronic monitoring or home confinement restrictions. And rightly so, there appears to be none. First, the last alleged fraudulent actions are described in Counts Four and Five of the Federal Superseding Indictments as having taken place on October 28, 2021 and July 15, 2021 when Mr. Laffitte initiated two financial transactions. [Doc. 25]. The conduct described in the first three counts all took place at least two years before the 2015 financial transaction at issue in Count Six, which was the sole count added to the Federal Indictment.

The vast majority of the conduct at issue in the Federal Superseding Indictment took place years ago. Civil lawsuits and media coverage describe Mr. Murdaugh returning to Palmetto State Bank in 2018 to carry out the same scheme in which he partnered with Mr. Laffitte. However, he did not partner with Mr. Laffitte that time. Instead, he used a completely different bank employee. While it is unclear why Mr. Murdaugh opted not to join Mr. Laffitte, who has been described as the most important "cog" in his conservatorship scheme, it is important to highlight that point for the Court since it begs the question – *How does this point to Mr. Laffitte being a future danger to the community?* When setting bail conditions, the question should be what future behavior can be predicted and whether the Court believes a defendant has a propensity to commit future crimes: "The statute, by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs

10

to show that there is a serious risk that these potential harms exist going forward." *United States v. Madoff*, 586 F.Supp.2d 240, 250 (S.D.N.Y. 2009).

Mr. Murdaugh has been charged with murder, not Mr. Laffitte. There has not been any indication at this point that Mr. Laffitte was in any way connected with violent crimes. Mr. Murdaugh has been detained pending trial of his case and given that he has acknowledged responsibility for the financial crimes at issue in the State and Federal indictments, he is not likely to return to Hampton County for a significant amount of time. As a result, the most critical part of Mr. Murdaugh's conservatorship scheme, personal injury clients, are no longer part of the equation. Equally important to carry out the scheme was Mr. Laffitte's position at PSB. Given that he resigned as CEO in January 2022, however, he clearly cannot pose even the slightest risk of carrying out any of the alleged criminal activities in the future.

2. **Weight of the evidence against the defendant.**

Mr. Laffitte is still going through discovery from the State and expects discovery from the Government in the coming weeks. While the State and the Government have a significant amount of evidence against Alex Murdaugh, Mr. Laffitte does not believe either sovereign have a significant amount of evidence to present against him individually. Mr. Laffitte would also point out to the Court that he has been cooperating with law enforcement since September 2021, over 8 months before he was indicted by the State on April 11, 2022, or the Government on July 19, 2022.

Both State and Federal prosecutors handling Mr. Laffitte's cases made it abundantly clear that they each intended to indict Mr. Laffitte prior to doing so. Nonetheless, Mr. Laffitte did not flee. Instead, in both instances, he voluntarily surrendered himself to law enforcement without incident and appeared in court. If either sovereign had at any point believed he was a flight risk,

he undoubtedly would have been arrested without prior notice as was Alex Murdaugh in October 2021 when he was arrested by SLED agents in Florida.

### 3. History and characteristics of Mr. Laffitte.

Mr. Laffitte has no prior failures to appear, and he has already shown that he will appear when required. He is a lifelong resident of Hampton County, South Carolina, with significant ties to the community including having numerous immediate and extended family members nearby.

His financial resources and assets have been tied up by the State court's order freezing them, so, in addition to having no interest in fleeing the country, he has no resources to do so. Courts have held that the threat of flight must be serious. *See, e.g., U.S. v. Wasendorf*, 2012 WL 4052834 (N.D. Iowa 2012) (holding that the fact that defendant's assets have been frozen eliminates serious flight risk). Mr. Laffitte was also not on parole or probation prior to his arrest on his currently pending charges in State and Federal court, nor was he pending any other charges. 18 U.S.C. § 3142(g)(3)(B). Therefore, the third factor should not persuade the Court that GPS monitoring is warranted.

Mr. Laffitte has been married to his wife for 21 years. The couple have two children, one of whom currently lives with them and just began his senior year in high school. He has extremely close relationships with both children, as he does with his numerous relatives in Hampton and the rest of South Carolina.

If for no other reason, Mr. Laffitte would not flee the country and leave his family at the mercy of having their assets subject to being forfeited by the State or the Government.

### 4. The nature and seriousness of the danger posed by Mr. Laffitte.

Mr. Laffitte has no prior criminal record other than convictions for open container and public intoxication more than 25 years ago. He is now 52. He also has no history of violence. The

crimes with which he is charged are not crimes of violence, as defined by the United States Code, nor are any of them one of the crimes listed that would argue for detention or more stringent pretrial supervision. See 18 U.S.C. § 3142. Therefore, factor (4) does not argue in favor of GPS monitoring or home confinement. 18 U.S.C. § 3142(g).

## IV.  Conclusion

Mr. Laffitte respectfully prays that this Honorable Court grant his Second Motion to Modify the Conditions of Release in the above-captioned case and enter an order directing the removal of the electronic monitoring provisions and home confinement provisions in the Release Order [ECF 15].

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: *s/ E. Bart Daniel*
E. Bart Daniel
Federal Bar No. 403
E-Mail: bart.daniel@nelsonmullins.com
Marshall "Matt" Austin
Federal Bar No. 11435
E-Mail: matt.austin@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806) Charleston, SC 29401-2239
(843) 853-5200

*Attorneys for Russell Lucius Laffitte*

August 23, 2022

Charleston, South Carolina

13