# EXHIBIT 1

*Defendant's May 17, 2022 State Court Motion to Reduce Bond and to Modify Conditions of Release*

**STATE GRAND JURY OF SOUTH CAROLINA**

FILED
MAY 17 2022
MARGARET J. SELF
CLERK, SC STATE GRAND JURY

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA ) | Case No.s: | 2022-GS-47-01 |
| ) | | 2022-GS-47-02 |
| v. ) | | 2022-GS-47-03 |
| ) | | |
| RUSSELL LUCIUS LAFFITTE ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

## DEFENDANT'S MOTION TO REDUCE BOND AND TO MODIFY CONDITIONS OF RELEASE

Russell Lucius Laffitte, through his undersigned counsel, hereby moves before the Presiding Judge of the State Grand Jury for a reduction of his bond and modification of the conditions of release. Mr. Laffitte's bond should be reduced for the following reasons:

1. Mr. Laffitte's bond was excessively high and unduly burdensome;

2. The State did not present any evidence suggesting Mr. Laffitte is a risk of flight or a danger to the community;

3. The Court relied upon statements of Mr. Laffitte that were improperly introduced by the State in violation of the State's express promises under the terms of the proffer letter signed by the State (the "Proffer Agreement"); and

4. The State mischaracterized Mr. Laffitte's proffered statements in arguing that Mr. Laffitte is a flight risk.

**I.   Introduction**

On May 4, 2022, three indictments (the "Indictments") were unsealed charging Mr. Laffitte with 15 counts of Breach of Trust ($10,000 or more), three counts of Computer Crime ($10,000 or more), and three counts of Criminal Conspiracy. With the permission of the State and in coordination with the South Carolina Law Enforcement Division ("SLED"), Mr. Laffitte turned himself in at the Kershaw County Detention Center at 7:00 a.m. the morning of May 6, 2022. Later that morning, the Court held his arraignment and bond hearing (the "Bond Hearing").

## II.     Arguments at Mr. Laffitte's Arraignment and Bond Hearing

### A. Mr. Laffitte's argument for bond.

The undersigned counsel for Mr. Laffitte argued he should be released on his own recognizance, stating that he was neither a danger to the community nor a flight risk given the non-violent nature of the allegations against him, his lack of any criminal record, and his long-standing and substantial ties to Hampton County specifically and South Carolina in general. Bond Hearing Tr., 6:15-8:10.

Defense counsel explained that Mr. Laffitte had never lived outside of the state, having only lived as far away as Newberry, South Carolina when he attended college. *Id.* at 7:6-7. Further demonstrating the lack of any economic danger to the community posed by Mr. Laffite, counsel highlighted the fact that Mr. Laffitte's allegedly criminal activities were only possible by virtue of his position at Palmetto State Bank, a position he no longer holds. *Id.* at 6:23-7:2.

Defense counsel concluded, noting the fact that Mr. Laffitte had been voluntarily cooperating with law enforcement from the onset of the investigation, a fact indicating that Mr. Laffitte was unlikely to flee prior to trial and did not, in the eyes of law enforcement, pose either an economic or physical danger to the community. *Id.* at 7:24-8:9.

### B. The States' argument for conditions of bond.

The State's presentation to the Court did not include any arguments or evidence showing that Mr. Laffitte posed a serious risk of flight or a danger to the community. The State began by appropriately acknowledging the "notoriety of this case" and Mr. Laffitte's right to address the allegations against him in court as opposed to "out in the world of the media." Bond Hearing Tr., 8. Despite noting that Mr. Laffitte is a different person than Alex Murdaugh, the State nonetheless immediately attempted to tie them to each other through what it characterized as a "long

association" between the two men and their families. Bond Hearing Tr., 9:3-6. *Id.* The State also mentioned that the Court, presumably in other hearings, had previously heard of a "string of financial allegations" against Mr. Murdaugh, referring to "an exhausting velocity of money over many, many years on behalf of Mr. Murdaugh" without any explanation of their relationship to the specific charges at issue. *Id.*

The State described Mr. Murdaugh as having "had to beg, borrow and allegedly steal to stay afloat", first connecting Mr. Laffitte to the allegations by describing him as "[a]n important cog in that hamster wheel constantly spinning." *Id.* The State then summarized a number of allegations without specifying which were actually contained within the Indictments, all to support the general contention that Mr. Laffitte assisted Alex Murdaugh's criminal financial machinations.

