IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL. NO. 9:22-658 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| RUSSELL LUCIUS LAFFITTE | ) | |
| | ) | |

**Government's Response to Defendant's Motion for Bond Reconsideration**

The Defendant, Russell Lucius Laffitte ("Laffitte"), contests the current conditions of his bond, claiming that the Court "imposed excessive conditions" that are "wholly unwarranted and unnecessary." Def.'s Mot. at 1. Laffite takes particular issue with the electronic monitoring and home confinement conditions. *Id.* The Government stringently opposes Laffitte's request for removal of his electronic monitoring device. Laffitte claims to be victim of an "unprecedented media firestorm," resulting in these "excessive conditions." Def.'s Mot. at 1-2. However, for the reasons set forth below, and contrary to Laffitte's arguments, the Court did not impose the current bond conditions in response to press coverage. Rather, the Court properly weighed the factors set forth under 18 U.S.C. § 3142(g) to determine that the conditions imposed, including electronic monitoring, were necessary to assure Laffitte's reappearance in Court.

## Procedural Background

On April 11, 2022, the South Carolina Attorney General's Office charged Laffitte with various state financial crimes for conspiring with Alex Murdaugh. Judge Alison Lee released Laffitte on a $1,000,000 bond, placing him on house arrest with electronic monitoring. On July 19, 2022, a federal grand jury returned a five-count Indictment charging Laffitte with Conspiracy to Commit Wire Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349 (Count 1); Bank Fraud,

in violation of 18 U.S.C. § 1344(2) (Count 2); Wire Fraud, in violation of 18 U.S.C. § 1343 (Count 3); and two counts of Misapplication of Bank Funds, in violation of 18 U.S.C. § 656 (Counts 4 and 5). Laffitte was arraigned on the Indictment on July 27, 2022. At that time, the Government consented to a $25,000 secured bond with special conditions, including that Laffitte be placed on home detention with electronic monitoring. The Court imposed stricter conditions, releasing Laffitte on a $500,000 secured bond, with posting of $25,000, and requiring home detention and electronic monitoring.

Following the Court's imposition of bond, the Government had numerous conversations with the USPO and defense counsel regarding the home detention conditions. Laffitte is currently employed by the Laffitte Family Partnership, which apparently pays him $230,000 annually to farm the family property. Laffitte's hours were often unpredictable, and the size of the property placed an incredible burden on the USPO to monitor his precise movements. Therefore, the Government consented to a modification of the bond conditions to allow Laffitte to wear a stand-alone monitor with travel restricted to Allendale and Hampton Counties. Under the agreed-upon modifications, Laffitte would no longer be confined in his home and would be permitted to move freely within Allendale and Hampton Counties without a curfew.

On August 16, 2022, the same federal grand jury returned a six-count Superseding Indictment against Laffitte. The Superseding Indictment supplemented conduct to the scheme and artifice of the Conspiracy to Commit Wire Fraud and Bank Fraud charge (Count 1) and added an additional count for Misapplication of Bank Funds, in violation of 18 U.S.C. § 656 (Count 6). Laffitte was scheduled to be arraigned on August 24, 2022. The day before his arraignment, defense counsel filed a motion for reconsideration of his bond terms, claiming that the home detention and electronic monitoring conditions were "excessive" and "unnecessary." Def.'s Mot.

at 1. Laffitte was arraigned on the Superseding Indictment on August 24, 2022, but the Court scheduled a hearing on the bond reconsideration motion for September 6, 2022.

### Legal Standard

The Bail Reform Act, 18 U.S.C. § 3142, outlines the conditions under which a court may release a defendant on bond, including the factors that the court must weigh in determining what conditions should be imposed to assure the appearance of the defendant in court and ensure the safety of the community. Pertinent here, under 18 U.S.C. § 3142(c)(1)(B), if the court determines that a personal recognizance or unsecured bond will not reasonably assure the appearance of the defendant, the court shall order the pretrial release of the defendant subject to the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person. In doing so, the court must take into account the available information concerning the factors outlined in 18 U.S.C. § 3142(g). Relevant to this Court's analysis, in fashioning the least restrictive conditions that will reasonably assure Laffitte's appearance, the Court should weigh the nature and circumstances of the offenses charged, whether the crimes involve a minor victim, the weight of the evidence against Laffitte, and Laffitte's history and characteristics.

