IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| United States of America, | Case No. 9:22-cv-00658-RMG |
| v. | |
| Russell Lucius Laffitte, | |
| Defendant. | |

### Reply in Support of Defendant's Motion for Bond Reconsideration

Mr. Laffitte is now wearing two separate GPS monitors—one imposed by each sovereign prosecuting him. He is currently on home confinement under two separate sets of rules and requirements—one set by the State; one by the Government. He simply asks this Court to remove the duplicative federal GPS monitor and release him from home confinement, as neither pretrial condition is necessary to secure his appearance at trial, much less are they the "least restrictive" conditions for accomplishing that goal under 18 U.S.C. § 3142.

The Government spends nearly fifteen pages telling the Court that it believes Mr. Laffitte to be guilty of the crimes charged and that the evidence of his guilt is overwhelming. The Government's argument misses the point. At this point, the question is not whether Mr. Laffitte is guilty, but whether he will appear at trial. Indeed, he is presumed innocent until he appears at that trial and the Government proves his guilt beyond a reasonable doubt. Regardless of the Government's confidence in its ability to do just that, it has yet to meet its burden of establishing duplicative federal GPS monitoring is necessary to ensure Mr. Laffitte will appear in Court.

Between the financial conditions imposed in state court (including a secured bond of $1,000,000) and those imposed by this court (including a secured bond of $500,000), Mr. Laffitte's total financial exposure should he flee would be $1,500,000, a far greater amount than most

Page 1 of 10

criminal defendants that is more than sufficient to ensure his appearance in court. As a result, Mr. Laffitte requests that the Court grant his motion and enter an order amending the conditions of his pretrial release.

## Argument

### I.   The Government fails to address the overarching purpose of § 3142(b).

As explained in his motion, the guiding principle for imposing conditions of pretrial release on Mr. Laffitte under the Bail Reform Act is "the *least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required. . . ." 18 U.S.C. § 3142(c)(1) (emphasis added).[1]  On this point, the Government bears the burden of proof by a preponderance of the evidence.  *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) ("With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings.").

The Government fails to address this leading point, instead resting its opposition on the type of crimes charged and the alleged weight of the evidence against Mr. Laffitte.  (Resp. Br. at 13, ECF No. 38.)  Indeed, the Government devotes 11 pages of its 13-page argument to the topic. (*Id.* at 3–14.)  Although the "nature and circumstances of the offense charged" and the "weight of the evidence" are considered by the Court under § 3142(g), they are not the only relevant considerations.  Courts must consider the remaining factors as it pertains to ensuring Mr. Laffitte's appearance at trial.  18 U.S.C. § 3142(g) ("The judicial officer *shall* . . . take into account the

---

[1] The Government does not suggest that Mr. Laffitte's release would pose a danger to "the safety of any other person and the community"—the second consideration under § 3142(c)(1).  (Resp. Br. at 3, ECF No. 38.)  Thus, Mr. Laffitte only addresses the "appearance" prong of § 3142.

available information concerning" § 3142(g)(1)–(4)).  So contrary to the Government's argument, Mr. Laffitte should not be kept on home detention and GPS monitoring just because of the allegations against him, no matter their weight.  *Id*.

The Government concludes its discussion of the two GPS monitors by saying it does not understand the "practical import" of this motion given the State monitor Laffitte is already wearing.  (Resp. Br. at 15.)  The Government seems not to recognize that wearing two GPS monitors from two sovereigns requires abiding by two sets of overlapping and confusing rules applicable to each.  Doing so only increases the risk of some technical violation when Mr. Laffitte has shown a willingness and ability to meet his obligations to appear and cooperate at every hearing or meeting with a wide range of law enforcement agencies.[2]  The Government is effectively arguing that because he has been ordered one monitor, he might as well wear two. Neither of the undersigned counsel have encountered a criminal defendant who has been forced to wear two separate monitors and have been unable to find any other instances in which it has occurred in this district or elsewhere.

