1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
 2                         COLUMBIA DIVISION
     _____
 3                                   )
     UNITED STATES OF AMERICA,       )
 4                                   )
             Plaintiff,              )   Docket No. 9:22-658
 5                                   )
             vs.                     )   Columbia, SC
 6                                   )
     RUSSELL LUCIUS LAFFITTE,        )
 7                                   )
             Defendant.              )
 8   _____)   DATE:  September 6, 2022

 9            BEFORE THE HONORABLE MOLLY H. CHERRY
            UNITED STATES MAGISTRATE JUDGE, PRESIDING
10                        BOND HEARING

11
     A P P E A R A N C E S:
12
     For the Plaintiffs:
13
     EMILY EVANS LIMEHOUSE
14   U.S. Attorney's Office
     151 Meeting Street, Suite 200
15   Charleston, SC 29401-2238
     843-266-1663
16   Email: Emily.Limehouse@usdoj.gov

17
     For the Defendants:
18
     EDWARD BART DANIEL
19   Nelson Mullins Riley and Scarborough
     151 Meeting Street
20   Charleston, SC 29401
     843-534-4123
21   Email: bart.daniel@nelsonmullins.com

22

23          Electronically recorded by April Snipes

24        Transcribed by Karen V. Andersen, RMR, CRR
                 United States Court Reporter
25                    901 Richland Street
                      Columbia, SC  29201
```

1                            INDEX

2                         EXAMINATION

3    Witness Name                                      Page

4    RUSSELL LAFFITTE

5        BY MR. DANIEL ......................................... 5

6        BY MS. LIMEHOUSE...................................... 16

7        BY MR. DANIEL ........................................ 98

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Good morning, Ms. Limehouse.

2           MS. LIMEHOUSE:  Good morning, Your Honor.

3           THE COURT:  Is the Government ready to proceed?

4           MS. LIMEHOUSE:  We are.

5           THE COURT:  And is the Defense ready?

6           MR. DANIEL:  Yes, Your Honor.

7           THE COURT:  All right.  The Government may call the

8    case.

9           MS. LIMEHOUSE:  Thank you, Your Honor.  May it

10   please the Court.  We are here in the matter of United States

11   v. Russell Laffitte, Criminal Docket No. 9:22-658.  Mr.

12   Laffitte is here today represented by his attorneys, Matt

13   Austin and Bart Daniel and we are here for a hearing on their

14   motion for reconsideration of the bond terms.

15          THE COURT:  Okay.  Thank you, Ms. Limehouse.  All

16   right.  So counsel is aware, I have reviewed the defendant's

17   motion for reconsideration and the Government's response.

18   And since it's the defendant's motion, I think it makes sense

19   to hear from the defense first and then Ms. Limehouse.  I

20   will hear from the Government.

21          MR. DANIEL:  Judge, can you repeat that.  I couldn't

22   quite hear you.  I've got a little hearing problem.

23          THE COURT:  Certainly.  Since it's the defendant's

24   motion, I think it makes sense to hear from the defense

25   first.  So I will hear from you.

1          MR. DANIEL:  Okay.  I'm sorry, Your Honor.  May I

2    consult?

3          THE COURT:  You may.

4          MR. DANIEL:  Your Honor, just by preamble, we all

5    agree this is not a detention hearing.  We've never had a

6    detention hearing.  The only issue is what is the Court to

7    impose the least restrictive conditions necessary to

8    reasonably ensure Mr. Laffitte's appearance.  We had a

9    standing Court's ruling previously for a secured bond.  We

10   are not asking for the Court to remove that condition to an

11   unsecured bond.  What we are asking the Court for is to

12   remove electronic monitoring and home confinement.

13          And, Your Honor, at this time, I believe -- well, I

14   would like to next say I believe there was a lot of

15   misinformation.  And I am not blaming the U.S. Attorney's

16   Office so much as the plaintiff's lawyers, a lot of

17   misinformation both in the state court, which is whether for

18   lack of reason or which I just believe based that incredibly

19   crazy bond in state court.  And that was assumed, I'm sure,

20   and rightfully so, I might add, by the U.S. Attorney's Office

21   and by this Court that there was a reason for that and must

22   have strong evidence of that.  But, Your Honor, we now know

23   there was not.  And so, Your Honor, at this time I would call

24   Mr. Russell Laffitte to the witness stand.

25          THE COURT:  Okay.  Now, Mr. Daniel, you may do so,

1    but I do want to make clear that this Court's ruling was made

2    on the information that the Court had before it.  This Court

3    is not -- has no control over what happens in state court.

4    And the state court determinations had no bearing on the

5    decision that this Court made.  I am familiar with the Bail

6    Reform Act and the conditions that I have to consider in

7    terms of imposing bond conditions.  So I do want to clarify

8    that for the record in light of what you've just said.

9         MR. DANIEL:  Thank you, Your Honor.  We understand

10   that.  Your Honor, if I may call Mr. Russell Laffitte to the

11   stand.

12        THE COURT:  The witness may approach.

13        THE COURT DEPUTY:  And if you could please raise

14   your right hand and state your name for the record.

15        THE WITNESS:  Russell Laffitte.

16                      RUSSELL LAFFITTE,

17        having been duly sworn, testifies as follows:

18        THE COURT:  And, Mr. Daniel, I trust that you have

19   advised the witness of his right to remain silent?

20        MR. DANIEL:  Yes, Your Honor.

21                    DIRECT EXAMINATION

22   BY MR. DANIEL:

23     Q.   Mr. Laffitte, please tell the Court where you were

24   born and where you grew up and sort of trace your high school

25   years, where did you go to elementary school and where you

1    grew up through high school?

2        A.    I was born in Columbia, South Carolina, and raised

3    in Varnville my whole life.  My parents have never moved.

4    And went to high school and graduated from Patrick Henry

5    Academy.  And then I went into farming for about four or five

6    years.  And then I went back to college and went to Newberry

7    College and graduated in '97.  And actually moved back home

8    and bought a house about a year later, literally across the

9    street from my parents, which we lived there until 2001.

10       Q.    This is since what?

11       A.    2001.  And, again, we moved to Forest Drive in

12   Varnville, which is about a quarter of a mile away.

13       Q.    Okay.  And we will get to that in just a minute.

14   And trace your work history.  Have you worked back -- when

15   you went back to Hampton County, did you always work in

16   Hampton County?

17       A.    I've always worked and lived in Hampton County.

18   After graduating from college in May of '97, I immediately

19   went to work at Palmetto State Bank, and been there ever

20   since.

21       Q.    And you mentioned your home you bought across the

22   street from your parents.  Did you ultimately sell that home?

23       A.    I did.  I sold that one.  That was the one I sold in

24   2001 when my wife and I and Carter moved to Forest Drive.  We

25   sold Forest Drive in -- I guess it was in June or July when

1    it actually closed.  Because we obviously, with losing my job

2    at the bank, great change of income, and needed to be able to

3    pay for attorneys, pay for legal expenses.

4        Q.   And what became of the proceeds?  What happened to

5    the proceeds of that -- from that sale?

6        A.   All of the proceeds are in escrow in Nelson Mullins.

7        Q.   And where do you live now?  Where is your primary

8    residence?

9        A.   I live at 3268 Jericho Road.  It is an old

10   double-wide trailer on our family's farm.

11       Q.   Okay.  And what kind of home do you have now?

12       A.   It's just an old double-wide trailer.

13       Q.   Okay.  Let me ask you a couple of questions about

14   Mr. Murdaugh.  First of all, do you currently have a passport

15   in your possession?

16       A.   I do not.  I had to surrender it to the State.

17       Q.   Have you ever flown anywhere with Alex Murdaugh?

18       A.   I have not.

19       Q.   Have you ever flown in a private jet?

20       A.   I have not.

21       Q.   Have you ever been out of the country with Alex

22   Murdaugh?

23       A.   I have not.

24       Q.   Have you ever been to the college world series with

25   Alex Murdaugh?

1    A.    No, sir, I didn't.  And that was brought up in the

2  state bond hearing.  That was not true.

3    Q.    Please describe for the benefit of the Court your

4  family life.  I know your wife is here, your wife Susan is

5  here as well as all these family members here in support all

6  of you.  Tell the Court a little bit about your family life.

7    A.    My wife and I have, we have two kids, Carter, who is

8  here today, she is a sophomore at Carolina, and my son is a

9  senior at Patrick Henry Academy.  And then there's my mother

10  and father, and both are here today.  And they live in

11  Varnville.  And my sister is also here.  And I also have a

12  brother and nieces and nephews -- nieces and nephew.

13    Q.    So it's just about your entire family, extended

14  family in the Varnville area?

15    A.    Yes, sir.  My immediate family all live in Hampton

16  County.

17    Q.    Now, the conservator loans that were made and

18  subject of this indictment, were they all timely paid back at

19  the time?

20    A.    They were.

21    Q.    And they were all timely paid back with interest?

22    A.    Yes, sir.

23    Q.    And the conservative loans to Alex Murdaugh, were

24  those timely paid back?

25    A.    Yes, sir.

1    Q.   And were those loans that you took up, your loans

2    from the conservatorship, were those lines fully secured?

3    A.   They were.

4    Q.   What were they secured by?

5    A.   They were secured by Palmetto State Bank stock.

6    Q.   Was that collateral ample enough to cover the loans?

7    A.   Absolutely.

8    Q.   Now, the plaintiff's lawyer came in here last

9    hearing we had before Judge Cherry and he talked about the

10   victims in the case.  Now, did the Plylers have money taken

11   from them?

12   A.   They did not.

13   Q.   So when Alex Murdaugh, he stole some $8 million, he

14   didn't steel any of Plyler's money?

15   A.   No, sir.

16   Q.   So did they get all their money shortly after the

17   settlement?

18   A.   Yes, sir.

19   Q.   Tell the Court a little bit about your community

20   involvement.  What sort of civic clubs have you been in and

21   what sort of community --

22   A.   I've always been proud to live in Hampton County and

23   tried to be involved.  I was on the vestry of All Saints

24   Episcopal Church for 15 years.  I was vice chairman of the

25   Hampton County Disabilities and Special Needs Board until

1    after I was released from the bank.  And I resigned at that

2    point in time.  I was on the Hampton Economic Development

3    Commission for a couple of years.  I had to step off of that

4    because I didn't realize that you could not be on two county

5    or state control boards at the same time.  So I had to choose

6    between Disabilities and Special Needs Board or Economic

7    Development.  So I chose Disability and Special Needs.

8         And I was a Little League baseball -- Little League

9    coach for a year or two when my son was coming through.  I

10   also ran the concession stand for the Hampton County Little

11   League or Rec Department when they had -- for their football

12   teams.

13   Q.   Up until this year, did you always run those

14   concession stands at the legal league football stands?

15   A.   I did it when my son and daughter were going through

16   Little League.  And I was also a member of Rotary.  Just been

17   trying to be involved.

18   Q.   What are your hobbies?

19   A.   Really my only hobbies are hunting with my family

20   and my kids.  And I like to take friends hunting.  And that's

21   about all I do.

22   Q.   And where are your shotguns or any guns you have

23   now?

24   A.   All of my guns are at my mother's or father's and my

25   brother's house in Varnville and Hampton.

1    Q.    Have you ever been accused of an act of violence?

2    A.    No, sir.

3    Q.    Now, let's shift gears and talk a little bit for the

4    benefit of the Court about your ties to Alex Murdaugh.  Tell

5    the Court how you came to know Alex Murdaugh.

6    A.    Alex Murdaugh and I grew up next-door across the

7    street from each other.  He's two to three years older than I

8    am.  So, you know, we were always in the neighborhood growing

9    up together.  But being older, we were never really close.  I

10    was much closer, actually, with his younger brother, John

11    Marvin, because of similar age and similar interests.  And we

12    would play on the sports teams together where Alex and I

13    never would.  And, you know, that was pretty much the extent.

14    I mean, we never did things like -- never went on trips,

15    never did.  You know, everybody in the media would make out

16    that we were just best friends.  We were not.  We were in

17    business -- we definitely had a business partnership.

18    Q.    As an adult, how many times have you been to Alex

19    Murdaugh's home?

20    A.    His house on Mozel that they had just sold, I had

21    been there two times.  One time I was coming home from a dove

22    hunt.  I knew I was in there.  I decided I was going to ride

23    by.  Never been down.  Wanted to see it.  So I rode by and

24    visited with him for about 30 minutes.

25         The next time I went to see him was to pay my

1    condolences for his wife and son being murdered.

2         Q.   And Alex Murdaugh borrowed much money many times

3    from Palmetto State Bank over the years?

4         A.   Yes, sir.  He's borrowed millions of dollars and

5    paid back millions of dollars over the years.  And we never

6    had -- you know, he might have paid slow sometimes, but he

7    always paid us.

8         Q.   And did he always pay the interest on the loans?

9         A.   Yes, sir.

10        Q.   And Alex Murdaugh had numerous overdrafts with

11   Palmetto State Bank?

12        A.   Yes, sir.

13        Q.   Did he always make those overdrafts good?

14        A.   He did.

15        Q.   And as far as income and net worth, please describe

16   for the benefit of Judge Cherry what Alex Murdaugh's rough --

17   average annual income roughly was, Russell?

18        A.   I would say his average annual income was in excess

19   of 5- or $600,000 a year, many, many times well over a

20   million dollars a year.

21        Q.   And Alex Murdaugh actually banked with another bank;

22   is that right?  Which bank was that?

23        A.   Yes, sir, he also had an account over at Bank of

24   America.

25        Q.   And was that in the Hampton County?

1     A.   No, sir.  I know we have Bank of America branch in

2  Beaufort, South Carolina.  And I want to say there's one in

3  Walterboro, but I'm not sure of that.

4     Q.   Okay.  Thank you.  And when you were conservator,

5  how did you consider your relationship as conservator with

6  Alex Murdaugh?

7     A.   I was conservator for his cases, which the vast

8  majority of them and all ones we are dealing with in this

9  court, he was my attorney.

10     Q.   Did you trust Alex Murdaugh to be honest?

11     A.   I did.  I mean, you know, he had been in business or

12  been a partner at the law firm, Peters, Murdaugh, Parker,

13  Eltzroth & Detrick for many years.  He's past chair or past

14  president of the Trial Lawyers Association.

15     Q.   South Carolina Trial Lawyers, state-wide?

16     A.   Yeah.  And, you know, you just -- there was no

17  reason I would not have thought -- his family, he was an

18  assistant solicitor, his family had been in the law

19  enforcement, and basically were law in the 14th Judicial

20  Circuit for many, many decades.

21     Q.   Okay.  You are currently on bond.  Who posted that

22  bond for you?

23     A.   My father and I did.

24     Q.   And have you been compliant with all the conditions

25  of that bond?

1      A.    Yes, sir.

2      Q.    And you are currently wearing two GPS devices; is

3    that correct?

4      A.    That is correct.

5      Q.    And you've been on state bond for wearing the

6    initial GPS device since sometime -- when is that?

7      A.    May 6th.

8      Q.    And have you had any issues when you were on state

9    bond?

10      A.    Not any issues with the bond.  I've had issues with

11   the monitor itself.

12      Q.    And when you have issues with that monitor, what do

13   you have to do?

14      A.    I have to go back to Columbia to their office.

15      Q.    How many times roughly have you had those issues?

16      A.    I've been back up four times since May.

17      Q.    Do you have any issues since you've -- since Judge

18   Cherry set the federal bond?

19      A.    No.  No, sir.

20      Q.    And when did you first begin cooperating after Alex

21   Murdaugh's thievery and stolen money came to light?

22      A.    You know, I first started getting interviewed by

23   SLED I want to say -- or the FBI, I want to say it was

24   September or October of '21.

25      Q.    Okay.  And since you've been on bond, have you

1    transferred or sold any property?

2        A.    Only thing I sold was my -- I say "my," our, wife

3    and I's, primary residence in Varnville.

4        Q.    And that was publicly listed?

5        A.    That was publicly listed with Ellis Realty and

6    Insurance.

7        Q.    Did we tell the Court about that, the state court

8    judge about that?

9        A.    I believe we did.

10       Q.    Did we agree to place money, the proceeds, in escrow

11   at Nelson Mullins?

12       A.    Yes, sir.

13       Q.    Have you and your family gone to counseling since

14   this time?

15       A.    We have.  My wife and I decided that we needed to

16   take our children, and we went to a counselor in Hilton Head.

17   We wanted to make sure -- you know, this is a traumatic

18   experience for them to see.  And we wanted them to have an

19   outlet to talk about their frustrations and, you know, where

20   maybe they don't want to talk about it with their friends or

21   talk about it with us, because I'm sure they're scared.  So

22   we went to counseling.

23       Q.    Finally, Mr. Laffitte, do you intend to fight these

24   charges at trial?

25       A.    Absolutely.

1          MR. DANIEL:  I have no further questions.

2          THE COURT:  Thank you.

3          Ms. Limehouse.

4          MS. LIMEHOUSE:  May it please the Court.  Thank you.

5                         CROSS-EXAMINATION

6   BY MS. LIMEHOUSE:

7      Q.   We've met before; isn't that right?

8      A.   Yes, ma'am.

9      Q.   We first met back in February of this year during

10  what we call a proffer; is that correct?

11     A.   That is correct.

12     Q.   And during that proffer, you signed an agreement,

13  what we call a proffer agreement with the Government,

14  correct?

15     A.   Yes, ma'am.

16     Q.   And in that proffer agreement, you swore to tell the

17  truth?

18     A.   That is correct.

19     Q.   I was at the proffer agreement -- proffer hearing,

20  excuse me, session.  Representatives from the Attorney

21  General's Office were there as well, correct?

22     A.   Yes, ma'am.

23     Q.   Special Agent Brian Womble with the FBI was there?

24     A.   Ah-huh.

25     Q.   And Agent Steve Bechtold with the South Carolina Law

1    Enforcement Division were there, right?

2         A.   Yes.

3         Q.   And we've had the opportunity to meet on another

4    occasion; is that correct?

5         A.   Yes, ma'am.

6         Q.   You and I sat down along with your lawyers and

7    Special Agent Brian Womble back in June of this year; is that

8    correct?

9         A.   Yes, ma'am.  I don't remember the dates.

10        Q.   Sometime this summer, right?

11        A.   Yes, ma'am.

12        Q.   And during that meeting, I went over evidence

13   against you in this case?

14        A.   That's correct.

15        Q.   I want to talk a bit about giving some of your

16   testimony on your direct about the nature and circumstances

17   of these offenses and the weight of the evidence against you.

18   Let's start with your history with Palmetto State Bank.  You

19   were terminated from your employment with Palmetto State

20   Bank; is that correct?

21        A.   That's correct.

22        Q.   And at the time you were CEO?

23        A.   That is correct.

24        Q.   How long had you been CEO of the Palmetto State

25   Bank?

1    A.    Since '20 -- maybe May or June of 2020, not long.

2    Q.    And before becoming CEO, what was your title and

3  position with the bank?

4    A.    I was executive vice president and chief operating

5  officer.

6    Q.    Okay.  You are based in the Hampton branch of

7  Palmetto State Bank; is that correct?

8    A.    Yes, ma'am.

9    Q.    You are sort of the branch manager of the Hampton

10  branch, is that right?

11    A.    Yes, ma'am.

12    Q.    How long had you served in that capacity?

13    A.    Probably 20 years, 15 years.

14    Q.    So your father also is located in that branch,

15  correct?

16    A.    That is correct.

17    Q.    What was his role during the course of the

18  allegations in the indictment?

19    A.    He was chairman of the board.

20    Q.    Chairman of the board.  So what was his role in the

21  Hampton branch specifically?

22    A.    As chairman of the board, he was the top banker.

23  You know, he would do loans.  He would do whatever.  He looks

24  at all the daily statements every morning, goes through

25  overdrafts, everything.

1    Q.   Talk to me about the bank's relationship with the

2    law firm PMPED?

3    A.   PMBED had been very good customers of ours for

4    decades.  They were probably at largest private -- I will say

5    private, nonpublic -- depositor that we had.  We had numerous

6    loans with many of their lawyers.  We worked very closely

7    with them.

8    Q.   Safe to say that your relationship -- the bank's

9    relationship and your relationship as the branch manager in

10    Hampton was very important with PMPED?

11    A.   Correct.

12    Q.   And how about with Alex Murdaugh?  How about your

13    relationship with Alex Murdaugh as a professional banker?

14    A.   He had always paid as well.  So we didn't have any

15    issues with him.  We would always watch, just like everybody

16    else, talked about his overdrafts, and we watched them.  We

17    spoke with him many times.  E-mailed him about them.  You

18    know, we stayed on top of him.  Loaned him money sometimes to

19    cover them.  Sometimes he would cover them with his own

20    funds.

21    Q.   Stayed on top of him, you watched his personal

22    accounts all the time, right?

23    A.   No.

24    Q.   The internal bank records can show when you accessed

25    Alex Murdaugh's accounts, is that correct?

1    A.    Absolutely.

2    Q.    And you would check to see the status of those

3 personal accounts regularly; is that accurate?

4    A.    No.  No, ma'am.  I would -- we have a report called

5 nonsufficient funds report.  It's printed every morning.  And

6 if somebody is in overdraft, it's on that report.  So I would

7 not access his accounts.

8    Q.    So every morning you got a report that notified you

9 if a customer was in overdraft?

10    A.    Yes, ma'am.

11    Q.    So every morning you got a report when Alex Murdaugh

12 was in overdraft?

13    A.    He would be on the report if he was in overdraft or

14 had an overdraft account checked.

15    Q.    All right.  Let's talk about your agreement to serve

16 as conservator or personal representative for clients of Alex

17 Murdaugh.

18    A.    Yes, ma'am.

19    Q.    Those clients were Alania and Hannah Plyler?

20    A.    Ah-huh.

21    Q.    Natasha Thomas and Hakeem Pinckney?

22    A.    Yes, ma'am.

23    Q.    Malik Williams?

24    A.    Yes, ma'am.

25    Q.    And the estate of Donna Badger; is that correct?

1    A.    No, ma'am.  Malik Williams was Paul Detrick's

2    client.

3    Q.    Okay.  But you served as conservator for him; is

4    that correct?

5    A.    That's correct.

6    Q.    And Paul Detrick is another lawyer at the PMPED,

7    right?

8    A.    He was, yes, ma'am.

9    Q.    What was your understanding of your duties as a

10   conservator?

11   A.    I would get their money and take it and hold it and

12   put it in accounts and invest it, handle it for them.

13   Q.    So you were responsible with managing funds for

14   those individuals?

15   A.    Yes, ma'am.

16   Q.    And you owed them a duty to properly manage their

17   funds; is that correct?

18   A.    That's correct.

19   Q.    And how about your duties as a personal

20   representative, how did you understand those duties?

21   A.    Same as a conservator.

22   Q.    What was your requirement in terms of reporting to

23   the probate court?

24   A.    On which case?

25   Q.    All of them, as a conservator or personal

1    representative?

2        A.    If you were getting ready to borrow -- not borrow,

3    if you are getting ready to buy something or spend money, you

4    would have to fill out an order, expense order or allowance,

5    purchase order or something like that.  And then every year

6    you would have an annual accounting that you would turn in.

7        Q.    So you knew you had to go to the probate court to

8    request permission to spend funds from the conservator

9    accounts; is that correct?

10       A.    Yes, ma'am.

11       Q.    During the course of the years that are set forth in

12   the indictment and then you serving in your roles as personal

13   representative or conservator for those individuals that we

14   discussed, how much money did you collect in fees?

15       A.    390-, 400,000, somewhere around there.  I am not

16   exactly sure of the amount.

17       Q.    So let's talk about from 2011 to 2015, because

18   that's when you served in these roles for the most part.

19   What was your annual salary at the bank?

20       A.    I really don't know, 100,000, 150,000 at the most.

21       Q.    So during this time, you were making a substantial

22   percentage of your yearly income on fees in your role as

23   conservator or personal representative?

24       A.    Right, 25 percent, yes, ma'am.

25       Q.    Did you report these fees to the IRS?

1      A.   Yes, ma'am.

2      Q.   Every year you included the fees on your tax

3  returns?

4      A.   I went back and paid all of them.  We didn't do

5  it -- I did not do it at that time.  I did some, not all of

6  them.  But I went back and I have amended all my tax returns

7  to include them.

8      Q.   So between 2011 and 2015, you never reported the

9  income to the IRS?

10     A.   I would have to go back and look at my tax returns.

11     Q.   When did you first report the income to the IRS from

12  these fees?

13     A.   We --

14     Q.   You just said you went back --

15     A.   Some I did then.  Some I didn't.  And I would say

16  2021 I corrected all of them.  We amended all of my tax

17  returns.

18     Q.   So do you remember which income you did report?

19     A.   No, ma'am.

20     Q.   And you don't remember which income you did not

21  report?

22     A.   Well, we would have to go back and get my accountant

23  to go through it.

24     Q.   But safe to say between 2011 and 2015, you did not

25  report substantial income that you made on fees as personal

