IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

United States of America,

v.

Russell Lucius Laffitte,

                Defendant.

Case No. 9:22-cr-00658-RMG

**Defendant's Response to Palmetto State Bank's Motion to Quash**

Defendant Russell Lucius Laffitte provided two subpoenas for the production of documents to Palmetto State Bank's counsel. It is uncontested that the Bank's counsel received the subpoenas and communicated with Mr. Laffitte's counsel to attempt to both negotiate the scope of the subpoenas and comply with them. Specifically, the Bank sought to avoid producing an investigative report created by Attorney Gregory Poole Harris (the "Harris Report"), asserting attorney-client privilege and the work-product doctrine. When negotiations over the subpoenas reached an impasse, Mr. Laffitte moved to compel (ECF No. 128) and the Bank moved to quash (ECF No. 129).[1] The Court should grant Mr. Laffitte's Motion to Compel and deny the Bank's Motion to Quash because:

(1)      The Bank waived formal service of the subpoena through its counsel;

(2)      The Harris Report is not protected by the attorney-client privilege or the work-product doctrine because it was intended for use by third parties;

(3)      Implied waiver from the Bank's production of privileged emails to the Government, the crime-fraud exception, or the "at-issue" waiver apply; and

(4)      Any privilege or protection must yield to Mr. Laffitte's constitutional rights.

---

[1] To avoid repetition, Mr. Laffitte incorporates by reference his Motion to Compel (ECF No. 128) and Response to Palmetto State Bank's Letter Asserting Attorney-Client Privilege (ECF No. 103).

1

## Argument

### I.    The Bank waived its objection to lack of formal service of the subpoenas.

In its motion, the Bank's counsel does not dispute that he received the subpoena seeking the Harris Report.  (Mot. to Quash ¶¶ 1–2.)  The Bank even explicitly states that its counsel "cooperated" with Mr. Laffitte after receiving the subpoenas and, in response, "produced . . . the requested documents except for those that are privileged and protected." (*Id*. ¶ 5.)  At no time did the Bank's counsel raise any issue about formal service of the subpoena or object to its service— the only thing the Bank did in response was to provide documents and claim certain documents were privileged or otherwise protected.  (**Exhibit 1,** Gressette Subpoena Resp. Letter, October 5, 2022.)  The Bank can hardly now claim that it did not waive formal service of the subpoena given its actions.  *See In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999) (refusing to quash subpoena for invalid service given that entity had retained counsel to respond to the subpoena and counsel for both parties had discussed the appropriate subpoena response); *see also Powell v. Time Warner Cable, Inc*., No. 2:09-CV-00600, 2010 WL 5464895, at *3 (S.D. Ohio Dec. 30, 2010) (rejecting claim of invalid service when non-party that received subpoena failed to raise defective service issue despite raising other objections and producing documents in response); *Anwalt Energy Holdings, LLC v. Falor Companies, Inc.*, No. 2:06-CV-0955, 2008 WL 2268316, at *1 n.2 (S.D. Ohio June 2, 2008) ("Objections to irregular service of process and personal jurisdiction are waived, if not properly and timely asserted.").

### II.    The attorney-client privilege and work-product doctrine do not protect the Bank because the Harris Report is not legal advice and was intended for uses involving third parties.

The Bank's privilege assertion assumes that the entire purpose of the investigation leading to the Harris Report was the provision of legal advice to the Bank.  (Mot. to Quash ¶ 8.)  This is

not completely accurate, as the Bank and its counsel have issued news releases touting the Harris investigation as a way to control its image. *See* Michael M. DeWitt, Jr., *Palmetto State Bank, ex-bank manager issue statements in Alex Murdaugh case*, Greenville News (Jan. 31, 2022), available at https://bit.ly/3h0y5RB. The dual-purpose of the Harris Reports causes it to fall outside the attorney-client privilege. *In re Grand Jury*, 23 F.4th 1088, 1092 (9th Cir. 2021) (applying primary purpose test for determining privilege of dual-purpose communications), *cert. granted sub nom. In re Jury*, No. 21-1397, 2022 WL 4651237 (U.S. Oct. 3, 2022).

