```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF SOUTH CAROLINA
 2                         CHARLESTON DIVISION

 3


 4     _____ )
                                        )
 5     UNITED STATES OF AMERICA,        )
                                        )
 6            Plaintiff,                )  Docket No. 9:22-658
                                        )
 7            vs.                       )  Charleston, SC
                                        )
 8     RUSSELL LUCIUS LAFFITTE,         )  Volume II
                                        )
 9            Defendant.                )
       _____ )  DATE:  November 9, 2022
10

11              BEFORE THE HONORABLE RICHARD M. GERGEL
               UNITED STATES DISTRICT JUDGE, PRESIDING
12                          JURY TRIAL

13

14     A P P E A R A N C E S:

15     For the Plaintiffs:

16     EMILY EVANS LIMEHOUSE
       U.S. Attorney's Office
17     151 Meeting Street, Suite 200
       Charleston, SC 29401-2238
18     843-266-1663
       emily.limehouse@usdoj.gov
19
       WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
20     U.S. Attorney's Office
       1441 Main Street, Suite 500
21     Columbia, SC 29201
       803-929-3000
22     winston.holliday@usdoj.gov
       kathleen.stoughton@usdoj.gov
23

24     COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
                                    United States Court Reporter
25                                  901 Richland Street
                                    Columbia, SC  29201
```

228

1    A P P E A R A N C E S:

2    For the Defendant:

3    EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
     Nelson Mullins Riley and Scarborough
4    151 Meeting Street
     Charleston, SC 29401
5    843-534-4123
     bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com
6
     CHRISTIAN JOSHUA MYERS
7    Nelson Mullins Riley and Scarborough
     101 Constitutional Avenue NW, Suite 900
8    Washington, DC 20001
     202-689-2001
9    josh.myers@nelsonmullins.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2                             EXAMINATION

3     Witness Name                                         Page

4     NORRIS LAFFITTE (continued)

5         BY MR. AUSTIN ......................................... 257

6         BY MR. HOLLIDAY ....................................... 324

7     JEANNE SECKINGER

8         BY MS. LIMEHOUSE...................................... 327

9         BY MR. DANIEL ........................................ 426

10        BY MS. LIMEHOUSE...................................... 463

11    JAN MALINOWSKI

12        BY MS. LIMEHOUSE...................................... 474

13                             EXHIBITS

14    Exhibit                                              Page

15    Government's Exhs. 45, 46,47,49                      426

16    Defendant's Exh. 66                                  450

17

18

19

20

21

22

23

24

25

1          THE COURT:  Any matters we need to address, first

2    from the Government?

3          MS. LIMEHOUSE:  Nothing from the Government, Your

4    Honor.

5          THE COURT:  From the defense?

6          MR. DANIEL:  Nothing from the defense, Your Honor.

7          THE COURT:  Very good.  Bring in the jury.

8          (Whereupon, the jury returns to open court at 9:13

9    a.m.)

10          THE COURT:  Please be seated.  Will the Government

11    have the witness return to the witness stand.

12          MR. HOLLIDAY:  Thank you, Your Honor.  The

13    Government calls Norris Laffitte back to the witness stand.

14          THE COURT:  Mr. Laffitte, let me remind you, you are

15    still under oath.

16          Please continue, Mr. Holliday.

17          MR. HOLLIDAY:  Your Honor, thank you very much.

18    BY MR. HOLLIDAY:

19      Q.   Mr. Laffitte, I want to begin today by reminding you

20    and the jurors where we left off yesterday.  Okay?  Should be

21    two documents in front of you on the screen there.

22      A.   Yes, sir.

23      Q.   And we went over both of these at length yesterday.

24    On the left-hand side you see Government's Exhibit -- the

25    check that we started talking about; is that right?

1      A.     Yes, sir.

2      Q.     And then on the right-hand side -- and that check

3  was executed when?

4      A.     That check is dated 10/28/2021.

5      Q.     Okay.  And then we are really just reorienting the

6  jury back as to the time we've been talking about.  So the

7  e-mail on the right is dated when?

8      A.     February 8, 2013.

9      Q.     Right.  So the Badger transactions that we were

10  talking about yesterday were taking place in 2013; is that

11  correct?

12     A.     That's correct.

13     Q.     But the Board's concern regarding those transactions

14  really began in October of 2021 with the receipt or the

15  knowledge that that check had been transacted; is that right?

16     A.     Yes, sir, from that e-mail from Russell.

17     Q.     Okay.  Now we are going to move on.  We are going to

18  move on from October of 2021 to December of 2021.  And in

19  December of 2021, did you discover more questionable activity

20  committed by the defendant in this case?

21     A.     Yes.

22     Q.     Showing you what's been marked as Government's

23  Exhibit 15.  I think we are going to look at 15A first.  If

24  you would, beginning at the top, at the very top line, give

25  us the date and who is sending the e-mail, please.

1     A.    On Wednesday, December 1, 2021, at 11:21 a.m.,

2    Russell Laffitte using his Palmetto State Bank e-mail

3    address, wrote:  Everyone -- you want me to read it?

4     Q.    I can do that:  We have found another two

5    settlements that were stolen.  I have spoken with Mark Ball

6    and Jeanne Seckinger about them concerning the research only.

7          Just -- I believe the jury is going to be hearing --

8    well, I know at least one of them the jury is going to be

9    hearing more of.  Who is Mark Ball and who is Jeanne

10   Seckinger?

11    A.    Mark Ball is one of the lawyers in the law firm in

12   Hampton.  And Jeanne Seckinger, I think her title is

13   bookkeeper or accountant for that law firm.

14    Q.    Then it says:  We have not agreed to do anything at

15   this time, I have attached -- what has he attached?

16    A.    You will need to show me.

17    Q.    We will get back to that.

18          "We will need to send this to SLED and the ODC.  I'm

19   assuming our lawyers -- our attorneys will do this.  Mark was

20   talking with a client about one other small check to see if

21   she got the funds.  It was cashed.  The amount was

22   $25,240.08.  Thanks.  Russell Laffitte."

23          Did you receive this e-mail?

24    A.    Yes, I did.

25    Q.    What was your immediate reaction when you received

1    the e-mail?

2        A.    Disbelief.

3        Q.    Did you send an e-mail following up on this?

4        A.    Knowing me, probably so.

5        Q.    Well, I'm going to show you.  Government's Exhibit

6    15B, please.  Okay.  Go ahead just for identification

7    purposes, because the court reporter needs it as well, give

8    us the header of the e-mail, please.

9        A.    This is an e-mail from Norris Laffitte

10   hbrailroad@gmail.com.  It was sent December 1st, 2021, at

11   2:35 p.m. to Russell at his e-mail account that we use,

12   Subject:  Regarding the stolen settlement.

13       Q.    So now we've moved on from the word "conversion" and

14   we have "stolen settlement" acknowledged at the beginning,

15   right?

16       A.    Yes, sir.

17       Q.    This is yours.  So please read it.

18       A.    "Russell, without the narrative explaining each of

19   the 45 pages, are you telling me other conversions took place

20   along the same lines as Badger?  These checks are dated 2011,

21   and Badger's in 2013.  How many others are out there that

22   have not surfaced?  Pre-2011?  Post-2011?  Post-2013?  Please

23   provide a narrative on the 45 pages.  And please advise if

24   there are potentially any others we need to know about.

25   Norris."

1    Q.   So that's what I was getting at with my previous

2    question as far as what was attached or whatever.  What's the

3    45 pages that you are referring to?

4    A.   We had copies of checks and copies of bank

5    statements included in there.

6    Q.   And you are asking him to basically summarize what

7    you are looking at?

8    A.   Lord, it was just page after page.  What's he trying

9    to tell us?

10   Q.   Did he respond to you?  Well, I better stop asking

11   it that way.  15C.

12   A.   Please.  I slept two hours last night.

13   Q.   That's not the most efficient order.  All right.  So

14   here's his response.  I'm going to read it to you.  Okay?

15   Russell Laffitte, also Wednesday, December the 1st, also

16   stolen settlement, "Norris, yes, this is basically the same

17   as Badger."

18        What did you think when you read that?

19   A.   We were in trouble again.

20   Q.   "I do not know how many there are out there.  Jeanne

21   and Mark Ball think they are through the bulk of his cases.

22   Two checks were presented together.  $10,000 was deposited to

23   Maggie Murdaugh's account."  And we found out yesterday --

24   well, we know who Maggie Murdaugh is; is that right?

25   A.   Maggie Murdaugh is -- well, was Alex's wife.

1     Q.   $9,500 was made to a money order for cash.  $920

2     paid principal -- "Two checks were presented together.

3     $10,000 was deposited to Maggie Murdaugh's account.  $9,500

4     was made to a money order for cash.  $920 paid principal on a

5     loan.  $3,137.30 is interest paid to the same loan.  $100,000

6     was paid to my father to repay a loan he had made to Alex.

7     $50,135.61 and $91,220.57 was made to me as conservator for

8     the Plylers."

9          Did that make sense to you, money being paid to them

10    as conservator to the Plylers and it's coming out of these

11    new settlement funds?

12    A.   No.  No.

13    Q.   "This repaid a loan to him from the

14    conservatorship."  Did that set off any alarm bells?

15    A.   Yes.

16    Q.   "$329,500 went to rent to pay Randolph for

17    something."  Again, who is Randolph?

18    A.   Randolph would be Alex's father.

19    Q.   "He may have lent him money or he may have bought

20    something from his father.  And then $40,167.69 was paid to

21    the conservatorship of Malik Williams for money loaned."

22         At the time, did you know who Malik Williams was?

23    A.   Did not.

24    Q.   Have you learned who he was since then?

25    A.   I've learned -- yes.

1     Q.    Who is Malik Williams?

2     A.    He is another conservator fiduciary account that

3     Russell was in charge of.

4     Q.    "The rest of the pages are the conservatorship

5     account and show the balance.  It has been closed out since

6     2012.  I hope this helps."

7           All right.  I'm going to show you some exhibits

8     related to this e-mail.  Okay?  First of all, looking at

9     Exhibit 110, showing you -- well, reading you some of the

10    data off of that, the probate court docket sheet is what this

11    is identified as in the upper left-hand corner.  Do you see

12    that?

13    A.    I do.

14    Q.    And then filing date right beside that, August the

15    26th of 2010, you see that as well?

16    A.    Yes, sir.

17    Q.    And then the estate or guardianship is for Natasha

18    Thomas.  Do you see that right below there?

19    A.    I do.

20    Q.    And then the -- it's checked over here on this

21    sheet, conservator.  Do you see that as well?

22    A.    Yes, sir.

23    Q.    And then it says Russell Laffitte also?

24    A.    Yes, sir.

25    Q.    If we could, let's go to Exhibit 20, please.  This

1  is one of the disbursement sheets -- we are not going to go

2  there quite yet.  I'm going to start at the top.  We looked

3  at a conservatorship for Mr. Badger yesterday, right?

4      A.   Yes.

5      Q.   We are going to take a quick look at this one as

6  well.  up right above plaintiff's line, will you please read

7  what the text says there?

8      A.   Natasha Thomas through her conservator, Russell

9  Laffitte.

10     Q.   Okay.  Very good.  And then, you know, obviously,

11 this is a legal document.  Natasha Thomas, through her

12 conservator, Russell Laffitte and it's a lawsuit against

13 Michelin North America and Budget Tire and Pamela Pinckney as

14 well.  You see in this case there was a recovery amount of $2

15 million.  Do you see that as well?

16     A.   Yes, sir.

17     Q.   Now, I want you to look down at the bottom under

18 disbursement fees, disbursements and fees.  And you see

19 Russell Laffitte name there?

20     A.   Yes, sir.

21     Q.   How much money did he receive?

22     A.   $15,000.

23     Q.   Okay.  Very good.  All right.  I think that's all I

24 need to do with that document.  Now we are going to move on

25 to -- and, again, that was for Natasha Thomas; is that

1    correct?

2         A.    Yes, sir.

3         Q.    All right.  Moving on now to Government's Exhibit

4    No. 109.  Same thing we just looked at but for a different

5    individual, probate court docket sheet, and again, September

6    3rd of 2010.  If you would, tell us please the

7    conservatorship is for whom?

8         A.    Hakeem L. Pinckney.

9         Q.    And then the conservator again?

10        A.    Is Russell Laffitte.

11        Q.    Okay.  Very good.  That's all I need from that one.

12   And then moving to Exhibit 22, please.  All right.  We will

13   do the same thing, starting at the top, again, a legal

14   document, Russell Laffitte conservator for Hakeem Leonard

15   Pinckney.  You see that at the beginning?

16        A.    Yes, I do.

17        Q.    Under that again, Michelin North America, Budget

18   Tire and Pamela Pinckney.  In your capacity as a Board member

19   and all looking into this, were you made aware that Ms.

20   Thomas and Mr. Pinckney were in a very, very bad car accident

21   that resulted in this legal settlement?

22        A.    We were not notified of this at a Board meeting

23   in December 1, I think is the time frame you are referencing.

24        Q.    Okay.  Just to continue to publish this sheet,

25   what's the recovery amount on this lawsuit?

1       A.    $10,245,000.

2       Q.    And then going back down to the same place we were

3   before, Russell Laffitte is paid how much money to act as

4   conservator in this case?

5       A.    $60,000.

6       Q.    Okay.  I think what I would like to do is go back to

7   15A very briefly.  So the reason I wanted to come back to

8   this is maybe it will make just a touch more sense now to the

9   jury in this context.  We have found another two settlements

10  that were stolen.  And you and I have just looked at Natasha

11  Thomas and Hakeem Pinckney; is that right?

12      A.    Yes, sir.

13      Q.    Okay.  What I want to do is, we are going to briefly

14  walk through the checks as we did yesterday, but I want to

15  expedite this a little bit.  We are not going to linger as

16  much as we've done on some.  I think the jury basically got

17  the idea.

18            Showing you Exhibit 16, we are going to start with

19  this one.  We can focus on the top part.  This is Palmetto

20  State Bank, and it's $325,000, and it's settlement proceeds

21  of Natasha Thomas.  Do you see all that information on the

22  check there?

23      A.    I do.

24      Q.    And this, again, indicates December of 2011.  So,

25  again, when we talked about Badger yesterday, we were 2013

1   with the initial accident, the settlement, and we are in

2   2011, two years previous now for Pinckney and Thomas?

3       A.   Yes, sir.

4       Q.   Okay.  And if we could go to the next page, please.

5   And this is a settlement proceeds check going to Palmetto

6   State Bank, $309,581.46.  Do you see that?

7       A.   Yes, I do.

8       Q.   Again, we are talking about, again, that December

9   2011 time frame?

10      A.   Yes, sir.

11      Q.   And according to the e-mails that we were looking at

12  just a minute ago, these two amounts were combined; is that

13  correct?

14      A.   Yes.

15      Q.   You seemed slightly unsure, so we are just going to

16  do this real quick.  15C, please.  We are going to bounce

17  back.  And this is what I'm asking you.  When he says two

18  checks were presented together, we are talking about the two

19  300,000-and-change checks that we just talked about?

20      A.   That is correct.

21      Q.   All right.  Now let's go back to Exhibit 16, the

22  Maggie Murdaugh check, please.  All right.  Very first one,

23  this is a checking deposit dated 12/21/2011.  Do you see the

24  name there?

25      A.   I do.

1       Q.    And the amount is $10,000; is that right?

2       A.    Yes, sir.

3       Q.    And this is a deposit ticket; is that correct?

4       A.    Yes, sir.

5       Q.    I know Russell indicated he laid all these out in

6    the e-mail that we talked about for 15C, but did he indicate

7    why $10,000 was diverted from the conservatorship accounts to

8    Maggie Murdaugh?

9       A.    He did not.

10      Q.    And the jury has seen this.  He was the conservator

11   for both settlement accounts, Natasha Thomas and Hakeem

12   Pinckney, correct?

13      A.    Yes, sir.

14      Q.    As a conservator for those settlement accounts, what

15   is his responsibility, basically?

16      A.    He is to manage the money from those disbursement

17   sheets for the individuals that were supposed to get the

18   money.

19      Q.    So one of the reasons we looked at the disbursement

20   sheets, I wanted to show the jury he's being paid $60,000 on

21   one account; is that right?

22      A.    Yes, sir.

23      Q.    And $15,000 on the other account?

24      A.    Yes, sir.

25      Q.    And the reason he's getting $75,000 is to follow and

1    manage this money; is that correct?

2        A.    Yes, sir.

3        Q.    Would you imagine that somebody who's supposed to be

4    being paid $75,000 to follow and manage money would know why

5    $10,000 was paid to Maggie Murdaugh out of that account?

6        A.    You would think he would know why that money --

7    where that money should go.

8        Q.    Well, he was the one who notified y'all that it had

9    actually gone out.  Did he give you an explanation?

10       A.    He did not.

11       Q.    Next one, please.  This one is just basically a

12   cash-out; is that right?

13       A.    Yes, sir, it's a cash-out.

14       Q.    And what's the amount?

15       A.    $9,500.

16       Q.    Next one, please.  Again, all of this is happening

17   when?  There's a date on this transaction.  What is it?

18       A.    12/21/11.

19       Q.    And then roughly how much money is going out?

20       A.    $920.29.

21       Q.    I believe by now the jury is familiar with that.

22   What is the account name that the money is being transferred

23   into?

24       A.    Murdaugh Charters.

25       Q.    Do you know what Murdaugh Charters is?

1      A.    At the time I did not.  I do know now.

2      Q.    What is it?

3      A.    Alex had taken a loan, apparently, for a boat he

4    had.

5      Q.    Do you know why Natasha Thomas and Hakeem Pinckney

6    would be paying money to Alex Murdaugh to finance a boat?

7      A.    Beyond me.

8      Q.    Would you think the conservator would know that

9    information?

10     A.    He should.

11           MR. AUSTIN:  Objection, Your Honor.  He's going into

12   conclusions about the duties and obligations of a

13   conservator.  He's not qualified to weigh in on this at all.

14           THE COURT:  Why don't you lay a foundation of his

15   knowledge of the responsibilities of the conservator.

16           MR. HOLLIDAY:  Sure.  Thank you, Your Honor.

17           THE COURT:  Sustain the objection.

18   BY MR. HOLLIDAY:

19     Q.    We discussed conservatorships a little bit

20   yesterday; is that right?

21     A.    Yes, we did.

22     Q.    As a member of the Board of the bank of Palmetto

23   State Bank -- well, of Palmetto State Bank, in that role,

24   have you become familiar with how conservators function,

25   generally?

1          A.    Yes.

2          Q.    And what is --

3               MR. AUSTIN:  Objection, Your Honor.  I don't know

4     how he would become familiar with what fiduciaries would do

5     in a conservator context through the service onboard.

6               THE COURT:  Mr. Austin, let him complete what he's

7     doing here and then I will make a determination.  Please

8     continue, Mr. Holliday, laying the foundation.

9     BY MR. HOLLIDAY:

10         Q.    In your role as member of the bank, obviously,

11    occasionally conservatorships come to your attention; is that

12    correct?

13         A.    With these activities, they came to my attention.

14         Q.    Right.  And in these activities, in trying to

15    unschool exactly what was going on with the money, why the

16    bank was thought to be responsible for paying this money,

17    have you become generally familiar with the roles of

18    conservators and what they do?

19         A.    Yes.

20              THE COURT:  I believe you've laid an adequate

21    foundation.  Please continue.

22    BY MR. HOLLIDAY:

23         Q.    So as a conservator for settlement fees, is that

24    individual responsible for knowing exactly how the money is

25    disbursed?

1      A.    Yes.

2      Q.    And is that, in fact, why they are paid tens of

3    thousands of dollars to do that role?

4      A.    In this case, it's $75,000.

5      Q.    Right.  Well, sometimes it's hundreds of thousands

6    of dollars; is that right?

7      A.    We have seen that also, yes.

8      Q.    And so if someone is being paid on these cases tens

9    of thousands of dollars, a conservator certainly should have

10   known why $920 was going --

11          MR. AUSTIN:  Your Honor --

12          THE COURT:  Sustain the objection.  It's leading.

13   BY MR. HOLLIDAY:

14     Q.    Well, as a conservator for those accounts, would the

15   conservator have a basis of knowledge for why that money was

16   being paid to Murdaugh Charters?

17          MR. AUSTIN:  Objection, Your Honor.  He's asking all

18   sorts of legal conclusions about conservators' duties

19   obligations still.

20          MR. HOLLIDAY:  Your Honor, it's not a legal

21   conclusion.

22          THE COURT:  It's not.  Overruled.  Please continue.

23   BY MR. HOLLIDAY:

24     Q.    Would a conservator over these accounts have the

25   basis for knowing exactly why this money was being paid?

1    A.    He should.

2    Q.    Next one.  Give us the account name again.

3    A.    Alex Murdaugh/Murdaugh Charters.

4    Q.    Okay.  And what's the date on this transaction?

5    A.    This is also 12/21/11.

6    Q.    And what's the payment on the boat this time?

7    A.    $3,137.30.

8    Q.    Next one, please.  So this one is -- was referenced

9  in the e-mail as well; is that correct?

10   A.    It was.

11   Q.    What's the date on this transaction?

12   A.    12/21/2011.

13   Q.    Again, this is a bank money order; is that correct?

14   A.    Yes, it is.

15   Q.    The amount and who it's going to?

16   A.    $100,000 to Charles A. Laffitte Jr.

17   Q.    And lots of names have been going the jury's way.

18  Tell us again who Charles Laffitte Jr. is.

19   A.    That was Russell's father.

20   Q.    And what's his role in the bank?

21   A.    He's done it all.  But at this time, he's chairman

22  of the Board and in 2011, probably CEO.  I wasn't on the

23  Board in 2011.

24   Q.    Fair enough.  Next one, please.  And here we are

25  actually looking at the check; is that correct?

1      A.    I am looking at a check, yes, the money order

2    itself.

3      Q.    And then what's the amount?

4      A.    $100,000.

5      Q.    And, again, it's made out to Charles Laffitte Jr.;

6    is that correct?

7      A.    Yes.

8      Q.    Read the signature that's there, please.

9      A.    Russell L. Laffitte.

10     Q.    And in December when this came to light, were you

11   told by the conservator on this account, Russell Laffitte,

12   why he was paying his father $100,000 from Pinckney/Thomas

13   money?

14     A.    I believe the e-mail said a loan.

15     Q.    We could pull it back up.  15C, please.  Okay.

16   Right in the middle there of the text:  $100,000 was paid to

17   my father to repay a loan he made to Alex.

18     A.    Yes.

19     Q.    So that's what you recall from the e-mail; is that

20   right?

21     A.    Yes.

22     Q.    Did he explain why a loan from his father to Alex

23   should have been repaid out of Pinckney/Thomas money?

24     A.    He did not.

25     Q.    Next one, please.  Okay.  We are going to look at

248

1      the front side first, but then we are going to flip it over.

2      Just identify for the jury what this is.

3          A.   This is a Palmetto State Bank checking deposit slip

4      in Charles Laffitte's name and his account.

5          Q.   Okay.  And the amount here?

6          A.   $111,960.06.

7          Q.   And then there's text here indicating that, for

8      details, look on the other side; is that correct?

9          A.   That is correct.

10         Q.   So we are going to look at the other side.  So I

11     know we are asking you and the jury to read sideways, not the

12     best situation, but focusing the attention here as to the

13     calculation, do you see that number there?

14         A.   Yes, sir.  $100,000 you underlined.

15         Q.   And then what does it say above it as a description

16     of what the $100,000 was?

17         A.   Loan repay.

18         Q.   And is that consistent with the e-mail as well as

19     the check, the money order that we looked at as well?

20         A.   Yes.

21         Q.   So this gets us back again.  Would you just

22     basically publish the money order?

23         A.   This is a Palmetto State Bank bank money order No.

24     219726.  It's date 12/21/2011.  Pay to the order of R.

25     Laffitte as conservator for Hannah Plyler $50,135.61 signed

1    by Russell L. Laffitte.

2        Q.    This check actually picks up a couple of things

3    going on.  We talked about Hannah Plyler a little bit

4    yesterday.  Who is Hannah Plyler?

5        A.    Another conservator, another fiduciary

6    responsibility of his.  I don't know if it was personal

7    representative or conservator.

8        Q.    But we saw money at least going from the Badger

9    account to repay loans made from the Hannah Plyler account;

10   is that right?

11       A.    That's right.

12       Q.    What are we seeing now?

13       A.    Now we are seeing the Hakeem Pinckney money and

14   Natasha Thomas money going into a Hannah Plyler account.

15       Q.    Was the Board given an explanation by Russell

16   Laffitte as to why conservatorship money from the

17   Pinckney/Thomas accounts would have been going to pay the

18   Hannah Plyler account?

19       A.    We had no explanation.

20       Q.    But who is the conservator or personal

21   representative for all of the accounts we are talking about?

22       A.    Russell Laffitte.

23       Q.    Again, what is this?

24       A.    This is the bank's copy of, as it says, file copy of

25   the money order.

1    Q.    Okay.  Next one, please.  So now the jury has seen

2    two transactions in the name of Hannah Plyler from the

3    Pinckney/Thomas account.   What is this one?

4    A.    This is a deposit slip from Palmetto State Bank to

5    Hannah Plyler dated 12/23/11 of which the two checks we had

6    he just looked at, the 91,220.57 and the $50,135.61 had been

7    deposited, totaling $141,356.18 into the Plyler account from

8    the Badger/Pinckney checks.

9    Q.    Next one, please.  So this is a substantial one,

10   right?  What do we have here?

11   A.    This is the bank's copy of a money order drawn on

12   12/21/2011, purchased by Alex Murdaugh, $329,500, payable to

13   his father, Randolph Murdaugh III.

14   Q.    Next one, please.  Now we are actually looking at

15   the money order; is that right?

16   A.    That is the actual money order.

17   Q.    What does the signature read?

18   A.    Russell L. Laffitte.

19   Q.    Well, basically, we have everything going on here.

20   The remitter says what?

21   A.    Alex Murdaugh.

22   Q.    So in basic terms, I want you to describe this

23   transaction.  Who is authorizing the transaction by their

24   signature?

25   A.    Russell Laffitte is authorizing the transaction.

1     Q.   And the money is going from where?

2     A.   It's going from -- it says here remitter is Alex

3  Murdaugh.

4     Q.   But is that actually Alex Murdaugh's money?

5     A.   The checks that we were shown in first part of the

6  e-mail was a check to Hakeem Pinckney's conservatorship, and

7  Natasha Thomas's conservatorship.  So, no, it's not Alex's

8  money.

9     Q.   Again, it's going to pay Alex father out of the

10  Hakeem Pinckney/Natasha Thomas settlement money; is that

11  right?

12     A.   Yes, sir.

13     Q.   Next one, please.  And then just to round out, the

14  transaction we see here is a deposit; is that correct?

15     A.   Going into Randolph Murdaugh, III savings account.

16     Q.   Next one, please.  So this one is a little

17  different, right?  We are going to touch on this.  We are

18  going to go back to an e-mail and going to come back to it.

19  First of all, it's different language sort of in the account

20  holder of this check.  Would you just publish it for the

21  jury, please.

22     A.   Russell Laffitte as conservator for Malik Williams.

23     Q.   Okay.  So now in this case, you testified that he

24  was conservator, personal representative for the Plyler

25  sisters; is that correct?

1       A.   Yes, sir.

2       Q.   Pinckney and Thomas as well; is that correct?

3       A.   That's correct.

4       Q.   Badger as well; is that correct?

5       A.   Yes, sir.

6       Q.   Now, the jury has Malik Williams, correct?

7       A.   Yes, sir.

8       Q.   And the amount on the check is what?

9       A.   $40,000.

10      Q.   Okay.  And the signature reads what?

11      A.   Russell L. Laffitte.

12      Q.   And being made out to whom?

13      A.   Alex Murdaugh.

14      Q.   Now, I want to go back to 15C for just a minute.

15   And down at the very bottom, there's reference to this one,

16   $40,167.69 was paid to the conservatorship of Malik Williams

17   for money loaned.  Do you see that language there?

18      A.   I do.

19      Q.   Now we are going to go back.  Okay.  So this is the

20   money that that e-mail is referencing; is that correct?

21      A.   Yes, sir.

22      Q.   Next one, please.  What are we looking at here?

23      A.   Once again, it's the bank's file copy of that money

24   order.

25      Q.   And in the next one, please.  And this is a checking

1     deposit into the Malik Williams's account in the amount of

2     that $40,161.69?

3          A.   40,167.69.  You said 61.

4          Q.   My fault.  Thank you.  Do you know whether or not --

5     strike the question.  Yet again, did Russell Laffitte as

6     conservator for Malik Williams, explain to you why he

7     extended a loan to Alex Murdaugh from the conservatorship

8     account?

9          A.   No, he did not.

10         Q.   As far as all of these transactions go, when you

11    are -- he, in his own words, analogized this to the Badger

12    situation; is that right?

13         A.   Yes, he did.

14         Q.   When y'all are trying to unravel the Badger

15    situation, you were looking for explanations for why all

16    these transactions took place; is that correct?

17         A.   That's correct.

18         Q.   Were you looking for similar explanations as to why

19    the Pinckney/Thomas money would have been transacted very

20    much the same way two years previously?

21         A.   Was looking for that answer.

22         Q.   And did you get it?  Did you get it from him?

23         A.   No.

24         Q.   So soon after all this took place, did the bank

25    sever its relationship with Russell Laffitte?

1     A.    The bank severed its relationship with Russell

2  Laffitte January 7th, 2021.

3     Q.    And when you sever -- when that took place, how did

4  the Board accomplish that?

5     A.    We had a special meeting.  We had our litigation

6  team involved, our attorneys involved.  We tried to figure

7  out what was going on.  At that meeting --

8     Q.    We will come to the rest of it in a minute, if you

9  would like.  Do you want to -- finish your answer if you'd

10  like?

11     A.    It's easy for me for you to talk.

12     Q.    Did you take a vote?

13     A.    Yes, we took a vote.

14     Q.    Was the vote unanimous?

15     A.    The vote was not unanimous on severing relationship.

16     Q.    Who voted no?

17     A.    His father voted no.

18     Q.    And his father's name is what?

19     A.    Charles A. Laffitte, Jr.

20     Q.    Have we seen his name on a number of these checks

21  and transactions from the conservatorship accounts?

22     A.    At least one for $100,000.

23     Q.    Did Russell Laffitte indicate to the Board also that

24  he helped approve the $750,000 loan?  Going all the way back

25  to beginning of your testimony.

1    A.    Yes, sir, he said his father approved that loan.

2    Q.    And then was there anyone who abstained from the

3    vote?

4    A.    Russell's sister, Gray Laffitte Henderson, abstained

5    in the vote.

6    Q.    And had he indicated also that Gray Henderson had

7    something to do with that questionable $750,000 loan?

8    A.    Yes.

9    Q.    Did you vote to sever your relationship with Russell

10   Laffitte?

11   A.    I did.

12   Q.    Why did you do that?

13   A.    There's a lot to the answer, but the short answer

14   is -- there isn't a short answer.  He converted -- excuse me.

15   My fiduciary -- this is hard.  The fiduciary responsibility

16   is to, it's my understanding being a director, is to look

17   after the corpus of the bank, the bank's name, the bank's

18   reputation, the shareholders.  The duty of a conservator is

19   to -- personal representative, is to look after the entity

20   he's responsible for.  But in this case, as a director, my

21   responsibility is to the shareholders of the bank.  And we've

22   now been presented with, God, three checks that were supposed

23   to go to Arthur Badger that were converted other places, and

24   then nine checks that were supposed to go to Arthur Badger's

25   wife's estate.  And those nine checks were converted to go

1    other places.  A check for $300,000, plus 325 to Natasha

2    Thomas didn't go where it was supposed to go.  It was

3    converted to other places.  325 -- 309 to Hakeem Pinckney

4    that was supposed to go to Hakeem's people, and it was

5    converted to other places.  A $680,000 check written with

6    shareholder's money to cover -- the bank didn't have anything

7    to do with those conversions.  And we were paying a

8    conservator fee, half of something he hadn't returned, money

9    to -- that we had nothing to do, that went to Bank of

10   America.  A loan that said was for a beach house that Alex

11   didn't own and the loan was presented as a loan on a beach

12   house renovation and it ended up -- $350,000 of that money

13   had gone out to a law group.  And $400,000 had gone to a

14   checking account that's overdrawn $367,000.  I'm just baffled

15   by all of it.

16            We had to get rid of him.  He lied to the Board And

17   we asked him, Russell, how many times have you done this?  He

18   said once or twice.  Golly.  Two Plyler girls, Malik, Hakeem,

19   Natasha, a fellow from somewhere in Central or South America.

20   I don't still know that I have all of them that I can tell

21   you.  Now, he's said one or two.

22            And in the transactions with our attorney, he misled

23   them also.  A $680,000 check that -- how do you say?  I mean,

24   he's admitted, I converted checks and I sent money to the

25   Murdaugh firm.  And everything in that e-mail was past tense.

1    And by the time the Board found out about it, that check had

2    been deposited.  We couldn't do anything then.  The fiduciary

3    responsibility towards the bank has not been served at all

4    with all these dealings.  He cheated.

5         MR. HOLLIDAY:  All right.  Mr. Laffitte, thank you

6    very much.  Please answer any questions the defense has for

7    you.

8         THE COURT:  Cross-examination.

9                    CROSS-EXAMINATION

10   BY MR. AUSTIN:

11   Q.   Good morning, Mr. Laffitte.  Take your time.

12   A.   Good morning.  Well, I can't say good.  Hello.

13   Q.   Do you need a minute?

14   A.   No.  No.

15   Q.   So I just want to start sort of from the beginning

16   where Mr. Holliday started with you.  You said you started

17   working for your family bank -- I'm sorry, family timber and

18   railroad business back in 1980; is that right?

19   A.   I don't know.  Can you --

20   Q.   I will try to speak up.

21   A.   No, I don't know your name.  If you said it, I

22   didn't hear it.

23   Q.   It's Matt Austin.  You started working for your

24   family's timber and railroad business back in 1980; is that

25   right?

1      A.    That is correct.

2      Q.    And the railroad closed in 2012?

3      A.    That is correct.

4      Q.    All right.  And you kept working for the timber

5  business after that?

6      A.    Yes, sir.

7      Q.    Up until 2020?

8      A.    That is correct.

9      Q.    Okay.  And you were terminated then?

10      A.    That's the way I looked at it, but the family says

11  it was just a realignment.

12      Q.    And then you went to work for your in-laws working

13  at their plantation, is that right, after that?

14      A.    No, sir, that's not right at all.

15      Q.    Okay.  My mistake.  I believe you said you still

16  keep books for your family business?

17      A.    Yes, sir.

18      Q.    Is that a full-time job?

19      A.    I do it every day, yes, sir.

20      Q.    But you are not a banker at the same time, right?

21      A.    No.

22      Q.    You've never been a banker?

23      A.    No, I was a teller after my sophomore year in

24  college.

25      Q.    Okay.  But you've never worked as a -- I guess you

1    are an adult during college.  If you are like me, probably

2    weren't fully an adult yet -- but worked full-time at the

3    bank after college?

4        A.    No, sir, I have not.

5        Q.    And I believe you said that when you joined the

6    Board, you sort of learned on the job; is that right?

7        A.    Yes, sir.

8        Q.    But, again, it wasn't a full-time job.  And --

9            MR. HOLLIDAY:  Was that a question?

10            THE COURT:  Yeah.  Was that a question?  Was it a

11    full-time job is the question.

12            MR. AUSTIN:  My apologies.

13            THE WITNESS:  Has been lately.

14    BY MR. AUSTIN:

15        Q.    Okay.  And you became a Board member in July 2018;

16    is that right?

17        A.    Charlie asked me to join the Board in June, but I

18    was not in town for that meeting.  So I don't know if

19    technically if I joined it in June or not.  My first meeting

20    was July.

21        Q.    And you said Charlie asked you, you are saying that

22    Russell's dad asked you to join the Board?

23        A.    That is correct.

24        Q.    And he was just doing what your dad asked him to do;

25    isn't that right?

1      A.   He was doing -- say that again.

2      Q.   Didn't he ask you to join the Board because your dad

3   asked him to?

4      A.   I have no idea about that.

5      Q.   Isn't it typical for Board memberships to be passed

6   down from family members to their handpicked successors?

7      A.   I can't agree with that statement.

8      Q.   Okay.  And in order to be on the Board and have a

9   voting position as a Board member you have to own stock in

10   the bank; isn't that right?

11      A.   Yes, sir.

12      Q.   And how much stock do you own in the bank?

13      A.   I own 10 shares.

14      Q.   Ten shares, okay.  And what about family members,

15   how many shares do your family members own?

16      A.   What family?

17      Q.   Let's start with your dad.  How many shares does

18   your dad own?

19      A.   Today, I think he has a little over 3,000, but I am

20   not --

21      Q.   You don't have to be totally accurate, but roughly

22   around 3,000?

23      A.   I think that's correct.

24      Q.   And what about, do you have a wife?

25      A.   Does he have -- does he have a wife?

1      Q.    Do you have a wife?

2      A.    I am happily married for 38 years.

3      Q.    Does she own any shares?

4      A.    No, sir.

5      Q.    What about children?

6      A.    My children own no shares.

7      Q.    Okay.  Have they recently sold any shares?

8      A.    They sold their shares within the last five years.

9      Q.    All right.  If we could please pull up Defendant's

10    Exhibit 3.  I believe yesterday we touched -- Mr. Holliday

11    touched on some of the bylaws.  But I don't think we actually

12    went through any of them.  Can you explain to the Board -- I

13    mean, for the jury, what the bylaws are and how they operate?

14    A.    From the business standpoint, when you set up a

15    corporation, you have bylaws --

16            MR. DANIEL:  Can you speak into the microphone.

17            THE COURT:  Put the microphone a little closer to

18    you, sir.

19    Q.    I will speed this up a little bit.  Bylaws basically

20    set out the operating procedures for the bank; is that right?

21    Sort of set the guidelines for what people can and can't do

22    and what authority they have; isn't that right?

23    A.    That is correct.

24    Q.    And as a Board member, you are tasked with being

25    familiar with those bylaws; is that right?

1      A.    Yes.

2      Q.    And can we please go to Section 3.01.  And this

3  section basically just says the Board has full authority to

4  conduct -- or authority over the conduct and management of

5  the business of the bank; is that right?

6      A.    You read that well.

7      Q.    Ultimate authority over the conduct and management

8  of the business and affairs of the corporation, corporation

9  being the bank?

10     A.    Yes, sir.

11     Q.    Correct?  Okay.  And can we go to 3.03.  And we can

12  go to -- oh, geez, on the top of page 7, top paragraph,

13  please.  In Subsection 3 here, it just says that basically

14  what we already talked about.  You have to own certain amount

15  of shares in order to be on the Board.  And that applies to

16  you?

17     A.    Yes, sir.

18     Q.    So can we now go to 3.15.  And this is a really long

19  sentence.  And leave it to a lawyer to draft this.  But if

20  you go to the second half of the paragraph, basically says

21  that if you disagree with some Board action and you want to

22  document that you disagree with something, you need to put it

23  in writing and make sure it's covered in minutes from a Board

24  meeting; is that right, or at least a follow-up with the

25  secretary?

