```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                       CHARLESTON DIVISION

3

4    _____)
                                     )
5    UNITED STATES OF AMERICA,       )
                                     )
6            Plaintiff,              )  Docket No. 9:22-658
                                     )
7            vs.                     )  Charleston, SC
                                     )
8    RUSSELL LUCIUS LAFFITTE,        )  Volume III
                                     )
9            Defendant.              )
     _____)  DATE:  November 10, 2022
10

11              BEFORE THE HONORABLE RICHARD M. GERGEL
                UNITED STATES DISTRICT JUDGE, PRESIDING
12                        JURY TRIAL

13

14   A P P E A R A N C E S:

15   For the Plaintiffs:

16   EMILY EVANS LIMEHOUSE
     U.S. Attorney's Office
17   151 Meeting Street, Suite 200
     Charleston, SC 29401-2238
18   843-266-1663
     emily.limehouse@usdoj.gov
19
     WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
20   U.S. Attorney's Office
     1441 Main Street, Suite 500
21   Columbia, SC 29201
     803-929-3000
22   winston.holliday@usdoj.gov
     kathleen.stoughton@usdoj.gov
23

24   COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
                                  United States Court Reporter
25                                901 Richland Street
                                  Columbia, SC  29201
```

507

1    A P P E A R A N C E S:

2    For the Defendant:

3    EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
     Nelson Mullins Riley and Scarborough
4    151 Meeting Street
     Charleston, SC 29401
5    843-534-4123
     bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com
6
     CHRISTIAN JOSHUA MYERS
7    Nelson Mullins Riley and Scarborough
     101 Constitutional Avenue NW, Suite 900
8    Washington, DC 20001
     202-689-2001
9    josh.myers@nelsonmullins.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

508

```
1                              INDEX

2                           EXAMINATION

3    Witness Name                                    Page

4    JAN MALINOWSKI

5       BY MS. LIMEHOUSE...................................... 509

6       BY MR. DANIEL ........................................ 574

7       BY MS. LIMEHOUSE...................................... 646

8    RONNIE CROSBY

9       BY MS. LIMEHOUSE...................................... 661

10      BY MR. DANIEL ........................................ 724

11      BY MS. LIMEHOUSE...................................... 762

12
                              EXHIBITS
13
     Exhibit                                          Page
14
     Government's 8A-8D, 9A-9E                        534
15
     Defendant's Exh. 39D                             593
16
     Defendant's Exh. 40E                             594
17
     Defendant's Exh. 80                              620
18
     Government's Exh. 223                            656
19

20

21

22

23

24

25
```

1          THE COURT:  Okay.  Mr. Austin, please proceed.

2          MR. AUSTIN:  So it's come to, I guess, both parties'

3    attention there's a letter that Jim Griffin sent both to the

4    Government and the defense.

5          THE COURT:  I'm going to address it by an order.

6    You don't need to do anything further about it.

7          MR. AUSTIN:  Thank you.

8          THE COURT:  Please bring in the jury.

9          (Whereupon, the jury returns to open court at 9:18

10   a.m.)

11         THE COURT:  Please be seated.  Government call --

12   resume your examination.

13         MS. LIMEHOUSE:  The Government recalls Jan

14   Malinowski.

15         THE COURT DEPUTY:  You are still sworn.  Thank you.

16         THE COURT:  Good morning.  I want to remind the

17   witness he's still under oath.  Thank you very much.  Please

18   proceed, Ms. Limehouse.

19         MS. LIMEHOUSE:  Mr. Malinowski, will you pull that

20   microphone up close so everyone can hear you.

21         THE WITNESS:  Yes.

22         MS. LIMEHOUSE:  Thank you.

23   BY MS. LIMEHOUSE:

24     Q.   So when we left off yesterday, you had described a

25   lot of the bank's bylaws and policies, the loan process and

1    really set the stage for where we are going to head today.

2    Let's move to the summertime of 2021.  As the president, one

3    of the presidents of the bank and the branch manager of two

4    branches not in Hampton, what was your knowledge of Alex

5    Murdaugh's relationship with the bank?

6        A.    I knew he was a significant borrowing customer of

7    Palmetto State Bank and a partner at PMPED Law Firm, which

8    was a large depositor of Palmetto State Bank.

9        Q.    Okay.  Who was Alex's point of contact at the bank?

10       A.    Primarily, Russell Laffitte.

11       Q.    So what was your understanding of Russell Laffitte's

12   relationship with Alex at the bank?

13       A.    That it was a well-developed relationship.  He was

14   the primary contact whenever Alex had a banking need.  And

15   that's the way it was handled.  Seemed to work well.

16       Q.    So going into the summer of 2021, the jury has heard

17   a lot about where Alex was personally at the time.  What was

18   the climate like at the bank with respect to Alex?

19       A.    I think in 2021, as events unfolded, there was

20   elevated concern about Alex and his relationship and the

21   impact it would have on his relationship with the bank.

22       Q.    I'm going to take you to the July 13th Executive

23   Committee meeting.  The jury has heard about a $350,000

24   transfer that took place on July 15th.  I'm going to pull up

25   Government's Exhibit 70, really just to refresh your

 1    recollection, if necessary.  But what discussions, if any,

 2    were there between during this July 2013 Executive Committee

 3    meeting about a beach house loan for Alex Murdaugh?

 4         A.   On this page, none.

 5         Q.   Do you recall any discussions during the July 13th

 6    Executive Committee meeting about a loan to Alex Murdaugh?

 7         A.   No, I don't.

 8         Q.   I'm now going to take you to the July 20th, 2021,

 9    Board meeting, Government's Exhibit 1.  This is five days

10    after that $350,000 wire transfer.  Were there any

11    discussions about a loan to Alex Murdaugh for beach house

12    renovations during this Board meeting?

13         A.   No.

14         Q.   Okay.  So moving on from the July 20th Board

15    meeting, what happens after that with respect to Alex?  Did

16    you have meetings with anybody on the board to discuss

17    concerns about Alex?

18         A.   Yes, I had -- Norris Laffitte had asked me about the

19    bank's relationship with Alex and I explained to him that

20    what I knew of the entire relationship.

21         Q.   Do you recall when that conversation took place with

22    Norris Laffitte?

23         A.   August 9th.

24         Q.   On August the 9th of 2021, what did you know about

25    Alex's overdraft status?

1       A.    I looked on our banking system, our computer system,

2    on the 9th and saw that he was overdrawn.

3       Q.    So Norris comes to you expressing concerns and what

4    do you do at that time?

5       A.    I went on -- well, I went on the computer that -- he

6    had asked for a summary.  I went on my computer, pulled up

7    Alex's port, which is kind of a generic -- captures deposits

8    and loans.  And I explained to Norris what loans were

9    outstanding and what the status of an overdraft on the

10   account was.

11      Q.    As a branch manager and president, would you have

12   been receiving this information about Alex's overdraft?

13      A.    Not at my two offices, no.

14      Q.    So you have access to this information, but you

15   wouldn't have regularly received it?

16      A.    Not a report, no.

17      Q.    Who would have been receiving reports of Alex's

18   overdraft?

19      A.    Typically, officers in the Hampton office.

20      Q.    And how would they be getting that information?

21      A.    They would be getting it daily.  It's produced

22   daily.  And there's a lady in the branch who gives it to the

23   responsible officers or executive managers to look at.

24      Q.    What is this report called?

25      A.    A deficit balance report or NFS report, two of them

1    basically.

2        Q.    NFS means?

3        A.    Nonsufficient funds.

4        Q.    Okay.  And so there's an employee at the bank who is

5    responsible for reporting this information daily to officers

6    of the bank?

7        A.    Yes.

8        Q.    What is required for that employee to then approve

9    payment out of that account?

10       A.    She would go to the responsible officer and ask for

11   approval whether to pay it or not pay it.

12       Q.    So who would that person be in the Hampton branch?

13       A.     If it were Alex Murdaugh, it would most likely have

14   been Russell Laffitte.

15       Q.     I'm going to pull up Government's 192 and take you

16   to the overdraft status on August the 9th that you reviewed.

17   Okay.  So the morning of August 9th, Norris came and met with

18   you.  What did you see on the internal records about Alex's

19   overdraft?

20       A.    He was overdrawn in an account $367,784.67.

21       Q.    Would the Board have had this information at the

22   time?

23       A.    No.

24       Q.    So in the summer of 2021, was overdraft information

25   given to the Board during their regularly scheduled meetings?

1       A.    No.

2       Q.    Okay.  So what did you do with this information?

3       A.    I communicated it to Norris along with the balances

4   of the loans.

5       Q.    Okay.  So the jury has now seen an e-mail from

6   Norris Laffitte on August the 9th.  I'm going to have

7   Government's Exhibit 2 pulled up, please.  So Norris sends an

8   e-mail to the Executive Committee copying the Board members

9   and says, "Executive Committee, since the June events, would

10  the committee prepare for the Board what is PSB's total

11  exposure with regard to Alex Murdaugh directly, indirectly,

12  through different family relationships and/or LLCs with his

13  borrowing practices and repayment plans if he is not

14  working."

15          So did Norris send this e-mail after y'all's

16  meeting?

17      A.    He did.

18      Q.    I'm now going to take you to August the 12th, 2021,

19  which was the Executive Committee meeting that took place

20  after August 9th.  What happens during this Executive

21  Committee meeting?

22      A.    We have a discussion of multiple topics, including

23  Alex Murdaugh.

24      Q.    Okay.  So does someone prepare a report of the

25  status of the bank's exposure with respect to Alex --

1  A. Yes.

2  Q. -- and present it during that meeting?

3  A. There was.

4  Q. Okay.  I'm going to pull up Government's 72.  So is

5 this a copy of the information that was prepared and

6 presented to the Executive Committee on August the 12th?

7  A. The typewritten is.  The handwritten was not part of

8 it, but the typewritten is.

9  Q. Okay.  Was Russell Laffitte in attendance during

10 that Executive Committee meeting?

11  A. No.

12  Q. So who was presenting this information?

13  A. Gray Henderson.

14  Q. Okay.  Let's review what information was presented

15 and, again, Gray Henderson is Russell's sister; is that

16 right?

17  A. Correct.

18  Q. "Mr. Murdaugh is continuing to work as a partner as

19 PMPED.  He currently has total principal balance through

20 family, et cetera, of $4,219,623."

21   We then see that she outlines the outstanding loans,

22 including loan No. 6996048, the last loan listed.  And it

23 says, "$750,000, new loan to finish up remodel of house in

24 Edisto and expenses, one share of Green Swamp, Inc."

25   And it goes on to provide a narrative about Mr.

1    Murdaugh.  It says, "Mr. Murdaugh's wife and son were killed

2    a while back.  No one has been charged at this time.  I have

3    spoken with Mr. Murdaugh several times about what is going

4    on.  He is listing his farm for sale with Jared Romero.  He

5    hopes to get 3.5 to 4 million for the 1750 acres.  He is also

6    planning to sell his wife's Mercedes as soon as possible.  If

7    he can get his land sold in the next 6 to 12 months, this

8    will put him in a much better financial position.  He also

9    had some interest in the property in Berkeley County that

10   would get us paid off in full.  He hopes that will be sold

11   within six months.  Randolph also has a loan for $599,400

12   that Alex co-signed.  Mr. Randolph passed away and we will

13   file on his estate when it is opened.  His estate should be

14   able to easily handle this debt.  We just made him a $750,000

15   loan on his share of Green Swamp Inc.  This is worth around

16   $230,000.  We will also be taking a second on his home in

17   Edisto, which appraised at $730,000.  We are currently

18   waiting for Kevin Brown to get the second closed.  We went

19   ahead and closed the loan with just the stock until we get

20   the mortgage."

21          So I understand that Gray Henderson is presenting

22   this information to the Executive Committee.  What was your

23   understanding of who had prepared this summary?

24   A.    It was my impression that she had prepared the

25   summary.

1    Q.   Okay.  So when it says, "I have spoken with Mr.

2    Murdaugh several times about what is going on," you

3    understood that to be that Gray had spoken to Mr. Murdaugh?

4    A.   That's my understanding, yes.

5    Q.   Okay.  So let's talk specifically about that

6    $750,000 loan.  What conversations were there during the

7    Executive Committee meeting about this loan?

8    A.   At the Executive Committee meeting, you know, it was

9    part of the overall summary.  There really wasn't any

10   specific conversation about the details of it and when it was

11   advanced and anything else.

12   Q.   So no dates were provided for any of these loans; is

13   that right?

14   A.   Correct.

15   Q.   And so it was really just an overall presentation --

16   A.   Yes.

17   Q.   -- of all of the loans he had outstanding with the

18   bank?

19   A.   That's correct.

20   Q.   Did you understand it to be a loan for purposes of

21   beach house renovations?

22   A.   That was my understanding, yes.

23   Q.   Was there any mention of a $350,000 wire transfer

24   that occurred on July the 15th?

25   A.   There was not.

1     Q.    Was there any mention of Mr. Murdaugh's overdraft?

2     A.    There was not.

3     Q.    Was there any mention of a $400,000 transfer that

4     took place on August the 9th?

5     A.    There was not.

6     Q.    So after the meeting, would there have been minutes

7     prepared?

8     A.    Yes.

9     Q.    Okay.  Let's pull up Exhibit 4.  These are the

10    August 12th, 2021, meeting minutes.  So who would have

11    written these meeting minutes?

12    A.    I would have.

13    Q.    Okay.  As the secretary of the Executive Committee?

14    A.    As the secretary of the Executive Committee.

15    Q.    Okay.  Please read for the jury what the meeting

16    minutes reflect about the summary.

17    A.    Richard Alexander -- Alex Murdaugh, "Gray Henderson

18    distributed a memo to the members outlining the bank's

19    current relationship.  Indebted totals $4.2 million

20    consisting of various unsecured and secured notes, a

21    co-borrowing and guaranteed loans.  In early June, Mr.

22    Murdaugh lost his wife and son to a double homicide committed

23    on the family's property near islands in South Carolina.

24    Local and state law enforcement continue to investigate.  Mr.

25    Murdaugh, a long-time customer of the bank, is a partner in

1    the law firm of Peters Murdaugh Parker Eltzroth & Detrick.

2    The members discussed the various notes, status of loan,

3    collateral, and actions to be taken regarding maturing

4    obligations."

5        Q.   Okay.  So you got this information from Gray's

6    presentation?

7        A.   Yes, ma'am.

8        Q.   And that would include the $4.2 million total?

9        A.   Yes, ma'am.

10        Q.   So the jury saw the written report, Exhibit 72, that

11    had a loan number referencing the $750,000 loan.  When you

12    saw this loan number following the Executive Committee

13    meeting, what did you do?

14        A.   I looked it up.

15        Q.   And when you say "looked it up," what would that

16    entail?

17        A.   Went on the computer -- my computer to look up that

18    loan.

19        Q.   Okay.  So you looked up the number itself?

20        A.   Yes.

21        Q.   And what did you see?

22        A.   I did not see a loan number on the port, as we call

23    it, listing all the various obligations of Alex Murdaugh.

24        Q.   So were you able to find any information on the

25    internal systems with respect to this loan?

1      A.    Not on the bank's loan system, no.

2      Q.    Okay.  When are loans typically inputted into this

3  system?

4      A.    We typically try to input them after they are signed

5  and money is advanced.

6      Q.    Okay.  So following the Executive Committee meeting,

7  would those minutes that you prepared be incorporated into

8  the Board's package in anticipation of the Board meeting?

9      A.    It would.

10     Q.    Okay.  Was there also a summary that was created for

11 the Board following the presentation from Gray Henderson?

12     A.    Yes, there was another memo in the Board package

13 summarizing the relationship.

14          MS. LIMEHOUSE:  Let's move to August 17th, the day

15 of the regularly scheduled Board meeting, and pull up

16 Government's 3.  If you will do the total, too, Ms. Rozsa, at

17 the bottom.  Thank you.

18 BY MS. LIMEHOUSE:

19     Q.    So is this copy of the initial report that was

20 provided to the Board for that meeting?

21     A.    Yes, it is.

22     Q.    Was Russell Laffitte in attendance at the August

23 17th Board meeting?

24     A.    I do not believe he was.

25          MS. LIMEHOUSE:  Let's pull up the Exhibit 6, August

1    17th, Board meeting minutes real quick, if you will.  And if

2    you just pull up the top.

3    BY MS. LIMEHOUSE:

4        Q.    Okay.  And this reflects the attendance, do you see?

5        A.    Yes.  Corrected, he was there.

6        Q.    Okay.  So Russell was in attendance at the August

7    17th Board meeting

8            MS. LIMEHOUSE:  If you will go back to Exhibit 3,

9    please.

10   BY MS. LIMEHOUSE:

11       Q.    Okay.  So is this the overall presentation that is

12   given to the Board with respect to the bank's exposure with

13   Alex Murdaugh?

14       A.    In the Board package, yes.

15       Q.    In the package.  Okay.  And so who is conveying this

16   information during the Board meeting?

17       A.    Russell Laffitte.

18       Q.    Okay.  What information was conveyed to the Board

19   about the bank's total exposure with respect to Alex?

20       A.    Well, you have two conflicting pieces of

21   information.  You have the Executive Committee minutes that

22   say $4.2 million and this other summary of $2.7 million

23   dollars?

24       Q.    So there was inconsistencies with respect to the

25   total exposure?

1     A.   Yes, ma'am.

2     Q.   All right.  So who noted that inconsistency?

3     A.   I believe, Norris Laffitte.

4     Q.   Okay.  And who was responsible for that

5  inconsistency?  Was there an explanation for it?

6     A.   Yes, there was an explanation.

7     Q.   Okay.  And what was that explanation?

8     A.   That two loans were excluded because they had been

9  charged off.

10    Q.   Okay.  And we've talked a little bit about

11 charged-off loans, generally.  And we will get to those

12 specifically here.  So was there eventually an updated report

13 that outlines the total exposure?

14    A.   Yes.

15    Q.   Okay.

16         MS. LIMEHOUSE:  I'm going to pull up Government's 5

17 -- well, first, I'm sorry, Tracy, real quick before we do

18 that, go back to 3, please, and blow it up.

19 BY MS. LIMEHOUSE:

20    Q.   Okay.  Let's go to the $750,000 loan at the bottom,

21 loan No. 6996048.  It indicates that the principal is

22 $750,000 and that the collateral is one share of Green Swamp

23 stock valued at $243 and a second on the Edisto Beach house.

24 So during the meeting, what's conveyed about this $750,000

25 loan?

1    A.    From the collateral perspective, it's secured by one

2    share of Green Swamp Hunt Club stock and then a second

3    mortgage on the Edisto Beach house.

4    Q.    Did you know anything about the Green Swamp stock at

5    this point?

6    A.    I had heard of it before as collateral on other

7    loans.

8    Q.    Okay.  What did Russell tell the Board with respect

9    to the collateral?

10   A.    That the loan was made, secured just by Green Swamp

11   and they were waiting for the second mortgage to be filed

12   against the house.

13   Q.    So there was a general discussion of the total

14   exposure and the collateral was represented during the

15   meeting as one share of Green Swamp and getting a second on

16   the Edisto Beach house?

17   A.    Correct.

18   Q.    Did Russell tell the Board about a $350,000 wire

19   transfer on July the 15th?

20   A.    He did not.

21   Q.    Did Russell tell the Board about Mr. Murdaugh's

22   substantial overdraft?

23   A.    He did not.

24   Q.    Did Russell tell the Board about the $400,000

25   transfer that took place on August the 9th?

1    A.    He did not.

2    Q.    Were there any dates with respect to these loans?

3  So did you know when this loan had been extended?

4    A.    There were no dates on the reports.

5    Q.    And of course, at this point you've already looked

6  to see if there's any loan paperwork and you know there is no

7  loan paperwork with respect to --

8    A.    No on the report, no, ma'am.

9    Q.    So you talked about an updated report that was

10 provided to the Board following this inconsistency.

11         MS. LIMEHOUSE:  If you could please pull up Exhibit

12 5.

13 BY MS. LIMEHOUSE:

14    Q.    So is this the updated report that was provided to

15 the Board?

16    A.    Yes, it is.

17    Q.    Okay.  I will go to the 750 at the bottom, principal

18 750, "Collateral, one share Green Swamp Inc. valued at

19 $243,000, we will be getting a second mortgage on the house

20 when his wife's estate is open, the lawyer has already done

21 the title work to prepare for this.  Total 3.5, $3,544,894

22 total exposure."  I want to just briefly highlight, if you

23 will, the other loans that the bank had outstanding for Alex.

24    A.    I'm sorry?

25    Q.    The first loan, if you can just talk about, very

1   briefly, the principal and the collateral securing that loan?

2       A.   The loan number ending in 8806 had a principal

3   balance of $806,666 secured by a mortgage on 914 acres of

4   real estate, plus improvements appraised at $2,090,000.

5       Q.   Is that what we have heard to be called "Moselle"?

6       A.   Yes.

7       Q.   Okay.  How about the next one?

8       A.   Principal of $193,961, the collateral being first

9   mortgage on Edisto Beach house, appraised at $730,000.

10      Q.   So is this the same Edisto Beach house that they say

11  they are going to try to get a second mortgage on?

12      A.   It is.

13      Q.   So the value of the beach house is 730, is that less

14  than the full second $750,000 loan?

15      A.   It is.

16      Q.   So the value of the house itself wouldn't even fully

17  secure this loan --

18      A.   As indicated there, it would not.

19      Q.   Okay.  How about the third loan?

20      A.   Principal of $999,650, secured by 866 acres of farm

21  and a second on 914 acres of real estate.

22      Q.   Okay.  So is that the acreage that -- that 914

23  matches that first loan, are those two tracks of property

24  what we call "Moselle"?

25      A.   They are.

1          Q.   Okay.  How about the fourth loan?

2          A.   Fourth loan ending in 0489, principal balance is

3     $104,119, and the collateral are islands in Beaufort County

4     appraised at $227,000.

5          Q.   The next loan, please.

6          A.   The next one ending in 5486, principal balance of

7     $91,368, the collateral being a 2021 Mercedes.

8          Q.   Okay.  And then the last one before the 750, please.

9          A.   The last one ending in 1524, is a loan jointly

10    signed Randolph Murdaugh III and Alex Murdaugh, principal

11    balance of $599,400, and it was unsecured.

12         Q.   Okay.  So this is a loan to Randolph Murdaugh, who

13    is Alex father?

14         A.   That's correct.

15         Q.   And they co-signed it together?

16         A.   They did.

17         Q.   And was it just an unsecured line of credit?

18         A.   Yes.

19         Q.   Okay.  So during the August 17th Board meeting, did

20    you understand the loan to be for purposes of beach house

21    renovation?

22         A.   Yes, I did.

23         Q.   All right.

24         Q.   Let's go to what happens after the August 17th Board

25    meeting and pull up some of the e-mails that were exchanged

1    amongst Board members.  Exhibit 7A.  Okay.  Russell sends an

2    e-mail, they will be able to see everyone on the chain, but

3    it's to the Board.  And specifically the second paragraph,

4    "Everyone, Alex Murdaugh loans that are completely charged

5    off did not have a payment made on them in 2020.  He

6    typically would have made them in January of 2021, in the

7    amounts of $52,046.75 and $55,684.62.  I will contact him

8    about trying to get those payments or will try to collect

9    them in January when they get their bonus."

10           So why was Russell updating the Board about these

11   charged-off loans?

12       A.   Because there had been specific questions about

13   those two loans, which were part of the original $4.2 million

14   memo.

15       Q.   If we can go back.  I'm sorry, Mr. Malinowski, I

16   skipped over it.  Exhibit 6, please.  The second page.  Yes,

17   thank you.

18           Okay.  So these are the Board meeting minutes from

19   August the 17th and you said that Gray Henderson is the

20   secretary, so she would have prepared these meeting minutes?

21       A.   Yes.

22       Q.   Okay.  And she represents that during the August

23   17th Board meeting, Chairman Laffitte, so that would be

24   Charlie Laffitte, Russell's father?

25       A.   Yes.

1      Q.    Reviewed the loans to Richard Alex Murdaugh,

2    "Russell Laffitte stated that his intention is to sell the

3    farm, we have mortgages on the properties that supersede the

4    property being transferred into Maggie's name.  Norris

5    Laffitte found be a mathematical error which will be

6    corrected to $3,544,897 total loans.  Norris Laffitte

7    questioned why we have charged-off loans, but continue to

8    loan him money.  Chairman Laffitte and Russell Laffitte

9    explained that the charged-off loans were charged off around

10   five years ago and those were the ones with Barrett Boulware

11   estate.  These charged-off loans haven't been foreclosed on

12   yet.  Payments are not current, but Alex had been paying all

13   payments that were made.  Russell L. Laffitte will update the

14   Board regarding status of the loans.  Elizabeth Malinowski

15   commented, 'The $750,000 loan did not appear to have been

16   approved by the Executive Committee.'  Russell Laffitte

17   explained that three of the five members approved the loan."

18         So what discussions were there about the failure to

19   bring the $750,000 loan to the full Executive Committee?

20   A.    The discussion surrounded the fact that there was a

21   large relationship and the loan had been made without going

22   through an Executive Committee meeting.

23   Q.    And what was Russell's response?

24   A.    Russell explained that three of the five Executive

25   Committee members had approved the loan.

1    Q.   You talked yesterday about what the bylaws require

2 with respect to Executive Committee meetings and approving

3 loans, what do the bylaws require?

4    A.   The bylaws required, A, a meeting take place at

5 which time, you know, a loan or a relationship of this size

6 would be discussed and/or approved or declined.  Absent a

7 meeting, a quorum of voting members could meet, could make a

8 decision, but then it needed to have unanimous decision of

9 all the voting members minuted and reported to the Board.

10    Q.   Is there any record of a meeting that took place

11 during that which the $750,000 loan was presented?

12    A.   There is not.

13    Q.   Did you ever give your written consent for the

14 Executive Committee to take action outside of a meeting?

15    A.   I did not.

16    Q.   Did you ever see any record of an action taken by

17 the Executive Committee outside of a meeting and document it

18 for the Board?

19    A.   I did not.

20    Q.   I'm going to go back up to Norris Laffitte's

21 questioning about why the charged-off loans -- why the bank

22 had charged-off loans but continued to loan him money.  And

23 then Russell explained that they were charged off five years

24 ago and that he would update the Board regarding the status

25 of the loan.  So let's go back to Exhibit 7A.  Okay.  So

1     Russell says what I've already read.  Is this him updating

2     the Board about the status of those charged-off loans?

3          A.   Briefly, yes.

4          Q.   What was your understanding of those charged-off

5     loans at the time?

6          A.   That they had been charged off a number of years ago

7     and that Alex was making payments on them periodically.

8          Q.   But the e-mail reflected that he hadn't paid -- it

9     was August 18th of 2021, and he had not paid on those loans

10    during the entire year of 2020 until August 18th of 2021?

11         A.   That's correct.

12         Q.   Okay.

13              MS. LIMEHOUSE:  If you will up Exhibit 7B, please.

14    BY MS. LIMEHOUSE:

15         Q.   So Norris responds to Russell and says, "Did you get

16    his current financials as discussed?"  Why was there a

17    request for his current financials?

18         A.    To determine if he had the ability to repay, to

19    bring his credit files current.

20         Q.   So did the bank have Alex Murdaugh's current

21    financials in the summer of 2021?

22         A.   No.

23         Q.   And you talked about the typical process.  Is that

24    information that typically would have been obtained before

25    extending someone a loan?

1     A.   Typically, it would have, yes.

2          MS. LIMEHOUSE:  Exhibit 7C, please.

3     BY MS. LIMEHOUSE:

4     Q.   Russell then responds to Norris, "The financials

5     have been requested from his accountant.  I do not have them

6     yet."

7          MS. LIMEHOUSE:  Let's go to 7D, please.

8     BY MS. LIMEHOUSE:

9     Q.   So here we are on Thursday, September 2nd.  So this

10    is two weeks after the August 17th Board meeting.  Norris

11    e-mails Russell and copies the rest of the Board and says,

12    "Russell and Gray," why was he addressing both Russell and

13    Gray?

14    A.   Because they were two of the members that had voted

15    to make this loan.

16    Q.   "In reviewing the PSB onboard August 2021 Board

17    meeting, Executive Committee minutes, I see a page quote Alex

18    Murdaugh corrected, reflecting the actual total.  Thank you.

19    But I now notice the $750,000 loan No. 6996048 has only the

20    Green Swamp share as collateral, which does not cover the

21    loan especially if the share has been pledged elsewhere.  Has

22    it been pledged elsewhere?  What happened with the collateral

23    of a second mortgage on the Edisto house that was shown

24    against this loan to the Board at the August meeting?  Is

25    this loan secure or is it now like the unsecured $599,400

1     loan No. 6991524 on the same page?"

2           So here two weeks after the Board meeting, is Norris

3     still asking questions about the status of this $750,000

4     loan?

5       A.   He is.

6       Q.   Are there still questions about the collateral

7     that's securing this $750,000 loan?

8       A.    There are.

9            MS. LIMEHOUSE:  If we could go to Exhibit 70,

10    please.

11    BY MS. LIMEHOUSE:

12      Q.   Russell then responds to Norris the same day, "We

13    took the second mortgage off since it is not in place yet.

14    We cannot get the second mortgage until the estate on

15    Margaret Murdaugh is opened.  They are working on that now.

16    The attorney is ready to close as soon as it does.  The stock

17    has not been pledged elsewhere."  What stock is he referring

18    to?

19      A.   The one share of Green Swamp Club.

20      Q.   So he's representing to the Board that the Green

21    Swamp had not been secured on any other loans with the bank?

22      A.    That's correct.

23            MS. LIMEHOUSE:  If you could please pull up Exhibit

24    7G, please.

25    BY MS. LIMEHOUSE:

 1      Q.    We have now consulted an attorney -- excuse me.

 2   Russell e-mails again and says, "We have not consulted an

 3   attorney about the estate's opening.  I have spoken with

 4   Randy IV about them.  They have one year to open the estate."

 5          So are you familiar with the two charged-off loans

 6   that were then updated on the full bank report to reflect the

 7   charged-off loans?

 8      A.    I'm familiar with them.

 9      Q.    Okay.  And are those loans Red Beard and Zero

10   United?

11      A.    They are.

12      Q.    Okay.  I'm going to show you what has not been

13   admitted, Government's 8A through 8D and 9A through 9D.  This

14   is 8A through 8D.  Do you recognize those documents?

15      A.    Yes.  They are the promissory note one in the name

16   of Red Beard, LLC dated December 30th, 2011.

17      Q.    Are those bank loan documents?

18      A.    They are.

19      Q.    I'm going to show you Exhibit 9A through 9D.  We

20   will go through them individually.  First I want to get them

21   admitted.

22      A.    The second is promissory note in the name of Zero

23   United Drive, LLC dated November 30th, 2010.

24      Q.    And are these documents that are maintained in the

25   regular course of Palmetto State Bank's business?

1          A.    They are.

2               MS. LIMEHOUSE:  Government moves to admit 8A through

3     8D and 9A through 9D.

4               THE COURT:  May I see them, please?

5               MS. LIMEHOUSE:  Yes, Your Honor.

6               THE COURT:  This is 9.  How about 8?  This is 8,

7     here?

8               MS. LIMEHOUSE:  Yes.

9               THE COURT:  Is there an objection from the defense?

10              MR. AUSTIN:  I can't pull it up right now.

11              THE COURT:  Let me hand them to you.

12              MR. DANIEL:  It's without objection, Your Honor.

13              THE COURT:  Exhibits 8A through 8D and 9A through 9D

14     are admitted without objection.

15              MS. LIMEHOUSE:  It's 9A through 9E, Your Honor.

16              THE COURT:  Thank you, 9A through 9E.

17              (Exhibits 8A, 8B, 8C, 8D, 9A through 9E, were

18     received in evidence.)

19     BY MS. LIMEHOUSE:

20         Q.    If you can just -- so what does this promissory note

21     reflect, Mr. Malinowski?

22         A.    It reflects a note amount of $756,076.60.

23         Q.    And what's the note date?

24         A.    The date of the note -- the curser is in the way --

25     December 30th, 2011.

1      Q.   I'm going to take you to 8D.  What is this document?

2      A.   It's a request for verification of stock securities.

3      Q.   And what does it indicate about the stock securing

4  that loan?

5      A.   It identifies the -- has a description of the stock,

6  Green Swamp Club, Inc., one share.

7      Q.   Then I'm going to show you -- just point you to the

8  signature of the loan officer, who is the loan officer on

9  this loan?

10     A.   Russell L. Laffitte.

11     Q.   Okay.

12          MS. LIMEHOUSE:  If I can go to 9A, please.

13  BY MS. LIMEHOUSE:

14     Q.   What does this promissory note indicate?

15     A.   This is a promissory note in the name of Zero United

16  Drive, LLC.  The loan amount is pretty blurry on the screen.

17     Q.   A date range maybe?

18     A.   Yes, 11/30/2010.

19     Q.   Okay.  If I can take you to 9C, please.

20          And what does it say about the security -- I will

21  read it -- the security of this loan, "The loan is secured by

22  previously executed separate security instruments including

23  the following, real estate mortgage on 7929 acres more or

24  less located in Berkeley County."  And go down a little

25  farther, to line 3.  "Cross-collateralized with Green Swamp

1    stock share."

2         So it indicates that both the Red Beard and the Zero

3    United loans are secured by that same one share of Green

4    Swamp stock?

5         A.    That is correct.

6         Q.    You testified yesterday about what a charged-off

7    loan is.  What were the bank's rights with respect to the

8    Green Swamp share on these charged-off loans?

9         A.    They still had a security interest in the share, and

10   if had chosen to do so, could have sold the share to collect

11   a portion of the loan.

12        Q.    But they had not been charged off yet?  I mean,

13   excuse me, they had not been foreclosed on that one stock?

14        A.    Yes.

15             MS. LIMEHOUSE:  If you will pull up 9D, please.

16   BY MS. LIMEHOUSE:

17        Q.    And who does it indicate the loan officer is for the

18   Zero United loan?

19        A.    Russell L. Laffitte.

20        Q.    So Russell's statement to the Board that the stock

21   was not pledged elsewhere; was that accurate?

22        A.    It was not accurate.

23        Q.    So leaving that September 2nd e-mail chain with

24   respect to questions of the collateral, I'm going to take you

25   to Exhibit 11A.  So this is an e-mail the jury has already

1    seen from Monday, September 6th.  And it's notifying everyone

2    on the board from Russell Laffitte, "I wanted all of you to

3    see this.  I will hopefully have more information for you at

4    the next Board meeting."

5            So is this when you learned that Alex Murdaugh had

6    resigned from the law firm?

7    A.    Yes.

8    Q.    And what does Palmetto State Bank learn after you

9    learn of his resignation?

10   A.    After we learn of his resignation, we learned that

11   his law firm is investigating and looking into his various

12   activities within the firm.

13   Q.    Okay.  So did you learn about this Satterfield

14   matter?

15   A.    Yes.

16   Q.    Okay.  Why was the bank involved in that matter?

17   A.    One of our other bank officers had been -- had an

18   appointment as a personal representative in that action.

19   Q.    Who was that bank officer?

20   A.    Chad Westendorf.

21   Q.    So, the jury heard a lot already about funds from

22   Hakeem Pinkney, Natasha Thomas, and Arthur Badger moving

23   through Palmetto State Bank.  Had any of the funds related to

24   the Satterfield matter gone through Palmetto State Bank?

25   A.    No.

1      Q.    So what did the bank do to assess its liability?

2      A.    It hired attorneys.

3      Q.    So about when were these attorneys retained?

4      A.    September -- late September.

5      Q.    Okay.  So I'm going to take you now to October 28th

6  of 2021.  Exhibit 74.  This is an e-mail --

7            MS. LIMEHOUSE:  If you will do the top two, so we

8  can see them on the screen.

9  BY MS. LIMEHOUSE:

10     Q.    An e-mail from Russell to you, Charlie Laffitte,

11 Gray Henderson and Scott Swain, so these are the members of

12 the Executive Committee; is that right?

13     A.    That's correct.

14     Q.    "Everyone, I just wrote up $680,000 to losses other

15 than loans from a 2013 case with Alex Murdaugh.  We converted

16 1.1 million plus in checks made to Palmetto State Bank on a

17 settlement that Alex stole.  The law firm and I agreed to

18 split the loss and make the client whole."

19           What was your reaction when you received this

20 e-mail?

21     A.    I was shocked and amazed.

22     Q.    Why?

23     A.    Because this is the first I had ever heard of

24 anything like this.

25     Q.    Does this 680 relate to Satterfield at all?

1    A.    It did not.

2    Q.    So did you know anything about what this 680 related

3    to?

4    A.    I did not, at the time.

5    Q.    Does he mention anything about the specifics of the

6    case or his involvement?

7    A.    He did not.

8    Q.    I'm going to now pull up Exhibit 75A.  This is an

9    e-mail response from Scott Swain to Russell and the rest of

10   the Executive Committee.  "This sets an awful precedent.  Do

11   we know of any on the similar situations?  Have we contacted

12   our bonding company.  Most bonds require us to disclose any

13   losses incurred over a set amount even if we don't make a

14   claim, so we may want to check our policy.  I assume that

15   this will be run through our income statement in the month of

16   October."

17         So explain for the jury, we've heard that Scott

18   Swain is the chief financial officer, explain what he is

19   discussing with respect to bonds.

20   A.    A bank in South Carolina needs to have what is

21   called a fidelity bond.  And it's a large insurance policy

22   covering many activities, insuring us against many

23   activities.  And in this situation, a loss as large as this

24   would require us to notify the bonding company of this

25   unusual situation.

1      Q.   Okay.  And so why would that be?  What would be the

2   potential effect?

3      A.   The potential effect is we would file a claim with

4   the bonding company and ask for a reimbursement for the loss.

5      Q.   Scott also talks about the income statement.  Why

6   would it need to be reflected on the income statement?

7      A.   To be properly accounted for.

8      Q.   Okay.  And the income statement is something you

9   testified yesterday would be provided to the FDIC?

