```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
                          CHARLESTON DIVISION
```

1

2

3

4
_____ )

5  UNITED STATES OF AMERICA,        )
                                    )
6          Plaintiff,               )   Docket No. 9:22-658
                                    )
7          vs.                      )   Charleston, SC
                                    )
8  RUSSELL LUCIUS LAFFITTE,         )   Volume I
                                    )
9          Defendant.               )
   _____ )   DATE:  November 8, 2022

10

11              BEFORE THE HONORABLE RICHARD M. GERGEL
                UNITED STATES DISTRICT JUDGE, PRESIDING
12                           JURY TRIAL

13

14  A P P E A R A N C E S:

15  For the Plaintiffs:

16  EMILY EVANS LIMEHOUSE
    U.S. Attorney's Office
17  151 Meeting Street, Suite 200
    Charleston, SC 29401-2238
18  843-266-1663
    emily.limehouse@usdoj.gov
19
    WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
20  U.S. Attorney's Office
    1441 Main Street, Suite 500
21  Columbia, SC 29201
    803-929-3000
22  winston.holliday@usdoj.gov
    kathleen.stoughton@usdoj.gov
23

24  COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
                                 United States Court Reporter
25                               901 Richland Street
                                 Columbia, SC  29201

APPEARANCES:

For the Defendant:

EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
Nelson Mullins Riley and Scarborough
151 Meeting Street
Charleston, SC 29401
843-534-4123
bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com

CHRISTIAN JOSHUA MYERS
Nelson Mullins Riley and Scarborough
101 Constitutional Avenue NW, Suite 900
Washington, DC 20001
202-689-2001
josh.myers@nelsonmullins.com

1

INDEX

2

EXAMINATION

3

Witness Name                                                    Page

4

NORRIS LIGHTSEY LAFFITTE

5

BY MR. HOLLIDAY ...................................... 116

6

EXHIBITS

7

Exhibit                                                         Page

8

Government's Exhs. 1-7                                115

9

Government's Exhs. 10-44                              115

10

Government's Exh. 48                                  115

11

Government's Exhs. 50-154                             115

12

Government's Exhs. 160-172                            115

13

Government's Exhs. 176-190                            115

14

Government's Exhs. 211-222                            115

15

Defendant's Exhs. 1-4                                116

16

Defendant's Exhs. 6-14                               116

17

Defendant's Exhs. 17-38                              116

18

Defendant's Exhs. 41-45                              116

19

Defendant's Exh. 48                                  116

20

Defendant's Exh 50                                   116

21

Defendant's Exh. 53-55                               116

22

Defendant's Exh. 57                                  116

23

Defendant's Exh. 59                                  116

24

Defendant's Exh. 64-65                               116

25

Defendant's Exhs. 67-75                              116

EXHIBITS

Exhibit                                              Page

Government's Exhs. 191 - 198                         144

Government's Exh. 200                                196

1    THE COURT:  Is the Government ready to call its next

2    case?

3    MS. LIMEHOUSE:  We are, Your Honor.  Good morning.

4    We are here in the matter of the United States v. Russell

5    Lucius Laffitte, Criminal Docket No. 9:22-658.  Emily

6    Limehouse, Winston Holliday, and Katie Stoughton on behalf of

7    the Government.  Mr. Laffitte is here today represented by

8    his attorneys, Mr. Bart Daniel and Mr. Matt Austin.  And we

9    are here for jury selection.

10    THE COURT:  Thank you very much.  Could defense

11    counsel identify himself for the record, please.

12    MR. DANIEL:  Yes, Your Honor.  I'm Bart Daniel.  And

13    I represent Russell Laffitte along with Matt Austin and Josh

14    Myers.  We've got with us our paralegal, Grace Hamill, and

15    our legal assistant, Elizabeth Todd, along with some others,

16    Your Honor.  And this is Mr. Russell Laffitte.

17    THE COURT:  Thank you very much, Mr. Daniel.

18    Ladies and gentlemen, good morning.  And welcome to

19    United States District Court.  The first thing -- have we

20    called the roll yet, Ms. Perry?

21    THE COURT DEPUTY:  No, sir.

22    THE COURT:  Please call the roll.

23    THE COURT DEPUTY:  Good morning, ladies and

24    gentlemen of the jury.  As I call your number, please stand

25    and answer by saying present.

1          No. 4?

2          PROSPECTIVE JUROR:  Present.

3          THE COURT:  Let me go back.  Number 3, is number 3

4    here?

5          THE COURT:  I think it's been scratched off.

6          THE COURT DEPUTY:  I just wanted to make sure.  That

7    was an early morning one.

8          No. 5?

9          PROSPECTIVE JUROR:  Present.

10         THE COURT DEPUTY:  No. 6?

11         PROSPECTIVE JUROR:  Present.

12         THE COURT DEPUTY:  No. 7?

13         PROSPECTIVE JUROR:  Present.

14         THE COURT DEPUTY:  No. 9?

15         PROSPECTIVE JUROR:  Present.

16         THE COURT DEPUTY:  No. 13?

17         PROSPECTIVE JUROR:  Present.

18         THE COURT DEPUTY:  No. 17?

19         PROSPECTIVE JUROR:  Present.

20         THE COURT DEPUTY:  No. 23?

21         PROSPECTIVE JUROR:  Present.

22         THE COURT DEPUTY:  No. 25?

23         PROSPECTIVE JUROR:  Present.

24         THE COURT DEPUTY:  No. 28?

25         PROSPECTIVE JUROR:  Present.

1        THE COURT DEPUTY:  No. 31?

2        PROSPECTIVE JUROR:  Present.

3        THE COURT DEPUTY:  33?

4        PROSPECTIVE JUROR:  Present.

5        THE COURT DEPUTY:  40?

6        PROSPECTIVE JUROR:  Present.

7        THE COURT DEPUTY:  42?

8        PROSPECTIVE JUROR:  Present.

9        THE COURT DEPUTY:  43?

10        PROSPECTIVE JUROR:  Present.

11        THE COURT DEPUTY:  46?

12        PROSPECTIVE JUROR:  Present.

13        THE COURT DEPUTY:  54?

14        PROSPECTIVE JUROR:  Present.

15        THE COURT DEPUTY:  55?

16        PROSPECTIVE JUROR:  Present.

17        THE COURT DEPUTY:  56?

18        PROSPECTIVE JUROR:  Present.

19        THE COURT DEPUTY:  60?

20        PROSPECTIVE JUROR:  Present.

21        THE COURT DEPUTY:  62?

22        PROSPECTIVE JUROR:  Present.

23        THE COURT DEPUTY:  64?

24        PROSPECTIVE JUROR:  Present.

25        THE COURT DEPUTY:  68?

1          PROSPECTIVE JUROR:  Present.

2          THE COURT DEPUTY:  74?

3          PROSPECTIVE JUROR:  Present.

4          THE COURT DEPUTY:  77?

5          PROSPECTIVE JUROR:  Present.

6          THE COURT DEPUTY:  81?

7          PROSPECTIVE JUROR:  Present.

8          THE COURT DEPUTY:  82?

9          PROSPECTIVE JUROR:  Present.

10         THE COURT DEPUTY:  84?

11         PROSPECTIVE JUROR:  Present.

12         THE COURT DEPUTY:  88?

13         PROSPECTIVE JUROR:  Present.

14         THE COURT DEPUTY:  92?

15         PROSPECTIVE JUROR:  Present.

16         THE COURT DEPUTY:  93?

17         PROSPECTIVE JUROR:  Present.

18         THE COURT DEPUTY:  96?

19         PROSPECTIVE JUROR:  Present.

20         THE COURT DEPUTY:  99?

21         PROSPECTIVE JUROR:  Present.

22         THE COURT DEPUTY:  101?

23         PROSPECTIVE JUROR:  Present.

24         THE COURT DEPUTY:  105?

25         PROSPECTIVE JUROR:  Present.

```
1              THE COURT DEPUTY:  107?

2              PROSPECTIVE JUROR:  Present.

3              THE COURT DEPUTY:  109?

4              PROSPECTIVE JUROR:  Present.

5              THE COURT DEPUTY:  111?

6              PROSPECTIVE JUROR:  Present.

7              THE COURT DEPUTY:  113?

8              PROSPECTIVE JUROR:  Present.

9              THE COURT DEPUTY:  115?

10             PROSPECTIVE JUROR:  Present.

11             THE COURT DEPUTY:  119?

12             PROSPECTIVE JUROR:  Present.

13             THE COURT DEPUTY:  120?

14             PROSPECTIVE JUROR:  Present.

15             THE COURT DEPUTY:  121?

16             PROSPECTIVE JUROR:  Present.

17             THE COURT DEPUTY:  123?

18             PROSPECTIVE JUROR:  Present.

19             THE COURT DEPUTY:  124?

20             PROSPECTIVE JUROR:  Present.

21             THE COURT DEPUTY:  125?

22             PROSPECTIVE JUROR:  Present.

23             THE COURT DEPUTY:  130?

24             PROSPECTIVE JUROR:  Present.

25             THE COURT DEPUTY:  139?
```

1          PROSPECTIVE JUROR:  Present.

2          THE COURT DEPUTY:  141?

3          PROSPECTIVE JUROR:  Present.

4          THE COURT DEPUTY:  153?

5          PROSPECTIVE JUROR:  Present.

6          THE COURT DEPUTY:  154?

7          PROSPECTIVE JUROR:  Present.

8          THE COURT DEPUTY:  155?  Juror No. 155?

9          159?

10         PROSPECTIVE JUROR:  Present.

11         THE COURT DEPUTY:  161?

12         PROSPECTIVE JUROR:  Present.

13         THE COURT DEPUTY:  162?

14         PROSPECTIVE JUROR:  Present.

15         THE COURT DEPUTY:  164?

16         PROSPECTIVE JUROR:  Present.

17         THE COURT DEPUTY:  172?

18         PROSPECTIVE JUROR:  Present.

19         THE COURT DEPUTY:  173?

20         PROSPECTIVE JUROR:  Present.

21         THE COURT DEPUTY:  180?

22         PROSPECTIVE JUROR:  Present.

23         THE COURT DEPUTY:  189?

24         PROSPECTIVE JUROR:  Present.

25         THE COURT DEPUTY:  191?

1      PROSPECTIVE JUROR:  Present.

2      THE COURT DEPUTY:  200?

3      PROSPECTIVE JUROR:  Present.

4      THE COURT DEPUTY:  202?

5      PROSPECTIVE JUROR:  Present.

6      THE COURT DEPUTY:  205?

7      PROSPECTIVE JUROR:  Present.

8      THE COURT DEPUTY:  210.

9      PROSPECTIVE JUROR:  Present.

10     THE COURT:  211?

11     PROSPECTIVE JUROR:  Present.

12     THE COURT DEPUTY:  221?

13     PROSPECTIVE JUROR:  Present.

14     THE COURT DEPUTY:  222?

15     PROSPECTIVE JUROR:  Present.

16     THE COURT DEPUTY:  Is there anyone present whose

17  number I did not call?  Please stand.  And your number?

18     PROSPECTIVE JUROR:  207.

19     THE COURT DEPUTY:  Okay.  We received an e-mail from

20  you this morning.  Would you like to serve?  You may be

21  excused.  If you would like to be excused, you qualify.

22     PROSPECTIVE JUROR:  I do.

23     THE COURT DEPUTY:  Okay.  Thank you.  Are there any

24  people other than counsel and jurors in the courtroom?

25  Someone -- please stand if you are in the courtroom and you

1    are not a juror.  And state your identity.

2         MS. ANDERSON:  Tracy Anderson, media.

3         THE COURT DEPUTY:  Okay.  Media are not allowed in

4    the courtroom for jury selection.  Is there anyone else

5    seated in the gallery that is not a juror?

6         (No response from the jury.)

7         THE COURT DEPUTY:  Only jurors.  Jurors, please hold

8    on to your summons.  You will need it to refer back to it to

9    your nine-digit participation number if you're selected as

10   your juror.  And please stand and be sworn.

11        (Whereupon, the venire is sworn.)

12        THE COURT:  Thank you, Ms. Perry.  Again, ladies and

13   gentlemen, my name is Richard Gergel.  I'm a United States

14   district judge.  And I will be presiding over this jury

15   selection and at the trial of this case.

16        We are now in the midst of the jury selection

17   process.  You previously completed a questionnaire for the

18   Court, which has been reviewed by the attorneys in the case.

19   These questionnaires have been very helpful in providing the

20   attorneys and the parties the necessary information to select

21   a fair and impartial jury.  And, ladies and gentlemen, our

22   goal here is to select a fair and impartial jury.

23        We need some additional information from you.  And I

24   will be asking some additional questions before jurors are

25   finally selected.  In just a moment, I will provide you a

brief summary of the case we are drawing the jury for,

introduce you to the attorneys, identify the parties and

possible witnesses, and may ask you special questions that

touch on your ability to be fair and impartial about this

particular case.

Please remember you are under oath.  And our goal is

to select a jury that can be completely open-minded, fair,

and impartial.

If one of the questions I ask you applies to you,

please stand.  And when I recognize you, state your juror

number, not your name, your juror number, and speak loudly

and distinctly when giving an answer.  On many of these

questions, I will ask you -- if you are going to respond, I

will ask you to come forward so that you can discuss the

matters with me privately, because some matters I do not want

to do in front of the entire jury pool.  If I ask you a

question that I don't appreciate may involve something

private and you would prefer to answer it privately, you just

let me know that.  Okay?

I know that your presence here today and possible

service on a jury may disrupt your normal routines and plans

and feel in some ways like a burden.  I want you to remember,

we have in the United States the most remarkable and admired

legal system in the world.  And the key part of that system

is a trial by jury.  Ordinary hard-working citizens like

1    yourselves are given the critical responsibilities of jury

2    service.  It is an honor to be an American citizen.  And it

3    is an honor to serve as a juror.  I want to thank you in

4    advance for your jury service.  And I want to do my part to

5    minimize any inconvenience or burden you may experience.

6         A few basic ground rules:  Whenever you speak,

7    again, use your juror number.  Secondly, if you speak in

8    response to a question, speak loud enough for my court

9    reporter sitting up here to hear you.  We need to get all of

10   this down.  She needs to hear everything that you say.  And,

11   again, as I just said, if you prefer to answer any question I

12   ask you in private, please indicate.  I will be bringing you

13   forward in many of these questions regardless.

14        Okay.  First question, do you have any personal

15   hardship which prevents you from serving effectively as a

16   juror?  And let me define what a personal hardship is:  You

17   have transportation problems getting to and from the

18   courthouse; you have children under the age of 10 at home for

19   whom you are primarily responsible; you have a physical or

20   medical condition that you believe prevents you from

21   effectively serving, and you would like to claim an exemption

22   from jury service for that reason.  If you have any personal

23   hardship as I have just defined it, please stand.

24        Okay.  Sir, I'm going to have you come forward, if

25   you could please, and counsel.

1    (Whereupon, the following bench conference takes

2  place):

3    THE COURT:  Juror No. 107.  Can you tell me your

4  personal hardship, sir?

5    PROSPECTIVE JUROR:  I have a significant amount of

6  hearing loss.  I'm really struggling to understand you.  And

7  if they have a mask on, I'm having to watch the people around

8  me to see what to do.

9    THE COURT:  Let me say this.  My friend Mr. Daniel

10  has the same problem.

11    MR. DANIEL:  Even with these.

12    THE COURT:  Even with the most powerful hearing aids

13  he can buy.  So I'm going to excuse you, sir.  Thank you.

14    (Bench conference ends.)

15    THE COURT:  Juror No. 107 is excused.

16    Ladies and gentlemen, you may be excused if you are

17  over the age of 70 and wish to exercise your right to be

18  excused.  Also, if you've served on a federal grand or petit

19  jury in the last two years, federal grand jury or trial jury

20  in the last two years, you are eligible.  I say you are

21  eligible because over the years, some of my best jurors are

22  over 70 years of age, but you have the right to assert the

23  exemption if you wish.  Is anyone over 70 or who has been in

24  the past two years on a federal grand or trial jury and

25  wishes to be excused, please stand.

1          (No response.)

2          THE COURT:  Let the record show no one has stood.

3    Ladies and gentlemen, you have previously completed a

4    questionnaire.  Your responses are important.  If you have,

5    since completing your questionnaire, remembered or learned

6    additional information that should have been included, please

7    stand.

8          (No response.)

9          THE COURT:  Let the record show no one has stood.

10         Ladies and gentlemen, the case under consideration

11   this morning for which we are drawing the jury is United

12   States v. Russell Laffitte.  We will begin the trial today

13   after jury selection.  And it's estimated it will run through

14   the week ending on November 18th, so this week and next week.

15   I promise you, I will push these lawyers to do it as soon --

16   quick as possible, but that's the present estimate.  If you

17   have any personal conflicts during this particular time, I

18   need to know about them.  Let me define what personal

19   conflicts are:  A personal vacation plan that cannot be

20   changed; travel plans that cannot be rescheduled; significant

21   business or employment-related conflict.  And I don't mean

22   it's sort of a burden to be away from work, it is something

23   extraordinary that keeps you from maintaining your business

24   or employment that makes it particularly critical that you

25   not serve on a jury.  Now, those are the definitions for a

1    personal conflict.  If anyone asserts they have a personal

2    conflict between today and November 18th, please stand.

3           Okay.  I'm going to have you come forward, please.

4           (Whereupon, the following bench conference takes

5    place):

6           THE COURT:  Okay.  Juror 211, yes, ma'am, what's

7    your conflict?

8           PROSPECTIVE JUROR:  No. 211.  I am traveling to

9    Greenville, South Carolina, this weekend.  My mother-in-law

10   is having a lumpectomy.  She has lung cancer.  And I have two

11   young children.

12          THE COURT:  We are not going to be doing stuff over

13   the weekend.  Can you be hear -- let me say Friday is

14   Veterans Day, so we are not having jury service.  Can you be

15   back Sunday so you can be here Monday morning?

16          PROSPECTIVE JUROR:  Her surgery is Monday.

17          THE COURT:  Her surgery is Monday?

18          PROSPECTIVE JUROR:  It is, yes.

19          THE COURT:  Okay.  I'm going to excuse you.  Okay.

20   Thank you, ma'am.  Prayers for your mom.

21          Next juror, please.

22          THE COURT:  Let me show counsel this.  Juror No. 4.

23   Let me tell you my thinking about this.  I want to

24   accommodate you, but I've got to have enough jurors.  So at

25   this moment I'm going to leave it open.  I am not going to

1    grant it yet, but I have a note about it.  Does that seem

2    fair enough?  You can keep that note.  Thank you, ma'am,  you

3    may return to your chair.

4            Juror 162.  Yes, sir.  Good morning.

5            PROSPECTIVE JUROR:  Good morning.  I am a tournament

6    director at a professional golf course.  We are missing a

7    tournament today.  I need to be running.  And I have this one

8    Friday, Saturday.

9            THE COURT:  Well, Friday we are gone.  It's Veterans

10   Day, in honor of veterans.  Saturday we are not here.  And

11   right this moment, I can't let you go.  Appreciate you coming

12   forward.

13           Yes, sir.  What juror number are you?

14           PROSPECTIVE JUROR:  141.

15           THE COURT:  Yes, sir.

16           PROSPECTIVE JUROR:  Thursday and Friday, I will be

17   in Florence due to an annual conference, I'm a preacher, and

18   as a security for the AME district.

19           THE COURT:  I've actually attended AME conferences

20   before, so I know exactly what's involved.  Let me just say,

21   Friday you are free, because it's Veterans Day.  And right

22   this moment, I can't let anyone go.  I need to make sure I

23   have enough jurors.  This is an important case.  So I need

24   for you to do your Lord's work here on Thursday if you get

25   drawn.  Okay?  You need to explain to the bishop.  I am not

1   going to excuse you here.  But on Friday, you are free anyway

2   because we are not having court on Friday.

3          PROSPECTIVE JUROR:  So as far as my room and money

4   paid for Thursday for my reservation --

5          THE COURT:  I can't do anything about that.  I'm

6   just saying, sir, of course, you could leave Thursday and get

7   there Thursday night.  You just can't be there Thursday if

8   I -- we don't know if you are going to get drawn yet.  But

9   right now, I can't let you go.  All right?  Thank you, sir.

10         Yes, sir.  Good morning, sir.  Juror No. 210.  Yes,

11  sir.

12         PROSPECTIVE JUROR:  My wife is pregnant and she has

13  kidney stones.  So I've been operating her business as well

14  as doing my own job.

15         THE COURT:  And what's the nature of her business?

16         PROSPECTIVE JUROR:  She owns a pet store.

17         THE COURT:  The pets have to be fed?

18         PROSPECTIVE JUROR:  Yeah.

19         THE COURT:  And what's your business?

20         PROSPECTIVE JUROR:  I'm the vice president of

21  operations for a local synthetic turf company.

22         THE COURT:  Well, I wouldn't let you off for your

23  business.  But for your wife, you have a lot of explaining to

24  do if I don't let you go, so I'm going to excuse you, sir.

25  Thank you very much.  Best for your wife.  Thank you.

1    (Bench conference ends.)

2    Okay.  Okay.  Ladies and gentlemen, I need to give

3 you a brief summary about the case we are getting ready to

4 try.  We will be selecting a jury today in the case of United

5 States v. Russell Laffitte.  The defendant has been charged

6 with various counts relating to alleged bank and wire fraud

7 involving Alex Murdaugh, a former member of the law firm of

8 Parker, Murdaugh, Peters, Eltzroth & Detrick, based in

9 Hampton, South Carolina.  He's also been charged with

10 misappropriating bank funds.

11    The defendant is presumed innocent.  And the

12 Government carries the burden of proving the defendant guilty

13 beyond a reasonable doubt.  Has any member of the jury heard

14 or read or is otherwise aware of this case?  If so, please

15 stand.

16    I am not surprised.  Okay.  We are going to --

17 individually, we are going to do -- we are going to

18 individually bring people forward.  I want -- I'm going to

19 ask my court folks, we will do five in line at a time.  And

20 we will do from the front row to the back.  Okay?  First

21 person, please.

22    (Whereupon, the following bench conference takes

23 place):

24    THE COURT:  Juror No. 93.  Yes, ma'am.  Tell me

25 about your knowledge of this case.

1          PROSPECTIVE JUROR:  It's limited, but it was

2     something to do with an attorney that had a murder at a

3     house.

4          THE COURT:  By the way, that's not this case.  This

5     is a bank case.

6          PROSPECTIVE JUROR:  That's what I know about it.

7          THE COURT:  Do you know anything about the

8     allegations about bank activity?

9          PROSPECTIVE JUROR:  I don't know anything about

10    that.

11         THE COURT:  Do you have any opinion as to innocence

12    or guilty or anything like that?

13         PROSPECTIVE JUROR:  No, sir.

14         THE COURT:  Do you feel like you can be a fair and

15    impartial juror?

16         PROSPECTIVE JUROR:  I do.

17         THE COURT:  Very good.  You may return to your seat.

18    93.

19         Next.  Juror No. 42.  Good morning.  Thank you for

20    being here.  Tell me what you know about this case.

21         PROSPECTIVE JUROR:  All I really know is the name

22    Murdaugh and I know what he is accused of.  I do not know

23    this gentleman.

24         THE COURT:  Do you have any opinions as to the

25    innocence or guilt of this gentleman?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Do you feel like you can be a fair and

3   impartial juror?

4          PROSPECTIVE JUROR:  I do.

5          THE COURT:  You can return to your seat.  Thank you.

6          Yes, ma'am.  Juror No. 62.  Good morning.

7          PROSPECTIVE JUROR:  Good morning.

8          THE COURT:  Tell me what you know about this case.

9          PROSPECTIVE JUROR:  Only what I've read in the

10  newspaper.

11         THE COURT:  And what basically is your impression of

12  what this case is about?

13         PROSPECTIVE JUROR:  Just keeps snowballing.

14         THE COURT:  Do you know anything about the

15  particular issues involved in our case, involving the bank?

16         PROSPECTIVE JUROR:  No, I've never heard of this

17  individual.

18         THE COURT:  And do you have any opinion as to

19  innocence or guilt?

20         PROSPECTIVE JUROR:  No, not really.

21         THE COURT:  Do you feel like you could be a fair and

22  impartial juror in this case?

23         PROSPECTIVE JUROR:  Sure.

24         THE COURT:  Okay.  I'm going to return -- you are

25  fine.  Thank you.

Next.

THE COURT:  Juror No. 105.  Good morning, sir.  Tell me what you know about this case.

PROSPECTIVE JUROR:  I read the Post and Courier daily and the Wall Street Journal daily.  I'm generally aware of it.

THE COURT:  Are you aware of the allegations involving Mr. Laffitte himself or the larger case here you are knowledgeable about?

PROSPECTIVE JUROR:  I'm familiar with the fact that there are a handful of charges.

THE COURT:  Do you have any -- other than reading the newspaper, have you picked up any other -- have you watched any videos or TV or podcasts, listened to podcasts or anything like that?

PROSPECTIVE JUROR:  I have seen some video productions in part, not anything in great detail.  I'm aware that there is a podcast.

THE COURT:  Do you have any opinions?  Have you reached any opinions about innocence or guilt or anything like that about the case?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you have any reason -- do you feel like you could not be a fair and impartial juror in this case?

1          PROSPECTIVE JUROR:  Not at all.

2          THE COURT:  Very good.  I'm going to send you back

3     to your seat.  Thank you, sir.

4          Next.

5          THE COURT:  Juror No. 82.  Good morning.

6          PROSPECTIVE JUROR:  Good morning.

7          THE COURT:  Tell me what you know about this case.

8          PROSPECTIVE JUROR:  I just heard the name.  I heard

9     the Murdaugh name and just, like, whenever things kind of

10    surfaced about it, but I don't know anything about --

11         THE COURT:  Details of this case with Mr. Laffitte,

12    you don't know anything about that?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  How have you obtained information?

15         PROSPECTIVE JUROR:  It's kind of all over the place.

16         THE COURT:  The name is all over the place?

17         PROSPECTIVE JUROR:  But nowhere in particular.

18    There was a podcast that I listened to in the very beginnings

19    of everything.  But I haven't remembered -- I don't know

20    anything about it really.

21         THE COURT:  And do you have any opinions about

22    innocence or guilt?

23         PROSPECTIVE JUROR:  Hm-mm.

24         THE COURT:  Do you know of any reason you could not

25    be a fair and impartial juror?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Thank you.  You could return to your

3     seat.

4          Juror No. 33.  Yes, sir.  What do you know about

5     this case?

6          PROSPECTIVE JUROR:  The question is pretty vague, so

7     I felt compelled to come up.  Other than what I've read in

8     the paper, seen in the newspaper, but no knowledge of any

9     substance, facts.  Other than allegations, nothing.

10          THE COURT:  Do you have any -- so you've just

11     basically picked it up from reading the newspaper?

12          PROSPECTIVE JUROR:  Every day.

13          THE COURT:  Have you reached any opinions as to

14     innocence or guilt?

15          PROSPECTIVE JUROR:  Not at all.

16          THE COURT:  Do you have any real knowledge of the

17     details relating to the bank situation?

18          PROSPECTIVE JUROR:  No, I don't.

19          THE COURT:  Is there any reason you feel like you

20     could not be a fair and impartial juror in this case?

21          PROSPECTIVE JUROR:  I do not.

22          THE COURT:  Very good.  You could return to your

23     seat.

24          Juror No. 205.  Yes, sir.  Good morning, sir.  Tell

25     me what you know about this case.

1          PROSPECTIVE JUROR:  Well, I know about accident and

2    couple deaths and about him.  So on my phone I clicked on it,

3    but I had to pay to read it, so I didn't click on it.

4          THE COURT:  So do you know anything about -- do you

5    have any opinions about this situation?

6          PROSPECTIVE JUROR:  About him?  I know he was a

7    lawyer or something -- no, he's a banker.

8          THE COURT:  The defendant here is a banker.  Do you

9    have any knowledge about banking issues in the case?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Do you have any opinions to innocence or

12    guilt?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Do you feel like you could be a fair and

15    impartial juror in this case?

16          PROSPECTIVE JUROR: Yes.

17          THE COURT:  Very good.  I'm going to send you back

18    to your seat.

19          Next, please.  Juror No. 200.  Yes, sir.

20          PROSPECTIVE JUROR:  I'm just aware of the case but

21    not really any details, just --

22          THE COURT:  So tell me about how you acquired any

23    knowledge about it.

24          PROSPECTIVE JUROR:  Just saw different articles

25    placed in different papers and things like that.

1          THE COURT:  Have you listened to any podcasts or

2  anything like that?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Do you have any opinions as to the

5  defendant's innocence or guilt?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you have any reason to think you

8  could be not a fair and impartial juror?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Very good.  You could return to your

11  seat.

12          Juror No. 23.  Good morning.

13          PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  Thank you for being here.  Tell me what

15  you know about this case.

16          PROSPECTIVE JUROR:  I followed it on podcasts and

17  documentaries.

18          THE COURT:  Tell me what podcasts you have listened

19  to.

20          PROSPECTIVE JUROR:  One of them is the Murdaugh

21  Murders and --

22          THE COURT:  And you've listened to those?

23          PROSPECTIVE JUROR:  I have.

24          THE COURT:  You have also seen anything on TV or

25  video?

1          PROSPECTIVE JUROR:  Yes.  I saw a documentary on IDT

2     and started one on HBO.

3          THE COURT:  And do you have opinions as to the

4     innocence or guilt of the defendant?

5          PROSPECTIVE JUROR:  No.  I can be pretty partial.

6          THE COURT:  Well, I need for you to be completely

7     impartial, not pretty impartial.  Do you feel like maybe you

8     have too much knowledge, perhaps?

9          PROSPECTIVE JUROR:  Maybe.

10         THE COURT:  Okay.  I'm going to excuse you.  Thank

11    you.

12         Next.  Juror No. 120.  Good morning.  Tell me what

13    you know about this case.

14         PROSPECTIVE JUROR:  I know that there was a murder

15    involved, a wife and a nanny.  I read about it a little bit

16    on Democratic Underground.  I know it's a long, convoluted

17    story.

18         THE COURT:  And do you know much about the banking

19    issues?  These are banking issues.

20         PROSPECTIVE JUROR:  Not a whole lot about that.

21         THE COURT:  Do you know anything about Mr. Laffitte,

22    the defendant here?

23         PROSPECTIVE JUROR:  I read his name online, I

24    mean --

25         THE COURT:  Do you have any opinions as to innocence

1  or guilt?

2      PROSPECTIVE JUROR:  No, not really.

3      THE COURT:  Well, let's explore that a little bit.

4  You were hesitant.  And it's important that we get fair and

5  impartial jurors.  Do you have some opinions about this?

6      PROSPECTIVE JUROR:  Maybe a little.

7      THE COURT:  Okay.  I'm going to excuse you.  Thank

8  you, ma'am.

9      Juror No. 153.  Yes, sir.  Good morning.

10     PROSPECTIVE JUROR:  Good morning.

11     THE COURT:  What do you know about this?

12     PROSPECTIVE JUROR:  I mean, I've definitely heard

13 news, read the news, listened to some podcasts, not a huge

14 amount of it, but I know more, I would say, on the Murdaugh

15 case than this particular aspect of it.

16     THE COURT:  Do you have any opinion as to innocence

17 or guilt of Mr. Laffitte, the defendant here?

18     PROSPECTIVE JUROR:  I mean, for this particular

19 case, I don't know, seems to be systematic abuse somewhat

20 based on what I've read and heard.

21     THE COURT:  I'm going to excuse you from this case.

22 Thank you, sir.

23     Next.  I've seen you before.  Yes, ma'am.  What do

24 you know about this?

25     PROSPECTIVE JUROR:  What's been on the news and

1  what's the next, 20/20, I've seen that.  But my co-worker,

2  who I support, is from Hampton and she went to school with

3  him.

4         THE COURT:  So you think that might affect your --

5         PROSPECTIVE JUROR:  I just don't want any questions.

6         THE COURT:  I'm going to excuse you.  Thank you,

7  ma'am.  4 is excused.

8         No. 13.  Yes, ma'am.

9         PROSPECTIVE JUROR:  Just some articles I read

10  online, nothing really too in-depth.