Without calling a witness or offering any evidence in support of its contentions, the State concluded its presentation by requesting a surety bond of approximately $500,000, a prohibition against wasting of assets, the surrender of firearms, an extradition waiver, and a no contact order for bank employees, victims, and for any co-defendants in the case. *Id.*

Rather than offer any arguments or evidence in support of the contention that Mr. Laffitte poses a danger to the community or a risk of flight, the State called upon attorney Justin Bamberg to do so, asking the Court "give him the floor and make whatever comments as to risk of flight and danger to the community that he wishes to make." *Id.* at 14:7-10. While Mr. Bamberg offered a compelling description of the negative impacts upon the victims of the alleged crimes, he presented no evidence related to the issue at hand. Simply put, he did not present any evidence that Mr. Laffitte poses a danger to the community or a risk of flight.

Mr. Bamberg focused the Court on a private flight taken by co-defendants Alex Murdaugh and Corey Fleming. While a third person appears to have been present on that flight, there is no indication that Mr. Laffitte attended. Mr. Bamberg noted the following:

> Mr. Lafitte also has access to friends and associates, for example, who have access to private planes. Some of the money that was misappropriated from these individuals was used by, apparently, some of his friends and associates to fly to Omaha, Nebraska. That is a consideration in the victim's eyes as to whether or not he is a flight risk. These aren't commercial flights. These are private planes.

*Id.* at 16:22-17:4.

Curiously, Mr. Bamberg publicly stated just the day before that Mr. Laffitte had been a passenger on that flight, stating that "Justice has been done. Murdaugh and Laffitte have experienced the benefit of inheriting generational wealth, and that was not enough for them. ***To think of their depravity and their selfishness in using my client's money to fly to the College World Series in Omaha.***" Monk, John, *Indicted: Murdaugh, Hampton banker, Beaufort lawyer charged with major financial crimes*, The State, May 5, 2022, www.thestate.com/news/local/crime/article261069987. (emphasis added).

While the undersigned counsel is informed and believes that Mr. Bamberg, at the urging of Mr. Laffitte's civil counsel, corrected the quotation to reflect the fact that Mr. Laffitte was not on the flight at issue, it did not take place until the night after the Bond Hearing. It is worth drawing the Court's attention to it in the current motion, however, to ensure it did not factor into the Court's decision. The only other argument related to Mr. Laffitte's risk of flight came in rebuttal to the arguments of defense counsel, when, as explained more fully below, the State breached the terms of its proffer agreement in stating that Mr. Laffitte had made the statement that "he liked to boat to the Bahamas." *Id.* at 20:21-22.

With regard to the potential danger Mr. Laffitte posed to the community, Mr. Bamberg acknowledged that there had been no "formal threats of violence." *Id.* at 15:14. Instead, he pointed to the fact that Mr. Laffitte has "access to firearms" and the fact that he had been photographed taking pictures turkey hunting seven days prior. *Id* at 16:2-3.

### C. The Court's Order

In issuing its ruling, the Court first noted that Mr. Laffitte is innocent until proven guilty. Turning to the conditions of bond, the Court began with the three "most important" conditions, all of which related to Mr. Laffitte's risk of flight. Specifically, the Court stated that "Number one is that he has got to surrender a passport. Number two, he may not -- I will not allow him to leave the State. Number three, I will place him on house arrest with electronic monitoring. *Id.* at 21:18-21.

The Court then addressed the amount of bond, stating that based upon all of the allegations presented to it, including from the attorneys for the alleged victims. The Court stated:

> Given what I've heard related to the allegations and the potential danger to the community, while he is a respected member of the community and he has not posed any physical threat to any person, there are allegations that he engaged in behavior that would be less than honorable and potentially criminal depending on the view of the evidence once the jury has the opportunity to hear it.
>
> So I think that he does have the ability to be able to flee. While he may not be inclined to do so, the fact of the matter is that there's very serious allegations that are pending against him.
>
> Many of them carry multiple years of potential for incarceration, and while it's not always a desire for someone to leave the State, oftentimes that does occur. So that, hence, my reason for house arrest with electronic monitoring, and he may not leave the State.
>
> I'm going to set bond in the amount of -- a surety bond in the amount of $1 million. He may post 10 percent cash. I think that's commensurate with the charges that are pending against him and the allegations, and I think it's

5

> significant amount to be able to guarantee his remainder in the state and appearance in court.