### I.    Nature and Circumstances of the Offenses and the Weight of the Evidence

The nature and circumstances of the offenses, the weight of the evidence, and Laffitte's history and characteristics all weigh in favor of restrictive conditions of bond. Laffitte claims that he is the subject of intense scrutiny and "excessive" bond conditions for "no other reason than his connection to Alex Murdaugh." Def.'s Mot. at 1-2. To the contrary, a federal grand jury has returned a six-count Superseding Indictment alleging that Laffitte, while an employee, officer, and director of Palmetto State Bank ("PSB"), conspired with a Bank Customer to defraud personal injury clients of nearly $2 million. The Superseding Indictment further alleges that Laffitte

3

misapplied bank funds by extending "sham" loans to the Bank Customer and paying the Bank Customer's Law Firm without advance notice or approval. In support of the charges in the Superseding Indictment, the Government has reviewed thousands of documents, including bank records, emails, and probate records, as more fully outlined below. Moreover, the Government has obtained incriminating statements in support of the allegations in the Superseding Indictment from dozens of witnesses, including victims, PSB employees, employees of the Law Firm, and a probate judge.

A.    Counts 1 through 3 – Conspiracy to Commit Bank Fraud and Wire Fraud

The Superseding Indictment alleges that from around July 2011 and continuing until at least October 2021, Laffitte conspired with a Bank Customer to defraud the Bank Customer's personal injury clients of funds in the custody and control of PSB. Laffitte began working at PSB in the 1990s, and served in numerous capacities while employed by PSB, including bank teller and loan officer, until he became Executive Vice President Chief Operating Officer in 2015. In 2020, Laffitte was named as PSB's Chief Executive Officer. Laffitte also served on PSB's Executive Committee, responsible for reviewing large loans, and PSB's Board of Directors. The Bank Customer was a personal injury attorney with the Law Firm, located in Hampton, South Carolina. The Bank Customer, the Law Firm, and the Law Firm's other partners maintained bank accounts at PSB and were long-time clients of PSB.

Given the Bank Customer's long-standing relationship with PSB and Laffitte, and Laffitte's role as manager of PSB's Hampton branch, the Bank Customer and Laffitte established a close working or "professional" relationship. Laffitte handled nearly all of the Bank Customer's banking needs, including negotiating checks and extending loans, and served as the Bank Customer's primary point of contact at PSB. The Bank Customer and the Law Firm asked Laffitte

to serve as personal representative or conservator for numerous personal injury clients, including the Estate of D.B., H.P., A.P., H.P.Y., N.T., and M.W.

       i.     <u>Laffitte's Actions as Conservator for H.P. and A.P.</u>

Laffitte served as conservator for H.P. and A.P., two girls whose mother and brother were killed in a horrific car accident in 2005. Laffitte collected more than $250,000 in fees for serving as conservator for H.P. and A.P. Both H.P. and A.P. received large sums of money following the settlement of civil claims. Laffitte, in his role as conservator, managed the settlement funds in PSB bank accounts until the girls turned eighteen. While serving as conservator for H.P., Laffitte extended eight loans at favorable rates from the conservatorship account to himself, totaling $355,000, beginning in July 2011. Laffitte never sought approval from the probate court to extend these loans, and he never notified the Law Firm, the girls for whom he served as conservator, or their guardian of the loans. Laffitte ultimately paid off the loans by transferring conservator and personal representative fees he fraudulently obtained from other personal injury clients. When H.P. turned eighteen, Laffitte had to pay off the loans in full, so he obtained a $245,000 loan from a private third-party and credited himself conservatorship fees for managing H.P.'s funds. Laffitte was still paying off that loan to the third-party in 2022.

Two months after Laffitte extended himself the first loan from H.P.'s conservatorship account, Laffitte extended an unsecured loan to the Bank Customer for $90,000 from the same conservatorship account. At the time, the Bank Customer had over-drafted by thousands of dollars his personal account at PSB. Internal bank records reflect that Laffitte accessed the Bank Customer's personal account and saw that he was thousands of dollars in overdraft status, but nevertheless transferred $90,0000 from H.P.'s conservatorship account into the Bank Customer's account, ignoring the significant financial risk associated with the Bank Customer. Thereafter,

Laffitte provided the Bank Customer thirteen additional unsecured loans out of H.P.'s conservatorship account, totaling $990,000. When Laffitte extended loans to the Bank Customer, the Bank Customer was over-drafted on his account. Internal bank records and communications indicate that prior to extending the loans, Laffitte regularly accessed the Bank Customer's accounts to inquire about the status of the accounts and thereafter transferred funds from H.P.'s conservatorship account into the Bank Customer's account. The evidence also shows that Laffitte communicated with the Bank Customer about being in overdraft on his account and lending funds from H.P.'s conservatorship account to cover the deficit.