More to the point: the Government's closing remark that it does not understand the practicalities involved ignores that the Bail Reform Act does not require Mr. Laffitte to prove that the federal GPS monitor is not necessary—the burden rests with the Government to show that the

---

[2] The Government's conclusory statement about Mr. Laffitte's cooperation with the Office of Disciplinary Counsel being "irrelevant" misses the larger point.  Mr. Laffitte is not a lawyer, so he did not have to appear before ODC.  Or if he did, he also could have simply asserted his Fifth Amendment right not to testify.  Yet he did not do so, instead choosing to testify over three days and cooperate with the enforcement arm of the legal disciplinary function of the South Carolina Supreme Court.  That appearance and cooperation is more evidence that Mr. Laffitte intends to honor his obligation to appear before this Court when called to do so.

federal monitor *is* necessary to ensure his appearance at trial.[3] *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). The Government has failed to meet this burden.

If the main goal under § 3142 is to ensure Mr. Laffitte's attendance at trial using the least restrictive set of conditions, then two GPS monitors are unnecessary because they provide the Government with the same ability to locate Mr. Laffitte, regardless of which sovereign has ordered the monitoring. If the Court were to remove his federal GPS monitoring and he failed to appear to appear in the future—a hypothetical scenario that has not occurred in the 5 months since he was first indicted by the State—it would be very easy for the Government to find him. It would not even have to use the infinite resources at its disposal to track Mr. Laffitte as its agents could merely request his location from the State monitoring company. There is no suggestion that this will come to pass, but this scenario is a long way of saying that two GPS monitors are redundant.

Given the circumstances, the only purpose of the federal GPS monitoring is to impermissibly punish Mr. Laffitte before he has been adjudicated guilty. *Stack v. Boyle*, 342 U.S. 1, 4 (1951); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (discussing due process violation where punishment is imposed before an adjudication of guilt in violation of the Fourteenth Amendment). There is also no indication what purpose monitoring, home confinement, or any of the conditions mentioned in the Government's response such as curfew or limitations to specific counties could possibly serve. It is hard to imagine what, if anything, could be achieved by watching Mr. Laffitte's precise movements 24 hours a day. To the extent any of his alleged crimes were dependent on

---

[3] The Government's request for home confinement and electronic monitoring during Mr. Laffitte's initial bond hearing also came as a surprise to the undersigned counsel based on the Government's representations made in a July 21, 2022 meeting that it would only seek a nominal $25,000 secured bond. As the transcript from the hearing makes clear, the Government did not initially ask for home confinement or location monitoring, raising it out of the blue after the Court heard from counsel for the Plyler sisters. Initial Appearance Hr'g. Tr. 4:24-25, 5:1-16, 9:22-25, 10:1-7.

being in a specific location, there is no risk that he could engage in similar behavior given that he no longer works at Palmetto State Bank. In light of the Court's order prohibiting him from contacting bank employees, there is also no meaningful risk that he would show up at the bank. In fact, the Government's case would actually be strengthened if he were to violate that condition or any others. Similarly, the notion that a curfew is necessary is also unsupported by the nature of the offense. There are no allegations that Mr. Laffitte carried out his alleged crimes under the cover of darkness. As the Government has repeatedly made clear, his alleged crimes were made possible by virtue of his position at the bank, all carried out during normal business hours. What's more, some of the most important evidence relied upon by the Government includes probate documents Mr. Laffitte personally signed and filed in Hampton County Probate Court. As much as the Government believes that Mr. Laffitte knowingly and intentionally conspired with Mr. Murdaugh, the question that will linger throughout the duration of this case is – why would anyone, let alone a bank official, sign their own name to documents that prove their guilt AND file them in court?

The penal nature of the monitoring can be presumed given that it is duplicative, especially in the face of the Bail Reform Act's requirement that only the "least restrictive" conditions be imposed. To rectify the Government's overreach in this regard, the Court should grant Mr. Laffitte's First Motion for Bond Modification (ECF No. 30).