```
 1   representative or conservator in these cases?

 2        A.   I wouldn't say substantial, but some, yes, ma'am.

 3        Q.   25 percent by your estimate?

 4        A.   If -- that's on some of them.  The vast majority

 5   came off of two cases.  And those I know I paid the taxes on.

 6   So I would say some.

 7        Q.   All right.  Let's talk about some of these cases

 8   specifically.  Let's talk about Hannah Plyler and Alania

 9   Plyler.  You were appointed to serve as their conservator

10   after their mother and brother were killed in a horrific car

11   accident; is that correct?

12        A.   That's correct.

13        Q.   How old were they at the time you were appointed to

14   serve as their conservator?

15        A.   Maybe 11 and 15, somewhere right there.  I'm not

16   sure.

17        Q.   So how did you understand your role as their

18   conservator?

19        A.   I understood my role as they would -- if they wanted

20   any money from the lawsuit, they would come into me, I would

21   pay their expenses or whatever they needed and manage their

22   money for them until they turned 18.  And at that point in

23   time, turn it over to them.

24        Q.   So they received substantial settlement funds

25   following civil lawsuits; is that correct?
```

1      A.    Absolutely.

2      Q.    About how much money were charged with managing for

3  them as their conservator?

4      A.    I would have to get accounts to actually look at.

5  There's probably 4- or 5 million in each of them.  Maybe a

6  little more than that.

7      Q.    During the course of the time you served as their

8  conservator, you took eight loans from the conservatorship

9  account to yourself; is that correct?  And those loans

10 totaled $355,000?

11     A.    Yes.

12     Q.    You testified that at the time your salary was about

13 $100,000?

14     A.    Somewhere right in there, yes.

15     Q.    In addition to your salary and the fees you

16 collected for managing these conservatorship accounts, you

17 also took $355,000 in loans?

18     A.    Correct.

19     Q.    And that first one took place in July of 2011,

20 correct?

21     A.    Somewhere right there, yes, ma'am.

22     Q.    And you took a loan for about $250,000?

23     A.    That's correct.

24     Q.    What did you take that loan out for?

25     A.    Actually, my lawyers and I were discussing, we have

1    to research.  I don't remember at this time.

2        Q.   So you don't remember taking out a $250,000 loan --

3        A.   No, ma'am, I remember taking the loan.  I don't

4    remember exactly what the money went to.

5        Q.   So at the time you were making less than half in a

6    yearly salary of the amount of loan that you took out of

7    Hannah Plyler's account?

8        A.   Yes, ma'am.

9        Q.   But you don't remember why you would need that loan?

10        A.   Offhand, no, ma'am, I do not.

11        Q.   And you don't remember how you spent any of that

12    money?

13        A.   I'm sure I paid bills.  I'm just trying -- I mean,

14    it's 2011.

15        Q.   And you continued to take loans from Hannah Plyler's

16    conservatorship account beyond that initial $250,000 loan?

17        A.   Yes, ma'am.

18        Q.   You say that the loans were secured by your interest

19    in Palmetto State Bank stock; is that correct?

20        A.   It was secured by the stock, yes, ma'am.

21        Q.   Did you tell anyone about these loans that you took

22    from the Plyler account?

23        A.   No, ma'am.

24        Q.   Did you tell anybody at Palmetto State Bank?

25        A.   No, ma'am.

1       Q.    Did you tell Alex Murdaugh that you were taking

2   loans from the Plyler accounts?

3       A.    No, ma'am.

4       Q.    Did you tell Hannah or Alania Plyler that you were

5   taking loans?

6       A.    I did not.  But they were in the filings after when

7   they turned 18 when I gave it to them.

8       Q.    Did you tell their guardian that you were taking

9   loans from their account?

10      A.    I've never spoke with the guardian over five times.

11      Q.    Did you request permission from the probate court to

12  extend these loans to yourself and the conservatorship

13  account?

14      A.    I spoke to the probate judge originally.  She said

15  it was okay, that we could loan money.  So yes, I did.

16      Q.    Tell me about those conversations with Judge Odom.

17      A.    I went over -- Alex had come to me and asked me, he

18  said, you know, can we -- said I need to borrow some money or

19  whatever.  He said, can I borrow it from the girl's account.

20  And I said, look, I don't have any idea.  I said, you know,

21  we have a lot sitting here.  But I said, I will have to talk

22  to the judge.  So I went over, walked across the street to

23  the courthouse, went to Judge Odom, sat down and talked with

24  her, and she said it wouldn't be a problem.

25      Q.    So your testimony is Alex came to you needing a

1   loan?

2       A.   Yes.

3       Q.   Why didn't you loan him money from Palmetto State

4   Bank rather than from the conservatorship accounts?

5       A.   I could have.  Well, I say I could have.  I couldn't

6   approve this loans.  I had to go through the executive

7   committee

8       Q.   Why didn't you extend loans from Palmetto State Bank

9   rather than from a minor child's money?

10      A.    I still feel that it was a good investment for the

11  girls.  They made money off of that investment, a lot more

12  than they would have made sitting there in a money market or

13  CD.

14      Q.   Were these loans secured?

15      A.   Not then.

16      Q.   All of the loans you extended to Alex were unsecured

17  loans, correct?

18      A.   Yes.

19      Q.   All right.  I want to just get back into how these

20  loans came about.  Your testimony is that Alex came to you?

21      A.   Yes, ma'am.

22      Q.   Before you took the initial loan from Hannah

23  Plyler's account?

24      A.   Yes.

25      Q.   So months prior to you extending a loan to Alex

1    Murdaugh, he came to you with the idea of taking a loan from

2    Plyler's account?

3        A.   That's right.

4        Q.   And at that point, you testified that you went to

5    Judge Odom and asked permission, and she told you you could?

6        A.   That is correct.

7        Q.   Would it surprise you to learn Judge Odom has told

8    us you never requested permission --

9            MR. DANIEL:  Your Honor, I'm going to object to what

10   Judge Odom said to the Government.  Judge Odom -- it's just

11   hearsay.

12           THE COURT:  The way the question was phrased, I

13   don't think she's eliciting -- she asked if it would surprise

14   him to know.  I will allow that question.  But, Counsel,

15   please be mindful.

16           MS. LIMEHOUSE:  Thank you, Your Honor.

17   BY MS. LIMEHOUSE:

18       Q.   Would it surprise you to know?

19       A.   No, it does not.

20       Q.   So you testified that you didn't notify anybody of

21   the loans that you took from Hannah Plyler's account?

22       A.   That's correct.

23       Q.   But you claim that they were secured.  What would

24   have happened if you didn't pay that loan back?  No one knew.

25       A.   If something happened and I didn't pay it back --

1   the judge knew.

2       Q.   By your annual accounting, is that how you say the

3   judge knew?

4       A.   Yes, ma'am.  And if something happened, I mean, we

5   have to account for this money at the end of each year,

6   either in assets and liabilities or in cash.  Depending on

7   what time it was that something happened, you know, it's

8   clearly stated on the loan form secured by whatever --

9   however many numbers of shares of Palmetto State Bank stock.

10  I handled the shares of the actual certificate as well.

11      Q.   Let's talk about the rate.  What interest rates did

12  you pay on the loans from the Plyler account?

13      A.   Anywhere from three and a half to one and a half.

14      Q.   So you would reduce the interest rate as you took

15  more loans from Plyler to your benefit?

16      A.   I always tried to make sure they were at least

17  making double what they would have made in the investment.

18      Q.   But you unilaterally negotiated for yourself more

19  favorable interest rates from this child's account?

20      A.   I guess, yes, ma'am, I did.

21      Q.   And with no notice to anyone else and no one to call

22  you on it?

23      A.   No, ma'am.  The judge could have called me on it.

24      Q.   When it comes time for you to pay these loans back,

25  you've used fees --

1      A.    Yes, ma'am.

2      Q.    -- that you may or may not have reported to the IRS

3   from serving as PR or conservator for other personal injury

4   clients for Alex Murdaugh; is that correct?

5      A.    That's correct.

6      Q.    And at the end, you owed a large sum of money.  And

7   I say in the end, when Hannah turned 18 and you had to close

8   the conservatorship out, you owed a large sum of money still;

9   is that correct?

10     A.    That's correct.

11     Q.    And you got a loan from Johnnie Parker?

12     A.    That's correct.

13     Q.    To pay off those loans to Hannah Plyler?

14     A.    Yes, ma'am.

15     Q.    Not a single penny of your own money legitimately

16   made from Palmetto State Bank were used to pay off those

17   loans for Hannah Plyler; is that correct?

18     A.    No, ma'am.  I don't agree with that.

19     Q.    Did you use fees to pay off the loans?

20     A.    Yes, ma'am.

21     Q.    And did you use a loan from Johnnie Parker to pay

22   off the remainder of those loans?

23     A.    To pay off the remainder, yes, ma'am.  I've been

24   paying during -- over the years.

25     Q.    You didn't use any of your own income to pay off

1    these loans?

2        A.    Ma'am, the fees are my income.

3        Q.    Not enough to report it to the IRS?

4        A.    I reported it to the IRS.

5        Q.    You testified that you didn't report all of your

6    income to the IRS.

7        A.    No.  I just testified I amended my tax returns in

8    2021 to incorporate any fees that I did not report.

9        Q.    At the time you didn't consider it legitimate income

10   to report to the IRS?

11       A.    I wouldn't say I didn't consider it legitimate

12   income.

13       Q.    Well, we will get into how you took your role as

14   conservator or PR a little bit later for these other

15   individuals.  It's my understanding that you are still paying

16   off this loan to Johnnie Parker that you used to pay off all

17   the loans to Hannah Plyler, is that correct?

18       A.    That's correct.

19       Q.    Let's talk about these loans to Alex Murdaugh.  You

20   extended the first loan to Alex Murdaugh in September of

21   2011; is that correct?

22            MR. DANIEL:  Can you repeat?

23       Q.    You extended the first loan to Alex in September of

24   2011; is that correct?

25       A.    I'm going to assume somewhere in there.

33

1      Q.    That's two months after you took the initial
2    $250,000 loans?
3      A.    Yes, ma'am.
4      Q.    Two months after you claim Alex came to you with the
5    idea of getting loans from the conservatorship account?
6      A.    Yes, ma'am.
7      Q.    And at the time you gave this first loan that was
8    $90,000, what was the status of Alex Murdaugh's personal
9    account?  He was in thousands of dollars in overdraft; is
10   that correct?
11     A.    That's what you wrote in your response.  I'm going
12   to assume that that is correct.
13     Q.    Well, internal bank records show me that you had
14   accessed his account to determine the status.
15     A.    I don't doubt that.  I don't remember what exact
16   status was 11 years later.  I'm sorry.
17     Q.    But at the time you would access the accounts to
18   determine the status before loaning him money from the Plyler
19   accounts?
20     A.    Yes, ma'am.
21     Q.    You were aware that he was thousands of dollars in
22   overdraft?
23     A.    Yes, ma'am.
24     Q.    All right.  Two months later, you then extend a
25   $40,000 loan from -- this is the Malik Williams account --

1    just two months later, at that point he's still in overdraft?

2    A.    Yes, ma'am.

3    Q.    And what we see is you continue to extend a total of

4    14 unsecured loans totaling nearly a million dollars from a

5    minor child's account?

6    A.    That's correct.

7    Q.    And you were charged and had the duty to manage this

8    money properly?

9    A.    Yes, ma'am.

10    Q.    And every time you extended a loan from Hannah

11    Plyler's account, Alex Murdaugh was thousands of dollars in

12    overdraft; is that correct?

13    A.    I'm going to assume that's correct, yes, ma'am.

14    Q.    Well, you would check his account to see that he was

15    in overdraft before transferring the money from Plyler's

16    account; isn't that correct?

17    A.    I would check it before I transferred it because I

18    would have to pull the account up to transfer money.  But I

19    just don't remember what his account status was each time,

20    each loan, 11 years later.  I have to see the records.

21    Q.    But you agree you would check the account before

22    transferring the money for Plyler and see that he's thousands

23    of dollars in overdraft?

24    A.    I would agree that I checked the account.

25    Q.    All right.  Let's go through the first loan,

1   September 14th, 2011.  He was $3,900 and some change in

2   overdraft when you gave him a $90,000 loan; is that correct?

3        A.   Yes, ma'am, I'm assuming so.

4        Q.   Let's go to a $50,000 loan.  On October the 23rd of

5   2012, he was $26,000 in overdraft; is that correct?

6        A.   I'm assuming.

7        Q.   Let's go to February 12th, 2013, he was 115,000 and

8   some change in overdraft, and you loaned him $150,000 from

9   the Plyler account; is that correct?

10       A.   I would assume that, yes, ma'am.

11       Q.   Let's go to July 29th, 2013, he was $16,000 and some

12  change in overdraft and you loaned him $100,000?  Let's go to

13  September of 2013, he's 27,000 and some change in overdraft

14  and you loaned him $40,000?

15       A.   Yes, ma'am.

16       Q.   Let's go to October 23rd of 2013, he was $64,000 and

17  some change in overdraft, and you loaned him $70,000.

18            THE COURT:  Mr. Laffitte, if you could speak on the

19  record.

20            THE WITNESS:  Yes.

21  BY MS. LIMEHOUSE:

22       Q.   Let's go to November 2013.  You loaned him $25,000,

23  and he was $6,000 in overdraft?

24       A.   Yes, ma'am.

25       Q.   Let's go to December of 2013.  He was over $30,000

1    in overdraft, and you loaned him another $100,000?

2        A.    Yes, ma'am.

3        Q.    Let's go to March of 2014.  He was nearly $15,000 in

4    overdraft, and you loaned him $75,000; is that correct?

5    Let's go to May of 2014.  He was $18,000 and some change in

6    overdraft, and you loaned him $50,000; is that correct?

7        A.    That's true.

8        Q.    So you loaned him nearly a million dollars in

9    unsecured loans as an executive at the Palmetto State Bank --

10       A.    Yes.

11       Q.    -- while you were charged with managing this minor

12   child's funds?

13       A.    That's correct.

14       Q.    All right.  Let's talk about how Alex Murdaugh paid

15   these loans off when it came time.  You served as conservator

16   and/or PR for all of the individuals where this money came

17   from; is that right?

18       A.    Yes, ma'am.

19       Q.    And you negotiated every single check that he used

20   to pay off the loans to Hannah Plyler?

21       A.    That's correct.

22       Q.    And you saw that the memo lines on every single one

23   of those checks referenced the individual who you owed a duty

24   to on that memo line?

25       A.    Saw that after the fact.  I would not have noticed a

1    memo line during the time.

2        Q.    You would not have noticed that a memo line says,

3    for example, estate of Donna Badger, when you are

4    transferring hundreds of thousands of dollars?

5        A.    You know, when your attorney comes in and says, hey,

6    I need you to do this, this, this, with a check, with your

7    check and it's made correctly to Palmetto State Bank, I don't

8    know if he's borrowed money from the law firm, I don't know

9    what he's done.

10        Q.    We will talk about those specifics when we get into

11    how those moneys are paid.  Let's talk about at the very end

12    when Hannah Plyler turns 18 and she has to -- you know, first

13    let me ask you one other thing about one of those lines

14    specifically.

15        A.    Sure.

16        Q.    The one we talked $70,000 loan you extended on

17    October 23rd of 2013, do you recall receiving an e-mail from

18    Alex -- excuse me.  You e-mailed him first on October the

19    22nd of 2013, saying, need a deposit, thought you were coming

20    in yesterday; is that correct?

21        A.    Yes.

22        Q.    And you e-mailed him because he was thousands of

23    dollars in overdraft, more than $60,000 in overdraft, and you

24    needed him to come in and make that overdraft right; is that

25    correct?

1      A.    That's correct.

2      Q.    And Alex responds, can you make a loan from Hannah

3  and I will pay it as we discussed?

4      A.    That's correct.

5      Q.    And then you respond and say, I transferred $70,000?

6      A.    Yes, ma'am.

7      Q.    And he tells you, I will come back at some point

8  this week, out of town today and in the morning, so it will

9  be tomorrow or after Friday?

10     A.    Yes, ma'am.

11     Q.    So you are accessing his accounts, seeing that he's

12 thousands of dollars in overdraft, calling him and contacting

13 him to come and make that overdraft right, and you then

14 transfer money from Hannah Plyler's account?

15     A.    Yes, ma'am.

16     Q.    And that's how it was with every one of these loans,

17 right?

18     A.    Not every one, I'm sure, but some of them.

19     Q.    All right.  So when Hannah turns 18, you and Alex

20 are paying really close attention to this conservatorship

21 having to be closed out; is that correct?

22     A.    She was turning 18, we knew we had to close it out,

23 yes, ma'am.

24     Q.    And so what happens when Alex owes over 280 grand

25 still to Hannah Plyler?