In any event, the Bank confirms the Harris Report includes Mr. Harris's "findings," meaning factual issues uncovered through discussions with individuals inside and outside the Bank's management structure. (*Id.* ¶ 9.) Under Fourth Circuit precedent, the Harris Report and the underlying facts are not privileged. While the attorney-client privilege may protect some communications with an attorney, the privilege does not "protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Likewise, information communicated to an attorney intended to be shared with a third party are not protected. *In re Grand Jury Proc.*, 727 F.2d 1352, 1356 (4th Cir. 1984) ("[I]f a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as the details underlying the data to be published will not enjoy the privilege."). Expanding on *In re Grand Jury Proceedings*, the Fourth Circuit has explained that the "details underlying the data to be published," is extremely broad:

> The details underlying the published data are the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the document, and any attorney notes containing material necessary to the preparation of the document. Copies of other documents, the contents of which were necessary to the preparation of the published document, will also lose the privilege.

*United States v. (Under Seal)*, 748 F.2d 871, 875 n.7 (4th Cir. 1984).

Relying on 12 U.S.C. § 1828(x), the Bank asserts that the production of the Harris Report to the FDIC is not a waiver of the attorney-client privilege. Although some courts reject a bank to rely on this section to assert a privilege claim, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *6 (S.D.N.Y. Nov. 16, 2016), the Court need not decide the scope or applicability of § 1828(x) here because the Harris Report is not privileged and any waiver occurred independent of the Bank's producing the report to the FDIC. *See, e.g.*, *U.S. ex rel. Mitchell v. CIT Bank*, C/A No. 4:14-CV-00833, 2021 WL 4439516, at *3 (E.D. Tex. Sept. 28, 2021) (discussing waiver by production to third party aside from FDIC and explaining § 1828(x) "does not include information shared between banks and third-party consultants, even if a federal banking agency requires a bank to retain the independent third party."). Similarly, although Mr. Laffitte has doubts that the Harris Report is considered an "exempt record" under 12 CFR § 309.6 as claimed—the Bank improperly conflates the definition of "record" under § 309.2(a) with the basis for an exemption under § 309.5(g)(1)–(9) and the entity to which § 309.6 applies—the Court need not resolve this issue to confirm that the subpoena should not be quashed.[2]

## III. Implied waiver-through-production, the crime-fraud exception, and the at-issue waiver rules apply to the Harris Report and related materials.

### A. The Bank has produced privileged material to the Government, resulting in a subject-matter waiver that includes the Harris Report.

"Implied waiver nullifies a privilege when disclosure of a privileged communication has vitiated confidentiality." *In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988).

---

[2] The Bank's statements about not producing the Harris Report to third-parties other than the FDIC leaves some room for interpretation. (Mot. to Quash ¶ 23.) The Bank should have to provide sworn testimony that it has not provided the Harris Report to any other third parties as any production would result in a waiver.

Disclosure to the government meets the test for an implied waiver. *Id*. Within the Fourth Circuit, such an implied waiver is not limited, but applies to the full subject matter of the otherwise privileged material produced to the Government. *Id*. (citing *In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C. Cir. 1984)).

Just last month, the Bank produced two pages of emails to the Government, PSB 205599–600. (*See* **Exhibit 2**, Gressette Ltr. to Limehouse, Sep. 16, 2022.)[3] The emails produced begin with Mr. Laffitte's October 29, 2021 email to members of the Bank's board. One of the Bank's Board Members, Elizabeth Malinoski, responded to the email by copying the Bank's counsel. *Id*. Ms. Malinoski also marked the email as "CONFIDENTIAL- ATTORNEY CLIENT PRIVILEGE INFORMATION" in the subject-line. Despite this invoking of privilege by the Bank's Board, the Bank still produced the email chain to the Government.

The cover letter to the production states the Bank is "making this production based upon your agreement with Greg Harris that, among other things, this production does not constitute a waiver of privileges and protections, including the attorney-client privilege and work product protection." (Ex. 2, Gressette Ltr.) Contrary to this assertion, however, the Fourth Circuit does not permit the type of limited waiver the Bank attempted to execute here. *See Duplan Corp. v. Deering Milliken, Inc*., 397 F. Supp. 1146, 1162 (D.S.C. 1974) ("Thus, if a client, through his attorney, voluntarily waives certain communications, but guarded with a specific written or oral assertion at the time of the waiver that it is not its intention to waive the privilege as to the remainder of all similar communications, the privilege, as to the remaining undisclosed communications, is nevertheless waived."). The Bank's production results in the intentional

---

[3] The emails produced are recounted in paragraphs 15–16 of Mr. Walker's October 24, 2022 Affidavit.