1      A.   I'm looking at this for the first time with you

2  today.  It's been a long time since I read these.  I have now

3  read it.  And what's your question again, please?

4      Q.   So --

5      A.   Like you said, it's long.

6      Q.   You've talked a lot about different actions that

7  were taken by Russell as the CEO of the bank and actions

8  taken by his father and his sister and as board members and

9  Executive Committee members.  Do any of the minutes reflect

10 that you had filed any opposition as required by the bylaws

11 to what they've done?

12     A.   No, sir.

13     Q.   Okay.  And why is that?

14     A.   Forgot there was this wording in the bylaws.

15     Q.   Okay.  It was an innocent mistake though, right?

16          MR. HOLLIDAY:  Your Honor, I think that

17 mischaracterizes the testimony.  I think it's been

18 established that Gray Henderson took the minutes.  So that

19 would probably be a question --

20          THE COURT: I think that's a speaking objection.

21 Just say objection.

22          MR. HOLLIDAY:  I object, Your Honor.

23          THE COURT:  Okay.  He's answered the question, I

24 think.  Please continue.

25 BY MR. AUSTIN:

1    Q.    Can we go to Section 3.16, please.  Again, another

2    really long paragraph.  It's hard to follow.  But, basically,

3    this sets out the rules for the Executive Committee; is that

4    right?

5    A.    Appears to be, yes.

6    Q.    And standing up here in front of everybody, I don't

7    know that I could point to it really quick, so I'm going to

8    read from my notes, which should be accurate, but you tell me

9    if you disagree.  It basically says that the chairman shall

10   be a member of the Executive Committee and serve as chairman

11   of that committee; is that right?  Is that your understanding

12   of how it works?

13   A.    I read the sentence:  The chairman of the Board

14   shall be a member -- that's about the sixth line down -- and

15   serve as chairman of the Executive Committee unless otherwise

16   prescribed by the Board of Directors.

17   Q.    And chairman of the Board is Charles, or Charlie

18   Laffitte, Russell's dad?

19   A.    That's correct.

20   Q.    And it says that:  The Executive Committee shall

21   have delegated to it and may exercise all the power and

22   authority of the Board for management of the business and

23   affairs of the corporation, except to the extent, if any,

24   subsequently eliminated by resolution of the full Board.

25        Do you see that sentence?

1      A.    I see that sentence.

2      Q.    Okay.  And it says here:  The authority to approve,

3  bind the corporation under, and initiate, defend, or settle

4  legal proceedings, which duties shall and authority shall be

5  exercisable without further action of the full Board and

6  shall continue to apply until modified by the Board; is that

7  right?

8      A.    That's correct.

9      Q.    Okay.  In the event of absence, incapacity,

10  inability, or refusal of the CEO to act, the Executive

11  Committee can designate somebody else, another officer or

12  director, to assume their authority and act on behalf of the

13  corporation; is that right?

14      A.    Yes, sir.

15      Q.    Okay.  So we will get into some of the actions that

16  Russell took now that you've already talked about, but,

17  basically, this says exactly what the Executive Committee can

18  do.  And they have the authority to perform or enforce

19  contracts, agreements, and debt obligations, initiate,

20  defend, or settle legal proceedings; is that right?

21      A.    That's the wording.

22      Q.    That's the wording, but that's how it works, right?

23      A.    Yes, sir.

24      Q.    Okay.  So if the Executive Committee decided to do

25  any of the things that are allowed under this section, that

1    would be appropriate under the bylaws, correct?

2         A.   Correct.

3         Q.   Okay.  And I believe yesterday when Mr. Holliday was

4    asking you questions about some of the actions taken by Mr.

5    Laffitte, he phrased something to the effect of, they did not

6    comply with any expectation or requirement as set forth in

7    these bylaws; is that right?  Do you remember him asking you

8    that?

9         A.   I do not remember it phrased that way.

10        Q.   Okay.  But assuming that's correct, an expectation

11   wouldn't really have any legal significance in this context,

12   would it?  Aren't board members required to follow the

13   bylaws?

14        A.   Yes.

15        Q.   Okay.  Let's go to Section 4.02.  All right.  This

16   covers the powers and duties of the chairman of the Board And

17   I see here, the chairman of the Board, that would be Charlie

18   Laffitte, correct?

19        A.   Yes, sir.

20        Q.   He may execute on the corporation's behalf any and

21   all contracts, agreements, notes, bonds, deeds, mortgages,

22   certificates, instruments, and other documents, is that

23   right?

24        A.   Yes, sir.

25        Q.   And you don't have any disagreement with that?

1     A.    That's in the bylaws.

2     Q.    And bylaws govern everything the bank does?

3     A.    Yes, sir.

4     Q.    Let's go to Section 4.03.  And here, this covers the

5   CEO's duties and obligations.  And that would be Russell?

6     A.    Yes, sir.

7     Q.    And I should clarify.  That would be Russell during

8   the times you've been talking about with regard to the

9   $680,000 check, the $750,000 loan, and then the $500,000 line

10  of credit, which basically Counts 4, 5 and 6 of the

11  indictment; is that right?  He was the CEO at the time?

12    A.    Yes, sir.

13    Q.    Okay.  And once again, says that he will be subject

14  to the authority of the Board of Directors and shall manage

15  the business and affairs of the corporation, again, being the

16  bank.  And he shall have the authority, full authority, to

17  execute on the corporation's behalf any and all contracts,

18  agreements, notes, bonds, deeds, mortgages, certificates,

19  instilments and other documents; is that right?

20    A.    Yes, sir.

21    Q.    That is not dependent on anybody else saying it's

22  okay; is that correct?

23    A.    That's correct.

24    Q.    Same with the chairperson?

25    A.    That's correct.

1      Q.    And you testified that you first became aware in

2  June 2020 that Alex Murdaugh was a Palmetto State Bank

3  customer; is that correct?

4      A.    Yes.

5      Q.    And that's because of a million dollar line of

6  credit he got?

7      A.    Correct.

8      Q.    And you said that you joined the Board in June or

9  July, 2018?

10     A.    Yes, sir.

11     Q.    All right.  And during that time, did the FDIC ever

12 conduct any audits of Palmetto State Bank, or any

13 examinations?  I'm not sure the correct phrase, but did FDIC

14 examiners come in and review anything?

15     A.    Yes.

16     Q.    And they did that routinely?

17     A.    Yes.

18     Q.    Okay.  And did they ever raise any red flags about

19 Mr. Murdaugh?

20     A.    Not that I know of.

21     Q.    As a Board member you would probably be made aware

22 of that, wouldn't you?

23     A.    We get a summary.  I'm not sure that I've seen the

24 whole report.  I just don't remember.

25     Q.    As a standard part of every Board meeting wouldn't

1    Mr. Laffitte send out a Board to the entire Board containing

2    things like FDIC reports, third-party auditor reports,

3    transaction reports, suspicious activity reports, things like

4    that, a whole host of documents every time?  And as a board

5    members it's your obligation to review all of it; isn't that

6    right?

7         A.    That is correct.

8         Q.    So you are saying you don't remember ever seeing

9    anything about Alex Murdaugh having raised any concerns

10   during that time?

11        A.    I do not remember seeing anything.

12        Q.    But you know Alex Murdaugh, right?

13        A.    I know -- I met him, but, I mean, I'm not a friend.

14        Q.    I apologize if I go back and forth on pronunciation

15   of his name.  I've heard so many different ones at different

16   times it comes out.  If you get confused who I'm talking

17   about, just let me know.

18              All right.  So I want to go to $750,000 loan to Alex

19   Murdaugh.  You met with the U.S. Attorney's Office and FBI

20   and SLED multiple times; is that correct?

21        A.    Yes, sir.

22        Q.    In fact, you met with them on April 13th of 2022; is

23   that right?

24        A.    I don't remember.

25        Q.    Exact date --

```
 1        A.    I don't remember exact date.  I met with --
 2        Q.    Does that sound about right?
 3        A.    -- two gentlemen, yes, sir.
 4        Q.    Okay.  And I'm sorry for talking over you.  I will
 5   try not to do that.  And you said when you spoke with them,
 6   you told them that during the July --
 7             MR. HOLLIDAY:  Your Honor, objection.  Hearsay.
 8             THE COURT:  Let me hear the question again.  What's
 9   the question?
10        Q.    You stated that --
11             MR. HOLLIDAY:  Your Honor, I object.  He's
12   publishing something that I don't know where it's coming
13   from.  If it's an MOI, it's not his sworn statement.  It's
14   the agent's statement of what he thought he said.
15             THE COURT:  Well, this is a statement.  This is a --
16   are you seeking to question him about a statement he made
17   that was documented, not a sworn statement, but a statement
18   to a law enforcement officer?  Is that what you are asking
19   him?
20             MR. AUSTIN:  Right.  I believe, Your Honor, he's
21   testified to everything about the cover yesterday.
22             MR. HOLLIDAY:  Yeah, but that doesn't mean --
23             THE COURT:  I'm looking at 801.  Thank you.  Are you
24   intending -- first of all, this is not a sworn statement; is
25   that correct?
```

1          MR. AUSTIN:  That's right, Your Honor.

2          THE COURT:  And it's not done under penalty of

3   perjury, not a hearing or anything like that?

4          MR. AUSTIN:  It would be under obligation not to lie

5   to a federal agent.

6          THE COURT:  Are you seeking to impeach him on a

7   prior statement?

8          MR. AUSTIN:  Yes, Your Honor.

9          THE COURT:  Overruled.

10         MR. HOLLIDAY:  Your Honor, I understand the ruling,

11  but our analysis was under 613B.

12         THE COURT:  613A really covers this.  If you ask him

13  something and he needs to see the statement, you are

14  obligated to share it with him.

15         MR. AUSTIN:  Yes, Your Honor.

16         THE COURT:  Okay.  Overruled.

17         MR. AUSTIN:  May I approach the witness, Your Honor?

18         THE COURT:  You may.

19  BY MR. AUSTIN:

20     Q.   I apologize.  I have some of my notes on there

21  underlining stuff.  But please take a look at that and tell

22  me if it refreshes your recollection about statements you've

23  previously made to law enforcement.

24         THE COURT:  Is there a specific point you want him

25  to look to?

1          MR. AUSTIN:  I was giving him a chance to generally

2     look at it.  And then I will drill down more specifically.

3     BY MR. AUSTIN:

4     Q.   And just to cut to the chase a little bit more here,

5     you covered a lot of these same topics yesterday in your

6     testimony and this morning with Mr. Holliday; is that right?

7     A.   Yes, sir.

8     Q.   Okay.

9          THE COURT:  Is there a particular statement you are

10    focusing on?

11         MR. AUSTIN:  Yes, sir.

12         THE COURT:  Seems like an extensive statement.

13         MR. AUSTIN:  It's just two pages.  I will take it

14    back.  All right.  I will take it back.

15         THE COURT:  Why don't you just ask him, you know --

16    you impeach him on a prior statement if it's inconsistent.

17         MR. AUSTIN:  Sure.  Well, Your Honor, he gave two

18    statements.  And in order to draw the contrast, I wanted to

19    get the first one in.

20         THE COURT:  Okay.  Why don't you ask him the

21    question.

22         MR. AUSTIN:  Yes, Your Honor.

23    BY MR. AUSTIN:

24    Q.   You said that you grew up in the Hampton area but

25    that you never associated with any of the Murdaughs; is that

1    right?

2         A.    I was born in Charleston.  Moved to Columbia when I

3    was two.  Left Columbia when I was 18.  Went to college for

4    four years.  Moved to Walterboro in 19 -- August of '80.  Got

5    married in '83.  Moved to Varnville in May, I believe it was,

6    of '84.  And left Varnville in June of '98.  And been in

7    Ladies Island since.

8         Q.    My question is, though, did you associate with the

9    Murdaughs or anybody in their family, or have you ever over

10   the course of your life?

11        A.    No.

12        Q.    No?  You never associated with anybody related to

13   them?

14        A.    Define associate.

15        Q.    Okay.  I'm just going from your statement.

16             THE COURT:  Ask him the question.  And if you want

17   to impeach him, you can then impeach him.  Can you not say on

18   a certain date?

19             MR. AUSTIN:  I'm sorry.  I thought I did.  Trying to

20   keep track of this.

21   BY MR. AUSTIN:

22        Q.    Is it right that you said through your family,

23   growing up in the same area, you know Alex Murdaugh, but that

24   you do not associate with Murdaugh or any other Murdaugh

25   family members?

```
1        A.    That is a true statement.

2        Q.    Okay.  Then you also explained that at the August

3   17th, 2021, Board meeting, that was the first time anybody on

4   the Board heard about the $750,000 loan; is that correct?

5        A.    That sounds correct.  I don't have the paperwork in

6   front of me.

7        Q.    Sure.  But to the best of your recollection, you had

8   never heard about it, nobody on the Board had heard about it

9   before that?

10       A.    No, excuse me, no, we had not.  Yes.

11       Q.    So would it surprise you to know that that loan was

12  actually initiated in April --

13            MR. HOLLIDAY:  Your Honor, objection.

14            THE COURT:  Sustained.

15  BY MR. AUSTIN:

16       Q.    Did you know that there was an appraisal --

17            MR. HOLLIDAY:  Your Honor, objection.

18            THE COURT:  Sustained.  Haven't laid a foundation.

19  Bring it in in your own case, Mr. Austin.

20  BY MR. AUSTIN:

21       Q.    What was your understanding of the purpose of the

22  $750,000 loan?

23       A.    Beach house.

24       Q.    Beach house.  And it was your contention that that

25  is not how that money was actually spent; is that correct?
```

1        A.    $300,000 of that went to the Wilson Law Group in

2    Bamberg, and 400,000 of the 750 was deposited in Alex

3    Murdaugh's overdrawn checking account.

4        Q.    What does Charles Laffitte do at the bank?

5        A.    You are talking about Charles Jr. or Charles III?

6        Q.    Charles III?

7        A.    Charles III.

8        Q.    He works in appraisals; is that right?

9        A.    Yes, he works in appraisals.

10       Q.    Did you know he was working on the appraisal of the

11   beach house in the spring and summer of 2021?

12       A.    I did not know that.

13       Q.    And did you know that he began that process for Alex

14   Murdaugh and Maggie Murdaugh in April 2021?

15       A.    I did not know that.

16       Q.    Did you know that Maggie Murdaugh was handling all

17   of the plans for the renovation during that time?

18       A.    No.

19       Q.    Did you know that she was living out at Edisto at

20   the time, not every day, but for the most part?

21       A.    No.

22       Q.    Okay.  And did you know that she had an appraisal

23   scheduled for the day after she was murdered?

24       A.    I did not know that.

25       Q.    Okay.  And so when you say the money wasn't used for

1    its intended purpose upfront, you don't know exactly what the

2    intended purpose was at the beginning?  It sounds like you

3    are saying that the purpose all along was to go to other

4    areas, like to Chris Wilson --

5              THE COURT:  Do you have an objection?

6              MR. HOLLIDAY:  I do.  I was going to let him finish.

7    It's argumentative, Your Honor.

8              THE COURT:  Sustained.  Sustained.

9              MR. AUSTIN:  I could feel myself going too long

10   there.  Sorry.

11   BY MR. AUSTIN:

12        Q.   So to say that it wasn't originally intended for the

13   beach house renovations is inaccurate; is that right?

14        A.   I got confused.  Say that question.  What's your

15   question again, please.

16        Q.   You didn't know that the original purpose was for

17   the beach house; is that correct?

18             MR. HOLLIDAY:  Your Honor, objection.  The only way

19   that has been sustained is through the questioning.  It's not

20   been established as a fact.

21             THE COURT:  There was no direct testimony that he

22   said that on his direct, Mr. Austin.  So you can ask him the

23   direct question and then you could follow up.

24             MR. AUSTIN:  Sure.

25   BY MR. AUSTIN:

1    Q.    I believe you said yesterday that Russell threw his

2    dad under the bus when he turned to him during the August

3    2021 Board meeting.  And this was after you had discovered

4    some discrepancies between the Executive Committee minutes

5    and summary of Alex Murdaugh's exposure; is that correct?

6    A.    The under-the-bus statement yesterday was on the

7    Alex Murdaugh list of loan, with the loan number, and the

8    amount of money and the collateral and those five, six,

9    seven, eight, nine loans were added up incorrectly at the

10   bottom.  And when I said $2.7 million figure was incorrect,

11   that's when my colloquialism of words, "I didn't do that

12   this.  Daddy, you did."

13   Q.    Right.  Did you know that Russell had prepared an

14   earlier version of that document that was changed by his

15   father?

16   A.    I did not know that.

17   Q.    Did you ask him if -- what he meant when he said,

18   "You did this?"

19   A.    Didn't need to.  "Daddy, you did this," is what I

20   heard.

21   Q.    Okay.  And you testified as well that his father

22   said, we gave him, him being Alex Murdaugh, the money and we

23   will give him more money if he wants; is that right?

24   A.    His father said that, yes, or something close to

25   that.  May not be exact words, but that's, yes.

1    Q.   Didn't really seem like he thought he was being

2    thrown under the bus, right?

3    A.   The "thrown under the bus" comment that I made was

4    in regard to the addition on that page.  And Russell said he

5    didn't do this, Daddy, you did the additional on the page.

6    And that's where my thrown-under-the-bus comment comes into

7    play.  And now your question was what about the giving more

8    money?  I got lost.

9    Q.   I'm just -- Mr. Laffitte, Charles Laffitte -- I'm

10   sorry.  Charlie Laffitte did not seem to believe that he was

11   thrown under the bus?

12        MR. HOLLIDAY:  Your Honor, objection.  Speculation.

13        THE COURT:  It's irrelevant.  How about that?

14        MR. AUSTIN:   Okay.

15   BY MR. AUSTIN:

16   Q.   And you said you only learned from Jan Malinowski

17   that Alex's account was overdrawn at the time; is that

18   correct?

19   A.   Yes, sir.

20   Q.   And what is Jan Malinowski's position in all this?

21   A.   At the time Jan was president of Palmetto State

22   Bank.

23   Q.   Okay.  And --

24   A.   Charlie was chairman, Russell, CEO, Jan, president.

25   Q.   And he told you about Alex being overdrawn?

1        A.   Yes.

2        Q.   And do you have access to the overdraft reports as a

3   Board member?

4        A.   There were no overdraft reports until the last maybe

5   three or four months.

6        Q.   What do you mean there were no overdraft reports?

7        A.   You asked if I had seen overdraft reports, I think

8   was your first question.  And, originally, the Board packet

9   did not include overdraft reports of any form.

10        Q.   But any time you wanted as a director, you could go

11   and find overdraft reports; isn't that right?

12            MR. HOLLIDAY:  Your Honor, he cut the witness off.

13   I think he was finishing his answer.

14        Q.   I'm having trouble hearing.  Sorry.

15        A.   As I was saying in the beginning, the Board was --

16   never saw overdraft reports.  It's only been in the last few

17   months that it is now included in the Board packet.

18            So, gosh, now I lost your question again.  Keep

19   going.

20        Q.   At any moment, talking about as a director of the

21   Board, you could ask for the Board -- I mean, for the

22   overdraft reports from the bank; is that correct?

23        A.   Jan Malinowski has -- you can ask any question you

24   want as a Board of director.

25        Q.   And you just never asked before?

1        A.    No.

2        Q.    So to say that there were no -- that Alex Murdaugh

3    wasn't included in the overdraft report is not accurate,

4    right?  You just didn't know whether he was or not?

5            MR. HOLLIDAY:  I object.  It misstates testimony.

6    He didn't say he wasn't included in overdraft reports.

7            THE COURT:  Sustained.  Ask the question more

8    directly, Mr. Austin.  You are assuming information.  I think

9    you are misstating the record.

10           MR. AUSTIN:  Okay.  I will try to move on.

11   BY MR. AUSTIN:

12       Q.    During your initial meeting with the FBI in April

13   2021, you said that Russell never admitted any wrongdoing and

14   that he only followed the direction of Murdaugh as an

15   attorney and Hampton County Probate Judge Sheila Odom; is

16   that correct?

17       A.    That's a lot.  Read that to me again.

18       Q.    Did Russell say that he was relying on Alex Murdaugh

19   as his attorney?

20           MR. HOLLIDAY:  Wait.  Wait.  Wait.  Wait.

21       Q.    At any point in time?

22           MR. HOLLIDAY:  Objection.

23           THE COURT:  This is a little confusing, Mr. Austin.

24   Slow down.

25           MR. AUSTIN:  I've tried not to object during his

1    questioning.

2              THE COURT:  I know.  We've got to have some

3    connection to a witness that has to be able to understand

4    what you are asking him.

5              MR. AUSTIN:  Sure.  Okay.

6              THE COURT:  So what was the question you just asked?

7         Q.   At any point in time, did Russell Laffitte tell you

8    that he relied on Alex Murdaugh as his attorney?

9              THE COURT:  He can answer that question.

10             MR. HOLLIDAY:  It's hearsay, Your Honor.

11             MR. AUSTIN:  No.  It's not soliciting for the truth

12   of the matter asserted.  It's whether or not he said it.

13             MR. HOLLIDAY:  It is soliciting for the truth of the

14   matter.

15             THE COURT:  You brought out that he had never --

16   about the justification.  I overruled the objection.  You can

17   ask the question.

18   BY MR. AUSTIN:

19        Q.   At any point in time did Russell say he was relying

20   on Alex Murdaugh as his attorney?

21        A.   He has said that.

22        Q.   Okay.  And did he say that he relied on Hampton

23   County Probate Judge Sheila Odom in any of the things that he

24   did as conservator or PR?

25             MR. HOLLIDAY:  Your Honor, I still don't get this.

1    A statement of a party opponent is not hearsay.  Russell

2    Laffitte is the party opponent.  The Government can publish

3    his statements.  He is their client.  You cannot publish

4    Russell Laffitte's statement through this witnesses.

5            THE COURT:  You know, here's -- the difficulty is

6    you are trying to ask him whether the party defendant made a

7    statement to him that wasn't part of his direct.  I didn't

8    understand him to make it in the direct.  If he made it in

9    the direct, you can question him about it.  Otherwise, put it

10   in through other testimony.

11           MR. DANIEL:  Your Honor, may we approach?

12           THE COURT:  You can.

13           (Whereupon, the following bench conference takes

14   place.):

15           THE COURT:  Matt, let me explain to you what the

16   problem is.  You are not getting him to answer the question

17   and impeaching him of it.  You are jumping into the statement

18   as if it's the evidence, which is not in.  But what you've

19   got to do is ask him the question so-and-so and then isn't it

20   a fact on so-and-so date you made a contrary statement.  You

21   can't -- because, otherwise, you are doing what Winston is

22   complaining you are doing; you are trying to introduce

23   evidence.  But to the extent you made a statement -- the

24   problem is, I think you are misquoting the record some here

25   on what his testimony was.  And you are really trying to

1      take --

2           MR. AUSTIN:  Not on purpose.  My understanding is he

3      was testifying to, I mean, today about different things that

4      he could or couldn't do under the probate code.

5           THE COURT:  That's fine.  You can do that.  But you

6      are really using the prior statement of the defendant and you

7      are not laying a foundation.  So you've got to take his

8      statement, and if he says, no, he never told me that, say,

9      isn't it true he did tell you that, or whatever.  Just

10     impeach, it's for impeachment.

11          MR. AUSTIN:  I understand.

12          THE COURT:  If it's inconsistent.  If he says -- if

13     he says -- you know, you've got to lay a foundation, prior

14     statement of the defendant, if he said the defendant never

15     told me that he was acting on the advice -- I didn't hear him

16     say that, by the way.

17          MR. HOLLIDAY:  I didn't either.

18          THE COURT:  If he said that, you could impeach him,

19     isn't it true that he previously told you at meetings to the

20     contrary.  That would be impeachment.

21          MR. AUSTIN:  He said today that he did not give any

22     explanation for his actions, repeatedly over and over.

23          THE COURT:  That's a fair point.

24          MR. HOLLIDAY:  Not his actions.  He didn't say he

25     didn't give explanation for his action.  He didn't explain

1    why he transferred the money.

2              THE COURT:  Let me say this.  The questions that Mr.

3    Holliday was asking was, did he ever explain this check or

4    that check.  That's fair enough.  But to say that you are now

5    extrapolating that to generally talking about no explanation

6    for anything.  But --

7              MR. AUSTIN:  That's the whole point, is he never had

8    any duty --

9              MR. HOLLIDAY:  The word "authority" was never used

10   in any of my questions.  I never used the word "authority."

11             MR. AUSTIN:  Did he ever take responsibility was the

12   question.

13             MR. HOLLIDAY:  No.  No, it wasn't.  It was, did he

14   ever explain.

15             THE COURT:  Remember, you can get evidence in

16   through your own client, but you are trying to impeach --

17   bring in this prior ... his statements that are in the

18   record.  They are not impeaching him.

19             MR. DANIEL:  Judge, the critical point, he said he

20   didn't tell us.  He didn't.  He says it over and over and

21   over.  We've got our hands tied.  We can't represent our

22   client.  We really can't, Judge.  He's going to testify to

23   what was said at the Board meeting.

24             THE COURT:  Let's send the jury out, if we could.

25   I'm going to take a break, if we could.  If the jury could

1    return to the jury room.

2              (Jury leaves open court at 10:29 a.m.)

3              THE COURT:  Please be seated.  I'm going to ask you

4    to step out, Mr. Laffitte, just for a moment, sir.  You could

5    step out the back.  We will retrieve you in a second.

6              Let's lay some foundation here.  I think the series

7    of questions were so confusing, frankly, that I don't think

8    the witness himself understood what he was being asked and

9    how any prior statement was being used.  So let's lay some

10   foundation here.

11             An opposing party's statement is hearsay unless it

12   is offered against the opposing party.  Now, you could

13   impeach a witness if he says something, for instance, he

14   says, Mr. X, the defendant, told me something.  And then you

15   could impeach him, isn't it true he told you at a Board

16   meeting the opposite?  That is impeachment.  But you've got

17   to lay the foundation first that he's got a prior -- that you

18   are impeaching him on something, not simply offering the

19   defendant's statement.  That is not permitted.

20             Now, the defendant is going to have every right to

21   testify himself.  But the question here is, you can't use the

22   defendant's statement -- you can't bring it in simply to

23   bring it in.  You can do it if he made -- Mr. Laffitte,

24   Norris Laffitte, made a statement, and then you impeach him

25   on that.

1           MR. DANIEL:  Your Honor, may I address the Court?

2           THE COURT:  You certainly may be heard.

3           MR. DANIEL:  Your Honor, what the question was, and

4    Mr. Austin asked it numerous times, did he testify, the

5    witness testify that he never told us, he never gave us

6    information at that Board meeting, he never explained it?

7    And, Your Honor, he's got a right to then say, didn't you say

8    that yesterday?  Didn't you testify to that yesterday?  And

9    then say, but isn't it true he did tell you about Odom, he

10   did tell you about A, B, and C.

11          THE COURT:  Okay.  Here's the difficulty here.  As I

12   understood Mr. Holliday's questions and the witness's

13   answers, they were asked, did you get an explanation for this

14   check?  Why was this check used from somebody else's

15   conservator account?  Okay.  And did you get an explanation

16   for that?  You can ask him about that.  But to the

17   question -- I never heard the witness say he never gave us

18   any explanation at all about anything.  I didn't hear him say

19   that.

20          MR. DANIEL:  Your Honor, he did.

21          THE COURT:  Well, you and I are listening to

22   different things.  I didn't hear him say that.  It was a very

23   precise set of questions which went to these series of checks

24   that were written.  And he said he never gave us an

25   explanation about these checks.

1          But to the extent he's made a statement that you

2     want to impeach him on, you can impeach him on that.  But

3     you've got to first identify a statement he has made that is

4     actually in the record, not one that is imagined or hoped for

5     or inferred.  He hasn't made it.  But -- and you could ask

6     him, you know, to the question, did you ever have an

7     understanding about why these particular checks were made?

8     That was the testimony he's given.

9          I am not trying to tie anybody's hands here.  We

10    just got to have some order.  And we are not going to let the

11    defendant march in the defendant's statement in his favor.

12    That is not what Rule 801(d)(2) allows.  You can't use the

13    defendant's statement unless against him.  But you can do it

14    if he's made a prior inconsistent statement.

15          So lay the foundation, you said on so-and-so date X.

16    Okay?  Lay that foundation.  Don't skip over it.  Don't jump

17    to the defendant's statement and try to slip it into the

18    record.

19          Okay.  Let's take about a five-minute break and then

20    we will bring the jury back.

21          (Whereupon, a recess transpired.)

22          THE COURT:  Let me explain so we can get past all of

23    this.  If we are attempting to impeach a witness on a prior

24    statement, if that's what we are doing, you've got to first

25    identify the statement.  Is it the trial testimony?  Is it

1    some prior statement?  You've got to identify specifically.

2    And then if you have some evidence to the contrary to impeach

3    him with, impeachment is a pretty broad thing.  Okay?

4            But what's been happening here is we've been trying

5    to get in this -- my interpretation of it -- we've been

6    trying to get in the defendant's statement favorable to him

7    through the -- to the examination of a witness, which is not

8    permitted here, basically leaping over any claim for

9    impeachment.

10           Now, I've looked back over my notes on the issue of

11   these series of questions about, did you get an explanation.

12   Every one of these, the best I can tell, was a request, did

13   you get an explanation regarding this check and why it came

14   from somebody else's conservator account.  It was very

15   precise.  It wasn't, did this man ever give you any

16   justification for his conduct?  That was never the question.

17   I never heard that question.  And to simply try to act like

18   that's the question he got and you get to march into court

19   the defendant's statements, that's not permitted.

20           The defense is going to have every chance to

21   testify.  But you can't -- you can't be bringing in his prior

22   favorable statements he thinks is exculpatory statements he

23   made when you are not using it for any purpose other than to

24   march it into the courtroom and try to get it in without

25   him -- without him -- you know, by through some alleged

1    impeachment.  It's not impeachment.  A party's opposing

2    statement is not permitted 801(d)(2).

3            MR. DANIEL:  Can we ask a question, did he provide

4    any explanation?

5            MR. HOLLIDAY:  No.  It's pretty clear, Your Honor.

6    I've looked at the 302s that they are saying it contained.

7    There's no mention of this at all.  I'm even wondering where

8    they think this happened.  And if it did happen --

9            THE COURT:  That's why I was trying to get precise

10   of -- I didn't hear a statement on direct to which you could

11   impeach, a direct statement that the man never gave us any

12   explanation whatsoever on anything he did.  I never heard

13   testimony like that.

14           And so the question is, can the defendant use his --

15   what he wants to use as his defense to bring it in.  It's

16   hearsay.  It's a hearsay statement.  And it's not falling

17   within the exception for hearsay.  And if he's not impeaching

18   him, he can't use it.

19           So, you know, a lot of this wasn't even clear what

20   prior statement he was presuming to impeach.

21           MR. DANIEL:  Judge, could I just have the floor to

22   ask the question?  I would just like to ask the question.

23           MR. HOLLIDAY:  No.  It's an improper question.

24           MR. DANIEL:  I can have --

25           MR. HOLLIDAY:  It's an improper question.  You can't

1    ask an improper question.

2         THE COURT:  What you are trying to say is, tell me

3    what the defendant said to you.  And you can't use a prior

4    statement of an opposing party statement unless it's offered

5    against the opposing party.

6         MR. DANIEL:  Judge, I understand that.  But can we

7    say to him, did he provide an explanation?  That's my

8    question to the Court.

9         MR. HOLLIDAY:  No.  It's very easy, Your Honor, no.

10   And there's an additional issue here that you just put your

11   finger on.  They haven't shown us where this contradictory

12   statement is.

13        THE COURT:  I read what you are trying to do is get

14   other witnesses to testify about what this defendant said.

15   He's going to have every right to get on the stand and

16   explain this.  And, you know, I don't see what the problem

17   is.  It's just you are trying to circumvent the rule against

18   hearsay.  And if you've got a prior inconsistent statement,

19   this is what, you know, I was saying to Mr. Austin, who is --

20   as y'all know, I'm very fond of everybody in this courtroom.

21   Y'all are all my friends.  But we are going to run a

22   courtroom.  Okay?  And we are going to follow the rules.  And

23   part of the problem was that Mr. Austin was not laying a

24   foundation for a statement for which he was impeaching.  If

25   he can do that, that's fine.  But he's got to do it first.

1   And Mr. Holliday says there's no statement to impeach.  Well,

2   we will deal with that if it arises, but you've got to start

3   by identifying the statement you are impeaching him on.

4   You've got to start with that.  Fair enough, Mr. Austin.

5          MR. AUSTIN:  Fair enough.  I thought I did.  And I

6   apologize.  Not trying to do that on purpose.  I'm ready to

7   move on from this topic anyway.

8          THE COURT:  Let's bring Mr. Laffitte back in.  Let's

9   bring the jury back in.

10          (Whereupon, the jury returns to open court at 10:49

11   a.m.)

12          THE COURT:  Please be seated.  Ladies and gentlemen

13   of the jury, I told you in the opening statement that there

14   will be times that the lawyers would make objections.  And

15   they are doing their job.  They are doing what they are

16   supposed to do.  The Rules of Evidence are very specific,

17   very technical.  I took it out of your presence because it

18   was a little more complicated and I wanted to be able to talk

19   and hear out the counsel.  And that's why I sent you back.

20   Plus, it was a good time for a break.  So I did that.  But I

21   don't want you to hold it against any lawyers for making

22   objections, not the person asking the question or the

23   objection being made.  No one is doing anything improper.

24   You happen to be blessed with some of the best lawyers in

25   South Carolina sitting at these two tables.  So don't judge

1    anything they are doing.  They are just doing their job.

2            Mr. Austin, please continue.

3            MR. AUSTIN:  Thank you, Your Honor.

4        Apologies.

5            THE COURT:  Let me say for the record, the objection

6    is sustained, prior record.

7            MR. AUSTIN:  Thank you.

8    BY MR. AUSTIN:

9        Q.    Through your April 13th, 2022, meeting with FBI,

10   isn't it true that you placed all blame on Russell Laffitte

11   for negotiating the checks that Mr. Murdaugh asked him to

12   re-cut related to the Badger settlement?

13       A.    Yes.

14       Q.    But you testified yesterday about a special meeting

15   on October 31st, 2021; is that right?

16       A.    We talked about a lot yesterday.

17       Q.    Sorry?

18       A.    We talked about a lot yesterday, sir.

19       Q.    Okay.  You don't remember?

20            THE COURT:  Be precise, Mr. Austin, about what you

21   are talking about.

22   BY MR. AUSTIN:

23       Q.    Did you take part in the October 21st, 2021,

24   emergency Board meeting of the Palmetto State Bank Board?

25       A.    Yes, I did.

1      Q.   And without getting into anything your lawyers told

2  you, isn't it true that based on that meeting, Russell asked

3  Ronnie Crosby at the PMPED law firm to put a pause --

4           MR. HOLLIDAY:  Your Honor, objection.

5           THE COURT:  What's the objection?

6           MR. HOLLIDAY:  It's hearsay.

7           THE COURT:  Yeah.  This is -- these issues you are

8  talking about was not raised on direct.  Ask him -- if you

9  want to impeach him, identify a specific statement he made,

10 and then you can impeach him.  But first you've got to

11 identify the statement.

12          MR. AUSTIN:  I will try to do this a different way.

13 BY MR. AUSTIN:

14     Q.   Did the Board ever ask Russell to put a pause on the

15 check --

16          MR. HOLLIDAY:  Your Honor, objection.  Hearsay.  Did

17 the Board ever ask.

18 BY MR. AUSTIN:

19     Q.   Did Mr. Laffitte ever put a pause on the check?

20          THE COURT:  That's a proper question.

21          THE WITNESS:  Did Laffitte ever put a pause?  No.

22 It was delivered and it was deposited.

23 BY MR. AUSTIN:

24     Q.   Okay.  And what is your understanding of the purpose

25 of that check?

1        A.    Russell -- if you could pull that e-mail back up

2   when he told us, was that the one where he said we had

3   converted -- I can't remember the language of that e-mail to

4   me.

5        Q.    Is it --

6        A.    That was his explanation.

7        Q.    Is it your understanding that Mr. Crosby at PMPED,

8   in fact, did put a pause on a check?

9             MR. HOLLIDAY:  Your Honor, objection.  Facts not in

10   evidence.  A lawyer testifying.

11             THE COURT:  What's -- lay your foundation.  Is this

12   cross-examination?

13             MR. AUSTIN:  Yes, Your Honor.

14             THE COURT:  Can you identify the specific statement

15   that you are examining here?  I'm a little confused.  I think

16   you are adding evidence not yet in the record.  That's the

17   problem here.

18   BY MR. AUSTIN:

19        Q.    All right.  Did the Board ever approve the $680,000

20   check written to PMPED?

21        A.    No.

22        Q.    Okay.  And do you know when that check -- or let me

23   put it a different way.  Do you know whether or not Arthur

24   Badger was ever of paid $1.325 million?

25        A.    Do I know if Arthur Badger was paid $1.325 million?

1      Q.    By the law firm.

2      A.    That e-mail said they were going to present the

3  1.325 million.  Do I absolutely without a doubt know?  I have

4  no idea whether they did or did not do it.

5      Q.    And did Palmetto State Bank attempt to enter a

6  settlement with the Badgers and PMPED?

7      A.    Attempt to enter a settlement?  The Litigation

8  Committee and the bank had hired our lawyers.  There was an

9  e-mail that Russell -- e-mail chain between Russell and

10  Trenham Walker, one of our lawyers.  And in that e-mail,

11  Russell made a statement to our lawyer that was not accurate,

12  because I think that e-mail was either from November 1st or

13  2nd.  And the way the e-mail was phrased to Trenham, it did

14  not show that the check, the $680,000 check, had been given

15  to the law firm and had been deposited by the law firm.

16      Q.    Okay.  Do you know what happened to those funds

17  specifically?  Were they given to Arthur Badger?

18      A.    That would be a question you need to ask --

19      Q.    Do you have any personal knowledge of whether or not

20  those funds were given to Arthur Badger?

21      A.    I do not have personal knowledge that those funds

22  were given to Arthur Badger, no.

23      Q.    And I think you testified earlier that Russell had

24  the authority as the CEO of the bank to settle any lawsuits,

25  disputes, and agreements on behalf of the bank; is that

1   right?

2       A.    That is correct.

3       Q.    And so did his dad as chairman under the bylaws; is

4   that right?

5       A.    Well, if it's not fraudulently done, the bylaws say

6   you have that authority.

7       Q.    Okay.  What was fraudulently done about it?

8       A.    Well, the $680,000 check was covering three checks

9   written to Arthur Badger that were converted -- excuse me, in

10  the memo line, Arthur Badger.  The following nine checks in

11  the memo line was the estate of Donna Badger that were

12  converted and went someplace else.  The next two checks were

13  written to -- through Bank of America that Palmetto State

14  Bank had nothing to do with.  And that part of that 680 was

15  his $35,000 conservator fee that Palmetto State Bank had not

16  benefited out of.

17      Q.    And did Russell pay back any part of his fees that

18  he received in relation to the Badgers?

19      A.    Not that I'm aware of.

20      Q.    So you don't know whether or not he paid half of it

21  back?

22      A.    I have never been presented with that information,

23  no.