10      A.   It would, yes.

11      Q.   Okay.  So this is a loss that would have to be

12   reflected to report to the FDIC?

13      A.   Yes.

14      Q.   Okay.

15           MS. LIMEHOUSE:  So please pull up Exhibit 75B.

16   BY MS. LIMEHOUSE:

17      Q.   Russell then responds to Scott, "Why would it set an

18   awful precedent?  It saves us from another lawsuit and we

19   could have been on the hook for $1,172,945.76.  We were wrong

20   and made it right."

21           So when Russell is saying, "We were wrong and made

22   it right," what was your understanding of those statements?

23      A.   I didn't know who "we" was.  And I didn't know how

24   the decision had been made.

25      Q.   So did he tell you anything about who was involved

1     in a decision to pay the law firm $680,000?

2          A.    At that point, no.

3          Q.    When he's saying "we", who do you think that he's

4     talking about?

5          A.    He's talking about the bank, but which individual

6     had been -- had participated in the conversion and which

7     individual had decided to make the decision to pay the money.

8          Q.    So you still had a lot of questions?

9          A.    I did.

10         Q.    Did you understand that the payment had already been

11    made?

12         A.    I understood it to be a done-deal.

13               MS. LIMEHOUSE:    Exhibit 74A, please.

14    BY MS. LIMEHOUSE:

15         Q.    Then how do you respond to Russell?

16         A.    How many similar transactions are out there per

17    PMPED?

18         Q.    So why did you ask him this question?

19         A.    Satterfield had emerged through PMPED and now this

20    situation, conversion of checks also through PMPED and Alex

21    Murdaugh.  My instincts, is there anything else we need to be

22    aware of.

23         Q.    Okay.  So end of October, you are concerned this

24    might not be all?

25         A.    Correct.

1       Q.   But do you know anything about the details of what

2   led to the 680 payment at this point?

3       A.   At this point, no.

4       Q.   So as CEO, did Russell have authority to pay the law

5   firm the money on his own?

6       A.   He did not.

7       Q.   Why not?

8       A.   Because it would require a conversation with the

9   Executive Committee due to the fact that it was an unusual

10  occurrence.  And it would also, in my opinion, need to be

11  reported to the Board again, because of its unusual nature.

12      Q.   And by this point --

13           MR. DANIEL:  Can we move to strike him stating his

14  opinion?  He said in his opinion it needed to be reported to

15  the Board.

16           THE COURT:  Well, what's the Government's response?

17           MS. LIMEHOUSE:  He's a member of the Executive

18  Committee and he knows exactly --

19           THE COURT:  It's a proper lay opinion.  Overruled.

20  BY MS. LIMEHOUSE:

21      Q.   So in your opinion, he did not have authority to pay

22  this $680,000 on his own?

23      A.   That's correct.

24      Q.   October 29th, the day after the Executive Committee

25  received the e-mail notification.  I'm going to pull up

1    Exhibit 12 A.  So Russell e-mails the Board.  You get this

2    e-mail as well; is that right?

3        A.    That's correct.

4        Q.    And he says, "Everyone, I just wanted to give

5    everyone a heads-up on a charge that you will hear about in

6    detail during our next Board meeting.  We took a $680,000

7    loss to fix an issue between us and the PMPED law firm.  We

8    converted $1,172,945.76 in checks made payable to PSB to

9    numerous other places as part of another stolen case

10   settlement.  This all involved a case with Alex Murdaugh.  I

11   negotiated with the law firm to pay part and they pay the

12   balance to make their client whole.  We are moving $680,000

13   out of loan loss reserve to offset this loss since we have

14   ample reserves at this time.  I look forward to discussing

15   further at the Board meeting."

16            What is this loan loss reserve account?

17       A.    Loan loss reserve account is an account that's

18   established to make charges against this account when a loan

19   is deemed uncollectable.  It's an accounting contra asset,

20   that when a loan is on the books, it's deemed uncollectable,

21   we would charge that balance off against the loan loss

22   reserve to record the loss.

23       Q.    Was this $680,000 a loan?

24       A.    It was not.

25       Q.    I'm going to point you to his statement.  "I

1   negotiated with the law firm."  Does Russell say anything

2   about anyone else's involvement in this $680,000 payment?

3        A.    He does not.

4        Q.    And, again, in this notification to the Board, does

5   he give you any details about the underlying payment?

6        A.    He does not.

7        Q.    And October 29th, what's your understanding of when

8   that payment took place?

9        A.    The day before, the 28th.

10            MS. LIMEHOUSE:   Going to pull up Exhibit 12B.

11  BY MS. LIMEHOUSE:

12       Q.    All right.  So you can see the bottom, your wife's

13  name Liz, she's the one sending this e-mail and she says, "I

14  assume one of our attorneys was consulted before the decision

15  was made.  Will you please share the communication with the

16  Board?  I would like to see the Board meet prior to the

17  regularly scheduled November meeting for a full update and

18  discussion.  Perhaps if we schedule something for late

19  afternoon, one day next week, most people can attend or join

20  by Zoom."

21            There's also a few more people that are added to

22  this list that were not on the e-mail chain before.  Who are

23  these individuals?

24       A.    These are attorneys hired by the bank.

25       Q.    So why does Liz copy these attorneys?

1    A.    Because at that time, they had been advising us on

2   matters related to Satterfield and this triggering event, she

3   wanted to make sure they were informed as well.

4    Q.    Would you also have expected Russell to consult with

5   the lawyers that y'all had retained six weeks prior?

6    A.    Yes, I would.

7    Q.    Why?

8    A.    In light of what we were doing and negotiating

9   and/or discussing and negotiating with Satterfield, this is

10  an unusual occurrence, more than likely, given the events as

11  he described, would probably get them involved.

12   Q.    Government's 12C.  Russell responds, "Attorneys were

13  informed, but not consulted.  They were consulted by phone,

14  so nothing to share.  This is not a lawsuit issue.  It is a

15  banking issue of us converting checks."

16        Did you agree that it was a banking issue of us

17  converting checks?

18   A.    No, I did not.

19   Q.    And "attorneys were informed, but not consulted,"

20  what's your understanding of his statement?

21   A.    He was notifying them of the payment, but not

22  seeking any advice or counsel.

23   Q.    Exhibit 12D.  Norris then e-mails Russell, "Who was

24  responsible for the conversion?  Are multiple employees

25  involved?  When did it -- they happen?  What all was

1    involved?  How many times?  How many other cases like this

2    are out there?  Have we let the employees who did this go?"

3              Did you also have these questions?

4       A.    Yes.

5       Q.    Did you also want to know this information about the

6    $680,000 payment?

7       A.    Yes.

8       Q.    Exhibit 13.  Russell then responds, "We will discuss

9    in the Board meeting.  I was responsible.  Twelve checks made

10   payable to PSB converted to others.  Hopefully no other

11   cases.  This took place in 2013."

12             What was your understanding of his statement that "I

13   was responsible"?

14      A.    That he had converted the checks.

15      Q.    All right.  Let's talk about that $680,000 payment

16   and the transaction details.

17             MS. LIMEHOUSE:  Pull up Government's 14, please.

18   BY MS. LIMEHOUSE:

19      Q.    Okay.  The jury has seen this check numerous times

20   now.  Is this the $680,000 check that you understand Russell

21   Laffitte paid the law firm?

22      A.    Yes, I do.

23      Q.    Okay.

24             MS. LIMEHOUSE:  Government's 76, please.

25   BY MS. LIMEHOUSE:

1    Q.   All right.  What does this document indicate?

2    A.   The document shows the file copy of the -- on the

3    top line, the file copy of the cashier's check.  And it shows

4    the time that the cashier's check was processed.  And it

5    shows the account to which the funds were taken, meaning

6    losses other than loans.

7    Q.   Okay.  And so that receipt says, "Losses other than

8    loans, half Badger settlement stolen by AM, bank cashed,

9    converted 1.1 million plus checks.  Split loss with PMPED."

10        Do you recognize whose initials those are?

11   A.   Laffitte Russell Laffitte.

12        MS. LIMEHOUSE:  Government's 77, please.

13   BY MS. LIMEHOUSE:

14   Q.   So when does it indicate that this check was

15   deposited by the bank -- I mean, by the law firm?

16   A.   October 29th, 2021.

17   Q.   Okay.  So that would have been the same day that the

18   Board received notification from Russell?

19   A.   That's correct.

20   Q.   So after everyone gets this October 29th e-mail,

21   what happens?

22   A.   We establish an emergency Board meeting for the 31st

23   to discuss.

24   Q.   Okay.  And what happens at that emergency meeting on

25   October 31st?

1     A.   We review details of this event, the 680, along with

2     other activities that -- the Satterfield issue that at that

3     time still remained unresolved.

4     Q.   What that two actions does the Board decide to take

5     on October 31st?

6     A.   It takes the -- it establishes a Litigation

7     Committee and it establishes an investigation of the matters.

8     Q.   Okay.  So there's an internal investigation that

9     y'all decide to --

10     A.   Initiate.

11     Q.   -- begin at that point?  Okay.

12          What discussions were there about the 680?

13     A.   There were no details.

14     Q.   So why an internal investigation?

15     A.   Because the Board thought it important to understand

16     what, in fact, had transpired.

17     Q.   And did you have any idea at this point what did, in

18     fact, transpire?

19     A.   Did not.

20     Q.   Okay.  Did Russell during that October 31st meeting,

21     give any details about that $680,000 payment?

22     A.   He did not.

23     Q.   Does the Board meet again on November the 3rd?

24     A.   They do.

25     Q.   Okay.  So what happens during the November 3rd

1  meeting?

2      A.   We have a meeting to discuss a number of issues, the

3  680 being one, as well as the state of the negotiation on

4  Satterfield.

5      Q.   Did Russell tell the Board any details about the 680

6  payment during the November 3rd Board meeting?

7          THE COURT:  I'm sorry, when?

8          MS. LIMEHOUSE:  The November 3rd Board meeting.

9          THE WITNESS:  No.

10  BY MS. LIMEHOUSE:

11     Q.   At that point, what could be done about the 680

12  payment?

13     A.   At that point in time, the Board members believed it

14  was a done deal and little could be done.

15     Q.   So did the Board decide to allow their attorneys to

16  try to negotiate with the law firm?

17     A.   To determine what could be -- what could be in terms

18  of securing a release, legal term.

19     Q.   So that would be a release with the law firm?

20     A.   Yes, that's correct.

21     Q.   And what was the Board's goal in trying to obtain a

22  release?

23     A.   To limit the damage, the possibility of any damage

24  resulting from the decision to pay $680,000 on this check

25  conversion, giving the check to PMPED.

1      Q.   And your understanding is that the payment has

2   already been made?

3      A.   That's correct.

4      Q.   So the Board is trying to mitigate the loss?

5      A.   That's correct.

6      Q.   At any point, did the Board ratify Russell

7   Laffitte's payment of the $680,000?

8      A.   They did not.

9      Q.   So Russell does not tell the Board any details about

10  the 680 payment, as you testified.  When did you learn the

11  details about the $680,000 payment?

12     A.   Through the Harris Report.

13     Q.   So when did you receive the results of the Harris

14  Report?

15     A.   That was released in December.

16     Q.   Okay.  So we talked about internal investigation.

17  Was the Harris Report a report that was generated following

18  that internal investigation?

19     A.   Yes.

20     Q.   And at that point, did you learn for the first time

21  about what that 680 payment actually --

22          MR. DANIEL:   Your Honor, I'm going to object

23  discussing the Harris Report.  They said it's privileged.

24  And we can't have even access to it, we've never seen it

25  before, Your Honor.

 1          MS. LIMEHOUSE:  We can discuss what he learned from

 2     it.  We are not talking about what the report itself says.

 3          THE COURT:  I think you are flirting with waiving

 4     the privilege.

 5          MS. LIMEHOUSE:  Understood.

 6     BY MS. LIMEHOUSE:

 7        Q.   So as Chairman of the Board, you saw in these

 8     e-mails that Russell was the one taking responsibility saying

 9     he negotiated with the law firm as Chairman of the Board --

10          MR. AUSTIN:  Objection, Your Honor.  Just to

11     clarify, you are saying as Chairman of the Board, we are

12     doing this now or at the time the e-mails were sent?  It's

13     not clear.

14          THE COURT:  Let me just say, one defense counsel

15     regarding a witnesses needs to do the objection.  We can't

16     have two popping up.  Y'all need to work that out.

17          Now, let me understand what the issue was because I

18     couldn't understand.

19          MR. AUSTIN:  Your Honor, it wasn't really an

20     objection.  I just didn't understand the timing of the

21     question.

22          THE COURT:  Could you rephrase the question, please?

23          MS. LIMEHOUSE:  Sure.

24     BY MS. LIMEHOUSE:

25        Q.   Did Charlie Laffitte have authority to make a

1    $680,000 payment as Chairman of the Board?

2        A.    He did not.

3        Q.    Why not?

4        A.    Because of the unusual circumstance of it.  He did

5    not have unilateral authority to make that decision.  And it

6    was not brought before the Executive Committee nor was it

7    communicated to the Board.

8        Q.    Did Russell Laffitte ever tell the Board that the

9    $680,000 included the $35,000 fee he obtained from Arthur

10   Badger?

11       A.    Did not.

12       Q.    Did Russell Laffitte ever tell the Board that the

13   funds from Arthur Badger were negotiated to pay off loans

14   that he extended from Hannah Plyler's conservator account?

15       A.    He did not.

16       Q.    Did Russell tell the Board that he -- that nearly

17   $400,000 of those checks were used to pay another lawyer at

18   the law firm?

19       A.    He did not.

20       Q.    Did Russell tell the Board that the $680,000 payment

21   included over $150,000 in checks that were negotiated at the

22   Bank of America?

23       A.    He did not.

24       Q.    So following this internal investigation, have you

25   had an opportunity to review documents related to this

1    $750,000 loan?

2        A.    I have.

3        Q.    Okay.  Let's go over some of these documents.

4            MS. LIMEHOUSE:  I'm going to pull up Exhibit 10G and

5    10I.  If you will just put them side-by-side, please.

6    BY MS. LIMEHOUSE:

7        Q.    So what did you learn about the first advance that

8    was made on this $750,000 loan?

9        A.    The first advance on the $750,000 loan was a wire

10    transfer of $350,000 to the Wilson Law Group in Bamberg,

11    South Carolina.

12        Q.    Who is Chris Wilson?

13        A.    An attorney.

14        Q.    And what was the date of that wire transfer?

15        A.    July 15th, 2021.

16        Q.    Did Chris Wilson have any involvement with

17    renovating Alex Murdaugh's beach house?

18        A.    To my knowledge, no.

19        Q.    I'm going to pull up Government's Exhibit 192.  What

20    was the status of Alex Murdaugh's checking account at the

21    time of this $350,000 wire transfer?

22            MS. LIMEHOUSE:  If you can just blow up the top,

23    please.

24        A.    He was overdrawn.

25    BY MS. LIMEHOUSE:

1     Q.    By how much?

2     A.    On the 15th, he was overdrawn $163,019.03.

3     Q.    I'm going to show you an e-mail from July the 16th,

4  which would be the day after the $350,000 wire transfer,

5  Exhibit 81.  This is an e-mail from Russell to Chastity

6  Malphrus.  Who is Chastity Malphrus?

7     A.    She's an employee of the bank.

8     Q.    Russell says, "Please have Kevin start title search

9  on Edisto house.  I am doing a second mortgage on it and one

10  share of Green Swamp stock for $750,000.  I have gotten where

11  the key is to Charles to let the appraiser know."

12          So this is one day after the $350,000 advance goes

13  through.  What happens?

14     A.    Russell was indicating to Chastity Malphrus to call

15  Kevin Brown to initiate a title search, which would be

16  routine when taking a mortgage against a piece of real

17  property.

18     Q.    And would that be the process that's followed prior

19  to advancing on a loan?

20     A.    It should be done prior to advancing on a loan.

21     Q.    What happened with the efforts to secure a mortgage

22  on that beach house?

23     A.    The second mortgage was not closed.

24     Q.    Do you know of any due diligence that was performed

25  about construction at the beach house?

1      A.    No.

2      Q.    So after the $350,000 wire transfer on July the

3  15th, what happens to Alex Murdaugh's bank accounts?  I'm

4  going to pull up Exhibit 192 again.  Does Alex Murdaugh

5  continue to go into overdraft?

6      A.    He does.

7      Q.    And you talked about the nonsufficient funds reports

8  that Russell would have received as branch manager.  Would he

9  be getting notification of these overdrafts?

10     A.    Yes, in a NSF report and another report, yes.

11     Q.    What does Jimmy Butler Auto Sales have to do with

12 renovating a beach house?

13     A.    I do not know.

14     Q.    What does DeBordieu Club have to do with renovating

15 a beach house?

16     A.    I do not know.

17     Q.    How about PMPED, 14,000 and some change to the law

18 firm, any idea what that would have to do with renovating

19 Alex's beach house?

20     A.    I do not know.

21         MS. LIMEHOUSE:  Next page, please.

22 BY MS. LIMEHOUSE:

23     Q.    What does Peeples-Rhodes Funeral Home have to do

24 with a beach house?

25     A.    I do not know.

1    Q.    What does LabCorp and Charleston Gastroenterology

2    have to do with renovating a beach house?

3    A.    I do not know.

4    Q.    What does Veterinary Specialty Care have to do with

5    renovating a beach house?

6    A.    I do not know.

7    Q.    What does The Sports Medicine Shop have to do with

8    renovating a beach house?

9    A.    I do not know.

10    Q.    All right.  So August 9th --

11    MS. LIMEHOUSE:  If you will just highlight that

12    bottom portion, please.

13    BY MS. LIMEHOUSE:

14    Q.    So what happens to the accounts on August the 9th?

15    A.    On August the 9th, it was overdrawn $367,784.67.

16    And then there is a credit entry or a deposit to the account

17    in the amount of $400,000.

18    Q.    All right.  I'm going to show you this 20,000

19    transferred to checking, did that happen out of the account

20    on the same day as the 400 in, the 20,000?

21    A.    Yes, yes.

22    Q.    So this is the 400 deposit that was made on the

23    morning of August the 9th; is that right?

24    A.    Correct.

25    Q.    All right.

1           MS. LIMEHOUSE:  Just pull up quickly that August 9th

2    e-mail, Exhibit 2, please.  So this is the e-mail that the

3    jury has seen numerous times, Monday, August 9th at 9:39 a.m.

4    Can we please pull up Exhibit 82, please.

5    BY MS. LIMEHOUSE:

6        Q.    So what do these documents reflect?

7        A.    It shows a checking account deposit to the account

8    of Alex Murdaugh, account 6092, in the amount of $400,000.

9        Q.    I'm going to highlight a timestamp for you.  And

10   it's upside down, if you can read upside down, can you do

11   that for me?

12       A.    It's at 10:47 a.m.

13       Q.    So about an hour after Russell Laffitte receives the

14   e-mail from Norris Laffitte asking for Murdaugh's total

15   exposure -- the bank's total exposure with respect to

16   Murdaugh, there's $400,000 deposited in his account?

17       A.    Correct.

18       Q.    Who signs this $400,000 check?

19       A.    That's the signature of Charles Laffitte III,

20   Russell's brother.

21       Q.    Russell's big brother.  Okay.  And how about this

22   "For deposit only," do you recognize that handwriting?

23       A.    Appears to be Russell's.

24       Q.    So 10:47 that's deposited.  I'm going to pull up now

25   Government's 220.  All right.  So what are these records?

558

1    Explain to the jury what these records are.

2        A.    These are electronic records that our system retains

3    of inquiries into various aspects of our computer system.

4    It's a log, who went in to look at specific areas of the

5    bank, on what day and at what time.

6        Q.    So it would reflect Russell accessing Alex

7    Murdaugh's accounts?

8        A.    Correct.

9        Q.    Okay.  So is that what this Exhibit 220 shows?

10       A.    Yes.

11       Q.    Okay.  The first entry I want to highlight is this

12   August 9th, $20,000, is that the $20,000 transfer from

13   checking that we saw in the records?

14       A.    Yes.

15       Q.    And who is it indicating, based on these records, is

16   effectuating that $20,000 transfer?

17       A.    Russell Laffitte.

18       Q.    And after that $20,000 transfer, about two hours

19   after Norris's e-mail, how many times does Russell access

20   Alex's account to check the status?

21       A.    There are six entries here.

22       Q.    I'm going to now pull up Exhibit 84.  So you

23   testified earlier about following the August Executive

24   Committee meeting looking to see if there was a loan with

25   that loan number on the system.  What does this document

1    show?

2        A.    This document shows the sequences of loan numbers

3    and the dates they were produced on our Compliance One loan

4    documentation system.

5        Q.    So you testified yesterday that Compliance One is a

6    system that would generate a loan number when that process

7    begins?

8        A.    That's correct.

9        Q.    So what does the Compliance One numbers indicate

10   about when that loan began to be generated in the system?

11       A.    It was generated on August 9th.

12       Q.    Okay.  Based --

13       A.    Based on the sequence of the loan before being

14   generated on August 9th and loan No. 6049, the one thereafter

15   being generated on August 9th.

16       Q.    Okay.  So that would be after the $350,000 wire

17   transfer?

18       A.    That's correct.

19       Q.    And after the $400,000 transfer?

20       A.    Correct.

21       Q.    And is this date of the loan then backdated to

22   reflect that $350,000 wire?

23       A.    It is.

24       Q.    Let's look at some of the paperwork for the loan

25   that was generated.  Exhibit 10B, please.  Okay.  So what is

1    this document?

2         A.   It's a business purpose statement.

3         Q.   What's the -- what is the purpose of this document?

4         A.   It is the borrower's indication of the bank as to

5    the stated purpose for a commercial loan.

6         Q.   Okay.  And what's the stated purpose of this

7    $750,000 beach house loan?

8         A.   The purpose is investment.

9         Q.   And, again, what's the date on this loan?

10        A.   July 15th, 2021.

11             MS. LIMEHOUSE:  I'm going to pull up quickly again

12   10G and 10I side-by-side, please.

13   BY MS. LIMEHOUSE:

14        Q.   Okay.  Were these wiring instructions from July 15th

15   included in the paperwork?

16        A.   Included in the paperwork?

17        Q.   The loan documentation?  Excuse me.

18        A.   Not to my knowledge.

19        Q.   Okay.  I'm going to show you this date on the

20   bottom.  What's the date on the bottom of those?

21        A.   August 17th of 2021.

22        Q.   Okay.  But the initial wire request is dated what

23   again?

24        A.   July 15th, 2021.

25        Q.   Okay.  I'm going to now go to 10H.  What does this

561

1    documentation show?

2        A.    This documentation is the customer copy for a

3    cashier's check 287933 in the amount of $400,000.

4        Q.    And that would reflect the August 9th $400,000

5    transfer?

6        A.    Credit to the account, yes.

7        Q.    Credit to the account.  Let's go to 10L, please.

8    All right.  So what do these records show in loan

9    documentation, generally, not necessarily with respect to

10   this, just explain to them what this reflects in the loan

11   approval process?

12       A.    It shows from start to finish who initiated the

13   transaction, in this case, the first person was Carrie Sauls.

14       Q.    Who is Carrie Sauls?

15       A.    She's a loan officer at the Hampton branch.

16       Q.    Okay.  Did she work for Russell?

17       A.    Yes.

18       Q.    And so what's the time stamp on her approval?

19       A.    August 17th, 2021 at 3:02 p.m.

20       Q.    And is that the same day as the August Board

21   meeting?

22       A.    It is.

23       Q.    Okay.  And what does line 2 of the approvers

24   comments indicate?

25       A.    The approver is Russell Laffitte, August 18th, 2021,

1    at 8:36 a.m.

2        Q.    How about No. 3?

3        A.    Executive Committee, approval on August 18th, 2021,

4    at 8:39 a.m.

5        Q.    Were you, as a member of the Executive Committee, at

6    all involved in the approval of this $750,000 loan?

7        A.    I was not.

8        Q.    Did you ever receive notice in writing that this

9    approval had taken place?

10        A.    I had not.

11        Q.    Did you ever give your consent for the approval to

12    take place outside of the meeting?

13        A.    I had not.

14        Q.    And with respect to the Board meeting, does this

15    document indicate that the loan was approved the day after

16    the Board meeting?

17        A.    Yes.

18        Q.    I want to move to some of the other loans that

19    Russell extended Alex Murdaugh.

20            MS. LIMEHOUSE:    If you will just quickly pull up

21    Exhibit 5, please.

22    BY MS. LIMEHOUSE:

23        Q.    I'm going to point you to loan No. 6987336, this

24    million dollar line of credit.    Had there been initial line

25    of credit prior to this million dollar line of credit?

1    A.    Yes.

2    Q.    Okay.  I'm going to take you to Government's 87.

3  All right.  What does this document show?

4    A.    It's a documentation waiver form.

5    Q.    What's the date on the top?

6    A.    February 9th, 2015.

7    Q.    And whose signature is on the bottom as the

8  approver?

9    A.    Russell Laffitte.

10         MS. LIMEHOUSE:  I'm going to pull up 87A.  If you

11  will just highlight the top, please.

12  BY MS. LIMEHOUSE:

13    Q.    Is this the promissory note that reflects that line

14  of credit?

15    A.    No.  It's a smaller line of credit.

16    Q.    Okay.  So it's the initial $500,000 line of credit?

17    A.    Yes, it is.

18    Q.    All right.  So what is the note date?

19    A.    February 9th, 2015.

20    Q.    89B, please.  What was this document?

21    A.    The business purpose statement.

22    Q.    So it's similar to the business purpose statement we

23  saw for the 750.  This is for the $500,000 line of credit.

24  What does it indicate is the stated purpose of that $500,000

25  line of credit?

1          A.    It would be used in farming.

2          Q.    How does that stated purpose limit the borrower's

3     right to use that money?

4          A.    It should be used for the purpose intended which is

5     farming.

6          Q.    Okay.  So what type of things would be approved

7     expenses for farming?

8          A.    Fertilizer, seed, equipment purchases.

9          Q.    Okay.  Let's go to 87C.  So who does it indicate on

10    the loan review sheet as the loan officer?

11         A.    Russell Laffitte.

12         Q.    And what's the date of his signature?

13         A.    February 9th, 2015.

14         Q.    Now, I'm going to pull up Government's 88.  This is

15    a summary of the advances on that line of credit.  If you can

16    just highlight for the jury the dates and the amounts of the

17    advances on the $500,000 line of credit.

18         A.    On February 18th, 2015, an advance of $77,734.50; on

19    the 19th of February, an advance of $6,500; on February 19th,

20    another advance of $85,000; on February 20th, an advance of

21    $8,500; again on February 20th, an advance of $90,000; on

22    February 20th, an advance of $284,787.52; on April 13th,

23    2015, an advance of $17,477.98.

24         Q.    I'm going to show you some documentation related to

25    that $284,787.52.

1           MS. LIMEHOUSE:  Can you pull up Exhibit 93, please.

2    BY MS. LIMEHOUSE:

3        Q.    So is this a record reflecting that advance made on

4    the line of credit?

5        A.    Yes.

6           MS. LIMEHOUSE:  Exhibit 95, please.  If you will

7    just pull up the bottom two.

8    BY MS. LIMEHOUSE:

9        Q.    What is this document?

10       A.    It's a loan system debit transaction form.

11       Q.    And what does it show?

12       A.    An amount of $284,787.52 on loan No. 6986998.

13       Q.    And whose initials are on this debit transaction

14   form?

15       A.    Russell Laffitte.

16          MS. LIMEHOUSE:  If you could do the top portion of

17   this, please, Ms. Rozsa.

18   BY MS. LIMEHOUSE:

19       Q.    All right.  What does it show here?

20       A.    That there's a purchase of a cashier's check, check

21   No. 239893, on February 20th, 2015, in the amount of

22   $284,787.52.

23          MS. LIMEHOUSE:  Exhibit 94, please.  Make a little

24   larger.

25   BY MS. LIMEHOUSE:

1      Q.   So what does this cashier's check show?

2      A.   Well, you have the face of the cashier's check

3   itself payable to SouthState Bank, February 20th,

4   $284,787.52.  Signer is Russell Laffitte.  On the back of the

5   check it says, "Not used for purpose intended."

6      Q.   So what does that mean?

7      A.   That the check was not negotiated at SouthState

8   Bank.  It was essentially voided because it was not used for

9   the original purpose.

10      Q.   So was there a new cashier's check issued?  I will

11   show you Government's 96.  So this was still that original

12   cashier's check on the bottom?

13      A.   Yes.

14      Q.   And then what does the top portion show?

15      A.   That there's a new cashier's check purchased, check

16   No. 240372, purchased on March 23rd, 2015, in the amount of

17   $284,787.52.

18      Q.   And who is it made payable to?

19      A.   Hannah Plyler.

20          MS. LIMEHOUSE:  I'm going to show you Government's

21   95A.  The middle two, Ms. Rozsa.

22   BY MS. LIMEHOUSE:

23      Q.   What does this cashier's check indicate?

24      A.   It's the same cashier's check and it's deposited --

25   the endorsement is Russell Laffitte as conservator.

1      Q.    And is it paid to the order of Hannah Plyler?

2      A.    It is.

3      Q.    So it was originally issued to SouthState Bank and

4   then it had to be made out to Hannah Plyler; is that right?

5      A.    Yes.

6      Q.    What's the endorsement on the check indicate?

7      A.    That it is made payable to Hannah Plyler and the

8   endorser is Russell Laffitte as conservator.

9      Q.    Have you now reviewed e-mails with respect to this

10  loan payoff?  I'm going to show you Government's 57.

11          MS. LIMEHOUSE:  If you will highlight the bottom

12  portion.

13  BY MS. LIMEHOUSE:

14     Q.    This is an e-mail from Russell to Alex.  "These are

15  the loans outstanding.  I have advanced $284,787.52 from your

16  credit line to pay these off.  She turns 18 and I am closing

17  the conservatorship."

18          I then want to take you to the bottom.  He says, "I

19  advanced 6,500 yesterday to farm to cover overdrafts.  I

20  advanced 8,500 today to equal the 15,000 you requested in

21  your text to the farm account.  I had previously advanced

22  85,000 on February 19th to your personal account.  I advanced

23  an additional $90,000 today to make the $175,000 requested.

24  You will have a current available credit of $17,477.98 after

25  all of this clears tonight."

568

1          MS. LIMEHOUSE:  Ms. Rozsa, can you put that

2     side-by-side with 88.

3     BY MS. LIMEHOUSE:

4     Q.    And do those amounts in the principal advances you

5     previously reviewed match the advances that he discusses on

6     the bottom of this e-mail?

7     A.    They do.

8     Q.    Is the Plyler loan payoff consistent with the

9     purposes intended on the line of credit?

10    A.    It is not.

11    Q.    What does Hannah Plyler have to do with farming?

12    A.    I do not know.

13    Q.    So this $500,000 line of credit is then increased to

14    a million line of credit?

15    A.    That's correct.

16          MS. LIMEHOUSE:  Let's pull up Exhibit 58, please.

17    BY MS. LIMEHOUSE:

18    Q.    On March the 20th -- excuse me, 30th, of 2015, Alex

19    e-mails Russell.  So this would have been after the advances

20    to cover the Plyler loans and those other advances on the

21    line of credit.  "Also, I need to do whatever we have to do

22    to activate my full credit line.  I didn't quite understand

23    what you were saying, but I took it that there was something

24    else that needed to be done.  I had not figured the payoff

25    for Hannah and the other loan when I was planning.  When we

1    paid those, it took most of the partial line you activated.

2    I need to do it fairly quickly, too, there are two pieces of

3    equipment I need for planting.  Thanks.  And I will call you

4    after I speak to Mark."

5            MS. LIMEHOUSE:  I'm going to pull up Exhibit 97.

6    Page 3, please.  The promissory note, the page right before

7    it.  Yes, just the top portion.

8    BY MS. LIMEHOUSE:

9        Q.    Okay.  So is this the million dollar line of credit

10   we reviewed on Exhibit 5 with the total exposure with respect

11   to Murdaugh?

12       A.    Yes.

13       Q.    So what was the status of this line of credit in

14   July 2021 when the $350,000 wire transfer went to Chris

15   Wilson?

16       A.    It was largely fully drawn.

17       Q.    So what happens to Russell Laffitte and his

18   employment with the bank after y'all learn the results of the

19   internal investigation?

20       A.    He was suspended and then separated, two different

21   days.

22       Q.    How did you vote with respect to his severance from

23   the bank?

24       A.    Separation?

25       Q.    Separation.

1      A.    I voted to separate him.

2      Q.    How about his sister, Gray Henderson?

3      A.    I believe she voted not to separate him -- or excuse

4  me, abstained, I believe.

5      Q.    So she didn't vote?

6      A.    She did not vote.

7      Q.    And how about his father, Charlie?

8      A.    He did not vote to separate him.

9      Q.    Was there ever a payment made on that $750,000 loan?

10     A.    There was not.

11     Q.    And whose money paid that $680,000 to the law firm?

12     A.    The shareholders.

13     Q.    Okay.  I want to show you a few documents for the

14  purposes of authentication.  I will let you look at these in

15  a moment.

16          MS. LIMEHOUSE:  May I approach, Your Honor?

17          THE COURT:  You may.

18          MR. DANIEL:  Your Honor, might this be good time to

19  take a break?

20          MS. LIMEHOUSE:  I'm just -- I'm putting these in for

21  authentication and then I'm done.

22          THE COURT:  Okay.  Your direct is done once you do

23  this?

24          MS. LIMEHOUSE:  I have one question.

25          THE COURT:  You can have more than one.

BY MS. LIMEHOUSE:

Q.    Do you recognize those documents, Mr. Malinowski?

A.    Yes, I do.

Q.    What do you recognize those documents to be?

A.    They're multiple loans, promissory notes, appearing to be in the name of Curtis E. Smith.

Q.    For the purposes of the record, Government's 202, 203, 204, 205, 206, 207, 208, and 209, are these documents that are held and kept in the regular course of Palmetto State's business?

A.    Yes.

MR. DANIEL:  We object to these documents because that particular person, those documents, is not on trial here.

THE COURT:  I'm going to take it up outside the jury.  Is there anything further?

BY MS. LIMEHOUSE:

Q.    Last question I have for you, Mr. Malinowski, is, why did you vote to separate from Russell Laffitte?

A.    Because he converted checks and he was not transparent with the Board.

MS. LIMEHOUSE:  Okay.  No further questions, Your Honor.

THE COURT:  Very good.  Ladies and gentlemen, we will take our morning break.

1          (Jury leaves open court at 10:41 a.m.)

2          THE COURT:  I think your opposing counsel, at least

3    one of them, has left the room.  Mr. Austin, are you ready to

4    address this issue?

5          MR. AUSTIN:  I couldn't hear you, Your Honor.

6          THE COURT:  Sure.  Are you ready to address this

7    issue?  I know there was an objection from the defense.

8          MR. AUSTIN:  I think Bart stepped out for a second.

9    And, I mean, I would be happy to do it, but I don't know if

10   he has other thoughts.  I would rather wait until he comes

11   back in, if that's all right.

12         THE COURT:  Okay.  Why don't we wait just a moment.

13   Could someone let Mr. Daniel know we are waiting for him.

14         What is the objection?

15         MR. AUSTIN:  We are talking about the exhibits we

16   were just discussing, right?

17         THE COURT:  Yes, I haven't seen Exhibits 207 to 209.

18   I haven't even seen them.  I don't know what they are.

19         MS. LIMEHOUSE:  These are all loan documents, Your

20   Honor, loans that Palmetto State Bank extended to an

21   individual named Curtis Smith.

22         THE COURT:  And why is that relevant to this case?

23         MS. LIMEHOUSE:  During Mr. Laffitte's testimony at

24   his bond hearing, he represented that he didn't know who

25   Curtis Eddie Smith was.  Mr. Murdaugh's bank records indicate

1    that large sums of money between July 15th and August 9th

2    went to Curtis Eddie Smith.

3         THE COURT:  I think it would be more appropriate to

4    have the witness on the stand before you did it.

5         MS. LIMEHOUSE:  Well, I'm only doing it for

6    authentication purposes as an officer of the bank to

7    establish that those are business records.  He's not

8    testifying about the substance of those loan documents, just

9    to get them in as business records of the bank.

10        THE COURT:  But they've got to be relevant.  Just

11   getting them -- authenticating them is not enough.

12        MS. LIMEHOUSE:  I'm not talking about --

13        THE COURT:  Let me ask you this.  I'm trying to keep

14   the trial moving.  Mr. Austin, is there a dispute about the

15   authenticity of these documents, not about the --

16        MR. AUSTIN:  I don't think there is a dispute about

17   the authenticity, Judge.

18        THE COURT:  Will you stipulate that to the extent

19   it's later determined to be relevant, I don't need to bring

20   this witness back to authenticate them.  Do we agree on that?

21        MR. AUSTIN:  Yes.

22        MS. LIMEHOUSE:  Understood.

23        THE COURT:  At this point, I'm denying the motion to

24   admit without prejudice.  Fair enough?

25        MS. LIMEHOUSE:  Thank you.

1          THE COURT:  Let's be at ease.

2          (Whereupon, a recess transpired.)

3          THE COURT:  Let's bring the jury back.

4          (Whereupon, the jury returns to open court at 11:01

5    a.m.)

6          THE COURT:  Please be seated.  Cross-examination.

7          MR. DANIEL:  May it please the Court, Your Honor.

8          THE COURT:  You may.

9                         CROSS-EXAMINATION

10   BY MR. DANIEL:

11       Q.   Good afternoon.  Good morning, Mr. Malinowski.  How

12   are you?

13       A.   Fine.

14       Q.   And we've known each other for a long time?

15       A.   Long time.

16       Q.   So no introductions necessary?

17       A.   That's correct.

18       Q.   Okay.  From our days --

19          THE COURT:  You can remove your mask, if you'd like.

20          MR. DANIEL:  Okay.  Yes, sir.  Thank you, Your

21   Honor.

22   BY MR. DANIEL:

23       Q.   As president of Palmetto State Bank -- when did you

24   become president?