11         THE COURT:  Do you have any opinions about innocence

12  or guilt?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Do you have any reason you could not be

15  a fair and impartial juror?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  If you could return to your seat.  You

18  are fine.  Thank you.

19         Next Juror No. 17.  Good morning.

20         PROSPECTIVE JUROR:  Good morning.

21         THE COURT:  Tell me what you know about this case.

22         PROSPECTIVE JUROR:  So I just know that Murdaugh is

23  on the news and seen on social media and Post and Courier.

24         THE COURT:  What kind of social media have you seen

25  other than just sort of commenting on this?

1          PROSPECTIVE JUROR:  Mostly just headlines from the,

2     like, Post and Courier, Live 5, his crimes.

3          THE COURT:  Do you know anything about Mr. Laffitte,

4     any particular issues relating to the bank or anything like

5     that?

6          PROSPECTIVE JUROR:  I just know that he mentioned

7     he's a banker.

8          THE COURT:  That's the extent of that?

9          PROSPECTIVE JUROR:  Yeah.

10         THE COURT:  Do you have any opinions as to innocence

11    or guilt?  You need to say yes or no.

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  And do you have -- is there any reason

14    you could not be a fair and impartial juror?

15         PROSPECTIVE JUROR:  I don't think so.

16         THE COURT:  Good.  I'm going to send you back to

17    your chair.  Thank you.

18         Juror No. 172.  Good morning.

19         PROSPECTIVE JUROR:  Good morning.

20         THE COURT:  Thank you for being here.

21         PROSPECTIVE JUROR:  Of course.

22         THE COURT:  Tell me what you know about this case.

23         PROSPECTIVE JUROR:  Mostly on the Murdaugh side,

24    just everything that I've seen on TV and podcasts.

25         THE COURT:  Tell me about the podcasts you've seen

1    or heard, listened to.

2           PROSPECTIVE JUROR:  Several.  I don't know the names

3    of some of them, but mostly, like, documentaries on Netflix.

4           THE COURT:  You've seen a Netflix --

5           PROSPECTIVE JUROR:  On ID channel, just shows that

6    have been on there.

7           THE COURT:  Okay.  And do you have any opinions as

8    to the innocence or guilt, watching all this stuff?

9           PROSPECTIVE JUROR:  No, I guess not.  I mean --

10          THE COURT:  Well, I don't need you to guess.  Do you

11   have any feelings about this since you followed it pretty

12   closely?

13          PROSPECTIVE JUROR:  I mean, yes.  I do have feelings

14   about whether he's guilty or not.  But I don't know

15   necessarily much on Russell, I guess.

16          THE COURT:  You are talking about innocence or guilt

17   of Murdaugh himself?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  How about the defendant here, Laffitte,

20   do you have any opinions about that?

21          PROSPECTIVE JUROR:  I don't, no.  I don't know that

22   much into it.

23          THE COURT:  Do you have any reason you could not be

24   a fair and impartial juror in this case?

25          PROSPECTIVE JUROR:  No, not at all.

1       THE COURT:  Okay.  And is there anything about what

2  you know that would cause you concern that you could not make

3  an independent and fair judgment?

4       PROSPECTIVE JUROR:  No, not at all.

5       THE COURT:  I'm going to have you return to your

6  seat.

7       Before we go, this is the first person I've had

8  who's listened to some of this but appears to know very

9  little about the defendant.  I am not going to disqualify

10 her.  Any objection to that?

11      MR. DANIEL:  I do object for the record, Your Honor,

12 because the podcast scares the heck out of us.

13      THE COURT:  I can understand that.

14      MR. DANIEL:  And it does discuss Laffitte and it

15 does discuss -- I mean, has strong opinions of guilt.

16      THE COURT:  I will revisit this.  This one I will

17 come back to.

18      Okay.  Juror No. 81.  Good morning.  How are you?

19 Thank you for being here.

20      PROSPECTIVE JUROR:  Absolutely.

21      THE COURT:  And tell me what you know about this

22 case.

23      PROSPECTIVE JUROR:  Just what we've seen in the

24 newspaper and on TV, which I think may have been a Netflix

25 special.  That's about it.  Yeah.  I think it's Netflix is

1  what it ran on.  I am not really sure.  My sister and mother

2  were watching it when I came in.  And I just kind of sat down

3  and we watched it together.

4          THE COURT:  Do you have any opinions regarding this

5  case?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you have any ideas about innocence or

8  guilt?

9          PROSPECTIVE JUROR:  I have no idea.  You have to get

10  the whole story before you can decide that.

11          THE COURT:  Is there any reason you could not be a

12  fair and impartial juror?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  I'm going to send you back to your

15  chair.  Thank you.

16          Juror No. 55.  Good morning, sir.

17          PROSPECTIVE JUROR:  Good morning.

18          THE COURT:  Tell me what you know about this case.

19          PROSPECTIVE JUROR:  I've read the articles in the

20  Post and Courier published yesterday and this morning.  I

21  didn't know that was going to be the case today, but, you

22  know, about the allegations of fraud and embezzlement of

23  investors in alleged colluding with Mr. Murdaugh.

24          THE COURT:  You read that in the paper the last

25  couple of days?

1        PROSPECTIVE JUROR:  Yes, sir.

2        THE COURT:  Do you have any opinions as to whether

3   the defendant is innocence or guilty?

4        PROSPECTIVE JUROR:  I presume he's innocent.

5        THE COURT:  You presume he's innocent?

6        PROSPECTIVE JUROR:  That's my understanding of

7   what -- that you go into the case with that assumption.

8        THE COURT:  And you have the presumption that he's

9   innocent?

10        PROSPECTIVE JUROR:  Yes, I do.  And it's up to the

11   Government to prove otherwise beyond a reasonable doubt.

12        THE COURT:  Is there any reason you could not be a

13   fair and impartial juror in this case?

14        PROSPECTIVE JUROR:  No, Your Honor, I don't think

15   so.

16        THE COURT:  Very good.  I'm going to have you return

17   to your seat.

18        Next juror, Juror No. 115.  Good morning.

19        PROSPECTIVE JUROR:  Good morning.

20        THE COURT:  Thank you for being here.  Tell me what

21   you know about this case.

22        PROSPECTIVE JUROR:  I was vaguely aware of

23   headlines, co-worker conversations of murder for hire.

24        THE COURT:  Actually, that's not part of this case.

25   This case is about banking.

1      PROSPECTIVE JUROR:  Right.  So just Alex Murdaugh is

2 all I know.

3      THE COURT:  You don't know the anything about this

4 defendant?

5      PROSPECTIVE JUROR:  No.

6      THE COURT:  Do you know anything about the innocence

7 or guilt of this defendant?

8      PROSPECTIVE JUROR:  No.

9      THE COURT:  Any reason you could not be a fair and

10 impartial juror?

11      PROSPECTIVE JUROR:  No.

12      THE COURT:  I will send you back to your seat.

13 Thank you.

14      Juror No. 189.  Good morning.

15      PROSPECTIVE JUROR:  How are you?

16      THE COURT:  Thank you for being here.  Tell me what

17 you know about this case.

18      PROSPECTIVE JUROR:  I've just watched things on the

19 news and watched Dateline and that kind of thing.  But I

20 really don't know anything about this particular defendant.

21 I just heard comments about Mr. Murdaugh.

22      THE COURT:  Okay.  She said she doesn't know

23 anything about the defendant.  She just knows about Murdaugh.

24      MR. DANIEL:  You watched something on TV?

25      PROSPECTIVE JUROR:  I watched Dateline.

1          THE COURT:  And do you have any opinions as to the

2     innocence or guilt of the defendant?

3          PROSPECTIVE JUROR:  I believe I could just listen to

4     the evidence.

5          THE COURT:  You feel like you could be a fair and

6     impartial juror?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Very good.  If you could return to your

9     seat.

10          Next.  Juror No. 121.  Good morning.

11          PROSPECTIVE JUROR:  Good morning.

12          THE COURT:  Thank you for being here.

13          PROSPECTIVE JUROR:  Yes.  So I attended the

14     University of South Carolina and I personally know Buster and

15     B.J.  On top of that, my mother, she went University of South

16     Carolina, she knows Maggie Murdaugh personally as well as her

17     best friend Caroline --

18          THE COURT:  I think we are going to excuse you.

19     What do you think?

20          PROSPECTIVE JUROR:  That's what I think too.

21          THE COURT:  Thank you for coming.  121 is excused.

22          Juror No. 64.  Yes, sir.  If you could get a little

23     bit closer here.  Thank you.  Good morning.

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  Tell me what you know about this case.

1           PROSPECTIVE JUROR:  Basically what you summarized,

2    an article online, whatever, just Mr. Russell, whatever his

3    name, is accused of helping Mr. Murdaugh.

4           THE COURT:  Do you have any opinions as to innocence

5    or guilt?

6           PROSPECTIVE JUROR:  Well, the news has already kind

7    of painted him as doing wrong, but I think I could be

8    impartial.

9           THE COURT:  Well, it's important here.  Do you have

10   any opinions as to whether he's likely innocent or guilty?

11          PROSPECTIVE JUROR:  I don't know.  I don't have an

12   opinion.

13          THE COURT:  Okay.  And do you feel like you could

14   listen to the evidence and make a decision?

15          PROSPECTIVE JUROR:  Yes, I do.

16          THE COURT:  Do you feel like you could be a fair and

17   impartial juror in this case?

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Very good.  I'm going to send you back

20   to your chair.

21          MR. DANIEL:  We object to this juror.

22          THE COURT:  I'm going to make a note.

23          Juror No. 77.  How are you today?

24          PROSPECTIVE JUROR:  I'm doing well.  How are you?

25          THE COURT:  Fine.  Thank you for being here.  Can

1  you tell me what you know about this case.

2  PROSPECTIVE JUROR:  I've just listened to the

3  podcasts with Mandy Matney.

4  THE COURT:  Okay.  You've listened to more than one

5  of those?

6  PROSPECTIVE JUROR:  Yeah.

7  THE COURT:  And you've been following this pretty

8  closely?

9  PROSPECTIVE JUROR:  Yeah.

10  THE COURT:  Do you feel like you've sort of acquired

11  a lot of information from all of this?

12  PROSPECTIVE JUROR:  Yes.

13  THE COURT:  I'm going to excuse you.

14  PROSPECTIVE JUROR:  Okay.  Thank you.

15  THE COURT:  That was 77.

16  Juror No. 180.  Good morning.  How are you today?

17  PROSPECTIVE JUROR:  I'm good.

18  THE COURT:  Tell me what you know about this case.

19  PROSPECTIVE JUROR:  I just know it's a family that

20  died.  That's all.

21  THE COURT:  You need to get a little closer here.

22  Thank you.  And do you have any knowledge about the defendant

23  here, Mr. Laffitte, any allegations?

24  PROSPECTIVE JUROR:  No.

25  THE COURT:  Is there any reason you could not be a

fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  I'm going to send you back to your seat.
Thank you.

Juror No. 46.

PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  Good morning.  Eagles football, which
Eagles is that?

PROSPECTIVE JUROR:  The good ones.

THE COURT:  This year.  Tell me what you know about
this case.

PROSPECTIVE JUROR:  Basically I reside in Hampton,
South Carolina.  So, of course, you know, you hear talking,
media coverage.  And unrelated, but I guess kind of related,
the gentleman whose daughter was killed in the boating
accident works at the facility that I work at.

THE COURT:  Beach.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  I'm going to excuse you.  Thank you,
sir.

Juror No. 130.  Tell me what you know about this
case.

PROSPECTIVE JUROR:  I've listened to podcasts.  I
know about the boat incident, the mother and the son who were
murdered, that the family come from a line of solicitors.

1  That's about it.

2  　　　　THE COURT:  Do you know anything about Mr. Laffitte

3  and the issues with the bank?

4  　　　　PROSPECTIVE JUROR:  No.

5  　　　　THE COURT:  Do you have any opinions as to the

6  innocence or guilt of this defendant?

7  　　　　PROSPECTIVE JUROR:  No, I just have to go off the

8  information I receive.

9  　　　　THE COURT:  And you feel like you could be a fair

10 and impartial juror?

11 　　　　PROSPECTIVE JUROR:  Yes, sir.

12 　　　　THE COURT:  And tell me about these podcasts you've

13 listen to.  What have you heard?

14 　　　　PROSPECTIVE JUROR:  It was on Apple.  It was like

15 two or three episodes.  At first they talked about the boat

16 incident with the son and one of the females got, you know,

17 killed or whatever.  And then another episode is where

18 another young man is killed that they thought had something

19 to do with it.

20 　　　　THE COURT:  That's all related to Mr. Murdaugh.  You

21 don't know anything about Mr. Laffitte?

22 　　　　PROSPECTIVE JUROR:  No.

23 　　　　THE COURT:  I'm going to send you back to your

24 chair.  Thank you.

25 　　　　Thank you.  We are doing fine.

1    Juror No. 5.  Good morning.  Thank you for being

2  here.  Tell me what you know about this case.

3    PROSPECTIVE JUROR:  I know generally from the

4  national news, because I don't have a lot of time to read the

5  newspaper, because I work for a hotel.  We're really, really

6  busy right now.  So I just know about the situation with the

7  accident that happened and the fact that there's allegations

8  against another lawyer and a banker.  That's all I know.  I

9  don't know any details.

10    THE COURT:  Do you have any -- have you reached any

11  opinions as to innocence or guilt?

12    PROSPECTIVE JUROR:  No.

13    THE COURT:  Do you feel like you could be a fair and

14  impartial juror in this case?

15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  I'm going to send you back to your

17  chair.  Thank you.

18    Next.  Tell me what you know about this case.

19    PROSPECTIVE JUROR:  So I've listened to some

20  podcasts, watched the YouTube videos on it.  Also, my job

21  services the Hampton County area.  So there's been a lot of

22  talk at work.

23    PROSPECTIVE JUROR:  Okay.  I'm going to excuse you.

24    THE COURT REPORTER:  What number?

25    THE COURT:  139.

1          Juror No. 119.  Good morning.  Thank you for being

2    here.  Tell me what you know about this case.

3          PROSPECTIVE JUROR:  Nothing really about this case,

4    but all of the Murdaugh case, the boat crash, and I know two

5    of the Beach family members.  I just thought that might be

6    important.

7          THE COURT:  Do you feel like your knowledge of the

8    Beach family members may affect your ability to be fair and

9    impartial here?

10          PROSPECTIVE JUROR:  No.  I just wanted as to make

11    sure everybody knows.

12          THE COURT:  Okay.  This case does not involve the

13    Beach family at all.

14          PROSPECTIVE JUROR:  I just wanted to -- I didn't

15    want it to cause a problem later.

16          THE COURT:  Do you know anything about Mr. Laffitte

17    and the charges?

18          PROSPECTIVE JUROR:  Just what I've seen on the

19    headlines of the newspaper.  I never read an article about

20    it.

21          THE COURT:  Any reason you could not be a fair and

22    impartial juror in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  I'm going to send you back to your seat.

25          Next, please.  Juror No. 161.  Yes, sir.  Good

1  morning.  Thank you for being here.  Tell me what you know

2  about this case.

3          PROSPECTIVE JUROR:  I have a nephew that worked for

4  Charleston County Sheriff's Department.  He's doesn't work

5  there anymore.  But there were just a lot of stories that he

6  was conveying, I guess.

7          THE COURT:  I'm going to excuse you.  Thank you,

8  sir.

9          Juror No. 74.  Good morning, sir.

10         PROSPECTIVE JUROR:  Good morning.

11         THE COURT:  Thank you for being here.  Tell me what

12  you know about this case.

13         PROSPECTIVE JUROR:  I know nothing about this case.

14         THE COURT:  You know nothing about this thing?

15         PROSPECTIVE JUROR:  I don't know why we are here.

16         THE COURT:  Come a little closer.

17         PROSPECTIVE JUROR:  I don't know why we are here.  I

18  don't believe in nothing.

19         THE COURT:  I'm sorry?

20         PROSPECTIVE JUROR:  I said I don't know why we are

21  here.  I don't believe in all this, like a jury.

22         THE COURT:  You don't understand about the jury?

23         PROSPECTIVE JUROR:  Well, I wouldn't want to testify

24  for nobody.

25         THE COURT:  Okay.  I'm going to excuse you.  Thank

1  you, sir.

2      Folks, he just seemed confused.

3      (Bench conference ends.)

4      THE COURT:  I'm now going to ask counsel first for

5  the Government and then for the defendant to identify

6  themselves, their law firm, and to identify any witnesses

7  they may be calling.  Let me warn everybody now, these

8  lawyers are going to list more witnesses than they are

9  actually going to call.  But out of abundance of caution,

10 they will listen not only witnesses they are likely to call,

11 but they could possibly call.

12     Ms. Limehouse, please.

13     MS. LIMEHOUSE:  Thank you, Your Honor.  Good

14 morning, everyone.  My name is Emily Limehouse.  I'm an

15 Assistant United States Attorney here in Charleston.  My

16 colleagues, Winston Holliday and Katie Stoughton, are going

17 to be trying this case with me.  And they work in our

18 Columbia office.

19     I'm going to be calling various witness names.

20 These people work for the Palmetto State Bank in Hampton

21 County.  They also work for the law firm Peters, Murdaugh,

22 Peters, Eltzroth & Detrick, in Hampton County.  And you will

23 also hear other members of the public that I will identify:

24 Norris Laffitte, Jeanne Seckinger, Jan Malinowski, Ron

25 Crosby, Lee Cope, Mark Ball, Alania Plyler, Hannah Plyler,

1    Johnnie Parker, Cyndra Swinson, she works for the FBI,

2    Charles Laffitte, Spann Laffitte, Jim Gibson, Liz Malinowski,

3    Scott Swain, Lucius Laffitte, Becky Laffitte, Kyle Ward,

4    Sheila Odom, Irv Condon, Nancy Drawdy, Linda McelHaney,

5    Carrie Sauls, Doris Anne Bailey, Morgan Peoples, Arthur

6    Badger, Tiffany Provence, Natash Dash Thomas, Pamela

7    Pinckney, Malik Williams, Mark Altman, John Peters, Trenham

8    Walker, he's a lawyer here in Charleston, Timothy Rich, he

9    works for the FDIC in Atlanta, and Brian Womble, he's a

10   special agent with the FBI.

11            THE COURT:  Very good.

12            Mr. Daniel, can you please introduce yourself, your

13   lawyers, and the possible witnesses.

14            MR. DANIEL:  Again, I'm Bart Daniel.  And I

15   represent Mr. Russell Laffitte, along with my partner Matt

16   Austin, Josh Myers.  We've got our legal assistant, Elizabeth

17   Todd and paralegal, Grace Hamill, here.  And I will read -- I

18   will have to use my glasses to read, but I will read our list

19   that we may be calling for trial.

20            The first one is Tiffany Provence, next is Grayson

21   Tuck, Charles Laffitte, Jr., Gray Henderson, Elizabeth

22   Laffitte Malinowski, Jan Malinowski, Dr. Henry L. Laffitte

23   Jr., Charles A. Laffitte III, H. Spann Laffitte, H. Lucus --

24   Lucius Laffitte, Jr., Rebecca Laffitte, John Peters, Norris

25   Laffitte, James Gibson, Chad Westendorf, Chastity Malphrus,

1    Nancy Drawdy, Morgan Peoples, John Parker, Ronnie Crosby,

2    Mark Ball, League Creech, John Parker, Jr., Daniel Henderson,

3    Neil Alger, Randolph Murdaugh, IV, Mary Bass Lohr, Lee Cope,

4    Matt Creech, Graham Holmes, Austin Crosby, William Barnes,

5    Jeanne Seckinger, James Christopher, Chris Wilson, James

6    Randall Drawdy, Trenholm Walker, Alex Murdaugh, John Marvin

7    Murdaugh, Susie Laffitte, Carter Laffitte, and Beth Chapin.

8          THE COURT:  And, Mr. Daniel, I may have not heard.

9    If you could name your law firm, please.

10          MR. DANIEL:  I am so sorry.  Mr. Myers, Mr. Matt

11   Austin and Josh Myers and I, along with rest of our legal

12   team, is at the law firm of Nelson Mullins Riley &

13   Scarborough.  And we are just right down the street.

14          THE COURT:  Thank you, sir.

15          Ladies and gentlemen, I'm first going to ask you

16   about the lawyers and the law firm.  Has any member -- and

17   those are the lawyers you've heard and from the offices, the

18   U.S. Attorney's Office and Nelson Mullins Law Firm.  Has any

19   member of the jury panel or any member of your immediate

20   family ever had any type of association with these attorneys

21   or their law firms?  By that I mean, have you or any member

22   of your family ever been represented by them in a legal

23   matter, been employed by them, or had any social relationship

24   with them?  If so, please stand.

25          I'm going to have you come forward, please, ma'am.

1      (Whereupon, the following bench conference takes

2  place):

3      THE COURT:  Juror No. 40.  Yes, ma'am.  Who do you

4  know?

5      PROSPECTIVE JUROR:  My brother-in-law was previously

6  employed by Nelson Mullins in Greenville.

7      THE COURT:  Okay.  And he's no longer employed

8  there?

9      PROSPECTIVE JUROR:  He's retired.

10      THE COURT:  Retired.  And who is your

11  brother-in-law?

12      PROSPECTIVE JUROR:  Sonny Graves or Jennings L.

13  Graves.

14      THE COURT:  And does the fact that your

15  brother-in-law has been previously associated with the

16  defendant's law firm, counsel's law firm, does that affect

17  your ability to be fair and impartial in this case?

18      PROSPECTIVE JUROR:  I don't think so.

19      THE COURT:  You say you don't think so?

20      PROSPECTIVE JUROR:  No, it does not.

21      THE COURT:  It does not?  You feel like you can be

22  fair and impartial?

23      PROSPECTIVE JUROR:  Yeah.  He's been retired now

24  five or six years.

25      THE COURT:  I'm going to have you return to your

1    seat.

2          (Bench conference ends.)

3          THE COURT:  Has any member of the jury panel or any

4    member of your immediate family ever had any type of personal

5    relationship with the parties?  The defendant here is Russell

6    Laffitte.  And I'm also going to ask you about his prior

7    employer, the Palmetto State Bank.  So by personal

8    relationship, I mean the following:  Are you personally

9    acquainted with, related by blood or marriage, had any

10   business dealings with, had any employment relationship with,

11   or had any stock ownership in Palmetto State Bank.  If any of

12   that, any type of personal relationship like that, please

13   stand.  I'm going to have you come forward, please.

14         (Whereupon, the following bench conference takes

15   place):

16         THE COURT:  Hello again.  Tell me about it.

17         PROSPECTIVE JUROR:  I work for a real estate --

18   well, actually, I work for a law firm.  Alysoun Eversole owns

19   the law firm out of Beaufort.  And I've been with her for a

20   year.  And she does real estate.  So we deal with Palmetto

21   State Bank and Jan Malinowski.  Also my former employer,

22   Gilbert Law Firm, who's out of Beaufort as well, real

23   estate -- I was a real estate paralegal and helped him with

24   that.  We dealt with them there and with --

25         THE COURT:  So you've had a good bit of business

1    relationship with Palmetto State Bank?

2         PROSPECTIVE JUROR:  Yes, just through mortgages and

3    stuff, real estate closings.

4         THE COURT:  Do you know anything about this

5    particular case?

6         PROSPECTIVE JUROR:  Only -- not from that

7    standpoint, only with what we've heard in the media.  That's

8    it.

9         THE COURT:  And do you have any reason you could not

10   be a fair and impartial juror?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  I'm going to send you back to your

13   chair.  That was 81.

14        MS. LIMEHOUSE:  This is substantially related to

15   loan process, specifically real estate.

16        THE COURT:  I'm going to excuse Juror 81.  I agree

17   with that.

18        (Bench conference ends.)

19        THE COURT:  I'm going to excuse Juror 81.

20        I now want to ask you about the law firm of Peters,

21   Murdaugh, Parker, Eltzroth & Detrick.  And I'm inquiring

22   whether there's any personal relationship with that law firm

23   and are you personally acquainted with that Law Firm, related

24   by blood or marriage, had any business dealings with that Law

25   Firm, had any employment relationship with that law firm?  If

1    so, please stand.

2              (No response.)

3              THE COURT:  Let the record show no one has stood.

4    You heard a long line of witnesses by both the United States

5    Attorney's Office and by the defense counsel.  Do you know

6    any member -- do you know any of those individual prospective

7    witnesses that were identified?  If so, please stand, if you

8    know any one of them.

9              I'm going to have you come forward, please.

10             (Whereupon, the following bench conference takes

11   place):

12             THE COURT:  Juror No. 119.  Yes, ma'am.  Who do you

13   know?

14             PROSPECTIVE JUROR:  League Creech.

15             THE COURT:  And these are witnesses?

16             MS. LIMEHOUSE:  For the law firm.

17             THE COURT:  How do you happen to know them?

18             PROSPECTIVE JUROR:  I used to babysit the oldest

19   daughter.

20             THE COURT:  Okay.  I'm going to excuse you.

21             PROSPECTIVE JUROR:  Okay.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR:  119 is excused.

24             THE COURT:  Juror No. 221.  Yes?

25             PROSPECTIVE JUROR:  Mary Bass Lohr's husband used to

1    work for me, but I don't know her personally.

2              THE COURT:  Mary Bass Lohr, who is that?

3              MR. AUSTIN:  She works in the law firm.

4              THE COURT:  So her husband used to work for you?

5    What kind of work do you do?

6              PROSPECTIVE JUROR:  Yes, sir.  I worked at the

7    hospital.  It was about five years ago.

8              THE COURT:  Does the fact that you knew the husband

9    of this prospective witness, and you don't know the witness,

10   affect your ability to be fair and impartial in this case?

11             PROSPECTIVE JUROR:  No, sir, not at all.

12             THE COURT:  You feel like you could be a fair and

13   impartial --

14             PROSPECTIVE JUROR:  I feel I can.

15             THE COURT:  I'm going to send you back to your

16   chair.  Thank you.

17             (Bench conference ends.)

18             THE COURT:  Ladies and gentlemen, if you are

19   selected to sit as a juror in this case, then in reaching

20   your verdict, you must be able to render a verdict solely on

21   the evidence presented at trial and in the context of the law

22   as I explain it to you in my instructions, disregarding any

23   ideas or beliefs that may have -- you may have previously had

24   about the facts or the law.  If you feel you cannot do this,

25   please stand.

1      (No response.)

2      THE COURT:  Let the record show no one has stood.

3      I have asked a number of folks already when I asked

4  about personal knowledge, have you read, watched any program

5  or listened to any podcasts about this case.  And so

6  excluding people who have already come forward and spoken to

7  me about that, has anyone read, watched any program, or

8  listened to any podcasts about the case that has not come

9  forward already?

10      (No response.)

11     THE COURT:  Let the record show no one has stood.

12     Has anyone posted anything on social media or shared

13  articles about the case with anyone?  If so, please stand.

14      (No response.)

15     THE COURT:  Let the record show no one has stood.

16  Have you or any member of your immediate family been a victim

17  of a fraudulent or dishonest scheme which resulted in a

18  significant loss of money?  If so, please stand.  If you

19  could come forward, sir.

20      (Whereupon, the following bench conference takes

21  place):

22     THE COURT:  Juror No. 173.  Yes, sir.  Tell me about

23  this.

24     PROSPECTIVE JUROR:  We had a Navy Federal Credit

25  Union.  Checks were stolen.  They were copied.  And they were

1   used to transfer money out of my account into their account.

2           THE COURT:  Okay.  And did they catch them?

3           PROSPECTIVE JUROR:  They didn't catch them but the

4   bank did reimbursement us.

5           THE COURT:  Good.  Does the fact of that experience

6   affect your ability to be a fair and impartial juror in this

7   case where there are allegations of fraud?

8           PROSPECTIVE JUROR:  I can't really say so.  I can't

9   really say that it will, in other words.  In other words,

10  we've gone away from paper checks.  We've gone away from that

11  kind of thing.

12          THE COURT:  My question is, is there anything about

13  that experience that would affect your ability to be a fair

14  and impartial juror in this case?

15          PROSPECTIVE JUROR:  I don't think so.

16          THE COURT:  Well, I don't want you to say "think".

17  Are you confident you can be fair and impartial?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  I'm going to have you return to your

20  seat.

21          Ladies and gentlemen, having heard the questions put

22  to you and the factual summary I previously provided, is

23  there any reason why you could not sit on this jury and

24  render a fair verdict based on the evidence presented to you

25  and in the context of the Court's instructions on the law?

1    If you feel like you can't be a fair and impartial juror for

2    any reason, please stand.

3            (No response.)

4            THE COURT:  Let the record show that no one has

5    stood.  Let me ask counsel to approach for a moment.

6            (Whereupon, the following bench conference takes

7    place):

8            THE COURT:  I had two prospective jurors that the

9    defendant has identified as objecting to.  Those are No. 172

10   and No. 64.  Are there any others?

11           MR. DANIEL:  No, Your Honor.

12           THE COURT:  I'm going to excuse Juror No. 172 and

13   Juror 64.

14           (Bench conference ends.)

15           THE COURT:  I'm going to excuse Jurors 172 and 64.

16   You are free to leave.

17           Ladies and gentlemen, we've got a little bit of

18   computer work to do here.  If you want to take a brief

19   restroom break or step out in the hall, just you need to stay

20   immediately around because we will need to suddenly get you

21   back in.  But if you want to stretch your legs for a minute,

22   that would be fine.

23           Counsel, 20 minutes.  Ladies and gentlemen, you can

24   be at ease for at least 20 minutes, if you want to stretch

25   for a moment, but don't leave the immediate area, because we

1    will be proceeding with jury selection in just a moment.

2              (Whereupon, a recess transpired.)

3              THE COURT:  Is the Government ready to strike?

4              MS. LIMEHOUSE:  We are, Your Honor.

5              THE COURT:  Is the defense ready to strike?

6              MR. DANIEL:  Yes, Your Honor.

7              THE COURT:  Very good.  I want to remind everyone

8    that we use the random number on the left.

9              Ms. Perry.

10             THE COURT DEPUTY:  Government?

11             MS. LIMEHOUSE:  Government strikes Juror No. 9.

12             THE COURT DEPUTY:  The Government strikes Juror No.

13   9.

14             Defendant?

15             MR. AUSTIN:  Defendant strikes 141.

16             THE COURT DEPUTY:  Is that the random number?

17             THE COURT:  Random number.

18             MR. AUSTIN:  No. 3.  Apologies.

19             THE COURT DEPUTY:  Defendant strikes No. 3.

20             MS. LIMEHOUSE:  The Government strikes Juror No. 15.

21             THE COURT DEPUTY:  Random No. 15.

22             Defendant?

23             MR. AUSTIN:  The defendant strikes Random No. 14.

24             THE COURT DEPUTY:  Defendant strikes No. 14.

25             MS. LIMEHOUSE:  Government strikes Juror No. 4.

THE COURT DEPUTY:  Government strikes No. 4.

MR. AUSTIN:  The defendant strikes No. 16.

THE COURT DEPUTY:  Defendant strikes No. 16.

MS. LIMEHOUSE:  Government strikes Juror No. 20.

THE COURT DEPUTY:  The Government strikes No. 20.

MR. AUSTIN:  The defendant strikes No. 35.

THE COURT DEPUTY:  The defendant strikes No. 35.

MS. LIMEHOUSE:  Government strikes Juror No. 21.

THE COURT DEPUTY:  Government strikes No. 21.

MR. AUSTIN:  Defendant strikes No. 36.

THE COURT DEPUTY:  Defendant strikes 36.

MS. LIMEHOUSE:  Government strikes Juror No. 22.

THE COURT DEPUTY:  Government strikes No. 22.

And the remaining strikes for the defense?  Five strikes remaining until we reach the two strikes each at the end.  Okay?  Defendant has five strikes left.

MR. AUSTIN:  No. 6.

THE COURT DEPUTY:  No. 6?

MR. AUSTIN:  Yes, ma'am.

THE COURT DEPUTY:  Okay.  You have four more.

MR. AUSTIN:  No. 109.

THE COURT:  No, random numbers.