*Id.* at 22:2-23.

## III. Argument

### A. Mr. Lafitte's bond was excessively high and should be reduced.

The United States Constitution prohibits excessive bail. U.S. Const. amend. XIII; S.C. Const. art. I, § 15. S.C. Const. art. I, § 15. Excessive bail is higher than an amount reasonably calculated to insure defendant's presence at trial. *Stack v. Boyle*, 342 U.S.1, 5 (1951); *State v. Taylor*, 255 S.C. 268, 273, 178 S.E.2d 244, 246 (1970). The ***"traditional right to freedom before conviction permits the unhampered preparation of a defense and serves to prevent the infliction of punishment prior to conviction."*** 342 U.S. at 4 (emphasis added).

Mr. Laffitte is not charged with a single violent offense. *See* S.C. Code § 16-1-60 (providing an exclusive list of offenses that are considered violent offenses). He also has no criminal record. As a result, Mr. Laffitte has a constitutional right to be released on bail in an amount no higher than necessary to insure his presence at trial.

The Court's findings placed primary emphasis on Mr. Laffitte's risk of flight. Mr. Laffitte respectfully suggests the Court failed to give sufficient weight to his lack of criminal record over his 51 years, standing in the community, stable family life, time delay between his initial contact with law enforcement and when he voluntarily turned himself in upon indictment, no evidence he ever attempted or even considered attempting to flee, and the possibility that any concerns with flight could be adequately addressed by the amount of bail imposed alone. The conditions imposed upon Mr. Laffitte, including GPS monitoring and home arrest, are excessive and are unnecessary to insuring Mr. Laffitte appears at all court proceedings.

Mr. Laffitte has known of this investigation since at least September 2021 when he was first contacted by Special Agent David Williams with the South Carolina Law Enforcement Division ("SLED"). Mr. Laffitte has been fully aware that he could end up being charged in this case. That only became clearer in January 2022 when State and Federal prosecutors informed the undersigned counsel that Mr. Laffitte was a target in his investigation. Mr. Laffitte's status as a target has not changed at any point. Nonetheless, the State allowed him to voluntarily surrender the morning of May 6, 2022.

Mr. Lafitte's recent history indicates that he is not a danger to the community or a risk of flight. During the Bond Hearing, the undersigned counsel mentioned Mr. Laffitte's cooperation with the investigations being conducted by the Attorney General's Office as well as the United States Attorney's Office. That information was important not only to show that Mr. Laffitte is not hiding from responsibility. It also demonstrates that he is not a risk of flight.

Similarly, the mere arguments that Mr. Laffitte poses a flight risk and a danger to the community do not support the Court's findings. Mr. Bamberg argued that Mr. Laffitte has "access to friends and associates…who have access to private planes", pointing to a trip that did not involve Mr. Laffitte in any way. While his co-defendants were on that trip, not only have their assets since been frozen, one of them is currently incarcerated. Defense counsel is at a loss in understanding how simply knowing two people, especially two people whose freedom has been curtailed by the Court to a substantial degree, makes Mr. Laffitte a flight risk. In addition to constituting a breach of the State's proffer agreement, the comment that Mr. Laffitte likes to "boat to the Bahamas" provides similarly weak support for the notion that he is a flight risk given that he has not been to the Bahamas since 2012. It was also a gross mischaracterization of what Mr. Laffitte actually said

to investigators, as it was relayed to give the impression that Mr. Laffitte cavalierly offered the statement rather than a response to a specific question posed by investigators.

As it pertains to Mr. Laffitte's supposed danger to the community, Mr. Bamberg also pointed to the fact Mr. Laffitte had been the subject of photographs posted to social media a week prior to the hearing showing him. To date, defense counsel has been unable to find any supporting precedent in which a Court has held a defendant charged with non-violent crimes constituted a danger to the community based solely on liking to hunt.