For example, on October 22, 2013, the Bank Customer was over-drafted on his account by $64,643.95. That day, Laffitte sent the Bank Customer an email stating: "Need a deposit. Thought you were coming in yesterday." In response, the Bank Customer stated: "Sorry I forgot. Can u make a loan from [H.P.] and I will pay it as we discussed." The next day, on October 23, 2013, Laffitte transferred $70,000 from H.P.'s conservatorship account to the Bank Customer. Laffitte responded by email stating: "I transferred 70k this morning." The Bank Customer responded: "I will come by at some pt this week. Out of town today and in morn so it'll be Tom after or Friday."

The evidence will show that the Bank Customer used funds stolen from other personal injury clients to pay off the loans Laffitte extended from H.P.'s conservatorship account, including funds stolen from the Estate of D.B., H.P.Y., and N.T. For example, five days after Laffitte extended the $70,000 loan on October 23, 2013, to pay the Bank Customer's overdraft, Laffitte negotiated a $101,369.49 check he received from the Bank Customer, with the "Estate of [D.B.]" written on the memo line. Notwithstanding that designation, on October 28, 2013, Laffitte transferred the $101,369.49 into H.P.'s conservatorship account. At the time, Laffitte served not only as H.P.'s conservator but also had served as personal representative for the Estate of D.B.

Despite Laffitte's fiduciary responsibilities, this pattern repeated itself throughout the existence of the scheme to defraud. Laffitte negotiated every check representing funds stolen or converted from the Bank Customer's personal injury clients that were used to pay off the Bank Customer's loans from H.P.'s conservatorship account. Every check referred to the personal injury client on the memo line, individuals to whom Laffitte owed a duty as their conservator or personal representative and from whom Laffitte was personally collecting thousands of dollars in fees. The Bank Customer used $663,646 in stolen funds to pay off loans Laffitte extended from H.P.'s conservatorship account.

Additionally, the evidence will show that Laffitte and the Bank Customer were closely tracking when H.P. would turn eighteen, at which point they would have to pay back the loans in full. For example, in March 2014, the Bank Customer wrote Laffitte an email asking: "How long before [H.P.] is 18?" When H.P. turned eighteen and the Bank Customer had to pay off the remainder of the outstanding loans Laffitte extended from H.P.'s conservatorship account, Laffitte extended a $500,000 line of credit to the Bank Customer, purportedly for "farming." Thereafter, Laffitte issued a cashier's check from the line of credit totaling $284,787.52, equal to the outstanding balance owed to H.P. by the Bank Customer. With Laffitte's assistance, the Bank Customer then used those funds to pay off the remainder of the loan balance.[1]

    ii.    <u>Laffitte's Actions as Personal Representative of the Estate of D.B.</u>

In January 2011, D.B. was killed in a car accident, leaving behind her husband and six children, who ranged in ages from three to fifteen at the time of her death. D.B.'s husband, who was also involved in the car accident, was originally appointed to serve as the personal

---

[1] The $500,000 line of credit extended by Laffitte for the stated purpose of "farming" but used to pay off the Bank Customer's loans from H.P.'s conservatorship account, is also the subject of the Misapplication of Bank Funds charge in Count 6.

representative of her Estate. But, at the Bank Customer's request and direction, Laffitte applied with the probate court to serve as personal representative of the Estate in September 2012.

D.B.'s husband and Estate both obtained large civil settlements related to the car accident. According to the disbursement sheet from the settlement of D.B.'s husband's claims, PSB was to receive $1,325,000 to fund a structured settlement "per client request." The check was dated November 19, 2012. Notably, Laffitte was never named conservator or personal representative for D.B.'s husband, and therefore neither Laffitte nor PSB should have ever obtained money on his behalf. The evidence will show that on February 6, 2013, the Bank Customer emailed Laffitte and requested that he separately email the Bank Customer and request that the check for $1,325,000 be "re-cut as listed above." The Bank Customer then set forth dollar amounts outlining how he wanted the check to be re-cut. Specifically, the Bank Customer requested a check for $388,687.50, "[w]hatever the amount I owe on [H.P.] loan," $75,000, and "[w]hatever the balance would be on $1,325,000 after these deductions."