## II. The Government's Response Brief, like its indictment, is riddled with inaccuracies and inconsistencies.

The Government spends much of its brief merely reciting allegations from the superseding indictment to mount its opposition to modifying the conditions of release. (Resp. Br. 4–13.) This is a curious strategy because the superseding indictment and the allegations in the Response Brief are riddled with inaccuracies and evidence that Mr. Laffitte intends to present will contradict much

of what the Government claims. Some examples may be mere oversights that occur in all cases. Others may be attributed to the Government's misunderstanding of the limitations placed upon him by the State Court when it orally granted the State's request to freeze Mr. Laffitte's assets to prevent waste. (State Court Bond Hr'g. Tr. 22:24–24:10, May 6, 2022.)[4]

But some inaccuracies are more than mere oversights. More than a week ago, the Government confirmed to Mr. Laffitte's counsel that "a portion of the [superseding] indictment is inaccurate," (*see* Superseding Indictment at 8(r), ECF No. 25), and that the Government would notify Mr. Laffitte's counsel "if [the Government] learn[ed] of any other inaccuracies with the Superseding Indictment." The Government informed counsel that allegations set forth in the scheme and artifice portion of the initial indictment and the superseding indictment were not true. Specifically, paragraph 8, subparagraph "r" of the superseding indictment alleges that Mr. Laffitte "signed documents to close out the conservatorships" of victims H.P.Y. and N.T. and "represent[ed] that H.P.Y. and N.T. were eighteen years old." The Government then states that N.T. was, in fact, "only fifteen years old" at the time. [ECF No. 25 at 9] According to the Government, this statement is not true. As it turns out, N.T. was actually 18 years old at the time.

To its credit, the Government explained to Mr. Laffitte's counsel that it contacted them quickly after learning of the error and stated that they plan to notify Judge Gergel of the factual error the upcoming status conference scheduled for September 12, 2022 as well as its intent to "re-present" the indictment to the grand jury to fix this error, a move Mr. Laffitte plans to oppose.[5]

---

[4] Just like his other Federal and State conditions of pretrial release, Mr. Laffitte has complied with this requirement, even if it were not ultimately memorialized in the State Court's Bond Order. More than $500,000 currently sits in the trust account of Mr. Laffitte's undersigned counsel following the sale of his home in May 2022.

[5] Mr. Laffitte also plans to move to compel production of the relevant grand jury transcripts under Fed. R. Crim. P. 6(e)(3)(C)(i). Mr. Laffitte has conferred with the Government about this motion and it has opposed the request even in the face of a clear misstatement in the superseding

Yet the Government neglected to note this misstatement when summarizing the superseding indictment in its Response Brief, meaning the initial imposition of Mr. Laffitte's bond conditions and the Court's decision was based, at least in part, on inaccurate factual statements. While both of the undersigned counsel has worked closely on numerous occasions with the federal prosecutors handling this case and are confident that their failure to correct the record is the result of nothing more than an honest oversight, it is imperative that the Court immediately be made aware of all factual misstatements in order to rule appropriately on this and any other motions. The Government's repetition of the allegations set forth in the superseding indictment to demonstrate the strength of its case is understandable. They clearly believe in their case. It is important to keep in mind, however, that at this point, the superseding indictment contains nothing more than untested allegations. The fact that factual errors have already been identified by the Government underscores this point and demonstrates why courts should look beyond an indictment in setting conditions of bond.

It is also important to promptly correct such errors for the sake of protecting Mr. Laffitte's constitutional right to a fair trial. In light of the intense public interest in Mr. Murdaugh's alleged schemes, failure to publicly correct such errors creates the very real possibility that potential jurors are forming opinions of Mr. Laffitte based on inaccurate information. After all, the Government publicly announced Mr. Laffitte's initial indictment in a press release, and the superseding indictment has since been quoted extensively by the media.

---

indictment and his obvious particularized need and constitutional right to review what likely contains evidence the Government is required to produce pursuant to its obligations under *Brady* and *Giglio*.