```
 1          A.   He had made arrangements to borrow half a million
 2    dollars from Palmetto State Bank on a line of credit.
 3          Q.   Explain to me "made arrangements."
 4          A.   I mean, he came to us about borrowing money.  I
 5    didn't know what he needed half million for.  But he made the
 6    arrangements to do it.  He went through -- I mean, to make a
 7    loan of that size, it's not going to happen overnight.  First
 8    of all, it was secured, so we had to do a closing and
 9    everything else.  It took awhile.
10          Q.   Okay.  What did he tell you when he came to you to
11    get a $500,000 line of credit?
12          A.   He just said he wanted to open up a line of credit.
13    I don't know exactly what he said.  But, I mean, yes, I did
14    know that he would use some of the funds to pay it back.
15          Q.   Okay.  What was the stated purpose of that line of
16    credit?
17          A.   Farming.
18          Q.   So you knew he came to you and asked -- did he ask
19    for money for farming or it was your idea to make it for
20    farming?
21          A.   I'm not sure whose idea it was to put farming.  He
22    owned a large property, 1700 acres, plus or minus, that had
23    timber growing on it, so dust farms sort of.  But it's common
24    practice in banks to put loans onto the commercial side for
25    ease of regulations or regulatory burden.
```

1    Q.   Less oversight, right?  You make a commercial loan,

2  there's less oversight?

3    A.   Yes, ma'am.

4    Q.   So you state that it's for farming, even though you

5  know he's going to spend hundreds of thousands of dollars to

6  pay off loans to Hannah Plyler?

7    A.   Yes, ma'am.

8    Q.   And you knew that when the loan was extended?

9    A.   I didn't know whether he was going to do that or

10  not, but I was assuming that, yes, I was.

11    Q.   So when he came to you asking for a line of credit

12  for farming, you knew at that time he was going to use some

13  of that money to pay off the loans to Plyler's account?

14    A.   I don't remember whether I knew for a fact that

15  that's what he was going to do or not.  I did know for a fact

16  when I transferred the money.

17    Q.   But it was for the stated purpose of farming?

18    A.   That is correct.

19    Q.   And you do know as a CEO of a bank that you have to

20  put the accurate use and purpose of the funds in the loan

21  documents and use those funds in the way that the loan is

22  intended, correct?

23    A.   I know --

24    Q.   That's not the way you did --

25    A.   I know that's what's supposed to happen, but that

1    didn't in reality.

2        Q.    It never happened with Alex, did it, in reality?

3        A.    In reality, I am not saying it didn't happen with

4    Alex, didn't happen with a lot of instances.

5        Q.    With Alex included, correct?

6        A.    With Alex included.

7        Q.    So in February of 2015, Hannah Plyler is about to

8    turn 18.  Y'all decide, you and Alex decide that the bank is

9    going to loan him $500,000 line of credit for the purpose of

10   farming and use over 280 grand of these moneys, these funds,

11   to pay off the Plyler loans?

12       A.    "Y'all" did not decide.  Alex requested a loan, a

13   line of credit secured by his property.  We agreed to the

14   line of credit.  And at that point, it was made, need to

15   transfer $284,000, or whatever, and pay it off, and that's

16   what I did.

17       Q.    Well, you negotiated all those checks to pay it off,

18   right, the Plyler accounts?

19       A.    Which checks?

20       Q.    The cashier's check that was issued out of line of

21   credit and then deposited into Plyler's account, you

22   negotiated those checks?

23       A.    Probably.  I'm going to assume I did.

24       Q.    So you knew at the time he was getting the $500,000

25   line of credit that he was going to use those funds to pay

1    off the loans to Hannah Plyler?

2        A.    Yes, ma'am, I knew he would use the line of credit

3    when he did that.

4        Q.    Inconsistent with the stated purpose of the loan?

5        A.    Yes, ma'am.

6        Q.    Okay.  Let's talk about specifically the October

7    23rd $70,000 loan that y'all e-mailed about.  And I need a

8    deposit.  Alex responds, I will be back later this week to

9    pay back as discussed.  Correct?

10       A.    Yes, ma'am.

11       Q.    He, in fact, used money from the estate of Donna

12   Badger to pay off that loan, is that correct, as you

13   discussed?

14       A.    I'm not sure on that specific loan, but I know he

15   used the money from other -- well, I didn't know at the time.

16   I learned about it in late 2021 when we were doing -- when

17   I'm doing the research for the SLED and FBI, doing research,

18   I realize what he had done, where he had stolen the money.

19       Q.    At the time you negotiated checks with the memo

20   line, "Estate of Donna Badger," as PR for the estate of Donna

21   Badger to pay off Hannah Plyler loans?

22       A.    I did not realize it was her money, no, ma'am.

23       Q.    But you negotiated those checks?

24       A.    I did negotiate the checks, yes, ma'am.

25       Q.    And that was five days after you extended that

1    initial $70,000 loan?

2         A.   Somewhere right there, yes.

3         Q.   And that pattern was consistent and repeated itself

4    for all of these loans -- except for the 284 that the bank

5    extended, all were checks negotiated by you referencing Alex

6    clients?

7         A.   Yes, ma'am.

8         Q.   Let's talk about the estate of Donna Badger.  So

9    Alex requested that you serve as personal representative for

10   the estate of Donna Badger?

11        A.   That's correct.

12        Q.   So Donna Badger was killed in a horrific car

13   accident, correct?

14        A.   Yes.

15        Q.   She left behind six surviving children and her

16   surviving husband, who was the driver of the car, correct?

17        A.   Correct.

18        Q.   So you were appointed to serve as the personal

19   representative for the estate, not for her husband, but for

20   the estate, correct?

21        A.   That's correct.

22        Q.   And what did you understand your duties to be as the

23   PR for the estate of Donna Badger?

24        A.   I would handle her money if it came in and when it

25   came in.

1      Q.   If and when it came in.  Did you ever meet any of

2    the beneficiaries of the estate of Donna Badger?

3      A.   I met with Arthur Badger.  I don't remember.  I'm

4    sure I probably met with some of them at some point in time,

5    but I don't recall.

6      Q.   What was the context of your interactions with

7    Arthur Badger?

8      A.   We just would speak.  I'm going to say that I took

9    over as PR from Arthur.  I don't remember the exact details

10   of what was going on with the case.  I helped him set up

11   the -- what they call the structured settlements for all of

12   the beneficiaries.

13     Q.   So your testimony is that you did meet Arthur

14   Badger?

15     A.   At some point, yes, ma'am, I did.

16     Q.   In your role at personal representative of his

17   estate -- of her estate, excuse me?

18     A.   I am not saying I was as personal representative at

19   the time that I met him.  At some point in time during that

20   case, I did meet with him.

21     Q.   Okay.  And both the estate of Donna Badger and

22   Arthur Badger received substantial settlements following

23   civil lawsuits?

24     A.   The estate did, yes.

25     Q.   At the time of the settlement, the law firm issued

1    one large check for $1,325,000 for the estate of Donna

2    Badger; is that correct?

3         A.    We never saw the check.

4         Q.    Well, you received an e-mail from Alex --

5         A.    I did.

6         Q.    -- asking you to reissue the check for 1.325 and

7    re-cut it as he listed in his e-mail; is that correct?

8         A.    His e-mail asked me -- he said, got a million 325,

9    or something along those lines, and said, hey, what do I owe

10   the girls, and subtract what I owe the girls, and this and

11   that and let me know and send it back to me to sign and have

12   it re-cut.

13        Q.    Why would Alex be telling you to e-mail him

14   separately and ask that a settlement check be re-cut in the

15   way that he listed?

16              MR. DANIEL:  Your Honor, I object to the question.

17   He's got no way of knowing what Alex Murdaugh was thinking at

18   the time.

19              MS. LIMEHOUSE:  He testified that they have a

20   professional relationship.  He said he's his lawyer.

21              THE COURT:  So, Counsel --

22              MR. DANIEL:  This is my concern.  She's asking what

23   Alex Murdaugh thought at the time.  How could he know that?

24              MS. LIMEHOUSE:  I asked why.

25              THE COURT:  Counsel, excuse me.  Let me issue a

1    ruling.  I hear you.  To the extent that this witness is

2    familiar or had a discussion, I will allow the question.  I

3    agree with you that he's not in the mind of that individual

4    and cannot know.  But he may have had discussions.  And to

5    the extent that he does, I will allow the question.

6         Counselor, if you will be mindful in terms of how

7    you phrase the question.  You may proceed.

8         MS. LIMEHOUSE:  Understood, Your Honor.  Thank you.

9    BY MS. LIMEHOUSE:

10   Q.   Why did you understand Alex Murdaugh to be sending

11   you an e-mail asking that the Badger settlement check be

12   re-cut?

13   A.   I did not understand.  I didn't realize it was the

14   Badger settlement.  I didn't know what it was.

15   Q.   Why did you understand him to be sending you an

16   e-mail asking you to then e-mail him to have a check re-cut?

17   What did you think he was doing in your mind?

18   A.   I had no idea.  Maybe -- I had no clue what he was

19   thinking.  I don't.  I assume what he was doing, but at the

20   time I had no clue.

21   Q.   So you took his e-mail and you did your own math,

22   right?

23   A.   Yes.

24   Q.   You took the $388,687.50 that he first listed, and

25   then whatever the amount I owe on the Hannah loan, you did

1    your math there for $151,726.05, correct?

2         A.    Correct.

3         Q.    $75,000 Alex told you to do?

4         A.    Yes, ma'am.

5         Q.    And then whatever the remaining balance is what you

6    put out to be $709,586.45; is that correct?

7         A.    Yes, ma'am.

8         Q.    So after you did your math, you then e-mailed Alex

9    in a separate e-mail chain and stated those amounts and said,

10   can you get Jeannie to re-cut check number 43162 dated

11   November 19th, 2012 as follows.  You then e-mail Alex in a

12   separate e-mail asking him to have his staff re-cut the

13   check.

14        A.    That's what he asked me to do.

15        Q.    Why couldn't Alex just tell his staff to re-cut the

16   check?  Why did it have to come from you?

17        A.    He needed to know the amounts.  He didn't know the

18   exact payoff of the girls' loans.  So he e-mailed me, I would

19   assume, to find out the exact amount.  Why he did it?  I

20   don't know why he did it.  I have a good idea now years

21   later.

22        Q.    He needed you to send the e-mail as the personal

23   representative of the estate to the staff at PMPED so that

24   they would re-cut the check to you as personal

25   representative.  He couldn't do it without your agreement to

1    do it; is that correct?

2        A.    I don't know what he had -- why he did it.  I can't

3    answer that.  I don't know why he did it.

4        Q.    You saw a disbursement sheet --

5        A.    I signed a disbursement sheet, yes, ma'am.

6        Q.    -- related to the settlement funds and where they

7    were supposed to go; is that correct?

8        A.    That's correct.

9        Q.    And according to the disbursement sheet, you were to

10   receive $35,000 in settlement -- in fees for serving as

11   personal representative?

12       A.    That's correct.

13       Q.    And you claim you've met with Arthur Badger as a

14   personal representative?

15       A.    At some point, I met with him.  I don't know whether

16   it was at Alex's office or he came into my office.  I don't

17   have any idea.

18       Q.    Did you manage any money for them like you did for

19   the Plylers?

20       A.    No.

21       Q.    Was any money held at the Palmetto State Bank to be

22   managed for their well-being?

23       A.    Not that I recall.

24       Q.    Was any money managed for those six minor children

25   after their mother had died in a car accident?

1    A.    Yes.  I did not personally manage it.  I set up the

2    structured settlements through Forge.

3    Q.    But those annuities wouldn't mature until the kids

4    turned 18, right?

5    A.    Sure.

6    Q.    So they weren't going to get any money managed by

7    you --

8    A.    No, ma'am.

9    Q.    -- while the kids were all minor, six children?

10   A.    That's correct.

11   Q.    The disbursement sheet says that Palmetto State Bank

12   was supposed to receive $1.325 million to pay a structure per

13   client request.  You were supposed to manage $1.325 million

14   for the benefit of those six minor children until their

15   annuities matured; isn't that correct?

16   A.    What the settlement sheet says, yes, ma'am.

17   Q.    And instead of doing that as you were required as

18   personal representative, you transferred the funds as Alex

19   directed you to transfer them?

20   A.    I never received the funds.

21   Q.    You received the checks that he asked you to tell

22   Jeannie to re-cut, correct?

23   A.    I never received a check for a million 325 as would

24   come from the law firm, as came when Hannah Plyler or

25   whoever, Williams.  They would be cut Russell Laffitte as

1    conservator, Russell Laffitte as PR, or whatever.  I never

2    received a check for that amount.

3        Q.    You received the checks that you listed in the

4    amounts to Alex to tell Jeannie from the trust account?

5        A.    That's correct.

6        Q.    Directly to Palmetto State Bank, right?

7        A.    I received those checks that he had asked about.

8    And when he came in and he would say, you know, do this,

9    this, this.  He was my attorney, so why would I not do it?

10        Q.    And the memo line of every single one of those

11    checks references the estate of Donna Badger?

12        A.    Yes.  I never saw it.

13        Q.    So you are collecting $35,000 in fees to manage

14    money, and you don't even look at the memo line that

15    referencing your -- the estate?

16        A.    Memo lines are for the writer of the check so they

17    can remember what it was for.

18        Q.    And instead of managing that 1.325 for those six

19    minor children, you distribute the money at Alex's direction?

20    Let's go over how you negotiated every single one of those

21    checks.  Okay?

22            $388,687.50 to Johnnie Parker, who is another lawyer

23    at PMPED; is that correct?

24        A.    That's correct.

25        Q.    Do you know what the 383,000 was for?

1        A.    I assume it's to pay a loan.

2        Q.    In February of 2013, you negotiated $151,726.05 into

3    Plyler's account, that's correct, to pay off the loans?

4        A.    Yes, ma'am.

5        Q.    From a check that referenced the estate of Donna

6    Badger?

7        A.    Yes, ma'am.

8        Q.    Again in February, that same day, $75,000 money

9    order to Randolph Murdaugh, III, you negotiated that check

10   too?

11       A.    Yes.

12       Q.    Then we have a bunch of checks that were dated

13   September 13th of 2013.  And I'm just going to go over those

14   for you.  Three checks, each totaling $101,369.49, two of

15   which were deposited into Plyler's account to pay off loans.

16   One was a money order to Plyler for a loan payment for

17   $7,500, and a money order -- excuse me.  A money order almost

18   for $10,00 for Plyler and a 7,500 money order to Maggie

19   Murdaugh, who is Alex's deceased wife, correct?

20       A.    Correct.

21       Q.    And then there are three more checks, each totaling

22   $50,684.75.  And you negotiated those checks, a wire transfer

23   to Southern Crane for $49,500, with some cash back for Alex

24   Murdaugh.  You deposited over $50,000 into his personal

25   account from the estate of Donna Badger, a wire to 4M Iron

1   LLC for $34,000?  Can you answer, I'm sorry, verbally for the

2   record, Mr. Laffitte?

3       A.   Yes, ma'am.  You hadn't stopped, so I couldn't

4   answer.

5       Q.   Thank you.  I will go more slowly and let you

6   answer.

7       A.   That's all right.

8       Q.   You deposited $50,684.75 into Murdaugh's account,

9   personal account; is that correct?

10      A.   Yes, ma'am.

11      Q.   You deposited $50,000 -- excuse me.  You sent a wire

12  to 4M Iron, LLC for $34,000; is that correct?

13      A.   That's correct.

14      Q.   A money order for $8,200 to Eddie Smith?

15      A.   That's correct.

16      Q.   And cash back to Murdaugh for little over $8,000; is

17  that correct?

18      A.   Something like that, yes, ma'am.

19      Q.   You sent a money order for $29,000 to Honeycreek

20  Motors?

21      A.   That's correct.

22      Q.   You made a $33,000 deposit again into Murdaugh's

23  personal account, correct?

24      A.   Yes, ma'am.

25      Q.   You made another $33,000 transfer into Plyler's

1    account to pay off loans, correct?

2         A.   Yes, ma'am.

3         Q.   And then in May of 2014, you transferred one

4    $50,684.75 and one $101,349 in Murdaugh's account in another

5    bank; is that correct?

6         A.   I put it there?

7         Q.   You negotiated the check that transferred it into

8    his personal account at another bank; is that correct?

9         A.   I'm not sure.  Maybe I did.  I don't know.

10        Q.   Let's talk a little bit about Palmetto State Bank's

11   arrangements with Alex Murdaugh and the other lawyers at

12   PMPED.  So traditionally most of the world pays their

13   mortgage monthly, right, their loans monthly?

14        A.   That's correct.

15        Q.   That's not the arrangement that Palmetto State Bank

16   had with Alex Murdaugh or the other lawyers; is that correct?

17        A.   Alex Murdaugh paid his monthly, even though he

18   typically would pay annually.  He would make all the payments

19   in January or February, but --

20        Q.   So you would allow him to pay on an annual basis?

21        A.   Yes, ma'am.

22        Q.   And why is that?

23        A.   Because most of their money would come in.  I mean,

24   they earned a salary, but most of the money came in January