implied waiver of any attorney-client privilege attaching to communications about the same subject matter:  The Bank's involvement in potentially criminal and fraudulent transactions between Alex Murdaugh and members of the Peters Murdaugh law firm.  *See United States v. Cohn*, 303 F. Supp. 2d 672, 680 (D. Md. 2003) ("When a party selectively discloses certain documents, it may waive protection of other documents that relate to the same issue.").  Under the concept of subject-matter waiver, "[a]ny voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (citing In re Sealed Case, 676 F.2d 793, 808–09 (D.C. Cir. 1982)).  In other words, once a privilege is waived, the entire subject of the privilege is waived.  *See United States v. Joyce*, 311 F. Supp. 3d 398, 409 (D. Mass. 2018) ("[U]nder principles of subject-matter waiver, the waiver of privilege applies as to the entire subject matter, not a narrowly defined subset of documents." (citation omitted)).

The same rationale applies to the attorney work-product doctrine.  *See, e.g.*, *In re Bank One Secs. Litig.*, 209 F.R.D. 418, 424 (N.D. Ill. 2002) (holding that a bank's documents provided to the Office of the Comptroller of the Currency ("OCC") were not subject the work-product protection because the OCC targeted the bank for an investigation and were in an "adversarial relationship"); *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 593 (2d Cir. 2022) ("waiver by disclosure can be made by transmitting the actual work-product to a potential adversary" (emphasis added) (citation omitted)).  Given the potential for investigations of the Bank related to its conduct during this time period, it can hardly be said that production to the Government would not have "substantially increased the opportunities for potential adversaries to obtain the information." (Mot. to Quash ¶ 34 (quoting United States v. Stewart, 287 F. Supp. 2d 461, 468 (S.D.N.Y. 2003));

*see also In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993) (holding that a party waived the work-product protection when there was an "adversarial nature of the relationship" between a party and the Securities and Exchange Commission because the party "knew that it was the subject of an SEC investigation" and voluntary cooperation does not transform a relationship from adversarial to "friendly"); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428–30 (3d Cir. 1991) (holding that Westinghouse's disclosures to the SEC and DOJ, who were both adversaries, waived the work-product protection it disclosed the materials to "forestall prosecution" or "obtain lenient treatment").

As a result, the Bank has waived any applicable privilege or protection that could have applied to the subject matter of the Harris Report, including the report itself.

### B.      The crime-fraud exception applies to the Harris Report.

The attorney-client privilege is lost "when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud." *In re Grand Jury Subpoena No. 5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 251–52 (4th Cir. 2005) (citing *In re Grand Jury Subpoena (U.S. v. Under Seal)*, 884 F.2d 124, 127 (4th Cir. 1989)).  In the same vein, the attorney-client privilege cannot support the commission of a fraud against the court.  *See Nix v. Whiteside*, 475 U.S. 157, 167–68 (1986) (discussing argument that attorneys cannot help clients present perjurious testimony or false evidence).  This crime-fraud exception requires showing that:

(1)     "the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and

(2)     the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud."

7

*Id.* at 251 (quoting *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)). The first prong "is satisfied by a prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Id.* (citations omitted). "Prong two may be satisfied with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." *Id.* (citation omitted). The exception need not be established "by a preponderance or beyond a reasonable doubt," but "must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *Id.* (citations omitted).[4]

Because the Bank may have been facilitating a fraud committed by Peters Murdaugh on its client, the crime-fraud exception applies. As explained in its previous briefing and exhibits provided to the Court, the $680,000 that is referenced in Count Four of the indictment was a payment to reimburse a Peters Murdaugh client for funds stolen by Alex Murdaugh. Unlike a normal settlement, however, Peters Murdaugh could not get such a release from its client without having the client engage independent counsel. *See* Rule 407, SCACR, Rule 1.8(a); *id.* cmt. [15]. So the Bank relied on counsel at Peters Murdaugh to seek a de facto release through payment, similar to how Peters Murdaugh had treated other firm clients who had lost money. Intentionally omitted from the explanation to Peters Murdaugh's own clients was (1) that the funds were being paid by the Bank as satisfaction of a claim, and (2) that the client could consult separate counsel before taking the funds given the implications of accepting such a "reimbursement." Such a scheme—one directed at Peters Murdaugh's own clients—required those involved to be less than

---

[4] By arguing the crime-fraud exception applies here, Mr. Laffitte does not intend to argue that Mr. Harris or the Bank's committed fraud. Indeed, "for the exception to apply, the attorney need not be aware of the illegality involved. Rather, it is enough that the communication furthered, or was intended by the client to further, that illegality." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (internal citations omitted).

candid (at a minimum) and outright fraudulent (at its worst).  This scheme necessarily required the Bank to help approve the settlement and paying funds, which contradicts the facts alleged in the Second Superseding Indictment.