24      Q.    And you don't know whether or not PMPED agreed to a

25  settlement with the bank with Russell operating as CEO?

1          A.    Say that again, please.

2          Q.    Do you know whether or not Russell entered into a

3     settlement with PMPED?

4          A.    He had a conversation with a PMPED lawyer for that

5     $680,000.  And if that is the complete settlement, it doesn't

6     appear to be.

7          Q.    How is it not a complete settlement?

8          A.    The Board has been made aware that PMPED would like

9     the balance on that $1,325,000.

10         Q.    They have since said that?

11         A.    Yes.

12         Q.    Okay.  But at the time, they didn't say that?

13         A.    Well, I wasn't talking to them.  The only

14    information we were getting was from Russell.  And Russell's

15    e-mail, you can pull it up and we can read it again, was

16    Russell's words.  It wasn't PMPED words.  So --

17         Q.    You are saying Russell is the only person who had

18    conversations with PMPED about this settlement?

19         A.    From our bank.

20              MR. HOLLIDAY:  Objection.  Mischaracterizes his

21    testimony and evidence of the facts.

22              MR. AUSTIN:  That's exactly what he just said.

23              THE COURT:  Ask the question again.

24         Q.    Ask -- oh, gosh.

25              THE COURT:  The question was --

BY MR. AUSTIN:

1   Q.   Was Russell the only person who had spoke with PMPED
2   about this settlement?

3   A.   Was Russell the only one that spoke with PMPED about
4   this settlement?  Trenham Walker spoke with PMPED about this
5   settlement.

6   Q.   Okay.  And did Mr. Walker on behalf of PSB -- there
7   are too many acronyms here -- on behalf of the bank, I will
8   try to keep it simple, did he try to claw back that check?

9   A.   You can't claw back a check that's already been
10  deposited.

11  Q.   Are you familiar with how IOLTA accounts work?

12  A.   No.

13  Q.   Did -- so you are saying that it's just impossible
14  and that there's no request made?

15  A.   I don't know that I know exactly what Trenholm's
16  conversation was with --

17  Q.   Okay.  Did you express any concerning in writing as
18  required by the bylaws about this payment to PMPED?

19  A.   Oh, yeah.

20  Q.   Okay.  When?

21  A.   That's when I pulled on the side of the road.  I was
22  coming back from Columbia, driving, wife in the car with me.
23  Phone went off.  Wife read the e-mail out loud.  What?  And I
24  pulled on the side of the road.  Spoke with Jan Malinowski.

1      What in the world is this?  Got some information.  I wrote

2      those seven or eight questions.  And my last one is:  Have

3      the people that did this been let go?

4           Q.   Right.  Did you ever ask for that money to be clawed

5      back?

6           A.   I'm a Board member.  I was not in a position to ask

7      for -- pick up the phone and call Ronnie and say, give me the

8      money back.  No, I did not call Ronnie.

9           Q.   Did you ask anybody on the Board to do that?

10          A.   We're still in the learning curve.  What all is

11     going on here?

12          Q.   The question is, did you ever ask for it to be done?

13          A.   I did not.

14          Q.   Okay.

15          A.   I don't remember.

16          Q.   In writing or orally; is that right?

17          A.   I don't believe I did.

18          Q.   Okay.  So fair to say that you did not oppose it as

19     you are required to do if you disagreed with it?

20          A.   You are going back to that section of the bylaws you

21     spoke of earlier?

22          Q.   Correct.

23          A.   I did not do what the bylaws said to do.

24          Q.   Or anything else?

25               MR. HOLLIDAY:  Objection.  That's an ambiguous

1    question.  What's that mean, or anything else?

2         THE COURT:  Overruled.  Go ahead.

3    BY MR. AUSTIN:

4         Q.   Did you do anything else to pull that money back?

5         A.   I personally did not.

6         Q.   Did the Board honor that agreement?

7         A.   Which agreement are you talking about?

8         Q.   To pay the $680,000 to PMPED to settle the Badger

9    case.

10        A.   I don't believe the Board ever approved that

11   $680,000.

12        Q.   Did anybody on the Board express any agreement that

13   this was a good idea?

14             MR. HOLLIDAY:  Your Honor, objection.  Hearsay.

15             THE COURT:  Sustained.

16   BY MR. AUSTIN:

17        Q.   Did anybody else oppose it and ask for the money to

18   be clawed back?

19             MR. HOLLIDAY:  Objection, Your Honor.  Hearsay.

20             THE COURT:  Sustained.

21   BY MR. AUSTIN:

22        Q.   Do you know when that money ultimately went to

23   Arthur Badger?

24        A.   No.

25        Q.   Would it surprise you to learn it went to him two

1    weeks later on November 15th?

2            MR. HOLLIDAY:  Your Honor, objection.  Lawyer

3    testifying facts not in evidence.

4            THE COURT:  Sustained.

5    BY MR. AUSTIN:

6        Q.   Was that case settled?

7        A.   I don't know.

8        Q.   Okay.  So you just moved on?

9        A.   There are so many irons in the fire right now.

10       Q.   Fair enough.

11       A.   I have not moved on.

12       Q.   Well, okay.  Did anybody from the bank meet with

13   Arthur Badger and discuss the terms of this settlement, to

14   your knowledge?

15       A.   I would not know if they did.

16       Q.   Okay.  Do you know if anybody from the law firm met

17   with him?

18       A.   I would not know if they did.

19       Q.   Okay.  Do you know if the bank wanted him to know,

20   that's -- or sorry, that was a bad question.  Did the bank --

21   was it the Board's intention to hide their involvement in

22   that settlement?

23           MR. HOLLIDAY:  Your Honor, objection.  Intention?

24           MR. AUSTIN:  He's a Board member.

25           MR. HOLLIDAY:  He's asking about the whole Board,

1    Your Honor.

2    BY MR. AUSTIN:

3        Q.   Do you know whether the Board -- did you have

4    discussions with Board members about the bank's involvement

5    in this settlement agreement?

6        A.   Try me one more time.

7             THE COURT:  You are asking did Mr. Norris

8    Laffitte --

9    BY MR. AUSTIN:

10       Q.   Did you participate in any conversations with the

11   Board at a Board meeting about the $680,000 settlement?

12       A.   We discussed the $680,000.  I can't say $680,000 --

13   I would not agree with your word "settlement."

14       Q.   What's your understanding of it?

15       A.   It's money stolen from Palmetto State Bank that went

16   to the PMPED -- the law firm.

17       Q.   You are saying that Russell stole that money?

18       A.   Well, that's how I looked at it, because the money

19   that was talked about was funds for fiduciary clients that

20   Russell was in charge of.  It was not bank funds.

21       Q.   Did Russell ever serve as a personal representative

22   for Arthur Badger?

23       A.   Yes, he did.  Excuse me.  Was it Arthur or was it

24   Donna?  I'm sorry.  You would have to show me the paperwork.

25       Q.   You don't know whether he served as a personal

1    representative for Arthur Badger?

2        MR. HOLLIDAY:  Your Honor, objection.  He just said,

3    if you show me the paperwork, I could tell you.

4        THE COURT:  Show him the paperwork.

5        MR. AUSTIN:  I will move on.

6    BY MR. AUSTIN:

7    Q.    Beg the Court's indulgence.  Will you please pull up

8    Defense Exhibit 1.  Do you recognize this document?

9    A.    I've never seen it before, no.  I do not recognize

10   it.

11   Q.    Okay.  I'm going to read from it here.  Paragraph

12   (a), it says:  Except as otherwise qualified or limited by a

13   court order, a conservator, acting reasonably in the best

14   interest of the protected person, and in an effort to

15   accomplish the purpose for which he is appointed, may act

16   without court approval to -- now if we got go to subparagraph

17   (1) -- invest and reinvest funds of the estate as would a

18   trustee.

19        Do you see that?

20   A.    I see that.

21   Q.    And if we can go to the second page, please, in

22   subparagraph 11:  Borrow money to be repaid from estate

23   assets or otherwise.  Do you understand that?

24   A.    I need to see the first part of that page.

25   Q.    Says that the conservator without court approval can

1    borrow money to be repaid from estate assets or otherwise?

2        A.    All right.

3        Q.    So based on that, do you still believe that Russell

4    stole any money from his fiduciaries?

5        A.    Yes.

6        Q.    Okay.  How so?

7        A.    There were three checks there were supposed to go to

8    Arthur Badger that didn't make it there.  There were three

9    checks -- or nine checks with his wife's estate on it that

10   were converted and went other places.  And you have the

11   Hakeem Pinckney check and the Natasha Thomas check that were

12   converted and went other places.

13       Q.    If he's relying on his attorney to do that, that

14   wouldn't be stealing; is that right?

15       A.    If he is relying on his attorney to do that, that

16   wouldn't be stealing?

17            MR. HOLLIDAY:  Wait.  Are we --

18            THE WITNESS:  I'm confused.

19            MR. HOLLIDAY:  Facts not in evidence.

20            MR. AUSTIN:  He just said he stole.  And I'm asking

21   if he could rely on his attorney to take these actions.

22            THE COURT:  Is there any evidence that -- in the

23   record at this point on that fact?  Otherwise, you are

24   introducing it, Mr. Austin.  I sustain the objection.

25   BY MR. AUSTIN:

1      Q.    Did Russell ever tell you that he relied on --

2            MR. HOLLIDAY:  Your Honor, objection.  Hearsay.

3            THE COURT:  It's the same basis.  Hearsay.

4      BY MR. AUSTIN:

5      Q.    I will move on here.  Please pull up Defendant's

6      Exhibit 17E.  Do you recognize this document?

7      A.    I've been on the Board July, August, September,

8      October.  I would have seen this after I had been on the

9      Board for five months.  So do I remember it, no.

10     Q.    Do you recognize the name Risk Management Group?

11     A.    A name that has been mentioned in our Board

12     meetings, yes.

13     Q.    And in what are context?

14     A.    Well, they must -- by the headline, loan portfolio,

15     quality review, they must be the people that do the risk

16     assessment on those loans.

17     Q.    Okay.  Do they do that on a regular basis?

18     A.    I imagine it's done annually, but may be a different

19     time frame than that.  I don't know.

20     Q.    They don't do it every single year?

21     A.    I don't know.

22     Q.    You don't know?  Do you review the Board packet

23     before every single meeting?

24     A.    Oh, yeah.

25     Q.    Okay.  So do you know if these had been included in

1    the Board packets?

2        A.    You would have to pull them up and show me, because

3    I don't remember everything that's been in every Board

4    packet.

5        Q.    So you don't know whether or not the bank routinely

6    engages a third-party auditors to conduct reviews of the

7    bank's loans and other financial transactions?

8        A.    The management of the bank could answer your

9    question better.

10        Q.    Aren't you management of the bank?

11        A.    No, sir.  I'm a Board member.

12        Q.    What is the difference, in your mind?

13        A.    Well, the Board tries to set policies and

14    procedures.  And then the CEO, CFO, president, vice

15    presidents, run the business.  I am not involved in the

16    day-to-day part of running of the bank.

17        Q.    Okay.  What about the yearly running of the bank?

18        A.    Yes.

19        Q.    Okay.

20        A.    We try to review the policies of the bank.

21        Q.    Okay.  If we can please go to page 4.  Are you

22    familiar with these tables?

23        A.    I have seen information like that in the packets.

24        Q.    Okay.  And in the top table where it says risk

25    rating 4, what does it say to the right of that?

1      A.    Risk rating 4, acceptable risk.

2      Q.    What does that mean to you?

3      A.    When you look at this definition of risk rating, it

4    looks like it's one step above weak pass and one step above

5    satisfactory risk.

6      Q.    If somebody is an acceptable risk category, would

7    that cause alarm for you as a Board member?

8      A.    No.

9      Q.    Let's go to page 8, please.  Zoom in on the Murdaugh

10   names here.  Okay.  If you look at the far right category, I

11   mean, yes, column, PSB rating, that's listing Alex Murdaugh

12   in relation to these four different loans as either a 3 or a

13   4; is that right?

14     A.    Yes.

15     Q.    And as a Board member, you signed off on that; is

16   that correct?

17     A.    I don't know that I've seen this report before.  So

18   I can't say that I signed off on it, no.

19     Q.    It's Hard to remember things from a few years ago?

20     A.    I think -- yeah, I don't remember this being

21   presented.

22     Q.    Okay.  And RMG, that stands for Risk Management

23   Group, right?

24     A.    If it's in the same report, that's what it would

25   stand for.

1      Q.   Safe to assume that's the same thing.  What did they

2  give Mr. Murdaugh?

3      A.   I read 4, 4, 4, and 4.

4      Q.   And that's an acceptable risk?

5      A.   From the prior page, yes.

6      Q.   Okay.  So third-party auditors came in, they took a

7  look at all his loans in the year that you joined the Board

8  and said that he had -- he was an acceptable risk, correct?

9      A.   Yes, sir.

10      Q.   And do you know how much money Alex Murdaugh was

11  earning in 2018 or at any point in time?

12      A.   Never been exposed to that information.

13      Q.   Never have?

14      A.   No.

15      Q.   Okay.  So when you were disagreeing with the

16  $750,000 loan, what was the basis for that disagreement?

17      A.   Since the events of June, please, advise Alex

18  Murdaugh's exposure to PSB directly, indirectly, through

19  family relationships, LLCs, whatever ways.  If he is not

20  working, how is he paying the money back?

21      Q.   And are you familiar with Mr. Murdaugh's assets?

22      A.   As far as I know today, he has none.

23      Q.   He has none?

24      A.   I don't know -- excuse me.  I do not know what he

25  has.  That would be a better way for me to answer your first

1    question.  I don't know his asset base.

2        Q.   So has the bank entered into any transactions to

3    foreclose on any of Alex Murdaugh's properties?

4        A.   I believe if you would pull up the minutes of -- I'm

5    not sure where they are.  I think Gray Henderson had gotten

6    in touch with Towns -- and it's a two-name law firm, to try

7    to start foreclosure proceedings.

8        Q.   And do you know whether or not Moselle is on the

9    market right now?  I'm sorry.  Let me back.  What is Moselle?

10       A.   Moselle is a town on the map.

11       Q.   Well, okay.  Did or does Alex Murdaugh own property

12   that people refer to as Moselle, a hunting property in

13   Colleton County?

14       A.   Yes.

15       Q.   Is that where the murders took place?

16       A.   Yes.

17       Q.   And do you know whether that is actually under

18   contract now for $3.9 million?

19       A.   That would be hearsay because I have not seen the

20   contract.  I do not know.

21       Q.   You just don't know?  What about the Edisto Beach

22   house?

23       A.   That house sold.

24       Q.   For how much money?

25       A.   It was -- I looked at the deed, and I can't

1    remember.  I'm sorry.

2        Q.    Is it close to a million dollars?

3        A.    I believe it's in the $900,000 range, yes.

4        Q.    So a second ago, you said you weren't familiar with

5    any of his assets.  But now you are familiar with that; is

6    that correct?

7        A.    I don't know who has the receivership of ownership

8    of these things, if that's where you are going.  I'm a little

9    bit confused.  So when I said I don't know what his assets

10   are, the Board was presented a list of his loans with --

11   addition was incorrect.  Are all those his assets?  I mean,

12   he's got his father's name in there.  And Maggie's name is on

13   the Edisto Beach house.  So he had something at one time, but

14   I'm not sure what it is now.

15       Q.    Do you know who is the beneficiary of Maggie's

16   estate?

17       A.    I've probably read it in the newspaper, but I do not

18   know.

19       Q.    When did you read the newspaper?

20            MR. HOLLIDAY:  Objection.  Hearsay.

21            THE COURT:  Sustained.

22   BY MR. AUSTIN:

23       Q.    Let's pull up Government's Exhibit 15C, please.  And

24   you testified to this earlier when you said you read here

25   where Russell wrote:  Jeanne and Mark Ball think they are

1    through the bulk of their cases.  Do you know how many cases
2    they found at PMPED?
3        A.   No idea.
4        Q.   Okay.  Is it your understanding it was just the
5    cases that are involved in Mr. Laffitte's indictment?
6        A.   That's a leading sentence.  It has a lot of open
7    ends on it.  Mark thinks they are through the bulk of his
8    cases.  I don't know if it was directly related to us or
9    directly to everything Alex had done since he's been
10   practicing law.
11       Q.   So it's your understanding there are a lot of cases
12   that have nothing to do with Russell?
13       A.   I don't think anybody has ever told me that.
14       Q.   You haven't tried to find out?
15       A.   I'm not messing with Jeanne and Mark Ball.
16       Q.   What do you mean?
17       A.   I am not going to call them and say, please tell me
18   what you found out in your cases and your work files.
19       Q.   So are you aware that other people served as
20   personal representatives or conservators for clients of Alex
21   Murdaugh?
22       A.   I do not know that.
23       Q.   Okay.  And do you know whether or not other people
24   were duped by Alex Murdaugh?
25       A.   Do I know if other people were -- I'm sorry.  I

1    missed your word.

2        Q.    Were duped by Alex Murdaugh as part of his criminal

3    schemes?

4            MR. HOLLIDAY:  Objection.  There's no basis for

5    this.

6            THE COURT:  Not in the record.

7            MR. AUSTIN:  Well, they are talking about the bulk

8    of his other cases.  And they are making a reference there.

9    And he's testified to his understanding of this e-mail.

10           THE COURT:  You know, Mr. Austin, that e-mail is

11   related to the next paragraph.  It's basically the details

12   that was put in for that.  If you've got other information

13   you can put it in, if it's relevant.  It's not a proper basis

14   for cross-examination here.  Sustained.

15   BY MR. AUSTIN:

16       Q.    Did the bank become aware of any other cases?

17       A.    Is the bank aware of any other cases?  Other than

18   what case?  Your question is very wide.  I'm not sure.

19       Q.    I'm sorry.  Now, in Government's Exhibit 29

20   yesterday, and I think it's probably too long ago,

21   specifically, to it.  I want to try to wrap this up.  There

22   are a series of checks and cash-out orders and things like

23   that.  And you testified to Russell's initials being on those

24   checks.  And they were in blue ink; is that right?

25       A.    There was blue ink signatures and there were his

313

1   full-name signatures.

2       Q.   Right.  Do you know when he placed his signatures or

3   those initials, the ones that are in blue, on them?

4       A.   I don't know.

5       Q.   No?  Okay.  Do you know whether or not he placed

6   those initials on there to provide those documents to the

7   bank's attorneys?

8            MR. HOLLIDAY:  Your Honor, objection.  He's

9   testifying.  Facts not in evidence.

10           THE COURT:  Facts not in evidence.  Sustained.

11  BY MR. AUSTIN:

12      Q.   So you don't know when they were put on?

13           THE COURT:  Asked and answered.

14  BY MR. AUSTIN:

15      Q.   Does the bank have a stock repurchase program?

16      A.   It instituted one, but it's now halted.

17      Q.   Okay.  Why was it halted?

18      A.   We were getting hit with a lawsuit and then another

19  lawsuit and then another lawsuit.

20      Q.   Okay.  And since then, has anybody sold any of their

21  stocks of Palmetto State Bank?

22      A.   I would not know an answer to that.

23      Q.   Okay.  You have no idea?

24      A.   Well, if you own shares in the bank and you sold

25  them to somebody else, I wouldn't know that it happened.

1      Q.    What if they were sold back to the bank?

2      A.    If they were sold back to the bank, the bank would

3  know it, but I have not been given a report that the bank has

4  bought any stock back since we quit -- stopped that program.

5      Q.    And who is the bank, when you say the bank would

6  know it?

7      A.    Palmetto State Bank.  Gray Henderson is usually --

8  gray Laffitte Henderson, his sister, is usually the one who

9  has provided that information.

10      Q.    But you don't have any personal knowledge of

11  anything repurchasing a stock?

12      A.    At what point?

13      Q.    I'm sorry, selling stock back to the bank?

14      A.    What time frame are you talking about?

15      Q.    Since December 2021?

16      A.    I am not aware of anybody -- excuse me.  December of

17  2021?  There was a Board discussion of -- I don't know when

18  it happened, because now I'm thinking yesterday I answered a

19  question that Daddy owned 3,000 shares, give or take some.

20  But I think he sold those shares.  I know he sold the shares,

21  but I don't know if he sold them during the stock repurchase

22  program.  I know he couldn't have done it after the stock

23  reprogram was stocked.

24      Q.    I didn't hear you.  Who did you say?

25      A.    My father.

1    Q.   Oh, he did it -- you don't know whether he did it

2    before or after that program has been in place?

3    A.   I can't -- somewhere there should be a document that

4    shows when the program was put in place.  And there should be

5    another Board meeting saying when we had stopped the

6    repurchase program.  I'm sorry.  I don't remember those

7    dates.  My sister is in charge of my 92-year-old grandfather

8    who's pretty much a vegetable.  And I think I remember his

9    stock being purchased back by the bank.  But I don't remember

10   when it was done.

11   Q.   It's 2,000 shares; is that right?

12   A.   I think it was a little over 3,000, I think, yeah.

13   Q.   And do you remember how much it was purchased back

14   for?

15   A.   That was not --

16   MR. HOLLIDAY:  I cannot let this go for a while, but

17   objection, relevance.

18   THE COURT:  What's the relevance?  Mr. Austin,

19   what's the relevance?

20   MR. AUSTIN:  There have been a number of comments

21   about priority of actions taken by Russell Laffitte in

22   relation to his actions on the Board.  And I think it's fair

23   game to get into his awareness of different transactions

24   entered into by family members during this time.

25   THE COURT:  You haven't laid a foundation there was

1    anything improper.  Sustained.

2    BY MR. AUSTIN:

3        Q.    Do you know whether or not it's unusual for

4    unsecured loans to be given out by the bank?

5        A.    The bank lending policy gives the loan officers

6    limits for unsecured loans and secured loans.  So, yes, the

7    bank does do unsecured loans.

8        Q.    Okay.  So just they are not -- unsecured loans are

9    not illegal?

10       A.    No.

11       Q.    And, in fact, they happen all the time?

12       A.    I don't know what "all the time" means.

13       Q.    It's not unusual, though, for the bank to give

14   unsecured loans?

15       A.    I believe the bank does give unsecured loans, yes.

16       Q.    Okay.  You believe or you know as a Board member?

17       A.    I know, because $750,000 loan went out the door.

18       Q.    Sure.  And there are others that go out the door all

19   the time, you don't review them on a regular basis as part of

20   Board meetings; is that correct?

21       A.    We do not review all the loans on a basis, no, sir,

22   we do not.

23       Q.    Not all the loans, but you do review loans on a

24   regular basis?

25       A.    We do.  The Board packet includes loans over $25,000

1      that we look at.

2          Q.    Okay.

3          A.    Excuse me.  They are presented to us on a piece of

4      paper.  Loans over $25,000 has a name, has an amount of the

5      loan, has total indebtedness.

6               And the minutes used to reflect -- I would love for

7      it to be pulled up an exhibit so I don't miss the wording,

8      that the loans over $25,000 were presented, reviewed, and

9      approved.  And I objected to that language being approved as

10     a Board member, because we are looking at it on the third

11     Tuesday of this month of loans that had gone out the door, or

12     whatever the proper banking term is, the month before.  And

13     if we decided on that list of loans we were looking at, was a

14     point I made with his father, I can't approve a loan, you've

15     already sent the check out.  So there's no way for me to

16     unapprove a loan when you've already sent the money out the

17     door.

18         Q.    It's not your job to approve loans, right?

19         A.    It's not my job?  It was our job to review the loans

20     they had made.  But I certainly -- that's a day-to-day

21     management system.  And I'm a Board member.

22         Q.    You are not working as a banker on a daily basis?

23         A.    Excuse me.  We do approve -- the Board does approve

24     loans over a certain amount, yes.

25         Q.    Okay.  $750,000 is below that amount; is that right?

1    A.    If that amount stands alone by itself, if that

2    amount is over the aggregate, is included as an aggregate,

3    and it goes over a level, then the Board has to hear about

4    it.

5    Q.    What is that level?

6    A.    $8 million.

7    Q.    Okay.  $750,000 is below that level, though,

8    correct?

9    A.    Yes.

10    Q.    And there are times where customers will come into a

11    bank, say on a Friday afternoon, requesting just, as a

12    hypothetical, like a car, they are going to buy a car over

13    the weekend, and they apply for a loan; does that sound like

14    an unusual situation to you?

15    A.    Sounds like somebody wanting to buy a car on Friday.

16    Q.    Right.  And if the loan officer doesn't have time to

17    put through all the underwriting paperwork and get everything

18    set up, and they fund that loan so the person can buy the car

19    over the weekend, is there anything wrong with that?

20    A.    Shouldn't be done that way.

21    Q.    Why?

22    A.    Policy and procedures.

23    Q.    Which policy and which procedure?

24    A.    I like the way you ask that.  If it's a car, I would

25    think the loan officer, I think.  Who you are buying it from?

1    What's it going to be?  How are we getting a copy of the

2    title?  Are we listed in the paperwork?  Is Palmetto State

3    Bank listed in the paperwork?

4         Q.   So is that a specific policy you are referencing?

5         A.   I do not know.

6         Q.   You don't know?  Because you are not a banker and

7    you are not a loan officer?

8         A.   We've established that.

9         Q.   Okay.  And if somebody were to come back into work

10   on Monday and fill out the paperwork for it, even though the

11   money has already gone out the door, that wouldn't

12   necessarily mean they are doing anything fraudulent or

13   illegal; is that right?

14        A.   As a Board member, I would rather have all of it be

15   dotted and crossed like it's supposed to be.  And it doesn't

16   sound like if they gave money out on a Friday and didn't have

17   the paperwork completed until Monday, it does not sound like

18   sound business practice and sound banking practices to me.

19        Q.   Doesn't sound like it, but you don't know whether it

20   is?  There's no policy referenced to identify that says you

21   cannot do that?

22        A.   I am not aware of that policy.

23        Q.   Okay.  And so with regard to the $750,000 loan, if

24   that were to happen, if Charlie Laffitte and Russell Laffitte

25   decided, as the chairperson and the CEO, and they included

1      Gray Henderson, who is also an Executive Committee member,

2      would that not be sufficient authority to make a loan without

3      going to the rest of the Board?

4           A.   The Executive Committee is to review loans.  And the

5      Committee would be those three people you talked about, plus

6      Jan Malinowski, plus Scott Swain, the bank's CFO.  And that

7      loan, to be approved by the Loan Committee, would have been

8      presented to the five people together, discussed, approved or

9      disapproved.

10          Q.   What is your basis for that statement?

11          A.   That's how the Executive Committee is set up to run.

12          Q.   Okay.  Where does it say -- you can pull up Section

13     3.16, Defendant's Exhibit 3.  Where does it say that?

14          A.    I believe if you look in the minutes, I don't know

15     what month, we talked about coming before the entire

16     committee.

17          Q.   Right.  It was October 19th, 2021; isn't that right?

18          A.   October?  Please pull up -- I can't agree with your

19     date, because I don't --

20          Q.   Do you recall Russell Laffitte making that

21     recommendation to the bank Board?

22               MR. HOLLIDAY:  Wait.  Wait.  Objection.  Hearsay,

23     Your Honor.

24               MR. AUSTIN:  His awareness of whether or not Russell

25     presented that, he brought it up, not me.  He said that he --

1    MR. HOLLIDAY:  He hasn't brought anything up.  He's

2    answering questions.

3         THE COURT:  Let's go back and figure this out for

4    just a second.  You want him to address the issue of

5    whether -- re-ask your question.  I want to hear precisely

6    what your question is.

7    BY MR. AUSTIN:

8    Q.   I'm going to try my best.  So you testified that in

9    the meeting minutes, this precise --

10        THE COURT:  You wanted to know who recommended --

11        MR. AUSTIN:  Yes, because he said it was discussed.

12        THE COURT:  My first -- okay.  Overrule the

13   objection.  Let him answer that question.

14        MR. HOLLIDAY:  I would like to say best evidence,

15   Your Honor.  He's guessing.

16        THE COURT:  That's fine.  He can say it.

17        THE WITNESS:  I would like to see the minutes.

18        THE COURT:  Fair enough.

19   BY MR. AUSTIN:

20   Q.   I will just say you don't remember.  Are you

21   familiar with Credit Leader?

22   A.   That term is mentioned in the bank, yes.

23   Q.   What's your understanding of it?

24   A.   If someone comes into the office and wants a loan,

25   the Credit Leader is a computer business model which all of

322

1    the information of the loan is described.

2         Q.   Okay.  And does it keep track or does it keep

3    essentially digital fingerprints or breadcrumbs of what

4    actions people at the bank take?

5              MR. HOLLIDAY:  Your Honor, I think he can ask him

6    his understanding, but he can't testify.

7              MR. AUSTIN:  Goes to his understanding.

8              MR. HOLLIDAY:  It's not his understanding.

9              THE COURT:  He can ask his understanding.  If he has

10   it, if it's relevant, he can address it.  So if he knows.

11             THE WITNESS:  Come back at me again, please.

12   BY MR. AUSTIN:

13        Q.   Do you know -- you said that -- paraphrasing a

14   little bit here.  But you were saying Credit Leader keeps

15   track of loan application paperwork, essentially, and keeps

16   track of who's inputting information at the bank, right?

17        A.   Yes, yes, it's my understanding.

18        Q.   And do you know when that system was put in place?

19        A.   I do not.

20        Q.   Do you know who put that system in place?

21        A.   I do not.

22        Q.   Okay.  So when you talked about -- I believe you

23   testified to this yesterday, that with regard to the $750,000

24   loan, there's information put in there.  You don't know what

25   that system or how that system was put into effect at the

1    time bank?

2        A.    I don't remember talking to him about Credit Leader

3    at all.

4        Q.    Okay.

5        A.    So you are asking me about yesterday's conversation

6    with -- about Credit Leader.  And I don't think we had that

7    conversation.

8        Q.    Okay.  My mistake.

9        A.    I might be wrong.

10       Q.    Okay.  Do you know whether or not Russell Laffitte

11   is responsible for purchasing Credit Leader for Palmetto

12   State Bank?

13       A.    I do not know if Russell was, no.

14       Q.    Do you know whether or not, as the person

15   responsible -- if he was the person responsible for

16   purchasing it, he would be aware of how it works and what

17   information it keeps track of?

18       A.    You broke up on me there for a minute.

19       Q.    If I'm correct, he's the person responsible, as CEO,

20   for purchasing that --

21            THE COURT:  Sustained.  You don't even need to

22   object.  It's not in evidence.

23            MR. AUSTIN:  Beg the Court's indulgence, Your Honor.

24   BY MR. AUSTIN:

25       Q.    Going back to November 3rd meeting of the Board, did

1     you participate in that meeting?

2          A.    I did.

3          Q.    Okay.  And based on the discussions of that meeting,

4     you never took any action to claw back the $687,000 that was

5     paid to PMPED?

6          A.    I did not make any claw back.

7                THE COURT:  Thank you.

8                MR. AUSTIN:  No further questions, Your Honor.

9                THE COURT:  Redirect.

10                         REDIRECT EXAMINATION

11    BY MR. HOLLIDAY:

12         Q.    Regarding the question you were just asked about the

13    November 3rd Board meeting, jury has already seen this, it's

14    a sworn statement of Russell Laffitte, Exhibit 200.  He was

15    asked the question:  Was there any consideration, like, with

16    cost benefit, litigation in Hampton County turning an adverse

17    result that was greater than 1.3 million?

18                Defendant's response:  You know, they didn't want to

19    pay it.  When I took it to the Board, the Board went

20    absolutely ballistic.  They wanted to claw it back.  That's

21    the defendant's words in his sworn statement; is that

22    correct?

23         A.    As it says on line 19.

24         Q.    "And part of the reason I got fired, I put my foot

25    down.  I said, no.  I said three of the four members of the

1  Executive Committee discussed this in depth, which is my

2  sister, Gray Henderson, myself, and Charlie Laffitte.  It was

3  also the Board chairman.  We have the authority by our bylaws

4  to settle any lawsuits whatever or potential we thought was

5  in the best interest.  So we did it.  And they wanted us to

6  claw it back."

7       Do you see the language there?

8  A.   Yes.

9  Q.   And this is the defendant's sworn statement:  And I

10 told them absolutely not.  I gave them my word.  We were

11 paying it.  And by God, we were paying it.

12      Those are the defendant's words, yes?

13 A.   Yes.

14 Q.   You were shown some banking documents from 2018 or,

15 I guess, some audit documents from 2018 about Alex Murdaugh's

16 4 rating or mediocre rating of loan status.

17      MR. AUSTIN:  Objection, Your Honor.

18 Mischaracterizing.

19      THE COURT:  Sustained.

20 BY MR. HOLLIDAY:

21 Q.   His rating was a 4, correct?

22 A.   His rating was a 4.

23 Q.   In 2018, was Alex Murdaugh in a vastly different

24 position than was on July 15, 2021?  What happened on June

25 7th, 2021?

1      A.   His wife Maggie and his son Paul were murdered.

2      Q.   And so when the loan is extended about a month, a

3   little over a month later, would his status, his employment

4   status, his family status, his life status, be vastly

5   different than it was in 2018?

6      A.   Yes.

7      Q.   You were asked about a bunch of loans, whether loans

8   are valid, invalid, or whatever.  Loans should generally be

9   extended for the purpose stated, correct?

10      A.   Correct.

11      Q.   So the car hypothetical that went on for a while,

12   where somebody buys a car Friday, if it turns out Monday they

13   went to Vegas with the loan money, would that have been a

14   legitimate purpose for the loan?

15      A.   No.

16      Q.   It's vastly different if they actually bought a car?

17      A.   Vastly.

18      Q.   And there was a lot of discussion about bylaws and

19   what CEOs can do under bylaws.  Do the bylaws authorize a CEO

20   to steal money from his bank?

21      A.   No.

22           MR. HOLLIDAY:  That's all I have, Your Honor.  Thank

23   you.

24           THE COURT:  Very good.  The witness may step down.

25   Thank you, sir.  You are free, Mr. Laffitte.

1              (Whereupon, the witness is excused.)

2              THE COURT:  Call your next witness.

3              MS. LIMEHOUSE:  The Government calls Jeanne

4    Seckinger.

5              THE COURT DEPUTY:  Please state your full name.

6              THE WITNESS:  Jeanne Seckinger.

7                        JEANNE SECKINGER,

8         having been duly sworn, testifies as follows:

9                     DIRECT EXAMINATION

10   BY MS. LIMEHOUSE:

11        Q.   Good morning.

12        A.   Good morning.

13        Q.   Ms. Seckinger, where are you from?

14        A.   I'm from Hampton, South Carolina.

15        Q.   And where do you work?

16        A.   Parker Law Group, formerly PMPED.

17        Q.   So Parker Law Group, that law firm has undergone

18   some restructuring lately?

19        A.   It's actually not a restructuring.  PMPED has

20   been -- we are in the process of shutting that down.  And

21   Parker Law Group is a whole new entity that we formed.

22        Q.   Formerly known as PMPED.  Tell the jury, they heard

23   about it, but what PMPED stands for?

24        A.   Peters, Murdaugh, Parker, Eltzroth & Detrick.

25        Q.   What do you do at the law firm?

1      A.   I'm the CFO.

2      Q.   Let's talk a little bit about your background, your

3 education.  What do you have a degree in?

4      A.   Business with a concentration in accounting.  And

5 I'm also a CPA.

6      Q.   How long have you worked for the law firm?

7      A.   I started in August of '99, so right around 23 years

8 now.

9      Q.   Have you always been in the same capacity at the law

10 firm or has that evolved over time?

11      A.   It's kind of evolved over time.  I started as a

12 part-time and came into this.  And as the years have gone by

13 and the firm has grown, I took on more and more duties.  I

14 also did the HR, some of the office management.  But I've

15 been doing the lion's share of the management for 15 years or

16 so.

17      Q.   So as CFO, how long have you been a CFO at the law

18 firm?

19      A.   For probably about 15 years.

20      Q.   Do you supervise and oversee the whole financial

21 department of the law firm?

22      A.   I do.  I do.

23      Q.   Let's explain for the jury a little bit of

24 background about that law firm.  How many lawyers are there?

25      A.   Oh, we've had -- there was -- at one point there was

1    18 in four locations.  We are currently at about 15 lawyers.

2    We've been changing rapidly.  So without counting today, I

3    would guess 15.

4        Q.    You said four locations.  Where are those offices

5    located?

6        A.    Charleston, we have a satellite out of Walterboro.

7    So we have Walterboro, Jasper, which is in Richland, and

8    Hampton.  We are currently down to just the three locations.

9        Q.    And which office do you work in?

10       A.    I work in the main office in Hampton.

11       Q.    That's the largest office where the most of the

12   lawyers are?

13       A.    That's correct.

14       Q.    So what types of cases does the law firm handle?

15       A.    Handle mostly personal injury cases where somebody's

16   been hurt either by a product, an automobile accident, a slip

17   and fall, or something at work, medical malpractice, but most

18   of our cases are personal injury.

19       Q.    So those people would hire the law firm to represent

20   them to sue other people who caused their injuries?

21       A.    That's correct.

22       Q.    So you said you are the CFO.  Do you have any

23   involvement in sort of the casework with the lawyers?

24       A.    No, not typically.

25       Q.    So you are strictly on the financial side?

1        A.    Correct.

2        Q.    So you are not the paralegal or legal assistant that

3    would be preparing legal documents for the lawyers?

4        A.    No.

5        Q.    So as a CFO then, what are your job duties?

6        A.    So my job duties are to just oversee the finances of

7    the firm, to make sure that the books are balanced, taxes are

8    paid, money is accounted for.  I do the payroll.  I also do

9    all the HR hiring, firing.

10       Q.    That sounds like a fun job.

11       A.    Yeah.  I've managed to ditch that one in the new

12   entity.  So that's good.

13       Q.    Congratulations.

14       A.    Basically, anything to do with the finance of it,

15   procuring insurance, overseeing that the bills are paid on

16   time, that money is collected, that expenses are paid.

17       Q.    Okay.  So other than the HR component, have you held

18   those responsibilities largely for over the last decade?

19       A.    Yes, or more than a decade, probably for the best --

20   the majority, really, 15 years is when I went full-time.

21       Q.    A lot of the stuff we are going to talk about today

22   happened back in 2011, 2015.  So you held these

23   responsibilities at that time?

24       A.    I did.

25       Q.    Let's talk about some of those lawyers at the law

1    firm that the jury is going to hear about.  Ronnie Crosby, is

2    he a partner at the law firm?

3        A.   He is.

4        Q.   And what types of cases does he work on?

5        A.   So Ronnie does mainly product liability, so tire

6    tread separation, seatbelt cases.  He does a lot of things

7    against Michelin and Ford.  So he's primarily our expert.  If

8    a product has injured you, that's who you go to.

9        Q.   And is he located in the Hampton office as well?

10       A.   He is.

11       Q.   How about Lee Cope, what kind of cases does he work

12   on?

13       A.   Lee does mainly medical malpractice, nursing home

14   cases, and some cases involving DOT, which are road accident

15   cases, but his main focus is the nursing home and medical

16   malpractice.

17       Q.   What about Johnnie Parker, is he also a partner in

18   the law firm?