25       A.   2015.

```
1        Q.    Okay.  Is that when Sterling passed away?

2        A.    That's correct.

3        Q.    Okay.  And what year, 2015?

4        A.    Yes.

5        Q.    And as president, you have access to all the daily

6   reports on your computer?

7        A.    I do.

8        Q.    Okay.  And did you ever look at Alex Murdaugh's

9   accounts prior to the issues being raised in 2021?

10       A.    I don't recall.

11       Q.    Sir, I'm sorry?

12       A.    I don't recall.

13       Q.    You don't recall.

14             MS. LIMEHOUSE:  Mr. Malinowski, will you pull the

15   microphone up, if you don't mind.

16             THE WITNESS:  I'm sorry.

17             MS. LIMEHOUSE:  No, you're are fine.

18   BY MR. DANIEL:

19       Q.    Thank you.

20             Now, you're in the two branches in Beaufort, right?

21       A.    Yes.

22       Q.    You run those two branches?  I said you're in them,

23   but you actually run those two branches?

24       A.    Yes.

25       Q.    And Beaufort, as most of us know, is significantly
```

1    larger and more populated than the branches in Hampton -- in

2    the town of Hampton?

3        A.    Yes.

4        Q.    And people generally are wealthier in Beaufort than

5    most people, per capita at least, in Hampton County?

6        A.    Yes.

7        Q.    And the -- yet, the business generated in the

8    Hampton County is much more significant than the income

9    generated from the Beaufort branches?

10       A.    Yes.

11       Q.    You talked a little yesterday about the bank's

12   policy, but did all the bank officers follow bank policy

13   strictly every time?

14       A.    They should.

15       Q.    I understand they should.  That's a good policy and

16   it's a good banking practice, but my question is:  Did they

17   always follow Board policy?

18       A.    There are exceptions.

19       Q.    Sir, I'm sorry?

20       A.    There are exceptions.

21       Q.    Okay.  Now, you testified about charging off loans

22   under direct examination.  And like many community banks,

23   loans are charged off, and they are not all necessarily bad

24   loans or uncollectable, are they?

25       A.    That's correct.

1      Q.   Because at the end of the calendar year, which is

2   some time in December, they, in order to clean up its books

3   and to avoid taxes, certain loans are charged off?

4      A.   They were.

5      Q.   Okay.  And also, sometimes when the regulators come

6   in, whether it's the FDIC, whoever, they'll say to you, you

7   need to charge off this particular loan or whatever their

8   reason is?

9      A.   An examiner?  Yes.

10     Q.   Yes, sir.  And you mentioned that on direct

11  examination that the minutes should contain everything that

12  was discussed at an Executive Committee meeting or a Board

13  meeting?

14     A.   Yes.

15     Q.   But weren't there, at some point, at various times,

16  matters or information added that had not been included after

17  the fact, after the Board meeting and the minutes had come

18  out?

19     A.   I don't recall.

20     Q.   Okay.  And were they ever added -- I will withdraw

21  that question.

22          So I think you've testified before that -- well, let

23  me ask you now.  Did you feel that Alex Murdaugh got special

24  treatment?

25     A.   Yes.

1      Q.   Okay.  And he borrowed each -- money -- excuse me,

2   he borrowed loans, made loans out -- no, excuse me, he

3   borrowed money each year from Palmetto State Bank?

4      A.   Each year, I don't know.  But he borrowed money from

5   Palmetto State Bank.

6      Q.   Okay.  Since this has all back -- since this has all

7   come out, have you ever gone back and looked in prior years

8   to see what his loan history is, for instance?

9      A.   Could you repeat that question, please?

10      Q.   Yes, sir.  I'm sorry.

11           So have you ever -- since all this came out about --

12   since you learned about Alex Murdaugh and all the havoc he's

13   caused, did you ever go back and look at previous years of

14   his loan -- did you look at his loan history, for instance,

15   of previous years?

16      A.   I have.

17      Q.   You have.  And in those previous years, he had

18   significant loans outstanding?

19      A.   Yes.

20      Q.   And he paid those loans back?

21      A.   Yes, they were paid out.

22      Q.   Yeah.  Except in Red Beard, where we will talk about

23   a little bit later, but that was charged off and we will

24   discuss that a little bit later, but save for that one, which

25   was charged off a while back, he was good on all his loans,

1    wasn't he?

2         A.   He paid loans, yes.

3         Q.   Yes.  And he also paid interest on those loans?

4         A.   Yes, he did.

5         Q.   And that was almost every year he had significant

6    outstanding loans going back to when he first went to the --

7    came back to Hampton?

8         A.   I didn't understand that question.

9         Q.   Oh.  But Alex Murdaugh had significant loans almost

10   every single year going for decades back with the Hampton --

11   with the Palmetto State Bank?

12        A.   Decades, I wouldn't know.

13        Q.   Okay.  And Alex Murdaugh referred many customers to

14   Palmetto State Bank?

15        A.   I do not know.

16        Q.   Okay.  And you're not familiar that the law firm,

17   his law firm also referred many customers to Palmetto State

18   Bank?

19        A.   I'm aware of his law firm.

20        Q.   Okay.  And are you aware of the lawyer loans, the

21   firm's clients would take out with the law firm, in effect,

22   ethically or morally guaranteeing those loans in writing?

23        A.   I'm aware of those, yes.

24        Q.   And the bank made good interest off those loans?

25        A.   When they paid.

1      Q.    Sir, I'm sorry?

2      A.    If they paid.

3      Q.    Yeah, but if they didn't pay, the interest was as

4   high as 18 percent; is that right?

5      A.    That's a consumer rate, yes.

6      Q.    Yes.  Okay.  And when you said, "if they paid," if

7   they didn't pay, the law firm always made those loans good,

8   didn't they?

9      A.    I am not aware of that.

10     Q.    And in general, in a small town, lawyers and law

11   firms are generally some of the best customers a bank could

12   have?

13     A.    They could be.

14     Q.    Yep, they could.  And Palmetto State Bank has

15   certainly been a good customer?

16     A.    Customer --

17     Q.    I'm sorry.  I'm sorry.  The PMPED Law Firm has

18   certainly been a good customer?

19     A.    They could be.

20     Q.    But they -- you're not sure?

21     A.    Well, in what -- in what respect a good customer?

22     Q.    The bank makes a lot of money off the law firm?

23     A.    They're a good borrower.

24     Q.    Yeah.  And the law firm also has all of its trust

25   accounts?

1    A.    I am not aware of all its trust accounts with us.

2    Q.    Okay.  But they have a significant -- I don't know

3    that they have multiple trust accounts, but they do have a

4    significant amount in their trust account with Palmetto State

5    Bank?

6    A.    They do.

7    Q.    Okay.  And that enables the bank to loan money and

8    make money off the loans?

9    A.    The question is?

10    Q.    Is that good for the loan to have large accounts

11    with millions of dollars in it?

12    A.    Is it good for depositor -- is it good for the bank

13    to have a depositor with large deposits?  Yes.

14    Q.    Yes.  Okay.  And you mentioned that you felt like

15    Alex Murdaugh was given special treatment.  But the other

16    lawyers at the law firm, PMP, were also given sort of a lot

17    of attention or special interest?

18    A.    I believe so.

19    Q.    And that's because, again, they referred clients and

20    they, themselves, took out loans?

21    A.    That I can't -- I do not know specifically.

22    Q.    But you are -- as president, your job is sort of to

23    keep up with the day-to-day operations of the bank, isn't

24    that one of your duties?

25    A.    Yes.

1      Q.   So you don't keep up with the Hampton branches and

2  its largest customers?

3      A.   Not on a regular basis, no.

4      Q.   Okay.  But you could have if you wanted to?

5      A.   Yes.

6      Q.   You could check daily reports?

7      A.   Yes.

8      Q.   And prior to 2021, you were not aware of anything

9  involving PSB's relationship, Palmetto State Bank's

10  relationship that was inappropriate with Alex Murdaugh?

11      A.   I was not.

12      Q.   And before 2021, actually before September 2021,

13  everyone thought Alex Murdaugh was one of Hampton County's

14  finest citizens?

15      A.   Yes.

16      Q.   And he was an assistant solicitor part-time for

17  Hampton County and Beaufort Counties?

18      A.   Yes, I'm aware, yes.

19      Q.   Okay.  And did you know that he was also past

20  president of the prestigious Trial Lawyers Association?

21      A.   I did not.

22      Q.   And you knew he was a senior partner in the

23  Palmetto -- excuse me, I'm sorry, in the Peters Murdaugh and

24  Parker Law Firm?

25      A.   Yes.

1     Q.   And he was from a distinguished long-time family in

2     Hampton?

3     A.   Yes.

4     Q.   And had close ties to the Laffitte family?

5     A.   Yes.

6     Q.   Yeah.  And so Buster Laffitte was close with Mr.

7     Charlie, and then Randolph was really close friends with Mr.

8     Charlie, and then on down and even today, John Marvin is

9     close friends with Russell Laffitte?

10    A.   I'm aware of that, yes.

11    Q.   Now, all that changed about the opinion and

12    reputation of Alex Murdaugh, that all changed in September

13    2021?

14    A.   Correct.

15    Q.   And now at that time, everyone found out he was a

16    con man?

17    A.   Is that a question?

18    Q.   Yes, sir.  Yes, sir.  I'm sorry.

19    A.   I assume so.

20    Q.   Okay.  And -- well, that's when you found out, you

21    didn't know that he was stealing --

22    A.   Well, I read media reports of his alleged

23    activities.

24    Q.   Okay.  And you found out he was a pathological liar?

25    A.   I can't comment on pathologies.

1    Q.   And -- but he was a liar, there's no doubt he lied

2    to people?

3         MS. LIMEHOUSE:  Objection, Your Honor.  He doesn't

4    know anything about whether Alex Murdaugh is a liar --

5         THE COURT:  He can -- this is cross-examination.  If

6    he can answer the question, if he can't, this gentleman can

7    handle himself.  Go ahead.

8    BY MR. DANIEL:

9    Q.   He stole a whole a lot of money from a whole a lot

10   of people?

11   A.   Allegedly.

12   Q.   Yeah.  But back then, back in 2020 or 2018, going

13   all the way back in his 30-year history since returning to

14   Hampton, that wasn't what people thought of him?

15   A.   Possibly so.

16   Q.   Well, you didn't think that of him, did you?

17   A.   I did not.

18   Q.   Okay.  In his reputation with the community for the

19   reasons we discussed just now, assistant solicitor, senior

20   partner in the law firm, it was a good reputation?

21   A.   I would think so.

22   Q.   And the Murdaugh name, we now know has been dragged

23   through the mud because of what Alex did, but that Murdaugh

24   name was a very good name in Hampton County?

25   A.   Prior to '21, yes.

1     Q.    Okay.  And as a matter of fact, as solicitors, Mr.

2   Buster, who then retired, was replaced by Mr. Randolph

3   Murdaugh?

4     A.    I understand that.

5     Q.    And they -- and then, of course, Alex followed the

6   family tradition and went with the law firm?

7     A.    I understand that.

8     Q.    And also went with the solicitor's office?

9     A.    I understand that.

10    Q.    Okay.  And so, you know, everybody considered them

11  law enforcement, the top law enforcement in the county?

12    A.    That's my understanding.

13    Q.    Yeah.  So you mentioned that the $750,000 was not

14  approved by the Executive Committee on direct examination; is

15  that right?

16    A.    That's correct.

17    Q.    Okay.  But it was approved, it just wasn't followed

18  up in writing; isn't that right?

19    A.    It was approved by three members of the Executive

20  Committee.

21    Q.    Yes.  And the Executive Committee has five members;

22  is that right?

23    A.    Five members.

24    Q.    Yeah.  But it only has four voting members?

25    A.    That is correct.

1      Q.   Okay.  So it was approved by three of the five

2  Executive Committee members, but that's also three of the

3  four voting members?

4      A.   That is correct.

5      Q.   But as you said, it was not followed up in writing,

6  it was only followed up at a Board meeting?

7      A.   That is correct.

8           MR. DANIEL:  And if you can pull up Exhibit 39,

9  please.  Now, I believe it's already in evidence.  Is it 39?

10          MS. LIMEHOUSE:  Your Honor, I don't believe any of

11 these exhibits have been admitted yet.

12          THE COURT:  Okay.

13          MR. DANIEL:  Beg the Court's indulgence, Your Honor.

14          THE COURT:  Take your time.

15 BY MR. DANIEL:

16     Q.   You testified on direct examination that it was a

17 meeting, a Board meeting, I believe it was August 12th,

18 Executive Committee meeting, and that's when Charlie Laffitte

19 -- Mr. Charlie Laffitte, that was Charles Jr., sort of a

20 elderly gentleman, who was chairman --

21     A.   He's the chairman, yes.

22     Q.   Okay.  And he explained the purpose of the loan for

23 the beach house?

24     A.   Question?

25     Q.   Didn't he explain the purpose of the loan for the

1    beach house?

2        A.    On the 12th?

3        Q.    Yes, sir.

4        A.    Is there a document?  Can I see a document that

5    indicates that?

6        Q.    Well, I think the Government has actually -- we will

7    go on from that, but I think we are going to find the

8    document a little bit later.

9            MR. DANIEL:  Do you have it now?  And is it in

10    evidence?  Yeah.  Okay.  Go ahead and call out that.  And

11    what exhibit is that?  It's Government's Exhibit 4.  I'm

12    sorry.  That's Exhibit No. 44 and it's already in evidence.

13    So please just see the very first paragraph.

14            MR. AUSTIN:  It's Government's 4.

15            MR. DANIEL:  It's Government's 4.  I'm sorry.  Okay.

16    And going to where it says, "Richard Alex Murdaugh."  Okay.

17    And if you enlarge that paragraph, please.

18    BY MR. DANIEL:

19        Q.    Does that refresh your recollection?

20        A.    Yes.

21        Q.    Okay.  And so it was explained Gray Henderson

22    distributed a memo?

23        A.    Correct.

24        Q.    Okay.

25            MR. DANIEL:  And if you can pull up the next

1    paragraph.  I'm sorry.  I'm sorry.  Go back.

2    BY MR. DANIEL:

3        Q.    Okay.  And the memo discussed the various notes, the

4    status of the loan collateral, and the actions to be taken

5    regarding the obligations.  And further -- not this meeting,

6    but didn't Mr. Charles Laffitte Jr. explain to the Board why

7    they took the action they took and he was defending their

8    action that they took?

9        A.    Which Board meeting?

10       Q.    Let me just ask you in general, did he stand up at a

11   Board meeting and defend the fact that they had made that

12   loan to Alex Murdaugh?

13       A.    I believe he did, but I would like to see the

14   document that would have it in the minutes, if that's the

15   case.

16       Q.    We'll try to find it.

17       A.    Okay.

18       Q.    I don't want to hold things up, but he did discuss

19   it at a Board meeting?

20       A.    Yes.

21       Q.    And one of the things he did say, and I think you'll

22   remember this one, is he said, "If Mr. Murdaugh needed more

23   money or asked for more money, we would give it to him"?

24       A.    That was his position.

25       Q.    Okay.  And that's because he worked, Mr. Charles

1  Laffitte, he worked every day, even though he's older, right?

2          MS. LIMEHOUSE:  Objection, Your Honor.  He's not

3  asking him a question.

4          THE COURT:  Just ask it -- ask it as a question.

5  BY MR. DANIEL:

6      Q.   Mr. Charles Laffitte Jr., the chairman, went to work

7  every day?

8          MS. LIMEHOUSE:  Your Honor, he's testifying.

9          THE COURT:  I think the proper thing is, "isn't it

10  true that," and then put it, rather than testifying.

11         MR. DANIEL:  Okay.  I'm sorry.  I'm just closing

12  with a question mark.

13  BY MR. DANIEL:

14     Q.   Isn't it true that Mr. Charles Laffitte showed up at

15  work every day?

16     A.   Yes, he did.

17     Q.   And he was of the Board?

18     A.   Yes, he is.

19     Q.   And he -- it was mentioned that -- you've testified

20  that Russell Laffitte was sort of the banking contact with

21  Alex Murdaugh.  But Mr. Charles Laffitte Jr., the Board

22  chairman, was also the contact for Alex Murdaugh?

23     A.   Yes.

24     Q.   Okay.  And so they sort of were -- was sort of --

25  that was their -- those were their branches there.  They were

1    sort of boots on the ground; isn't that right?  I mean, they

2    go to work every day there.  They deal with Alex Murdaugh and

3    have for years?

4         A.    They were closest to Alex Murdaugh.

5         Q.    Okay.  And so -- and what I'm saying to you, they

6    would know more than the Board would know necessarily what

7    Alex Murdaugh's track record was?

8         A.    They should.

9         Q.    Okay.  And now did that track record include

10   making -- borrowing extensive amounts of money throughout the

11   year?

12        A.    Who's making extensive amounts of money, the bank or

13   Alex Murdaugh?

14        Q.    No, no, Alex Murdaugh borrowing significant money

15   from the bank each year?

16        A.    He would know -- yes, they would know if he had

17   borrowed money.

18        Q.    Yeah.  And they would know if he paid that money

19   back?

20        A.    Yes.

21        Q.    And you could have known if you had gone and looked

22   at his loan history?

23        A.    Yes.

24        Q.    Okay.  So you have customers -- oh, well, let me ask

25   this question:  Do you have customers at the -- at your

1    Beaufort branches that are significant customers to the bank?

2        A.    I do.

3        Q.    And you have those relationships with those

4    customers?

5        A.    I do.

6        Q.    Okay.  And so you would know much better than

7    Russell Laffitte or Mr. Charlie Laffitte or Gray Henderson,

8    for instance, the loan history and the importance of those

9    good customers to Palmetto State Bank?

10       A.    I should.

11       Q.    Okay.  And -- are you aware that Alex Murdaugh every

12   year, at the end of the year, or in January, is when the firm

13   got their bonuses?

14       A.    Russell Laffitte mentioned that to us, yes.

15       Q.    Yeah.  And that's sort of when they shared the pie,

16   so all the profit of the firm the partner split?

17       A.    I am not aware of their practices, but Russell

18   mentioned that's when the bonuses were paid.

19       Q.    Okay.  And if you look at the loan history for the

20   other Peters, Murdaugh and Parker lawyers wouldn't you know,

21   too, that they had large loans throughout the year and then

22   paid those loans off in December or January when they got

23   their bonuses or their profit?

24       A.    Yes.

25            MR. DANIEL:  Okay.  Please pull up Exhibit 39.

1   Exhibit 39, I believe it is the Executive Committee minutes

2   from October the 12th.

3           MS. LIMEHOUSE:  Your Honor, this is not yet in

4   evidence.

5           MR. DANIEL:  It's not in evidence?  Okay.  Okay.

6   Just call it up for Mr. Malinowski.

7   BY MR. DANIEL:

8       Q.   And did you actually take those minutes?  You wrote

9   up those minutes, Mr. Malinowski?

10      A.   Yes.

11      Q.   Okay.  Go ahead and take time to read it.  And are

12  you familiar with the matters that you reported on in those

13  minutes?

14      A.   I'd like to read it first.

15      Q.   Yes, sir.  Take your time.

16      A.   All right.

17      Q.   Okay.

18          MR. DANIEL:  And, Your Honor --

19  BY MR. DANIEL:

20      Q.   Were those minutes accurate and are they kept in the

21  regular course of the business?

22      A.   Yes.

23          MR. DANIEL:  Your Honor, at this time I would offer

24  Exhibit No. 39, minutes of the October 12th, 2021, Executive

25  Committee meetings.

1           THE COURT:  Is there an objection?

2           MS. LIMEHOUSE:  I have no objection, Your Honor,

3    except I think this is just 39D.  I think 39 is a bunch of

4    minutes, and then they're subdivided.  So I just want to make

5    sure we're addressing -- I think this is 39D.

6           THE COURT:  Is this 39D you are asking him?

7           MS. LIMEHOUSE:  I think it's your 39D.

8           MR. AUSTIN:  That's right.

9           MR. DANIEL:  Just look at Exhibit 39D, which is the

10   October 12th, 2021, meeting.

11          THE COURT:  Very good.  And as to 39D?

12          MS. LIMEHOUSE:  No objection.

13          THE COURT:  No objection.  Is that Defendant's 39?

14          MR. DANIEL:  Yes, Your Honor.

15          THE COURT:  Defendant's 39D is admitted without

16   objection.

17          (Defendant's Exh. 39D is received in evidence.)

18   BY MR. DANIEL:

19      Q.   Yes.  And so if you will go ahead and call out the

20   full for the jury to see.  Okay.  And if you would call out

21   the -- first of all, who attended this meeting?

22      A.   Do you want me to read it?

23      Q.   Yes, sir, please.

24      A.   "Attending were Charlie Laffitte, Russell Laffitte,

25   Gray Henderson, Scott Swain, and Jan Malinowski."

1      Q.   And that's the full Executive Committee; is that

2   correct?

3      A.   That is correct.

4      Q.   Okay.  And if you will please call out the paragraph

5   called "The loan approval process."  If you would read the

6   highlighted section, please.

7      A.   "Russell Laffitte requested that the Executive

8   Committee consider changes to the large loan decision and

9   reporting process."

10     Q.   Okay.  So the sort of more formalizing the large

11  loan process or updating it, so to speak, that was generated

12  and that was brought up by Russell Laffitte?

13     A.   In response to questions.

14     Q.   Yeah.  But he's the one that brought it up, isn't

15  he?

16     A.   He was the CEO of the bank, yes.

17          MR. DANIEL:  And can we pull up the October 19th,

18  just for the witness, the October 19th, 2021, full Board

19  minutes, which is Exhibit 40.  40D?  It's Exhibit 40E.

20          THE COURT:  Okay.  I don't think that's in either.

21  Is there an objection?

22          MS. LIMEHOUSE:  No objection, Your Honor.

23          THE COURT:  Exhibit 40E is admitted without

24  objection.

25          (Defendant's Exh. 40E is received in evidence.)

1          THE COURT:  Please proceed.

2    BY MR. DANIEL:

3      Q.   Please call out the attendees of that meeting.

4    Okay.  And the attendees there, is that the full Board or is

5    somebody missing?

6      A.   It appears to be the full board with two attending

7    via Zoom.

8      Q.   I'm sorry?  I can't quite hear you.  I'm sorry.  I

9    am hard of hearing.

10     A.   Okay.  It appears to be the full board with two

11   attending by Zoom.

12     Q.   Okay.

13          MR. DANIEL:  And if you would, please, call out six

14   paragraphs down on page 2, which begins with "Elizabeth

15   Malinowski."

16   BY MR. DANIEL:

17     Q.   Okay.  And please read that for the benefit of the

18   jury.

19     A.   "Elizabeth Malinowski wanted it noted that there

20   were several loans that were approved that did not go to the

21   full Executive Committee.  Russell Laffitte explained that

22   all loans are approved by at least three of the five

23   members."

24     Q.   Okay.  And then Elizabeth Laffitte Malinowski

25   request -- that's your wife?

1       A.    Yes.

2       Q.    Yeah.  She requested a write-up on all the loans in

3   the Executive Committee minutes?

4       A.    Yes.

5       Q.    Okay.  And Russell and I guess that's you, agreed

6   actions are being taken to approve the process?

7       A.    Yes.

8       Q.    Okay.  So the loans they are talking about, the

9   significant loans, isn't it the $750,000 loan they are sort

10  of talking about when Russell says, "It was approved by three

11  members of the Executive Committee"?

12      A.    In the context of this memo or in the context of the

13  $750,000 loan?

14      Q.    In the context of $750,000.  I'm sorry.

15      A.    He said that three of the voting members, three of

16  the five on the committee and three of the four voting

17  members had approved the loan.

18      Q.    Okay.

19            MR. DANIEL:  And just please re-call up Exhibit 3,

20  which is the amended and restated bylaws of Palmetto State

21  Bank dated June the 22nd, 2021.  I believe they are already

22  in evidence, Your Honor.

23  BY MR. DANIEL:

24      Q.    And these are the most current bylaws governing the

25  bank -- I'm sorry, these are the current bylaws?

1          A.    That's my understanding.

2          Q.    And if you could call out paragraph 3.16 with the

3     Executive Committee.  And these are the duties and

4     responsibilities of the Executive Committee; is that right?

5          A.    That's what's delineated here, yes.

6          Q.    Okay.  And please just read the highlighted portion

7     for the benefit of the jury.  "If designated..."

8          A.    "If designated by the Board of Directors, the

9     Executive Committee initially shall have delegated to it and

10    may exercise to the extent permitted by applicable law all

11    the power and authority of the Board of Directors for

12    management of the business and affairs of the corporation,

13    except to the extent, if any, subsequently limited by

14    resolution of the full Board of Directors."

15         Q.    All right.  And then if you'd read the -- what some

16    of the things -- the powers are.  It says, "To approve..."

17    The highlighted portion, please.

18         A.    "To approve, bind the corporation under, and

19    authorize the corporation to perform or enforce contracts,

20    agreements, and debt obligations, to initiate, defend or

21    settle legal proceedings, which duties and authorities shall

22    be exercisable without further action of the full Board of

23    Directors and shall continue to apply until modified by the

24    Board of Directors despite any change in membership of the

25    committee."

1       Q.   So the Executive Committee has the power to, first,

2  approve significant loans, a $750,000 loan?

3       A.   If it falls within the loan approval process.

4       Q.   Before the loan approval process, Mr. Malinowski, it

5  has to start somewhere?

6       A.   What is your question?

7       Q.   You don't think it was a good banking practice for

8  them to do it on their own out at Hampton County where their

9  branch is, but they're three of the five members of the

10  Executive Committee?

11       A.   They are three of the five, correct.

12       Q.   And your real beef with them is, A, you didn't like

13  them, which I understand, right, you didn't like it?

14       A.   I didn't see a reason to -- I need -- saw a reason

15  to discuss under the circumstances, yes.

16       Q.   Okay.  And there's nothing wrong with that.  And I'm

17  not implying there is.  Okay.  But they said they approved

18  it.  The only thing that they didn't do to fully comply with

19  the bylaws, is later on in the bylaws, you testified on

20  direct examination that they should follow it up in writing

21  with the full Executive Committee?

22       A.   With the consent of the full Executive Committee in

23  writing --

24       Q.   Right.

25       A.   -- of the voting members, yes.

1    Q.    Okay.  And so -- but they did discuss it later with

2    the Executive Committee and then still went with the full

3    Board?

4    A.    They did.

5    Q.    There's no doubt about that.  And while the Board

6    disagreed -- some members of the Board disagreed, the -- Mr.

7    Charlie and Ms. Gray and Russell felt like it was in the best

8    interest of Palmetto State Bank at the time?

9    A.    They made the decision --

10              MS. LIMEHOUSE:  Your Honor, objection.  He's

11    testifying again.

12              THE COURT:  Do it as a question, Mr. Daniel.

13    BY MR. DANIEL:

14    Q.    Wasn't it made clear at the board meetings and at

15    the Executive Committee meetings that Mr. Charlie, Ms. Gray

16    Henderson, and Mr. Russell Laffitte, that's the chairman, the

17    secretary and the CEO, felt it was in the best interest of

18    Palmetto State Bank to loan that money, the $750,000?

19    A.    In their opinion, at the time, yes, they did.

20    Q.    Okay.  Because no one knew at that time all the

21    craziness that Alex Murdaugh had done, all the thievery?

22              MS. LIMEHOUSE:  Objection, Your Honor.

23              THE COURT:  It's cross-examination, overruled.  Keep

24    going.

25    BY MR. DANIEL:

1    Q.   Did anyone know at that time that Mr. Alex Murdaugh

2    had stolen money from so many different people?

3    A.   No one.

4    Q.   Okay.  And since this all did break out, this all

5    did happen and became -- exposed Alex Murdaugh and the bank's

6    role and Mr. Russell Laffitte's role, the Board is rightly

7    concerned -- I'm asking as a question:  Isn't the Board

8    rightly concerned about possible lawsuits against the bank?

9    A.   They are.

10   Q.   And the Board is also concerned that there could

11   even be personal liability on individual Board members?

12   A.   They are.

13   Q.   Okay.  And you testified about the Board has

14   insurance or the bank has insurance, but the insurance

15   carrier could very well deny coverage for those issues?

16   A.   They could.

17   Q.   Okay.  And so you're really concerned about that

18   because then you would have personal liability; isn't that

19   right?

20   A.   Possibility.

21   Q.   Okay.  And -- so really above all else, the Board

22   wants -- the board, individual board members, isn't it true

23   that they would like to avoid personal liability and be

24   exposed to a large money judgment?

25   A.   They want to do what's in the best interest of the

1    shareholders.

2        Q.    Okay.  But are you telling me in their individual

3    interest, that they aren't concerned about being sued and

4    getting a large personal judgment against individual Board

5    members?

6        A.    They are concerned about that.

7        Q.    Okay.  And if somehow Russell Laffitte is painted as

8    a rogue board member or rogue bank employee or rogue Board

9    officer, and did all this on his own, then that would be less

10   of a chance -- I'm asking you a question, wouldn't it be less

11   of a chance for the Board members to be personally

12   responsible?

13       A.    I don't know.

14       Q.    Have y'all discussed that?

15       A.    No, we haven't.

16       Q.    You've discussed that?

17       A.    I am not aware of a discussion specific to that

18   topic.

19       Q.    Let's discuss -- you testified extensively on direct

20   examination to the 670 -- excuse me, $680,000 payment that

21   was made to the law firm by Russell Laffitte.

22       A.    Yes.

23       Q.    Okay.

24           MR. DANIEL:  And if you would bring up Exhibit 60,

25   which is a transcript, just for the witness.

1    BY MR. DANIEL:

2        Q.   Now, there's actually a transcript of a recording of

3    a November 3rd meeting, the meeting y'all had on November

4    3rd.  You're familiar with the fact that it was recorded and

5    there is a transcript, isn't there?

6        A.   I'm aware of that, yes.

7        Q.   And you remember that meeting, don't you, the

8    November 3rd meeting?

9        A.   I do.

10       Q.   And that was a pretty significant meeting?

11       A.   It was.

12       Q.   Okay.  And prior to that meeting, I believe on

13   October 29th, you testified that there was an Executive

14   Committee meeting -- no, excuse me, I'm sorry, a Litigation

15   Committee was formed?

16       A.   Yes.

17       Q.   Okay.  And then after that Litigation Committee was

18   formed, there was a October 31st, Halloween night, I believe,

19   Board minutes by Zoom and some members were present?

20       A.   I assume so.

21       Q.   Okay.  Well, you don't remember there was an evening

22   meeting?

23       A.   No, I do remember the meeting.  I don't know who was

24   in person or who was by Zoom but --

25       Q.   I'm sorry.  You don't know what?  I'm sorry.

1      A.    There was a meeting on the 31st, you're correct,

2   Board meeting.

3      Q.    And at that meeting, this issue with Alex Murdaugh

4   was discussed?

5      A.    Which issue?

6      Q.    The issue involving the exposure to the bank, the

7   issue that we are all here about today?

8      A.    Are you saying the 680 or the Satterfield, which

9   one?

10     Q.    No, I'm talking to you about all the exposure, the

11  bank may have because of outstanding loans to Alex Murdaugh.

12     A.    We discussed Alex Murdaugh, yeah.

13     Q.    Well, what would you discuss about Alex Murdaugh if

14  it weren't for the outstanding loans and the fact that the

15  bank --

16     A.    We had other topics as well.  We had on the topics

17  as well.

18     Q.    Okay.  And isn't it a fact that at the October 31st

19  emergency meeting, nighttime meeting, that the Board counsel,

20  its counsel, asked Russell Laffitte to call Ronnie Crosby at

21  the firm and put a pause, put a pause, a hold --

22          MS. LIMEHOUSE:  Objection, Your Honor.  He's trying

23  to get his own client's self-serving hearsay in the witness.

24          MR. DANIEL:  I'm sorry.  I don't understand the

25  objection.

1          THE COURT:  He has not yet gotten to the defendant's

2     statement.  So he hasn't done that.  If he does, we'll

3     address it.  Okay?

4          MR. DANIEL:  And right now I'm just refreshing his

5     recollection.

6          THE COURT:  Yeah.

7     BY MR. DANIEL:

8        Q.   So isn't it a fact that at that October 31st, 2021,

9     emergency nighttime meeting, that the Board, its counsel,

10    asked Russell to call Ronnie Crosby at the Murdaugh law firm

11    --

12         MS. LIMEHOUSE:  Objection, Your Honor, this is

13    hearsay.  What the counsel said during the meeting is

14    hearsay.

15         THE COURT:  He's asking did the Board act and the

16    Board act, he's not asking --

17         MS. LIMEHOUSE:  No, he said "ask," he said "Did they

18    ask their lawyer to call Ronnie Crosby."

19         THE COURT:  Ask it as did the Board act to request.

20         MR. DANIEL:  Did the Board ask --

21         THE COURT:  Act, a-c-t.  Did the board act to

22    request...

23    BY MR. DANIEL:

24       Q.   Did the Board act at the request, and the lawyer

25    discussed, having Russell Laffitte contact Ronnie Crosby at

1     the law firm to put a pause on the $680,000 check?

2         A.   On the 31st or the November 3rd meeting?

3         Q.   No.  Let me refresh your recollection.  Go to -- go

4     to the top of page 13 of the transcript, please, Mr.

5     Malinowski.

6         A.   Yes, sir.

7         Q.   Okay.  And go ahead and take your time to read that.

8         A.   Which line do you want me to start, 1?

9         Q.   Yeah, go ahead and read 1.

10             MS. LIMEHOUSE:  Objection, Your Honor.  This is not

11    in evidence yet.  And he's publishing statements of a

12    transcript that's not yet in evidence.

13             THE COURT:  What I think is he's offering it to

14    refresh your recollection of the witness.  Is that what you

15    are doing?

16             MR. DANIEL:  Yes, Your Honor.

17             THE COURT:  You're not offering it into evidence at

18    this point?

19             MS. LIMEHOUSE:  Then go ahead and say it, so I just

20    want to make sure.

21             THE COURT:  Just have him -- if he wants to read it

22    and refresh his recollection, that would be proper.  He can

23    read it to refresh his recollection.  It shouldn't be up for

24    anybody but for the witness to read.

25             THE WITNESS:  Mr. Daniel, you want me to read from

1    line 1, is that where you want me to start?

2            MR. DANIEL:  Yeah.  If you pull that a little bit

3    closer or something, can you do that, please.

4            THE COURT:  Read to yourself, sir.

5            THE WITNESS:  Yes, sir.  Okay.  Thank you, Your

6    Honor.

7            THE COURT:  Yes, sir.

8    BY MR. DANIEL:

9        Q.   So my question is --

10           THE COURT:  Let him read it.  Now, you asked him to

11   refresh his recollection, let him read it.

12           THE WITNESS:  Thank you.

13   BY MR. DANIEL:

14       Q.   First, a pause was put on the check over at the law

15   firm at the request of Palmetto State Bank and Russell

16   Laffitte?

17       A.   The attorneys asked Russell to ask Ronnie to put a

18   pause --

19           MS. LIMEHOUSE:  Objection, Your Honor.  He's reading

20   from the transcript that's not in evidence.

21           THE COURT:  He's speaking -- he had his recollection

22   refreshed, if he can speak from his recollection.

23           THE WITNESS:  Yes, in the 3rd of November.

24   BY MR. DANIEL:

25       Q.   In the 3rd of November meeting, it says -- or let me

607

1    ask you what it says.  Okay.  It refers back to a Sunday

2    meeting.  And that would be the October 31st meeting,

3    wouldn't it?  This is November 3rd we are at now.

4         A.   Yes.

5         Q.   Okay.  And at that one is when it was asked to put

6    Russ- -- to get Russell in touch with Ronnie Crosby at the

7    law firm to put a pause on that $680,000 check?

8         A.   Correct.

9         Q.   Correct.  And your lawyer engaged in discussions on

10   behalf of the Board with Ronnie Crosby after that?

11        A.   Correct.

12        Q.   Okay.  And the $680,000 payment to settle the Badger

13   matter was discussed at length at this Board meeting,

14   November 3rd, 2021?

15        A.   It was discussed, yes.

16        Q.   Well, without me mentioning names, there were really

17   two things, big issues discussed, another case and this

18   Badger case?

19        A.   That's correct.

20        Q.   Okay.

21             MR. DANIEL:  Please go ahead and scroll down some

22   for the witness.  Still page 13, okay.

23   BY MR. DANIEL:

24        Q.   And if you read -- and at that meeting, isn't it

25   true the Board's consensus was the bank did not want Ronnie

608

1    Crosby at the Murdaugh firm to throw the bank under the bus

2    or even mention the bank to Mr. Arthur Badger when he paid

3    the money to Mr. Badger?

4        A.    That's correct.

5        Q.    That's correct.  And particularly look at lines 20

6    to 22.  Okay.  Now, I'm going to ask you a question about

7    that.  Now, your lawyer, Mr. Trenham Walker, was familiar

8    with Mr. Ronnie Crosby, the lawyer over at the Parker Law

9    Firm?

10       A.    Yes, he is.

11       Q.    Okay.  And what the lawyer was reporting back to the

12   Board that he had contacted, himself, Ronnie Crosby, and he

13   had a discussion with Ronnie Crosby.  And first part of that

14   discussion, because he didn't think Ronnie Crosby was going

15   to throw the Board under the bus -- or the bank under the

16   bus?

17       A.    That's my understanding.

18       Q.    And he didn't think, in fact, that Ronnie Crosby was

19   going to even mention the fact that the bank was involved in

20   the settlement?

21       A.    And the question?

22       Q.    Yes, sir.

23       A.    The question is what?

24       Q.    Didn't he also -- was it also that the bank -- that

25   his discussion with Ronnie Crosby that he reported to the

1    Board that night -- or excuse me, that day is that Ronnie

2    Crosby would not even mention that the bank was in any way

3    involved with the settlement?

4         A.   That's correct.

5         Q.   Okay.  And that's what the bank wanted?

6         A.   Didn't want --

7         Q.   Isn't that what the bank Board wanted?  They didn't

8    want the lawyers at the Murdaugh Firm telling Mr. Badger

9    about the bank's involvement in the matter?