MR. AUSTIN:  I apologize.  No. 12.

THE COURT DEPUTY:  No. 12.

MR. AUSTIN:  13.

THE COURT DEPUTY:  13.

MR. AUSTIN:  Yes, ma'am.  No. 19.

THE COURT DEPUTY:  19.

MR. AUSTIN:  Yes, ma'am.

THE COURT DEPUTY:  One more.

MR. AUSTIN:  And 32.

THE COURT DEPUTY:  32.

Now we have two strikes each remaining.  We will go one, two, one, two.

So Government?

MS. LIMEHOUSE:  Government strikes Juror No. 1.

THE COURT DEPUTY:  No. 1.

Defendant?

MR. AUSTIN:  No. 8.

THE COURT DEPUTY:  No. 8.

Government?

MS. LIMEHOUSE:  Court's indulgence.  Juror 10.

THE COURT DEPUTY:  No. 10.

One remaining strike.

MR. AUSTIN:  17.

THE COURT DEPUTY:  May I review the strikes?  The Government strikes Nos. 9, 15, 4, 20, 21, 22, 1, and 10; is this correct?

MS. LIMEHOUSE:  That's correct.

THE COURT DEPUTY:  And the defendant strikes 3, 14,

1    16, 35, 36, 6, 12, 13, 19, 32, 8, and 17.  Is this correct?

2           MR. AUSTIN:  Yes, ma'am.

3           THE COURT DEPUTY:  Would you like me to call them

4    up?

5           THE COURT:  Yes.  Please call them into the jury

6    box.

7           THE COURT DEPUTY:  As I call your number, please

8    come forward and have a seat in the jury box.

9           No. 2.

10           THE COURT:  No.

11           THE COURT DEPUTY:  Oh, I'm sorry.

12           Juror No. 205, 17, 25, 88, 93, 173, 111, 55, 60, 9,

13    6, 189, 28, 13, 5, and 200.

14           JUROR:  You said 60, not 50, right?

15           THE COURT DEPUTY:  60, yes, ma'am.

16           THE COURT:  One didn't come up.

17           THE COURT DEPUTY:  Juror No. 205, just raise your

18    hand if you are seated over there.  17, 25, 88, 93, 173, 111,

19    55, 60, 9, Juror 9.

20           THE COURT:  That's who is missing.  Juror 9.  Not so

21    easy.  We knew we were missing one.

22           Ladies and gentlemen, for those of you who have not

23    been selected, you are free to leave.  Thank you for

24    attending.

25           (Whereupon, the venire leaves.)

1    THE COURT DEPUTY:  Ladies and gentlemen of the jury,

2    please stand and raise your right hand and be sworn.

3        (Whereupon, the jury is sworn.)

4        THE COURT:  Please be seated.  Ladies and gentlemen,

5    thank you for your patience this morning.  And I'm going to

6    provide you some -- opening instructions on your duties as a

7    juror.  And just so you know the lay of the land, after I do

8    my opening charge, we are going to break for lunch.  And what

9    we are going to do is, we are going to bring in lunch every

10   day for you.  And you will be in this adjacent courtroom.

11   Y'all will have where the jury -- I spread you out a little

12   bit.  You obviously can see we are very COVID conscious

13   around here.  I know each of you are here as being good

14   citizens.  And I want to protect you in every way that I can.

15       So let me provide you the opening charge.  Members

16   of the jury, I will now give you some preliminary

17   instructions to guide your participation in this trial.  It

18   will be your duty to find the facts from all the evidence in

19   the case.  To those facts you must apply the law as I give it

20   to you at the conclusion of the trial.  You must follow the

21   law as I give it to you whether you agree with it or not.

22   And you must not be influenced by any personal likes,

23   dislikes, opinions, or sympathy.  That means you must decide

24   the case solely on the evidence before you and according to

25   the law.  You must not read into anything I may say or do

during the course of the trial as any suggestion of what
verdict you should return.  That is a matter entirely for you
to decide as members of the jury.

Let's talk about the types of evidence for a second.
You will decide the facts from the evidence.  The different
types of evidence which may be presented in this case and
from which you are to decide the facts consist of the
following:  First, the sworn testimony of witnesses, both
from direct examination and cross-examination, regardless of
whether the Government or the defendant calls the witness;
secondly, you will see exhibits that will be received into
evidence; and finally, any facts to which the lawyers will
stipulate, and that means they agree to it.

Let's talk about what is not evidence.  You may
consider only the testimony and exhibits received into
evidence.  Certain things are not evidence and you may not
consider them in deciding what the facts are.  I will list
those for you now:  Arguments and statements by lawyers are
not evidence.  The lawyers are not witnesses.  What they say
in their opening statement, closing arguments, and at other
times is intended to help you interpret the evidence, but it
itself is not evidence.  If during the course of the trial
the facts as you remember them differ from the way the
lawyers have stated them, your memory of the facts controls.

Secondly, questions and objections by lawyers are

not evidence.  Attorneys have a duty to their clients to object when the attorneys believe a question is improper under the Rules of Evidence.  Don't hold it against the lawyers.  They are doing their job.  You should not be influenced by the objection or the Court's ruling on it. Should the Court rule adversely, just put it aside.

Third, testimony that may be excluded or stricken and that you may be instructed to disregard is not evidence and must not be considered.  In addition, if testimony or exhibits are received into evidence only for a limited purpose, and I will explain that to you at the time, you must follow the limiting instruction that I give.

And, finally, anything you may see or hear when the court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Let's talk a moment about the difference between direct and circumstantial evidence.  There are two kinds of evidence, direct and circumstantial.  Direct evidence is the direct proof of a fact, such as testimony of an eyewitness.

Circumstantial evidence is indirect evidence of a fact that is proof of a chain of facts from which you could find that another fact exists, even though it has not been proven directly.  It is for you to decide whether a fact has been proven by circumstantial evidence.  In making that decision, you must consider all the evidence in light of

1    reason, common sense, and experience.

2         You are entitled to consider both direct and

3    circumstantial evidence.  The law permits you to give equal

4    weight to both, but it is for you to decide how much weight

5    to give to any evidence.

6         Let's talk a moment about the credibility of

7    witnesses.  In deciding what the facts are, you must consider

8    all the evidence.  In doing this, you must decide which

9    testimony to believe and which testimony not to believe.  You

10   may disbelieve any and all parts of any witness's testimony.

11        In making that decision, you must take into account

12   a number of factors.  Let me list some of these.  Was the

13   witness able to see or hear or know the things about which

14   that witness has testified?  Secondly, how well was the

15   witness able to recall and describe those things?  Third,

16   what is the witness's manner while testifying?  Fourth, does

17   the witness have an interest in the outcome of the case or

18   any bias or prejudice concerning any party or any matter

19   involved?  Fifth, how reasonable is the witness's testimony

20   considered in light of all the evidence in the case?  Sixth,

21   was the witness's testimony contradicted by what the witness

22   has said or done at another time or by the testimony of other

23   witnesses or by other evidence?

24        In deciding whether or not to believe a witness,

25   keep in mind that people sometimes forget things.  You need

1    to consider whether a contradiction is an innocence lapse of

2    memory or an intentional falsehood.  And that may depend on

3    whether the contradiction has to do with an important fact or

4    only a little, small detail.  In the end, you the jury must

5    decide whether to believe a witness's testimony.  And you may

6    use some of the factors I just described in reaching that

7    decision.

8            Number of witness, the weight of the evidence

9    presented by each side does not depend on the number of

10   witnesses testifying on one side or the other.  You must

11   consider all the evidence in the case.  And you may decide,

12   for instance, that the testimony of a smaller number of

13   witnesses on one side has a greater weight than a larger

14   number of the other, or vice-versa.

15           Burden of proof, this is important.  You must

16   presume the defendant is innocent of the charges, of the

17   crimes charged.  The Government has the burden of proving

18   that the defendant is guilty beyond a reasonable doubt.  And

19   if it fails to do so, you must find the defendant not guilty.

20   Thus, while the Government's burden of proof is a straight or

21   heavy burden, it is not necessary that the defendant's guilt

22   be proven beyond all possible doubt.  Instead, it is a

23   requirement that the Government prove the defendant guilty

24   beyond a reasonable doubt.

25           Now let me briefly give you some instructions on the

law.  In this case, the defendant, Russell Lucius Laffitte,
is charged with six offenses.  In Count 1, the defendant is
charged with conspiracy to commit wire fraud and bank fraud.
The Government alleges that the defendant was involved in a
conspiracy with a bank customer to fraudulently obtain money
and property from the bank's customers, personal injury
clients, through false pretenses, representations, and
promises.

In Count 2, defendant is charged with a substantive
offense of bank fraud.

In Count 3, defendant is charged with a substantive
offense of wire fraud.

In Counts 4, 5 and 6, the defendant is charged with
the substantive offense of misapplication of bank funds.

These charges, ladies and gentlemen of the jury, are
simply allegations, which the defendant denies.  The
defendant is presumed to be innocent.  And the Government has
the burden of proving the defendant guilty beyond a
reasonable doubt.

Now, let me talk a little bit about the conduct of
the jury.  You as jurors must decide the case solely on the
evidence presented here within the four walls of the
courtroom.  This means that during the trial, you must not
conduct any independent research about the case.  In other
words, you should not consult dictionaries or reference

1   materials, should not search the Internet, websites or blogs,

2   should not use any other electronic tools, such as social

3   media platforms, to obtain information about this case or

4   help you decide the case.  Please do not try to find out

5   information from any source outside the confines of the

6   courtroom.  You should avoid all media coverage during your

7   jury service.  That includes newspapers, TVs, or any other

8   source.

9          Let me say something, folks.  We have excellent

10  lawyers in this case.  They will give you all the facts that

11  are appropriate for you to consider when weighing the

12  evidence.  You've got the best seat in the house.  Okay?

13  Nobody else is going to have it any better than what you have

14  right here.

15         You may not discuss this case with anyone.  Now, let

16  me say this.  You are going to go home and your significant

17  other or friends are going to say, oh, my goodness, tell me

18  about the case.  Here's your answer, the judge told me I

19  couldn't talk about it.  Okay.  Blame me.  Everybody else

20  does.  Okay?  I'm glad to take the blame.  When the case is

21  over, you can share it to your heart's content.  But we don't

22  want anyone saying anything to you or influencing you in any

23  way.  I want you to get your information right here in the

24  courtroom.  That's where you will make.

25         You should also not discuss the case with your

1    fellow jurors.  Now, this may seem a little

2    counter-intuitive, but what we don't want you to do is to

3    hear the first witness and go back and decide among

4    yourselves the person is not guilty or guilty.  That's just

5    not -- you need to hear all the evidence in the case.  And so

6    I don't want you talking with your fellow jurors about the

7    case until you retire to deliberate at the end of the case.

8         And the purpose of this rule is to keep you from

9    committing yourself to a particular position before you've

10   heard all the evidence.  You need to keep an open mind until

11   all the evidence is in and you start your deliberations at

12   the end of the evidence.

13        After you retire to deliberate, you may begin

14   discussing the case with your fellow jurors.  But you cannot

15   discuss the case with anyone else until you have returned a

16   verdict and the case is at an end.  If anyone, anyone should

17   try to talk to you about the case, bring it to my attention

18   promptly.

19        I know that many of you use cell phones, the

20   Internet and other tools of technology.  You must not talk to

21   anyone about the case or use the tools to communicate

22   electronically with anyone about the case until you have

23   returned a verdict and the trial is over.  No Facebook, no

24   Instagram, none of that.  You all need to put it aside.  When

25   it's over, you are free to do all the talking and sharing

1   that you wish.  As I mentioned earlier, this includes your

2   family and friends.  You may not communicate with anyone

3   about the case on your cell phone, through e-mail, or text

4   messaging, or by way of any social networking website or app,

5   including Facebook, Twitter, LinkedIn, Instagram, Tumbler,

6   Snapchat, TikTok, and YouTube.

7           During the trial you may take notes if you wish.  I

8   know that my courtroom deputy's already provided you pads.

9   But if you do, you must leave them in your chair when you

10  leave the courtroom at the end of the day and in the

11  deliberation room at the end of the trial.  Remember, these

12  notes are for your personal use only.  They are not to be

13  given to anyone else.  And in the deliberations, you

14  shouldn't show them to say, well, here's the evidence.  Those

15  are for your use and your recollections.

16          Finally, do not form any opinion until all the

17  evidence is in.  Keep an open mind until you start your

18  deliberations at the end of the case.

19          Ladies and gentlemen, you were selected because

20  these lawyers thought you could be fair and impartial.  They

21  have reviewed your questionnaires.  They had -- many of them

22  had encountered you when you came up to talk to me.  And they

23  selected you because they knew you could be fair and

24  impartial.  And I have every confidence you could fulfill

25  their expectations.

The trial will begin after lunch.  What we will do is we are going to break for lunch.  And then after lunch, it will begin with each side making an opening statement.  I want to remind you that an opening statement is neither evidence nor argument.  It is an outline of what the party intends to prove.  And it is offered to help you follow the evidence.

After the opening statements, the Government will present its witnesses.  And the defendant may cross-examine them.  Then the defendant may present his witnesses.  I want to emphasize "may" because the defendant has no duty to prove his innocence.  Only the Government has the burden to prove that the defendant is guilty beyond a reasonable doubt.  If the defendant does choose to present witnesses, the Government may cross-examine them.

Finally, after the evidence is presented, the parties will make their closing arguments to summarize and interpret the evidence for you.  And I will give you instructions on the law.  You will then deliberate on your verdict.

The parties estimate this trial will take approximately two weeks.  I told you at the beginning, I'm going to push them harder than that.  Y'all's time and the Court's time is important.  We will get through it, but we've got to take the time necessary.  We are going to start every

1   morning at nine o'clock.  Now, that means you need to get

2   here, because if one juror doesn't show up, we can't start.

3   So it's important that you come here a little early.  We will

4   take a morning break.  We will take a lunch break.  We will

5   take an afternoon break.  And we will stop each day between 5

6   and 6 p.m.  I generally will do it based on -- you know, I

7   don't want to leave in the middle of a witness if I can avoid

8   that, I would like to get to the end of that witness.  So we

9   are going to take the break now.  And when we return, we will

10  begin with opening statements.

11          So, Ms. Perry, if we can lead out the jurors.  And I

12  believe we want to flip off the -- very good.  They will lead

13  you out now.  You are going to go to that door.

14          (Jury leaves open court at 12:15 p.m.)

15          THE COURT:  Okay.  We will be seated just for a

16  moment.  Any objection to the opening charge from the

17  Government?

18          MS. LIMEHOUSE:  Not from the Government.

19          THE COURT:  From the defense?

20          MR. DANIEL:  Not from the defense, Your Honor.

21          THE COURT:  Very good.  Folks, we had talked

22  yesterday about exhibits that you may want to stipulate in.

23  Where are y'all on that?

24          MS. LIMEHOUSE:  We have made substantial progress,

25  Your Honor.  Mr. Holliday is going to be calling the first

1   witness.  And we intend to move in to admit a bunch of

2   exhibits in advance of his direct examination.  I can go

3   ahead and do it now if Your Honor prefers.

4        THE COURT:  Well, I think I ought to do it in front

5   of the jury.  But we will do it after the opening statement.

6   I want you to remind -- sometimes we all get moving and

7   you've got -- are these only your exhibits or are they Mr.

8   Daniel's exhibits be as well?

9        MS. LIMEHOUSE:  They have some as well that we've

10  also agreed to admission.

11       THE COURT:  Mr. Daniel, you will be prepared to move

12  those into evidence?

13       MR. DANIEL:  Yes, Your Honor.

14       THE COURT:  Okay.  Very good.  We are going to take

15  an hour break for lunch.  And we will be back at 1:15 for

16  opening statements.

17       MS. LIMEHOUSE:  Thank you, Your Honor.

18       (Luncheon recess was taken.)

19       (Whereupon, a bench conference takes place off the

20  record.)

21       THE COURT:  I am told that one of our jurors has

22  revealed that she has a boyfriend who is having surgery in

23  the morning and he doesn't really have transportation.  And

24  she's all -- didn't think she was going to be selected.

25  People drive me crazy.  What do we want to do?  I feel like

1    we need to let her go, because, otherwise, she's going to be

2    all stressed out about this.  What do you think?  I want to

3    consult with y'all.

4            MS. LIMEHOUSE:  I don't know that we have a choice.

5            THE COURT:  I don't know that we really have a

6    choice.

7            MR. HOLLIDAY:  That's why we chose four, needed

8    three.

9            THE COURT:  It's not a good start.  One day we are

10   going to look back and say we should have kept her.

11           MS. LIMEHOUSE:  Please don't tell me that.

12           THE COURT:  Okay.

13           MR. HOLLIDAY:  Is there a way first thing tomorrow

14   we couldn't delay by an hour and accommodate her?

15           THE COURT:  It's surgery, yeah, he's having surgery.

16   I don't know any solution, practical solution.  You want me

17   to send a marshal to give him a ride?  Okay.  I'm going to

18   tell her.  Crystal, you can excuse her.

19           THE COURT DEPUTY:  Okay.  Let her go now?

20           THE COURT:  Yes.  Yes.

21           MR. DANIEL:  Judge, if we could have two seconds.

22           (Whereupon, the bench conference ends.)

23           THE COURT:  Okay.  I understand that defense counsel

24   has an issue it needs to raise.

25           MR. DANIEL:  Your Honor, we just have a couple of

1  housekeeping matters.

2          THE COURT:  Go right ahead.

3          MR. DANIEL:  Yes, Your Honor.  The first is the

4  sequestration of witnesses, both sides have agreed on, agreed

5  to.  And I mentioned to the Court yesterday, some of the

6  lawyers who represent witnesses were not here yesterday.  And

7  they are -- some of them are in the courtroom.

8          THE COURT:  You want me to say what I said

9  yesterday?

10         MR. DANIEL:  Yes, Your Honor.

11         THE COURT:  Well, let me just make it very clear

12 that sequestration is based on the principle that witnesses

13 do not know what other witnesses have testified to and what

14 exhibits had been admitted previously.  And counsel who may

15 be representing witnesses are specifically instructed not to

16 share any information with your clients or anyone else

17 regarding information that you may glean while sitting in the

18 courtrooms.  I'm talking, of course, about sequestered

19 witnesses.  You cannot share any information with them or

20 provide it to someone else to share it with them.  They are

21 sequestered for a reason.  Is that satisfactory, Mr. Daniel?

22         MR. DANIEL:  Yes, Your Honor.

23         THE COURT:  What else?

24         MR. DANIEL:  Second matter, as the Court is well

25 aware, Mr. Gressette and I have reached accommodation on the

1  additional redactions that the bank requested.  And Mr.

2  Gressette was going to get those, the redacted copies to the

3  Court this morning in an e-mail.  For some reason, he hadn't

4  gotten there yet.  I'm very confident Mr. Gressette will have

5  them.  But Mr. Austin is going to need to use them for the

6  first cross.  So that's probably likely to be the first

7  witness that comes up.  But we will have time, I believe.  We

8  will try to remind Mr. Gressette by e-mail.

9       THE COURT:  Get over here?  Tell him I sent for him.

10       MS. LIMEHOUSE:  I will note, Your Honor, we were

11 copied on communications about these redacted minutes.  We

12 have not agreed to their admission yet.  We are going to have

13 to review them, but we can do that during the

14 cross-examination.

15       THE COURT:  Very good.  Thank you.

16       MR. DANIEL:  One final thing, Your Honor, in terms

17 of masks, while the respective sides are seated at their

18 table, is it okay to take off the mask?

19       THE COURT:  Here's the problem.  If you are

20 speaking, you leave the mask -- you take the mask off.

21 Otherwise, you need to keep the mask on.  I want everyone to

22 be well, including my counsel.  Okay?  We are all sitting in

23 one room close.  Then ventilation in this courthouse is not

24 great.  And I want to keep everybody safe.  I want us to get

25 it to the end and be healthy when we do it.  Okay?

1          Mr. Austin, yes.

2          MR. AUSTIN:  We originally intended to call Ms.

3   Susie Laffitte and her daughter Carter Laffitte.  And we are

4   not going to call them anymore.  They are in the courtroom

5   here.  So we would ask that they not be --

6          THE COURT:  No one is subject to sequestration who

7   will not be called.  But once you allow them to sit in here,

8   they are struck at witnesses.  Fair enough?

9          MR. AUSTIN:  Fair enough.

10         THE COURT:  Are we ready?

11         MS. LIMEHOUSE:  We are, Your Honor.

12         THE COURT:  Defense is ready?

13         MR. DANIEL:  Yes, Your Honor.

14         THE COURT:  Bring in the jury.

15         (Whereupon, the jury returns to open court at 1:27

16  p.m.)

17         THE COURT:  Please be seated.  Opening statements by

18  the Government.

19         MS. LIMEHOUSE:  May it please the Court.  Absolute

20  power corrupts absolutely.  This case is about one of the

21  most powerful man in Hampton County, the defendant, Russell

22  Laffitte, the former CEO of the Palmetto State Bank and how

23  he conspired with another powerful man in Hampton County,

24  Alex Murdaugh, a former personal injury attorney, conspired

25  to steal nearly $2 million from Murdaugh's personal injury

clients, clients to whom Laffitte owed an independent duty to

protect their funds.

And this case is also about the cover-up of that

conspiracy.  In July of 2021, when Murdaugh's world was

completely unraveling, you will see how Laffitte moved money

around to cover up their conspiracy.  Laffitte wired $350,000

in bank funds to an attorney to whom Murdaugh owed money.

Six weeks later, Laffitte transferred $400,000 of bank funds

into Murdaugh's personal bank account to cover his more than

$367,000 in overdraft.  Laffitte then tried to make the

$750,000 in bank funds look like a legitimate loan to

Murdaugh to renovate his beach house, knowing that those

funds had been used for other purposes.

About a month later, Murdaugh's former law firm

discovered that he had stolen his client's money.  And when

the law firm exposed Laffitte's role in the conspiracy,

Laffitte paid Murdaugh, Murdaugh's former law firm, $680,000

in bank funds.

Let's start with the scheme to steal money from

Murdaugh's personal injury clients, charged in Count 1 of the

indictment.  Laffitte used to run the Hampton branch of the

Palmetto State Bank.  Alex Murdaugh used to be a personal

injury attorney at a law firm called Peters, Murdaugh,

Parker, Eltzroth & Detrick.  Yes, it's a mouthful.  So we

will call it PMPED or just the law firm.

1     Murdaugh and the other law partners banked at

2     Palmetto State Bank.  And Laffitte was Murdaugh's point of

3     contact, and really served as Murdaugh's personal banker.

4     You will hear about exactly what types of cases the law firm

5     works on.  But, essentially, when someone is injured in an

6     accident, they hire the law firm to sue the people that are

7     responsible for their injuries, tire and automobile

8     manufacturers, and the people that caused those injuries.

9     Laffitte served as a personal representative and a

10    conservator for some of these clients.

11    You will hear exactly what a personal representative

12    and a conservator is and does.  But, essentially, it's

13    someone who is appointed by the probate court to look after

14    the money that is received by those clients.  Now, most of

15    those clients were Murdaugh's clients, Hannah and Alania

16    Plyler, Hakeem Pinckney, Natasha Thomas and Arthur and Donna

17    Badger.

18    One other name you will hear is Malik Williams.  He

19    was also a client of the law firm, but his lawyer was not

20    Murdaugh.  So why will you hear his story?  Because a lot of

21    the evidence will point to Russell Laffitte's personal

22    involvement.  And to the extent Murdaugh was involved in the

23    other cases, he wasn't involved in Malik's case.  We submit

24    that this evidence will show that Laffitte was a knowing and

25    willing participant in this scheme, often making the

1    decisions on exactly what to do with the money.

2          So how does a successful bank executive get involved

3    in a scheme to steal nearly $2 million?  It all started with

4    Hannah and Alania Plyler.  Hannah and Alania Plyler were two

5    sisters who were involved in a horrific accident in 2005 when

6    their mother's Ford Explorer had a tire failure.  At the time

7    Alania was 12 and Hannah was 8.  Their mother and brother

8    were both killed in a car accident.  And they hired Murdaugh

9    to represent them.  They both received millions of dollars in

10   settlement funds in 2009, when Alania was 16 years old and

11   Hannah was 12.

12         Since they were so young, Laffitte was appointed to

13   serve as the conservator to manage those settlement funds

14   until they turned 18.  In the summer of 2011, Laffitte began

15   engaging in self-dealing by loaning himself money at

16   favorable interest rates out of Hannah's conservatorship

17   account.

18         In July of 2011, Laffitte loaned himself the first

19   $225,000 from Hannah's settlement funds.  Laffitte continued

20   to extend himself loans from the account totaling $355,000.

21   You will see Laffitte's bank records which demonstrate how

22   Laffitte used the loans he paid himself to pay off personal

23   loans he had obtained at another bank, loans he'd obtained at

24   a much higher interest rate.  And he also used Hannah's money

25   for his own personal benefit, including to put a pool in and

for home improvements.

Laffitte not only gave himself loans from Hannah Plyler's conservator account, but he also extended Murdaugh loans unsecured from the account.  A few months after Laffitte gave himself that first $225,000 loan, he loaned Murdaugh $90,000.  At the time Murdaugh's bank account had a negative balance, which you will hear me call "overdraft." Laffitte transferred the money from Hannah Plyler's conservatorship account to cover Murdaugh's overdraft.  This pattern repeated itself over and over again for the next nearly three years.

Murdaugh's account would be a negative or near zero, and Laffitte would transfer money from Hannah Plyler's conservator account to cover that overdraft.  You will see e-mails between Laffitte and Murdaugh outlining how Laffitte would transfer the money when Murdaugh was in overdraft status.

Over the course of the nearly three years, Laffitte gave Murdaugh 16 unsecured loans totaling more than $950,000 from Hannah's money.  This whole time Hannah was just a teenager.  She had no idea, and neither did her big sister, Alania.

Now, Hannah's account was not the only conservator account that Laffitte used to give Murdaugh unsecured loans. Laffitte also transferred money from Malik Williams's

account.  Malik Williams was injured in a car accident and
hired another partner at the law firm to handle his lawsuit.
Williams obtained a relatively small settlement.  And
Laffitte was appointed to serve as a conservator over those
funds.  Laffitte transferred $40,000 from Malik's account.
And within weeks, Murdaugh spent it.

Now, there's no evidence in the probate files that
Laffitte sought or obtained approval from the probate court
before extending the loans to himself or to Murdaugh.
Instead, these loans were buried in the annual accounting
filed at the end of the year with stacks of documents.

But most importantly, the indictment does not allege
that the loans themselves, although questionable, were
illegal.  What leads to the criminal charges is how they were
paid off.  Even if you can loan yourself or someone else
money from a conservatorship account that you manage, you
cannot steal other people's money to pay those loans back.
Let me say that again.  We are here today because you cannot
steal people's money to pay back loans.

This is where Natasha Thomas and Hakeem Pinckney and
Arthur and Donna Badger come into the story.  Natasha Thomas
and Hakeem Pinckney were involved in a car accident in 2009.
You will hear from Natasha.  And she will tell you how she
suffered some pretty bad injuries as a result and how her
cousin, Hakeem Pinckney was rendered a quadriplegic.  Hakeem

later died following the accident. Laffitte was appointed to serve as both Pinckney and Thomas's conservators. Pinckney and Thomas both obtained large settlements following the resolution of those civil claims.

But rather than manage the money in conservatorship accounts, like he did for the Plyler girls, the evidence will show that Laffitte and Murdaugh stole the money. Laffitte signed disbursement sheets, the document that outlines exactly where those settlement funds are supposed to go, showing that Natasha Thomas and Hakeem Pinckney were supposed to receive 325,000 and about $310,000 respectively.

Murdaugh delivered the settlement checks to Laffitte. The memo lines on those checks showed that they were for settlement proceeds for Natasha Thomas and Hakeem Pinckney. But rather than deposit the money into their conservatorship accounts, Laffitte combined the two amounts and then wrote out money orders and checks to people totally unrelated to Hakeem Pinckney and Natasha Thomas. For example, Laffitte issued $100,000 money order to his father, Charlie Laffitte. He also issued a money order for nearly $330,000 to Murdaugh's father. They then diverted thousands of dollars in cash back and to Murdaugh's now-deceased wife in additional money orders.

But Laffitte not only used the funds for their personal purposes, he also used over $180,000 of Natasha and

Hakeem Pinckney's money to pay back the loans that he had
extended from Hannah Plyler's conservatorship account, all to
cover his tracks.

Laffitte issued all of these money orders from
Pinckney and Thomas's settlement funds on the same day,
December 21st, 2011.  The next day, December 22nd, 2005,
he -- 2011, he filed paperwork with the probate court
requesting that he be discharged from his role as
conservator, and indicating that there were no funds in the
conservatorship accounts.

Laffitte later converted a third settlement check
intended for Natasha Thomas totaling over -- a little over
$25,000.  And you would see how they cut the check into
smaller amounts, a technique called structuring so the bank
would not notice the large amount and become suspicious.

All this was not enough.  Laffitte didn't just do
this with Natasha Thomas or Hakeem Pinckney's money.  He did
it with the Arthur Badger's money as well.  Arthur Badger and
his wife Donna were involved in a terrible accident in 2011.
Arthur was driving when he collided with a UPS truck as it
was taking a left turn when he attempted to pass.  Arthur
lived, but his wife Donna died shortly after the accident,
leaving behind their six children who ranged in ages from 3
to 15.

Murdaugh asked Laffitte to serve as the personal

representative of Donna Badger's estate. Not long after the settlement was reached, Laffitte and Murdaugh exchanged e-mails, planning how to cut up Arthur's settlement money. Murdaugh e-mailed Laffitte and asked Laffitte to e-mail him and request that the law firm re-cut the settlement check. Laffitte then sends Murdaugh a separate e-mail, asking that the check be divided up according to Laffitte and Murdaugh's math. Murdaugh then forwarded Laffitte's e-mail to law firm staff. After receiving the e-mail from Laffitte, the personal representative, the law firm then issued new settlement checks. Thereafter, Laffitte negotiates these checks for his and Murdaugh's benefit, over $151,000 goes to pay off the unsecured loans he extended to Murdaugh from Plyler's conservatorship account. $388,000 goes to Johnnie Parker, another lawyer at the law firm, to pay back another one of Murdaugh's personal loans. And $75,000 goes to Murdaugh's father.

A few months later, more of Arthur Badger's settlement funds are negotiated. You will hear exactly where this money goes. But, again, hundreds of thousands of dollars, Laffitte deposits into Hannah Plyler's conservatorship account to pay off the unsecured loans that he gave Murdaugh. Laffitte also deposited more than $80,000 into Murdaugh's personal bank account at Palmetto State Bank.

Laffitte wired settlement funds to purchase large

1   equipment and to buy cars, and gave Murdaugh thousands of

2   dollars in cash back.

3          One of the checks used to pay off Hannah Plyler's

4   loans is the subject of Count 2.  And one of the checks

5   deposited into Murdaugh's personal bank account is a subject

6   of Count 3.

7          Now, why would Laffitte do all of this for Murdaugh?

8   Because Laffitte made hundreds of thousands of dollars to do

9   it.  Not only did he give himself hundreds of thousands of

10  dollars in loans at favorable interest rates from Hannah

11  Plyler, but he also collected more than $400,000 in

12  conservator and personal representative fees.  Laffitte used

13  his position as personal representative and conservator to

14  enrich himself.  Laffitte made over $250,000 in conservator

15  fees just for managing the Plylers' conservatorship accounts.

16         But most notably, Laffitte made $35,000 from Arthur

17  Badger, $15,000 from Natasha Thomas, and $60,000 from Hakeem

18  Pinckney.  Yet, he never even met them in his capacity as

19  their conservator or personal representative.  And he never

20  managed any money for them.  Instead, he used nearly $2

21  million in their settlement proceeds for his and Murdaugh's

22  personal benefit.