The Court's order setting bond at one million dollars, imposing GPS monitoring and home arrest, and limiting his contact with employees of Palmetto State Bank is excessive and drastically out of proportion to his co-defendant, Corey Fleming, who received a bond of $200,000 without GPS monitoring or house arrest. The disparity between the two defendants is unsupported by the record, as the State clearly was not worried about Mr. Lafitte fleeing given that he was allowed to turn himself into the Kershaw County Detention Center the morning of the Bond Hearing. This makes sense given that Mr. Laffitte has been fully aware of the investigation and in regular contact with law enforcement since in or around September 2021. It similarly supports the State's decision not to request GPS monitoring or house arrest. It also shows the State did not consider Mr. Laffitte a danger to the community either.

Based on the State's comments during the Bond Hearing and given its lack of concern for the risks posed by Mr. Laffitte since at least September 2021, it is clear the State's primary focus has been on Alex Murdaugh. While the State began arguments during the Bond Hearing by stating that Mr. Laffitte is a different person, the State seems determined to tie him to Mr. Murdaugh as much as possible. Although the undersigned believes Mr. Laffitte has demonstrated that he is assured to appear at all court hearings in this case even without a bond, Mr. Laffitte is at the very least deserving of a

bond equal to Mr. Fleming's and respectfully requests the Court reduce the amount of his bond accordingly.

IV.     **The Court's finding that Mr. Laffitte is a flight risk was based on inadmissible and inaccurate statements made by the State in breach of its promises under the Proffer Agreement it entered with Mr. Laffitte.**

Assistant Attorney General ("AAG") Creighton Waters, Mr. Laffitte, and defense counsel signed a proffer agreement on February 22, 2022. Ex.1. That same day, Mr. Laffitte, accompanied by the undersigned counsel, sat for an interview at the United States Attorney's Office in Columbia, South Carolina. For nearly five hours, Mr. Laffitte was questioned by an agent with the Federal Bureau of Investigation ("FBI") and three agents from the South Carolina Law Enforcement Division ("SLED"). He also answered questions posed by three Assistant Attorney Generals ("AAG") and an Assistant United States Attorney ("AUSA). Mr. Laffitte signed two proffer letters, both of which were separately drafted by the Attorney General's Office and the United States Attorney's Office.[1]

Most relevant to the instant motion is the Proffer Agreement's second paragraph in which the Attorney General states:

> The purpose of this agreement is also to provide that *Russell Laffitte statements given pursuant to this agreement will not be used against him in a criminal case,* except as provided in the subsequent paragraphs of this agreement (for example, Russell Laffite breach of his obligations under this agreement would allow the State to use any statements or other evidence against him in future proceedings).

Ex. 1 (emphasis added) The Proffer Agreement further addresses Mr. Laffitte's promise to be fully truthful during the proffer and the consequences of failing to do so, stating that:

> The State and Russell Laffitte expressly agree as an essential term to this proffer agreement that *the State will determine whether Russell Laffitte*

---

[1] The United States Attorney's Office did not participate in the February 22, 2022 bond hearing.

9

> *has complied with his obligation to be fully truthful, forthcoming, and cooperative in the information he provides to the State as set forth above.*

*Id.* at 4. (emphasis added)

In return, for this promise, the State received the right to make derivative use of Mr. Laffitte's statements. *Id.* at 4. The State breached the Proffer Agreement at the very first hearing in Mr. Laffitte's case. During Mr. Laffitte's bond hearing held on May 6, 2022, the State used a statement of Mr. Laffitte in support of its argument that Mr. Laffitte was a flight risk:

> If we want to talk about his statements, you know, *one of the things that he mentioned in his statements was how, you know, he liked to boat to the Bahamas.* So he has the ability and the access to do that. I think Mr. Bamberg is correct, and I would reiterate the State's request given the seriousness of these charges in this ongoing investigation; that there be a substantial surety bond in place to ensure the safety of the community and more importantly that there is no risk of flight. Thank you.

Bond Hearing Tr., 20:19-21:4.