Laffitte reviewed the Bank Customer's email, identifying the amount owed by the Bank Customer on the unsecured loans Laffitte extended from H.P.'s conservatorship account and the remaining balance after those deductions. The evidence will show that Laffitte then emailed the Bank Customer in a separate email chain requesting that the Bank Customer have his Law Firm staff re-cut the check according to the Bank Customer's and Laffitte's calculations. The Bank Customer then forwarded Laffitte's email to Law Firm staff, and the check was re-cut as requested. Thereafter, Laffitte negotiated the funds at the Bank Customer's direction as follows:

- $388,687.50 money order to a third-party individual to repay a private loan;

- $482,124.35 transfer to H.P.'s account to repay loans Laffitte extended as conservator for H.P.;[2]

- $75,000.00 money order to the Bank Customer's father;

- $7,500.00 money order to the Bank Customer's wife;

- $34,000.00 wire transfer to 4M Iron LLC;

- $8,200.00 money order to another individual associated with Bank Customer;

- $29,000.00 money order to Honey Creek Motors;

- $49,500.00 wire transfer to Southern Crane; and

- $250,987.35 in deposits and transfers into the Bank Customer's personal checking accounts and cash back.[3]

*None* of D.B.'s husband's settlement funds were used to fund a structured settlement as the client ostensibly requested. Laffitte fraudulently collected a $35,000 fee from D.B.'s husband's settlement funds, although he did not serve as his personal representative or conservator, he never met any of the beneficiaries of the Estate of D.B. in his capacity as personal representative, and he never managed any money on their behalf. Instead, while personally benefitting from the arrangement, Laffitte assisted with and facilitated with the transfer of the funds at the Bank Customer's direction for his own personal purposes.

        iii.     <u>Laffitte Actions as Conservator for H.P.Y. and N.T.</u>

At the Bank Customer's request, Laffitte was appointed to serve as conservator for N.T. and H.P.Y., who were seriously injured in a car accident in 2009. Both H.P.Y. and N.T. obtained

---

[2] Some of the funds transferred from the Estate of D.B. to H.P.'s conservatorship account are the basis for the Bank Fraud charge in Count 3, specifically the $101,369.49 transfer on October 28, 2013.

[3] The subject of the Wire Fraud charge in Count 3 is a $33,789.83 transfer from the Estate of D.B. to the Bank Customer's personal account.

substantial settlements of civil claims related to the accident. According to the disbursement sheets for H.P.Y.'s and N.T.'s settlements, signed by Laffitte, PSB was to receive $309,581.46 and $325,000.00, respectively, to be managed by Laffitte on behalf of H.P.Y. and N.T.. Upon receipt of the disbursement checks, rather than distributing the funds into H.P.Y. and N.T.'s conservatorship accounts, Laffitte then negotiated and distributed the funds, as follows:

- $10,000.00 deposit to the Bank Customer's wife's account;

- $9,500.00 money order;

- $920.29 principal payment to a loan regarding Bank Customer's boat;

- $3,137.30 interest payment on loan for the Bank Customer's boat;

- $100,000.00 money order to Laffitte's father to pay off personal loan;

- $50,135.61 money order to H.P.'s account to repay loans Laffitte extended as conservator for H.P.;

- $91,220.57 money order to H.P.'s account to repay loans Laffitte extended as conservator for H.P.;

- $329,500.00 money order to Bank Customer's father; and

- $40,167.69 money order to M.W. to repay loans Laffitte extended as conservator for M.W.

Rather than manage the funds as their conservator and fiduciary, Laffitte disbursed the money at the Bank Customer's direction. Laffitte obtained $75,000 in conservatorship fees from H.P.Y.'s and N.T.'s funds even though he never met them in his role as conservator and never managed any money for them.