In the same vein, civil attorneys representing victims in the case have failed to correct blatant misstatements of fact both in open court and to the media.[6] As noted in Mr. Laffitte's initial motion for a reduction of his conditions of pre-trial release, the Court was presented with inaccurate information about Mr. Laffitte's alleged victimization of Alania Spohn at his initial appearance. (Initial Appearance Hr'g. Tr. 5:20–9:20, July 27, 2022, ECF No. 12.)  During that hearing, the Government called two civil attorneys to speak on behalf of Spohn and her sister, Hannah Plyler. (*Id.* 5:13–16.)  The two women did not present any testimony. The attorneys claimed on the record that Mr. Laffitte "loaned these girls' funds" and "borrowed over $1.4 million from these girls," (*Id.* 6:13, 6:18), and that when they were requesting Mr. Laffite give them both access to their funds, "they have no idea that he's using that money to make pocket loans," (*id.* 9:13–16).  The problem: As they relate to Ms. Spohn, these claims are objectively false. Mr. Laffitte never made any loans to himself or anyone else from Ms. Spohn's funds. Allowing such obvious errors to linger only serves to undermine Mr. Laffitte's right to a fair trial and the public's confidence in these proceedings.

Rather than correct the record, the Government turns to claims that Mr. Laffitte breached his proffer agreement. (Resp. Br. at 13–14.)  That claimed breach was in February 2022. Seven months later, and the Government still hasn't acted on its threat to set aside the agreement. Were there really a violation of that agreement, the Government would certainly have moved to hold him in violation of it and charged him for making false statements under 18 U.S.C. § 1001. That

---

[6] This is but one example of factually incorrect public statements about Mr. Laffitte, both by lawyers and by the media. As stated herein, there is a very real possibility that this could prevent him from a fair trial. While Mr. Laffitte's primary focus is proving his innocence at trial, he is also preparing to retain defamation counsel. Should Mr. Laffitte be exonerated at trial, he will be ready to begin addressing the seemingly constant stream of false statements being made about him.

it has waited so long to do so confirms that the only inaccuracies lay with the Government, in both its superseding indictment and portions of the presentations made to this Court.

Last, the Government states in its response that Mr. Laffitte is currently being paid $230,000 annually to farm his family's property. That is incorrect. Extrapolating what he is currently making per month, he is earning approximately $84,000, less than half the amount claimed by the Government.

Mr. Laffitte plans to present testimony and evidence to correct these misstatements, inaccuracies, and misrepresentations striking at the merits of the Government's case against him. As Mr. Laffitte's counsel has repeatedly stated, Mr. Laffitte is not going anywhere. He is not hiding. He is not denying many of the underlying facts in this case. He simply disagrees with the Government's belief that he knowingly and intentionally joined Alex Murdaugh's criminal scheme, and the undersigned counsel looks forward to proving that the Government's theories about Mr. Laffitte are unfounded.

But now is not the time to try the merits of the case—it is the time to address the § 3142(g) factors and the "least restrictive" conditions to secure his appearance at trial. Put simply, Mr. Laffitte is already wearing one GPS monitor—he doesn't need two. He has shown time-and-again that he will abide by whatever pretrial conditions this Court or the State Court may impose on him. As a result, the Court should grant Mr. Laffitte's motion and remove the duplicative federal GPS monitoring.

**Conclusion**

For the reasons set forth above, the Court should grant Mr. Laffitte's motion and enter an order directing the removal of the electronic monitoring and home confinement provisions of its Release Order (ECF No. 15).

                    NELSON MULLINS RILEY & SCARBOROUGH LLP

                    By: */s/ E. Bart Daniel*
                        E. Bart Daniel
                        Federal Bar No. 403
                        E-Mail: bart.daniel@nelsonmullins.com
                        Matt Austin
                        Federal Bar No. 11435
                        E-Mail: matt.austin@nelsonmullins.com
                        151 Meeting Street / Sixth Floor
                        Post Office Box 1806 (29402-1806)
                        Charleston, SC  29401-2239
                        (843) 853-5200

                  *Attorneys for Russell Lucius Laffitte*

Charleston, South Carolina
September 2, 2022