25   and February, December to February, somewhere, whenever they

1    closed the books.

2        Q.   So it was typical that Alex, along with the other

3    lawyers, would come to the bank after the year end with their

4    bonuses based on however they had done that year, and they

5    would pay down their loans at that point, right?

6        A.   Yes.

7        Q.   Were there any difference between the checks that

8    were salary versus checks that came out of a trust account

9    for a client?

10       A.   I have no idea.

11       Q.   In colors, you don't recall any difference in

12   colors?

13       A.   I have no idea.

14       Q.   So when Alex shows up with a Badger settlement of

15   1.325 not at your end --

16       A.   He didn't.

17       Q.   You know he doesn't get paid in February and March

18   and September and May?

19       A.   He never showed up with a $1.325 million check.

20       Q.   When he asked you to re-cut a check totaling 1.325,

21   you know he's not supposed to show up with $1.325 million

22   because you had years of business with Alex?

23       A.   I don't know what Alex is doing at the law firm.  I

24   don't know if he's borrowing money or gets his fees that he's

25   earned.  I don't have any idea.  I'm sure he told me

1    something at the time.  I don't know.  I mean --

2        Q.   But you know that it's typical for the lawyers to

3    come with their bonuses at the end of the year?

4        A.   Yes.

5        Q.   It is not typical for a lawyer to show up with

6    $1.325 million in the middle of the year?

7        A.    It all depends.  I mean, no, they get their money in

8    the beginning.

9        Q.   And you, as the PR for Donna Badger, had a duty to

10   figure out where that money was coming from and what it was

11   to be used for?

12       A.   I had a duty to protect her.

13       Q.   And those funds, correct?

14       A.   I never received the funds.

15       Q.   You saw the disbursement sheet that you were

16   supposed to receive $1.325 million to manage a structure per

17   the client's request?

18       A.   That's correct.

19       Q.   When Alex e-mails you about that $1.325 million,

20   instead of funding a structure, you wired out to all sorts of

21   people at Alex's direction?

22       A.   I listened to my attorney when he brought in checks

23   and I did what he asked me, yes.

24       Q.   You say that Alex is your attorney?

25       A.   Yes.

1    Q.    Alex represents the personal injury clients.

2    A.    That's right, but once I'm conservator or PR, I take

3    the place of the personal injury client.

4    Q.    You have a separate duty to manage their money,

5    correct?

6    A.    Correct.  But I am in the stead of personal injury

7    clients, so he becomes my attorney.

8    Q.    Okay.  Let's move on to Hakeem Pinckney and Natasha

9    Thomas.  So they were both involved in an, again, a very

10   serious car accident.  Hakeem Pinckney later dies.  Natasha

11   Thomas is severely injured as a result of that accident.  And

12   they both receive millions of dollars following the

13   settlement in civil claims; is that correct?

14   A.    Yes.

15   Q.    And you were appointed to serve as their

16   conservator?

17   A.    That's correct, yes.

18   Q.    How many times did you meet Hakeem Pinckney and

19   Natasha Thomas?

20   A.    I don't recall.

21   Q.    Did you ever meet Hakeem Pinckney?

22   A.    I don't think I ever met Hakeem Pinckney.

23   Q.    Did you ever meet Natasha Thomas?

24   A.    I'm sure I did in court.

25   Q.    In court you think you met her?

1      A.   I would think.

2      Q.   And you collected $60,000 for managing -- for what

3   was supposed to be managing Hakeem Pinckney's money, but you

4   never met him?

5      A.   No.

6      Q.   And you received $15,000 for Natasha Thomas, but you

7   never met her; maybe in court?

8      A.   That's correct.

9      Q.   And you never managed any money for them, did you?

10     A.   Never.

11     Q.   All right.  Let's talk about their disbursements

12  sheets.  We will start with Hakeem Pinckney's disbursements

13  sheets.  You signed that disbursement sheet, correct?

14     A.   I did.

15     Q.   According to that disbursement sheet, you were to

16  receive $60,000 in a conservator fee?

17     A.   Yes, ma'am.

18     Q.   And also according to that disbursement sheet, you

19  were to receive as their conservator and an official of

20  Palmetto State Bank $309,581.46; is that correct?

21     A.   I agree with that, yes, ma'am.

22     Q.   Let's talk about Natasha Thomas's disbursement

23  sheet.  You were going to get a $15,000 conservator fee.  And

24  then you were, as an excessive of Palmetto State Bank and

25  Natasha Thomas's conservator, to get a check for $325,000?

1      A.   Yes, ma'am.

2      Q.   Did you receive those checks?

3      A.   I did not.  I-- well, sort of, but no.

4      Q.   You received those checks, but you just did not

5  manage them for the benefit of Natasha Thomas or Hakeem

6  Pinckney like you were supposed to do, correct?

7      A.   No, I didn't.  I listened to my attorney, and he

8  said do this, this, and this with these checks.  I didn't

9  know what these checks were for, because they were not made

10  by Palmetto State Bank versus being made out to Russell

11  Laffitte as conservator, which is how they should have been.

12      Q.   But the memo line of those checks referenced Hakeem

13  Pinckney and Natasha Thomas, correct?

14      A.   Correct.

15      Q.   And you had a duty to manage the money that you were

16  supposed to receive per these signed disbursement sheets?

17      A.   That's correct.

18      Q.   What did you think had happened with the 325 and

19  309?

20      A.   I had no idea.  That's why I turned in the zero on

21  all annual accountings to the probate judge.

22      Q.   So you signed a disbursement sheet saying that you

23  were supposed to get over 300,000 for each of these

24  individuals?

25      A.   That's correct.

1    Q.   And you never asked any questions about where this

2    money was?

3    A.   I didn't know what happened.  I knew we had never

4    received the funds, so --

5    Q.   But coincidentally, you received checks matching

6    these exact amounts?

7    A.   Yes.

8    Q.   And you negotiated those checks again at Alex's

9    direction?

10   A.   That's correct.

11   Q.   Let's just go over how some of these funds were

12   spent.  $10,000 to Alex E. Murdaugh, correct?

13   A.   Yes.

14   Q.   $9,500 money order?

15   A.   Yes, ma'am.

16   Q.   $920 principal payment to loan for Murdaugh

17   Charters.  What is Murdaugh Charters?

18   A.   I assume it's his boat.

19   Q.   $3,137 interest payment again to Murdaugh Charters;

20   is that correct?

21   A.   That's right.

22   Q.   $100,000 money order to Charlie Laffitte.  Charlie

23   is your father; is that correct?

24   A.   That's correct.

25   Q.   And he is, as you testified, the chairman of the

1    board.  What do you know about this $100,000 money order from

2    December 2011?

3         A.   My father had loaned -- personally loaned Alex the

4    money and he was paying him back.

5         Q.   Why did your father, as chairman of the board of a

6    bank where Alex has millions of dollars in loans outstanding

7    have to give him a personal loan?

8         A.   I don't think he had to give him a personal loan.

9         Q.   Why did he give him a personal loan?

10        A.   You'd have to ask him.

11        Q.   So you do not -- you're testifying you do not know

12   why your father extended $100,000 personal loan to Alex

13   Murdaugh?

14        A.   I assume he wanted to help him.

15        Q.   Why did Alex need help?

16        A.   He was probably overdrawn.  I have no idea.  You'd

17   have to ask --

18        Q.   That's correct.  So months before you extended loans

19   from the Plyler account, Alex was in overdraft, right?

20        A.   Alex was in overdraft regularly.

21        Q.   All the time.

22        A.   Right.

23        Q.   And at that point, your father decided to extend him

24   $100,000 to cover his overdraft, personal loan?

25        A.   No, ma'am.

1      Q.    No that's not what happened?

2      A.    No, ma'am.

3      Q.    So what happened?

4      A.    He loaned him 125,000.  And you'd have to ask him

5  why he did it.

6      Q.    But you said that Alex was in overdraft at the time?

7      A.    I'm saying that I would assume that he might have

8  been.  I don't know.  I'd have to see the accounts at that

9  time.

10      Q.    Okay.  So that really is what sets up these loans

11  from the Plyler account, because Charlie Laffitte can't

12  bankroll Alex Murdaugh personally, but Hannah Plyler can; is

13  that correct?

14      A.    No, ma'am.

15      Q.    But you did allow Hannah Plyler to bankroll Alex

16  Murdaugh, correct?

17      A.    I allowed him to borrow money from the

18  conservatorship.

19      Q.    To pay off his overdraft?

20      A.    To do as he chose with his loans.

21      Q.    But you watched how he spent money, right?  You

22  watched the accounts?

23      A.    No.  I don't know what caused his overdraft.  You

24  know --

25      Q.    You never looked to see what he was spending money

1   on?

2       A.   I might have if it was something really frequently

3   or that I needed to know, but I didn't go through and pull up

4   his checks and see what he was spending money on all the

5   time.  You make it look like I looked at his accounts every

6   day.  I didn't do that.

7       Q.   But you just saw that he was thousands of dollars in

8   overdraft?

9       A.   That's correct.

10      Q.   The rest of the money from Hakeem Pinckney and

11  Natasha Thomas, $50,000 and some change, money order to you

12  as conservator for Plyler, that was, again, paid -- used to

13  pay off some of the Plyler loans; another $91,000 and some

14  change money order to you as conservator for Plyler to pay

15  off some of these loans; a $329,000 money order to Randolph

16  Murdaugh deposited in his personal account; is that correct?

17      A.   That's right.

18      Q.   And then a $40,000 money order payable to you as

19  Malik Williams's conservator, correct?

20      A.   That's correct.

21      Q.   Because you had extended loans from Malik Williams's

22  conservator account to Alex Murdaugh.  I want to talk about

23  the $25,000 settlement check that Natasha Thomas received

24  that you negotiated, correct?

25      A.   (Inaudible.)

1    Q.   So on August the 20th, 2012, you give out cash back

2  to an unknown person.  Who was that?

3    A.   I assume that it was Alex Murdaugh.

4    Q.   So Alex shows up with a $25,000 check, and you give

5  him $9,000 cash back?

6    A.   Where do you see it?  He must have asked for that.

7  Yes, ma'am.

8    Q.   Why would he -- why did you understand him to be

9  asking for $9,000?

10    A.   I didn't understand why he was asking for $9,000.

11    Q.   What happens when someone gets, say, $11,000 in cash

12  back?

13    A.   We would report it to -- I can't even remember what

14  it's called now.

15    Q.   It triggers reporting, correct?

16    A.   Yeah, triggers a report.

17    Q.   So when you structure payments under $10,000, it

18  avoids reporting requirements; is that correct?

19    A.   That's correct.

20    Q.   Commonly referred to as structuring.

21    A.   But if we think it's structuring, then we report it

22  also.

23    Q.   So on August 20th, 2012, you give Alex $9,000 from

24  the $25,000 check.  And then 9 days later, there's a money

25  order for $16,285.08.  What's that?

1      A.   Money order.

2      Q.   At Alex's direction?

3      A.   I would assume, yes, ma'am.

4      Q.   And then the following day, that 16,000 and some

5   change money order is then cashed out by an unknown person

6   again for $9,000.  Who was that?

7      A.   I assume it was Alex Murdaugh.

8      Q.   And the same day, there was a second money order

9   from the original 16,000 for 7,000 and some change, again for

10  Alex Murdaugh?

11     A.   Right.

12     Q.   So you assisted him in negotiating checks to avoid

13  reporting requirements?

14     A.   Not intentionally, no, ma'am.

15     Q.   But you are a bank excessive.

16     A.   Yes, ma'am.

17     Q.   You know your structuring laws.  You know your

18  reporting requirements, correct?

19     A.   I do know the reporting requirements, yes.

20     Q.   And you knew that by breaking this check up in that

21  way, you were avoiding reporting requirements; is that

22  correct?

23     A.   No, ma'am.  I did what he asked me.  You know, he

24  asked me to come in -- typically when Alex Murdaugh would

25  come in, it was always a big to-do.  Just would have to know

1   Alex.  You know, when he came in, he was always rushing and

2   say, look, I need this, and we would do it.

3       Q.   So you just didn't ask any questions?

4       A.   No, no, very rarely.

5       Q.   Let's talk about when you were appointed to become

6   conservator for Natasha Thomas.  Do you remember signing a

7   petition for the probate court to have you appointed?

8       A.   I don't remember signing it, but I'm sure I did.

9       Q.   If I showed you a document, would it maybe refresh

10  your recollection?

11      A.   I would assume that I signed it.  I had to sign it.

12      Q.   Do you remember signing a petition that stated that

13  Natasha Thomas was 15 years old?

14      A.   No.

15      Q.   Just review that quickly, specifically the first and

16  third pages.

17      A.   Could you give me my glasses, please?  What am I

18  looking at?

19      Q.   The first and the third pages, specifically you will

20  see where you stated what Natasha Thomas's age was.

21      A.   Natasha Thomas, age 15, date of birth 6/5/1997,

22  Social Security number --

23      Q.   Look on page 3, if you will, where you signed it in

24  two portions.

25      A.   Correct.  I signed it.

1    Q.    Okay.  All right.  Those two portions that you

2  signed, one is the verification portion that you swear that

3  the facts in this statement are true to the best of your

4  knowledge, information, and belief.  And that includes that

5  Natasha Thomas was 15 years old at the time?

6    A.    Yes.

7    Q.    And the second portion you signed is the

8  qualification and statement of acceptance under which you

9  agreed to perform the duties as the conservator for Natasha

10  Thomas?

11    A.    Correct.

12    Q.    At the time Natasha Thomas was actually 18 years

13  old, wasn't she?

14    A.    I don't know that.

15    Q.    Because you never met her?

16    A.    I'm not sure.  I think I probably met her in court.

17    Q.    You didn't know that she was 18 at the time that you

18  swore to the probate court the facts were accurate?

19    A.    I didn't -- I didn't type that up.  That was brought

20  and handed over to sign it, but, yes, I did sign it.

21    Q.    And you swore that she was 15 when, in fact, she was

22  18 years old?

23    A.    Yes, because I signed it.

24    Q.    And the significance of that misrepresentation to

25  the court is that had you been truthful about her age, you

1    would not have been appointed to serve as a conservator

2    because she was 18 years old?

3        A.    To the best of my knowledge, when I signed it, that

4    was correct.  I didn't fill it out.

5        Q.    Did you do anything to determine what her actual age

6    was as her conservator?

7        A.    My lawyer brought those forms over.  Said, hey, I

8    need you to be conservator.  And I went, looked at it.  He

9    said, this is what I need.  And I signed it.

10       Q.    You had a duty -- you owe a duty to Natasha Thomas,

11   not to Alex Murdaugh.  You owe a duty to Natasha Thomas?

12       A.    I do.

13       Q.    And you didn't do anything to determine, as you

14   swore, that she was actually 15 years old?

15       A.    I did not check her I.D.

16       Q.    And you did what Alex Murdaugh needed you to do so

17   that he could steal her money, and you collected fees to do

18   so?

19       A.    No, ma'am.

20       Q.    You collected fees, not even determining if she was

21   18?

22       A.    I didn't collect fees.  I did not in any way, shape,

23   or form do anything to assist Alex Murdaugh to steal from

24   her.

25       Q.    You swore to the Court that she was 15 when she was

1    really 18.

2        A.    I did not know she was 18.

3        Q.    You swore to the Court.

4        A.    I did.  I am not arguing that fact.

5            MR. DANIEL:  Your Honor, I object.  She's asked it

6    four times and he's given the same answer each time.

7            THE COURT:  I will agree.  Move on, Counselor.

8            MS. LIMEHOUSE:  Thank you, Your Honor.

9    BY MS. LIMEHOUSE:

10       Q.    Had you not lied to the Court for Alex Murdaugh, he

11   would not have been able to steal the money because you would

12   not be the conservator?

13       A.    He would not have been able to steal it.  I will

14   agree with that.  But I did not do it intentionally.  I did

15   not know.

16       Q.    All right.  Let's talk about the summer of 2021.

17   Okay?

18       A.    All right.

19       Q.    All right.  So June of 2021, what is Alex's

20   financial picture with Palmetto State Bank?

21       A.    He's got his loans.  That's all I remember.

22       Q.    How much?

23       A.    I don't know.

24       Q.    What's happening with that?

25       A.    Over a million dollars.  I'm trying to think what --

1    I don't know exactly the financial picture in June of 2021.

2        Q.    Safe to say, millions of dollars in loans from

3    Palmetto State Bank?

4        A.    That's correct.

5        Q.    What was happening with that line of credit that was

6    initially $500,000?  What happened to that line of credit?

7        A.    It was increased to a million dollars at some point

8    later on.

9        Q.    So he still owed money, substantial amount of money

10   on that initial line of credit?

11       A.    Yes, ma'am.

12       Q.    How about his personal accounts?

13       A.    He was overdrawn, I believe.

14       Q.    By how much?

15       A.    I don't recall, but it was a lot, because he was

16   supposedly working on his house in Edisto.

17       Q.    A lot to me can be $50 on an overdraft.  What is a

18   lot to you on an Alex Murdaugh overdraft?

19       A.    This is hundreds of thousands.

20       Q.    Hundreds of thousands of dollars in overdraft, okay,

21   in summer of 2021.  Alex's wife and son were murdered,

22   correct?

23       A.    That's correct.

24       Q.    And Alex comes to you desperate for money?

25       A.    I'm not sure if he came to me or my father, but he

1    came to us.  He came to Palmetto State Bank.