The Harris Report is expected to have touched on this scheme through its interviews of those within and without the Bank's corporate structure.  The investigation and ultimate "findings" of historical facts would have included discussions counsel at Peters Murdaugh—conversations that would not have been covered by the attorney-client privilege.  As a result, if any privilege did attach, the crime-fraud exception would prevent the privilege from being applied here.

### C.    The Bank has placed the Harris Report at issue.

"The 'at issue' waiver is rooted in fairness—when the holder places the information at issue to his own benefit, allowing 'the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'"  *United States ex rel. Mitchell v. CIT Bank*, N.A., No. 4:14-CV-00833, 2021 WL 4439516, at *8 (E.D. Tex. Sept. 28, 2021) (quoting *Conkling v. Turner*, 883 F.2d 431,434 (5th Cir. 1989)).

The Bank has placed its settlement with Mr. Arthur Badger—and by extension, the facts investigated and recounted in the Harris Report—at issue in litigation.  In *Badger v. Laffitte, et al.*, No. 2022-CP-03-00080, filed in June 2022 and pending in Allendale County, South Carolina, the Bank has asserted, among other things, that Mr. Badger's claims "are barred, in whole or in part, by [hos] compromise and settlement with other persons or parties."  (**Exhibit 3**, Bank's Ans. ¶ 50, Aug. 4, 2022.)  This is a reference to the settlement negotiated by the Bank with the Peters Murdaugh firm, and between the firm and Mr. Badger using the Bank's funds.

Members of the Bank's Board and management that have been interviewed have also placed the Harris Report at issue.  For example, Elizabeth Malinowski, the Bank's Executive Vice

President and member of its Executive Committee, has cited the Harris Report as confirming that certain checks were improperly negotiated. (Malinoski Interview, May 2, 2022, Laffitte_Restricted_Access_0129162.) The same is true for interviews of other members of the Bank's management. The Bank has also made public statements about internal investigation it has conducted to ensure investors and customers continue to patron the bank. This too places the report at issue. *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 230 F.R.D. 433, 436 (D. Md. 2005).

By placing the Bank's actions in attempting to settle matters as detailed in the Harris Report at issue, the Bank has waived any protection that may apply. The Court should deny the Bank's motion to quash the subpoena on that basis.

## IV.    If any evidentiary privilege or protection apply, they must yield to Mr. Laffitte's Constitutional rights under the Fifth and Sixth Amendments.

The attorney-client privilege is an evidentiary privilege that is not absolute, contrary to the Bank's claim. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011). "Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances," *Herbert v. Lando*, 441 U.S. 153, 175 (1979); *see also State v. Doster*, 276 S.C. 647, 651, 284 S.E.2d 218, 220 (1981) ("The public policy protecting confidential communications must be balanced against the public interest in the proper administration of justice."). A privilege should operate only where "necessary to achieve its purpose," *see Fisher v. United States*, 425 U.S. 391, 403 (1976), and "is to be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Proc.*, 727 F.2d 1352, 1355 (4th Cir. 1984) (quotation omitted).

Mr. Laffitte has three primary Constitutional rights implicated by the Bank's motion to quash: (1) his right of confrontation, U.S. Const. amend. VI; (2) his right to compelled process, *id.*; and (3) his right to Due Process, U.S. Const. art. V. The Bank's attempts to prevent disclosure

of material evidence establishing Mr. Laffitte's actual innocence cannot frustrate these Fifth and Sixth Amendment rights, even if the records were privileged.

The Sixth Amendment gives criminal defendants the right "to be confronted with the witnesses against him." U.S. Const. art. VI. Cases construing the "clause hold that a primary interest secured by it is the right of cross-examination.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). "[T]he criminal defendant's right to confront witnesses necessarily encompasses his right to also see any documentary evidence that such witnesses offer at trial as evidence to support a conviction." *United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) (balancing government's right to protect classified documents under a governmental privilege against the defendant's constitutional rights).