19       A.   Johnnie is.  And he does pretty much any type of

20   negligence case.  You are going to see Johnnie.  Johnnie is

21   now in his mid-70s.  So he's had a long, great career of

22   doing different cases.  But right now he just does -- really

23   any that comes in the door.  He doesn't really have a

24   specialty.

25       Q.   So you said that you now work for the Parker Law

1    Group.  Is that who the law firm is now named after, Mr.

2    Johnnie Parker?

3       A.   That is right.

4       Q.   How about Alex Murdaugh?  They've heard a lot about

5    Alex Murdaugh.  Was he a partner in the law firm until this

6    past year?

7       A.   He was.

8       Q.   And what types of cases did he work on?

9       A.   Again, personal injury, a lot of automobile accident

10   type cases.  He's had a couple of big cases that, again,

11   automobile accidents.  Probably if I had to guess that would

12   be what I would say his main focus was.

13      Q.   So you talked about how Ronnie sort of specializes

14   in product liability and Lee was sort of nursing home cases.

15   Did Alex have any sort of specialty?

16      A.   No, not really.  But like I said, he was mostly --

17   to me, the cases that he had that were large were automobile

18   accident-type things.

19      Q.   So you've already testified that you don't have any

20   day-to-day work on these cases with those lawyers.  What was

21   your involvement with Alex Murdaugh professionally?

22      A.   Professionally, we were -- we are not even in the

23   same building.  He's across the street.  Again, it would be

24   just talking to him if I needed guidance or a clarification

25   on something that had come up in a case that he was involved

1    in, interaction at partner meetings.  But we did not really

2    speak on a day-to-day basis by any means.  And it's not

3    uncommon for me to be at work all week and really not have

4    any interaction with any particular attorney.

5        Q.    So you get involved on those cases on the financial

6    side?

7        A.    That's right.

8        Q.    How about on Russell Laffitte, what's your

9    relationship to Russell Laffitte?

10       A.    Russell is my brother-in-law.  He's married to my

11   sister's -- I mean, let me think about this.  He's married to

12   my husband's sister.

13       Q.    So professionally, Russell Laffitte, we've already

14   heard, was the CEO of Palmetto State Bank.  Explain to the

15   jury sort of the bank's location with respect to the law firm

16   geographically.

17       Q.    Geographically, we are probably within a half mile

18   of each other.  We are on -- Hampton is made up of a

19   four-lane highway.  We are on one side and the bank is on the

20   other side, within a block of each.

21       Q.    Easily to walk back and forth?

22       A.    If you wanted to, yes.

23       Q.    Okay.  Describe the law firm's banking relationship

24   with Palmetto State Bank.

25       A.    Since I started in '99, we were -- they were our

334

1    sole banker for many, many years.  Our branches within

2    Richland and Walterboro would have held a local account

3    sometimes for our trust money, just because it was easier to

4    get the money in the bank quicker and disburse it easier from

5    those locations.  But they've always been our bank.  Most of

6    the attorneys within the bank banked with them.

7         Q.   So both the law firm accounts and the law partners'

8    personal accounts were held at Palmetto State Bank?

9         A.   Yes.

10        Q.   And was that true for Alex's accounts?

11        A.   As far as I know, yes, he had some.

12        Q.   Okay.  So what was your understanding of the

13   relationship between Russell Laffitte and Alex Murdaugh?

14        A.   My understanding has been that they were a

15   professional relationship.  I mean, Hampton, obviously, is a

16   very small town.  If anybody is from a small town, you know

17   everybody.  But they did not really run in the same social

18   circles, as far as I knew.  It was just business

19   relationship, primarily.

20        Q.   Okay.  So knowing you don't have any day-to-day

21   involvement on the actual cases, from your perspective, let's

22   sort of describe for the jury the life of a personal injury

23   case with your limited involvement.  So you said that the law

24   firm would be hired by somebody who is in an accident or has

25   sustained injuries otherwise?

1      A.    Correct.

2      Q.    And they would represent them to sue the people

3 responsible for those injuries; is that right?

4      A.    That's correct.

5      Q.    So what would happen when a settlement would be

6 reached?  Could you explain to them sort of how a settlement

7 would be reached and what happens?

8      A.    So a settlement can be reached different ways.

9 There's different -- and we collect depending on how that is

10 done.  So when a case happens, you have -- you can go through

11 it until the person finishes treatment and getting medical

12 treatment.  You could always resolve the case.  So that would

13 be they settle before a lawsuit.  It can be settled after a

14 lawsuit is filed, which means someone -- a complaint is filed

15 in the court.  And there could be depositions.  There could

16 be court going back and forth.  They could still settle or it

17 can go to trial and settle.  But when it settles, that just

18 means that the plaintiff has won the case and there's going

19 to be some money awarded to them by the defendant or the

20 defendant's insurance company.

21      Q.    So that money that's awarded to them.  How is it

22 divided up before it's distributed to the client?

23      A.    Okay.  So when a settlement comes in, the money is

24 paid to the law firm.  And it's usually made out Peters

25 Murdaugh Parker and Johnnie Client.  It is deposited into our

1    trust account.  And at that point, there's a fee and expense

2    taken out.  So we take a portion of our fee.  We collect any

3    expenses we've got back.  There would be any liens or loans

4    that are involved in the case, medical bills that need to be

5    paid.  And the balance would go to the client.

6        Q.   So let's first talk about fees.  Tell the jury what

7    a typical percentage fee would be that the law firm would

8    take before the money was given to the client.

9        A.   So if it settled before it went to a lawsuit, our

10   typical fee would be 33 1/3.  If we filed suit, it would be

11   40.  If it had gone to trial or appeal, it could be 45

12   percent.

13       Q.   So those percentages would be just taken off that

14   overall settlement amount?

15       A.   Correct.

16       Q.   Then expenses, you talked about expenses, what types

17   of things would be taken out of the amount for expenses?

18       A.   So expenses would be the cost to litigate the case.

19   It could be experts that we had to hire, filing fees that we

20   incurred to file -- every piece of paper you file in court

21   has a filing fee.  It could be we have to retrieve medical

22   records, so medical records expenses.  It could be payments

23   to witnesses to appear in court, expenses just like that.

24       Q.   Okay.  So we have the overall settlement.  Lawyers

25   get their fee.  Then the expenses are paid.  And then you

1  talked about liens.  Would liens come from the same place as

2  expenses or would that be separate?

3      A.    We segregate them because our expenses and fees and

4  expenses conversed.  And we show those as two separate line

5  items.  And then we show loans and liens in another area.

6  And loans and liens would be, for example, if somebody needed

7  to pay a funeral home bill.  Another example of a lien is if

8  you've gone to see a medical provider and you had insurance,

9  the insurance company has a right to get some of the money

10  back from you.  Medicare has the right to get money back from

11  you.  So that's the type of thing I mean by liens.  Sometimes

12  it is just a payment to a medical provider for somebody who

13  did not have insurance and you have to pay their medical

14  bill.  And that's the types of things that I would consider

15  liens.

16      Q.    The jury heard a lot already about personal

17  representative and conservator fees.  Where in this process

18  are those fees taken out?

19      A.    Typically, we will pay the PR fee on the settlement

20  and the conservator fee on the settlement.

21      Q.    So that would be another deduction made before the

22  client gets --

23      A.    Correct.

24      Q.    So they've seen a few disbursement sheets.  And we

25  will go over a number of them with you as well.  But talk to

1    the jury about the process of preparing these disbursement

2    sheets.  How does that take place?

3        A.    So the disbursement sheets are actually fixed by the

4    paralegal who is handling the case.  So each of our attorneys

5    generally has one to two paralegals.  And they are

6    responsible for drafting up the disbursement that shows the

7    money that comes in.  They get a listing of expenses that

8    everybody -- we have a case management system they can go in

9    and print off, which is every check that has been paid on

10   behalf of that client.  They call the medical providers and

11   get the final balances that are due.  If there's a loan, they

12   get the payoffs and they disburse -- they figure and

13   calculate that disbursement, which is then approved by the

14   attorney who is handling the case.

15       Q.    So the paralegals are the first ones that would

16   typically prepare a draft disbursement sheet?

17       A.    Correct.

18       Q.    And where would all that information come from to

19   prepare the disbursement sheet?

20       A.    Well, like I said, the money comes in.  When it

21   comes in, there are several papers that they have to sign.

22   Each client would have to sign a release.  So the paralegals

23   are aware of what money has come in.  Again, they know what

24   fee to charge based on what the contract is when we sign at

25   the stage where it settled or the money was collected.  They

1  can go into our system and print what we call a WIP report

2  which is a listing of all the expenses our law firm has

3  incurred.

4        During the case, they are also keeping up with

5  medical providers and loan providers and lienholders.  And

6  they would have to contact each one of those to establish

7  payoffs.  And those are where the figures would come from.

8    Q.   So paralegal provides the first draft based on all

9  the documents they have in case, then send it to the lawyer

10  that was working the case, primarily?

11   A.   Yes.

12   Q.   And would the lawyer then have the opportunity to

13  make changes or revisions to the disbursement sheet?

14   A.   Yes.

15   Q.   So who's responsible for the final disbursement

16  sheet?

17   A.   If I'm correct in what you are asking, it's done by

18  the paralegal, and then the attorney has to sign approval

19  before it comes over to accounting to be paid.

20   Q.   So before it gets to you, a lawyer is signing off

21  that that's an accurate representation of how the funds

22  should be used?

23   A.   That's right.

24   Q.   Okay.  So disbursement sheet now comes to your

25  department, and what happens?

1      A.   We actually have -- 10 or so years ago, we had one

2  clerical assistant.  Now we have two or three.  And it goes

3  to them.  And they check it to see if it balances out.  They

4  enter the checks in the system.  Those checks are then

5  printed.  And the disbursement sheet, along with the checks,

6  are returned to the group or the attorney that's handling

7  them to be disbursed to the client.  Because then they have

8  to meet with the client.  They go over all of this with the

9  client.  The client has to sign off and approve as well.  And

10  they handle the meeting with the client and the mailing out

11  of any medical bills, liens and loans.

12      Q.   Okay.  So checks that are written for PR and

13  conservator fees, for example, who would be responsible for

14  actually signing those checks?

15      A.   The attorney handling the case, generally.

16      Q.   But your department would generate them prior to the

17  attorney's signature?

18      A.   Well, no, we would -- well, we would have the

19  attorney's signature on the disbursement.  But the checks

20  were written and they were not signed in our office.  They

21  were sent back to the attorney.

22      Q.   Okay.  We talked a little bit about the different

23  accounts that the law firm holds at Palmetto State Bank.

24  Explain for the jury the different accounts that the law firm

25  has.

1    A.    Okay.  So he have we our payroll account.  And the

2    payroll account is generally a pass-through account.  As we

3    do payroll, we would transfer money into that account, pay

4    out payroll.  And it would generally have a minimal balance

5    in it.  We have what we call the Hampton -- or client trust

6    IOLTA accounts, which is where any money that is paid on the

7    behalf of a defendant, anything from a settlement, from what

8    we are calling from an insurance company or anything, any of

9    that money goes through the Hampton client trust account.

10   And that's where all the checks that I was just talking about

11   on a disbursement are issued from.

12         We have what we call an attorney account which is

13   slash operating account.  That account has money -- well, let

14   me go back.  We have what we called an income account as

15   well.  So as we collect those fees and expenses that are

16   referred to on the disbursement sheet, we then deposit those

17   into a Money Market income account, which made some interest.

18   To cover the firm's expenses, we made money from that income

19   account into an attorney operating account.  That account

20   would pay the bills of the office, the insurance, the health

21   insurance for the employees.  It would pay for these advanced

22   costs that we were talking about for clients, like the

23   medical bills, the medical records, experts.  So that's where

24   a lot of check activity came out of.

25   Q.    I'm going to show you what's been admitted as

1    Government's Exhibit 17.  So talking about some of these

2    specific accounts, what type of account does this check come

3    from?

4        A.    So this is the client trust account.  You can see

5    under our Peters, Murdaugh, Parker, it says client trust

6    account.  That would signify that that's the client's money.

7        Q.    You talked about that's how disbursements are made

8    to the client.  Are payments to a lawyer ever made out of

9    this account?

10       A.    Kind of a trick question.  Let me tell you.  We will

11   make a payment to an associated attorney out of this account.

12   And we would pay our law firm out of this account.  No

13   payments to an individual attorney within our firm are made

14   from client trust account.  Our attorneys are paid through

15   payroll.

16       Q.    All right.  We will talk about the partnership

17   compensation in a minute.  But these would be the checks that

18   are drawn on that client trust account, correct?

19       A.    Correct.

20       Q.    Okay.  Let's go to the next page.  So how about this

21   check, what kind of account does this check come from?

22       A.    So this is the attorney account, which is what I was

23   referring to, that attorney account/operating account.  This

24   would be where firm expenses, insurance, the lights, the

25   utilities, rents, anything like any car payments for

343

1     partners, any reimbursement to employees for fuel, the

2     medical records, any client cost advance would come out of

3     this account.

4          Q.   Okay.  So partnership compensation, you talked about

5     when an attorney is paid, and you talked about the fees that

6     are taken off the top, 30 percent, 40, 50, depending on what

7     happens with the case.  So when are the partners actually

8     compensated?

9          A.   Well, they are compensated -- they have an annual

10    salary through the year that was paid bi-weekly, but --

11         Q.   About how much would that typically be?

12         A.   It has been as low as 60,000 a year.  And I think

13    the last it was 120,000 a year.  But then in December of each

14    year, at the end of the year, they would receive a rather

15    large bonus payment that was paid typically the week between

16    Christmas and New Year's.

17         Q.   So throughout the year, as these disbursements are

18    being made and the law firm is getting fees, what happens to

19    those fees during the whole year until December?

20         A.   The fees are held in our income account and used to

21    pay also operating expenses of the firm.

22         Q.   Okay.  So if Alex had a big settlement on a big case

23    and, say, he got 40 percent of a fee in March, would he be

24    paid that fee in March?

25         A.   He would not be paid until December.

1      Q.    Okay.  And how is it determined how much the

2   partners are going to be compensated at the end of the year?

3      A.    It can be complicated, but it's basically based off

4   of how much fee each attorney brought in less the expenses of

5   the firm.  And we derived a percentage to pay.  So,

6   basically, they eat what they kill.  You know, the money that

7   was distributed was what was left after we paid firm

8   expenses.  And that would be distributed based upon the

9   percentage of revenue each attorney earned.

10     Q.    So that determination would be made at the end of

11  the year based on things you just discussed.  What account

12  would that bonus be made out of?

13     A.    The payroll account.

14     Q.    And what does it say on the check when we talk about

15  payroll account?

16     A.    Payroll account.

17     Q.    Okay.

18     A.    And that was paper for a number of years and it is

19  now direct deposit.

20     Q.    So when did the law firm switch to direct deposit?

21     A.    Roughly 2017 or '18.

22     Q.    Prior to 2017 or '18, the lawyers at the law firm

23  would all be given --

24     A.    A paper check.

25     Q.    -- a paper check, and that's what they would

1    distribute into their bank accounts?

2        A.    That's right.

3        Q.    Are lawyers ever paid, lawyers at the law firm,

4    partners, ever paid large sums of money out of an attorney

5    account prior to December?

6        A.    Sometimes a new partner will have to loan money to

7    the firm at the end of the year so we have beginning

8    operating expenses.  And so those payments would be paid

9    typically March or April.  Those generally ran about 100- to

10   $125,000.

11       Q.    Do you recall if Alex had this arrangement ever?

12       A.    No, he's never loaned money for that.

13       Q.    So Alex was never paid from the attorney pay account

14   except for the end-of-the-year bonuses?

15       A.    Rather than his bi-weekly salary and end-of-the-year

16   bonuses, he would never be paid otherwise.

17       Q.    And that client trust account you talked about, are

18   lawyers for the law firm ever paid out of a client trust

19   account?

20       A.    No.

21       Q.    And why not?

22       A.    Because the money when it comes in is considered

23   firm revenue.  And it's -- their contract that they sign when

24   they're an employee states it's firm revenue.  And it's used

25   to hold and pay the bills of the firm until the end of the

1    year.

2        Q.    You testified that all of the partners or most of

3    the partners have personal accounts at Palmetto State Bank,

4    and that the law firm also has their accounts held at

5    Palmetto State Bank.  What did Russell Laffitte know about

6    the law firm's end-of-the-year compensation structure?

7        A.    I know that for several years, a lot of the

8    attorneys would do annual payments on mortgages, especially

9    as our attorneys were younger.  Obviously, as they've gone

10   on, a lot of times they've paid off their mortgages.  But a

11   lot of their payments were set up on an annual basis because

12   of the fact that they were paid basically the majority of

13   their funds at the end of the year.

14       Q.    So Russell would have know that the lawyers were

15   being compensated at the end of the year except for their

16   smaller salary?

17       A.    I believe he should have, yes.

18       Q.    So you don't work on the daily cases with the

19   lawyers, but I want to review some of these cases and your

20   knowledge of them now.  Let's first start with Hannah and

21   Alania Plyler.  Have you now become familiar with Hannah and

22   Alania Plyler's case to a certain extent?

23       A.    To a certain extent, yes.

24       Q.    Do you know generally what happened with the Plyler

25   girls?

1    A.   Generally, their vehicle, I believe it had a tire

2    tread separation.  And there were several individuals in the

3    vehicle.  And the mother died.  And I believe one of the boys

4    died.  And the two minor girls were also in the vehicle.

5    That got hurt in their -- I believe it was Ford that they

6    sued.  And we recovered from Ford.

7    Q.   So who were the lawyers at the law firm that worked

8    on the Plylers' case?

9    A.   Ronnie Crosby and Alex Murdaugh.

10    Q.   We talked a little bit about Ronnie's specialty and

11    Alex really didn't specialize.  Was it common that lawyers in

12    law firm would work cases together?

13    A.   Yes.  If somebody had a specialty, that case would

14    primarily be handled by somebody that was the specialist in

15    that area.  But the other attorney could work in tandem with

16    them, or they could hand it off and just let them work on it

17    completely alone and still get a portion of the fee.  But,

18    generally, they would split activities during a case.

19    Q.   So what role does Ronnie typically play in that

20    circumstance?

21    A.   So Ronnie is the one who figures out what the

22    causation of the accident was and argues that, the cause, and

23    deals with the other side on the technical issues of the

24    case.

25    Q.   So he's more handling sort of the special legal

1    issues involved in a case?

2        A.    Correct.

3        Q.    In cases where he would typically work them with

4    Alex, who would interface with the client?

5        A.    Alex.  And most of Ronnie's cases, a lot of his

6    cases are what we call associated cases, where another

7    attorney will bring them to us.  And it's -- most of the time

8    the associated case would handle -- the associated attorney

9    would handle the client interface and the disbursements with

10   the client.

11       Q.    Let's take a little side road for a second, because

12   that's going to come up.  Cases that the law firm was

13   associated on with another law firm, when we talk about this

14   disbursement process and things like that, how does that

15   differ when the law firm has been associated by another

16   lawyer?

17       A.    So, again, it depends on which firm is deciding to

18   disburse the case.  And that would depend upon the agreement

19   between the two.  If we disburse the case, all there is going

20   to be in the disbursement is another line item showing

21   payment to the associating attorney for their fee and any

22   expenses that they involved.  If the other side handled it,

23   they would be the one drafting the disbursement sheet and

24   doing all the technical check writing and meeting with the

25   client, and we would receive a check for our payment.

1      Q.    So that would be sort of an agreement that's worked

2  out between the lawyers working the case on the front end?

3      A.    Right.

4      Q.    Let's go back to the Plylers.  So you said they sued

5  Ford and it was related to a tire failure.  Is it your

6  understanding that they obtained large recoveries following

7  these lawsuits?

8      A.    They did.

9      Q.    Let's talk about through the disbursement sheets,

10 Government's Exhibit 18.  All right.  So you've explained to

11 the jury what these amounts would be.  But if you will walk

12 them through this disbursement sheet for Alania Plyler.

13     A.    The first part is the recovery, which means this is

14 the portion where the defendants paid.  So we can see

15 Bridgestone paid roughly 3.6 million.  The note out here

16 where 2 million of that was structured means that the

17 insurance company or Bridgestone paid directly to a company

18 that does structured settlements.  And we would only receive

19 the 1.6 or 1.594 to be exact.  This means there is another

20 defendant, Ford Motor, that got little bit over a million

21 dollars of settlements.  And then this is Vintage Motors, who

22 I can assume was the car seller probably.  And they got

23 128,250 from them.

24         So our gross settlement is the 4,750,000.  And they

25 are showing that there's 2 million that the structure is

1    going to be done.  Leaving us to disburse 2,750,000.  That's

2    the cash that we should have gotten in our account for that

3    client.

4    Q.   So the jury heard a little bit about structure, but

5    explain to them what that means.

6    A.   So structure is when they agree to sum of money

7    that's going to be put into an annuity.  It's generally done

8    to pay future guaranteed amounts over a period of years.

9    Q.   Okay.  So they would get that at a later date and it

10   would be a regular payment rather than a lump sum?

11   A.   Yes.  Yes.

12   Q.   Okay.  So, again, you talked about these liens paid,

13   loans paid, attorneys' fees.  Talk them through Alania's

14   disbursement sheet.

15   A.   So the first one is Medicaid.  That's where I was

16   talking about if you have Medicaid or Medicare or you have

17   any insurance, they have the right to what they call

18   subrogation.  So anything that we -- that is paid that their

19   insurance company pays, they have a right to get that money

20   back.  So in this case, this client had Medicaid.  And they

21   had a claim to the $36,769.85 of the money.  So that had to

22   be repaid to Medicaid.

23        This second portion is loans.  And you can see

24   Palmetto State Bank -- occasionally our clients were given

25   loans during the course of litigation.  And, generally, those

1    are for clients who were pretty much destitute and didn't

2    have a means of making the light bill or buying a grocery or

3    something.  And we would incur some of those, track those,

4    and those would be paid off as well at the time of payment,

5    at the time of disbursement.  So in this one it's

6    considerable loan.  I am not familiar, I haven't looked at

7    what this one was and why it was so large, but that was a

8    payment on this.

9        Q.    So are those loans typically called lawyer loans?

10       A.    They are referred to as lawyer loans by others.  We

11   refer to them as client loans.

12       Q.    So, basically, before the settlement's received or

13   even an award is made, the settlement is reached, the client

14   would go to the bank and get a loan based on their future

15   recovery?

16       A.    Yes.

17       Q.    Okay.  What's the typical percent that the bank

18   would loan these clients money on?

19       A.    Again, I don't look at these, but roughly they are

20   18 to 22 percent.  My understanding was that it was in line

21   with what credit card rates would be at those prevailing

22   times.

23       Q.    So the client would go to the bank and they would

24   extend them around an 18 percent loan, secured by the

25   potential for future recovery?

1       A.    That's right.

2       Q.    What does it indicate about attention to whom on the

3    loans paid portion?

4       A.    Russell Laffitte.  Mostly he was the point on that.

5    And he had a girl in his office named Nancy Drawdy that we

6    also worked with.  But all loans -- we actually have a letter

7    that was sent to the bank saying that Client John Doe was

8    considering getting a loan and that we felt we had a

9    potential case that was going to recover enough and that we

10   were going to send him to see him.

11      Q.    So then once the recovery is actually obtained, the

12   loans would be paid back at 18 percent, and that's what this

13   disbursement sheet is indicating?

14      A.    Correct.

15      Q.    Okay.  Attorneys' fees, you've already talked about

16   that, but just describe it with respect to Alania's case,

17   please.

18      A.    Okay.  So, again, you can see this one was a 40

19   percent fee, which means it had gone into the litigation

20   phase where summons and complaints were filed.  You could see

21   right here, PMPED -- you might have to scroll down a little

22   bit for me here, or up -- is there more to the sheet?

23      Q.    There's a second page.

24      A.    I was going to say.  Okay.  So this one is PMPED.

25   Typically, we don't show the RLC split on here.  But this

1    just meant within our firm we were going to allocate a 65

2    percent to Alex's column and the other -- that doesn't even

3    make sense.  There must be an associated attorney on here

4    because I'm looking at this.  We apparently got 65 percent of

5    the fee.  Palmetto State Bank -- I mean, PMPED got 65 percent

6    of this 40 percent fee.  And this split over here where it

7    says 50/50 means Alex and Ronnie are each going as to get

8    credit for half of that on their name.

9        Q.   Okay.  Let's go to the next page, please.

10       A.   Yeah, I have a problem focusing.

11       Q.   There you go.

12       A.   So then this would be Arnold Beacham would have been

13   what we called the associated attorney.  And he got 35

14   percent of that 40 percent fee.  The next portion down that

15   you are seeing is the expenses that I referred to as the cost

16   of litigation expenses.  So PMPED had little over $90,000 of

17   expenses.  And Arnold Beacham only had $43.  That's not

18   really atypical for us to have the lion's share.  Once they

19   toss it off to us, we generally bear the cost of the case in

20   litigation.  That's not always the case, but that's not very

21   unusual.

22       Q.   Is that a lot of the reason why lawyers associate

23   the law firm, is because y'all can expend funds to support a

24   case?

25       A.   I would say -- you know, I can't speak for other

1    attorneys, but I would say that, yes, we are able to carry

2    the cost of it.  And, again, their reputation and their

3    expertise in these particular fields is why they would reach

4    out for them.

5        Q.    And then again, if you will just talk about the

6    conservator fees that are outlined under the client portion.

7        A.    Okay.  So in this case, Russell was the conservator

8    for Alania Plyler.  And payment was made to him on her behalf

9    in the amount of $691,643.83.

10       Q.    And, again, on the bottom, it will indicate who

11   signed this disbursement sheet on behalf of Alania Plyler?

12       A.    Russell signed as conservator for Alania Plyler.

13       Q.    Okay. Let's move to Government's Exhibit 19, please.

14   This would have been Hannah's disbursement sheet; is that

15   right?

16       A.    Yes.

17       Q.    And you can do this quickly because they have now

18   seen it for Alania, but just what do the amounts show?

19       A.    Okay.  So we have a total recovery of 3 million.

20   1.5 of that was sent through a structure, which means she

21   would get it over a set course of years in annuity.  And then

22   we had $1.5 million that we would have disbursed out of our

23   client trust.  And of that, we paid Medicaid back $2,695,000.

24   We collected a 40 percent fee, which was split between us and

25   Arnold Beacham.

1          Q.    Next page.

2          A.    And, again, we collected expenses that had been

3     advanced for the cost of litigation.  And then the balance

4     would have been written to Russell Laffitte as conservator

5     for Hannah Plyler, which would be her proceeds.

6          Q.    How much does it say Russell Laffitte got as her

7     conservator.

8          A.    243,131.29.

9          Q.    Did Russell also serve as the personal

10    representative for the estates of Hannah and Alania's brother

11    and mother?

12         A.    I think so, but I cannot tell you that 100 percent

13    to be honest.

14         Q.    How about Exhibit 19A.  Just show the top caption

15    real quick, if you don't mind.  Okay.  So this is the

16    disbursement sheet for the estate of Angela Lynn Plyler.  So

17    this would have shown overall recovery; is that right?

18         A.    Yes.

19         Q.    Again, talk them through the amounts on this

20    disbursement sheet, if you will.

21         A.    Okay.  So total recovery was a million dollars.

22    Recovery withheld, $15,000, just means that we are not going

23    to disburse that $15,000 at that point in time because we

24    expect some future cost to either come in that haven't been

25    billed yet or we are going to incur additional costs in the

1    probate court.  That means that we are left with $985,000

2    that were going to be disbursed out.  And, again, we take the

3    fees at 40 percent.  And you show the payments to PMPED and

4    to the associating attorney.  You again show the expenses for

5    the litigation for each of the firms.  And then the bottom

6    part is a personal rep fee that Russell earned for serving as

7    PR for the estate of Angela Plyler.

8         Q.   Okay.

9         A.   And then this is the money that would have been

10   disbursed to the client, or in the case of a death case,

11   their beneficiaries.  So that's why this says clients and

12   beneficiaries.  So in this case, Ricky Plyler got 258,000 and

13   some change.  Russell got money as conservator to be held for

14   Alania Plyler in the amount of $86,130.96.  You've got money

15   for Hannah Plyler as conservator in the amount of $86,130.96.

16   And then Christine Turner also got $86,130.96.

17        Q.   So just the bottom, what does it show?

18        A.   The total disbursements, the 985,000, which means

19   the 15,000 should still have been in our trust account.

20        Q.   And, again, that's Russell Laffitte's signature as

21   the personal representative for the estate of Angela Plyler?

22        A.   Yes.

23        Q.   Let's go to Government's Exhibit 19B.  Okay.

24   There's a few signatures I think based on him taking out for

25   each one of those.  So, again, Russell Laffitte, as

357

1    conservator for Alania Plyler, a minor beneficiary, Russell

2    Laffitte, as conservator for Hannah Plyler, a minor

3    beneficiary of the estate.  And this would have just denoted

4    that Mr. Ricky Lewis Plyler had not yet signed; is that

5    right?

6        A.    That's right.

7        Q.    This would be a second disbursement sheet for the

8    state of Angela Plyler.  Is it common that y'all have

9    multiple disbursement sheets for the same action?

10       A.    Yes.

11       Q.    Why is that?

12       A.    A lot of times there would be a lien or a

13   subrogation issue that had not been worked out yet.  So we

14   would hold certain money to work those out so we weren't

15   holding money from the client.  We also would potentially

16   hold money for future expenses in a case that was big because

17   we anticipated things that were coming in.  Pre-pandemic

18   there was a lot of travel.  And so things might not hit

19   credit cards or come in until after the case.  So it was

20   typical to hold a little bit back.  And, again, in a probate

21   case, there's things in probate court that you have to do.

22   And there may be other people that we used to perform probate

23   functions.

24       Q.    Okay.  So the earlier disbursement sheet, you

25   testified that y'all withheld 15,000.  So this would be held.

358

1    An additional 15,000 was used?

2        A.    Yes.

3        Q.    What does it show?

4        A.    So it shows the 15,000 that was withheld.  And it

5    shows attorneys' fees, court costs for Provence Messervy.

6    That is somebody that does probate work.  So that is actually

7    her fee.  We had additional expenses that we picked up and

8    paid to PMPED.  And that was probably -- they have to have a

9    hearing to approve settlements.  And that's probably

10   settlement approval fee, if I had to guess.  And then the

11   money showing going to the two beneficiaries, which were

12   Ricky Plyler, 50 percent, and then obviously there's more,

13   Alania Plyler, and there should be another page showing

14   Hannah Plyler, and --

15       Q.    That Provence Messervy, excuse me, attorneys' fees

16   and court costs, 597, it indicates that Tiffany Provence is

17   an esquire.  So it's somebody who was -- she was paid out of

18   the settlement for working on this case as a lawyer?

19       A.    Yes.

20       Q.    And then you can move on.

21       A.    And then this shows the amount that went to Hannah

22   Plyler as -- Russell as conservator for Hannah, and then

23   money for Christine Turner, the other beneficiary, and you

24   can see it totals the 15,000.

25       Q.    And, again, Russell Laffitte signing as conservator

1    for Alania Plyler, minor beneficiary of the estate?

2        A.    That's right.

3        Q.    And Russell Laffitte is again signing for Hannah

4    Plyler, minor beneficiary of the estate?

5        A.    That's right.

6        Q.    All right.  19C, again, this is an additional

7    disbursement sheet for the estate of Angela Plyler.  And so

8    this would outline her recovery from Ford Motor Company; is

9    that right?

10        A.    That's right.

11        Q.    So what were those?  How were those disbursements

12    made?

13        A.    So they recovered $216,300.  There's a 40 percent

14    fee taken of the 86,520.  We collected $18,007.10 back in

15    expenses.  Russell was paid a PR fee based off of 5 percent

16    in the amount of $10,815.  And then the beneficiaries would

17    have gotten the balance of the money, split to Ricky Lewis

18    and split to Russell as conservator for Alania and Hannah,

19    and then Christine Turner would have also gotten another

20    share.

21        Q.    All right.  So this one -- if you will just do the

22    caption real quick, Ms. Rozsa.

23            So this is for the estate of Justin Plyler.  So that

24    would have been the brother?

25        A.    Yes.

1    Q.   How were those recoveries disbursed based on the

2    disbursement sheet?

3    A.   So his recovery was $108,150.  We got a 40 percent

4    fee of $43,260.  We collected expenses of $13,552.45.

5    Russell got a personal representative fee of $5,407.50.  And

6    the beneficiaries in this case, just Ricky Lewis Plyler, got

7    $45,930.05.

8    Q.   This is for the Hannah's Plyler's Ford Motor Company

9    settlement disbursement sheet; is that right?

10   A.   Yes.

11   Q.   Okay.  And what did the disbursements indicate?

12   A.   Indicated that the recovery was $648,600 from Ford

13   motor.  Indicates same 40 percent fee of $259,440, the

14   expenses of $53,086.63, and beneficiary payment to Hannah

15   Plyler through her conservator, Russell Laffitte, of

16   $336,073.37.

17   Q.   So in these disbursement sheets we've seen a lot of

18   funds going to Russell Laffitte as the conservator for both

19   Hannah and Alania.  So those funds would go to him to be

20   managed as their conservator; is that right?

21   A.   Right.

22   Q.   And that would be in conservatorship accounts?

23   A.   Typically, yes.  That's my understanding.

24   Q.   And, again, this is the same thing for Alania,

25   disbursement sheet from Ford Motor Company.  And what does it

1    indicate about the settlement proceeds?

2        A.   So she received $1,026,950.  Again, we show a 40

3    percent fee of $410,780, our expenses of $88,848.24, and a

4    payment to her conservator, Russell, for Alania Plyler's

5    proceeds, which were $527,321.76.

6        Q.   That 527 and some change would be going to Russell

7    to manage as her conservator?

8        A.   Correct.

9        Q.   So we are going to move on to do a similar exercise

10   on the disbursement sheets with Pinckney and Thomas.

11           THE COURT:  Ms. Limehouse, it's 12:30.  I think this

12   might be a good time to break.  I'm advised that my jurors'

13   lunches have arrived.  I think that's a popular time to break

14   and unpopular for you to object.  So we will be back in one

15   hour.  Thank you.

16           (Jury leaves open court at 12:31 p.m.)

17           THE COURT:  We will return at 1:30.

18           (Luncheon recess was taken.)

19           THE COURT:  Any matters to address with the Court

20   before we bring the jury back in, from the Government?

21           MS. LIMEHOUSE:  Nothing from the Government, Your

22   Honor.

23           MR. DANIEL:  Just one matter, Your Honor.  We've had

24   people -- I haven't noticed, I haven't been looking, that Mr.

25   Eric Bland, the attorney I cautioned you about yesterday has

1   texting out and, apparently, these texts are going to news

2   about people's testimony.  That's what I hear from people on

3   our side.

4           THE COURT:  Well, you know, the -- I saw Mr. Bland

5   here earlier.  I don't see him in the courtroom right now.

6   That's potentially problematic because it interferes with our

7   sequestration, potentially our sequestration order.

8           One admonition -- here's a little complicating.

9   We've got journalists who are reporting the story.  They are

10  doing their job.  And I've told my jury not to read the

11  newspaper.  And I think y'all should tell the sequestered

12  folks not to read the newspaper, because even if I ask -- if

13  you correctly state that Mr. Bland is doing that, I'm aware

14  that he's involved in various blogs and stuff or in podcasts.

15  And he's probably viewing himself something as a journalist.

16  Okay?  So that might be a stretch.  But the bottom line is,

17  there's something called the First Amendment.  I think it's

18  still around, best I can tell.

19          MR. DANIEL:  He can be restricted.  And the Court is

20  restricting witnesses from discussing their testimony or

21  something they heard in the courtroom with another witness to

22  testify.  He's a lawyer first in this court with a witness in

23  this court and my client is on trial.

24          THE COURT:  Yeah.  Listen, I'm very concerned about

25  it.  But I'm worried that -- yes, he is an officer of the

1    court.  He is not a counselor of record in this case.  And he

2    has -- he is representing, I understand, the clients of

3    certain parties.  You know, I'm not sure of the practical

4    side of this, because let's say for just a minute he -- we

5    tell him not to do it.  My friends in the media are writing

6    the story every day.  Frankly, I don't read it, so I can't

7    tell you for sure, but I would be stunned if you can't pick

8    up the Post and Courier and the state newspaper and see, you

9    know, just reports.  So I am not quite sure -- I am not going

10   to have a prior restraint against the press.

11           So I think the better solution is for you to tell

12   your sequestered witnesses not to read -- I can't control it.

13   Because let's say we stop Mr. Bland, he's like -- it's like a

14   drop in a waterfall.  I mean, there's just all kinds of

15   information going out.  It's not going to affect anything.

16   So what I'm going to tell you, each of you, is to tell your

17   sequestered witnesses, not only not to talk to anyone, but to

18   stay away, just like I've instructed the jury, stay away from

19   media coverage.

20           Yes, Ms. Limehouse.

21           MS. LIMEHOUSE:  Just for the record, I'm not aware

22   of what Mr. Daniel is speaking of, but we have and we did

23   prior to the trial beginning notify the witnesses through

24   their counsel and their counsel of the Court's sequestration

25   order.

1          THE COURT:  Can I be assured that counsel will tell

2     each of their sequestered witnesses --

3          MS. LIMEHOUSE:  We will be sure to reiterate --

4          THE COURT:  Mr. Daniel, will you reiterate to your

5     sequestered witness that they will not watch the media,

6     podcasts, everything I'm asking the jury not to do, they not

7     do.  And, of course, when this is all over, everybody can

8     Twitter and e-mail and social media all they want.  We are

9     just trying to preserve the integrity of this trial.

10         And, you know, it is -- perhaps this case has gotten

11    more attention than other cases.  But we are trying to run it

12    just like every other case.  You know, we are just trying to

13    maintain order.  And the biggest one is, I want the witnesses

14    to testify on their own personal knowledge, not what they

15    acquired from third parties.  And I want the jury to make a

16    decision on the evidence in this courtroom and nothing else.

17    That's my objective.  It's not a perfect world, but, you

18    know, we are trying to be a little cocoon here in the middle

19    of an ocean of information about this case.

20         And I think we've learned in jury selection that,

21    surprisingly, not many people knew much about this.  I mean,

22    there were a few people who seemed to be intensely

23    interested.  And on the request of the defense, I think I

24    knocked every one of them out.  So I think we've done a

25    really good job.  Our -- both of you got to be happy.  The

1     jury is paying a lot of attention.  They are following

2     everything.  They are -- one of the signs of respect is both

3     through the directs and crosses, they are completely engaged.

4     And, you know, I don't think you could ask any more from a

5     jury than that.  I wish one of the jurors had shown up

6     exactly on time and not have us waiting 5 or 10 minutes.  But

7     other than that, I think it's almost perfect.

8              Please keep bringing to me if you have concerns

9     about this, because I share those concerns.  But better

10    course is let's make our sequestered witnesses really

11    sequestered.

12             All right.  Let's bring in the jury.

13             (Whereupon, the jury returns to open court at 1:38

14    p.m.)

15             THE COURT:  Please be seated.

16    BY MS. LIMEHOUSE:

17       Q.   Okay.  Ms. Seckinger, when we left off --

18             THE COURT:  Hold on.  I want to say something, Ms.

19    Limehouse.  I appreciate your eagerness.

20             Ladies and gentlemen of the jury, I just want to

21    commend you on the close attention you are paying.  It's

22    obvious to everybody you are very engaged.  And I want to

23    thank you for your careful attention.