10        A.   I don't think that was the sole reason.

11        Q.   I apologize.  Say it again?

12        A.   We wanted to make sure that we understood what might

13   be available to us in conversation with Ronnie Crosby as he

14   approached Mr. Badger.

15        Q.   Okay.  And that was that, A, Mr. Badger would not be

16   told that the bank was paying half of the settlement or a

17   portion of the settlement; is that right?

18        A.   That's correct.

19        Q.   Okay.  And the Board -- excuse me, the bank Board

20   did not want to tell Mr. Badger that?

21        A.   That's correct.

22        Q.   They wanted to keep the bank out of it?

23        A.   They would hope so, yes.

24             MR. DANIEL:  And show the witness page 15, please.

25   BY MR. DANIEL:

1    Q.   Now, I will ask you the question first.  Isn't it

2    true that the Litigation Committee felt that the PSB, was the

3    bank, was better off having Ronnie Crosby meet with Mr.

4    Badger, hand him a check, and use his diplomacy to settle the

5    matter?  That would be lines 19 through 25.

6        A.   The money was out the door at that time.  The

7    check's been paid --

8        Q.   But -- Go ahead.

9             THE COURT:  He can explain his answer.  Let him

10   explain.

11            THE WITNESS:  The money is out the door at that

12   time.  There's a pause, as you so indicated --

13            MR. DANIEL:  Okay.  But --

14            THE COURT:  Let him finish his answer, Mr. Daniel.

15            THE WITNESS:  And we are looking to find out if --

16   what Mr. Crosby can do on behalf of the Board

17       Q.   Okay.  And what did you take it to mean, a pause had

18   been put on that check?

19       A.   The check in the possession of PMPED at that time --

20       Q.   In the trust account, you're familiar with that?

21       A.   Yes, I am.

22       Q.   Okay.  And they had intended to pay Mr. Badger with

23   that check along with their check?

24       A.   That's correct.

25       Q.   Okay.  And so by him putting a pause on it, the

1  check had not been negotiated with the client, it hadn't been

2  delivered to the client, had it?

3       A.   It had been delivered to the law firm.

4       Q.   It had been delivered to the law firm and it was in

5  their trust account?

6       A.   I assume that's where they put it, yes.

7       Q.   And so the Board was fine with Ronnie Crosby --

8  excuse me, with having Ronnie Crosby meet with Mr. Badger,

9  quietly settle the case, and leave the bank out of it; is

10 that right?

11      A.   That's correct.

12      Q.   And that would be sort of, by chance, if anything

13 about Badger ever got out, that the lawyers who were trolling

14 around for different clients to represent plaintiffs would

15 already be settled before those lawyers, specifically, Eric

16 Bland and Ronnie Richter, would be already settled, and there

17 wouldn't be any damages or much injury to Mr. Badger other

18 than the loss of the use of that money; isn't that correct?

19      A.   One would think.

20      Q.   Sir, I'm sorry?

21      A.   I believe so.

22      Q.   Well, you believe so?  Refresh your recollection and

23 read it.

24           THE COURT:  He's answered the question.  He didn't

25 need to refresh your recollection.  He answered it.

1          THE WITNESS:  Are we still on lines 19 through 25?

2          MR. DANIEL:  Yes, sir.

3          THE COURT:  Well, let's focus on this.  If you are

4    using it to refresh his recollection, he answered the

5    question without the need to refresh his recollection, if you

6    are trying to use it for another purpose --

7          MR. DANIEL:  Judge, that's what I was getting at,

8    but he's playing hard to get with me.

9          THE COURT:  He's not playing hard to get.

10   BY MR. DANIEL:

11     Q.   Okay.  Refer to the bottom of page 15 -- well, let

12   me ask you this.  That's important because Eric Bland is an

13   attorney that already had dealings with the bank, wasn't he?

14     A.   Yes, he was.

15     Q.   And not pleasant dealings, were they?

16     A.   None of the dealings were pleasant.

17     Q.   And he could generate a whole a lot of publicity

18   that was bad publicity for the bank, wasn't he?

19     A.   We were subject to bad publicity.

20     Q.   Okay.  And so the Board, as it should have been, was

21   concerned about that bad publicity?

22     A.   That and other issues.

23     Q.   So last thing the Board at that meeting on November

24   3rd wanted was for Mr. Bland, the plaintiff's lawyer, to find

25   out about Badger?

1    A.    Correct.

2    Q.    And it's a fact, too, that y'all were put on notice

3    that Mr. Ronnie Crosby had settled other matters with other

4    clients very quietly without any lawsuits being filed?

5    A.    That's correct.

6    Q.    And that's what the bank wanted and that was the

7    subject of this meeting?

8    A.    Yes, among other topics.

9    Q.    And so the consensus of the Board then was for its

10   lawyer to work with Ronnie Crosby and make sure it got

11   whatever legal documents it might need to protect the Board

12   from Ronnie Crosby's the firm; is that right?

13   A.    Can you restate that question one more time, please?

14   Q.    Yeah.  They wanted its lawyer, Mr. Trenham Walker,

15   to handle the matter now with Mr. Ronnie Crosby over at the

16   Parker Murdaugh Law Firm rather than Mr. Russell Laffitte or

17   anyone else?

18   A.    That's correct.

19   Q.    Okay.  And it's -- that was the general consensus of

20   the Board, correct?

21   A.    The Board wanted Trenham Walker to deal with Ronnie

22   Crosby.

23   Q.    And I believe the Board wanted Mr. Walker to obtain

24   a release not necessarily from Badger, but a release from the

25   law firm, that the 680 was to settle any sort of dispute

1    between them, as to the payment?

2        A.    That's correct.

3        Q.    Okay.  Now, the Board seemed generally -- you tell

4    me.  The Board -- didn't the Board seem generally pleased

5    with what Mr. Ronnie -- excuse me, what the discussions were

6    between your lawyer, Mr. Trenham Walker, and Ronnie Crosby

7    and the results of those conversations at that time, at this

8    meeting?

9        A.    At the time of the meeting, Mr. Walker believed he

10   could have a good conversation with Mr. Crosby.

11       Q.    Okay.

12             MR. DANIEL:  And if you will pull up page 19 for the

13   witness.

14             THE COURT:  Are you asking him to refresh his

15   recollection?

16             MR. DANIEL:  Your Honor, I'm going to ask --

17             THE COURT:  You've got to ask him a question first.

18             MR. DANIEL:  I'm trying to read it myself.  I've

19   gotten it written down here.

20             THE COURT:  Refresh your recollection first.

21             MR. DANIEL:  Yes, Your Honor.  It's been a long day

22   already, yet it's still morning.

23   BY MR. DANIEL:

24       Q.    I believe Jim Gibson commended the job that Trenham

25   Walker was doing in trying to settle the case?

1       A.    That's what it appears to read, yes.

2       Q.    Well, just use your own recollection.  Okay?  Isn't

3   it true that at the Board -- Mr. Gibson expressed to the

4   Board and himself that they were pleased with the job Trenham

5   Walker was doing in having discussions with Ronnie Crosby

6   from the PMP Firm to settle the case?

7       A.    To determine what damage control, yes, that was the

8   point of the conversation.

9       Q.    Okay.  You tell me.  Tell me at that point what that

10  means.  You can review that transcript and we can talk about

11  damage control.

12      A.    The money had already been paid to PMPED.

13      Q.    And there was a pause on it, wasn't it, Mr.

14  Malinowski?

15          THE COURT:  Mr. Daniel, you asked him a question.

16  Let him answer it, then you ask.  Please continue.

17          THE WITNESS:  A pause on payment to Mr. Badger.

18  BY MR. DANIEL:

19      Q.    Correct.

20      A.    The check had already been paid.  Your client on

21  line 5 says, "We are paying it."  It's already passed tense.

22  It's been paid.  The check's been cut.  PMPED has it -- has

23  it in its possession and it's been deposited in their

24  account.  The pause was, let's try to find out what damage

25  control we can effect --

1      Q.   Your lawyer -- go ahead.

2           MS. LIMEHOUSE:  Will you let the witness answer,

3    please?

4           THE COURT:  Let him finish his answer.

5           THE WITNESS:  To determine what damage control we

6    can effect.

7    BY MR. DANIEL:

8      Q.   Isn't that --

9           THE COURT:  He wasn't finished, please continue.

10          MR. DANIEL:  I thought he was finished.

11          THE WITNESS:  I'm finished, Your Honor.

12          THE COURT:  Very good.  Now, ask the next question.

13   BY MR. DANIEL:

14     Q.   Was the term "damage control" ever used at that

15   meeting --

16     A.   No, but --

17     Q.   -- on November 3rd?

18     A.   -- that's my assessment.

19     Q.   But that's not what you remembered what happened at

20   that meeting -- that was discussed at that meeting, is it?

21     A.   Damage control or just --

22     Q.   Damage control?

23     A.   Damage control was not used.  I said it's my

24   assessment of the meeting.

25     Q.   Did you ever bring up damage control?

617

1        A.    Did I mention damage control?

2        Q.    Yeah.

3        A.    No.

4        Q.    And after that meeting -- well, let me ask you this:

5   At that meeting, there's a general consensus also of the

6   Board that they didn't want the law firm, Ronnie Crosby and

7   the lawyers over there at the Murdaugh Parker Law Firm, they

8   didn't want them to try to get a release for Mr. Badger for

9   bank, did they?

10       A.    I don't believe they could get a release from Mr.

11  Badger because he was still a client.

12       Q.    But you didn't want it because it would bring

13  attention to Mr. Badger that the bank was involved in the

14  settlement?

15       A.    I assume so.

16       Q.    Mr. Malinowski, be honest.  I'm not asking you to

17  assume.  I'm asking about the general discussion was, he

18  didn't want Badger to know anything about the bank?

19       A.    That's correct.

20       Q.    Because they didn't want his lawyers, vultures, to

21  come around and sue the bank?

22       A.    That's correct.

23       Q.    Okay.  So after that meeting and after subsequent

24  events, the Board generally was pleased with Trenham Walker

25  and what he was able to accomplish?

618

1        A.   Yes, through his conversations, yes.

2        Q.   Okay.

3             MR. DANIEL:  And at this time, please pull up

4    Exhibit 3.  And this is already in evidence, Your Honor.

5    BY MR. DANIEL:

6        Q.   Exhibit 3, which is the bylaws of the bank that were

7    modified, or at least the date is June 22nd, 2021.  And I

8    believe it's already been testified by Mr. Malinowski that

9    this is the most current version; is that right, Mr.

10   Malinowski?

11       A.   To my knowledge, yes, sir.

12       Q.   Yeah, okay.  So under Section 4.03, please pull up

13   and please call out chief executive officer.  Okay.  So tell

14   me when you are ready for me to ask a question.

15       A.   Yes, sir.

16       Q.   So the CEO has the authority to settle matters on

17   behalf of the corporation -- or on behalf of the bank?

18       A.   That's what it appears to read, yes.

19       Q.   Okay.  But, Mr. Malinowski, those bylaws govern your

20   Board?

21       A.   They are.

22       Q.   And you say "appears to be," but isn't it true that,

23   in fact, that's what governs the Board and he does have that

24   authority, pursuant to the bylaws?

25       A.   He has the authority.  This was an extraordinary

1    circumstance.

2         Q.    But the Board -- but the bylaws, the chief executive

3    officer is not limited by extraordinary circumstances?

4         A.    That is correct.

5         Q.    Okay.  So he does have the power, he does the

6    authority to settle a case?

7         A.    Yes.

8              MR. DANIEL:  Oh, and please, if you would, go back

9    to that Exhibit 3 and pull up 3.15.

10   BY MR. DANIEL:

11        Q.    Please go ahead and read that for the benefit of the

12   jury.  You can read it out loud.

13        A.    "A director of the corporation who is present at a

14   meeting of the Board of Directors at which action on any

15   corporate matter is taken shall be presumed to have assented

16   to the action taken unless such director's dissent shall be

17   entered into the minutes of the meeting or unless such

18   director shall file such director's written dissent to such

19   action with the person acting as the secretary of the meeting

20   before the adjournment thereof or shall forward such

21   director's dissent by registered mail to the secretary of the

22   of the corporation immediately after the adjournment of the

23   meeting.  The right to dissent shall not apply to a director

24   who voted in favor of such action."

25        Q.    Okay.  So did you ever submit in writing after that

1    meeting on November 3rd that you objected to it and you

2    wanted to make that known?

3        A.    I did not.

4        Q.    And did any other member of that Board of Directors,

5    to your knowledge, submit something in writing?

6        A.    I do not know.

7        Q.    You don't know?

8        A.    I don't know.

9        Q.    You haven't seen anything?

10       A.    I have not seen any.

11       Q.    Okay.  Fair enough.

12            MR. DANIEL:  Okay.  Bring up the next exhibit.

13    Please call up Exhibit 40.  The date on the exhibit -- it's

14    entitled "Other loan finding summary" -- it's dated November

15    the 9th, 2016.

16            If there is any objection, I would have given you a

17    copy this morning, too.

18            MS. LIMEHOUSE:  I have no objection, Your Honor.

19            THE COURT:  40 what?  Is there a sub --

20            MS. LIMEHOUSE:  80, I believe.

21            THE COURT:  I'm sorry?

22            MR. AUSTIN:  80.

23            THE COURT:  No. 80, Exhibit 80 is -- Defendant's 80

24    is admitted without objection.

25            (Defendant's Exh. 80 is received in evidence.)

1   BY MR. DANIEL:

2       Q.   If you would read -- read the highlighted portion at

3   the top.

4       A.   "Exam start date, October 24th, 2016; asset as of

5   date, September 30th, 2016; date generated, November 9th,

6   2016.  Richard A. Murdaugh."

7       Q.   And, Mr. Malinowski, you are familiar with these

8   such reports, aren't you?

9       A.   They appear to come from either FDIC or the State

10  Board of Financial Institutions.

11      Q.   Okay.  So it would be an official document either

12  from the FDIC or the State Board of Banking Control?

13      A.   That is my -- yes.

14      Q.   And this would be -- they are conducting examination

15  on -- from, I should say, October 24th, 2016?

16      A.   Yes.

17      Q.   Okay.  And how long were they generally in the bank

18  when they have an inspection or go through the bank examiner

19  books?

20      A.   Three to four weeks.

21      Q.   Okay.  So your loan documents are pretty closely

22  scrutinized into large volumes, isn't that right?

23      A.   They are.

24      Q.   And you see this is one involving customer Mr.

25  Richard Murdaugh in the years 2016, correct?

1      A.   Yes.

2      Q.   Okay.  And in 2016, it looks like he has five total

3  loans; is that right?

4      A.   Can we reduce the scope of the document?  Thank you.

5      Q.   Oh, sorry.

6      A.   Yes.

7      Q.   And it's very clear that the State Board of Banking

8  Control or the FDIC, they are closely scrutinizing all the

9  loans from Mr. Murdaugh?

10     A.   They are examining those loans, yes, sir.

11          And as a result of that examination -- examiner was

12  a Mr. Michael Brandyburg; is that correct?

13     A.   Yes.

14     Q.   Okay.  And he didn't find anything wrong with those

15  loans, did he?

16     A.   There's nothing that indicates that here.

17     Q.   And you mentioned the State Board of Banking Control

18  and mentioned the FDIC.  There are also outside auditors of

19  the bank?

20     A.   There are.

21     Q.   And is the bank required to have those outside

22  auditors come in?

23     A.   It's recommended that we have independent --

24     Q.   And to efficiently run banks, compliant banks

25  randomly have outside auditors come in and conduct a similar

1    kind of inspection of banks books and large loans --

2        A.    Yes, sir.

3        Q.    Okay.  And in this case, these outside auditors, you

4    testified on direct, I believe, or didn't you testify on

5    direct that it was a firm, a CPA firm out of Charlotte?

6        A.    No.

7        Q.    Okay.  Sir?

8        A.    Those are our internal audit company.

9        Q.    Oh, that's called internal audit.  But internal

10    audits are done by outside auditors, right?

11        A.    Yes.

12        Q.    I mean, it's not within the firm?

13        A.    We use a third party -- we use a third-party CPA

14    firm to conduct internal audit reviews inside the bank.

15        Q.    Right.  And they come in and look at the loans

16    pursuant to accounting rules?

17        A.    They don't look at the loans, no, sir.

18        Q.    Okay.  What do they do?

19        A.    They look at how the branches are run, how our loan

20    operations is run.  But they specifically don't look at

21    individual loans.

22        Q.    Okay.  And they haven't found any problems?

23        A.    They wouldn't look for problems looking at the

24    individual loans.

25        Q.    They wouldn't know problems with loan history, but

1    they may know of some other problems?

2        A.    I don't understand your question.

3        Q.    Isn't it true that Palmetto State Bank has been a

4    very well-run, very efficient, very profitable bank since

5    you've been associated with it?

6        A.    Yes, sir.

7        Q.    Okay.  And did the FDIC, when they came in, did they

8    ever raise any red flags about Alex Murdaugh and his loan

9    history?

10       A.    To my knowledge, no.

11       Q.    Did they ever raise any -- the FDIC, did they ever

12   raise any red flags about his overdraft history?

13       A.    To my knowledge, no.

14       Q.    And you're familiar with the fact -- certainly now

15   you're familiar with the fact that he had a large overdraft

16   almost every year?

17       A.    Not every year, but I understand he had large

18   overdrafts.

19       Q.    The State Board of Banking Control also regulates

20   the community banks?

21       A.    Correct.

22       Q.    And they send their own people in?

23       A.    They do.

24       Q.    And they look more towards state laws and state

25   regulations?

1    A.    State regulations and good underwriting practices,

2    yes.

3    Q.    Okay.  They never had any complaints about Alex, the

4    underwriting which is the backup for his loans, they never

5    had any problems with him, raise any red flags, did they?

6    A.    To my knowledge, no.

7    Q.    Okay.  Now, you mentioned that there's a difference

8    between the date that the $750,000 loan sort of actually went

9    out and Murdaugh got drafts of or got payments of, okay, but

10   between that, between the date he got it and the date the

11   paperwork was done --

12   A.    The question is -- what's the question?  The

13   question again?

14   Q.    Did you testify on direct examination that the loan

15   sort of went out the door, if you want to use your

16   terminology, before the loan documents were formally

17   executed?

18   A.    That's correct.

19   Q.    Okay.  And you mentioned that -- I think you

20   mentioned that it was not contained in any formal documents

21   at that time it went out the door?

22   A.    $350,000 had been wired out.

23   Q.    Okay.  And but the -- the $350,000 -- $750,000 loan

24   actually was on the list called an LNOS, and that stands for

25   loans not in system, on system yet?

1      A.    Correct.

2      Q.    And that's a regular record the bank keeps?

3      A.    There's no note, no note signed.

4      Q.    No, no note signed.  But it tells you as a board

5  member the LNOS, which is loans not on system, that it's

6  actually in process a loan; in fact, the paperwork just

7  hadn't caught up with it yet?

8      A.    Recognition, that's where the money is -- the debit

9  account for loans that have not been formally put on the

10  system.

11      Q.    And you don't think that's a good practice, do you?

12      A.    Not on July 15th and then having documentation

13  signed in August, no, sir.

14      Q.    Okay.  Now, are you aware of -- that the beach house

15  was -- you are aware that the beach house was going to be

16  mortgaged, but later found out that they couldn't put a

17  mortgage on the beach house; is that right?

18      A.    We were told there would be a second mortgage on the

19  beach house.

20      Q.    And are you aware that as far back in April, this is

21  -- we're talking about July and August, as far back as April,

22  the month of April, that there was a real estate appraisal on

23  behalf of the bank that was conducting -- beginning to

24  conduct an appraisal?

25      A.    I'm not aware of that.

1        Q.   And are you aware that Mr. Charles Laffitte was

2   involved in all -- a former real estate appraiser, isn't he?

3        A.   Which Charles Laffitte?

4        Q.   Good question.  Charles Laffitte III?

5        A.   He is our bank's real estate officer, yes.

6        Q.   And you talked about the Red Beard loan on direct

7   examination.  And while -- were you aware that even though

8   the Red Book (sic) loan -- Red Beard loan had been charged

9   off some five years ago, that Alex Murdaugh was still making

10   payments of $100,000 a year on that loan?

11        A.   I'm aware that he made periodic payments.

12        Q.   And his partner, Mr. Barrett Boulware, had

13   contracted cancer and was very sick?

14        A.   I knew he's deceased, yes.

15        Q.   So he wasn't making any payments on the loans to the

16   bank?

17        A.   Correct.

18        Q.   But Mr. Murdaugh was honoring the agreement as best

19   he could, paying the bank $100,000 a year?

20        A.   He made periodic payments.

21        Q.   And are you aware that the Moselle property, which

22   is the plantation that the bank did have collateral on and

23   did have a mortgage on, was worth a significant amount of

24   money?

25        A.   I'm aware of that.

1    Q.    Okay.  And are you aware that there is a contract

2  signed for purchase price of $3.9 million for the purchase of

3  Moselle?

4    A.    I learned that this year.

5    Q.    And had all this not come tumbling down, the bank

6  would have made fully whole by the collateral they had?

7    A.    Quite possibly.

8    Q.    Yeah.  Because the bank, in fact, had the mortgage

9  on Moselle, okay, and they had other property's mortgages

10  that were regular property.  It may not have been fully

11  collateralized, but maybe go against the mortgage on the

12  property and collect whatever Red Beard was worth -- what the

13  property was worth?

14    A.    There could have been possible.

15    Q.    Okay.  So the fact that Red Beard -- the stock

16  share's, stock was worth $350,000, that wasn't a true --

17    A.    350 is what?

18    Q.    The share of stock that Murdaugh had in Red Beard.

19    A.    I don't know what the value of that stock.

20    Q.    In some ways to the bank, it really didn't matter,

21  because they could go if they had a mortgage on the Red Beard

22  property?

23    A.    It did in matter, we took it as security on the

24  loan.

25    Q.    Okay.  But you also had a mortgage to protect the

1    bank's interest?

2        A.    But we didn't know what the value of that was.

3        Q.    Okay.  But Mr. Laffitte -- Mr. Russell Laffitte and

4    his father and Gray would certainly know the value was more

5    than $350,000?

6        A.    Of the mortgage or the share of stock?

7        Q.    Of the protected mortgage, the protected loan that

8    Mr. Murdaugh had --

9        A.    I don't know what they knew as the value of the --

10   are you talking about Red Beard?

11       Q.    I'm talking about Red Beard.

12       A.    I don't know what their valuation was.

13       Q.    And even though a loan is charged off, the bank can

14   still go after and try to collect that loan?

15       A.    Yes, sir.

16       Q.    Okay.  And the bank can still go after the

17   collateral it has?

18       A.    Yes, sir.

19       Q.    And so if there are any outstanding mortgages, the

20   bank can go off and foreclose and -- foreclose on those

21   mortgages?

22       A.    We could do that.

23       Q.    And it could sell the property?

24       A.    Once we get it, yes, sir.

25       Q.    Yes, sir.  And then they can use the proceeds from

1    that sale against any money -- any outstanding loan that's in

2    arrears or not being paid?

3        A.   Yes, sir.

4        Q.   And currently, the bank is seeking foreclosure on

5    Mr. Murdaugh's -- or began foreclosure proceedings on Mr.

6    Murdaugh's properties?

7        A.   Foreclosure proceedings began.

8        Q.   Okay.  Now, you testified on direct about the

9    conservatorship loans or the PR, the personal representative

10   loans.  Those loans were all paid back in full, weren't they?

11       A.   I don't know that.

12       Q.   You don't know to this day --

13       A.   I don't know --

14       Q.   -- those loans have been paid back --

15       A.   I don't know to this day if they were all paid back.

16       Q.   And you don't know that they were paid -- that

17   interest was paid on those loans?

18       A.   I'm aware interest was paid.

19       Q.   But you're not aware that they were paid back in

20   full?

21       A.   I am not aware that all of them were paid back in

22   full.

23       Q.   And if interest was charged and the interest rate

24   was more than they would make, there would be a higher

25   interest rate than if the estate's money just sitting in the

1    bank?

2        A.    What time period?

3            MS. LIMEHOUSE:  Objection, Your Honor.  He doesn't

4    know anything about the Hannah Plyler loans.  They were not

5    bank loans.

6            THE COURT:  You shouldn't be -- if you have an

7    objection, but not a speaking objection.

8            MS. LIMEHOUSE:  Understood, Your Honor.

9            THE COURT:  So what is -- just state briefly your

10   objection.

11           MS. LIMEHOUSE:  He's questioning him about the

12   Hannah Plyler loans, which were not bank loans, and he

13   doesn't have knowledge of those.

14           THE COURT:  Why don't you ask specifically his

15   knowledge of the loans relating from the conservator

16   accounts.

17   BY MR. DANIEL:

18       Q.    Didn't you testify about conservator loans, not just

19   the Plyler, but conservator loans in general that Mr.

20   Laffitte had taken out and also given loans to Mr. Murdaugh?

21   Didn't you testify about that on direct?

22       A.    I don't believe I did.

23       Q.    Oh, I must have written it down wrong.

24           MR. DANIEL:  I withdraw that question, Your Honor.

25    BY MR. DANIEL:

632

1      Q.   Now, Mr. Malinowski, the two sort of branches of the

2      Laffitte family.  It's a family-backed community bank,

3      correct?  Isn't that correct?

4      A.   That's correct.

5      Q.   And there is sort of two branches of that

6      family-owned community bank?

7      A.   There are multiple branches.

8      Q.   Okay.  But there's really -- let me name them.  Liz

9      Malinowski is your wife?

10     A.   That's correct.

11     Q.   Okay.  And are her parents living?

12     A.   They're deceased.

13     Q.   They're deceased, okay.  So Liz Malinowski owns

14     stock in the bank?

15     A.   She does.

16     Q.   Okay.  And Becky Laffitte is also a Laffitte and she

17     also -- her mother, I believe, owns significant shares of

18     stock in the bank?

19     A.   She does.

20     Q.   Okay.  And Norris Laffitte did own significant

21     shares and his father owned really significant shares; is

22     that right?

23     A.   It's my understanding, yes.

24     Q.   And did his father some time in the past few years

25     purchase -- excuse me, have the bank or sell the bank shares,

1    sell his bank shares back to the bank?

2        A.    He did.

3        Q.    Okay.  And how much was it sold for?  Do you know?

4    I don't remember exactly.

5        A.    I do not recall.

6        Q.    Okay.  Well, how much was the bank stock worth when

7    the sale -- roughly, how much was the bank stock worth, the

8    individual share of stock worth?

9        A.    What time period?

10        Q.    What time period?  Well, before September 2021.

11        A.    Probably -- I'm going to say approximately $330 a

12    share.

13        Q.    Okay.  And how many shares did he own?  Do you know?

14        A.    I don't recall.

15        Q.    Was it 3,000 shares?

16        A.    I don't know.

17        Q.    You don't remember the bank making a significant

18    expenditures when Norris's father sold back?

19        A.    I'm aware that a transaction did take place, yes.

20        Q.    Let me ask you this way:  Did the bank make a couple

21    hundreds dollars off it or much more?

22        A.    Did the bank --

23        Q.    Did the bank pay a couple of hundred dollars more or

24    much more?

25        A.    More than a couple hundred dollars.

1    Q.    Okay.  And more than a couple thousand dollars?

2    A.    No.

3    Q.    No, not more than a couple thousand dollars?

4    A.    Are you talking price per share?

5    Q.    No, sir, I'm talking about the total amount the bank

6    bought it back for.

7    A.    So you want me -- you want a figure?

8    Q.    A rough figure, yes.

9    A.    Probably about hundreds of thousands of dollars.

10   Q.    Okay.  It could be as much as a million dollars?

11   A.    It could be, depending on how many shares he owned.

12   Q.    Okay.  And roughly what time period was that?  Was

13   it before September 2021?

14   A.    I don't know the exact date.

15   Q.    Okay.  But it couldn't be after September 2021,

16   could it?

17   A.    I am not aware of that.  I just don't know.

18   Q.    Okay.  But -- I'm going to ask you a question from a

19   banking executive standpoint.  Wouldn't it be considered

20   inside trading or inside dealing --

21         MS. LIMEHOUSE:  Objection, Your Honor.  Relevance.

22         THE COURT:  Sustained.

23   BY MR. DANIEL:

24   Q.    Now, I mentioned there were different branches of

25   the Laffitte family.  So the other branches of the

1    conservator would be Mr. Russell Laffitte, his father, Mr.

2    Charles Laffitte, Charles Laffitte III, which is his brother,

3    and Gray Henderson Laffitte and Russell Laffitte?

4        A.    Yes, sir.

5        Q.    Okay.  And they own a significant share of the bank

6    stock?

7        A.    They do.

8        Q.    And after Sterling Laffitte passed away, some time

9    after that -- well, strike that.

10            In 2020, the Board had a strategy retreat, are you

11    familiar with that; do you remember that?

12       A.    I am.

13       Q.    Okay.  And I believe it was a gentleman -- actually,

14   I guess you would say moderated that or --

15            MS. LIMEHOUSE:  Objection, Your Honor.  I don't know

16   what the relevance of a --

17            MR. DANIEL:  It's very relevant, Your Honor.

18            THE COURT:  Well, you know, lay a foundation for

19   relevance.

20   BY MR. DANIEL:

21       Q.    There are currently -- I will ask it a different

22   way.  There are currently -- this first came out at this

23   meeting, at this retreat, that there are members of the

24   Laffitte family that want to sell the bank to a bigger bank

25   or some kind of purchaser?

636

1          A.    I am not aware of that.

2          Q.    You're not aware of that --

3                MS. LIMEHOUSE:  He answered the question.

4                MR. DANIEL:  Judge, I'm going to give him some more

5     specific information.

6                THE COURT:  He can't testify about it, Mr. Daniel.

7     He answered and he --

8                MR. DANIEL:  I can't hear you now.

9                THE COURT:  Yeah.  He answered he doesn't know.  You

10    are now saying you're ready to provide him specific

11    information, which you would be testifying.  You can put the

12    evidence in, but you can't be a witness.  You're the lawyer.

13               MR. DANIEL:  I understand, Your Honor.  But I would

14    like to remind him and refresh his recollection with what I

15    say.

16               THE COURT:  But you can't refresh his recollection

17    with your memory.

18    BY MR. DANIEL:

19         Q.    So you don't remember that at all?  That discussion

20    at the strategic retreat that the Board had in 2020?

21         A.    I remember we discussed a number of options

22    regarding the future of the bank, one was future growth of

23    the institution, both internally and through acquisition, but

24    also attempting to find out what the current value of the

25    bank was as is.

1     Q.   And in 2020, I believe, Sterling Laffitte was

2     president of the bank prior -- he was president of the bank

3     in 2000, I guess, started in 2015?

4     A.   He died in 2015.

5     Q.   He died in 2015.  Oh, I'm sorry.  So he died.  And

6     he was your classmate at The Citadel?

7     A.   He was.

8     Q.   And he was your, Liz Malinowski, Liz Laffitte, your

9     wife's brother?

10    A.   Correct.

11    Q.   He was your brother-in-law?

12    A.   Correct.

13    Q.   And in 2000 -- no, excuse me, when -- when did he

14    become president of the bank?

15    A.   I believe when all three banks were put together.

16    Q.   Okay.  And so after he passed away, he passed away

17    in 2015, you wanted to be considered to be president of the

18    bank?

19    A.   I didn't, no.

20    Q.   Okay.  Okay.  Fair enough.  Of the members of the

21    Laffitte family, are you the only one on sort of that side of

22    the family, Liz's side of the family, Becky's side of the

23    family, and Norris's side of the family, that currently works

24    day-to-day in the bank?

25    A.   I am.

1       Q.   Okay.  And it's been that way for some time, hasn't

2  it, since Sterling passed away?

3       A.   Yes, sir.

4       Q.   Okay.

5       A.   And his father.

6       Q.   Correct.  Okay.  Now, on direct examination --

7            MR. DANIEL:  And I'm close to wrapping up, Your

8  Honor.

9  BY MR. DANIEL:

10      Q.   On direct examination you testified that Russell

11 Laffitte was not being transparent in his dealings with Alex

12 Murdaugh?

13      A.   I didn't say that.  In what context?

14      Q.   Okay.  Well, let me ask this way:  Are you

15 familiar -- you must be familiar, because you've seen them

16 and we've reviewed them in this case, a good number of

17 e-mails between Russell Laffitte and Alex Murdaugh discussing

18 those -- they are in evidence.  And I believe you discussed

19 some of them today?

20      A.   I did.

21      Q.   That's pretty transparent, isn't it?

22      A.   It's not transparent with the Board, it's

23 transparent with Alex.

24      Q.   It's in writing?

25      A.   Yes.

1    Q.    And there was never any problems with Mr. Murdaugh

2    until they found out on September 20th -- well, I guess,

3    leading up to -- after his wife passed away, that would have

4    been June the 7th?

5    A.    That is correct.

6    Q.    Okay.  There's no reason for the people that work in

7    the bank, Gray or Mr. Charlie or Russell, to be bringing up

8    customers that there's no problem with, right, that they're

9    making money off of?

10   A.    If there are no problems, no.

11   Q.    Okay.  Large loans are a good thing for the bank if

12   they are properly managed?

13   A.    Yes, sir.

14   Q.    And the history of Alex Murdaugh, his loans were

15   properly managed and the bank did make money off those loans?

16   A.    We made money off those loans, yes, sir.

17   Q.    Now, when you met with the agents -- well, let me

18   ask you this:  The loan documents that you looked at, with

19   the loan relationship between Murdaugh and the bank, they may

20   have been -- I believe you described as irregular, but there

21   was nothing false or not true in those, was there?

22        MS. LIMEHOUSE:  Objection.  Is he asking about a

23   statement he's made today?

24        THE COURT:  Are you asking -- why don't you ask

25   about a specific -- are you asking about specific documents?

640

1          MR. DANIEL:  Yes, Your Honor.

2          THE COURT:  Okay.  Why don't you be more specific.

3    BY MR. DANIEL:

4       Q.   Isn't it true that you told the agents --

5          MS. LIMEHOUSE:  Objection, Your Honor.

6          THE COURT:  No, no, that's different.  You --

7    BY MR. DANIEL:

8       Q.   Well, let me ask this way:  These dealings with

9    Murdaugh, those loans, they were irregular, but they weren't

10   illegal?

11          MS. LIMEHOUSE:  Objection, Your Honor.  He's

12   testifying.

13          MR. DANIEL:  Your Honor, he's been testifying to

14   those on direct examination.  We've spent half a day --

15          THE COURT:  Whoa.  Whoa.  I'm just trying to get you

16   to be more specific.  Are you asking about the $750,000 loan,

17   the $680,000 payment?  I think you should be a little more

18   specific.

19   BY MR. DANIEL:

20      Q.   The $750,000 loans, there was nothing illegal --

21          MS. LIMEHOUSE:  Objection, Your Honor.  He's making

22   a statement about an ultimate issue that's for the jury to

23   decide.

24          MR. DANIEL:  Your Honor, the $750,000 loan is in the

25   indictment.

1          THE COURT:  Yeah, it's that you're testifying.  Just

2     ask him a question rather than --

3          MR. DANIEL:  Your Honor, that's what I'm doing.

4          THE COURT:  Okay.  Go ahead.

5     BY MR. DANIEL:

6       Q.   There's nothing irregular -- no, there was nothing

7     illegal -- isn't it true, there was nothing illegal --

8          MS. LIMEHOUSE:  Objection, Your Honor.  He can't

9     have an opinion about an ultimate issue like that.

10          THE COURT:  Overruled.  Answer the question.  Go

11     ahead and ask the question.

12     BY MR. DANIEL:

13       Q.   Isn't it true there was nothing illegal about the

14     loan documentation involving Alex Murdaugh?

15       A.   I can't testify to the legal documentation.

16       Q.   But didn't you have a meeting with the agents and

17     tell the agents that, that they were irregular, but they were

18     not illegal?

19       A.   The process was irregular.

20       Q.   Okay.  Isn't it true, in closing, that prior to --

21     excuse me, prior to September 2021, no one, not a soul, knew

22     about significant problems with Mr. Murdaugh, with Alex

23     Murdaugh?

24       A.   I can't testify to a soul.

25       Q.   Nobody at the bank knew about any significant --

642

1          MS. LIMEHOUSE:  Objection.  He can't talk about

2   other people's knowledge.  He can talk about his own.

3          THE COURT:  Answer the question.

4   BY MR. DANIEL:

5     Q.   Was it ever brought up that there were problems with

6   Mr. Murdaugh's loans prior to June the 7th when his wife

7   passed away?

8     A.   No.

9     Q.   Okay.

10         MR. DANIEL:  No further questions, Your Honor.

11         THE COURT:  Thank you.  We'll break for now.  We'll

12  do redirect after lunch.

13         MR. DANIEL:  Can I check with my co-counsel first,

14  Your Honor?

15         THE COURT:  Yeah, check first because I'm trying to

16  finish the cross-examination.

17  BY MR. DANIEL:

18    Q.   You testified about the $680,000 payment to the law

19  firm.  Is it your understanding that that money is still in

20  their trust account?

21    A.   I have no idea if it's in their trust account.

22    Q.   Okay.  And let me ask you:  You didn't know -- the

23  Board never heard about -- you never heard about any problems

24  with Murdaugh until his wife was murdered in June the 7th,

25  2021?  You just testified to that, right?

1     A.   Yes, sir.

2     Q.   But now today is different because everyone is

3 looking back now and playing Monday morning quarterback;

4 isn't it true?

5     A.   We're all reassessing, yes.

6          MR. DANIEL:  Okay.  I don't have any further

7 questions.  Thank you, sir.

8          THE COURT:  Very good.  Ladies and gentlemen, we'll

9 break for lunch.  And we'll do the redirect when we return.

10 We will be back in one hour.

11          (Jury leaves open court at 12:30 p.m.)

12          MS. LIMEHOUSE:  May I approach, Your Honor, with

13 counsel?