23         Now, Laffitte cannot reasonably claim that he did

24  not know the checks he negotiated belonged to Natasha Thomas,

25  Hakeem Pinckney, or Arthur Badger.  Pay close attention to

the details.  You will hear that Laffitte knew exactly when and how the law firm paid Murdaugh in salary and bonuses. You will see each one of these financial transactions.  And you will see how the checks paying Laffitte's PR and conservator fees, fees he used to personally enrich himself and payoff his loans to Hannah Plyler, were drafted in the exact same way as the stolen settlement proceeds.  You will see how Laffitte and Murdaugh communicated about these financial transactions.

And, remember, Laffitte owed a duty to protect each of those individual settlement funds.  And he was collecting hundreds of thousands of dollars to do it.

Murdaugh was a lawyer.  You may hear testimony that when Laffitte was acting as a personal representative, he stood in the shoes of the personal injury client.  But Laffitte cannot reasonably claim that he did any of this because he relied on Murdaugh as his lawyer.  Pay close attention to the timeline.  Ask yourself, if Laffitte claims to have not known that the checks belonged to Natasha Thomas or Hakeem Pinckney or Arthur Badger, how can he claim to be relying on Murdaugh as their attorney when he negotiated those checks?  And common sense tells you that you cannot rely on a lawyer to steal other people's money, especially when you owed a duty to those individuals and were collecting hundreds of thousands of dollars in fees.

The evidence will show that the whole point of Laffitte's role as a personal representative and a conservator was so that they could steal money, not a legitimate attorney-client relationship.

Now, you heard how the Badger, Pinckney, and Thomas money was used to pay off some of the loans from Hannah Plyler's conservator account. But in 2015, Hannah Plyler was turning 18 and her conservatorship had to be closed. But at the time, both Laffitte and Murdaugh owed hundreds of thousands of dollars on those loans.

So how did Laffitte pay those loans back? He first reduced the amount he owed on those loans by the amount he claimed he was due by serving as her conservator. Laffitte then asked Johnnie Parker, a partner at the law firm, to loan him $245,000. He used that loan to pay off the Plyler loans. And he's still paying off that loan to Johnnie Parker today.

When Hannah was turning 18, Murdaugh owed over $284,000 on the loans, exactly $284,787.52. But Murdaugh did not have the money to pay her back. In fact, he was overdrafted on his personal account by more than $85,000. Laffitte extended him a $500,000 line of credit of bank money for purposes of farming. He then issued a cashier check from that line of credit in the exact same amount Murdaugh owed Hannah. And then he transferred the money into Hannah Plyler's conservatorship account to pay off the loans. This

1   $284,787.52 from the line of credit for purposes of farming

2   is the subject of Count 6.

3           You will hear testimony about how in 2015,

4   Laffitte's role and trajectory in the bank change.  His

5   changing role changed the conspiracy.  But with more power

6   came more problems.  And that takes us to the cover-up.

7           By the summer of 2021, Murdaugh had been defending a

8   lawsuit related to the death of a young girl following a

9   boating accident while his son was allegedly driving.

10  Murdaugh's finances had been under intense scrutiny.  The law

11  firm was concerned that Murdaugh had been hiding fees.  And

12  on June the 7th, a law firm employee confronted Murdaugh

13  about missing fees from one of his cases.  That night,

14  Murdaugh's wife and son were murdered on his farm.

15          Within a week of the murders, Murdaugh is

16  overdrafted on his personal account at Palmetto State Bank by

17  thousands of dollars yet again.  The evidence will show that

18  Murdaugh's life was completely unraveling.  Within weeks,

19  Murdaugh went to Laffitte in need of money.  But by now,

20  Murdaugh is overdrafted on his personal account by more than

21  $162,000.  And he's maxed out on his line of credit.

22          On July 15th, 2021, Laffitte wired Chris Wilson, a

23  lawyer in Bamberg, South Carolina, $350,000 of bank money at

24  Murdaugh's request.  Laffitte then started the process of

25  trying to secure a second mortgage on Murdaugh's beach house

1  in Edisto.  But the beach house was also in Murdaugh's wife's

2  name.  And the house could not be used to secure a loan until

3  her estate had been probated.  In the meantime, Laffitte

4  continued to allow Murdaugh to overdraw on his account by

5  hundreds of thousands of dollars.  Each day that Murdaugh

6  wrote a check from the overdrafted account, the funds

7  appeared on a nonsufficient funds report.  And Laffitte

8  approved the payments of the funds from that account.

9          Over the next six weeks, Murdaugh's overdraft status

10 deepened.  But Laffitte continued to approve payments from

11 the account, including cash back, check to a man named Curtis

12 Eddie Smith, legal fees, and miscellaneous expenses.

13         By August the 9th of 2021, Murdaugh was more than

14 $367,000 in overdraft.  And on that morning, the morning of

15 August 9th, 2021, a concerned Board member from the bank,

16 Norris Laffitte, e-mailed Laffitte and other bank employees,

17 and asked them to prepare a summary of the bank's total

18 exposure with respect to Murdaugh.  Within about an hour of

19 receiving that e-mail, Laffitte transfers $400,000 in bank

20 money to Murdaugh's account to cover the overdraft.

21         Laffitte then directs other bank employees to

22 prepare a loan for $750,000, the total between the $350,000

23 wire to Chris Wilson and the $400,000 to cover his overdraft.

24 Laffitte directed the bank employees to backdate the loan

25 paperwork to July 15th, the date of the first wire transfer.

You will then hear how Laffitte presented this loan
to the bank's Board of Directors as a second mortgage on the
beach house for purposes of renovations, knowing that the
funds had been used to pay off a lawyer and to cover his
overdraft.

You will hear about Palmetto State Bank bylaws and
policies.  These bylaws and policies will talk about the
Executive Committee.  You will learn in detail about the
Executive Committee.  But it's essentially a committee of the
bank tasked with approving loans over a certain amount.  The
this loan, beach house loan, was not properly presented to or
approved by the Executive Committee.

And to the extent you hear testimony that the loan
was approved by Laffitte, Laffitte's father and the chairman
of the Board, Charlie Laffitte, and his sister, Gray
Henderson, three members of the Executive Committee, their
support of the loan was not approval as required under the
bylaws.  But importantly, regardless of whether his sister
and his father approved of the loan, bank employees cannot
give loans for purposes of beach house renovations if they
know that the funds were used to pay a lawyer and to cover
overdraft.  This $750,000 beach house loan is the subject of
Count 5.

Now, by the fall of 2021, Murdaugh is under
substantial public scrutiny.  Murdaugh had stolen millions of

1   dollars from one of his client's estate, Gloria Satterfield.

2   Murdaugh had asked Chad Westendorf, another bank employee, to

3   serve as a personal representative for Gloria Satterfield's

4   estate.  Now, unlike Laffitte, Westendorf did not negotiate

5   any settlement checks.  And none of the funds were ever held

6   at Palmetto State Bank.  But the bank had hired civil

7   attorneys to determine their liability, given Westendorf's

8   role as a personal representative.

9          By the end of October, the bank's Board had been

10  addressing the legal fallout from Murdaugh for weeks.  But

11  they had not yet known Laffitte's role in the conspiracy.  In

12  October, the law firm approached Laffitte about all of Arthur

13  Badger's settlement checks.  On October 28th, Laffitte met

14  with some of the lawyers from the law firm and gave them a

15  check for $680,000 to cover his tracks, money that came from

16  one of the bank's accounts.  But Laffitte is not the bank.

17         That day, October 28th, Laffitte sent the Executive

18  Committee an e-mail, telling them that he had just paid the

19  law firm $680,000, stating that he and the law firm had

20  agreed to split the loss from a settlement that Murdaugh

21  stole.

22         The next day, October 29th, Laffitte sent a similar

23  e-mail to the bank's Board telling them that "We converted

24  over $1.1 million in checks."  Laffitte did not have Board

25  approval or authority to give the law firm $680,000 before he

handed that check over.  And the law firm deposited the check into their account on October 29th, the day after Laffitte delivered it.

The Board met on October 31st and November 3rd, days after Laffitte handed the check to the law firm and days after the law firm deposited it.  After Laffitte had unilaterally paid the law firm, the Board was in damage-control mode and tried to mitigate the loss to the bank caused by Laffitte's actions.  The Board asked their attorney to try to negotiate an after-the-fact release of liability from the law firm in exchange for the $680,000 that Laffitte had paid.  But by the time the Board met on October 31st and November 3rd, the check was out the door.  And Laffitte had made it clear to the bank's attorneys that "It was not an option to not pay."

But most importantly, during these Board meetings, Laffitte did not tell the Board that the $680,000 payment represented half of the funds stolen from Arthur Badger, plus Laffitte's $35,000 personal representative fee.  Laffitte did not tell the Board that the money included more than $150,000 in Badger funds that had been deposited at the Bank of America, money that never even came to the Palmetto State Bank.  And Laffitte did not tell the Board how the Badger money had been used, to pay off the unsecured loans that he had extended Murdaugh from Hannah Plyler's conservatorship

1   account to pay off loans to Johnnie Parker, another lawyer at

2   the law firm, to buy farm equipment and cars and to pay

3   Murdaugh's wife and father.

4        The Board did not learn these details about the

5   stolen Badger funds until they learned the results of an

6   internal investigation in December of 2021, months after

7   Laffitte paid the law firm $680,000.  The Board's decision to

8   allow its lawyers to negotiate with the law firm in an effort

9   to mitigate the loss is a decision that they made completely

10  in the dark without the pertinent facts that only Laffitte

11  knew and Laffitte chose not to tell them.  The Board did not

12  and could not have knowingly ratified Laffitte's payment of

13  those bank funds.

14       You will see in the bylaws that Laffitte, as CEO,

15  did not have authority to pay this check to the law firm

16  without notice or approval from the Board.  Again, Laffitte

17  is not the bank.  And you will see in the bylaws that Charlie

18  Laffitte, the chairman of the Board, also did not have

19  authority to make the payment without notice or approval.

20  Charlie Laffitte is also not the bank.  The bank's bylaws do

21  not give the CEO or the chairman of the Board authority to

22  pay $680,000 to cover up fraud.  Laffitte's payment of the

23  $680,000 is the conduct that underlies Count 4.

24       During the trial, you will hear from the accident

25  victims, Hannah and Alania Plyler, Natasha Thomas and Arthur

1   Badger.  You will hear from the bank's Board members,

2   Laffitte's own family, lawyers from the law firm, and

3   employees from both the bank and the law firm.  You will see

4   internal bank records, e-mails between Laffitte and Murdaugh,

5   and the paper trail left by all of these financial

6   transactions.

7        You will not hear or see any evidence that minimizes

8   the actions of Laffitte's co-conspirator, Alex Murdaugh.  But

9   Murdaugh's actions do not absolve Laffitte of his own

10  responsibility for the role that he played in this

11  conspiracy.

12       And this trial focuses on Russell Laffitte.  The

13  only decision that the Court will charge you with making is

14  the guilt of the person sitting at that table, and not the

15  guilt of someone who isn't.  Russell Laffitte and his

16  co-conspirator, Alex Murdaugh, held absolute power in Hampton

17  County.  Laffitte was the CEO of the most prominent community

18  bank in town.  Alex Murdaugh was a partner in one of the most

19  prosperous law firms in the state.  Their powerful positions

20  gave them the opportunity to do whatever they wished,

21  including using money belonging to Hannah Plyler, Natasha

22  Thomas, Hakeem Pinckney, and Arthur Badger, for their own

23  personal benefit.  And their absolute corruption has brought

24  us here today.

25       Now, during the trial you will see evidence that

will answer your questions. And I will come back at the end
and I will help you to connect the dots. We appreciate your
attention and we feel confident that when you see the
evidence, you will return a verdict convicting Laffitte of
all counts charged in the indictment.

THE COURT: Opening statement by the defense.

MR. DANIEL: May it please the Court, Your Honor.

Ms. Limehouse said you cannot steal other people's
money to pay loans back. No truer words were spoken. We are
in full agreement. That is one proposition, one fact on
which we can all agree. You can't do that. Russell Laffitte
never did. Furthermore, you will see, you will learn
throughout the trial, the witnesses on that stand, the
written documentation, Russell Laffitte never received one
red cent of Alex Murdaugh's stolen money, not one plug
nickel.

Ladies and gentlemen, you met Russell Laffitte. You
met, of course, Josh Myers, our co-counsel, along with Matt
Austin. I would like you to also know that Russell's wife of
22 years, Susie, is in the audience with him, as well as his
daughter, who is a student at University of South Carolina,
who is actually doing virtual learning for the next week and
a half or so, however long this trial will last.

In addition, you've already met Ms. Todd, our legal
assistant, as well as Mr. Hamill, our paralegal. But I would

like you to also meet and know all about Dan who is sitting

over here, that masked man back there.  Dan is our computer

guru who is actually the tech expert who is loading all the

exhibits and already has, in fact, so that you will be able

to see the exhibits on your screen in a nice large fashion

rather than have to strain your eyes with some of these

fine-print documents, the legal documents, or documents from

the bank.

Now, Judge Gergel has instructed you on the law sort

of throughout, really, particularly when you were with the

panel, but then again right before we started with the

opening statements.  And you have sworn under oath to follow

that law as Judge Gergel has given it to you.  One of the

most important laws he gave to you is based on the very

fabric of our country.  And we all know what it is.  You've

heard it a hundred times.  And that is a defendant, someone

is innocent until proven guilty.  And that someone -- the

Government has to prove that someone guilty beyond a

reasonable doubt.  So you've promised us, you promised oath

to the judge, to the Court, but you've also promised us that

you would give Russell Laffitte the benefit of any doubt.

Now, as you know, another basic principle of our

country is that Russell Laffitte is not required to prove his

innocence.  He's not required to come in here and take that

witness stand.  But I tell you this, he will take that

witness stand.  He will put his hand on this Bible and he will swear to the good Lord.  And he will tell you the truth. He will tell you what happened.  And he will tell you exactly how it happened, each and every step of the way.

I couldn't keep him off that stand if I wanted to. A team of wild horses couldn't keep Russell Laffitte off that witness stand.  He's been waiting until this day to be able to tell the jury exactly what happened, just as he's told others repeatedly.  He's made mistakes.  He will tell you that.  He let documents slip by him that Alex Murdaugh slipped by him repeatedly, time and again, because he trusted Alex Murdaugh, just like the lawyers at the Murdaugh law firm trusted Alex Murdaugh, just as Alex Murdaugh slipped documents by shrewd, sophisticated lawyers, some of the best lawyers in the state of South Carolina.

So like Alex Murdaugh's law firm, they trusted, Russell Laffitte also trusted Alex Murdaugh, like so many other people, so many others.  They trust him as a lawyer, as law enforcement, assistant solicitor in Hampton County, and as a customer and community leader for over 30 years.

So I want to remind you to keep your promise throughout this trial, because it is an important sacred promise, and that you give Russell Laffitte the benefit of the doubt.  You make the Government prove it to you.  So what I mean by that?  What if I wake up in the morning, and I wake

up and read my morning newspaper, Post and Courier in my case, or I look at the news on the I-Pad or you may look at the news on the computer, and see the head lines, "Police Arrest Serial Con Man." And under that headline it says, "Stolen from the most vulnerable, the poorest of the poor." And then you see a mug shot of a despicable-looking, desperado-looking character, unshaven, disheveled. And you say to yourself, I hope he gets what's coming to him, because jail is too good for him.

But what if, on the other hand, you open that newspaper or turn on that iPad, in your daily news feed, and you get the headline this, "Local banker charged with aiding and abetting serial con man." But instead of the photo showing a disheveled, despicable desperado, it shows your next-door neighbor, the same next-door neighbor who coached your daughter's soccer team for two years, the same next-door neighbor who brought drinks and snacks to your son's football game. You might say to yourself, I don't believe it, I want to make them prove that to me, they are going to have to prove that to me, the Government has got to prove that to me beyond a reasonable doubt. And that's the doubt we are asking you to give Russell Laffitte.

Now, you are going to see throughout this trial -- and I want you to keep this in mind -- that Russell Laffitte always acted in good faith. He always acted in good faith

1   and he always acted in what he thought was the best interest

2   of the bank.

3       Now, I will give you just a little brief background

4   of Russell Laffitte.  I told you that he's going to take that

5   witness stand, and he certainly will.  So you will learn much

6   more of his background.  You will likely learn some of his

7   background through other witnesses.  So I will give you a

8   little snapshot.  51 years old, born and raised in Hampton

9   County.  Only time he ever left Hampton County was to go to

10  Newberry College for four years.  And then he returned right

11  back to Hampton County.

12      Now, interestingly enough, when Russell graduated

13  from high school, he didn't go to college.  He worked as a

14  farmer for five years.  And then his father convinced him by

15  that time to go to college.  He went up to Newberry for four

16  years, came right back home to Hampton County, and worked in

17  the Laffitte-owned family bank.  You are going to learn a lot

18  about Laffittes.  You are going to hear that throughout.

19  Because there's really two different sides of the family.

20  And you will learn, unfortunately, all about those two

21  different sides to the family.  One side actually works at

22  the bank and has worked at the bank for generations, while

23  the other side no longer wants -- no longer works at the

24  bank.  And they have sort of completely different interests

25  in the bank and with each other.

1    Now, he returned to Hampton and went to work at

2  Palmetto State Bank.  First when he went there, he worked as

3  a teller and making small car loans for used cars and

4  whatever they needed.  Eventually, the loan officer left and

5  he became the loan officer.  And from that way forward, he

6  moved himself up, worked himself up all the way to eventually

7  becoming when some of these facts occurred either the loan

8  officer or the chief operating officer of the bank.

9    And then in 2020, in 2020, after his cousin, the

10  CEO, Sterling Laffitte, passed away from pancreatic cancer,

11  Russell Laffitte was elected unanimously by the Board to

12  serve as chief executive officer.

13    Now, you are going to learn throughout this case of

14  Russell Laffitte's extensive cooperation.  But, you know, you

15  can tell the measure of a man how he, or woman, how they

16  react when they are confronted with something that's

17  completely shocking to them, whether they were complicit, a

18  conspirator on one hand, or whether they were shocked and

19  surprised and caught off guard like everyone else.

20    Russell Laffitte, when he was first contacted by the

21  lawyers over at the Parker Murdaugh law firm when all

22  this fraud -- excuse me, initiated, began, when Ronnie

23  Crosby, the lawyer called him, Russell said almost

24  immediately, but we were involved in that case.  He said, let

25  me go check the file.  And he went back and checked in the

deep records in the bank. And he learned right then. He

called Ronnie Crosby right back. He didn't think, how am I

going to cover this up? What am I going to do? How am I

going to cover my tracks? No. He caused Ronnie Crosby back

and said, you know what, it's on us. He said, I made a

mistake and we are going to be good for it. And he and

Ronnie Crosby worked up right there on the telephone of the

bank paying half and Ronnie Crosby's firm paid the other

half. So you will learn all about that.

But then in addition to working with the law firm,

and after that, he did gather additional documents for the

law firm, had additional conversations and discussions with

lawyers at the law firm, provided as much helpful information

he could to that firm, but then when the SLED agents began

their investigation, he immediately got with them. You will

hear all about that. The SLED investigation agents came to

the bank numerous times. And each time he provided helpful

information. And he went and found evidence, found

documents, found bank records going back as far as 2011 that

they didn't even know existed. And he would piece together

for them, they would figure out together, meeting after

meeting after meeting, he educated those SLED agents. And

many of the documents that you will see on the screens right

before you in evidence in this case are documents that

Russell Laffitte found in the bowels of that bank and gave to

the agents at the very outset when the investigation began.

The measure of a man when he's confronted is how he reacts. And Russell not only answered each and every question and got all these records, but he, again, pieced things together as best he could, and they pieced them together together.

But in addition to that, informal cooperation at the very start, repeatedly, day after day, week after week, as the agents were there on the ground in Hampton and at the bank, the feds -- he also agreed to meet with the feds. He was interviewed by the feds, the Assistant U.S. Attorney, the FBI, the Assistant State Attorney General, and again, additional SLED agents, in additional to the original agents, who were there, told them full story. Provided them helpful information. Answered every question. Could have plead the Fifth. He didn't plead the Fifth. He told them everything. He was an open book. He had been from the very start.

But the feds who came in the case late did not like what Russell Laffitte was telling them. And that's because it did not fit their narrative, their preconceived narrative. Because they had made up their minds and were rushing to indict.

Now, there's no denying that Alex Murdaugh's story is a captivating one, statewide, yeah, maybe even worldwide. It's the most unbelievable story anybody has ever heard. And

1    it has kept evolving day after day after day.  It's a wild,

2    crazy story.  In fact, if it were a Grisham novel, if it were

3    a John Grisham novel or movie, you would say, that could never

4    happen, that simply couldn't be true.  But it is true.

5          And, see, so in the Government's rush to hold Alex

6    Murdaugh accountable, they lumped in Russell Laffitte.  Alex

7    Murdaugh, you will see throughout this trial, tricked and

8    took advantage of Russell just as he did everyone else.

9          Now, let's talk a little bit about Alex Murdaugh.

10   Alex Murdaugh is a master manipulator and a world-class con

11   man.  That's right, a world-class con man.  I've been

12   practicing now 40-plus years.  Federal prosecutor, then a

13   state prosecutor, and then now private practice.  I've never

14   seen or come across a more complicated figure than Alex

15   Murdaugh, not in my long-time being a lawyer.

16         So you ask yourself, how did this happen?  How in

17   the world?  Well, surprisingly, part of that complicated

18   figure I told you about is, everyone trusted and many loved.

19   That's right, many loved Alex Murdaugh.  You see, for three

20   generations in Hampton County, the Murdaugh name was

21   synonymous -- it was the very same with law enforcement.

22   Because, you see, Alex Murdaugh's grandfather, Buster

23   Murdaugh, was the legendary popularly elected solicitor or

24   district attorney, just like we have here in Charleston Ms.

25   Wilson.

And not only was he the elected solicitor, he became a statewide legend, but Buster Murdaugh -- this is important part, Buster Murdaugh also practiced law part-time at the Peters Murdaugh and Parker law firm. And that's how he original got his name. So while the grandfather was elected solicitor, then Alex Murdaugh's father, Randolph Murdaugh, when Buster Murdaugh was older and served his time, he retired, Randolph Murdaugh ran as the popularly elected solicitor, was elected in a landslide, and he became the top chief law enforcement officer for the entire county, in fact, for the entire judicial circuit, the 14th Judicial Circuit.

And he too, Randolph Murdaugh, Alex Murdaugh's father, served in the powerful, prestigious Peter, Murdaugh and Parker law firm. And like his grandfather and father before him, Alex Murdaugh followed in their footsteps in the Murdaugh family tradition working at the solicitor's office and serving as a senior partner eventually in that prestigious law firm, the Peters Murdaugh and Parker firm.

Now, some people like to say that the Peter Murdaugh Parker was the best law firm in the Lowcountry. Some might argue with that. But no one would argue that they were the most successful financially in that part of the state.

And so I mentioned that Alex Murdaugh was the master manipulator. But he was also an enigma or a complicated puzzle, most complicated than most of us have ever seen and

probably you will ever hear about, as it was with me.

Because, you see, surprisingly, I told you people loved him,

he helped people in the community every day.  He was friends

with everyone, rich and poor, black and white, town folks or

country folks on the farm.  Alex Murdaugh, just like his

father and just like his grandfather, was the perfect

politician.  He never met a stranger and he was friends with

everyone.  And he was empathetic.  He really seemed to care

for people.

Interestingly enough, you will hear testimony he

knew everyone's name.  And not only did he know the adults

names and what they did for a living, he knew the children's

names.  As a matter of fact, when he would see one of the

children on the street, he would might say, Sally, wow,

congratulations, that was a great soccer match y'all had last

week, you are still undefeated, that's quite impressive.  He

might see Johnnie, Sally's brother, Johnnie, that was a tough

loss at Friday night's football game, but that's okay, you

will get them next week.

He knew and cared -- people will testify, they will

say, when Alex Murdaugh talked to you, you felt like you were

the most important person in the world.  He never looked over

your shoulder to look for someone more important to talk to.

He talked to you.  He looked in your soul.  He looked in your

heart.  And that's how he did it.  He befriended everyone.

1  And you will see, you will hear testimony from that stand,

2  the poorest of the poor, he was good friends with.  He was,

3  indeed, a very, very big personality.

4          But there was another side to Alex Murdaugh, a deep,

5  deep, dark side that no one saw, no one knew, not even his

6  closest friends, not even his family.  Alex Murdaugh, you

7  will see, fooled a lot of good, hard-working people over

8  many, many years.

9          You will hear tell about going back to 2011, there

10  will be testimony that it went back much farther than that.

11  And you will hear the testimony.  He fooled us here before, a

12  lot of good, hard-working people, including those that were

13  closest to him.

14          Over the next week and a half, you will learn just

15  how he did it.  He tricked, fooled, and stole from his

16  clients, some of the poorest of the poor.  He stole $10,000

17  from a poor client who was one of the most vulnerable poorest

18  of the poor.  He stole from his law partners, the people he

19  worked with every day.  He even stole -- by not contributing

20  his fees to the firm, he ended up even stealing from the

21  staff when it would get to annual bonuses at Christmastime,

22  because there was less in that bonus pool because he had

23  stolen already.  Stole from his closest friends.  He tricked

24  and fooled and stole from his closest friends.

25          And, yes, finally, and saddest of all, he tricked

and fooled and stole from his very family, those who loved him the most, those he was closest to, those he had lived with and knew, for his closest friends, his family and friends. Alex Murdaugh, the master manipulator, but he was an equal opportunity thief. He will be described alternately as an evil genius, but patient and cunning and brilliant.

And whether you were the chief -- excuse me, the chief financial officer at the law firm, Jeanne Seckinger, with an MBA and CPA degree, or whether you were Russell Laffitte at Palmetto State Bank, or you were one of the sophisticated, wealthy lawyers at the Parker Murdaugh firm, or poor clients who he tricked and stole from, his MO, his modus operandi, if you will, was always the same, always in a rush, always in a hurry, always came in a deadline, always wanted to stop by at lunchtime when there were very few people around. Same with the law firm, always on Friday afternoon to get somebody to slip a check in for one of his partners to sign.

You will hear testimony he created a stream of confusion. He created a stream of chaos. He created chaos everywhere he went. And he did it when he wasn't stealing. So it never seemed out of the ordinary. You will hear many witnesses say, oh, well, I'm thought it was just Alex. That's the way Alex was. That's the way Alex is. It was cunning and it was intentional and it was patient, the whole

1   time, over 30 -- overall those years.

2          He fooled everyone the same way he fooled Russell

3   Laffitte.  He fooled dozens -- no, tens of dozens of good,

4   hard-working, honest people and stole from them.  He took

5   advantage of people's good faith.  He took advantage of

6   people's honesty.  He took advantage of people's trust in him

7   because they were just good, honest people.  And he preyed

8   upon them.  And he took advantage of that trust.

9          Now, the Government paints a narrative -- has

10  painted a narrative that Russell Laffitte and Alex Murdaugh

11  were close friends.  Simply not true.  Growing up, they lived

12  right next-door to each because the Murdaugh family and the

13  Laffitte family had been friends for generations.  But Alex

14  Murdaugh was older by some 3 1/2 years of Russell.  Now, they

15  didn't -- they never played on ball teams together.  They

16  never hunted together.  They never fished together.  They

17  never played together as kids.  They never really socialized

18  together when they grew up as adults.

19         Now, they ran in different circles.  And you will

20  see, you will learn through the trial that Russell Laffitte

21  is mostly a homebody.  He works hard at the bank, comes home,

22  eats with the family, with Susie and Carter and Luke, and

23  then may go back to work, but then come right back at a

24  reasonable hour.  He's just not the kind of guy to go

25  partying around.  Alex Murdaugh, on the other hand, life of

the party, always looking for a good time, always

socializing. You could see him always "holding court,"

telling stories, because he was a big, big figure who struck,

who struck a big figure in story telling.

But Russell was close friends with his brother, best

friends with John Marvin. And you will hear. John Marvin is

going to come in here and testify. John Marvin Murdaugh were

close friends with Russell. They were the same age. THey

played on ball teams together. They hunted together. They

fished together. To this day, to this day, they are still

close friends, but they are much younger than Alex Murdaugh.

Now, Alex Murdaugh was a customer at Palmetto State

Bank, a very good customer, just like the other members of

that law firm were good customers. Good customer, just like

his father, Randolph, had been before that, just like his

grandfather, Buster, had been before that. Palmetto State

Bank, you will see, made a lot of money off of Alex Murdaugh

because they loaned him a bunch of money. Was he preferred

customer? You bet, just like any long-term customer of 30

years at Palmetto State Bank.

Simple farm folks, many struggling to make ends

meet, would come in there, go straight to Russell to get a

loan for a used car, many black people, many white people.

Russell Laffitte was friends with everybody because it was a

small town community bank. And banks get business from

people coming in and borrowing money and paying that money

back. Banks don't make any money if you are not loaning

money out.

So what did it mean to be a preferred customer?

Well, interestingly, Russell's office was right in the lobby.

So if he saw Jim, the carpenter, come in, Jim, the carpenter,

didn't have to ask to speak to Russell Laffitte. Russell

Laffitte went out there and greeted him and say, come in my

office, let's talk. And then they would conduct business

together. And the same with the plumber, same with the

farmer, and same with the lawyers at the Parker Law Firm.

Now, I'm winding up here, but I want to talk a

little bit about community banks. Community banks are not

big banks. They are much different than Bank of America or

Wells Fargo or JP Morgan. But one important thing to have in

common, both are heavily regulated and closely scrutinized.

There are three different groups that scrutinize Palmetto

State Bank and come to the bank. One, they are required to

hire outside auditors. And those auditors get the 10 biggest

loan customers sent to them in advance and all the records

involved with those loans, and examine those. And they come

in the bank days at a time. And they are looking to see to

make sure that they are complying with all banking principles

and accounting GAAP principles, is what they call them.

But the second group -- oh, and those auditors never

found fault with any of Alex Murdaugh's loans.  And the reason why, he had the income, he had the assets, and he had the proven track record to support the loans.  He borrowed money each year, he paid it back, over time, over year after year after year.

The second group was the FDIC.  You will hear about FDIC insured banks, FDIC, savings and loan insurance.  Well, they come in too periodically.  And they do the same kind of thing.  They look at all the loans and all the individuals.  Alex Murdaugh was always on this list, the biggest borrowers, as was his law firm, as was the hospital and some others.  But they looked at those loans and they never found a problem with any of Alex Murdaugh's loans because, again, the track record, the income, and the assets supported it.  They looked much more towards the federal regulations in compliance with federal laws and federal statutes.

And, finally, the State Board of Banking Control, they did the same thing as the other two groups that came in, something similar to what they did, but they were looking more to eye to state law, the state court and state rules and regulations.

Now, Palmetto State Bank was a small bank, but it wasn't country bumpkin podunk bank.  You will learn through the trial that they had a strong executive management in there.  And they had an outstanding track record.  In fact,

1   for the past five years, each year, they've been selected as

2   the most efficient community bank, number one in rankings,

3   most efficient community bank in the state of South Carolina.

4       You look at these allegations.  You heard about the

5   conservatorships.  Nothing wrong with that.  You learned

6   about loaning money.  Nothing wrong with that.  And even Ms.

7   Limehouse said, loaning himself money, it might have been not

8   a good thing to do, a mistake for sure.  But you will learn

9   that the fact is that all these loans were fully disclosed at

10   the courthouse and discussed.  In fact, the very first one

11   was discussed with the judge, Judge Sheila Odom.  And you

12   will also see the statute allows such loans by a conservator

13   or a personal representative.

14       Now, there's an allegation that the 5 percent fee

15   might have been a little bit high.  Anyone who served as

16   conservator, PR, personal representative in Hampton County,

17   you will hear a bunch of testimony about this, received a 5

18   percent fee.  In fact, the law provides for a fee up until 5

19   percent.  And lawyers and banker served as conservators.

20       The allegation is that he borrowed money, Russell

21   Laffitte borrowed money from the estates he managed.  And,

22   yes, he did.  And so did Alex Murdaugh.  But here's where the

23   rest of the story to that is.  Perhaps it wasn't a good idea,

24   but it wasn't illegal.  And certainly was not a crime.  And

25   in this case, every loan was in writing, evidenced by a

1 written note, an IOU, that was filed in the probate court.