The State's argument is problematic for several reasons. The State expressly promised Mr. Laffitte that "[n]o statements made or other information provided by Russell Laffitte during this proffer or discussion will be used against him in any criminal case except as provided herein." Ex. 1 at 3. Although the State's promise was conditioned upon Mr. Laffitte's "obligation to be fully truthful, forthcoming, and cooperative in the information he provides to the State", no member of the investigative team has indicated they viewed Mr. Laffitte as having violated the terms of the agreement.

As for Mr. Laffitte's honesty during the Proffer, the State promised the following:

> *The State warrants this determination will be made in good faith and upon a reasonable basis*, such as, but not limited to, Russell Laffitte failure to take or pass a polygraph examination, or the existence of evidence contradicting statements or information provided by Russell Laffitte.

*Id* at 3.

10

"A 'proffer agreement' is generally understood to be an agreement between a defendant and the government in a criminal case that sets forth the terms under which the defendant will provide information to the government during an interview, commonly referred to as a 'proffer session.' *State v. Wills*, 409 S.C. 183, 187, 762 S.E.2d 3, 5 (2014). *Citing United States v. Lopez*, 219 F.3d 343, 345 n. 1 (4th Cir.2000). "The proffer agreement defines the obligations of the parties and is intended to protect the defendant against the use of his or her statements, particularly in those situations in which the defendant has revealed incriminating information and the proffer session does not mature into a plea agreement or other form of cooperation agreement." *Id*. These cases establish that the State cannot reap the benefits of the bargain without keeping the bargain.

The State simply should not be allowed to make use of information it got by making a promise it broke. The State never indicated it believed Mr. Laffitte had been dishonest and breached the terms of the Proffer Agreement. The State's improper use of Mr. Laffitte's statement provides further support for the fact that the State simply did not meet its burden of presenting any evidence suggesting Mr. Laffitte is a flight risk or a danger to the community.

## V.   Conclusion

Based upon the foregoing, Mr. Laffitte prays that this Court order his release in an amount commensurate with his co-defendant Corey Fleming and with the same conditions.


[signature page to follow]

11

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ MARSHALL "MATT" AUSTIN
    E. Bart Daniel
    SC Bar No. 1530
    E-Mail: bart.daniel@nelsonmullins.com
    Marshall "Matt" Austin
    SC Bar No. 77941
    E-Mail: matt.austin@nelsonmullins.com
    151 Meeting Street / Sixth Floor
    Post Office Box 1806 (29402-1806)
    Charleston, SC  29401-2239
    (843) 853-5200

*Counsel for Defendant*

Charleston, South Carolina

May 17, 2022



**EXHIBIT 1**

ALAN WILSON
ATTORNEY GENERAL

January 12, 2022

Mr. Marshall (Matt) Taylor Austin, Esquire
151 Meeting Street, Suite 600
Charleston, South Carolina 29401

**Re: Russell Lucius Laffitte**

Dear Mr. Austin:

The purpose of this letter is to outline a proffer agreement between the State and your client under which your client would voluntarily provide information to law enforcement. This proffer has been prepared because you and your client, Russell Laffitte, have requested an opportunity for your client to voluntarily be interviewed by law enforcement regarding this case, and requested a proffer agreement to do so.

## PROFFER AGREEMENT

The purpose of this proffer agreement is to provide the State with an opportunity to assess the value, extent, and truthfulness of Russell Laffitte information about his potential criminal liability and the criminal liability of others, based on his request to provide such information. The purpose of this agreement is also to provide that Russell Laffitte statements given pursuant to this agreement will not be used against him in a criminal case, except as provided in the subsequent paragraphs of this agreement (for example, Russell Laffitte breach of his obligations under this agreement would allow the State to use any statements or other evidence against him in future proceedings). The parties agree and warrant that this agreement results solely from Russell Laffitte request to be interviewed by investigators of the State, without any prior request from the State to do so.

**THIS IS NOT A COOPERATION AGREEMENT.** Russell Laffitte agrees to provide the State with statements and information and to respond fully to all questions posed by the State so that the State may evaluate his statements and other information in making prosecutorial decisions. By receiving Russell Laffitte proffer, the State does not agree to forego or dismiss any charge against Russell Laffitte, make any recommendation on his behalf, or to enter into a cooperation agreement, plea agreement, immunity agreement, or non-prosecution agreement with Russell

Laffitte. The State makes no representation about the likelihood that any such agreement will be reached in connection with this proffer, and Russell Laffitte warrants that he understands this.