B.  Count 4 - $680,000 Payment to Law Firm

In the Fall of 2021, the Law Firm uncovered the Bank Customer's actions with respect to the Estate of D.B. Accordingly, Law Firm representatives approached Laffitte seeking answers

regarding the disbursements of the funds. According to witness interviews and PSB records, Laffitte approached Law Firm employees and offered to divide the funds stolen from the Estate of D.B. On October 28, 2021, Laffitte wrote a check to the Law Firm totaling $680,000. This was not Laffitte's money, it was PSB's. He then notified PSB's Executive Committee and Board, explaining that he took a $680,000 loss to pay the Law Firm because "We" negotiated more than $1,100,000 in checks from a settlement the Bank Customer stole. Laffitte did not obtain prior approval from the Board to expend these funds. Moreover, he did not notify the Board that he served as personal representative for the personal injury client from whom the funds were stolen and was in fact the bank employee that negotiated all of the stolen checks at the Bank Customer's direction.

### C.  Count 5 - $750,000 Loan to Bank Customer

The evidence will show that in July 2021, the Bank Customer approached Laffitte and requested a loan from PSB. According to some PSB employees, the loan was supposed to be used to cover "expenses" and to renovate the Bank Customer's beach house. On July 15, 2021, Laffitte requested that a $350,000 wire transfer be sent to a law firm in Bamberg, South Carolina. At the time of the wire transfer, the Bank Customer had overdrafted his account by more than $100,000. In the weeks following the $350,000 wire transfer, the Bank Customer continued to overdraft his account, and Laffitte was aware that the Bank Customer was then in excess of $300,000 in overdraft. On August 9, 2021, a PSB Board Member sent an email requesting that the Executive Committee, including Laffitte, prepare a summary of PSB's total exposure regarding the Bank Customer. Internal PSB records show that hours after receiving this email, Laffitte accessed the Bank Customer's account and transferred $400,000 of PSB funds to cover and conceal the

$300,000 overdraft. Laffitte combined the $350,000 wire transfer on July 15, 2021, and the $400,000 transfer on August 9, 2021, and authorized a $750,000 loan to the Bank Customer.

PSB's loan system demonstrates that on August 9, 2021—the same day Laffitte received the email from a PSB Board member and transferred $400,000 into the Bank Customer's account—PSB employees began processing loan paperwork for a $750,000 loan to the Bank Customer. According to witness interviews, PSB employees prepared loan paperwork at Laffitte's direction, backdating the paperwork to July 15, 2021, the date of the original $350,000 transfer. The paperwork indicated that the loan was intended as a commercial loan, the proceeds of which were to be used as "investment." The collateral for the loan was proposed to be the Bank Customer's beach house and one share of the Bank Customer's ownership in a hunting club. However, the beach house was not in the Bank Customer's name. Moreover, the ownership share of the hunting club was already pledged as collateral on two other PSB loans to the Bank Customer.

Executive Committee and Board Meeting minutes from August 2021 show that Laffitte failed to disclose the $350,000 wire transfer on July 15, 2021, the overdraft status of the Bank Customer's account, the destination of the funds, the true nature of the collateral, or that he had personally authorized the transfer of $400,000 into the Bank Customer's account to cover a substantial overdraft. In September 2021, Board members continued to ask Laffitte questions about the loan, and specifically the collateral securing the loan. At that time, Laffitte represented to the Board that the ownership share in the hunting club had not been pledged elsewhere, when in fact it served as collateral on two separate loans.

### D.  Count 6 - $284,787.52 Advance on the Line of Credit

As fully set forth above, when H.P. turned eighteen, the Bank Customer had to pay back the unsecured loans Laffitte provided to the Bank Customer from the conservatorship account. On

February 9, 2015, Laffitte extended the Bank Customer a $500,000 line of credit for purposes of "farming." Thereafter, on February 20, 2015, Laffitte issued a cashier's check from the line of credit totaling $284,787.52, equal to the outstanding balance owed to H.P. by the Bank Customer. The Bank Customer then used those funds to pay off the remainder of the loan balance. The Bank Customer never paid off the line of credit, and eventually, more than six years later, PSB charged off the loan at a loss.