2        Q.    Desperate for money?

3        A.    I don't think he was desperate, no.

4        Q.    How would you describe him?

5        A.    He came, told me he was working on his house.  When

6    I talked to him, I just don't know who the initial

7    conversation was.  It was either my father or myself.  But he

8    said he was working on his house, because we had been calling

9    him about his overdrafts.

10        Q.    You and your father had both been contacting him

11    about his substantial overdrafts?

12        A.    I'm not sure if my father contacted him, but I

13    definitely contacted him.

14        Q.    You had definitely contacted him about this more

15    than $100,000 in overdraft?

16        A.    Yes.

17        Q.    And he tells you he's in desperate need of cash?

18        A.    No, ma'am.

19        Q.    What does he tell you?

20        A.    Tells me he's working on his house and wants to know

21    if we can do a loan.  He said he needed $750,000 for

22    something.  Actually, I think he started out at 500, and then

23    he changed it to 750.  But, regardless, it ended up being a

24    $750,000 loan.  And we started working on that.

25        Q.    Okay.  So a man whose wife and son were just

1   brutally murdered, who is hundreds of thousands of dollars in

2   overdraft, owing the bank millions of dollars, comes to you

3   for cash to fix up his house?

4       A.   He was -- to my knowledge, it was already a work in

5   progress prior to the murders.  I don't -- can't say that

6   that timeline is perfect, but --

7       Q.   So it's a priority of Alex Murdaugh to renovate the

8   beach house under these circumstances?

9       A.   I don't know what his priorities were.

10      Q.   Enough for you and your father to decide to loan him

11  money from Palmetto State Bank?

12      A.   Yes, ma'am.

13      Q.   All right.  Let's talk about July the 15th, $350,000

14  rider transfer.  Tell me about that.

15      A.   Alex called or came by and asked me to wire Chris

16  Wilson Law Firm $350,000.

17      Q.   And this is before or after he's told you that he

18  needs money for his beach house?

19      A.   This is after.  We were already well working towards

20  the loan.

21      Q.   So what does $350,000 to Chris Wilson have to do

22  with renovating a beach house?

23      A.   I have no idea.

24      Q.   I mean, you're -- the bank's money, you were the CEO

25  of the Palmetto State Bank, and you are not going ask why

1    this money is going to Chris Wilson?

2         A.    No, ma'am.

3         Q.    You are just going to give it to Alex, $350,000?

4         A.    No, ma'am.  I had given Alex $750,000.  And he asked

5    to send 350 to Wilson Law Firm, which is his right because it

6    is to be his money, so I sent it to him.

7         Q.    It is the bank's money, correct?  It is Palmetto

8    State Bank's money?

9         A.    Once he signs the loans, which he had not at that

10   time, but once he signs the loan documents, it is his money.

11        Q.    He had not signed the loan documents and he doesn't

12   for six weeks later, correct?

13        A.    That is correct.

14        Q.    And you don't ask any questions about this $350,000?

15        A.    No, ma'am.

16        Q.    When he's hundreds of thousands of dollars in

17   overdraft, you just wire the money to Chris Wilson Law Group?

18        A.    Uh-huh.

19        Q.    All right.  So the next thing that happens after

20   this 350 wire transfer is that Alex continues to accrue

21   hundreds of thousands of dollars in overdraft?

22        A.    Correct.

23        Q.    And bank employees come to you every day with that

24   report saying Alex is more and more in overdraft, more and

25   more in overdraft?

1      A.   They didn't come to me every day.  The report is

2  there and I see it every day.

3      Q.   And where is this money going?

4      A.   I would have to go look, but a lot of it went to

5  Eddie Smith.

6      Q.   Did you ever ask any questions?

7      A.   Yes.

8      Q.   To whom?

9      A.   Well, my father and I discussed it.  And we assumed

10  that Eddie Smith, being that it was an once-a-week check, was

11  his contractor.  Because he also said, hey, I'm working on my

12  beach house, remodeling.  So, typically, contractors get paid

13  weekly.  And so -- but after a while, you know, we kept

14  saying -- my father asked me to call Reid Pollard, the CEO of

15  Enterprise Bank.  I called Mr. Pollard and said:  Reid, this

16  is Russell Laffitte.  We have a customer of ours that's

17  depositing checks -- writing checks that are being deposited

18  at your bank.  Who is Eddie Smith?  He didn't know who it

19  was.

20      Q.   Did you ever ask Alex who Eddie Smith was?

21      A.   No.

22      Q.   But you continued to allow him to accrue hundreds of

23  thousands of dollars in overdraft by writing checks to Eddie

24  Smith and never asked him a question?

25      A.   That's correct.

74

1      Q.    So while he's now over 350 grand in overdraft --

2      A.    Correct.

3      Q.    -- August 9th comes.  What happens on August the

4   9th?

5            MR. DANIEL:  What happened when?

6      Q.    August the 9th?

7      A.    I have no idea.

8      Q.    The board starts asking questions, don't they?

9      A.    I really don't know.  I don't know what August the

10  9th was.

11     Q.    On August the 9th, you received an e-mail from

12  Norris Laffitte, who is a member of the Palmetto State Bank

13  Board, correct?

14     A.    That's correct.

15     Q.    And he wants to see a full financial picture of the

16  bank's exposure regarding Alex Murdaugh?

17     A.    Yes, ma'am.

18     Q.    And that's because of all of the press coverage

19  that's covering all this stuff that's going on with Alex

20  Murdaugh, correct?

21     A.    That's correct.

22     Q.    Within hours, you access Alex's account, right?

23     A.    Yes.

24     Q.    And what --

25     A.    Some of our internal investigators did, yes.

1     Q.    And what do you see?

2     A.    What do you mean, what did I see?

3     Q.    You see that Alex is more than $350,000 in overdraft

4  within hours of the board asking what the full financial

5  picture looks like?

6     A.    That's correct.

7     Q.    And what do you do at that point?

8     A.    Transfer the balance that is owed on his loan.

9     Q.    You transfer $400,000 to cover the entirety of that

10  overdraft?

11     A.    Yes, ma'am, because that is what the laws permit me

12  to do.

13     Q.    At that point there's not a single signed loan

14  document acknowledging this $750,000 loan?

15     A.    That's correct.

16     Q.    There's not a single record within the bank when you

17  wire that $400,000 memorializing this agreement that you had

18  with Alex to extend $750,000?

19     A.    There's no signed documents, no signed loan

20  documents.  I mean, in community banking, that is not --

21  maybe on a scale of that size, that's unusual.  But to

22  advance funds prior to getting loans signed is not

23  necessarily uncommon.

24     Q.    Were there any records that show that you had

25  decided to loan him $750,000 prior to August the 9th, any

1    records?

2         A.   I'm sure there were some e-mails and maybe

3    handwritten notes or something, but I did not sign the loan.

4    I could not loan Alex Murdaugh money alone.

5         Q.   We will talk about the decision in just a minute.

6              MR. DANIEL:   Talk about what?  I'm sorry.

7              MS. LIMEHOUSE:   The decision and who made it in just

8    a minute.

9    BY MS. LIMEHOUSE:

10        Q.   After you access this account and wire the $400,000,

11   you then direct bank employees to start to create a record of

12   a $750,000 loan to Alex Murdaugh, correct?

13        A.   I told them to get the documents and let's get it

14   signed.

15        Q.   And you direct them to backdate those documents?

16        A.   Backdated it to the date of the $350,000 advance,

17   yes, ma'am.

18        Q.   You direct them to backdate it to July the 15th to

19   that 350 wire to Chris Wilson?

20        A.   That's correct.

21        Q.   And you had them start creating the paperwork to

22   memorialize this loan to Alex Murdaugh?

23        A.   That's correct.

24        Q.   What was the type of loan that was extended,

25   according to the documents?

1      A.   I'm sure it's commercial loan.

2      Q.   Why would it be commercial if it's to renovate his

3   beach house?

4      A.   Regulatory burden, but I don't know that it's a

5   commercial loan, because it was going to be -- originally, it

6   was going to be a second mortgage on his beach house and a

7   share of Green Swamp to collateralize it.  Kevin Brown, an

8   attorney, a real estate attorney in Hampton, did the -- when

9   we got ready to go to closing, and found out that the house

10  was in his and Maggie's name.  So he could not mortgage,

11  because Maggie's estate had not been opened.  And so at that

12  point, we decided to do it with share of Green Swamp stock,

13  and the balance unsecured, the rest unsecured until we could

14  get that secured.

15     Q.   So the $750,000 loan was secured only by Alex's

16  shares at Green Swamp, which is a hunting property, correct?

17     A.   Correct.

18     Q.   And was the share already used as collateral in any

19  bank loans that Alex had?

20     A.   Yes.

21     Q.   How many?

22     A.   I don't know.  Several.

23     Q.   Several loans?

24     A.   Uh-huh.

25     Q.   What was the value you would guess, estimate, you

1    were using of the one share of Green Swamp?

2        A.    Probably between 200- and $250,000.

3        Q.    So this one share of Green Swamp was now

4    cross-collateralized with multiple loans at the bank?

5        A.    Correct.

6        Q.    And was the only security for the $750,000 loan?

7        A.    Correct.

8        Q.    It was essentially an unsecured loan?

9        A.    Sure.

10       Q.    You essentially decided to bankroll Alex Murdaugh

11   yet again?

12             MR. DANIEL:  Bankroll?

13             MS. LIMEHOUSE:  Alex Murdaugh yet again?

14             THE WITNESS:  It was not -- I could not loan --

15       Q.    Okay.  Let's talk about bank policy at the time

16   then.  You were a member not only of the board but the

17   executive committee, correct?

18       A.    That's correct.

19       Q.    And the executive committee is five members,

20   correct?

21       A.    That's correct.

22       Q.    Four voting members?

23       A.    Correct.

24       Q.    And the duties of the executive committee are to

25   manage large loans from the bank to decide whether to extend

1    those loans.  And those members were you, your father,

2    Charlie Laffitte, your sister, Gray Henderson, Scott Swain,

3    who was a nonvoting member, correct, and Jan Malinowski who

4    was a voting member?

5         A.    That's correct.

6         Q.    And board -- or excuse me, policy at the bank at the

7    time allowed for the approval of a loan of three of those

8    voting members?

9         A.    Had to be majority.

10        Q.    Majority, correct?

11        A.    That's correct.

12        Q.    And so you and your dad and your sister could always

13   be a majority on the executive committee, correct?

14        A.    Yes, if we all agreed.

15        Q.    Okay.  So prior to the July 15th 350 wire transfer,

16   there had been concerns about you and your sister and your

17   dad not bringing loans to the full executive committee,

18   correct?

19        A.    That's correct.

20        Q.    And prior to the 350 wire transfer, the executive

21   committee had decided you were no longer going to be the

22   three of y'all voting to extend a loan and not presenting it

23   to the executive committee, correct?

24        A.    I don't know.

25        Q.    Prior to the July 15th transfer, your father brought

1    numerous loans that y'all had approved without putting it

2    before the full executive committee and notified them of that

3    information, correct?

4        A.    We knew that we had a breakdown in our -- the way we

5    were dealing with loans approved.

6        Q.    So y'all knew that the executive committee had

7    specific concerns about you and your father and your sister

8    approving loans without the full committee's knowledge?

9        A.    No.  I think they were worried about how it was

10   being reported.  So we started -- we were working through

11   some changes.  We were trying different things, trying to

12   make it work, make sure everybody was notified.  So that is

13   what we were working through.  And there was an issue that we

14   had internally as a bank trying to go through it.

15       Q.    So in July when this wire transfer goes out, the

16   executive committee met that month, right?

17       A.    Yes.

18       Q.    There's no mention from you or your father or your

19   sister of this 350 wire transfer to Alex Murdaugh?

20       A.    I don't believe it went to the executive committee

21   at that time.

22       Q.    There's no mention of a $750,000 loan to Alex

23   Murdaugh during the executive committee meeting?

24       A.    I assume that is correct.

25       Q.    So the only people who know about this loan

1    according to your testimony at the time were you and your

2    sister and your Dad?

3         A.   That's correct.

4         Q.   Despite y'all having internal issues with loans not

5    being presented to the full executive committee?

6         A.   Yes.

7         Q.   The executive committee again meets in August,

8    correct?

9         A.   That's correct.

10        Q.   That was August the 12th, 2021; is that right?  So

11   that's three days after you wire $400,000, and three days

12   after you directed bank employees to start to create

13   documents to memorialized the $750,000 loan to Alex Murdaugh,

14   correct?

15        A.   Yes.

16        Q.   And what do you tell the executive committee at that

17   time about this loan?

18        A.   I have no idea.

19        Q.   Did you tell them about the $350,000 wire transfer?

20        A.   I'm sure I told them about the $750,000 loan, what

21   he was doing and what he was wanting the money for, yes,

22   ma'am.

23        Q.   Did you tell him that the $350,000 went to the Chris

24   Wilson Law Group?

25        A.   No.  That would have been a detail that wouldn't

1    have crossed my mind.

2        Q.   The purpose of the loan, the purpose of the loan,

3    you didn't share them -- share with them the purpose, how

4    that money was actually used?

5        A.   I don't know what he and Chris Wilson were doing.

6        Q.   Alex comes to you in need of money.  It's the bank's

7    money.  You have a right to know the purpose for that use of

8    those funds, correct?

9        A.   If I asked him, yes.  He told me -- but I did.  He

10   had already said he was doing some work on his house and

11   doing other things, you know.  Alex would always give some

12   story.  And so then we advance the funds as our customer

13   requests.

14       Q.   But you didn't tell anything about this 350 wire

15   transfer to the executive committee?  Did you tell them

16   anything about you transferring $400,000 after receiving an

17   e-mail from Norris Laffitte?

18       A.   I don't remember whether I did that afterwards.  I

19   know by the dates and times of the e-mail and things.  I just

20   don't know when I had actually read the e-mail or what.  But

21   I do know that it happened that same day or within hours.

22       Q.   But did you discuss the specific use of the funds

23   with the executive committee?

24       A.   We discussed in very high level.  We don't -- I

25   mean, we wouldn't say, hey, y'all, I wrote a money order

1    today to John Doe for whatever.  I mean, we wouldn't do that.

2    We'd just say, hey, we are doing this loan for such-and-such

3    and this is what it is and this is why we are doing it.

4         Q.   Did you discuss the collateral?

5         A.   Yes.

6         Q.   What did you tell them about the collateral in the

7    August executive committee meeting?

8         A.   I'm sure that I told them that we were using share

9    of Green Swamp stock.  I'm sure I told them that we were

10   trying to get the second mortgage on the house.  I just don't

11   know exactly when we found out that they weren't going to be

12   able to get a second.

13        Q.   So the board has a meeting scheduled then for August

14   17th; is that correct?

15        A.   13th, or whatever that is.

16        Q.   And at this point there are still no documents

17   signed to memorialize the $750,000 loan, correct?

18        A.   I am not going to argue.  I'm not sure.

19        Q.   So at this point, August the 17th, you are tasked

20   with creating a full financial picture of the bank's exposure

21   with relation to Alex Murdaugh for the board?

22        A.   Yes.

23        Q.   And what do you tell them about the $750,000 loan?

24        A.   I don't have any idea what I told them.

25        Q.   Did you tell them about the collateral or lack of

84

1   collateral?

2       A.   I'm sure I did.

3       Q.   Did you tell them about the 350 wire to Chris

4   Wilson?

5       A.   No.

6       Q.   Did you tell them at the time he was hundreds of

7   thousands of dollars in overdraft?

8       A.   I'm sure they knew.

9       Q.   How do you think they knew?

10      A.   Jan Malinowski, who is -- they discussed it.  I'm

11  sure they did.

12      Q.   Did you tell them about the $400,000 that you

13  transferred to cover the 362 in overdraft?

14      A.   No.  We would have told them that there was a

15  $750,000 loan.

16      Q.   During that board meeting on August the 17th, did

17  board members ask questions about the specifics of this loan

18  to Alex Murdaugh?

19      A.   I don't remember the specifics of the board meeting?

20      Q.   Did anybody ask that you pull up the documents

21  memorializing this loan during that board meeting?

22      A.   I don't recall.

23      Q.   Were you able to show them any documents?

24      A.   I couldn't have if I hadn't had any signed --

25      Q.   Right, because there was nothing to memorize this

1    loan at that point, right?  It had not been finalized?

2         A.   I disagree with that.

3         Q.   But the money had all been advanced; is that

4    correct?

5         A.   That's correct.

6         Q.   You provided ultimate report to the board that

7    includes all of Murdaugh's liabilities to the bank, correct?

8         A.   No.

9         Q.   Who provides that?

10        A.   That list was provided by Charles Laffitte and it

11   was drawn up with Morgan -- I can't remember Morgan's last

12   name.

13        Q.   Wood?