The Compelled Process Clause enshrines in the Constitution the defendant's right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *United States v. Moussaoui*, 365 F.3d 292, 307 (4th Cir.), *opinion amended on reh'g*, 382 F.3d 453 (4th Cir. 2004) (holding right is "integral to our adversarial criminal justice system."). Exclusion of evidence can violate the Compulsory Process Clause if the rules authorizing the exclusion is "disproportionate to the purposes they are designed to serve," and the exclusion "has infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citing *Rock v. Arkansas*, 483 U.S. 44, 56–58 (1987)).[5]

---

[5] "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation omitted). The

So far, the Supreme Court has declined to address whether evidentiary privileges and protections must give way to other constitutional protections, *Swidler & Berlin v. United States*, 524 U.S. 399, 408 n.3 (1998), rather than having "expressly rejected the use of such a balancing test" as the Bank asserts, (Mot. to Quash ¶ 31). Other courts have relied on other Supreme Court cases holding "that evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment." *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004). Among the privileges that must yield to confrontation is the attorney-client privilege. *Id.*; *United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994) ("Even the attorney client privilege . . . hallowed as it is, yet not found in the Constitution, might have to yield in a particular case if the right of confrontation . . . would be violated by enforcing the privilege."); *Mills v. Singletary*, 161 F.3d 1273 (11th Cir. 1998); *United States ex rel. Blackwell v. Franzen*, 688 F.2d 496, 501 (7th Cir. 1982) ("The court must ultimately decide whether the probative value of the [excluded] alleged privileged communication was such that the defendant's right to effective cross examination was substantially diminished."). Given that the Bank concedes the work-product protection is only a "qualified" protection, (Mot. to Quash ¶ 12), the same reasoning applies to either the evidentiary privilege or the discovery protection.

"The defense's constitutional right to produce evidence under the compulsory process clause may overcome the attorney-client privilege." *United States v. Romano*, 46 M.J. 269, 274 (C.A.A.F. 1997); *State v. Hoop*, 134 Ohio App. 3d 627, 641, 731 N.E.2d 1177, 1187 (1999) ("The right to compulsory process will also outweigh privilege when enforcing privilege prejudices the right."); *see also* 24 Wright & Miller, *Fed. Prac. & Proc. Evid*. § 5506 (1st ed.) ("Finally, the

---

test applied to determine whether a defendant's right to present complete defense is similar to the test for determining whether a defendant's compulsory process rights have been violated.

attorney-client privilege, like all privileges, may have to yield when it comes in conflict with the constitutional right of a criminal defendant to produce evidence in his own behalf.").  In the context of other privileges, such as those held by the Government, the Fourth Circuit has explained that "[o]nce a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way."  *United States v. Rivera*, 412 F.3d 562, 569 (4th Cir. 2005); *see also United States v. Smith*, 780 F.2d 1102, 1110 (4th Cir. 1985) (outlining balancing framework for disclosure and admissibility of protected information).

The Harris Report is expected to directly contradict the Government's assertion that Mr. Laffitte issued the $680,000.00 check "without notice to or consent from the [Bank's] Board of Directors," (2d Superseding Indictment ¶ 18), and that he "initiated the payment without consultation with, approval from, or notice to the [Bank's] Board of Directors," (*id.* ¶ 8(k).)  Just as the recording the Court concluded was not privileged, Mr. Laffitte understands that the Harris Report shows that before the check was cashed by Peters Murdaugh and provided to the law firm's client, the Bank's Board was provided information about the payment and did not object to counsel proceeding with the plan.  Thus, the Harris Report will confirm there was both "notice" and "consent" from the Bank's Board, completely contradicting the picture of Mr. Laffitte's actions the Government has painted.  As a result, the Harris Report can hardly be said to be immaterial under any of the tests applicable to Mr. Laffitte's Fifth and Sixth Amendment rights, requiring the motion to quash be denied.

## Conclusion

For the reasons set forth above, the Court should compel the Bank to produce the Harris Report and should deny the Bank's request to quash the subpoenas.

**[Signature on following page.]**

13

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ E. Bart Daniel*

E. Bart Daniel, Federal Bar No. 403
E-Mail: bart.daniel@nelsonmullins.com
Matt Austin, Federal Bar No. 11435
E-Mail: matt.austin@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

Christian J. Myers, Federal Bar No. 13096
E-mail:  josh.myers@nelsonmullins.com
Phone: (202) 689-2800
101 Constitution Avenue NW, Suite 9000
Washington, DC 20001

*Attorneys for Russell Lucius Laffitte*

Charleston, South Carolina
October 24, 2022