24             Please continue, Ms. Limehouse.

25             MS. LIMEHOUSE:  Thank you, Your Honor.

1    BY MS. LIMEHOUSE:

2       Q.   When we left off, Ms. Seckinger, we had just

3    reviewed the disbursements sheets relating to Hannah and

4    Alania and her mother and her brother.  We are going to the

5    same exercise with Natasha Thomas and Hakeem Pinckney and

6    Arthur Badger.  The jury has seen these disbursement sheets.

7    So we may be a little quicker.  But tell them what you know

8    about the Hakeem Pinckney and Natasha Thomas case.

9       A.   What we call companion cases, there was, again, a

10   very bad car accident in which they were both in.  I think at

11   that time Hakeem ended up a paraplegic, and Nashua was hurt

12   as well.

13      Q.   Who were the lawyers on that case?

14      A.   Ronnie, again, and Alex.

15      Q.   So you testified about Ronnie's role traditionally

16   being one of the more technical side, working on the legal

17   side, while Alex interfaced with the clients.  Is that same

18   true with Hakeem Pinckney and Natasha Thomas case as well?

19      A.   Yes.

20      Q.   Let me go to Natasha Thomas's disbursement sheet.

21   And, again, they've seen this.  So if you can just highlight

22   the first half for them.  Ms. Rozsa will pull it up.

23      A.   So for clarification, do you want me to go over the

24   individual amounts?

25      Q.   Yes.  Yes.

1        A.    So in this one, they had a recovery of $2 million.

2   Allstate Insurance Company paid $15,000.  Budget Tire paid

3   $360,000.  Michelin North America paid $975,000.  And then

4   another $650,000 which was structured.  Of that amount, we

5   took fees of 815,000 -- or we took fees of 800,000, and

6   Russell Laffitte was paid $15,000 fee as conservator.

7        Q.    If you will highlight the bottom part of that

8   disbursement sheet, please.  If you will walk the jury

9   quickly through these amounts as well.

10       A.    PMPED was paid for cost advance in the amount of

11  $8,162.28.  We had loans and liens and medical bills totaling

12  $117,367.99, of those loans were from Palmetto State Bank,

13  $3,402.72.  ACS recoveries, which is someone that handles

14  Medicare liens $110,965.27.  Solomons and Lawton had some

15  type of lien on here for $3,000

16       Q.    I'm going to highlight a couple of those amounts, if

17  we can, for the jury.  The first one, that 3,400 and some

18  change, Palmetto State Bank loan, would that have been one

19  those, what I will call, lawyer loans we discussed?

20       A.    Yes.

21       Q.    So Ms. Thomas would have gone to Palmetto State Bank

22  and gotten a loan with the -- secured by her future recovery?

23       A.    Correct.

24       Q.    And then another amount I want to highlight for you

25  is this $325,000.  So what does it indicate about that

368

1    325,000?

2        A.    So that indicates that that is her money, and that

3    as far as accounting was concerned, that Palmetto State Bank

4    was going to be holding that money and investing it for her.

5        Q.    Okay.  And then we've got a 650 structured payment.

6    You testified about generally what a structure was.  But that

7    650 would be going for structure which she would get paid out

8    regularly rather than a lump sum, correct?

9        A.    Right.

10       Q.    And then we have a check paid for 750.  And then

11   Natasha Thomas remaining cash due, $83,719.73.  So would that

12   83,000 and some change have been drafted directly to Ms.

13   Thomas?

14       A.    Yes.

15       Q.    Okay.  If you will go to the next page, please.

16   Now, this disbursement sheet is not dated.  But, again, like

17   we've seen with the Plylers, Russell Laffitte signed this

18   disbursement sheet as the conservator for Natasha Thomas,

19   correct?

20       A.    That's correct.

21       Q.    We can go to Exhibit 21.  So this is a second

22   disbursement sheet.  If you will just highlight this for the

23   jury, please.

24       A.    So we've had $113,965.27 in the account to pay the

25   liens and loans.  And if you remember correctly, on the

1    previous one, ACS recoveries was, I believe, the $113,965.27.

2    What this indicates is that Medicaid agreed to reduce their

3    lien to $88,720.19.  So the other money was written to

4    Palmetto State Bank for 25,245.08.

5        Q.    In the prior disbursement sheet you mentioned the

6    ACS recoveries; is that right?

7        A.    Yes.

8        Q.    I want to highlight this, Palmetto State Bank loan,

9    25,245.08.  And it indicates that would be going to Palmetto

10   State Bank.  It says loan.  Were there any -- the last

11   disbursement sheet showed details about a loan to Natasha

12   Thomas.  Are there any details here?

13       A.    No, not that I've seen.

14       Q.    Okay.  And we saw in the last disbursement sheet

15   that Russell Laffitte signed it.  Do we know -- do you know

16   why this disbursement sheet was not signed?

17       A.    No.

18       Q.    Okay.

19       A.    Other than these are very old records and we didn't

20   have -- we didn't scan everything then.  So we may not have

21   had it in our records.

22       Q.    You are not aware of a signed second disbursement

23   sheet for Natasha Thomas?

24       A.    No.

25       Q.    Ms. Rozsa, if you can go to 22, Hakeem Pinckney's

1    disbursement sheet.

2         They've seen this.  Can you highlight from the

3    firm's perspective what -- the first half, Ms. Rozsa -- what

4    the amounts show?

5    A.    Hakeem Pinckney had a total recovery of $10,245,000.

6    Allstate Insurance Company paid $25,000.  Budget Tire paid

7    $348,000 -- $345,000.  And Michelin North America paid

8    $9,875,000.

9    Q.    And how about the fees?

10   A.    The fees on that were $4,158,000 in total, which

11   included $4,098,000 of attorney fee and a $60,000 conservator

12   fee payable to Russell.

13   Q.    How about costs and expenses?

14   A.    Costs and expense were PMPED's cost were $66,193.77.

15   And in this case, we held trust -- we held in trust expenses

16   of $25,000 in anticipation of future expenses.

17   Q.    Ms. Rozsa, if you will go to page 2 of Hakeem

18   Pinckney, the bottom.  If you will highlight, Ms. Seckinger,

19   what this disbursement sheet dictates.

20   A.    Okay.  This dictates the portion that was paid out

21   for the loans, liens, and medical bills.  So Palmetto State

22   Bank was paid for a loan that was obtained on Hakeem

23   Pinckney, for Hakeem Pinckney.  That pay-off amount was

24   $3,965.08.  Gibson & Sharps handled the lien for M.U.S.C.

25   And that lien resolved for $500,813.08.  Then there was

1    another Medicaid lien that resolved for $181,446.61.  The

2    amount payable to the client in full was $5,309,581.46.

3    Check was written to the bank for $309,581.46.  And I believe

4    the other was done through structures.

5        Q.   Okay.  Just a couple of amounts again.  This 39 and

6    some change would have been a loan, a lawyer loan, like

7    Natasha Thomas received; is that right?

8        A.   That's correct.

9        Q.   And this amount you highlighted 309,581.46, that

10   would have been going to Palmetto State Bank?

11       A.   Correct.

12       Q.   And 5 million, again, would be a structure that he

13   would receive from payouts regularly rather than a lump sum?

14       A.   Correct.

15       Q.   All right.  I want to engage in the same exercise

16   with the Badger disbursement sheets.  Again, they've seen

17   most of these.  Okay.  Again, this Hakeem Pinckney

18   disbursement sheet shows Russell Laffitte signed it as

19   conservator.  And this one is also not dated.  Do you know

20   why neither the Natasha Thomas or a Hakeem Pinckney

21   disbursement sheets weren't dated?

22       A.   I do not.

23       Q.   All right.  Now we will move on to the Arthur Badger

24   and estate of Donna Badger disbursement sheets.  What do you

25   know about the Badger case?  I know you weren't involved on a

372

1    day-to-day basis, but what do you know?

2        A.    So the Badger case was against GPS and Allendale

3    County and involved Arthur Badger's wife and several children

4    in the vehicle.  It was -- his wife passed away from it.  And

5    it was actually a very big case that he settled.

6        Q.    So who worked that case?

7        A.    You know, I am not going to go out here and say

8    something I don't know.  I know that Alex worked it.  I can't

9    remember if anybody else worked on it with him.

10       Q.    Fair enough.  If you will highlight all the amounts

11   on the top.  Okay.  And if you will just go over those

12   amounts for us.

13       A.    Okay.  There was a recovery of $3,100,000.  Our fee

14   was $1,240,000.  There was case costs collected of

15   $72,277.02.  You see on here it's a little bit of difference.

16   We have individual case costs.  Those would have been case

17   costs directly for Arthur Badger in the amount of $18,149.95.

18   And if you see common expenses of $16,627.07, that's things

19   that we would have paid that would have been applicable to

20   every member -- there would have been companion cases for the

21   children and other people in the wreck.  And if we paid them,

22   we ended up splitting them between the parties involved.  And

23   that's indicated by common expenses.  We have $2,500 in trust

24   for future expenses.  And this actually included Russell's

25   representative, PR fee, in the amount of $35,000 as part of

1    expenses.

2    Q.  I want to highlight that again in a moment.  But if

3    you will talk about the loans and medical bills as well.

4    A.  Okay.  So on this loans and liens, you see several

5    loans to Palmetto State Bank that were each tracked

6    individually and paid off at the time of disbursement.  The

7    total of those were $49,649.04.  There was then some liens,

8    one to Kory Fleming in the amount of $15,000, one to Harry

9    and Ella Walker for $15,819.93, one to Solomons & Lawton for

10   $7,500.

11          And then you see a slew of medical bills.  Allendale

12   County EMS was paid 705.50.  Allendale County Hospital was

13   paid 2,006.50.  Hampton Regional Medical Center was paid

14   759.20.  And Palmetto Primary Care Physicians was paid

15   $1,400.  Then you see a payment to Palmetto State Bank in the

16   amount of $1,325,000.  And the rest of the balance of

17   $369,882.81 was written to Arthur Badger.

18   Q.  So this 1325, according to the disbursement sheet,

19   was supposed to go to Palmetto State Bank to fund a

20   structure, per client's request.  And then what would have

21   happened with this $369,882.81?

22   A.  That should have been paid directly to Arthur

23   Badger.

24   Q.  Okay.  And then again, highlighted the $35,000,

25   Russell Laffitte personal representative fee?

1      A.   Correct.

2      Q.   Ms. Rozsa, will you highlight the top portion of the

3    caption of this disbursement sheet, please.

4          So the jury has heard both about Arthur Badger and

5    the estate of Donna Badger.  This disbursement sheet is for

6    Arthur Badger's settlement; is that right?

7      A.   That's right.

8      Q.   Why was Russell Laffitte accepting a $35,000 PR fee

9    for Arthur Badger?

10     A.   That's a good question.  It should have been on

11   Donna Badger's.

12     Q.   Okay.  So he should not have been receiving $35,000

13   from this disbursement?

14     A.   Typically, that would not be the way it's handled.

15     Q.   Let's go to page 2, please, Ms. Rozsa.

16          Okay.  So the signatures here, we've seen a few

17   where Russell Laffitte signs as the conservator for the

18   Plylers and for Pinckney and Thomas.  But here Arthur Badger

19   just signs.  And is that because Russell Laffitte was not the

20   PR?  Arthur Badger didn't need a PR?

21     A.   That's right.

22     Q.   I just want to highlight this date that it was

23   signed, November the 19th of 2012; is that right?

24     A.   That's right.

25     Q.   Okay.  Let's go to Exhibit 24, please.  Okay.  Look

1     at the caption real quick, Ms. Rozsa.

2          So this indicates it's a disbursement sheet for the

3     estate of Donna Badger.  And this would be the one that

4     Russell Laffitte was involved in; is that right?

5     A.    That's right.

6     Q.    Okay.  If you will just highlight the whole amount

7     this time.

8          Okay.  And again, for the jury, I don't think

9     they've seen this one yet.  So spend a little bit more time,

10    but highlight these amounts.

11    A.    So there was a total recovery in this one of

12    $4,675,000.  And you see a portion between wrongful death and

13    survival.  That's above my pay grade about how they arrive at

14    those, but they generally split them into the two categories

15    when there is a death involved.  So the wrongful death is

16    $4,674,500.  Their survival was $500.  The attorney fees in

17    total were $1,870,000.  And then it shows you what they were

18    on each of those.  The wrongful death was $1,869,800.  And

19    the survival was $200.

20         Again, we go down, what you are familiar with is the

21    cost again.  We had individual cost of 3 -- I mean $3,812.55.

22    Their portion of the common cost was $25,133.95.  And in this

23    case, $18,018.51 was held for future expenses.  And then

24    another individual expense of $300 attributed to this

25    survival action of this cost.

1    Q.   How about the disbursements to the beneficiaries?

2    A.   So the disbursements to the beneficiaries totaled

3    $2,757,734.99, then list each one of the beneficiaries,

4    which, as you can see, there were six of them.  And they

5    actually were purchased -- annuities were purchased for those

6    six beneficiaries.

7    Q.   I want to just highlight a couple of amounts,

8    because the jury will see them later.  This 1870 for

9    attorneys' fees, and this 47,000 and some change for costs

10   and expenses.  So we saw that Russell Laffitte took $35,000

11   from Arthur Badger's disbursement sheet.  There's no funds

12   that he took as PR for the estate of Donna Badger; is that

13   right?

14   A.   That's right.

15   Q.   If you will go to page 2, Ms. Rozsa.

16        Okay.  So this is Russell Laffitte signing as the PR

17   for the estate of Donna Badger on May the 3rd of 2013.  So we

18   just saw how Arthur Badger's disbursement sheet was dated

19   November of 2012.  And so here we are six months later, and

20   Russell is actually signing as the PR for the estate of Donna

21   Badger; is that right?

22   A.   That's right.

23   Q.   Let's go to Exhibit 25, please.  So you've testified

24   about how sometimes there will be additional disbursements

25   based on settlements.  So just explain for the jury what this

1    disbursement shows.

2         A.   So we had held $18,018.51 on the first initial

3    disbursement.  We incurred $6,017.37 of additional expenses.

4    And the remainder of $12,001.14 was then issued to the estate

5    of Donna Badger.

6         Q.   Okay.  Page 2, please.  And, again, this indicates

7    on the same date, May the 3rd of 2013, Russell Laffitte

8    signed this additional disbursement sheet as the PR for Donna

9    Badger?

10        A.   Correct.

11        Q.   I think you provided the jury a great background of

12   all these disbursement sheets.  Let's kind of get into what's

13   happened in 2021 and since.  Okay.  Let's start with the

14   spring of 2021.  The jury has already heard that Alex was

15   dealing with some financial stressors.  And so from your

16   perspective, what's the first thing in your mind that's

17   happening at the law firm?

18        A.   So the first thing that popped up on our radar was

19   the Faris case.  We received money in for expenses, but not

20   for the fee.  And, generally, they come in together.  So --

21        Q.   Let's back up just a minute.  So the Faris case,

22   explain to them how the law firm got involved in that case

23   and sort of what the arrangement was supposed to be for fees

24   and expenses.

25        A.   So Chris Wilson and Alex were associated attorneys

1    on that case.  And Chris Wilson's office was handling the

2    disbursement on the case.  It was a case involving a Mack

3    truck.  And I believe it went to trial.  I'm not sure what

4    venue it was in.  But the money was collected and disbursed

5    through Chris Wilson's office.

6        Q.    What was Alex and Chris Wilson's relationship?

7        A.    They had, I believe, been college roommates.  I know

8    that they were college friends and still had a close

9    relationship, closing friends.

10       Q.    Chris was a good friend, also a lawyer?

11       A.    That's correct.

12       Q.    So the two of them were working what we call the

13   Faris case together that had gone to trial?

14       A.    Correct.

15       Q.    What was the arrangement in terms of the

16   disbursements from that case?

17       A.    So there should have been a split in the fees that

18   would have been remitted to Peters Murdaugh Parker.  And we

19   should have gotten our portion of the expenses that we spent

20   in the litigation of that case.

21       Q.    Okay.  So what happened?

22       A.    So we only received a check for the expense portion

23   and did not receive a check for the fee.  Again, that's very

24   unusual.  So the question came up of, where was this money?

25   We asked some questions.  This was late April.  We asked some

questions.  Some time went back and forth because secretaries

were on vacation.  We asked for verification and question of

where some information was and why we didn't have the money.

We weren't getting very good answers.  And on June 7th, I

actually confronted Alex --

Q.    One second before you go to June 7th.  So what's

your concern?

A.    So our concern --

Q.    Alex's a partner in the law firm.  Why are you

concerned about this fee?

A.    So at this point, we are concerned because we know

about the boat accident.  We know that we don't want to be

any part of him covering up any kind of money, delaying the

collection of fees, trying to structure fees where they will

be collected later in this life.  We didn't want him to hide

money due to this boat wreck, that we didn't want any part of

that.

Q.    Just highlight this boating accident and why y'all

were worried about Alex with his fees with the boating

accident.

A.    So the boating accident was a civil lawsuit against

Alex.  And, of course, he was supposed to be producing some

financial -- personal financial statements.  And the fear

there is that he was going to be sued personally.  And so,

like I said, our concern was we wanted no part of him hiding

1     income, deferring income, or reducing his income.

2          Q.   All right.  So at this point, you are worried he's

3     hiding the fees from the civil lawsuit?

4          A.   That's right.

5          Q.   And you don't want to be a part of that?

6          A.   That's right.

7          Q.   Did you have any concerns at this point that he's

8     stealing money from his clients?

9          A.   I never in my wildest dreams would have thought that

10    and had no concerns about it at that point at all.

11         Q.   Let's go to June the 7th.  What happens on June 7th?

12         A.   June 7th we still hadn't gotten any answers back

13    from his secretary or Chris Wilson about where the checks

14    were.  Seemed like they were giving us a lot of song and

15    dance.  So I confronted Alex and told him that I needed to

16    know where the fees were from that case, because they had not

17    been received and that he needed to provide me information

18    that the fees were still there.

19         Q.   So y'all had made efforts to find out where this fee

20    was before you confronted him on June the 7th?

21         A.   We did.

22         Q.   What efforts did you make?

23         A.   So I had already -- I had e-mailed -- I went and

24    talked to Lee Cope, who is one of our attorneys.  And we

25    decided that, you know, the best thing, which is what we were

381

1   typically were missing -- we were missing the disbursement

2   sheet from Chris Wilson's office that would have shown us

3   where the money was supposed to go.  We e-mailed his

4   secretary, Chris Wilson's secretary, asking for it.  Turns

5   out, a week or so went by, she was on vacation.  When she

6   came back from vacation, she said, I have to get this

7   information from Chris Wilson.  Chris did not provide the

8   information.  But within a day or two of receiving the e-mail

9   from Chris Wilson's secretary, we got a visit from Alex, at

10  which time Alex said that the money was in Chris Wilson's

11  trust.  And he actually made the statement that they were

12  trying to -- he wanted to try to defer money or put money in

13  his wife's name because of the boat account.

14      Q.    So y'all had exchanged communications with Chris

15  Wilson staff and the law firm's staff in an effort to try to

16  find these fees?

17      A.    That's right.

18      Q.    You approach him on June 7th.  And what happens?

19      A.    So during that conversation that we had, I actually

20  asked him that I needed proof of where it was.  Alex again

21  assured me that Chris Wilson had it in his trust.  During

22  that meeting, some few minutes into it, he gets a phone call,

23  Alex gets a phone call stating that his father is going to be

24  terminal, be coming home on Hospice.  So that pretty much

25  abruptly ends that conversation, as I thought he needed to go

1    turn his attention to his father.

2       Q.    So then what happens on the night of June 7th?

3       A.    That's when his wife Maggie and son Paul were

4    murdered.

5       Q.    All right.  So leading up to June the 7th, the law

6    firm is concerned that Alex is hiding funds.  And you

7    approach him about that.  His wife and son are murdered.

8    What happens with your efforts to try to find this fee from

9    the Faris case?

10       A.    Well, our efforts stalled out for a little while

11    because, obviously, you can imagine the trauma that was going

12    on.  You know, his wife and son had just been brutally

13    murdered.  Two or three days later his father dies.  Our

14    whole firm, to be honest, was in a tizzy.  Nobody knew what

15    was going on.  There was fear in the office.  So nothing got

16    pursued for several weeks.

17            And then in July, we ended up, on July 19th,

18    receiving an e-mail from Chris Wilson assuring us that all

19    the money was in his trust account.

20       Q.    And I'm going to show you what's been admitted as

21    Government's Exhibit 222.  So you just referenced a July 19th

22    e-mail.  So this is an e-mail from Chris Wilson to Alex

23    Murdaugh.  And it says:  Alex, as discussed, I am confirming

24    that I am holding in trust $600,000 in the Andral Faris case,

25    and $192 in the Denise Faris case, which represents

383

1    attorneys' fees.  I will continue to hold these moneys in

2    trust until I'm instructed by you or your firm regarding

3    payment.  And then the top portion shows that Alex forwards

4    this e-mail to you and Lee Cope, who you have testified is

5    another partner at the law firm.

6              Once you receive this e-mail, what do you do about

7    trying to track down these fees?

8        A.    At this point, you know, we are believing Chris

9    Wilson and Alex, because they are attorneys.  They've taken

10   an oath.  We are assuming the money is there.  Lee has

11   actually instructed me to let's just step back.  Alex was in

12   a bad way still.  We knew he was struggling.  And we felt

13   like we could resolve this.  Let's just back off for a little

14   bit.

15       Q.    So July 19th, do you have any idea that Alex is

16   stealing money from his clients?

17       A.    Absolutely none.

18       Q.    Okay.  So in early September, let's fast-forward a

19   little bit, did you discover that Alex was, in fact, stealing

20   his client's funds?

21       A.    We did.

22       Q.    And did you share that information with other

23   partners at the law firm?

24       A.    We did.  Immediately found that -- when -- the day I

25   found out he was stealing funds, I believe it was September

1    2nd, the next day, we actually -- we had conversations

2    immediately, had some of the partners in my office discussing

3    it.  We immediately terminated him the next morning.  We took

4    him off of our bank records.  We reported the information to

5    SLED immediately.  We self-reported to ODC.  We reported him

6    to ODC, which is the Office of Disciplinary Counsel that

7    holds attorney licenses.  Did everything in our power at that

8    point to make sure that everybody who should know about it

9    would know about it.

10        Q.   Let's talk about that.  SLED, why did you reach out

11   to SLED?

12        A.   Because we knew that it was in tandem.  The same

13   time that this was happening was his shooting that we had.

14   We were there.  And we disclosed to them that we had just

15   found out the previous day that money had been missing.

16   Obviously, it's against the law.  We wanted them to help us

17   investigate.  We wanted to make sure that all of our former

18   clients received their funds back and that actions would be

19   taken to start the investigation with law enforcement.

20        Q.   So ODC, you testified that it's called the Office of

21   Disciplinary Counsel.  Explain for the jury what ODC is?

22        A.   So ODC is, for lack of a better word, the governing

23   body that disciplines and censures lawyers, makes sure that

24   they are complying with the code of ethical conduct,

25   completely doing things within the law.  They are also the

1    entity that if a client calls and complains about an

2    attorney, if they think an attorney is doing something wrong,

3    that's who you call.  And they will investigate the

4    attorneys.

5         So they -- we obviously knew that misappropriation

6    is a cause for suspension and cause for violation.  We also

7    reported it with each of our attorneys to voluntarily let

8    them know that we wanted them on come, and that we were not

9    hiding anything, and that we were doing our best to give

10   everything back to the clients that we had found.

11       Q.   So you testified that y'all made efforts to notify

12   everybody that needed to know.  So you said SLED, ODC.  Who

13   else did you notify about uncovering the theft of the funds?

14       A.   We notified FBI.  We also notified Russell.  Went to

15   his bank.  I believe that weekend was Memorial Day, so we

16   went the Tuesday, and notified Russell of what we had found.

17       Q.   So why did you notify Russell?

18       A.   Well, because of the close banking relationship that

19   we had.  We had taken Russell off the accounts on Friday.  We

20   knew there would be questions.  We also wanted to let him

21   know that he would no longer be a representative of us and

22   that he needed to be on alert, and that Alex would not really

23   be having any paychecks anymore.  We knew that the bank had

24   loaned.

25       Q.   So you notify law enforcement.  You notify the

1   people who oversee and regulate lawyer conduct.  And then you

2   notify the people who oversee the law firm's funds?

3        A.   That's right.

4        Q.   And that's who Russell was at the time?

5        A.   Well, I wouldn't say he oversaw the funds, but the

6   bank had the accounts, yes.

7        Q.   So the week of September the 7th, what happens?

8        A.   Week of September 7th?

9        Q.   Uh-huh.  Who did you meet with that week?

10       A.   We met with SLED.  And we also met with Hobbs Group,

11   which is a forensic auditor group, to bring them in to help

12   them investigate our accounts.

13       Q.   So y'all hired an outside group to come in and

14   analyze the accounts?

15       A.   That's correct.

16       Q.   All right.  So how about with Russell, did you all

17   meet with him that week?

18       A.   We met with him that Tuesday, as I previously

19   attested to.

20       Q.   So that notification that you gave him was in

21   person?

22       A.   Yes.

23       Q.   And who was in attendance at that meeting?

24       A.   Mark Ball, Lee Cope, and myself.

25       Q.   So what do you all communicate with Russell about

1    what has happened?

2        A.    We told him that we had found that he had been

3    misappropriating client funds and had stolen firm money from

4    us, and indicated again, as I said, that he was no longer on

5    our checking account, that he had been resigned from the

6    firm.

7        Q.    What was Russell's response?

8        A.    Well, I would say disbelief at first.  He made the

9    statement that he thought the bank would lose a lot of money.

10       Q.    Why did you think that Russell was telling you the

11   bank was going to lose a lot of money?

12       A.    I really didn't know, because I didn't know the

13   extent of Alex's finances, nor do I really want to.  And I

14   can't quite recall the exact details of that conversation,

15   because as you heard, we've learned -- we've lived this for a

16   year, year and a half.  And if I told you that Russell said

17   X, Y, or Z at this, it may be because I learned it a month

18   later, could be heard somebody talking in the office.  I

19   personally remember being surprised because I would have

20   thought Alex would have had properties paid for, and if not,

21   that he would have collateral.

22       Q.    So why would you think that?

23       A.    Because Russell -- because Alex made a good living

24   and he did not appear to live outside of his lifestyle.  And

25   I know some of what the other people make.  And knew little

1    bit more about their finances.  So I had no reason to believe

2    that Alex had any financial difficulties.

3        Q.    So it surprised you to hear that this was going to

4    cause the bank a lot of loss?

5        A.    Yes.

6        Q.    So after you met with Russell, what did you start to

7    do?  You start to undercover as much as you could?

8        A.    Well, we did.  We started just going through files

9    as much as we could.  And we started with the larger files.

10    And, obviously, his largest files were Plyler, Natasha

11    Thomas, and Pinckney, which were companion cases.

12        Q.    Let's go through those individually.  So your next

13    step is to identify some of Alex's largest settlements.  And

14    that's where you started to try to determine whether funds

15    had been stolen?

16        A.    That's right.

17        Q.    So let's start with Badger.  I'm going to show you

18    Exhibit 26.  You've already testified that based on the

19    disbursement sheet, Russell had been appointed to serve as

20    the PR for the estate of Donna Badger.  And so this is an

21    e-mail from Alex Murdaugh to Kristi Jarrell and Annette

22    Griswold.  Who are Kristi Jarrell and Annette Griswold?

23        A.    Those are his paralegal, secretary paralegals.

24        Q.    So Monday, September 17th, 2012, Alex e-mails his

25    staff and says, we need to pick up the order naming Laffitte

1    PR from Allendale Probate Court ASAP, right?

2        A.    That's right.

3        Q.    Let's go back and look at that disbursement sheet,

4    Exhibit 23, the second page.  You will highlight the date.

5    And so this is November the 19th of 2012, not long after this

6    September e-mail picking out the order naming Russell PR.

7    Arthur Badger's disbursement sheet is signed; is that right?

8        A.    That's right.

9        Q.    So November 19th, 2012.  All right.  Let's go to

10   Exhibit 27, please.  So this is an e-mail from Alex to

11   Annette Griswold, who you said is some of his legal staff.

12   On November the 19th of 2012, he says:  I have short meeting

13   at bank.  Call me when you get in.

14           Is that right?

15       A.    That's right.

16       Q.    The same day Arthur Badger signed his disbursement

17   sheet, there is an e-mail indicating that Alex was going to

18   the bank; is that right?

19       A.    That's right.

20       Q.    I'm going to show you Government's Exhibit 169, page

21   9.  So this is a check written to Palmetto State Bank.  The

22   memo line says:  Arthur Badger, personal representative fee.

23   That's $35,000.  Does that correspond with the amount that

24   was on Arthur Badger's disbursement sheet?

25       A.    Yes.

1    Q.    Okay.  And, again, the date on here is November the

2    20th, 2012.  So that's the day after this supposed meeting at

3    the bank and the day after Arthur Badger's settlement sheet

4    is signed -- disbursement sheet, excuse me, is signed?

5    A.    That's right.

6    Q.    Does this check indicate that it was deposited on

7    November the 21st of 2012, the next day?

8    A.    It does.

9    Q.    Okay.  So in November of 2012, Russell receives his

10   $35,000 PR fee from Arthur Badger's settlement funds.  Let's

11   just revisit Government's 24, please.  That's the estate of

12   Donna Badger's disbursement sheet.

13        And if you will just go to the second page, please,

14   Ms. Rozsa.

15        All right.  So this disbursement sheet, as you've

16   already testified, was signed by Russell Laffitte as the PR

17   on May the 3rd of 2013, so six months after he takes that

18   $35,000 fee from Arthur Badger; is that right?

19   A.    That's right.

20   Q.    And so this is where he should have been taking a PR

21   fee from in May, right?

22   A.    Right.

23   Q.    Not from Arthur Badger's disbursement sheet back in

24   November?

25   A.    Correct.

1      Q.   All right.  So you've met with Russell at the bank.

2   You've notified him of what happened with Alex.  What happens

3   then after that meeting in September once you've seen that

4   the Arthur Badger checks have been misappropriated, or what

5   leads you to ask about the Arthur Badger case?

6      A.   Well, some period of time goes through, because most

7   of September I'm collecting information for ODC and for

8   audits.  So -- and then I had a slight vacation.  So we

9   didn't round back into this until mid-October.  And at the

10  point I saw this, I asked Russell if he could give me the

11  backups.  You know, I could see where the checks were

12  written.  But once they go to the bank, I can't see where

13  they go to.  So I asked Russell if he could provide me the

14  detail to some of those checks to see where they were

15  applied.

16     Q.   So you look back and see the way that the checks

17  were cut from the law firm?

18     A.   Right.

19     Q.   And you see that those Badger checks were written to

20  the Palmetto State Bank.  And so you go to Russell --

21     A.   That's right.

22     Q.   -- to ask about the checks.  And so what does he

23  provide?

24     A.   He provides most of the checks.  He -- the only ones

25  he did not provide were the ones for his PR fees and

1    conservator fees.

2    Q.    So he provides you all of the Badger checks that

3    were negotiated that the jury has seen but not his PR fees

4    charged?

5    A.    Right.

6    Q.    I want to just quickly for the jury highlight a

7    check that he signed, Exhibit 28.

8         And if you will just highlight the bottom, Ms.

9    Rozsa, real quick of that check.

10        Okay.  So this indicates 1.9 million and some

11   change, Russell Laffitte as personal representative of the

12   estate of Donna Badger.  And it's October 30th, 2012, right?

13   So that's before the November 19th, 2012, disbursement sheet

14   was signed.

15        Ms. Rozsa, will you just go to the back of Exhibit

16   28, please.

17        This shows that Russell signed that 1.9 check; is

18   that correct, Ms. Seckinger?

19   A.    That's correct.

20   Q.    If you go back to the first page, please, of Exhibit

21   28, and highlight this bottom portion of the check, please.

22        Okay.  So earlier when you talked about the

23   disbursement sheets for the estate of Donna Badger -- we

24   earlier looked at -- if you will just go back to the

25   disbursement real quick.  We looked at two amounts, 1870, and

1    47,000, and 265.  So does that about add up to that

2    1,917,265?

3         A.   It does.

4         Q.   I'm sure you could do math better than me, because I

5    do not have that financial background.  That check that

6    Russell signed accounted for the attorneys' fees and the

7    costs and expenses for the estate of Donna Badger in October

8    of 2012; is that right?

9         A.   That's correct.

10        Q.   Okay.  So you said Russell brings you the checks.

11   Was this in an in-person meeting, or how did this meeting

12   take place?

13        A.   Yes, in-person.

14        Q.   So what happened during this initial meeting about

15   the Badger checks?

16        A.   So as we're presented them and as we looked through

17   them, he volunteered that -- or asked that perhaps we should

18   split the cost of these -- this case, because it had been

19   messed up.  And he volunteered to bring over the $680,000.

20   And that was the discussion that was made at that time.

21        Q.   All right.  Before we go into the 680, the point of

22   this meeting is him bringing the supporting documentation?

23        A.   Right.

24        Q.   And so you said that you see the checks going over

25   there, but you don't know what happens to them once they went

1    over there?

2        A.    Right.

3        Q.    So this is him showing you what happened with those

4    checks?

5        A.    That's right.

6        Q.    So you testified that he brings all these checks

7    except his PR fee check?

8        A.    That's right.

9        Q.    When y'all sit in that first meeting, is this the

10   first time you are seeing all of those checks from the Badger

11   settlement?

12       A.    It is.

13       Q.    Are you able to sit and go through them at the time,

14   or how do you -- what do you see about these checks during

15   that initial meeting?

16       A.    During the initial meeting, I am able to go through

17   and sit and see what the checks were for.  And there were

18   various things, but you could tell there were payments

19   against Plyler loans.  There were money orders to various

20   equipment companies.  There were payments to Mr. Randolph,

21   which is Alex's dad.  In one of them there's a payment to Mr.

22   Charlie, which is Russell's dad.  So I could tell that these

23   were things that were benefiting Alex Murdaugh and that they

24   were not for the Badgers.

25       Q.    So the use of these funds immediately stuck out to

1    you.  Was there anything else about these checks that stuck

2    out to you, like the account they were coming from?

3        A.    They were all coming from our client trust account.

4        Q.    So you testified that the client trust account is

5    always client funds, not attorneys getting paid?

6        A.    That's correct.

7        Q.    You mentioned Plyler and that some of the funds were

8    going to Plyler.  What, if anything, did Russell tell you

9    about the funds going to Plyler?

10        A.    He had told me that he had borrowed -- he had loaned

11    Alex money from the Plyler girls' accounts, and that he had

12    talked to Sheila Odom, who is the probate judge, and had

13    permission to do that, and that that's what those payments

14    were for.

15            MR. DANIEL:  I didn't quite hear that.

16        Q.    Can you repeat that, please.

17        A.    Russell indicated that he had loaned Alex Murdaugh

18    money from the Plyler girls' accounts, and that he had talked

19    to Sheila Odom about that, and that that's why those payments

20    were going back there.

21            MR. DANIEL:  Okay.  Thank you.

22        Q.    Did he mention loans that he received from the

23    Plyler accounts?

24        A.    No.

25        Q.    Did Russell ever tell you that he extended himself

1    loans from the conservatorship accounts?

2        A.    No.

3        Q.    What did you think when he told you that he had

4    loaned Alex money from the Plylers' accounts?

5        A.    I didn't think that that was a good move, because

6    from my training, a fiduciary, I know that you are not

7    supposed to do that.  The conversations were that he had

8    had -- he had talked to Sheila Odom and that she had given

9    him a piece of paper.  Mark Ball was in the same

10   conversations, and he was concerned about it as well.

11       Q.    Okay.  So the jury has seen these Badger checks

12   pretty closely.  And they've seen them going to the various

13   people that you referenced.  I want to show you Exhibit 31,

14   which is a lost check form.  So the jury heard how there were

15   three initial Badger checks, 388 to Johnnie Parker, $75,000

16   to his father, and 151 to Hannah Plyler.  This is that

17   additional 709,586.45.  So what happened to that -- what was

18   supposed to be that fourth check?

19       A.    So, again, records are gone.  Years having by.  But

20   what I've got to assume from this is the check had been

21   misplaced or lost.  So this is a stop payment on that check.

22       Q.    So who would have directed this stop payment?

23       A.    It would have been at the point in time -- more than

24   likely, what happened is I'm asking where the check was, and

25   Alex would have said it was lost, and we would have drawn it

1    at the direction of Alex.

2        Q.    Let's go back to that meeting.  You said that during

3    the meeting, Russell indicated that he was willing to split

4    it.  Was -- whose idea was that to split the loss?

5        A.    Russell's.

6        Q.    And at this point, had you had any opportunity to

7    investigate what had really happened with the Badger funds?

8        A.    No.

9        Q.    This is the first time you are seeing those checks?

10       A.    I believe it was.

11       Q.    How about the other lawyers who were in that

12   meeting, had they seen any of these checks before?

13       A.    No.

14       Q.    So this is the first time any of y'all are ever

15   seeing the other side of the way the checks were drafted?

16       A.    That's right.

17       Q.    Okay.  And so Russell says during that meeting -- he

18   suggests that y'all split the cost?

19       A.    That's right.

20       Q.    So what was the thought when he suggested that?

21       A.    The thought appeared to be that -- we knew that the

22   checks -- that the client had been misappropriated from.  I

23   think the thought process there was we had to both be

24   somewhat at fault, so we needed to split it.

25       Q.    What responsibility did Russell take for the way the

1    Badger checks were misappropriated?

2        A.    As in -- he didn't take any responsibility as far as

3    any personal responsibility.  It was like an institutional

4    problem.

5        Q.    Okay.  So did he tell you that the bank --

6            MR. DANIEL:  I'm going to object to leading.  She

7    asked a question.  She answered the question.

8            THE COURT:  Well, repeat the question.

9            MS. LIMEHOUSE:  I just said, did he tell you, and

10   then he objected.  So I haven't asked it yet.  I was going to

11   ask whether he told her that he was the one who negotiated

12   all of those checks.

13           MR. DANIEL:  You need to ask an open-ended question.

14           MS. LIMEHOUSE:  It's not suggesting an answer.

15           THE COURT:  Overruled.  I think that's a proper

16   question.  Go ahead.

17   BY MS. LIMEHOUSE:

18       Q.    Did he tell you that he was the one who negotiated

19   each one of those checks?

20       A.    No, he never did.

21       Q.    Was it your perception that some other bank

22   employee, at this point in time, had been responsible for

23   negotiating all of those checks?

24       A.    I really did not think about it.  I would have

25   thought that there were.

1      Q.   So this meeting Russell suggests splitting the loss

2   from Badger.  So what happens later October 28th?

3      A.   So October 28th is when the check was made to PMPED

4   client trust, because there, what we were trying to do was

5   reimbursement -- first when we found out the money was

6   misappropriated, we were going to make sure we reimburse our

7   former clients as fast as we can.  And the first step in that

8   is putting money in the client trust.  So money order was

9   brought over from Palmetto State Bank in the amount of

10   $680,000 dated October 28th.