14          THE COURT:  Yes.

15          (Whereupon, the following bench conference takes

16 place.)

17          MS. LIMEHOUSE:  We are going to move to admit this

18 November 3rd transcript.  But we would like those two

19 portions that the Government requested in its additional

20 notice to be included.  I doubt there's an exhibit made that

21 way, but we can make sure we get that transcript.

22          THE COURT:  Is there going to be an objection to

23 have the additional -- we have the --

24          MS. LIMEHOUSE:  Jim Gibson's statement and then --

25          MR. DANIEL:  We didn't have a problem, but I think

1    the bank did.

2            THE COURT:  No, they're okay with it.  If you want

3    to prepare a redacted one that includes that, that will not

4    be a problem.

5            MS. LIMEHOUSE:  Okay, thank you.

6            THE COURT:  Thank y'all.

7            (Luncheon recess was taken.)

8            THE COURT:  Are there any matters that either party

9    needs to raise with the Court, from the Government?

10            MS. LIMEHOUSE:  Just for clarity about the

11    transcript, the parties have agreed with the portions of the

12    transcript.  We've also made sure that the bank's

13    consultation in advance of this is consistent with all of our

14    understanding.  I think the audio is still going to be in

15    dispute, but the transcript will be moved in without

16    objection.

17            THE COURT:  Okay.  Mr. Austin?

18            MR. AUSTIN:  I just think it will be -- it's helpful

19    for the jury to hear the audio as well, hear the context,

20    understand the --

21            THE COURT:  I am not keeping it out.  If you want to

22    use it, that's fine.

23            MS. LIMEHOUSE:  So for purposes of authentication,

24    Mr. Malinowski cannot authenticate a recording that Mr.

25    Laffitte made.  And that's our concern.  If he's going to

1    testify --

2              THE COURT:  Well, let me say this.  We haven't

3    offered -- are you wanting to offer now the transcript?

4              MS. LIMEHOUSE:  Yes, sir.

5              THE COURT:  Well --

6              MR. DANIEL:  We opposed it and then they are in

7    favor of it, then we oppose it.

8              THE COURT:  I'm just trying to keep up where the

9    bouncing ball is, you know.

10             MS. LIMEHOUSE:  Your Honor, they used it in the

11   direct.  And we believe the jury needs to see -- excuse me,

12   in their cross, we believe the jury needs to see more

13   portions of that transcript to provide the clarity and

14   context that's necessary.

15             MR. AUSTIN:  And we are totally fine with that.  We

16   would just like the additional clarification --

17             THE COURT:  Well, you don't get to control her --

18   she's on redirect.  You can't -- if you want to put in the

19   tape, do it, you know, when you've got the floor.  She's got

20   the floor now.  She wants to use the transcript, that's fine.

21   Later, if y'all want to use the audio, use it.

22             MR. DANIEL:  Your Honor, will I have an opportunity

23   to recross?

24             THE COURT:  No.  This is not a ping-pong match.  You

25   know, it's a direct, it's a cross, and a redirect.  That's

646

1    it.

2              MR. DANIEL:  Redirect, I didn't want to recross,

3    redirect.

4              THE COURT:  No.

5              MR. DANIEL:  Recross, I don't get to --

6              THE COURT:  No, no, no, it's direct, cross, you've

7    done the cross.  She's now doing her redirect, that's it.

8              MR. DANIEL:  Oh, okay.  I've never done that.

9    Obviously, I've never done it, Judge.  I've never been

10   limited to a recross.

11             THE COURT:  You've never practiced in front of me

12   then.  I've never let you do it.  You've never asked me for

13   it and I would have told you the same thing.  Let's bring the

14   jury back.

15             (Whereupon, the jury returns to open court at 1:43

16   p.m.)

17             THE COURT:  Please be seated.  Redirect by the

18   Government.

19                      REDIRECT EXAMINATION

20   BY MS. LIMEHOUSE:

21       Q.   Thank you, Your Honor.  Mr. Malinowski, during

22   cross-examination you heard Mr. Daniel argue that Alex

23   Murdaugh always paid, always on time, good on his loans,

24   until late 2021.  Let's go through some e-mails between

25   Russell Laffitte and Alex Murdaugh.

1          Government's Exhibit 53, it's an e-mail from Russell

2     Laffitte to Alex Murdaugh, March the 26th of 2014, "Alex, I

3     need about a $10,000 deposit.  You were overdrawn 8,000 in

4     one account and $1,500 in the farm.  That does not include

5     the checks that are in today.  I also need to get something

6     done with the loan to Robert Soto."

7          Does this show Alex paying on time, always good?

8     A.    No, it doesn't.

9          MS. LIMEHOUSE:  Government's Exhibit 56, please.

10    BY MS. LIMEHOUSE:

11    Q.    E-mail from Russell Laffitte, March 28th, 2014,

12    "Alex, I really need a deposit.  You needed around $10,000

13    yesterday, but another $15,000 in checks are here today."

14         Does this show Alex always paying on time, always

15    being good on his accounts?

16         MR. DANIEL:  Your Honor, I object until it's put in

17    proper context.  These are just random e-mails.  We don't

18    know when they were made good.

19         MS. LIMEHOUSE:  They were made on March the 28th.

20         THE COURT:  This is in response to your questioning.

21    Overruled.  You opened the door.

22         MS. LIMEHOUSE:  Exhibit 59.  The bottom portion

23    first, please.

24    BY MS. LIMEHOUSE:

25    Q.    Friday, July 24th, 2015, "Alex, I put $15,000 in

1    your checking account from your credit line."

2            MS. LIMEHOUSE:  Will you go to the next e-mail,

3    please.

4    BY MS. LIMEHOUSE:

5        Q.   Alex responds, "Please put 50 instead of 15.  When

6    do y'all go to Edisto?"

7            Russell then responds, "Leave for Edisto on Monday.

8    Different house this year.  Not sure where it is.  Monday to

9    Monday.  Transferred the other 35."

10           Does this show Russell making Alex good on his

11   accounts?

12       A.   Yes.

13           MS. LIMEHOUSE:  Exhibit 60.  The bottom portion,

14   please.

15   BY MS. LIMEHOUSE:

16       Q.   February 26th, 2016, "I transferred 15,000 into your

17   personal account and 2,500 into the farm from the credit

18   line."

19           Does this e-mail show Russell making Alex's accounts

20   good?

21       A.   Yes.

22           MR. DANIEL:  Your Honor, I'm objecting.  It shows

23   the bank -- him borrowing more money to off -- to pay it

24   down.  It's an incorrect characterization.

25           THE COURT:  I think there's maybe a point here, Ms.

1    Limehouse.  Do you have things where he's late on paying

2    loans?

3              MS. LIMEHOUSE:  I do.

4              THE COURT:  Okay.  Let's focus on those, because if

5    it's an approved credit line, the fact that his banker is

6    moving money from a credit line, if it's approved, he may be

7    having overdrafts, but it's not -- it's not a violation --

8    it's not a failure to pay his loan.

9              MS. LIMEHOUSE:  It's the farming account.  It's the

10   farming line of credit.  The purpose of that loan was for

11   farming.  And he's --

12             THE COURT:  Well, that's another point.  But you're

13   challenging the statement that he was always, you know, that

14   he was always current on his loans.  Y'all have put some

15   evidence in.  I think you should focus on those.  I think

16   there's a point about when you're pulling money from a credit

17   line.  I sustain the objection as to those.

18             MS. LIMEHOUSE:  Understood.

19             Exhibit 98, please, page 3.

20   BY MS. LIMEHOUSE:

21       Q.   Mr. Malinowski, can you describe for the jury what

22   this document is?

23       A.   This is a loan statement history.

24       Q.   So what does this show with respect to a loan?

25       A.   It looks at all the advances and the principal

650

1  payments, fees financed, late charges.

2       Q.   Okay.  I'm going to draw your attention to late

3  charge, $30,504, late charge waived, $30,504, what does this

4  show?

5       A.   It looks like a late charge on a matured loan.

6       Q.   When does someone accrue a late charge?

7       A.   When the loan goes 15 days or more past due.

8       Q.   So does this indicate that he was past due on his

9  loans?

10      A.   On that loan, yes.

11      Q.   Does it indicate that the late charge was waived?

12      A.   It does.

13      Q.   I going to take you to late charge, late charge

14 waived.  What does this indicate?

15      A.   Again, another late charge and a late charge waived,

16 $52,332.30.

17      Q.   Does this show Alex Murdaugh always paying on time?

18      A.   No, it doesn't.

19           MS. LIMEHOUSE:  Exhibit 7A, please.

20 BY MS. LIMEHOUSE:

21      Q.   This is the e-mail from August 19th from Russell,

22 "Alex Murdaugh's loans that are completely charged off did

23 not have a payment made on them in 2020.  He typically would

24 have made them in January of 2021 in the amounts of

25 $52,046.75 and $55,684.62.  I will contact him about trying

1    to get those payments or will try to collect them in January

2    when they get their bonuses."

3         Does this show that Alex did not pay loans on time?

4    A.    In this one, yes.

5         MS. LIMEHOUSE:  Exhibit 61, please.

6    BY MS. LIMEHOUSE:

7    Q.    E-mail from Russell Laffitte to Alex Murdaugh on

8    Monday, March 30th, 2020.  "I really need to get a payment in

9    on the farm loan tomorrow if possible.  It is currently 74

10   days past due.  Regular payment is $104,056.51."

11        Does this show that Alex Murdaugh was not paying his

12   loans on time?

13   A.    Yes, it does show.

14        MS. LIMEHOUSE:  Exhibit 62, please.

15    MS. LIMEHOUSE:

16   Q.    Mr. Daniel, during the cross-examination said,

17   "Prior to September of 2021, there were no problems with Alex

18   Murdaugh's accounts."  Did the Board know of any problems

19   with Alex's payment of his loans?

20   A.    No.

21   Q.    Who knew that Alex was behind on paying his loans?

22   A.    Russell Laffitte.

23   Q.    Who knew that Alex was consistently overdrawn on his

24   accounts?

25   A.    Russell Laffitte.

1    Q.   Did the Board know that Alex was consistently

2    overdrawn on his accounts?

3    A.   They did not.

4    Q.   Mr. Daniel, in his cross-examination, argued that,

5    by putting things in e-mails with Alex, Russell was

6    completely transparent.  And you testified that you didn't

7    see those e-mails.  Were you part of the bank's acquiring of

8    documents to respond to a Government's Exhibit's request for

9    documents in this case?

10    A.   Yes, I was.

11    Q.   Do you know whether any of the e-mails I just showed

12    you were on the bank's servers?

13    A.   I believe they were.  I am not aware that they were.

14    Q.   Okay.  Mr. Daniel argued about the executive

15    committee and he argued that Russell's sister --

16    MR. DANIEL:  Your Honor, I didn't argue, I asked

17    questions.

18    THE COURT:  Well, redirect.  Overruled.  Just go

19    ahead, ask the question.

20    BY MS. LIMEHOUSE:

21    Q.   Mr. Daniel stated that Russell's sister and father

22    had approved of the $750,000 beach house loan and you already

23    testified on direct that that loan was not approved as

24    required by the bylaws.  I'm going to pull up Exhibits 10I --

25    MR. DANIEL:  Judge, is she going to be allowed to

653

1    lead like this.  She's going through a long paragraph.

2              THE COURT:  She's just setting up the question.  I'm

3    watching the lead.  Go ahead.

4    BY MS. LIMEHOUSE:

5         Q.    In 192, can you use a loan for purposes of beach

6    house renovations to pay off a lawyer and to cover your

7    overdraft for expenses that are totally unrelated?

8         A.    Can you use it?  Yes.  Should you use it?  No.

9         Q.    You can use a loan for purposes of beach house

10   renovations to pay off a lawyer?

11        A.    No.

12        Q.    Can you use a loan for purposes of beach house

13   renovations to pay for expenses that have nothing to do with

14   beach house renovations?

15        A.    No.

16        Q.    Regardless of who approves of that loan?

17        A.    Yes.

18        Q.    Let's move to the 680.  You testified that you were

19   in damage control mode and that the deal was done.  I'm going

20   to pull up Exhibit 12A.  This is the e-mail from Russell

21   notifying the Board.  "I just wanted to give everyone a

22   heads-up on a charge that you will hear about in detail

23   during our next Board meeting.  We took a 680 loss to fix an

24   issue between us and the PMPED Law Firm."

25              Is Russell talking in past tense in this e-mail?

654

1    A.   Yes.

2    Q.   And is this what framed your mindset that the deal

3 was done?

4    A.   Yes.

5         MS. LIMEHOUSE:  Let's go to Government's 12C.

6 BY MS. LIMEHOUSE:

7    Q.   Mr. Daniel questioned you about Russell's authority

8 as CEO to settle legal proceedings under the language of the

9 bylaws.  I'm going to point you to Government's 12C, e-mail

10 from Russell, "Attorneys were informed, but not consulted.

11 They were consulted by phone, so nothing to share.  This is

12 not a lawsuit issue.  It is a banking issue of us converting

13 checks."

14        Did Russell's own words indicate that he was

15 settling a lawsuit?

16    A.   No, he was not settling a lawsuit.

17    Q.   And had Arthur Badger or anyone related to the

18 Badger settlement sued the bank when he paid the 680?

19    A.   Not at the time.

20        MS. LIMEHOUSE:  Okay.  I'm going to pull up

21 Government's Exhibit 80.  Just the top portion, please.

22 BY MS. LIMEHOUSE:

23    Q.   This is an e-mail from Russell to Trenham Walker,

24 the bank's attorney, that you've testified, copying the

25 Litigation Committee on Tuesday, November 2nd.  So did this

1    e-mail take place after the 680 payment?

2        A.    Yes, it did.

3        Q.    And did this e-mail take place after the October

4    31st emergency Board meeting?

5        A.    Yes, it did.

6        Q.    And in this e-mail Russell says, "Trenham, the bank

7    is paying this amount.  The verbal contract between PSB and

8    PMPED was done with the approval of the Chairman of the Board

9    and the CEO.  You are welcome to discuss terms, but is not an

10   option to not pay."

11            Was this the mindset the Board had when they went

12   into the November 3rd meeting?

13            MR. DANIEL:  Your Honor, she can't speak -- I

14   object.  He can't speak for the Board.  He can speak for

15   himself.

16            THE COURT:  He can speak for himself.  Ask him was

17   that his --

18   BY MS. LIMEHOUSE:

19       Q.    Was this your mindset going into the November 3rd

20   meeting?

21       A.    That it had been paid, yes.

22       Q.    And that it was not an option to not pay?

23       A.    Correct.

24            MS. LIMEHOUSE:  I'm going to pull up Government's

25   223 and move to admit it without objection, Your Honor.  It's

1    the transcript.

2            THE COURT:  Okay.

3    BY MS. LIMEHOUSE:

4        Q.   Mr. Daniel asked you questions about --

5            THE COURT:  Hold up.  You're moving to admit

6    Government's 223; is that correct?

7            MS. LIMEHOUSE:  Yes, sir.

8            THE COURT:  Is there an objection?

9            MR. DANIEL:  Your Honor, as long as the entire

10   transcript is read or put before the jury, I would have an

11   objection.  Otherwise, I don't have any objection at all.

12           THE COURT:  No.  I have already ruled about

13   relevancy and other issues.  I have ruled on that issue.  The

14   part I have authorized is going to be admitted, not other

15   parts.

16           MR. DANIEL:  So, Your Honor, but the rest of it's

17   not going to be before the jury?

18           THE COURT:  When you say the rest of it, what are

19   you talking about?

20           MR. DANIEL:  It's page 12 to page 18.

21           THE COURT:  Yeah.  We're going to admit that.

22           MR. DANIEL:  Oh, okay.  I apologize, Your Honor.

23           THE COURT:  Not the entire transcript, you

24   understand.

25           MR. DANIEL:  Yes.  I withdraw my objection, Your

1    Honor, I misunderstood.

2              THE COURT:  Okay.  Exhibit -- Government's Exhibit

3    223 is admitted without objection.

4              (Government's Exh. 223 is received in evidence.)

5    BY MS. LIMEHOUSE:

6         Q.    Okay.  I'm going to read to you the bottom of --

7    I'll read you the middle and the bottom.  This is pages 16

8    into 17.  Trenham is saying, "So that is our thinking about

9    Badger.  We are going to have to report Badger because we

10   have subpoenas that have asked for all transactions dealing

11   with Alex Murdaugh.  And from what -- everything we've seen,

12   this was his mechanism for taking money from a client and

13   sending it through the bank to pay other debts.  And this is

14   something that the criminal authorities are going to be very

15   interested in, the Office of Disciplinary Counsel, SLED, all

16   of that.  So we want to get ourselves to the best position

17   that we can be in if we have to weather a storm."

18              And Jim Gibson, who you've testified is a board

19   member, responds, "But we will continue investigation into

20   what happened?"

21              Was the Board's understanding that y'all were going

22   to investigate what happened?

23        A.    Yes.

24        Q.    And did you have that understanding because you did

25   not know what had happened with the 680?

658

1     A.    Yes.

2     Q.    And so as you testified, damage control, was putting

3  yourself in the best position knowing that it would be fully

4  investigated?

5     A.    Yes.

6          MS. LIMEHOUSE:    Page 20, please.

7  BY MS. LIMEHOUSE:

8     Q.    Trenham then says, "And about 1.3 million was on the

9  disbursement statement to Palmetto State Bank to purchase an

10  annuity.  And I asked Ronnie if -- I think, Russell, you were

11  personal representative, and I asked Ronnie, I said, well, I

12  don't think Russell ever knew that or signed anything.  And

13  he said that they had no disbursement statement that had been

14  signed by you.  The only person who had signed it was Mr.

15  Badger."

16          And Russell responds, "I was the personal

17  representative for Donna Badger, not Arthur Badger."

18          At any point during this November 3rd meeting did

19  Russell tell the Board that he had taken $35,000 from Arthur

20  Badger?

21     A.    No, he had not.

22     Q.    At any point during the November 3rd meeting, did

23  Russell tell you that he had negotiated nine checks that said

24  "The estate of Donna Badger" on the memo line?

25     A.    No, he did not.

1     Q.   At any point during that November 3rd meeting, did

2     Russell tell the Board that he had negotiated hundreds of

3     thousands of dollars from this Badger money to pay off loans

4     that he had extended from Hannah Plyler's conservatorship

5     account?

6          A.   No, he did not.

7               MS. LIMEHOUSE:  I'm going to pull up Government's

8     200B, please.

9     BY MS. LIMEHOUSE:

10         Q.   I'm going to read the bottom, Russell's statements

11    about the November 3rd meeting.  "You know, they didn't want

12    to pay it.  When I took it to the Board, the Board went

13    absolutely ballistic.  They wanted to claw it back.  And I,

14    part of the reason I got fired, I put my foot down, I said,

15    no.  I said three of the four members of the executive

16    committee discussed this in depth, which is my sister, Gray

17    Henderson, myself, and Charlie Laffitte, who was also on the

18    board.  We have the authority by our bylaws to settle any

19    lawsuits, whatever or potential.  We thought it was in the

20    best interest, so we did it.  And they wanted us to claw it

21    will back, and I told them absolutely not.  I gave them my

22    word.  I gave them my word we were paying it, and by God, we

23    were paying it."

24              Are those Russell's own statements about what

25    happened in the November 3rd meeting?

660

1          A.    Yes, they are.

2               MR. AUSTIN:  Objection, Your Honor.  I don't believe

3     that this testimony here in this transcript is about the

4     November 3rd meeting.

5               THE COURT:  It appears to be a statement made in

6     another proceeding.  Am I correct about that?

7               MR. AUSTIN:  There's no reference to which meeting

8     they're talking about.

9               MS. LIMEHOUSE:  My question is to Russell's own

10    characterization of what the Board's response was to his

11    payment.

12              MR. AUSTIN:  In the November 3rd meeting, she said.

13              MS. LIMEHOUSE:  We can say generally.

14              THE COURT:  Okay.  Ask generally, because this

15    apparently wasn't in that meeting.  Was that consistent with

16    what he explained.

17    BY MS. LIMEHOUSE:

18         Q.    Are Russell's statements his understanding of the

19    Board's reaction to his payment of the $680,000?

20         A.    That is consistent with the Board's understanding.

21              MS. LIMEHOUSE:  Court's indulgence.  No further

22    questions.

23              THE COURT:  Okay.  You can step down.  Thank you,

24    sir.  Government call your next witness.

25              MS. LIMEHOUSE:  The Government calls Ronnie Crosby.

1          MR. AUSTIN:  Your Honor, we can release Mr.

2    Malinowski from our subpoena as well.

3          THE COURT:  Very good.  He's free to go.  I'm sure

4    he will not be unhappy about that.

5          (Whereupon, the witness is excused.)

6          THE COURT:  Ladies and gentlemen, let me explain

7    something to you about -- you saw these blacked-out parts of

8    transcripts.  Let me explain that to you.  There are issues

9    of attorney-client privilege and relevance and so forth.  And

10   prior to the trial, we identified what was relevant to this

11   case and what wasn't.  So no one is trying to hide anything.

12   It is simply what's relevant to this case.  Okay?

13         THE COURT DEPUTY:  Please state your full name.

14         THE WITNESS:  Ronnie L. Crosby.

15                        RONNIE L. CROSBY,

16        having been duly sworn, testifies as follows:

17                        DIRECT EXAMINATION

18         THE COURT:  Mr. Crosby, you have the unhappy

19   experience of being in the witness chair rather than asking

20   the questions.

21         THE WITNESS:  Much prefer to be asking the

22   questions, Your Honor.

23         THE COURT:  I'm sure you do, sir.

24         Please proceed.

25   BY MS. LIMEHOUSE:

1    Q.   All right.  Mr. Crosby, tell the jury a little bit

2    about yourself.  Where are you from?

3    A.   I am from Colleton County, grew up in Colleton

4    County, currently live in Beaufort County.  I am -- went to

5    high school in Colleton County, graduated from The Citadel in

6    1989 and then the University of South Carolina Law School in

7    1993.

8    Q.   All right, sir.  So after law school, what did you

9    do?

10   A.   I worked a year as a judicial clerk for a local

11   judge and then I became employed with the law firm of Peters

12   Murdaugh Parker Eltzroth & Detrick, also referred to in these

13   proceedings I'm sure as PMPED.

14   Q.   So how long have you been with PMPED?

15   A.   Gosh, almost 26 years, maybe 26 years.

16   Q.   So the jury has heard a little bit been the law firm

17   and some background, but if you will just tell them again,

18   the office locations, where you are, what office you are

19   located in.

20   A.   We have a office in Hampton, one in Walterboro, one

21   in Richland.  And for a period of time we had a lawyer here

22   in Charleston that occupied some office space.  And I

23   practice out of the Hampton office.

24   Q.   So Alex Murdaugh, was he a law partner of yours?

25   A.   He was for a little more than 20 years.

1    Q.   Okay.  So you've known him for a very long time?

2    A.   I have.

3    Q.   What types of cases do you work on at PMPED?

4    A.   Well, we largely do personal injury cases.  And the

5    firm does a pretty wide array.  My focus is largely on what's

6    called products liability cases, where there may be a case

7    for a faulty consumer product, such as a pressure cooker that

8    blows up and burns someone, or I've done a lot of what's

9    called automotive products cases where a vehicle may have a

10   defect in it that either causes an accident or because it has

11   a component, such as a faulty airbag or a faulty seatbelt or

12   a fuel system is not protected, where people are injured

13   because of the vehicle failing to provide appropriate levels

14   of protection.

15   Q.   So would you consider products liability sort of

16   your specialty?

17   A.   It is.

18   Q.   So because of that specialty, do you often get

19   associated by other lawyers from other law firms to work on

20   cases involving products liability issues?

21   A.   I do.  That's pretty much the mainstay of my

22   practice, is doing what in the legal world is called

23   associated work, where a lawyer will get a case in that's not

24   within their specialty, and they will, if it involves a

25   product defect or potential product defect, I'm often asked

664

1    to partner with that lawyer and help investigate the case and

2    litigate it if it has merit.

3        Q.   How about with other lawyers at PMPED, do you work

4    cases with them?

5        A.   Yes.  We do that within the firm.  You know, if it's

6    a products case, you know, another lawyer in the firm may

7    come to me and ask for my help on the case or -- I don't

8    really do medical malpractice work.  If -- I may ask one of

9    my partners who does medical malpractice work to get involved

10   or, you know, just whatever their particular specialty -- you

11   know, one of my partners has done a lot of railroad

12   litigation over the years and, you know, we would ask him to

13   get in just so the case was competently staffed.

14       Q.   So when you're playing that role as someone who has

15   been sort of associated by another lawyer, what role do you

16   play in that case?

17       A.   Typically, unless it's a case that came in straight

18   to me where there's not another lawyer, whether it's an

19   outside firm or within the firm, I usually do the role that

20   I'm asked, which would be dealing with engineers, technical

21   issues, that sort of thing, analyzing that.  And dealing with

22   -- all these cases usually have a lot of engineers involved

23   in them.  And that's just what I like to do.  I like to

24   figure out why things fail and interact with engineers and

25   dealing with those types of principles.  So I usually focus

1    on what's called the liability side of the case.

2        Q.   And those cases, how much interface would you

3    typically have with the clients?

4        A.   This will sound a bit odd, but in more than 50

5    percent, very little.  If there's a mediation, I may meet the

6    client at the mediation.  If there's an issue that's really

7    important to the liability side from the client's deposition,

8    I may -- I would be there and be involved in that.  But I

9    have very little actual client interaction.

10       Q.   So the jury has heard a lot about the fees and how

11   y'all are paid.  And they've also seen some disbursements

12   sheets.  But from your perspective, could you just explain

13   the partnership compensation model at the law firm?

14       A.    It's a bit different than most law firms where you

15   own an equity percentage of the law firm.  We divide fees

16   based on what we bring into the law firm after overhead is

17   deducted.  And so, you know, whatever I brought in after we

18   had figured overhead, and there was some profit sharing

19   that's shared equally, which was at the time seven and a half

20   percent after the, you know, of what the net would be after

21   we pay all of our bills, which are oftentimes pretty high.

22   And then the balance would generally be paid at the end of

23   the year to the lawyer.  And we would also get a salary

24   throughout the year.

25       Q.   Okay.  Comparatively to the end of the year bonuses,

666

1    is that salary, you know, comparable or --

2        A.   Well, you know, that's all relative to what you

3    brought in.  But, no, as a general rule, it would be -- you

4    know, a salary would be a small part of what most of us made.

5    We would usually get what we termed as a bonus at the end of

6    the year.  And that could range from, you know, something

7    equal to your salary to many times what the salary was.

8        Q.   Okay.  So you said "at the end of the year."  So if

9    you make -- you get a good result at a trial or a good result

10   at a settlement, those fees would be paid into the law firm

11   and you wouldn't see those fees yourself until the end of the

12   year?

13       A.   No, we never -- and it's probably was not the best

14   business model, because of not having the benefit of time,

15   value and money, you know, getting distributions throughout

16   the year.  Senior partner throughout the year, he believed in

17   making sure you had money to pay all your bills before you

18   took money out.  And so we would get that -- typically we

19   would meet in December and then distribute it between

20   December 20th and, say, January 31st, because otherwise, you

21   would have to pay corporate income tax on it if you didn't

22   get it out before then.  You know, you would end up paying

23   corporate income tax and then personal income tax.  So it

24   always happens during that last week of December when Jeanne

25   would be able to accomplish all of that.

1     Q.   So this is how all the partners were compensated at

2     the law firm?

3     A.   That's how all of us were compensated.

4     Q.   The jury has heard a little bit about from -- a

5     little from Ms. Seckinger about the life of a civil case.

6     But you're the lawyer who works these civil cases.  So can

7     you explain to them when a client comes in and hires your law

8     firm, sort of what the process is?

9     A.   Well, there's a lot of similarity between the

10    process, but say a small accident case where someone, you

11    know, goes to the emergency room and maybe goes to some

12    follow-up, you know, for minor soft tissue injuries, those

13    cases may resolve without filing a lawsuit.  And could

14    resolve quickly within four to six months, you know, after

15    you get the medical records and get to the insurance carrier.

16         And cases such as med mal cases and products

17    liability cases rarely settle without a lawsuit being filed.

18    So once that happens, the process just takes awhile.  So

19    those types of cases could go, you know, for three, four,

20    five years on average.  I've got one right now because it's

21    been on appeal and back and forth through the appellate

22    courts that is 11 years old.  And we've got to try it again

23    in April of next year.  So there's a big variation, but the

24    more complicated stuff usually takes longer.

25    Q.   So when you've reached a settlement or you've gotten

668

1    a favorable verdict after a trial and there's been a

2    recovery, how do the funds get disbursed?

3        A.    Well, in a typical case, you get settlement funds

4    in.  Certain cases, if there's a case involving a death or an

5    incapacitated person, there has to be -- that could include a

6    minor, there has to be a court approval.  But in a normal

7    case, you get the funds in and they are deposited in a trust

8    account.  We have always required the funds to sit for 10

9    days to make sure they clear, because believe it or not,

10   there have been times when insurance companies wrote bad

11   checks.  So we would require that during that time.

12           If there's any medical liens, a lot of times we have

13   to pay back Medicare, Medicaid, insurance companies.  They

14   all have claims if there's a corresponding workers' comp.

15   You would gather those liens and make sure that you were

16   negotiating on the client's behalf to pay back those entities

17   because, you know, for example, with Medicare, if you fail to

18   do that, a client could become ineligible and lose their

19   benefits.  And so you are taking care of that.

20           And then a disbursement is prepared for the client

21   to review showing what our costs -- our fee is, what our cost

22   that we've expended, because we advanced the cost in the

23   case, and then whatever liens, and sometimes you have to

24   withhold some money because it takes a little longer.  And

25   then you review that with the client and request checks from

669

1    accounting, Ms. Seckinger's office or her staff.

2         And then once that's disbursed and there's always a

3    release signed, either for the insurance company or for the

4    at-fault party, once those documents are signed and the money

5    is disbursed, we close our file.

6         Q.   Okay.  You mentioned cases involving minors or

7    people who were otherwise incapacitated and also mentioned

8    death cases.  Let's start with cases involving minors or

9    people who are otherwise incapacitated.  What is a

10   conservator?

11        A.   Well, a conservator is just what it says.  It's a

12   person who is appointed or approved by a probate court to

13   conserve someone's property.  And it's not always money.  It

14   can be land, real estate, you know.  For example, if you lost

15   your only parent and you were underage, then that child can't

16   act on their own behalf, so the court system would set up --

17   require a conservator to be appointed and to serve in a

18   fiduciary capacity that's overseen by the probate court to

19   preserve and conserve the corpus of the conservatorship,

20   whatever it may be.

21        Q.   So when you have a client who comes in and is a

22   minor or an incapacitated individual, is the lawyer working

23   the case the person who's responsible for working to get a

24   conservator appointed?

25        A.   Well, that varies.  Sometimes it's already done when

670

the client comes to you.  And sometimes we are responsible

for doing that.  And it's normally the parent or family

member, but -- you know, that serves in that role.  But

sometimes we hire financial institutions or ask them to serve

in that, or other lawyers to do that, especially lawyers with

expertise in probate matters because, you know, we don't

have -- I don't possess real expertise in that.  I know the

basics but, you know, it's nice to have someone who is a

skilled probate lawyer because sometimes there's a lot of

issues that, you know -- so someone else would be appointed

to serve in the capacity, because the -- and the reason is

there because the minor is under 18 can't sign papers, can't

bind, you know, can't take legal action on their behalf.  So

somebody has to step in in that capacity until they are at

the age of majority to make their own decisions and legally

bind themselves.

Q.    You mentioned the probate court.  How's someone

appointed to serve as a conservator?

A.    It's just a form.  The probate court has a lot of

forms because a lot, you know, a lot of stuff in the probate

court with simple estates and lawyers, people don't need

lawyers, probate judges are there to help guide people

through, so most of the forms are pretty simple.  So you fill

out a petition requesting that a conservator be appointed.

Sometimes you run into difficulties because the probate

1    courts usually require that someone be bonded.  And there's

2    an expense there.  And some people can't get bonded.  So

3    that's when you turn to other, you know, a lawyer or a

4    financial institution, because they don't have to -- they're

5    seen as already bonded, so to speak, in my way of looking at

6    it.  Because a bond could cost about $5,000.  And if it's a

7    smaller case, that's a pretty good percentage of, you know,

8    the client's money.

9        Q.    So how is a conservator compensated?

10       A.    A conservator, you know, usually it can be a

11   percentage or it can be based on the work that's done.  I

12   mean, some of these things involve more work, you know, than

13   others.  But whatever the compensation is determined is

14   usually subject to -- well, it's always subject to court

15   approval.

16       Q.    Do you often work with conservators in your cases?

17       A.    You know, not near as much as working with personal

18   representatives.  You know, but because a lot of times the

19   personal representative would fill the capacity there,

20   normally.  But it's not uncommon.  But it's a very small

21   percentage of cases that have a conservatorship appointed in

22   it.

23       Q.    Okay.  Why is that?

24       A.    Well, a lot of the settlements are less than what

25   the law requires you to.  There are certain dollar figures.

672

1    If it's less and you've got -- and the money is going to

2    there to a parent and there's a guardian appointed, you don't

3    have to go through the trouble to do a conservator, where the

4    probate court has to approve all disbursements.  So a lot of

5    them fall into that category.

6        Q.   So explain for the jury the role that the lawyer,

7    you, play when you are working with a conservator during the

8    lawsuit, what's that relationship like?

9        A.   You know, it depends.  If we are talking about a

10   conservatorship and the lawsuit is being brought in the name

11   of the conservatorship, the conservator most times will have

12   some relationship with the clients and they could help you

13   get discovery responses, you know, so you are not dealing

14   with a child to get it, you've got a go-between.  And you

15   would -- in most cases, there's not a lot of interaction

16   other than to answer discovery if it's a parent or something.

17   You know, I would say very minimal interaction.

18       Q.   So do you consider yourself, as the personal injury

19   attorney, to be the lawyer for the conservator or the client?

20       A.   Well, obviously, if it's a minor, the minor can't

21   hire me.  Maybe their parent hired me.  So I always consider

22   myself to be representing the client, but in order to

23   facilitate that, when you have a conservator, the conservator

24   is in the capacity of that client.  So to the extent the

25   conservator is in that capacity, I'm representing the client

1    through the conservator.

2        Q.    So when does that relationship end?

3        A.    Well, the relationship will end when the case is

4    resolved, as we talked about, and the money is disbursed and

5    the release documents are signed and the stipulation of

6    dismissal, if a lawsuit is filed, is filed, our relationship

7    would end.

8        Q.    So let's talk about personal representatives,

9    explain for the jury the difference between a personal

10   representative and a conservator.

11       A.    Well, we probably all, you know, are more familiar

12   with that term.  When someone dies and they have an estate

13   that needs to be probated, normally people will appoint a

14   personal representative in their will.  And if they have it

15   and don't have a will, there's a statutory preference, for

16   example, if I passed away, my wife would automatically have

17   that preference.  And it's so the personal representative is

18   there to administer whatever the estate is.  And,

19   unfortunately, some estates also have tort claims that may be

20   associated, maybe a case where someone was killed in an

21   accident.  And they -- an estate was opened and perhaps they

22   have property and a house or a will that needs to be

23   probated, but that personal representative would also be able

24   to bring, again, in a representative capacity on behalf of

25   the estate, obviously, the deceased person can't bring the

1    case, so you need somebody to stand in.  And there's also a

2    component to -- where the beneficiaries are -- maybe what's

3    called a wrongful death case, and the personal representative

4    would have the legal ability to pursue that personal injury

5    claim on behalf of both the estate and the beneficiaries,

6    which often time are children or, you know, a spouse or

7    whoever it may be.

8        Q.   So who's typically selected to serve as the personal

9    representative of an estate?

10       A.   Well, normally, it's whoever the will says, number

11   one.  And if you've appointed someone, that would be -- that

12   person could waive and let somebody else, you know, maybe

13   there was a widow or that person is just so distraught or

14   maybe even injured in a accident, if we are just talking

15   about those kinds of cases, and so it's really whoever the

16   statute says then if there's no will.  And then sometimes,

17   you know, there's just really tragic events where the people

18   who would be entitled to serve are deceased in an event, and

19   then we would seek out, you know, a third party to do that.

20       Q.   So who appoints that person?

21       A.   Probate court.

22       Q.   And we talked about how a conservator's compensated.

23   How about a personal representative, how are they

24   compensated?

25       A.   Typically, if we are talking about -- well,

1    typically, it's five percent of whatever passes through, less

2    real estate, because real estate can be transferred.  And I'm

3    no probate expert, but it's usually five percent of the

4    estate is what the personal representatives would be entitled

5    to.

6        Q.   You talked about the relationship between you, the

7    lawyer, and the conservator, how about the relationship

8    between you, the lawyer, and the personal representative?

9        A.   Well, there, again, it's varied.  If the personal

10    representative is the spouse and mother of the beneficiaries,

11    then probably a lot, because, you know, of communications,

12    getting information.  If it's, say, it's a lawyer or a

13    financial institution, there's less interaction at least

14    during the pendency of the case.  There may be a lot of stuff

15    they need to do at the end of the case, getting paperwork

16    signed and that type of stuff.  You know, normally in those

17    instances we would probably even be dealing directly with

18    the, you know, the minor children, you know, to get stuff or

19    a family member who could go get, for example, photographs

20    from, you know, that we may need to show the family

21    relationships or get medical bills or get other things.  So

22    it varies just like with a conservatorship.

23        Q.   Okay.  So when does that relationship end?

24        A.   It's the same.  And it's the same with every case

25    that I'm involved in. When the money is disbursed -- and

1   there may be some liens that have to be dealt with, but when

2   the release is signed and the official documents are filed

3   with the court that says this case has ended with prejudice

4   and it's over with, the parties have resolved their

5   differences or there's been a jury verdict, and the money is

6   out of our trust account, our representation is -- it ends.