2 But in addition to that, it was fully collateralized. The

3 bank's stock, Palmetto State Bank's stock of Russell Laffitte

4 was pledged as collateral in writing, again put in the

5 publicly filed probate file. And most important, Russell

6 Laffitte and Alex Murdaugh paid every loan back in full, on

7 time with interest. Now, Russell Laffitte, despite what you

8 heard in opening statement, he had no idea that Murdaugh was

9 paying his loans back with stolen money.

10 There's allegations that some loans were paid back

11 from loans from other banks or from Johnnie Parker or some

12 private individual. There's nothing wrong with paying off

13 one loan by borrowing from another bank. It's done every

14 day. You refinance your home mortgage. You might have a

15 home mortgage at Bank of America at 8 percent rate. The

16 rates go down, as it did a few years back and stayed low, you

17 immediately refinance. You go over to the Wells Fargo and

18 say, I owe $100,000 on my home, I would like to refinance a

19 new mortgage. They give the money over. It gets paid to

20 Bank of America. But now, instead of owing Bank of America

21 $100,000, you owe the same amount of $100,000 to Wells Fargo.

22 There's nothing wrong with using one loan, taking out one

23 loan to pay off another loan. College debt, before the Loan

24 Forgiveness Program, students, graduated students did it all

25 the time. They had borrowed it at 5 percent. Got a chance

to get a loan later at 3 percent, they paid off the 5 percent loan. So there's nothing wrong with that.

In closing, I want you to remember throughout this case that Russell Laffitte always acted in good faith. And the most important is, he never received a single red cent of Murdaugh's stolen money. So then you ask yourself, if Russell Laffitte were knowingly and intentionally helping Alex Murdaugh steal, why wouldn't he just have some of these transactions handled by some unsuspecting, unwitting teller, have her or him do the transaction? Why would he sign his name over and over and over, and disclose it, and file it in probate court year after year after year for the probate judge, for her staff, for her deputy, and for the public, and anybody that walked in the courthouse in probate court for all to see.

So in closing, you ask yourself, and ask yourself through this trial, why would Russell Laffitte risk everything to intentionally help Alex Murdaugh steal? Why would he risk his job? Why would he risk the family bank? Why would he risk his career, his reputation? Why in the world would he risk his good family that he loves so dearly? Why would he risk his freedom to help someone else steal money? The answer is clear. He would not and he did not. Thank you.

THE COURT: Ms. Limehouse, does the Government have

1    exhibits it wishes to admit by stipulation?

2        MS. LIMEHOUSE:  We do, Your Honor.  I will note our

3    first witness is very lengthy.  And that Rozsa needs to make

4    sure she's set up good with Ms. Perry.  Can we take a couple

5    of minutes just to make sure the input is working?

6        THE COURT:  Yeah.  Let's do this.  Let's take a

7    break.  Go to the jury room.  We will be back in about 10

8    minutes.  Thank you.

9        (Jury leaves open court at 2:37 p.m.)

10       (Whereupon, the jury returns to open court at 2:48

11   p.m.)

12       THE COURT:  Everyone be seated.  Ladies and

13   gentlemen of the jury, let me tell you what ends up happening

14   with seating and so forth.  You will get it organized where

15   you will come in the order, everybody gets really organized,

16   and it happens, but it takes a day or two to figure that out.

17       Mr. Holliday, does the Government have exhibits it

18   wishes to admit?

19       MR. HOLLIDAY:  Your Honor, we do.  We've conferred

20   with the defense.  Government's Exhibit 1 through 7, 10

21   through 44, 48, 50 through 154, 160 to 172, 176 to 190, and

22   211 to 222 should all be admitted without objection.

23       THE COURT:  Mr. Daniel, any objection?

24       MR. DANIEL:  No objection, Your Honor.

25       THE COURT:  Very good.

1          Government's Exhibit 1 through 7, 10 through 44, 48,

2   50 through 154, 160 through 172, 176 to 190, 211 to 222 are

3   admitted without objection.

4          Government's Exhibit 1 through 7, 10 through 44, 48,

5   50 through 154, 160 through 172, 176 through 190, 211 through

6   222, are received in evidence.)

7          Mr. Daniel, do you have exhibits you wish to offer

8   at this time?

9          MR. DANIEL:  I'm sorry, Your Honor?

10         THE COURT:  Do you have exhibits you wish to offer

11  at this time?

12         MR. DANIEL:  I think that's Mr. Austin's role.

13         MR. AUSTIN:  Yes, Your Honor.  Government agrees to

14  stipulate to Defense Exhibits 1 through 4, 6 through 14, 17

15  through 38, 41 through 45, 48, 50, 53 through 55.

16         THE COURT:  53 through 55?

17         MR. AUSTIN:  Yes, sir.  57, 59, 64 through 65, and

18  67 through 75.

19         THE COURT:  Any objection from the Government?

20         MR. HOLLIDAY:  No, Your Honor.  That all sounds

21  good.

22         THE COURT:  Very good.  Defendant's Exhibits 1

23  through 4, 6 through 14, 17 through 38, 41 through 45, 48,

24  50, 53 through 55, 57, 59, 64 through 65, 67 to 75, are

25  admitted without objection.

1          MR. AUSTIN:  We have one more, 77, Your Honor.

2          THE COURT:  77 admitted without objection.

3          (Defendant's Exhs. 1 through 4, 6

4   through 14, 17 through 38, 41 through 45, 48, 50, 53 through

5   55, 57, 59, 64 through 65, 67 to 75, are received in

6   evidence.)

7          MR. HOLLIDAY:  Yes, Your Honor.

8          THE COURT:  Very good.  Government, call your first

9   witness.

10          MR. HOLLIDAY:  Your Honor, thank you.  The

11   Government calls Norris Laffitte.

12          THE COURT DEPUTY:  Please state your name your full

13   name for the record.

14          THE WITNESS:  Norris Lightsey Laffitte.

15                NORRIS LIGHTSEY LAFFITTE,

16          having been duly sworn, testifies as follows:

17          THE COURT:  Mr. Laffitte, feel free to take off your

18   mask while you are testifying if you feel comfortable doing

19   that.

20                    DIRECT EXAMINATION

21   BY MR. HOLLIDAY:

22      Q.   So your name is Norris Laffitte; is that right?

23      A.   That's correct.

24      Q.   And you have the same last name as the defendant?

25      A.   That is correct.

1    Q.   So how are you two related?

2    A.   His father is my first cousin.  So he's my first

3    cousin once removed.

4    Q.   Okay.  Now, you are currently a member of the

5    Palmetto State Bank Board; is that right?

6    A.   Yes.

7    Q.   Before joining the Board, what kind of work did you

8    do?

9    A.   My mother's family was in the railroad and timber

10   business, and I worked with them.

11   Q.   And as far as the timber and railroad businesses,

12   was that all down in Hampton County?

13   A.   Hampton, Colleton, and Beaufort County, yes, sir.

14   Q.   And as far as your work history in either one, you

15   don't have to go blow-by-blow, but briefly tell us kind of

16   where you started and how high you went up.

17   A.   First title was grandson, because I was working for

18   my granddaddy.  He inherited the business from his family,

19   from his father.  So I was learning.  I was a business major

20   in college, had to learn what property was, property lines.

21   I was in the forestry side of it for a year.  And then he

22   asked me to come over and learn about the railroad.  And so I

23   figured out what a short line railroad was and how to

24   operator it.

25   Q.   Okay.  And how high up did you go in the timber and

1  railroad businesses?

2    A.  Well, I'm still a family member in the timber

3  business.  And the railroad, I was president of the railroad.

4    Q.  Okay.  And do you still hold positions in either

5  one?

6    A.  I'm a -- the railroad has been shut down.  So that's

7  completely gone.  With the Lightsey family, I am their

8  bookkeeper.

9    Q.  Now, at some point you joined the leadership of the

10  bank, as I've already mentioned.  When did that happen?

11    A.  I got a phone call June of '18.  And my first

12  meeting was July of '18.

13    Q.  Okay.  And what position was it that you took on the

14  Board of directors?  Were you a member --

15    A.  I was a member of the Board of directors, yes.

16    Q.  And who held that position before you took it?

17    A.  My father.

18    Q.  And what was his name?

19    A.  Moses Tucker Laffitte Jr.

20    Q.  Now, obviously, this case has a lot to do with

21  banking, but that's not your background.  Your background is

22  in, as you mentioned, railroads and timber or whatever?

23    A.  Yes.

24    Q.  How is it that you brought yourself up to speed so

25  that you are a productive member or a contributing member of

1 the Board's bank?

2     A.   Well, when I was working with the Lightsey family, I

3 think there were 11 checkbooks I was in charge with different

4 entities in the Lightsey family and my family.  And figured

5 out what profit and loss was and balance sheets.  When

6 Charlie asked me to come over, our family had been banking

7 with Palmetto State Bank with those accounts.  And it's

8 on-the-job training.  I picked up all I could from everything

9 I could that they gave me to read.

10     Q.   As you mentioned a minute ago, you still keep the

11 books for some of the Lightsey family businesses?

12     A.   That's correct.

13     Q.   Now, prior to the middle of 2021, did you know who

14 Alex Murdaugh was?

15     A.   I know who -- yes.

16     Q.   Was that in part because you lived in the area,

17 worked in the area, or whatever?

18     A.   That is correct.

19     Q.   Okay.  And in June of 2021, what happened?  What

20 significant event happened in the life of Alex Murdaugh?

21     A.   His wife and son were killed.

22     Q.   Okay.  And when you heard about the murders, did you

23 know whether Alex Murdaugh had a connection with the Palmetto

24 State Bank?

25     A.   Alex did have a connection with Palmetto State Bank,

1    yes.

2       Q.   What was the extent of your knowledge?  For

3    instance, did you know about loans that he had, accounts that

4    he had open, status of those accounts, basically what the

5    bank's exposure was due to their customer relationship with

6    Alex Murdaugh?

7       A.   As a Board member we get packets of information what

8    we are getting ready to talk about at the next meeting.  And

9    in June of '20, the loans over $25,000 were discussed.  And

10   Alex Murdaugh's name was on that sheet of paper.

11      Q.   And is that basically how you became aware that he

12   was even a customer of the bank?

13      A.   I believe that's the first time I knew that he was

14   he was a customer of the bank.

15      Q.   Now, where were you the weekend of July 4th, 2021?

16      A.   I was at DeBordieu Colony Beach, above Georgetown,

17   South Carolina.

18      Q.   And while were you were at -- I guess you were

19   vacationing that week?

20      A.   My father had a villa up there.  And he's passed it

21   down to the kids.  So, yes, my wife is from Georgetown.  We

22   go to -- excuse me.  I have grandkids in Murrells Inlet with

23   my daughter and son-in-law.  So we go to the beach a good

24   bit.

25      Q.   So when you are with family in DeBordieu, did you

1    have a conversation regarding Alex Murdaugh?

2        A.   Yes, I did.

3        Q.   And who was that conversation with?

4        A.   Gentleman named Les Carter.

5        Q.   How do you know Mr. Carter?

6        A.   Les and I grew up in Columbia High School, went

7    to -- roomed together in college.  Our children went to the

8    same colleges.  We've been family friends through our mothers

9    for my whole life.

10       Q.   And did Alex Murdaugh come up in the context of that

11   conversation?

12       A.   Yes, he did.

13       Q.   And as a result of you talking to Mr. Carter, did

14   you have concerns regarding the bank?

15       A.   Les made the comment -- and we had talked about a

16   lot of things, our wives, our children, what was going on

17   with them, but in that conversation, Les mentioned the fact

18   that Alex was not working any longer.

19       Q.   So if Alex is not working any longer, it's a

20   somewhat obvious question, how would that impact the bank?

21       A.   What was our exposure?  If he's not working, how is

22   he going to pay back money he owed us, if he owes money at

23   all?

24       Q.   And was there a specific financial instrument that

25   he was the beneficiary of at the bank that you are aware of

1  during that July 4th, 2021, conversation?

2      A.   Like I say, when Les -- we really didn't talk

3  about it.  Once he mentioned Alex wasn't working anymore, a

4  red flag went up in the back of my mind.  I didn't want him

5  to know I was on the Board, but we changed the subject.  But

6  I kept that flag there because I knew just a year earlier,

7  Alex had a line of credit with the bank, a million dollar

8  line of credit with the bank.  Was that line of credit

9  exposed or not?

10     Q.   So now you are going into the next Board meeting in

11 July 2021.

12     A.   Yes, sir.

13     Q.   Having, just a few weeks before, had this

14 conversation on the beach at DeBordieu?

15     A.   Yes.

16     Q.   Do you raise any of your concerns at that Board

17 meeting in July of 2021?

18     A.   Yes.  At that Board meeting, at the proper time --

19 we sit around the Board room table like people do in church,

20 nobody moves.  And I sit on one end of the table on edge.  On

21 the far end it was Russell, his daddy at the head, his sister

22 and his brother, that would be Russell, Charlie Laffitte,

23 Jr., his sister, Gray Henderson, and Charles Laffitte, III.

24 And at the proper time I just raised a question, stuck my

25 head forward and said, do you all know what's going on with

1    Alex?  So I did raise a question, what's happening with Alex?

2       Q.   And did anybody answer your question?

3       A.   I believe Russell spoke first and said he's still

4    working.  And Gray also said he's still working, he's having

5    trouble, he's struggling through the grief of the murders of

6    his wife, Maggie, and his son Paul, but he's still working.

7       Q.   So the conversation from the beach made you question

8    whether or not he was working.  And, yet, you go to the Board

9    meeting and you are getting confirmation from your fellow

10    Board members that he is, in fact, still working; is that

11    right?

12       A.   That was the conversation, yes, sir.

13       Q.   Let me ask you before we move on.  I've asked you

14    previously to review the minutes from that meeting from July

15    the 20th of 2021; is that right?

16       A.   Yes, sir.

17       MR. HOLLIDAY:  Your Honor, can I briefly approach?

18       THE COURT:  You may.

19    BY MR. HOLLIDAY:

20       Q.   And I've asked you to look over the minutes of that

21    Board meeting.  There's not a mention of the Alex Murdaugh

22    discussion in the Board minutes from July the 20th of 2021,

23    is there?

24       A.   No, sir, there's not a mention of that discussion.

25       Q.   Okay.  Who keeps the minutes for your Board

1  meetings?

2      A.   Gray Henderson.

3      Q.   Who is Gray Henderson?

4      A.   That is Russell's sister.

5      Q.   While you are at that July 20th, 2021, Board

6  meeting, did you all discuss any recent loan requests that

7  were made -- that had been made by Alex Murdaugh after the

8  murders?

9      A.   Restate that, please.

10     Q.   Okay.  When you are at the July 20th Board meeting,

11  did anyone bring up whether or not Alex Murdaugh had made a

12  loan request following the June 7th, 2021, murders of his

13  wife and son?

14     A.   No, sir, that was not brought up.

15     Q.   Did you later learn, in fact, that some activity

16  had, in fact, taken place regarding Alex Murdaugh and the

17  bank's finances?

18     A.   Later I learned that, yes.

19     Q.   If you look at the screen in front of you, we are

20  going to pull up Government's Exhibit 10A and 10B.

21          MR. HOLLIDAY:  Your Honor, for your information, 10

22  has been admitted.  And we've just segregated certain pages

23  out.  It's a lengthy exhibit.

24          THE COURT:  Okay.

25  BY MR. HOLLIDAY:

1          Q.   If you look at 10A first.  It's side-by-side.  It's

2     absolutely fine.  Thanks.

3          A.   I have one picture in front of me.  I don't have a

4     side-by-side.

5          Q.   We can work with that.  If we could, we are going to

6     start with 10A.  If we look at the very top of 10A --

7          A.   Yes, sir.

8          Q.   And my screen is a little fuzzy.  I hope the jury

9     can make out of some of this.  But if we look in the upper

10    left-hand corner --

11              A JUROR:  We don't have a picture.

12              THE COURT:  Thank you, all.  Got it now?  Thank you.

13    That's what you are supposed to do, folks.  Thank you.

14              MR. HOLLIDAY:  Let's hope they don't have to do it

15    again.

16    BY MR. HOLLIDAY:

17         Q.   All right.  I just want to make sure everybody was

18    good.  Looking at 10A, at the very top, we've blown up that

19    exhibit.  I know it's a little fuzzy, but in the top

20    left-hand corner, there's a loan number there.  It appears

21    ending 048.  Do you see that?

22         A.   I see, yes, sir.

23         Q.   Okay.  And if we go below that, there's a note

24    amount that's $750,750?

25         A.   Yes, sir.

1    Q.    Accounting for processing fees and so forth?  Yes?

2    A.    Yes, sir, I see the note amount of $750,750.

3    Q.    Okay.  And the loan name, you see Richard Alexander

4    Murdaugh's name there, correct?

5    A.    That is correct, yes, sir.

6    Q.    And the note date is what?

7    A.    07/15/21.

8    Q.    So July 15th of 2021?

9    A.    Yes, sir.

10    Q.    That would be five days before your July 20th, 2021,

11    Board meeting; isn't that correct?

12    A.    That is correct.

13    Q.    This loan, paperwork, was not brought up during that

14    Board meeting?

15    A.    Not at all, no, sir.

16    Q.    And then maturity date, this kind of interesting,

17    what is that?

18    A.    It looks like 01/15/22.

19    Q.    July 15th of 2022?

20    A.    Mine looks like January 15th of --

21    Q.    I'm sorry.  You are absolutely right, January 15th,

22    2022.  So, basically, six months later, this $750,000 loan is

23    coming --

24    A.    Due, yes, sir.

25    Q.    And then just while we've got this up on the screen,

1    it just confirms the lender is Palmetto State Bank and the

2    borrower is Richard Alexander Murdaugh.  You see that as

3    well?

4         A.   Yes, sir, I do.

5         Q.   Now if we could go to 10B, please.  When we were

6    looking at 10A, I had you read off the loan number.  It's a

7    little clear on this one.  You see it's written in the upper

8    right-hand corner?

9         A.   6048, yes, sir.

10        Q.   And then the borrower's name and address, is that

11   consistent with what we just looked at?

12        A.   That is consistent, yes, sir.

13        Q.   And, in fact, this is all from Government's Exhibit

14   10, which I believe you've had the chance to review.  But

15   that's the entire loan package for the $750,000 loan; is that

16   right?

17        A.   Yes, sir.

18        Q.   And, in fact, if you would just confirm for the

19   jury's benefit, this would be something that they will looked

20   at eventual, we've just reviewed the first two pages.  10A

21   would be the first page and 10B would be the second page?

22        A.   That is what it is, yes, sir.

23        Q.   Okay.  Now, 10B has a little bit more information.

24   And that's why we are looking at it.  Obviously, the Richard

25   Alexander Murdaugh name is consistent, but if you read in

1    line 1, what do you see there?  Just read the whole line

2    typewritten and handwritten notes.

3        A.   Of what you have written in front of me on the

4    screen?

5        Q.   Yes, starting with the very first -- well, it said:

6    I, Richard Alexander Murdaugh, as or on behalf of borrowers,

7    state as follows.  And I asked you to read number 1.

8        A.   The proceeds of this loan or other extension of

9    credit evidenced by loan dated 7/15/21, identify document,

10   will be used in the following type of business; business

11   expenses.

12       Q.   So it says business expenses on 10B from Exhibit 10.

13   We will hold that point.  Okay.

14       A.   Just -- you said earlier page 1 and page 2.  This is

15   not my page 2 I'm looking at.  Am I supposed to -- that's

16   somewhere else in this package.

17       Q.   Yeah, go eight pages back, you will see it.

18       A.   Yes, I see this on PSB016891.

19       Q.   819?

20       A.   Excuse me, 819.

21       Q.   I've misspoken.  It is within the same packet?

22       A.   It is within the packet, yes.

23       Q.   Very good.  We are now going to show you from the

24   same loan package, and you don't have to find it in 10, I was

25   just showing you the entire loan package, it's Government's

1   Exhibit 10I.  And if you could, let's pull up the very top

2   part.  All right.  Tell us what this is, please.

3       A.   This is a form Palmetto State Bank uses in a

4   domestic wire request.

5       Q.   Okay.  And the jury has just had the benefit of

6   seeing other pages from this Exhibit 10, which is the loan

7   package for the $750,000.  But what's the date in the upper

8   right-hand corner?

9       A.   07/15/2021.

10      Q.   Okay.  And so that's consistent with what we are

11  seeing on 10A and 10B; is that right?

12      A.   That is correct, yes.

13      Q.   And, again, the bank is identified there, Palmetto

14  State Bank?

15      A.   Yes, sir.

16      Q.   And that's the address where the bank is located, is

17  that correct?

18      A.   That is its address, yes, sir.

19      Q.   While we have this blown up, we have sender

20  information and receiving information as well, correct?

21      A.   I can't see it on this screen.

22      Q.   Well, don't you have receiving bank information

23  right at the bottom?

24      A.   Excuse me, receiving bank information, bank's name,

25  SouthState Bank.

1    Q.    And we are going to scroll down in a minute.  While

2  this is up, we are going to hit that.  And that's SouthState

3  Bank is in Bamberg, South Carolina, correct?

4    A.    That's what is stated here, yes, sir.

5    Q.    So this is a little bit more information.  What's

6  the beneficiary information here?

7    A.    Name of the beneficiary is Wilson Law Group, LLC,

8  IOLTA account.

9    Q.    Do you know what an IOLTA account is?

10   A.    Interest on lawyer something.

11   Q.    It's an account a lawyer might have to manage?

12   A.    Yes.

13   Q.    Fair enough?

14   A.    Fair enough for me.

15   Q.    And the Wilson Law Group, do you know who that is?

16   A.    I did not at the time.

17   Q.    You are a Board member of the bank privy to its

18  business.  So do you know who the Wilson Law Group is?

19   A.    I do now.

20   Q.    Who is it?

21   A.    The only one I know is a gentleman named Chris

22  Wilson.  Only know him by name.

23   Q.    And if we could, let's go to the very bottom.  And

24  then as far as -- there's authorizations down at the bottom,

25  right?

1    A.    Yes, sir.

2    Q.    And before we get there, though, what was the amount

3    of money that's being wired?

4    A.    $350,000.

5    Q.    So that's $350,000 being wired from Palmetto State

6    Bank into the Wilson Law Group's account with SouthState

7    Bank; is this correct?

8    A.    Yes, sir.

9    Q.    And as far as the request received via, what does it

10   say there?

11   A.    Russell Laffitte.

12   Q.    Okay.  And then there would have been a couple of

13   employees that actually executed the wire for Mr. Laffitte;

14   is that correct?

15   A.    That is correct.

16   Q.    Now, about this time, you are coming out of the

17   Board meeting, you've had Russell say that Alex Murdaugh is

18   still employed.  You have information that he's not employed

19   from the beach conversation.  Did you go talk to anybody else

20   about what's going on with Murdaugh?

21   A.    I went back to the beach shortly thereafter, ran

22   into another of Alex's cousins on his father's side,

23   Stephanie Young Oxner, and she also told me that he was not

24   working.

25   Q.    Okay.  So now you've got -- you've still got

1　conflicts information.  At some point, did you go talk to a

2　member of the Board?

3　　　A.　I believe I went and chatted with Jan Malinowski,

4　who at that time was the president of Palmetto State Bank,

5　and voiced some concerns.

6　　　Q.　So why did you go to Jan?

7　　　A.　I live on Ladies Island.  Jan lives on Ladies

8　Island.  And the branch he works out of is on Ladies Island.

9　　　Q.　And between the two of you, were you able to resolve

10　the conflicting information that you had about Alex

11　Murdaugh's work status and how that might affect the bank and

12　his obligations to the bank?

13　　　A.　Jan and I had conversations, what's our exposure, if

14　he's not working, what are we going to do, so what is the

15　bank going to do?

16　　　Q.　And after you talked to Jan, did you follow up with

17　an e-mail?

18　　　A.　I did.

19　　　Q.　Showing you what's been marked as Government's

20　Exhibit 2.

21　　　　　All right.  The "from" in the line is -- that's you,

22　right?

23　　　A.　Yes, sir.

24　　　Q.　And the jury is going to be seeing your e-mail

25　address on a number of documents.  You are HB Railroad?

1      A.   That was the name of the Lightsey Railroad, yes,

2   sir.

3      Q.   And what's the date of this e-mail?

4      A.   Monday, August 9, 2021, 9:39 a.m.

5      Q.   And then you are sending it.  I'm going to break

6   this down.  First of all, in the "to" line, who are you

7   sending it to?

8      A.   Those five people:  Russell Laffitte, who was the

9   CEO at the time; Gray Henderson, his sister, who works at the

10  bank in the mortgage department; Charles Laffitte, is their

11  father; Jan Malinowski is the president of the bank; and

12  Scott Swain is the CFO of the bank.  And they are the

13  Executive Committee for the bank.

14     Q.   This is something the jury is going to be hearing a

15  little bit more about.  So I think it's important for them to

16  understand how the bank is run early on.  There's an

17  Executive Committee and they report to whom?

18     A.   The Board of Directors.

19     Q.   So what -- how does the Executive Committee's work

20  support what the Board of Directors is doing?

21     A.   State that again for me.

22     Q.   What does the Executive Committee do for the Board?

23     A.   In this instance, the Executive Committee is

24  responsible for looking at all the large loans.  All large

25  loans over 25 is brought to the Board's attention.  If the

1   loan officers -- they all have limits, some limits for

2   secured loan, some for unsecured.  When we get to this level,

3   Russell, Gray, Charlie, Jan, have a lot of large limits.  And

4   in this case, we are trying to figure out what's the

5   exposure.  If it gets above a certain level, it takes two of

6   the Executive Committee members to review the loan.  If it

7   gets bigger than another number, it takes three of them.  And

8   it takes a Committee meeting for the loans to be approved.

9       Q.   So we are going to talk about that a little bit as

10  well.  There's five members on the Executive Committee,

11  right?

12      A.   That is correct.

13      Q.   How many of those numbers actually vote?

14      A.   Scott Swain is not a voting member of that

15  committee.  The other four vote.

16      Q.   So if Scott Swain can't vote, why is he on the

17  Executive Committee?

18      A.   The more risk management people we have on these

19  loans, the more eyes are looking at them, the better off we

20  are.

21      Q.   So what do you know about Scott Swain's background?

22      A.   Scott has been in the banking business apparently in

23  a public bank.  I think he was down in Florida.  He came to

24  work for the family bank, Palmetto State Bank, I think three

25  years ago as our CFO.

1    Q.   You mentioned the other four members, right?  Those

2    are all Laffittes or related to Laffittes?

3    A.   Jan Malinowski married a Laffitte.  The rest of them

4    are Laffittes, yes, sir.

5    Q.   Those are the four voting members of the Board,

6    correct?

7    A.   That is correct.

8    Q.   When these loans get to be above a certain

9    threshold, you mentioned there's a requirement, an

10   expectation, that all five members of that Board will sit

11   down -- of the Executive Committee, will sit down and

12   consider loans; is that correct?

13   A.   That is correct.

14   Q.   And even if there's three members who decide amongst

15   themselves that they are going to approve a loan, is there an

16   expectation that at some point the entire Executive Committee

17   would consider the loan?

18   A.   The entire committee should approve the loan, yes.

19   It should come before the committee.  Whoever is presenting

20   the loan gives their case, gives a chance for all five

21   members of that committee to speak about that loan, and

22   either accept it and approve it or turn it down.

23   Q.   Now, again, just kind of orienting the jury a little

24   bit to how the bank is run, there's a cc line on that e-mail

25   as well, right?

1     A.    That is correct.

2     Q.    Who are the people on the cc line?

3     A.    When I sent this e-mail to the Executive Committee,

4  I also included all the Board members in it.  Jim Gibson is

5  the first address.  Jim is not a family member.  Spann

6  Laffitte is another cousin.  The next one is Liz Malinowski.

7  She is a Laffitte.  The next one is -- sorry, they're all

8  cousins -- Dr. Lucius Laffitte, and then Russell's brother,

9  Charles III, and then Becky Laffitte is another cousin.

10    Q.    So the Laffitte footprint at the Palmetto State Bank

11 is a significant footprint; is that correct?

12    A.    Started by my grandfather Laffitte and his oldest

13 son Charlie, who is not the same Charles mentioned here.

14 It's Charlie's daddy.

15    Q.    There's a Charles, Jr.; is that right?

16    A.    Yes, sir.

17    Q.    Referred to commonly as Charles?

18    A.    Charlie, yes.

19    Q.    How old is Charlie?

20    A.    Charlie is in his early 80s.

21    Q.    So if we just jump back a year or two, what was

22 Charlie's position at the bank?

23    A.    Charlie was chairman of the Board and CEO for many

24 years.

25    Q.    Okay.  And then if we jump back a couple of years,

1   who was the CEO of this bank?

2      A.    When you say --

3      Q.    A few years ago, who was the CEO of Palmetto State

4   Bank?  Charlie is the chairman?

5      A.    Charlie is the chairman and Russell became the CEO.

6      Q.    Father and son?

7      A.    Father/son, yes, sir.

8      Q.    The subject line of your e-mail is:  PSB exposure

9   with Alex Murdaugh; is that right?

10     A.    That is correct.

11     Q.    And that's how he pronounces his name, right?  It's

12   spelled Alex Murdaugh, but it's Alec (ph) Murdaugh?

13     A.    Alex Murdaugh, yes, sir.

14     Q.    So read your e-mail to the jury, please.

15     A.    I wrote this to the Executive Committee, whose names

16   are on the "to" line.  "Since the June events" -- and the

17   June events that I'm referring to here are the murder of

18   Maggie, Alex's wife, and Paul, Alex's son, so that's the

19   events I'm referring to.  "Since the June events, would the

20   Committee prepared for the Board what is PSB's total exposure

21   with regard to Alex Murdaugh directly, indirectly, through

22   different family relationships, and/or LLCs with his

23   borrowing practices and repayment plans if he is not working.

24   Norris."

25     Q.    So I think it's fairly obvious, but how would you

1    summarize the concern that you had when you were sending this

2    e-mail?

3        A.    Well, I had heard from two of his first cousins.

4    And I've known them for as long as I've known Russell and the

5    rest of the family.  But I had conflicting information.  The

6    two family members say he's not working.  And my fellow Board

7    members who live in Hampton saying he is.  And I wasn't

8    comfortable with the conflicting information.

9        Q.    And as far as this concern goes, I want to refocus

10   your attention on that loan that we've been talking about

11   that's in Exhibit 10.  Right?

12       A.    The $750,000 loan.

13       Q.    That's right.  And the date on the $750,000 loan is

14   when?

15       A.    I thought we read the date was -- original note

16   date, July 15, 2021.

17       Q.    And if that date is actually correct, would you have

18   expected to be receiving more information about that loan at

19   the next Board meeting or whatever?

20       A.    Certainly, yes.

21       Q.    I want to show you within the loan package you've

22   got there, we've got to split out again, Government's Exhibit

23   10E.  We are pulling it up.

24       A.    I ask for a page number.

25       Q.    All right.  And I think we want to -- so for the

1    jury's benefit, I put an e-mail -- or Tracy's put the e-mail

2    back up on the right side showing the August 9th date when

3    you are inquiring as to Alex Murdaugh's obligations to the

4    bank.

5         A.   Yes, sir.

6         Q.   And over on the left -- I don't think we need to

7    blow anything up.  I think it's clear.  What's the date on

8    this general ledger debit?

9         A.   8/9/21.

10        Q.   How does that compare to the date of your e-mail?

11        A.   That is the same date as my e-mail.

12        Q.   As far as -- we won't bother for now with LNOS, but

13   right under that, what do you see?

14        A.   Alex Murdaugh.

15        Q.   Okay.  And there's sort of routing information or

16   account information there as well?

17        A.   Yes, sir.

18        Q.   And the amount of that debit is how much?

19        A.   $400,000.

20        Q.   Yeah.  And when there's a general ledger debit at

21   the bank, that money is going into that person's account; is

22   that correct?

23        A.   That is correct.

24        Q.   And then as we go on down, it's almost -- there's a

25   number on the right, 287933.  Below that there's some

1    additional information.  Is the date confirmed again, August

2    the 9 of 2021?