**THIS IS NOT A PLEA AGREEMENT.** There is no offer to plead guilty to any crime; and there is no agreement by the State to accept a plea to any crime or to forego or dismiss any charges against Russell Laffitte. This document does NOT constitute plea discussions, and any statements given by Russell Laffitte are not made in the course of plea discussions. This proffer is solely entered into by the parties due to Russell Laffitte request to be interviewed by law enforcement and Russell Laffitte request to do so pursuant to a proffer agreement.

**THIS IS NOT AN IMMUNITY AGREEMENT.** Russell Laffitte understands he has a right under the United States and South Carolina constitutions to remain silent and not answer any question that might incriminate him, and he agrees he is waiving that right by voluntarily entering into this agreement made because of his request to be interviewed by representatives of the State. He further understands and agrees that any statements he makes or other information or evidence he provides to the State pursuant to this agreement is not being compelled by the State but is being voluntarily given by Russell Laffitte to the State at Russell Laffitte request. The State is not offering immunity of any sort to Russell Laffitte in return for any information Russell Laffitte provides to the State pursuant to this agreement, and Russell Laffitte understands and agrees that any statements or other information Russell Laffitte provides to the State pursuant to this agreement is being knowingly and voluntarily provided by Russell Laffitte at his request and without any compulsion by the State. Russell Laffitte understands and agrees that no statements or other information he provides pursuant to this agreement is the basis for any immunity for Russell Laffitte from any criminal charge or other penalty.

By signing this proffer agreement, Russell Laffitte agrees to be fully truthful and forthright with the Attorney General's office for the State of South Carolina and its law enforcement investigators in their investigation of all unlawful activities, to include, but not limited to, truthful and complete debriefings, with no misstatements, misleading statements, half-truths, or material omissions of fact, of his knowledge concerning all unlawful activities. Russell Laffitte further understands that he must fully disclose and provide truthful information to the State including any books, papers, documents, or any other items of evidentiary value to the investigation. Russell Laffitte agrees he must fully answer all questions put to him by the State. He must also testify fully and truthfully before any grand juries and at any trials or other proceedings if called upon to do so by the State from time to time, and can be subject to prosecution for perjury for not testifying truthfully.

Russell Laffitte failure to be fully truthful and forthcoming with regard to all material information within his knowledge and possession, as set forth in the

preceding paragraph, constitutes a breach of this agreement which will cause the obligations of the State within this agreement to become null and void. Further, Russell Laffitte expressly agrees that if the obligations of the State within this agreement become null and void due to the lack of complete cooperation or truthfulness on Russell Laffitte part, including fully and truthfully answering all questions put to him by the State, the State may use for any purpose and at any time and at any stage of any proceeding, including a criminal trial, any and all statements made and other information provided by Russell Laffitte. Russell Laffitte hereby expressly waives any claim of inadmissibility of his statements pursuant to Rule 410, SCRE.

Russell Laffitte further agrees to submit to polygraph examination(s) by a qualified polygraph examiner selected by the State should such a request be made by the State. The parties expressly agree as an essential element of this proffer agreement that Russell Laffitte failure to pass any polygraph examination administered pursuant to this agreement constitutes a breach of this agreement rendering the State's obligations under this agreement null and void, and the State then at its option may use for any purpose whatsoever any statements made and other information provided by Russell Laffitte in the prosecution of him or any others on any charges, including use of any statements or evidence obtained pursuant to this proffer in the prosecution's case-in-chief at any trial of Russell Laffitte.

The State and Russell Laffitte expressly agree as an essential term to this proffer agreement that the State will determine whether Russell Laffitte has complied with his obligation to be fully truthful, forthcoming, and cooperative in the information he provides to the State as set forth above. The State warrants this determination will be made in good faith and upon a reasonable basis, such as, but not limited to, Russell Laffitte failure to take or pass a polygraph examination, or the existence of evidence contradicting statements or information provided by Russell Laffitte. The determination by the State that Russell Laffitte has not complied with his obligation to be fully truthful, forthcoming and cooperative in the statements and information provided to the State pursuant to this agreement constitutes a breach of this agreement rendering the State's obligations under this agreement null and void, and the State then at its option may use for any purpose whatsoever any statements made and other information provided by Russell Laffitte in the prosecution of him on any charges, including use of any statements or evidence obtained pursuant to this proffer in the prosecution's case-in-chief at any trial of Russell Laffitte.