***

In sum, the nature and circumstances of the offenses and the weight of the evidence supporting the same both militate in favor of restrictive bond conditions. Laffitte argues that he "does not believe [the Government] ha[s] as significant amount of evidence to present against him individually." Def.'s Mot. at 11. To the contrary, the evidence is overwhelming. Laffitte exploited the vulnerabilities of the very people for whom he was appointed to serve as fiduciary, preying upon and profiting from the assets he was charged and entrusted with managing. And he did so all while an employee, officer, or director at PSB. He unilaterally misapplied PSB funds to provide "sham" loans to the Bank Customer, despite the palpable financial risks associated, all in furtherance of the scheme.

In two portions of his motion, Laffitte states that "he has been cooperating with law enforcement," Def.'s Mot. at 11, claiming that at no point since Laffitte's interview with the FBI in February 2022 has the Government "indicate[d] that Mr. Laffitte breached his proffer agreements by failing to tell the truth," Def.'s Mot. at 2, n. 1.[4] To the contrary, the Government has, on numerous occasions, notified defense counsel that the Government believes Laffitte lied

---

[4] In the same paragraph, however, defense counsel acknowledges that, the during the State bond hearing, the prosecutor indicated that Laffitte lied during his proffer.

to the FBI. The Government even presented evidence to defense counsel outlining how Laffitte's statements were untruthful during two reverse proffers conducted on June 28 and June 30, 2022. And, while the Government has not yet filed a motion requesting that the Court hold Laffitte in breach of his proffer agreement, it fully intends to do so. Moreover, Laffitte's "cooperation" with the South Carolina Bar's Office of Disciplinary Counsel—a body tasked with regulating the conduct of lawyers and judges—is irrelevant. Therefore, the Court should disregard Laffitte's claims of "cooperation" in favor of his motion for reconsideration of his bond terms.

## II.     History and Characteristics of the Defendant

Laffitte's history and characteristics also weigh in favor of restrictive conditions. Laffitte is currently employed by the Laffitte Family Partnership, which apparently pays him $230,000 to farm certain property. In addition to his salary, Laffitte has millions of dollars in assets, including his shares in PSB stock. In his motion, Laffitte claims that his financial resources and assets are "tied up by the State court's order freezing them," arguing that he has no resources with which to flee. Def.'s Mot. at 12. The Government is unaware of any court order freezing Laffitte's assets. While it is the Government's understanding that the state court ordered Laffitte not to dispose of or otherwise waste assets while on bond, Laffitte's assets were not frozen, and Laffitte's access to those assets remains unchanged. Therefore, contrary to the claims in his motion, Laffitte has substantial resources.

Defense counsel argues that Laffitte's minor criminal history weighs in favor of their request. Laffitte also argues that the "vast majority of the conduct at issue . . . took place years ago." Def.'s Mot. at 10. Notably, as fully set forth above, the Superseding Indictment alleges that Laffitte conspired with the Bank Customer from approximately July 2011 until at least October 2021, alleging that for the last decade, Laffitte has been engaging in criminal conduct. And,

14

according to the charges in the Superseding Indictment, Laffitte continued to act in furtherance of the conspiracy to defraud the personal injury clients as late as October 2021 by issuing a $680,000 check to the Law Firm in an apparent attempt to resolve and conceal his role in the scheme. Essentially, Laffitte continued to use his role at PSB in furtherance of the scheme until the termination of his employment.

Defense counsel has expressed to the Government that Laffitte wants to go to trial this calendar year. Thus, as a practical matter, Laffitte takes issue with wearing a monitor for a matter of months prior to the trial in the case. The Government has accommodated Laffitte's requests to travel outside of his current bond conditions, most recently agreeing to his request to attend his son's football game halfway across the state. Absent violations of the bond terms, the Government intends to continue to consent to reasonable requests. Moreover, even if this Court were to remove the federal monitor, Laffitte would still be required to wear a monitor and stay on house arrest under the state bond conditions. The Government is therefore uncertain of the practical import, if any, of Laffitte's current motion.

## **Conclusion**

For the reasons set forth below, the Court properly weighed the factors set forth in 18 U.S.C. § 1342(g) in imposing the current conditions of Laffitte's bond, and his electronic monitor should not be removed.

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: s/ *Emily Limehouse*
    Emily Evans Limehouse (Federal ID #12300)
    Winston D. Holliday, Jr. (Federal ID #7597)
    Assistant United States Attorney
    151 Meeting Street, Suite 200
    Charleston, South Carolina, 29402
    (843) 266-1663
    Emily.Limehouse@usdoj.gov

August 31, 2022

16