14        A.   No.

15        Q.   Peeples?

16        A.   Peeples.

17        Q.   All right.  So in September, isn't it true that the

18   board is still asking questions about this loan?  They still

19   don't know the specifics about this loan; is that right?

20        A.   They were asking a lot of questions not just about

21   that, about everything.

22        Q.   Because they have a right to know how the bank's

23   money is being spent; isn't that right?

24        A.   They do have a right, yes.

25        Q.   And you have a duty to tell them how the bank's

1    money is being spent?

2        A.    Correct.

3        Q.    And you had a duty to accurately report facts about

4    the bank's money to the board?

5        A.    We tried to do that, yes.

6        Q.    Tried?  You had a duty as the CEO to be truthful to

7    the board; is that correct?

8        A.    When was I not truthful?

9        Q.    Well, on September the 2nd, Norris Laffitte sends

10   another e-mail asking about specifics related to the 750

11   loan, because he still doesn't know what this loan is about.

12   And he specifically asks you about the collateral.  He says,

13   I now notice that the $750,000 loan has only the Green

14   Swamp's share as collateral which does not cover the loan

15   especially if the share has been pledged elsewhere.  Has it

16   been pledged elsewhere?  And what's your response?

17       A.    I don't know.

18       Q.    You said the stock has not been pledged elsewhere.

19   That was not true?

20       A.    I was wrong.

21       Q.    That was not true, correct?

22       A.    Well, I was wrong, yes.

23       Q.    Because it had been?  It had been --

24       A.    Yes.

25       Q.    -- used as collateral on multiple loans from Alex

1    Murdaugh?

2        A.    We used his share many, many times over the years.

3        Q.    But the board is asking questions and you do not

4    give them truthful answers about the nature of the collateral

5    that's supposed to secure this 750 loan?

6        A.    I guess in that instance, no, I did not.  But I did

7    not intentionally.

8        Q.    You knew that Green Swamp was cross-collateralized

9    with multiple other loans, didn't you?

10       A.    I knew that he had used that Green Swamp share many

11   times.  I did not go back and verify that each of the loans

12   that it was used had been paid off or had been released or

13   whatever.

14       Q.    The stock has not been pledged elsewhere is what you

15   specifically stated.  You knew that that was not true?

16       A.    I guess.

17       Q.    Because you were the loan officer for all of Alex's

18   loans.  You approved Alex's loans?

19       A.    Yes.

20       Q.    So with this $750,000, the board, as of September,

21   never knew the true nature of the collateral securing this

22   loan, correct?  Because you told them it hadn't been pledged

23   elsewhere, correct?

24       A.    We had -- they knew the collateral for the loan was

25   a share of Green Swamp stock, which it was.

1   Q.   The true nature of that collateral, that it had been

2   pledged elsewhere?

3   A.   I'm not sure.

4   Q.   You never told the board that you wired $350,000 to

5   the Chris Wilson Law Group as part of this commercial loan to

6   Alex?  You never told the board that, did you?

7        MR. DANIEL:  Your Honor, I object only because that

8   was asked 25 or 35 minutes ago, very same question, what did

9   you wire to Chris Wilson, very same question.

10       THE COURT:  Okay.  And, Counselor, I didn't recall

11  the question.  If she's repeated it, I will let that slide.

12       MS. LIMEHOUSE:  I was asking about the reporting to

13  the executive committee.  And now I'm asking about the

14  reporting to the board specifically.

15       THE COURT:  Thank you for that clarification.

16  BY MS. LIMEHOUSE:

17  Q.   You didn't mention to the board of the status of the

18  overdraft, ever?

19  A.   I don't recall.  No, I don't think I did, but I

20  don't recall.

21  Q.   You never told the board that the hundreds of

22  thousands of dollars in overdraft were going to Eddie Smith?

23  A.   No, ma'am.

24  Q.   Did you tell the board that you had backdated all of

25  the loan documents to reflect the 350 wire transfer?

1     A.    No, ma'am.

2     Q.    And did you ever tell the board that you wired

3  $400,000 within hours of receiving Norris Laffitte's e-mail

4  asking about the full financial picture?

5     A.    I never wired the money.  I just transferred it.

6     Q.    Did you ever tell the board that you transferred

7  $400,000 as part of this loan within hours of receiving

8  Norris Laffitte's e-mail?

9     A.    As I stated earlier, I don't know anything about the

10  e-mail or when I read it or not.  I don't know whether I was

11  told to go ahead and cover it.  You know, my father, my

12  sister and I, we discussed what was going on in detail all

13  the time.  It wasn't like one person's doing something.  I

14  did not tell the board that, though.  But, I mean, I wouldn't

15  have -- if I did it, which it looks like I did, but I

16  wouldn't have -- I mean, we funded the loan.

17     Q.    Did your father know that $350,000 went to Chris

18  Wilson?

19     A.    Yes, ma'am.

20     Q.    Did your father know that you transferred $400,000

21  into Murdaugh's account to cover over $350,000 in overdraft?

22     A.    I'm sure he did.

23     Q.    Why do you say that?

24     A.    Because we would have discussed it.

25     Q.    Did your father know the purpose, how this money was

1    being spent?

2         A.   Yes, ma'am.

3         Q.   All right.  I want to talk about the $680,000

4    payment to the firm PMPED.  So we all know what happened in

5    September of 2021 with Alex Murdaugh, right?

6         A.   Yes, ma'am.

7         Q.   What happens internally with the bank at that point,

8    anything?

9         A.   There were all kinds of things going on.  We were

10   being sued and every other thing.

11        Q.   In October of 2021, the law firm comes to you and

12   asks questions about the Badger money, right?

13        A.   That's correct.

14        Q.   And they show you all these checks that you

15   negotiated that referenced the estate of Donna Badger?

16        A.   Yes.

17        Q.   Asking you where this money went?

18        A.   That's right.  They asked me to do some research.

19        Q.   Asked you to do some research?

20        A.   Yes.

21        Q.   At that point, you went to the law firm and you

22   agreed to pay $680,000?

23        A.   I took the research to the law firm.  And lawyers

24   discussed it.  I don't remember how long we discussed it for.

25   You know, we met several times.  We knew we had a problem,

1    yes.

2        Q.   And at that point, you decided on your own to write

3    a check for $680,000 to the law firm to cover half of the

4    loss to the Badger estate?

5        A.   Absolutely not.

6        Q.   So tell me who was with you in making that decision.

7             MR. DANIEL:  Can you repeat that question?

8    BY MS. LIMEHOUSE:

9        Q.   Tell me who made that decision with you if you did

10   not unilaterally decide to do that.

11       A.   Myself, my father, and my sister.

12       Q.   You all agreed to pay the law firm $680,000?

13       A.   That's correct.

14       Q.   Did they know that you had negotiated every single

15   one of the checks?

16       A.   Yes, ma'am.

17       Q.   Did they know that every single one of these checks

18   referenced the estate of Donna Badger?

19       A.   You'd have to ask them that.

20       Q.   Did you tell them?

21       A.   I gave them copies of the checks.

22       Q.   So you told them that you negotiated every single

23   one of these checks?

24       A.   I never did not say I didn't negotiate --

25       Q.   But did you tell them that you were the one who

1    negotiated every single one of these checks of stolen money

2    from Alex Murdaugh?

3    A.    I don't recall.  I'm sure, without a doubt, that I

4    told them, but you would have to ask them that.

5    Q.    So according to your testimony, the three of y'all

6    decided to pay the law firm $680,000?

7    A.    That's correct.

8    Q.    Did you notify the board before you paid the 680?

9    A.    No, ma'am.

10   Q.    Why not?

11   A.    We didn't need to.

12   Q.    Why not?

13   A.    Bylaws, we had the authority to settle and operate

14   the bank.  We thought it was in the best interest of the

15   bank.

16   Q.    Tell me what those bylaws are that you claim allowed

17   you and your Dad and your sister to decide to extend bank

18   money without board notice or approval?

19   A.    The bank's bylaws to the executive committee, which

20   the three of us would have the majority of the votes, allow

21   us to try to settle any kind of claims, operate the business,

22   spend any money, purchase land, purchase, sell, to operate

23   the business.

24   Q.    So the bylaws allowed a majority of the executive

25   committee to decide to spend bank funds in this way without

1    notice or approval from the board?

2        A.    Yes, ma'am.

3        Q.    Okay.  So you and your Dad and your sister decided

4    to pay $680,000 of bank money to the firm?

5        A.    We did.  We thought that was the best thing.

6        Q.    And after you did that, did you then give both the

7    executive committee and the board notice of this?

8        A.    No, I wouldn't have given to exec -- I would have

9    sent it to the board, which would have included it in there.

10   I may have sent it to everybody.  I'm not sure.  But I

11   did send -- we did send it to the board.

12       Q.    And in your notice to the board, you stated, "We

13   converted $1,172,945.76 in checks made payable to PSB to

14   numerous other places as part of another stolen case

15   settlement?"

16       A.    Right.

17       Q.    When you say "we", did you ever tell the bank that

18   you were the one who personally converted all of those checks

19   at Alex Murdaugh's direction?

20       A.    I'm sure I did.  We, as Palmetto State Bank.

21       Q.    You are saying you did tell the board that you were

22   the one --

23       A.    I'm sure I did.  I mean, I've never not -- first

24   time when I send it out, when I send out the documents, it

25   shows where all the funds went.  So, yes, they were aware of

1    it.

2        Q.    Did you ever tell them that you were the one who

3    served as personal representative for the estate whose funds

4    were stolen?

5        A.    I don't recall.  I don't know.  I'm sure I did.  I

6    have no idea.

7        Q.    You don't know whether you told the bank whether you

8    served as personal representative?

9        A.    I told them I served as personal representative

10   numerous times.  I don't know what I told them the first

11   time, when I notified.  I have no idea.

12       Q.    So you are not sure whether you told the bank that

13   you were the one who negotiated these checks as PR to the

14   estate of Donna Badger?

15       A.    I told them -- I did not negotiate them as PR for

16   Donna Badger.  I was PR.  Keep that in mind.  I negotiated

17   those checks as an employee of the Palmetto State Bank.  That

18   there is the "we", Palmetto State Bank.

19       Q.    But you personally were the one who negotiated the

20   checks?

21       A.    Yes, I did.

22       Q.    Earlier you testified that you said that Hannah

23   Plyler was always paid back.  That's not true, right?

24       A.    She was paid back all of her money.

25       Q.    You extended multiple loans to Alex Murdaugh that

1   were never paid back to Hannah Plyler, never?

2        A.   I beg to differ.  I would love to see it.

3        Q.   You extended an $8,000 loan to Hannah Plyler.  The

4   records were not with the probate court.  And Hannah was

5   never paid back?

6        A.   She was.

7        Q.   With whose money?

8        A.   His money.

9        Q.   His money?

10       A.   His money.

11            MS. LIMEHOUSE:  The Court's indulgence, Your Honor.

12   BY MS. LIMEHOUSE:

13       Q.   Mr. Laffitte, you are personally employed by the

14   Laffitte Family Partnership, is that correct?

15       A.   That's correct.

16       Q.   And at least you stated to the Probation Office that

17   you expect to earn $230,000 this year; is that correct?

18       A.   No, ma'am.

19       Q.   You did not tell the Probation Office that you

20   expect to make $230,000 this year?

21       A.   No.  They passed what I was making as an employee of

22   the Laffitte Family Partnership as over $7,000 a month.  If I

23   made 230, that might be including dividends.  We don't know

24   exactly where that 230 came from.

25       Q.   Okay.  So you, prior to your termination -- you were

1    terminated from the bank, correct?

2        A.    Yes.

3        Q.    Prior to your termination, what was your yearly

4    salary?

5        A.    I believe it was 238, somewhere right in there.

6        Q.    All right.  So what is your total asset access

7    regarding your stocks at Palmetto State Bank?

8        A.    Probably 6 million, something like that.

9        Q.    Six million dollars in stock?

10       A.    Yes.

11       Q.    And you are making seven grand a month now to farm

12   the property?

13       A.    Yes.

14       Q.    And what does that employment entail?

15       A.    I manage the timber because that's what we farm is

16   timber.  Working on ditches, working on equipment, running

17   equipment, whatever needs to be done.

18       Q.    And you are getting paid $7,000 to do that?

19       A.    Uh-huh.

20       Q.    I'm going to go back to this 230, because there

21   seems to be --

22            MR. DANIEL:   Go back to the where?

23            MS. LIMEHOUSE:   $230,000.

24   BY MS. LIMEHOUSE:

25       Q.    There seems to be some issue about that amount.  I'm

1     going to read from the pretrial services report.  Okay?

2               The defendant has been employed with the Laffitte

3     Family Partnership farm in Estill, South Carolina since July

4     1st of 2022.

5               You do the farming and timber maintenance.

6               The defendant has two part-time employees and

7     advised that the firm operates Monday through Friday from 8

8     a.m. to 6 a.m. and 8 a.m. to noon on Saturdays.  Laffitte

9     reported earning $7,000 monthly and expects to earn $230,000

10    annually.

11              MR. DANIEL:  I'm sorry, $230,000 what?

12              MS. LIMEHOUSE:  Annually.

13    BY MS. LIMEHOUSE:

14       Q.   You don't recall telling the Probation Office that

15    you were going to make $230,000 this year?

16       A.   If I made that, that's including -- assuming we get

17    dividends and any other things, yes.

18       Q.   Okay.  So your testimony is that --

19       A.   I testified that I make $7,000 from Laffitte Family

20    Partnership.

21       Q.   And then that you have additional income that you

22    expect to earn in dividends from your assets at the Palmetto

23    State Bank?

24       A.   I expect, but I'm not sure.

25       Q.   But you expect to earn about $230,000 in income this

1    year?

2         A.    I hope.  I doubt it.  I hope.

3              MS. LIMEHOUSE:  No further questions, Your Honor.

4              THE COURT:  All right.  Counselor, I will allow

5    redirect.  I just want to note for the record we've been

6    going about two hours.  And out of consideration for the

7    witness and our court reporters, depending on how much time

8    you think you may --

9              MR. DANIEL:  I think the argument will take some

10   time, not the questions.

11             THE COURT:  Well, if you think you can conclude your

12   questions fairly briefly, we will do that.  And then I will

13   take a break for anyone who needs one.  We will break after

14   this witness.

15             MR. DANIEL:  Yes, Your Honor.

16                      REDIRECT EXAMINATION

17   BY MR. DANIEL:

18        Q.    Now, Ms. Limehouse asked you about the executive

19   committee and the board.  Tell me about the executive

20   committee, were they familiar with Alex Murdaugh and his

21   financial dealings over the years?

22        A.    All the members of the executive committee had been

23   familiar with Alex Murdaugh.

24        Q.    They were familiar with his loan history?

25        A.    Yes.

99

Q.    That he had significant outstanding loans?

A.    That's correct.

Q.    And they were familiar with his overdrafts?

A.    Yes.

Q.    And they were also familiar, were they not, that the bank got paid back every single time?

A.    Yes.

Q.    Now, we mentioned -- Ms. Limehouse mentioned these overdrafts quite credulously, that you continued to loan Alex Murdaugh money.  He already had outstanding loans.  You already had overdrafts.  You continued to do it.  Did the state or federal bank regulators, did they regularly audit and examine the loan -- excuse me, the bank's records?

A.    Yes, sir, they did.

Q.    Did they ever raise the issue to you that you had too much outstanding to Alex Murdaugh or that you had too many overdrafts for Alex Murdaugh?

A.    I don't recall them -- they would have absolutely looked at them because he was one of our larger borrowers. They would have looked at the large borrowers and large people.  We had to turn over an overdraft list to them and all that.  So they would have looked at his financials.  I just don't recall them ever really coming down.

Q.    But they would have seen the same thing that your board saw?  He had always made good, right up until his

1    family got murdered?

2         A.   That's correct.

3         Q.   Now, Ms. Limehouse asked you about the loans for the

4    conservatorship.  I believe you testified that you had

5    written notes or written forms you called them in every case?

6         A.   I had them at some point.  I could not find all of

7    them.  I did not try to re-create or do anything after I

8    realized that I just --

9         Q.   But did you have them at the time?

10        A.   I would think so, yes.

11        Q.   Okay.  And did you file this information, the fact

12   that you were getting loan permission -- you sought

13   permission from the probate court for -- originally before

14   you loaned Alex Murdaugh any money or yourself any money out

15   of these?

16        A.   That's correct.

17        Q.   And all these loans that you made for the

18   conservatorship, that you took for the conservatorship, were

19   all fully secured by your bank stock?

20        A.   That's correct.

21        Q.   And did you file annual filing with the probate

22   court that included all these loans?

23        A.   I did.

24        Q.   Now, you mentioned that you got a loan from Johnnie