11      Q.   So who prompted the delivery of that check?

12      A.   Russell brought it to us.

13      Q.   Did you all ask for it?

14      A.   No.

15      Q.   So he just comes over with a check unprompted for

16   $680,000?

17      A.   That's right.

18      Q.   Who attended this meeting on October the 28th?

19      A.   I believe it was Mark Ball, myself.  And again, time

20   passes by, I think Ronnie came in at a certain point at that

21   meeting.

22      Q.   So what takes place during this meeting?

23      A.   I don't know really particular conversations that

24   took place.  The check was accepted.  Again, this goes back

25   to conversations -- I think there's been different

1     conversations, but my recollection of this meeting was that

2     Russell had brought it over and nobody knew about it.

3          Q.    I'm going to show you Government's Exhibit 14.

4                You can blow up the top, please.

5                Is this that $680,000 check to PMPED signed by

6     Russell Laffitte?

7          A.    That's correct.

8          Q.    And this is dated October 28th.  So that's the date

9     that you testified Russell showed up to the law firm

10    unprompted with this money?

11         A.    I can't be sure if that's the exact date that he

12    did, because there's so much going on.  But that's the date

13    of the check.  So I'm assuming that's the date he came over.

14         Q.    Okay.

15         A.    I couldn't tell you time of day or anything.

16         Q.    Sure.  Let's bring up Exhibit 14A, please.  So I'm

17    going to pull up the bottom of this.  Do you recognize this

18    handwriting?

19         A.    That is my handwriting.

20         Q.    So what is this map showing?

21         A.    So what this map is showing is how half would have

22    been determined.  Because the 1.3 million 2 -- $1,325,000 was

23    what that original check was written to Palmetto State Bank,

24    and that got applied to expenditures on Alex's behalf.  The

25    35,000 fee for the PR was also being returned, which brought

1    it to the 1,360,000.  Half of that is 680.  So that was a

2    notation in my mind about how do we come up with 680,000

3    rather than just half of 1.325.

4         Q.   What discussions, if any, were there about this PR

5    fee?

6         A.   Those were mostly between Mark and Russell.  And I

7    remember Mark saying, it might be a good idea you give your

8    PR fee back.

9         Q.   But the law firm was agreeing to, basically, cut his

10   PR fee in half as well; is that right?

11        A.   No.  At that point, we are not agreeing to anything,

12   to my knowledge.  It was just taken and put on the table

13   about how much they would be putting back, and the fact that,

14   I guess, it looks like we would be accepting half of it,

15   that's the agreement we had entered into that day.

16        Q.   Did you know where the $680,000 was coming from?

17        A.   Palmetto State Bank.

18        Q.   Okay.  So Russell wasn't indicating to you that he

19   was using his own money to pay back the loss to Badger?

20        A.   No.

21        Q.   I'm going to show you Exhibit 77, just the bottom

22   half.  Thank you.  Again, this is a copy of the same check,

23   680, October 28th.  What date was this check deposited?

24        A.   October 29th.

25        Q.   Okay.  So the following day, check's deposited.

402

1    What account is this check deposited into?

2        A.    It's deposited into our client trust account.

3        Q.    Okay.  We could pull up Government's Exhibit 78,

4    please.

5            All right.  So this is a check from PMPED attorney

6    account to PMPED client trust account in the amount of 680 on

7    October the 29th, deposited on October 29th.  So on the same

8    day y'all deposited the bank's $680,000, what do you all do

9    with funds from the law firm?

10       A.    We deposit $680,000 as well.

11       Q.    So why did you all do that?

12       A.    Well, that would have been the entire amount that

13   was owed back to the client at that point in time.

14       Q.    So after you deposit $680,000 into the client trust

15   account on October 29th, what do you all decide to do?

16       A.    Well, we have conversations.  If you've ever worked

17   or been around attorneys, you know they are kind of hard to

18   catch.  So as this is unfolding and the days commend,

19   different attorneys are coming in and out.  We are discussing

20   what we need to do.  And the consensus was that we should put

21   our own -- another $680,000 into the client trust account.

22   Because at that point in time, we really didn't know the full

23   scope of what was going on with the bank.  And they didn't

24   want to bar -- what is the word?  They didn't want to bar the

25   possibility of collecting future money from Palmetto State

1    Bank.  But we wanted to make sure that our former client was

2    paid in full.  So we put the entire -- what was it

3    1,360,000 -- I'm having problems on my math today -- into the

4    client trust account so we could refund the client.

5       Q.    So from the law firm's perspective, this is pretty

6    early on in the investigation of what's happened?

7       A.    Yes.

8       Q.    And so y'all decided to not pay any of the bank's

9    money towards Arthur Badger, but y'all were going to make him

10   whole yourselves?

11      A.    That's right.

12      Q.    You said that was because you didn't want to

13   prohibit yourselves from pursuing anything against the bank

14   later?

15      A.    Yes.

16      Q.    And that's because you were not able to investigate

17   anything yet?

18      A.    Right.

19      Q.    So this is October 29th.  You said early in October

20   y'all met with Russell for the first time and he provided the

21   Badger check.  This is just within a couple of weeks of

22   beginning to look into this; is that right?

23      A.    That's right.

24      Q.    I'm going to show you Government's Exhibit 79.  All

25   right.  So this is a check again from the law firm's attorney

1    account to the law firm's client trust account, 680 on

2    November the 3rd, deposited on November the 4th.  So what do

3    these checks show?

4        A.    This check shows again that the firm is putting firm

5    money into the client trust on the behalf of Arthur Badger so

6    that we can repay Arthur Badger his misappropriated funds.

7        Q.    So what funds were used to pay Arthur Badger back?

8        A.    The law firm's -- that $680,000 from Palmetto State

9    Bank is still sitting in our trust account under Arthur

10   Badger's name.

11       Q.    So none of the bank funds ever went to make Arthur

12   Badger whole?

13       A.    No.

14       Q.    Do you know when it was that y'all paid Arthur

15   Badger back?

16       A.    Right off the top of my head, I do not.  There's

17   been so many dates and so many disbursements, but it would

18   have been shortly after this.

19       Q.    Shortly after this?

20       A.    Yeah.  I say shortly.  We did have a little bit of

21   trouble locating Arthur Badger, but it was in November or

22   December, yeah.

23       Q.    Fair enough.  So the jury has seen these Badger

24   checks, spent some time on them.  I want to briefly go over a

25   few of them with you.  So after y'all take the 680 from the

1    bank and pay Arthur Badger with law firm money, what do you

2    do in terms of the Badger -- investigating the Badger

3    misappropriation?

4        A.    I really don't understand your question other than

5    the fact, at that point, you know, we are more concerned with

6    making our client whole.  We then start investigating other

7    files as well.

8        Q.    Okay.  We will get into some of those other files in

9    a minute.  I just want to highlight some of these checks with

10   you.  Exhibit 29, please, if you will pull up the whole first

11   half, please.

12            So this is a check you talked about, $380,000,

13   February the 8th to Palmetto State Bank, Arthur Badger, and

14   it indicates it's going to Johnnie Parker.  So who is Johnnie

15   Parker?  Remind the jury, please.

16       A.    So Johnnie Parker is one of the partners in our

17   firm.

18       Q.    Do you know why Johnnie Parker was getting over

19   $388,000 --

20       A.    When we asked, he had said that he had loaned Alex

21   money.

22       Q.    Okay.  Do you recognize these initials?

23       A.    It looks like Russell's, but I couldn't swear 100

24   percent to that.

25       Q.    When he handed these checks over to you, did he add

1    any signatures or initials to these checks when he gave them

2    to you?

3        A.   Not to my knowledge, no.  It was given to me like in

4    a package.

5        Q.   He just handed over the check?

6        A.   Yeah, yeah.

7        Q.   All right.  Just a couple more.  All right.  So,

8    again, this is Hannah Plyler -- excuse me.  It goes to Hannah

9    Plyler, 151, Palmetto State Bank, Arthur Badger.

10            And if you will go to the next page, please, Ms.

11   Rozsa.

12            So this indicates that that money was going to

13   Hannah Plyler.  And, again, did Russell ever tell you that he

14   had taken loans out to Hannah Plyler -- from Hannah Plyler's

15   account?

16       A.   Not for him personally.  He told me that he had

17   loaned Alex money on Hannah Plyler.

18       Q.   So you said you began to investigate other cases in

19   which Russell served as conservator or PR.  Let's talk about

20   the Plyler case.  Have you investigated what happened with

21   the Plyler case at all?

22       A.   Well, we checked to make sure that the client had

23   not been -- had any funds misappropriated in ours, once they

24   lost -- you know, left -- once they were in our trust, we

25   made sure that they were good.  If they left our custody and

1    care and control, we really couldn't pursue that.  But we

2    went back and reviewed everything to make sure we were good.

3        Q.    So you went back and reviewed the Plyler case just

4    to be sure there hadn't been misappropriated funds?

5        A.    Yes.

6        Q.    And what did you determine?

7        A.    We determined there had not been.

8        Q.    Did you ask Russell for any information about the

9    Plyler cases?

10       A.    I don't recall that we did.

11       Q.    Okay.  So he didn't -- you didn't ask him for any

12   documentation about the Plyler girls?

13       A.    That one does not stick out to me, no.

14       Q.    Okay.  So you meet with him in October.  You get the

15   680.  You deposit it into the law firm's account.  At that

16   point does he indicate anything about any other cases?

17       A.    No.

18       Q.    Did Russell mention Hakeem Pinckney or Natasha

19   Thomas at that point?

20       A.    No.

21       Q.    So how do you learn about Pinckney/Thomas?

22       A.    So there again, they're some of the bigger cases.

23   So we are starting to pull them up and look at them.  And I

24   see payments made to Palmetto State Bank again on that.  So

25   once again, I called Russell and asked him if he could

1    provide the details for those checks, and which he did.

2        Q.    About when did this conversation take place?

3        A.    I think I discovered Natasha Thomas around November

4    30th.

5        Q.    November 30th you said?

6        A.    Yes.

7        Q.    So you reach out to Russell --

8            MR. DANIEL:   I'm sorry.   When?

9            MS. LIMEHOUSE:   30th.

10   BY MS. LIMEHOUSE:

11       Q.    So you reach out to Russell.   Did you say 30th?

12       A.    Yes.

13       Q.    Okay.   So you reach out to Russell and you ask for

14   supporting documentation again.   At this point, do you think

15   Russell is involved at all?

16       A.    No.

17       Q.    Okay.   What does Russell do?

18       A.    Well, he brought me the documentation for those

19   checks.   And, again, we find that the money has been applied

20   to expenditures on Alex behalf.   And, again, I can't sit here

21   and tell you this check went to this A, B, C, or D, because

22   I've been looking at checks for a year and a half.   But it

23   was clear that checks had been used to pay for expenses for

24   Alex.   So at this point, we fund, we being Palmetto State

25   Bank, the amounts back into our client trust in order to pay

1     Thomas and Pinckney back.

2          Q.   Let's pull up Exhibit 20 real quick, please, Ms.

3     Rozsa.  And can you put that side-by-side with Exhibit 32, 20

4     and 32.

5               Okay.  So this is the $325,000 you talked about

6     earlier.  And this is the check for $325,000 indicating

7     settlement probation for Natasha Thomas?

8          A.   That's right.

9          Q.   So you see it's going to Palmetto State Bank and

10    that's why you've asked Russell for supporting documentation?

11         A.   That's right.

12         Q.   Okay.  Can we do the same thing, Ms. Rozsa, with 22

13    and 34, please.

14              So same thing here, Hakeem Pinckney, 309, settlement

15    proceeds of Hakeem Pinckney, 309, checks going to Palmetto

16    State Bank?

17         A.   Right.  And those kind of came back together,

18    because those two checks together were added together to then

19    apportion down and makes payments.  So it wasn't like I got a

20    package for 309 and 325.

21         Q.   If you could pull up Government's Exhibit 33,

22    please.

23              So this was the additional $25,000 check.  The jury

24    saw this amount on Natasha Thomas's second disbursement

25    sheet.

410

1      If you could do a side-by-side with Exhibit 33A,

2  please.

3      Okay.  So this is an e-mail from Kristi Jarrell to

4  Amanda Godley.  And it says:  Please write a check made

5  payable to Palmetto State Bank for $25,245.08.

6      So is that the number that corresponds with the

7  $25,000 -- $25,245.08?

8      A.   It is.

9      Q.   So Russell provides supporting documentation for the

10 Pinckney/Thomas checks, like he did with Badger.  What

11 happened during that meeting?

12     A.   The same thing that he just gave me the information

13 for.  There was no discussion about, to my recollection,

14 about if we were going to split that or what we were going to

15 do.  I believe he might have had some of those discussions

16 with Mark Ball at a later date, but I wasn't privy to those.

17     Q.   What, if anything, was Russell saying during this

18 meeting where he hands over the Pinckney/Thomas checks?

19     A.   I don't recall there being much of a conversation.

20     Q.   Okay.  So, again, though, at this point -- and the

21 jury has seen where the Pinckney/Thomas checks go.  At this

22 point, do you think Russell is at all involved?

23     A.   Absolutely not.  He's my brother-in-law.  I trusted

24 him implicitly.

25     Q.   This meeting would have taken place in late November

1    or early December.  Did Russell ever indicate anything about

2    splitting the cost of the loss to Pinckney/Thomas?

3        A.    Once again, I don't remember that discussion being

4    made with me.

5        Q.    Okay.  So after these meetings with Russell where he

6    gave you the supporting documentation for the Badger checks

7    and the supporting documentation for Pinckney/Thomas, did the

8    law firm continue to investigate what had happened with the

9    Badger and Pinckney/Thomas misappropriations?

10       A.    Well, as we questioned the clients and tried to find

11   out when we met with them if anything stood out with them, we

12   were inquiring about that.  We'd also provided all the

13   information to SLED for them to investigate and hand over to

14   them.

15       Q.    Did you all eventually start to review internal

16   e-mails between Alex and Russell?

17       A.    I think that got produced at a much -- I wasn't part

18   of that process, but e-mails were being pulled for law

19   enforcement and ODC and everything else.  And that was part

20   of what was being pulled, were communications with banks.  I

21   mean, we provided, like, almost 10 million e-mails to various

22   law enforcement and ODC, so a laundry list.

23       Q.    So much later, after these meetings with Russell,

24   you learned about communications between Russell and Alex

25   related to the Badger and Pinckney/Thomas cases?

412

1      A.    I learned about it in February from Ronnie Crosby.

2      Q.    Okay.  Let's start with Exhibit 38, please -- excuse

3   me, 37.

4          All right.  This is an e-mail the jury has seen from

5   Alex to Russell:  $388,687.50, whatever the amount I owe on

6   the Hannah loan, 75K, whatever the balance would be on

7   1,325,000 after these deductions.

8          And he says at the bottom:  Please e-mail me and ask

9   that Check No. 43162 dated November 19th, 2012, for 1325 be

10  re-cut as listed above.

11         I first want to ask about the significance of the

12  November 19th, 2012 date.  Was that the date that Arthur

13  Badger's disbursement sheet was signed?

14     A.    Yes.

15     Q.    And was that the date of the e-mail indicating that

16  Alex had a meeting at the bank?

17     A.    Yes, I believe so.

18     Q.    So let's pull up Government's Exhibit 38, please.

19         So we then see an e-mail from Russell to Alex in a

20  totally separate e-mail chain.  Says:  Alex, can you get the

21  Jeanne to re-cut Check No. 43162 dated November 19th, 2012,

22  as follows, $388,687.50, $151,726.05, 75,000, and 709,586.45.

23  So does that 388 corresponds with the Johnnie Parker 388

24  check?

25     A.    Yes.

413

1    Q.    Does this 151 correspond with the Hannah Plyler

2    repayment?

3    A.    That's right.

4    Q.    The jury has seen the $75,000 that went to his

5    father.  This 709, was that the amount of the canceled check

6    that you talked about?

7    A.    Yes.

8    Q.    So why would Russell have to send this e-mail to

9    Alex?

10         MR. DANIEL:  I object.  She can't speculate to why

11   would Russell do something.

12         THE COURT:  I sustain that objection.

13   BY MS. LIMEHOUSE:

14   Q.    After this e-mail -- let me show you this first

15   part, actually.  Tracy, can we go to the top, please.

16         Okay.  So Alex then forwards this e-mail to you and

17   Amanda Godley, the e-mail from Russell to Alex about

18   recutting these checks.  Why did Alex forward this e-mail to

19   you?

20   A.    I guess he would have forwarded it to me because I'm

21   head of accounting.  And it would have been forwarded to

22   Amanda because she was the one who actually cut the checks.

23   Q.    So why didn't Alex just e-mail you and ask that you

24   re-cut the checks?

25   A.    Good question.  I can't speak to that.

1    Q.    What if Alex had --

2        MR. DANIEL:  Same objection, Your Honor.  Alex is

3    not testifying.  She can't answer why Alex did something or

4    what was in his mind.

5        THE COURT:  Why don't you lay a foundation about

6    routine or custom.

7    BY MS. LIMEHOUSE:

8    Q.    Sure.  So you testified that the lawyers are

9    responsible for reviewing and approving disbursement sheets?

10    A.    That's right.

11    Q.    And then those disbursement sheets come to you in

12    the finance department?

13    A.    That's right.

14    Q.    And then you distribute those funds according to

15    that disbursement sheet?

16    A.    That's right.

17    Q.    If there's a PR or a conservator, can a lawyer tell

18    you how to handle funds that are being disbursed to the

19    conservator or the PR?

20    A.    They would tell us how much to pay the PR or the

21    conservator.

22    Q.    And how about the specific handling of that money

23    that's supposed to go to the PR or the conservator, could the

24    lawyer tell you how to do that?

25    A.    They could.

1      Q.   And how would that come about?

2      A.   Well, it would generally be on a disbursement sheet,

3  but it could also come through some kind of other verbal or

4  through an e-mail saying that there had been a change in

5  circumstance and this needed to be the amounts now.

6      Q.   So if Alex had e-mailed you and said to re-cut the

7  check without Russell on it, would the finance department

8  have been able to re-cut these checks that way?

9      A.   Yes.

10     Q.   And why would that be?

11     A.   Because under the authority of the attorney on the

12 case and the trust that we had for the attorney in the case.

13     Q.   So you would have re-cut the checks even if Alex had

14 just told you to do it?

15     A.   Yes.

16     Q.   Okay.  Fair enough.  What visibility did you have at

17 the law firm into what was happening with these checks once

18 they were re-cut?

19     A.   I didn't have anything -- any visibility of where

20 they went after that.

21     Q.   Why not?

22     A.   Because they went to Palmetto State Bank.  And once

23 they left our care and custody, I would not have a way of

24 knowing how they were used.

25     Q.   Who was the only person who did know where these

1    funds were going after they were cut by the law firm?

2        A.    I would assume whoever negotiated the checks, and

3    perhaps Alex, if he was involved in telling them where to go.

4        Q.    So the person who negotiated those checks would have

5    been the person who knew where those funds were going?

6        A.    Yes.

7        Q.    No one at the law firm would have known where those

8    checks went?

9        A.    No.

10       Q.    I'm going to pull up Exhibits 51 and 52, please.

11   Okay.  So this is an e-mail from Alex to Russell dated

12   Monday, October 28th, 2013.  And he says:  RL, this is where

13   49,500 goes.  I will pick up difference.  Don't put it in an

14   account.

15             And then 52 on the right is an attachment to that

16   e-mail which shows that there is a Southern Crane and

17   Tractor, Inc. with an address in Walterboro and a phone

18   number, basically, an address; is that right?

19       A.    That's right.

20       Q.    I'm going to show you Exhibit 29, please.  Okay.

21             So if you will please blow that up for the jury.

22             So this indicates 4905, which corresponds to that

23   prior e-mail, cover wire to Southern Crane.  Do you recognize

24   those initials?

25       A.    They look like Russell's but I really -- they are so

1    scratchy that I never paid attention to them.

2        Q.    So this would be the amount that corresponds to the

3    e-mail from Alex; is that right, the 4905?

4        A.    Yes.    Sorry.

5        Q.    Let's go to Exhibit 219.    So what is this document?

6        A.    So this is what we call a general ledger printout of

7    our client's account within our client trust checking.

8    Everybody has an individual ledger that shows all the money

9    that comes in and all the money that goes out for them.

10        Q.    So this would show all the checks that would have

11    been issued in a certain case and how they were handled?

12        A.    That's right.

13        Q.    I want to highlight a few portions of this for the

14    jury.    So this first 1325 corresponds with the initial 1325

15    check that was supposed to go to Arthur Badger; is that

16    right?

17        A.    That's correct.

18        Q.    What happened to that check?

19        A.    That one was voided.

20        Q.    And why was it voided?

21        A.    That was voided off at the instruction of that

22    e-mail that Alex forwarded me from Russell.

23        Q.    Okay.    I'm going to show you the second check,

24    $35,000, Arthur Badger personal representative fee to

25    Palmetto State Bank; is that right?

1          A.    That's right.

2          Q.    So was the Arthur Badger personal representative fee

3     check drafted in the exact same way as the other Arthur

4     Badger checks to Palmetto State Bank?

5          A.    Yes.

6          Q.    Why was the check not drafted to Russell Laffitte as

7     personal representative for the estate of Donna Badger?

8          A.    That I can't answer.

9          Q.    Should it have been?

10         A.    It should have been.

11         Q.    Let's go to the next page, please, Ms. Rozsa.

12              So this is the second page of the Arthur Badger

13     general ledger.  These first three checks are going to look

14     familiar to the jury, 388,151 and 75,000, Arthur Badger,

15     Palmetto State Bank.  And then the next line shows the 709

16     that was voided.  And, again, you testified that that check

17     was canceled at someone's direction.  You are not exactly

18     sure how or why it was voided.

19              And then the next checks are the ones the jury has

20     seen at length yesterday, the 101,369.49 checks, memo line

21     estate of Donna Badger, drafted to Palmetto State Bank.  And

22     then continued down, the remaining eight checks, and two

23     additional at the bottom we will talk about in a minute.

24              So were all of these checks, estate of Donna Badger,

25     Palmetto State Bank, drafted in the same way that the $35,000

1    PR fee went to Russell Laffitte?

2        A.    Yes.

3        Q.    These last two checks indicate that they went to the

4    Bank of America.  What happened with those checks?

5        A.    Again, there were some instruction from what I would

6    have to assume would be Russell or Alex or somebody involved

7    with the case directing us to renegotiate those checks.

8    Unfortunately, the records are so sold and we weren't

9    scanning everything then, that I don't have any detail about

10   why or how.  And, obviously, I can't remember something from

11   that long ago.

12       Q.    So how did this happen?  How did the law firm not

13   catch that these checks --

14       A.    Well, I think that what was going on there was that

15   we were relying on the fact that Alex was telling us the

16   truth and that this is where the money should go, and relying

17   on the banker that we have long relationship, who is also my

18   brother-in-law, and assuming that -- looking back, what I

19   would assume is thinking that these were going to be funds

20   that were invested for the various children, the

21   beneficiaries of Donna Badger.

22       Q.    Okay.  Let's move on to e-mails that y'all have

23   uncovered in February and after related to the Pinckney

24   Thomas case.  First e-mail, Exhibit 48, so this is an e-mail

25   from Alex to Russell Laffitte dated the 20th of December,

420

1    2011:  Can you call me?

2           And if you can pull up Exhibit 32, please, Ms.

3    Rozsa.

4           Okay.  So this is Natasha Thomas's settlement

5    proceeds, December 20th, 2011.  Does that date correspond to

6    the e-mail to call him?

7    A.    They do.

8    Q.    Exhibit 34, please.  Same thing here, Hakeem

9    Pinckney, December 20, 2011, does this check also correspond

10   to the e-mail from Alex telling Russell to call him?

11   A.    Yes.

12   Q.    Ms. Rozsa, if you will pull up Government's Exhibit

13   36, please.

14          So this is just a summary of all of the money orders

15   that were drawn on the Pinckney/Thomas funds.  The jury again

16   has seen those checks at length this morning.  So these

17   checks were all negotiated -- excuse me.  These money orders

18   were all issued on December the 21st of 2011; is that right?

19   A.    Yes.

20   Q.    And was that the day after the e-mail from Alex to

21   Russell saying, please call me?

22   A.    Yes.

23   Q.    If you will please pull up Government's Exhibit 215.

24   So they've just seen this with Badger, but explain what this

25   is with Natasha Thomas.

421

A.    Same thing, this would be the ledger printout of moneys that were collected and disbursed on the behalf of Natasha Thomas.

Q.    All right.  So we first want to highlight the $15,000 conservator fee, Natasha Thomas.  Unlike the ones we not from Badger, this one is first written to Russell Laffitte as the payee, and it's voided.  Do you know why that would be?

A.    I do not know why.

Q.    Okay.  We see that it's also the $15,000 reverse check number.  So what happens with that voided check?

A.    It's made to Palmetto State Bank.  And the next line item on Check 41406 is made to Palmetto State Bank in reference conservator fee, Natasha.

Q.    So the conservator fee for Natasha originally written to Russell Laffitte is voided and rewritten to Palmetto State Bank; is that right?

A.    That's right.

Q.    So that's consistent with the same way that the $325,000 check that was supposed to go to Natasha Thomas was drafted to the Palmetto State Bank?

A.    Correct.

Q.    Let's do the same thing with the Hakeem Pinckney ledger, please, Exhibit 216.  All right.  So, again, does the ledger indicate that Russell Laffitte was supposed to receive

1    the $60,000 check to him individually for conservator fee for

2    Hakeem Pinckney?

3        A.    Yes.

4        Q.    What happened to that check?

5        A.    That check was also voided out and replaced with a

6    check payable to Palmetto State Bank in the amount of $60,000

7    for the conservator fee, check 41405.

8        Q.    Okay.  And does it show that his conservator fee for

9    $60,000 check was drafted in the exact same way as the

10   $309,000 check to Palmetto State Bank?

11       A.    That's right.

12       Q.    I'm going to review some e-mails with you about the

13   Plyler case.  You testified that Russell told you that he had

14   loaned money from Alex out of the Plyler accounts, but he

15   didn't mention that he had loaned money to himself?

16       A.    That's correct.

17       Q.    I'm going to first show you an e-mail from October

18   the 22nd of 2013, Government's Exhibit 50, bottom portion,

19   please.  So this is an e-mail from Alex to Russell -- excuse

20   me, first Russell to Alex on October 22nd 2013, Russell says:

21   Need a deposit.  Thought you were coming in yesterday.

22           And Alex responds to Russell:  Sorry.  I forgot.

23   Can you make a loan from Hannah and I will pay it as we

24   discussed?

25           Okay.  Go to the top, please, Ms. Rozsa.  There's

1      then an e-mail from Russell to Alex that says:  I transferred

2      70K this morning.

3             And Alex responds and says:  I will come by at some

4      point this week.  Out of town today and in the morn.  So it

5      will be tomorrow afternoon or Friday.

6             So does this e-mail correspond, do you know, with

7      one of the loans that Russell made out of the Plyler account?

8      A.    I am not going to venture to guess that.  I've seen

9      way too many dates and amounts now.

10     Q.    I'm going to show you Exhibit 55, March 2014 e-mail.

11     So this is an e-mail from Alex to Russell.  The subject line

12     is, give me a call.  And Alex says:  I will be in to see you.

13     How long before Hannah is 18?

14            And, again, these were e-mail communications that

15     the law firm did not find until February and after --

16     A.    Correct.

17     Q.    -- during the course of this internal investigation?

18            Exhibit 57, please, an e-mail from February 23rd of

19     2015.  So I'm first going to highlight this top portion.  And

20     this is a chart.  Shows the e-mails from Russell on February

21     the 20th, 2015.  It's a chart outlining a bunch of loans,

22     okay, and loan dates and amounts that correspond.

23            All right.  Ms. Rozsa, if you will just pull up the

24     bottom portion of that first e-mail, please.

25            So this is the narrative portion of the e-mail from

1   Russell to Alex.  And it says:  Alex, these are the loans

2   outstanding.  I have advanced $284,787.52 from your credit

3   line to pay these off.  She turns 18.  And I'm closing the

4   conservatorship.  The following is the breakdown on the

5   payoffs.

6           So he outlines the check number, the interest rate,

7   and the total.  And then at the bottom he says:  I advanced

8   6,500 yesterday to farm to cover overdrafts.  I advanced

9   $8,500 today to equal the 15,000 you requested in your text

10  to the farm account.  I had previously advanced 85,000 on

11  February 19th to your personal account.  I advanced an

12  additional 90,000 today to make the $175,000 requested.  You

13  will have a current available credit of $17,477.98 after all

14  of this clears tonight.

15          Ms. Rozsa, if you pull up the top, please.

16          This is an e-mail from Alex in response to Russell,

17  subject line Hannah Plyler, this is three days after the

18  initial e-mail from Russell explaining the payoff on February

19  23rd, 2015.  Alex says:  Please hold off on this until I

20  return and can meet you.  Hard to follow all this on my

21  phone.  Thanks.

22          So, again, these e-mails were uncovered after all

23  your conversations with Russell about Natasha Thomas and

24  Badger?

25      A.   Well, to be clear, I didn't know when they were

1    recovered, but I didn't know anything about them until after

2    this.

3        Q.    So you testified that during all your meetings with

4    Russell in the fall of 2021, you had no idea that he was

5    involved?

6        A.    No.

7        Q.    And now you've reviewed a bunch of e-mails during

8    the course of the law firm's internal investigation.  Has

9    your opinion of Russell's involvement changed?

10        A.    I still trust Russell and trust him very much, love

11    him very much, but I've seen some things that cause me

12    concern.

13        Q.    So why?  Why?  What causes you concern?

14        A.    I guess just the magnitude of how much debt that

15    Russell -- I mean, that Alex was in, and that it seems like

16    somebody could have known, somebody should have known, or

17    somebody could have told, and we could have prevented a lot

18    of this.  You know, I've seen so many things in hindsight now

19    that the same could be said for our side.  You know, it's

20    just a bad thing.  But I do think things don't look good.

21    But you know --

22        Q.    So who -- you testified that you had no idea what

23    Alex's finances were.  From what you saw, he was doing well.

24    You never would have expected him to have been in this much

25    debt?

426

1      A.    That's right.

2      Q.    Who knew Alex's full financial picture?

3      A.    I would assume Russell did.

4           MS. LIMEHOUSE:  I'm going to move to admit without

5      objection Government's Exhibit 45, 46 and 49.

6           THE COURT:  25, 46 and 49?

7           MS. LIMEHOUSE:  That's correct, Your Honor.

8           THE COURT:  Any objection from the defense?

9           THE COURT:  I'm sorry, 45, 46 and 49?

10          MS. LIMEHOUSE:  And 47, yes.

11          THE COURT:  Let's do it again because I'm getting

12     different numbers.  Give it to me slowly.

13          MS. LIMEHOUSE:  Sure.  45, 46, 47, and 49.

14          THE COURT:  Any objection, Mr. Austin?

15          MR. AUSTIN:  No, Your Honor.

16          THE COURT:  Very good.  The Court admits Government

17     Exhibits 45, 46, 47 and 49.  Please proceed.

18          MS. LIMEHOUSE:  No further questions, Your Honor.

19          (Government's Exhs. 45, 46, 47 and 49, are received

20     in evidence.)

21          THE COURT:  Very good.  Cross-examination.

22                     CROSS-EXAMINATION

23     BY MR. DANIEL:

24     Q.    Good afternoon, Ms. Seckinger.  I'm Bart Daniel, and

25     I represent Russell.  So if you could please pull up the

1     Thomas exhibit, Government's Exhibit 16, page 1.  And if you

2     could pull out how the check is made out to.  Yes, who it's

3     made out to, I'm sorry.  And call it out.  Who is that made

4     out to?

5          A.   Palmetto State Bank.

6          Q.   Okay.  And if you could please put up page 2 of the

7     same exhibit, Exhibit 16, and call out who it's paid to?

8          A.   Palmetto State Bank.

9          Q.   Okay.  And Exhibit 29, will you please pull up page

10    2.  And who is that made out to?

11         A.   Palmetto State Bank.

12         Q.   And so all of the checks of the stolen funds that

13    Alex Murdaugh stole are all made out to Palmetto State Bank;

14    is that correct?

15         A.   Looks correct.

16         Q.   And if they had been made out to a conservator or a

17    personal representative at -- for instance, if they had been

18    made out properly, should have been made out to Russell

19    Laffitte as conservator or whichever client it was or -- is

20    that right?

21         A.   They probably should have been.

22         Q.   Probably?

23         A.   Or they should have been.

24         Q.   Should have been, right?  Not probably.  Okay.  So

25    if he made out the check in the Badger case, all the checks

428

1   he had, it would have been made out properly to Russell

2   Laffitte as conservator or PR for Arthur Badger?

3       A.   Well, on the Badger case, the assumption there was

4   that Palmetto State Bank was holding funds that were done --

5   we did that at the direction of the attorney that was

6   handling that case.

7       Q.   I understand.  I am not faulting you.  But that's

8   how all the checks we are talking about, all the checks that

9   were blown up, all these checks that he is accused of helping

10  Murdaugh steal, were all improperly made out to Palmetto

11  State Bank?  It's a simple question.

12      A.   Oh, you were making a statement, I thought.  That

13  looks correct, yes.

14      Q.   So if we didn't have all these checks made out to

15  Palmetto State Bank, if it had been properly made out to

16  Russell Laffitte as conservator or as PR, we wouldn't be

17  here, would we?

18      A.   I hoped we wouldn't have been here.  Also I think if

19  we had gotten a check, if we noticed that it said client

20  trust, the phone call could have gone the other way.  I wish

21  one of those two happened.

22      Q.   Because you trusted and your firm trusted and the

23  firm's staff trusted Alex Murdaugh?

24      A.   That's correct.

25      Q.   And the firm's lawyers trusted Alex Murdaugh?

1        A.    That's correct.

2        Q.    Okay.  Now, you got your Bachelor of Science degree

3   in accounting from the University of South Carolina.  And for

4   the first three years, I think you worked initially as a

5   financial analyst for Westinghouse?

6        A.    Actually, I worked for a CPA firm initially, and

7   then became a financial analyst with Westinghouse.

8        Q.    Were you ever certified as a public accountant?

9        A.    Yes.

10        Q.    In addition, after undergraduate school, you got

11   your CPA certification, very difficult to get, it's a

12   professional degree?

13        A.    Yes.

14        Q.    And then you got I believe -- did you get an MBA?

15        A.    No.

16        Q.    So you went, I believe you testified, to Peter

17   Murdaugh and Parker in 1989.  And you mentioned in direct

18   examination, as the CFO -- you finally became CFO, I think

19   that was since 2012, you began overseeing accounting and all

20   the financial aspects of the firm.

21        A.    That's right.

22        Q.    And that's the business part of the firm?

23        A.    That's right.

24        Q.    And you administrative part of the firm?

25        A.    That's right.

1      Q.   So you would agree with me, wouldn't you, that Alex

2  Murdaugh was one of the top performers?

3      A.   It depends on some of the years.  It would depend on

4  the year.

5      Q.   But most years --

6      A.   He was successful.

7      Q.   Okay.  And so many of those years, Alex Murdaugh

8  made over a million dollars, didn't he?

9      A.   That's correct.

10      Q.   And he was always -- I think you described him as a

11  little chaotic?

12      A.   Chaotic, yes.

13      Q.   But he got good results?

14      A.   As you could see with some of these e-mails with

15  Russell, I will call you later, I will be back.  He was hard

16  to pin down.

17      Q.   And he had sort of the gift of gab, is that what you

18  would say?

19      A.   I would definitely say that.

20      Q.   And I think a lot of -- you described to the agents

21  as a lot of BS?

22      A.   That's right.

23      Q.   But he was smart, wasn't he?

24      A.   In hindsight, he was.

25      Q.   He lived off that big personality?

```
 1        A.    He did live off of a big personality.

 2        Q.    And he used the traits he had, the natural God-given

 3   traits as a means of using people as pawns?

 4        A.    I would agree with that.

 5        Q.    Okay.  And you also told -- you don't think that

 6   Alex you thought you knew ever even existed?

 7        A.    That was a correct statement.

 8        Q.    And when y'all talked, when your firm sat down with

 9   the victims, what you call the victims, they were all

10   shocked, weren't they?

11        A.    Oh, yes.

12        Q.    Because they had trusted Alex Murdaugh?

13        A.    To a degree, nobody believed it.

14        Q.    Okay.  And so when y'all first told them, they

15   didn't believe it, because some of them told you that he was

16   my friend?

17        A.    That's right.

18        Q.    And all of them to you -- a good deal told you, he

19   cared about me?

20        A.    That's right.

21        Q.    And what he had done was over the years he really

22   worked on forming bonds with clients and law enforcement and

23   everybody in the community?

24        A.    I would think that's a fair assessment.

25        Q.    You say it's fair what?
```

1    A.    Fair assessment.

2    Q.    Okay.  Thank you.  And then he would figure out who

3  were the most vulnerable, and then he would work through

4  them?

5    A.    Well, I don't know how he figured on who he's going

6  to do it to, but he had some kind of method.

7    Q.    He did have a method, though, no doubt about that?

8    A.    That's right.

9    Q.    And you did tell the agents that?

10   A.    Yes.

11   Q.    In fact, you said at one time you thought he had a

12  photographic memory, and he always had a story, a reason, an

13  excuse, and it just flies?

14   A.    Right.

15   Q.    And when you said he had a photographic memory, I

16  think you gave an example that he could talk about some

17  disbursement that was six months earlier but remember exactly

18  the story he had told six months earlier six months later?

19   A.    It appeared like that when we went back and started

20  piecing things together, that he did do a lot of manipulation

21  and set stories up and remembered things.

22   Q.    And even though some of these were lies, somehow he

23  was able to keep the lies straight?

24   A.    Apparently.

25   Q.    You also told agents and the grand jury he

1    manipulated and took advantage of a lot of people.  Now, he

2    had a reputation, though, for helping people, didn't he?

3        A.    He had a reputation for helping people in the

4    community, being available, I think he coached ball here and

5    there, always willing to give and help, yes.

6        Q.    But as a matter of fact, he was exceptional at

7    having trust built up with the community?

8        A.    I don't know what the community really thought of

9    him.  I know that he made great efforts.

10       Q.    Okay.  And he was always thinking of moving ahead,

11   wasn't he?

12       A.    Apparently he was.

13       Q.    Y'all thought he was scatter-brained?

14       A.    I did.

15       Q.    But he wasn't?

16       A.    Apparently not.

17       Q.    So on Faris and Mack truck case with Chris Wilson,

18   now, PMPED never received a fee in that case?  Well, much

19   later on, obviously, but they didn't initially receive their

20   fee?

21       A.    That's right.

22       Q.    And Chris Wilson wouldn't respond to your e-mails?

23       A.    He did not initially, no.

24       Q.    And weeks go by and then he comes by your office.

25   Does Chris Wilson lie to y'all?

1    A.    "He" being Alex came by my office.  I never had a

2  personal interaction with Chris Wilson.

3    Q.    And does Chris Wilson end up lying to your lawyers?

4    A.    We found out in September that he had lied.

5    Q.    And I believe you testified on direct examination

6  that Chris Wilson and Alex were friends from the University

7  of South Carolina?