7   I mean, otherwise, we would be representing people for

8   decades.  There would be no end to it.  But that's when it

9   ends because what we have done is accomplished what was in

10  the contract, because we would have a contract that says we

11  are representing Jane Doe for injuries sustained in an auto

12  accident on whatever date it was.  And once we get to the end

13  of that and we have settled with the tortfeasor or the

14  wrongdoer and the money has been delivered and disbursed and

15  the case is dismissed, there's nothing for us to do beyond

16  that.

17      Q.   So the jury has heard about Russell Laffitte serving

18  as a conservator or PR on some of the law firm's cases.  Did

19  you ever ask Russell to serve as PR or conservator yourself?

20      A.   I don't know that I have personally asked.  I did

21  concur and have discussions with Alex Murdaugh about having

22  Russell serve in a case that I always refer to as "Plyler."

23      Q.   We will talk in detail about the Plyler case in a

24  minute.  But let's talk about your relationship with Russell

25  Laffitte.  How long have you known Russell Laffitte?

1          A.    You know, I remember the first time I had met

2     Russell, his father had invited The Citadel Rifle and Gun

3     Club to hunt at their farm in Hampton.  You know, his Dad was

4     a Citadel graduate.  And it was a very nice thing to do to

5     have -- offer a place for people to go hunting and put us up.

6     And I remember meeting Russell there and didn't -- you know,

7     just met him.

8          And then once I joined the firm and moved to

9     Hampton, I started doing my banking at Palmetto State Bank.

10    And that would have been in the mid '90s.  And Russell had

11    been -- Russell and his family had been -- I had a banking

12    relationship and a friendly social relationship.  You know,

13    Hampton is a small town.  We all get to know each other.

14    Russell has been to my house for social gatherings, he and

15    then other members of his family.  And just always been

16    friendly and, you know, the person I dealt with for banking

17    needs.

18         Q.    Okay.  Let's talk about the banking relationship.

19    What was your banking relationship with Russell?

20         A.    You know, in my opinion, there couldn't be a better

21    banking relationship.  I mean, Russell and Palmetto State

22    Bank provide a very, very good service, to the extent that

23    even if I borrowed money, they would send somebody over to my

24    office to have the papers signed instead of -- it wasn't a

25    great inconvenience to go do it, but that's the type of

1    service that they would provide.  I mean, it was a good, very

2    good relationship.

3        Q.    So you held your personal bank accounts at Palmetto

4    State Bank?

5        A.    I still have several personal and business accounts

6    at Palmetto State Bank.

7        Q.    And how about the law firm's accounts?

8        A.    PMPED still has a trust and operating account there.

9        Q.    So let's talk about some of the way the loan

10    repayments are set up for the partners at the law firm.  How

11    was -- what was your arrangement with Palmetto State Bank in

12    terms of loan repayment?

13        A.    Well, because of the way we got paid, most of us who

14    borrowed money from Palmetto State would -- the loans would

15    be set up.  It was a great convenience so we weren't having

16    to make monthly payments.  We would -- I think normally --

17    and there's probably some variation, but my memory is that

18    most of them were notes that would be due on or around

19    January 15th, in order to allow us to get our bonus and then

20    come over and make payments toward that, and then the note

21    would be renewed, there would be another note for whatever

22    that balance was.  And so that was the typical -- I still

23    have a loan with them, and right now, one loan.  And that's

24    the way it's set up.  You know, I just go pay and try to get

25    it done before the end of the year so we could get the tax

1    benefits of the interest on it.

2        Q.   So is that the arrangement the other law partners

3    had at PMPED?

4        A.   I know that all of us -- most of us, at least those

5    who borrowed money, I mean, everybody wouldn't -- I don't

6    think everybody.  But as far as I know, myself, Mark Ball, I

7    think Randy and Alex, you know, that we would go over and try

8    to -- before it got to whatever that date, January 15th,

9    where you would hit a late penalty, and those of us who were,

10   you know, tried to take -- you know, get the best tax

11   treatment would do it before December 31st.

12       Q.   So it was typical for law partners to come to the

13   bank with their bonus checks at the end of the year?

14       A.   Yes.  When we were still getting physical checks.

15   And then, you know, when we started doing direct deposit, you

16   know, I might not even, you know, have to take anything.  I

17   may just send an e-mail saying, how about put this much on

18   this loan and this much on this loan.  And Russell would take

19   care of that.  Usually, I would deal with Russell.  And -- or

20   if we had physical checks, I may just go sit down with

21   Russell and say, here's my bonus check, how about, you know,

22   pay this on this loan.  And Russell would normally just write

23   it down.  And then he would take care of it and put the

24   balance or deposit it in my personal checking account and

25   then he would debit it out, or I might deposit it at the

1    counter and just tell him what to pay.

2    Q.    Was it typical that you or the other partners would

3    go to Russell with large checks from Palmetto State Bank

4    during other -- excuse me, from the law firm during on the

5    parts of the year?

6    A.    No.  Just because that's when we got paid.

7    Otherwise, you know, we've been doing direct deposits on our

8    salaries for a long time.  So -- but, no, it would be very

9    atypical.  I don't know of a time we would other than if we

10   got a loan repayment where we would loan the law firm money

11   to begin the year, you know, because you have to start out

12   with zero money to avoid paying, you know, tax consequences.

13   Q.    So what did you know about Alex and Russell's

14   relationship?

15   A.    You know, I only knew Alex and Russell to, you know,

16   be mutual acquaintances.  I don't think that they did like a

17   lot of hunting and fishing that type of stuff together.   I

18   knew they were friends.  But not to the level that Alex's

19   brother or Randy or John Marvin -- they were much closer with

20   Russell as far as friendship, from my observation.

21   Q.    So did you understand their relationship to be more

22   of a professional banking relationship?

23   A.    Yeah.  But I think they were friends.  I mean, they

24   grew up in the same neighborhood, had known each other all

25   their lives.  So I just would characterize based on my

1    observations that Russell and Randy and John Marvin were

2    closer.

3        Q.    So you mentioned the Plylers.  The jury has heard a

4    little bit about the Plyler case.  But as a lawyer who worked

5    on it, tell the jury what happened to the Plylers.

6        A.    The Plylers being Angela Plyler and her three

7    children were not -- I can't remember if it was Bluffton or

8    Hilton Head.  They had left in a Ford Explorer.  And I don't

9    remember the year or model.  But it was one of the ones that

10   were definitely defective from a stability standpoint.  They

11   had the misfortune of having what had become original

12   equipment tires on the Ford Explorer during the late '90s,

13   early 2000s.  It's really going back into the mid '90s, which

14   was a tire, a Firestone ATX.  And if anybody is familiar or

15   people that are old enough to recall, in or about the 2000

16   time period, there was a huge news story around the country

17   of Firestone and Ford Explorers having tire failures and

18   rolling over.  And there was a lot, a lot of accidents.  A

19   lot of people were injured and killed because of that deadly

20   combination.

21        I believe it was the left rear tire on the Ford

22   Explorer that they were traveling in that separated just

23   south of the Cumbee River in Hampton County.  And when that

24   occurs, when the tread comes off, vehicles become very

25   unstable, very hard to control.  And it left Interstate 95

682

1    and went down an embankment into the -- I guess it would be

2    the south shoulder or the east shoulder, but off to the right

3    of I-95, down a pretty steep embankment into what I would

4    call as the river plain, river swamp area.

5         Q.   What happened to Justin and Angela?

6         A.   They were both killed.

7         Q.   Okay.  So Hannah and Alania were the only survivors

8    of that accident?

9         A.   Correct.

10        Q.   So how did you become involved in the case?

11        A.   A lawyer in Columbia named -- Lexington, I take that

12   back, named Arnold Beecham -- I don't think they knew that

13   they really had a case, obviously, the girls wouldn't have

14   known, I don't remember their exact ages, but they were

15   young -- ran into their dad, Ricky Plyler, in Walmart in

16   Lexington at the gun counter.  And I just -- I can remember

17   that fact because it just sort of stood out that this is how

18   he got involved in such a big case.  And Arnold was hired by

19   Ricky to represent the family.  Ricky somehow -- Arnold

20   somehow had a relationship with Alex or met him somewhere.  I

21   don't remember that in detail.  But then it came into the

22   firm.  And I was already neck deep in Ford and Firestone

23   litigation.  So Alex asked me to get involved and handle that

24   portion of it.

25        Q.   So Alex associated you because of your specialty

1    with the products liability stuff?

2        A.    Well, you could say associated.  We don't formally

3    say that.  He just asked me -- you know, in a lot of cases,

4    if it's a complex case, with big injuries or complex issues,

5    even if it is not in a specialty, we will get more than one

6    lawyer on it just because -- to have, you know, two heads are

7    often better than one.  But because of my specialty in this,

8    he asked me to be involved because, you know, he didn't want

9    to try to go and reinvent the wheel and learn, and he knew it

10   was a serious case.

11       Q.    So was Russell appointed to be the personal

12   representative for Angela and Justin's estate?

13       A.    At some point in time, but not initially.

14       Q.    Okay.  So what were the circumstances that led to

15   his appointment?

16       A.    Well, my memory is that the reason that they had

17   been in Hilton Head or Bluffton with a family member is

18   because there was -- Ricky and Angela were having some

19   domestic issues.  And they were on the way back, you know,

20   when this happened.  But initially when Ricky hired Arnold

21   and thereafter hired us, he was appointed as the personal

22   representative.

23       Q.    And so eventually was Russell appointed to be the

24   personal representative for Angela and Justin's estate as

25   well as the conservator for both Hannah and Alania?

684

1      A.    Well, you are testing your memory pretty good, but I

2   believe that Ricky could not get bonded, as I was talking

3   about earlier, because he had a domestic violence charge.

4   And, therefore, could not be bonded to serve as conservator.

5   So I believe Russell at some point a decision was to ask him

6   to serve as conservator.  And then Ricky was appointed as PR.

7   And then we later had him removed as PR, asked him in the

8   best interest of the case, to step down and waive his right

9   to serve, and asked that Russell be appointed.

10     Q.    So had Russell served as a conservator or PR for

11  your cases before that?  Do you remember?

12     A.    I don't believe so, but, you know, subject to, you

13  know, memory, I believe that would have been the first time.

14  We had used other bankers.  I mean, it wasn't like a novel

15  idea to do that.

16     Q.    How did the case get resolved?  What happened with

17  the case?

18     A.    Well, the case lasted several years.  There was an

19  appeal that went on and, you know, just over some issues that

20  not really relevant to this.  We had what's called a

21  mediation where the parties come, sit down and try to resolve

22  their differences.  We finally reached a mediation with

23  Bridgestone -- I mean, a settlement on a number, and later

24  with -- some time thereafter with Ford.  And there was some

25  other parties involved that we settled with as well.

1    Q.   Okay.  So when did the law firm's involvement with

2    the case end?  I'm going to bring up Exhibit 105.  What is

3    this document?

4    A.   It's a document that we used to close out files.

5    Q.   Okay.  So this would indicate that the file was

6    closed and the case was over from the law firm's perspective?

7    A.   Right.  The RSS is one of my paralegals, Rebecca

8    Spires' initials.  And the RLC is my initials.  And the

9    reason we have this checklist is to try to make sure that

10   certain documents are being retained in case -- because Rules

11   of Professional Conduct require that we keep our files for

12   six years.  And also, if there was costs that had to be

13   written off, sometimes we missed cost in a disbursement, and

14   we required that the lawyer sign off.  And if there's any

15   evidence that needs preserved, there's a lot of little things

16   on there.  But, yes, this is a document that would have been

17   used to close the file.

18   Q.   So what date does this indicate that Hannah Plyler's

19   file was closed?

20   A.   I can't tell.  Is there a date at the bottom or is

21   this the only set of dates --

22   Q.   It's the date of last trust activity, describe what

23   that date is?

24   A.   Well, that means that would have been when the money

25   was disbursed out of the account.

1    Q.    Okay.

2         MS. LIMEHOUSE:    Could we go to 106, please.

3    BY MS. LIMEHOUSE:

4    Q.    All right.    This is the same document for Alania.

5    Does it have the same March 4th, 2009, date on it?

6    A.    It is the same.

7    Q.    So what's the law firm's role in the case

8    post-disbursement?

9    A.    The law firm has no role post-disbursement, absent a

10   client calling us asking do you have something in my file

11   that they may need for something else.    Maybe we gave them

12   the settlement paperwork and they lost it and they need to

13   take it to their tax advisor, you know, just as a custodian

14   of their file.    But as far as activity, when that's done, our

15   representation is over.    Because as I said earlier, we have

16   completed what we were asked to do, and that is handle, if

17   it's an accident case, handle this accident case.

18   Q.    I'm going to show you Government's Exhibit 71.    This

19   is an e-mail from you to Tiffany Provence.    Will you read

20   that e-mail to the jury?

21   A.    What's the date on it?    4/15/2009?

22   Q.    4/15/2009.

23   A.    Tiffany -- and Tiffany Provence is a lawyer who

24   specializes in probate matters.    I think her office is now on

25   Daniel Island.    I think it was in Summerville at the time.

1    "Tiffany, please let me use this e-mail to introduce you to

2    Russell Laffitte, who is a client of our firm.  He is serving

3    as PR for two estates in Richland County.  The estates were

4    open so that we could bring wrongful death actions arising

5    from an automobile accident.  The cases have settled and we

6    are now at the point where the estates need to be closed.  I

7    know that you're close with the probate judge in Richland

8    County and believe that you could help Russell get this done.

9    I have the probate files in our office and will provide them

10   to you if you and Russell decide to work together.  If you

11   do, he will be responsible for your fees.  Anita Aiken and

12   Beverly Harmon (ph) in our office are contacts or copies the

13   file.  Sorry for the informality of this introduction.  But I

14   believe that this is something that I mentioned before to

15   both you and Russell.  If you have any questions, please feel

16   free to contact me."

17        Q.   So what's the purpose of this e-mail?

18        A.    Well, the estates are in Richland County.  I don't

19   do probate court work.  And our law firm generally doesn't

20   other than open an estate or something.  I don't know,

21   sitting here today, if there was more involved in the estate

22   that needed to be closed out.  But Tiffany is a go-to person,

23   that I was just making a connection between she and Russell,

24   so that they could get that -- those two estates closed out

25   to comply with -- you know, there's usually something called

1    an accounting that has to be done, and just form work that I

2    was just making -- connecting them because I wasn't going to

3    do it.

4         Q.   So you are referring Russell to a probate lawyer to

5    handle the matters with the estate?

6         A.   That is correct.

7         Q.   Did Russell ever ask you advice on what to do with

8    the Plyler funds after this case was closed?

9         A.   Well, prior to closing, we had discussions.  And I

10   believe that Ricky Plyler would have been involved as well as

11   parent, about doing some structured settlements for the

12   Plyler girls.  And Russell, in his representative capacity,

13   would of had to sign those documents.  And that was done

14   through an annuity company.  And so to that extent, we would

15   have.  As far as the funds that were going into the

16   conservatorship, I would of had -- our last involvement would

17   have been writing the check and delivering it to Russell to

18   put into the conservatorship account, so however the bank

19   would do that.

20        Q.   Okay.  I'm going to show you Government's 104 real

21   quick, just the top.

22             So you -- I think you have mentioned Anita Aiken.

23   Who was Anita Aiken?

24        A.   She was then one of my paralegals.

25        Q.   Okay.  She is e-mails you back in July of 2008 and

689

1    says, "FYI, Russell Laffitte got an order from the judge to

2    approve $250 each for Alania and Hannah Plyler for school

3    shopping from their conservatorship accounts at Palmetto

4    State Bank.  Per my telephone conversation with Russell at

5    2:00 p.m., he was sending someone to pick up the court order

6    approving above, and then he would transfer the funds to the

7    Palmetto State Bank branch in Bluffton, South Carolina, for

8    the Plyler girls to pick up funds at 3:00 p.m.  Per Russell,

9    the Plyler girls will need to submit copies of their school

10   shopping receipts to the court per the judge's request.  I

11   telephoned Alania at her number and advised her of all this.

12   Russell stated that I did not need to send him anything in

13   writing to release these funds to the Plyler girls."

14           So was this just an example of how Russell was

15   managing those funds and notifying y'all of doing that?

16       A.   Well, understand this was before the case was

17   settled.

18       Q.   Right.  Uh-huh.

19       A.   So there was a -- and I don't remember the amount,

20   there was some money off the vehicle.  Anita was a close

21   contact with the Plyler girls.  And so I don't know if she

22   helped facilitate that at that time.  But, you know, this

23   would have been just been before, and I guess they're

24   confirming there that we didn't need to do anything.  These

25   are not the types of, you know, post-case stuff that I would

1    ever see.  We would not see those requests to the probate

2    court or orders approving this type of settlement.  But I

3    suspect the communications -- Anita may have been involved in

4    setting up this request because I know she was very close to

5    these girls.

6        Q.    Okay.  Malik Williams, I know you were not involved

7    in the Malik Williams' case, but if you could tell the jury

8    about Malik Williams, what you know, and who did represent

9    him?

10       A.    Malik Williams was a minor that was represented by

11   my now-deceased partner, Paul Detrick.  It was a

12   run-of-the-mill auto accident case.  I believe -- and you may

13   have documents that will correct this, I believe the

14   settlement was for $100,000.  I believe Malik's dad was

15   deceased.  And Paul attempted to get the mother appointed as

16   conservator because he was going to get, I think, 60 of that,

17   or somewhere in that range, his net proceeds going to the

18   client.  But because he was a minor, we had to get a

19   conservator set up.  And I only know this because I've

20   reviewed the files.  I was not a part of the file, but just a

21   very simple file.  It was one of those ones that settled, you

22   know, but litigation, without that type of thing.  And the

23   mother could not get bonded because of her credit.  There's a

24   letter from -- in the file that indicates that.  And so Paul

25   reached out to Russell about serving as conservator.

1    Paperwork was submitted to the probate court.  He was

2    appointed conservator.  Money was transferred to Palmetto

3    State and Paul closed our file.

4        Q.   I'm going to pull up Government's 107.  Okay.  So is

5    this a disbursement sheet that -- the jury has seen a few.

6    This one looks a little different.  Is this a disbursement

7    sheet?

8        A.   It is.  And I see there, again, I was wrong on the

9    amount.

10       Q.   Close.

11       A.   It's a little bit more.  I knew there was that

12   60,000 that went to him.  And that's how I was coming up with

13   that.  Yes, that is the disbursement sheet.

14       Q.   Okay, so it indicated that Russell, Palmetto State

15   Bank as conservator for Malik Williams, was getting

16   $60,512.24?

17       A.   Right.  And I think here the parent could consummate

18   the settlement, but she couldn't keep the money because she

19   wasn't qualified to get a bond.

20            MS. LIMEHOUSE:  Let's go to Exhibit 108, please,

21   just the first page, top portion.

22   BY MS. LIMEHOUSE:

23       Q.   So this is just the probate court docket sheet.

24   Does that show that Malik Williams, his conservator was

25   Russell Laffitte?

1       A.    Yes.

2       Q.    So what role did Alex Murdaugh play in Malik

3    Williams's case?

4       A.    Alex Murdaugh was not involved in Malik Williams's

5    case.

6       Q.    What did you do to determine whether Alex Murdaugh

7    had any involvement with Malik Williams case?

8       A.    Well, one, when this came up, none of us had ever

9    heard the name Malik Williams until, you know, this was

10   actually, I think, discovered by law enforcement.  We didn't

11   have any knowledge of Malik Williams because it would have

12   just been a nondescript, a client of Paul's.  But Alex

13   Murdaugh's name is not present anywhere in that file, nor is

14   there any other lawyer in the law firm have any involvement

15   in that other than Paul Detrick.

16      Q.    So how would Alex had known about Malik Williams

17   getting $60,000 to Palmetto State Bank?

18      A.    I don't know.

19            MS. LIMEHOUSE:  Government's 16, please.  Pages 18

20   through 20.

21   BY MS. LIMEHOUSE:

22      Q.    Okay.  This is a $40,000 check to Alex Murdaugh

23   dated November 18th, 2011.  Do you know anything about this

24   $40,000 to Alex Murdaugh?

25      A.    No.  There's no record of that in our file.

1          MS. LIMEHOUSE:  Next page, please.

2    BY MS. LIMEHOUSE:

3        Q.   Is this a $40,167.69 check dated 12/21/2011 to

4    Russell Laffitte as conservator for Malik Williams signed by

5    Russell Laffitte?  Do you know anything about this payment to

6    Russell as conservator for Malik Williams?

7        A.   No, other than seeing this check.

8          MS. LIMEHOUSE:  Next page, please.

9    BY MS. LIMEHOUSE:

10       Q.   And, again, do you know anything about a receipt for

11   a money order that was drawn at the bank to pay Russell

12   Laffitte as conservator for Malik Williams $40,167.69?

13       A.   No.

14       Q.   Okay.  Pinckney/Thomas, you didn't have anything to

15   do with Malik Williams case, but what about Hakeem Pinckney

16   and Natasha Thomas?

17       A.   Yes, I was involved in those.

18       Q.   Who were Hakeem -- who was Hakeem Pinckney and who

19   is Natasha Thomas?

20       A.   Hakeem Pinkney was the deaf son of Pamela Pinckney

21   and -- who was a member of the School of the Deaf and Blind

22   in Columbia or a student there.  Natasha, as best I can

23   recall, was a family member of Pamela and Hakeem, and they

24   were, again, in an unfortunate circumstance of traveling on

25   I-95 in a Ford Explorer.  This time equipment -- and I can't

1    tell you the nomenclature on the tire, but a Michelin-made

2    tire, I don't think it was a Michelin-branded tire, I think

3    it was maybe a BFGoodrich or Universal or something, that had

4    the same type of failure as the Plyler accident, a tread belt

5    separated.  The Explorer lost control.  And this time, if my

6    memory holds correctly, the vehicle rolled several times and

7    came to rest in the median.  Hakeem was ejected from the

8    vehicle and was rendered a quadriplegic.

9        Q.   So how did you become involved in the case?

10       A.   The same as we discussed earlier, just because of my

11   knowledge about these issues.

12       Q.   So Alex came to you and asked that you work the case

13   with him given your specialty?

14       A.   He did.

15       Q.   So what was your interface with Hakeem Pinckney and

16   Natasha Thomas?

17       A.   I became to know a lot about Hakeem because of the

18   story was so incredible, what he had achieved in light of his

19   disability of being deaf.  And, gosh, I want to say he was

20   even playing football for the School of the Deaf and Blind.

21   I don't remember the details.  But he was such a

22   sympathetic -- I can't say that I ever met him.  And I do not

23   believe I ever met Natasha Thomas.

24       Q.   Is that because traditionally your role is to serve

25   on the legal side rather than interfacing with the clients?

1      A.    Well, yeah.  And you understand that Hakeem was, I

2   believe -- and I don't remember if it was the entire time,

3   but for a portion of the time I know he was

4   ventilator-dependent.  So getting him to an office or

5   mediation -- and I think Alex may have visited with him, you

6   know, once -- you know, at some point.  I don't want to

7   quantify, but I just -- it is in keeping with -- you know,

8   you sort of stay in your lane when you are asked to do

9   something.  And nobody is looking to do more work than

10  they've got to do, because you got other stuff going on.  So

11  I never had any involvement with them personally.

12     Q.    So who was appointed to be the conservator for

13  Hakeem Pinckney and Natasha Thomas?

14     A.    Russell Laffitte was.

15     Q.    Do you know the circumstances surrounding why he

16  became conservator?

17     A.    Well, in this particular case, Pamela was a

18  defendant.  She was driving the vehicle.  And in these cases,

19  typically, the manufacturers will blame the driver.  And so

20  for one, we made her a defendant.  And so we couldn't

21  represent her and she couldn't be in that capacity.  But also

22  it was to keep the case venued, you know, where -- in a

23  favorable location, you know, better county.  I mean, when

24  you are a lawyer, there's a lot of things you think about

25  when you are bringing a case in.  And one of them is where --

1    or is it going to be a better court to put the case in to get

2    the maximum recovery for the client.  And that would allow us

3    to bring it in Hampton County, was probably the bigger driver

4    of that.

5         Q.   So did you ask Russell to serve as conservator or

6    was it Alex?

7         A.   I'm confident Alex did, but I would have concurred

8    in it.

9         Q.   So what happened with the lawsuit with Hakeem and

10   Natasha's case?

11        A.   Well, it went through the litigation process.  And

12   eventually after -- I believe we mediated the case at least

13   three times, and ultimately reached a settlement with the

14   defendants in the case.

15             MS. LIMEHOUSE:  I'm going to pull up Government's

16   109 -- 111.  Just make this a little larger.

17   BY MS. LIMEHOUSE:

18        Q.   So what happened to Hakeem?

19        A.   I remember the case not settling at mediation.  And

20   I could remember continuing to negotiate with counsel and

21   ultimately settling the case over the phone I'm going to say

22   some time in September of that year.  I just only remember it

23   because I was trying a case against Ford, and that's a

24   totally separate matter, and I remember taking breaks, it

25   just sticks out in my mind, and I remember Alex indicating

1    that Hakeem was, you know, they had had some problems with

2    his ventilator.  I don't remember the details of it.  And

3    ultimately, Hakeem died right after we had reached a verbal

4    settlement of the case.

5        Q.   Do you remember what day Hakeem died?

6        A.   Ms. Limehouse, I don't.

7        Q.   Okay.  So --

8        A.   I could tell you it was sometime around the date of

9    this e-mail, whether it was that day or the date after, it

10   was in October, first half of October.

11       Q.   Okay.  So I'm going to show you Hakeem Pinckney's

12   disbursement sheet, the second page, Exhibit 22.

13            MS. LIMEHOUSE:  Let's stop at the first page real

14   quick and just blow up the top.

15   BY MS. LIMEHOUSE:

16       Q.   So this 10,245,000, that was the amount that y'all

17   settled the Hakeem case for; is that right?

18       A.   Correct.

19            MS. LIMEHOUSE:  So page 2, please.

20   BY MS. LIMEHOUSE:

21       Q.   All right.  So this is the disbursement sheet that

22   the jury has already seen.  And it's signed by Russell and

23   Alex, Russell as conservator for Hakeem, and there's no date.

24   Do you know why there's no date on these disbursement sheets?

25       A.   I do not.  I was not involved in that.

1     Q.    I'm going to show you Exhibit 20, the top portion

2   real quick.   So this is Natasha's 2 million, is that the

3   recovery amount for the settlement of Natasha's case?

4     A.    That's correct.

5     Q.    Okay.   I'm going to show you page 2 of the

6   disbursement sheet.   This shows, again, no date with the

7   signatures.   Do you know why there were no dates on the

8   signatures?

9     A.    I do not.

10     Q.    All right.   So I'm going to show you the releases.

11   You mentioned the release.   Just explain for the jury briefly

12   what a release is.

13     A.    Well, releases can come up in a lot of context, but

14   for what we are talking about here, if a defendant and a

15   plaintiff reach an agreement to settle something, the payment

16   is always in exchange for dismissal of the lawsuit, and sign

17   a legal document that says that you are not going to sue us

18   again out of these facts.   And it will have a lot of language

19   about taking care of liens.   But it's a legal document that

20   says that as a settling parties, upon payment of this money,

21   the case is over, it will be dismissed and forever barred

22   from coming back and trying to sue for more.   It's for

23   finality.

24     Q.    So when are those releases usually signed in

25   conjunction with the disbursement sheet?

1      A.    Well, it depends.  Sometimes the defendants require

2  you to get them signed in advance of funding.  Sometimes they

3  are signed in conjunction with the signature on the

4  disbursement sheet.  And, you know, on occasion, money will

5  be sent to us -- especially from insurance companies, to hold

6  in trust pending signing, you know, signature on the release.

7  But it's always in those days or weeks surrounding the

8  settlement disbursement sheet being signed, the release will

9  get signed.

10     Q.    I'm going to show you Government's 212.  Do you

11 recognize this document to be the Natasha Thomas release of

12 Michelin North America?

13     A.    I do.

14     Q.    Okay.

15         MS. LIMEHOUSE:  I'm going to go to the signature

16 page, please.

17 BY MS. LIMEHOUSE:

18     Q.    Okay.  And what date does it indicate this release

19 was signed for Natasha Thomas?

20     A.    The 7th day of November 2011.

21     Q.    Do you know who Brenda Tuten is?

22     A.    Yes.  Ms. Tuten -- and I forget her position, but

23 she's an employee of Palmetto State.

24         MS. LIMEHOUSE:  I'm to pull up Exhibit 213, the top

25 portion.

BY MS. LIMEHOUSE:

Q.    Okay.  Do you recognize this document to be a release for the Hakeem Pinckney case from Allstate Insurance Company?

A.    I do.

MS. LIMEHOUSE:  The signature page, please.

BY MS. LIMEHOUSE:

Q.    And what date does this indicate it was signed?

A.    The 8th day of November 2011.

Q.    Okay.  So the day after Natasha's release was signed.  So what role did the law firm play once these documents were signed?

A.    Well, once they were signed, we would have transmitted them to the defendants, to their counsel.  If there was any liens remaining to be negotiated per the terms of that release, we would have negotiated those.  And we would have transmitted the funds to -- I saw in one of those there was structured settlements.  We would have made -- well, I don't think on those we would have transferred the funds, but we would have transferred the funds to Palmetto State that were supposed to go there and just ended the case. We would have signed a stipulation of dismissal and our involvement would be over.

MS. LIMEHOUSE:  Your Honor, I'm about to switch gears substantially if you want to take a short afternoon

1      break.

2              THE COURT:  Let's try to keep going for a little

3      while longer.

4              MS. LIMEHOUSE:  Okay.  Perfect.

5      BY MS. LIMEHOUSE:

6      Q.    We are going to move to 2021.  The jury has heard a

7      lot what was happening with Alex at that point.  But from

8      your standpoint, spring of 2021, what was going on in Alex's

9      life?

10     A.    Spring of 2021, Alex had just tried a case in

11     Richland County.  I don't remember the exact amount, but a

12     multi-million dollar verdict he achieved in a case that we

13     were all familiar with.  And in May -- and I can't tell you

14     the exact date, Jeanne -- I was in my partner, Lee Cope's

15     office, as best I can recall, and Jeanne raised an issue

16     about Alex trying or indicating that he was going to hide

17     money in the form of -- well, he had mentioned something

18     about a structured settlement, the fees from Faris, because

19     he was -- wanted to protect it or hide it from a civil

20     lawsuit that was pending against him involving a boating

21     accident.  By the time she got that out of her mouth, I used

22     some profanity and said, "Hell no," you know, "that ain't

23     ever going to happen. You need to get -- figure out -- get to

24     the bottom of it."

25              MR. DANIEL:  Can Mr. Crosby be asked to pull the mic

1    a little closer?

2              THE WITNESS:  I'm sorry, Mr. Daniel.

3              MR. DANIEL:  I can't hear you.

4              THE WITNESS:  I apologize.  My voice tends to drop

5    off sometimes.

6              It was a nonstarter because -- for many reasons.

7    You can start with the ethics of it, the tax -- I mean, I was

8    shocked.  And so I just told Jeanne, you need to get the

9    money, find it.  And so she was -- it was her role, because I

10   didn't think he was doing anything other than that, that he

11   was trying to pull something because he was worried about

12   getting a judgment against him.

13   BY MS. LIMEHOUSE:

14       Q.   So did you have any idea at this point that Alex had

15   stolen funds from clients?

16       A.   I had none.

17       Q.   So what role did you play then in trying to track

18   down these missing fees?

19       A.   Well, other than to delegate Jeanne, who I feel is

20   very capable, and she's not afraid of us as lawyers, she will

21   push back.  And, you know, we were talking about $792,000.

22   And it wasn't that I thought he was stealing.  But it was,

23   one, it was our money, and two, the notion of hiding money or

24   diverting it or whatever he was saying and, you know, just

25   wasn't going to happen.  But I just assumed she get it

703

1    straight with -- because she was being advised that it was in

2    the lawyer who he handled the case with's trust account.  So

3    I really didn't worry about it that much.  I was like, well,

4    this ain't going to happen.  We will get our money, you know,

5    wasn't -- no use for me to make a big deal about it at the

6    time.

7         Q.   So at some point you learned that these fees were

8    supposed to be in the other attorney's trust account and you

9    kind of put it in the back of your mind?

10        A.   I did.  And then, obviously, we experienced the

11   horrors of a double murder just a couple of weeks after that.

12   It never came back up.  You know, we were being assured the

13   money was in this other lawyer's trust account.  And so just

14   let's let it be.  You know, we will get it before the end of

15   the year, let him grieve, and we were grieving.  And then I

16   guess some time mid-June, Jeanne started pushing about it

17   again, asking questions.  But she was more pushing the other

18   law firm, hey, go ahead and send us these fees, let's get

19   this cleaned up, we want to close out the file.  And, you

20   know, I really wasn't involved other than being advised that

21   they were pushing to get the money.

22        Q.   So in early September, did you learn that Alex

23   Murdaugh had been stealing money from his clients?

24        A.   Yes.  After we located the Faris checks and saw that

25   they had been written back in March, which would have

1    indicated that he was being dishonest with us and that the

2    lawyer who was telling us it was in a trust account was not

3    being truthful either.

4        Q.    Okay.  So the jury has heard about the incidents in

5    September.  What did the law firm partners decide to do after

6    the incident in September?

7        A.    Well, we immediately within -- well, I was in on the

8    initial meeting.  And I made up my mind that Thursday night

9    when I saw what was going on that he had to leave.  We met

10   and asked him to resign.  And then started, you know, a long

11   investigation into, you know, what turned out to be a, you

12   know, a long-term debt that had been going on.

13       Q.    So who all did y'all notify about what you

14   uncovered?

15       A.    We notified -- you know, our first, you know,

16   reaction was we needed to notify our clients.  But from the

17   initial, we started -- hired a lawyer to advise us on how to

18   deal with the Office of Disciplinary Counsel, because we knew

19   we had to replenish those funds into our trust account.  And

20   we notified the Office of Disciplinary Counsel --

21       Q.    Why the Office of Disciplinary Counsel?

22       A.    Well, because it was a trust violation that we had

23   discovered.  The Rules of Professional Conduct require that

24   you self-report.  And while I didn't misappropriate any of it

25   or have anything to do with it, it was our trust account and

1    so we had to address that.

2        Q.    So you also had to report yourselves?

3        A.    Yeah.

4        Q.    Okay.  And then what about SLED?

5        A.    Well, we talked about reporting it that day.  We

6    didn't have a package, you know, put together.  That would

7    have been the 3rd.  And we wanted to work to get a package

8    together and to take to SLED.  It was Labor Day weekend.  And

9    we'd already had some interaction with SLED out of the murder

10   investigation.  So, you know, we all had been around those

11   guys.  And, you know, that whatever happened on the Old

12   Salkehatchie Road occurred.  And so that Saturday afternoon,

13   we verbally disclosed what we knew at the moment to South

14   Carolina Law Enforcement Division.  And I believe there was

15   some sheriff's departments out there.  I don't, you know --

16       Q.    Who else did y'all decide to notify that following

17   week?

18       A.    Well, that Friday, we made the decision to -- that

19   we had to disclose what was going on to Palmetto State Bank,

20   because we knew he had a banking relationship with the bank,

21   not that he had stolen money from the bank, it was -- there

22   was a relationship there.  We had a loyalty to Palmetto State

23   both personally and as a law firm.  And so we sent a group to

24   Palmetto State to let them know, because, you know, we knew

25   that if Alex had any loans over there, that the bank was

1    going to have issues.

2         Q.   Were you involved in this initial meeting at the

3    bank?

4         A.   I didn't go to the bank.  I was involved in setting

5    up, you know, to get it done.

6         Q.   So did Jeanne then start to kind of track down

7    Alex's largest cases to get some answers?

8         A.   Yeah.  The thought was, well, is there any more?

9    You know, we knew that -- well, we see what we see.  I mean,

10   and so we just started going through the bigger files where,

11   intuitively, he would be stealing.  And so, yes, we undertook

12   that.

13        Q.   Okay.  So let's start with the Badger case.

14             THE COURT:  Why don't we -- I think maybe this would

15   be a good time before we get into the details of that case.

16   Ladies and gentlemen, let's take our afternoon break.

17             (Jury leaves open court at 3:16 p.m.)

18             THE COURT:  Please be seated.  Any matters we need

19   to address, first from the Government?

20             MS. LIMEHOUSE:  Nothing from the Government, Your

21   Honor.

22             MR. DANIEL:  Nothing from the defense.

23             THE COURT:  Okay.  Let's be at ease.

24             (Whereupon, a recess transpired.)

25             THE COURT:  Let me just mention one thing.  One

1    reason I was pushing you a little bit on time, Ms. Limehouse,

2    was because I'm trying to get Mr. Crosby finished by the end

3    of the day because I don't want to break up the cross and the

4    direct and all that.  So I was trying to push along a little

5    bit and --

6             MS. LIMEHOUSE:  I'm streamlining him a little bit.

7             THE COURT:  Both your direct, your cross, your

8    redirect, let's kind of push it along, because I don't think

9    it's just a good trial practice to break up and not be back

10   till Monday in the middle of a witness.  Okay?

11            MS. LIMEHOUSE:  We appreciate that.  We actually

12   have Hannah and Alania Plyler, who we're hoping to put on the

13   stand after Mr. Crosby.  We have another lawyer from the law

14   firm waiting by.  Can we release him?  Because it doesn't

15   look like that's going to happen.

16            THE COURT:  Yeah.  I mean, something might change,

17   but I would be surprised that you're going to get the Plylers

18   up.  You can try.  I think that's great.  And I will

19   certainly try to accommodate you.  But, you know, you're

20   getting ready to get into the substance of these cases.  And

21   Mr. Daniel has every right to cross-examine.  And you're

22   going to want to redirect.  I'm just saying practically

23   speaking.

24            MS. LIMEHOUSE:  If the Court is okay, we'd like to

25   let the Plyler girls go then for their schedule.

1    THE COURT:  I would leave them around just in case

2    y'all surprise me, you know.  I'm not usually surprised with

3    y'all's rapidity, but you might -- the day is still young as

4    they say, you know.  But the key is, I don't think it's fair

5    to either side to break up the direct, the cross and the

6    redirect.  So let's try to get that done before the end of

7    the day at a minimum.