3        A.    That is the same, August 9, 2021.

4        Q.    And then purchased by, what does that say?

5        A.    Purchased by?  I'm sorry.  Loan proceeds.

6        Q.    Loan proceeds.  And then far out to the right, it

7    says what?

8        A.    $400,000.

9        Q.    I actually do want to go back up.  That LNOS, it

10   says purchased by loan proceeds.  Do you know what the

11   acronym LNOS means?

12       A.    Loans not on system.

13       Q.    So what does that mean?

14       A.    Banking term is my understanding where there's an

15   account where they can park funds until they get the

16   accounting exactly right.

17       Q.    So let's just -- we are not going to pull the

18   document back up again.  The jury heard this statement a

19   number of times.  I've shown you Exhibit 10 for the $750,000

20   loan.  What's the date supposedly that that loan was put in

21   place?

22       A.    The original note says July 15th, 2021.

23       Q.    So this is some type -- three weeks or so after

24   that, August 9th, 2021?

25       A.    That's correct.

1    Q.   10I and 10E.  All right.  So $400,000, you see I

2    just circled that, right?

3    A.   Yes, sir.

4    Q.   This one is a little tougher.

5    A.   I can read $350,000.

6    Q.   $350,000.  So there's a $400,000 deposit into Alex

7    Murdaugh's account at the bank; is that correct?

8    A.   Yes, sir.

9    Q.   And then there's a $350,000 wire going to Chris

10   Wilson's IOLTA account down in Bamberg; is that correct?

11   A.   That's correct.

12   Q.   What do those two numbers add up together?

13   A.   $750,000.

14   Q.   And that's the amount -- well, does that coincide

15   with the amount of the loan package in Government's Exhibit

16   10?

17   A.   The loan package is for $750,750.  That 750 is the

18   fee that the bank charged to put together the loan.  So we

19   are $750 different.  But that is the bank's fee for putting

20   together that $750,000 loan.

21   Q.   So the principal is gone?

22   A.   Yes, sir.

23   Q.   It's been committed to Alex Murdaugh's bank account

24   and it's been sent to Chris Wilson; is that right as well?

25   A.   Yes.

1    Q.   This is before you get any answers regarding the

2    security of all the loans and what the bank's exposure is to

3    the Alex Murdaugh loans and Alex Murdaugh in general; is that

4    right?

5    A.   I sent my e-mail -- I think it was 9:39.  And I

6    didn't have an answer yet.

7    Q.   I want to show you something, Government's Exhibit

8    192.

9    A.   Still got red marks.

10   Q.   Yeah, I'm working on it.  Government's Exhibit 192,

11   fourth page.  Perfect.  So here's the thing.  You send your

12   e-mail on August the 9th asking about Alex Murdaugh's

13   exposure or the bank's exposure to Alex Murdaugh; is that

14   right?

15   A.   That is correct.

16   Q.   There's an entry, the very first entry -- well,

17   let's just back it one day or three days, one entry.  August

18   the 6th of 2021, what is Alex Murdaugh's balance as indicated

19   in the far right column?

20   A.   I have three August 6th dates.  Which one do you

21   want me to use?

22   Q.   I'm sorry.  The one right above August 9th.

23   A.   One right above August 9th is $347,784.67 in

24   overdraft in negative balance.

25   Q.   Substantial negative balance, correct?

1    A.   My goodness, yes.

2    Q.   So that was just before the jury.  Now let's go down

3    to August the 9th, the date of your e-mail.  What's the

4    negative balance say?

5    A.   After the deposit of $400,000, he's now in the black

6    $32,215.33.

7    Q.   All right.  You jumped me just a little bit.  But

8    it's okay.  The entry right above that, what is that?

9    A.   That is -- he is in the negative $367,784.67.

10   Q.   Are there reports generated at the bank of people

11   who are upside-down on their accounts at the bank?

12   A.   It's my understanding every day the officers get an

13   overdraft report.

14   Q.   So on the day of your e-mail, on August the 9th of

15   2021, when you send your e-mail, $367,000 in the hole; is

16   that right?

17   A.   Alex is overdrawn $367,784.67.

18   Q.   And then according to the document that the jurors

19   just saw, that $400,000 transfer from the loan took him into

20   black; is that right?

21   A.   It took him to 32,000 positive, yes, sir.

22        THE COURT:  Mr. Holliday, are you offering

23   Government's Exhibit 192 as an exhibit?  It wasn't on your

24   all's stipulated list.

25        MR. HOLLIDAY:  Your Honor, could I have just a

1  minute, please?

2          THE COURT:  Take your moment.

3          MR. HOLLIDAY:  I'm informed that when I read to 190,

4  I should have read to 198.

5          THE COURT:  No, it's 192.

6          MR. HOLLIDAY:  No, they are telling me I misspoke

7  and it should have been to 198.

8          THE COURT:  So you are offering 176 to 198?  So what

9  we don't have here is 191 to 198; is that correct?

10          MR. HOLLIDAY:  Yes.

11          THE COURT: Is there an objection to the admission of

12  191 to 198 from the defense?

13          MR. AUSTIN:  No, Your Honor.

14          THE COURT:  191 to 198 are admitted.

15          (Government's Exhs. 191 to 198 are received in

16  evidence.)

17          MR. HOLLIDAY:  I appreciate the catch.  That was my

18  mistake.

19          THE COURT:  We just want to get it right.

20          MR. HOLLIDAY:  I do too.

21  BY MR. HOLLIDAY:

22     Q.   We are not going to pull back up the August 9th

23  e-mail, but, ultimately, in a Board meeting perhaps, you get

24  a download of Alex Murdaugh's financial situation, at least

25  in terms of loans that had been taken out at Palmetto State

1    Bank?

2        A.    In response to my e-mail, for the next -- the bank

3    always meets on the third Tuesday of every month.  So for

4    that next meeting coming up, I received some papers, as the

5    rest of the Board members, received paperwork regarding

6    Alex's financial position with the bank.

7        Q.    Now we are going to look at Government's Exhibit 3.

8    And before we blow anything up, do you recognize Government's

9    Exhibit 3?

10       A.    I do.

11       Q.    And what is it?

12       A.    This is included in the loan packet that the Board

13   members received.  It comes through a secure server e-mail so

14   we can all have the information a few days before a meeting.

15   We won't go into it cold.  And this was apparently page 46

16   showing Alex Murdaugh exposure.

17       Q.    So we are not going to linger on this one because,

18   in fact, if you look down at the bottom, the total given

19   there $2,783,000, was there a problem with that total?

20       A.    When I received the loan packet a few pages before

21   this, there was an executive summary.  There were minutes of

22   an executive meeting they had.  And it had a different

23   figure.  So when I got this piece of paper, 2/7, it was a big

24   difference between it and the Executive minutes And so I took

25   out my calculator and added it up.  And that figure is off.

1    Q.   Was there a discussion at the Board meeting about

2    the bad math?

3    A.   When it came to the proper time this came up, I

4    brought up the fact to Charlie, Russell, Gray, this math was

5    incorrect.  And I passed them down my adding sheet text.  And

6    Liz Malinowski was sitting beside me.  And she also agreed

7    with the number that I offered up.

8    Q.   And were there words between Russell and his father

9    Charlie at that Board meeting?

10   A.   Russell threw his daddy under the bus and said,

11   Daddy, you did this work, not me.

12   Q.   All right.  So was a second summary prepared for

13   your benefit at the Board meeting?

14   A.   Later we received a corrected number after, yes,

15   sir, corrected the figure I had given them.

16   Q.   So, like I said, we are not going to linger on this

17   one.

18        THE COURT:  Is this exhibit in?  What is the exhibit

19   number.

20        MR. HOLLIDAY:  No. 3, Your Honor.

21        THE COURT:  No. 3.  Thank you.

22   BY MR. HOLLIDAY:

23   Q.   Now we are on to Exhibit 5.  Focusing, first of all,

24   the total down at the bottom, is this at least better than

25   the previous one?

1    A.   Those figures added up, yes, sir.

2    Q.   Thank you.  We will look at the whole document

3  again.  And roughly what's the difference between the two

4  totals?  You have 2.8 million and now 3.5 million.

5    A.   So we are $750,000, $760,000 different.

6    Q.   So there are several loans listed on this page.  And

7  I think at the very least, we can cut off the very bottom so

8  they can see a little better.  Okay.  Very good.

9         The first one, the loan 8806, little over $800,000

10  loan; is that right?

11    A.   You are using the last four numbers on that?

12    Q.   I am.  I think that's easier.

13    A.   Yes, sir.

14    Q.   So the collateral, what's the collateral?  And tell

15  the jury, if you know, what the collateral is?

16    A.   Collateral; 914 acres real estate, plus improvements

17  appraised at $2,090,000.

18    Q.   Did you know, in fact, what that property was?

19    A.   Yes.  That is the home site of his Moselle farm, as

20  it's been expressed, however they call it in the newspaper.

21    Q.   Next loan, 9180, principal amount is 193,000 and

22  change; is that correct?

23    A.   That is correct.

24    Q.   This one is interesting.  The collateral on that

25  loan is what?

1    A.    Edisto beach house appraised at $730,000.

2    Q.    Briefly focusing down at the bottom in the 6048

3    loan, which is the one they were kind of going to end up on,

4    the $750,000 loan?

5    A.    Yes, sir.  The very last one?

6    Q.    Yes.  So collateral one mentions a share of Green

7    Swamp Club, and I am not going to talk about that a whole

8    lot, but talk about the second line.  And there was actually

9    additional information on Government's Exhibit 2, but -- or

10   Government's Exhibit 3.  We are not going to bother pulling

11   that back up.  But what is that language under the Green

12   Swamp language talking about?

13   A.    "We will be getting a second mortgage on the house

14   when his wife's estate is opened.  The lawyer has already

15   done the title work to prepare for this."

16   Q.    Now, all this is being presented to you at the

17   August 17th Board meeting; is that right?

18   A.    That is correct.

19   Q.    And do you recall again when the -- roughly when the

20   Chris Wilson wire took place and also the movement of money

21   into Alex Murdaugh's account of $400,000?

22   A.    The Chris Wilson wire was in July 15th and the 4 --

23   that's 350 in July.  And the $400,000 in his checking

24   accounting happened August 9th.

25   Q.    And why is it that this 6048 loan down at the very

1    bottom mentions the beach house?  What's the significance of

2    the beach house in the context of that loan?

3         A.    When the Board heard about the $750,000 loan, it was

4    expressed that it was to be used for improvements at the

5    beach house.

6         Q.    When, in fact, you know that at the very least, the

7    $400,000 that had just gone into Alex Murdaugh's account had

8    gone from the red into the black?

9         A.    That money couldn't be spent on this houses.  It was

10   gone.

11        Q.    The Chris Wilson wire?

12        A.    Unless he's a builder, he's a lawyer, that money was

13   gone too.

14        Q.    And then as far as just in pure banking terms, the

15   issue with the loan 9180 and the loan 6048, were both being

16   secured by the beach house?

17        A.    Well, the 9180, when that loan appears to be made,

18   it appears to be well-collateralized loan.  The last loan

19   6048 for $750,000, if there is -- the house is in Maggie's

20   name, his wife, that house can't be put as collateral against

21   the $750,000.  So now that loan is unsecured except for that

22   Green Swamp Club, Inc. valued at 243,000, one share of it.

23        Q.    So let's talk about this for just a second.  There's

24   language in there about wife's estate and all of that.  As a

25   Board member, you became aware of the circumstances regarding

1  Maggie's estate in relation to that house.  What was the

2  issue there?

3      A.    With Maggie's name on the deed, Palmetto State Bank

4  should not be loaning money on somebody else's house to Alex.

5  It would be no different than me going to the bank and

6  saying, I want to borrow $750,000 for mortgage purposes I'm

7  going to put one of y'all's houses in as collateral.  Just

8  doesn't work that way.

9      Q.    And in this instance, unfortunately, Maggie was dead

10  at this point; is that right?

11      A.    Maggie had passed away.

12      Q.    And when somebody passes away, an estate has to be

13  open to deal with their assets and all of that?

14      A.    That's correct, yes.

15      Q.    That could be a lengthy process?

16      A.    You would know better than me, but, yes, lengthy

17  process.

18      Q.    And just to cut to the chase, this house was tied up

19  in the estate or the estate money hadn't been opened?

20      A.    I have no idea when the estate was opened.  But at

21  this time -- it says it right there, wife estate is not open.

22      Q.    Yep.  Just going on down a little bit more just so

23  we cover all the loans, 7336, almost a million dollars there.

24  You see the third line down?

25      A.    Yes, sir, I do.

Q.   And as far as the 866 acres, and then we see another
reference to that 914 acres?

A.   Yes, sir.

Q.   So the first loan on the page and the third loan
seem to have, again, been collateralized by the 914 acres?

A.   Yes, sir.

Q.   Do you know what the 0489 loan is all about for
little over 100,000?

A.   Islands in Beaufort County appraised at $277,000.
Alex apparently was in a partnership with some other people
and had bought some islands.  I guess that's in Saint Helena
Sound or close to it.

Q.   Then we've got a car loan, little over $90,000 car
loan?

A.   Yes, sir.

Q.   Collateral is a 2021 Mercedes?

A.   Yes, sir.

Q.   In your capacity as a Board member, did you learn
anything about that Mercedes and any issues with the
Mercedes?

A.   The loan had been -- $91,386 had been extended to
Alex.  Alex then put that money in his wife's account.  And
she bought that car.  And it ended up being titled in Maggie
Murdaugh's name.  So the bank had no collateral on that loan
because the loan had been given to Alex.  Alex gave the money

to his wife Maggie.  And Maggie, when she bought the car,

didn't title it in Alex's name.  She titled it in her own

name.

Q.  So then finally, the 1524 loan, Randolph Murdaugh,

III and Alex Murdaugh, first of all, who is Randolph

Murdaugh, III?

A.  That is Alex's dad.

Q.  How much is that loan for?

A.  $599,400.

Q.  Okay.  And we've been talking about security a

little bit for the benefit of the jury.  We were talking

about beach house as security, talking about the Moselle

house as security.  But what does it mean when a loan is

unsecured?

A.  Palmetto State Bank gave the money to those two men

and said, pay us back, please.  There is nothing to go

against.  If they default on that loan, hat in hand, Palmetto

State Bank will say, please give us the money we've loaned

you back.

Q.  Again, this information is being provided to you at

the August 17th, 2021, Board meeting; is that right?

A.  Yes.

Q.  Fair to say Alex Murdaugh's life situation is

somewhat up in the air?

A.  He isn't working.

1    Q.   So you've got --

2    A.   Dead wife, dead son, can't be in good mental state.

3    Q.   You have one unsecured loan that he's taken out with

4    his father?

5    A.   Yes, sir.

6    Q.   You have two loans both secured by this same beach

7    house?

8    A.   Yes.

9    Q.   Two of the loans --

10   A.   Well, one was secured by the beach house.  The

11   second loan was not secured by the beach house.

12   Q.   Fair enough.  Thank you for the correction.  And

13   then also we have the house in Moselle, at least in part,

14   also listed as security?

15   A.   Yes, sir.

16   Q.   So how did this make you feel as you are considering

17   the bank's situation in regard to Alex Murdaugh?

18   A.   Well, if Alex owes the bank $3,544,894, how is he

19   going to pay it back if he's not working?  And this is not

20   the correct figure that we had seen in the Board packet.  The

21   Executive minutes said the exposure was $4.2 million.  So

22   there's a problem here with the paperwork still, even though

23   we corrected the math on this page with the Executive

24   Committee minutes.

25   Q.   All right.  Give me a second to catch up.  We are

going to go to on Government's Exhibit 6.  I showed you the

minutes that are Government's Exhibit 1, but I don't think

we've shown the jury yet any examples of any minutes.  If you

would just -- obviously the top says minutes.  And then it

gives a list of attendees?

A.   Yes, sir.

Q.   Directors at the very top there?

A.   Yes, sir.

Q.   And Charlie Laffitte, that's the 80-year-old?

A.   C.A. Laffitte, Jr. is the chairman of the Board,

Charlie we call him.  Gray L. Laffitte is Gray Laffitte

Henderson, his daughter.  Russell L. Laffitte is in the

courtroom with us.  And Jim Gibson has been on the Board for

many years, a friend of Charlie's.  Jan N. Malinowski married

Liz, who is written down in the next line beneath it all.

He's the president of the bank at the time.  C.A. Laffitte,

III is Russell's older brother.  And my name is there.  And

then attendance by Zoom.  H.S. Laffitte is Spann, the cousin.

H.L. Laffitte is Lucius, the doctor.  And Liz is Liz Laffitte

Malinowski.  And the last name Rebecca Laffitte.  That is the

entire Board.

Q.   And not to put too fine a point on that, but as the

jury is very well aware by now, the Laffittes are basically

running this bank?

A.   Yes, sir.

1    Q.   Now, at the very, very bottom, because we are just

2    setting up what's going on the next page, "Review the

3    Executive Committee minutes from August 12, 2021."  Then

4    after that it says, "The loans outstanding on Richard

5    Alexander Murdaugh were discussed.  A copy is attached."

6         We've been going over that copy already; is that

7    correct?

8    A.   That's correct.

9    Q.   Next page, please, second paragraph.  So Chairman

10   Laffitte reviewed the loans to Richard Alexander Murdaugh.

11   And, again, so we are keeping all the roles right, we have

12   CEO, chairman of the Board, who is chairman?

13   A.   Chairman is Charlie Laffitte, C.A. Laffitte Jr.

14   Q.   And Russell Laffitte fills you in, stated that his

15   intention is to sell the farm?

16   A.   Yes, sir.

17   Q.   What did that mean?

18   A.   We are in August.  We now recognize what see down

19   there, the $3 million is due.  And he intends to sell the

20   Moselle property, which was the 900 acres and 816 acres.

21   Q.   And then in the next line, is there at least some

22   notion that there are mortgages on properties that might,

23   when they supersede, they would take priority as far as those

24   being transferred into Maggie's name, at least somebody makes

25   that representation?

A.   It's my understanding on the farm properties, that 900 acre and -- 916, 866 acres, the mortgages were in Alex's name.  And, therefore, the mortgage is still good with the Palmetto State Bank even though he had transferred the property into Maggie's, his wife's name, Alex is the one who still owed the money on those loans.

Q.   Okay.  And then we are not going to belabor this point, but that's talking about the mathematical error that you found.  The next point is:  Norris Laffitte questioned why we have charged-off -- we have charged-off loans, but continue to loan him money.  What is a charged-off loan?

A.   In this instance -- I hate to keep referring back to --

Q.   Tell me just generally.

A.   Generally, a charged-off loan is when instead of foreclosing on the property, they've established an account in the bank where we realize we are not getting any money at the time, and that loan just sits over there.

Q.   And why would a bank charge off a loan?

A.   Charging off would be you don't think you ever going to get paid on it.

Q.   So, generally speaking, what would be the wisdom if you had somebody who had a number of charged-off loans continuing to loan them money?

A.   That's why I asked the question.  If you have

1    charged-off loans, let's make him pay off the first loans,

2    make them good, interest, principal, show that he can

3    continue paying, and just don't keep throwing money out the

4    door.

5        Q.    And there's language after that that -- I guess they

6    were trying to assuage their good terms, but says:  Chairman

7    Laffitte and Russell Laffitte explained that the charged-off

8    loans were charged off five years ago.  And then it says

9    those are the ones with this other guy.

10           Would it give you further pause that a loan has been

11   charged off for five-years and the bank has done nothing as

12   far as the collateral, as far as foreclose or anything like

13   that?

14       A.    I believe the question was, why hadn't we

15   foreclosed.  Why hadn't we done something different?  Yeah,

16   this is, what are we doing?

17       Q.    Then they say:  Payments aren't current, but Alex

18   had been making payments that were made.

19           So are you aware of what payments were made?

20       A.    Apparently, by this statement and other information

21   since received, is Alex had been making payments on the two

22   charged-off loans when he did.  I don't know.

23       Q.    Do you know if he was actually paying into the

24   loan's principal or anything, or if he was just making

25   nominal interest payments?

1    A.    I don't know that.

2    Q.    Okay.  So then Russell says he's going to update the

3    Board regarding the status of the loan.  And then you have

4    Liz Malinowski comment about the $750,000 loan that's now

5    kind of been brought up in front of the -- to attention of

6    the Board.  What's her concern that she raises regarding the

7    Executive Committee?

8    A.    Again, the loan officers have limits.  Alex had

9    exceeded the limit of one loan officer or two combined.  The

10   loan limit was now aggregate high enough that it had to go

11   before the entire Committee for the risk to be assessed.

12   Q.    And Russell explains that three of the five members

13   of the Executive Committee had approved this loan.  Did he

14   tell you what three had done it?

15   A.    His father, Charlie Laffitte, his sister Gray, and

16   himself.

17   Q.    Did that give you further concern as to why it

18   hadn't been brought up to the entire Executive Committee,

19   that it's just the father, son, daughter, approving a loan

20   for $750,000 loan?

21   A.    Certainly.  It's supposed to go to the Executive

22   Committee.

23   Q.    And at this point, did you know when the $750,000

24   loan had even supposedly been made?

25   A.    No.  No.

1    Q.   Was loan paperwork made available to you during the

2  meeting?

3    A.   No.

4    Q.   Did anyone ask to see it?

5    A.   Excuse me.  Yes.  It was brought up by Jan

6  Malinowski and myself, one of the two of us, said, is there

7  any documentation on the $750,000, yes.

8    Q.   Okay.  And did anyone go look for it for you?

9    A.   Gray Henderson got up from her chair, walked around

10  the Board table.  Her office is connected to the Board room.

11  She went and looked on her computer for some information

12  about the $750,000.

13    Q.   And was she able to find any paperwork on $750,000?

14  And, again, this Board meeting is taking place on August the

15  17th; is that right?

16    A.   That is correct.

17    Q.   And she checks the system looking for the $750,000

18  loan, what does she find?

19    A.   She came back out of her room and said she doesn't

20  see anything on it.

21    Q.   Did any Board members react to that information?

22    A.   Well, at that time there were -- excuse me.  Yes.

23  The majority of us could not believe it, yes.

24    Q.   It's a substantial loan?

25    A.   Where is the paperwork?  What's going on here?

1    Q.   Did that discussion continue or did somebody cut it

2    off?

3    A.   Well, the Laffittes are pretty cordial people.  But

4    this had us riled up pretty good.  What in the world is

5    happening?  And Charlie, at the end of the table, leaned

6    forward and said, we've given him this, and if he comes back

7    and wants more, we will give him some more.

8    Q.   Again, Charlie is?

9    A.   Charlie is Russell's daddy.  And that pretty much

10   shut down the conversation for the rest of us.

11   Q.   So by him indicating that whatever the rest of the

12   Board thinks, we are just going to keep lending this guy

13   money, is that following bank procedures?

14   A.   Doesn't come close.

15   Q.   Did you know the status of Murdaugh's accounts with

16   Palmetto State Bank at this point at that meeting?

17   A.   We had the loan information and that's all I knew.

18   Q.   We are going to go to Government's Exhibit 7 now,

19   7A.  Y'all had requested at that August 17th Board meeting

20   that some more information be provided to you.  So if you

21   look at this August 18th e-mail, second paragraph -- well,

22   first of all, who is it coming from?

23   A.   The e-mail is from Russell Laffitte.

24   Q.   And then the second paragraph, I will read it to

25   you.  "Alex Murdaugh's loans that are completely charged

1    off" -- and those are the two we were talking about?

2    A.   Yes, sir.

3    Q.   "Did not have a payment made on them in 2020."

4    A.   Yes, sir.

5    Q.   "He typically would have made them in January of

6    2021."  And the amounts of $52,046 and $55,684.  "I will

7    contact him about trying to get those payments and will try

8    to collect them in January when they get their bonus."

9         Obviously, now we are talking a little bit about the

10   inner workings of the Peter Murdaugh Law Firm.  Do you know

11   how the partners were paid at the Peters Murdaugh Law Firm?

12   When do they get their bonuses?

13   A.   According to Russell -- sorry, information I have,

14   apparently, they get their bonuses in January, end of the

15   year.  I think I've -- he's bounced from December to January

16   to February.

17   Q.   So if it's December/January time frame, if no

18   payments were made in all of 2020, and you are asking this

19   question in mid-2021, it's at least a year and a half --

20   A.   Those numbers are doubled.

21   Q.   -- that he's charged off loans; is that correct?

22   A.   That's correct.

23   Q.   I want to move forward a little bit in this e-mail

24   chain.  Going to 7D.  Now, this is you, right, from Norris

25   Laffitte, HB Railroad?

1     A.   Yes.

2     Q.   And you are sending this directly to Russell.  But

3 then you are copying the Board, the Executive Committee.  Who

4 are you copying?

5     A.   That is both.  That is the entire Board and the --

6 which is -- excuse me, it does not include Scott Swain.  So

7 that would be the Board members.

8     Q.   So if you would, this is coming from you, read to

9 us, please -- this is directed to Russell and to Gray.  Why

10 did you include Gray on this one?

11     A.   They both work in the Hampton office, brother and

12 sister.

13     Q.   I didn't mean to cut you off.  Go ahead.

14     A.   He had said that Gray and Russell were two of the

15 three that approved it on their own outside of the Committee

16 meeting.

17     Q.   Okay.  So read for me that first bullet point,

18 please.

19     A.   "In reviewing the PSB Onboard August 2021 Board

20 meeting --" and that is the -- when I say "Onboard," that is

21 the e-mail server that sends us the packet of information.

22     Q.   Is Alex here previewed to the Board meeting so you

23 can prepare your own board, so you can access and look at it

24 so you go to the Board meeting prepared for the meeting?

25     A.   When I first started in the bank, we would get the

1  information when we walked in that Tuesday for that meeting.

2  And it wasn't fair to anybody. So I requested early on that

3  we find a way to get the information earlier. And this

4  information, Onboard packet, usually comes Friday, Saturday,

5  Sunday, Monday before our meeting on Tuesday.

6  So in reviewing the PSB Onboard August 2021 Board

7  meeting, the Executive Committee minutes, which would be a

8  section of that, I see that "Alex Murdaugh-corrected,"

9  reflecting the actual total. So I had gone back in the

10  machine after the August meeting, pulled it back up. And

11  that's saying, thank you, Charlie, Gray, or Russell, whoever

12  corrected the 2.7 million, the 3.5 million. So I was saying

13  thank you for that.

14  But I now notice the $750,000 loan, Loan No. 6996084

15  has only the Green Swamp share as collateral, which does not

16  cover the loan. Especially if the share has been pledged

17  elsewhere. Has it -- referring to the Green Swamp share --

18  has it been pledged elsewhere? What happened with the

19  collateral of the second mortgage on the Edisto house that

20  was shown against this loan to the Board at the August

21  meeting? Is this loan secure or is it now like the unsecured

22  $599,400 Loan No. 6991524 on the same page?

23  Q.  So I don't know that we need to pull up that exhibit

24  again, Exhibit 5, which showed all the different loans that

25  we were talking about. But at the very bottom there was the

1    $750,000 loan that the jury saw.

2        A.    Right.

3        Q.    And then you also make reference to the one right

4    above it, $599,400.  And you are further pushing the

5    collateral question, because now you know the beach house is

6    complicated by Maggie's estate?

7        A.    That's correct.

8        Q.    How about the Green Swamp?  Did you have concerns

9    about the Green Swamp stock?

10       A.    Somewhere in my three and a half, four years on the

11   Board, I had seen Green Swamp share somewhere else against

12   Alex's loans.  So if it had been against 0 United loan, was

13   it still against that loan or not?  It had been talked about

14   on the Red Beard loan, which, was still on that loan as a

15   collateral or share?  I think I was mentioning somewhere

16   else.  And now here it is written on this $750,000 loan as

17   collateral.  So my fear was where was that collateral?  How

18   was it going to be used?

19       Q.    You get a response from Russell on September the

20   2nd.  I'm going to show you Government's Exhibit 70.  All

21   right.  This is the response that I was talking about.

22   Question -- this is from Russell to you, right?

23       A.    That's correct.

24       Q.    Question one, we took the second mortgage off since

25   it is not in place yet.

1          That would be the beach house?

2     A.     That would be the beach house, yes, sir.

3     Q.     We cannot get the second mortgage until the estate

4     on Maggie -- Margaret Murdaugh is open.  We've been

5     discussing that at length?

6     A.     Yes, sir.

7     Q.     They are working on that now.  The attorney is ready

8     to close as soon as it does.  The stock has not been pledged

9     elsewhere.

10          When he says "the stock," is he referring to that

11     Green Swamp stock?

12     A.     Yes, sir.

13     Q.     Did you later learn whether or not that was true?

14     Was the Green Swamp share pledged elsewhere?

15     A.     As far as I knew, it had been pledged at least two

16     places.

17     Q.     And then there is a lot of back-and-forth.  Now we

18     are into early September talking about all the security on

19     this loan.  But just to bring this section of our discussion

20     to a close, if we can put 7D and 10I side-by-side.

21          I don't think I want 7D.

22          So it's early September.  And you are having this

23     back-and-forth with the Board and this back-and-forth with

24     Russell about how this money might be secured.  But as the

25     jury has already heard, going back to the middle of July and

1  into early August, whether it's collateralized or not, that

2  money is already gone; is that right?

3      A.   That money is gone, yes, sir.

4      Q.   All right.  What happened with Alex Murdaugh Labor

5  Day weekend 2021?

6      A.   Alex was -- met with his partners at the Peters

7  Murdaugh Parker Eltzroth & Detrick law firm, if we could say

8  law firm and cut all that out, and his partners apparently

9  had found some things they weren't happy with.  And he lost

10 his job with the Murdaugh firm.

11     Q.   And was that exactly your concern all along going

12 back to July 4th --

13     A.   At DeBordieu I was told he wasn't working at this

14 time.  And now my radar looked ballistic that now he didn't

15 have a job.

16     Q.   Were you -- how was it -- well, what else happened

17 with Alex Murdaugh that weekend?

18     A.   There's apparently an incident on the road with a

19 gun going off near somebody's head.

20     Q.   "Somebody" would be Alex Murdaugh?

21     A.   Alex Murdaugh, yes, sir.

22     Q.   And so now you have confirmed that he's not working?

23     A.   He's not working.

24     Q.   And June the 7th of 2021, you have his wife and his

25 son killed at the house in Moselle?

1    A.   Correct.

2    Q.   And now we've got an incident on the side of the

3    road involving a gun and his Mercedes?

4    A.   Yes, sir.

5    Q.   And him?

6    A.   Yes, sir.

7    Q.   How are you feeling about that $3.5 million right

8    now?

9    A.   It is not a good feeling.  How is Palmetto State

10   Bank going to recover this money?

11   Q.   Okay.  Showing you Government's Exhibit 11A,

12   focusing down at the bottom there.  Well, actually, stay

13   right there.  Up top, you see, "from Russell Laffitte?"

14   A.   Yes, sir.

15   Q.   And it's copied, again, those are the names the

16   jurors are used to seeing now on just about everything.

17   A.   That is our Board of Directors, yes, sir.

18   Q.   And it's Monday, September the 6th?

19   A.   Yes, sir.

20   Q.   And, everyone, I wanted all of you to see this, I

21   hopefully will have more information from you at the next

22   Board meeting.  That is from Russell; is that right?

23   A.   That is from Russell.

24   Q.   And Russell is basically Alex's contact at the bank;

25   is that right?

1    A.    Yes, sir.

2    Q.    So he's the one keeping you informed about what's

3    going on in Alex's life?

4    A.    Correct.

5    Q.    And also his loan, he knows his loan status, he

6    knows his account status, and all these things as well?

7    A.    Yes.

8    Q.    If you want to know about Alex Murdaugh and his

9    activity at Palmetto State Bank, who are you asking questions

10   to?

11   A.    Asking them to Russell.

12   Q.    So I'm just going to read the WIS news release:

13   Alex Murdaugh says he resigned from his law firm and in a

14   rehab in his first statement released since he was shot along

15   a rural road in Hampton County.  Murdaugh released the

16   following statement through his attorney, Dick Harpootlian.