Provided Russell Laffitte meets all the above conditions of fully providing true information to the State, the remaining terms of this agreement are as follows:

1. No statements made or other information provided by Russell Laffitte during this proffer or discussion will be used against him in any

criminal case except as provided herein.

2. The State may make derivative use and may pursue any investigative leads suggested by any statements made or other information provided by Russell Laffitte for the purpose of obtaining evidence which may be used in a prosecution of him or any others and in any stage of any proceeding, including a criminal trial. This is necessary to prevent the State from having to prove that evidence it would introduce at any future trial is not tainted by any statements made or other information provided by Russell Laffitte during this proffer, and Russell Laffitte hereby waives any such claim. The State may make use at any stage of a trial or other proceeding, or for any other purpose, information or evidence it has already uncovered or obtained, or any information or evidence it subsequently uncovers or obtains through its own investigative efforts, even if the information or evidence is the same and/or similar as information or evidence provided by Russell Laffitte pursuant to this proffer. Russell Laffitte also waives any such claim to challenge based on this proffer agreement the admission of any evidence or information the State has obtained or will obtain through derivative use and/or its own investigative efforts.

3. In the event that Russell Laffitte is a witness at a trial or other proceeding concerning any matter discussed in this proffer, and testifies differently in any respect from any statements made or other information provided during this proffer, the State may cross examine him concerning any statements made or other information provided during this proffer, or use such to rebut any evidence or arguments offered by or on behalf of Russell Laffitte at any stage of the criminal prosecution should any prosecution of him or any others be undertaken.

4. To the extent the State is entitled under this agreement to offer in evidence any statements made or other information provided by Russell Laffitte, or leads obtained therefrom, he shall assert no claim under the United States Constitution, the South Carolina Constitution, any statute, or rule of evidence that such statements made or other information provided or any leads therefrom should be suppressed. It is the intent of this agreement to waive all rights in the foregoing respects.

5. The parties hereby agree that this agreement contains the entire agreement of the parties; that this agreement supersedes all prior promises, representations and statements of the parties; that this agreement may be modified only in writing signed by all parties; and

that any and all other promises, representations and statements made prior to this agreement are null and void.

> ALAN WILSON
> Attorney General
>
> By: _____
> S. Creighton Waters, Esquire
> Chief Attorney

I have read this proffer agreement carefully and reviewed each part of it with my attorney. I understand the terms of the proffer and voluntarily agree to it.

_____
Russell Lucius Laffitte

Date: 2/22/22

I represent Russell Laffitte as legal counsel. I have carefully reviewed every part of this proffer agreement with ▇▇▇▇▇▇▇▇▇. To my knowledge, the decision to make this proffer agreement is informed and voluntary.

_____
Marshall (Matt) Taylor Austin, Esquire

Date: 2/22/2622

## STATE GRAND JURY OF SOUTH CAROLINA

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | Case No.s:  2022-GS-47-01 |
| | ) | 2022-GS-47-02 |
| v. | ) | 2022-GS-47-03 |
| | ) | |
| RUSSELL LUCIUS LAFFITTE | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, Grace Hamill, paralegal to the attorneys for the Defendant, Nelson Mullins Riley & Scarborough, LLP, with offices located at 151 Meeting Street, Suite 600, Charleston, South Carolina 29401, hereby certify that on May 17, 2022, I did serve by placing in the U.S. mail, first class postage affixed thereto and via electronic transmission to cwaters@scag.gov, the following document to the below mentioned person:

Document:    Defendant's Motion to Reduce Bond and to Modify Conditions of Release

Served:    Creighton Waters, Esquire.
Office of The Attorney General
Rembert C. Dennis Building
Post Office Box 11549
Columbia, South Carolina 29211-1549
cwaters@scag.gov

_____
Grace Hamill, Paralegal
Nelson Mullins Riley & Scarborough, LLP
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC 29401-2239
(843) 853-5200