25   Parker to pay back -- Ms. Limehouse mentioned you never paid

1    any of it with your own money.  Have you been paying Johnnie

2    Parker back, the lawyer from the Parker firm?

3        A.    I did.

4        Q.    Did you pay him interest?

5        A.    Yes, sir.

6        Q.    Are you late with your payments to Mr. Parker?

7        A.    No, sir.

8        Q.    Does Mr. Parker regularly loan people in the

9    community money?

10       A.    Yes.

11       Q.    And when Alex Murdaugh was borrowing money in the

12   conservatorship, did he pay interest to the conservatorship

13   funds, to the account?

14       A.    No.

15       Q.    Now, she mentioned something about Alex Murdaugh

16   coming to Palmetto State Bank to do business.  Did he also

17   bank with another bank?

18       A.    He did.  He banked with Bank of America.

19       Q.    And you did not have access to what -- his account

20   at Bank of America?

21       A.    (No reply.)

22            MR. DANIEL:  Beg the Court's indulgence, Your Honor.

23            THE COURT:  Certainly.

24            MR. DANIEL:  No further questions, Your Honor.

25            THE COURT:  All right.  This witness may step down?

1          MR. DANIEL:  Yes, Your Honor.

2          THE COURT:  At this time, I don't know if anybody's

3     got any other witnesses or other evidence to present.  But I

4     am going to take ten-minute recess for everyone.  We will

5     reconvene at noon.

6          MR. DANIEL:  Yes, Your Honor.

7          MS. LIMEHOUSE:  Thank you, Your Honor.

8          (Whereupon, the proceedings are adjourned.)

9          THE COURT:  Mr. Daniels, do you have any other

10    witnesses to present?

11         MR. DANIEL:  No, Your Honor, we do not have any

12    other additional witnesses.  However, the defendant's wife,

13    Ms. Susan Laffitte, would like to address the Court.

14         THE COURT:  I will hear from her.

15         MR. DANIEL:  Thank you.  Please come around.

16         MRS. LAFFITTE:  Good morning, Your Honor, all

17    counsel present and ladies and gentlemen of the audience.

18    Thank you for allowing me the opportunity to say a few words

19    to me.  Bear with me.  This is not my arena.  I prefer

20    kindergartens, third graders, anything below sixth graders.

21    And this is certainly not on my bucket list.  However, I feel

22    it is necessary that I share with you today.

23         First of all, I want to express sympathy to each and

24    every victim that has been taken advantage of by Alex

25    Murdaugh.  My family and I understand how it feels to be

victimized by someone you trusted.  And we sympathize with
each of those victims.

        Russell and I have remained quiet throughout this
process for several reasons.  One, we thought that was the
expectation, the way the legal process was supposed to
proceed, the appropriate behavior in legal proceedings; two,
we feared that our words would be spun and misrepresented by
the media or attorneys; three, we do not pray of being in the
spotlight.  We are simply a family striving to live each day
with purpose and conscious integrity.

        However, due to multiple media inaccuracies and
false statements by plaintiff's attorneys and how those
misconceptions have thus far negatively affected my husband's
freedom and our family in general, I feel that it is
necessary to share some true facts with you all today.  My
goal today is to share a few facts with you that will make it
clear beyond a shadow of a doubt that Russell Laffitte is not
a flight risk and in no way is he a threat to society.

        A bit about Russell, myself and our family.  We are
the proud parents of two amazing young people, Carter, a
sophomore in college, Luke a senior in high school.  We met
in preschool, according to a group class photo; however, we
don't remember a lot of details about that.  When we began
dating, we both knew quickly that we were meant to be
together.  We dated for two months, got engaged, and married

1    nine months later.  We've presently been married for 29

2    years.

3            Russell and I both grew up in Hampton County.  We

4    have lived there since we were married and do not intend to

5    live anywhere else.  I am a reading interventionist in

6    Hampton County School District.  I've been teaching for

7    20-plus years.  Russell started his first career in farming

8    and since then has been in banking for 24 years.  Our first

9    and foremost priority is our family.  As parents, we strive

10   to live a responsible, respectful life, and to contribute in

11   a positive manner to our community.  Our goal is to raise our

12   children to be kind, responsible, respectful, productive

13   members of their community.

14           I would like to clear up a few misconceptions so

15   that y'all will have the true facts before we proceed.

16   Misconception number one, that we live an extravagant

17   lifestyle.  We do not live an extravagant lifestyle, nor do

18   we have access to a mountain of cash.  We presently live in a

19   vintage, at best, double-wide trailer on our family farm.  We

20   have lived a comfortable life because we work hard.  We have

21   raised our children to work hard.  They have both had jobs

22   since they were old enough to work.  This past summer, our

23   daughter Carter worked two jobs.  Our son Luke worked on a

24   farm six days a week.

25           Next misconception, we tried to hide the sale of our

home of 18 years.  We did not try to hide the sale of our

home.  We listed it with a realtor.  We are responsible

people.  Our household income changed drastically very

unexpectedly.  We acquired hefty legal fees.  We have two

kids to put through college.  When you don't have the income

coming in to pay your bills, responsible people adjust;

hence, we sold our home of 18 years.

Next misconception, Russell accompanied Alex

Murdaugh on a private jet.  Russell has never flown on a

plane with Alex Murdaugh.  Russell has never attended the

college baseball world series.  Not only has he not been on a

private jet with Alex Murdaugh, he also does not have a

pilot's license.  He did attempt to acquire a pilot's license

very early in our marriage, however, he never completed his

license.

Next misconception, we socialize frequently with

Alex Murdaugh.  That is not true.  Alex Murdaugh was a bank

customer.  We attended the funerals of Maggie and Paul

Murdaugh, as most members of our community did.  Other than

that, I do not remember exactly when I last saw Alex

Murdaugh.  My best recollection was several years ago in a

local restaurant.

Most importantly, Russell Laffitte is not a danger

to society.  He's not cold or callous.  He is kind and

caring.  He has never once been accused of any act of

violence.  He is a hero to his children and many of their
friends.  He is the favorite uncle.  He is the person whose
niece calls when she hits a deer with her car.  He is the
person who anonymously purchases football practice clothing
for the kid who's running laps holding up his pants because
he does not have a belt to keep them up.  He is the person
that our friends who is a single mom calls when she is out of
town and her car breaks down and she does not have family
close by.  He is the boss who drives to Augusta in the middle
of the night to support an employee whose son has gotten in a
very serious and later fatal car accident.  He's the friend
that drives to Florida and back in a day to attend his
friend's mother-in-law's funeral, not his mother, but
mother-in-law.  He is the son who stops by to change his
mother's light bulbs.  He is the son-in-law that Granny
brings her cell phone to any time she has an issue.  And
that's pretty often.  In fact, he is a gentle giant.

He is involved in his community and has been.  He is
respected in his community.  He is the dad that delivers
tables for the children's school spring fundraiser and hangs
out into the wee hours to clean up those tables and return
them at the end of the event.  He is the booster club member
that has been active in booster club since his children began
sports at a young age.  He is the organizer and the manager
of the Little League concession stand.  And what some of you

1    that are not familiar with small-time life do not realize,

2    that's a four-day process for each home game.  That means

3    traveling to Savannah with a covered trailer to purchase a

4    plat, preparing, icing down multiple, probably about 10

5    coolers of drinks, working about 9 a.m. to 10 p.m. for home

6    games, cleaning up, and then removing those supplies after

7    the game.

8           As I mentioned, he's a respected member of his

9    community, so respected that he was requested to speak at his

10   daughter's senior class's baccalaureate service.  We turned

11   that offer down, but he was requested as one of their top

12   choices.

13          He has also been celebrated by bank employees with a

14   surprise birthday party several months after his employment

15   with the bank ended.  That, to me, shows that he is a

16   respected member of his community.

17          I assure you that Russell Laffitte is not a flight

18   risk.  He has never had any desire to leave Hampton County.

19   Family is his priority.  Family -- our family and extended

20   family are in Hampton County.  We have three elderly parents

21   in Hampton County.  The people who are near and dear to our

22   hearts are in Hampton County.  And that is where we plan to

23   be.  Also, not to mention, we could not afford to lose $1.5

24   million dollars in bond money at this point or any point.

25          In summary, Russell is a man who has worked

1    tirelessly with conscious integrity to support his family,

2    serve his community and give back to his community.  He would

3    never in a million years intentionally put his family's

4    future at risk or his family business at risk.  In addition,

5    he would never willingly and intentionally harm another

6    family in any way.

7           He, like so many others, has been taken advantage of

8    and manipulated.  I look forward to a trial where his legal

9    team has the opportunity to share his side of this nightmare.

10          As you proceed today, please consider that Russell

11   has cooperated every step of the way since the beginning of

12   this nightmare.  You might not like what he has to say, but

13   his story has always been the same.

14          Also, please keep in mind, he has never been

15   convicted of a crime.  Therefore, he should be presumed

16   innocent until proven guilty.  However, that is not the

17   treatment he has received thus far.  He is presently wearing

18   two ankle monitors which we are paying a total of over $400 a

19   month for the dual monitoring systems.  We have made four

20   trips so far to Columbia to service these devices.  He spends

21   approximately two hours per day hooked up to two chargers in

22   order to charge his multiple monitoring devices.  He has

23   difficulty sleeping at night because he often gets tangled up

24   with all of this equipment.  We've received calls at all

25   hours of the night concerning his monitoring system, 4:20

1    a.m., 12:57 a.m., to verify his location when, in fact, we

2    were asleep in the bed with both monitors fully charged.

3          Now, there are few experiences that Russell has

4    missed out on throughout this process.  And that is probably

5    the most disturbing, because those experiences we can never

6    get back.  Just a few:  Such as college tours with our

7    17-year-old son, Luke.  He's missed out on moving his

8    daughter Carter into college this year.  He's missed out on

9    multiple engagement parties, weddings, funerals of very

10   special friends.  He's missed out on hunting with his

11   children.  Most recently, Russell sat at home last Friday

12   night and missed the first football game of his son's senior

13   year.  Even more disturbing, he was given permission that day

14   by federal counsel to attend.  We told our son that his Dad

15   was going to be able to attend his game.  We were all

16   extremely excited, only to be disappointed when we were

17   notified at 8 p.m. on Thursday evening that Russell would not

18   be allowed to attend Luke's game because it was too far from

19   our home.

20         We could never get back the memories we've missed at

21   this very crucial time in our lives, our son's senior year of

22   high school and our daughter's college years, the last years

23   before they venture out into the world on their own.  I ask

24   you all today, do not allow this injustice to continue.

25         Throughout this motion and in the following days to

1    come, I ask all judicial members involved, number one,

2    remember that you are here today to focus on Russell

3    Laffitte, not Alex Murdaugh.  Number two, remember that

4    Russell is innocent until proven guilty and has the right to

5    fair and just treatment and a fair trial.  Above all, please

6    remember that these -- the proceedings of this court affect

7    real life.  And please base your decisions on the facts, the

8    fact that Russell Laffitte is not a flight risk or a danger

9    to society, the fact that there's no evidence to support

10   either of those accusations.

11        I have one last plea before I leave you today.

12   Please do everything in your power to ensure that Russell has

13   a fair trial.  This is Russell's fourth hearing.  The day

14   before his first arraignment hearing, there was a press

15   conference held on the State House steps which included

16   factually incorrect public statements.

17        During his second hearing, there were several

18   inaccurate statements by plaintiff's attorneys in the

19   courtroom during the hearing.  In addition, immediately

20   following the hearing, there was a press conference held

21   outside the courthouse by plaintiff's attorneys.  The morning

22   after Russell's third hearing, a newspaper headline read:

23   Ex-Palmetto State Bank CEO Russell Laffitte, and was

24   published alongside a photo of Alex Murdaugh during his bond

25   hearing in Columbia.  Let me be clear, no photo of Russell

1    Laffitte was published.

2          It's imperative that this is stopped.  If it is

3    allowed to continue, it will be impossible for Russell to

4    have a fair and just trial.  Thank you.

5          MR. DANIEL:  Your Honor, would you like us to

6    present our argument first?

7          THE COURT:  No.  I want to know if the Government

8    has any evidence or witnesses that they intend to present

9    before we move to argument.

10         Ms. Limehouse.

11         MS. LIMEHOUSE:  We do not, Your Honor.

12         THE COURT:  All right.  Thank you.  Ms. Limehouse,

13   is the Government ready for argument?

14         MS. LIMEHOUSE:  We are.

15         THE COURT:  And, Mr. Daniel, if you are ready, I

16   will hear from you.

17         MR. DANIEL:  May it please the Court, Your Honor.

18   What Ms. Laffitte said I think is significant.  And that is

19   to these crimes, she said judge Russell Laffitte, don't judge

20   Alex Murdaugh.  These crimes are Alex Murdaugh crimes.

21         Alex Murdaugh stole all this money.  He stole from

22   his own client.  He fooled everybody.  He fooled every member

23   of that Parker law firm, Johnnie Parker's law firm, got

24   fooled and victimized.  He fooled the people -- the

25   sophisticated bankers of Bank of America, one of the largest

1    institutions in the world.  He fooled them and victimized

2    them.  He fooled individuals.  He fooled clients.  He was a

3    fraud.  But at the time no one knew that.

4              Russell Laffitte never stole one red cent.  Russell

5    Laffitte borrowed money from the conservatorship.  He paid it

6    back with interest.  And each time it was secured by the bank

7    stock.  He paid his loans back, every single dime.  He had

8    sought probate court permission.  The probate judge granted

9    that permission.

10             He filed every loan publicly.  Went to probate court

11   annually.  And some of these lasted many years.  He filed

12   them annually with the probate court for all the public to

13   see.

14             Your Honor, what he has done, I believe, is proof of

15   a breach of fiduciary duty, perhaps some negligence, perhaps

16   gross negligence, maybe even recklessness, but certainly not

17   an intentional commission of a crime.  And as mentioned

18   earlier, Your Honor, and the Court is well aware, that the

19   least restrictive conditions necessary to reasonably ensure

20   the defendant's appearance, and I believe that we have met

21   that burden.

22             Your Honor, by background, as you've seen, Russell

23   Laffitte is a lifelong resident of Hampton County except for

24   the few years he was in college at Newberry, again within the

25   state of South Carolina.  He's been married for 21-plus years

1    to Susie and has two children.  Even his parents and siblings

2    and his extended family all live in Hampton County.

3              He's been, as the Court's seen, an active member of

4    the community, vice chair of the Hampton County Special Needs

5    and Disability Board for 10-plus years.  He served as

6    chairman of the Hampton -- Town of Hampton Downtown

7    Revitalization Project.

8              As you've heard from Ms. Laffitte as well as Russell

9    Laffitte, he worked concession stands for the Hampton

10   Football Little League.  He surrendered his passport

11   initially after that May 6th hearing.  His assets were

12   frozen.  The proceeds from the sale of the family home are in

13   an escrow account at Nelson Mullins.  He possesses no

14   weapons.  He's got no history or even mentioned or an

15   accusation of violence.

16             And, Your Honor, since February he's been

17   cooperating fully with law enforcement.  And that was early

18   on when the SLED agents came to see him.  They would come to

19   see him to try to get to the bottom of it.  He was also

20   trying to get to the bottom of it on behalf of himself and

21   the bank and the Parker law firm.  And he went and pulled

22   checks and found all sorts of documents that he realized at

23   the time what they meant.  And that's the first time that he

24   realized that he too and the bank had been victimized right

25   along with the lawyers, right along with the Bank of America,

1     right along with the clients.

2         He's been cooperating with law enforcement and --

3     excuse me, at the beginning of the investigation, he met with

4     those agents from SLED.  And in February of 2022, he

5     voluntarily agreed to be interviewed by the FBI, the U.S.

6     Attorney, SLED, and the Attorney General's Office.  There

7     were at least 9, 10 or 11 -- I would say 9 or 10 different