8    A.    That's right.

9    Q.    So in June 8, Alex came by your office.  What

10  happened?

11    A.    Not June 8th now.

12    Q.    I'm sorry.

13    A.    June 7th I went to his office, to Alex's office.

14  And as I testified, I told him that I thought money was

15  missing and that he needed -- that I had reason to believe

16  that we had not received the funds, that perhaps he had, and

17  that he needed to prove it, that the funds were still with

18  Chris Wilson.

19    Q.    And what was his response?

20    A.    His response was that Chris Wilson did have the

21  funds and that he was thinking about what -- Alex was

22  thinking about how he could divert money to Maggie or to

23  structure funds for future.  And at that point, that's when

24  we realized that we did not want to be a part of him hiding

25  any money from this boat wreck.

1       Q.   Because that money actually belonged to the firm.

2   It didn't belong all the way to Alex, did it?

3       A.   That's right.

4       Q.   Alex was already planning to steal from the firm?

5       A.   I guess you could put it like that.  Our thoughts

6   were he was planning on hiding money or deferring Faris.

7       Q.   And so weeks go by, his wife and son are murdered.

8   Weeks go by and everyone wants to give him time to grieve?

9       A.   That's right.

10      Q.   And then Lee Cope calls Chris Wilson.  And what does

11  Christian Wilson tell Lee Cope?

12      A.   I don't know.

13           MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

14           THE WITNESS:  I am not privy to that conversation.

15           THE COURT:  Hold it.  Sustained.

16  BY MR. DANIEL:

17      Q.   But you did testify at the grand jury that he

18  called -- that Lee Cope called Chris Wilson?

19           MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

20           THE COURT:  Sustained.

21           MR. DANIEL:  Your Honor, she testified at the grand

22  jury.  She just said that she didn't --

23           MS. LIMEHOUSE:  He first has to identify something

24  that he thinks is inconsistent.

25           THE COURT:  You didn't lay the foundation, Mr.

1    Daniel.  You've got to say --

2    BY MR. DANIEL:

3        Q.    Did you testify to the State Grand Jury --

4            THE COURT:  No.  No.  You've got to say the

5    statement.  I'm getting confused.  What are you impeaching,

6    her statement to the State Grand Jury or are you

7    impeaching --

8            MR. DANIEL:  No, sir.  I'm asking her, did Lee Cope

9    call Chris Wilson?

10            THE COURT:  Okay.  And --

11            MR. DANIEL:   That's not hearsay.  If she knows,

12    Your Honor.  If she doesn't know, she can say, I don't know.

13    If she needs --

14            THE COURT:  Well, you are asking did she call

15    someone?  You are asking the substance of the conversation?

16            MR. DANIEL:  No.  I'm ask, did she know if Lee

17    Cope --

18            THE COURT: That's a fine question.  You can ask that

19    question.

20            MR. DANIEL:  Thank you, Your Honor.

21    BY MR. DANIEL:

22        Q.    Did you know that Lee Cope called Chris Wilson?

23        A.    If I testified for it at the grand jury, then I knew

24    it, yes, that he would have.  As I said before, it's hard to

25    remember what I knew when and how and why.

1    Q.   I understand.  And I am not trying to trick you.

2    A.   But if I said that, then, yes, it would have been my

3    understanding at the time.

4    Q.   Okay.  And do you remember that you testified -- or

5    do you remember whether you said that he had told you that he

6    lied three times or he told you three times that he had the

7    money.

8    A.   He told us he had the money then.

9    Q.   That's all.  Now, when you dealt with the estate of

10   Hershberg --

11        MS. LIMEHOUSE:  Objection, Your Honor.  This has

12   nothing to do with the charges in the indictment.

13        MR. DANIEL:  Your Honor, she hadn't heard my

14   question yet.

15        MS. LIMEHOUSE:  I heard a name that was subject to a

16   pretrial motion that Your Honor held in abeyance.

17        MR. DANIEL:  I can re-ask the question, Your Honor.

18   BY MR. DANIEL:.

19   Q.   When you learned there were other cases --

20        MS. LIMEHOUSE:  Objection, Your Honor.

21        THE COURT:  Sustained.

22   BY MR. DANIEL:

23   Q.   When did the light come on?  When did you have your

24   epiphany?  When did you have an epiphany?

25   A.   On September 2nd, whenever we found a desk -- on the

1    desk of Alex Murdaugh's office, Annette Griswold found the

2    check made payable to Richard Alexander Murdaugh, we knew for

3    a fact that he had gotten money from Faris.

4        Q.    And this was your law firm that made the same

5    mistake?

6        A.    How did my law firm make the mistake?

7        Q.    Didn't your law firm made the mistake by paying

8    checks to other people in other banks?

9              MS. LIMEHOUSE:  Objection, Your Honor.  This has

10   nothing to do with the indictment.

11             MR. DANIEL:  Your Honor --

12             THE COURT:  I think we've been through this already.

13   Sustained.

14             MR. DANIEL:  This is a completely different line of

15   questioning.  And we have every right to talk about the

16   mistakes they made at their law firm.

17             THE COURT:  Sustained.  The firm is not on trial.

18   The defendant is on trial.  Sustained.

19             MR. DANIEL:  Your Honor, but their credibility is on

20   trial.  Their motivation for your testifying is on trial.

21             THE COURT:  You haven't laid a foundation for that.

22   Sustained.

23             MR. DANIEL:  Thank you, Your Honor.  We take

24   exception.

25   BY MR. DANIEL:

1    Q.   In some instances, Alex Murdaugh held money back

2    from the client as if it had been a lien?

3         MS. LIMEHOUSE:  Objection, Your Honor.  If this has

4    anything to do with the charges in the indictment, he needs

5    to lay a foundation.

6         THE COURT: Just lay a foundation, which if it's

7    relating to the charges of the indictment.  It's got to be

8    relevant.  We are not trying -- I am not turning this case

9    into a circus, Mr. Daniel.

10        MR. DANIEL:  I don't intend to turn it into a

11   circus.

12        THE COURT:  Lay the foundation if it's the subject

13   of this indictment.

14   BY MR. DANIEL:

15   Q.   He would submit -- excuse me.  He created an

16   illusion, always an illusion of chaos and confusion?

17   A.   I would agree with that, yes.

18   Q.   There were times when he stole money and wasn't --

19   for instance, to Chris Wilson, if that check had gone

20   straight to Alex Murdaugh, that means the law firm wouldn't

21   have gotten that check, right?

22   A.   That's right.

23   Q.   Law firm wouldn't have gotten their fee?

24   A.   That's right.

25   Q.   And the other lawyers in that law firm would not

1    have gotten a share of that fee at the end of the year?

2        A.    If they were due that portion of it.

3        Q.    And staff for bonuses, they wouldn't get the share

4    at Christmastime that fee either?

5        A.    Perhaps that's right.

6        Q.    He was really stealing from the lawyers?  Yes,

7    ma'am?

8        A.    That's when we decided on -- when we found that out

9    on September 3rd, yes, he was stealing from the lawyers, and

10   we to found out he was stealing from clients.

11       Q.    And he was also stealing from the people he worked

12   with, the staff?

13       A.    Yes, you could say it that way.

14       Q.    Because it was less in that pool at the end of the

15   year to be able to pay them?

16       A.    It doesn't necessarily -- that might not have

17   affected their bonuses.  So I don't say that I would say

18   stealing from the -- he was stealing from his partners and

19   the law firm.

20       Q.    Fair enough.  All the clients that you guys

21   reimbursed --

22            MS. LIMEHOUSE:  Objection, Your Honor.  He's talking

23   about clients that have not been the subject of direct or

24   related to the indictment.

25   BY MR. DANIEL:

1      Q.   Ms. Badger, Ms. Thomas, everybody involved with this

2 case that y'all talked to, were in a disbelief, weren't they?

3      A.   Yes.

4      Q.   He felt like he was genuinely their friend?

5      A.   Yes.

6      Q.   And he genuinely cared for them?

7      A.   Yes.

8      Q.   And they trusted him completely?

9      A.   Yes.

10     Q.   Just like y'all trusted him?

11     A.   Yes.

12     Q.   Just like people at Palmetto State Bank, including

13 Russell Laffitte trusted him?

14     A.   Yes.

15     Q.   Now, these lawyer loans that we talked about, that's

16 when clients, y'all would send a letter over, or client would

17 bring a letter over from one of the lawyers at your law firm,

18 and it would say that, please loan Client X, in this case

19 might be Badger, might be any one of the clients, Pinckney,

20 please loan them a certain amount of money, 2,000, $3,000?

21     A.   Right.

22     Q.   And did you know or did you later learn from the

23 Office of Disciplinary Counsel that that was a violation for

24 the lawyers to do that, to guarantee loans for a client?

25     A.   That hadn't been established that they were

1  guaranteed.  We were giving the bank our educated assessment

2  that there would be enough funds of which they relied upon to

3  decide whether they were going to produce those loans to us.

4     Q.  Also in those cases, when settlements didn't go

5  through, the clients got no money, the lawyers paid off those

6  loans, right?

7     A.  If we had a reason for doing so, if we missed the

8  case balance, or when we did, we would pay them off, yes.

9     Q.  I know they were not legally guaranteeing.

10    A.  Right.

11    Q.  But they were sort of morally or ethically

12 guaranteeing?

13    A.  If they felt like we made a mistake in the case in

14 the assessment we would pay them off.

15    Q.  Several based on a handshake?

16    A.  I wasn't privy to those conversations.

17    Q.  Okay.  Now, I believe you testified that Alex

18 Murdaugh always created a stream of chaos and --

19    A.  In hindsight, yeah.  You know, he came in.  He was

20 loud.  He was late.  He always -- if you were trying to talk

21 to him, his phone would ring 9.5 times out of 10.  And then

22 you would see him again a week later.  So that's the chaos

23 I'm referring to.

24    Q.  He always came in with things at the last minute?

25    A.  Yes.

1    Q.    And he was always sort of frenetic, if you want to

2    use that word, right?

3    A.    What was the word?

4    Q.    I'm sorry.  He was always sort of frenetic.  My

5    throat has gotten too dry.

6    A.    Frenetic, is that the word you used?  What word did

7    you use?  I couldn't understand you.  I'm sorry.

8    Q.    I'm sorry.  So but he was always frenetic, he would

9    get things -- rush things to get them done?

10    A.    He was always late and wanted to do it in a hustle,

11    yes.

12    Q.    And at the time you thought it was just Alex being

13    Alex?

14    A.    That's right.

15    Q.    You thought he didn't have any attention to detail?

16    A.    That's correct.

17    Q.    Thought details weren't interesting to him?

18    A.    Yeah.

19    Q.    But you realized later after you found all this out

20    it was very intentional?

21    A.    That's right.

22    Q.    Because many times the details would go by you guys

23    in the stream of chaos?

24    A.    No, I wouldn't say the details would go by us.  We

25    would try to catch the details as best as we could.  And if

444

1    we didn't, then we would clear them up later.  So --

2        Q.   But your firm did issue all these checks.  And

3    they're printout checks.  They are not checks that are

4    handwritten.  You saw them up there.  They are all made out

5    to Palmetto State Bank.

6        A.   They were.  And at that point it was the trust of

7    him and the fact that Russell was on the conservator and that

8    that's -- for some reason, that's how they needed money.

9        Q.   Now, let's go to the Badger settlement.  Now, the

10   $1.3 million was made out to Palmetto State Bank, not Russell

11   Laffitte as conservator or personal representative, but to

12   Palmetto State Bank.  And I think it says disbursement for a

13   structured settlement.  I think you testified to that on

14   direct examination.

15       A.   Yes.

16       Q.   But Palmetto State Bank doesn't do -- to your

17   knowledge, doesn't do structured settlements, do they?

18       A.   Right.  On that, I would have thought that there was

19   a miss -- I don't know that I even saw the original

20   disbursement.  But that would have been a misnomer.  But my

21   thoughts were, looking back at this when we were doing this,

22   that they were going to be holding funds and investing for

23   your each person.

24       Q.   But on the check it said structured settlement and

25   it was made out to Palmetto State Bank?

1    A.    I don't know if the memo said that, but if it

2    did ...

3    Q.    Now, there was a check, I believe it's that 43162,

4    that came up.  And I believe it was later voided.  Are you

5    familiar with the fact that Russell Laffitte and the bank

6    never got that check?

7    A.    The 1.325?

8    Q.    Yes, ma'am.

9    A.    No, I am not.

10    Q.    So when y'all tracked it down later on, after you

11    voided it, did you see where it was signed and put into an

12    account or anything?

13    A.    No, not to my knowledge.

14    Q.    That's because the bank never got it.  It never came

15    over there?

16    A.    That's right.

17    Q.    And so when Alex Murdaugh asked him months later to

18    re-cut these checks, to re-cut this check, it's accurate the

19    checks -- the e-mail, if we could pull up Exhibit 68 to be

20    specific.  I'm trying to ask you in the dark, and I

21    apologize.

22    A.    Okay.

23    Q.    So this e-mail is dated February the 8th.  Okay?

24    And here Russell says to Alex:  Can you get Jeanne to re-cut

25    check 43162 dated 11/19/2012 as follows.

1          But that check 43162, it never actually made it to

2     the bank?

3          A.   I wouldn't have any way of knowing if it made it to

4     the bank.

5          Q.   When y'all were investigating and you get all these

6     checks back, back of the check had to be negotiated; isn't

7     that right?  And wouldn't it show where it went?

8          A.   I don't recall whether we even saw that check when

9     it came back, that check came back showing it was broke down

10    into this.  And at this point, we were relying -- if they had

11    never gotten a check, the question in my mind is, why didn't

12    he say, what check, and what is this for?  I mean, so it goes

13    both ways.

14         Q.   Fair enough.  Okay.

15              THE COURT:  Mr. Daniel, it's about 3:30.  I don't

16    want to break you up, your cross, but I think the jury has

17    been going for a while.  Why don't we do the afternoon break

18    and you can continue after that.  Return to the jury room for

19    about 10 minutes.

20              (Jury leaves open court at 3:31 p.m.)

21              THE COURT:  We are going to resume in about 10

22    minutes.  You can take a restroom break if you would like.

23              (Whereupon, the jury returns to open court at 3:47

24    p.m.)

25              THE COURT:  Please be seated.  Mr. Daniel, please

1    continue your cross-examination.

2          MR. DANIEL:  May it please the Court.

3    BY MR. DANIEL:

4       Q.   Now, I asked you to bring up Exhibit No. 66, please.

5    Are you familiar with the fact that after y'all stopped

6    payment or voided the $709,000 check, I think that a series

7    of checks were issued from the firm on September the 13th,

8    2013?

9       A.   I am looking at the ledger, yes.

10      Q.   Okay.  And so those checks were actually issued on

11   September 13th.  I believe there's nine of them that were

12   issued on September 13th.  Are you familiar with the fact

13   that they didn't get processed, they didn't go through any

14   account until a month or so later, some even later than that?

15      A.   I am when I look back on them, yes.

16      Q.   That was part of Alex Murdaugh --

17      A.   Could have been.

18      Q.   -- being patient?  That was part of -- is that

19   right?

20          MS. LIMEHOUSE:  Objection.  Speculation.

21          THE COURT:  I didn't understand the question.

22   BY MR. DANIEL:

23      Q.   It was part of Alex Murdaugh being patient?

24          MS. LIMEHOUSE:  Objection.  Speculation.  She

25   doesn't know why Alex --

1          THE COURT:  Rephrase your question.  I think you

2    could ask it properly.

3    BY MR. DANIEL:

4      Q.   You testified earlier that one of the ways that Alex

5    Murdaugh was able to manipulate people and to be able to pull

6    off this scheme is he was patient; is that right?

7          MS. LIMEHOUSE:  I don't believe the witness has

8    testified about his patience, Your Honor.

9          MR. DANIEL:  Your Honor, she testified to the grand

10   jury.  I asked her about it and she said that's what she

11   testified to, he could be patient.

12         THE COURT:  Why don't you ask a direct question to

13   lay a foundation and then --

14   BY MR. DANIEL:

15     Q.   To pull off the scheme, was Alex Murdaugh -- did it

16   appear to you after the investigation that -- was he patient?

17     A.   I don't know if I testified to that, but if I did,

18   that was the impression I have.  Yes, it seems like he was

19   able to wait and plot things out.

20     Q.   Okay.  And part of that was he could remember, also

21   as you said, what lies he had told six months ago?

22     A.   Definitely.

23     Q.   And what he -- only thing he had done in a

24   particular transaction six months ago?

25     A.   Yes.

1     Q.   And he took advantage of that with your firm?

2     A.   Yes.

3     Q.   And so these checks were all issued on November

4  13th; were all processed later?

5     A.   Is that a question or a statement?

6          THE COURT:  You can't testify, Mr. Daniel.

7          MR. DANIEL:  May I show her a document?

8          THE COURT:  Sure.  You may show it to her.  Is that

9  exhibit in?

10          MR. DANIEL:  It is not an exhibit.  I would like to

11  make it an exhibit.

12          THE COURT:  Lay a foundation for it.

13  BY MR. DANIEL:

14     Q.   Take your time.  And I want to ask you, after you

15  look at it, are you familiar, when you look at the individual

16  line items of those checks?

17     A.   Yes, they look like the proper amounts.

18     Q.   They look like what?

19     A.   They look like the proper amounts that the checks

20  were.

21          MR. DANIEL:  Your Honor, I would at this time like

22  to offer into evidence Exhibit No. 66, Defendant's Exhibit

23  66.

24          THE COURT:  Defendant's Exhibit 66.  Government's

25  view?

1              MS. LIMEHOUSE:  It looks like a summary that was

2    created by one of them.  I want to make sure she can confirm

3    the accuracy --

4              MR. DANIEL:  She just did.

5              MS. LIMEHOUSE:  She said the amounts, but I don't

6    know about the dates, the transactions.

7              THE COURT:  Do the dates appear to be accurate?

8              THE WITNESS:  I remember all of them being pretty

9    much one day.  They look like they are correct.  If could say

10   they were actually the exact same amount but they look

11   close --

12             THE COURT:  He's asking you about the dates.  Do

13   they appear to be --

14             THE WITNESS:  They appear within the time frame of

15   what I remember, yes.

16             THE COURT:  Defendant's Exhibit 66 is admitted.

17             (Defendant's Exh. 66 is received in evidence.)

18   BY MR. DANIEL:

19   Q.   If we pull up, please -- if you would highlight or

20   pull out the left column, the dates of the checks.  Okay.

21   And the first few are made out on February the 8th; is that

22   right?

23   A.   That's right.

24   Q.   And we know if you look at that chart, you can pull

25   up to whom the checks are -- how much the checks are for.

1    The next column.  Yeah.  And we know those checks from what's

2    already in evidence, because they are in evidence, were paid

3    out to -- actually, first four were paid out.  I believe one

4    went to pay off the Plyler loan.  Alex, he had directed

5    Russell Laffitte and Palmetto State Bank to do different

6    things, to take different actions with these checks?

7         A.   That's what it appears.

8         Q.   Now, the check number -- beginning with Check No.

9    45026 for 101,000, and all those succeeding checks, they are

10   actually -- yes.  Those checks are actually September --

11   let's go through the first one, 45026.  And it is made out on

12   September 13th.  And it's for $101,369.  And it's actually

13   processed on October 3rd, pretty close, within weeks of it

14   being cut.  They can't hear you.

15        A.   Yes.

16        Q.   And the next check, 45028, on the same -- cut on the

17   same date, September 13th, 2013, for $101,369 is processed

18   this time much later on October the 28th?

19        A.   Correct.

20        Q.   So it's issued on September 13th but not processed

21   at Palmetto State Bank until October 28th?

22        A.   Okay.  Yes.

23        Q.   And the next November 13th check, excuse me -- yeah,

24   September 13th check, 45030, for $50,684.75, this one is then

25   processed on October the 29th, 2013?

452

1      A.    Yes.

2      Q.    Again, cut in September, but not processed until the

3    end of October.  Please go to the next one for check 45034.

4    This one for $33,789, No. 45034, it was cut on September

5    13th, 2013.  But it looks like it's not processed until

6    December the 9th, 2013, month and a half later?

7      A.    Right.

8      Q.    And then go to the next check 45027, the check is on

9    45027, $101,369.49, again, cut on September 13th, but not

10   processed until when?

11     A.    Which check were we referring to?

12     Q.    45027 for $101,369.

13     A.    12/18/13.

14     Q.    And the next check, 45032, the $50,684.75 is

15   processed on?

16     A.    12/19/13.

17     Q.    And then the next one is 45031, and clearly was

18   written the same date, September 13th, 2013, check 45031 for

19   $50,684.75.  And when is this one processed?

20     A.    January 21st, 2014.

21     Q.    That's a pretty good example of Alex Murdaugh being

22   patient?

23     A.    Pretty good.  And real-time, I don't sit there and

24   check when the dates are processed until they are outstanding

25   after a certain period of time.  So we wouldn't be noticing

1    that as it's going in real-time.

2         Q.   And that's part of his manipulation, that's --

3         A.   Could be, or could be whatever.

4         Q.   Yep.  It's part of his concealment for sure.  And

5    then check 45035 is written for $33,789.83 cut on September

6    the -- September 13th, 2013, but not processed until January

7    21st, 2014?

8         A.   That's correct.

9         Q.   The next check, May 12th, 2014, it's processed

10   correctly on the 14th.  And that check is in evidence.  It

11   was a check that's written in the Bank of America.  And that

12   check was part of where he piggyback -- you testified earlier

13   that he piggybacked -- piggy banked money, he put money aside

14   and remembered which --

15        A.   He seemed to have, yes.  That was kind of what we

16   thought, that there would be funds that he kind of could use

17   if he needed them going back and pieces together.

18        Q.   Sometimes like this, he would wait months later

19   before he stole them?  And then the next check is May 12th,

20   2014, which is 46598, for $101,369.49, paid to Bank of

21   America.  It's in evidence.  That wasn't paid until June

22   25th, 2014.  And that is a month and 12, 13 days later.

23        A.   That's right.

24        Q.   Those last two checks are the ones that he stole and

25   put in some other account?

454

1          A.   Apparently.  I don't remember where they went

2     exactly.

3          Q.   And Russell -- that's good enough.

4          A.   Yeah, I don't know where they went.

5          Q.   When you mentioned earlier on direct examination

6     Russell Laffitte brought over the check for $680,000, and you

7     said one of his -- he remembered something funny about the

8     check, about the transaction.  That's what you told the State

9     Grand Jury, isn't it?  Didn't you say that he remembered

10    something funny about the transaction?

11         A.   I don't recall that now.  If I said something, like

12    I said --

13         Q.   Does that --

14         A.   I don't know whether I testified to that or not, and

15    I don't recall that now.  As I said, as time has gone by, I

16    can't recall what has been said or not been said.

17         Q.   I'm sorry.  Are you finished?

18              MS. LIMEHOUSE:  Your Honor, if he's trying to get

19    his defendant's own statements in --

20              MR. DANIEL:  It's an exhibit.  Can you please pull

21    up the witness only, the State Grand Jury testimony.

22              THE COURT:  Are you impeaching -- I'm a little

23    confused.  Are you impeaching the witness?

24              MR. DANIEL:  Yeah.  I'm refreshing her recollection

25    first.  I am not going to impeach her.  I'm going to refresh

1    her memory by showing her what I believe is her testimony and

2    then we will follow from there.

3              THE COURT:  Fair enough.  Go ahead.

4              MR. DANIEL:  There's three different grand juries,

5    Your Honor.  And I just want to make sure I've got the right

6    one.  Okay.

7    BY MR. DANIEL:

8        Q.   This is grand jury transcript of November 18th,

9    2021.

10             THE COURT:  Show it to her.

11             MR. DANIEL:  I'm just showing it to her, not the

12   jury.

13             MS. LIMEHOUSE:  We have it.  It's showing up here.

14             MR. DANIEL:  I'm sorry.  I thought you in meant the

15   witness.  The Government has it.

16             THE COURT:  But you refresh her recollection to the

17   witness.  You don't show it as an exhibit.

18             MR. DANIEL:  I was going to show on her screen only.

19             THE COURT:  Her screen only, fine.  That's fine.

20             MS. LIMEHOUSE:  Your Honor, I believe that the jury

21   can see this right now.  Okay.  Good.  Good.  They can't.

22   Yes.

23             THE COURT DEPUTY:  There's one button here.  I have

24   to push it.

25             THE COURT:  We are just getting the technology

1     straight.  Go ahead.  Ask the witness.

2             MR. DANIEL:  Thank you.

3             THE COURT:  Do you have a particular page?

4             MR. DANIEL:  I do.  I'm going to get that page right

5     now.  I want to be able to show her, in fact, that's what she

6     testified to the grand jury.  And it would be -- refer to

7     page 159.  The please bring up 159 just for the witness.  I

8     believe this one -- Your Honor, I'm incorrect.  This one is

9     dated Wednesday, December 8th, 2021.  I'm going to withdraw

10    the question and move on.

11    BY MR. DANIEL:

12        Q.   And we agree, based on your testimony on direct and

13    your part on cross-examination, that the origination of the

14    fraud began at your law firm, about the way the checks were

15    made out?

16        A.   I don't know that we agreed upon that.  But, yes, I

17    think it could contribute to that.  Also, I have to point out

18    on the fact that on the ones from Natasha Thomas and

19    Pinckney, that they were made and he signed the disbursement

20    statement showing payable to Palmetto State Bank.

21        Q.   But he was playing tricks and mirrors, smoke and

22    mirrors?

23        A.   But I am just saying, I can't say it originated one

24    place because it looks like was more than place.

25        Q.   Isn't it true usually when he stole from one of

1    these clients, he always had another check for them, like a

2    smaller check, perhaps?

3        A.    Yeah, a lot of times there was a bit of a settlement

4    made.  There was never a time that we discovered that a

5    settlement was not made to the client.

6        Q.    And your firm actually had had some problems --

7            MS. LIMEHOUSE:  Objection, Your Honor.  Foundation

8    for what this has to do with the charges.

9            THE COURT:  I don't know what the question is.  I

10    can't rule on it.

11            MR. DANIEL:  I'm glad to lay a foundation, Your

12    Honor.

13    BY MR. DANIEL:

14        Q.    Y'all conducted an investigation and you later

15    testified about that investigation at the grand jury?

16        A.    The forensic investigation.

17        Q.    Because when you testified, you testified that

18    during the course -- this is long before all this fraud came

19    to light -- that Alex Murdaugh had done some other things

20    that were -- sort of gave some hints, perhaps, that he was

21    not so up and up or on the up-and-up?

22            MS. LIMEHOUSE:  Objection.  I don't know what other

23    things Alex Murdaugh did had anything to do with these

24    things.

25            THE COURT:  We are going to stay on the indicted

1    charges.  Sustained.  Stay on the indicted charges.

2           MR. DANIEL:  We can't point out that how the firm

3    was on notice that Alex Murdaugh was dishonest?

4           THE COURT:  Firm is not on trial.  Sustained.

5           MR. DANIEL:  Beg the Court's indulgence.

6    BY MR. DANIEL:

7       Q.   In this particular case, did he set aside money in

8    his piggy bank that should have been paid?  It looked like

9    liens on the case?  He put in disbursement sheets, there was

10   a lien, like to anybody, to M.U.S.C. or to some other people,

11   and then use that money later on?

12          MS. LIMEHOUSE:  Objection.  Are you asking about a

13   specific case?

14          THE COURT:  Please ask specific to these cases,

15   please.  I sustain it as asked.

16   BY MR. DANIEL:

17      Q.   In any of these cases, in the Badger case, the

18   Pinckney case or say the Thomas case, did he list money on

19   disbursement sheets as liens, and then use that money later

20   on when it wasn't paid for liens to steal?

21      A.   I don't recall that in these.  I would have to

22   review the disbursements to make sure of that, because I

23   don't recall that in these.

24      Q.   Okay.  Now, one of the things -- your firm began

25   this investigation.  They were very, very concerned about the

1    Office of Disciplinary Counsel and its investigation?

2        A.    I would think anybody would be.

3        Q.    Well, the firm mentioned -- had to report all of

4    this to the Office of Disciplinary Counsel?

5        A.    That's correct.

6        Q.    And this involved money -- all these cases we are

7    talking about today involved money, checks out of their trust

8    account?

9        A.    Correct.

10       Q.    And a law firm's trust account is a sacred account

11   as far as inside the law firm is concerned; is that correct?

12       A.    That's correct.

13       Q.    Because it's really the client's money or somebody

14   else's money until it's paid to the law firm or until it's

15   paid to someone else?

16       A.    That's right.

17       Q.    And the Office of Disciplinary Counsel pretty

18   closely scrutinizes when there's a problem, these trust

19   accounts?

20       A.    They have scrutinized us upside-down, backwards,

21   forward, diagonally --

22       Q.    In fact, your law firm itself, your accounting

23   people, your financial people, you, y'all keep close tabs on

24   your trust account?

25       A.    Yes, we do.

1    Q.    Because it's very important not to run afoul of the

2    Office of Disciplinary Counsel?

3    A.    Well, we don't want to run afoul stealing clients'

4    money, first off.

5    Q.    Yeah.  But you would also be running afoul with the

6    Office of Disciplinary Counsel?

7    A.    Yes.  I don't wake up every day worrying about the

8    Office of Disciplinary Counsel in the course of my ordinary

9    work life.

10    Q.    You all cooperated fully with the Offense of

11    Disciplinary Counsel because the Office of Disciplinary

12    Counsel can yank or shut down a law firm, they can pull a

13    license?

14    A.    They can.

15    Q.    And put them out of practice?

16    A.    Yes.

17    Q.    Which is what you do to make a living?

18    A.    Yes.

19    Q.    They could shut you all down as a firm --

20    A.    Yes.

21    Q.    Or shut down --

22         MS. LIMEHOUSE:  Your Honor, Mr. Daniel is just

23    testifying for the witness.  Is he going to ask questions?

24         THE COURT:  It's cross-examination.

25         MR. DANIEL:  It's cross-examination.

461

1          THE COURT:  Overruled.

2    BY MR. DANIEL:

3        Q.    And y'all paid all this money back.  And I believe

4    you went and borrowed back -- I think is it one of these

5    cases -- one of our cases goes back to 2010, 2011, is how far

6    back y'all looked.  That's when y'all first began imaging.

7    You didn't image your records before then, your closing

8    files?

9        A.    Right.  We started about a decade ago.  And you know

10   when you first start, it's a little shaky.

11       Q.    So you keep or you store somewhere any of your older

12   files?

13       A.    We stored the financial documents of some of the

14   trust stuff that I have on my side of the street, all of

15   which has been submitted to ODC.  And it's still being looked

16   at and scrutinized by ODC.

17       Q.    You did store some of your hard copy files, just the

18   financial parts of it?

19       A.    Right, like the trust reconciliation, that type of

20   thing.

21       Q.    So did you go back and search beyond 2010, all the

22   way back to 2009 and '08 and '07 and '06 to see if there was

23   additional fraud?

24       A.    We have.

25       Q.    You have?

1        A.    Yes.

2        Q.    So it's your testimony that fraud didn't begin until

3    sometime after 2010 or 2011?

4        A.    I didn't testify to that.  I testified that this

5    did.  We found some later that went back to 2005 that's

6    currently being investigated by SLED.

7             MS. LIMEHOUSE:  Objection, Your Honor.  These other

8    cases have nothing to do with this trial.

9             THE COURT:  Stay on this trial.

10            MR. DANIEL:  Judge, it goes to their investigation.

11            THE COURT:  They are not on trial, Mr. Daniel.

12   Sustained.

13            MR. DANIEL:  Okay.  Beg the Court's indulgence.

14            THE COURT:  Take your time.

15   BY MR. DANIEL:

16       Q.    You testified on direct that someone could have

17   prevented all this.  And I believe you testified that Russell

18   Laffitte could have prevented all this?

19       A.    He could have with a phone call.  I am not saying

20   he's the only one who could have, but if we had gotten a

21   phone call, I would have looked into it.  There's a lot of

22   missed opportunities on a lot of places.

23       Q.    But your law firm was where it all began, isn't it?

24   Checks began in your law firm?

25       A.    They did.  They originated out of there.

1        Q.   But your law firm, Peters Murdaugh and Parker, we

2   wouldn't be here, because there wouldn't be any fraud

3   involved in this case?

4        A.   We wouldn't be here if Alex Murdaugh had never done

5   anything.

6             MR. DANIEL:  There's plenty of blame on Alex

7   Murdaugh.  That's one thing which we can all agree.  No

8   further questions, Your Honor.

9             THE COURT:  Redirect.

10                      REDIRECT EXAMINATION

11  BY MS. LIMEHOUSE:

12       Q.   Ms. Seckinger, you testified that Alex was a stream

13  of chaotic, frenetic, I believe you said, always late,

14  last-minute; is that right?

15       A.   That's right.

16       Q.   I'm going to pull up Government's Exhibit 37 and 38

17  side-by-side, please.

18            So these are the e-mails we reviewed in your direct.

19  Alex asking Russell to e-mail him and ask that a check dated

20  11/19/2012 for 1.325 be re-cut as listed above.  And he has

21  an amount 388,687.  Second is:  Whatever the amount I owe on

22  the Hannah loan; is that right?

23       A.   Yes.

24       Q.   Did Alex even know what he owed Hannah?

25       A.   I have no idea if Alex knew what he owed Alex.

464

1    Apparently, he didn't.

2        Q.   Is he asking Russell to determine whatever the

3    amount he owes on the Hannah loan?

4        A.   It appears that way.

5        Q.   And then he says:  Whatever the balance would be on

6    1.325 million after these deductions.

7             Is he asking Russell to determine the amount these

8    checks are going to be re-cut?

9        A.   It appears from this e-mail.

10       Q.   Go to 38, please.  Russell then sends this e-mail

11   that we reviewed:  Alex, can you get Jeanne to recut check

12   dated 11/19/2012 as follows.

13            And we see 388.  Russell was the one who determined

14   that 151,726, isn't he?

15       A.   Yes.

16       Q.   And that last amount $709,586.45, Russell was the

17   one who determined that amount?

18       A.   Yes, by computing the balance.

19       Q.   So stream of chaos, who is he relying on to

20   determine what amounts these Badger checks need to be re-cut?

21       A.   Who was Alex relying on?

22       Q.   Yes.

23       A.   Russell.

24       Q.   I'm going to pull up Government's Exhibit 50,

25   please.  This is the e-mail we reviewed on your direct.  From

465

1    Russell at the bottom:  Need a deposit.  Thought you were

2    coming in.

3            Alex:  Sorry.  I forgot.  Can you make a loan from

4    Hannah and I will pay it as we discussed?

5            Is that consistent with your testimony that he was

6    late, frenetic, hard to pin down, I believe you said?

7        A.    Absolutely.  That would be a prime example of

8    putting things off.

9        Q.    Do you see Russell's response:  I transferred 75 --

10    70K this morning.

11            And then Alex's response:  I will come by at some

12    point this week.  Out of town today and in the morning.  So

13    it will be tomorrow afternoon or Friday.

14            Is that consistent with Alex's phrenic stream of

15    chaos, hard to pin down?

16        A.    Yes.  And I venture to guess he didn't come by that

17    day or Friday.

18        Q.    Who is the one making the financial transaction

19    related to these funds based on this e-mail?

20        A.    From the information on this, it looks like Russell

21    is doing it.

22        Q.    If you could please pull up Exhibit 29, Check 45028.

23            Mr. Daniel reviewed a summary of the Badger checks

24    with you and including the dates that they were drafted and

25    the dates of their negotiation.  And one of those was

1    $101,000 and some change to Hannah Plyler, check 45028.  And,

2    again, Mr. Daniel highlighted that it was a check written to

3    the Palmetto State Bank, memo line, estate of Donna Badger,

4    September the 3rd, 2013.  And if we go to the next page,

5    please.  How was this check used?

6         A.   To pay back Hannah Plyler loan proceeds that had

7    been borrowed by Alex.

8         Q.   Were these loan proceeds that Russell had extended

9    to Alex from Hannah Plyler's conservatorship account?

10        A.   Yes.

11        Q.   And these -- loan repayment was on 10/28/2013; is

12   that right?

13        A.   Right.

14        Q.   Please go back to Exhibit 50, please.  10/28/2013,

15   Plyler money is paid back with Badger money.

16             If you will pull up the top please, Ms. Rozsa.

17             I transferred 70,000 this morning.  Five days before

18   the Plyler money, the Badger money is deposited into the

19   Plyler account.

20             If you could pull up the bottom of this e-mail,

21   please.

22             And again, Alex is saying, on October 22nd, six days

23   prior:  I will pay it as we discussed.

24             Is that what these e-mails reflect?

25        A.   Yes.

467

1      Q.    Who is Alex relying on to make these transactions

2  for him?

3      A.    Russell.

4      Q.    Please pull up Government's Exhibit 55.  Alex

5  e-mailing Russell:  Give me a call.  I will be in to see you.

6  How long before Hannah is 18?

7            Who is Alex relying on to determine when Hannah

8  turns 18?

9      A.    Russell.

10     Q.    Exhibit 57, please.  This is the e-mail we reviewed

11 on your direct, an e-mail that outlines exactly how Russell

12 is paying back all of the loans from the Hannah Plyler

13 account.  And he meticulously outlines the loan numbers, the

14 interest rate, the total amount, and how it was all paid

15 back.  And Alex responds:  Please hold off on this until I

16 return and can meet you.  Hard to follow all this on my

17 phone.

18            Who is Alex relying on to make all of those

19 transactions?

20     A.    Russell.

21     Q.    Is this consistent with stream of chaos, hard to pin

22 down, always late, last-minute?

23     A.    Yes.

24     Q.    Who is keeping track of all of these funds?

25     A.    Russell.

468

1       Q.   If you could please pull up Exhibit 30.

2            This is a summary of all the Badger checks, similar

3    to how you reviewed with Mr. Daniel.  And he outlined for you

4    how all of these checks are made out to the Palmetto State

5    Bank.  And Mr. Daniel said that was improper.  And then the

6    right-hand side shows the use.  So the law firm saw the

7    $388,687.50 to Palmetto State Bank; is that right?

8       A.   Yes.

9       Q.   Did the law firm see that a money order to Johnnie

10   Parker was then drawn from that check to Palmetto State Bank?

11      A.   No.

12      Q.   Who saw that?

13      A.   Russell did.

14      Q.   The second one, $151,726.05, the law firm saw that

15   that check made was to Palmetto State Bank; is that right?

16      A.   That's right.

17      Q.   Did the law firm see that there was a money order to

18   pay off loans to Hannah Plyler's conservatorship account?

19      A.   No.

20      Q.   Who saw that?

21      A.   Russell.

22      Q.   The third one, $75,000, Palmetto State Bank, the law

23   firm saw that $75,000 was going to Palmetto State Bank,

24   didn't it?

25      A.   Yes.

1    Q.    Did the law firm see that a money order was then

2    drawn to pay off Alex's father?

3    A.    No.

4    Q.    Who saw that?

5    A.    Russell.

6    Q.    The next check, Palmetto State Bank, the law firm

7    saw that $101,369.49 was going to the Palmetto State Bank,

8    didn't it?

9    A.    Yes.

10    Q.    Did the law firm see that $39,869.49 money order to

11    pay off Hannah Plyler loans?