8    MS. LIMEHOUSE:  Yes, understood, Your Honor.

9    THE COURT:  Mr. Crosby, do you want to come on back.

10    (Whereupon, the jury returns to open court at 3:30

11    p.m.)

12    THE COURT:  Please be seated.  Ms. Limehouse, please

13    continue your direct examination.

14    MS. LIMEHOUSE:  Thank you, Your Honor.

15    So we left off with the Badger case --

16    A JUROR:  Judge, we have one that's not here.

17    THE COURT:  Thank y'all very much.  They're not

18    supposed to do that.  They're supposed to let me know.  Thank

19    you.

20    A JUROR:  It's hard to keep up with all of us, I

21    know.  We can take another break until we find her.

22    THE COURT:  No.

23    Okay.  Ms. Limehouse, please continue.

24    MS. LIMEHOUSE:  Thank you, Your Honor.

25    BY MS. LIMEHOUSE:

709

1      Q.   Okay.  Mr. Crosby, we left off on Arthur Badger's

2    case.  So what did the law firm uncover with the Arthur

3    Badger case?

4      A.   Mr. Daniel, can you hear me okay?  I will try to do

5    better.  I apologize.

6           Well, the case involving Arthur Badger was an

7    accident case that resulted in a large settlement.  I don't

8    remember the exact figures, but it was one of the ones that

9    we felt we needed to look at given what we had discovered.

10   And we, I want to say, audited.  Jeanne was largely

11   responsible for going through to make sure she could detail

12   all of the transactions in the case to see, you know, if

13   there was something there that stood out to us as being an

14   apparent theft.  And that was one of several that we had

15   intended to look at.

16     Q.   Okay.  I'm going to pull up Government's 30.  So the

17   jury has seen all of the checks that were negotiated from

18   Arthur Badger numerous times.  So this is a summary of those

19   checks.  So if you'll just review that for me to refresh your

20   recollection with what happened with Arthur Badger.

21     A.   I marked it.  I'm sorry.

22     Q.   That's all right.  I can delete it for you.  Did

23   y'all learn that checks that were intended to go to Arthur

24   Badger were written to Palmetto State Bank and then

25   negotiated for people unrelated to Arthur Badger?

1      A.    Well, ultimately we learned that, but we did not

2    learn that on our initial review of our files.

3      Q.    Okay.  So how did your knowledge of this -- these

4    checks come about?

5      A.    I don't want to misstate accounting terminology, but

6    Jeanne, in looking at it, Ms. Seckinger could not tell what

7    happened to the money.  We could see where it was written out

8    to Palmetto State Bank.  And then at some point in time she

9    contacted Russell and asked him to bring information that

10   would help her understand.  And we were hoping that we would

11   have clear information that there had been no theft, because,

12   you know, is what -- but we felt obligated to investigate

13   that.  And we asked him to bring -- or she asked him to bring

14   materials over to help review that.

15     Q.    So when he brought the materials over, were you part

16   of that meeting?

17     A.    I don't recall if I was the first meeting or the

18   second meeting.  I was a part of one of the meetings.

19     Q.    Okay.  So at some point, did you have conversations

20   with Mr. Laffitte about the Badger checks?

21     A.    I was in a meeting in Jeanne's office.  I had -- I

22   was getting ready for a trial.  And I like to just take a

23   conference room and sort of shut myself away.  And I recall

24   Russell pulling up in his truck and parking right outside of

25   the conference room.  And at some point, I walked over to

1    Jeanne's office because I think he had a folder, and just to

2    walk over to see what the two of them had figured out.

3         Q.    And so what took place during that meeting?

4         A.    I don't remember all of the details.  I know that we

5    were given a check for $680,000.  And I don't know if we were

6    brought any additional paperwork or additional paperwork was

7    delivered at that time or not.  I know Jeanne had a folder on

8    her desk with papers in it.

9         Q.    I'm going to pull up Government's 14A.  So is this

10   the check that you're talking about, the $680,000 check?

11        A.    Correct.

12        Q.    And did this math here outline how y'all got to the

13   $680,000?

14        A.    Yes.  I think part of that was a PR fee was added

15   back in.  At some point Russell made a decision that he was

16   going to divest himself of the fee in that case.

17        Q.    Did you ever learn whether he himself divested

18   himself of the 35,000?

19        A.    No, I didn't inquire about where the source of the

20   35,000 was.

21        Q.    But it was part of the calculation for the $680,000?

22        A.    Correct.  I think -- I think the initial was 1.325

23   or something and so -- yeah, it was part of that calculation.

24        Q.    So whose idea was it for y'all to split the amount

25   of the Badger loss?

1    A.    Well, we were unaware that he was bringing a check

2    to us.  So the genesis of that had to come either from

3    Russell or the bank or -- it was Russell's idea.

4    Q.    So he just showed up with the $680,000 check?

5    A.    He showed up with it.  And I would paraphrase, he

6    said, part of this is on the bank, we'll split it with you.

7    Q.    So what was your understanding of the Badger checks

8    at this point?  What had actually happened with Badger?

9    A.    You know, at this point, I did not have a full

10   appreciation.  I could see the cashier's checks, but at this

11   time I didn't sit down and study it to gain an understanding.

12   I think we were all a little taken aback about the

13   unsolicited, that he was giving us $680,000.

14   Q.    Okay.  So from y'all's perspective you were

15   surprised that he was handing over $680,000?

16   A.    Yes, and I didn't understand what the true basis of

17   it was, what the meaning of this is on the bank.  I didn't

18   know at that time what he was referring to.  So -- and I had

19   not sat down and detailed those documents that were brought

20   over to us.

21   Q.    Okay.  Were there any other statements that Russell

22   made about the Badger checks during that meeting?

23   A.    Because some of those documents referenced, I

24   believe, Hannah Plyler, there was a statement -- and I really

25   didn't appreciate it even then, there was a statement that

1    the probate -- that he got permission from the probate court.

2    Q.    So Hannah Plyler was discussed during this meeting

3    about the $680,000 payment?

4    A.    Right, because it was showing money getting -- some

5    of that money went to Hannah Plyler.

6    Q.    So what was your thought when you're seeing money

7    going from Badger to pay off Hannah Plyler?

8    A.    Well, my thought was that this is surprising.  But

9    Russell's statement that Sheila, who I knew to be the probate

10   judge, had gave approval, which would have to take effect

11   because the orders all say no disbursements without that.  I

12   was surprised that the probate judge would do that based on

13   my understanding of the tight restrictions on conservatorship

14   money.  But I had no reason to doubt what he was saying at

15   the time.  And you've got to understand, this is late

16   October.  We are super focused on protecting our clients and,

17   you know, complying with the ethical rules.  We are being

18   deluged with subpoenas from South Carolina Law Enforcement

19   Division.  At some point, the FBI was requesting documents.

20   And so we had an incredible amount of resources being spent

21   on complying with legal subpoenas and constant law

22   enforcement in and out of our office.  And so, to sit down

23   and really study this, it was not my priority at the moment,

24   because it was more to satisfy legal requirements that -- you

25   know, that we were taking very serious because -- and our

714

ethical requirements.

Q.    So before that meeting, did you know that Russell had extended Alex loans from Hannah Plyler's conservatorship account?

A.    No.

Q.    Had he ever offered to loan you money from Hannah Plyler's conservatorship account?

A.    No.

Q.    And during that meeting, did he tell you that he himself also took loans from Hannah Plyler's conservatorship account?

A.    He would not provide that information.

Q.    Did he tell you that that $35,000 PR fee from Arthur Badger was used to pay off his loans to Hannah Plyler?

A.    No.

Q.    Were there any other discussions about the bank's involvement or anyone at the bank's involvement with the $680,000 check?

A.    Only thing that I recall about the bank was that Russell said that he had not run it by the Board as of that day, which would have been on -- I believe that meeting occurred on the 28th.

Q.    So what did he tell you about that?

A.    I don't remember much other than that. I took it that it was going to be just a formality to do that.

1          Q.    I'm going to show you Government's 77.

2                MS. LIMEHOUSE:  If you'll just make the middle part

3     larger.

4     BY MS. LIMEHOUSE:

5          Q.    So when did the law firm decide to deposit this

6     $680,000 check?

7          A.    The next day.

8          Q.    So why did y'all decide to go ahead and deposit it?

9          A.    Well, he gave it to us.  And said -- he said that we

10    -- I guess in as much owed it to us by taking some

11    responsibility there.  And I mean, I thought that was the

12    thing to do.  If somebody gives you money, you put it in the

13    bank.

14         Q.    So let's talk about how y'all decided to handle the

15    Badger settlement.  I'm going to show you Government's 78.

16               MS. LIMEHOUSE:  So just blow up the middle part,

17    yes.

18    BY MS. LIMEHOUSE:

19         Q.    So what did the law firm decide to do with respect

20    to the other portions of these funds?

21         A.    Well, ultimately, we decided to restore the trust

22    completely with our funds and not to use those.  And we made

23    that decision within the next couple of days.

24         Q.    Okay.  So this is a check dated 10/29, the same day

25    that the 680 from the bank was deposited showing that

1    $680,000 from the law firm's attorney account was deposited

2    into the law firm's client trust account.  So was that

3    putting a portion of the funds into the trust account?

4        A.    Well, yes, signed by Mark Ball.

5        Q.    I'm going to show you Government's 79.  This is a

6    second check dated November the 3rd, again, from the law

7    firm's attorney account to the law firm's client trust

8    account, and it's an additional 680.  So why are y'all

9    putting in an additional 680?

10       A.    Well, because I believe I had a conversation with

11   Russell subsequent to that about a Board meeting coming up.

12   And I also started getting calls from the bank's attorney,

13   Mr. Trenham Walker, about the $680,000.

14       Q.    So why did y'all decide to handle it this way, to

15   put your own 680 in again?

16       A.    Ms. Limehouse, I'm not perfect on the dates, but I

17   believe the very first few days of November, Mr. Walker

18   called me and asked for a release to the bank.  And we had

19   not even discussed -- and, basically, he was wanting us to

20   release the bank of any liability, I guess to get something

21   for this 680.  And I recognized then what he was wanting, and

22   we hadn't even assessed our -- whose responsibility, how this

23   happened.  And we made a decision to restore it fully, not

24   use the money provided by Palmetto State because we didn't

25   want it to be construed as a release if we later found out

1    that the bank had more -- had responsibility for what had

2    happened.  And so I told Mr. Walker that we can't -- we're

3    having trouble finding Mr. Badger.  And I don't believe it

4    was until about two weeks later, sometime around the 15th,

5    that we found Mr. Badger.  And I was continuing to

6    communicate with Mr. Walker about that.  And I think we

7    communicated throughout the month of November about whether

8    we would give a release.

9        Q.   So did you have any other discussions with Mr.

10   Laffitte about the $680,000?

11       A.   If I did, I don't recall it other than the phone

12   call where he said the Board hadn't met yet.  And he may have

13   asked us not to do anything with it.  I don't remember exact

14   wording, but Mr. Walker called with the same -- and I was

15   more concerned about if we did something with it, that he was

16   wanting a release.  And so it was kind of, I don't know,

17   putting us on notice sort of to speak that he would interpret

18   it as a release.  At least that's the way we were taking it.

19       Q.   So from the law firm's perspective, what had already

20   happened with the $680,000 from the bank?

21       A.   It was just deposited.

22       Q.   So was there -- were they going to be able to go

23   back on that deal with the law firm?

24       A.   Nobody from the bank ever asked us to give it back.

25       Q.   The attempts by Trenham Walker to get the law firm

1    to sign a release, did you all ever sign a release releasing

2    the bank of liability with respect to Arthur Badger?

3         A.    No.    Ultimately, said to Mr. Walker that we were not

4    willing to do that at this time, we did not know what might

5    ultimately be the outcome of what Mr. Badger may decide to

6    do.    And, you know, we didn't think it was in our best

7    interest until we actually studied the picture to make a

8    determination of whether it was appropriate to take that and

9    give a release or whether we thought the bank had bigger

10   liability toward us.

11        Q.    So how was Arthur Badger made whole then?

12        A.    Well, he came in our office.    We tracked him down.

13   I almost think we had to get some help tracking him down.    He

14   came in.    I didn't meet with him, but we did the same

15   procedure we did with the clients who came in.    And did

16   something that -- it's really hard to say, hey, our former

17   law partner stole your money, but here's a check for it,

18   we're so sorry.    And we would have detailed out all the

19   transactions, you know, what would have occurred, and gave

20   him a package and told him if he needed to call a lawyer --

21   you know, that he could consult with a lawyer if he wanted

22   to.    And there's actually a picture of Mr. Badger very, very

23   happy holding a $1.3 something million check that he had no

24   idea about.

25        Q.    So did the bank's money, $680,000, ever go to pay

1     back Mr. Badger?

2          A.   No, it's still in our account, you know.

3          Q.   So at that point you said you still had not seen the

4     full picture with respect to Badger.  Have you now had an

5     opportunity to review some internal communications from the

6     law firm?

7          A.   Yes.  I've been involved in, I guess for lack of a

8     better word, putting out fires and dealing with liabilities

9     ever since this began and trying to make things right, as

10    other people in the firm.  And sometime after Christmas, I

11    was able to, you know, turn my attention to that issue.  And

12    I really had not studied it, but I had at some point a

13    conversation -- I think it was after this, but I decided to

14    try to figure it out, you know, what's going on.  So I had

15    our IT person -- I gave him parameters to do a search of all

16    of our e-mails that would pick up communications between

17    Palmetto State, Alex Murdaugh, and Russell Laffitte.  I

18    received the results of that search.  And I went in that same

19    conference room.  And I stayed there until I went through all

20    of those e-mails and got an understanding, and found some

21    e-mails that shed a lot of light, at least I thought, on this

22    issue.

23         Q.   I'm going to show you Government's 37 and 38.

24              MS. LIMEHOUSE:  Can you do a side-by-side, please.

25    BY MS. LIMEHOUSE:

720

1     Q.    Are these two of the e-mails that you discovered?

2     A.    Yes.

3     Q.    So about when did you go through all these e-mails

4     in that conference room?

5     A.    I'm going to say between mid-January of 2021 and

6     early February.  I could get the date.  I mean, I have a

7     thumb drive with a download on it, but I can't tell you the

8     exact date.  But it was in that time period, because we were

9     starting to look at -- we didn't understand how it happened

10    in conjunction with Russell coming over and voluntarily

11    offering us this money.  I knew there had to be more to it,

12    but just had not -- because that would be more in our

13    interest of, you know, hey, what's the liabilities to us.  We

14    had focused entirely on clients and other liabilities that

15    were arising out of this.

16    Q.    So when you saw these e-mails, what did you think?

17    A.    Well, I took those e-mails and went and got the

18    package from Jeanne that Russell had brought over.  And then

19    I laid it out so that I could fully understand it.  And I was

20    alarmed and shocked at what I was seeing.

21    Q.    Why?

22    A.    Well, the checks that are being referenced, the

23    check number 43162, I went and confirmed that it was a client

24    trust check, and then that -- how it was broken down.  And

25    then I could see where the funds were applied via money order

1    to places that were not for our clients.  They were paying

2    debts that our clients did not have anything to do with.  And

3    I turned it over to our lawyers.  And I had a meeting with

4    Jeanne and her husband, who is a close friend of mine and

5    Russell's brother-in-law, and Randy Murdaugh, because I knew

6    that they would be -- I mean, I wanted them to see what was

7    there.  And that's what I did.

8        Q.    Why did you want them to see it?

9        A.    Well, I felt like in fairness to the familial

10   relationships there, you know, we're all friends, Randy's

11   close to Russell, I wanted them not to hear this secondhand.

12   I wanted them to see it so I could show them what was there

13   and how it matched up and, you know, to those backup

14   documents, those money orders.  And everything just fit like

15   a perfect glove.  And the way Alex had asked Russell to do

16   this, instead of him asking, you know, Jeanne to do it, he

17   got Russell to do it.  And then Russell replied, not back to

18   that e-mail copying Jeanne, but it was a totally separate

19   e-mail that did not have Alex's request on it.  And I found

20   it very concerning.

21       Q.    So back in October and early November when you were

22   talking to Russell and Trenham about the 680, did you think

23   Russell had any involvement in the Badger checks?

24       A.    No.  I didn't.  I didn't know what had really

25   happened.  And I did not understand the whole concept of how

1    you could take a check.  I mean, these checks had the

2    client's name on them.  And I had no concept of how you could

3    do the way these checks were negotiated and turned into

4    cashier's checks.  And so, you know, I just shoved it in the

5    corner until capacity was there to work through this.

6        Q.   So once you saw these e-mails, did your opinion

7    change?

8        A.   My opinion did begin to change.

9        Q.   All right.  Let's talk about Pinckney.  To reorient

10   a little bit, you've seen February, the e-mail

11   communications.  Let's go back a little bit until

12   post-October when y'all first uncovered the Natasha Thomas

13   and Hakeem Pinckney misappropriations.  So about when did

14   y'all discover that those funds had also been

15   misappropriated?

16       A.   I'm going to say if we learned about Badger in late

17   October, it would have been some time mid-November, early

18   November.  That would have been the next.  And then Plyler

19   would have been one that I would have -- that I would have

20   listed out for Jeanne to look at.

21       Q.   So back in the meetings with Russell in October, did

22   he ever mention Hakeem Pinckney and Natasha to y'all?

23       A.   I don't think we had any discussions with him about

24   those cases until Jeanne made a similar request.

25       Q.   Okay.  So Jeanne, just like she did with Badger,

1    asked Russell for supporting checks; is that your

2    understanding?

3        A.    That's correct, because you couldn't see that on our

4    side of things.  We couldn't see where the money went.  We

5    could see it was made out to Palmetto State.  We couldn't see

6    how the checks were negotiated or how -- what kind of account

7    it was put in.  So we just couldn't see it until we got the

8    documents from the bank.

9        Q.    And were you part of any of these meetings

10   discussing the Hakeem Pinckney and Natasha Thomas funds?

11       A.    If I was, it was a very limited role.

12       Q.    Do you recall anything that Russell said about

13   Hakeem Pinckney and Natasha Thomas funds?

14       A.    You know, as I sit here, sometimes it's hard to

15   remember what you've learned and what he said.  And I

16   can't -- as I sit here today, I can't honestly say I remember

17   a specific conversation.  But I could have been in -- I was

18   in one meeting when we were talking about it, but I don't

19   want to misstate something.

20       Q.    So did you review e-mails -- first let me just pull

21   up Exhibit 36, please.  So this is a summary of what happened

22   with Natasha Thomas and Hakeem Pinckney's settlement funds.

23   And it shows the way the checks were negotiated to issue

24   money orders, all on December 21st of 2011.  So you talked

25   about how the firm didn't see the other side.  You could only

1    see that the checks were issued to Palmetto State Bank.  So

2    what did you think when you saw where all these checks were

3    going?

4        A.    I had the same type of reaction, especially when you

5    could see the recipients of the money.  That was not where

6    client money goes.

7        Q.    Have you looked at e-mails that relate in time to

8    some of the Pinckney/Thomas negotiations?

9        A.    Yes.

10            MS. LIMEHOUSE:  If you could pull up side-by-side

11   with this Exhibit 48, please.

12   BY MS. LIMEHOUSE:

13       Q.    So you'll see this e-mail from Alex to Russell dated

14   December 20th, 2011, "Can you call me?"  Does that relate in

15   time to the date that all of these money orders were issued?

16       A.    Yeah, it does.

17       Q.    During these conversations with Russell, did he ever

18   tell you that he negotiated these checks because he was

19   relying on Alex as his attorney?

20       A.    No.  The only authority that I was ever given was

21   that Sheila had approved it.  Well, no, not these, no.  I

22   apologize.  No.  I was never told that Alex advised him that

23   this was okay to do.

24       Q.    And have you looked into law firm documents to

25   confirm whether Russell has ever been separately represented

1    by Alex Murdaugh?

2         A.    Yes.

3         Q.    And what have you found?

4         A.    The answer was no, based on our current records from

5    what we could see, which goes back about 15 years.

6         Q.    So in all of these checks that were negotiated, both

7    from Badger and Pinckney/Thomas, did Russell ever call you

8    and ask why these checks were being negotiated this way?

9         A.    No.

10        Q.    And what would you have done if he had called you

11   about any of these checks?

12        A.    Had I known Alex Murdaugh was taking client trust

13   checks over and converting them for his own use and

14   laundering money through the bank, I would have done the same

15   thing I did on September 2nd and September 3rd of 2021.  He

16   would have immediately been reported to law enforcement.  He

17   would have been kicked out of the law firm.  It would not

18   have been tolerated.  All I needed to do was see it, I mean,

19   see one, and I would have known that this is the most highly

20   improper thing a lawyer can do.

21             MS. LIMEHOUSE:  No further questions, Your Honor.

22             THE COURT:  Cross-examination.

23             MR. DANIEL:  May it please the Court.

24                       CROSS-EXAMINATION

25   BY MR. DANIEL:

1       Q.   Good afternoon, Mr. Crosby.

2       A.   Good afternoon, Mr. Daniel.

3            MR. DANIEL:  Your Honor, I'm going to skip portions

4    of my outline.

5            THE COURT:  Take your mask off if you like.

6            MR. DANIEL:  Some of it's already been discussed.

7            THE COURT:  You're welcome to take off your mask if

8    you like.

9            MR. DANIEL:  I'm sorry, yes.  I can hear better when

10   I take it off.

11           THE COURT:  I know you can, that's why I'm trying to

12   get you to get it off.

13   BY MR. DANIEL:

14       Q.   Now, I believe you testified that Russell Laffitte,

15   in one of these exhibits, signed releases for several of the

16   clients, firm clients; is that right?  He signed disbursement

17   sheets, I'm sorry.

18       A.   Right.  And I believe if there was a minor or an

19   estate involved, he would have signed the release too.

20       Q.   And the lawyers in this case, Mr. Murdaugh's office,

21   your office, would have prepared the disbursement sheets?

22       A.   Yes.  And in the cases that we're talking about, Mr.

23   Murdaugh's end would have done that because the case would

24   have been settled, and I would have tried to stay out of

25   administrative stuff.

1      Q.   Okay.  When you discovered it, it appeared that Alex

2   Murdaugh -- initially, you learned about a problem with Alex

3   Murdaugh and the Chris Wilson check, I believe, yet, you

4   wanted to make sure everyone understood that you were not --

5   your firm was not going to be any part of having him go

6   through his own structured settlement because that was wrong

7   with that firm receiving the money?

8      A.   If he was doing it for the stated purpose of hiding

9   assets, it was what I would say illegal, unethical, and in

10   violation of his employment agreement with the law firm.  So

11   on so many levels, it would have been wrong.

12      Q.   In addition to that, it was actually the firm's

13   money too, wasn't it?

14      A.   Correct.

15      Q.   At least a portion of it?

16      A.   Well, all of it would have been until it was

17   distributed.

18      Q.   So he was, in effect, stealing from the firm by not

19   turning the money fee into the firm?

20      A.   Well, what we didn't cover with Ms. Limehouse is

21   that in that same spring time period, he was talking about

22   structuring fees, which lawyers can do.  And he had mentioned

23   that to me and, I think, Mr. Cope.  And we had said, well,

24   yeah, you can do it, but you still have to account for your

25   overhead, and you can't just -- and the seven and a half

1    percent.  So you know, our belief, Mr. Daniel, up until

2    September was his stated -- was he was trying to hide assets,

3    not steal from us.

4        Q.   But in so doing, he hadn't told you about what he

5    was doing over there, had he?

6        A.   No.

7        Q.   And he was going -- he was hoping -- and it appeared

8    to at least, from what you've learned, he was hoping, based

9    on everything you learned, to get away with it and steal

10   those funds?

11       A.   Oh, he wanted to steal them, as I know now.

12       Q.   Yeah, that answered me.  But if he did that, either

13   the firm or Mr. Murdaugh, it would have violated income tax

14   laws; isn't that right?  In other words, you don't claim the

15   money that doesn't come through an account in your

16   possession?  In your firm, you just have someone over here in

17   a different law firm send the money directly to an insurance

18   company to structure a fee or send it anywhere.  You're not

19   accounting for that; isn't that right?

20       A.   Well, you're correct.  You would expect the law firm

21   that he was working with to send him a 1099.  Even if it's

22   structured there should have been a 1099.  But, yes, if he's

23   taking it and not reporting it and -- you know, I'm no tax

24   expert, but I pay enough taxes to understand that that would

25   be a violation of tax laws, just like when he took this other

1    money we've been talking about and got cashier's checks,

2    didn't report it to the Government, that that was a violation

3    of tax laws.

4        Q.    Okay.  And when he came -- when Russell Laffitte

5    came over to y'all's office with the $680,000 check, you were

6    asked on direct examination if he discussed these other cases

7    with you; is that right?

8        A.    That's correct.

9        Q.    Okay.  But at that time, no one knew about the other

10   cases?

11       A.    No.  We were just working through our audit.  And,

12   you know, it takes time to do what we were doing.  And we

13   hadn't got to those other cases yet.  You're correct.

14       Q.    And in fact, Mr. Laffitte was working with Ms.

15   Seckinger so that both together, the bank on his side and the

16   law firm on their side, could find extent of the stolen

17   funds, the misappropriated funds?

18       A.    Well, I don't know what -- he was complying with our

19   request for documentation, yes.

20       Q.    And he was doing that willingly, there wasn't any

21   reluctance to it, was there, that you knew of?

22       A.    I was never given any information, I mean, he

23   brought it over upon request.

24       Q.    Okay.  But, in fact, he did provide documents to

25   your law firm?

1    A.    He did provide documents, yes.

2    Q.    And he provided documents as best you know to SLED

3    as well?

4    A.    We provided those documents to SLED.  I don't know

5    what the bank -- I am not privy to what the bank provided.

6         MR. DANIEL:  Please pull up Exhibit 37, please --

7    the Government's Exhibit 37.  And it is the -- it's the

8    e-mails between -- thank you.

9    BY MR. DANIEL:

10    Q.    And these e-mails that are in evidence, in

11    Government's Exhibit 37, between Mr. Murdaugh and Russell

12    Laffitte?

13    A.    Yes, sir.

14    Q.    Yeah.  Okay.  And you didn't know that these --

15    actually, Exhibit 37, actually came and was delivered to SLED

16    early on by Mr. Russell Laffitte?

17         MS. LIMEHOUSE:  Objection, Your Honor.  He doesn't

18    know what --

19         MR. DANIEL:  I'm asking --

20         THE WITNESS:  I am unaware of that, Mr. Daniel,

21    because that would have been, I assume, a subpoena that I

22    wouldn't have had knowledge of.

23    BY MR. DANIEL:

24    Q.    Okay.  And now when y'all sort of struck the deal

25    with Allen Badger and returned the stolen funds from Allen to

1    Arthur Badger, okay, y'all did not get a release from Arthur

2    Badger, did you?

3        A.    Nor did we attempt to, because it would have been

4    unethical.

5        Q.    Because in at least some way, y'all had sort of a

6    conflict of interest, didn't you?

7        A.    No.

8        Q.    You don't believe you had any conflict of interest

9    meeting with somebody whose money your senior partner or one

10   of your senior partners had misappropriated in an attempt to

11   resolve it?

12       A.    No.  Mr. Daniel, I had a absolute obligation to do

13   it and fully disclose what had happened and tell him that if

14   he needed, he could consult with a lawyer.  And we did that.

15   We fully disclosed what was there, which was our ethical

16   obligation.

17       Q.    And so you testified that -- a little bit -- a few

18   minutes ago, that you had not seen initially, you had not

19   seen the bank's side of it and it was a revelation for you to

20   see the bank's side of it, to see the e-mails you've talked

21   about that came up, 37 and 38, and to see the bank documents;

22   is that right?

23       A.    It was a shocking revelation.

24       Q.    Okay.  It was a revelation.  Okay.  But the bank had

25   not seen, at the time, your side of the documents, the law

1    firm's side of the documents, hadn't seen y'all's documents?

2            MS. LIMEHOUSE:  Objection.  He doesn't know what the

3    bank has seen and not seen.

4            THE COURT:  Well, ask him the question.  If he

5    knows, if he doesn't know, he will say so.

6            THE WITNESS:  Mr. Daniel, the bank had every check

7    that we had.  They would have had a copy in their system --

8    BY MR. DANIEL:

9        Q.    We are going to a -- you go ahead.

10       A.    Well, they would have, because we were checking that

11   they had copies of the checks.  We didn't have copies of the

12   money orders and how the checks were written out to people

13   that were not our clients at the time.

14       Q.    We will get to those checks in a minute very

15   specifically.  Okay?

16       A.    All right.

17       Q.    Now, even after y'all confronted Mr. Murdaugh and he

18   confessed to you, you had no idea of the level of his deceit,

19   did you?

20       A.    No, it was unimaginable.

21       Q.    And I believe it was mind-boggling, wasn't it?

22   Isn't that what you told the agents?

23       A.    It was mind-boggling.

24       Q.    And you eventually learned that he had been stealing

25   from clients, money, I guess, since as early as 2005?

1          MS. LIMEHOUSE:  Objection, Your Honor.  Those other

2     clients are have nothing to do with --

3          THE COURT:  Sustained.  We're going to stay on --

4     BY MR. DANIEL:

5     Q.   Well, we know as far as back as 2011, at least as it

6     appied to this case, right?

7     A.   Yes, I believe that was the first, and this case was

8     in 2011.

9     Q.   Okay.  And it involved millions of dollars that he

10    stole, it involved in this case?

11    A.   Yes, I think it was somewhere maybe a little north

12    of $2 million.

13    Q.   Okay.  And you would agree with me, wouldn't you,

14    that Alex Murdaugh fooled a lot of good people?  Well, let me

15    ask it a different way.

16    A.   Yeah.  I mean, you've got some modifiers in there I

17    don't want to quibble with you about, but --

18    Q.   Yeah.  He tricked -- he tricked and stole from

19    clients, right?

20    A.   He did that.  And it still amazes me to this day how

21    none of them -- we were not notified of it by any of the

22    clients.

23    Q.   And some of them were very poor clients, weren't

24    they, vulnerable people?

25    A.   I mean, I would say that some of them were -- some

1    of them may have been classified as lower socioeconomic.

2        Q.   As what, I'm sorry?

3        A.   As lower socioeconomic.

4        Q.   Okay.  Is that the same to you as poor people, as to

5    me?

6        A.   It would be, but, I mean, not all of them were in

7    that category.

8        Q.   But some of them?

9        A.   Yes.

10       Q.   Okay.  He fooled a lot of good, smart people, even

11   lawyers at your law firm?

12       A.   Do you have like specific -- I mean, we're saying

13   that in a broad-based context?

14       Q.   I'm saying that in a broad-based contact, yes, sir.

15       A.   I will tell you what he fooled.  He fooled us about

16   who he was.  He never fooled me in the terms of showing me

17   what he was doing in front of my face.  I didn't see it until

18   we saw it in September of 2021.  But, yes, he was somebody

19   who wasn't who we thought he was.

20            MR. DANIEL:  Your Honor, can I approach the bench,

21   please?

22            THE COURT:  At sidebar.

23            (Whereupon, the following bench conference takes

24   place.)

25            THE COURT:  Yes, sir.

1        MR. DANIEL:  He did fool him specifically.  He

2   tricked him into signing the Forge check.  He tricked him.

3   He knows he tricked him.  He testified --

4        THE COURT:  Was it one of these cases?

5        MR. DANIEL:  Sir?

6        THE COURT:  Is it one of these cases?

7        MR. DANIEL:  No, sir.  It's the Forge case.  It goes

8   back to Bank of America.

9        THE COURT:  We are going to stay on these cases.

10  He's already said -- he gave you his answer that he was

11  fooled.  I don't know what more you want.  You got it.

12        MR. DANIEL:  I didn't think he did, but I will --

13        THE COURT:  We are staying on these cases.  I'm not

14  trying other cases.

15        (Whereupon, the bench conference concluded.)

16  BY MR. DANIEL:

17    Q.   Now, so you do agree that he fooled people in your

18  office and tricked people in your office?

19    A.   He definitely tricked people in our accounting

20  office for sure.

21    Q.   Okay.  And no one in your accounting office or the

22  rest of your office had a clue what he was doing, that he was

23  stealing?

24    A.   No, we didn't know until we knew.

25    Q.   And in y'all's case, it was really right under your

1    noses, right?

2         A.    Your descriptor there, under our noses --

3         Q.    Sure.  Sure.  You were co-counsel with Mr. Murdaugh

4    involved in some of these cases that we are talking about in

5    court today, and you didn't know he stole the client's money?

6         A.    No, Mr. Daniel, but if I would have saw those checks

7    made out and saw how they were negotiated, I would have

8    known.  I did not have privy to that information.

9         Q.    Yeah.  And perhaps if the checks had been made out

10   properly, they were going to the conservator or the PR

11   estate, they should have been made out to Russell Laffitte as

12   conservator or personal representative of the estate of Malik

13   Williams, Plyler, Pinckney; is that correct?

14        A.    Well --

15        Q.    Is that correct?

16              THE COURT:  Let him answer the question.

17              THE WITNESS:  You asked a multi-part question and

18   I'm trying to break it down and answer it.

19        Q.    Okay.  You do that.  Okay.  I'll ask it one --

20              MS. LIMEHOUSE:  Let the witness answer the question.

21              THE COURT:  He's going to answer the question.

22              THE WITNESS:  I'm going to say -- I want to break it

23   down.  You asked me about Malik Williams.  That check, to my

24   knowledge, was made out by Paul Detrick and went to the

25   conservatorship.

1          The Badger disbursement sheet, that is made out to

2    Palmetto State.

3          The Thomas and Pinckney are made out to Palmetto

4    State.  So the answer -- which was on the disbursement sheets

5    and I believe signed by Mr. Laffitte.

6          Now, the answer to your question is, if they were

7    made out as conservator or PR, that this couldn't happen.

8    Mr. Daniel, I take issue with that because I saw where we

9    made out checks to Mr. Laffitte as conservator and he had it

10   sent back and voided and asked us to make it out to Palmetto

11   State Bank.

12          And where we made it out as PR, he sent it back,

13   asked us to void it and make it out to Palmetto State and

14   then took and did the same thing that Alex did.  So the

15   answer to your big question is, no, I have no guarantee that

16   that would have occurred.

17   Q.   And do you know where that fraud initiated?  In your

18   accounting department, in your accounting department.

19   A.   Well, I take issue with that, that our accounting

20   department --

21   Q.   Well, let --

22          THE COURT:  Let him answer the question.  Go ahead,

23   Mr. Crosby.

24          THE WITNESS:  I take issue that, suggesting my

25   accounting department was a part of this scheme, and that is

738

1    patently untrue, Mr. Daniel.

2     BY MR. DANIEL:

3        Q.   I did not allege that to you.  I didn't ask that of

4    you.  I asked you, if it would not have occurred without

5    those checks being incorrectly originated in your accounting

6    department?

7        A.   So, the premise is that where a disbursement sheet

8    is signed saying the money is going to Palmetto State and my

9    accounting department complies with that, that that's

10   improper?

11       Q.   It would certainly be improper if it were a

12   settlement check for a client in a conservatorship.  It

13   should be made out to Russell Laffitte as conservator or

14   Russell Laffitte as personal representative; isn't that

15   correct?

16       A.   It was made out in accordance with the signed

17   disbursement sheets, that we should be correcting Mr.

18   Laffitte and Mr. Murdaugh and changing it to something other

19   than the disbursement sheet is just inaccurate, Mr. Daniel.

20   It's just wrong.

21            THE COURT:  Let him finish his answer.

22   BY MR. DANIEL:

23       Q.   Are you finished?

24       A.   Yeah.  And I don't mean to argue with you, but the

25   premise of what you are saying is just incorrect.  They

1  followed what the disbursement sheet said.  And they

2  knowingly -- if I saw these checks made out that way, knowing

3  they were going to Palmetto State, who I trusted, who I still

4  have money there, my money is there, I was not questioning,

5  and I don't expect that our accounting department would have

6  went over something that Russell Laffitte signed and undone

7  it, and suggested it should have been done differently.  And

8  I don't want to argue with you, but you're wrong.

9      Q.   Okay.  When did the disbursement sheet originate?

10  Who creates the distribution sheet?

11      A.   They typically are in the attorney's office.  The

12  paralegals would do that.

13      Q.   And that's in you and Alex Murdaugh's office,

14  correct?

15      A.   It was in the firm.  It didn't come out of -- my

16  staff didn't.  Alex Murdaugh's staff would have done that.

17      Q.   But in some of the cases you were involved with Mr.

18  Murdaugh; is that correct?

19      A.   I was.  And I explained earlier when my involvement

20  would end.  I didn't typically do administerial work, which

21  was closing out a file.  And with me not having client

22  relationships, I don't usually get involved in giving a

23  check.  It's the same thing if a lawyer from Charleston hires

24  me in a case, I usually -- they get to disbursement money to

25  their client.  I don't get involved in that.

1      Q.   And you never met with clients Ms. Thomas and --

2   there was another client I missed, Pinckney, you never met?

3      A.   I know I never met Hakeem.  I don't believe I've

4   ever met Ms. Thomas.  If I did, I have no memory.  I know I

5   met Pamela Pinckney.

6      Q.   And that's because the client relationship, Mr. Alex

7   Murdaugh had with the client?

8      A.   Correct.

9      Q.   Yeah.  He was the one dealing with the clients,

10   right, I mean, those clients?

11      A.   Yeah, typically, that would be the way we would

12   work.

13           MR. DANIEL:  If you would pull up, please, Exhibit

14   71, which is the certificate of fairness and reasonableness

15   filed on February 26th, 2009, in Hampton County.  This is in

16   evidence, I believe, Your Honor.  Okay.

17           THE WITNESS:  Did you want me to read it?

18           MR. DANIEL:  Yes.  Did you call it up?  It's not

19   coming up on my screen.  Okay.