17   "The murders of my wife and son have caused an incredibly

18   difficult time in my life.  I've made a lot of decisions that

19   I truly regret.  I'm resigning from my law firm and entering

20   rehab after a long battle that has been exacerbated by these

21   murders.  I'm immensely sorry to everyone I hurt including my

22   family, friends, and colleagues.  I ask for prayers as I

23   rehabilitate myself from my relationships."

24   Q.    Is this how you found out that Alex Murdaugh was

25   done with the law firm?

1    A.    Bad news travels fast.  Hampton County is small.

2  And I think I knew about it Friday.

3    Q.    Okay.

4    A.    Before this.

5    Q.    Who is Becky Laffitte?

6    A.    Becky is my first cousin on the Board.

7    Q.    And when did she join the Board, roughly?

8    A.    I believe she joined the Board in June of '20.

9    Q.    And --

10   A.    Or, excuse me, or was it June of '21?  Excuse me.

11  She had just joined.  I don't know.  One of those two days.

12  I'm sorry.  She had not been on the Board long when all of

13  this was happening.

14   Q.    So we are going to look at Becky's response first.

15  It's Government's Exhibit B.  All right.  It's kind of

16  chopped up, because the way we have it, it goes over two

17  pages.  But Becky writes, good evening, Russell.  And then

18  there's a little condolences at the top.  But then:  As a

19  member of a law firm, I'm intrigued by his decision to resign

20  based solely on the need for counseling.  In his statement

21  there is -- we can go to the next part -- an admission that

22  mistakes had been made for which he apologizes.  But as of

23  now, these alleged mistakes are unknown.  When a law partner

24  is down with an illness, the first thing you want to do is

25  support him or her and their families during a difficult time

1   unless there are other culpable reasons which could legally

2   implicate the law firm in an adverse way.

3   So, clearly, Becky is thinking there's a little more

4   up here than something that happened on the side of the road.

5   Is that right?

6   A.    Becky is very sharp.  Yes, sir.

7   Q.    Therefore, I have concerns there may be issues other

8   than the physical and mental ones which necessitated his

9   resignation.  Depending on the issues, his law license could

10  be in jeopardy as well.

11  So it's one thing that he gets removed from his law

12  firm, but if a lawyer abuses the license, you can't practice

13  anywhere, much less your own law firm; is that correct?

14  A.    That is correct.

15  Q.    So his days as a lawyer could be finished?

16  A.    Correct.

17  Q.    This news brings a realization that he will have no

18  income stream for some time into the future, thus, as we all

19  recognize, leaving Palmetto State Bank and its shareholders

20  vulnerable if he is unable to meet his financial obligations

21  on outstanding loans and payments due in the future.

22  And then she continues on.  And we will skip.

23  There's some logistics in the middle.  But it says:  I hope

24  this e-mail won't be viewed as insensitive; however, given

25  that others may be jockeying for position where his assets

1  are concerned -- I will go back.  Is she talking about

2  security, like we were talking about security for loans and

3  all?

4     A.  Yes.

5     Q.  And these loans that have been cycled through

6  Palmetto State Bank --

7     A.  Yes.

8     Q.  -- in part by Russell, Alex Murdaugh's banker,

9  unsecured loans, loans secured by -- multiple loans secured

10 by one piece of property, issues with cars, issues with beach

11 houses, all of these things?

12    A.  All of those things.

13    Q.  She said, I wanted to -- continuing on with that

14 sentence:  I wanted to share some of my thoughts from a legal

15 perspective and would welcome Jim Gibson's thoughts as well

16 since he is a far more seasoned litigator than I.

17        We are going to read an e-mail from Jim in a minute,

18 but he is a Board member who also happens to be a retired

19 lawyer?

20    A.  That's correct.

21    Q.  I look forward to hearing more about your plan to

22 address the outstanding indebtedness in light of today's

23 development.

24        When she says, I look forward to hearing more about

25 your plan, she's directing that at Russell, correct?

1    A.   Yes.

2    Q.   I'm also hopeful we can have a discussion about

3    immediately retaining counsel to assist in these efforts as

4    today's development has significantly changed the landscape

5    where his indebtedness and collateral are concerned.

6         And then she brings up the car issue.  It appears

7    that the 2021 Mercedes is now impounded during the

8    investigation; is that right?

9    A.   Yes, sir.

10   Q.   After that, Gibson weighs in, correct?  Go to 11D.

11   I will show you.  Do you see there Jim Gibson, whoever set it

12   up, kind of botched his last name there, but there he is?

13   A.   Yes, sir.

14   Q.   September 6th, same day, 9:12 in the evening:  I'm

15   very suspicious about the reason for his resignation from his

16   law firm.  I think we need to assume the worst and take

17   immediate steps to protect the bank's position.  Assuming

18   that Alex is not going to be earning any money any time in

19   the near future, it's my opinion that Alex is not going to be

20   able to avoid what is coming his way by enrolling in a rehab

21   program.

22        I kind of want to cut to the end of the chase here.

23   Did Alex Murdaugh ever make a payment on the $750,000 loan?

24   A.   No, sir, he did not.

25   Q.   So the money, $350,000 went to Chris Wilson.

1    $400,000 went into his account to get him just into the black

2    from when he had been 360 in the red?

3         A.    That's correct.

4         Q.    So the money has basically dissipated immediately?

5         A.    Money is gone.

6         Q.    And we know at least from the wire that Russell

7    Laffitte was the one --

8         A.    Sent the wire.

9         Q.    -- sent off the wire to the Wilson Law Firm?

10        A.    Yes, sir.

11             MR. HOLLIDAY:  Your Honor, I don't know when you

12   plan to take a mid-afternoon break.  This is a somewhat good

13   spot.

14             THE COURT:  Ladies and gentlemen, let's take an

15   afternoon break, 10 minutes.

16             (Jury leaves open court at 4:08 p.m.)

17             THE COURT:  We will be at ease 10 minutes.

18             (Whereupon, a recess transpired.)

19             (Whereupon, the jury returns to open court at 4:18

20   p.m.)

21             THE COURT:  Please be seated.  Mr. Holliday, please

22   continue direct examination.

23             MR. HOLLIDAY:  Your Honor, thank you.

24   BY MR. HOLLIDAY:

25        Q.    So we've taken a little bit of a break, Mr.

1   Laffitte. So I just want to orient us back to where we were

2   before we took the break. There was an exchange that very

3   first week of September the 6th regarding Alex Murdaugh's

4   employment status, and then just life situation in general;

5   is that right?

6       A.   That is correct.

7       Q.   We are going to take it forward a little bit into

8   the end of October. And before we talk about communications,

9   I want to show you a check. Exhibit 14 is what we are

10  bringing up. I'm showing you a cashier check dated October

11  28th of 2021, and the amount of the check is what?

12      A.   $690,000.

13      Q.   Okay. And it's paid to the order of?

14      A.   PMPED.

15      Q.   And I think the jury knows this, having heard it a

16  few times, but let's just be cleared, what is PMPED?

17      A.   Peters Murdaugh Parker Eltzroth & Detrick. And

18  that's what I've referred to as the law firm instead of

19  stumbling under those letters.

20      Q.   And the signature down at the bottom right-hand

21  corner, what does it read?

22      A.   Russell Laffitte.

23      Q.   And then in the remitter, remitter line is

24  interesting. I think you should blow it up. It's hard to

25  see, the remitter line.

1     A.   Remitter line says:  Badger settlement from A.M.

2  misappropriation.  And so A.M. clearly Alex Murdaugh, right?

3     A.   Alex Murdaugh.

4     Q.   Badger settlement, what does that mean?  In your

5  capacity as a Board member you've had the opportunity to look

6  into this; is that correct?

7     A.   Russell was a fiduciary for the Badger family.

8     Q.   Right.

9     A.   And --

10     Q.   Well, the Badger family had been involved in a very

11  bad car accident; is that correct?

12     A.   That is correct.

13     Q.   And a member of the family has died in that

14  accident; is that correct?

15     A.   That's my understanding, yes.

16     Q.   And was there a financial settlement reached in that

17  case?

18     A.   Yes.

19     Q.   And as part of that settlement, who would oversee

20  the funds after the lawsuit was basically put to bed?

21     A.   Apparently, Alex Murdaugh asked Russell to be the

22  fiduciary responsible for that settlement.

23     Q.   And so here we have a check, and if we could blow

24  that one up, for $680,000 that your bank is now writing to

25  the law firm?

1    A.   Yes, sir.

2    Q.   And is the word "misappropriation" on that check,

3    right?

4    A.   Scary word.

5    Q.   I want to show you Government's Exhibit 23.  Okay?

6    You see there what lawyers call a caption in the upper

7    left-hand corner, basically identifies the parties to a

8    lawsuit, right?

9    A.   Yes, sir.

10   Q.   So if we look at that, County of Allendale, that's

11   down there near Hampton County.  That's the lower part of the

12   state?

13   A.   Adjoining county.

14   Q.   United Parcel Services, Arthur Badger v. UPS and

15   Matthew Fields --

16   A.   Yes, sir.

17   Q.   -- driver.  So there's a recovery amount listed

18   there as well?

19   A.   Recovery amount, yes, sir.

20   Q.   At least as to Arthur Badger, that's not the entire

21   lawsuit, but at least as to Arthur Badger, it's $3.1 million,

22   correct?

23   A.   Yes, sir.

24   Q.   I want to go down to the bottom.  You see your

25   bank's name there?

1  A. Yes, I do.

2  Q. It's right there, Palmetto State Bank?

3  A. Yes, sir.

4  Q. "Payment to fund structure per client request."  In

5 your experience in banking as a Board member, do you know

6 what a structure is?

7  A. My understanding is settlements made, is the things

8 due to give it to the client, it's cash, or a structured fund

9 would be setting up an annuity, buying an annuity plan with

10 that money.

11  Q. An annuity is an investment?

12  A. It is.

13  Q. And someone would get paid out, rather than a lump

14 sum, certain payments over time?

15  A. Correct.

16  Q. When somebody buys an annuity or structure, it has

17 to be funded; is that correct?

18  A. Yes, sir.

19  Q. So then we have, payment to fund the structure,

20 $1,325,000 to fund the structure; is that correct?

21  A. That is correct.

22  Q. Now, we are going to blow the document back up.  Now

23 we are going to go under cost and expenses, which is middle

24 of the page, basically.  Do you see the defendant's name

25 there?

1    A.    Russell Laffitte, personal representative fee.

2    Q.    And what's the amount that's over there on the far

3    right side associated with the personal representative fee?

4    A.    $35,000

5    Q.    Okay.  Now, if we could just blow the document back

6    up.  I always hesitate to do this, why I wasn't a teacher.

7    But $1,325,000, which is the amount to fund the structure; is

8    that right?

9    A.    Bottom line, bottom page, yes, sir.

10   Q.    And then we have a $35,000 PR fee going to Russell

11   Laffitte; is that right?

12   A.    Yes, that's correct.

13   Q.    What does that add up to?

14   A.    Excuse me, $1,360,000.

15   Q.    Right.  $1,360,000.  You know what, if we divide

16   that by two, do you know what that is?

17   A.    The amount written on the check.

18   Q.    $680,000.  Do you know why this is a disbursement

19   sheet made by a law firm in association with this accident

20   involving Mr. Badger and there's a payment that's supposed to

21   be funding a structure of $1.325 million, and Russell

22   Laffitte has been made $35,000 to administer this, at least

23   according to this sheet, he's supposed to be administering

24   this.  And there's $1,360,000 out there, and he's stroking a

25   check for half of it back to the law firm.  Did this make any

1   sense to you at the time?

2       A.   Not a bit.

3       Q.   Did it come to make sense later on?

4       A.   Still doesn't make sense.

5       Q.   How did you find out about all of this transaction?

6       A.   Russell sent an e-mail, I believe it included all

7   the Board members.

8       Q.   All right.  Standard header, now the jury is very

9   aware of, this an e-mail from Russell to, in part, you and a

10  bunch of other people, right?

11      A.   That appears to be the entire Board.

12      Q.   HB Railroad, right there, there you are.

13      A.   Yes, sir.

14      Q.   And Russell writes -- this is October the 29th.  Do

15  you remember the date on the check was October 28th, right?

16      A.   Yes, sir.

17      Q.   Next day:  Everyone, I just wanted to give everyone

18  a heads-up on a charge that you will hear about in detail

19  during our next Board meeting.  We took a $680,000 loss to

20  fix an issue between us and the PMPED law firm.  We converted

21  $1,172,945.76 in checks made payable to Palmetto State Bank,

22  to numerous other places as part of another stolen case

23  settlement.  This all involved a case with Alex Murdaugh.  I

24  negotiated with the law firm to pay part and they paid the

25  balance to make their client whole.  We are moving $680,000

1  out of loan loss reserve to offset this loss since we have

2  ample reserves at this time.  I look forward to discussing

3  this further at the Board meeting.  Thanks, Russell Laffitte.

4       Do you remember where you were when you got this

5  e-mail?

6       A.   I had been in Columbia with my wife.  And I was on

7  I-26 driving home to Beaufort.

8       Q.   And what was your reaction when you got it?

9       A.   I was driving.  My wife in the passenger seat.

10  These fancy phones went bling.  And my wife opened the e-mail

11  and read it to me.  And I immediately went to the side of the

12  road, you've got to drive, I've got to figure out what we

13  just read.

14       Q.   In that e-mail in the second line, the "we" and the

15  "us", we took a $680,000 loss to fix an issue between us and

16  the PMPED law firm, did these words raise questions in your

17  mind?

18       A.   Who's the "we"?  Who is the "us"?

19       Q.   And then there's this word, "we converted," did

20  "converted" mean anything to you at the time?

21       A.   At the time I had no idea what the word "converted"

22  meant.

23       Q.   Have you come to learn what it meant?

24       A.   Well, after the wife started driving the car, I

25  called Jan Malinowski who had also received this e-mail:

1    Jan, what is this telling us?  What do you need to teach me

2    about the word "converted"?

3         Q.   Was Jan's feeling about receiving this e-mail and

4    what you guys were being informed of similar to yours?

5         A.   Yes, sir.  Excuse me.  I think it was on the tone of

6    his voice.

7         Q.   Then you have this line that says, I negotiated with

8    the law firm.  What did you think about the "I negotiated?"

9    Tell me what's going on with your bank in late October.

10        A.   The bank had been involved in another issue.  And we

11   had hired an outside firm, an attorney and whoever he needed

12   with him, to investigate where we stood on the first issue.

13        Q.   So there was a team of lawyers at the Board and the

14   Executive Committee's disposal, is that correct?

15        A.   Yes.  The Board had hired -- I can't remember if --

16   with this going on, if the Litigation Committee had been

17   formed yet.  But there was concern at the Board level, what's

18   happening?  Because we had one incident, now this is a second

19   incident, what is going on?

20        Q.   And you got the word "misappropriation," would that

21   have been something that you would have expected to be

22   brought up with this team of lawyers you have dealing with

23   whatever arises?

24        A.   Certainly.

25        Q.   And instead, what you are getting from the CEO of

1    the bank is, I negotiated with the law firm to pay part. And

2    then, is $680,000 a significant amount?

3        A.   Huge amount of money.

4        Q.   And then what is this loan loss reserve, what's he

5    talking about?

6        A.   In the accounting system of the bank, there is an

7    account loan loss reserves that the bank sets aside money so

8    if we do have problems with loans, it's an accounting issue.

9        Q.   Was this even a loan, to your knowledge?

10       A.   This e-mail is written in the past tense, we took,

11    we converted, I negotiated. I mean, he's done something

12    that -- what has happened?

13       Q.   Let's do this. Keep in mind that loan loss

14    language. We did the math before. I am not going to do it

15    again.

16       A.   Yes, sir.

17       Q.   But the $680,000 was half of $1,360,000, right,

18    1.3 --

19       A.   Half of his personal representative fee added with

20    the structured fund money, yes, sir.

21       Q.   So when the money to fund the structure was coming

22    out of the settlement and then you had also Russell's PR fee

23    as well, there's no loan involved, right?

24       A.   No.

25       Q.   So then when it's coming out of the loan loss fund,

1   would that even have been -- even if hypothetically this had

2   been a legitimate transaction, it wouldn't have come out of a

3   loan loss fund, would it?

4   A.   No.

5   Q.   We are going to go back into that e-mail chain where

6   you've pulled off on the side of the road, and your wife

7   starts to drive so you can start talking to Board members,

8   trying to figure out what in the world you guys had just

9   received.  Well, another Board member responds in the chain;

10  is that correct?

11  A.   That is correct.

12  Q.   12B.  I think we lost the very top, the "from."  All

13  right.  We lost the "from" again.  But at the bottom you can

14  see who signed off.  Who's Liz?

15  A.   Liz Malinowski, a Board member.

16  Q.   Liz writes:  I assume one of our attorneys was

17  consulted before the decision was made.

18       In fact, y'all didn't just have one attorney at your

19  disposal, you had a team of lawyers at your disposal; is that

20  right?

21  A.   Well, I can see in the cc line, at least Bobby

22  Stepp, Cal Watson, Kathy Helms, Trenholm Walker.  There were

23  at least four attorneys we had hired.

24  Q.   Then she said:  Will you please share the

25  communication with the Board?

1    Speaking about the communication with the lawyer; is

2  that right?

3     A.   She had asked -- as I read it, Liz was asking

4  Russell:  I assume you -- one of our attorneys was consulted

5  before the decision was made.

6     Q.   Yeah.  And "consulted" means, just what, generally

7  speaking, does it mean when somebody consults with somebody?

8     A.   That's a conversation with full disclosure goes from

9  one party with help from that party, back and forth, trying

10  to make sure we are making the right decision.

11     Q.   We are going to get to this, but does she ask for an

12  emergency meeting in the next paragraph?

13     A.   Her words:  I would like to see the Board meet prior

14  to the regularly scheduled meeting for a full update and

15  discussion.  Yes.

16     Q.   So is this an all-hands-on-deck moment for the

17  Board, like, to try to figure out what exactly the CEO of the

18  bank has done?

19     A.   Yes.

20     Q.   Going on down now to 12C, did Russell respond?

21     A.   Russell's response:  I didn't get up.  I'm sorry.  I

22  don't remember the time/date of Liz's, but I think this would

23  have been a short time later Russell responded --

24     Q.   I will take care of that one:  Attorneys were

25  informed but not consulted.  They were consulted by phone so

1   there's nothing to share.  This is not a lawsuit issue.  It

2   is a banking issue of us.

3          Again, that word "converting" checks, what you've

4   come to know is not the best word in a banking context; is

5   that right?

6          A.   That is a bad word.

7          Q.   And then he's very precise with his words here.  He

8   says:  The attorneys were informed but not consulted.

9          So what's the distinction between if you inform

10  somebody versus if you consult somebody?

11         A.   As I read this, Russell called one of our attorneys.

12  Don't know -- doesn't say which one.  It's an apostrophe S,

13  so I don't know if there was more than one attorneys called

14  or not.  I am not an English teacher.  But that's something

15  crazy, I think.  Who did he call, what he called, but whoever

16  he called, he said, this is what I have done.  He didn't ask

17  for their opinion at all.

18         Q.   In your experience in the timber industry and the

19  railroad industry and now on the Board of the bank, when you

20  are making consequential decisions that involve hundreds of

21  thousands of dollars, do you document those decisions?

22         A.   Certainly.

23         Q.   Would you want to have some record of what has

24  transpired between you and attorneys, Board members,

25  Executive Committee members, or whatever, before you commit

1  almost three-quarters of a million dollars of the bank's

2  money?

3      A.   There should have been a whole a lot more than a

4  informed conversation informing you.

5      Q.   In fact, you don't even know from his e-mail even --

6  if this conversation took place, you have no idea the

7  contents of the conversation --

8      A.   That is correct.

9      Q.   -- at that point?

10     A.   No idea.

11     Q.   And then about an hour later, that's when you had a

12 chance to weigh in; is that right?

13     A.   I sent an e-mail.

14         MR. AUSTIN:  Objection, Your Honor.  I'm trying not

15 to interrupt.  He's just leading an awful lot.

16         THE COURT:  He's trying to keep the thing moving

17 here.

18         MR. AUSTIN:  I try not to interrupt too much.

19         THE COURT:  I'm going to overrule it.  I don't think

20 it's misleading the jury in any way.

21         Please continue, Mr. Holliday.

22         MR. HOLLIDAY:  Thank you, Your Honor.

23 BY MR. HOLLIDAY:

24     Q.   12D, this is you, right?

25     A.   Yes.

Q.   And you are directing it to Russell.  And then there's a number of people in the cc line, including lawyers; is that right?

A.   I'm sorry.  I missed the word.  Including?  I missed your word.

Q.   Including attorneys.

A.   Oh, yes, sir.  Sorry.  Yes.

Q.   These are your questions.  So tell me your questions.

A.   Well, after figuring out what a conversion was in the banking industry a little bit, my questions, 1, 2, 3, 4, 5, 6, 7 questions, were all trying to figure out what his e-mail meant.  Who was responsible for the conversions?  He had used a "we" and an "us."  Are multiple employees involved?  Who are the employees?  And I asked, when did it happen?  And I added a slash line, "they," wanting to know if it happened one time, would be it.  "They" being did it happen more than one time?  What all was involved?  How many times?  How many other cases like this are out there?  And had we let the employee -- once again, I didn't know, he had used the "we" and the "us", so I put if there are multiple employees parenthesis S for employees, had we let the employees who did this go?

Q.   Why did you consider this a firing offense?

A.   Banks live on trust and doing the right thing.  To

1    take somebody's money, it was supposed to go to party A and

2    it did not go to party A, you don't bank that way.  You don't

3    fiduciary responsibility that way.  This is a horrible

4    offense.

5        Q.    Did Russell respond and provide further

6    clarification to exactly what his role was?

7        A.    Russell did send back an e-mail.

8        Q.    This is Exhibit 13.  He says:  We will discuss in

9    the Board meeting.  I was responsible.  12 checks made

10   payable to Palmetto State Bank converted to others.

11   Hopefully no other cases.  This took place in 2013.

12            It's interesting that he says, hopefully no other

13   cases.  We will get to this, but were there other cases?

14       A.    Yes.

15       Q.    Was he involved in the other cases?

16       A.    Yes.

17       Q.    He would have known about that "hopefully no other

18   cases" better than anybody else in the bank; is that right?

19       A.    That is correct.

20       Q.    Did the Board meet on October the 31st of 2022?

21       A.    Special called meeting, yes.

22       Q.    I'm sorry.  2021, I got the date wrong.  A special

23   Board meeting August 31st of 2021?

24       A.    I'm sorry.  I was in the 2021 time frame with you,

25   yes.

1    Q.   So there's privilege issues obviously there, lawyers

2    were involved, but generally speaking, generally, what were

3    the two major decisions that the Board reached at that

4    meeting?

5    A.   At that meeting, we wanted to know what was going

6    on.  And we needed to get to the bottom of it.  So out of the

7    Board, we elected a Litigation Committee with Board members

8    to help guide us and direct us.  And we decided to hire a

9    litigation -- a team of investigative attorneys and whoever

10   else they needed to help us get to the bottom of this problem

11   and if there were other problems that we did not know about.

12   Q.   Okay.  And I think let's just leave it there for

13   now.  There is, in fact, a November 3rd, 2021, Board meeting,

14   right, shortly after the Halloween meeting?

15   A.   Yes, sir.

16   Q.   A few days later?

17   A.   Yes, sir.

18   Q.   Did you attend that meeting?

19   A.   If you could pull up the exhibit, I would rather

20   answer it that way.

21   Q.   I will get to that.  First of all, before the

22   November 3rd Board meeting, I want to show you an e-mail

23   exchange to put it in context.  It had been admitted into

24   evidence as Government's Exhibit 80.  And we need to go to

25   the second page first.  So just for the jury's benefit, we

1    are going to read below that red line.  Okay?  So this is

2    from Russell Laffitte, November 2nd, 2021, to Trenholm

3    Walker, who is Trenholm Walker?

4         A.   Trenholm is one of the attorneys that we had hired

5    to help us figure out what was going on.

6         Q.   And tell me the significance of the four people who

7    are copied on that e-mail.

8         A.   Those four people are the Litigation Committee that

9    had been established a few days prior.

10        Q.   Okay.  And the re line says what?

11        A.   Badger.

12        Q.   So that's the whole Badger matter that we've been

13   discussing, the $1.325 structure plus the $35,000 PR fee and

14   all that?

15        A.   Yes.

16        Q.   It says from Russell to Trenholm:  Please let me

17   know when we decide to pay the check to the law firm.  I

18   would like to call them to do this sooner rather than later.

19   Thanks, Russell.  Okay?

20        A.   Yes, sir.

21        Q.   Now, above that -- I think very briefly, Tracy, we

22   need to go to the first page so the jury can know when that

23   was -- yeah.

24             So apologies, the header is down at the bottom, from

25   Trenholm Walker to Russell, copying the Litigation Committee

1    November 2, 2021, later that day; is that right at the very

2    bottom?

3        A.    Above the line or below the line?

4        Q.    Below the line.

5        A.    Yes, at 5:06 p.m. you are talking about?

6        Q.    Yes.

7        A.    Trenholm did send an e-mail apparently to Russell

8    and the Litigation Committee regarding Badger.

9        Q.    All we are doing here is orienting the jury as to

10   when that e-mail was sent, because the text is on the next

11   page.

12       A.    I'm trying to keep up too.

13       Q.    So let's go to page 2, please.  And this is it:

14   Russell, I will handle it.  It will get in touch with Ronnie

15   again to discuss this.  Please refrain from dealing with

16   Ronnie on this.  I need to make sure that there's a clear

17   understanding of the terms if the bank is willing to pay the

18   amount.  I will call him again later today or first thing in

19   the morning.  Trenholm.

20             Who is Ronnie?

21       A.    That would be Ronnie Crosby, one of the lawyers in

22   the law firm.

23       Q.    Okay.  So Trenholm is informing Russell that he will

24   get back in touch with Ronnie; is that correct, from the

25   first line?

1    A.    I will get in touch with Ronnie to discuss, yes.

2    Q.    And then what are -- what is Trenholm suggesting as

3 far as Russell's interaction with Ronnie in the next

4 sentence?

5    A.    Please refrain from dealing with Ronnie on this.

6    Q.    I need to make sure that there's a clear

7 understanding of the terms if the bank is willing to pay this

8 amount.  Were you aware, when Russell indicated that he had

9 negotiated this, had he negotiated anything besides an

10 amount?  Was there a release?  Was there any kind of language

11 protecting the bank's interest that went along with his

12 unilateral negotiation with the law firm?

13    A.    No.

14    Q.    And then Trenholm is saying he's going to get on it:

15 I will call him again later today or first thing in the

16 morning.  Do you see that?

17    A.    Yes, sir.

18    Q.    And next page.  Russell responds -- and these

19 e-mails are going back and forth.  So if you look at the

20 bottom, and I apologize it's small, but says 5:06, November

21 the 2nd?

22    A.    Yes.

23    Q.    And on top I think it's 5:35 on November the 2nd.

24 So the e-mails -- there's a Board meeting the next day,

25 right?

1     A.   Yes, sir.

2     Q.   And so the e-mails on the afternoon, late afternoon

3  of November the 2nd are going quickly back and forth?

4  Trenholm is saying Russell says, call me, let me know when I

5  get back in the firm.  Trenholm says, I don't want you to do

6  that.

7          And then we get this from Russell:  Trenholm, the

8  bank is paying this amount.  The verbal contract between --

9  again, verbal, nothing in writing -- between Palmetto State

10 Bank and the law firm PMPED was done with the approval of the

11 chairman of the Board and the CEO.

12         Who is the chairman of the Board?

13    A.   That would be his father, Charlie Laffitte.

14    Q.   Charlie Laffitte, right?

15    A.   Yes.

16    Q.   Who also signed off on the $750,000 loan back in

17 July?

18    A.   Charlie Laffitte.

19    Q.   You're welcome to discuss terms, but it is not an

20 option to not pay.  What are the instructions that Russell is

21 giving to Trenholm in the first paragraph of this e-mail?

22    A.   Russell, the CEO, is saying we are going to pay the

23 $680,000, don't get in the way of it.

24    Q.   He says:  We agreed to this settlement amount, not

25 because I was PR.

1       Was he, in fact, a PR somewhere, because he received

2  a PR fee?

3       A.   He was a PR in the Badger subject line name, yes.

4       Q.   Or Alex stole -- if Alex is the only one stealing

5  the money, why would your bank pay his law firm half the

6  amount that was stolen?

7       A.   Should have never done it.

8       Q.   It was done due to the fact that I converted these

9  checks made payable to -- made to Palmetto State Bank.  We

10 were actually happy to settle for $680,000 versus the full

11 amount.  Were you happy?

12      A.   No.  I mean, $680,000 of shareholder money out the

13 door, for what?

14      Q.   Without a release, what was the bank's exposure

15 regarding this $680,000, or if you cut it the other way,

16 $1,325,000?

17      A.   Say that question again.

18      Q.   If you had no release, what's the bank ongoing

19 exposure based on this $1,325,000, or $1,360,000

20 misappropriation of money?

21      A.   We could have owed the whole thing.  We could have

22 owed none of it.  The Board doesn't have a clue what's going

23 on.

24      MR. HOLLIDAY:  Your Honor, at this point I'm going

25 to introduce Exhibit 200.  That is a transcript that the

1  defense has not stipulated to.  It's an ODC transcript.  It

2  is a sworn statement by the defendant.  And, obviously, it's

3  a sworn statement of a party opponent.  I aim to introduce

4  two pages from this transcript.

5          THE COURT:  I have not seen the document.  Do you

6  have it available, a printed copy?

7          MR. HOLLIDAY:  I do.

8          THE COURT:  Is that the whole thing?

9          MR. HOLLIDAY:  But I have the two pages here.  What

10  would you like to see, Your Honor?

11          THE COURT:  The pages you intend to use.

12          MR. HOLLIDAY:  Your Honor, too, just for your

13  reference, so you have that, we flagged the portion that I

14  intend to talk about.

15          THE COURT:  Does the defense oppose the admission of

16  this document?

17          MR. AUSTIN:  Say again, Your Honor.

18          THE COURT:  Does the defendant oppose the admission

19  of this document?

20          MR. AUSTIN:  No, Your Honor.

21          THE COURT:  You are offering Exhibit 200?

22          MR. HOLLIDAY:  I am.  At this time, the Government

23  moves to admit Government's Exhibit 200.

24          THE COURT:  Admitted.  No objection.  You were

25  trying to get in the first two pages or the entire exhibit?

1    MR. HOLLIDAY:  We are going to move the entire

2    exhibit in, but I'm only going to reference two pages.

3    THE COURT:  Exhibit No. 200 is admitted.

4    Government's Exhibit 200 is admitted.

5    (Government's Exh. 200 is received in evidence.)

6    MR. AUSTIN:  Your Honor, we have no objection to the

7    entire transcript coming in.

8    THE COURT:  I think it's all -- it would all come

9    in, the entire thing.  Yes, sir.

10   BY MR. HOLLIDAY:

11   Q.   So going to 200B.  So I want to show you -- this is

12   Government's Exhibit 200.  It's an excerpt.  Page 104 and 105

13   is all we are going to do, a sworn statement by the

14   defendant.  He's being questioned.  In the middle of the

15   page, picking up on line 13:  And was there another

16   consideration too, like with cost benefit and litigation in

17   Hampton County turning an adverse result that was greater

18   than the 1.3 million?

19   And that's a rounding of the 1.3 million we've been

20   talking about at length after the break, right?

21   A.   Yes.

22   Q.   Russell's response:  You know, they didn't want to

23   pay it.  When I took it to the Board, the Board went

24   absolutely ballistic.  They wanted to claw it back.  And I --

25   part of the reason I got fired, I put my foot down, and I

1   said no.  I said three of the four members of the Executive

2   Committee discussed this in-depth, which was my sister, Gray

3   Henderson, myself, and Charlie Laffitte, who is also the

4   Board chairman.

5           So at this point, this questionable payment of

6   $680,000 to settle an obligation you don't even know that the

7   bank actually owes, he's pulling his sister and his father

8   into it; is that right?

9   A.   Yes.

10  Q.   We have the authority by our bylaws to settle any

11  lawsuits whatever or potential.