8     Government people from different agencies in that room,

9     including investigators and auditors.

10        Three times he has met with the Office of

11    Disciplinary Counsel about the lawyers involved in this case.

12    And at no time did he have to.  At any time he wanted, he

13    could have asserted the Fifth Amendment.  And he's been

14    cooperating fully with them on DC and been very helpful to

15    them.  The third time was in August -- the first two meetings

16    lasted all day in Columbia.  That was in July this year.  The

17    third time was in August of this year.  And that meeting was

18    here in Charleston.  Lasted about a half of a day.

19        He knew that charges were coming.  He didn't go

20    anywhere.  He continued to meet with his lawyers.  He has

21    continued to meet with his lawyers to prepare for trial.

22    He's been on state court bond since the 6th, May 6th, and had

23    no issues.  He's been on this Court's federal bond since his

24    initial arraignment, again, absolutely no issues.

25        All the conservatorship loans they've talked about

1    were paid back with interest in a timely fashion.  All the

2    conservatorship loans were secured by bank stock, more than

3    ample enough to cover the loans themselves if something went

4    bad.  He has either paid back or attempted to pay back the

5    Murdaugh victims, he and the bank and the Parker firm where

6    they were involved.

7            Now, just Friday night he sought permission and he

8    received permission from Ms. Limehouse, U.S. Attorney's

9    Office, and Mr. Kramer with the Attorney General's Office to

10   go to his son's high school football game.  And as you heard,

11   the night before was when the U.S. probation officer turned

12   down that request and she said what you heard Ms. Laffitte

13   say, that it was too far away from his home.

14           Your Honor, I have -- one thing I will ask the Court

15   to consider is some of the other bonds that have been set in

16   this district.  And one of the first ones was billed as Mr.

17   Andrew Chmiel -- and it's not Ms. Limehouse's case.  But it

18   was billed as the largest healthcare fraud in the history in

19   the FBI and the Department of Justice.  This particular

20   healthcare fraud was over $1.2 billion in Medicare fraud,

21   operation Brace Yourself.  He was released on $25,000

22   unsecured bond by Judge Hodges in Columbia.

23           Jeff Benjamin -- and this is Ms. Limehouse's and --

24   yeah, Ms. Limehouse's case.  He's an ex-Westinghouse

25   official.  And he's been accused of a multi-billion dollar

1   fraud.  Again, a $25,000 unsecured bond.  Now, she didn't

2   request that bond, it was Jim May.  But she's allowed him to

3   remain under that bond.  And he, like Mr. Laffitte, is

4   fighting the charges and they are awaiting a trial.  He's

5   also on a state bond and has no ties to South Carolina.

6        Next and probably the most disproportional of all

7   when compared to this case is Mr. Kevin Marsh.  He was

8   accused -- he was a SCANA executive that was accused of a

9   multi-billion dollar fraud, which is one of the most highly

10  publicized and the largest fraud in the history of the state

11  of South Carolina.  He was also given a bond of $25,000

12  unsecured.

13       And now Emily -- excuse me, Ms. Limehouse and Mr.

14  O'Halloran, they have that case now.  And they have not moved

15  to do anything with that bond.  In fact, Mr. Marsh went all

16  the way through sentencing without that bond being modified.

17       Your Honor, again, David Johnston was a lawyer who

18  stormed the U.S. Capitol on January 6th.  And that was a

19  case, again Ms. Limehouse's case, of $25,000 unsecured bond.

20       Next, Ashley Fain, another one of Ms. Limehouse's

21  case, conspiracy to commit extortion, money laundering,

22  smuggling phone in the prison, and she was released pretrial

23  on a $75,000 unsecured bond.

24       Next Ms. Catherine Needham, which is a PPP fraud

25  case.  She's already pled to it.  So she's got no presumption

1    of innocence.  The total loss in the conspiracy, $4.7

2    million.  The total individual loss $1.2 million.  She is

3    currently on a $25,000 unsecured bond while awaiting

4    sentence.

5        And, Your Honor, finally, lastly, Mr. Chadwick

6    Gordon, and he was released pretrial.  His travel was

7    restricted to South Carolina, except from permission of the

8    USPO.  No curfew.  No home detention.  He stormed the Capitol

9    also on January the 6th.  No curfew.  No home detention.  No

10    home incarceration.  No stand-alone warranty.  He was

11    released on a $25,000 unsecured bond.

12        Your Honor, I only ask that the Court -- that this

13    Court be consistent with other cases that are either as

14    sensational as this or much more egregious as this current

15    case.  Thank you, Your Honor.

16        MS. LIMEHOUSE:  Thank you, Your Honor.  May it

17    please the Court.  Mr. Laffitte claims to be in the midst of

18    an unprecedented media firestorm.  But the timing and the

19    substance of his motion makes clear that his objection to the

20    bond conditions have become a matter of theatrics in search

21    of an audience in both state and federal court.  He claims

22    injury from negative press coverage, yet files a 11th-hour

23    motion compelling a response from the Government on matters

24    not previously in the record regarding the nature and

25    circumstances of these offenses and the weight of the

1    evidence, thereby inviting the exact same press coverage from

2    which they claim injury.

3            Now, Your Honor knows that you must evaluate the

4    factors under 3142(g) to determine the least restrictive

5    conditions or combinations of conditions that will assure the

6    defendant's appearance in court.  And part of your analysis

7    today are the nature and circumstances of the offenses, the

8    weight of the evidence and the history and characteristics of

9    Mr. Laffitte.  And we believe all of those factors weigh in

10   favor of more restrictive conditions than what they are

11   currently requesting.

12           For a brief history, Your Honor, Mr. Laffitte

13   appeared before you back in July.  At that time, the

14   Government requested a $25,000 secured bond with home

15   detention and location monitoring.  As we have stated and his

16   testimony has made clear today, Mr. Laffitte is currently

17   employed by the Laffitte Family Partnership, and is tasked

18   with farming thousands of acres of property as part of his

19   employment.

20           Through numerous discussions with the defense

21   counsel and United States Probation Office, the Government

22   agreed to a slight modification -- a substantial

23   modification, excuse me, of those bond terms to allow him to

24   have a stand-alone monitor rather than home detention, with

25   travel restricted within Allendale and Hampton Counties.  But

1    he takes specific issue today with that monitor, with the

2    electronic monitor specifically on the federal side.

3         Now, we briefed the nature and circumstances of the

4    offenses and the weight of the evidence extensively.  I know

5    Your Honor has reviewed those filings.  I will not belabor

6    those points.  But, Your Honor, as the superseding indictment

7    makes clear, Mr. Laffitte is alleged to have conspired with

8    Alex Murdaugh to steal nearly $2 million in funds from

9    personal injury clients all while collecting hundreds of

10   thousands of dollars in fees, fraudulently collecting

11   hundreds of thousands of dollars in fees.  And the

12   superseding indictment alleges that he, as an officer,

13   employee, and director of the Palmetto State Bank

14   unilaterally misapplied bank funds by extending sham loans to

15   Alex Murdaugh and by extending $680,000 to the law firm to

16   cover some of these stolen funds.

17        The allegations and the evidence make clear that

18   Laffitte exploited the vulnerabilities of the very people

19   with whom he was charged with serving as a fiduciary, and

20   that he allowed Alex Murdaugh to steal money, the exact funds

21   that he was charged with managing.

22        Contrary to their arguments and their motion, the

23   evidence is overwhelming against him.  The Government has

24   reviewed thousands of records, including bank records,

25   probate records, e-mails, Mr. Laffitte's own e-mails, and

1    also conducted dozens of interviews of witnesses that provide

2    incriminating statements in support of the Government's case.

3    The severity of the charges alone warrant more restrictive

4    conditions than what they are currently requesting.

5           But also, Mr. Laffitte's own history and

6    characteristics, as he's testified today, he is expecting to

7    earn $230,000 this year.  He has millions of dollars in

8    assets at the Palmetto State Bank.  They claim that these

9    assets are frozen.  While he has been ordered not to dispose

10   or waste of these assets, his access to them remains the

11   same.  And they claim that his lack of a criminal history and

12   community involvement warrant less restrictive conditions,

13   but, Your Honor, he is alleged to have been committing a

14   conspiracy to steal money for more than a decade and taking

15   actions in furtherance of that conspiracy most recently in

16   October of 2021.  And all of the factors weigh in favor of

17   more restrictive conditions.

18          Practically, Your Honor, we are arguing about Mr.

19   Laffitte wearing an ankle monitor for a matter of months.

20   Defense counsel has made clear that Mr. Laffitte intends to

21   go to trial, that he intends to request a trial within this

22   calendar month.  And so within a matter of months, we will

23   determine whether he is guilty or not.  And the Government is

24   only arguing that we should be able to monitor his

25   whereabouts during that short period of time.

1          As the defense stated, we have agreed to reasonable

2    requests to travel within those bond conditions.  We will

3    continue to do so as long as he remains compliant on the bond

4    conditions.  We just request that we be able to monitor him

5    while he is out on bond.

6          Mr. Daniel outlined numerous cases before Your Honor

7    that he said has comparable facts.  I'm actually only counsel

8    in a few of those cases.  Specifically, the riot cases are

9    out of DC.  I just appeared here before those cases were

10   transferred to D.C. and represented their request for bond

11   conditions as the AUSA in DC has requested.

12         I will note, Mr. Kevin Marsh that he stated the best

13   example of disparate treatment, Mr. Kevin Marsh appeared as

14   he was pleading guilty to an information, taking full

15   responsibility for his role in the charges that he was being

16   arraigned on and that he was being fully cooperative with the

17   Government.

18         And despite their numerous statements on the record

19   that Mr. Laffitte has been fully cooperative, as we stated in

20   our response and as I told them more than three times, we

21   believe Mr. Laffitte lied to the FBI on numerous occasions

22   during his proffer in February 2022.  Unlike Kevin Marsh,

23   he's not cooperating with the federal government.  He's not

24   coming in and pleading guilty to an information taking full

25   responsibility for his conduct.  And so he's in a much

1    different position in terms of what the bond conditions

2    should be to assure his reappearance rather than Mr. Kevin

3    Marsh.

4         And the same can be said with Ms. Cathy Needham.

5    She came in and pled guilty to an information with

6    corporation language agreeing to be fully cooperative with

7    the Government.

8         Contrary to their arguments in the motion, Your

9    Honor did not impose these current conditions in response to

10   negative press coverage.  But Your Honor properly weighed the

11   factors under 3142(g) to impose the least restrictive

12   conditions to ensure his reappearance in court.  And we

13   believe he should be continued to wear -- continue to require

14   -- continue -- he should be required to wear the electronic

15   monitor, Your Honor, until the trial of this case.  Thank

16   you, Your Honor.

17        MR. DANIEL:  One second.

18        THE COURT:  Certainly.

19        MR. DANIEL:  Your Honor, I began as an assistant

20   U.S. Attorney 40 years ago, March 1982.  I've been on both

21   sides back and forth.  And I have never seen a bond, stating

22   it fairly, that's disproportion.  In this kind of case, it's

23   a fraud case, Your Honor.  There's no violence.  There's no

24   threat to community.  It's not a thug case.  The presumption

25   is against all the reasonable conditions.  And all we are

1   asking is do away with home confinement and do away with

2   electronic monitoring, Your Honor.  He's currently wearing

3   two ankle bracelets.

4         THE COURT:  All right.  Thank you for that.

5   Anything further, Ms. Limehouse, from the Government?

6         MS. LIMEHOUSE:  Nothing further, Your Honor.

7         THE COURT:  Okay.  For the record, I want to be

8   clear, there was no argument from the Government and there

9   has been no finding from this Court that Mr. Laffitte is a

10  danger to the community.  That's not an issue before me.  My

11  considerations on bond were under the factors that I am to

12  consider under the Bail Reform Act.  They were at the time

13  when I made the initial bond conditions, and they are today

14  under 3142(g).  And I have before me the case against Mr.

15  Laffitte.  This is not about Mr. Murdaugh.  I have a

16  superseding indictment with charges against Mr. Laffitte.  It

17  is that indictment, it is those charges, and it is the

18  evidence that has been presented before me at this hearing

19  and the arguments that were made at the previous hearing that

20  I considered then and that I am considering now in issuing my

21  decision.

22         I appreciate the emphasis on other cases, but I also

23  do want to remind counsel that each individual case is

24  decided on the particular factors of that case and the

25  particular factors of that defendant.  I don't know the

1  particulars of the cases that you went through before, Mr.

2  Daniel.  I do know the case that I've got in front of me and

3  the factors that I'm considering in this case.

4        I do want to address, as I understand it,

5  notwithstanding your argument regarding bond amounts, that

6  issue is not before me.  As I understand it, Mr. Daniel, you

7  are not making any argument for reconsideration of the bond

8  amount.  Is that correct?

9        MR. DANIEL:  That's correct, Your Honor.

10       THE COURT:  Okay.  So the two issues that I

11 understand we are talking about are the location monitoring

12 and the home detention.  I want to address the location

13 monitoring.  I am charged with identifying the least

14 restrictive conditions that I deem necessary to reasonably

15 assure Mr. Laffitte's presence as required.  And I have done

16 that.  And I have determined that location monitoring is

17 appropriate.

18       We had this discussion at the last hearing.  I can

19 appreciate the inconvenience of having two monitors.  I do

20 not have control over the state monitoring system.  As I

21 understand it from probation, the issues with the monitor

22 that requires traveling to Columbia is the state monitor.  It

23 isn't the federal monitor.  I don't have any control over

24 that.  And I can't do anything about that.

25       I appreciate that you included a copy of the motion

1   to reconsider the bond conditions that you filed in state

2   court.  I don't know where that stands.  But, again, I don't

3   have control over the state system.  I am looking at the

4   federal charges before me and the considerations that I have

5   to make.  And I am not removing the location monitoring

6   condition.  I deem that one of the least restrictive means

7   that are necessary.

8          Now, at the time when I ordered home detention, I

9   allowed for Mr. Laffitte to work the farm.  I did not at that

10  time understand the size or geographic location of that farm.

11  I understand from the Probation Office that there are some

12  challenges with the home detention and location monitoring in

13  light of that.  So at the Probation Office's request or

14  suggestion, I am going to move Mr. Laffitte to a standalone

15  monitor.  So he is no longer -- I am modifying that condition

16  of his bond.  He is no longer in home detention.  I am moving

17  him to a stand-alone monitor.

18         In conjunction with that, however, I am going to

19  restrict his travel.  I understand that the majority of his

20  family is in Hampton County.  The neighboring county is

21  Allendale.  I am going to restrict his travel to those two

22  counties unless approved by the Probation Office.  I have

23  talked to Probation.  They understand at a minimum they will

24  be need to be approved to go to Columbia if you aren't able

25  to resolve the state monitor piece.  And there may be other

1   family matters that they will consider approving.  Moving him

2   to stand-alone will give the Probation Office that discretion

3   that they did not have before with the home detention.  All

4   right?

5           Now, I want to make sure I've addressed, Mr. Daniel,

6   the modifications that you requested.  As I understood it

7   from the motion, it was removal of home detention and the

8   location monitoring.  I've addressed home detention and

9   location monitoring.  Are there any other conditions of my

10  bond that you wanted to argue for me to reconsider?

11          MR. DANIEL:  No, Your Honor.

12          THE COURT:  Okay.  And, Ms. Limehouse, anything

13  further from the Government with regard to the modifications

14  that I've just made to Mr. Laffitte's bond?

15          MS. LIMEHOUSE:  Nothing further from the Government,

16  Your Honor.

17          THE COURT:  All right.  And, Mr. Daniel, I should

18  have asked, any further argument from you?

19          MR. DANIEL:  No, Your Honor.  Already done.

20          THE COURT:  Okay.  This matter is adjourned.

21          MS. LIMEHOUSE:  Thank you, Your Honor.

22          (Whereupon, proceedings are adjourned.)

23

24

25

1                          CERTIFICATE OF REPORTER

2

3          I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8          I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15                                  Karen V. Andersen
                                    Registered Merit Reporter
16                                  Certified Realtime Reporter

17

18

19

20

21

22

23

24

25