12    A.    No, they did not.

13    Q.    Who saw that?

14    A.    Russell.

15    Q.    Did the law firm see that $7,500 of a money order

16    went to Maggie Murdaugh, Alex's wife?

17    A.    No.

18    Q.    Who saw that?

19    A.    Russell.

20    Q.    The next check, $101,369.49, did the law firm see

21    that Palmetto State Bank was getting a check in that amount

22    to Palmetto State Bank?

23    A.    Yes, the law firm did see that, yes.

24    Q.    Did the law firm see that a money order was then

25    drawn to repay in this amount the Hannah Plyler loans?

1        A.    No, ma'am.

2        Q.    And who saw that?

3        A.    Russell.

4        Q.    Let's go to the $50,684.75.  Did the law firm see

5    that a check was drawn in that amount, check 45030 to

6    Palmetto State Bank?

7        A.    We did.

8        Q.    Did the law firm see that $49,500 wired to Southern

9    Crane?

10        A.    No, we did not.

11        Q.    Who saw that?

12        A.    Russell.

13        Q.    And who, in fact, based on our review of those

14    e-mails, was the one who effectuated that transaction?

15        A.    Alex had Russell do it.

16        Q.    Did the law firm see that this money was spent

17    $1,184.75 in cash back?

18        A.    No.

19        Q.    Who saw that?

20        A.    Russell.

21        Q.    Next one, $50,684.75 to Palmetto State Bank.  That's

22    what the law firm saw, isn't it?

23        A.    That's right.

24        Q.    Did the law firm see that that check was then

25    deposited into Alex Murdaugh's personal bank account at

471

1    Palmetto State Bank?

2         A.    No.

3         Q.    Who saw that?

4         A.    Russell.

5         Q.    The last 50,000, did the law firm see that a check

6    in that amount was drafted to Palmetto State Bank?

7         A.    Yes.

8         Q.    Did the law firm see that $3,400 went on a wire to

9    4M Iron LLC?

10        A.    No, we did not.

11        Q.    Who saw that?

12        A.    Russell.

13        Q.    Did the law firm see that $8,200 money order was

14   drawn to E. Smith for a Jeep purchase?

15        A.    No.

16        Q.    Who saw that?

17        A.    Russell.

18        Q.    Who was on the back end of this fraud?

19        A.    I know that -- it's a hard question for me to

20   answer.  Russ is brother-in-law.  I love him very much.  I

21   know he endorsed the checks.  I don't know what he knew.

22        Q.    But you know that he's the one who endorsed all the

23   checks on the back end that the law firm never saw?

24        A.    Yes, I do know that.

25        Q.    Can we please pull up 168.  Mr. Daniel highlighted

1   how these checks were written improperly to Palmetto State

2   Bank.  Page 8, please.  And that they should have been

3   written to Russell Laffitte as the PR or the conservator.

4   This is Russell Laffitte's $60,000 fee from Hakeem Pinckney;

5   is that right?

6        A.   That's right.

7        Q.   And it's written to Palmetto State Bank, just like

8   all the Pinckney/Thomas and Badger checks; is that right?

9        A.   That's right.

10       Q.   Next page, please.  This money, $53,465.88 is used

11  to pay off the Hannah Plyler conservatorship loans.

12            Next one please.  And the next one, $6,534.12 to

13  cash, totaling 60 grand; is that right?

14       A.   That's right.

15       Q.   Is that a total of the Hakeem Pinckney --

16       A.   Yes.

17       Q.   Did the law firm know that Russell Laffitte took his

18  $60,000 conservatorship fee and paid off loans he had

19  extended himself from Hannah Plyler's account?

20       A.   Did not know until much, much later.

21       Q.   Did the law firm know that Russell took out 6,500

22  and some change in cash --

23       A.   No.

24       Q.   -- from Hakeem Pinckney's conservatorship fee?

25       A.   No.

1    Q.    And was that conservatorship fee check drafted in

2    the exact same way as the Badger and Pinckney/Thomas checks?

3    A.    Yes.

4    Q.    Did Russell ever tell you that he extended himself

5    loans?

6    A.    No.

7    Q.    Did Russell ever tell you that he used the fees he

8    got for serving as PR and conservator to pay back those

9    loans?

10    A.    No.

11    Q.    Please pull up Government's Exhibit 119.  This is

12    the $35,000 Arthur Badger personal representative fee.

13    Again, who is the payee on this check?

14    A.    Palmetto State Bank.

15    Q.    Is this Russell using his $35,000 PR fee to pay off

16    Hannah Plyler loans he extended himself?

17    A.    Appears that way, yes.

18    Q.    And was that check for his PR fee drafted in the

19    exact same way as all the Badger and Pinckney/Thomas checks?

20    A.    It was.

21    Q.    And he negotiated those just fine?

22    A.    That's right.

23    MS. LIMEHOUSE:  No further questions, Your Honor.

24    MR. DANIEL:  Just briefly on redirect.

25    THE COURT:  No, no.  That's all there is.  There is

1    no re-redirect.  You may step down.  Thank you.

2            MR. DANIEL:  May she be subject to re-call and

3    sequestration?

4            THE COURT:  Yes, if you wish to re-call her.  Is she

5    on your witness list?  I believe she is, is she not?

6            MR. DANIEL:  Pardon, Your Honor?

7            THE COURT:  Is she on your witness list?

8            MR. DANIEL:  She was on the Government's Exhibit

9    witness list and she's a witness today.  Yes, she is.

10           THE COURT:  I thought she was to your witness list.

11   You can call her in your case if you would like.

12           You may step down.  You are still subject to

13   sequestration, so don't talk to anyone about the case.  Don't

14   read any press accounts or anything else.  Thank you.

15           Government's Exhibit call your next witness.

16           MS. LIMEHOUSE:  The Government calls Jan Malinowski

17   Pinckney.

18           THE COURT DEPUTY:  State your full name.

19           THE WITNESS:  Jan Malinowski.

20                       JAN MALINOWSKI,

21       having been duly sworn, testifies as follows:

22                    DIRECT EXAMINATION

23   BY MS. LIMEHOUSE:

24       Q.   Good afternoon, Mr. Malinowski.

25       A.   Good afternoon.

1    Q.    Tell us a little bit about yourself.  Where are you

2    from?

3    A.    I'm from Baltimore originally.

4    Q.    All right.  Tell us about your education, your

5    background?

6    A.    I graduated from The Citadel 1976.  Thereafter, went

7    back to Baltimore for a short period of time to get some

8    accounting credits.  Returned to Charleston in 1977, where I

9    then joined the Citizens of Southern National Bank of South

10   Carolina and began my banking career.

11   Q.    Can I get you to pull the microphone a little bit

12   closer so everyone can hear.  Before we get into your sort of

13   professional background, which I definitely want to hear

14   about, the jury has heard from a lot of people who are

15   somehow related already.  Are you somehow related?

16   A.    Yes, I am.

17   Q.    Okay.  So tell us your relationship to the

18   Laffittes?

19   A.    My wife, Elizabeth, is a Laffitte.

20   Q.    And she goes by Liz?

21   A.    Liz, yes, ma'am.

22   Q.    Liz Laffitte Malinowski?

23   A.    Yes.

24   Q.    So you married into the family?

25   A.    Yes.

1    Q.   How do you know Russell?

2    A.   Through the family relationship as well as

3    professional association.

4    Q.   What was Russell's role prior to his termination?

5    A.   He was CEO of the bank.

6    Q.   In addition to being CEO, what were some of his

7    other roles and responsibilities?

8    A.   CEO of the bank, some of the previous roles and

9    responsibilities, he was CEO -- COO of the bank.  He was a

10   loan officer, branch manager over our Hampton office.

11   Q.   So you now hold that role as CEO; is that right?

12   A.   I do.

13   Q.   How did you come to hold the role as CEO?

14   A.   After Russell was separated from the bank, I was

15   named interim CEO.  And then in August of this year, I was

16   named CEO of the bank.

17   Q.   Okay.  So you hold the current title and direct

18   response to what happened with Russell; is that right?

19   A.   I do.

20   Q.   So let's talk about your professional background.

21   Just give me a brief overview of your history in banking and

22   how you found yourself at Palmetto State Bank?

23   A.   As I said earlier, I joined the old Citizens of

24   Southern National Bank of South Carolina right here in

25   Charleston in 1977.  I was with the bank, the CNS Bank, until

1    1980.  In 1980 I went to the university in Columbia, the

2    business school.  Following completion of getting my degree

3    in international business, I then joined in 1980 the Wachovia

4    Bank and Trust Company in Winston-Salem, North Carolina,

5    where I went through their commercial banking training

6    program.  I was with Wachovia from 1982 to 1986.  1986 I

7    joined the Barnet Bank, Barnet Banks, Inc. in Jacksonville,

8    Florida.  And then in 1989, I joined First Union in Savannah.

9    And then in February of 1991, I joined the Palmetto State

10   Bank.

11        Q.   So you have a whole career in banking?

12        A.   I do.

13        Q.   And you've been with Palmetto State Bank you said

14   since 1991?

15        A.   Yes.

16        Q.   So when you joined Palmetto State Bank, was there a

17   family reason why you joined?

18        A.   Yes.  We were getting closer to my wife's family in

19   South Carolina.

20        Q.   Okay.  So you've been with Palmetto State Bank for

21   30 --

22        A.   31 years.

23        Q.   31 years.  So what kind of training have you

24   received, just generally, in your experience in banking?

25        A.   When I joined the CNS Bank of South Carolina, I was

1    trained as a junior lender.  Moved to Columbia for a credit

2    training program.  When I joined the Wachovia Bank, we went

3    through a one-year commercial training program, lending

4    program, and that basically was my professional training.

5         Q.    So you had extensive sort of on-the-job training in

6    banking, but also in your -- have you attended trainings and

7    things of the like?

8         A.    Yes, I have.

9         Q.    Okay.  So prior to becoming CEO, what was your job

10   title at Palmetto State Bank?

11        A.    I was president of the bank.

12        Q.    And so we've heard a little bit about the hierarchy,

13   but could you just explain where you fall, or you did fall

14   prior to becoming CEO?

15        A.    I was on the Executive Committee.  I worked

16   alongside Russell and his father, Charlie Laffitte, and our

17   CFO, Scott Swain.

18        Q.    We will go into those roles specifically.  We've

19   heard a little bit about how Palmetto State Bank is a

20   community bank.

21        A.    Yes.

22        Q.    Explain what that means.

23        A.    A community bank differs in concept from a large

24   national bank like Bank of America or Wells Fargo.  The best

25   way to characterize it, we are a Main Street bank.  We raise

1    deposits in the community where we have offices.  We take

2    those deposits and turn them around and make loans to

3    individuals and small businesses in those communities.  We

4    are reinvesting community money back into the community,

5    hopefully for the betterment and economic development of the

6    citizens of those areas.

7        Q.    So when compared to Bank of America or a national

8    bank, you really just want to be working with the people who

9    live in your community; is that right?

10       A.    Yes, relationship banking one-on-one.

11       Q.    From a regulatory standpoint, what's the difference

12   between a community bank and, say, a national bank like Bank

13   of America?

14       A.    Not much in general.  Again, the regulatory

15   environment is roughly the same.  A Bank of America is going

16   to be far more sophisticated and more complex.  They will

17   have greater scrutiny of examination than, say, Palmetto

18   State Bank.  But we are subject to the same rules and

19   regulations as the very largest banks.

20       Q.    So when the FDIC is examining the bank, they are

21   enacting the same regulations that they do on more

22   international banks?

23       A.    Yes.

24       Q.    So the standards are the same?

25       A.    Yes.

1     Q.   So you talked about how prior to becoming CEO, you

2   became -- you are the president.  What bank branch did you

3   work at?

4     A.   I've been responsible for our two branches in

5   Beaufort, specifically, since 1991.

6     Q.   So you've been a branch manager, so to speak, of two

7   of the banks' branches in a different part of the state?

8     A.   Correct.

9     Q.   So were your roles as branch manager of these two

10  branches comparable to Russell's role?

11    A.   Roughly comparable, yes.

12    Q.   What involvement did you have with the Hampton

13  branch?

14    A.   My role with the Hampton branch really was

15  administrative, largely.  We have -- at the time and over the

16  years, we've had a very decentralized operating style.  I was

17  given responsibility for the two Beaufort branches.  That was

18  my primary focus.  Russell's and other individuals in the

19  bank would be given responsibility for other branches that we

20  operate.

21    Q.   All right.  So you started talking a little bit

22  about the roles that you hold at the bank and the jury has

23  heard about the Board of Directors.  But let's start there.

24  Are you a Board member?

25    A.   I am.

1    Q.    Let's pull up Government's Exhibit 65, please.

2    Explain for the jury what the Board of the bank is?

3    A.    The Board of the bank is the controlling group of

4    the activities and direction of the institution.  They are

5    voted on the Board by the shareholders.

6    Q.    So what is the Board's authority?

7    A.    Board's authority is essentially absolute.  They set

8    up the rules -- the policies and procedures that management

9    is charged with the responsibility of implementing.

10    Q.    Just the top page of 65 shows these are the bylaws.

11    What are the bylaws for the bank?

12    A.    Bylaws are kind of the operating manual of the bank.

13    It sets up how the organization -- how the bank in this case

14    is organized, how it functions, how committees are

15    established, what the rules and procedures of committees are,

16    what they are supposed to do in managing the affairs of the

17    bank.

18    Q.    If we could go to page 6, please.  3.01:  The bylaws

19    outline that the Board of Directors shall have ultimate

20    authority over the conduct and management of the business and

21    affairs of the corporation; is that right?

22    A.    Yes, ma'am.

23    Q.    So the corporation is the bank?

24    A.    Yes.

25    Q.    Okay.  So the Board, how many Board members -- and

482

1    we will go back to 2021, because that's what we are spending

2    a lot of time on.  How many board members were there in 2021?

3         A.   Eleven, I believe.  You want me to name them?

4         Q.   Well, if you can.

5         A.   Sure.  Charles A Laffitte, Jr., Charles A. Laffitte

6    III, Russell L. Laffitte, Gray Henderson, Jim Gibson, Spann

7    Laffitte, Norris Laffitte, Becky Laffitte, Liz Malinowski,

8    Lucius Laffitte, and I believe I mentioned Norris Laffitte.

9         Q.   You said your wife is Liz.  She's the other

10   Malinowski?

11        A.   Yes.

12        Q.   Everybody else is a Laffitte except Jim Gibson?

13        A.   Correct.

14        Q.   Does he have any family relationship?

15        A.   None.

16        Q.   Is he the longest-serving Board member?

17        A.   Yes, he is.  Yes, he is today.

18        Q.   So when does the Board meet?

19        A.   The Board meets regularly on the third Tuesday of

20   every month.

21        Q.   And how are these Board meetings memorialized?

22        A.   In minutes.

23        Q.   So who takes --

24        A.   Written minutes.

25        Q.   Okay.  Who takes the minutes of a Board meeting?

1      A.    The secretary of the bank takes the Board minutes.

2      Q.    Who was the secretary in 2021?

3      A.    Gray Henderson.

4      Q.    So that is Russell's sister?

5      A.    Correct.

6      Q.    Do the minutes include everything that's discussed

7    at these Board meetings?

8      A.    Yes.

9      Q.    Are there things that are sometimes left out of

10   Board minutes?

11     A.    They should not be left out.  Typically you are

12   supposed to be detailed enough to give a third-party an idea

13   of what had been discussed at that particular meeting.

14     Q.    But Gray, as the secretary, is the person who drafts

15   those minutes?

16     A.    Correct.

17     Q.    Okay.  Let's move on from the Board and go to

18   committees.  I'm going to ask you specifically about

19   committees that you serve on.  The Audit Committee, what is

20   the Audit Committee?

21     A.    Audit Committee is charged with the responsibility

22   of making sure that policies and procedures as they relate to

23   internal operations are adhered to and maintained.  We have

24   third-party -- we contract out with third-party entities,

25   internal auditors, to come in and look at how each individual

484

1    branch is run, how a loan operation is run, how mortgage

2    banking is run.  These audits are then compiled in a written

3    format and presented to the Audit Committee for review and

4    approval.  And the Audit Committee's responsibility is to

5    make sure that management is following what is prescribed in

6    the policy.

7        Q.    Okay.  Let's move to the Executive Committee.  The

8    jury has heard a bit about the Executive Committee.  What is

9    the function of the Executive Committee?

10       A.    The function of the Executive Committee is to guide

11   the direction of the bank on a day-to-day basis, make

12   decisions that impact the activities of the bank in this

13   case, whether it be in loans or operations or computer

14   systems, everything related to the running of the bank on a

15   day-to-day basis.

16       Q.    Specifically as it relates to loans, what's the

17   Executive Committee's responsibility with loans?

18       A.    Executive Committee -- Executive Committee's

19   responsibility with respect to loans is to review those

20   larger loan relationships that exceed authorized lending

21   levels within the bank, individual loan authorities within

22   the bank.  Typically, the Executive Committee would look at

23   large single transactions or larger relationships that the

24   bank has, more sophisticated transactions or ones that may

25   require great deal of conversation so that we can assess the

485

1    risks and determine whether the bank wants to approve the

2    loan or not approve the loan.

3    Q.    Pull up Government's Exhibit 63, the lending limits.

4    Can you explain this document for the jury, please?

5    A.    This is the Board approved individual lending limits

6    as of April of 2021.  As it says at the very top, that the

7    Board has the authority to approve loans up to the legal

8    lending limit of the bank.  Subordinate to that is the

9    Executive Committee, which has loan authority collectively up

10   to $6 million either in a single transaction or to a large

11   borrower.

12          Below that, the individual members of the Executive

13   Committee are assigned loan authorities, Charles A. Laffitte,

14   Jr., a million dollars, Jan Malinowski, a million dollars,

15   Russell Laffitte, a million dollars, Gray Henderson, a

16   million dollars.  And then two executives -- two Executive

17   Committee members together could approve a loan up to one and

18   a half million dollars.

19   Q.    So we are getting a little technical here.  This

20   says, relationship lending limits.  Describe what

21   relationship means when you talk about loan limits.

22   A.    Okay.  For instance, if a noncustomer of the bank

23   approached me for a loan of a million dollars, I could lend

24   that individual a million dollars.  If one of my existing

25   customers, say, had an existing loans totaling $750,000 and

1    wanted an additional loan of $500,000, thereby taking that

2    loan limit, if you want to call it, to a million 250, I

3    couldn't lend that additional $500,000.  I would need to find

4    another or to have a discussion with another of the Executive

5    Committee members to determine whether we wanted to make that

6    loan or not.  Going back to what I said earlier, two

7    Executive Committee members could lend up to a total of a

8    million and a half dollars before they then would have to go

9    to the Executive Committee for anything higher.

10        Q.   So we are going to be talking a lot about later a

11   $750,000 loan, which is less than any of these individuals

12   members and the two executive officers together.  But if that

13   individual's relationship, i.e., full exposure from the bank,

14   is higher than 1.5, then the whole Executive Committee has to

15   approve it; is that right?

16        A.   That is correct.

17        Q.   This outlines the membership?

18        A.   Yes.

19        Q.   But there's another member; is that right?

20        A.   Scott Swain is a member of the Executive Committee.

21   He's a nonvoting member of the Executive Committee.  He is

22   our chief financial officer.

23        Q.   So there's four voting members, Charles A. Laffitte.

24   Jury heard that's Charlie, Russell's dad, you, Jan

25   Malinowski, Russell --

1           THE COURT REPORTER:  You're going to have to slow

2    down.  Can you start that again?

3        Q.   Sorry.  Charles A. Laffitte, Jr., the jury heard is

4    Charlie Laffitte, Russell's father, Jan Malinowski, you,

5    Russell Laffitte, and then his sister, Gray Henderson, and

6    then you said there's a fifth member, Scott Swain?

7        A.   Scott Swain, yes.

8        Q.   Who is Scott Swain?

9        A.   Scott Swain is our chief financial officer.

10       Q.   And you said he's a nonvoting member.  Why is he a

11   nonvoting member?

12       A.   Because for loan approval authority at the Executive

13   Committee level, each voting member must be a director of the

14   bank.

15       Q.   So if he can't vote, why is he there?

16       A.   He's there because, A, he's got significant banking

17   experience in his own right.  Executive Committee meetings

18   would include topics that were in his area of expertise.  But

19   with prior employers, Scott had been with institutions that

20   had him on loan committees.  He knows how to read a balance

21   sheet and income statement.  His opinion is valued.  And he

22   was considered part of the Executive Committee for that

23   reason.

24       Q.   So as the chief financial officer, is Scott Swain

25   the one that really has the bank's full financial picture?

488

1          A.    On a day-to-day basis, yes.

2          Q.    So does Palmetto State Bank have a loan policy?

3          A.    Yes, we do.

4          Q.    Pull up Exhibit 191.  This is a loan policy.  But

5    generally, what does it provide with respect to the bank's

6    loaning ability?

7          A.    This is our -- well, it's our general loan policy.

8    And within the general loan policy, it describes in great

9    detail the types of loans that the bank's interested in, what

10   types of risk the bank is interested in, how these loans

11   should be underwritten for approval.  It's also how the loan

12   should also be managed on an ongoing basis.  And then it gets

13   into additional information on if a loan has problems in

14   payment.  Talks about how -- what's prescribed in terms of

15   taking action with a nonpayment of a loan or when a loan goes

16   into default, great depth in many areas.

17         Q.    Okay.  So it just provides general guidelines that

18   Executive Committee members and loan officers are to follow?

19         A.    Yes.

20         Q.    Okay.  I'm going to go to Exhibit 65, page 12,

21   Section 3.16 of the bylaws.  What is the Executive

22   Committee's responsibility with respect to the Board?  This

23   is long and lengthy, but I just want you to sort of summarize

24   your understanding to the jury.

25         A.    The Executive Committee has great latitude to run

1    the bank.  It does have a responsibility to report to the

2    Board its decisions it's taken.  It is to meet as a body.  We

3    typically met on the second Tuesday of each month, meaning

4    the Tuesday preceding the Board meeting.  The meetings of the

5    Executive Committee were to be minuted and written out and

6    reported to the Board at the regular Board meetings.  But the

7    Executive Committee had a great deal of latitude in running

8    the bank, provided it was within the policies and procedures

9    of the institution as set by the Board.

10        Q.    Okay.  I'm going to direct you to Section 3.19.  You

11   talked about Executive Committee meetings.  This is the

12   section of the bylaws that relates to Executive Committee

13   meetings.  What does it provide with respect to the Executive

14   Committee meeting to act?

15        A.    Well, it states that the Executive Committee should

16   meet and that minutes of that meeting should be minuted and

17   forwarded to the Board.  There is a section here that says

18   that the Committee minutes -- the Executive Committee -- a

19   quorum of the Executive Committee may meet, however, at a

20   meeting such as that, any decision taken must be -- have

21   written unanimous consent of all the voting members, meaning

22   if three people got together in the Executive Committee for

23   whatever reason and met that way, that they would then need

24   to come to the fourth voting member.  And all of them have

25   unanimous consent for meeting outside of a formal meeting,

1    and then present that to the Board.

2        Q.    Okay.  So the bylaws do allow meeting to take

3    place -- I mean, action to take place outside of a meeting

4    but it requires the written consent of the person who didn't

5    participant in the meeting; is that right?

6        A.    Correct.

7        Q.    And then if a meeting does take place, that meeting

8    should be memorialized and presented to the Board?

9        A.    Correct.

10       Q.    Okay.  Let's talk about the reporting that goes to

11   the Board after these meetings.  So you said y'all meet

12   regularly before the board meets each month?

13       A.    Yes.

14       Q.    What information is provided to the Board from that

15   Executive Committee meeting?

16       A.    Receive lengthy minutes summarizing all the topics

17   that were discussed at that particular Executive Committee

18   meeting.

19       Q.    Who takes the minutes for the defendant Executive

20   Committee meetings?

21       A.    I do.

22       Q.    So after the meeting takes place, you write up

23   minutes, and then those minutes are provided to the Board in

24   advance of the Board meeting?

25       A.    That's correct.

491

1    Q.   What information is given to the Board with respect

2    to loans that were approved by the Executive Committee?

3    A.   A brief summary of the borrower, the amount,

4    additional details about the transaction, the health of the

5    borrower, whether the borrower had an existing relationship

6    with the bank, what the total dollar amount of any indebted

7    might have been, what the deposit level may have been if it

8    was an existing customer.

9    Q.   Executive Committee is responsible to accurately

10   report loan information to the Board?

11   A.   Correct.

12   Q.   While we are on policies and bylaws, did the bank

13   have a conflict of interest policy?

14   A.   We do.

15   Q.   I'm going to pull up Exhibit 66.  Just the top page,

16   if you highlight that for me.

17        Why does the bank have a conflict of interest

18   policy?

19   A.   The bank has a conflict of interest policy because

20   there are certain situations where the bank wants it to be

21   known to members of staff and officers that there are certain

22   behaviors that are expected to take place at all times.

23   Q.   If you could go to page two, please.  What is the

24   bank's policy with respect to fiduciary appointments?  What

25   was it?  I know it's changed.  What was it?

1       A.    In 2021, it says for -- an employee or officer

2  should generally decline appointment as a fiduciary or

3  co-fiduciary, either individually or with a banking --

4  affiliate of the bank or another person, firm or corporation

5  for anyone other than a member of his immediate family.

6       Q.    So would they have applied to conservatorship and

7  personal representative appointments?

8       A.    Yes.

9       Q.    If you could go back to the first page real quick.

10  What was the effective date of this policy?

11       A.    The effective date was January 18, 2022.  The last

12  revision was January 2012.

13       Q.    So does that indicate that the policy has remained

14  the same since January of 2012?

15       A.    Yes.

16       Q.    You hinted at some of the oversight.  Talked about

17  audits when we talked about the Audit Committee.  I want to

18  talk about the FDIC regulatory oversight of Palmetto State

19  Bank.  Is Palmetto State Bank a federally insured

20  institution?

21       A.    We are.

22       Q.    Please pull up Exhibit 67.  What does it mean to be

23  FDIC insured?

24       A.    That means that the deposits of every depositor are

25  insured by the Federal Deposit Insurance Corporation, meaning

1    if something were to happen to the bank, the FDIC would step

2    in and make the deposit whole up to the limit of the

3    insurance.

4    Q.    What do you have to do to maintain your status as a

5    FDIC insured financial institution?

6    A.    You have to follow the rules and regulations as

7    prescribed by the FDIC.

8    Q.    With respect to the rules and regulations, what were

9    the bank's reporting requirements to the FDIC?

10    A.    Well, on a quarterly basis, we file what is called a

11    call report, which is a very detailed balance sheet and

12    income statement of the bank's activities for that particular

13    quarter.

14    Q.    So balance sheet and income statement, would that

15    include the loans outstanding from the bank?

16    A.    Gross levels of the loans, gross amounts.

17    Q.    How about the overdraft, would overdraft be included

18    on these quarterly call reports to the FDIC?

19    A.    They are included on a line item in the call report,

20    yes.

21    Q.    Why is overdraft included on the reporting

22    requirements to the FDIC?

23    A.    Well, an overdraft, according to the FDIC, is

24    considered a loan.

25    Q.    What type of loan?

1     A.    It's an unsecured loan.

2     Q.    Is that because you are extending a client -- a

3  customer, excuse me, credit without any security that that

4  overdraft will be paid back?

5     A.    Correct, yes.

6     Q.    What about currency transaction reports, what are

7  they?

8     A.    Currency transaction reports are reports that the

9  bank files at any time when a depositor either withdraws more

10  than $10,000 or -- withdraws more than $10,000 on any given

11  day or deposits more than $10,000 on any given day.

12     Q.    So when there's a transaction over $10,000, y'all

13  have to report that information?

14     A.    A cash transaction.

15     Q.    Cash transaction.  And why are these reports made?

16     A.    These are made under the bank's Secrecy Act and U.S.

17  Patriot Act, principal reason is to combat money laundering

18  and terrorism financing.

19     Q.    When we talk about the FDIC, what were these, the

20  examinations that take place from the FDIC?

21     A.    We are subject to examination by the FDIC and the

22  State of South Carolina's banking division.  Typically, we

23  get an examination every 12 to 18 months, pretty detailed

24  examination going on for two to three weeks on a sequential

25  basis by each of those organizations.

1        Q.    What's the purpose of these examinations?

2        A.    To make sure that we are maintaining or we are

3    following the rules and regulation of the FDIC, that we are

4    maintaining safe and sound banking practices, and that we are

5    following our own procedures.

6        Q.    Which an FDIC examiner comes in to the bank, what

7    information do they look at in performing the examination?

8        A.    They have the right to look at everything that the

9    bank is doing.  And they typically request it in very

10   detailed format.

11       Q.    What information do they look at with respect to the

12   bank's processes?

13       A.    They will look at our own internal audit reports to

14   determine if our own third-party internal auditor has

15   reviewed those processes.  We give those reports to the FDIC.

16   They review them.  They may come in and test independently.

17   But they typically will look to see that we have someone

18   looking at our own internal processes and procedures and is

19   rendering some sort of an opinion on our ability following

20   those.

21       Q.    Why are are the processes important to the FDIC?

22       A.    For safety and soundness and prudent banking

23   practices.  They want to make sure that there are protocols

24   and procedures in place that are followed by all the bank's

25   employees, branch employees, loan operations, lenders, for

1    the health and integrity of the bank.

2        Q.    So when we talk about processes, would this include

3    the process with the Executive Committee in extending loans?

4        A.    It would.

5        Q.    What information is given to the FDIC about loans

6    specifically?

7        A.    Well, as I mentioned earlier, they certainly have

8    access to all of our call reports, which they see on a

9    quarterly basis.  But when they come in for an examination,

10    they will send us what's called a lead sheet where they will

11    randomly select loans from our loan portfolio.  We will send

12    them a tape with all the borrowers' names, account numbers,

13    amounts.  They are randomly select any number of large and

14    small relationships.  But, typically, they tend to look at

15    the larger loan relationships.  And then they will send in

16    examiners to review each of those individual files.  And they

17    will ask the bank questions or the loan officer questions

18    about the condition of the borrower and various other

19    questions related to it.

20        Q.    I want to briefly touch on audits, because we

21    mentioned those.  What is the purpose of these internal

22    audits?

23        A.    The purpose of the internal audit is to establish

24    whether we are following our own procedures and policies.

25        Q.    And who conducts these internal audits?

497

1      A.    The internal audits, the third-party internal audits

2    that we now conduct are done by a CPA firm out of Atlanta

3    named Maulden and Jenkins.  And they come in multiple times

4    of the year.  They have their own processes.  They identify

5    areas of the bank that they want to look at.  And they look

6    at those areas of the bank in detail, render a report, which

7    then goes to our Audit Committee.

8      Q.    What is done by Palmetto State Bank in preparation

9    for these examinations and audits?

10     A.    We have to spend a lot of time outside the usual

11   daily activities of the bank gathering information to present

12   to either bank examiners, maybe the FDIC or the State Board

13   of Financial Institutions, and also we gather information to

14   give to our third-party internal auditors.

15     Q.    So as CEO, what role do you now play in the

16   examinations and the audits?

17     A.    I'm typically the first point of contact on an

18   examination.  We have one underway right now.  The examiner

19   in charge will contact me, tell me what day the examination

20   is to begin.  He, in turn, will send a request for

21   information, which can be multiple pages in length, in great

22   detail and multiple areas of the bank.  We pull together all

23   that information, upload it to a portal.  And then they get

24   on with their examination and look at what we've provided.

25     Q.    What's the risk of a negative audit from the FDIC, a

498

1  negative examination, excuse me?

2      A.    Well, the risk of a negative examination is severe

3  criticism and recommendations to improve the processes and

4  procedures of the bank.  The level of deposit insurance that

5  we pay to the FDIC could be increased as a result of that if

6  they feel that the bank's in a more riskier position than it

7  was, say, previously.

8      Q.    Let's move to the typical loan process.  Let's just

9  talk through what the typical loan process looks like when an

10  a customer comes to the bank and wants a loan.

11      A.    Depending on whether it's a consumer loan or

12  commercial loan, I will go with a commercial loan, if

13  somebody were to go to me or one of my loan officers,

14  typically, the borrower would like to know -- would tell us

15  they want to borrow X amount of money for whatever purpose.

16  In the case, say, of a small business, individual wants to

17  buy three or four new trucks for his business, the other ones

18  are wearing out, he needs to replace his rolling stock, he

19  would have a conversation with a lender or myself.  And we

20  would sit down and say, okay, for us to come to a credit

21  decision, we are going to need certain pieces of financial

22  information from you.  That could include a personal

23  financial statement, tax returns, personal tax returns,

24  business tax returns on the business, year-to-date financial

25  information, and just a general overview of what the business

1    does, how it conducts its business, who are its customers, so

2    on and so forth.

3        Q.    The jury is going to hear about interest rates.  How

4    are the interest rates determined when you are extending a

5    loan?

6        A.    Interest rates are largely driven off of, well, the

7    prime rate, which we all read about in the press.

8        Q.    What is prime interest rate?

9        A.    Prime right now is 7 percent.  And it's --

10       Q.    So if someone is getting an above-prime interest

11   rate, what does that typically indicate?

12       A.    Well, prime would be the base rate, the index.  A

13   margin above prime typically would be representative of the

14   level of risk that the bank thought that the borrower was to

15   us.  A rate closer to prime, less risky.  One that's prime

16   plus, a spread of one and a half, two-and-a-half points,

17   would be either just the size of the loan or perhaps just

18   overall perceived riskiness (sic) of the transaction.  We

19   want to get paid for the risk.

20       Q.    When we talk about risk, what indicates risk when

21   you are determining whether to extend a loan.

22       A.    It's a review -- it's a review and analysis of the

23   borrower's financial condition.

24       Q.    And so you would look at their outstanding loans,

25   for example?

1    A.   Yeah, outstanding loans, their track history over

2    the last three or four years, in good times and in bad, how

3    did they manage during, say, a recession.  How are they

4    managing if they were expanding their business?  How are they

5    managing that?  What kind of management structure did they

6    have in the event that someone, say, a key employee of the

7    bank died or was incapacitated, who would take over the

8    company to run it, so we would understand if we were going to

9    be repaid.

10   Q.   You talked about information you would get from the

11   borrower, like tax returns, financial statements, is that all

12   information that you want to consider when determining the

13   risk?

14   A.   Yes.

15   Q.   Okay.  The jury is going to hear about some internal

16   systems that the bank has, Compliance One and Credit Leader.

17   What is Compliance One?

18   A.   Compliance One is a software program that generates

19   our loan documentation.

20   Q.   And what about Credit Leader?

21   A.   Credit Leader is a software program that assist in

22   loan underwriting.

23   Q.   When you are going through this process you talked

24   about, assessing risk, collecting information from a

25   borrower, is that the type of information you would input

1   into Credit Leader?

2       A.   Yes.

3       Q.   And then Compliance One is what would generate sort

4   of the loan number internally, right?

5       A.   Yes.

6       Q.   Okay.  But those systems are sort of used parallel

7   throughout the loan process?

8       A.   They are.

9       Q.   You testified about the Executive Committee and

10  their role in loan -- reviewing loans.  When is the loan

11  presented to the Executive Committee for approval?

12      A.   It should be submitted -- if it's a large loan that

13  requires going to the Executive Committee, it should be

14  presented at the next Board meeting, if the loan is ready for

15  discussion.

16      Q.   So it would be presented at the next Executive

17  Committee?

18      A.   Yes.

19      Q.   Before it's approved?

20      A.   Yes.

21      Q.   So if you are the loan officer on that loan, what

22  kind of information would you convey to the Executive

23  Committee in determining whether to approve that loan?

24      A.   Typically, a completed Credit Leader and any

25  requested tax returns or other information that the Executive

1    Committee wanted to see in consideration for that loan

2    request.

3        Q.    So the information you testified is important to

4    assessing risk is the information you would be conveying to

5    the Executive Committee --

6        A.    Yes.

7        Q.    -- before they determine whether to approve a loan?

8    Okay.  So when the loan actually considered approved?

9        A.    Loan is considered approved at the -- basically,

10   upon conclusion or decision of the Executive Committee, if

11   it's a large loan warranting a discussion.

12       Q.    And when is an advance made on a loan once approved?

13       A.    Typically, it would be after the loan documentation

14   has closed.

15       Q.    Okay.  So after approval, then a loan -- then the

16   advance of a loan is typically made?

17       A.    Yes.

18       Q.    Why is this process important to maintaining the

19   integrity of the institution?

20       A.    Banking is a process.  And we all go through that

21   process.  We attempt -- we are in the risk assessment

22   business.  Having the necessary discussion among all the

23   executives who had the responsibility to do so is important

24   to maintain the quality of the loan portfolio, which has

25   direct implications in the overall safety and soundness of

1    the bank.

2        Q.    Okay.  We are going to hear about some charged-off

3    loans.  What does it mean when are a loan is charged off?

4        A.    A charged-off loan is a loan that has had

5    difficulty.  In the opinion of management, the ability to

6    collect that loan has disappeared.

7        Q.    Why would a loan be deemed uncollectable?

8        A.    That the borrower or the business or the company had

9    stopped paying us.

10        Q.    What rights -- say that loan is secured by

11    collateral and the loan is charged off, what rights does the

12    bank have with respect to that collateral?

13        A.    The bank can still pursue the collateral.

14        Q.    So they charge off the loan.  And then they may

15    decide to foreclose on the property securing --

16        A.    That's correct.

17        Q.    So they would try to collect on that collateral to

18    get the payment?

19        A.    Yes.

20            MS. LIMEHOUSE:  Okay.  Your Honor, I will say I'm at

21    a very natural stopping point at 5:10.  I'm completing

22    transitions after this.

23            THE COURT: I think we've had a long enough day.

24    Ladies and gentlemen, number one, I want to remind you to

25    avoid all communication with anyone, reading or researching

1    anything, reading the newspaper about this or anything else,

2    just for the duration of the trial.

3         I think all of us had noted that there's some issues

4    about weather.  I've been trying to track it all day.  The

5    county court is remaining open tomorrow, best I can tell, I'm

6    going to track it this evening.  Ms. Perry will have the

7    ability to talk to you, able to communicate with you if our

8    plans would change.  But our present plan is to meet at 9

9    a.m. tomorrow morning unless you hear otherwise.  Everyone be

10   safe and I will see you tomorrow at 9.

11        (Jury leaves open court at 5:09 p.m.)

12        THE COURT:  I want to confirm, as a sequestered

13   witness, you are not to speak to anyone or anyone about this

14   trial.  You are free to go.  We will see you tomorrow in the

15   morning at 9 a.m.

16        Any matters to come before the Court from the

17   Government?

18        MS. LIMEHOUSE:  Nothing from the Government, Your

19   Honor.

20        THE COURT: From the defense?  Anything from the

21   defense?

22        MR. DANIEL:  No, Your Honor.

23        THE COURT:  Very good.  Everyone be safe.  See you

24   in the morning.  Be here shortly before 9.

25        (Whereupon, a recess transpired.)

506

1                        CERTIFICATE OF REPORTER

2

3          I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8          I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15                          Karen V. Andersen
                            Registered Merit Reporter
16                          Certified Realtime Reporter

17

18

19

20

21

22

23

24

25