20   BY MR. DANIEL:

21      Q.   Yeah.  Explain to the jury what this is.

22      A.   When this settlement was approved, under the

23   statute, it would require that the attorney certify that in

24   his or her opinion that the settlement was fair and

25   reasonable.

 1          Q.   Okay.  And you state at the beginning -- read the

 2     very first statement there right under the heading.

 3          A.   Oh, you asked me to read it, yes.  "We, the

 4     undersigned, are legal counsel for Russell Laffitte as

 5     personal representative of the estate of Angela Plyler,

 6     deceased, plaintiff, petitioner" --

 7          Q.   And I believe you testified that the direct, the

 8     personal representative in this case or a conservator steps

 9     into the shoes of the person he's the conservator to, the

10     client?

11          A.   Correct.

12          Q.   Okay.

13          A.   It's a representative capacity.

14          Q.   Yes, sir.  Okay.  And when I mentioned that the law

15     firm was cheated and stolen from and tricked, that would also

16     be Mr. Johnnie Parker, people that Alex Murdaugh stole money

17     from, right?  I mean, you didn't know he was stealing the

18     money, did you?

19          A.   Well, just to be clear, he stole from the law firm

20     some fees.  And he always did it from outside, had

21     participants to go around and try to go around, because if he

22     ever went into our operating account, he couldn't have done

23     it.  But, yes, he did.  And just so you are not asking me to

24     comment on any loans between Russell and Johnnie --

25          Q.   No, I'm not asking you to comment --

1    A.    I just want to be clear.  But, yes, he did.

2    Q.    Okay.  And that would include your law partners and

3  would be Mr. Dan Henderson?

4    A.    Well, yeah.

5    Q.    And Mr. Johnnie Parker?

6    A.    Yes.

7    Q.    Okay.  And Mr. William Barnes?

8    A.    Yes, he was at the time.

9    Q.    At the time.  Mr. Mark Ball?

10   A.    Yes.

11   Q.    Mr. Lee Cope?

12   A.    Yes.

13   Q.    Jay Parker?  I believe it may be Johnnie Parker's

14  son.

15   A.    He's not a partner.

16   Q.    Okay.  And what about Randy Murdaugh IV, is he a

17  partner?

18   A.    He is.

19   Q.    And how about Randy Murdaugh III, who would be Mr.

20  Murdaugh -- Mr. Alex Murdaugh's father, who's passed away,

21  Mr. Randolph Murdaugh?

22   A.    No, he was not.

23   Q.    He was not a partner in the firm?

24   A.    He was not during the period of time when he retired

25  as solicitor and came back.  He may have been before my time,

1    but during my time he was never a partner.

2        Q.    So he was still a solicitor during this time period?

3        A.    No, he just came back and had a place to retire, to

4    hang out, so to speak.

5        Q.    He wasn't a partner, he just had a place to sort of

6    hang his hat?

7        A.    Right.  And spend time with his boys and played a

8    lot of solitaire in the office we gave him.

9        Q.    Played a lot of what?

10       A.    Solitaire.  He was just fun to have around the

11   office, he didn't do much legal work during those years since

12   his retirement.

13       Q.    He was a great story teller, wasn't he?

14       A.    He entertained us a lot.

15       Q.    And just like Alex Murdaugh was a great story teller

16   also?

17       A.    He wasn't as good as his daddy, but he could tell us

18   some stories.

19            MR. DANIEL:  I'm actually saving the Court time,

20   Your Honor, so beg my indulgence -- beg the Court's

21   indulgence.

22            THE COURT:  Take your time, Mr. Daniel.

23   BY MR. DANIEL:

24       Q.    Now, you would agree with me that part of Alex

25   Murdaugh's scheme involved great patience on his part?

1      A.   I would agree that from the documents that I've

2    reviewed as part of our investigation, he would exhibit

3    patience with regard to some of his thefts.

4      Q.   Okay.  And that's what you testified to before the

5    State Grand Jury?

6      A.   Yeah.  He was -- he did exhibit that.  It wasn't --

7    I don't know how you say it, but it wasn't like he had to

8    have it today, he would wait and pick opportune times.

9      Q.   He would, for lack of a better term, put money aside

10   and piggy bank it, the law firm didn't know, they thought it

11   had been paid out, and then months later come back and steal

12   it?

13     A.   Well, I think what you are referring to is that he

14   would hold money for liens and wait a significant period of

15   time and then steal the lien money.  I wouldn't call it a

16   piggy bank.  Maybe he was looking at it like, but it would

17   stay in our trust account, because sometimes it takes long

18   time to negotiate a civil lien with the Government or

19   something.  And he did that on occasions where he would let

20   it sit for maybe even a couple of years.

21     Q.   Maybe even as long as a couple of years?

22     A.   Yes, sir.

23     Q.   Okay.  Thank you.  Now, when talking about the

24   Arthur Badger settlement, when y'all found out that he had

25   been stealing and Russell Laffitte brought the check for 680

745

1    over to your firm -- okay, you testified on direct

2    examination, right?

3        A.   Yes, sir.

4        Q.   Okay.  And he said, part of this is on us too, part

5    of this is on the bank?

6        A.   Yes, sir.

7        Q.   Okay.  And here's half of the settlement, here's

8    half of a proposed settlement to reimbursement the client?

9        A.   That's correct.

10       Q.   Okay.  And then a day or two later, he called back

11   over and asked you to put a pause or put a hold on that

12   because the Board wanted to approve it?

13       A.   There was something to the effect that the Board had

14   not met yet.  And I think, yeah, I could be mistaken, yeah,

15   I'm sure you've got board minutes.  I think maybe if Mr.

16   Laffitte and I spoke on the 2nd, maybe on the 3rd, it might

17   have been a Board meeting, because I know that's when Mr.

18   Walker started calling me.

19       Q.   Okay.  And so you did put a pause on it because you

20   didn't -- the check wasn't negotiated with the client until

21   the 15th of November?

22       A.   I think that's when we gave Mr. Badger the money.

23       Q.   Yeah.  In the meantime, evidently, Mr. -- your

24   understanding at least, is Mr. Russell Laffitte called your

25   office -- or I didn't mean your office, your firm's office,

1   and talked to Ms. Seckinger and said, go ahead, the Board had

2   met on it and go ahead.

3        A.   I'm not sure I have a clear understanding of that.

4   But I was talking to Mr. Walker and maybe -- we had already

5   put it in the bank and had already made a decision to do

6   nothing with the money by the 3rd.

7             MR. DANIEL:  Beg the Court's indulgence.  Just for

8   the witness to see.

9    BY MR. DANIEL:

10       Q.   So do you recall testifying --

11            MR. DANIEL:  Now, go to the front page again,

12   please.

13   BY MR. DANIEL:

14       Q.   Do you recall testifying --

15       A.   Yes, sir.  If that's --

16       Q.   Okay.  I'm going to ask you if this document

17   refreshes your recollection.

18            THE COURT:  Ask him the question.  If you are

19   intending to impeach him, you first ask him the question, Mr.

20   Daniel.  Don't quote him --

21            MR. DANIEL:  I think I did ask him the question,

22   Your Honor.  I did ask him the question.

23            THE COURT:  I'm sorry?

24            MR. DANIEL:  I specifically did ask him.

25            THE COURT:  What was the question?

1          MR. DANIEL:  The question is:  A day or two later,

2     Ronnie Crosby, your firm, called Ms. Seckinger, and told him,

3     it's all right, go ahead and negotiate the check?

4          THE COURT:  Okay.  If you want to raise it on that

5     issue, that will be fine.

6          MR. DANIEL:  Okay.

7     BY MR. DANIEL:

8          Q.   Okay.  Please go to page 160.  If you can read page

9     160 of your testimony.

10         A.   Mr. Daniel, I may not be seeing what you are saying,

11    but I think what I said there is what I said here.

12         Q.   Okay.  Yeah, but then I asked you, did he later

13    call, a some day or two later -- I'm sorry, not a day or two

14    late, did he call some time later and talk to Ms. Seckinger

15    and tell her to go ahead?

16         A.   I don't recall.  I can tell you we would not have

17    gone ahead because I was in discussions with the bank's

18    lawyer, Trenham Walker, and I would have not -- just as we

19    haven't -- a year later --

20         MR. DANIEL:  Your Honor, he can't speculate what he

21    would have done.

22         MS. LIMEHOUSE:  Objection.

23         THE COURT:  Let him answer the question.

24         THE WITNESS:  I didn't do it because I was talking

25    to his lawyer.  So if it occurred that he said to do

1    something with it or whatever, it did not make any

2    difference, because the bank's lawyer was asking for a

3    release from us of liabilities to the bank.  And we made a

4    decision that we were not going to do anything with that

5    money because we wanted to assess the situation to see what

6    the bank's responsibility to our law firm was for not just

7    this $680,000, but the Pinckney, the Thomas.  And at the

8    time, I was only thinking about Badger because I hadn't gone

9    through Pinckney and Thomas.  But so from November 3rd, when

10   we put that money in, there was -- we -- we -- whatever

11   anybody told us to do, we didn't do it.

12       Q.   Okay.  And Mr. Walker, on behalf of the bank, wanted

13   a release for that, and a release would be a legal document

14   he would get for the bank from your law firm?

15       A.   Yes, sir.

16       Q.   Okay.  And that means there would be no dispute

17   later on between your law firm and his client and the bank?

18       A.   That's correct.  And we didn't think we were in a

19   position to do that at the time.

20       Q.   I am not arguing with that at all.

21       A.   But you're right.  That is the same as I talked to

22   the jury about earlier explaining the release, he wanted that

23   kind of separation and protection from further liability.

24       Q.   And he made it clear if you were willing to give him

25   a release, then the case was settled, the matter was settled?

1      A.    That's what he was wanting, yes, sir.

2      Q.    Yeah.  I mean, that's what he -- he was wanting to

3  settle the case, but you wouldn't give him the release; isn't

4  that right, in simple language?

5      A.    That's correct.

6      Q.    Okay.  And when Russell Laffitte came over to see

7  y'all with the check, he was -- he didn't try to hide it,

8  said, he just didn't catch it?  He was candid with you?

9      A.    Yeah.  He didn't hide that the -- the documents, you

10 know, from us.  He brought the documents pertaining to that

11 to us, yes.

12     Q.    Okay.  And y'all also found out sort of together at

13 least that it was the same with the Pinckney case, that Alex

14 Murdaugh had stolen significant sums of the Pinckney's money?

15     A.    Yes, we found out in the same fashion.

16     Q.    Yeah.  And Russell Laffitte came to you very early

17 on and said, you know, we want to do that, too, we want to

18 settle that, too?

19          MS. LIMEHOUSE:  Objection, Your Honor.  This is

20 hearsay.  It's his own client's statement.

21          MR. DANIEL:  Judge, it's the transaction themselves.

22 We are not offering it for the truth of the matter asserted.

23 It's the transactions.

24          THE COURT:  The better question or the fairer

25 question without suggesting the answer, was there an offer to

1    settle that case.

2    BY MR. DANIEL:

3        Q.   Yeah.  Was there an offer to settle the Pinckney

4    case also?

5        A.   It's my understanding that there was, but I wasn't a

6    part of the conversation, so --

7        Q.   Who was a part of that conversation?

8        A.   Whoever they were speaking with, it got related to

9    me.  You know, there was a lot of conversations going on in

10   this --

11       Q.   But someone at your firm?

12       A.   Yeah, and I don't want to misstate it.

13       Q.   No, that's okay.  But it was someone at your firm?

14       A.   Yes.

15       Q.   Okay.

16            MR. DANIEL:  Now, please bring up Exhibit No. 77,

17   which is check 1.325 to PSB, check number 43162.

18            THE WITNESS:  Can you blow that up a little bit?

19            MR. DANIEL:  I'm sorry, sir?

20            THE WITNESS:  Can you have them blow it up a little

21   bit?

22            MR. DANIEL:  Oh, sure.  I was going to ask for that

23   next because I can't see it either.  Okay.  That's not --

24   I've got the wrong exhibit.  I'm sorry.  Exhibit No. 65,

25   please.  Can you blow it up?

1    BY MR. DANIEL:

2        Q.    Okay.  So read the top.  What is this, a stop

3    payment order?

4        A.    Yes, sir.

5        Q.    Okay.

6            MR. DANIEL:  And go down to the bottom of it and see

7    -- okay.

8    BY MR. DANIEL:

9        Q.    And who signed that on behalf of the accountant?

10       A.    Jeanne Seckinger.

11       Q.    Okay.  And are you aware that the stop payment on

12   that, the bank had never even received that initial check?

13   In other words, the 1.325 check in the Badger settlement

14   case, the bank had not received the original check?  Did you

15   know that?

16       A.    It makes sense, because it was the balance of the

17   1.325, whatever the balance is based on those e-mails.  So I

18   didn't see anywhere where that money got applied in that

19   initial --

20       Q.    Okay.

21           MR. DANIEL:  Please bring up extension number --

22   excuse me, Exhibit No. 66, which is Defendant's Exhibit 66.

23   BY MR. DANIEL:

24       Q.    So part of what you didn't see -- so, we know about

25   the first -- let's see, the first four checks, and we know

752

1    where those went, right?

2         A.    Correct.

3         Q.    And the fifth check was dated 9/13.  And it was

4    cashed -- or, excuse me, it was negotiated, it was $101,000

5    check.  We know about that.  It was on October the 3rd, it

6    was negotiated with the bank -- processed?

7         A.    I will take your chart as being accurate.  I don't

8    have all those committed to memory.

9         Q.    Okay.

10             MR. DANIEL:  So let's go on down and look at the

11   rest of the checks.  And you can make them larger, just take

12   those out, all the way down to the bottom, the next nine

13   checks.

14   BY MR. DANIEL:

15        Q.    Okay.  And you testified earlier that Mr. Murdaugh

16   could be patient with his scheme?  That was one of his

17   traits?

18        A.    Yeah, I just think here he had so much money it took

19   him awhile to spend it.

20        Q.    Yeah.  Okay.  So let's look at the first check 45028

21   on September 13th, it wasn't processed until October the

22   28th, a month and a half later; is that right?

23        A.    Yes, sir.

24        Q.    Okay.  And going down the list, all of them are made

25   out or issued on September 13th.  That's when the firm issues

1    them.  But they are negotiated at various months down the

2    road, some months and months down the road; is that right?

3        A.    Yes, that's correct.  They were continually --

4    apparently, when he had needs come up, he would take one of

5    these checks, go to the Palmetto State and turn it into a

6    cashier's check and buy equipment and buy whatever he was

7    buying at the time, buying his drug dealer a car, you know,

8    whatever he wanted, so...

9        Q.   A check that's made out to Palmetto State Bank from

10   your firm, could be -- it could be to somebody that's not

11   necessarily for a client, is it, because if it were to a

12   client, it should be made out differently?

13       A.    Well, if the bank had an account or they had a

14   reason and it had a memo line on there that said -- on these

15   ones you are looking at now, the estate of Donna Badger or

16   Arthur Badger or Pinckney or Thomas, I would assume that the

17   check would be going to the bank for the purpose of something

18   to do with that client's business at the bank, and certainly

19   would not suspect that it's going to be cashed and applied in

20   the manner that we see these were applied all over the place

21   like they were.

22       Q.   But a check is made out to Palmetto State Bank

23   that's processed months later, and it's broken down, Mr.

24   Laffitte and nobody at Palmetto State Bank would know these

25   were supposed to go into a conservatorship account, did they?

1    Could they?

2        A.    I don't think those checks were made out in that

3    manner.  They were made out to Palmetto State Bank.  I don't

4    know what Palmetto State Bank thinks when it gets a check

5    made out to the bank on behalf of a client.  I would think,

6    since you're asking me about thinking, that the bank would

7    think it's the client's money when it says settlement

8    proceeds.

9        Q.    Well, let's be serious here now.  These checks here

10   are made out to the bank.  If we're going -- if it were the

11   client's money that they were managing over at the bank, they

12   would be made out to Russell Laffitte as conservator of

13   whatever the client's name was, or as PR for whatever the

14   client was.  I don't want to argue with you, Mr. Crosby.

15       A.    I'm not going to argue with you.  My testimony has

16   already been clear on that.  And I would think a check made

17   out to the bank, at the bank, it would have some obligation

18   there.  When I made out checks to Palmetto State Bank, they

19   were to make out and pay something at the bank.  You know,

20   they -- and I can tell you, Mr. Daniel, if we went and

21   searched over the years, other than us having to buy a money

22   order for a client where there would be documentation, you

23   would never have us taking money that's made out to Palmetto

24   State Bank and anybody thinking it's my money, that it goes

25   to me if it's got settlement proceeds.  We don't get paid

1     like that.  We don't get paid out of trust accounts.  We get

2     paid out of operating accounts.  And all of these were trust

3     account checks.  This is highly irregular.  I'm not a banker.

4     I'm not involved with that.  But this is just basic, coming

5     out of a trust account and then given to a lawyer.  There's

6     nothing that could ever look right about that.

7          Q.    The checks are not made out properly if they're to

8     go to a conservatorship or to go to a personal representative

9     to hold for a client; isn't that correct?

10         A.    That is incorrect.  And if the bank thought the

11    checks were made out improperly, they knew how to ask us to

12    write them in a different way if that was the case.  The

13    Court had seen those disbursement sheets, the ones that had

14    to be approved.  We made them out in accordance with how the

15    Court approved the disbursement sheets.  And had they needed

16    to be written out in a different way to protect the money

17    from being misappropriated through the bank's daily cash,

18    they could have asked us to do it.  I didn't know we needed

19    to protect our clients from a company that we have a

20    fiduciary relationship with.  And I would have expected the

21    same treatment when they saw these coming in, if they thought

22    they were improperly made out, the same treatment that we did

23    on September 7th, where we went over and we explained what

24    had happened with Alex, because we took our relationship with

25    the bank very seriously and had all trust in this

1    institution.  So, no, I disagree with what you're saying.

2        Q.    Let me ask you this:  In cases where you had a

3    conservator or you had a personal representative, did you

4    ever send checks over to the bank that were not made out to

5    Russell Laffitte or some other conservator as conservator for

6    a particular client?

7        A.    Mr. Daniel, I've never personally, that I can recall

8    -- and I was asked this question earlier -- recall me using

9    Palmetto State.  I've used other institutions.  I can't sit

10   here -- but I can tell you I've made out many, many checks to

11   minors' pooled trust where it doesn't have that kind of

12   language.  I get check writing instructions.  And they would

13   go to whatever institution they needed to go to, however

14   they're made out.  So there is no rule of thumb that it's

15   made out that way.  I see -- I mean, I can tell you that that

16   isn't always the case.

17       Q.    Please pull up Exhibit Number 69.  It's check No.

18   46498.  And what does that represent?

19       A.    Mr. Daniel, I think this is the, from what I can

20   tell, the last of the $709,000.  Apparently, Mr. Murdaugh

21   needed to develop a new scheme to get the last, I think it

22   was, approximately $150,000.  He created a fake letter to

23   Michael Gunn at Forge Consulting or -- there was a fake

24   letter that got these checks and said to send them to the

25   bank.

1    Q.   Yeah, but this is the final portion -- there's two

2    checks, actually.

3    A.   It is --

4    Q.   Exhibit No. 70 is -- if you pull up Exhibit No. 70,

5    which is the $50,000 check.  That's where the 151 came from?

6    A.   Yes, sir.  Yes, sir.

7    Q.   Okay.  And this is where he had basically -- Mr.

8    Murdaugh had sort of -- you said used the figure -- the

9    number $709,000, that's the last of the checks that totaled

10   709.  He parked that money, pooled that money, unbeknownst to

11   anybody at your law firm, and then he issued -- stole the

12   money?

13   A.   Of course, we didn't know what he was doing.  If we

14   looked at the trust account, we could have -- it would have

15   been there.  He was stealing it out of the trust account with

16   this -- I guess, he needed to steal the rest of that 709.

17   And that's how he did it.  It's -- it's shameful.

18   Q.   And that was part of his scheme?

19   A.   He did it.  He did it and it was improper.

20   Q.   Now, Alex Murdaugh, you believe, groomed, if you

21   will, the term "groomed", fooled people in the accounting

22   department by always being in a rush and always being at the

23   last minute; is that right?

24   A.   I do believe that he groomed the staff over there

25   to -- in the things that he would tell them and, you know.

758

1    Yes, I've used that terminology.

2       Q.   And Alex -- Alex Murdaugh would actually make

3    mistakes in good files, not in files he didn't steal from,

4    like changed disbursement sheets or changed the amount of

5    something, and he wasn't even stealing in this case, he

6    appeared to be scatter-brained, right?

7       A.   That would be a good term for that, but, yes, he

8    did.  I've seen voided checks in files where there was no

9    money stolen.

10      Q.   And that was part of his modus operandi, is to do it

11   in good cases or cases there was no money stolen from so it

12   would be grooming the people, they would think, oh, this is

13   Alex Murdaugh, there goes Alex again?

14      A.   I wouldn't dispute that -- I wouldn't dispute what

15   you're saying, that that argument could be made.

16      Q.   Okay.

17      A.   Yeah, that argument could be made.

18      Q.   You would oftentimes ask for checks from the

19   accounting department to be rewritten?

20      A.   Yes, that's what I was talking about voiding, having

21   them voided, like we looked at with one earlier.

22      Q.   Right.  And then he would sort of wait if the money

23   was stolen, patiently, part of his scheme again, steal the

24   money later on or take the money for his own purposes?

25      A.   There were times when that occurred.

1    Q.   Sir?

2    A.   There were times when that description would be

3    accurate.

4    Q.   He also broke down larger checks so that the

5    purchases would look less suspicious?

6         MS. LIMEHOUSE:  Your Honor, is Mr. Daniel asking

7    about a specific check in this case?

8         THE COURT:  I think just asking him generally.

9         MR. DANIEL:  Pull up for the witness --

10        THE COURT:  Are you talking about one of our cases?

11   That's the question.  We're going to stay on the cases under

12   the indictment.

13        MR. DANIEL:  This is on this case.

14        THE COURT:  Okay.  Well, that's fine.  Then identify

15   it so we can talk with specificity.  Sustained.

16   BY MR. DANIEL:

17   Q.   Okay.  Didn't he create chaos at the firm, in the

18   camp?  Wasn't his regular modus operandi is to create chaos?

19   A.   Well, I mean, he would -- as you and I have been

20   discussing, he would get checks voided.  And if that's

21   described as chaos, yeah, I think that some of the staff felt

22   like he was chaotic.

23   Q.   And he was routinely sort of doing things either at

24   the end of the day, or there was a deadline or when people

25   were short staffed; is that right?

1        A.    That occurred, and then not just in financial

2    situations, you know.

3        Q.    Okay.  But that was part of his modus operandi, it's

4    part of the way he stole money?

5        A.    I think he used some of that to help steal money.

6        Q.    Okay.  Now, the fact that Johnnie Parker would loan

7    Mr. Laffitte or Mr. Murdaugh money was not uncommon; is that

8    true?

9        A.    Well, as far as -- when you look back at it, I

10   didn't know Johnnie loaned as much money over the years as I

11   do know now.

12       Q.    Right.

13       A.    I didn't know he ever loaned money to Mr. Laffitte

14   until somebody sent a subpoena for that.

15            MS. LIMEHOUSE:  Your Honor, this is outside the

16   scope of his direct.  We didn't talk about Johnnie Parker

17   loans to Mr. Laffitte.

18            MR. DANIEL:  It's part of the allegations, Your

19   Honor.

20            THE COURT:  You've got this $388,000 payment in

21   direct.  He has a right to ask about it.

22   BY MR. DANIEL:

23       Q.    So it was not unusual for Mr. Johnnie Parker, your

24   senior partner at the law firm, to loan money out to people?

25       A.    I was familiar with Johnnie loaning money to family

1    and to lawyers in the law firm.

2        Q.   And he loaned money to you, didn't he?

3        A.   Yeah, some 20-plus years ago, maybe 25 years ago.

4        Q.   And he loaned money to some of your other partners?

5        A.   Yes.

6        Q.   Okay.  And, generally, the interest rate charged is

7    higher than he might get -- than anybody might get from a

8    regular bank.  If it's a higher interest rate, and you've got

9    good collateral, that's a good investment, isn't it, for

10   someone that can afford to loan money out?

11       A.   If you can make a loan at a higher interest rate and

12   it's collateralized, I would say generally, you know, just

13   from basic finances, probably a good thing.

14       Q.   So that means it's a good thing, right?

15       A.   Yeah, I would like to have a little more context if

16   you're asking me about a specific loan because I don't really

17   know all of what Johnnie was doing.  I know he always charged

18   me whatever I could have borrowed it from the bank, you know.

19   Johnnie, if he loaned me -- if I could borrow it at 5 percent

20   from Palmetto State back in -- years ago, he always wanted to

21   get at least that much.  He didn't give me a break.  I can

22   tell you that.

23       Q.   Okay.  Now, you knew Alex Murdaugh very well?

24       A.   I thought I did.

25       Q.   You thought you did.  Okay.  You and Alex had some

1    25 or 35 cases together?

2        A.   I wouldn't quibble with that.  I would say that's

3    possible, yes.

4        Q.   And where was your office in relation to his office,

5    in the same building?

6        A.   The same building, opposite ends.

7        Q.   Opposite ends of the building.  Okay.  So you saw

8    him a good bit of each other?

9        A.   We saw each other on a regular basis.  I didn't see

10   him as much as I did some of my partners because --

11       Q.   When Alex was in the building, you could hear Alex

12   first before you saw him?

13       A.   Yeah, which is one of the reasons I wasn't down on

14   that end of the building.

15       Q.   Now, you and your firm blame the bank and they blame

16   Russell, and they blame Alex Murdaugh for this whole thing,

17   don't they?

18       A.   Mr. Daniel, you used the term "blame".  I -- after

19   doing my investigation, I believe that Palmetto State has

20   responsibility and liability toward my law firm for failing

21   to look out for us because of our fiduciary relationship.

22   Whether that's blame, I know nothing about the criminal

23   charges here.  You know, I'm here to tell the truth.  It's

24   not to point fingers.  But my assessment and what I was

25   looking at is how this happened, who's responsible for it and

1    the bank is aware that -- I believe, that they are

2    responsible for it.

3        Q.   And all these checks that were converted were

4    originated, came from, were written by your law firm?

5        A.   Yes.  The checks out of our trust account were

6    written out by our law firm.

7          MR. DANIEL:  No further questions.  Let me check

8    with co-counsel first, Your Honor.

9          THE COURT:  Go ahead.  Take your time.

10   BY MR. DANIEL:

11       Q.   Now, that $680,000, that's in y'all's trust account

12   that was given -- was delivered to you by Mr. Laffitte?

13       A.   Yes, sir.

14       Q.   So did you ever tell the FBI -- were you ever asked

15   what happened to that $680,000 by the FBI?

16       A.   I feel like everybody -- people have asked.  I can't

17   remember, you know, if it was FBI, SLED or both.  I don't

18   think that there's anybody who doesn't know where the money

19   is, you know, including the South Carolina Bar.  Everybody

20   knows that money is sitting in our account.  We hadn't done

21   anything with it.

22       Q.   And y'all's account is at the bank, correct?

23       A.   It's sitting in Palmetto State, yes.

24         MR. DANIEL:  No further questions.  Thank you.

25         THE COURT:  Redirect.

1                        REDIRECT EXAMINATION

2    BY MS. LIMEHOUSE:

3        Q.    Mr. Crosby, Mr. Daniel pointed out how the checks

4    were written to Palmetto State Bank rather than to Russell

5    Laffitte as the conservator for Natasha Thomas, Hakeem

6    Pinckney or the PR for the estate of Donna Badger; is that

7    right?

8        A.    He did bring that up.

9        Q.    And Mr. Daniel asked you about how those checks were

10   improperly drafted to the Palmetto State Bank?

11       A.    He did.

12       Q.    I'm going to pull up Exhibit 215.  Do you recognize

13   this to be the Natasha Thomas ledger?

14       A.    I do.

15       Q.    You testified on cross-examination about how Russell

16   Laffitte's fee check was also voided and drafted to Palmetto

17   State Bank?

18       A.    It was.

19       Q.    Do these inputs under general ledger demonstrate

20   that Russell Laffitte's conservator fee was drafted in the

21   exact same way?

22       A.    It was initially made out to -- as conservator and

23   they were rewritten as made out to Palmetto State and they

24   were negotiated as being made out to Palmetto State.

25       Q.    Show you Government's Exhibit 216, please.  Do you

1    recognize this to be the Hakeem Pinckney ledger?

2        A.   I do.

3        Q.   Again, was Russell Laffitte's $60,000 conservator

4    fee drafted in the exact same way that the settlement

5    proceeds that were stolen were drafted?

6        A.   It was initially drafted as Russell Laffitte as

7    conservator.  And a request was made to have that check

8    rewritten to Palmetto State Bank.  And we honored that

9    request.

10       Q.   I'll show you Government's 214.

11           MS. LIMEHOUSE:  The two middle ones, please.

12   BY MS. LIMEHOUSE:

13       Q.   These copies of that $60,000 conservator fee check

14   and that $15,000 conservator fee check written to Palmetto

15   State Bank?

16       A.   Those are the ones that were rewritten to Palmetto

17   State Bank and it looks like Alex signed it.

18       Q.   And in the exact same way that the stolen proceeds

19   were written?

20       A.   Yes.

21       Q.   I'm going to show you Government's 219.  And this is

22   the Arthur Badger ledger.  Does this show that Russell

23   Laffitte's personal representative fee was drafted in the

24   exact same way to Palmetto State Bank?

25       A.   It does.

1      Q.   I'm going to show you Government's 168, page 8.

2  This is Hakeem Pinckney.  So the Arthur Badger, Hakeem

3  Pinckney and Natasha Thomas fee checks were also drafted to

4  Palmetto State Bank?

5      A.   They were.

6          MS. LIMEHOUSE:  Government's 36, please.

7  BY MS. LIMEHOUSE:

8      Q.   On cross-examination, Mr. Daniel highlighted the

9  Badger checks and how they were negotiated and asked you

10 about how Mr. Murdaugh was patient and would sit on checks

11 before they were actually negotiated.  Do you recognize this

12 document to be a summary of Natasha Thomas and Pinckney --

13 and Hakeem Pinckney's checks?  Do you see all the money

14 orders on these checks were issued on the exact same day?

15     A.   Yes.  If I'm recalling correctly, that was the day

16 of or day after the disbursement was done.

17     Q.   So on the exact same day Russell Laffitte issued a

18 money order for $10,000 for Maggie Murdaugh?

19     A.   Yes, ma'am.

20     Q.   On the exact same day, Russell Laffitte issued a

21 money order for cash back for $9500?

22     A.   Yes, ma'am.

23     Q.   On the exact same day, Russell Laffitte issued a

24 money order for $920.29 to Murdaugh Charters?

25     A.   Yes.

1      Q.   And on the exact same day, Russell Laffitte issued a

2  money order for $3,137.30 to Murdaugh Charters?

3      A.   Yes.

4      Q.   And on the exact same day, Russell Laffitte issued a

5  $100,000 money order to his father?

6      A.   Yes.

7      Q.   And on the exact same day, Russell Laffitte issued a

8  $50,135.61 money order to himself as conservator for Hannah

9  Plyler to repay Plyler loans?

10     A.   Yes.

11     Q.   And on the exact same day, Russell Laffitte issued a

12  $91,227.50 money order to himself as conservator for Hannah

13  Plyler to repay loans he had extended?

14     A.   Yes.

15     Q.   And on the exact same day he issued a money order

16  for $329,500 to Alex's father?

17     A.   He did.

18     Q.   And on the exact same day he issued a $40,167.69

19  money order to himself as conservator for Malik Williams to

20  pay back the loans he had extended?

21     A.   Yes.

22     Q.   Who was the only person who saw where all these

23  checks went?

24     A.   Russell Laffitte.

25          MS. LIMEHOUSE:   No further questions.

768

1           THE COURT:  Very good, you may step down.  Thank

2      you, Mr. Crosby.

3           Ms. Limehouse, you had mentioned you had two short

4      witnesses.  Exactly how short are they?

5           MS. LIMEHOUSE:  They're actually Mr. Holliday's

6      witnesses.

7           MR. HOLLIDAY:  Your Honor, thank you.

8           MS. LIMEHOUSE:  Can he be excused, Your Honor?

9           THE COURT:  Yes, he may be excused.  Thank you, Mr.

10     Crosby.

11          THE WITNESS:  Am I still under --

12          THE COURT:  Is he still under subpoena?

13          MR. DANIEL:  No, he's not under subpoena.  We

14     release him.

15          THE COURT:  He's released.  Thank you, Mr. Crosby.

16          (Whereupon, the witness is excused.)

17          THE COURT:  Yes, Mr. Holliday, I'm a very big

18     skeptic about y'all being brief.

19          MR. HOLLIDAY:  Your Honor, I know I will be brief.

20     I had very much hoped that we would get to Alania Plyler

21     Spohn and Hannah Plyler today.  I think in fairness to the

22     jury and to the witnesses, that we should probably wait until

23     Monday for that.

24          THE COURT:  I think we should as well.  Ladies and

25     gentlemen, let me explain to you, tomorrow is Veterans Day

1    and our courthouse is closed.  So I know I'm going to

2    disappoint everyone to say we don't have court tomorrow.  But

3    Monday morning, 9:00 a.m., please be here a few minutes

4    before 9:00.  We'll crank it up again.  And we're going to

5    keep pushing hard.  Okay?  Please do not read any media

6    material.  Do not go on the Internet.  Do not discuss this

7    case with anyone.  You are excused for the day.

8            (Jury leaves open court at 5:07 p.m.)

9            THE COURT:  Can the Government give me some idea how

10   much longer they think before they will rest?

11           MS. LIMEHOUSE:  Yes, Your Honor.  We have decided to

12   cut a few witnesses.

13           THE COURT:  That's a good decision.

14           MS. LIMEHOUSE:  Yes.  I don't know that I have the

15   best estimate for you at this point.  But how about we circle

16   back after today and get an update to the Court tomorrow?

17           THE COURT:  I won't be here tomorrow.

18           MS. LIMEHOUSE:  Well, your e-mail.

19           THE COURT:  It's endless.  It's endless.  Mr.

20   Daniel, do you have any idea, any estimate about the

21   defense's case?

22           MR. DANIEL:  Well, I think probably like three or

23   four days, Your Honor.

24           THE COURT:  I'm just concerned as we're pushing on

25   the Thanksgiving holiday here and pushing in beyond next

1    week, I'm just concerned about it.  I'm trying to push y'all

2    as hard as I can because I want to -- I think in fairness to

3    the jury, I'd love to try to, you know, get as much as done

4    as we can.  But we will take the time we need to take.  But I

5    just want to urge everybody, you know, things are starting

6    already to sound a little repetitive.  Okay?  It's not like

7    we're unaware of a lot of these details.  So I want you to

8    think hard about at some point do you just wear the jury out

9    by repeating over and over the same set of facts.  I've tried

10   my best to keep us on these cases and not other cases,

11   sometimes to Mr. Daniel's unhappiness.  But I think they've

12   become very familiar with these documents and cases.  So I

13   think what you need to assess how many witnesses do you need

14   to prove facts, some of which don't seem largely in dispute.

15          So, you know, I'm not going to tell you how to try

16   your cases.  Y'all know this case better than I do.  But it

17   does seem to me we're starting to see some repetition on

18   stuff that I think the jury already gets.

19          MR. DANIEL:  We can cut some cross, Your Honor.  I

20   don't know if we can cut too much of our direct case out yet.

21   We just have to see.

22          THE COURT:  Let me say this, Mr. Daniel, you're

23   going to put up the case you need to put up.  And I'm not

24   going to stop you.  I just -- you know, sometimes more is

25   less in trial work, right.

1          MR. DANIEL:  Less is more.

2          THE COURT:  Yeah.  When you do more, you sometimes

3     actually get less and the opposite is true that less is

4     sometimes can be more.  You know your case.  I don't know all

5     the details of your case, so I can't judge it.  I'm just

6     saying after hearing this for several days, I'm starting to

7     recognize some fairly constant repetition.  Okay?

8          Now, let me advise you of something else.  Next

9     Thursday I have an obligation I cannot avoid.  I am in the

10    ceremony to install Judge Childs to the D.C. Circuit, so I've

11    got to fly up Wednesday night.  I'll be back Thursday

12    evening.  But that one day we will lose.  Okay.  I just don't

13    have any choice.  I'm one of, like, three speaker that

14    includes the attorney general and Ketanji Jackson.  Okay?  So

15    I can't miss that.

16         So everybody needs to know that we are -- we've got

17    four days next week.  I'm going to push you hard.  The jury

18    is pretty attentive.  I thought going into Plyler was a bad

19    idea.  You doing one without the other probably wouldn't make

20    a lot of sense.  But, Mr. Holliday, let's work on moving

21    through that pretty quickly.  I'm guessing the information is

22    they didn't know and that doesn't take long to say.

23         MR. HOLLIDAY:  Right.  I was expecting probably 30

24    minutes for Alania and 20 for Hannah.

25         THE COURT:  I bet you could do it quicker than that.

1    I don't think it takes that long to say I don't know.

2            MR. HOLLIDAY:  There's a little more.

3            THE COURT:  I'm sure it is.  I'm oversimplifying

4    everything, but everybody just reflect on this, that at some

5    point the jury just tunes you out.  That's the problem.  I've

6    seen that happen.  And you don't want that to happen and when

7    you -- I always thought when I was trying cases, crisp

8    directs and crisp cross were always more effective than

9    lengthy, unplanned, stumbling around looking for documents.

10   I'm just saying both direct and cross, it just -- but y'all

11   have done a great job of educating these folks.  I think they

12   fully understand the Government's position and the defense.

13   I really do think they already get it.  So think about that

14   when you're putting up your witnesses.

15           Let's everybody be real safe over the weekend and

16   we'll see you Monday.

17           MS. LIMEHOUSE:  Thank you, Your Honor.

18           (Whereupon, the proceedings are adjourned.)

773

1                        CERTIFICATE OF REPORTER

2

3          I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8          I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25