12          Was there a lawsuit at the time?

13  A.   There was a lawsuit --

14  Q.   Regarding Arthur Badger and your bank?

15  A.   Not with Arthur Badger and our bank.

16  Q.   We thought it was in the best interest, so we did

17  it, and they wanted to claw it back.

18          When he says "they" again, he's referring to the

19  Board; is that right?

20  A.   Yes.

21  Q.   And I told them absolutely not.  I gave them my word

22  we were paying it, and by God, we were paying it.

23          Is that what it says?

24  A.   You read like I read.

25  Q.   Did you say:  Like, for the authority to settle on

1  an amount that large, would you, could you do it yourself, or

2  did you need that particular support?

3          He says:  I don't think I needed to go, but I was

4  going to.  I mean, we are family.

5          So, again, pulling his sister and his father into

6  this deal where you are not even sure that the bank has any

7  exposure here because it just says A.M. misappropriation.

8  It's not a loan from the disbursement sheet, is it?

9      A.   No.

10     Q.   You don't know what it is at this point?

11     A.   In the dark.

12     Q.   Then he says:  We would discuss it.  I never tried

13  to hide it.  We wouldn't try to hide it.  Never tried to say

14  it was anybody's fault but my own.

15         The payment of $680,000 to the law firm is Russell

16  Laffitte's fault, isn't it, by his own admission?

17     A.   By his own admission.

18     Q.   Now, at the Board meeting, when you are seeking

19  answers to your questions -- and I know it's difficult to

20  separate because you've learned things since.  You have to

21  put yourself back in November the 3rd.

22     A.   All right.

23     Q.   Were you all informed where that $680,000 had come

24  from?  We've seen the disbursement sheet today.  Did you have

25  that disbursement sheet on November the 3rd?

1     A.   Did not.

2     Q.   Were you told what that $680,000 or $1.3 million had

3  been converted to?

4     A.   Did not know that.

5     Q.   One of his e-mails says there were 12 checks that he

6  transacted.  Were you shown any of the 12 checks?

7     A.   I was not.

8     Q.   Were you all explained who those 12 checks went to?

9     A.   You are facing the other way.

10    Q.   Who the 12 checks went to?

11    A.   No, sir.

12    Q.   Were you told the purpose behind the 12 checks?

13    A.   No, sir.

14    Q.   Were you told why the bank, your bank, should be

15  paying the law firm back for those 12 checks?

16    A.   No, sir.

17    Q.   Were you operating in the dark?

18    A.   Hard dark.

19    Q.   And at that time, because you hadn't seen the

20  disbursement sheet, were you told that some of that $680,000

21  was half of the $35,000 that he had paid?

22    A.   Did not know that.

23    Q.   Moving now to Government's Exhibit 37 -- might as

24  well put up 38.  These two e-mails go hand-in-hand.  One

25  follows the other one.  And we are going to walk through them

for the benefit of the jury. On the left-hand side of this screen, there's an e-mail from Alex Murdaugh to Russell. Do you see that?

A.   I do.

Q.   Subject, check, singular. Do you see that?

A.   Single check, yes, sir.

Q.   And now we are going back. So we've been talking about how this is unraveling in October of '21. But the date of this e-mail goes all the way back to 2013, right?

A.   Yes, sir.

Q.   And you know that in one of the Russell's e-mails to the -- to all of you, he talks about this happening back in 2013?

A.   Yes, he did.

Q.   And then there's basically four lines that we are looking at right there. Okay? And Alex is saying -- yeah. Go ahead. That's good.

      We are going to start at the bottom. Okay? It says, please e-mail -- this is Alex writing to Russell. He's saying: Please e-mail me and ask that Check No. 43162 dated November 19th, 2012, for $1,325,000 be re-cut as listed above.

      $1,325,000, that was the structuring amount for the Arthur Badger settlement sheet, wasn't it?

A.   Yes, it was.

Q.   And Murdaugh is saying re-cut it.  But he's --
what's the significance of him saying, please e-mail me and
ask that that check number be re-cut?  If it's too difficult
a question, I will make it clear in a minute.

A.   Please repeat your question to me.

Q.   I'm going to withdraw the question for now and we
will revisit the question.

There's an amount $388,687.50.  That's the first
re-cut, right?

A.   Yes.  I understand your question now.

Q.   And then the next line, whatever the amount I owe on
Hannah loan, as a Board member, you've had the benefit of
looking into this whatever.  Who is Hannah?

A.   Russell was a fiduciary for two girls that were
involved in an automobile accident.  And Alex had loaned --
had been loaned some money out of that fiduciary account.

Q.   Then there's $75,000 is the next one?

A.   Yes, sir.

Q.   Then:  Whatever the balance would be on the
$1,325,000 after these deductions.  So there's three things
he's got in mind.  And then he says, whatever is left, we are
going to take the rest of it as well; is that right?

A.   He's asking for a figure.

Q.   So if we can, we will blow it back up.  So left
side, Alex asked Russell to send him an e-mail describing --

1    asking him to re-cut the check?  Right side is the e-mail.

2        A.   Yes, sir.

3        Q.   All right.  Check No. 43162, that was the check that

4    was in that bottom line that said --

5             THE COURT:  Slow down.

6             MR. HOLLIDAY:  I apologize.

7    BY MR. HOLLIDAY:

8        Q.   Well, read it.

9        A.   Russell writing to Alex:  Alex -- and this goes back

10   to the e-mail you had talked about just a second ago -- can

11   you please get Jeanne to re-cut Check No. 43126 dated

12   11/19/2012, as follows.

13            And the check is now broken down into four figures.

14   First $388,687.50, which was on that first e-mail.  The

15   second figure goes back to the Hannah loan, $151,726.05.  The

16   third figure is the same that was on the previous e-mail of

17   $75,000.  And the fourth figure represents the difference, I

18   hadn't done the math, I guess between $1,325,000, taking out

19   the first three lines, and that's the amount that's left over

20   $709,586.45.

21       Q.   In the Alex e-mail on the left, the second line

22   under the 388,687 says what again?

23       A.   Whatever the amount I owe on Hannah loan.

24       Q.   Alex didn't know what he owed on the Hannah loan,

25   did he?

1     A.   Not by that sentence.

2     Q.   If you go by the e-mail on the right from Russell to

3     Alex, who knew what was owed on the Hannah loan?

4     A.   Russell knew the amount.

5     Q.   And he filled the amount in, didn't he?

6     A.   He filled the amount in.

7     Q.   I want to go now to Exhibit 29.  We are going to

8     blow it up.  What I would like to do, actually, is put the

9     Exhibit 38 on one side and 29 on the other, please.

10         So the first amount is $388,687.50.  We are going to

11    start at the bottom.  Alex has asked Russell to have the bank

12    re-cut the Badger structured check?

13    A.   Yes.

14    Q.   And this is the first one, right?

15    A.   Yes, sir.

16    Q.   So, again, it's on the Peters Murdaugh account paid

17    to the order of Palmetto State Bank.  And there's that amount

18    $388,687.50, right?

19    A.   Yes.

20    Q.   What's in the memo line?

21    A.   Arthur Badger.

22    Q.   And then on the right side, when was the check

23    transacted?

24    A.   Right side under Palmetto State Bank, routing

25    number, Hampton 2013-02- --

1    Q.    We don't need all that.  What's the date?

2    A.    I'm sorry.  That looks like February 11th, 2013.

3    Q.    February 11th, 2013?

4    A.    Yes, sir.

5    Q.    Now we go up and we see a check -- or a money order.

6    I'm sorry.  So it says there for the benefit of -- I know

7    it's small, but it says "bank money order" inside my circle;

8    is that right?

9    A.    Close.

10    Q.    Can you see it?

11    A.    Yes.

12    Q.    And then the amount is basically that 388 that was

13    on the very top line of the Russell to Alex e-mail; is that

14    right?

15    A.    Yes, sir.

16    Q.    Who is Johnnie Parker?

17    A.    Johnnie Parker is -- I guess at this point he is the

18    most senior member of the law firm in Hampton County.

19    Q.    When y'all had that November 3rd Board meeting

20    trying to get to the bottom of this Badger money and the

21    $680,000 that's supposedly the bank owes to the law firm,

22    does Russell tell you why $388,000 of Badger money is going

23    to Johnnie Parker?

24    A.    He did not.

25    Q.    Did he explain to you why y'all should pay the law

1  firm half of that amount when one of the -- the senior

2  partner in the law firm got the bulk, almost $400,000?

3      A.   He did not.

4      Q.   Moving now, second line under 388 is 151,726.  We

5  are going to move to Exhibit 29.  Next page, please.  And

6  this is another one of these checks that jury is going to be

7  seeing a lot of.  There's the $151,726.05.  On the left-hand

8  side where there's 38, I want to go back to 37.  Okay.  You

9  see there under the $388,687.50, reads that for the jury,

10 please.

11     A.   Whatever the amount I owe on Hannah loan.

12     Q.   Okay.  And if we can go to next page on the

13 right-hand side, please.  So there we've got the 151,726.05

14 that -- the jury will remember this from the Government's

15 Exhibit 38, whatever the amount I owe on Hannah loan, was

16 filled in with that amount; is that correct?

17     A.   Yes.

18     Q.   The checks's been cut by Palmetto State Bank.  And

19 now it's being deposited into the Hannah Plyler account; is

20 that right?

21     A.   Yes.

22     Q.   On your November 3rd meeting, where you were seeking

23 explanations as to why the bank should be paying $680,000 to

24 the law firm, does Russell Laffitte explain to you why Arthur

25 Badger's money is going to Hannah Plyler?

1    A.    He does not.

2    Q.    Let's go next page on Government's Exhibit 29.

3    Okay.  We don't -- we are going to stick with the -- the jury

4    can just see the corner of Government's Exhibit 37 there on

5    the far left.  What does it say in the third line down when

6    talking about amounts?

7    A.    75K.

8    Q.    What's the amount on this, the check down -- let's

9    start at the bottom.  What's the amount on that check?

10   A.    The law firm's check is for $75,000.

11   Q.    Just so the court reporter is clear, it's "for",

12   f-o-r, space, 75,000, right?

13   A.    I don't see --

14   Q.    Sounded like --

15   A.    I'm sorry.  I don't see "for".  But the check is

16   written for $75,000, yes.

17   Q.    Correct.  And then if we go up above that, there's

18   another bank money order that the jury has just seen in the

19   other instance.  Do you see that?

20   A.    Yes, I do.

21   Q.    Who is that made payable to?

22   A.    That would be Alex's dad, Randolph Murdaugh, III.

23   Q.    And he's getting $75,000 of Badger money, right?

24   A.    The memo line on the check says Arthur Badger.  And

25   it appears to be that his father got that --

1    Q.   The memo line at the bottom says that.  Is there

2    anything on the money order that indicates that?  Does it

3    basically go away once it gets to the next level?

4    A.   Yes, nothing.

5    Q.   And your November 3rd Board meeting, when y'all were

6    trying to figure out why you paid $680,000 to the law firm,

7    did he explain why you were responsible for half of what was

8    paid to Randy Murdaugh?

9    A.   No.

10   Q.   Let's go to the next page, please.  I missed

11   something.  So let's go back.  We are sticking with this

12   exhibit.  All right.  We actually need to go one back.  Blow

13   up the top.

14        You see we've talked about Randy Murdaugh here.  We

15   talked about the $75,000 here, which is also here; is that

16   right?

17   A.   Yes.

18   Q.   This is Palmetto State Bank.  Whose initials are

19   those?

20   A.   Russell Laffitte's initials.

21   Q.   Okay.  Next page on that side.  Okay.  Now, okay,

22   there's four lines in that e-mail.

23   A.   Let me back up.  Let me back up.  That appears to be

24   Russell Laffitte's initials.

25   Q.   Right.  That's sort of reads, RLL?

1    A.    Yes.

2    Q.    We've talked about the 388.  We've talked about

3 whatever I owe Hannah.  We've talked about 75.

4    A.    Yes, sir.

5    Q.    Now we are in the "whatever is left" phase of the

6 e-mail.  Okay?

7    A.    Correct.

8    Q.    So let's go to first one.  So, first of all, same

9 initials, bottom right-hand side?

10    A.    Same initials.

11    Q.    How much money?

12    A.    $7,500.

13    Q.    Who is this one made payable to?

14    A.    Made payable to Alex's wife, Margaret Murdaugh.

15    Q.    Next one down, please.   This one -- go ahead and

16 just -- you know what I'm going to ask you.  Publish the

17 check, please.

18    A.    This check says, loan payment dated 10/3/2013 for

19 $93,869.49 made payable to Hannah Plyler.  And it's signed by

20 Russell.

21    Q.    And just not to lose sight of this, this money is

22 coming from where?

23    A.    This is Arthur Badger money.

24    Q.    And, again, going to pay a loan payment for Hannah

25 Plyler; is that right?

1    A.   Yes.

2    Q.   And what do those initials read, the blue letters

3    read?

4    A.   RLL, Russell.

5    Q.   $93,000, does he explain to you in the November 3rd

6    meeting why y'all are paying half of that amount back to the

7    law firm?

8    A.   He does not.

9    Q.   So, again, all the thing that we have been going

10   over, all these checks, all the re-cut, the 388, the 75, the

11   one whatever it was to Hannah, and now all these, none of

12   these were presented to you in the November 3rd Board

13   meeting?

14   A.   They were not.

15   Q.   When you are trying to get to the bottom of the

16   $680,000 check?

17   A.   We don't know what it is.

18   Q.   And now the bottom one, please.  So focusing very

19   briefly, because there's going to be some in sequence, the

20   check number at the top right-hand corner is what?

21   A.   45026.

22   Q.   Okay.  And the amount is what?  It's a little hard

23   to make out.

24   A.   The wording is $101,369.49?

25   Q.   That's how I read it too.  Then in the memo line for

1  all to see, what does it say?

2      A.   Estate of Donna Badger.

3      Q.   Next one, please.  Now, this is why -- we haven't

4  done this yet, but we did it on this one.  I had you read the

5  check number from the previous one, right, 45026?

6      A.   Yes.

7      Q.   What's the check number here?

8      A.   Sequentially the next check, 45027.

9      Q.   And what's the amount on the check?

10     A.   $101,369.49.

11     Q.   And this one passed to Palmetto State Bank when?

12     A.   On 9/13/ -- September 13th of 2013.

13     Q.   That's when the check was cut.  When was it

14  transacted?

15     A.   I'm sorry.  December 18th of 2013.

16     Q.   Okay.

17     A.   Three months later; three months, five days.

18     Q.   Now we are going to go to the next page, please.

19  Now, you just mentioned for the benefit of the jury that that

20  check was cut on September the 13th.  It was not transacted

21  until December the 18th; is that right?

22     A.   That is correct.

23     Q.   Then when it ultimately is transacted, where does it

24  go?

25     A.   Hannah Plyler.

1    Q.   Did Russell ever explain to you all why Badger money

2  was being diverted to Hannah Plyler?

3    A.   He did not.

4    Q.   Okay.  Next page, please.  This one -- we've been

5  talking about checks in sequence.  What's this one?

6    A.   This now is the third check in a row.  This is

7  45028.

8    Q.   Right.  Right.  What's the amount on the check?

9    A.   $101,369.49.

10    Q.   Consistent with the same amount on the other ones,

11  right?

12    A.   Yes, sir.

13    Q.   And this check was cut on November -- September the

14  13th; is that correct?

15    A.   September 13th, yes.

16    Q.   But when was it transacted to the bank?

17    A.   It was transacted on 10/28/13.

18    Q.   So they were written in a certain sequence, but the

19  last two were reversed; is that right?

20    A.   As far as when they were deposited in the bank, yes.

21    Q.   I apologize for talking over you.  Next one, please.

22  And then again, so before we talked about there was a

23  December deposit into the Hannah Plyler account.  Now we jump

24  back.  We see what happened in October.  What happened in

25  October?

1    A.    October 28th, '13, $101,369.49 were deposited in the

2    Hannah Plyler account.

3    Q.    And I know this is repetitive, but it's important.

4    Did Russell Laffitte explain to y'all why these three checks

5    for $101,000 and change were cut to Hannah Plyler, deposited

6    into her account to pay off loans from the Badger account?

7    A.    He never explained it.

8    Q.    Did he explain why y'all, for some reason, needed to

9    pay half of that back?

10   A.    He did not explain that.

11   Q.    Next page, please.  I know we are walking through

12   financial documents.  I don't want the jury to lose sight

13   of -- this Government's Exhibit 37 again.  This is whatever

14   the balance would be on the 1.325 after these deductions.  We

15   are just spending money now, right?

16   A.    Yes.

17   Q.    Okay.  First one, please.  This is another one of

18   those loan not on system notations we saw back with the 750

19   way back several hours ago; is that right?

20   A.    Yes, sir.

21   Q.    And just read the description, please, under that,

22   loans not on system?

23   A.    Cover wire to Southern Crane.

24   Q.    And how much money are we talking about here being

25   wired to Southern Crane?

1      A.    $49,500.

2      Q.    And this is Badger money going to Southern Crane; is

3    that right?

4      A.    Yes, sir.

5      Q.    Did Russell explain to you why that happened?

6      A.    He did not.

7      Q.    Next one down, please.  Pretty straightforward, just

8    tell the jury what this one is.

9      A.    $1,184.75 was taken out of Palmetto State Bank.  And

10   that is exactly what it says, cash out ticket.  Came out of

11   teller No. 4's drawer.

12     Q.    Next one.  Okay.  This is a -- well, tell the jury

13   what this one is.

14     A.    This is a check drawn on the law firm dated -- I

15   think that's September 13th, 2013, pay to the order of

16   Palmetto State Bank, $50,684.75, with a memo line of Estate

17   of Donna Badger.

18     Q.    What's the check number on this one?

19     A.    This is 45030.

20     Q.    Okay.  And this is for 50,000 and change; is that

21   right?

22     A.    Yes, sir.

23     Q.    And when was it transacted?

24     A.    October 29th, 2013.

25     Q.    Okay.  Now, let's go to the next one, the next page,

1    please.  So we just looked at Check No. 45030.  What's the

2    check number here?

3         A.    This is sequentially the next check, 45031.

4         Q.    And another $50,000 and change; is that right?

5         A.    That's correct.

6         Q.    When was this one actually processed through the

7    bank?

8         A.    That was four months later.  That was January 21st

9    of '14.

10         Q.    Okay.  Let's go to the next one please.  All right.

11    Now, we've been looking at these $50,000 checks.  This is

12    that January 21st transaction we were just talking about.

13         A.    Yes, sir.

14         Q.    Just on the face of this, what is this document?

15         A.    It is a deposit slip that the bank uses.

16         Q.    And what's the date of the deposit slip?

17         A.    1/21/14.

18         Q.    Is that consistent with what we saw on the back of

19    the check just a second ago?

20         A.    Yes.

21         Q.    And the amount is also consistent 50,684?

22         A.    That is the same amount.

23         Q.    As an officer of the bank, have you had the

24    opportunity to confirm whether or not that account number

25    belongs to Donna Badger?

1    A.    That account number is not Donna Badger's account

2    number.

3    Q.    Whose account number is it?

4    A.    Alex Murdaugh's.

5    Q.    Did Russell Laffitte explain to you in the Board

6    meeting on November 3rd why y'all would pay half of this

7    money that was diverted under the name of Donna Badger into

8    Alex Murdaugh's account?

9    A.    He did not explain it.

10    Q.    Next page, please.  Just another one of these check,

11    when was it transacted down at the bottom?

12    A.    December 19th, 2013.

13    Q.    Okay.  Very good.  Next page, please.  This one is,

14    again, coming out of the Badger money.  Just what is this?

15    A.    Says a file copy payable for a wire fee dated

16    December 19th of 2013 for $34,000.

17    Q.    Were you all told what this wire fee was for by

18    Russell Laffitte?

19    A.    The Board was not told, no.

20    Q.    Were you explained why you should be paying back

21    half of this amount to the law firm when you don't even know

22    what the wire is for?

23    A.    There's no explanation.

24    Q.    We see those blue initials again that we've been

25    looking at already.

1    A.    I believe those are Russell's initials.

2    Q.    Next one, please.  So now a little more clarity as

3    to the wire that we just looked at.  If you would, just tell

4    the jury what's the date of the top of the wire?

5    A.    The date is 12/19/2013.

6    Q.    Okay.  And the sender is whom?

7    A.    Sender is Alex Murdaugh.

8    Q.    And the receiving bank is TD Bank in Charleston,

9    right?

10   A.    Yes.

11   Q.    Who is the beneficiary?

12   A.    4M Iron, LLC.

13   Q.    That's on Clements Ferry Road, not far from here, I

14   guess, here in Charleston?

15   A.    Yes.

16   Q.    Do you know what 4M Iron is?

17   A.    No idea.  Never heard of them.

18   Q.    And then the amount is noted there.  At the very

19   bottom you see 34,000 is consistent with the exhibit we just

20   looked at a minute ago?

21   A.    Yes.

22   Q.    And then the sender's signature reads at least what?

23   A.    The sender's signature reads Russell Laffitte.

24   Q.    And in fairness, is that consistent with the

25   signatures of Russell that we've seen before?

A.   He put initials on other places.  Here it's printed out.

Q.   But regardless, did he explain to you in that November 3rd Board meeting why Badger money would be going to 4M Iron on Clements Ferry Road in Charleston?

A.   No, he did not.

Q.   Next one, please.  We got -- apparently, the Badgers bought a Jeep, or at least money is sent to purchase the Jeep; is that right?

A.   This is a file copy of a money order drawn on Palmetto State Bank.  It says payable to Jeep purchase, $8,200.

Q.   What's the name -- you see receipt for bank money order drawn on, what's the name right under there?

A.   Edward Smith.

Q.   It's not a Badger name, is it?

A.   It's not a Badger name.

Q.   Did he explain why $8,200 would have gone from Badger money to pay for a Jeep for the benefit of Edward Smith?

A.   He has not; did not.

Q.   Next one, please.  We are not going to belabor this.  Another cash-out ticket for Badger money; is that right?

A.   Another $8,484.75 came out of Teller No. 2's drawer.

Q.   Next one, please.  And just to pick things up a

1    little bit, $29,000 to Honeycreek Motors, right?

2        A.    Yes, sir, Russell's initials.

3        Q.    You see the initials we are used to seeing down

4    there, right?

5        A.    That's correct.

6        Q.    Next one, please.  Another cash-out ticket.  How

7    much is this for?

8        A.    $4,739 -- or 89 and .03 cents.

9        Q.    Next one, please.  This is going back to the

10   December '13, but it's different amount $33,789.  Do you see

11   that?

12       A.    Yes, sir.

13       Q.    Transacted in December of '13, is that correct?

14       A.    Yes, sir.

15       Q.    Next one, please.  And on that page, is that

16   basically the same amount that we looked at a minute ago, the

17   $33,789?

18       A.    Sequential check.

19       Q.    No explanation why that's being cut out of the Donna

20   Badger account?

21       A.    That is correct.

22       Q.    Next one, please.  This goes back to what we were

23   saying before.  As an officer of the bank, did you have the

24   opportunity to review the account number on this slip?

25       A.    The account number is one of Alex Murdaugh's

1    accounts.  And the name says Donna Badger, conflict.

2        Q.   So the Donna Badger on there, that's a ruse?

3        A.   That's an absolute ruse.

4        Q.   Next one, please.  If that money is just going

5    straight to Alex Murdaugh, again, why is Palmetto State Bank

6    paying half to Alex Murdaugh's firm?

7        A.   It makes no sense whatsoever.

8        Q.   All right.  So this one -- again, the jury's seen a

9    number of these checks so far.  So we're just briefly going

10   to touch on it.  $33,789.83 drawn on the estate of Donna

11   Badger.  Next document, please.  And again, being deposited

12   into the account of Hannah Plyler.  No time in that meeting

13   were you ever given an explanation as to why Badger money was

14   being paid to Hannah Plyler's account; is that right?

15       A.   We were never given that explanation.

16       Q.   Okay.  All right.  Next one, please.  So this is an

17   interesting one.  Right?  So who's this one paid to the order

18   of?

19       A.   Bank of America.

20       Q.   Not even Palmetto State Bank; is that correct?

21       A.   Different banks completely.

22       Q.   And it's $101,369; is that correct as well?

23       A.   And 49 cents, yes, sir.

24       Q.   Didn't even cycle through your bank?

25       A.   No, sir.

1  Q.   This one just says "settlement proceeds" down at the

2  bottom?

3  A.   Yes, sir.

4  Q.   And then let's look at the next one.  Another bank

5  of America check, $50,684, this one did not go through your

6  bank; is that right?

7  A.   Went through Bank of America, not Palmetto State

8  Bank.

9  Q.   Did Russell explain to you why Palmetto State Bank

10 should be paying back money that went to Bank of America?

11 A.   He did not.

12 Q.   Next page, please.  I think that was it.  All right.

13 So just to summarize, we've gone through a lot.

14 Jurors have been very patient as we've walked through a

15 number of these transactions that were very important.

16 In summary, during that November 3rd, 2021, Board

17 meeting when you were trying to figure out how to handle

18 Russell's payment that he negotiated to the law firm, did he

19 present you with any of the checks or deposit slips or wires

20 that we've been looking at that went out of the Badger

21 account?

22 A.   He did not.

23 Q.   Did he explain why all these companies and people

24 unassociated with Badger were receiving these amounts?

25 A.   He did not.

1      Q.   As you sit here today, do you believe that he was

2   being candid with the Board about why the $680,000 was given

3   to the law firm?

4      A.   Absolutely not.

5      Q.   Did he explain that some of the money paid to the

6   law firm had actually -- was actually money that was paid to

7   him as a personal representative?

8      A.   He did not tell us that was in there.

9      Q.   And then we just talked about this, he didn't tell

10  you that some of the money had actually gone to Bank of

11  America either, did he?

12     A.   No, sir.

13     Q.   How did you find out about all of this?  It wasn't

14  from Russell, was it?

15     A.   It was not from Russell.

16     Q.   So we've been talking about November.  In December

17  you get another surprise; is that correct?

18     A.   Please refresh me.  I'm getting tired.

19          THE COURT:  I'm wondering, Mr. Holliday, I'm worried

20  about my jury getting tired.  Is this a good time for a

21  break?

22          MR. HOLLIDAY:  I don't want to lose their attention,

23  Your Honor.  So I am probably three pages from the end.  But

24  I'm just fine to stop here for the evening.

25          THE COURT:  I just think there's a lot of detail.

1          Ladies and gentlemen, we are going to break.  I want

2     you to be here a little before 9.  So at 9 we can walk

3     through the door and start again.  I want to thank you for

4     y'all's attentiveness.  Y'all have been great.  I'm going to

5     remind you, do not discuss the details of this with anyone.

6     Do not read anything in the media.  You have the front-row

7     seat here at trial.  I will see you tomorrow morning.  Thank

8     you.

9          (Jury leaves open court at 5:30 p.m.)

10          THE COURT:  You may be seated.  Either party have

11     any matters to bring before the Court at this point?

12          MS. LIMEHOUSE:  The Government has one minor issue,

13     Your Honor, that we would like to inform the Court about.

14          THE COURT:  Issues are not ever that minor.  Go

15     ahead.

16          MS. LIMEHOUSE:  Yesterday after the pretrial

17     conference, we reached out to Jim Griffin, who represents

18     Alex Murdaugh, and notified him of the briefing to the Court

19     that we've provided.  At that point Jim Griffin notified --

20          THE COURT:  If you could, Mr. Laffitte, I'm sorry,

21     thank you, we will see you tomorrow morning, sir.  Thank you.

22          MR. HOLLIDAY:  Nine o'clock tomorrow morning.

23          THE COURT:  Nine o'clock tomorrow morning.  Go

24     ahead.

25          MS. LIMEHOUSE:  We were notified by Alex Murdaugh's

1  attorney that Russell Laffitte had contacted John Marvin

2  Murdaugh, Alex's little brother, in an attempt to try to get

3  Alex to testify on his behalf that he had nothing to do with

4  the conspiracy. Given the Court's ruling today, I have less

5  concerns than we did this morning. But there are a couple of

6  concerns. One, Mr. Laffitte's attempt to effect witness

7  testimony; and two, John Marvin Murdaugh is a witness on

8  their list. And he's been ordered pursuant to his bond terms

9  not to contact any witnesses about this case. And so I'm

10  hoping the Court is willing to admonish him about that and

11  remind him --

12       THE COURT: Slow me down a little bit, because you

13  are talking about people. I don't know who all these folks

14  are. Okay. Start over again, Ms. Limehouse, a little

15  slower.

16       MS. LIMEHOUSE: Alex Murdaugh is represented by

17  attorney Jim Griffin.

18       THE COURT: I'm aware of that.

19       MS. LIMEHOUSE: And yesterday we notified him after

20  the pretrial conference that we intended to recommend what we

21  did in briefing to Your Honor.

22       THE COURT: Yes.

23       MS. LIMEHOUSE: At that point, he notified us that

24  Mr. Laffitte had contacted John Marvin Murdaugh, who is

25  Alex's little brother, who Mr. Daniel brought up in his

1  opening, that will testify in this trial, in an attempt to

2  get Mr. Murdaugh to testify and say that Mr. Laffitte had

3  nothing to do with this conspiracy.  And the Government has a

4  couple of concerns, one, an attempt by Mr. Laffitte to affect

5  witness testimony; and two, contacting one of their witnesses

6  about this case.

7        Given the Court's ruling, I don't think this is as

8  much of an issue as I was concerned this morning.  But I'm

9  hoping the Court will remind him of his bond terms, that he's

10  not to contact any witnesses about this case so that we don't

11  have any more issues during the pendency of the trial.

12        THE COURT:  So who a contacted Murdaugh's brother?

13  I'm just a little confused who these players are.

14        MR. AUSTIN:  I can add detail to this that is

15  probably helpful.  We've been in communication with Mr.

16  Griffin, I don't know, probably six or seven months, where he

17  indicated that Mr. Murdaugh was very willing to testify on

18  Russell's behalf and say that he had nothing to do with this.

19  He ultimately reconsidered that and said that his lawyers, or

20  through his lawyers, have said that they advised him not to

21  do that.  And so this is an ongoing conversation that's been

22  going on for a while.

23        THE COURT:  But so who reached out to Alex Murdaugh

24  or -- who did that?

25        MR. AUSTIN:  Mr. Laffitte did prior to the

1    sequestration order.  And there's no concern about him doing

2    that again.

3            THE COURT:  Mr. Laffitte, you understand the terms

4    of your bond.  You are not to speak to anyone.  You are

5    allowed to be here in the courtroom, but the witnesses are

6    sequestered.  Do you understand that, sir?

7            THE DEFENDANT:  Yes, sir, I do.

8            THE COURT:  I have ruled and I sealed it before jury

9    selection.  I did not want this out that I had ruled.  But

10   the law is very clear on the issue that you cannot call a

11   witness in a criminal case strictly to have him take the

12   Fifth.  That is improper, well-settled in this circuit and

13   virtually every other circuit in the country.  And he's not a

14   witness.  He's not going to be a witness so long as he's

15   going to take the Fifth.  Should he change his mind and say

16   he wasn't invoking the Fifth that would be a completely

17   different situation.  But I have been told consistently that

18   his counsel has indicated he will take the Fifth.  And he's

19   not going to come in simply to state that because that's

20   improper under well-settled law.  Okay?

21           Anything further?

22           MS. LIMEHOUSE:  Nothing further, Your Honor.  Thank

23   you.

24           MR. DANIEL:  Nothing further.

25           THE COURT:  Very good.  See everybody here about 10

1  minutes to 9 tomorrow.  We stand adjourned.

2          (Whereupon, the proceedings are adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF REPORTER</u>

2

3        I, Karen V. Andersen, Registered Merit Reporter,

4   Certified Realtime Reporter for the State of South Carolina

5   at Large, do hereby certify that the foregoing transcript is

6   a true, accurate and complete Transcript of Record of the

7   proceedings.

8        I further certify that I am neither related to nor

9   counsel for any party to the cause pending or interested in

10  the events thereof.

11

12

13

14

15  Karen V. Andersen
    Registered Merit Reporter
16  Certified Realtime Reporter

17

18

19

20

21

22

23

24

25