IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


_____ )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )   Docket No. 9:22-658
                                    )
        vs.                         )   Charleston, SC
                                    )
RUSSELL LUCIUS LAFFITTE,            )   Volume IV
                                    )
        Defendant.                  )
_____ )   DATE:  November 14, 2022


            BEFORE THE HONORABLE RICHARD M. GERGEL
            UNITED STATES DISTRICT JUDGE, PRESIDING
                         JURY TRIAL


A P P E A R A N C E S:

For the Plaintiffs:

EMILY EVANS LIMEHOUSE
U.S. Attorney's Office
151 Meeting Street, Suite 200
Charleston, SC 29401-2238
843-266-1663
emily.limehouse@usdoj.gov

WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
U.S. Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201
803-929-3000
winston.holliday@usdoj.gov
kathleen.stoughton@usdoj.gov


COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
                             United States Court Reporter
                             901 Richland Street
                             Columbia, SC  29201

A P P E A R A N C E S:

For the Defendant:

EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
Nelson Mullins Riley and Scarborough
151 Meeting Street
Charleston, SC 29401
843-534-4123
bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com

CHRISTIAN JOSHUA MYERS
Nelson Mullins Riley and Scarborough
101 Constitutional Avenue NW, Suite 900
Washington, DC 20001
202-689-2001
josh.myers@nelsonmullins.com

INDEX

EXAMINATION

Witness Name                                                    Page

ALANIA PLYLER SPOHN

    BY MR. HOLLIDAY ........................................ 783

    BY MR. AUSTIN ......................................... 812

HANNAH PLYLER

    BY MR. HOLLIDAY ........................................ 821

    BY MR. AUSTIN ......................................... 831

CYNDRA SWINSON

    BY MS. STOUGHTON ...................................... 834

    BY MR. DANIEL ......................................... 908

    BY MS. STOUGHTON ...................................... 922

HENRY SPANN LAFFITTE JR.

    BY MS. STOUGHTON ...................................... 924

    BY MR. AUSTIN ......................................... 939

    BY MS. STOUGHTON ...................................... 967

HENRY LUCIUS LAFFITTE JR.

    BY MS. LIMEHOUSE ...................................... 971

    BY MR. AUSTIN ......................................... 980

    BY MS. LIMEHOUSE ...................................... 1018

EXAMINATION

Witness Name                                          Page

BECKY LAFFITTE

    BY MR. HOLLIDAY ........................................ 1022

    BY MR. DANIEL ......................................... 1053

    BY MR. HOLLIDAY ....................................... 1082


EXHIBITS

Exhibit                                               Page

Defendant's Exh. 82                                    989

1    THE COURT:  Counsel approach, please.

2    (Whereupon, a bench conference takes place off the

3    record.)

4    THE COURT:  Good morning, everyone.  Couple of

5    things.  Number one, I don't intend to question my jurors.

6    I'm going to remind them of their duty, but we are not going

7    into that.  Second, I told y'all Friday that we were going to

8    be off Thursday.  Apparently, as a happy coincidence, one of

9    the jurors has a funeral that she needs to attend.  And I

10   will let them know today that we are not doing Thursday.

11   I am not there yet, but I may be open to having a

12   Saturday trial, continue on Saturday.  We will just see where

13   we are.  I don't want to do it, but we are getting close to

14   Thanksgiving.  And we've just got to keep this thing moving.

15   It's a bureaucratic -- it's a little bureaucratic.  You can't

16   do it because I have to make arraignments for GSA and with

17   the marshals.  But we are not there yet, but by Wednesday I

18   will make a decision on that.  But I need to alert y'all

19   because you will be in your case, Bart, and I want you to get

20   through your witnesses.  Anything else y'all need to address

21   with me?

22   MR. AUSTIN:  We may need one witness to testify via

23   Zoom because of a death in the family.

24   MS. LIMEHOUSE:  Is this the witness who hasn't been

25   sequestered?

1          MR. AUSTIN:  Right.

2          THE COURT:  What's the nature of the testimony?

3          MR. AUSTIN:  It's very favorable to Mr. Laffitte.

4          THE COURT:  I don't care about that.  What's the

5     nature of it?

6          MR. AUSTIN:  This is a lady, Ms. Drawdy, and she's

7     the loan officer, head of the loan department, and was

8     intimately involved in all of these transactions.

9          THE COURT:  Why wasn't she sequestered?

10         MR. AUSTIN:  We were going to start our meeting with

11    her, with her attorney.  She found out her cousin committed

12    suicide.  So we, obviously, didn't move forward with the

13    interview.  And we thought she would just be unavailable.

14    But we've spoken with her.  She's in Tennessee helping with

15    her family and doing all sorts of logistical things with

16    them.

17         MR. DANIEL:  She's the most critical witness.

18         THE COURT:  Why hadn't you named her earlier?

19         MR. AUSTIN:  No, we named her, but we sort of

20    thought we just weren't going to be able to do it.  And we

21    think if there's ability to do it, the Government can cross

22    her on what --

23         THE COURT:  I am not crazy about remote.  What's

24    your thought about that?

25         MS. LIMEHOUSE:  My understanding from speaking to

1  this witness's attorney is that she's been following all of

2  the news coverage of this trial.

3          MR. AUSTIN:  That's not what he said to me exactly.

4  So I'm going --

5          THE COURT:  With that, that's one issue, which is

6  the sequestration.  I'm worried about not having the jury

7  have her present.

8          MS. LIMEHOUSE:  I don't like Zoom, of course, but --

9          THE COURT:  The rule is pretty clear that you are

10 not supposed to do remote unless there are extraordinary

11 circumstances.  And I don't know.  You would have to show me

12 that she can't physically get back here.

13         MR. AUSTIN:  Oh, yeah, I think I can -- so, she's in

14 a town called South Fulton, Kentucky.  I can do it later if

15 you would like.

16         THE COURT:  Let me just say, she can get here unless

17 you are telling me that the roads have collapsed and the

18 mountains have gotten higher and all that.  She can get here.

19 What's the problem?

20         MR. AUSTIN:  She's about three hours from the

21 nearest airport and her car has broken down.  She just got a

22 new airbag piece in her car.  That's what she's telling me.

23         THE COURT:  We could get her here.  We can get her a

24 driver.  I've had these problems.  You know, as a lawyer, you

25 just get around them.  The whole sequestration thing is

1 another issue, is how did you not sequester her and what did

2 she learn that she would not have otherwise known?

3          MR. DANIEL:  Judge, everybody -- she works for

4 banks.  Everybody at the bank has been following all these

5 things --

6          THE COURT:  For years.

7          MR. DANIEL:  -- for years.

8          MS. LIMEHOUSE:  We have been very clear with these

9 bank employees' counsel numerous times that they are not to

10 read or watch any of the news coverage on this case.  And Ms.

11 Drawdy was not sequestered.  And my understanding speaking

12 with that same attorney is that she has been reading

13 everything, all the coverage.  And when a request of what

14 specifically have you read, her response was, well, anything

15 that comes up on my phone about it I've been reading.  So I

16 think --

17          THE COURT:  Let me say this.  I'm going to -- I will

18 address that issue when she's here.  And I will hear from the

19 Government at that time.  But I am not going to agree, unless

20 you can show me that she's laying in a hospital room with an

21 IV in her, near death --

22          MR. AUSTIN:  We would prefer her to be here.

23          THE COURT:  I'm sure you would.  And I'm going to

24 make it easy for you because I'm going to make her be here.

25 Okay.  Very good.

1      MR. AUSTIN:  Thanks, Judge.

2      (Whereupon, the bench conference ends.)

3      THE COURT:  Any other matters that we need to bring

4  before the Court before I bring the jury in?

5      MS. LIMEHOUSE:  Nothing from the Government, Your

6  Honor.

7      THE COURT:  Anything from the defense?  Silence I

8  take it as no.  Okay.  Bring in the jury.

9      (Whereupon, the jury returns to open court at 9:14

10  a.m.)

11      THE COURT:  Let me start off by saying good morning.

12  You look a lot more rested than you did at the end of the day

13  on Thursday.  For people who aren't in this business don't

14  realize how hard it is to concentrate for hours on end.  And

15  y'all are just doing a magnificent job.  So I want to thank

16  each of you individually for what you are doing, paying such

17  close attention.

18      Let me address a couple of matters.  I will be -- I

19  have another matter I need to address on Thursday.  And I

20  understand one of my jurors has a problem as well.  But we

21  will not be holding court on Thursday.  So we will end on

22  Wednesday and come back on Friday.  So I want everyone to

23  know that.

24      Secondly, I want to remind everyone to avoid all

25  media coverage, all Internet, all social media, all the -- I

1  know you've assured me you are going to do that.  And I want

2  you to stay on that.  We need to make this decision on what's

3  in this courtroom and nothing else.  And it's very important

4  for a fair trial for everyone.

5          Okay.  Mr. Holliday, call your next witness.

6          MR. HOLLIDAY:  Your Honor, thank you.  The

7  Government calls Alania Plyler Spohn.

8          THE COURT DEPUTY:  Please state your full name.

9          THE WITNESS:  Alania Spohn.

10                      ALANIA PLYLER SPOHN,

11        having been duly sworn, testifies as follows:

12                       DIRECT EXAMINATION

13  BY MR. HOLLIDAY:

14     Q.   All right.  Alania, good morning.

15     A.   Good morning.

16     Q.   Do you know the defendant in this case, Russell

17  Laffitte?

18     A.   Yes, I do.

19     Q.   And how do you know him?

20     A.   He was appointed my conservator from the car

21  accident I was involved in in 2005.

22     Q.   I know, because we've met a couple of times, you are

23  soft-spoken.  The jury is very interested in what you have to

24  say.  Get close enough to the mic.

25     A.   Yes.

1    Q.   And you indicated that the defendant was your

2    conservator.  And you were young at the time, but what was

3    your understanding of what a conservator is supposed to do

4    for you?

5    A.   My understanding was that he would -- the money that

6    I received from the lawsuit would go and basically be put in

7    his trust, if you will, and the money would sit there until I

8    turned 18, and then it would be given back to me.

9    Q.   How old were you when you first met him?

10   A.   I was around 15, I believe.

11   Q.   And then I think you just referenced back, but this

12   is an important point.  How old were you when he stopped

13   being your conservator?

14   A.   I was 18.

15   Q.   And as I mentioned just a second ago, you and I have

16   had a chance to sit down a couple of times before this to go

17   over basically your account of everything that happened

18   involving this case; is that right?

19   A.   Correct.

20   Q.   And so today we are just going to talk about that

21   for the benefit of the jury as well.  Okay.  First subject

22   though I know is difficult for you.  So I want to go back now

23   to the events that led to your initial dealings with the

24   defendant.  Okay?  You were in a very bad car accident with a

25   member of your -- members of your family; is that correct?

1    A.   Correct.

2    Q.   And when did that accident take place?

3    A.   July 16th, 2005.

4    Q.   And how old were you at the time?

5    A.   I was 12.

6    Q.   And who else was in the car with you?

7    A.   My mother was driving.  My at-the-time-14-year-old

8 brother, and at the time my 8-year-old sister.

9    Q.   Would you tell the jury, please, where everyone was

10 sitting in the car?

11    A.   So, like I said, my mother was driving and my

12 brother was in the passenger seat.  I was sitting directly

13 behind my brother.  And my sister was sitting behind my mom.

14    Q.   Now, there's a little bit of a story as to why your

15 brother Justin was in the front passenger seat and you were

16 behind him.  Tell the jury about that.

17    A.   Yeah.  So I was about to turn 13, so I thought that

18 was a big deal, becoming a teenager.  And I was at the age

19 where my mom was starting to allow me to sit in the front

20 seat.  My mom got off of work -- July 16th would have been a

21 Friday.  She got off of work.  And I was determined to sit in

22 the front seat, passenger seat, coming up to Columbia.  And

23 so my brother and I, we got into an argument that afternoon

24 about who was going to sit in the passenger seat.  And,

25 ultimately, my mother, she told us, she said my brother could

1  sit in the passenger seat on the way to Columbia, and when we

2  come back from Columbia, I could sit in the front.  So that

3  was the -- that was the agreement that we had.

4      Q.   You mentioned a little bit already that you were

5  traveling to Columbia.  Where were you traveling from?

6      A.   Hardeeville, South Carolina.

7      Q.   And why were your mom and the three of you living

8  down there and traveling up there?

9      A.   So just 12 days prior to the accident, that would

10  have been July 4th, 2005, my mother had finally made the

11  decision to leave my father, who was abusive and an

12  alcoholic.  And so as I said, July 4th, she made the decision

13  to finally move.  And so we moved to Hardeeville.  And so

14  that's how we ended up in the lower part of the state.

15      Q.   Okay.  And why was it that on July the 16th you were

16  traveling back to Columbia?

17      A.   My mom had a weekend gig.  Well, actually we all

18  did, a weekend gig just to make extra money through The State

19  newspaper.  She had newspaper routes that she would set up.

20  And we would go on the corners of the streets and we would

21  sell newspapers.  And we were going to do it one more time

22  the weekend of July 16th.  So we were going down there to

23  make a little bit of extra money.  And also my dad wanted a

24  TV returned to him.  So we had that in the vehicle as well.

25      Q.   So, so far we've just been saying "vehicle."  What

1  kind of vehicle were you in?

2      A.   It was a green Ford Explorer.

3      Q.   Obviously, the jury knows there was an accident.

4  What was happening right before the accident happened?

5      A.   Right before the accident, we were on I-95.  My

6  brother and my sister were sleeping.  Obviously, mom was

7  driving.  And I was listening to a CD player.  I had my own

8  little CD player and had the headphones in.  And I remember

9  Mom, it was low enough just so I could hear Mom, and she

10 said -- they always called me Lanie, that was my nickname.

11 So she said, Lanie, are you awake?  And I remember pulling

12 them down and saying, yeah, Mom, I'm awake.  And it was just

13 within moments then we ended up hearing a very loud pop, like

14 a -- almost like a gunfire shot.  And that was when the tire

15 exploded.

16     Q.   Okay.  So I know you are 12, you are riding in a

17 car.  At that age, tough to remember anything, but what do

18 you remember once the tire failed?

19     A.   Yeah, actually, I remember it very well.  Once I

20 heard the tire pop, I remember hearing my mom screaming.  We

21 immediately went into the trees that were on the right side

22 of the interstate.  And I remember hearing and hitting

23 several of the trees as we went through the brush.  And I

24 remember one final tree we hit where we -- all of the impact

25 hit this one particular tree and stopped the vehicle

1  completely.

2      Q.   So when everything stops and you are able to kind of

3  get your bearings and all, what's the situation at that

4  point?

5      A.   I remember it was very quiet.  I heard just some

6  limbs breaking.  And I remember seeing smoke and the smell of

7  pine and blood.  And then I remember looking to my left and I

8  saw my sister and she was moving.  And she was -- you could

9  tell she was in a state of shock as well.  And I remember

10  looking out the right side window and the CD that I was

11  listening to, it was an Usher CD, it was spinning on a tree

12  limb.  I guess somehow the CD I was listening to made its way

13  onto a branch.  And I remember my mom and my brother were

14  both lifeless.

15      Q.   And I'm going to lead just a second just so we --

16  your brother's seatback had failed; is that right?

17      A.   Correct.

18      Q.   And he's basically --

19      A.   He was in my lap, yes.

20      Q.   And he suffered a catastrophic head injury; is that

21  right?

22      A.   Correct.

23      Q.   What happened next?  Did Hannah go try to get some

24  help?

25      A.   So, after I realized that this was really bad, Mom

1    wasn't responding.  My brother wasn't responding.  And as we

2    just spoke about, my brother's seat from the impact came

3    completely down in my lap, to where his upper body was

4    basically in my lap.  I couldn't get out of the vehicle.  I

5    couldn't push him up, because when I did push him up, I

6    remember my arm twisting the opposite way.  And I knew this

7    was bad.  So I told Hannah to climb out the back of the car

8    because she couldn't get out from her door.  I remember

9    instructing her to climb through the backseat and get out of

10   the back hatch and climb up to the hill to go get help

11   because I was afraid no one had saw us.

12       Q.   Okay.  And was she successful?

13       A.   She was.

14       Q.   And there were -- I think you told me before, there

15   were already people at the scene that were coming down?

16       A.   Yeah, yeah.

17       Q.   So what happened at that point, Alania?

18       A.   At that point, I remember it felt like an eternity,

19   but I'm sure it was fairly quick the amount of people that

20   came to try to help.  I remember there were samaritans that

21   pulled off on the side of the road trying to come down there

22   and help us.  And they realized that it was a pretty bad

23   scene.  And they kept talking to me from afar asking if I was

24   okay, make sure I was still alive.  But it took a really long

25   time, it felt like, to get me out of the vehicle.  I remember

1    the fire department had to use Jaws of Life to basically cut

2    up the vehicle to get me out.  And I was the last one to get

3    out.

4         I remember seeing my mom and my brother Justin.

5    They had took them out of the vehicle while I was still in

6    the vehicle.  And I remember looking out at the left side of

7    the vehicle, and there was two body bags there.  And that's

8    when it had became really real that they weren't going to be

9    okay and that they were gone.  So I watched them load my

10   14-year-old brother and my mom into the body bags.  And when

11   they finally got me out of the vehicle, I remember them

12   loading me up and putting me into the helicopter.  And I was

13   airlifted to Savannah Hospital.

14        Q.   You were in the ICU for a while?

15        A.   I was, correct.

16        Q.   You mentioned just a second ago your shoulder, that

17   you had some trouble with moving it.  So what happened to

18   your shoulder?  How did that happen?

19        A.   So during the impact of the vehicle, and everything

20   going on inside, the TV was on my left side between my sister

21   and I.  And the way that the vehicle had turned, the TV

22   landed on my shoulder.  It was one of those older TVs, not

23   like your flat screen.  It was the old-fashioned, box style,

24   heavy TVs.  And when it -- just the way the vehicle was

25   maneuvering in the accident, it landed on my left shoulder,

1    crushing it.

2        Q.    And just to remind the jury, you are a 12-year-old

3    at the time; is that right?

4        A.    Yes, yes.

5        Q.    And Hannah was eight?

6        A.    Correct.

7        Q.    How long were you in the ICU?

8        A.    Around two weeks.  That was just for the ICU part.

9        Q.    Right.  And your shoulder wasn't your only other

10   injury.  Tell me about what else was --

11       A.    No, I ended up -- so I crushed my left shoulder.

12   And I -- they call it -- they told me I blew my left knee

13   out, which I tore every ligament that holds the knee

14   together.  They described it like a rubberband.  And they

15   said it was completely ripped apart.  So my ACL, my PCL, and

16   I think there was a couple of others.  I just don't remember

17   the names.  And so I blew my knee out and I broke my right

18   femur in two different places.  And then I had some minor

19   injuries to my pelvic bone.

20       Q.    And by my math, this is over 17 years ago that this

21   happened, right?

22       A.    Correct.

23       Q.    Are you still dealing with the after affects of some

24   of the injuries to your shoulder, to your knee?

25       A.    I do.  I do.  The older I get, the worse it's

1  getting too, but definitely feeling it.

2      Q.   So after the accident, and after you got out of the

3  ICU and then the hospital after that, where did you go live?

4      A.   It took -- during my entire hospital stay, I was

5  going back and forth between my -- to go stay with my father,

6  who was living with his parents, or to live with my uncle.

7  But, ultimately, I decided to go live with my dad and my

8  grandparents.

9      Q.   Did you decide that or did somebody decide it for

10 you?

11     A.   I had to decide that.

12     Q.   Why was it that you were bouncing around between

13 relatives a little bit?

14     A.   Like I said earlier, my dad, he was a raging

15 alcoholic.  He suffered from that for many years.  And I was

16 told it was kind of in his family blood line as well.  And

17 when my dad would drink, which was an everyday occurrence, he

18 would get really violent.  And he was really violent towards

19 my mom and even to us growing up.  So I knew that that was a

20 factor going to go live with dad, because I didn't have mom

21 anymore, and she was always our defense.  She didn't let

22 anybody mess with her babies.  So it was scary knowing that I

23 had to go live with him without my mama.

24     Q.   Was Hannah with you the whole time or did you all

25 sometimes get separated?

1    A.    As far as living?

2    Q.    Yeah.

3    A.    We would get separated occasionally, but for the

4    most part, where I went she went.

5    Q.    Okay.  Now, at some point there was a lawsuit about

6    the accident and all of this; is that right?

7    A.    Correct.

8    Q.    Who was your first lawyer?

9    A.    My first lawyer was Arnold Beacham.

10   Q.    How was it that Arnold Beacham came into your life?

11   A.    So, my dad worked at Walmart in the sporting goods

12   department.  And as I have said numerous times, he was an

13   alcoholic and he had numerous DUIs.  And Arnold Beacham at

14   one time was the prosecutor for one of my dads's -- or maybe

15   several, but I know at least one of my father's DUIs.  And,

16   apparently, just -- my dad -- when he wasn't drinking, he

17   could be a really good guy.  And I assume at the -- my dad

18   thanked him for helping getting him on the right path, is

19   what my dad made it out to be, but my dad never got on the

20   right path.  He just wanted the prosecution and everyone to

21   think that he had quit drinking.  And he promised he wouldn't

22   have another DUI, but there were more DUIs to follow.

23        But anyway, when my dad was working at Walmart one

24   day, Arnold Beacham came in and saw him and my dad remembered

25   him.  And Arnold had explained to my dad that he was no

1  longer in the prosecution side of the law, that he had become

2  a defense attorney. He had opened up his own attorney

3  practice and that he was -- so he was just doing

4  advertisement. Gave my dad a card and said if he ever needed

5  him to give him a call. And sure enough, he needed him one

6  day.

7  Q. So he becomes the first lawyer that you and your

8  sister have, correct?

9  A. Correct.

10  Q. At some point, Arnold Beacham realizes he's in a

11  little over his head with this lawsuit?

12  A. Yes.

13  Q. So did he find another lawyer?

14  A. So, as you said, Arnold realized this was going to

15  be a much bigger case than what he was familiar with and what

16  he was used to dealing with, so he had gotten advice about

17  the Murdaughs in Hampton were, like, bulldogs. And he

18  brought them on, onto the case. And that's how Alex Murdaugh

19  became a part of the -- our case.

20  Q. Okay. And we are not going to go through all of the

21  back-and-forth on the lawsuit. But, ultimately, it settled;

22  is that right?

23  A. Correct.

24  Q. And I have that it settled in 2009, so about four

25  years after the accident?

1    A.   Correct.

2    Q.   Okay.  After that settlement, did you deal with Alex

3    Murdaugh anymore?

4    A.   After the settlement, no, sir.

5    Q.   And were you told how much money you were going to

6    receive?

7    A.   I was never told how much.  I was only told that it

8    was enough where I would never have to work a day in my life,

9    is what I was always told.

10   Q.   And so I think when it settled, you were around 16.

11   What does that mean to you that you never have to work?

12   A.   That I never had to work.  I viewed it as a

13   bottomless pit, if you will.  I thought that I could go and

14   buy all the cars that I wanted and I could have the nicest

15   house and it was never going to run out.

16   Q.   At the very beginning of your questioning, I asked

17   if you knew the defendant Russell Laffitte.  Do you remember

18   meeting him?

19   A.   There was so much conversation between the two of us

20   by phone and text.  I can't recall first time I met him in

21   person.

22   Q.   And, again, your understanding of what he would be

23   doing for you now that the lawsuit was over, Murdaugh was

24   done, was what?

25   A.   Correct.  So at this point, I was just told if I

1    needed anything, that my funds were sitting in an account

2    with him watching it, basically.  Because I was put under the

3    impression that there was really no one in my family that

4    could trust with that amount of money.  And I could agree

5    with that.  It was a lot of money.  So he would just be there

6    to -- if I needed something, I would contact him, and he

7    would send the funds over and I could do what I needed to

8    with the money.

9        Q.   And certainly by this point, as you've explained

10   several times, your relationship with your father, not the

11   best?

12       A.   Correct.

13       Q.   He's not somebody that they wanted in charge of

14   millions of dollars that would ultimately be flowing to you

15   when you turned 18?

16       A.   Correct.

17       Q.   So I want to talk a little bit about your finances.

18   I know you didn't know how much money was there, but it was,

19   never-have-to-work-again money.  You were living with

20   different family members; is that right?

21       A.   Correct.  So my sister and I, we received my mom's

22   Social Security check every month, but it was for the people

23   who took care of us, basically.  So that's what I was told.

24   And I believe that's correct.  So at first I lived with my

25   grandparents.  So they were receiving.  It was around a

1   little over $500 a month.  And they were receiving two of

2   them, so about $1,000 a month.  I lived with my grandparents

3   the longest.  And then I was 16 when my grandmother died.

4   And when she died, that's when we really got tossed around

5   from family member to family member, different aunts I could

6   live with.

7           There were times where I was living in my car just

8   because there was really no room for us with my family.  And

9   so really, whoever needed the thousand dollars that month the

10  most was where my sister and I ended up living.

11      Q.   What were the kinds of things that you had to buy

12  for yourself?

13      A.   We would have to request money for school supplies,

14  school clothes.  When I was old enough to drive, I had to

15  get -- requests, like, gas money and food.  I would get a

16  weekly allowance of $100.  And that does sound like a lot of

17  money for a 16-year-old, but I was using that money for

18  school lunch, a lot of times for dinner.  Sometimes I had to

19  loan my family members money.  But I knew I wouldn't get it

20  back, but we kind of just did what we had to do to survive

21  and have a place to live.  So if they needed $40, I was put

22  in a position that I had to give them $40 of my weekly

23  allowance so we had a place to live.

24      Q.   A lot of things that kids normally -- their parents

25  buy or grandparents buy, you were having to buy for yourself

1    out of the conservatorship, correct?

2        A.    Correct, yeah.

3        Q.    You and your sister had both described at various

4    points the defendant as a father figure to you.  When you say

5    that, what does that mean to you?

6        A.    When I mentioned Russell being like a father figure

7    to me, it's more so on the logistics line.  I wouldn't call

8    Russell and tell him how bad of a week it's been, but if I

9    needed money for -- if I needed money for school or for lunch

10   money the following week, I would call him.  But it was never

11   on an emotional basis.  And the bar wasn't set too high,

12   being that I didn't have a very good father to begin with.

13   He has since passed away.  So he's at peace now.  But he had

14   a rough -- my dad had a rough life.  And I don't think he

15   ever really knew how to love his children.  So it was kind of

16   nice to be able to call Russell and tell Russell that I need

17   money.  I was in, like, Color Guard and Winter Guard in high

18   school.  And when I went to try out and I made it, I was kind

19   of nervous because I was afraid I wasn't going to have a way

20   to get to school or to practices or even to pay for it.  But

21   it didn't cross my mind to call my dad, but I knew I needed

22   to call Russell because I had money in an account.  So as a

23   father figure, that's more so along the lines that I go by,

24   is I would call Russell for financial things.

25            So like I said, I would immediately call Russell if

1   I needed money for, like, band boosters or Color Guard fees

2   versus going to my dad telling him, hey, Dad, I need money

3   for this.  Because any time we asked family members for

4   money, we get a funny look, because everyone viewed us as a

5   paycheck.

6      Q.  At this point you are living up in the Columbia

7   area; is that right?

8      A.  Correct.

9      Q.  And, of course, he's down in Hampton County?

10     A.  Correct.

11     Q.  How often would you see each other face-to-face?

12     A.  I could probably count on one hand the amount of

13   times that I saw Russell in person.  In the three to four

14   years that he was my conservator, it wasn't often at all.

15     Q.  So how would you get in touch with him?

16     A.  By phone.  I would either text him or call him and

17   occasionally e-mail him.

18     Q.  You mentioned your allowance.  It was $100 a week;

19   is that correct?

20     A.  Correct.

21     Q.  Did that fluctuate at all or was it basically $100

22   for the two to three years that he was your conservator?

23     A.  I didn't get the allowance -- at the time that

24   Russell became my conservator, I believe that it eventually

25   came.  I want to say that he had informed us that the judge

1    approved an allowance, a weekly allowance, just because we

2    were going to him so much about needing money.  It wasn't

3    very much at times.  I mean, asked for $40 one week or 100

4    the next week.  So he had advised that the judge approved for

5    me a $100.  It was either 100 or 150 a week.  So that was

6    eventually set up.  So that wasn't during the entire time of

7    the conservatorship.

8        Q.   So I want to touch on something you mentioned a

9    minute ago.  Occasionally there were bigger expenses, like

10   when you made Color Guard, other school activities that

11   require bigger checks and all.  Was there a procedure you

12   were supposed to go to in getting that additional money

13   beyond your allowance as communicated to you by the

14   defendant?

15       A.   Yes.  I knew Russell at times can be kind of

16   difficult to get ahold of, because I understood at that young

17   age that his world didn't revolve around me.  So as soon as I

18   knew that I needed money for, like, a school expense, I

19   immediately notified Russell, whether it was leaving a

20   message on voicemail or I would text him that I needed it,

21   just so he knew that, he was aware of the situation.  And

22   Russell eventually would get back with me.  And he would make

23   it very clear that he would need receipts.  And there were

24   times where it wasn't standard practice to receive a receipt

25   for certain things that I would ask for, kind of like --

1    like, uniforms and things that, typically, students would

2    have that directly taken out of their parent's accounts. But

3    there was times where I had to have the teacher just actually

4    write a note or kind of have one of those very bland

5    receipts, just for them to fill in that, yes, she paid this

6    amount of money for her band costume, or whatever it may have

7    been. But it was very clear that Russell needed the receipts

8    for anything that we had bought.

9    Q. So he was tracking very closely your expenses, what

10    you needed to pay for, and in fact, had you -- whether or not

11    you would actually pay that money?

12    A. Correct.

13    Q. Any extravagances that you can recall?

14    A. I bought a car and a house. I think those are

15    pretty extravagant.

16    Q. Let's talk about your car a little bit. About how

17    old were you when it came time you wanted a car?

18    A. I would have been 16.

19    Q. Okay. And why did you need a car?

20    A. I needed a car to get back and forth to school,

21    especially staying after school, joining the Color Guard and

22    Winter Guard in high school. I was running out of options

23    because friends would take me home so many times that there

24    were also times where they couldn't. And I didn't want to

25    quit because that was really the only thing that I loved at

1   the time.  I had a lot of doctor appointments that I needed

2   to get to as well.  And I kind of ended up being a taxi

3   driver for a lot of my family members because most of them

4   didn't have their license as well.  So even to take -- my

5   grandmother had a license, but she was terrified to drive.

6   So I would take her to the store.  And I was kind of used for

7   a lot of different reasons.

8       Q.   So what kind of car did you end up getting and where

9   did you get it from?

10      A.   I ended up getting a 2008 Nissan Maxima.  And I was

11  told by Russell that it was -- obviously, using my fund, my

12  money, he purchased it through an auction.  And so I knew

13  that the vehicle had come from Florida, but the vehicle was

14  ultimately -- that's what I was told, was at an auction.

15      Q.   Okay.  And then tell me how old you were when you

16  bought your house?

17      A.   I was 17 when I bought a house.

18      Q.   Okay.  Not many people bought a house when they were

19  17.  Why was it that you bought a house that young?

20      A.   I bought a house at 17 because I was starting to

21  realize that my normal life was not normal.  Like I said, all

22  of this being unstable started right after mom died.  So from

23  12 to 17 years old, I moved from house to house.  We were

24  living at a -- my sister and I, we were living out of bags.

25  It wasn't because we were bad children at all.  It was just

1    because we were never close to my father's family.  So there

2    was never a relationship built with them to begin with.  We

3    never saw them before my mom died.  Then all of a sudden, we

4    are living with these, really, strangers for years.  And so

5    we were sharing bedrooms with their children or living --

6    sleeping on couches.  So it wasn't our behavior, by no means.

7    It was just whenever the family needed money, that's who took

8    us in, like I said earlier.

9           And at one point everyone -- it seemed like the

10   stays were getting a lot shorter to the point where I was

11   living in my car.  And when I didn't have a place to live and

12   Hannah didn't have a place to live, dad, for the most part,

13   would always let us come, especially Hannah.  But for me

14   being older -- my dad always told me I reminded him of my

15   mom.  So he and I just never had good relationships at all.

16   And I think a lot of it has to do because I reminded him of

17   my mom.  And when I saw something not right, I told him about

18   it.  And so around 17, I ended up buying a house because I

19   was living in my car.  Not many people knew that.  I don't

20   even think Russell knew that I was living in my car.  But I

21   told him my living arrangements are terrible and I really

22   need -- I need something to happen.  And that's when he told

23   me that we could start looking into buying a house as long as

24   the judge approved of it.

25          Q.   So he was actually fairly involved in the decision

1    of which house you bought; is that right?

2        A.    Yeah, he was.  I was wanting to stay in the area, in

3    the Midlands.

4        Q.    You were living in Irmo; is that right?

5        A.    At the time, it was Lexington County that I was

6    living.  But I ended up buying a house in Irmo, which is 10

7    minutes from Lexington.  So it's the Midlands area.  So I was

8    on, like, Zillow and just looking at houses and fairly cheap.

9    I just really needed a house with four walls and a ceiling.

10   I don't think that I was expecting a whole a lot.  I don't

11   believe that -- I mean, I wasn't wanting a huge mansion.  I

12   just needed somewhere safe.

13        So I would send Russell some houses that I was

14   interested in.  And he would -- we looked at a few of them in

15   person, but a lot of them he denied.  I remember one specific

16   one that I loved.  But he said the kitchen was too small.  So

17   that was a no.  And then he actually found the house that I

18   ended up buying.  At that point I probably could have hated

19   it, but it was a place to call home.  So I was onBoard with

20   getting it.  And I didn't hate it, but I'm just saying, I

21   could have and it wouldn't have mattered.  It gave me a place

22   to live.  And I knew I was safe from my dad.  So the house

23   that he sent me and we actually went and walked through it,

24   that was the house that I ended up buying.

25        Q.    So now we've talked about a few different areas.  We

1  talked about expenses that were larger than normal, he would

2  require receipts, put everything in writing, very

3  detail-oriented; is that correct?

4  A.  Correct.

5  Q.  When it came time for you to have a car, he was

6  engaged in that activity?  He found you a used car at an

7  auction?  Is that right also?

8  A.  Correct.

9  Q.  And when it came time for you to buy a house, he was

10  also very much engaged in the details of the house that you

11  bought, to the extent the kitchen is too small on this one or

12  whatever.  Ultimately --

13  A.  Ultimately, it was his decision.

14  Q.  So, basically, you were living by yourself at 17 in

15  a house, getting yourself from place to place; is that

16  correct?

17  A.  Correct.  Eventually, Hannah came and lived with me,

18  very quickly, but she came in the picture very quickly.

19  Q.  Okay.  Were you ever aware of how much money he made

20  in conservator fees for managing your money for those two

21  years?

22  A.  No.  I did not find out the amount he made until

23  last year.

24  Q.  And what was that amount?

25  A.  I believe it was somewhere around 150,000, was

1    upfront.  And then I believe that he also earned a percentage

2    every year after that.

3         Q.   Okay.  And then were you aware of loans he was

4    taking out of your sister's account?

5         A.   No.

6         Q.   Were you aware of loans he was giving your former

7    lawyer, Alex Murdaugh, from your sister's account?

8         A.   No.

9         Q.   Do you know who Arthur Badger was or is, actually?

10   Well, let me say, at the time did you know who Arthur Badger

11   was?

12        A.   No, I didn't.

13        Q.   Did you know who Hakeem Pinckney was?

14        A.   No.

15        Q.   Do you know who Natasha Thomas is?

16        A.   No.

17        Q.   What happened when you turned 18, as far as your

18   conservatorship and your relationship with the defendant?

19        A.   When I turned 18 -- it was on my birthday.  I spent

20   my 18th birthday driving to Hampton County.  And I met with

21   Russell at the bank in his office.  And there was a stack of

22   notebooks, binders.  And it was a very quick meeting.  I

23   anticipated it to last all day, but it was -- I remember

24   thinking the drive took longer than the actual meeting.  He

25   basically handed over the binders and advised that that was

1    all the documentation from the lawsuit and everything.  And I

2    remember him saying I probably never will need it, but if I

3    do, it's here.  And it was an overwhelming amount of

4    paperwork.  I remember opening, like, the top binder and I

5    went through like four pages.  And it was just -- it was

6    overwhelming.  So I never looked into it.

7         But I remember in the meeting he told me that he was

8    going to end up wiring the cash that I had in the bank and

9    what was left in the bank and that that would be wired to me.

10   So it was in the week that I think it was two wires were made

11   into my bank account.

12        Q.   How much money was that?

13        A.   It was around, I want to say, $620,000.

14        Q.   And I want you to give the jury an idea of, when we

15   talk about him asking for receipts, being very involved in

16   the financial aspects of your life, when he passes you these

17   binders and all, are we talking substantial binders, box full

18   of stuff, you look through four pages and said, that's enough

19   for me?  Was it a lot of stuff?

20        A.   Oh, it was a lot of paperwork, yes.

21        Q.   So he had meticulously documented all the --

22        A.   Yeah.  And I remember thinking when Russell had

23   mentioned that all the paperwork was there, that I would

24   probably never, ever need it, but if I did, if I ever wanted

25   to look through it, it was all there.  And I remember

1  thinking, well, this guy documented it and was very organized

2  so much, I probably would never need it.  So I never felt the

3  need to go through it with a fine comb, because I remember

4  thinking if he had all of that documentation and -- like I

5  said, it was very well organized, I think everything would

6  have been okay.

7      Q.   Since that day when he just passed you all your

8  financial stuff, how often do you hear from him?

9      A.   I didn't hear from him often at all.  There would

10  be -- I am not really sure why, but the only time Russell

11  would reach out to me after I turned 18 was to get, like,

12  Hannah's -- to ask if Hannah had a new phone number or where

13  Hannah was living, what was her address.  But we hardly ever

14  talked after I was 18.

15      Q.   As far as that, the binders, the box of binders that

16  he passed across to you, did something happen to those?

17      A.   Yeah.  So in 2016, May 2016, on Mother's Day, I lost

18  my house to a fire.  And it was a total loss.  And I remember

19  everyone telling me that, you know, this is what insurance is

20  for, this is what insurance is for, because, like I said, it

21  was 100 percent loss.  I was a single parent.  I have got a

22  set of twins, a boy and a girl, which I don't think is a

23  coincidence.  But like I said, single mom to two babies, they

24  were two years old, almost two.  I lost everything to a house

25  fire and to soon realize that my homeowner's insurance didn't

1    cover any content.  It only covered the mortgage.  And so my

2    children and I had to start from ground zero.  But one of the

3    biggest things that I remember I needed was all those papers,

4    because that was -- a lot of my money was put into an

5    annuity.  So if I ever needed or if I had any questions about

6    my annuity, all the paperwork was in those binders that

7    Russell gave me years ago.  And I lost them in the house fire

8    in 2016.

9        Q.   So did you ask him for replacements?

10       A.   Oh, I did.  It was only a couple of weeks after the

11   fire, because I had already lost everything else.  I remember

12   thinking if something happened to my annuity, like, I'm in a

13   lot of trouble.  And so, yeah, I requested the documents

14   again from Russell in 2016.

15       Q.   How long did it take you to get them?

16       A.   It took several years for me to get the -- to get

17   papers from Russell.  I know for sure it would have been at

18   least by 2019, because I received the box in the house that I

19   live in now, and I bought that in 2019.  So 2016 to 2019, I

20   requested these documents.  And I received some documents at

21   first in 2019.  I remember Russell had randomly shot me a

22   text message saying, I put your papers in the mail, you

23   should be getting them any day.  And I think it took a day or

24   two.  And I got the box.  And I remember picking up the box,

25   I was like, wow, that's a lot lighter than I remember.  And

1     it was just a fraction of the documents that I got, that I

2     had received when I was 18. So I knew that wasn't all of the

3     documentation.

4         But I also remember thinking, well, if it took that

5     long to get this much, like, I will just work with what I

6     have at this point. So I only received a fraction of the

7     documentations at that time.

8     Q. And when was it when you finally received the rest

9     of what you were looking for?

10     A. So I remember I reached out and I texted -- I either

11     texted or I called Russell when I saw on the news that Alex

12     Murdaugh was shot in the head, Labor Day weekend or Labor

13     Day. I think it was 2021. And I had asked him, you know, if

14     Alex was okay. And he didn't have a whole lot to say because

15     he didn't know. Anyway, so it seems like from that date,

16     SLED was getting involved in everything and looking into

17     Alex's shooting. And then I remember talking to Russell.

18     And I told him that a SLED agent had called me. And he was

19     like, really, SLED, what did they say? And I told him what

20     we had talked about and then ended that conversation.

21         Within that week Russell told me, he said, you know,

22     SLED requested your -- all of your paperwork from when I was

23     your conservator, so I might as well send -- so I need to go

24     ahead and send it to you as well. So I remember that raised

25     a red flag to me at that moment that it took three years for

1    me to receive -- when I asked you for more documents -- for

2    my documentation that I lost in the house fire and only

3    received a fraction of it, but it took SLED requesting all of

4    my documentation before you sent it to me.  So when he sent

5    it to SLED, he also sent -- he sent my complete file to me.

6    And that would have been 2021.

7        Q.   So I only have a few more questions for you.

8        A.   Sure.

9        Q.   You work now for the Lexington County Sheriff's

10   Department; is that right?

11       A.   I do.

12       Q.   And what do you do there?

13       A.   I'm a patrol deputy.

14       Q.   And with the settlement money, and you've been told

15   all the way back when you were 12, 13, 14, 15, that the

16   settlement would take care of you, you would never have to

17   work again; is that right?

18       A.   That is correct.

19       Q.   So why do you work on now?

20       A.   And that still is very true.  The annuity I get,

21   it's sustainable for everyday life.  And do I have to work?

22   I don't.  But I choose to work because I believe healed

23   people are the best people to help hurting people.  I love

24   what I do.  And I see people on their worst days.  And so

25   what I do is I patrol the roads.  I respond to calls.  I

1    enforce county ordinances and state law.  So I was a

2    supervisor, but I took a demotion after I lost my baby

3    recently, because it was just getting to be too much, but I

4    told my job that I love working the road.  And I love being

5    the first people on the frontlines going to help people,

6    because for the children that get abused by their parents, I

7    know what that's like, or for the wreck that I show up on

8    where there's kids involved or there's people involved who

9    have lost loved ones, I know what that's like.  For the

10   single mom raising kids that can't make ends meet, who have

11   nowhere to live, I know what that's like too.

12          So I feel like with all of the traumatic events

13   that's happened in my life, there is a silver lining in it.

14   And I use it every day.  I will be using it tonight, in fact,

15   when I go to work tonight.  And I will use my life

16   experiences to help others.

17          MR. HOLLIDAY:  All right.  Alania, thank you very

18   much.  Answer any questions the defense might have for you.

19          THE COURT:  Cross-examination.

20                      CROSS-EXAMINATION

21   BY MR. AUSTIN:

22   Q.   Good morning, Ms. Plyler.

23   A.   Good morning.

24   Q.   You might remember me.  My name is Matt Austin.  We

25   met at the mediation.  I didn't really get a chance to say

1    anything there because I'm on the criminal side of this case,

2    but I just want to tell you I'm truly sorry for everything.

3    And that's for the whole team.  And I know it's a lot to

4    relive everything.  So I will try to be as quick as I

5    possibly can.  So I don't mean any disrespect by any

6    questions.  Just going to ask a few on the record and try to

7    get you and your sister on the way.

8         A.    Thank you.

9         Q.    I guess first question I have is just kind of a

10   basic one.  It's going back to the original lawsuit that, you

11   know, led to you meeting Alex Murdaugh.  And if I heard you

12   correctly, is it true that Alex, Ronnie Crosby and Arnold

13   Beacham were the three lawyers involved in that case?

14        A.    Correct.

15        Q.    And the way you got to Alex was through your dad's

16   relationship with Arnold Beacham?

17        A.    Correct.

18        Q.    And Ronnie was brought in because there was like a

19   tire defect issue in the case and that's his specialty?

20        A.    Correct.  I was told that Firestone, Bridgestone,

21   there was a major lawsuit, even with other people where

22   rubber got mixed up or something happened with their formula

23   and were making faulty tires.

24        Q.    I don't know anything about that, those kinds of

25   cases.  I will leave it to them.  But that was Ronnie's area,

1    and he was involved in the case. Can you describe his

2    involvement in terms of just, like, interpersonal reactions?

3    Were you talking with him as the case attorney?

4         A.    Ronnie?

5         Q.    Or Alex, yes, ma'am.

6         A.    No.  I had always liked -- I always felt like Ronnie

7    Crosby did more of, like, the work behind the scenes.  And

8    Alex was the talker.  He was the one that informed you of

9    what was going on.  That was always my personal impression of

10   the two.

11        Q.    Yeah.  That makes sense.  And so I understand

12   from -- well, let me ask you this, too.  Ultimately, you are

13   happy with the job that the law firm did on the case, right?

14        A.    Correct.

15        Q.    And I don't think there's any dispute amongst

16   anybody here that they did a good job in recovering a

17   substantial sum of money?

18        A.    I don't think there's any amount of money that can

19   replace, but I think that they did a good job.

20        Q.    Uh-huh.  And so I want to talk about the loans that

21   were taken from your sister's conservatorship.  I just want

22   to make sure this is clear for the jury.  Were any loans

23   taken out of your conservatorship?

24        A.    Not that I'm aware of.

25        Q.    And did you lose any money throughout this process?

A.    I believe so.  And the reason why I say that is
because, like I said, I was under the impression that the
money that I receive from the lawsuit was to go into an
account that was managed by Russell Laffitte.  And I have
learned recently that Russell took out a loan for my -- like
for my car.  And I paid high interest rates on that, when I
should have had hundreds of thousands of dollars, if not
more, sitting in an account.  So did I lose money?  I would
say yes, because I paid interest on loans that were taken
through the bank when I had funds -- I should have had funds
sitting in the account.

Q.    And when you said you paid interest, do you know who
you were paying interest to?

A.    From my understanding it went to the bank.

Q.    So it wasn't paying interest back into the
conservatorship?

A.    I don't know.

Q.    Okay.  And you were talking about your understanding
of Russell's duties as a conservator.  And, I mean, I totally
understand and respect him becoming a father figure, but that
wasn't really part of that job description, right?  The job
was to preserve the money?

A.    Correct.  If you are asking if he was supposed to be
a father figure, no, that wasn't in his job duties.

Q.    And I don't want to minimize anything with that.  I

1    don't mean anything by that.  I just want to get through what

2    the duties are.

3        A.    Sure.  Russell may not have even known that he

4    was -- I looked at him as a father figure, because, like I

5    said, we were -- I was in Columbia.  He was in Hampton.  So

6    he probably -- in his mind, it was all business, but as a

7    young teenager, I looked at him.  He seemed like good people.

8    And he was an older man that was close to my father's age.

9    So he took that role.  Probably didn't even know it.

10        Q.    Just sort of naturally developed that way?

11        A.    Yes.

12        Q.    And y'all are dealing with each other a lot, not a

13    daily basis seeing each other --

14        A.    On a financial basis, yeah.

15        Q.    And he may have been hard to get in touch with

16    sometimes, but, ultimately, you would get in touch with him;

17    is that right?

18        A.    Correct.

19        Q.    And so you are not saying that you take a side --

20    like you were talking about with the vehicle, you are not

21    saying that Russell stole any money from you; is that

22    correct?

23        A.    I am not really sure what was done with our money,

24    because it wasn't ever talked about.

25        Q.    Sure.

1     A.   Russell never asked us about our accounts.  We just

2  went to him when we needed money.

3     Q.   Fair enough.  Are you aware of how much money in

4  interest your conservatorship account accrued during the time

5  that Russell was your conservator?

6     A.   I do not.

7     Q.   Do you know about your sister?

8     A.   I do not.

9     Q.   And I think it's very admirable that you went into

10  law enforcement with everything you've been through.  I've

11  worked in law enforcement before, so I respect that.  I'm

12  just sort of curious about your training.  Did you go to the

13  police academy when you first became an officer?

14     A.   I did.

15     Q.   And I think you said your job is to enforce South

16  Carolina state law?

17     A.   Correct.

18     Q.   And so you are somewhat familiar with the South

19  Carolina Code, probably the criminal section?

20     A.   Criminal side, yes, sir.

21          MR. HOLLIDAY:  Your Honor, objection.  Relevance.

22          THE COURT:  What's the relevance, Mr. Austin?

23          MR. AUSTIN:  I'm about to get there, Your Honor.

24          THE COURT:  Go ahead and we will consider it.  Let

25  me hear what you've got to say.

BY MR. AUSTIN:

Q. As part of your training in search warrants, is it your understanding that the purpose of getting a search warrant, you get permission to do something you otherwise couldn't do?

A. Correct.

MR. HOLLIDAY: Objection. Relevance, Your Honor.

THE COURT: Sustained. And she's not -- sustained.

BY MR. AUSTIN:

Q. Again, I don't mean any disrespect here. In preparation for trial, I think you said you had multiple meetings with the Government, SLED, and FBI. At any point did anybody discuss whether or not it was illegal for Russell to make --

MR. HOLLIDAY: Objection. Relevance. Calls for a legal conclusion.

THE COURT: I didn't hear the question.

MR. AUSTIN: I was asking if she was informed that there was a statute saying that Russell could take loans.

MR. HOLLIDAY: Objection. Hearsay.

THE COURT: What they said would be hearsay, offered for the truth. Sustained.

MR. AUSTIN: Your Honor, may I -- I'm asking to try to get her understanding and her -- the effect on her and how she perceived Russell.

1    THE COURT:  Okay.  Her testimony and how she

2  perceived Russell, I don't see how that would reach that.  I

3  sustained the objection.

4    MR. AUSTIN:  Okay.  I will move on.

5  BY MR. AUSTIN:

6    Q.  I think you testified about the settlement funds

7  kind of seeming to you like a bottomless pit and thought you

8  could buy all the cars that you wanted, just like any

9  teenager probably would when you hear there's a huge amount

10  of money out there; is that right?

11    A.  Correct.  That would have been when I turned 18.  I

12  didn't have any say-so in what kind of car I wanted to buy.

13  Just like with the house, it was whatever Russell decided to

14  pick.

15    Q.  Well, on the house front, isn't it true that one of

16  the houses that you were interested in failed inspection, and

17  that's why the purchase didn't go through?

18    A.  It's been so long ago, almost 20 years ago, I can't

19  recall that.

20    Q.  And when you were talking about trying to get the

21  probate files from Mr. Laffitte, ultimately, you did get

22  those files from him, right?

23    A.  When he told me that SLED requested them, that's

24  when he sent me the complete file.

25    Q.  They are substantial.  I think we have a whole box

1    over here full of them.

2        A.    Yeah, it's a lot.

3        Q.    The whole time, all of those files were actually

4    with the court still; is that correct?

5        A.    I'm not sure.  I never dealt with the courts

6    personally.

7        Q.    And you don't think there's anything that he left

8    out or took out of them?  Do they seem complete?

9        A.    At this point, I'm not sure if everything is there

10   or not.

11       Q.    But there's a lot?

12       A.    There's a lot.

13       Q.    I've become all too familiar, unfortunately, with

14   probate documents.  And so I think just last thing to wrap up

15   and just to reiterate, aside from the car, you are not aware

16   of anything that you think was taken from your account?

17       A.    I believe we are still looking into all of that.

18       Q.    You don't know of anything at this moment?

19       A.    Correct.

20            MR. AUSTIN:  Thank you very much.  I appreciate it.

21            THE COURT:  Anything on redirect?

22            MR. HOLLIDAY:  Your Honor, I have nothing on

23   redirect.  I ask that Alania be allowed to be excused.

24            THE COURT:  Any objection?  Mr. Austin, any

25   objection on Alania being excused?

1        MR. AUSTIN:  No, Your Honor.

2        THE COURT:  You may be excused.  Thank you, ma'am.

3        (Whereupon, the witness is excused)

4        THE COURT:  Government call your next witness.

5        MR. HOLLIDAY:  Your Honor, thank you.  The

6   Government calls Hannah Plyler.

7        THE COURT DEPUTY:  Please state your full name.

8        THE WITNESS:  Hannah Marie Plyler.

9                        HANNAH PLYLER,

10        having been duly sworn, testifies as follows:

11                      DIRECT EXAMINATION

12   BY MR. HOLLIDAY:

13      Q.   Hannah, you can take your mask off so the jury can

14   hear you.

15      A.   Okay.

16      Q.   And the only thing I would ask, like your sister,

17   you are a little soft-spoken, be sure, when I ask you a few

18   questions, speak into the mic.  Okay?

19      A.   Okay.

20      Q.   How are you doing today?

21      A.   Doing all right.

22      Q.   It's an unnatural situation, I know.

23      A.   Yeah.

24      Q.   But these folks are very interested in what you have

25   to say.  You and I have sat down with each other a couple of

1    times before today; is that right?

2        A.   Yes, sir.

3        Q.   And I know from us sitting down that some of the

4    things that we cover are upsetting to you.  But I will tell

5    you we covered a lot with your sister, and I don't plan to go

6    over some of these things.  Okay?  You've helped me

7    understand some things about the accident.  In our

8    discussions, we talked about the accident you were in, the

9    conservatorship and things of that nature.  So we are going

10   to be talking about that.  Do you understand?

11       A.   Yes, sir.

12       Q.   Okay.  Do you know the defendant, Russell Laffitte?

13       A.   Yes.

14       Q.   How do you know him?

15       A.   He was my conservator.

16       Q.   And I know you were very young at the time, but what

17   kind of understanding did you have as to what he would be

18   doing for you as a conservator?

19       A.   My understanding was he was supposed to protect our

20   money until we turned 18.  That was my understanding of him.

21       Q.   Okay.  And then your conservatorship ended when you

22   were 18, as you've just said; is that right?

23       A.   Yes, yes, that's correct.

24       Q.   We are going to briefly go over some high level

25   details with the car accident.  I'm going to lead you through

1    some of that and then we will be done with it.  Okay?

2        A.    Okay.

3        Q.    So the accident was on July 16th, 2005; is that

4    right?

5        A.    Yes, that's correct.

6        Q.    And your mother and your brother, you and your

7    sister were all in the car; is that correct?

8        A.    That's correct.

9        Q.    And it was a Ford Explorer?

10       A.    Yes.

11       Q.    And you were eight years old; is that correct?

12       A.    Yes.

13       Q.    And there was a tire failure on the Explorer?

14       A.    Yes.

15       Q.    And that sent the Explorer down into the woods, and

16   y'all hit trees and things of that nature; is that right?

17       A.    That's correct.

18       Q.    And your mom and Justin died in the accident?

19       A.    That's correct.

20       Q.    And your sister was badly hurt.  She was trapped in

21   the car and all that.  Do you remember that?

22       A.    Yes.

23       Q.    You were actually the one -- you were not trapped?

24       A.    No.

25       Q.    And you went up to the road to get help; is that

1  right?

2  A.   Yes, that's correct.

3  Q.   We are done with that.

4  A.   Okay.

5  Q.   Did you have to go to the hospital?

6  A.   Yes.

7  Q.   Tell the jurors just a little bit about your

8  injuries.

9  A.   I had an injury to my leg, my eye, left side of my

10  face, dental.  So that was basically it.

11  Q.   After the accident, where did you go live, Hannah?

12  A.   With my grandparents.

13  Q.   Okay.  Did you get moved around a good bit or did

14  you basically stay with your grandparents most of the time?

15  A.   I moved around from family member to family member.

16  Q.   And you were actually the one that actually lived

17  with your father a little more than your sister might have,

18  is that right?

19  A.   That's correct.

20  Q.   At some point there was a lawsuit, right?

21  A.   Yes.

22  Q.   And do you remember any of the lawyers?  Again, you

23  are eight years old at the time of the accident, 12 when it

24  gets settled.  But do you remember any of the lawyers who

25  were involved?

1    A.   No, I don't, not besides Alex.

2    Q.   And the lawsuit was settled in 2009.  Do you

3  remember when it settled?

4    A.   Yes, sir.

5    Q.   Were you told how much money you were going to be

6  getting?

7    A.   No, sir.

8    Q.   Were you told anything about the settlement or the

9  money?

10   A.   We would be taken care of.

11   Q.   Okay.

12   A.   That was basically it.

13   Q.   So how was it that you became aware of the defendant

14 Russell Laffitte at that young age?  When did you meet each

15 other or how did you meet each other?  When is a difficult

16 question.  How did you meet him?

17   A.   I want to say I was around 11 years old, somewhere

18 around there.  I'm not sure of where we were at when we first

19 met.  I honestly -- I was young, you know.  It's been years

20 ago.  But I do know I was about the age of 11.

21   Q.   And what was your understanding of the role he would

22 be playing in your life?

23   A.   If I needed anything as far as clothes or school

24 supplies or anything like that, then I would have to contact

25 him first, and he would have to get it approved, and then he

1    would get back to me.

2        Q.    So as far as the approval goes, were there certain

3    conditions?  Let's back up a half a step.  Did you get an

4    allowance?

5        A.    Yes, every week.

6        Q.    Okay.  About how much was that?

7        A.    About $100.

8        Q.    And so occasionally there were things that exceeded

9    that $100; is that correct?

10       A.    Yes, that's correct.

11       Q.    Give the jury an example or some examples of the

12   kinds of things that you needed to buy that were outside the

13   allowance?

14       A.    Maybe if it was things for other family members or

15   bills.  I mean, could be a number of things.

16       Q.    Okay.  Tell me about that, what you said about other

17   family members.  What was going on there?

18       A.    Basically, if they needed help with bills or food or

19   anything like that, then I would have to contact Russell to

20   see if I could get more of an allowance to be able to do

21   those things.

22       Q.    Okay.  When you did have those unusual expenses,

23   what were the requirements that were -- that he told you you

24   had to do to get the money?

25       A.    I know he would have to contact the judge to get

1    approval for it.

2         Q.    Did you have to provide any documentation?

3         A.    Receipts.

4         Q.    Talking generally about some of the things that you

5    had to buy when you were a kid, did you have to buy school

6    supplies for yourself?

7         A.    Yes.

8         Q.    Did you have to buy your own clothing?

9         A.    Yes.

10        Q.    Sometimes your own food?

11        A.    Yes.

12        Q.    Tell me about the Disney trip.

13        A.    I was told if I didn't have receipts, then I just

14   had to keep it, you know, the basics.  And, you know, that's

15   hard for a little girl, especially who just lost her mom and

16   brother, just trying to have a good time.  And you still just

17   feel like -- I don't know.  I feel like it should have just

18   been easy for us.

19        Q.    Like your sister, at some point you needed a car as

20   well; is that right?

21        A.    Yes, that's correct.

22        Q.    Tell me a little bit about that.

23        A.    I had asked if I could get a vehicle.  And I wasn't

24   approved the first time.  And that's when I needed it the

25   most, you know, not only for school, but my granddad, he was

1 on a 100 percent oxygen.  So it was kind of important for me

2 to have to take him back and forth to the hospital.  But I

3 wasn't approved until I moved in with my sister.  And that's

4 when she was pregnant with her twins and needed my help.  And

5 so I guess finally he just thought it was okay then --

6     Q.    Okay.

7     A.    -- after the second time of asking.

8     Q.    I think you have given the jury a good idea of the

9 expenses up until you turned 18.  Why don't we talk a little

10 bit about that.  When you turned 18, did you have a meeting

11 with the defendant?

12     A.    Yes, I did.

13     Q.    Okay.  Tell us about that meeting.

14     A.    Not really much to it.  Met at Starbucks.  He handed

15 over just binders and binders and binders of paperwork.  And

16 that was pretty much it.  And we were on our way.

17     Q.    Did he explain to you what was in the binders?

18     A.    No, sir.

19     Q.    Did he talk to you about managing the money that

20 would be coming your way soon?

21     A.    No, sir.

22     Q.    Did he recommend a financial advisor to you?

23     A.    No, sir.

24     Q.    How long do you think you were at the Starbucks in

25 Irmo?

1    A.   Probably no longer than, like, 15 minutes.

2    Q.   And when did you hear from him again after that?

3    A.   Not very often, maybe one time.

4    Q.   When was the last time you heard from him?

5    A.   This past December.

6    Q.   Have you looked at the documents that he gave you at

7    Starbucks?

8    A.   No.

9    Q.   Why not?

10    A.   I wouldn't even know where to begin, honestly.  And

11    I wouldn't even know if it would make sense to me.

12    Q.   You are receiving an annuity, is that right, a

13    payment every month?

14    A.   That's right.

15    Q.   And you basically live off of that payment, correct?

16    A.   That's correct.

17    Q.   You have your own house now?

18    A.   Yes.

19    Q.   And you have a family as well, you have a little

20    one?

21    A.   Yes.

22    Q.   Going back to the time of the conservatorship, back

23    to when you were a teenager, did you know who Arthur Badger

24    was?

25    A.   No, sir.

1    Q.    Did you know who Hakeem Pinckney was?

2    A.    No, sir.

3    Q.    Did you know who Natasha Thomas was?

4    A.    No, sir.

5    Q.    During the conservatorship, were you aware of how

6    much money the defendant was paid for being your conservator?

7    A.    No, sir.

8    Q.    Did you know how much he was paid for being your

9    conservator?

10   A.    No.

11   Q.    Were you ever aware of loans he was taking out of

12   your account?

13   A.    No, sir.

14   Q.    Were you aware of loans he was giving to your former

15   lawyer, Alex Murdaugh, out of your account?

16   A.    No, sir.

17   Q.    And do you know where the money came from to pay

18   those loans back?

19   A.    No, sir.

20   Q.    When was it that you found out how much your

21   settlement was for?

22   A.    Can you repeat that?  I'm sorry.

23   Q.    The accident case settled for a certain amount of

24   money, right?

25   A.    Right.

1    Q.   When was it that you eventually found out how much

2    money that was?

3    A.   I'm not sure.

4         MR. HOLLIDAY:  All right.  Thank you, Hannah, for

5    answering my questions.  Please answer any questions the

6    defendants might have.

7         THE COURT:  Cross-examination.

8                    CROSS-EXAMINATION

9    BY MR. AUSTIN:

10   Q.   Good morning, Ms. Plyler.

11   A.   Good morning.

12   Q.   I've already said this to your sister, but just

13   repeat it, I will be really quick.  And, again, I'm Matt

14   Austin.  We met before at mediation.  And I just want to

15   express how sorry I am that you are having to do this today

16   and that you've been through everything you've been through.

17   So I will be short and quick.  Because it can be -- I forgot

18   my outline.  Sorry.

19        So with your conservatorship, do you know if any

20   money ultimately was taken or lost by Russell or by Alex

21   Murdaugh?

22   A.   I've been told now it was taken, but I wasn't aware

23   of it before.

24   Q.   And how much money was taken, just roughly?

25   A.   I don't know the exact amount.

1     Q.  Okay.  But your understanding is that Russell took

2 money from it?

3     A.  Yes.

4     Q.  And where does that come from?  Where have you heard

5 that?

6     A.  From my attorneys.

7     Q.  Okay.  And fair to say that Russell was pretty

8 engaged as a conservator at the time you were dealing with

9 him?  Did he talk to you on a weekly basis?

10     A.  I wouldn't say weekly, no.

11     Q.  No?  Okay.  But, ultimately, if you needed him,

12 could you get in touch with him to get the things that you

13 needed?

14     A.  Most of the time.

15     Q.  Okay.  And are you aware of whether or not your

16 conservatorship, the loans generated any interest income for

17 your conservator account?

18     A.  I am now.

19     Q.  Do you know how much that was in total, again, not

20 anything specific?

21     A.  I don't know.  I really don't.

22     Q.  Is it in the hundreds of dollars, thousands?

23     A.  Thousands.

24     Q.  Okay.  And so would you agree with me that he

25 effectively did conserve your conservatorship funds?

1    A.    Can you repeat that?

2    Q.    Would you agree that he did conserve the money that

3    was entrusted to his care, in fact, he grew it?

4    A.    I don't see how, but ...

5    Q.    Okay.  I am not trying to trick you or anything.  I

6    just -- I can move on from that.  And are you aware of the

7    fact that the South Carolina probate code allows for

8    conservatives to make --

9              MR. HOLLIDAY:  Your Honor, objection.

10             THE COURT:  Sustained.

11             MR. AUSTIN:  I think that's all I have.  Thank you

12   very much.

13             THE COURT:  Anything on redirect?

14             MR. HOLLIDAY:  No.  I appreciate that.  I'd ask

15   Hannah be allowed to be excused.

16             THE COURT:  Can she be excused?  Any need, Mr.

17   Austin?

18             MR. AUSTIN:  Yes.

19             THE COURT:  You are excused.  Thank you, ma'am.

20             (Whereupon the witness is excused.)

21             MS. LIMEHOUSE:  Your Honor, the Government's next

22   witness is a lengthy witness.

23             THE COURT:  Very good.  Let's take our morning

24   break.

25             (Jury leaves open court at 10:31 a.m.)

1    THE COURT:  We will be at ease for about 10 minutes.

2    (Whereupon, a recess transpired.)

3    THE COURT:  Counsel, I know there's a tendency to

4    want to wander towards the witness a bit.  You've got to stay

5    in front of the microphone because the jurors are having

6    trouble hearing you.

7    MR. DANIEL:  Thank you, Your Honor.

8    THE COURT:  I know in the old world, we never had --

9    old days we didn't have microphones and we all had our

10   teacher voices and we talked allowed.  But that's not the way

11   it is today.  And the courtroom, acoustics are a little funny

12   if you are not right at the microphone.

13   Ms. Perry, are the jurors ready?

14   THE COURT DEPUTY:  Yes, Your Honor.

15   THE COURT:  Bring the jury in.

16   (Whereupon, the jury returns to open court at 10:56

17   a.m.)

18   THE COURT:  Government, call your next witness.

19   MS. STOUGHTON:  The Government calls Cyndra Swinson.

20   THE COURT DEPUTY:  Please state your full name.

21   THE WITNESS:  Cyndra Swinson.

22                    CYNDRA SWINSON,

23   having been duly sworn, testifies as follows:

24                  DIRECT EXAMINATION

25   BY MS. STOUGHTON:

1    Q.   Good morning, Ms. Swinson.

2    A.   Good morning.

3    Q.   Will you introduce yourself to the jury?

4    A.   I'm Cyndra Swinson.  I'm a forensic accountant for

5    the Federal Bureau of Investigation.

6    Q.   What year did you start working for the FBI?

7    A.   2010.

8    Q.   And have you been working for them as a forensic

9    accountant since you joined in 2010?

10   A.   I have.

11   Q.   What did you do before you joined the FBI?

12   A.   I worked in public accounting for approximately 13

13   1/2 years.

14   Q.   How would you describe your day-to-day

15   responsibilities as a forensic accountant?

16   A.   I'm tasked with looking at various financial

17   documents, such as bank statements and supporting

18   documentation to support the case, cases, investigations of

19   the FBI.

20   Q.   Tell the jury a little bit about your education and

21   the training that you've done that qualifies you to be a

22   forensic accountant at the FBI.

23   A.   So I've been a certified public accountant since

24   1999.  I've also been certified as a fraud examiner since

25   2005.  And I'm required to maintain 40 hours of continuing

1    professional education each year.  I do have a bachelor's

2    degree in accounting.

3         Q.   You've been asked to review financial documents

4    associated with Russell Laffitte's case?

5         A.   I have.

6         Q.   So I want to start by walking you through the types

7    of documents that you reviewed in this case.  You reviewed

8    financial records for what two individuals?

9         A.   Russell L. Laffitte and Richard Alexander Murdaugh.

10        Q.   Let's start with Mr. Laffitte.  I'm going to hand

11   you a number of exhibits.  These have already been admitted

12   into evidence.  And we are going to walk through them one by

13   one.  Let's look first at Government's Exhibit 166, which

14   should be on the top of that stack.

15        A.   Okay.

16        Q.   We are going to talk about the substance of all

17   these documents more in a little bit.  But just at a high

18   level, explain to the jury what this document shows.

19        A.   This is a detailed listing of checks and other

20   disbursements and deposits into Russell Laffitte's SouthState

21   Bank account.

22        Q.   So this is a SouthState Bank account, not a Palmetto

23   State bank account, correct?  It's on their screens.

24             MR. HOLLIDAY:  The jurors cannot see the exhibits,

25   Your Honor.

1    THE COURT:  Thank you.  Are we good now?  Good.

2  Thank you, all.  Thank you all very much.  Please -- I can't

3  see what you can't see, so you got to let me know.  Please

4  continue.

5  BY MS. STOUGHTON:

6    Q.   So this is a SouthState bank account for Russell

7  Laffitte; is that correct?

8    A.   That's correct.

9    Q.   What did you rely on to prepare the list of

10  transactions in this spreadsheet?

11    A.   Bank statements and the supporting documentation,

12  such as deposit tickets and checks.

13    Q.   So we've got the first page pulled up for the jury.

14  You have the whole exhibit in front of you.  What time period

15  did you cover for this bank account?

16    A.   December 7th, 2010.  Can you go to the second page

17  of that?

18    Q.   That's all right.  So we start in December and then

19  we get to 2013; is that correct?

20    A.   Yes.

21    Q.   All right.  Is this the only personal account of

22  Russell Laffitte that you relied on in doing your analysis in

23  this case?

24    A.   Yes.

25    Q.   Let's go to Government's Exhibit 167, which is up on

1   the screen.  It's not in the stack that I gave you.  Can you
2   explain what this document is to the jury?
3       A.   This is a spreadsheet of the accounting prepared by
4   Russell Laffitte for loans and the principal and interest
5   that was paid back on those loans for various dates between
6   2011 and 2015.
7       Q.   Okay.  Across the top you will see there's a series
8   of loan numbers.  Can you explain those loan numbers to the
9   jury?
10      A.   So in the first column, for example, the loan 71811
11  corresponds to the date July 18th, 2011.
12      Q.   And that's true of all the loans listed on this
13  spreadsheet?
14      A.   Yes, it is.
15      Q.   Okay.  Let's turn to the documents you reviewed for
16  Alex Murdaugh.  Could we pull up Government's Exhibit 160.
17          So this is one of the accounts of Alex Murdaugh that
18  you reviewed; is that correct?
19      A.   That's correct.
20      Q.   And this is a farm account --
21      A.   Yes.
22      Q.   -- of Palmetto State Bank?
23      A.   Yes.
24      Q.   All right.  What did you rely on when you prepared
25  this list of transactions?

1    A.    I relied on the bank statement and the supporting

2  documentation, such as deposit tickets and checks.

3    Q.    What's the date range for these transactions?

4    A.    May 1st, 2013, through September 20th, 2013.

5    Q.    That's just the first page.  I think you should have

6  the full document in front of you.

7    A.    I'm sorry.  What's the exhibit number again?

8    Q.    160.

9    A.    One moment, please.  May 1st, 2013, to August 31st,

10  2021.

11    Q.    All right.  We are going to pull up Government's

12  Exhibit 161.  This is another Murdaugh account.  You have it

13  up there as a CD, but we've got the first page here and we

14  can pull up the last page.  Is this another Murdaugh account

15  at Palmetto State Bank that you reviewed?

16    A.    Yes, it is.

17    Q.    What are the date ranges for this transaction --

18  these transactions, excuse me?

19    A.    February 16th, 2010.

20    Q.    We will pull up the last page.

21    A.    To October 25th, 2021.

22    Q.    All right.  Let's look at Government's Exhibit 162.

23  This is a third Murdaugh account at Palmetto State Bank; is

24  that correct?

25    A.    That's correct.

1    Q.    Do you have the document in front of you?

2    A.    I do.

3    Q.    What's the date range for these transactions on this

4    account?

5    A.    November 14th, 2011, to December 12th, 2011.

6    Q.    Is that 162 that you are looking at?

7    A.    Yes, ma'am.

8    Q.    We have one more Murdaugh account, Government's

9    Exhibit 163.  This account was in the name of both Margaret

10   and Alex Murdaugh; is that correct?

11   A.    That's correct.

12   Q.    So this is a fourth Murdaugh account at Palmetto

13   State Bank.  But is this the only one you looked at that was

14   in both names, Margaret and Alex?

15   A.    That's correct.

16   Q.    And then what did you rely on to prepare this list

17   of transactions?

18   A.    The bank statements and supporting documentation,

19   such as deposit tickets and checks.

20   Q.    So in a few minutes we are going to talk about a

21   number of loans out of the Plyler conservatorship accounts

22   that came into these Murdaugh accounts.  But before we get

23   there, let's pull up Government's Exhibit 164.  This is one

24   of the Plyler conservatorship accounts; is that correct?

25   A.    Yes, it is.

1     Q.   Then we've got Government's Exhibit 165.  Is this

2  the second conservatorship account that you looked at?

3     A.   Yes, it is.

4     Q.   So are these the only two Hannah Plyler

5  conservatorship accounts that you looked at in the course of

6  doing your analysis?

7     A.   Yes.

8     Q.   In addition to these bank accounts that we just

9  looked at and walked the jury through, what other types of

10  documents did you look at in conducting your analysis in this

11  case?

12     A.   Loan records and supporting documentation,

13  promissory notes provided by Palmetto State Bank.

14     Q.   Were there checks?

15        MR. DANIEL:  Provided by who?

16        MS. LIMEHOUSE:  Palmetto State Bank.

17  BY MS. STOUGHTON:

18     Q.   Were there checks?

19     A.   Yes.

20     Q.   Deposit slips?

21     A.   Yes.

22     Q.   Money orders?

23     A.   Yes.

24     Q.   Credit and debit memos?

25     A.   That's correct.

1     Q.   Based on your review and your analysis of all of

2    those documents, did you analyze Russell Laffitte's loans

3    from Hannah Plyler's conservatorship?

4     A.   I did.

5     Q.   We are going to walk through that analysis.  It's

6    Government's Exhibit 172, which is already in evidence.  All

7    right.  Ms. Swinson, at the top, this says Russell Laffitte's

8    SCB&T loan No. 8101.  What is SCB&T?

9     A.   South Carolina Bank and Trust.

10    Q.   What are we looking at on this slide?

11    A.   This is the various terms of the note Russell L.

12   Laffitte had with South Carolina Bank and Trust.

13    Q.   When was this loan taken out?

14    A.   August 20th, 2007.

15    Q.   So this is a statement from the loan.  About what is

16   the date of this loan statement?

17    A.   Approximately July 1st, 2008.

18    Q.   Is this loan secured by collateral?

19    A.   It is.

20    Q.   What does the statement indicate that collateral is?

21    A.   Bank of America stock.

22    Q.   What's the interest rate on the loan?

23    A.   Five percent.

24    Q.   What's the principal balance remaining on the loan

25   as of the date of this statement?

1    A.    $68,443.32.

2    Q.    So you indicated the loan was taken out on August

3    20th of 2007, when was this loan due?

4    A.    August 21st, 2008.

5    Q.    Going to slide 3.  Is this a document associated

6    with the same loan that we just looked at?

7    A.    Yes, it is.

8    Q.    What does this slide show?

9    A.    This slide shows that the interest rate changed from

10   8.25 percent to prime rate 6 percent effective February 8th,

11   2008, per modification agreement dated around February 4th,

12   2008.

13   Q.    Okay.  On the bottom left, you've got a box around

14   LOC for $75,000.  What does that mean?

15   A.    This was a line of credit for $75,000.

16   Q.    So this is an August of 2007 loan.  We are going to

17   move to July of 2008 loan.  What does slide 4 show?

18   A.    So this is South Carolina Bank and Trust credit

19   approval form indicating a request for a new $120,000 loan

20   with a five-year maturity at an interest rate of 6 percent.

21   Q.    So this is part of a loan application?

22   A.    Yes.

23   Q.    And what is Mr. Laffitte requesting credit for?

24   A.    Investments.

25   Q.    In the amount of?

1    A.   $120,000.

2    Q.   Let's look at lines 5, 6 and 7.  Could you explain

3 this math to the jury?

4    A.   So $120,000 is the amount of the new request.

5 $68,323 is Russell Laffitte's total existing exposure.  And

6 refers back to the loan we just talked about.  And that loan

7 is going to be paid off with the new $120,000 loan.

8    Q.   Okay.  What is the collateral for this new $120,000

9 loan?

10    A.   In the bottom left, 2,471 shares of Palmetto State

11 Bank, stock certificate No. 1117.

12    Q.   And what's the interest rate?

13    A.   Six percent.

14    Q.   I'm going to go the next portion of this same

15 financial statement.  What are the terms of this loan?

16    A.   It's a five-year balloon with a ten-year

17 amortization at 6 percent interest rate.

18    Q.   And what does this indicate the source of repayment

19 of this loan will be?

20    A.   The debtor's personal income, liquidation of assets,

21 or sale of collateral.

22    Q.   Go to the third part of this same statement.

23 There's a box you circled that says AGI.  What does that

24 mean?

25    A.   Adjusted gross income.

1    Q.   And what does this indicate Mr. Laffitte's adjusted

2  gross income is?

3    A.   $288,736.

4    Q.   What about his outside net worth?

5    A.   $3,421,877.

6    Q.   And what about his occupation?

7    A.   Vice president, Correspondent Bank.

8    Q.   All right.  So we just looked at a loan application

9  from July of 2008.  Is this the promissory note that's

10 associated with the loan generated from that application?

11   A.   Yes, it is.

12   Q.   So what's the actual date of this loan?

13   A.   July 11th, 2008.

14   Q.   And what does the note indicate the interest rate

15 is?

16   A.   Six percent.

17   Q.   Do you know what a prime interest rate was in July

18 of 2008?

19   A.   Six percent.

20   Q.   Go to the next page of the promissory note.  When is

21 this loan due?

22   A.   It's a five-year note due July 11th, 2013.

23   Q.   And third page of the same note, what are the terms

24 of this loan should the defendant default on his payments?

25   A.   The holder of the note, which would be the lender,

1    could call the note due and payable in full.

2        Q.   All right.  I want to talk about a third loan that

3    the defendant got from SCB&T.  What is the date of this third

4    loan?

5        A.   July 28th, 2010.

6        Q.   All right.  So this is about two years since that

7    $120,000 loan that we just talked about?

8        A.   Yes, that's correct.

9        Q.   What's the amount of this loan?

10       A.   $50,000.

11       Q.   What's the interest rate?

12       A.   5.95 percent.

13       Q.   All right.  So next page of the promissory note,

14   when is this loan due?

15       A.   July 28th, 2011.

16       Q.   All right.  Could you explain this

17   cross-collateralization notice to the jury?

18       A.   Yes.  This notice indicates that the collateral

19   listed at the bottom of the page serves as collateral for

20   both the $120,000 loan and the $50,000 loan.

21       Q.   So the same Palmetto State Bank shares and Bank of

22   America stock is used to secure both of these SCB&T loans; is

23   that correct?

24       A.   Yes.

25       Q.   So let's go back and talk about that $120,000 loan.

1     What is this document?

2         A.    This is the paid note statement for that $120,000

3     note.

4         Q.    So it's showing payments made on that loan, correct?

5         A.    That's correct.

6         Q.    Is this -- this is a loan from July 2008?

7         A.    Yes.

8         Q.    When was that loan paid off according to this

9     statement?

10        A.    July 15th, 2011.

11        Q.    What was the balance on the loan when the final

12    payment was made?

13        A.    $92,428.55.

14        Q.    Let's go to the $50,000 loan.  What does this paid

15    note statement show?

16        A.    This loan was also paid off on July 15th, 2011.

17        Q.    So this is the $50,000 July 2010 loan, correct?

18        A.    That's correct.

19        Q.    And what was the date the loan was paid off?

20        A.    July 15th, 2011.

21        Q.    Is that the same date that the $120,000 loan was

22    paid off?

23        A.    Yes, it is.

24        Q.    All right.  And what was the balance on this loan

25    when the final payment was made?

1    A.    $52,908.88.

2    Q.    All right.  This is slide 15.  What does this show?

3    A.    This shows on July 15th, 2011, a check payable to

4    Russell L. Laffitte in the amount of $225,000 was disbursed

5    from Hannah Plyler's conservatorship account.

6    Q.    So the check on the right, Russell Laffitte's name

7    is on that check three times.  Could you explain that to the

8    jury?

9    A.    In the upper left-hand corner, Russell Laffitte's

10   name is listed as the conservator for Hannah Plyler's

11   account.  Indicates he would have authority to conduct

12   transactions on that account.  The "Paid to the order of

13   Russell Laffitte" indicates the check is payable to him and

14   he can negotiate that check as he wants to.  His name also

15   appears in the signature section of that check indicating

16   that he was authorized to make that withdrawal.

17   Q.    So this $225,000 check from Hannah Plyler's

18   conservatorship is dated July 15th, 2011.  Is that the same

19   date the defendant paid off those two prior loans we just

20   discussed?

21   A.    Yes, it is.

22   Q.    Is this the promissory note associated with that

23   $225,000 transfer?

24   A.    Yes.

25   Q.    What are the terms of this loan?

1          A.    The $225,000 balance earned interest at 3.25 percent

2     and was due and payable on May 1st, 2012.

3          Q.    So it's about a nine-month loan?  Is that math

4     right?

5          A.    That's correct.

6          Q.    Does this loan include an agreement to pay a late

7     fee for payments made more than 10 days past the due date?

8          A.    It does.  And you can see that in the middle of the

9     page.

10         Q.    What is that late fee?

11         A.    5 percent.

12         Q.    Whose name is in the "paid to" line of this

13    promissory note?

14         A.    Hannah Plyler's conservatorship.

15         Q.    Could you explain this collateral register from

16    SCB&T to the jury?

17         A.    This is a register that South Carolina Bank and

18    Trust kept in their possession while they had the stock that

19    secured the previous loans Russell Laffitte had with the

20    bank.  And when those loans were paid off, the security --

21    the security was to be returned to Russell Laffitte along

22    with the collateral register.  And you can see on -- excuse

23    me, September 12th, 2011, South Carolina Bank and Trust

24    returned the collateral and this collateral register to

25    Russell Laffitte.  And he signed for it and returned it to

South Carolina Bank and Trust on September 14th, 2011.

Q.   All right.  So you previously testified that the

defendant used the same Palmetto State Bank shares and Bank

of America stock to secure his two SCB&T loans.  Does this

mean that SCB&T returned those certificates to him after he

paid off those two loans?

A.   Yes, that's correct.

Q.   We are still on July 15th, 2011, the date that those

two loans to SCB&T were paid off.  What does this line show?

A.   You will see in the upper right-hand corner, the

same checks we saw earlier, payable to Russell Laffitte for

$225,000.  Only 223,000 of that check was deposited to

Russell Laffitte's account as noted on the left.  $2,000 of

that was kept as cash back from the transaction.

Q.   So after that $223,000 is deposited into the

defendant's account, where did it go?

A.   So the two transactions in the check section, one

for 52,908.88 -- so in the check section of the bank

statement, on the left, the first two transactions, one in

the amount of $52,908.88, and the second in the amount of

$92,428.55 were used to pay off Russell Laffitte's two loans

outstanding to South Carolina Bank and Trust.

Q.   So the defendant took a $225,000 loan from the

Plyler conservatorship at a 3.25 percent interest rate, and

then the same day, he used that money to pay back the two

1    loans that he had gotten at what interest rates from SCB&T?

2    A.    5.95 percent and 6 percent.

3    Q.    At the time of this $225,000 deposit into the

4    defendant's account, what was the last statement balance?

5    A.    $76.97.

6    Q.    All right.  So you testified that this July 15th

7    loan from the Plyler conservatorship was due on May 1st of

8    2012.  How did the defendant pay off that loan?  Let's start

9    with this check on the top left.

10   A.    On January 4, 2012, this check in the middle payable

11   to Palmetto State Bank in the amount of $60,000 was converted

12   to two bank money orders, as seen in the bottom middle and

13   bottom right.

14   Q.    Okay.  So we are starting with the check on the

15   left.  What's the date on that check?

16   A.    January 3rd, 2012.

17   Q.    Who is the check from?

18   A.    The firm.

19   Q.    And who is it to?

20   A.    Palmetto State Bank.

21   Q.    What does the memo line say this check is for?

22   A.    Conservator fee, Hakeem L. Pinckney.

23   Q.    And what's the amount of the check?

24   A.    $60,000.

25   Q.    So where does this $60,000 then go?

1    A.    It's converted to the bank, to bank money orders on

2    the right-hand side of the page.

3    Q.    Could you explain to the jury this box on the bottom

4    left-hand side of the screen?

5    A.    So this is just part of the accounting from the

6    original worksheet that we saw earlier where Russell was

7    accounting for each individual loan and the principal and

8    interest he was applying to each loan.  And the bank money

9    order in the middle right-hand side of the page in the amount

10   of $53,465.88 was used to apply to the principal and interest

11   balance due on that 7/18/11 transfer.

12   Q.    So this $53,000 in this check is a principal and

13   interest payment on the $225,000 Plyler loan, correct?

14   A.    Yes.

15   Q.    And then the balance of that from the $60,000 Hakeem

16   Pinckney fee goes to cash; is that right?

17   A.    That's correct.

18   Q.    So that $53,000 is deposited into Hannah Plyler's

19   conservatorship.  And then what happened to the rest of that

20   $225,000 loan?

21   A.    So the original note was considered paid off by the

22   renewal of a new note.

23   Q.    What's the outstanding balance on that loan now?

24   A.    $175,000.

25   Q.    So we are still on that first Plyler loan.  But now

1   it's been renewed.  Is this the promissory note associated

2   with that renewal of the July 15th loan?

3       A.   Yes, it is.

4       Q.   What are the terms of this note?

5       A.   The $175,000 is bearing interest at 2.25 percent and

6   it's due and payable January 4th, 2013.

7       Q.   Does this note, like the last note, include an

8   agreement to pay a late fee for overdue payments?

9       A.   It does.

10      Q.   Does it include a default provision in case payments

11  are not made?

12      A.   Yes, it does.

13      Q.   Whose name is in the "paid to" line?

14      A.   Hannah Plyler conservatorship.

15      Q.   You indicated the interest rate is 2.25 percent.

16  What was the interest rate on the original $225,000 loan?

17      A.   3.25 percent.

18      Q.   What was the prime interest rate at the time of the

19  renewal in January 2012?

20      A.   3.25 percent.

21      Q.   I want to fast-forward to the maturity date of this

22  loan, which you said was January 4, 2013.  Did the defendant

23  pay back the outstanding $175,000 on that date?

24      A.   No, he did not.

25      Q.   What does this slide show?  What happened instead?

1    A.   So on January 4th, 2013, Russell calculated the

2   interest due on the loan to be $3,937.50.

3    Q.   So did he make a principal payment?

4    A.   No.

5    Q.   Explain to the jury what the box on the top left

6   shows.

7    A.   This is Russell's accounting for the $3,937.50 check

8   dated January 4, 2013, in the bottom left-hand corner of the

9   screen.

10    Q.   The check is dated January 4th of 2013.  Was the

11   check deposited on or around that date?

12    A.   No.

13    Q.   So what is the box on the right-hand side of the

14   screen showing us?

15    A.   Shows there was no deposit in that amount or close

16   to that amount between December 26th, 2012, and January 26th,

17   2013 -- I'm sorry, January 22nd, 2013.

18    Q.   So that interest check was dated January 4th of

19   2013.  Do you recall when it was deposited?

20    A.   I believe it was in December of 2013.

21    Q.   So this says December 18th of 2013; is that correct?

22    A.   Yes.

23    Q.   Was the interest paid on this check calculated as of

24   January when that check was dated or as of December when the

25   interest check was deposited into Hannah Plyler's account?

1    A.    The interest was calculated as of the date the check

2    was written, January 4th, 2013.

3    Q.    So does this check account for interest that accrued

4    between January and December when the check was deposited?

5    A.    No, it does not.

6    Q.    So the principal and interest on the loan was due in

7    January, but the conservatorship wasn't paid back interest

8    until December of -- excuse me, December 18th.  Did this

9    check that was deposited account for the 5 percent late fee

10   that the defendant had agreed to pay for overdue payments?

11   A.    No, it did not.

12   Q.    So you've talked about the interest on this $175,000

13   loan.  I want to talk about the principal.  When that loan

14   was due on January 4th of 2013, did the defendant pay off the

15   principal?

16   A.    No.

17   Q.    What did he do instead?

18   A.    He considered the note paid off by renewal and

19   renewed the note.

20   Q.    So this is a second renewal of that original

21   $225,000 loan; is that right?

22   A.    Yes, that's correct.

23   Q.    What are the terms of this, the renewal of this

24   loan?

25   A.    The $175,000 is due with interest at either 2 1/4

1  percent or 1.5 percent on January 4th, 2014.

2      Q.   So it's a one-year loan?

3      A.   That's correct.

4      Q.   Whose name is in the "paid to" line?

5      A.   Hannah Plyler conservatorship.

6      Q.   Let's talk about the interest rate.  What was the

7  interest rate on the original $225,000 loan?

8      A.   3.25 percent.

9      Q.   What was the interest on the first renewal of the

10  remaining 175?

11      A.   2.25 percent.

12      Q.   What is the interest rate that comes with this

13  second renewal of the remaining 175?

14      A.   1.5 percent in parenthesis.

15      Q.   You testified that the original loan and the first

16  renewal contained an agreement to pay a late fee for overdue

17  payments.  Does this second renewal contain a provision like

18  that?

19      A.   No, that paragraph is missing.

20      Q.   Does this note contain a default provision?

21      A.   It does.

22      Q.   Would you read it to the jury, please?

23      A.   In the event of failure to pay any installment when

24  due, the holder hereof may declare the entire balance due and

25  payable.

1   Q. All right.  So when is this note going to come due?

2   A. January 4th, 2014.

3   Q. So let's fast-forward to January 4th of 2014.  Did

4 Mr. Laffitte pay off that $175,000 loan?

5   A. No, he did not.

6   Q. All right.  What happened instead?

7   A. On February 19th, 2014, he calculated the interest

8 that was due on the note, which is the check in the bottom,

9 $2,955.91.

10   Q. So this interest check is dated February 19th of

11 2014.  When was it deposited into Hannah Plyler's account?

12   A. December 31st, 2014.

13   Q. Is the defendant's calculation for interest due as

14 of February when this check is dated or as of December when

15 the check was deposited?

16   A. The interest calculated was as of February 19th,

17 2014.

18   Q. So does this check include interest that accrued

19 between February and when it was deposited in December?

20   A. No, it does not.

21   Q. So February 19th, which is over a month after this

22 $175,000 loan was due, the defendant calculated an interest

23 payment.  Did he ever renew this loan?

24   A. No.

25   Q. Did he pay the balance at this time?

1   A.   No.

2   Q.   So could the conservatorship have declared the

3   balance due and payable based on his default of payments at

4   this time?

5   A.   Yes.

6   Q.   Did it?

7   A.   No.

8   Q.   Let's move to a second loan to the defendant from

9   the Plyler conservatorship.  What does this slide show?

10   A.   On the left-hand side you see a check payable to

11   Russell L. Laffitte in the amount of $50,000 dated September

12   28th, 2012.

13   Q.   So we've moved back now to September of 2012.  Was

14   this loan taken out while the loan we just discussed was

15   still pending?

16   A.   Yes.

17   Q.   At the time of this $50,000 transfer into the

18   defendant's account, what was the last statement balance?

19   A.   $54.49.

20   Q.   And then when the $50,000 is taken out of Hannah

21   Plyler's conservatorship checking account, what is her

22   remaining balance?

23   A.   It left her with $611.73.

24   Q.   Is this the promissory note associated with that

25   $50,000 transfer from the Plyler conservatorship?

1    A.    Yes.

2    Q.    What are the terms of this second Plyler loan?

3    A.    The $50,000 accrued interest at 2.5 percent.  And it

4    was due in full January 4th, 2013.

5    Q.    All right.  This is September 28th of 2012.  And

6    it's due January 4th of 2013.  So this is about a four-month

7    loan; is that right?

8    A.    Close to it.

9    Q.    Okay.  And does this loan, like the original loan,

10   include an agreement to pay a 5 percent late fee for overdue

11   payments?

12   A.    It does.

13   Q.    Whose name is in the "paid to" line?

14   A.    Hannah Plyler conservatorship.

15   Q.    You indicated that the interest rate on the loan is

16   2.5 percent.  What was the prime interest rate at the time?

17   A.    3.25 percent.

18   Q.    So that $50,000 transfer was September 28th of 2012.

19   Then what happened on November 15th?

20   A.    Bottom right-hand corner you will see a check

21   payable to Russell Laffitte in the amount of $20,000 (sic)

22   disbursed from the Hannah Plyler conservatorship.

23   Q.    20,000?

24   A.    I'm sorry, 25,000.

25   Q.    Thank you.  So this is a third loan from the -- to

1    the defendant from Hannah Plyler's conservatorship.  What

2    were the terms of this loan?

3        A.    This $25,000 accrued interest at 2.5 percent, also

4    due and payable January 4th, 2013.

5        Q.    So this loan is due the same day as the second loan

6    that we just talked about; is that right?

7        A.    Yes, that's correct.

8        Q.    Before we continue with these loans, I just want to

9    take a step back for a minute and talk about the three Plyler

10   loans we've seen so far.  What does this chart show?

11       A.    This is the same chart we saw earlier.  It's a

12   detailed listing of all of the transfers from Hannah Plyler's

13   accounts and how those funds were spent as disbursed from

14   Russell Laffitte's account.

15       Q.    So this is the defendant's SouthState Bank account

16   that we talked about earlier; is that right?

17       A.    That's correct.

18       Q.    Does this chart show all of the transactions in this

19   account during the relevant time period?

20       A.    Yes, it does.

21       Q.    So before this $225,000 is taken from Hannah

22   Plyler's account and moved to the defendant's account, what

23   was his account balance?

24       A.    $76.97 is the balance that was carried since

25   December 7th, 2010.

1    Q.   So on July 15th, the date of that transfer, what are

2    the other transactions that happen that same day?

3    A.   So the first transaction there is the $2,000 cash

4    back from the deposit.  The next two transactions are to pay

5    off the two South Carolina Bank and Trust loans, one in the

6    amount of close to $53,000, and the other one was just over

7    $92,000.

8    Q.   All right.  July 18th, what's the next transaction?

9    A.   That's a Capital One phone payment for approximately

10   $13,669.

11   Q.   What about the next transaction on July 20th?

12   A.   The check was payable to cash and negotiated at

13   Palmetto State Bank for $3,000.

14   Q.   We are going to see on this slide and the next slide

15   a number of either cash withdrawals or checks payable to cash

16   between July 15th and May 21st of 2013.  Did you tally up all

17   of those cash transactions?

18   A.   I did.

19   Q.   How much cash did those transactions involve?

20   A.   $36,300.

21   Q.   All right.  So the same day as this $3,000 cash

22   transaction, what's the other payment that was made?

23   A.   Epay FUSA revolving credit account for the just over

24   $21,000.

25   Q.   In the course of your investigation, did you learn

1    what FUSA is?

2         A.    It's a revolving credit company.

3         Q.    So now we are looking at -- this is the second and

4    third deposits.  Before the $50,000 transfer from Hannah

5    Plyler's conservatorship, what was the defendant's account

6    balance?

7         A.    $54.49.

8         Q.    And then where did the bank statements reflect this

9    $50,000 was spent?

10        A.    On October 11th, 2012, there's a check payable to

11   Ala Glass in the amount of $13,630.  The check referenced

12   pool in the memo section.  There's other checks and

13   disbursements for cash and RLL, which are Russell L.

14   Laffitte's initials.

15        Q.    All right.  And what about October 24th?

16        A.    That's a second disbursement to Ala Glass for

17   $17,445.

18        Q.    On November 14th, the day before that $25,000

19   transfer, what was the defendant's account balance?

20        A.    $3,589.49.

21        Q.    And where did the bank statements reflect that

22   $25,000 was spent?

23        A.    There's additional disbursements for cash, Huber

24   Supply, Priester Enterprises, Stallion Air, Carolina

25   Counters.

1    Q.   So by May 21st of 2013, what's the balance on this

2  account?

3    A.   $84.65.

4    Q.   We are going to go back to the loans we were

5  discussing.  We left off with third Plyler loan, which was a

6  November 15th transfer of $25,000.  What happened with that

7  loan on November 20th?  And let's start with the check on the

8  right-hand side of the screen.

9    A.   This is a check from the firm payable to Palmetto

10  State Bank in the amount of $35,000.  There was a deposit in

11  the amount of $35,000 on the same day -- or, I'm sorry, the

12  next day, 11/21/12, to Hannah Plyler's conservatorship

13  account.

14    Q.   So we have a November 15th $25,000 loan, and then

15  this check dated November 20th.  What does the memo field of

16  this check from the law firm to Palmetto State Bank say?

17    A.   Arthur Badger personal representative fee.

18    Q.   And the following day, $35,000 is deposited into

19  Hannah Plyler's checking account; is that correct?

20    A.   That's correct.

21    Q.   Explain to the jury what the box on the left shows.

22    A.   So this is just another portion of Russell's

23  accounting for the principal and interest applied to each of

24  those loans.  This particular check, a portion was applied to

25  loan 92812 and a portion was applied to loan 111612.

1     Q.   Okay.  So $25,000 of the 35,000 he credits toward

2  the November 2012 loan; is that right?

3     A.   That's correct.

4     Q.   And did he also calculate interest on that loan?

5     A.   He did.

6     Q.   What was the amount of that interest payment?

7     A.   $10.27.

8     Q.   $9,801.35 is credited towards the principal of the

9  $50,000 September 2012 loan; is that correct?

10    A.   Yes.

11    Q.   Does he still owe a balance on that $50,000 loan

12  from September?

13    A.   Yes.

14    Q.   The same day the defendant deposited that Badger PR

15  fee into Hannah Plyler's account, which you said was November

16  21st, what did he do with the balance of that $50,000

17  September loan?

18    A.   He considered the $50,000 loan paid in full and

19  renewed the note for the difference of $40,198.65.

20    Q.   What are the terms of this loan renewal?

21    A.   The interest rate on this renewal is 2 percent due

22  and payable November 21st, 2013.

23    Q.   Does this note include an agreement to pay a late

24  fee for overdue payments?

25    A.   No, it does not.

1    Q.   Whose name is in the "paid to" line?

2    A.   Hannah Plyler conservatorship.

3    Q.   Does this loan include a default provision like some

4    of the earlier loans we looked at?

5    A.   It does.

6    Q.   When this loan was due on November 21st of 2013, did

7    the defendant pay off the $40,000 -- $40,198 balance?

8    A.   No, he did not.

9    Q.   Could the conservatorship, under that default

10   provision, have declared the balance due and payable?

11   A.   Yes.

12   Q.   Did it?

13   A.   No.

14   Q.   All right.  Moving forward from that November 2012

15   loan renewal into February of 2014, what does this slide

16   show?

17   A.   On the upper right-hand portion of the page, you see

18   a check written out of Russell Laffitte's account to Hannah

19   Plyler in the amount of $1,201.02.  It's deposited into her

20   conservatorship account on the left.

21   Q.   So the check is dated February 19th of 2014.  When

22   was it deposited?

23   A.   December 30th, 2014.

24   Q.   So with this interest check, what does the box on

25   the bottom right show in terms of the defendant's math of

1   repayment of the loan?

2       A.   So $198.65 of that payment was considered principal.

3   And the remaining $1,002.37 was considered interest on that

4   loan.

5       Q.   So the check is dated February 19th.  It's not

6   deposited until December 30th.  Earlier, you testified about

7   another interest check that was dated February 19th, 2014,

8   and not deposited until September.  You testified that check

9   did not include interest that accrued between February and

10  December.  What about this check?  Does this interest

11  calculation take place as of the date the check was dated or

12  the date it was deposited?

13      A.   The interest was calculated as of the date the check

14  was written.

15      Q.   So does the check account for interest that accrued

16  between February and December when it actually was deposited

17  into Hannah Plyler's account?

18      A.   No, it does not.

19      Q.   In addition to paying the interest and the $200

20  toward the principal of that November 2012 loan renewal, what

21  else did the defendant do on February 19th of 2014?

22      A.   He renewed the account in the amount of $40,000.

23      Q.   So this is a second renewal of the same Plyler loan?

24      A.   Yes, that's correct.

25      Q.   All right.  What are the terms of this loan renewal?

1      A.   The $40,000 earned interest at 1.5 percent and was

2  due February 19th, 2015.

3      Q.   Does this note include an agreement to pay a late

4  fee for overdue payments?

5      A.   It does not.

6      Q.   Whose name is in the "paid to" line?

7      A.   Hannah Plyler conservatorship.

8      Q.   You indicated that the interest rate on this second

9  renewal is 1.5 percent.  Do you recall what the interest

10  rates were on the original loan and then on the first

11  renewal?

12      A.   May I consult my notes?

13      Q.   Absolutely.

14      A.   And this is the September 28th, 2012, promissory

15  note?

16      Q.   Yes.

17      A.   The original interest rate on the $50,000 was 2.5

18  percent.

19      Q.   What about on the first renewal, which was November

20  21st of 2012?

21      A.   One moment, please.  The renewal in the amount of

22  $40,198.65 was renewed at 2 percent.

23      Q.   So the interest rate has dropped with each renewal;

24  is that correct?

25      A.   That's correct.

1    Q.   When is this loan due?

2    A.   February 19th, 2015.

3    Q.   We will discuss the final payment on this loan in a

4    little bit.  For now I want to move on to a fourth loan to

5    the defendant from the Plyler conservatorship.  Explain this

6    fourth Plyler loan to the jury.

7    A.   As you can see in the bottom left, on May 28th,

8    2013, this check was payable to cash in the amount of

9    $10,000.  And it was disbursed from Hannah Plyler's

10   conservatorship account.

11   Q.   What are the terms of this note?

12   A.   The $10,000 earned interest at 2.25 percent and was

13   due and payable May 28th, 2014.

14   Q.   All right.  You indicated the interest rate on this

15   loan is 2.25 percent.  What was the prime interest rate at

16   the time?

17   A.   3.25 percent.

18   Q.   So that fourth loan was taken out on May 28th of

19   2013.  I want to move forward about two weeks to June 14th of

20   2013.  What does this slide show?

21   A.   In the middle on the left side is a check from

22   Russell Laffitte's account payable to Hannah Plyler in the

23   amount of $17.25.  This check was deposited into Hannah

24   Plyler's conservatorship account on December 18th, 2013.

25   Q.   So this loan was taken out on May 28th.  And then on

1  June 14th of 2013, the defendant calculated interest; is that

2  right?

3       A.   That's correct.

4       Q.   What's the interest calculation?  How much on

5  interest did he owe at that point?

6       A.   $17.25.

7       Q.   All right.  The check was dated June 14th of 2013.

8  When was it deposited?

9       A.   December 18th, 2013.

10      Q.   So does this calculation of $17.25 in interest take

11 into account interest that accrued between June when the

12 check was dated and December when it was deposited?

13      A.   No, it does not.

14      Q.   In addition to paying this $17.25 in interest on the

15 $10,000 loan, what else did the defendant do on June 14th?

16      A.   He considered this note for $10,000 paid in full.

17      Q.   So he renewed the loan; is that correct?

18      A.   That's correct.

19      Q.   What are the terms of this June 14th renewal of the

20 fourth Plyler loan?

21      A.   As you can see on the left-hand side at the top, an

22 additional $10,000 was disbursed from Hannah Plyler's

23 conservatorship account into Russell Laffitte's account on

24 June 14th, 2013.  So the $10,000 from the previous loan was

25 added to this $10,000 to renew the note for a total of

1   $20,000.

2       Q.   What's the interest rate on this loan renewal?

3            MR. DANIEL:  Your Honor, may we approach briefly?

4            THE COURT:  I'm sorry?

5            MR. DANIEL:  May we approach?

6            THE COURT:  We will take a second.

7            (Whereupon, the following bench conference takes

8   place.)

9            MR. DANIEL:  Judge, I thought she was reading off of

10  the screen.  She's actually reading out of her notebook and,

11  evidently, her personal notes on these transactions and not

12  just relying on what's relied on the screen.

13           MS. STOUGHTON:  She's got her copy of the notes.

14  You are welcome to review them.

15           MR. DANIEL:  You are going to give us a copy of

16  those notes?

17           MS. STOUGHTON:  We've turned all of her notes over,

18  the personal notes, but you are welcome to look at them.

19           THE COURT:  Very good.

20           (Whereupon, the bench conference ends.)

21           THE COURT:  Ms. Stoughton, please continue your

22  direct.

23  BY MS. STOUGHTON:

24      Q.   So we are on the June 14th renewal of this fourth

25  Plyler loan.  You indicated the interest rate was 2.25

1    percent.  What was the prime interest rate at the time?

2    A.   3.25 percent.

3    Q.   So when this additional $10,000 was transferred from

4    the Plyler conservatorship to the defendant, what was the

5    defendant's account balance?

6    A.   $171.14.

7    Q.   Let's fast-forward from June of 2013 to December of

8    2013.  What does this slide show?

9    A.   On the left-hand side, it is Hannah Plyler's

10   account, and indicates on December 27th, 2013, $25,000 was

11   transferred out of this account and into Russell Laffitte's

12   account as entered on the right-hand side of the screen.

13   Q.   So this is a fifth loan from Hannah Plyler's

14   conservatorship to the defendant.  Is there a promissory note

15   associated with this $25,000 transfer?

16   A.   No.

17   Q.   Was there a set interest rate for this loan?

18   A.   No.

19   Q.   Was there a due date?

20   A.   No.

21   Q.   Was there any collateral?

22   A.   No.

23   Q.   Is there any statement of the conservatorship's

24   rights in the event the loan was defaulted on?

25   A.   No.

1    Q.   When this $25,000 was taken from the Plyler

2    conservatorship and put in the defendant's bank account, what

3    was the defendant's account balance?

4    A.   $28.69.

5    Q.   Was this the final transfer from the Plyler

6    conservatorship to Russell Laffitte?

7    A.   Yes.

8    Q.   I want to change gears a little bit and talk about

9    how this money got paid back.  We saw this slide earlier.

10   But could you just at a high level remind the jury what we

11   are looking at on slide 40?

12   A.   So the date of the transactions is on the far left

13   and across the top.  The loan number corresponds to the date

14   of the transfer.  So, for example, loan 71811 corresponds to

15   July 18th, 2011.  And principal and interest was allocated

16   for each of these loans as noted in the spreadsheet.

17   Q.   So what does this chart show?

18   A.   This is a summary that I prepared based on the

19   previous spreadsheet prepared by Russell Laffitte that

20   summarizes the loan number at the top and the balance on each

21   one of those transfers on that first line.

22   Q.   Okay.  That line two says:  Balance of transfer at

23   April 20th of 2015 when deposited.  Explain the significance

24   of that date to the jury.

25   A.   So April 20th, 2015, is when the total of $240,000

1    balance was considered paid in full.

2        Q.    What is this check from John Parker shown on this

3    slide?

4        A.    This shows a check drawn on the account of John E.

5    Parker and payable to Russell Laffitte in the amount of

6    $245,000.  And the corresponding deposit ticket for that

7    check is noted as deposited to Hannah Plyler's checking

8    account in the same amount.

9        Q.    Is that entire $245,000 from John Parker deposited

10   into Hannah Plyler's account?

11       A.    Yes, it is.

12       Q.    I want to go back to your summary chart.  April 20th

13   of 2015, when that Parker loan was received, what was the

14   outstanding balance of each of the loans as shown on line two

15   of your chart?

16       A.    The 71511 had a balance of $175,000.  The 92812

17   transfer had a balance of $40,000.  The 61413 transfer had a

18   balance of $20,000.  And the 122713 had a balance of $25,000.

19       Q.    So the Parker loan is used to pay off those first

20   three loans in full; is that correct?

21       A.    Not in full.

22       Q.    For the first three loans?

23       A.    I'm sorry, for the first three loans, yes.

24       Q.    How much is remaining on the fourth loan?

25       A.    $15,000.

1    Q.   In addition to that $15,000 in principal, did the

2   defendant owe interest on these four loans?

3    A.   Yes, he did.

4        MR. DANIEL:  I'm sorry.  I couldn't hear the answer.

5        THE WITNESS:  Yes, he did.

6        MR. DANIEL:  Okay.  Thank you.

7   BY MS. STOUGHTON:

8    Q.   What was the total amount of interest that he

9   calculated he owed on those loans?

10    A.   195 --

11    Q.   The interest payment.

12    A.   The total interest calculated?  I'm sorry.  The

13   total interest calculated was $4,537.29.

14    Q.   Okay.  So what was the total that he owed in

15   principal and interest?

16    A.   $249,537.29.

17    Q.   So after this $245,000 loan is applied, he's got a

18   $15,000 outstanding principal balance.  And then he

19   calculated $4,537.20 in interest.  How much in total does he

20   still owe after getting the Parker loan?

21    A.   $19,537.29.

22    Q.   How did he pay that remaining $19,537.29?

23    A.   Using the application of conservator fees that he

24   did not take from the Hannah Plyler's conservatorship.

25    Q.   So the total amount of conservator fees not taken

1    was $19,799.94; is that correct?

2         A.    That's correct.

3         Q.    So he applied that to his outstanding balance.

4    Where did that leave him?

5         A.    It left him with an overpayment of $262.65.

6         Q.    The June 14th, 2013, loan, you testified earlier

7    that that loan was due June 14th of 2014.  It was paid off

8    with this Parker loan in April of 2015; is that correct?

9         A.    Yes, that's correct.

10        Q.    Did his repayment of the loan, principal and

11   interest, include the 5 percent late fee he agreed to for

12   overdue payments?

13        A.    No, it did not.

14        Q.    All right.  In addition to analyzing the loans that

15   the defendant took from the Plyler conservatorship, were you

16   also asked to analyze loans that he extended to Alex Murdaugh

17   from conservatorships?

18        A.    Yes.

19        Q.    We are going to pull up Government's Exhibit 176,

20   which has also already been admitted into evidence.  At a

21   high level, what does this document show the jury?

22        A.    This is a similar spreadsheet prepared by Russell

23   Laffitte that shows the loan number across the top and the

24   date of the transaction down the left-hand side.  And it

25   breaks out the principal and interest calculated for each one

1    of those transfers.

2       Q.   Did you review and rely on this document when you

3    conducted your analysis in this case?

4       A.   I did.

5       Q.   I want to talk about the substance of these loans to

6    Murdaugh from the Plyler conservatorship.

7            MS. STOUGHTON:   Can we pull up Government's Exhibit

8    189, which is also in evidence.

9    BY MS. STOUGHTON:

10      Q.   So we are starting on September 14th of 2011.  What

11   does this slide show?

12      A.   In the bottom left-hand corner, you will see a check

13   payable to Alex Murdaugh in the amount of $90,000 dated

14   September 14th, 2011.  And you see that check clearing Hannah

15   Plyler's conservatorship account on September 14th, 2011, and

16   being deposited on the right-hand side to Alex Murdaugh's

17   account.

18      Q.   When this $90,000 is taken out of Hannah Plyler's

19   money market account, how much money is left?

20      A.   $2,227.87.

21      Q.   What were the terms of this September 14th loan?

22      A.   The $90,000 was due with interest at 5 percent on

23   December 31st, 2011.

24      Q.   Whose name is in the "paid to" line of this

25   promissory note?

1      A.    Russell Laffitte as conservator for Hannah Plyler.

2      Q.    Was that consistent with the name in the "paid to"

3  line of the loans that the defendant took for himself from

4  the Hannah Plyler conservatorship?

5      A.    No, it's not.

6      Q.    What did those loans say in the "paid to" line?

7      A.    Hannah Plyler conservatorship.

8      Q.    Did this note indicate there's any collateral for

9  this loan?

10     A.    No.

11     Q.    And when is the loan due?

12     A.    December 31st, 2011.

13     Q.    Before this $90,000 is taken out of Hannah Plyler's

14  account and moved to Alex Murdaugh's, what was Murdaugh's

15  balance in this account?

16     A.    Negative $3,950.88.

17     Q.    After this $90,000 deposit, how long was it before

18  Murdaugh was in overdraft again?

19     A.    Just over one month.

20     Q.    So that was September 14th that that $90,000 loan

21  was extended.  What happened on November 18th of 2011?

22     A.    In the bottom left-hand corner, a check was

23  disbursed to Alex Murdaugh in the amount of $40,000 from

24  Malik Williams's conservatorship account.  You see that check

25  cleared his account on the same day and was deposited to Alex

1    Murdaugh's account on the right.

2        Q.   After that $40,000 was taken out of Malik Williams's

3    conservatorship and moved to Murdaugh's account how much

4    money was left in the conservatorship?

5        A.   $2,086.85.

6        Q.   What were the terms of this loan from Malik Williams

7    conservatorship?

8        A.   The $40,000 was due with interest at 4.5 percent,

9    also on December 31st, 2011.

10       Q.   Does this note indicate there's any collateral for

11   this loan?

12       A.   No.

13       Q.   All right.  That $40,000 was moved into Murdaugh's

14   account from Malik Williams's conservatorship on November

15   18th.  What is Murdaugh's account balance about a month later

16   on December 12th?

17       A.   $399.19.

18       Q.   Two days after we see that $399 balance, on December

19   14th what happens?

20       A.   In the bottom left, this check is payable to Alex

21   Murdaugh in the amount of $50,000.  And you can see that

22   check clearing just above it, Hannah Plyler's conservatorship

23   account.  And then on the right you can see it deposited into

24   Alex Murdaugh's account.

25       Q.   So this is a second loan to Murdaugh from the Plyler

1  conservatorship; is that correct?

2     A.   That's correct.

3     Q.   What were the terms of this loan?

4     A.   This $50,000 was due and payable with interest at 4

5  1/2 percent also on December 31st, 2011.

6     Q.   Does this note indicate there's any collateral for

7  this loan?

8     A.   No.

9     Q.   So that $50,000 was deposited, you said, on December

10 14th.  What happens when we get to December 21st of 2011?

11 And I want to start with the checks on the top and bottom of

12 the left side.

13    A.   So these two checks combined total approximately

14 $635,000.  They are drawn on the account of the firm.  They

15 are dated approximately December 20th, 2011.  And they are

16 converted into the items that are remaining on the page.

17    Q.   Okay.  So you said the check is from the firm.  The

18 checks are from the firm.  Who are the two checks made out

19 to?

20    A.   Palmetto State Bank.

21    Q.   And what do the memo lines say?

22    A.   The one on top references settlement proceeds,

23 Hakeem L. Pinckney.  The one on the bottom left references

24 settlement proceeds, Natasha Thomas.

25    Q.   So these two checks come in.  And then where does

1    the $634,000 go?  And let's start with this money order over

2    here in the middle.

3        A.    So this money order is payable to Randolph Murdaugh

4    III in the amount of $329,500.

5        Q.    Who is Randolph Murdaugh III?

6        A.    Alex Murdaugh's father.

7        Q.    Let's go to the top of the middle column.

8        A.    This money order in the amount of $100,000 is

9    payable to Charles A. Laffitte, Jr.

10        Q.    Who signed that money order?

11        A.    Russell L. Laffitte.

12        Q.    Who is Charles Laffitte, Jr.?

13        A.    Russell Laffitte's father.

14        Q.    Will you just keep moving down the middle column,

15    please.

16        A.    Next bank money order in the amount of $9,500 is

17    payable to cash.

18        Q.    And who signed that money order?

19        A.    Russell L. Laffitte.

20        Q.    What about the next one?

21        A.    Payable to R. Laffitte, as conservator for Malik

22    Williams, in the amount of $40,167.69.

23        Q.    Who signed that money order?

24        A.    Russell L. Laffitte.

25        Q.    What about the one on the bottom of the middle

1  column?

2      A.   Payable to R. Laffitte as conservator for Hannah

3  Plyler in the amount of $50,135.61.

4      Q.   And who signed that money order?

5      A.   Russell L. Laffitte.

6      Q.   Let's move to the top of the right-hand side.  What

7  is the disbursed money order?

8      A.   It's payable to R. Laffitte as conservator for

9  Hannah Plyler in the amount of $91,220.57.

10     Q.   What about the checking deposit slip below that?

11     A.   It's deposited to the account of Margaret Murdaugh

12  in the amount of $10,000.

13     Q.   Who is Margaret Murdaugh?

14     A.   Alex Murdaugh's wife.

15     Q.   And then what about the two loan system slips that

16  you've got at the bottom?

17     A.   So those two transactions credit the loan accounts

18  of Alex Murdaugh, Murdaugh Charters.

19     Q.   So all of these money orders are dated December 21st

20  of 2011.  And you said three of them are going to Mr.

21  Laffitte as conservator for two different conservatorships.

22  Let's talk about how those money orders were used to repay

23  Mr. Murdaugh's outstanding Plyler loans.  So starting with

24  the first loan to Murdaugh, which was September of 2011, a

25  $90,000 loan, what does this slide show in terms of

1   repayment?

2       A.   This shows that the money order in the top left was

3   applied to pay that promissory note off.  And it was

4   deposited into Hannah Plyler's conservatorship account on

5   December 23rd, 2011.

6       Q.   What about the Malik Williams's loan, what does this

7   slide show?

8       A.   The bank money order on the bottom left-hand

9   section, payable to R. Laffitte as conservator for Malik

10  Williams, was deposited into Malik Williams's conservatorship

11  account on December 23rd, 2011.

12      Q.   All right.  And then what about the second Plyler

13  loan, what does this slide show?

14      A.   This bank money order was also deposited into Hannah

15  Plyler's conservatorship account on December 23rd, 2011.

16      Q.   So these first three loans that we talked about,

17  they were all due on December 31st; is that correct?

18      A.   Yes.

19      Q.   So by their maturity date, had Mr. Murdaugh paid

20  back all three of these loans using the Pinckney/Thomas

21  settlement funds?

22      A.   Yes.

23      Q.   All right.  So moving forward from December 2011,

24  when the Pinckney/Thomas money was used to pay off those

25  first three loans, we are now at December 11th of 2012.  What

1    does this slide show?

2        A.    On September 11th, 2012, $100,000 was disbursed from

3    Hannah Plyler's conservatorship account and deposited into

4    Alex Murdaugh's account.

5        Q.    So this is a third loan from Hannah Plyler's

6    conservatorship; is that correct?

7        A.    Fourth.

8        Q.    It's the fourth overall?

9        A.    Yes.

10       Q.    Right.

11       A.    You are right.

12       Q.    What were the terms of this loan?

13       A.    The $100,000 was due with interest at a rate of 3

14   percent due and payable December 31st, 2012.

15       Q.    Does this note include an agreement to pay a late

16   fee for overdue payments?

17       A.    It does.

18       Q.    You indicated the interest rate is 3 percent.  What

19   was the prime interest rate at the time of this loan?

20       A.    3.25 percent.

21       Q.    When will this loan become due?

22       A.    December 31st, 2012.

23       Q.    So before that $100,000 is taken out of Hannah

24   Plyler's conservatorship and put into Murdaugh's account,

25   what was Murdaugh's balance in this account?

1    A.    Negative $352.97.

2    Q.    And then how long after that September 11th,

3    $100,000 transfer is it before Mr. Murdaugh is in overdraft

4    again?

5    A.    Just over one month.

6    Q.    So we see on this slide, excuse me, October 17th,

7    Mr. Murdaugh is back in overdraft.  What happens on October

8    23rd of 2012?

9    A.    $50,000 is transferred from Hannah Plyler's money

10   market account to her checking account.  After it was

11   transferred to her checking account, the check in the bottom

12   left corner of your screen in the amount of $50,000 was

13   disbursed to Alex Murdaugh and deposited into his account.

14   Q.    So a fourth loan from Hannah Plyler's

15   conservatorship to Murdaugh, what were the terms of this

16   $50,000 loan?

17   A.    This $50,000 was due with interest at a rate of 3

18   percent also on December 31st, 2012.

19   Q.    Does this note indicate there's any collateral for

20   this loan?

21   A.    No, it does not.

22   Q.    All right.  And here you said the interest rate is 3

23   percent.  What was the prime interest rate at the time?

24   A.    3.25 percent.

25   Q.    And when did you say this loan will come due?

1      A.    December 31st, 2012.

2      Q.    So are this loan and the previous loan both due at

3   the end of 2012?

4      A.    Yes, that's correct.

5      Q.    Before this $50,000 is transferred from Hannah

6   Plyler's account to Murdaugh's account on October 23rd, what

7   was Murdaugh's balance in this account?

8      A.    Negative $26,229.34.

9      Q.    How long was it before he was in overdraft again?

10     A.    Just over one week.

11     Q.    So this is Murdaugh account that ends in 6092.  You

12  said that it overdrafted again.  That was November 1st of

13  2012.  What happened on November 2nd and 6th of 2012?

14     A.    The two checks on the left were disbursed to Alex

15  Murdaugh in the amount of $5,000 and $8,500.

16     Q.    These are fifth and sixth transfers from Hannah

17  Plyler's conservatorship to Murdaugh; is that correct?

18     A.    Yes, that's correct.

19     Q.    Were there promissory notes associated with these

20  transfers?

21     A.    No, there was not.

22     Q.    Was there a set interest rate?

23     A.    No.

24     Q.    Was there a due date?

25     A.    No due date.

1    Q.    Was there any collateral?

2    A.    No collateral.

3    Q.    So this is November 2nd and 6th.  What happens when

4    we get to November 15th of 2012?

5    A.    On the left-hand side of the screen, you see $13,500

6    was taken out of Alex Murdaugh's account on November 15th,

7    2012, and transferred back into Hannah Plyler's account on

8    the right-hand side.

9    Q.    So the $13,500 is transferred back to Hannah

10   Plyler's account.  Did that repayment include interest?

11   A.    No.

12   Q.    So we are in November of 2012, and the third and

13   fourth Plyler loans you testified are coming due at the end

14   of December.  Did Mr. Murdaugh make payments on those loans

15   by December 31st when they matured?

16   A.    No, he did not.

17   Q.    So December 31st comes and goes.  We are going to

18   fast-forward to February of 2013.  What does this slide show?

19   And let's start in the bottom right-hand corner.

20   A.    In the bottom right-hand corner is a check drawn on

21   the account of the firm, payable to Palmetto State Bank, in

22   the amount of $151,726.05.  This check was deposited into

23   Hannah Plyler's conservatorship account on --

24   Q.    What does the memo line of that check say?

25   A.    Arthur Badger.

1    Q.   Would you explain the box in the middle of this

2    screen at the top to the jury?

3    A.   This is Russell Laffitte's accounting for how that

4    payment was applied to the 91112 loans -- I'm sorry, the

5    91112 and 102312 loans due from Alex Murdaugh.

6    Q.   So this entire $151,726.05 goes into Hannah Plyler's

7    account, correct?

8    A.   Yes.

9    Q.   Does that pay off Mr. Murdaugh's outstanding

10    September and October loans in full?

11    A.   Yes, it does.

12    Q.   You testified those loans were due on December 31st

13    of 2012.  When they were paid off in February of 2013, was

14    the agreed-upon 5 percent late fee included in that payment?

15    A.   No, it was not.

16    Q.   What happened later on February 12th, the same day

17    that those two loans were paid back?

18    A.   $150,000 was disbursed to Alex Murdaugh in a series

19    of transactions that started with $120,000 being transferred

20    from Hannah's money market account to her checking account.

21    After the $120,000 got into her checking account, check No.

22    1048 in the amount of $150,000 was disbursed to Alex Murdaugh

23    and deposited into his checking account.

24    Q.   So February 12th of 2013, the Badger check is used

25    to pay off the outstanding September and October loans.  But

1  then the same day, a seventh Plyler loan is extended; is that

2  correct?

3      A.   That's correct.

4      Q.   What were the terms of this new $150,000 loan?

5      A.   $150,000 is due with interest at a rate of 3.75

6  percent on February 12th, 2014.

7      Q.   Does this note indicate there's any collateral for

8  this loan?

9      A.   No, it does not.

10     Q.   All right.  Before this $150,000 is transferred from

11 Hannah Plyler's conservatorship into Mr. Murdaugh's account,

12 what was his account balance?

13     A.   Negative $115,492.04.

14     Q.   After that $150,000 deposit, how long was it before

15 Mr. Murdaugh was in overdraft again?

16     A.   Two weeks.

17     Q.   All right.  What happens with this $150,000 loan

18 when we get to July of 2013?

19     A.   It's renewed for the difference of $80,000.

20     Q.   What were the terms of this $80,000 renewal?

21     A.   It's due with an interest rate of 3.75 percent on

22 February 12th, 2014.

23     Q.   So it's a February loan that he's renewed in July,

24 but the due date doesn't change; is that correct?

25     A.   That's correct.

1    Q.   All right.  Does this note indicate there's any

2  collateral for the loan?

3    A.   No collateral.

4    Q.   So he's renewed the loan at $80,000.  What happened

5  to the other $70,000 of that $150,000 loan?

6    A.   So $72,342.47 was transferred from Richard Alexander

7  Murdaugh's account to Hannah Laffitte's (sic) account on July

8  15th, 2013.

9    Q.   Explain the box in the bottom right-hand side to the

10  jury.

11    A.   This is Russell's accounting for how the principal

12  and interest for that particular transfer were applied to the

13  loan outstanding balance.

14    Q.   So when Mr. Murdaugh paid that $70,000 in principal

15  and the $2,342 in interest, what was his remaining account

16  balance?

17    A.   $80,000.

18    Q.   That was their remaining balance on the loan.  What

19  was the remaining balance in his checking account ending in

20  6092?

21    A.   My apologies.  It's a negative $2,381.65.

22    Q.   All right.  Let's move forward a couple of weeks to

23  July 29th of 2013.  What does this slide show?

24    A.   On July 29th, 2013, a transfer in the amount of

25  $100,000 was conducted from Hannah Plyler's conservatorship

1  account to Murdaugh's checking account.

2      Q.   So an eighth transfer from Plyler's conservatorship

3  to Murdaugh.  What were the terms of this loan?

4      A.   This loan earned interest at 3.75 percent and it was

5  due July 29th, 2014.

6      Q.   Does this note indicate there's any collateral for

7  this loan?

8      A.   There is no collateral.

9      Q.   Before the $100,000 from Hannah Plyler's account hit

10 Mr. Murdaugh's account, what was his account balance?

11     A.   Negative $16,411.

12     Q.   And then after that $100,000 deposit, how long was

13 it before he was in overdraft again?

14     A.   Approximately one month and a half.

15     Q.   So at the bottom here, we've got a September 16th,

16 2013, overdraft.  What happened just before that on September

17 13th of 2013?  And let's start with a check on the bottom

18 right-hand side of the screen.

19     A.   This is a check that's drawn on the account of the

20 firm payable to Palmetto State Bank in the amount of

21 $33,789.83.  And it's deposited into Hannah Plyler's

22 conservatorship account on September 13th, 2013.

23     Q.   What does the memo line of that $33,000 check state?

24     A.   Estate of Donna Badger.

25     Q.   So that money goes into Hannah's conservatorship

1  account.  What does the box on the top left show?  Explain

2  that math to the jury.

3      A.   This is Russell's accounting for how this check was

4  applied to the 72913 transfer, 25,000 and some change to the

5  principal, and 48289 for interest on that particular

6  transfer.

7      Q.   So there's a principal payment and interest.  Did

8  that amount account for the entire $33,000 that was deposited

9  in the Hannah Plyler's conservatorship?

10     A.   No, it did not.

11     Q.   So what happened to the difference?

12     A.   On the same day, just below that deposit, on the

13 bank statement you can see a disbursement in the amount of

14 $8,000.  And the memo on the checking withdrawal slip stated

15 charged to Alex for payments.

16     Q.   So did the whole $33,789 go into Hannah Plyler's

17 conservatorship account?

18     A.   No, it did not.

19     Q.   Did the whole amount get deposited into the account?

20     A.   Yes.  Yes.  The full amount was deposited into her

21 account.

22     Q.   And then $8,000 came out back to Mr. Murdaugh?

23     A.   Yes, that's correct.

24     Q.   Let's move forward from September 13th to December

25 27th of 2013.  What does this slide show?

1     A.   On September 27th, 2013, $40,000 was transferred

2    from Hannah Plyler's account to Murdaugh's account.

3     Q.   So this is a ninth transfer from Hannah Plyler's

4    conservatorship to Murdaugh.  What were the terms of this

5    $40,000 loan?

6     A.   The promissory note bore interest at 3.75 percent

7    and was due September 27th, 2014.

8     Q.   Does this note indicate there's any collateral for

9    this loan?

10     A.   There's no collateral noted.

11     Q.   Before that $40,000 was taken from Hannah Plyler's

12    account and put into Alex Murdaugh's, what was Murdaugh's

13    account balance?

14     A.   Negative $27,450.36.

15     Q.   And then after that September 27th, $40,000 deposit,

16    how long was it before Murdaugh was in overdraft again?

17     A.   Just under two weeks.

18     Q.   Let's move forward from September 27th to October

19    3rd of 2013.  What does this slide show?  I want to start

20    with the check in the middle at the top.

21     A.   This is a check drawn on the account of the firm

22    payable to Palmetto State Bank in the amount of $101,000 --

23    $101,269.43 -- or 49 cents.  Sorry.

24     Q.   So the check is from the firm.  Who's it made out

25    to?

1     A.   Palmetto State Bank.

2     Q.   And what's the date of the check?

3     A.   September 13th, 2013.

4     Q.   And then what's in the memo line?

5     A.   Estate of Donna Badger.

6     Q.   We are going to come back to this a little bit

7 later, but what's the check number on this check from the law

8 firm?

9     A.   45026.

10    Q.   So there's a $101,000 check from the firm dated

11 September 13th with estate of Donna Badger in the memo line.

12 What happens to that check?

13    A.   So on the right, you see this check was converted

14 into two bank money orders, one payable to Margaret Murdaugh

15 in the amount of $7,500, and the second bank money order

16 payable to Hannah Plyler in the amount of $93,869.49.

17    Q.   On the money order, whose initials are these?

18    A.   RLL is Russell L. Laffitte.

19    Q.   And then on the bottom money order, whose signature

20 is that?

21    A.   Russell L. Laffitte.

22    Q.   So this $93,869 check to Hannah Plyler, where did

23 that check go?

24    A.   It was deposited into her money market account on

25 October 18th, 2013.

1    Q.   And then the boxes on the top left, will you explain

2  the math there to the jury?

3    A.   So this is Russell's accounting for how that payment

4  of 93,000 was applied to the principal and interest for the

5  loan 21213 and loan 92713.

6    Q.   So we've paid off the September 2013 loan, correct?

7    A.   Yes.

8    Q.   And then on February 2013, there's a principal

9  payment and an interest payment; is that right?

10    A.   That's correct.

11    Q.   So still on October 3rd, the date that that check

12  went into Hannah Plyler's account, what happened to the

13  remaining balance of that February 2013 loan?

14    A.   The note was renewed for the difference of

15  $26,841.54.

16    Q.   What are the terms of this loan renewal?

17    A.   The interest rate is 3.75 percent.  And it's due

18  October 3rd, 2014.

19    Q.   Is there any indication that this loan is secured by

20  collateral?

21    A.   No, no indication.

22    Q.   Let's move forward from October 3rd to October 23rd

23  of 2013.  What does this slide show?

24    A.   On October 23rd, 2013, $70,000 was transferred out

25  of Hannah Plyler's account and into Maggie or Margaret

1 Murdaugh's account. And it was further transferred out of

2 Margaret Murdaugh's account to Alex Murdaugh's account.

3    Q.   So a tenth transfer from Hannah Plyler to Alex

4 Murdaugh, what were the terms of this October 23rd loan?

5    A.   The $70,000 transfer earned interest at 3.75

6 percent, and it was due and payable October 3rd, 2014.

7    Q.   Does this note indicate there's any collateral for

8 this loan?

9    A.   No.

10    Q.   Before that $70,000 is taken out of Hannah Plyler's

11 account and put in Alex Murdaugh's, what was Murdaugh's

12 account balance?

13    A.   Negative $64,708.95.

14    Q.   And then after that October 23rd $70,000 deposit,

15 how long was it before Mr. Murdaugh was in overdraft again?

16    A.   Approximately one week.

17    Q.   This is an October 23rd loan. What happens five

18 days later, on October 28th? And let's start with the check

19 on the bottom right.

20    A.   This check is drawn on the account of the firm.

21 It's payable to Palmetto State Bank in the amount of

22 $101,369.49.

23    Q.   And what does the memo line of that check say?

24    A.   Estate of Donna Badger.

25    Q.   What's the date of that check?

1    A.    September 13th, 2013.

2    Q.    Earlier you testified about an October 18th payment

3    to Hannah Plyler.  It came from a check from the firm to the

4    bank with the same date in the same amount.  And it also said

5    estate of Donna Badger in the memo line.  Is this the same

6    check you talked about earlier with the October 18th payment?

7    A.    No, it's a different check.

8    Q.    What's the number on this check?

9    A.    45028.

10   Q.    So what happens to this check on October 28th?

11   A.    This check was deposited in full to Hannah Plyler's

12   conservatorship account.

13   Q.    And then what happened?

14   A.    $4,395.05 was taken out of her account.  And the

15   checking withdrawal slip referenced "Refund overpayment by

16   A.M."

17   Q.    All right.  The box on the top left, will you

18   explain that math to the jury?

19         Yes.  This is Russell Laffitte's accounting for the

20   $101,000 check being applied to loan 21213, $10 applied to

21   loan 72913, and, $70,043.14 applied to 102313.

22   Q.    This 102313 loan, that's paid off in full using this

23   Badger check; is that correct?

24   A.    That's correct.

25   Q.    Then what happens on October 5th of 2013?

A.   On November 5th, 2013, $50,000 was transferred out
of Hannah Plyler's account.  It was split into two different
transactions.  $25,000 went into Alex Murdaugh's farm
account.  And the remaining $25,000 went into his checking
account.

Q.   So this is an eleventh transfer from Hannah Plyler's
conservatorship to Alex Murdaugh.  What were the terms of
this loan?

A.   This $50,000 was due with interest at 3.75 percent
November 5th, 2014.

Q.   Does this note include an agreement to pay a late
fee for any overdue payments?

A.   It does.

Q.   Is there a default provision in this note?

A.   Yes.

Q.   Would you read it to the jury, please?

A.   "In the event of failure to pay any installment when
due, the holder hereof may declare the entire balance due and
payable."

Q.   Does this note indicate there's any collateral for
this loan?

A.   No collateral noted.

Q.   You testified that half of this $50,000 went into
one of Murdaugh's personal accounts, and half went into the
farm account.  In the personal account, which is on top, what

1  was Mr. Murdaugh's account balance before that $25,000

2  transfer?

3      A.   Negative $6,098.50.

4      Q.   After that November 5th deposit, how long was it

5  before the personal account was in overdraft again?

6      A.   Three days.

7      Q.   Before the $25,000 into the farm account, what was

8  the balance on that account?

9      A.   Negative $13,083.21.

10     Q.   How long was it before the farm account was in

11  overdraft again?

12     A.   Just over one month.

13     Q.   All right.  So jumping from that November 5th,

14  $50,000 loan to December 6th of 2013, what does this slide

15  show?

16     A.   On December 6th, 2013, $100,000 was transferred from

17  Hannah Plyler's account to Alex Murdaugh's checking account.

18     Q.   So a 12th transfer from Hannah Plyler's

19  conservatorship to Murdaugh.  What were the terms of this

20  $100,000 loan?

21     A.   The loan was due with interest at 3.5 percent, due

22  and payable December 6th, 2014.

23     Q.   I'm sorry.  What was the interest rate?

24     A.   3.75 percent.

25     Q.   Does this note indicate there's any collateral for

1    this loan?

2        A.    No.

3        Q.    Before that $100,000 is taken out of Hannah Plyler's

4    account and moved into Murdaugh's, what was Murdaugh's

5    account balance?

6        A.    Negative $40,403.20.

7        Q.    After that December 6th, $100,000 transfer, how long

8    was it before this account was in overdraft again?

9        A.    One month.

10       Q.    Still in December of 2013, that $100,000 transfer

11   you said was on December 6th.  What happens on December 18th?

12   And let's start with the check on the bottom right.

13       A.    This is a check drawn on the account of the firm,

14   check's payable to Palmetto State Bank in the amount of

15   $101,369.49.  It's deposited into Hannah Plyler's

16   conservatorship account.

17       Q.    What's the date of this check from the law firm to

18   Palmetto State Bank?

19       A.    September 13th, 2013.

20       Q.    And what does the memo line of that check say?

21       A.    Estate of Donna Badger.

22       Q.    So this is the third time you talked about a check

23   from the firm to the bank on September 13th in this amount

24   with the estate of Donna Badger in the memo line.  Is this

25   check the same as either of the two checks you talked about

1  previously?

2      A.    No, it's different.

3      Q.    What's the check number on this check?

4      A.    45027.

5      Q.    So on December 18th, what happens with this

6  September 13th Donna Badger check?

7      A.    It's deposited into Hannah Plyler's conservatorship

8  account.

9      Q.    On the top left, would you explain that math to the

10  jury?

11      A.    This is Russell Laffitte's accounting for how this

12  check was applied to the 11513 and 12613 transfers.

13      Q.    So the $10,000 loan from Hannah Plyler on December

14  6th, was that paid off in full on December 18th?

15      A.    Yes.

16      Q.    What was the interest calculation on that loan?

17      A.    $133.51.

18      Q.    Let's jump from December 13th to March of 2014.

19  What does this slide show?

20      A.    On March 28th, 2014, $100,000 was transferred out of

21  Hannah Plyler's conservatorship account to Alex Murdaugh's

22  farm account.  From there, $75,000 was transferred out of the

23  farm account to Alex Murdaugh's checking account.

24      Q.    So this is a 13th transfer from Hannah Plyler's

25  conservatorship to Murdaugh.  Was there a promissory note

1  associated with this loan?

2      A.    No promissory note.

3      Q.    Was there a set interest rate?

4      A.    No.

5      Q.    Was there a due date?

6      A.    There was no due date.

7      Q.    Was there any collateral for the loan?

8      A.    There was no collateral.

9      Q.    Before that $100,000 is taken out of Hannah Plyler's

10  account and moved to Murdaugh's farm account, what was the

11  balance in that account?

12     A.    Negative $16,482.10.

13     Q.    After that March 28th transfer, how long was it

14  before the farm account was in overdraft again?

15     A.    It's approximately two weeks.

16     Q.    All right.  You testified that $75,000 of the

17  $100,000 was moved from the farm account to Murdaugh's

18  personal account.  At the time of that transfer, what was the

19  balance in the personal account?

20     A.    Negative $14,933.25.

21     Q.    And after that March 28th $75,000 transfer, how long

22  was it before his personal account was in overdraft again?

23     A.    Approximately one month.

24     Q.    Fast-forward a little bit from this March 28th

25  transfer to May 6th of 2014.  What does this slide show?

1    A.    On May 6th, 2014, $50,000 was transferred from

2    Hannah Plyler's conservatorship account to Alex Murdaugh's

3    checking account.

4    Q.    This is the 14th transfer from Hannah Plyler to Alex

5    Murdaugh.  Was there a promissory note associated with this

6    transfer?

7    A.    No.

8    Q.    Was there a set interest rate?

9    A.    No.

10    Q.    Was there a due date?

11    A.    No.

12    Q.    Was there any collateral for the loan?

13    A.    No collateral.

14    Q.    Before that $50,000 is moved from Hannah Plyler's

15    account to Alex Murdaugh, what was Murdaugh's account

16    balance?

17    A.    Negative $18,399.97.

18    Q.    After that May 6th transfer, how long was it before

19    Murdaugh was back in overdraft?

20    A.    Approximately one weeks.

21    Q.    Is this the final loan from Murdaugh to the Hannah

22    Plyler's conservatorship?

23    A.    Yes, it is.

24    Q.    I said that backwards.  All right.  We saw this

25    earlier.  But at a high level, will you remind the jury what

1  this slide shows?

2  A.  So this spreadsheet pertains to Alex Murdaugh's

3  loans.  On the left-hand side is the date of the transaction.

4  Across the top, the loan number corresponds to the date the

5  transfer took place.  It also details the amount of principal

6  and interest that was applied for each of those transfers.

7  Q.  What is this slide?

8  A.  This is just the second page of that accounting.

9  There was one note on the left-hand side for loan 5614.  And

10  the other are just calculator tabulations of the interest

11  that's due.

12  Q.  We saw a similar slide with respect to the loans

13  that the defendant took from Hannah Plyler's conservatorship.

14  Is this your summary of the slides that we just looked at?

15  A.  That's correct.

16  Q.  So as of March 23rd of 2015, how much did Mr.

17  Murdaugh still owe in loan principal to Hannah Plyler's

18  conservatorship?

19  A.  $273,683.11.

20  Q.  And did he owe interest on those loans as well?

21  A.  He did.

22  Q.  As of February 20th of 2015, how much interest did

23  the defendant calculate Mr. Murdaugh owed on those loans?

24  A.  $11,104.41.

25  Q.  What was the total amount of principal and interest

1  owed on these loans?

2      A.   $284,787.52.

3      Q.   How did Murdaugh pay off this $284,000?

4      A.   He received a principal advance on February 20th,

5  2015, in the amount of $284,787.52 that was used to apply to

6  the balance of the loans.

7      Q.   So this is from a line of credit at the bank?

8      A.   That's correct.

9      Q.   Did that transfer from the line of credit pay off

10 all of Murdaugh's remaining loans from the Plyler

11 conservatorship?

12     A.   Yes, it did.

13     Q.   So this principal advance is dated February 20th of

14 2015.  But when was this money deposited into Hannah Plyler's

15 account?

16     A.   February 23rd, 2015.

17     Q.   So up here, when was it actually deposited into

18 Hannah Plyler's account?

19     A.   I'm sorry.  March 23rd, 2015.

20     Q.   All right.  So this interest calculation as of

21 February 20th of 2015, would that interest calculation have

22 included interest that accrued between February and March

23 23rd when Hannah Plyler was actually paid back for those

24 loans?

25     A.   No, it did not include the interest for the 30-some

1    days.

2        Q.    And for the two loans that were paid late, July 29th

3    of 2013 and November 5th of 2013 loans, would this payment

4    have included the agreed-upon 5 percent late fee for overdue

5    payments?

6        A.    No, no late payment penalties were included.

7        Q.    All right.  Exhibit 190, which is also in evidence,

8    Ms. Swinson, will you explain this chart to the jury, please?

9        A.    This chart is a summary of Alex Murdaugh's bank

10   account balances before and after transfers from the

11   conservatorship accounts.  The horizontal axis represents

12   zero amounts.  Below the horizontal axis are negative.  The

13   amounts above the horizontal axis are positive account

14   balances.  And it shows the balances being negative for some

15   portions of those payments and then becoming positive once a

16   transfer from the conservatorship accounts are deposited into

17   his account.

18       Q.    The colors are a little bit hard to see on the

19   screen, but it looks like you've got a pink and a blue.  Can

20   you explain the significance of the colors of the boxes to

21   the jury?

22       A.    The transfers in the pink boxes correspond to

23   transfers from Hannah Plyler's conservatorship account.  And

24   the blue box corresponds to the transfer from Malik

25   Williams's conservatorship account.

1    Q.   And in your course of reviewing these transfers from

2    the conservatorships into Murdaugh's account, did you notice

3    any pattern in terms of the timing of these transactions?

4    A.   I did.

5    Q.   And what was that pattern?

6    A.   Around quarter end, when Alex Murdaugh's accounts

7    were overdrawn, there were transfers from the conservatorship

8    account into his account to make his account balance

9    positive.

10        MS. STOUGHTON:  All right.  That's all the questions

11   I have, Ms. Swinson.  Your Honor, I'm not sure if this might

12   be a good time for a break.

13        THE COURT:  I think it is a good time to stop.

14   Ladies and gentlemen, let's take about a one-hour break.  Do

15   not discuss this case.  Do not review anything external to

16   the court.

17        (Jury leaves open court at 12:32 p.m.)

18        THE COURT:  Any matters we need to address?

19        MS. LIMEHOUSE:  Nothing from the Government, Your

20   Honor.

21        THE COURT:  From the defense?

22        MR. DANIEL:  Nothing from the defense, Your Honor.

23        THE COURT:  Very good.  Be at ease.  We will be back

24   in a hour.

25        (Whereupon, a recess transpired.).

1        THE COURT:  Crystal, is the jury ready?

2        THE COURT DEPUTY:  Yes, Your Honor.

3        THE COURT:  Any matters we need to address?

4        MR. AUSTIN:  Yes, Your Honor.  We have one matter on

5   the witness issue that we talked about earlier at sidebar.

6   Can we approach again?

7        THE COURT:  Yes, you may.

8        (Whereupon, the following bench conference takes

9   place.):

10       MR. AUSTIN:  Jason Peavy is the attorney.

11       THE COURT:  Okay.  What's up?

12       MR. AUSTIN:  We need Jason here.  Jason wanted to

13  update you on what he's learned about.

14       THE COURT:  Can we go get him?

15       THE COURT REPORTER:  This is Jason -- his last name?

16       MR. AUSTIN:  Jason Peavy.

17       THE COURT:  And he represents?

18       MS. LIMEHOUSE:  He represents Nancy Drawdy and other

19  bank witnesses.

20       MR. AUSTIN:  I don't remember what I said earlier,

21  but, basically, Judge, we were just about to start this

22  interview with her when she found out about the suicide.  And

23  so we were like -- I mean, it put us in a tough spot.  We

24  didn't want to just press forward with a subpoena when she's

25  going through this tough ordeal.  And Jason said that he

1   thought that this would be a logistical hardship for her to

2   come.  And we talked about it over the weekend.  It's really

3   important to our clients.  It's really important to us.

4          THE COURT:  It's hard for the Government

5   cross-examining in front of the jury.

6          MR. DANIEL:  We will do -- logistically, we will do

7   what needs to be done.  We will have a car pick her up, take

8   her to the airport, and pay for all of that.

9          MR. HOLLIDAY:  We reached him and he's on his way

10  up.

11         MR. AUSTIN:  He was just here a second ago.

12         THE COURT:  Always is.

13         MR. DANIEL:  We can take it up at the next break.

14         THE COURT:  Let's take it up at the next break.

15         (Bench conference ends.)

16         THE COURT:  Ms. Perry, bring in the jury.

17         You can return to the witness stand.

18         (Whereupon, the jury returns to open court at 1:41

19  p.m.)

20         THE COURT:  Please be seated.  Cross-examination by

21  the defense.

22                    CROSS-EXAMINATION

23  BY MR. DANIEL:

24     Q.   May it please the Court, Your Honor.  Ms. Swinson,

25  I'm Bart Daniel.  Just a few questions for you this

1    afternoon.  Now, the loans you analyzed, y'all analyzed all

2    of Mr. Laffitte's loans from the conservatorship as the

3    personal representative; is that right?

4        A.   Yes, sir.

5        Q.   Okay.  And you analyzed all Mr. Murdaugh's?

6        A.   Yes, sir, that's correct.

7        Q.   And I believe you said all loans were paid back at

8    the end of the conservatorships, all the personal

9    representative duties, all those were paid back?

10       A.   So, at the end of the conservatorship, despite

11   multiple defaults on the loan and the insufficient interest

12   and late fees that was paid on those transfers, the loans

13   were paid back in full from Pinckney settlement funds and

14   Badger settlement funds, in addition to the $245,000 paid

15   back via funds from Johnnie Parker.  So the only funds that

16   came directly from Russell Laffitte is approximately $7,800

17   in interest payments.

18       Q.   But when you pay off a loan with another loan, that

19   first loan is paid off in full; isn't that correct?

20       A.   That's correct.

21       Q.   Okay.  And when you still owe the money, now that

22   you've refinanced that loan -- so, ultimately, Mr.

23   Laffitte -- I assume you are talking about Mr. Johnnie

24   Parker's loan, has been paying Mr. Johnnie Parker ever since

25   that time, has paid that loan way down, did you know that?

1        A.    That's correct.

2        Q.    And Mr. Laffitte still owes Mr. Parker some,

3   correct?

4        A.    I have no idea how much he owes.

5        Q.    But you do know he paid down that loan?

6        A.    I do not know that, no.

7        Q.    So you didn't talk to Mr. Parker to find out if Mr.

8   Laffitte was paying down the loan?

9        A.    No, sir.  I was only tasked with analyzing the

10   financial records.  I did not speak to anyone on behalf of

11   Russell Laffitte's loan.

12        Q.    You just mentioned as if there was something wrong

13   with using one loan to pay off these conservatorship loans.

14        A.    I just stated the fact that I --

15              THE COURT:  Stop.  Stop.  You asked the question.

16   Let the witness answer it before you ask the next question.

17   Answer the question, yes, ma'am.

18              THE WITNESS:  Could you repeat the last question?

19   BY MR. DANIEL:

20        Q.    You testified that -- you implied that there was

21   something wrong with paying off one loan with another loan.

22   But there's nothing wrong with that, is there?

23        A.    I stated the facts as I observed them in the

24   financial records.

25        Q.    And you did not follow up with Mr. Parker to see if

1　those loans were being prepaid -- that loan was being repaid,

2　did you?

3　　　A.　No, sir, that's correct.

4　　　Q.　And you testified about two of the loans, one of the

5　conservatorship loans, and I believe another loan that was at

6　SCB&T that Mr. Laffitte had, they were cross-collateralized.

7　In other words, you used the same collateral for this loan,

8　for loan number one, that you loaned for loan number two; is

9　that correct?

10　　　A.　Yes, that's correct.

11　　　Q.　And they were cross-collateralized using 2,471

12　shares of Palmetto State Bank stock; is that correct?

13　　　A.　Yes, as well as Bank of America stock.

14　　　Q.　Okay.　And that was in writing, right?　It was

15　actually a written piece of pledge in writing securing those

16　notes?

17　　　A.　Yes, that's correct.

18　　　Q.　Okay.　And did you check the value of the Palmetto

19　State Bank stock per share at that time?

20　　　A.　No, I did not.

21　　　Q.　Okay.　Would you be surprised to learn there was

22　approximately anywhere from --

23　　　　　MS. STOUGHTON:　Objection, Your Honor.

24　　　　　THE COURT:　You know, you can't introduce evidence

25　not in the record.　Sustained.

1    BY MR. DANIEL:

2        Q.   Did you know that it was more than enough to --

3             MS. STOUGHTON:   Objection, Your Honor.

4             MR. DANIEL:   Your Honor, she can answer that

5    question.

6             MS. STOUGHTON:   It's evidence that's not in the

7    record.

8             THE COURT:   Unless she knows, if she knows, fine.

9    BY MR. DANIEL:

10       Q.   So I will ask the question this way.  So you never

11   bothered to check to see the value of that collateral that

12   was posted on those two loans?

13       A.   No, I did not.

14       Q.   Okay.  Now, you went through the various interest

15   rates.  And first let's look at Mr. Laffitte's loans.  By my

16   notes, and you correct me if I'm wrong, by my notes, the most

17   amount of interest he paid on one of the notes was 1 1/2

18   percent, and the most he paid on the notes was 3.25 percent?

19       A.   Yes, I believe that's correct.

20       Q.   Okay.  And so did you know -- did you check out what

21   the annual -- excuse me, what the daily CD rate was for these

22   particular periods of time of these loans?

23       A.   No.

24       Q.   Do you have any idea what it was?

25       A.   No.

1     Q.   So you didn't see -- you didn't check to see if the

2    loan and interest he was paying was more than they were

3    getting from a bank just sitting in an account?

4     A.   No.

5     Q.   Okay.  But you did say at the end of it all, he

6    overpaid by $242?

7     A.   According to his calculation, yes.

8     Q.   According to his what?

9     A.   His calculation, yes.

10    Q.   Well, but isn't that you concluded in court today?

11    A.   So I testified earlier that there were multiple

12   instances in which the date of the check written for the

13   interest did not correspond to the date the check was

14   actually deposited.  In some instances, it was almost one

15   year after the date of the check.  And no late payments

16   within 5 percent were included on any of those checks.

17    Q.   And the Alex Murdaugh loans, those, unlike Mr.

18   Laffitte's loans which were secured by the stock, they were

19   unsecured; is that right?

20    A.   Alex Murdaugh's loans were not secured by anything.

21    Q.   Okay.  And he paid higher interest rate than

22   interest rate that Mr. Laffitte was paying on loans, wasn't

23   he?

24    A.   That's correct, yes.

25    Q.   And I wrote down his was -- the lowest was, I think,

1  3 percent, and the highest was 5 percent?

2      A.   Yes, I think that's correct.

3      Q.   Okay.  And then sometimes it's 3 and a quarter,

4  sometimes it's three and a half, sometimes it's 3.75, but all

5  between 3 and 5 percent?

6      A.   Yes.

7      Q.   Okay.  And you never checked to see what the yearly

8  rate or the daily rate on the money would -- what the money

9  would have been made -- excuse me, would have been paid if it

10 had just been sitting in the account in the bank and not

11 being invested?

12     A.   No.  But I'm pretty sure most banks don't go and see

13 how much the interest they are earning on CDs that they are

14 giving to other customers is when they are making their

15 lending decisions.

16     Q.   It's not my question to you.  If Mr. Murdaugh is

17 paying an average of somewhere between 3 and 5 percent on the

18 loan, all I asked you was, you didn't check to see what the

19 daily CD rate was, certificate of deposit rate, or the daily

20 money market rate that they would have been making if they

21 kept that money in those accounts?

22     A.   No, I did not check the CD rates.

23     Q.   Thank you.  And all the loans were documented in

24 writing; is that right?

25     A.   No.

1    Q.    Did you check the probate court files?

2    A.    I reviewed the records that I was given.  And those

3    did not include -- some -- some of the loans did not include

4    promissory notes, as stated in my testimony.

5    Q.    My question is, did you review the files from the

6    probate court?

7    A.    There were some files from the probate court given

8    to me and I reviewed those records.

9    Q.    Well, there was some filed, but you didn't review

10   all the files in the probate court that were filed publicly?

11   A.    I did not review the actual file on hand at the

12   probate court's office.

13   Q.    Well, that's not my question.  Did you review all

14   the records that were filed, not whether it was there or

15   somewhere else?  Did you review all the records that were

16   filed for each conservatorship or each personal

17   representative?

18   A.    I can't testify if the records that I was given was

19   complete because I did not compare that to the records that

20   were actually on file at the probate office.

21   Q.    Okay.  Did you add up all the interest that Alex

22   Murdaugh paid on the loans that he borrowed?  You went

23   through all of your spreadsheets.  I don't know how many

24   pages it was.

25   A.    It was a lot.

1    Q.   It was --

2    A.   A lot of pages.

3    Q.   A lot of pages for sure.  How much interest was it?

4    A.   I would have to check my notes.  I don't know the

5    figure right off.

6    Q.   Well, you've got it right before you.  Go ahead and

7    check.  I can add it up for you if you would like.

8    A.   Give me one minute, please.  Are you asking for Alex

9    Murdaugh's or Russell Laffitte's?

10   Q.   Would $16,850.89 sound about right to you?

11   A.   One moment, please.  What figure are you -- what's

12   your figure again?

13   Q.   $16,850.89.

14   A.   And that's for Alex's loans?

15   Q.   Alex Murdaugh's loans.

16   A.   I came out with approximately $11,104.

17   Q.   How much?

18   A.   $11,104.

19   Q.   Did you know -- you looked at all these checks.  You

20   saw where Alex Murdaugh signed a good number of the checks

21   from the PMPED firm.  He signed a good number of those

22   checks; isn't that correct?

23   A.   Yes, sir.

24   Q.   And did you know that as a senior partner and owner

25   of the firm, that he was authorized to sign checks on behalf

1  of the firm?

2      A.   No, I did not look at the signatory cards for the

3  firm's bank accounts.  So I have no idea who was authorized

4  and who was not authorized to sign.

5      Q.   So if he had been authorized -- this is my question,

6  if he had been authorized, that means he would also be

7  authorized to direct how the proceeds from particular loans

8  were paid?

9          MS. STOUGHTON:  Objection.  It calls for

10  speculation.

11          MR. DANIEL:  Your Honor, she's the expert.

12          MS. STOUGHTON:  First of all, she's not an expert.

13          THE COURT:  She's not an expert.  The question you

14  are asking her is -- if she knows from her own knowledge,

15  fine.  So why don't you re-ask the question.

16  BY MR. DANIEL:

17      Q.   I will ask the question, give a little bit more

18  background, Your Honor.  If someone is an owner of a

19  business, then they have authority to direct how the funds of

20  that check or from the proceeds of a loan are to be directed?

21      A.   I mean, are you asking me about a specific business

22  or --

23      Q.   I'm asking you about --

24      A.   -- in general?

25      Q.   I'm asking you about the PMPED law firm.

1     A.   Again, I don't know who was authorized on

2  transactions on that account.  I did not look at the

3  signature card.

4     Q.   If you could pull up Exhibit 66, please.  It's

5  Defendant's Exhibit 66.  Now, I believe you've got a similar

6  exhibit somewhere, but do you recognize these are the Badger

7  checks?  Did you look at the Badger checks?

8     A.   No, I did not look at all of the Badger checks.

9     Q.   I will ask you some questions about this chart

10  that's in the evidence.  It's Exhibit 66.  And you mentioned

11  there were a couple of checks that you testified to that were

12  made out on September -- because this is important --

13  September the 13th, 2013.  As a matter of fact, you see on

14  that list there's more than just a couple.  But you talked

15  about some specifics ones?

16     A.   Yes.

17     Q.   And before that, there's a -- the check that goes in

18  this list, there's a check that's the actual Badger

19  settlement check.  That's $1.325 million.  And it's dated

20  11/19/2012.  Did you come across that one?

21     A.   I did not.

22     Q.   So you didn't analyze the Badger settlement check?

23     A.   No, I did not analyze the Badger full settlement,

24  no.

25     Q.   Okay.  So you didn't see whether the Badger

1  settlement check of 1.325 ever was processed at the bank?

2      A.    No.

3      Q.    In other words --

4      A.    What do you mean by "processed"?

5      Q.    By processed I mean, did it ever get negotiated at

6  the bank?  Did it ever hit the bank?

7      A.    I have no knowledge of my own of that occurring, no.

8      Q.    Okay.  Let's look specifically at Exhibit No. 70.

9  And I believe you did look at -- this is Defendant's Exhibit

10  No. 70.  Okay.  And this, I believe, is on one of your

11  screens with a lot of different checks.  This is a check made

12  payable from the PMPED -- go ahead and read it for the jury,

13  highlights.

14      A.    So the check is drawn on the account of the firm and

15  it's payable to Bank of America in the amount of $50,684.75.

16      Q.    And what does it say in the settlement line?

17      A.    The memo line?

18      Q.    The memo line.  I'm sorry.

19      A.    Settlement proceeds.

20      Q.    Okay.  And that check is drawn on the law firm's

21  client trust account; is that correct?

22      A.    Yes.

23      Q.    And it's the $50,684.75 check that -- one of the

24  ones that you did examine?

25      A.    No, this is not a check that I have looked at

1  affiliated with my testimony earlier.

2      Q.   So that was a different Bank of America check that

3  you testified to?  You said there were two checks that went

4  to Bank of America.  Take your time and review your notes.

5  This is very important.

6      A.   Okay.  Are you referring to Russell's transactions

7  or to Alex's transactions?

8      Q.   This is a check that went to the Bank of America

9  from the Peters Murdaugh Parker Eltzroth checking accounting?

10     A.   I don't recall seeing this check in my earlier

11 testimony, no.

12     Q.   But you do agree with me this check, which is in

13 evidence -- you don't think you reviewed this one, but this

14 one is in evidence, and is drawn on the trust account of

15 PMPED law firm.

16         MS. STOUGHTON:  Your Honor, she just testified

17 that --

18         MR. DANIEL:  She can read the check.

19         MS. STOUGHTON:  It's outside the scope of her

20 direct.  She just testified --

21         THE COURT:  I don't understand the relevance.

22         MR. DANIEL:  Let me explain to you the relevance.

23 The very same mistakes they said --

24         THE COURT:  No.  Sustained.

25         MR. DANIEL:  Judge, this is part of the Badger

1    settlement.  It's part of this case.  It's in evidence.

2         THE COURT:  I've ruled.

3    BY MR. DANIEL:

4    Q.    In analyzing the checks that Mr. Murdaugh used, did

5    you notice that the checks were sometimes issued -- excuse

6    me, sometimes issued on one date and then much later used to

7    pay off on another date?

8    A.    Are you referring to the checks that --

9    Q.    Alex Murdaugh.

10   A.    The ones I testified about earlier?

11   Q.    Not the one you testified from.  Just asking you,

12   did you notice, not whether you testified --

13   A.    So with regard to the checks that I have testified

14   to earlier today, yes, some of the dates the checks were

15   written were prior to the date those checks were deposited.

16   Q.    And so when they were processed, some of them were

17   processed a good bit later?

18   A.    Yes.

19   Q.    Okay.  And did you go to Bank of America to talk to

20   them about those two checks you looked at?

21   A.    No.  As I testified earlier, I was given specific

22   financial records to look at and analyze, and that's all that

23   I did.

24        MR. DANIEL:  Okay.  Thank you, ma'am.  Give me one

25   second.  I think I'm finished.  No further questions.

1    THE COURT:  Very good.  Anything on redirect?

2    MS. STOUGHTON:  Just very briefly, Your Honor.

3                   REDIRECT EXAMINATION

4    BY MS. STOUGHTON:

5    Q.  Ms. Swinson, you testified earlier that you are a

6    forensic accountant with the FBI; is that correct?

7    A.  Yes.

8    Q.  You are not a special agent?

9    A.  That's correct.

10   Q.  Were you tasked with doing any part of the

11   investigation in this case in terms of serving subpoenas,

12   collecting documents, anything like that?

13   A.  No, I was not.

14   Q.  What were you tasked with doing in this case?

15   A.  Reviewing a limited number of financial records, to

16   include bank statements, check deposits, loan records,

17   promissory notes.

18   Q.  Did you review all the documents that were provided

19   to you by the case agent?

20   A.  Yes.

21   Q.  We are going to pull up Government's Exhibit 189,

22   which is already in evidence.  This is slide 9 that you

23   talked about earlier.  Could you just remind the jury, what

24   are these two checks that we are looking at on the top and

25   bottom of the left-hand side?

1      A.    They are two checks drawn on the firm's account.

2   They total approximately $635,000 that are payable to

3   Palmetto State Bank.  And they reference in the memo section,

4   settlement proceeds for Hakeem Pinckney and Natasha Thomas.

5      Q.    Settlement proceeds.  You also testified about these

6   three checks which were broken down out of that $634,000; is

7   that correct?

8      A.    Yes.

9      Q.    Were these three checks -- excuse me, money orders,

10  used to pay back three of the Murdaugh loans from

11  conservatorships?

12     A.    Yes, that's correct.

13     Q.    Is using settlement proceeds from another

14  individual's case taking out a loan to pay back another loan?

15     A.    No.

16         MS. STOUGHTON:  Thank you.  No further questions.

17         THE COURT:  Any reason to keep the witness under

18  subpoena?

19         MR. DANIEL:  Beg the Court's indulgence, Your Honor.

20  Just one question, Your Honor.

21         THE COURT:  No.  No.  No.  We've done redirect.  I

22  asked is the witness -- do you need to keep her?

23         MR. DANIEL:  I was just going to ask one question,

24  but if Your Honor is not going to allow me --

25         THE COURT:  Okay.  You are free to leave.  Thank

1    you.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  You are released from your subpoena.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  Call your next witness.

6              MS. STOUGHTON:  The Government calls Spann Laffitte.

7              THE COURT DEPUTY:  Please state your full name.

8              THE WITNESS:  Henry Spann Laffitte, Jr.

9                        HENRY SPANN LAFFITTE, JR.

10          having been duly sworn, testifies as follows:

11                          DIRECT EXAMINATION

12   BY MS. STOUGHTON:

13        Q.   Good afternoon, Mr. Laffitte.  I'm going to get you

14   to pull that mic up close to you before you talk.  Thank you.

15             So the jury has heard from a number of Laffittes

16   already.  How are you related to the defendant, Russell

17   Laffitte?

18        A.   He's my first cousin.

19        Q.   So you've known him your whole life, his whole life?

20        A.   Yes, ma'am.

21        Q.   Tell the jury a little bit about your background.

22   Where did you grow up?

23        A.   Allendale, South Carolina.

24        Q.   And where did you go to college?

25        A.   University of South Carolina.

1    Q.    What have you been doing since you graduated from

2    college?

3    A.    I've been in the insurance industry.

4    Q.    Are you also on the Palmetto State Bank Board of

5    Directors?

6    A.    Yes, ma'am.

7    Q.    Around 2015, there was some family events that led

8    to leadership changes at the bank.  Could you describe that

9    for the jury?

10    A.    My cousin, Sterling Laffitte, who was president of

11    the bank at the time, passed away.  And my father passed away

12    at the end of that year as well.

13    Q.    And then what did that sort of do in terms of the

14    leadership trajectory of the bank?

15    A.    Sterling had been named president when he was

16    president of the South Carolina Bankers Association.  And I

17    think he was the sort of leader in charge, so to speak.  And

18    when he passed, it just shifted roles and responsibilities.

19    Q.    So Jan became president; is that correct?

20    A.    Yes, ma'am.

21    Q.    And what about Russell?

22    A.    I believe he was the COO.

23    Q.    How long have you served on the bank's Board for?

24    A.    Since 2018.

25    Q.    And what role or responsibilities do you have in

1    your capacity as a Board member?

2    A.    The primary responsibility is to be a steward for

3    the shareholder interest.  And we sort of function in

4    supervisor role overseeing the bank's performance and

5    assessing that.

6    Q.    The Board as a whole is kind of high-level

7    oversight, right?

8    A.    Yes, ma'am.

9    Q.    Not day-to-day management of the bank?

10   A.    No, ma'am.

11   Q.    Do you serve on any committees of the Board?

12   A.    Yes, I serve on the Audit Committee and Litigation

13   Committee.

14   Q.    The jury has heard already about the Audit

15   Committee.  What is the Litigation Committee?

16   A.    It's a subgroup of the Board that was formed in

17   October of '21 to handle all matters related to litigation in

18   the bank.

19   Q.    Now, you said you've been working in insurance since

20   you graduated from college.  So you don't have a background

21   in banking; is that correct?

22   A.    I was a teller several summers, but no, ma'am, not a

23   background in banking.

24   Q.    How have you adjusted to your responsibilities as a

25   member of the Board at the bank?

1    A.    When I joined, it was just a matter of observing the

2    practices of the other Board members and studying the team

3    education that we received and our training, and just tried

4    to contribute when I felt it was valuable.

5    Q.    All right.  I want to shift gears a little bit.

6    Before the summer of 2021, did you know who Alex Murdaugh is?

7    A.    Yes, ma'am.

8    Q.    What was the nature of your relationship with him?

9    A.    I knew his family, Mr. Randolph, Ms. Libby, and

10   Randy, and Alex, and John Marvin.  I did more socially with

11   John Marvin than Alex.

12   Q.    Who is John Marvin in relation to Alex?

13   A.    Alex's younger brother.

14   Q.    Did you know Alex to be a customer of the bank?

15   A.    Yes, ma'am.

16   Q.    What was your impression of this financial status

17   before the summer of 2021?

18   A.    The perception was he had always done quite well as

19   an attorney, and lived a lifestyle that seemed most

20   comfortable.

21   Q.    Moving forward up into the summer and fall of 2021,

22   when was the first time you recall there being discussions at

23   the bank about the bank's potential exposure in terms of its

24   relationship with Murdaugh?

25   A.    It was after the boat crash.  My cousin Norris had

1    heard that Alex was no longer employed at the law firm, and

2    just inquired about his capacity to pay back his debt.

3        Q.   All right.  So in early August, the jury has already

4    heard about some e-mails among Board members involving bank

5    liability.

6        MS. STOUGHTON:  Can we pull up Government's Exhibit

7    6, please, which is already in evidence.

8    BY MS. STOUGHTON:

9        Q.   There was a Board meeting on August 17.  Were you

10   present at this meeting, or I guess did you attend the

11   meeting is probably a better question?

12       A.   Yes, ma'am, via Zoom.

13       Q.   All right.  At the bottom of this first page, it

14   says:  The loans outstanding on Richard Alexander Murdaugh

15   were discussed.  A copy is attached.

16           Do you recall at this August Board meeting

17   discussion surrounding a $750,000 loan to Murdaugh?

18       A.   Yes, ma'am.

19       Q.   What was the stated purpose of the loan?

20       A.   Renovations to his beach house.

21       Q.   And what was the stated collateral for that loan?

22       A.   A share of Green Swamp Hunt Club and the house

23   itself.

24       Q.   So this Board meeting was on August 17th.  Were you

25   made aware that 350,000 of the $750,000 had been wired to

1    Attorney Chris Wilson on July 15th?

2        A.    No, ma'am.

3        Q.    Were you made aware that the remaining $400,000 had

4    been deposited into Murdaugh's account to cover his

5    overdrafts on August 9th?

6        A.    No, ma'am.

7        Q.    Whose responsibility was it to share accurate

8    information regarding that loan with you and the rest of the

9    Board members?

10       A.    The loan officer associated with the loan.

11       Q.    And who was the loan officer associated with this

12   loan?

13       A.    Russell.

14       Q.    What would your reaction have been as a Board member

15   if you had seen Alex Murdaugh's overdraft in excess of

16   $360,000, and then learned he had just been extended a

17   $750,000 loan?

18       A.    It would have been most troubling.

19       Q.    Why is that?

20       A.    As I said earlier, I am not in banking, but it

21   doesn't seem sound banking practice.

22       Q.    Let's pull up Government's Exhibit 7D, which is

23   already in evidence.  This is an e-mail from Norris dated

24   September 2nd.  Did you receive this e-mail?

25       A.    Yes, ma'am.

1    Q.   This is you, Spann Laffitte, right?

2    A.   Yes.

3    Q.   The jury has seen this before, so I'm just going to

4    highlight a portion of it.  But starting on the second line

5    down here, Norris says:  I now notice the $750,000 loan No.

6    6996048 has only the Green Swamp share as collateral, which

7    does not cover the loan, especially if the share has been

8    pledged elsewhere.  Has it been pledged elsewhere?  What

9    happened with the collateral of a second mortgage on the

10   Edisto house that was shown against this loan to the Board at

11   the August meeting?  Is this loan secure or is it now like

12   the unsecured $599,400 loan No. 6991524 on the same page?

13        What was your reaction to seeing these questions

14   from Norris on September 2nd?

15   A.   Well, the concern was if the Green Swamp share was

16   the only collateral and it had been cross-collateralized and

17   there was no other collateral on the loan, we had exposure.

18   Q.   What do you mean by "exposure"?

19   A.   A way to recoup the funds that had been lent.

20   Q.   Let's go to Government's Exhibit 7E, please.  All

21   right.  This is a response from Russell.  At the end of it

22   says down here:  The stock has not been pledged elsewhere.

23        Was that true?

24   A.   No, ma'am.

25   Q.   When did you first learn that the $750,000 beach

1   house loan wasn't actually used to renovate the beach house?

2       A.   We conducted an internal investigation, and those

3   findings demonstrated that.

4       Q.   Did Alex Murdaugh ever make a payment on that

5   $750,000 beach house loan?

6       A.   Not to my knowledge.

7       Q.   I want to fast-forward from August and change gears

8   again a little bit.  The jury has heard about some continued

9   concerns from Board members about the bank's potential

10  exposure with respect to Murdaugh.  Moving into September and

11  October, do you recall Board conversations about bank

12  employees who had previously served either as a personal

13  representative or as a conservator in Alex Murdaugh's cases?

14      A.   Yes, ma'am.

15      Q.   What prompted those conversations?

16      A.   There was exposure to the bank through the

17  Satterfield conservatorship that Chad Westendorf was involved

18  in.  And a question was raised, did anybody else in the bank

19  serve as conservator?  Uncle Charlie said he served as

20  conservator 20 years ago and it was too much trouble and

21  wouldn't do it again.  And Russell said he served as

22  conservator a couple of times but it was no big deal.

23      Q.   So why did you, as a bank member, think it was

24  important to understand whether bank employees had served in

25  a fiduciary capacity for Murdaugh's clients in the past?

A.    Just was there a pattern there, was there additional exposure, or was it isolated to simply to one event with Satterfield.

Q.    What did Russell tell the Board when asked if he had served as a personal representative or conservator?

A.    That he had served it a couple of times, but it was no big deal.

Q.    Did he specifically talk about Hakeem Pinckney?

A.    He did not talk about Hakeem.  He was asked by Lucius Laffitte if he was familiar with the name, and he said he was not.

Q.    So based on the information you are learning in terms of Satterfield, as events unfold in September and October, at that point are you proposing any actions for the Board to take?

A.    Early on I suggested we bring in outside counsel.  I reached out to a friend of mine that's a defense attorney, just wanted to make sure we had a full understanding of what our exposure was and how best to address that.

Q.    So if you had learned at either of the Board meetings in September or October that Russell had, in fact, served either as a personal representative or a conservator in multiple cases involving Alex Murdaugh, including Hakeem Pinckney, what action would you have taken or recommended the Board take?

1      A.   Would certainly want to seek that clarity.  And if

2   we didn't have full understanding, potentially remove him

3   from the bank.

4      Q.   All right.  So when you say "seek further clarity

5   --"

6      A.   Full details, what's the difference between a couple

7   versus numerous, just getting an understanding of truly what

8   had transpired.

9      Q.   So later in October, did you become aware of an

10  issue involving a $680,000 check from the bank to PMPED?

11     A.   Yes, ma'am.

12          MS. STOUGHTON:  Can you pull up Government's Exhibit

13  13, please, which is already admitted into evidence.  And we

14  are going to go to the bottom of this second page.  Thank

15  you.

16  BY MS. STOUGHTON:

17     Q.   All right.  This is an e-mail from Russell the jury

18  has seen already from October 29th of 2021.  It says in part:

19  We took a $680,000 loss to fix an issue between us and the

20  PMPED law firm.

21          What did you understand this e-mail to mean when you

22  received it?

23     A.   I had actually been traveling that day.  And I saw

24  all of the e-mails almost in reverse.  But, basically, that

25  he had negotiated a settlement of some nature with the law

1    firm.

2        Q.   Did you understand that the decision had already

3    been made to pay the 680?

4        A.   Based on this, it seems that that decision had been

5    made, yes.

6        Q.   What was your reaction when you got this series of

7    e-mails?

8        A.   It was -- I was concerned.  It was troubling.  I

9    mean, we were in the middle of uncharted territory.  We had a

10   legal team in place to help us make informed decisions.  We

11   had a Board in place with a variety of leadership traits and

12   skills.  And it was an independent decision.

13       Q.   Is $680,000 a lot of money to the bank?

14       A.   Absolutely.

15       Q.   Let's move to the bottom of page 1 on this same

16   exhibit, please.  There's a follow-up e-mail from Russell.

17   He says:  Attorneys were informed, but not consulted.  They

18   were consulted by phone, so nothing to share.  This is not a

19   lawsuit issue.  It is a banking issue of us converting

20   checks.

21            Attorneys were informed but not consulted, what did

22   you understand that to mean?

23       A.   As it reads, he didn't seek guidance or direction.

24   He just informed them of what had transpired.

25       Q.   Did it concern you that Russell was negotiating some

1    sort of settlement on behalf of the bank?

2        A.   At the time, absolutely.  I mean, we were, again, in

3    very unfamiliar territory and too much exposure, not to

4    leverage every resource we had.

5        Q.   Let's go to the top of page 1, please.  There's a

6    third e-mail from Russell:  We will discuss in the Board

7    meeting.  I was responsible.  12 checks made payable to PSB

8    converted to others.  Hopefully no other cases.  This took

9    place in 2013.

10            Have you since learned whose money it was that was

11   converted in this first instance that the Board became aware

12   of?

13       A.   Yes.

14       Q.   Who was that?

15       A.   It was the Badger money.

16       Q.   I'm sorry?

17       A.   The Badger money.

18       Q.   Russell says:  Hopefully no other cases.

19            Did he indicate that there were conversions in any

20   other cases besides Badger?

21       A.   No, ma'am.

22       Q.   So this e-mail is October 29th of 2021.  The Board

23   met on Halloween night last year.  Do you recall that

24   meeting?

25       A.   Yes, ma'am.

1     Q.   Was that a regularly scheduled Board meeting?

2     A.   No, ma'am.

3     Q.   What was the purpose of that meeting?

4     A.   To try to gain understanding and clarity about the

5  680.

6     Q.   So what happened?  What decisions were made as it

7  pertains to the 680 or the, I guess, the search for clarity

8  on what was happening?

9     A.   We decided to engage an attorney and do an internal

10  investigation.

11     Q.   Is this the same meeting that the Litigation

12  Committee was created at?

13     A.   Yes, ma'am, I believe so.

14     Q.   I'm going to show you what's been admitted into

15  evidence as Government's Exhibit 80.

16          MS. STOUGHTON:  Let's go to the bottom of page two,

17  please, to the first e-mail in the thread.  Thank you.

18  BY MS. STOUGHTON:

19     Q.   So this is an e-mail from Russell.  Did you receive

20  this e-mail?

21     A.   Yes, ma'am.

22     Q.   Who is in the cc line?  Who are those four people?

23     A.   That's my cousin, Liz Malinowski, Becky Laffitte,

24  and Jim Gibson, the various members of the Litigation

25  Committee.

1    Q.   Who is the e-mail actually sent to?

2    A.   Our attorney, Trenholm Walker.

3    Q.   So Russell says to Trenholm:  Please let me know

4    when we decide to pay the check to the law firm.  I would

5    like to call them to do this sooner rather than later.

6         MS. STOUGHTON:  If you could zoom out.

7    BY MS. STOUGHTON:

8    Q.   So this is Trenholm's response.  He says in part:

9    Russell, I will handle it.

10        MS. STOUGHTON:  And then can we go to the top of

11   page one, please.

12   Q.   This is Russell's reply to Trenholm:  The bank is

13   paying this amount.  The verbal contract between PSB and

14   PMPED was done at the approval of the Chairman of the Board

15   and the CEO.  You are welcome to discuss terms, but it is not

16   an option to not pay.

17        So this is the evening of November 2nd of last year.

18   Were you aware that the firm had deposited the check on

19   October 29th?

20   A.   No, ma'am.

21   Q.   So there's another Board meeting the next day,

22   November 3rd.  Were you at that meeting?

23   A.   Yes, ma'am.

24   Q.   At that meeting, were you informed where the number

25   $680,000 had come from?

1    A.    It was half of the amount.

2    Q.    Were you told whether any of that $680,000 was to

3    repay money that had been paid to Russell personally?

4    A.    No, ma'am.

5    Q.    Were you told that the $680,000 included half of the

6    amount of checks that had gone to Bank of America and not

7    through Palmetto State Bank?

8    A.    No, ma'am.

9    Q.    Was that $680,000 a loss to the bank?

10   A.    Yes, ma'am.

11   Q.    Where did it come from?

12   A.    I believe it was out of our loan loss reserves.

13   Q.    What is a loan loss reserves account for?

14   A.    Reserved funds available in case loans are not paid

15   back.

16   Q.    Was the $680,000 a loan?

17   A.    No, ma'am.

18   Q.    In the months following this November meeting and

19   the 680 payment, did the bank decide to sever its

20   relationship with Russell?

21   A.    Yes, ma'am.

22   Q.    Was that vote unanimous?

23   A.    No, ma'am.

24   Q.    Did you vote to sever the bank's relationship with

25   Russell?

1    A.    Yes, ma'am.

2    Q.    And why?

3    A.    There had just been a lack of transparency about the

4    overall involvement with Alex.  And it just created such

5    tremendous exposure for the bank.  And checks had been

6    converted.  I mean, we truly had no choice.

7         MS. STOUGHTON:  Thank you, Mr. Laffitte.  Please

8    answer any questions the defense has.

9         THE COURT: Cross-examination.

10                  CROSS-EXAMINATION

11   BY MR. AUSTIN:

12   Q.    Good afternoon, Mr. Laffitte.

13   A.    Good afternoon.

14   Q.    My name is Matt Austin.  I represent Russell.  Give

15   me one second while I get my stuff set up here, please.

16        All right.  If we could go back, I think you covered

17   this, but just to go over it again, when did you first join

18   the Board at Palmetto State Bank?

19   A.    In 2018.

20   Q.    2018?

21   A.    Yes, sir.

22   Q.    And I think you testified that you never had any

23   prior experience in the banking industry; is that correct?

24   A.    Other than being a teller in high school.

25   Q.    Right.  Okay.  But no full-time experience?

1    A.   No, sir.

2    Q.   And are you a full Board member?  Are you able to

3 vote because you own stock?

4    A.   I'm able to vote because I'm on the Board.

5    Q.   But -- I didn't phrase that the right way.  In order

6 to be on the Board, you need to have stock; is that correct?

7    A.   Yes, sir.

8    Q.   Well, I guess except for Scott Swain, who doesn't

9 own stock, so he's a nonvoting member; is that correct?

10    A.   Yes, sir.

11    Q.   Okay.  And how many shares do you own?

12    A.   I think around 3,000 maybe.

13    Q.   And in preparation for trial -- or I guess before I

14 get to that question, are you familiar with the bylaws of

15 Palmetto State Bank?

16    A.   Yes, sir.

17    Q.   Is that part of your duty as Board member to be

18 familiar with them?

19    A.   Yes, sir.

20    MR. AUSTIN:  Okay.  Please bring up the Palmetto

21 State bylaws, please.  If we can zoom in, please, on Section

22 3.15.

23 BY MR. AUSTIN:

24    Q.   So are you familiar with this provision of the

25 bylaws?

1      A.   I'm -- I've seen it.  I'm reading it now.

2      Q.   Sure.  And what does this mean to you?  How do you

3 interpret this?

4      A.   Just the literal interpretation as it reads.

5      Q.   So, basically, you need to file written dissent if

6 you disagree with an action taken by the Board; is that

7 right?

8      A.   Yes, sir.

9      Q.   Okay.  And let's go to Section 3.16, the Executive

10 Committee.  This is a long paragraph, but if we could zoom

11 in, please.  There we go.  Thank you.

12      All right.  So you said earlier you thought that --

13 I believe you said it was improper the way that Russell

14 handled the $680,000 settlement, that he should have gone to

15 the full Board.  Now, if you read here, in this first

16 highlighted part it says that:  The Executive Committee shall

17 have delegated to it and may exercise, to the extent

18 permitted by applicable law, all the power and authority of

19 the Board of directors for management of the business and

20 affairs.

21      And then if you go down to the next highlighted

22 part, it says:  To approve, bind the corporation under, and

23 authorize the corporation to perform or enforce contracts,

24 agreements and debt obligations, to initiate, defend, or

25 settle legal proceedings.

1    So based on this provision in the bylaws, if Russell

2  voted along with his dad, Charlie, and his sister, Gray,

3  that's three-fourths of the voting members of the Executive

4  Committee, would he not have the authority under this

5  provision in the loan to make this decision to pay the

6  $680,000?

7    A.   Well, the full Executive Committee consists of

8  others, and they should have been consulted.

9    Q.   Okay.  And I think this is an important point.

10 Where do you get that belief from?  Are you relying on a

11 specific section of the bylaws or some other document that

12 governs how the Executive Committee is supposed to work?

13   A.   Common practice in any other business, a committee

14 is a committee and it's representative of the full body of

15 it.

16   Q.   Okay.  Well, so if the Executive Committee here has

17 the authority to initiate, defend, or settle legal

18 proceedings, why would that be dependent on the rest of the

19 Board?

20   A.   Well, in this particular instance, the lack of

21 transparency and the proximity Russell had to this settlement

22 that he negotiated independently was improper.

23   Q.   Well, if he had the consent and votes of both his

24 dad and his sister, would that not be independently?

25   A.   I can't speak for them, but I cannot believe that

1    they knew the full extent of what was involved with that 680

2    repayment.  And in terms of permitted by applicable law, I

3    mean, if the bylaws circumvented, you know, applicable law, I

4    don't think we would be here today.

5        Q.   What applicable law?

6        A.   Banking policy, regulatory policy.

7        Q.   Okay.  I mean, it's just important for you to

8    understand, what policy and what provisions are you talking

9    about?

10       A.   When these bylaws were adopted, there was an

11   expectation of any executive to act in a manner that was in

12   the best interest of the shareholders and that bank.  And in

13   my opinion, that did not take place.

14       Q.   Okay.  But regardless of your opinion, I mean, Board

15   members can have a difference of opinion, right?

16       A.   Sure.

17       Q.   And that's kind of the beauty of Boards, you have a

18   bunch of different people on there and there's different

19   opinions and you vote on things and that's how you decide

20   what action to take and not take.  According to this section

21   of the bylaws, the Executive Committee only needs to have

22   three-fourths, right, and they can settle lawsuits, enter

23   settlement agreements, things like that?

24       A.   Yes, but I still believe there should be

25   transparency about --

1    Q.   Well, should be isn't the same thing as actually

2    something being in place, right?

3    A.   I agree.

4    Q.   Okay.  Can we go to Section 4.02.  Going to take a

5    second to read that.  That section deals with the Chairman of

6    the Board.  I will speed this up.  If you look towards the

7    second half:  The chairman may execute on the corporation's

8    behalf any and all contracts, agreements -- and then the rest

9    of the words there I don't need to read here for you.  But

10   "agreements" is the operative word.  Wouldn't a settlement

11   agreement fall under this section of the bylaws?

12   A.   I don't know if a settlement agreement are the same,

13   but if they are, yes.

14   Q.   Okay.  And Charlie, the Chairperson of the Board,

15   wouldn't you expect him to be able to settle agreements or

16   enter into agreements on behalf of the bank?

17   A.   I think in normal circumstances, yes.  But these

18   were not normal circumstances.

19   Q.   Well, you don't think they are, but that's why we

20   have bylaws, right?  So then you can follow a set of standard

21   rules that don't care about whether something is unusual

22   circumstance or not?

23   A.   Okay.

24   Q.   Do you agree with that?

25   A.   Yes.

1    Q.   Okay.  And so, yeah, I think you've touched on

2    something that's obvious to everybody here.  This is an

3    unusual situation, right, with Alex Murdaugh?  I mean, this

4    is unprecedented.  Have you ever seen anything like it in

5    your lifetime?

6    A.   No, sir.

7    Q.   At the time of all these meetings in the fall where

8    things started really escalating, did you have a good grasp

9    of the amount of criminal conduct Alex Murdaugh was

10   potentially involved in?

11   A.   No, sir.  My concern was any involvement with the

12   bank itself.

13   Q.   Uh-huh.  I'm sorry.  I'm losing my voice.  Were you

14   aware that Alex had been a long-term customer of the bank?

15   A.   Yes, sir.

16   Q.   And when did you first become aware that he was a

17   customer of the bank?

18   A.   At some point in my youth, I would assume.

19   Q.   I'm sorry?

20   A.   At some point in my youth, I would assume.

21   Q.   Okay.  And did you have a chance to become familiar

22   with his finances during your service on the Board?

23   A.   I did not see the full extent of his finances until

24   the fall of '21.

25   Q.   Okay.  And in the course of reviewing his finances,

1    did you kind of learn that he had, yes, overdrafted at times,

2    but he always, for the most part, with the exception of Green

3    Swamp and 0 United back closer to 2010, always paid his debts

4    back, paid overdrafts, paid loans off?  Did that ever come

5    up?

6    A.   I don't -- I mean, he didn't pay anything on the 750

7    beach house.

8    Q.   Well, sure, because he was arrested and charged

9    criminally.  Right?  And he's sitting in jail.  But for that,

10    his track record is pretty good, wouldn't you agree?

11    A.   Other than Red Beard and 0 United.

12    MS. STOUGHTON:  Objection.  This mischaracterizing

13    testimony, Your Honor.

14    THE COURT:  Well, if the witness knows, it's

15    cross-examination.

16    BY MR. AUSTIN:

17    Q.   That's why I asked.  If you could please pull up

18    Section 4.03.  All right.  If you look towards the second

19    half, it says:  The CEO shall have full authority to execute

20    on the corporation's behalf any and all contracts,

21    agreements -- and the same word, basically the same sentence

22    that was in the chairman provision.  And so based on this

23    section alone, Russell would have had the authority to enter

24    this agreement by himself; isn't that right?

25    A.   Yes, sir.

1    Q.    Okay.  And so not only could he have done it,

2    Charlie could have done it by himself too.  And then also

3    Russell could have done this with his sister and his dad

4    voting on the settlement agreement.  And it doesn't matter

5    whether anybody else thinks it's unusual.  They could just do

6    it.  They had that authority under the bylaws; is that right?

7    A.    Yes, sir.

8    Q.    Okay.  And so in Count 4 of the indictment it says

9    that Russell wrote this check without notice to or approval

10   by the Board.  Do you think that he wrote that check not in

11   compliance with the bylaws in any way?

12   A.    It may have followed the bylaws, sir, but the

13   circumstances around the payment and the lack of transparency

14   and the exposure it created --

15   Q.    So -- I'm sorry.  I will let you finish.

16   A.    The bylaws are the governing laws of the

17   organization.

18   Q.    So he's following the --

19   THE COURT:  Let him finish his answer.

20   THE WITNESS:  But there's a responsibility of that

21   role to always do what's in the best interest of the

22   shareholders.  And when you break down what that 680 payment

23   involved and the proximity to it, it just was inappropriate.

24   BY MR. AUSTIN:

25   Q.    Okay.  That's just your opinion though.  And --

1    A.   It is my belief, yes.

2    Q.   That's fair.  And you are entitled to that.  But as

3    you said, it was legal under the bylaws.  And let me ask you

4    this.  Is the bank held liable for the acts of its employees?

5    A.   Yes, sir.

6    Q.   And as a Board member, did you ever deal with

7    lawsuits where somebody screwed up, and despite the fact that

8    one person made a mistake, the bank is still held liable?

9    A.   Not until 2021.

10   Q.   Okay.  But just in general, you are generally

11   familiar with that concept, right?

12   A.   Sure.

13   Q.   So if Russell made a mistake with regard to the

14   $680,000, 1.325 Badger dollar figures, why wouldn't the bank

15   be liable for the act of their employee?

16   A.   Why wouldn't the bank be liable?

17   Q.   Yeah.  If an employee screws up, the bank can be on

18   the hook, right?

19   A.   Yes, sir.

20   Q.   Okay.  And that would apply to a CEO as well,

21   wouldn't it?

22   A.   Yes, sir.

23   Q.   And as CEO, he has the authority to enter into

24   settlement agreements and settle lawsuits, and if the

25   exposure was potentially $1.325 million before you get to

1  anything else and he settles for $680,000, isn't that a

2  pretty good deal for that situation?

3  　　　A.　　Sir, we had so little information about what that

4  payment was, there was no telling whether it was a good deal

5  or not.

6  　　　Q.　　Right.  And that's why the bylaws provide this kind

7  of discretion for somebody like a CEO to act unilaterally at

8  times where they need to be able to just make decisions and

9  move forward.

10  　　　A.　　If Russell was acting in a manner to protect himself

11  as opposed to protecting the bank, I don't know where the

12  bylaws come into play.

13  　　　Q.　　Well, did he hide his involvement in this at all?

14  　　　A.　　Yes.

15  　　　Q.　　How?

16  　　　A.　　There was absolutely no transparency.  I mean, in

17  the e-mail he said hopefully there are no others.

18  　　　Q.　　He also said that we will discuss this in full at

19  the next Board meeting, didn't he?

20  　　　A.　　Said we will discuss it Tuesday, I believe.

21  　　　Q.　　Okay.  And he wasn't transparent about it then?

22  　　　A.　　There was no other mention of any other

23  conservatorships.  There was no other mention of loans coming

24  in and out of conservator accounts.  No, it was a lack of

25  transparency.

1    Q.   Did you talk to Russell about it?

2    A.   Yes, sir, when I asked if he had served as a

3    conservator before and he said I did it a couple of times and

4    it's no big deal.

5    Q.   Yeah.  So I think this is another interesting point.

6    So when he says a couple or just a few, there were cases that

7    involved multiple victims; isn't that right?

8    A.   Yes, sir.

9    Q.   And so when he's referring to one case, he could

10   refer to multiple people, but just refer to it as one, say,

11   the Badger case, the Plyler case?

12   A.   Sir, as a banker or a loan officer, there's a

13   responsibility to know your customer.  And if Russell was

14   lending money to Alex that wouldn't pull on a credit report,

15   that wouldn't be disclosed in loan offerings, it was just

16   terribly inappropriate.

17   Q.   Okay.  I'm still not sure what authority you are

18   relying on there.  Let me ask you this.

19   A.   You might want to ask Bank of America or Wells Fargo

20   what they would do to an employee in those conditions.

21   Q.   Are you familiar with the fact that Alex Murdaugh

22   wrote checks to Bank of America as well that were missed?

23   A.   Yes, sir.

24   Q.   Okay.  And nobody there is in trouble; is that

25   right?

1    A.    I can't speak to who's in trouble at another bank.

2    Q.    Okay.  All right.  So you said that Russell wasn't

3    transparent.  And at the time this would be fall of 2021.  So

4    as of November 3rd, would you say he wasn't being transparent

5    at that point?

6    A.    About the total involvement exposure to Alex, no.  I

7    don't think we ever had total transparency until the internal

8    investigation came out.

9    Q.    Okay.  And you didn't ask Russell what he was doing

10   to help authorities get to the bottom of this?

11   A.    I never would have assumed we would be in this

12   setting, sir.  No, I didn't ask that question.

13   Q.    Were you aware that Russell met with SLED on

14   November 8th, 2021, and provided basically all the documents

15   that are evidence in this case?

16        MS. STOUGHTON:  Objection, Your Honor.  He's

17   testifying.

18        THE COURT:  It's not in evidence.  I sustain the

19   objection.  You can ask another question about his knowledge.

20   BY MR. AUSTIN:

21   Q.    Okay.  Do you have any knowledge that Russell

22   cooperated with law enforcement?

23   A.    I know Russell met with SLED.

24   Q.    And do you know when or how many times?

25   A.    No, sir.

1      Q.   Okay.  Are you familiar with the fact that he met

2  with the FBI, SLED, U.S. Attorney's Office --

3      THE COURT:  There you go.  Sustained.  Quit

4  testifying, Mr. Austin.

5  BY MR. AUSTIN:

6      Q.   Are you familiar he met with --

7      THE COURT:  Mr. Austin, I ruled.  Don't provide

8  information through your questions.

9      MR. AUSTIN:  Okay.  Sorry.  I think I misunderstood.

10  Let me move on from that.

11  BY MR. AUSTIN:

12      Q.   So you talked about the October 31st meeting.  At

13  the November 3rd meeting, was the $680,000 check discussed?

14      A.   Yes, sir.

15      Q.   And did Russell take responsibility for writing that

16  check?

17      A.   He said he wrote the check, yes, sir.

18      Q.   Did he blame anybody else for doing it?

19      A.   No, sir.

20      Q.   Did he say, I was responsible?

21      A.   Yes, sir.

22      Q.   Okay.  So, ultimately, did the bank decide to honor

23  that agreement?

24      A.   There was never a vote.  I mean, at that point in

25  time, I mean, the money had been deposited four days prior.

1      Q.   But at the November 3rd meeting, you learned that,

2   in fact, a pause had been put on that check, didn't you?

3      A.   I was told there was a pause, but I've since learned

4   the check had already been cashed.

5      Q.   And did you ever suggest or ask that they try to get

6   that money back from PMPED?

7      A.   On the meeting of the 31st and the 3rd, we were

8   truly trying to wrap our heads around what had transpired and

9   why and what additional exposure existed.

10      Q.   So when we get to December 16th meeting, following

11   month, by that point, the Greg Harris investigation was fully

12   up and running; is that right?

13      A.   I would have to see the minutes of the meeting, but

14   Greg was engaged.

15      Q.   He was engaged at the Halloween meeting, right?

16      A.   Yes, sir.

17      Q.   He was conducting his investigation over the coming

18   weeks after that?

19      A.   Yes, sir.

20      Q.   And you said there was a lack of transparency.   I

21   still am not following where you are getting that from.   In

22   what way was Russell not being transparent about this at that

23   time?

24      A.   I mean, to me, the transparency started when the

25   Satterfield case occurred and we asked about

1    conservatorships.  We didn't directly ask, were you involved

2    with Alex.  But that information would have been helpful and

3    forthcoming.

4        Q.   Okay.

5        A.   And that was never provided.

6        Q.   So you find fault with him for not mentioning

7    conservatorships from, like, 10 years prior, even though he

8    never hid from you?  He brought all of this to the Board, did

9    he not?

10       A.   I have no recollection of him bringing all this to

11   the Board.

12       Q.   You just testified to that e-mail where he notified

13   the Board about the 680.

14       A.   That was a singular response.  You just asked me a

15   pretty broad question.

16       Q.   Okay.  And you are saying that he did not bring to

17   the Board's attention anything else?

18       A.   Not from the onset of the full exposure and

19   involvement with Alex.

20       Q.   Okay.  Because that took some time to put together,

21   didn't it?

22       A.   On an individual basis?

23       Q.   Sure.

24       A.   Are you asking me if it would take him time?

25       Q.   Anybody.  It took Greg Harris time to put the

1    investigation together.  We are talking about transactions

2    that took place 10-plus years ago.  And wouldn't you think

3    that would take some time for somebody to track some of these

4    documents down?

5    A.   I think the documents could have taken time, but the

6    knowledge of involvement would not have taken time.

7    Q.   Okay.  And has he ever hidden his involvement in any

8    of these things?

9    A.   A lack of transparency can be conceived as hiding.

10    Q.   Okay.  So let's go to the $750,000 loan as well.

11    Again, would he not have -- sorry.  I forgot I need to ask

12    something about the 680.  Under the assent provision of the

13    bylaws, the first one we read, did anybody submit a written

14    dissent with regard to the $680,000 check?

15    A.   No, sir.

16    Q.   Okay.  And so under the bylaws, the presumption is

17    that they assented to it; is that right?

18    A.   I mean, we never discussed it.  I mean, we were

19    trying to figure out what the check was for.

20    Q.   Okay.  But if you had problems with it, you didn't

21    think to just put it in writing, according to the bylaws you

22    are familiar with as a Board member, and ask that a stop

23    payment be issued?

24    A.   I don't know how we would stop payment on a check

25    that had been cashed, but if that was the process you are

1    suggesting we should have followed.

2        Q.   Do you know where that money is currently located?

3        A.   No, sir.

4        Q.   Okay.  Are you aware that -- well, I don't want to

5    go into that.

6             Let's go to the $750,000 loan.  So for the same

7    reasons that Russell would have had the authority under the

8    bylaws with regard to the $680,000, wouldn't he also have

9    that authority to approve the $750,000 loan?

10       A.   He would have the authority, but if his account was

11   overdrawn by 400,000 -- and he never told the Board where the

12   money was going.

13       Q.   Does he have any obligation to tell the Board where

14   the money is going?

15       A.   I think he had an obligation to his family, yes,

16   sir.

17       Q.   He has an obligation to his family.  Let's talk

18   about this on the bylaws side.  Is there any bylaw saying

19   that he had to let the whole Board know about a loan that he

20   entered into with his dad and his sister as three-fourths of

21   the Executive Committee?

22       A.   No, sir.

23       Q.   Okay.  And do you know when the process of getting

24   that loan up and running began?

25       A.   No, sir.

1    Q.   Okay.  What's your -- do you have any general

2  understanding of when that process began?

3    A.   Sometime before the check was issued.

4    Q.   Okay.  Well, we are talking about the $750,000 here.

5  So when the loan was approved?

6    A.   No, sir.  I remember we were in a Board meeting and

7  there was a question about it and we couldn't find it on the

8  system.

9    Q.   Who is Charles Laffitte?

10   A.   Russell's brother.

11   Q.   So there's Charlie, the dad, the chairman, and

12 Charles, what does he do at the bank?

13   A.   Handles the appraisal work.

14   Q.   Okay.  And are you aware that he was working on an

15 appraisal during that time?

16   A.   No, sir.

17   Q.   Did you ever ask him?

18   A.   No, sir.

19   Q.   And so did you know that an appraisal was scheduled

20 to be conducted on --

21       MS. STOUGHTON:  Objection.  He said he doesn't know

22 and now we are testifying.

23       THE COURT:  You are testifying again, Mr. Austin.

24       MR. AUSTIN:  Sorry, Your Honor.

25 BY MR. AUSTIN:

1      Q.   What responsibilities do loan officers have to

2  monitor how loan proceeds are spent?

3      A.   I mean, they underwrite the risk.  They evaluate the

4  collateral.  And they make a decision, either issue a loan or

5  not.

6      Q.   But once the loan is actually funded and the

7  customer is technically in possession of the money, it's

8  theirs, does a loan officer have to just follow up and make

9  sure that they are spending the money for the stated purpose?

10     A.   I mean, that's the way it's worked in other

11  institutions I've banked with.

12     Q.   They follow up on how you are spending the money?

13     A.   If you take a construction loan, you have draws

14  coming off of it, and they would look at the plans and

15  evaluate what the stated purpose of the loan is for.

16     Q.   Construction loan is a little bit different, isn't

17  it?

18     A.   This was a renovation.

19     Q.   Okay.  But he didn't get a construction loan, did

20  he?

21     A.   I'm not sure what the nature of the loan was.

22     Q.   Okay.  But set construction loans aside.  Normal

23  loan procedure, is there any obligation on a loan officer to

24  follow the money and make sure it's being used for the

25  purpose stated in the original loan application?

1  A. I am not certain.

2  Q. Okay.  So when you say that Russell should have been

3 monitoring how the $750,000 was spent, where do you get that

4 authority for that statement?

5  A. Well, if he told us the loan was for renovation on a

6 beach house, and he had wired $350,000 to an attorney and he

7 used 400,000 to cover overdrafts, that's not a forthright and

8 truthful representation of what the loan was for.  I don't

9 know what his responsibility is by law or by the bylaws.  But

10 he told us, his family, his shareholders, his Board, that it

11 was for one purpose when, in fact, it was not.

12  Q. But Charlie, the chairman, he was completely onBoard

13 with making that loan.  He defended it at the Board meeting,

14 didn't he?

15  A. He said he would loan him the money again tomorrow.

16  Q. Okay.  And so based on that, does it sound like they

17 discussed the loan and thought it was a good idea?

18  A. They were supportive of the loan.

19  Q. And you are not a banker, are you?

20  A. We covered that.

21  Q. Okay.  So you are saying that Charlie -- how old is

22 Charlie now, in his 80s?

23  A. I think he's 83.

24  Q. He's been working in banks his entire life?

25  A. Yes, sir.

1    Q.   You are saying your judgment is better than his how

2    to handle this loan?

3         MS. STOUGHTON:  Objection.

4         THE COURT:  That's improper.  Sustained.

5    BY MR. AUSTIN:

6    Q.   And do you know if there are times, just in general,

7    when -- you have to approve every loan over $25,000 -- you

8    have to review it, I should say, at every Board meeting; is

9    that right?

10   A.   Yes, sir.

11   Q.   Okay.  And does anybody check to make sure or bring

12   up whether or not the proceeds are being handled for the

13   reasons that they listed in the original loan application?

14   A.   We assume that what's presented is factual and

15   verified through the bank.

16   Q.   Have you ever gotten a loan and not spent all of it

17   on the stated purpose upfront?

18   A.   Have I ever gotten a loan -- can you repeat that?

19   Q.   Are you familiar with any situations, like with a

20   home equity line of credit, where somebody has not used all

21   of that entire line of credit for whatever the original

22   purpose is?

23   A.   Well, normally, on home equity line, you just have a

24   cash line, essentially, against the equity in your home that

25   you can use for discretionary purposes.  That's a broader

1  loan than borrowing money for a house and do something

2  different with it.

3    Q.   And despite the fact that there's an appraisal in

4  the works, did Charlie say that Alex came to him about this

5  loan?

6         MS. STOUGHTON:  Objection.  Hearsay.

7         MR. AUSTIN:  I could rephrase that.

8         THE COURT:  Yeah.  Sustained.

9  BY MR. AUSTIN:

10    Q.   Was Charlie surprised by how the money --

11         MS. STOUGHTON:  Objection.

12         THE COURT:  How somebody else is surprised is an

13  inappropriate question.  Sustained.

14  BY MR. AUSTIN:

15    Q.   According to your testimony, Charlie was in favor of

16  the loan; is that right?

17         MS. STOUGHTON:  Objection.  It's speculation and

18  it's hearsay.

19         THE COURT:  No, he can testify to that.

20         THE WITNESS:  He was supportive of Alex.

21  BY MR. AUSTIN:

22    Q.   Okay.  And you mentioned something about funds going

23  to a lawyer?

24    A.   Yes, sir.

25    Q.   And what's your understanding of the funds that went

1   to a lawyer?

2      A.   It was A $350,000 wire.

3      Q.   Did Charlie offer any explanations of that?

4      A.   Never discussed.

5      Q.   Despite the fact that you disagree with how that

6   loan was ultimately used, whether it's proper, Charlie and

7   Russell and Gray still had the authority to make it; isn't

8   that right?

9      A.   I don't take issue -- I take more of an issue with

10  what was shared the purpose of the loan was and the absence

11  of transparency about the transaction.

12      Q.   Have you gone back and looked at any other loans

13  since this made by anybody to see if they've used the funds

14  for a different purpose?

15         MS. STOUGHTON:  Objection.  Relevance.

16         THE COURT:  Overruled.  He can answer the question

17  if he knows.

18         THE WITNESS:  I function in a supervisory role as a

19  Board member, not day-to-day transactions of the bank.

20  BY MR. AUSTIN:

21      Q.   Now, did you take part in a retreat in 2020, the

22  leadership of Palmetto State Bank, the whole Board?

23      A.   Yes, sir.

24      Q.   And was there a consultant that came and spoke with

25  the Board?

1   A.   Yes, sir.

2   Q.   And at that time, were people polled about

3   potentially selling Palmetto State Bank?

4   A.   Yes, sir.

5   Q.   And how did that break down?  How many people on the

6   Board were in favor of selling as opposed to not, just

7   ballpark?  I know it's been a while.

8   A.   I don't think anybody was in favor.  What we were

9   trying to do was explore what the strategic plan for the

10  institution would be.

11  Q.   Okay.  And would that include getting it evaluated

12  in order to determine whether it could be purchased at some

13  point?

14  A.   We did not get it valued.  There was not a valuation

15  performed.  But if there was interest in selling the bank,

16  you would have to have a valuation.

17  Q.   Is there interest in selling the bank right now?

18  A.   No, sir.

19  Q.   Okay.  And are you familiar with the Loan Repurchase

20  Program?

21  A.   Yes, sir.

22  Q.   And when was that put in place?

23  A.   Couple of years ago maybe.

24  Q.   And was it suspended at any point?

25  A.   Yes, sir.

1     Q.    When was that?

2     A.    When all the legal matters began, any of us on the

3     Board would be conflicted.

4     Q.    What do you mean by that?  I'm not sure I'm

5     following.

6     A.    I mean, if we are in the middle of various legal

7     matters that weren't public, wouldn't be proper for anybody

8     to sell their shares back to the bank in the middle of that.

9     Q.    Is that just for somebody that's not -- I am not a

10    banker either.  Would that be considered insider trading?

11          MS. STOUGHTON:  Objection.  It's a legal opinion.

12          THE COURT:  If he knows.

13          THE WITNESS:  I just think the optics are poor;

14    could be.

15    BY MR. AUSTIN:

16    Q.    And to your knowledge, has anybody sold any stocks

17    since then, since the suspension of the program?

18    A.    Not to my knowledge.

19    Q.    Okay.

20    A.    Not back to the bank.

21    Q.    Not back to the bank.  Okay.  And you haven't

22    discussed sales of stock by any Board members or their family

23    members back to the bank since December 2021?

24    A.    I don't think so.

25    Q.    Okay.

1    A.   Is there a specific question or instance?

2    Q.   I think I can move on from that.  After the retreat,

3    did you speak with Charlie Laffitte at all about the prospect

4    of selling the bank?

5    A.   I can't remember.

6    Q.   Do you remember if he wrote any letters to the

7    Board?

8         MS. STOUGHTON:  Objection.  His letters would be

9    hearsay.

10        MR. AUSTIN:  I didn't ask what they say.

11        THE COURT:  I'm struggling with the relevance of

12   this.  We've got to stay on the case.  Whether the bank is

13   going to be sold or not, unless you can link up why that's

14   relevant --

15        MR. AUSTIN:  It's going to take us awhile.

16        THE COURT:  Well, you need to lay a foundation for

17   it.  Right now, I sustain the objection.  It's just not

18   relevant.

19   BY MR. AUSTIN:

20   Q.   Are there members of the Board that are

21   interested -- that would never want to sell the bank, to your

22   knowledge?

23   A.   Never is an awful long time.

24   Q.   What's your understanding of Russell, Charlie, Gray,

25   and Charles's intention for the bank?  Do they want to sell?

1    A.   I would think not.

2    Q.   And they all work at the bank; isn't that right?

3    A.   Yes, sir.

4    Q.   And amongst the rest of the Board members, only Jan

5 works at the bank; is that correct?

6    A.   That's correct, yes, sir.

7    Q.   Nobody else works in banks at all?

8    A.   No, sir.

9    Q.   All right.  And can you go through to the Board

10 members and tell me how old they are?

11    MS. STOUGHTON:  Objection.

12    THE COURT:  I'm struggling with relevance.  Let's

13 stay on the facts of this case.  I sustain the objection.

14    MR. AUSTIN:  Beg the Court's indulgence.

15 BY MR. AUSTIN:

16    Q.   Are you familiar with Credit Leader?

17    A.   Yes, sir.

18    Q.   And what's the purpose of Credit Leader?

19    A.   We review it in our Board meetings.  It's part of

20 the packet we receive.

21    Q.   Okay.  And is it fair to say that it leaves

22 additional fingerprints or breadcrumbs for any actions people

23 take at the bank when they log into that system?

24    A.   I would not know that.

25    Q.   Okay.  Do you know who's responsible for putting

1     that system in place?

2          A.   No, sir.

3          Q.   Okay.

4               MR. AUSTIN:  Beg the Court's indulgence.  Thank you.

5     I don't have any other questions.  Appreciate it.

6               THE COURT:  Redirect by the Government.

7                         REDIRECT EXAMINATION

8     BY MS. STOUGHTON:

9          Q.   Mr. Laffitte, I just have a few follow-up questions

10    for you, particularly as it relates to the bank's bylaws.

11              MS. STOUGHTON:  Could we pull up Government's

12    Exhibit 65, please, which is already in evidence.  Crystal,

13    I'm not sure the screen is on.

14              Do you want me to try the Elmo?

15              THE COURT:  Let's do the Elmo.

16    BY MS. STOUGHTON:

17         Q.   All right.  This is Government's Exhibit 65.  Mr.

18    Laffitte, could you read Section 3.01 of the bylaws to the

19    jury, please.

20         A.   Authority.  The Board of Directors shall have

21    ultimate authority --

22              MS. STOUGHTON:  It looks like the jury can't see

23    this.

24              THE COURT:  It's popping up now.  Good.  Thank you.

25         Q.   3.01, please.

1    A.    Authority.  The Board of Directors shall have

2    ultimate authority over the conduct and management of the

3    business and affairs of the corporation.

4    Q.    Is that consistent with your understanding of the

5    role that the Board of Directors plays in managing the bank?

6    A.    Yes, ma'am.

7    Q.    All right.  This is Section 4.03 of the same bylaws.

8    Could you read that first sentence to the jury, please?

9    A.    Chief executive officer, the CEO, shall be the chief

10   executive officer of the corporation and subject to the

11   authority of the Board of Directors, shall manage the

12   business and affairs of the corporation.

13   Q.    Subject to the authority of the Board of Directors,

14   is that consistent with your understanding as a Board member

15   of the Board's role in managing the bank?

16   A.    Yes, ma'am.

17   Q.    All right.  3.19, this one is a little lengthy, so I

18   will give you a minute to review it, if you don't mind.

19   Okay.  Could you read the sentence I'm marking off to the

20   jury, please.

21   A.    Each committee may also take action without a

22   meeting by consent as to such matters and in accordance with

23   such requirements and procedures authorized by the act for

24   director action.

25   Q.    What about the next sentence?

1    A.    Unless otherwise permitted by the act for director

2    actions, such consent must be signed by all of the

3    committee's voting members.

4    Q.    So this is talking about a committee taking action

5    without a meeting.  And you just read it requires the consent

6    of all of the committee's voting members.  Is that consistent

7    with your understanding of how the Board and its committees

8    should be operating?

9    A.    Yes, ma'am.

10    Q.    Mr. Austin asked you about Section 3.16 of the

11    bylaws with respect to the Executive Committee.  And you read

12    for the jury that the Executive Committee has authority to

13    settle legal proceedings.  Do you recall that?

14    A.    Yes, ma'am.

15    Q.    I'm going to show you Government's Exhibit 13, which

16    is already in evidence.  Bear with me a second because it

17    might take me a second to make it big enough for you to read.

18         All right.  At the bottom here is an e-mail from

19    Russell on October 29th, 2021, to the Board.  Could you read

20    this e-mail to the jury, please?

21    A.    Attorneys were informed but not consulted.  They

22    were consulted by phone, so nothing to share.  This is not a

23    lawsuit issue.  It is a banking issue for us converting

24    checks.

25    Q.    Russell says, this is not a lawsuit issue.  Did

1  Russell tell the Board that there was a lawsuit related to

2  this $680,000 payment?

3      A.   No, ma'am.

4      Q.   Was there a lawsuit related to this $680,000 payment

5  at that time?

6      A.   No, ma'am.

7      Q.   All right.  Section 3.15, this is another one that

8  you reviewed with Mr. Austin, presumption of assent.  It

9  says:  A director who's present at a meeting of the Board at

10  which action on any corporate matter is taken shall be

11  presumed to have assented to the action unless such

12  director's dissent shall be entered in the minutes of the

13  meeting or unless such director shall file such director's

14  written dissent to such action with the person acting as the

15  secretary of the meeting.

16         Did the Board of Directors vote to approve the

17  $750,000 loan?

18      A.   No, ma'am.

19      Q.   So was there any vote for you to dissent from?

20      A.   No, ma'am.

21      Q.   Did the Board of Directors ever vote to approve the

22  $680,000 payment to PMPED?

23      A.   No, ma'am.

24      Q.   So was there a vote for you to dissent from?

25      A.   No, ma'am.

1    MS. STOUGHTON:  All right.  Thank you, Mr. Laffitte.

2  Those are all the questions I have.

3    THE COURT:  Very good.  You may step down, sir.

4    MS. STOUGHTON:  I believe that Mr. Laffitte is on

5  the defense's witness list as well.

6    THE COURT:  Is he relieved?

7    MR. AUSTIN:  Yes, sir.

8    THE COURT:  Thank you.  You may leave.  I think this

9  is a good time -- well, it's only three o'clock.  Let's go --

10  call your next witness

11    MS. LIMEHOUSE:  The Government calls Lucius

12  Laffitte.

13    THE COURT DEPUTY:  Please state your full name.

14    THE WITNESS:  Henry Lucius Laffitte Jr.

15            HENRY LUCIUS LAFFITTE JR.,

16      having been duly sworn, testifies as follows:

17                DIRECT EXAMINATION

18  BY MS. LIMEHOUSE:

19    Q.   Mr. Laffitte, you said your name is Henry Lucius

20  Laffitte; is that right?

21    A.   Yes, ma'am.

22    Q.   You go by Lucius?

23    A.   I do.

24    Q.   Where are you from?

25    A.   I grew up in Allendale, South Carolina.  Currently

1    reside in Beaufort, South Carolina.

2         Q.   And what do you do for a living?

3         A.   I'm a medical doctor, family medicine.

4         Q.   The jury has heard from lots of Laffittes.  Please

5    tell them where you fit into the Laffitte family.

6         A.   Probably the youngest of a third generation of

7    the --

8         Q.   Please remove your mask.

9         A.   The youngest of the third generation of the family

10   members that you've heard about.  First cousin to Charlie,

11   second cousin to Russell, Charles and Gray.

12        Q.   Are you also on the Board of the Palmetto State

13   Bank?

14        A.   Yes, I am.

15        Q.   Tell us when you began on the Board.

16        A.   I started with the sister bank, the Carolina

17   Commercial Bank, in the fall of 1993 in Allendale.

18        Q.   So when did the banks merge?

19        A.   The banks merged with Exchange Bank, Carolina

20   Commercial, and the Palmetto State Bank in 2007.

21        Q.   So you've been a Board member for nearly --

22        A.   Almost 30 years.

23        Q.   Okay.  But no banking experience, just a medical

24   doctor; is that right?

25        A.   I'm sorry?

1    Q.    No banking experience, just a medical doctor?

2    A.    I did have the pleasure of working in the bank one

3    summer after my freshman year at The Citadel.

4    Q.    Sounds like you all don't come back after that one

5    summer.  So the jury has heard a lot about Alex Murdaugh and

6    a lot about the summer and the fall of 2021.  Just describe

7    to them from your perspective what was happening with the

8    bank in the fall of 2021?

9    A.    In September of 2021?

10   Q.    Yes.  Yes.

11   A.    That was at a time when we served -- the Palmetto

12   State Bank was served a lawsuit that was involving an

13   employee of the bank at that time.

14   Q.    And that was Chad Westendorf?

15   A.    Mr. Chad Westendorf, who apparently was acting

16   independently as a personal representative for the

17   Satterfields.

18   Q.    Did the bank have a fiduciary program at the time?

19   A.    We have never had a fiduciary program that I'm aware

20   of in my 29 years.

21   Q.    So prior to September 2021, were you aware of any

22   bank employees or executives serving as a personal

23   representative or conservator?

24   A.    No, ma'am, I was not.

25   Q.    So y'all were served with a lawsuit, and you learned

1  of this employee serving as a personal representative.  What

2  questions did you have?

3      A.   Well, we had lots of questions.  We actually had an

4  emergency meeting on a Sunday night, the first time in the

5  30-year history that I can remember, to acquire, basically,

6  legal counsel.

7      Q.   So after y'all retained counsel to assess the bank's

8  civil liability, what did you learn?

9      A.   On that Sunday night?

10     Q.   No, from a member of the public.

11     A.   I'm sorry.  So shortly afterwards, I was approached

12 by a friend in the community who had indicated that he was

13 certainly sorry for the publicity and the name in the paper.

14 And he had basically indicated that he was sorry.  And I

15 said, I appreciate that, but, fortunately, we don't have a

16 department, a trust department that deals with that, I think

17 the bank is going to be fine, that this was a unilateral

18 decision by the employee who was working basically on the

19 side of his job to do that.

20     Q.   So what did he express to you?

21     A.   He indicated that he wasn't sure how to really say

22 it, but I might would like to ask, that he had information to

23 me at that point that perhaps a Laffitte from the Hampton

24 bank was involved with a fiduciary relationship with someone

25 else other than the Satterfields.

1    Q.   So this person told you that there may be a Laffitte

2   from the Hampton branch who was, in fact, involved in a case?

3    A.   That's correct.

4    Q.   Did he mention any names?

5    A.   Just the last name Laffitte, fairly tall, white

6   male, branch of Hampton.

7    Q.   And did he mention anybody who was the person who

8   was serving as a conservator for?

9    A.   Yes, he did.

10        MR. AUSTIN:  Your Honor, we object.  This is all

11   hearsay.

12        MS. LIMEHOUSE:  It's not offered for the truth of

13   the matter.

14        THE COURT:  As I understand, it's not offered for

15   the truth, but the basis for what he then does.

16        MS. LIMEHOUSE:  That's correct, Your Honor.

17        THE COURT:  Overruled.

18   BY MS. LIMEHOUSE:

19    Q.   So a member of the public tells you that he believes

20   a Laffitte from the Hampton branch, tall, white male, served

21   as a conservator?

22    A.   That's correct.

23    Q.   Did he tell you who this person was that he served

24   as conservator for?

25    A.   Only the name.

1    Q.   And what was the name?

2    A.   Mr. Hakeem Pinckney.

3    Q.   So this is about September 2021?

4    A.   Yes.

5    Q.   What did you do with that information?

6    A.   Well, at the next -- it was the third Tuesday.  It

7    was after the Sunday meeting.  At the bank Board meeting, I

8    asked everybody in the room that, has anybody been a

9    fiduciary of some sort, whether it be a personal

10   representative, a conservator, or power of attorney.  And I

11   started with Charlie, who had indicated that he had been

12   remotely once.  He couldn't remember, it took a lot of time

13   and a lot of effort, he would never do it again.

14        Going down the road, Russell was the next one.  And

15   he indicated that he had done one or two, maybe a couple,

16   could not remember, been so long ago.

17        And then his brother, Charles, is the only other

18   Laffitte banker that fit that description.  I asked Charles

19   the same.  None of them had indicated that they had ever been

20   a fiduciary to Mr. Hakeem Pinckney.

21   Q.   So you mentioned the name Hakeem Pinckney?

22   A.   Yes.

23   Q.   What was Russell's response when you asked about

24   Hakeem Pinckney?

25   A.   When I asked again, he made a rhetorical question to

1    his sister, Gray Henderson:  Is that the guy from Yemassee?

2        Q.   Did he indicate that he had served as conservator

3    for Hakeem Pinckney?

4        A.   All of them had indicated they had not served for

5    Mr. Hakeem Pinckney.

6        Q.   So you have this information from someone in the

7    public who has told you that a Laffitte at the Hampton branch

8    served as a conservator for Hakeem Pinckney And now you've

9    been told by Russell that he did not serve as a conservator

10   for Hakeem Pinckney.  What did you do with that information?

11       A.   Not just Russell, but Charlie and Charles as well.

12       Q.   So what did you do?

13       A.   It was a little bit conflicting.  If that was the

14   case, perhaps it might have been one or two that he was

15   talking about, because I think Mr. Hakeem Pinckney also had a

16   relative involved with the crash.  And I was no way

17   insinuating that he had done anything wrong if he had been a

18   personal representative.  Even though our bank bylaws or the

19   handbook certainly says it's preferred not to do that, he

20   certainly could have done that.  And I was in no way

21   insinuating that he had been and had done anything wrong.

22   But it certainly piqued my interest when a few weeks later we

23   get another emergency meeting on another Sunday night, the

24   second time in at least a month, for 30 years, we've never

25   had that, with another potential settlement where Russell or

1    anybody from the bank was involved.

2        Q.   So what did you do to gain more information about

3    this Hakeem Pinckney situation?

4        A.   Well, I was able to look up the public record, the

5    southcarolinacourts.org.  And I searched for Mr. Hakeem

6    Pinckney until I found in the record where the gentleman who

7    had given me the information name was on the actual chart.

8    And Russell Laffitte was listed, along with several other

9    attorneys.  But at that point, it still did not mean anything

10   to me other than --

11       Q.   You are a doctor.

12       A.   -- potentially that he had been a personal

13   representative and he may have forgotten or may have not, but

14   we needed to track this down.

15       Q.   So what did you do with that information you found

16   on the public record?

17       A.   On the October, the Halloween night meeting is when

18   we had an emergency meeting.  And we had a set of lawyers

19   that said that's not their wheelhouse, this is an issue that

20   we need additional attorneys.  And we hired an investigative

21   team and an attorney from the FDIC.  And that information was

22   given to the bank president at the time.  It was e-mailed to

23   the present attorneys that we had.  And it was given to the

24   investigative attorney, I think within 48 hours of his

25   arrival on the scene.

1    Q.   So you took the information you found on the public

2    record and you shared it with the attorneys y'all had

3    retained to assess the liability and conduct an internal

4    investigation?

5    A.   Well, I gave it to the original attorneys who were

6    involved with the Satterfields.  And at the next meeting, the

7    emergency meeting, we hired the group because the original

8    attorneys said they were not criminal attorneys, we needed to

9    get expertise in that field, along with the FDIC attorney.

10   Q.   So a few months after you all retained counsel, was

11   there a vote to remove Russell?

12   A.   Yes, there was.

13   Q.   Was it a unanimous vote?

14   A.   It was not unanimous.

15   Q.   Who voted no?

16   A.   His father and his brother.

17   Q.   And who abstained?

18   A.   His sister, Gray.

19   Q.   How did you vote?

20   A.   I voted to fire him.

21   Q.   And why?

22   A.   I voted to fire Russell because I felt that he --

23   not that I felt, that he was intentionally deceptive.  He was

24   dishonest.  He had converted checks through a stolen

25   settlement.  He was not forthcoming and apparent.  He

1  actually partially obstructed the investigative team by not

2  fully cooperating.  He failed in his fiduciary relationship

3  with the Board and the stockholders.  At that point, as a

4  cousin that loved him very much, I did not fire him because

5  of his actions that may have been embarrassing to the family,

6  it's our name, I fired him because I had a fiduciary

7  relationship to the Palmetto State Bank that his grandfather,

8  that his great-grandfather and his father, integrity

9  throughout their life that had run that bank.

10             MS. LIMEHOUSE:  No further questions, Your Honor.

11             THE COURT:  Cross-examination

12                         CROSS-EXAMINATION

13  BY MR. AUSTIN:

14     Q.   Good afternoon.

15     A.   Good afternoon.

16     Q.   My name is Matt Austin.  I represent Russell.  While

17  I get myself set up here, to follow correctly, you are a

18  physician?

19     A.   That is correct.

20     Q.   Okay.  And aside from minor jobs, you never really

21  worked in a bank as a full-time career?

22     A.   No, sir, I have not.

23     Q.   How do you do your role on the Board in comparison

24  to the Board members who are actually working at the bank and

25  are career bankers?

A.   I think all of us on the Board share the same
responsibility, that we are to uphold the corporate
governances, that we are to implement policies and
procedures.  And my role is to see that we vote to put the
employees, the executive bankers, in a position to run the
bank.  I'm a medical doctor on the Board.  I am not in the
day-to-day -- I don't do credit loans.  I don't do credit
checks and make loans.  My job is to make sure that the
policies are carried out.  And I look at it as somewhat like
a barn owl.  An owl has senses of sight and hearing.  I don't
make a lot of noise at the barn -- at the Board meetings,
because my job is not to be in the face of the executives.
They have their job to do.  But if something goes across the
line that I think is not right, I can use the sharp talon to
point to that deficit and say, we need correction, or we need
change.  And that's how I foresee my Board.

Q.   That's a good description.  So as a Board member,
are you familiar with the bylaws of Palmetto State Bank?

A.   Fairly familiar.  I don't have them memorized, but
we have been through several sections over the last 30 years.

Q.   And how long have you been on the Board again?

A.   I started with the Carolina Commercial Bank in the
fall of 1993.

Q.   And that's separate from --

A.   That was a sister bank that also merged with the

1    Exchange Bank in Estill to form a larger Palmetto State Bank
2    in the year 2007.
3         Q.   Got you.  It's hard to keep track of the different
4    mergers that happened.  Since you've been on the Board, how
5    would you say the bank has done performance-wise?
6         A.   Exceptionally well.  Charlie, his brother, my uncle,
7    his son, they have run an exceptionally good bank.
8         Q.   And what do you attribute that to?
9         A.   Well, they follow the corporate bylaws and
10   procedures that we had delegated to them.  And they were
11   profitable, I think, in most years that I've been on the
12   Board.
13        Q.   The bank was voted number one in South Carolina at
14   some point, right?
15        A.   I think there are different categories.  We did make
16   one.  I'm not sure exactly what, if that was in the
17   efficiency rating or overall rating.  But they have done an
18   exceptionally great job.  And I'm so proud of them.
19        Q.   What's the end result of that?  Does that mean more
20   money for the shareholders?
21        A.   Yes.
22        Q.   Okay.  And would you say that Russell has been a big
23   part of that success?
24        A.   Russell has been instrumental in the last decade, I
25   would say, as his role at the Hampton bank.

1    Q.   As a Board member, are you familiar with the

2    profitability of the different branches of Palmetto State

3    Bank?

4    A.   Absolutely.

5    Q.   Okay.  And are you familiar with the fact that

6    Hampton is generally the best performer?

7    A.   That is our -- they are the main bank in the system,

8    yes.

9    Q.   Where are the other branches?

10   A.   We have one in Allendale, in Fairfax, Estill,

11   Burton, Ladies Island, and Bluffton.

12   Q.   Okay.  And Ladies Island, is that basically --

13   A.   Beaufort.

14   Q.   Beaufort.  Okay.  And Hampton County is an

15   economically distressed county; isn't that right?

16   A.   For the past several years it's been heading that

17   direction, I would say.

18   Q.   I mean, there's not a lot of industry in Hampton; is

19   that fair to say?

20   A.   I would say that's -- I don't live in Hampton.  I go

21   to meetings, but I would definitely say that it's not as

22   vibrant as Bluffton, Beaufort.

23   Q.   Okay.  So despite all of that success during that

24   time -- well, I guess, let me rephrase that.  Hampton has

25   been doing better than Beaufort and every other branch.  And

1  Beaufort, I say Ladies Island, but do you attribute that

2  success to Russell?

3  A.  I do not.  I think if you look at even the Allendale

4  branch, which is probably the most impoverished county in the

5  state, I think that branch has done successfully through the

6  years.  So I can't attribute it to just one individual.

7  Q.  Well, in part, would you say that Russell has tried

8  to help the bank during this time?

9  A.  Russell has tried to help the bank.  His father and

10  his sister and his brother had been outstanding bankers.

11  Q.  Dedicated to making sure the bank succeeds?

12  A.  That is correct.

13  Q.  Okay.  And have you been happy -- until this

14  situation, have you been happy with his service as CEO?

15  A.  Yes.  I'm sorry, sir.  Until which situation?

16  Q.  Until what brought us here today, until everything

17  about Alex Murdaugh came out in the fall of 2021?

18  A.  Yes.  It was in July, September, August, I think.

19  That would be the time frame that I think that we would be

20  talking about.

21  Q.  When did you all ultimately fire Russell?

22  A.  January of 2022.

23  Q.  Okay.  January 7th, does that sound right?

24  A.  I don't have the exact date with minutes.

25  Q.  Some time in January.  And when would you say that

1  you hired Greg Harris to do the internal investigation?

2     A.   Halloween night, Game 5, World Series, Sunday at

3  eight o'clock.

4     Q.   So stands out a little bit?

5     A.   Yes, it did.

6     Q.   So if I'm getting this timeline right, Greg Harris

7  and an investigative team is hired?

8     A.   We started a Litigation Committee formed with

9  several members on the Board.  And it's my understanding Mr.

10  B.T. Atkins, who is also an expert in the FDIC era realm of

11  this department, was also hired and engaged that night.

12    Q.   And based on their work, starting October 31st, by

13  January 7th --

14         MS. LIMEHOUSE:  Objection, Your Honor.  May we

15  approach briefly?

16         THE COURT:  You may.

17         (Whereupon, the following bench conference takes

18  place.):

19         MS. LIMEHOUSE:  I didn't want to do a speaking

20  objection.

21         THE COURT:  That's a nice development.

22         MS. LIMEHOUSE:  We have, at the Court's very clear

23  direction, streamlined our case.  Didn't get into everything

24  with Mr. Laffitte and Board members.  He was here for a very

25  limited purpose.  I think to allow Mr. Austin to get into all

1   the things that happened that we didn't get into on direct is

2   outside the scope.

3         THE COURT:  Well, explain to me, Mr. Austin, about

4   the relevance of these questions.  Why are you going into

5   these areas?

6         MR. AUSTIN:  Our position and our defense is that

7   they rushed through the investigation, that they didn't have

8   all the facts and made bad decisions and didn't understand

9   what they were doing.  And there's a segment of the Board

10  that rallied against him and didn't operate -- they

11  misunderstood what was going on.  They didn't do their due

12  diligence.  And that has bled into every other piece of the

13  case.  The fact that he was fired has been used against him

14  over and over by the Government.  Every single person that

15  testified from the bank has testified to him being fired.

16  And that makes it look like there was this considered action

17  that he messed up in a major way.  And it completely ignores

18  the fact that he was acting in good faith, believing that he

19  operated under the bylaws and with the consent of the entire

20  Executive Committee with the exception of Jan Malinowski.

21        THE COURT:  Well, I'm just struggling how this

22  witness is going to get --

23        MR. AUSTIN:  He's part of all these decisions.

24        MS. LIMEHOUSE:  We have another Board member next

25  who is going to talk about --

1          MR. AUSTIN:  I'm not asking the Government to admit

2    any --

3          THE COURT:  I'm going to allow the question.  Let's

4    take a break.

5          (Bench conference ends.)

6          THE COURT:  Ladies and gentlemen, we will take our

7    afternoon break.

8          (Jury leaves open court at 3:22 p.m.)

9          THE COURT:  We will be at ease for about 10 minutes.

10          (Whereupon, a recess transpired.)

11          (Whereupon, the jury returns to open court at 3:35

12    p.m.)

13          THE COURT:  Please be seated.  Mr. Austin, you may

14    continue your cross-examination.

15          MR. AUSTIN:  Thank you, Your Honor.

16    BY MR. AUSTIN:

17     Q.   Dr. Laffitte, you mentioned earlier going online and

18    running a search for Hakeem Pinckney And that's sort of what,

19    I guess for lack of a better term, initiated your

20    investigation into what was going on with Russell; is that

21    right?

22     A.   Did I go online to South Carolina Courts?

23     Q.   Yes.

24     A.   Yes, I did.

25     Q.   And did you look in a particular county?

1    A.   I want to say the 14th Circuit comes to mind.  There

2    was a date, October 7th that was closed.  I assume that was

3    something in the near future that was going on that this

4    particular person had been involved with that had actually

5    given me the information.

6    Q.   Okay.  So I'm going to show you what's been marked

7    as Defendant's Exhibit 82.  This is not in evidence.

8    MR. AUSTIN:  May I approach, Your Honor?

9    THE COURT:  Have you shown it to the --

10    MR. AUSTIN:  Yes, sir.

11    MS. LIMEHOUSE:  He has, Your Honor.

12    BY MR. AUSTIN:

13    Q.   Take a look at that please and tell me, is that the

14    case that you looked up on the Supreme Court website?

15    A.   I'm sorry.  The question again, please?

16    Q.   Is that a fair and accurate representation of what

17    you saw when you looked up --

18    A.   It's in a different format from when I printed it.

19    And I actually had to do it on my cell phone because I'm a

20    solo practitioner, and I don't know how to use the actual

21    copier without other staff members doing it.  So I may have

22    cut off some of the dates.  I'm not familiar with the 4/26/10

23    date.  But I do see the person who actually had given me the

24    information listed.  And I do see other attorneys that were

25    on here as well that I recalled, but I don't know all of

them.

Q.   Okay.  Does it appear that the information is substantially similar to what you saw that day?

A.   Yes, sir.

Q.   Would you agree this is a fair and accurate representation of the case that you looked up?

A.   Yes, sir.

MR. AUSTIN:  All right.  Your Honor, I move Defendant's Exhibit 82 into evidence.

THE COURT:  Is there an objection?

MS. LIMEHOUSE:  No objection, Your Honor.

THE COURT:  Defendant's Exhibit 82 is admitted without objection.

(Defendant's Exh. 82 is received in evidence.)

BY MR. AUSTIN:

Q.   Please publish 82.  Okay.  So right there it's Russell Laffitte.

JUROR:  We don't all have it, none of us.

MR. AUSTIN:  That's all right.  We can just describe it.

THE COURT:  Okay.  Please continue, Mr. Austin.

BY MR. AUSTIN:

Q.   So when you looked this up, you saw Russell Laffitte's name to the left.  And he's listed as plaintiff; is that right?

1    A.    Under the party type it lists plaintiff.

2    Q.    And now look down below, and we see Richard

3    Alexander Murdaugh.  Is that Alex Murdaugh?

4    A.    Yes, sir.

5    Q.    Okay.  And he is listed as what?

6    A.    Plaintiff attorney.

7    Q.    Plaintiff attorney.  All right.  So based on this,

8    did you have any understanding of what Russell and Alex's

9    relationship was?

10   A.    I had no understanding about this at all other than

11   the fact that there was a potential fiduciary relationship

12   carried on possibly by a Laffitte banker from Hampton.  And

13   that was all I basically could surmise out of this.

14   Q.    And I don't want to mischaracterize it, but it

15   sounded earlier like you said that under the handbook of PSB,

16   it's not prohibited to be a fiduciary?

17   A.    Absolutely.

18   Q.    Okay.  So it's not something -- I mean, obviously,

19   there are potential downfalls or we wouldn't be here today if

20   there weren't potential downfalls.

21   A.    I just had not heard of anyone ever participating in

22   that type of activity on the clock as a banker.

23   Q.    I'm sorry?

24   A.    I had never heard of anybody in the bank working on

25   the clock doing this as a sideline job basically under the

1    auspice of the Palmetto State Bank.  I just never heard of

2    that.

3         Q.   And did you ever ask Russell about his service as a

4    conservator, PR, in any of these cases?

5         A.   Only when I specifically asked about Hakeem

6    Pinckney.

7         Q.   He didn't remember it at the time?

8         A.   At the time, he said, preface of the question, he

9    had done one or two cases, maybe a couple, it's been so long

10   ago, I can't remember.  Specifically, Mr. Hakeem Pinckney he

11   did not recall that name at all.

12        Q.   And which meeting was that?

13        A.   This was the September 3rd, Tuesday of the month,

14   after the emergency Sunday night meeting that we had to

15   acquire the attorneys.

16        Q.   So you said September 3rd --

17        A.   Not September 3rd, the third Tuesday of the month.

18        Q.   Did you mean November 3rd?

19        A.   No, sir, September 3rd.

20        Q.   Y'all just went to hire the attorneys?  Are you

21   talking about Greg Harris or Trenholm Walker?

22        A.   We had met on Sunday night prior --

23        Q.   Okay.

24        A.   -- with our regular attorneys who had been acquired

25   to help defend the Satterfield case.

1    Q.    Okay.  So September 3rd, can you --

2    A.    Not September 3rd.  The third Tuesday of the month.

3    I could look at the minutes and potentially get the right

4    date.

5    Q.    Okay.  So in that meeting, how would you describe

6    the tenor of the discussions?

7    A.    The tenor of whose discussions?

8    A.    Of the Board's discussion.  Was it pretty heated?

9    A.    Well, we were a little concerned not knowing exactly

10   what was going on, to be honest.  To meet on a Sunday night,

11   having been served a lawsuit, I would say that everybody's

12   antennas were up to find out what exactly had transpired,

13   what liability, if we had any, who gave information or

14   approval for this employee to participate in this activity.

15   I would say it was a meeting that was more spirited than

16   usual.

17   Q.    Especially considering it's all family members too,

18   there's sort of an extra filter, I guess, is the best thing,

19   right?  Family member fights is a little bit different?

20   A.    No, we were all very cordial.

21   Q.    But, nonetheless, it was a pretty heated exchange?

22   A.    I wouldn't say heated.  It was an interesting

23   conversation between who, what, when, and why, who was

24   involved, where did it happen, how long did it happen.

25   Q.    Most of these questions are directed at Russell; is

1    that right?

2        A.    You said the general tenor of the Board, I suspect,

3    would have been directed more so towards Russell.

4        Q.    What do you remember?

5        A.    I remember that he was acting CEO at the time.  And

6    so he was the head of the -- he wasn't sitting on the end,

7    but he was sitting next to the CEO -- I mean, next to the

8    Chairman of the Board.

9        Q.    Buck stops with him?  He's in charge, so he's got to

10   answer the tough questions, right?

11       A.    I'm sorry?

12       Q.    He's in charge, he's the one who's got to answer the

13   tough questions?

14       A.    He was answering tough questions.  The Board is

15   ultimately in charge.

16       Q.    Okay.  Right.  This is probably a good time to go

17   through the bylaws here.  If you could please go to -- I

18   apologize to the attorneys that have already seen this so

19   many times, but bears repeating.  If you go to Section 3.15.

20   Are you familiar with this section of the bylaws?  So does

21   this essentially say if you disagree as a Board member, you

22   need to put it in writing and submit it to the Board?

23       A.    Sir, I am not exactly sure what this paragraph says.

24       Q.    Well, let's take a look.

25       A.    I may need some time to digest it.  We've got the

1   split screen and it's pretty bold.  But I can read it to you

2   and try to take my time to interpret.  But I don't know

3   exactly what you are asking or what I'm trying to tell you.

4       Q.   Is it fair to say that if you, as the Board member,

5   are a participant in a meeting --

6       A.   If I am a Board member participating in a meeting --

7       Q.   Correct.  -- and an action is taken -- and so I'm

8   going to fast-forward to the November 3rd meeting, 2021.

9       A.   I would need a copy of that --

10      Q.   Board meeting in November 2021 to discuss the

11  $680,000 check?

12      A.   Yes.  If I could have a copy of the minutes, I might

13  be able to refresh my memory much quicker.

14      Q.   Sure.  I just want to go off your memory right now.

15  Do you remember being a part of that meeting?

16      A.   Which meeting again, sir?

17      Q.   Meeting to discuss the $680,000 check that was

18  written to PMPED.

19      A.   That was a Friday night that we met.  I'm sorry.  We

20  got e-mails about a 680 loan on a Friday evening.  And we met

21  that Sunday.  I'm not sure.  That would have been the 31st.

22  That's the Halloween night.

23      Q.   And then you all end up meeting as a full Board on

24  November 3rd.  Does that sound about familiar?

25      A.   That does sound familiar.  I don't know if I can say

1    the exact date, but it was shortly after that.

2        Q.   Do you recall discussions around that time frame --

3        A.   Again, would it be possible -- you are asking me so

4    many questions about the minutes.  Could I please see a copy

5    of these minutes?

6        Q.   Well, that would be very helpful because it's not in

7    the minutes.  Because the $680,000 check was discussed in

8    executive session; is that right?

9        A.   I would have to look at the minutes, please.

10        Q.   You don't remember.  Okay.  So did the Board ever

11    ratify or honor Russell's agreement with PMPED to negotiate

12    the $680,000 check?

13        A.   Absolutely not.

14        Q.   Okay.  And why do you say that?

15        A.   Because a ratification, in my knowledge, is an

16    official formal stamp, a vote, and discussion prior that the

17    Board and the minutes, if I do recall those minutes, have no

18    indication that we ever did that.

19        Q.   Right, because you discussed it in executive

20    session, right?  Isn't the purpose of executive session --

21        A.   We had executive session minutes where we also

22    discussed the Satterfield case that same night where Charlie

23    had made the motion and we voted on the settlement, all in

24    the Executive Committee minutes, if I recall.  If I could see

25    it, I might be able to explain it better, please.

1      Q.   Well, executive session is different from Executive

2  Committee, isn't that right?

3      A.   I'm sorry.  If I said Executive Committee, you are

4  absolutely right.  It was an executive session, but we have

5  minutes outlining our vote procedures and all of the --

6      Q.   Okay.  So you are saying that nobody ever ratified

7  that decision?

8      A.   That is --

9      Q.   Next question I have --

10         THE COURT:  Let him answer.

11         THE WITNESS:  You said we had never ratified this.

12  We did not have a vote.  There was no ratification.  There

13  was nothing that the Board ever dealt to anybody at the

14  Murdaugh law firm.  It was Russell unilaterally who made that

15  whatever agreement he made.

16  BY MR. AUSTIN:

17      Q.   And did Charlie or Gray make any comments about the

18  $680,000?

19      A.   I don't recall any comments from them at all.

20      Q.   Did you ever ask them if they consented to that

21  payment?

22      A.   I had never asked them.

23      Q.   Is it your understanding that Russell has maintained

24  that they --

25         MS. LIMEHOUSE:  Objection, Your Honor.  He's

1    testifying.

2            THE COURT:  Sustained.

3    BY MR. AUSTIN:

4        Q.   Okay.  So after that meeting on November 3rd, did

5    you ever, in compliance with Section 3.15, ask that that

6    check be withdrawn?

7        A.   Could you help me a little bit about Section 3.15?

8        Q.   Right here.  This says --

9        A.   I understand that, but I'm a medical doctor, and

10   this is where the old barn owl gets a little bit confused.

11   Owls are not the smartest one in the bunch.

12           MS. LIMEHOUSE:  Objection, Your Honor.  He said that

13   they didn't take any action.  And he's asking about him

14   writing a dissent to an action.

15           THE COURT:  I think the doctor can explain.  Go

16   ahead.

17   BY MR. AUSTIN:

18       A.   Please --

19       Q.   So if I'm understanding this section right, to file

20   dissent or to document dissent for any action taken, the

21   meeting of the Board of Directors, and there's a November 3rd

22   meeting, you would have to put it in writing and file it with

23   the Board.  Does that match up with your interpretation of

24   this section?

25       A.   I'm sorry.  I'm a little slow.

1    Q.   Did you ever file a written dissent of any kind,

2    attempt to try to oppose that $680,000 check?

3         MS. LIMEHOUSE:  Objection, Your Honor.  He's

4    assuming facts that are not in evidence.

5         MR. AUSTIN:  I asked has he ever tried to oppose it.

6         THE COURT:  Mr. Austin, this is the confusion, the

7    doctor has testified that the Board never acted.  And you are

8    asking him to -- you are asking him did he file a dissent for

9    an action that didn't occur.  That's the confusion here.

10        MR. AUSTIN:  Sure.  Okay.

11        THE COURT:  I'm going to sustain the objection as

12   just being confusing under 403.

13        MR. AUSTIN:  My apologies.  I think I can tie this

14   in.

15   BY MR. AUSTIN:

16   Q.   Let's move on to the next section covering the

17   chairman's authority.  3. -- I'm sorry, 4.02.  Now in the

18   highlighted part here, you see where it says that the

19   chairman may execute on behalf of the corporation any

20   contracts, agreements, and then there's several other

21   documents described.

22   A.   Yes, I see that.

23   Q.   Okay.  And would an agreement to settle any

24   potential claims between PMPED and the bank fall under what

25   would be considered an agreement?

1     A.    Potentially on some occasion.  This was a very

2     unique situation.

3     Q.    Okay.  But just sticking with the bylaws.

4     A.    Sticking with the bylaws and knowing that we had

5     met, that the Executive Committee was on a rabbit-hole path

6     to try to hire attorneys to defend something that really --

7     that the Board found out and said that's not the type of

8     attorney we need.  And at that point, all bets are off for

9     anybody doing anything unilaterally.  We are a team at

10    Palmetto State Bank.  We will do everything together.  And

11    Russell or anybody else is not to make any decisions of this

12    matter involving this lawsuit, not one, but potentially two

13    on the leash, until our counsel that has been hired

14    appropriately has been involved with it.

15    Q.    Is there any requirement in the bylaws that you hire

16    counsel before you can take an action like this?

17    A.    Is there any requirement in the bylaws that we hire

18    counsel?  I'm not sure about that.  But I do know at that

19    meeting we had two attorneys present on our Board with a vast

20    experience that none of us else knew.  And their

21    recommendation was to immediately hire counsel even before we

22    hired the counsel to deal with the insurance.  And so it was

23    very complicated for somebody like myself and the majority, I

24    would say everybody else on the Board, except the two

25    attorneys present.  So it was a very, very complicated

1  situation that I don't think any of the written bylaws would

2  pertain to under these circumstances.  Two meetings out of 30

3  years emergently, it was an unusual night.

4      Q.  Okay.  Did you raise these concerns you are

5  outlining right now at any of these meetings that took place

6  in the fall?

7      A.  Did I raise which concern?

8      Q.  The ones that you just outlined.

9      A.  I think the general consensus was that our lead

10  attorney would be the person who would be handling the

11  communications with the other attorneys, the media, and

12  anybody else.

13      Q.  Isn't it true that your attorney told the Board that

14  it's in the best interest of the --

15          MS. LIMEHOUSE:  Objection, Your Honor.  Privileged

16  communications.

17          MR. AUSTIN:  Impeaching him, Your Honor.

18          MS. LIMEHOUSE:  And hearsay, Your Honor.

19          THE COURT:  Let me read the question here.

20          MR. AUSTIN: Goes to the effect on the listener.

21          THE COURT:  I'm going to sustain on attorney-client

22  privilege at this point and hearsay.

23  BY MR. AUSTIN:

24      Q.  After the November 3rd meeting, you already

25  testified you did nothing to try to prevent that check from

1 being kept by PMPED; is that correct?

2  A. I'm sorry.  Are we at the November 3rd meeting?

3  Q. Correct.

4  A. Where I've asked for the Executive minutes.  I'm

5 going based on recollection.  I know we did not ratify -- we

6 did not vote on anything to do with what you are discussing,

7 but we did deal with the Satterfield case.  We have minutes.

8 I've seen them, but I don't have them in front of me, but I

9 can assure you, there's nothing else on there regarding the

10 other case.

11  Q. I jumped ahead.  If we can go back to 3.16, outline

12 of the Executive Committee authority.  Starting on the first

13 highlighted part, you see where the Executive Committee is

14 given the authority to exercise the extent permitted by

15 applicable law all the power and authority of the Board of

16 Directors?

17  A. Yes, sir.

18  Q. And that's the full authority of the Board?

19  A. That is, with exceptions.

20  Q. Sure.  And like the provision we were just talking

21 about requiring a written dissent if the Board action is

22 something you disagree with, correct?

23  A. All I indicated was that in this particular

24 situation, that the Board is in charge of the Executive

25 Committee.  The Executive Committee has their rules and

1    regulations that they are to abide by.  But under these

2    circumstances, we had indicated that our attorney would be

3    the person who would be handling it and it would supersede

4    anything that our Executive Committee minutes or our bylaws

5    or anything else had because we were working through this

6    very critical situation.

7         Q.   So you had that specific conversation?

8         A.   That was in general at the Board.

9         Q.   That's your understanding of it?

10        A.   That is my understanding of what we were doing, that

11   Russell or anybody else on the Board was not to proceed with

12   anything without the advice of counsel that we had just

13   hired.

14        Q.   Okay.  Like meet with law enforcement?

15        A.   That was something that, as I had mentioned, that

16   they were starting out.  We found out that law enforcement

17   had come to the bank.  They were investigating.  The

18   Executive Committee minutes back in that meeting that I was

19   referring to, that's how we found out.  I was on the Audit

20   Committee which found out shortly thereafter.  And our Board,

21   and we all sat down and said, this is what needs to be done

22   and this is how we are going to have to do it.

23        Q.   And during that meeting where you found out about

24   law enforcement coming to PSB, who do they meet with?

25        A.   Who did who meet with?

1    Q.   Who did law enforcement meet with at the bank?

2    A.   I don't know if you recall, I am not an employee of

3    the bank, I'm a director.  So I don't have any idea about the

4    day-to-day operations of what took place in Hampton --

5    Q.   During that discussion with the Audit Committee,

6    y'all didn't talk about what law enforcement did, who they

7    talked to, or what the focus of their investigation was?

8    A.   We did not.

9    Q.   You never found out?

10   A.   We did not discuss about the law enforcement and who

11   they met and what documents were asked.  We were under the

12   impression they were asking for millions -- not millions, but

13   hundreds of documents.

14   Q.   Okay.  And how would you form that impression?  Did

15   you talk to somebody or did somebody at the Board --

16   A.   Jan Malinowski at the time was the president of the

17   bank.  And he also sits on the Audit Committee.  He also is

18   on the Executive Committee.  And that's how the Audit

19   Committee found out about it.

20   Q.   And he's responsible for writing all Executive

21   Committee meeting minutes; isn't that right?

22   A.   I'm not sure.  I've seen his name the majority of

23   the time on the Executive Committee meeting minutes.

24   Q.   Okay.  So if he's in charge of writing Executive

25   Committee meeting minutes and something is not in there,

1 would that ultimately fall on him?

2    A.    As far as being --

3    Q.    Having correct minutes.

4    A.    For the Executive Committee?

5    Q.    Yes, sir.

6    A.    I would suspect so, yes, sir.

7    Q.    And Gray Henderson, as the secretary for the general

8 Board, has same responsibility for Board meetings?

9    A.    Yes.

10    Q.    Let's go to -- actually, before we leave this, the

11 Executive Committee has the authority here to bind the

12 corporation and defend or settle legal proceedings; is that

13 right?

14    A.    Again, sir, you are taking excerpts out of an

15 entire -- this is Section 3.16.  I think if you would go back

16 to one of the sections that the Board has ultimate authority

17 over the Executive Committee and its employees, and as I

18 indicated, this was a special circumstance.  And I think that

19 you are taking things out of context and not allowing me to

20 see the entire sections 3. whatever, .10 and everything else.

21    Q.    I am not arguing with you.

22    A.    I am not arguing either.  I'm saying it's awfully

23 difficult for me to say yes or no to something that I know is

24 not the case.

25    Q.    And I agree with you that the Board ultimately has

1  full authority over everything.  But did they ever exercise

2  that authority to prevent the $680,000 from being paid?

3      A.   So you are asking me did the Board exercise

4  authority, meaning they did some ratification?

5      Q.   Did they do anything?

6      A.   The Board never voted on the $680,000.  When I got

7  the message in my e-mail on Friday afternoon, the money was

8  already out the door.

9      Q.   Okay.  And was it your understanding there was a

10  pause put on that payment?

11      A.   I'm sorry?

12      Q.   Was it your understanding there was a pause put on

13  that payment at any point?

14      A.   Was there a pause put on the payment?

15      Q.   Yes, sir.

16      A.   I think what you are referring to is our attorney

17  was concerned about an indemnification that the Murdaugh law

18  firm would then not sue us if that money never got to the

19  other victim.  I don't know about how the pause would work,

20  but that was more of, don't let the law firm hand out the

21  money to the victim without giving us some indemnification or

22  some release in case they wanted to turn back around and sue

23  the bank --

24      Q.   Okay.

25      A.   -- in a retrade-type deal.

1   Q.   So it's your position that the $680,000 was only

2   approved by Russell?

3   A.   That was my understanding.

4   Q.   Okay.  And you never heard Charlie or Gray

5   acknowledge being a part of that vote?

6   A.   I did not --

7   Q.   Let's go to --

8   A.   -- at that particular meeting that you are

9   referencing.

10   Q.   At any meeting?

11   A.   Only have heard reference that Russell had

12   indicated --

13   MS. LIMEHOUSE:  Objection, Your Honor.

14   MR. DANIEL:  Let him answer the question.

15   THE COURT:  What's the objection?

16   MS. LIMEHOUSE:  He has testified that he never heard

17   that before.  And he's trying to get in his own defendant

18   statements --

19   THE COURT:  He's now indicating he knew something

20   and this is cross-examination.  Overruled.

21   THE WITNESS:  Are we able to go through the internal

22   investigation?  Because that's where I'm --

23   THE COURT:  Well, let's go through this.  Why don't

24   you ask the question and then I will deal with it.  What's

25   the specific question?

BY MR. AUSTIN:

Q.   I think the question was, at any point did --

THE COURT:   You asked him did he hear anyone else, right?

MR. AUSTIN:   Oh, I'm sorry.   Sorry.

THE COURT:   That's the question.   Stick with that question.

BY MR. AUSTIN:

Q.   Did you ever hear Charlie or Gray taking responsibility for this check as well?

A.   For the $680,000?

Q.   Yes.

A.   No, I did not.

Q.   Never did?   Were you present at the December 16th meeting of the Board?

A.   Would you mind, please, sharing with me the minutes of that Board?

Q.   I'm just going off memory.   Do you remember if you were there?

MS. LIMEHOUSE:   He's asked multiple times to see minutes to refresh his recollection.

BY MR. AUSTIN:

Q.   You don't remember --

THE COURT:   No.   If he doesn't remember, then you can show him the minutes.   But without the minutes -- of

1    course, Ms. Limehouse, you can show it to them on direct if

2    you'd like.  Go ahead.

3    BY MR. AUSTIN:

4        Q.   Let's go to Section 4.02.  All right.  Chairman of

5    the Board here, the highlighted part, does it say that he may

6    bond -- or may execute on the corporation's behalf any

7    contracts, agreements, notes, and the rest of those

8    documents?

9        A.   Yes.  Section 4.02, Chairman of the Board, this

10   refers to, as it indicates, other documents, instruments.  We

11   are talking about the routine day-to-day banking, let's

12   repossess someone's car or their house, and let's take back

13   their washer and dryer.  We are talking about potential

14   multi-million lawsuits in which the Board has ultimate

15   control.

16       Q.   But you are not aware of any provision in the bylaws

17   that says that there's a different way to handle those kinds

18   of situations?

19       A.   Well, I'm reading the Section 4.02 that you've

20   highlighted.

21       Q.   But you are not aware of any other section that says

22   there's a difference?

23       A.   Again, I'm sorry, sir, I am not the expert.

24       Q.   All right.  Let's move on to Section 4.03.  And,

25   again, does this give the CEO unilateral authority to execute

1   on the corporation's behalf contracts, agreements, or notes?

2   And, of course, it's all subject to the Board's ultimate

3   approval.  I'm sorry.  I meant to say "authority" there.

4         THE COURT:  Is that a question, Mr. Austin?

5   BY MR. AUSTIN:

6      Q.   Does this section give the CEO authority to settle

7   or to enter into contracts and agreements on behalf of PSB?

8      A.   Yes, it does.

9      Q.   And so despite your disagreement about unusual

10   circumstances, based on this alone, he has the authority to

11   do this unilaterally?

12      A.   Has authority --

13      Q.   $680,000 --

14      A.   -- to approve a $680,000 check?

15      Q.   Yes, sir.

16      A.   Or transfer that his son, who is the CEO --

17      Q.   We are talking about the CEO now.

18      A.   So the CEO, you are asking me do these 4.03 approve

19   for him to do that?  I would say no, considering what we

20   found out the $680,000 was about.  As any good businessman

21   would know, you have to know what the issues are before you

22   can settle it.  He had no authority to do this when it was

23   potentially, as I indicated, our attorneys said that we don't

24   handle criminal matters, we need more attorneys.

25      Q.   Okay.  Let's move on to the $750,000 loan.  When did

1  that loan first come to your attention?

2      A.    Nothing is on my screen, sir.

3      Q.    The $750,000 loan made to Alex Murdaugh that you

4  testified about earlier on direct exam --

5          MS. LIMEHOUSE:  Your Honor, I didn't ask him any

6  questions about the $750,000 --

7          THE COURT:  Sustained.

8          MR. AUSTIN:  Apologies.

9  BY MR. AUSTIN:

10     Q.    Are you familiar with a $750,000 loan that was made

11  to Alex Murdaugh by Russell and Charlie and Gray?

12     A.    I am not.

13     Q.    Okay.

14     A.    I am familiar with a payment that was made in part

15  that made up a $750,000 payment.

16     Q.    Okay.  And was it your understanding that Charlie

17  and Gray and Russell approved that transaction?

18     A.    That is not my understanding.

19     Q.    What is your understanding?

20     A.    From the beginning?

21     Q.    Yes, sir.

22     A.    May I please see the minutes that would correlate

23  the corresponding time?

24          MS. LIMEHOUSE:  Your Honor, objection.  This is

25  outside the scope of his direct.

1    THE COURT:  Well, I think the question is -- the

2  witness keeps saying he doesn't remember.  And that should be

3  sufficient unless you are going to show him something to

4  refresh his recollection.  So I'm going to sustain it on that

5  basis.

6    MR. AUSTIN:  Okay.

7  BY MR. AUSTIN:

8    Q.  Did you ever take any actions to reprimand -- until

9  he was fired in January, did you take any actions as a Board

10  member in writing to voice your dissent to the $750,000 loan?

11    A.  Would you mind restating the question again?

12    Q.  Did you ever, in writing, oppose the $750,000 loan?

13    A.  First of all, again, I'd need the minutes.  But I

14  don't recall there being -- how should I say it?  One more

15  time, please, sir.  Would you mind?

16    Q.  It's real simple.  Did you ever take any actions to

17  express your dissent in writing to the Board about the

18  $750,000 loan?

19    A.  Nothing in writing.

20    Q.  Okay.  And do you recall speaking with Charlie --

21  Charlie speaking about the $750,000 loan during August Board

22  meeting?

23    A.  Again, if you could put the minutes up, I would

24  certainly appreciate that.

25    Q.  You don't recall him doing it?  You just don't

1   recall in general?

2       A.   No.  I'm sorry.  I may.

3           MS. LIMEHOUSE:  Your Honor, he's mischaracterizing

4   his testimony.

5           THE COURT:  Ms. Limehouse, if the witness doesn't

6   remember it, you can refresh his recollection.

7       A.   Well, could you please rephrase the question?

8           THE COURT:  Rephrase the question.

9   BY MR. AUSTIN:

10      Q.   Do you recall Charlie Laffitte at any point saying

11  that he was in favor and voted for the $750,000 loan?

12      A.   We are in executive session?

13      Q.   In any forum.

14          MS. LIMEHOUSE:  Objection, Your Honor.  This is

15  hearsay.

16          THE COURT:  It's not offered -- I think he's -- what

17  point are you attempting to make?

18          MR. AUSTIN:  I want to know if he is remembering

19  Charlie Laffitte taking responsibility for the loan.

20          MS. LIMEHOUSE:  It's for the truth of the matter

21  asserted --

22          MR. AUSTIN:  I'm asking if he remembers him taking

23  it.

24          THE COURT:  Ask the question.

25  BY MR. AUSTIN:

1    Q.   Do you recall Charlie Laffitte taking

2    responsibility, along with Russell and Gray, for the $750,000

3    loan?

4    A.   I do not.

5    Q.   You don't?  Okay.  Perfect.  And so it's your

6    position that the Board never approved the $750,000 loan?

7    A.   I'm sorry.  We are jumping back and forth.  It's

8    $750,000 loan?

9    Q.   Yes.

10   A.   The Board questioned.  I can go back through and

11   explain to you in my opinion.  What month are we talking

12   about exactly here?

13   Q.   I just want to know if the Board ever approved the

14   $750,000 loan to --

15   A.   First of all, I'm sorry, I think I better explain

16   now.  The Board doesn't -- the loan had already been made.

17   The Board was notified of the $750,000 combined payment.  But

18   as a Board member each month, the money is out the door.  I

19   don't make the decision to bring the money back in.  We might

20   say, don't do that again, or that was a bad loan.  We might

21   take a loss on it, but, no, I do not.

22   Q.   Making bad loans is something that happens routinely

23   with banks, right?

24   A.   Absolutely.

25   Q.   And based on your testimony about how successful the

1  bank is, sounds like they generally don't make bad loans?

2  A.  That's not the case, unfortunately.

3  Q.  And so in this situation, you might disagree with

4  the loan, or I guess you are saying you did disagree with the

5  loan; is that right?  You disagreed with the $750,000 loan?

6  A.  Did I disagree with the $750,000 loan?  If I would

7  have known what was packaged in the $750,000 single payment

8  so-called loan, I would have actually objected.

9  Q.  Okay.  And what's your understanding of how that

10  loan was initiated?

11  A.  The loan was initiated -- it's my understanding that

12  Mr. Murdaugh came to the bank stressed and was in financial

13  need of money back in July.

14  Q.  In July?

15  A.  Before our actual Board meeting in July.

16  Q.  And can you explain more why that would stick out?

17  Why was July such an important time for Alex Murdaugh?

18  A.  July was a difficult time because of the murder of

19  his wife and son.

20  Q.  So your testimony is that because the murders had

21  just happened --

22  A.  I did not know this in July.

23  Q.  Right.  I understand.  But when you are talking

24  about this later on and it does come to your attention, you

25  thought there were red flags because of the murders?

A.   No.   There was no red flag to me in July other than
we had gotten information from another Board member that
potentially he had lost his job or was not working, for
whatever reason.   That was the general concern, at least from
some of the Board members, but it wasn't taken up as a big
concern from the Hampton branch.

Q.   And do you know whether or not an appraisal had
already been ordered for the Edisto Beach house?

A.   Again, I am not involved with the day-to-day
activities, but --

Q.   Okay.   Did you ask any questions of Charles
Laffitte?

A.   I had not asked any questions of Charles Laffitte.
Now, you are talking about Charles --

Q.   Yes, sir, Charlie's son.

A.   Charlie's son.

Q.   And what does he do at the bank?

A.   Charles is a great asset.   He's the president or
vice president in some capacity.   He does some of the real
estate appraisal work.   He also facilitates with outside
appraisers.   And he's the bank's safety officer currently.

Q.   And you don't know if he was involved in a loan
prior to July?

A.   I do not.

Q.   Or prior to June?

1    A.    I do not.

2    Q.    And would that change your opinion about the

3    propriety of a loan, with that loan in particular?

4    A.    The $750,000 loan, as I indicated, from what I was

5    told and after the information was obtained and researched,

6    if you will, was that it was bank shared, if you will, on a

7    stock of a hunting club and collateral of a beach house that

8    Mr. Murdaugh was planning on renovating.

9    Q.    Okay.  And what's the problem with that?

10   A.    At the time?  It's my understanding through research

11   and further investigation that that stock of the hunting club

12   had been overcollateralized numerous times on previous loans,

13   and the beach house was not even in Ms. Murdaugh's name to do

14   the renovation on.

15   Q.    Not in Ms. Murdaugh or Mr. Murdaugh's?

16   A.    Mr. Murdaugh's name.

17   Q.    So it was in Maggie's name, Maggie Murdaugh?

18   A.    I'm sorry?

19   Q.    The beach house was in Maggie Murdaugh's name?

20   A.    That's what I was given information, that there was

21   an attorney in Hampton who was trying to coordinate this

22   settlement.

23   Q.    Okay.  And do you know who Maggie's beneficiary was?

24   A.    I do not.

25   Q.    Okay.  Would --

1    THE COURT:  Don't testify.

2  BY MR. AUSTIN:

3    Q.   Okay.  All right.  So do you know if that beach

4  house has been sold?

5    A.   I had seen something in the newspaper that perhaps

6  it had been sold.

7    Q.   Do you have any idea of price range?

8    A.   I do not.

9    Q.   What about Moselle, the hunting property?

10    A.   The hunting property?  I heard that there was a

11  potential contract on that.

12    Q.   Okay.  And do you know what the amount is on that?

13    A.   I do not.

14    Q.   And what about Red Beard and 0 United?

15    A.   What about what, sir?

16    Q.   Do you know whether or not there are any contracts

17  to purchase those properties?

18    A.   It's my understanding that that money has already

19  been collected for those properties through a reserve

20  receivership.

21    Q.   All right.  And Alex Murdaugh's father passed away

22  the week after the murders; is that right?

23    MS. LIMEHOUSE:  Objection.  He's testifying.

24    MR. AUSTIN:  I just asked if he passed away.

25    THE COURT:  That's testifying.  Sustained.

1          MR. AUSTIN:  No further questions, Your Honor.

2          THE COURT:  Anything on redirect?

3          MS. LIMEHOUSE:  I will be brief, Your Honor.

4                     REDIRECT EXAMINATION

5    BY MS. LIMEHOUSE:

6          Q.   Mr. Laffitte, you testified on cross-examination

7    about the $750,000, what you understood to be a loan for

8    purposes of beach house renovations; is that right?

9          A.   That is correct.

10         Q.   And you then testified that you learned about two

11   separate payments that made up the $750,000?

12         A.   Yes, ma'am.

13         Q.   At the time you were told about this loan, did you

14   know about a $350,000 wire transfer to Chris Wilson?

15         A.   Absolutely not.

16         Q.   Did you know about a $400,000 payment to cover more

17   than $367,000 in overdraft?

18         A.   I did not.

19         Q.   Let's go to Government's Exhibit 65, please.  I want

20   to now talk about some of your testimony related to the 680.

21   You testified that what was going on in the bank in the fall

22   of 2021 was completely outside of the bounds of the normal

23   course as these bylaws applied to; is that an accurate

24   summary?

25         A.   That is correct.

1    Q.   I want to review a couple of these portions with

2    you.  First Section 4.02, please, this is one of the sections

3    that Mr. Austin highlighted for you.  The first sentence

4    states:  The Board of Directors shall elect from the

5    directors a Chairman of the Board to serve at the pleasure of

6    the Board of Directors.

7         Is that how you understand the Chairman of the

8    Board's authority with respect to the Board of Directors?

9    A.   Yeah, ma'am, that's what I was trying to say.

10        MS. LIMEHOUSE:  And, Ms. Rozsa, if you will

11   highlight the portion 4.03, please.

12   BY MS. LIMEHOUSE:

13   Q.   4.03, similarly states:  The CEO shall be the chief

14   executive officer of the corporation and subject to the

15   authority of the Board of Directors.  Is that what you were

16   referring to when you talk about the CEO's authority with

17   respect to the Board of Directors?

18   A.   Yes, ma'am.

19   Q.   And if you could go to Section 3.01, page 6, I

20   believe.  Section 3.01 states:  The Board of Directors shall

21   have ultimate authority over the conduct and management of

22   the business and affairs of the corporation.  Is that your

23   understanding of the Board's role with the bank?

24   A.   Yes, ma'am.

25   Q.   If you will just go to section -- I mean, Exhibit 12

1  C, please.  This is an e-mail dated October 29th, 2021, from

2  Russell Laffitte relating to the $680,000 payment.  Now, we

3  didn't address each of these e-mails during your direct

4  examination.  In this e-mail, Mr. Laffitte states:  Attorneys

5  were informed, but not consulted.  They were consulted by

6  phone, so nothing to share.  This is not a lawsuit issue.  It

7  is a banking issue of us converting checks.

8        Is that what Russell Laffitte told the Board with

9  respect to the $680,000 when they were questioned why the

10  attorneys were not consulted?

11     A.   Would you please -- I'm sorry.

12     Q.   It was a lengthy question.  My fault.  Did Russell

13  Laffitte tell the Board that the $680,000 payment was not a

14  lawsuit issue?

15     A.   Correct.  In this "this is not a lawsuit issue"

16  e-mail by Russell Laffitte.

17     Q.   You testified on cross-examination about two Board

18  meetings that took place on October 31st and November 3rd.

19  And Mr. Austin asked you questions about the discussions

20  related to the $680,000 payment.  During either of those two

21  meetings, did Mr. Laffitte ever tell the Board that that

22  $680,000 payment included $35,000 that he personally received

23  from Arthur Badger?

24     A.   No, ma'am, he did not.

25     Q.   Did Mr. Laffitte ever tell the Board that that

1  $680,000 accounted for hundreds of thousands of dollars in

2  loans that he extended from Hannah Plyler's conservatorship

3  account?

4      A.   He did not.

5      Q.   Did Mr. Laffitte ever tell the Board that nearly

6  $400,000 of that money went to another law partner at the law

7  firm?

8      A.   He did not.

9      Q.   And did Mr. Laffitte ever tell the Board during

10 either of those two meetings that more than $150,000 of that

11 money went to the Bank of America and was never negotiated

12 through the Palmetto State Bank?

13     A.   He did not.

14          MS. LIMEHOUSE:  No further questions, Your Honor.

15          THE COURT:  You may step down.

16          MS. LIMEHOUSE:  May he be excused?

17          MR. AUSTIN:  Yes, sir.

18          THE COURT:  Thank you, Doctor.

19          Call your next witness.

20          MR. HOLLIDAY:  Your Honor, the Government calls

21 Becky Laffitte.

22          THE COURT DEPUTY:  Please state your full name for

23 the record.

24          THE WITNESS:  Becky Laffitte.

25

BECKY LAFFITTE,

having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. HOLLIDAY:

Q.   All right.  Ms. Laffitte, good afternoon.

A.   Good afternoon.

Q.   You are free to take your mask off if you would like.

A.   Thank you.

Q.   You are a lawyer, right?

A.   I am.

Q.   And how long have you been practicing?

A.   39 years.

Q.   Ever had the experience of being on the stand?

A.   I have not.

Q.   Where is it that you are located?

A.   I'm in Columbia.

Q.   And, generally speaking, what would you say your practice area is?

A.   I do all defense work.  I do trucking and auto, small products cases, premises liability, and some contract disputes.

Q.   So this isn't something I planned to ask you, but there's civil defense and criminal defense, right?  So your

1  practice area is civil defense?

2      A.   I do all civil defense, that's right.

3      Q.   And the jury heard a number of people talk about car

4  accidents and the Plylers and all of these things.  That

5  would be sort of your realm when people are sued?  There's

6  plaintiffs' work.  There's defense work.  You do the defense

7  work?

8      A.   I do the defense work, that's correct.

9      Q.   Do you have a role with Palmetto State Bank?

10     A.   I do.

11     Q.   And what is that role?

12     A.   I currently serve as a member of the Board of

13 Directors.  My first Board meeting was July 20th, 2021.

14     Q.   And how did it come to be that you became a part of

15 the Board?

16     A.   I was nominated by a cousin and that went before the

17 shareholders, and the shareholders voted, and so here I am.

18     Q.   What was the cousin's name that nominated you to be

19 on the Board?

20     A.   Monty Laffitte in Greenville.

21     Q.   Are other members of your immediate family connected

22 with the bank?

23     A.   Yes, they are.

24     Q.   If you would, I know we've discussed your father,

25 your mother, your brother and all, if you would just tell the

1    jury a little bit about that.

2        A.    Sure.  I grew up in Allendale.  My dad was a family

3    physician.  I think you would call him the last of the

4    country doctors.  He served on the Board until he passed

5    away, at which time my brother, Lucius, assumed his role or

6    he -- not assumed his role, but there was an open seat.  My

7    mom had significant chairs left at the generosity of my

8    father.  He left them.  She's 96 years old.  She's sharp as a

9    tack, still plays the piano beautifully, and she controls the

10   shots in our family.  But he left those shares so that we

11   could care for her.  And my oldest sister has physical

12   challenges that increase every year, make it more difficult

13   for her.  And so I have fiduciary responsibility not only to

14   my family's shares but to every shareholder.

15            I have two sisters.  I failed to mention them.  One

16   is married and lives in Allendale next-door to my mom.  And

17   she is the guardian angel for my mom and my sister.  And my

18   oldest sister lives with my mom.  And that's basically it.

19   Proud to be from Allendale but now live in Columbia.

20       Q.    You mentioned that your mother had a number of

21   shares, but is she the largest shareholder in the bank?

22       A.    I think she may be the single largest shareholder,

23   but don't hold me to that.

24       Q.    Okay.  What's your relationship to the defendant in

25   this case, Russell Laffitte?

1      A.   Russell and I are second cousins.  His dad and ours

2 were first cousins.

3      Q.   You are a lawyer.  Like me, you've been practicing

4 in this state a long time.  Before June of 2021, had you

5 heard of Alex Murdaugh?

6      A.   I had.

7      Q.   And how is it that you were aware of who he was?

8      A.   Well, being on the defense side, I've had a lot of

9 cases through the years with attorneys at the Murdaugh firm.

10 And I've had a case with Alex along the way.  And in fact, we

11 had a matter pending at the time where he had subpoenaed some

12 records from one of my clients.  And we were scheduled to

13 have a deposition the Friday before the tragic accident

14 involving his wife and son.  So that never proceeded.

15      Q.   Did you, because of your familiarity with him and

16 this pending case, or whatever, did you follow generally what

17 was going on with him from June 2021 forward?

18      A.   I didn't follow a lot.  I am not on Facebook.  I

19 don't do a lot of social media.  I would hear things.  So,

20 yes, I mean, I was aware of what was going on.  But did I do

21 a deep dive into it every day, no.  I had enough on my plate

22 with my work and other obligations.

23      Q.   So you indicated a minute ago that the first day,

24 your first day with the bank, was July the 20th of 2021?

25      A.   That's correct.

1    Q.    Did that correspond with a Board meeting?

2    A.    That was my first Board meeting.

3    Q.    Okay.  At that Board meeting, did you become aware

4    that Alex was a customer of the bank?

5    A.    I can't remember if we learned it that day, but I

6    did know he was a customer of Palmetto State Bank.

7    Q.    Okay.  I want to show you Government's Exhibit 2.

8    We are not going to belabor it.  It's going to come up on the

9    screen.  Jury has seen it a number of times.  We are not

10   going to read it again, but the frontline is Norris Laffitte.

11   You are familiar with Norris?

12   A.    Yes.

13   Q.    And the date is when?

14   A.    Date is August the 9th, 2021.

15   Q.    Okay.  And, generally speaking, when you received

16   this e-mail, was it a significant e-mail to you?

17   A.    Yes, it was.

18   Q.    Why is that?

19   A.    Because I think at that particular point in time,

20   Norris had raised a very good question.  We were trying to

21   determine what potential exposure did the bank have in terms

22   of liabilities with regard to loans or accounts that Mr.

23   Murdaugh had.

24   Q.    Okay.  I'm going to try to do this without pulling

25   up a whole bunch of documents.  I think we've done a lot of

1    that today.  Just generally speaking, what was your awareness

2    after Norris's e-mail of Alex Murdaugh's involvement

3    financially with the bank?

4        A.   It was not until we received the Board materials for

5    our August meeting that I received a breakdown of some

6    information that had been provided.  That, again, I had been

7    on the Board 19 days when this e-mail came on August the 9th.

8    So I was still in a learning curve at that point in time.

9        Q.   And was there a general discussion at the Board

10   meeting about the exposure to the bank regarding some loans

11   that Alex Murdaugh had outstanding at the bank?

12       A.   Yes.  Those were documented for us in the materials

13   that were provided.

14       Q.   We will leave it at that.  Okay.  In September, did

15   you get an e-mail regarding Alex Murdaugh's employment

16   status?

17       A.   Yes.

18       Q.   We are going to show you Exhibit 11.  So, Becky,

19   again, the jury has seen this plenty of times.  We've seen

20   it.  We've met before; is that right?

21       A.   Yes, we have.

22       Q.   Basically, it's a statement from WIS news that was

23   put out by Mr. Murdaugh's attorney regarding his resignation

24   from the firm; is that right?

25       A.   That's correct.

1    Q.    When you saw this e-mail, did you have some concerns

2   in light of what you had learned back in August regarding the

3   loans outstanding by Mr. Murdaugh?

4    A.    I did.

5    Q.    And who was the -- well, we won't play the guessing

6   game.  If we could, did another Board member respond?

7    A.    Well, I sent an e-mail in September.

8    Q.    Yeah.  What we are going to do is -- I think we need

9   to go one more page up.

10    A.    And would you mind increasing the size of that font,

11   please?

12    Q.    We are working on it.  All right.  So this is the

13   e-mail you are referring to.  Do you reply to the e-mail

14   informing you of Alex Murdaugh's employment situation?

15    A.    Was this my response to the e-mail?

16    Q.    Yes.

17    A.    Yes, it was.

18    Q.    Okay.  Generally speaking -- well, scratch that

19   question.  Picking up with the very last line on this page,

20   if you would read that, please.

21    A.    "As a member of a law firm, I am intrigued by his

22   decision to resign based solely on the need for counseling."

23    Q.    Okay.  Just while we flip to the next page, you,

24   again, had been practicing for almost 40 years?

25    A.    Almost.

1    Q.   And you've been a member of a firm for that entire

2    time?

3    A.   I've been a member of several firms.

4    Q.   And people are people.  Lawyers are people as well.

5    You've had, probably not to this extent, but you've had

6    lawyers in crisis before your firms; is that fair to say?

7    A.   Well, I think our law partners become an extension

8    of our families.  And we oftentimes are with them more than

9    we are with ourselves.  And I just found it interesting that

10   partners would not surround and help another partner who may

11   be in need.  And I just felt that there had to be something

12   more to this than just an illness, because that's when you

13   stick with your partners.  When they are down and out is when

14   you really need to stick with each other.

15   Q.   I'm going to -- just because it's a little -- we

16   jumped ahead to the page, but it picks up:  Admissions and

17   mistakes had been made for which he apologizes.  But as of

18   now, these alleged mistakes are unknown.

19        You can pick it up from there if you would like.

20   A.   Would you like for me to begin with "when?"

21   Q.   Yes.

22   A.   "When a lawyer is down with an illness, the first

23   thing you want to do is support him/her and their families

24   during a difficult time unless there are other culpable

25   reasons which could legally implicate the law firm in an

1    adverse way.  Therefore, I have concerns there may be issues

2    other than physical and mental ones which necessitated his

3    resignation.  Depending on the issues, his law license could

4    be in jeopardy as well.  This news brings the realization

5    that he will have no income stream for some time into the

6    future, thus, as we all recognize, leaving PSB and its

7    shareholders vulnerable if he is unable to meet his financial

8    obligations on outstanding loans and payments due in the

9    future."

10        Q.   So I want to break your e-mail down into a few of

11   its parts.  Okay?  So the first part would be the law firm.

12   The second part would be the law license.  Okay?  And then

13   the third thing would be your concern as a Board member,

14   which is here.  All right.  So a lawyer, as you've said,

15   you've been a member of multiple law firms, right?

16        A.   Yes, I have, yes, sir.

17        Q.   Lawyers tend to move around?

18        A.   They do.

19        Q.   So the relationship with the Murdaugh law firm or

20   the Peters Murdaugh law firm, could have been severed, but in

21   theory, had it been a temporary issue or whatever, he could

22   have gone somewhere else and practiced law; is that right?

23        A.   Well, I think anyone is free to go to wherever he or

24   she wishes to go.

25        Q.   Right.  So there's a more fundamental issue, though,

1  that you talk about. Depending on the issues, his law

2  license could be in jeopardy. That takes away a little bit

3  of your mobility, doesn't it?

4      A.   It takes away a lot if you are a lawyer, in terms of

5  being a lawyer in the legal community, yes, sir.

6      Q.   Lawyer with (sic) a law license can't make money

7  being a lawyer?

8      A.   You cannot be a lawyer without your law license,

9  that's correct.

10      Q.   And I would rather not pull it back up again, but

11  just generally speaking, do you remember the loan exposure

12  that Palmetto State Bank had to Alex Murdaugh?

13      A.   At that particular point in time?

14      Q.   Yes, based on the Board meeting --

15      A.   Yes.   The first report we received in August was

16  around 2-3.   It corrected a mathematical error by Norris.

17  And came to be about 3-5.

18      Q.   Norris had caught the error?

19      A.   Norris had caught the error.   And it was changed in

20  the Board packet and Board materials.

21      Q.   So you've expressed concern regarding his

22  relationship with his law firm, his ultimate ability to

23  practice law.   And then you talk about, obviously, the bank's

24  interest, Palmetto State Bank and its shareholders and the

25  loans outstanding if he's just not working at all; is that

1  right?

2      A.   That's right.  Those were concerns.

3      Q.   Okay.  Jumping down then to the fourth paragraph,

4  please.  And that's this one down here.  Okay?

5      A.   Yes, sir.

6      Q.   And these are your words, so I would like to hear

7  you read them, please.

8      A.   Certainly.  "I hope this e-mail won't be viewed as

9  insensitive; however, given that others may be jockeying for

10  position where his assets are concerned, I wanted to share

11  some of my thoughts from a legal perspective and would

12  welcome Jim Gibson's thoughts as well since he is a far more

13  seasoned litigator than I."

14      Q.   Can we hit the pause button there for a second.  I

15  don't know that I went there with Norris when he was on the

16  stand.  "Jockeying for position where his assets are

17  concerned," what is that talking about?

18      A.   Creditors, other credits may be going after his

19  assets if he had other indebtedness.

20      Q.   So in any secured transaction, there's priorities of

21  creditors; is that right?

22      A.   I don't do that type work, but, yes, sir, I do

23  understand there are priorities, that's correct.

24      Q.   I haven't talked about it since law school.  But

25  there are priorities based on when you may express your

1  interest in certain securities?

2  A.   That's right.

3  Q.   Were you concerned about the bank's place in line?

4  A.   I was concerned at that time.

5  Q.   Jim Gibson was whom?

6  A.   Jim Gibson is an attorney from Beaufort.  He's

7  retired now, but he's been on the Board a number of years.

8  And I have great respect for Jim.  And he's -- that's why I

9  was referencing Jim there.

10  Q.   Let's pick it back up with "I look forward."

11  A.   "I look forward to hearing more about your plan to

12  address the outstanding indebtedness in light of today's

13  development.  I'm also hopeful that we can have a discussion

14  about immediately retaining counsel to assist in these

15  efforts as today's development has significantly changed the

16  landscape where his indebtedness and collateral are

17  concerned.  (It appears the 2021 Mercedes is now impounded

18  due to the investigation -- or during the investigation.)"

19  Q.   So we are going to pick up with just the

20  parenthetical first, and then I want to jump back.  What was

21  your concern regarding the Mercedes?

22  A.   Well, it was about a $90,000 loan on the Mercedes.

23  It was an unsecured loan.  And now, what I had read, it was

24  now impounded either through SLED or through law enforcement.

25  So that's $90,000 out the door where the bank is concerned.

1    Q.   So in the back of your mind, or you even at the

2    front of your mind at this point, are you concerned about all

3    the various ways that the loans of Alex Murdaugh are secured

4    or unsecured?

5    A.   Certainly.

6    Q.   And tax interest?

7    A.   Certainly that came to mind.  Again, I've been on

8    the Board less than two months.  So I have a lot coming at

9    me, but also know my responsibilities.  And I was trying to

10   exercise and use my best business judgment to make the

11   decisions, as difficult as they were, that would be in the

12   best interest of Palmetto State Bank, the institution, the

13   shareholders, employees.

14   Q.   Now, going back to the previous sentence.  "I am

15   also hopeful we can have a discussion about immediately

16   retaining counsel to assist in these efforts as today's

17   development has significantly changed the landscape whereas

18   indebtedness and collateral are concerned."

19        Why did you think -- you are a lawyer.  You are on

20   the Board, right?

21   A.   That's correct.

22   Q.   And Jim's a lawyer and he's on the Board?

23   A.   That's correct.

24   Q.   Why are you at least floating in this e-mail that

25   the bank would need to retain counsel?

1  A.  I think now we are seeing that the bank may become a

2  target of some interest to some, depending on what's

3  uncovered.  And I've been doing this long enough to know that

4  I think we would be ill-advised not to have legal counsel.

5  And so, yes, I was very outspoken about that.  And we did

6  retain counsel.  And we have relied on our counsel.  And

7  we've been very fortunate that we've had that advice.

8  Q.  Going back to the September, early September time,

9  this is right after Labor Day?

10  A.  Yes, sir.

11  Q.  Going back to that time frame, who is the lawyer

12  that the bank hired?

13  A.  The litigation counsel, Trenholm Walker and Tom

14  Gressette.  We had several lawyers.

15  Q.  Right.  And not asking for any content or anything

16  for the work that they did, but generally what was their

17  mandate from the Board?  What did you want them to do?

18  A.  At that particular point in time?

19  Q.  Yes.

20  A.  To give the bank advice, to give the Board of

21  Directors advice on what may be coming down the pike and what

22  we should be anticipating so that we could be prepared.

23  Q.  I'm going to show you Exhibit 12.  We are jumping

24  forward in time now.  We've been dealing with early

25  September.  Now we are going to move to late October.  Okay?

1  The "from" is Russell Laffitte, Friday, October the 29th.  Do

2  you see your name on this e-mail?

3      A.   Yes, sir, I am on the e-mail.

4      Q.   "Everyone, I just want to give everyone a heads-up

5  on a charge that you will hear about in detail during our

6  next Board meeting."  And then it goes on about a $680,000

7  loss.  We are moving -- well, I am not going to hurry along

8  that much.

9           "We took a $680,000 loss to fix an issue between us

10  and the PMPED law firm.  We converted $1,172,945.76 in checks

11  made payable to PSB to numerous other places as part of

12  another stolen case settlement."  When you read "stolen case

13  settlement," did alarm bells go off for you?

14      A.   It did.  I did have concerns.

15      Q.   And there's another word there as well, "another."

16  So what was the other?

17      A.   Of the another case?

18      Q.   You've got another stolen case settlement, what was

19  the other stolen case settlement?

20      A.   At this point in time, all we know is the subject

21  line loss.  So what we are trying to do is determine, because

22  at this point in time, there is another threatened -- it has

23  not been filed, but there's threatened litigation to the

24  bank, of which we were aware and were working with through

25  our attorneys.  So we had that out there on the horizon and

1    now also a reference to another.  So this is now two,

2    potentially two.

3        Q.   And has Trenholm Walker been hired in part to deal

4    with the other matter as well?

5        A.   Yes, he was.  And he was dealing with it.

6        Q.   And the jury has heard this already, but is that the

7    Satterfield --

8        A.   It was the Satterfield, that's correct.

9        Q.   It says, "I negotiated with the law firm to pay part

10   and they paid the balance to make their client whole."  As

11   far as, "I negotiated with the law firm," was that a role

12   that you would have expected Trenholm Walker to play?

13       A.   I would have expected our lawyers to be involved in

14   this matter.  That's why we had them on retainer.  Not only

15   lawyers, I would have expected the Board to have been

16   involved and notified of this before the money left the bank.

17       Q.   Well, you said you would have expected the Board to

18   have been consulted beforehand.  In fact, does the language

19   of the e-mail suggest that it's a done deal?

20       A.   Oh, it's a done deal.  By the time we knew about it,

21   the money is out the door.  The Board that no knowledge about

22   it.  The Board knew nothing about it.

23       Q.   "We are moving $680,000 out of loan loss reserves to

24   offset this loss since we have ample reserves at this time."

25   I wanted to ask you about one other thing before we move.  I

1  am not asking you for a legal division, but as a lawyer, when

2  you read the word "converted," does that cause you concern?

3       A.   Well, it did.  I think the entire e-mail caused

4  concern.  Because, again, we knew nothing about it until we

5  received this e-mail at 3:22 on a Friday afternoon.  And at

6  that point in time, $680,000 we had been told is out the

7  door.  That was troubling.

8       Q.   Okay.  Let's move on to the next e-mail in the

9  chain, please.  I think part of this is cut off, but -- well,

10 there's enough down at the bottom.  You see at the very

11 bottom left-hand corner of your screen?

12      A.   I do.

13      Q.   Who is Liz?

14      A.   Liz Malinowski.

15      Q.   So the other -- well, Liz says, "I assume one of our

16 attorneys was consulted before the decision was made.  Will

17 you please share the communication with the Board.  I would

18 like to see the Board meet prior to the regularly scheduled

19 November meeting for a full update and discussion."

20           Then she goes into logistics.  Was there a meeting

21 that took place prior to the regularly scheduled November

22 meeting?

23      A.   Yes, sir, a special-called meeting was called for

24 Sunday, October 31st, at seven o'clock.

25      Q.   Okay.  We are going to get to that after we finish

1    with this e-mail chain.  Okay?

2         MR. HOLLIDAY:  Next one in line, please, Tracy.

3    BY MR. HOLLIDAY:

4    Q.   Russell responds to Liz, "Attorneys were informed

5    but not consulted.  They were consulted by phone, so nothing

6    to share.  This is not a lawsuit issue.  It is a banking

7    issue of us converting checks."

8         Is there a little bit of a discrepancy between this

9    is not a lawsuit issue and the word converting in the very

10   next line?

11   A.   We had concerns at that particular point in time.  I

12   can't say what was in his mind, but it was concerning to me

13   that with lawyers on retainer and with a Board of Directors

14   there to hear and address these matters but were never given

15   the opportunity, to insinuate that we, the Board, converted

16   it is very disturbing to me and was to everyone else.

17   Q.   And then, "informed but not consulted," as an

18   attorney, you want your clients to inform you or consult with

19   you?

20   A.   I want -- if we have attorneys, I would have

21   expected the attorneys to be involved in every decision that

22   we made based on any advice they had given us.  And it was

23   disconcerting to us that with what we had, Satterfield on the

24   horizon, these matters with attorneys a phone call away, no

25   phone call was made to the attorneys.

1    Q.   Well, Russell represents they were consulted by

2  phone, so nothing to share.  Did you ever -- were you ever

3  informed by him of any of the details of the conversation?

4    A.   I don't recall the details in the conversation.

5  There have been so many things and so many documents, so many

6  things said, if it was, I'm only here to tell you the truth.

7  So if I am forgetting something, it's not intentional.  But

8  this is what I was going on at that point in time, which is

9  somewhat of a very cryptic e-mail with very little

10 information in it.

11   Q.   And then Norris weighs in with a number of

12 questions.

13   A.   He does.

14   Q.   Were these questions that you also wanted to know

15 the answer to?

16   A.   I think we all did, yes.

17   Q.   And then finally, if we could jump to Exhibit 13,

18 please.  And so this is sort of the last in that chain.

19 Russell responds, "We will discuss in the Board meeting.  I

20 was responsible.  12 checks were made payable to Palmetto

21 State Bank converted to others.  Hopefully, no other cases.

22 This took place in 2013."

23        So that sets up your October the 31st meeting; is

24 that right?

25   A.   That's correct.

1    Q.    So as you mentioned, that's Halloween night, Sunday

2    night?

3    A.    Yes, it was.

4    Q.    What two decisions were made that evening?

5    A.    What decisions were made?

6    Q.    Yes.

7    A.    I remember several were made.

8    Q.    Okay.  If you could not limit it to two, please.

9    A.    A Litigation Committee was formed that night, of

10   which I was asked to serve as a member.  The 680 check was a

11   top concern.  And it triggered our belief that we did need to

12   have an internal audit conducted and performed within the

13   bank.  And the -- we had the discussion about the pending

14   Satterfield matter that had been in mediation.  Those are the

15   things that I remember on August 31st.

16   Q.    October 31st?

17   A.    I mean, October 31st, I'm sorry, Halloween night,

18   seven o'clock.

19   Q.    And then there is a November 3rd, 2021, Board

20   meeting, did you attend that meeting?

21   A.    I did.

22   Q.    For context, I want to show you an e-mail exchange,

23   Exhibit 80, next page, previous e-mail.  Down the bottom,

24   thanks.

25          The jury will get both and they are familiar with

1  this already.  I did want to point out, though, in the bottom

2  e-mail from November 2nd at 4:28, the name that you've

3  already mentioned, Trenholm Walker, is there; is that

4  correct?

5  A.  Yes, sir.

6  Q.  That's your outside counsel?

7  A.  That's correct.

8  Q.  And then what's the significance of the names in the

9  cc line?  Obviously, your name is in there.

10  A.  Yes.  This is the members of the Litigation

11  Committee.

12  Q.  Okay.  And then the subject lines specifically

13  references Badger; is that right?

14  A.  That's right.  So it goes from loss on the 322 on

15  October 29th to Badger by November 2nd at 4:28.

16  Q.  And it says, "Trenholm, please let me know when we

17  decide to pay the check to the law firm.  I would like to

18  call in to do this sooner rather than later.  Thanks."  Do

19  you see that?

20  A.  I do.

21  Q.  And then Trenholm responds and says, "Russell, I

22  will handle it.  I will get in touch with Ronnie again to

23  discuss this.  Please refrain from dealing with Ronnie on

24  this.  I need to make sure that there's a clear understanding

25  of the terms if the bank is willing to pay the amount.  I

1  will call him again later today or first thing in the

2  morning.  Trenholm."

3        The message from the lawyer, "I will handle it," was

4  that in line with your expectation of why you hired Trenholm

5  in the first place?

6     A.   Yes.  I mean, we hired lawyers to act on the bank's

7  best interest.

8     Q.   And then, in fact, does Trenholm ask Russell to

9  stand down, "please refrain from dealing with Ronnie on

10  this," would that have been your preference as well?

11    A.   It would be.

12    Q.   "I need to make sure that there is a clear

13  understanding of the terms if the bank is willing to pay the

14  amount."  The amount is gone, right?

15    A.   The amount, by the time we get the e-mail, is out

16  the door, that's correct.

17    Q.   So after the amount is gone, what's foremost in your

18  mind as far as what you can do now?

19    A.   Damage control.  We were in damage control, because

20  as directors, we have a fiduciary responsibility.  We have to

21  explain how $680,000 went out the door without the Board of

22  Directors' knowledge, vote or consent.  And we were looking

23  to our attorneys to give us advice on how best to position

24  and protect the bank.  And that's what we were doing, trying

25  to figure out what do we do to ensure the institutional

1  integrity and the well-being of the shareholders.  And that's

2  where -- and, of course, employees.  I mean, they were under

3  scrutiny and everything else from public, press, and whatnot.

4  And they were fabulous.  They have been wonderful.  But these

5  were concerns that we had.

6      Q.    Okay.  And then there's language here that seems to

7  cause the next e-mail to be sent.  "If the bank is willing to

8  pay the amount," so at this point, Trenholm at least is

9  holding out hope that something can be done about the money?

10     A.    He's holding out hope, but I think at that point in

11 time, nobody knew what had happened to that money.

12     Q.    Yeah.  Let's go to the next e-mail.  And, again, you

13 are copied on this one.  And then the very first line is,

14 "Trenholm, the bank is paying this amount."  Is that

15 consistent with your understanding that the money was gone?

16     A.    The money was gone.

17     Q.    "The verbal contract between Palmetto State Bank and

18 the law firm was done with the approval of the Chairman of

19 the Board and the CEO."  Who is the Chairman of the Board?

20     A.    The Chairman of the Board, Charlie Laffitte.

21     Q.    And the CEO?

22     A.    Russell Laffitte.

23     Q.    "You are welcome to discuss terms, but it is not an

24 option to not pay."  And you were copied on that e-mail and

25 you saw that language as well, right?

1    A.    I was.

2    Q.    Says, "We agreed to this settlement amount not

3    because I was PR or Alex stole the money, it was done due to

4    the fact that I converted these checks made to Palmetto State

5    Bank.  We were actually happy to settle for 680 versus the

6    full amount."  Were you happy with Russell, the way Russell

7    had handled the $680,000?

8    A.    No, sir.

9    Q.    If Russell had delivered the 680 to the law firm and

10   he indicates that he consulted with the Chairman of the

11   Board -- who was the Chairman of the Board again?

12   A.    Charlie, Laffitte.

13   Q.    His father?

14   A.    Yes.

15   Q.    Would you have expected if Charlie Laffitte gave

16   approval to this that Russell would have told him all the

17   details of the $680,000?

18   A.    I would think so, because Charlie is one of the most

19   honorable men that I know.

20   Q.    Would you have expected that Russell would have

21   shared that this was Badger settlement money with his father?

22   A.    If he knew everything, I'm not sure we would be

23   where we were.  Sir, I don't know.  I can't guess.  I can

24   only tell you what I know here.  And the money is out of the

25   door, $680,000, without knowledge or approval of the Board of

1  Directors.

2      Q.   We have two circumstances.  Right?  We either have

3  Russell has shared with Charlie everything he knows about the

4  $680,000, and Charlie went ahead anyway, or Russell is

5  representing that his father knew about it and ratified it

6  and his father didn't know; isn't that correct?

7      A.   I can't tell you which scenario that it was.  From

8  what you've said, it could be either/or.  I don't know at

9  that point.  I knew at this point for sure the Board knew

10 nothing about it and had nothing to do with that decision.

11     Q.   Okay.  This $680,000 has been paid.  Had Russell

12 negotiated any kind of release to go along with the payment?

13     A.   He had not.

14     Q.   Without a release, what was the bank's exposure?

15     A.   We were out the money.  I mean, you are on the hook

16 for everything.  If you get sued for this, the bank, again,

17 is entangled in a lawsuit.  And, in fact, we are entangled in

18 a lawsuit.

19     Q.   Over the Badger money?

20     A.   Well, we are in a lawsuit filed on behalf of Badger.

21     Q.   At this November 3rd Board meeting, were you

22 informed where the $680,000 had originally come from?

23     A.   No.  We did not know all the specifics of where

24 those 12 checks had originated from until later.

25     Q.   We talked about origination.  Did you know where the

1    money went?  Did you know the individuals who actually -- if

2    the Badger money was cut into 12 checks, according to the

3    e-mail, did you know where those 12 checks had gone?

4    A.   Not at that point in time, not on October 29th,

5    November 1, November 2, November 3, no, sir.

6    Q.   And -- well, if you didn't know where the checks had

7    gone, there was no indication of why those individuals would

8    have been entitled to receive money from the Badger

9    settlement; is that right?

10    A.   We were -- we didn't know what comprised the 680, we

11    did not.

12    Q.   And at the November 3rd Board meeting, you know of

13    Satterfield and now you know of Badger, did Russell share

14    with you whether there was anything else out there?

15    A.   I don't recall any discussion about anything else

16    out there.  I think some Board minutes are in or some -- a

17    transcript that we did not know was being recorded with our

18    lawyers present with us.  So I don't recall.  If it's not in

19    there, I don't recall it.

20    Q.   And were you all told whether or not that $680,000

21    payment included half of the $35,000 that Russell would have

22    been paid?

23    A.   We found that out.  It's the $35,000 that he had

24    gotten on the conservative fee or PR fee.

25    Q.   That wasn't shared with you in November?

1    A.    Not at that time.

2    Q.    Now, so we started your testimony in September.

3  We've gone to October.  Now we are going to go to December.

4  Okay?  I show you what's been marked as Government's Exhibit

5  15.  Down at the very bottom, "Everyone, we found another two

6  settlements that were stolen.  I have spoken with Mark Ball

7  and Jeanne Seckinger about them concerning the research only.

8  We have not agreed to do anything at this time.  I have

9  attached.  We will need to send this to SLED and the ODC.

10  I'm assuming our attorneys will do this.  Mark was talking

11  with a client about one other small check to see if she got

12  the funds.  It was cashed.  The amount was $25,000 and

13  change.  Thanks, Russell Laffitte."

14         So in December you learn of another Badger

15  situation; is that right?

16    A.    Yes, sir.

17    Q.    Those other Board members that weigh in, we are not

18  going to go back over that again in this case, or at least

19  with you.  But at this point, you are moving into January.

20  Has Russell's position with the bank become untenable?

21    A.    We had concerns.

22    Q.    At this point you know Badger money had been

23  converted by his own admission in the e-mails; is that

24  correct?

25    A.    Yes, at this point.  I believe we maybe had the

1    meeting on December 2nd, is when we maybe learned of this.

2    And this e-mail is the 1st.  So I don't want to get ahead of

3    myself, but it was in early December when the revelation of

4    what those 12 checks really were comprised of that came to

5    light.

6        Q.    Rather than have you guess, let's  -- Norris in the

7    e-mail above says, "Without the narrative explaining each of

8    the 45 pages."  So there's a 45-page attachment to Russell's

9    e-mail; is that correct?

10       A.    It's referencing that.  And I've received so many

11   documents, I can't tell you that, 45 or 44, but there were

12   attachments.

13       Q.    And so the Pinckney/Thomas checks are 2011 checks.

14   You knew the Badger situation was in 2013.  Norris is

15   asking -- now we have a span of at least two years we know

16   this is going on.  He's asking if there's anything else

17   either before or after that time frame; is that right?

18       A.    Yes, sir.

19       Q.    Okay.  And then if we can go to the next one,

20   please.  And then in response to Norris, he basically breaks

21   it down.  "Two checks were presented together.  10,000 went

22   to Maggie Murdaugh.  9,500 was made to a money order for

23   cash.  $920.29 paid principal on a loan.  $3,137.30 interest

24   paid to the same loan.  $100,000 was paid to my father to

25   repay a loan he made to Alex."  $50,001 -- "$50,135.61 and

1   $91,220.57 was made to me as conservator for the Plylers.

2   This repaid a loan made to him from the conservatorship."

3   Did you know who the Plylers were at that point?

4       A.   No, sir.  I think probably at that point, I had read

5   about the Beach -- well, no, that's Beach.  I'm sorry.  No,

6   the Plylers, I did not.

7       Q.   $329,500 went to pay Randolph for something.  Who is

8   Randolph?

9       A.   That was Alex's father.

10      Q.   "He may have lent him money or he may have bought

11  something from his father.  $40,167.69 was paid to the

12  conservatorship of Malik Williams for money loaned."

13           So now in this e-mail, you are getting new names,

14  aren't you; Plylers now?

15      A.   Williams.

16      Q.   And Malik Williams as well.  So now you have Badger,

17  Pinckney, Thomas, Malik Williams, and the Plylers, all named

18  in this e-mail chain in December; is that right?

19      A.   That's correct.

20      Q.   And then he talks about the conservatorship and

21  having been closed out in 2012.  So as a result of all this

22  back-and-forth and maybe some additional information you

23  received later, did the Board have a meeting to consider

24  whether or not Russell should be CEO anymore?

25      A.   We did.

1     Q.   And did you hold a vote as to whether or not he
2     should be a CEO anymore?

3     A.   We did.

4     Q.   And was the vote on separating him from the bank
5     unanimous?

6     A.   I don't recall that it was.

7     Q.   Okay.  Who voted no?

8     A.   I am not looking at it.  I know there was one
9     abstention.  And I don't want to misrepresent without seeing
10    that document.

11    Q.   Let's just tweak it slightly.  Who did not vote yes
12    to separating from the bank?

13    A.   I recall that Gray abstained.  And I may be
14    inaccurate there.  But, again, without that note, Mr.
15    Holliday, I am not going to take this stand and tell you
16    something that I am not certain about.

17    Q.   Sure.  Was Gray the only one that you recall, or do
18    you recall anyone else?

19    A.   Charles may have.  I can't remember.

20    Q.   When you say "Charles," are we talking the son or
21    the father?

22    A.   The son, Russell's brother.  But, again, I am not
23    going to -- without that detail then with certainty, I am not
24    going to venture there.  But I do remember there was an
25    abstention, at least one and perhaps two.

1    Q.    How did you vote?

2    A.    It was a very difficult vote, but I felt that we had

3    to make a change in the leadership of the bank.  And I voted

4    that he would become separated from the bank.

5    Q.    And why did you think there was a leadership change

6    that was necessary?  What had he done?

7    A.    You've been in this trial almost eight days now, so

8    I don't know what you've seen and what you have not seen.

9    But we started out with hearing about perhaps one situation.

10   And then we go from Badger -- or Satterfield to Badger to

11   Hakeem Pinckney to Plyler.  And the list kept coming and

12   coming.  I for the first time find out in August of 2021 of

13   the significant indebtedness that Alex has to Palmetto State

14   Bank.  Now, as a new Board member, 19 days in, this was very

15   disturbing to me, as it was to other directors.  So we had --

16   I saw some poor decisions had been made.  There was some

17   discrepancies.  There were some irregularities.  And I

18   learned early on when I looked up the responsibility and

19   definition of a fiduciary, I am required to set aside my

20   personal feelings, to set aside my family.  And we are a very

21   close family.  And we love each other dearly.  So to ask me

22   to separate myself and move my family out of that to make a

23   tough decision is probably one of the hardest things I've

24   ever had to do.  But I had that responsibility.  And I owed

25   it to the bank, its financial reputation.  I owed it to the

1  shareholders.  I owed it to the employees.  And I owed it to

2  our customers who have stuck by us.  And I have no regrets,

3  as hard as it was, that I made the decision that had to be

4  made.  And I stand by it.

5      MR. HOLLIDAY:  Okay.  Please answer any questions

6  the defense might have for you.

7      THE COURT:  Cross-examination.

8      MR. DANIEL:  May it please the Court, Your Honor.

9                   CROSS-EXAMINATION

10  BY MR. DANIEL:

11      Q.   Good afternoon.  How are you?

12      A.   I'm doing well.  How are you, sir?

13      Q.   Other than being here.

14      A.   Well, it's a tough day.  As I'm sure, Mr. Daniel,

15  for a lot of family it has been.  So I am not going to say

16  it's pleasant being here.

17      Q.   We certainly understand.  It's not pleasant for

18  anybody.  You referred to at the very outset the Satterfield

19  case.  And that y'all -- that was the initial matter y'all

20  were trying to deal with?

21      A.   That's right.  That's the one that we -- the lawsuit

22  had not been filed.  And our attorneys received a copy of the

23  lawsuit right before we had the -- it may have been on the

24  October 31 meeting, but it was within the time frame the 31st

25  through the 2nd, yes, sir.

1    Q.   I didn't mean to interrupt you.  And that one did

2    not involve Russell Laffitte?  Did not involve Russell

3    Laffitte?

4        A.   No, sir, it did not.

5        Q.   I wanted to make sure that was clear.  Thank you.

6    Now, you were with the law firm Robinson Gray Stepp &

7    Laffitte?

8        A.   I am now, but I used to be at Nelson Mullins Riley &

9    Scarborough for 13 years.  Yes, sir.

10       Q.   And I've worked with y'all extensively, with your

11   firm in the past?

12       A.   Yes, sir.

13       Q.   Particularly, with Mr. Bobby Stepp and some others.

14   Now, you are a litigator.  And one of your focuses -- one of

15   your business focuses as a litigator is on insurance

16   coverage?

17       A.   I have done insurance coverage in the past, yes,

18   sir.

19       Q.   And it's real important for a business or a bank to

20   have not just an insurance policy to cover them, but that

21   that policy be enough to cover any sort of lawsuit for the

22   Board, the individual Board members; is that right?

23       A.   Yes, sir.  But, unfortunately, while I was on the

24   Board, that policy had already been decided upon and I had no

25   vote in that policy.

1    Q.   I'm saying, in general, it's important for any

2    business --

3    A.   Oh, absolutely.  I want directors and officers

4    liability coverage.  If I'm going to give my time and serve,

5    I certainly want to be protected, yes, sir.

6    Q.   Right.  Okay.  And so some of the members of the

7    Board, and including yourself, are concerned with personal

8    liability in case the insurance company denies coverage,

9    because that happens from time to time?

10    A.   Well, you certainly have concerns about personal

11    liability.  I've been on the Board 19 days.  So, I mean, I

12    think I would probably be about as far out as somebody could

13    reach.  But, certainly, we are concerned about our personal

14    exposure.

15    Q.   And if you could show -- if you could somehow show

16    that it was intentional misconduct on the part of a bank

17    employee, such as Russell Laffitte, then that would be a

18    pretty good defense to any Board member that the Board

19    members ought to get coverage and it ought to be resolved?

20    A.   I am not here as a lawyer.  I am not going to answer

21    questions about coverage.  I haven't done coverage in a long

22    time.  And I don't feel comfortable answering your question.

23    I'm here as a fact witness.  I had nothing to do with the

24    insurance policies procured on behalf of the bank.

25    Q.   I'm sorry.  Maybe I wasn't clear enough.  I said if

1  it's proven that Russell Laffitte did something

2  intentionally, that would help resolve -- absolve the Board

3  of liability?

4       A.   I am not here to answer those legal questions.

5            MR. HOLLIDAY:  Your Honor --

6            THE COURT:  I sustain the objection.

7            MR. DANIEL:  Your Honor, she's relied on being a

8  lawyer with fiduciary responsibilities and duties all along.

9  I just asked her --

10           THE COURT:  This is an insurance coverage question.

11 Surely, speculative.  She said she doesn't know.  I sustained

12 the objection.

13 BY MR. DANIEL:

14      Q.   Okay.  So you just joined the Board, I believe,

15 probably six weeks or so before all this broke?

16      A.   19 days, 19 days.

17      Q.   Joined in July?

18      A.   July 20th, 2021, yes, sir.

19           THE COURT REPORTER:  You're talking on top of each

20 other.  Can you please slow down.

21 BY MR. DANIEL:

22      Q.   You joined in July?

23      A.   That's correct.

24      Q.   And then in September is when everyone finds out

25 that Alex Murdaugh is not the person that everybody thought

1    he was?

2       A.   I am not casting judgment on anybody.   That's not my

3    role here today, sir.

4       Q.   Okay.   Were you surprised when you found out that

5    Alex Murdaugh had evidently stolen a lot of money?

6       A.   I was very surprised, yes, sir, and disturbed, yes,

7    sir.

8       Q.   You had known Alex Murdaugh just in general, I am

9    not talking about as a good friend or anything, but you had

10   known him and his reputation for many years?

11      A.   Well, I didn't have many cases with him.   I had more

12   cases with Ronnie Crosby through the years.   So that's really

13   who I knew better, and also Johnnie Parker, and also -- he

14   passed away and -- Paul Detrick, those were the ones.   Alex's

15   probably 16 years younger than I am.   So I am more

16   contemporaries with the more seasoned ones in the firm,

17   Johnnie Parker, Ronnie, and those are the ones I dealt with.

18      Q.   But suffice it to say, you knew that those lawyers

19   in that firm, the ones you just named, along with Alex

20   Murdaugh, made significant sums of money?

21      A.   Well, I don't know what they made.   I know through

22   the years I've had clients pay significant resolutions to

23   them, yes, sir.

24      Q.   But --

25      A.   But I couldn't tell you to what extent --

1     Q.    When this -- when all of this arose in September and

2     the ensuing months, did you ever go back and look at Alex

3     Murdaugh's income statements that are filed with the income

4     tax return -- excuse me, that are filed with --

5          MR. HOLLIDAY:  Your Honor, objection.  Relevance.

6     Beyond the scope.

7          THE COURT:  It's cross-examination.  Overruled.

8          THE WITNESS:  No, sir.  If I may explain that, if

9     you don't mind.

10    BY MR. DANIEL:

11         Q.    Sure.  Certainly.

12         A.    When you have a person, particularly Charlie

13    Laffitte, and as I've said, Charlie is my first cousin, and

14    he's as honorable a person as you will find, I had confidence

15    that Charlie would know and tell us what we needed to know

16    and everybody else who worked as a Board official.  As a

17    Board of Director, I am not to be in the weeds of the bank

18    every day, and you have to rely on those in the bank to be

19    transparent and to tell you the truth.  And I relied on them.

20    So I didn't get in the weeds on that.  So, no, sir, I did

21    not, nor do I feel that it was my responsibility as a

22    director to do that.  I did not.

23         Q.    I didn't mean to imply that.  So I withdraw it.

24         MR. DANIEL:  Would you please call up Exhibit No.

25    40, which is in evidence.  It's the October 19th, 2021, Board

1  minutes.  Now, I would like to -- will you please call up the

2  attendees at this.

3  BY MR. DANIEL:

4      Q.  Okay.  And this is the meeting, just so you will

5  know where I'm going with this, where the $750,000 loan

6  that's been discussed on direct examination, that's where

7  this comes up at the -- this particular October 19th, 2021,

8  meeting.

9      A.  I think it came up in September.  It was in the

10  Board packet for our August meeting, I believe.  Norris sent

11  the e-mail on August the 9th.  The request was made to get

12  the information.  I think we met on the 17th.  And I think it

13  may have been August 17th when the 750 came up.  I may be

14  wrong.

15      Q.  Yes, ma'am.  I think it comes up a number of times.

16      A.  Okay.

17      Q.  Please scroll down to the paragraph that says

18  Elizabeth Malinowski.  Would you read that?

19      A.  Yes, sir.  "Liz Malinowski wanted it noted that

20  there were several loans that were approved that did not go

21  to the full Executive Committee.  Russell Laffitte explained

22  that all loans were approved by at least three of the five

23  members."

24      Q.  Okay.  And then she requested a write-up.  Now,

25  three of the five members was -- actually, that's Mr. Charlie

1  Laffitte, the chairman?

2      A.   Yes, sir.

3      Q.   And Ms. Gray Laffitte, the secretary?

4      A.   Gray Laffitte Henderson, yes, sir.

5      Q.   And Russell Laffitte, the CEO?

6      A.   And Jan Malinowski.

7      Q.   Yeah, I haven't finished.

8      A.   Sorry.

9      Q.   But the three that approved it in advance were three

10  of the four; the four voting members would be Mr. Jan

11  Malinowski?

12      A.   Yes, sir, but they did not follow the bylaws.

13      Q.   They did not follow the bylaws?

14      A.   No, sir.  We have -- I don't have the bylaws in

15  front of me, but, respectfully, I'm going to give you my best

16  recollection.  Section 3.19, there are two ways that an

17  Executive Committee can meet and vote.  One is if you have a

18  called meeting.  A majority can comprise the quorum if on a

19  call meeting you have the votes.  If you don't have a call

20  meeting, you have to get written consent of each voting

21  director on the Executive Committee.  And you have to put

22  each written consent from each director who's on the

23  Executive Committee in the minute meetings to the Board the

24  next time.  This never followed that route.

25      Q.   Okay.  And did you at the time note in writing an

1  objection to that not being followed at this time?

2      A.    Liz did.  Liz did in August.

3      Q.    Pardon?

4      A.    Liz Malinowski said in the August minutes that she's

5  concerned that this 750 did not follow bank protocol.

6      Q.    But isn't it true that in the same bylaws you were

7  talking about, it's required that you put -- any sort of

8  action that you take, you are required to put in writing --

9      MR. HOLLIDAY:  Your Honor, objection.  Best evidence

10  and argumentative.

11      THE COURT:  It's cross-examination.

12      MR. HOLLIDAY:  It's a little bit of an issue with

13  them.  They keep asking people to have memorized bylaws.

14      THE COURT:  If Ms. Laffitte would like the bylaws,

15  you can put them in front of her.  But, you know, here's the

16  difficulty, is the defendant has a right to cross-examine and

17  you have a right to do redirect.  And I'm going to give him

18  some leeway here because it's cross-examination.

19      MR. DANIEL:  I purposely hadn't brought up because

20  it's been brought up before the jury so many other times.

21      THE COURT:  I understand.  You should have some

22  leeway in cross-examination.

23  BY MR. DANIEL:

24      Q.    Please call -- I got this exhibit up now, Your

25  Honor.  I'm trying to think of which is the best way to

1   handle this.  If you would like to consult the bylaws, we can

2   do that before or after we deal with this.

3      A.   Okay.  3.19 I think is the section I was talking

4   about, but I will certainly let you do as you please.

5      Q.   Okay.  Okay.  This is the procedures.  If you will

6   just real quickly read.

7          MR. DANIEL:  If you could highlight it, the portion.

8   BY MR. DANIEL:

9      Q.   This is the correct one.  It's 3.15.  If you could

10   just read that for the benefit of the jury.

11          THE COURT:  I believe she was referring to 3.19.

12          MR. DANIEL:  We just took that down, Your Honor.

13   This is 3.15.  That's what she told me --

14          THE COURT:  I think that's what you were asking her

15   and she was saying she hadn't seen it.  It seems to me if you

16   are going to question her about that and she asked you for

17   it, you ought to show her.

18          MR. DANIEL:  I wasn't questioning her about 3.19,

19   Your Honor.  I was questioning her about 3.15.

20          THE COURT:  That's not my recollection, but you go

21   ahead.  You know, Mr. Holliday can do it on redirect.

22          Do you have a question?

23   BY MR. DANIEL:

24      Q.   Yes, sir.  So are you familiar that the Board had

25   approved the $750,000 loan?

1    A.    No, sir, we never approved it.

2    Q.    Okay.  But three members of the Executive Committee

3    certainly did, and that's Mr. Charlie, the chairman, Ms. Gray

4    Laffitte, the secretary, and Mr. Russell Laffitte.  And they

5    discussed it at the Board meeting.  That's where Russell

6    Laffitte brings it up at the Board meeting and says that,

7    right?

8    A.    Respectfully, sir, I disagree.  They did not follow

9    3.19 of our bylaws.

10    Q.    I understand that they did bring it up at the Board

11    meeting?

12    A.    They did bring it up at the Board meeting.  And at

13    that point in time, we didn't know that $350,000 had been

14    sent by wire on July the 15th.  They are bringing it up after

15    the fact.  And then they put the other $400,000 to cover the

16    overdraft of Alex Murdaugh's account.  So, no, sir, we did

17    not approve it.

18    Q.    Did you know that your compliance office actually

19    said approved --

20    MR. HOLLIDAY:  Objection, Your Honor.  He's

21    testifying.

22    THE COURT:  You are testifying.  Sustained.

23    MR. DANIEL:  Judge, all she's got to say is she

24    didn't know it.

25    THE COURT:  But you are testifying.  It's the way

1    you asked the question, Mr. Daniel.

2    BY MR. DANIEL:

3    Q.   But at this particular meeting, and I'm talking

4    about the October 19th, an Exhibit 40 meeting, is Russell

5    Laffitte tells y'all, three of the four voting members of the

6    Executive Committee had approved this $750,000 loan in

7    advance?

8    A.   Respectfully, sir, this had been brought up in

9    August.  They did not follow protocol.  That to me showed

10   right there we didn't follow protocol.  We never sent a

11   certified letter to family members about a matter.  If you

12   put it in the Board minutes, we trusted each other enough to

13   know that if it's in there, it is what it is.  We didn't

14   require certified letters.  We didn't operate that way

15   because we never -- we had a trust with each other until some

16   things were brought to light.  So, no, sir, respectfully, we

17   never approved it.

18   Q.   Okay.  And, Ms. Laffitte, you testified on direct

19   examination that you would have expected that Russell

20   Laffitte, before he made that -- before he issued that Badger

21   check and to -- the law firm of PMPED, that he would have

22   discussed it with his father, Chairman Charlie Laffitte?

23   A.   I don't know if he did or not.  I don't know if he

24   discussed it or not.  I just have to believe what I know

25   Charlie and his honor and integrity, he would have told us

1  everything, had he known it.  I do not believe he would have

2  withheld anything from us if he knew it, just based on my

3  knowing him all these years.

4      Q.   Okay.  So if Mr. Charlie Laffitte was consulted in

5  advance and agreed to the $680,000 payment, along with Ms.

6  Gray Laffitte Henderson, that would be three of the four

7  voting members of the Executive Committee, wouldn't it?

8      A.   No, sir, because they would have made that decision

9  without a meeting.  And under 3.09, you can ratify something

10 without a meeting, but you have to have a written consent of

11 every director, voting member director on the Executive

12 Committee, and then you have to put that in the minutes.

13 None of that is in any of the minutes.  So, no, sir,

14 respectfully, it was not approved nor recognized by the Board

15 to be approved.

16      MR. DANIEL:  Please call up Exhibit No. 80, please.

17 And it's Russell Laffitte -- I'm sorry.  It's Russell

18 Laffitte's e-mail to Trenholm and Mr. Laffitte gets a copy of

19 it.

20      MS. LIMEHOUSE:  We are happy to bring it up, if you

21 would like us to.

22 BY MR. DANIEL:

23      Q.   Okay.  This is the one that came up on direct

24 examination?

25      A.   Yes, sir.

1    Q.   Yeah.  And the e-mail says, I believe you testified

2    to it, but I think Mr. -- Government's lawyer skipped over

3    that it was a verbal contract.  Doesn't it say the verbal

4    contract between PSB and PMPED was done with approval of the

5    Chairman of the Board?

6    A.   Respectfully, they did not have the authority to do

7    that under our bylaws, in my opinion.

8    Q.   I understand.  But you can take that down now.

9         Now, this $680,000 payment in partial -- or in

10   settlement to the Badger, that check is delivered, it

11   actually was discussed first -- you are on the Litigation

12   Committee, I believe you testified?

13   A.   Yes, sir.

14   Q.   And it was discussed.  Y'all had a meeting maybe

15   October the 27th or so, right before the --

16   A.   I don't remember.  We've had so many meetings.  I

17   remember the 29th.  I remember the 1st, 2nd --

18   Q.   Then the October 31st Halloween night meeting, you

19   remember that one?

20   A.   Yes, sir.

21   Q.   And at that meeting, I believe, you correct me if

22   I'm wrong, but I'm asking the question, Mr. Trenholm Walker

23   says or y'all discuss asking Russell to call up Ronnie

24   Crosby, who the check was delivered to?

25        MR. HOLLIDAY:  Your Honor, objection.  Hearsay.

1   　　　　　MR. DANIEL:  Judge, it's --

2   　　　　　MR. HOLLIDAY:  It's still hearsay.

3   　　　　　MR. DANIEL:  It's not being offered for the proof of

4   the matter.

5   　　　　　THE COURT:  Overruled.

6   BY MR. DANIEL:

7   　　Q.   To put a pause on the check, the $680,000 check, in

8   other words, don't give to the client; do you recall that on

9   the October 31st meeting?

10  　　A.   I do recall that, but little did we know that that

11  check had been deposited at 4:11 on Friday, October 29th,

12  unbeknownst to any of us on the 31st or thereafter.  And that

13  is a critical fact that I cannot overlook, sir.

14  　　Q.   You certainly knew it then at the Litigation

15  Committee meeting?

16  　　A.   No.  We didn't know that it had been deposited.  No,

17  sir.  No, sir.  That all came to light later.

18  　　Q.   Okay.  And you had a meeting on, I guess it's

19  November the 3rd.  And this was discussed with your lawyer,

20  Trenholm Walker.  And I believe you had five lawyers, or at

21  least four other lawyers from your law firm present at that

22  meeting?

23  　　A.   We had all of our lawyers present, I believe, yes,

24  sir.

25  　　　　　MR. DANIEL:  And please bring up Exhibit No. 60.

1    Call it up.  It's the transcript.

2    BY MR. DANIEL:

3        Q.   And just when you found out -- this meeting is when

4    you found out that Russell Laffitte -- please go to page 13.

5    This is when you found out that Russell had, in fact, called

6    Ronnie Crosby and put a pause on it.  May have already been

7    in the account, but there was no settlement yet with Mr.

8    Badger?

9        A.   We didn't know it was in the account.

10       Q.   Okay.  But he did call to put a pause on it, whether

11   it had gone in the account or not gone in the account --

12       A.   I don't know if he did.  I wasn't privy to that, so

13   I don't know what he did.  We were working through our

14   lawyers.  So all I know is what we were told on November 3rd.

15   He had asked that a pause be put on it, but I don't even

16   think he knew at that point in time the check had already

17   been deposited.

18       Q.   Okay.  Fair enough.  Okay.  Now, at that

19   transcript -- now, isn't it a fact that at that meeting, the

20   $680,000 payment was discussed at length in detail?

21       A.   We did discuss the $680,000 check, yes, sir.

22       Q.   Okay.  And who all was present at that meeting; do

23   you remember?  It was most of the Board present?

24       A.   I think probably so, and most were by Zoom because

25   it was Sunday night at seven o'clock.

1    Q.    And that would be Mr. Lucius Laffitte?

2    A.    It should have been.  I think probably Jim Gibson,

3    Jan Malinowski, Liz Malinowski, Norris Laffitte, Lucius

4    Laffitte, Charlie, Gray, Russell, and Charles, I would think.

5    Q.    So Mr. Norris and Mr. Lucius, those two were

6    included in your list just now, correct?

7    A.    I think they were on the October 31, but I am not

8    looking at it, so I am not going to venture a guess without

9    certainty as to who was there.  The record would show it.

10    Q.    Okay.  So at that meeting, at that particular

11    meeting, the bank -- the consensus was that the bank did not

12    want Ronnie Crosby at the Murdaugh firm to throw the bank

13    under the bus?

14    A.    I don't think it was put that way.  I think our

15    lawyers were talking to us about the $680,000 is out of the

16    door.  What are we, as fiduciaries to this bank and to

17    shareholders, what is our responsibility.  And they basically

18    were saying, that money is out of the door, you are having to

19    deal with a crisis, damage control situation, because this

20    money went out the door unbeknownst to you.  We were not

21    discussing that we were consenting to it or ratifying.  No,

22    sir, never.

23    MR. DANIEL:  Will you please call out paragraph 2.

24    BY MR. DANIEL:

25    Q.    And please read paragraph 2.  This is the verbatim

1    transcript.

2        A.   Yes, sir.  It said, "And I had a good chance -- I

3    had a good chance to talk to Ronnie yesterday.  Some of my

4    concerns were how this was going to be implemented.  Ronnie

5    started off thinking that I was contesting that the bank had

6    liability for the amount.  I assured him we were not here to

7    retrieve -- to retread the deal under the circumstances.

8    What we wanted to know was what did he have in mind.  Was he

9    going to go to Mr. Badger and make some contention that the

10   bank -- or contend that the bank did something wrong or

11   somehow bring up PSB."

12       Q.   Please bring up the next paragraph.  Continue.

13       A.   "Ronnie, whom I know very well, not as well as other

14   people, but I know him extremely well, I've worked with him,

15   assured me that he would not even mention the bank in any

16   conversation he had with Mr. Badger.  He said what he was

17   going to do was going to treat this just like other clients

18   who had lost money -- lost less money."  I'm sorry.

19       Q.   That's okay.  Top of page 14.

20       A.   "What he would do is he would call them and say

21   we've been looking at this file that Alex handled for you and

22   would like to talk with you about it, set that appointment

23   and meet with him and explain that there had been discovered

24   a shortfall and that the firm wanted to reimbursement him."

25       Q.   Next paragraph, please.

1    A.  "Ronnie said that all the people that they have done

2    this with have been extremely appreciative and nobody has

3    suggested they are going to bring a claim against the firm.

4    I think that if I had anybody to pick to make this pitch to

5    this client, it would be Ronnie Crosby.  He is a genuine,

6    straight-up, stand-up guy, and I think -- I don't think he's

7    going to try to throw the bank under the bus at all."

8    Q.  So he did use that term, "throw the bank under the

9    bus."  next paragraph please.

10    A.  And, again, I wasn't misstating anything, but now

11    that it's in the transcript, I will say it's there.  I didn't

12    know if you would trying to impeach me on that.

13    Q.  No, ma'am.

14    A.  "You may be thinking, well, why do we want to do

15    this if he is not getting release of anybody from Mr. Badger.

16    The law firm can't get a release from Mr. Badger because they

17    would be -- he does not have separate representation.  And

18    they can't release any claim about their own wrongful

19    conduct.  They can't have their client release them under --"

20    Q.  And before you --

21    A.  "-- these circumstances."

22    Q.  Before you react to this paragraph, y'all don't

23    particularly, at the time, want a release from Mr. Badger,

24    did you?  I'm talking about Mr. Badger.  The bank, because

25    the bank is paying half the settlement, but y'all don't want

1    Mr. Badger to know that, do you?

2         THE COURT:  Whoa.  Whoa.  Ask the question.  Slow

3    down.  Ask the question.

4    BY MR. DANIEL:

5         Q.   Y'all, the bank does not want Mr. Badger to know the

6    bank is paying part of the settlement, and that's --

7         A.   Our concern was damage control, what is the best for

8    the bank.  I can't say -- I mean, these are our lawyers

9    speaking, you can interpret it, they can interpret it.  Our

10   understanding was, what can we do that's in the best interest

11   of the bank.  And I recall that Mr. Walker suggested to us

12   that night, what I would recommend is that let me go to

13   Ronnie Crosby and say, hey, Ronnie, what if -- would you

14   consider signing a release with indemnification for the bank.

15   And that is what I recall.  Our directive was to Mr. Walker

16   that night, was the 680 is out the door, what do we do to

17   protect the bank.  And our directive to him was, go to Mr.

18   Crosby, see if he would sign a release with an

19   indemnification clause.  And that's how I recall that evening

20   went.

21        Q.   Okay.  Please pull up the next paragraph.  Please

22   read that.

23        A.   Certainly.  "As far as we are concerned, we don't

24   want any suggestion that we are paying any money.  And I

25   think if he brought up a release, it might incite things

1    rather than calm things down."

2         Q.   Did you correct the lawyer on that?  I mean, you are

3    at a Board meeting at a discussion.  Did you correct the

4    lawyer and say anything differently?

5         A.   I think what I'm saying --

6         Q.   No, ma'am.  I'm asking the question.  Did you

7    correct him?  Did you say anything that you disagreed with as

8    a Board members?

9         A.   This is what I understood it to be.  I am a lawyer,

10   but I was not acting as a lawyer on the Board.  Let me finish

11   my question.  If I may answer, please, if you don't mind.

12        Q.   Answer --

13        A.   I want you to know my context and what I was

14   thinking that night.  We were not talking about going to get

15   a release from Badger, because at this point in time, the law

16   firm, the money had gone to the law firm.  And what Mr.

17   Walker was discussing with us is the law firm is who you need

18   to get something from, if you can get it.  That's what we

19   were talking about, sir.  That's how I recall the

20   conversation, respectfully.

21        Q.   But you are at a Board meeting and you've got the

22   lawyer who is talking to you about this, and he's talking

23   strategy, and you never -- no one at the Board meeting ever

24   says, oh, we don't want that strategy; did they?

25        A.   We are relying on some of the best lawyers in the

1   state of South Carolina. And we had every right to rely on

2   their advice. We were paying for it. You don't understand.

3   You weren't in that situation. We are faced where a family

4   member sent $680,000 out of the door. We have a

5   responsibility to many others who have shares in this bank.

6   We have a responsibility to the reputation of this bank. Our

7   concern was protecting the bank. We were not on anything

8   personally, sir. And we made the decision asking him to go

9   to Mr. Crosby to say, would the firm give the bank a release

10  with indemnification agreement. And that's never been given.

11  So we got nothing for that 680 that's out the door.

12       Q.   If you would read this paragraph.

13       A.   "What we do want is to make sure that there is a

14  release from PMPED to the bank for anything at all having to

15  do with this, so that if Mr. Badger, say, in 10 ends up

16  suing, even though he's been fully satisfied and Ronnie has a

17  receipt that he received that payment, putting aside loss of

18  use of funds, but if he brought that claim, then the law firm

19  could not sue the bank, couldn't bring the bank into the

20  case. Now if he brought the bank in the case, we just have

21  to deal with that."

22       Q.   And read the next paragraph.

23       A.   "But our view, the lawyers talked at length about

24  this with the Litigation Committee."

25       Q.   That's your committee?

1    A.   Yes, sir.

2    Q.   Okay.

3    A.   It's a committee on which I serve.  It's not my

4    committee.

5    Q.   But you serve on that committee.

6    A.   "And everybody believes that we are better off

7    having Ronnie go and satisfy Mr. Badger by handing him the

8    check and using his diplomacy so that if, by chance, anything

9    about Badger gets out and Bland --"

10   Q.   Next paragraph, please.

11   A.   Yes, sir.  "-- and Richter get ahold of it -- I'm

12   sorry.  "-- Richter get ahold of it, then their case will be

13   much less, because unlike Satterfield, their alleged victim

14   will have been fully compensated by the law firm and that we

15   will be side-by-side with the law firm in that."

16   Q.   Okay.  And Bland and Richter are some plaintiffs

17   lawyers that represented other plaintiffs.  And they are sort

18   of trolling for clients, is your understanding of it?

19   A.   No, sir.  They had the lawsuit that we were meeting

20   about on October 31st.  That's the Satterfield case.

21   Q.   But in this one, your lawyers concerned with them

22   finding another client, Mr. Badger?

23   A.   Well, I don't like the word "trolling," sir, so I am

24   not going to say trolling.  You said they are trolling for

25   something.  I don't refer to anybody trolling anything.  We

1 knew that there could be other litigation.

2     Q.  Okay.  Call up the next paragraph, please.  If you

3 can read this paragraph.

4     A.  "So that is our thinking about Badger.  We are going

5 to have to report Badger because we have subpoenas that have

6 asked for all transactions dealing with Alex Murdaugh.  And

7 from what -- everything we've seen, this was his mechanism

8 for taking money from a client and sending it through the

9 bank to pay other debts.  And this is something that the

10 criminal authorities are going to be very interested in, the

11 Office of Disciplinary Counsel, SLED, all of that."

12     Q.  Next paragraph, please.  You can skip -- yeah.

13 Okay.

14     A.  "So we want to get ourselves to the best position

15 that we can be in if we have a -- if we have to weather a

16 storm."

17     MR. DANIEL:  Okay.  And please skip over the

18 redacted portion.  Go to the next page.  Oh, yeah.  Bottom.

19 BY MR. DANIEL:

20     Q.  Okay.  Please read.

21     A.  Yes, sir.  "Any questions about where we're headed

22 in Badger?  I tried to get Ronnie today to talk about getting

23 a release of the firm.  Ideally, we could also get an

24 indemnification where the firm would say in return for us

25 paying 680, they would indemnify us.  I don't hold out much

1    hope of that, but I think from Russell's conversations with

2    Ronnie, before I spoke to him, he would be willing to give us

3    a release."

4        Q.   Okay.  And the next paragraph.

5        A.   "At least, Russell, wasn't that your impression?"

6    And Russell answered, "I think."

7        Q.   Next page please.

8        A.   "I think he would probably give us a release."

9        Q.   Okay.  And I guess you can bring up the rest of it.

10   If you would read the rest of it.  This is the very last, I

11   believe.

12       A.   No problem.  "Yeah.  We want to make sure before we

13   agree fully that we are getting a release.

14           "Mr. Russell Laffitte:  We are paying it.

15           "Mr. Walker:  We don't want to pay this and have

16   them come back, one, for more money later on.  We want this

17   to be a close vis-à-vis to the firm.

18           "Jim Gibson:  Well, you certainly have done a good

19   job of bringing this thing hopefully to a conclusion early on

20   before it gets messy, but thanks.

21           "Mr. Walker:  Well, I hope so.  This thing could

22   easily cartwheel out of control.  We've seen that happen with

23   other aspects of all of these incidents unless -- we've got

24   to do everything we can.  Time is a premium.  Thank you.  Any

25   questions about Badger or further discussion from me or the

1    Litigation Committee?"

2        Q.    Okay.  And there was some question, you disagreed

3    with me about the full Board approving the $750,000 loan?

4        A.    Well, when it came to the Board, that 750 was out

5    the door.  I mean, if you are talking about that if you are

6    going to say -- I mean, Gray, Charlie and Russell were on the

7    Board at that time, but my position was they didn't follow

8    the 3.19.  So --

9        Q.    Okay.  Now, you may not -- well, I'm going to ask

10   you this.  Were you on the Board for the minutes of the --

11   when it was discussed on September 21st -- September 2021?

12       A.    I was on the Board in September '21, yes, sir.  I

13   think Russell was at a convention, though.  I don't think he

14   was at the Board meeting.

15       Q.    So isn't it a fact that the Board always approved a

16   list at the Board meeting of any loan over $25,000?

17       A.    Sir, from the time I was on the Board, these loans

18   predate me way back.  So I was not privy to any of that.  The

19   first time I saw this 750 loan is when it came out in the

20   onBoard materials that we received in August.  And I

21   explained that they gave a list of Alex Murdaugh's loans and

22   indebtedness.  It was off about a million.  Norris caught it.

23   It was corrected.  And that's the first time I knew anything.

24   But, again, I've been on the Board less than a month.

25       Q.    But you've been on the Board for a while now?

1    A.    I have.

2    Q.    And isn't it a fact that at Board meetings, any loan

3    over $25,000 that was issued by the bank is listed --

4    contained on a list?

5    A.    Yes, sir, because we insisted on that.  In fact,

6    we've insisted on several things since this to ensure that

7    there's full transparency and we are all educated on what we

8    need to know that happens during the time we are not in the

9    Board meetings.

10   Q.    And so you are telling me that the full Board, as

11   far as you know, did not approve the $750,000 loan?

12   A.    Sir, we didn't know about it until after the fact.

13   And if you look at the materials, he didn't book the loan

14   until after our Board meeting in August.  The first money he

15   tells us he has issued on the first document that came out,

16   $750,000 to Alex Murdaugh.  The collateral was one share of

17   the Green Swamp Hunt Club.  And in the first one that came

18   out that had to be corrected, it listed the beach house.

19            When it came back to us, it was three five, because

20   of a clerical error that Norris had found.  And at that point

21   in time, they realized they had no security on the house

22   because it was in Maggie and Alex's name.  So the bank could

23   not get, yeah, a lien on it, because it was in probate court.

24   So, no, sir, the first time that -- again, I joined the Board

25   July 20th.  The first time I knew about the 750 loan came in

1  August.  And then as we went on in the investigation,

2  unbeknownst to us, we found out on July 15th that $350,000

3  wire had been sent to a law firm in Bamberg, at the Board

4  meeting in August.  It was not until after then that this

5  loan was even booked on the system.  And before then, when

6  August -- when Norris sent the August 9th e-mail, $400,000

7  that we had been told on a $750,000 beach house renovation

8  got put in Alex Murdaugh's account, because he was almost

9  $350,000 in arrears.

10         Sir, we never approved that loan.  We were not told

11  what it was for.  We were not shown the transparency that we

12  deserved and expected from this bank.  And it is problematic.

13  And we had found it to be problematic.  And we never did

14  approve it.

15     Q.   And let me ask you this.  Now, I believe the Board,

16  you correct me if I am wrong, you've got only Laffitte

17  members that are in the firm that work at the firm was Mr.

18  Russell Laffitte, who is no longer with the firm, he was let

19  go, Mr. Charlie Laffitte, and Ms. Gray Laffitte, and they go

20  to work every day, and they are actually at the bank in

21  Hampton, and Mr. Jan Malinowski in Beaufort, Ladies Island.

22     A.   Absolutely.  And they have worked hard.  But you

23  don't -- what we have to -- and I understand and appreciate,

24  is that as Board of Directors, we have the fiduciary

25  responsibilities.  And we relied on them, that they would be

1    transparent and tell us everything.  And, sadly, we found out

2    that we were not shared everything.  It's tough to be in a

3    fiduciary responsibility with information that's withheld.

4    And, sadly, it was withheld.

5        Q.   The reason I asked you about different family

6    members, some on this side work at the bank, and the others

7    are sort of your side, if you will, don't work at the bank.

8    There's some members of the Board that want to sell the bank?

9            MR. HOLLIDAY:  Your Honor.  Objection.

10           THE COURT:  I still haven't figured out the

11   relevance of this.  I'm going to sustain it.  Y'all haven't

12   connected --

13           MR. DANIEL:  Goes to motive to testify.  It goes to

14   the very motive.

15           THE WITNESS:  Your Honor, I'm happy to answer that

16   question.

17           THE COURT:  Go right ahead.

18           THE WITNESS:  Before I joined the Board, Charlie

19   called me up and said, before I vote for you, I need to know

20   what your position is on selling the bank.  And I said,

21   Charlie, I don't know what my position is, because I haven't

22   even gotten into the bank to figure out what's going on.  If

23   you asked me today what I was going to do with my law firm, I

24   couldn't tell you.  But I told him that day, I can't tell you

25   what I'm going to do because we don't know what the future

1   holds.  And you can put him on the stand and you can ask him

2   about that conversation.  But so help me God, that is what I

3   told him.  And that is my answer today.  And it was the

4   answer I gave him before I was elected to the Board.

5           THE COURT:  Are you through, Mr. Daniel?

6           MR. DANIEL:  No further questions.

7           THE COURT:  Mr. Holliday, redirect.

8                    REDIRECT EXAMINATION

9   BY MR. HOLLIDAY:

10      Q.   We are pulling up a document.

11      A.   Okay.

12      Q.   This is one I didn't show you before.  But I want to

13  put the November 3rd meeting in a little bit of context,

14  since you were asked extensively.  You actually walked

15  through the transcript of the November 3rd meeting.

16           I'm showing you a sworn statement of Russell

17  Laffitte, page 104 of Government's Exhibit 200B, down at line

18  17, "You know they didn't want to pay it."

19           Well, let me read you the question.  "Was there

20  another consideration too, like, with cost benefit,

21  litigation in Hampton County turning into an adverse result

22  that was greater than $1.3 million?"

23           And Russell says, "You know, they didn't want to pay

24  it.  When I took it to the Board, the Board went absolutely

25  ballistic.  They wanted to claw it back.  And part of the

1    reason I got fired, I put my foot down.  I said, no, I said,

2    three of the four members of the executive --"

3         MR. DANIEL:  Your Honor, I want clarification.  What

4    is this of?

5         THE COURT:  He said a sworn statement the defendant

6    previously made.

7         MR. HOLLIDAY:  Exhibit 200B.

8         MR. DANIEL:  That certainly didn't come up on

9    cross-examination.

10        THE COURT:  This is the November 3 meeting he's

11   describing.

12        MR. AUSTIN:  Your Honor --

13        THE COURT:  One of you object.  We don't have Jack

14   in the Box.

15        MR. DANIEL:  Whoa.  Whoa.  This is about the October

16   31st meeting.

17        THE COURT:  You asked about both of them.  It

18   doesn't really matter.  You asked about both of them, those

19   meetings.  It's redirect.  He has a right to address what you

20   raised.  Overruled.

21        MR. DANIEL:  No, Your Honor.

22        THE COURT:  Overruled, Mr. Daniel.

23        MR. DANIEL:  I just want clarification with the

24   dates, that's all.

25        THE COURT:  Go ahead, Mr. Holliday.

1       MR. HOLLIDAY:  Thank you, Your Honor.

2   BY MR. HOLLIDAY:

3       Q.   "You know, they didn't want to pay it.  When I took

4   it to the Board, the Board went absolutely ballistic.  They

5   wanted to claw it back.  And I -- part of the reason I got

6   fired, I put my foot down.  I said, no, I said three of the

7   four members of the Executive Committee discussed this in

8   department, which is my sister, Gray Henderson, myself, and

9   Charlie Laffitte, who was also the Board chairman."

10      That's, supposedly, the three agreeing that you said

11  took place outside of the bylaws of the bank; is that right?

12      A.   If you have a meeting that's not called and you

13  don't have written consent of all, that is not a proper

14  meeting under the bylaws under 3.9.

15      Q.   And continuing with line 25, "We have the authority

16  by our bylaws to settle any lawsuits, whatever, or potential.

17  We thought it was in the best interest, so we did it.  And

18  they wanted us to claw it back.  And I told them absolutely

19  not.  I gave them my word, we are paying it, and by God, we

20  were paying it."

21      Now, Government's Exhibit 223, and I want to go to

22  page 13, lines 9 through 13, please.

23      "Ronnie started off thinking that I was contesting

24  that the bank had liability for the amount.  I assured him we

25  were not here to retread the deal under the circumstances."

1 So in the context of the ODC statement, the Trenholm

2 Walker exchange that I gave you before, and the words of the

3 transcript that they just cited at length, the money is gone,

4 isn't it?

5 A. The money is gone.

6 Q. There's no retreading, retrading, or anything about

7 the money; is that correct?

8 A. The money is gone.

9 Q. Now, as far as Russell's participation in the

10 meeting, page 18, please, line 25, that just starts, "I

11 think," and then the next page, please. "I think he'd

12 probably give us a release." That's the one time that he

13 speaks. Next on down, "Yeah, we want to make sure before we

14 agree fully that we are getting release." And then Russell

15 Laffitte reiterates, "We're paying it," right?

16 A. He had already sent the check. And the check was

17 deposited on the night or the afternoon of October -- excuse

18 me, the 29th, and we knew nothing about it.

19 Q. Okay. And then I want to pull up page 20, lines 23

20 to 25. Well, I think for context, maybe that question right

21 above it. We could just leave it. I think the jury can see

22 this. "And I asked Ronnie, I think --"

23 MR. HOLLIDAY: You got me, Tracy.

24 Q. "-- And I asked Ronnie if -- I think, Russell, you

25 were personal representative. And I asked Ronnie, I said,

1  well, I don't.  I don't think Russell ever knew that or

2  signed anything."

3       And he said that they had no disbursement statement

4  that had been signed by you.  The only person signing it was

5  Mr. Badger.  And Russell volunteers, I was a personal

6  representative for Donna Badger, not Arthur.

7       Next page, please, just to be sure.  Okay.

8  Trenholm, okay, I got it.

9       Mr. Daniel went through the transcript at length

10  with you.  I am not going to go all the way back through it,

11  but that's what I saw Russell said.  Did Russell in that

12  meeting ever, according to what we've just seen, talk about

13  the 12 checks that had been cut and where they had gone.

14       MR. DANIEL:  Your Honor, I object.  It's leading

15  everything on.

16       THE COURT:  No, it's redirect.  Overruled.

17       THE WITNESS:  We didn't know the origin of the 12

18  checks until some time later.

19  BY MR. HOLLIDAY:

20    Q.  And it's certainly not being volunteered in the

21  November 3rd meeting by Russell?

22    A.  It was not in this transcript.

23    Q.  Or any other substantive information that would have

24  allowed the Board to make any decision about --

25       THE COURT:  Now, you are leading.  I sustain the

1  objection not yet made.

2  BY MR. HOLLIDAY:

3      Q.   Did you receive any information about the substance

4  of the 680 transaction that would have allowed the Board to

5  decide anything other than getting a release?

6      A.   No.   The money was out the door.   The money was in

7  the bank account of PMPED.   The best we could hope for is to

8  get a release to protect the bank with some indemnification

9  language.   And, unfortunately, we were not even able to get

10  that.

11     Q.   Last one, 10I and 10E side-by-side.   I had not

12  addressed the $750,000 loan, but since it came up on cross,

13  you handled it from memory very well.   On the left-hand side,

14  if you would just tell the jury what we are looking at, the

15  context of the $750,000 loan?

16     A.   We are looking at a domestic wire request dated July

17  15th, 2021, receiving bank SouthState for 3 -- I don't see

18  the amount, $350,000 under the payment information.

19     Q.   And then down under authorization where it says

20  request for --

21     A.   It has Russell's name and I don't recognize the

22  other employee's signature.

23     Q.   Then  just to finish out the 750 on the right-hand

24  side --

25     A.   Certainly.   I indicated that when Norris sent the

1  e-mail on August the 9th is when things began to surface.

2  And if you look at this document, it's dated August 9th,

3  2021.  And what we thought would be $750,000 beach loan

4  renovation, 400,000 of the 750 was put into Alex Murdaugh's

5  banking account, because if I recall, he was approximately

6  353,000 in the hole.  So what we thought was a beach house

7  renovation was not.  You have seen here 350 went out on the

8  door on 7/15.  My first Board meeting was July 20th, 2021.

9  No mention of this.  After the August 9th Board meeting,

10  $400,000 is put into the bank account.  So, no, sir, we did

11  not approve $750,000, because we were not given accurate

12  information.

13         MR. HOLLIDAY:  Ms. Laffitte, thank you.  It's late.

14  I have no more questions.

15         THE COURT:  Thank you.  All right.  Is it okay to

16  release Ms. Laffitte?  Any objection by the defense?

17         MR. DANIEL:  Yes, Your Honor.

18         MR. HOLLIDAY:  That's fine.

19         THE WITNESS:  I'm free to go back to Columbia?

20  Thank you.  Thank you, sir.

21         THE COURT:  Ladies and gentlemen, I think we've had

22  a full enough day.  What do you think?  Let's be back here

23  nine o'clock tomorrow morning.  We will start up.

24         (Jury leaves open court at 5:51 p.m.)

25         THE COURT:  I think there was a matter y'all wanted

1   to take up at sidebar.

2            (Whereupon, Mr. Peavy joins the conversation.)

3            MS. LIMEHOUSE:  Mr. Peavy represents Ms. Drawdy.

4            THE COURT:  Tell me, what's the woman's name?

5            MR. PEAVY:  Nancy Drawdy.

6            THE COURT:  What is Ms. Drawdy -- I'm told, though,

7    she hasn't been sequestered.  She's been following.  Tell me

8    about what you know about that.

9            MR. PEAVY:  So, after hearing about this probably

10   earlier at lunch and that the defense's intention to call

11   her, I called her to ask her very specific questions

12   regarding what information she's reviewed.  Your Honor, she

13   has been keeping up with FITSNews.  She has been reading

14   FITSNews, the State Paper, the Post and Courier.  All of

15   these are online.  She hasn't purchased the actual newspaper.

16   And then has reviewed the first of the YouTube videos.

17           THE COURT:  You know, first of all, we've settled on

18   the issue that if she's going to be here, she has to be here

19   personally.

20           MR. DANIEL:  Yes, Your Honor.

21           THE COURT:  So let me hear from you, Ms. Limehouse,

22   why you think I should not allow this testimony.

23           MS. LIMEHOUSE:  We have no intention or desire to

24   limit the defendant's right to put up exculpatory evidence,

25   but there's a reason why the sequester order is in place.

And so there's no real purpose, for one, if this witness who has admittedly viewed basically everything, including the defendant's own statements about the conduct he's charged with, is able to get up and testify.

MR. AUSTIN: She's not going to testify what she saw in the video.

MS. LIMEHOUSE: But that's not what the sequestration order is in effect to prevent.

THE COURT: Let me tell you something. There are a lot of concerns I have. Number one, if she's such a critical witness, why wasn't -- you know, why wasn't she sequestered? Let me finish. Let me finish. Just let me finish. I have concern about the sequestration order being violated. But I've got to weigh that against a defendant on trial for his liberty. And the balance tips towards the defendant here, just trying to give him a fair trial. And I tell defendants this many times in civil cases, and I tell you now as a prosecutor, one day you may thank me for not ruling with you. So I think the answer is, I'm going to allow her to testify. Not happy about it. It's not good circumstance. I want you to direct her not to listen and read anything else. She is sequestered. Okay? But she will testify in person and she will be subject to cross-examination so my jury can observe her credibility. Okay?

MS. LIMEHOUSE: Understood.

1    THE COURT:  Okay.  Very good.

2    MR. PEAVY:  Your Honor, she is actually up near the

3  Kentucky border dealing with a death of a family.

4    THE COURT:  I understand that.  We know that.  But

5  I've said these are -- the rules are that you testify in

6  court.  So that's where it's going to be.

7    MR. PEAVY:  Okay.

8    (Whereupon, the proceedings are adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>CERTIFICATE OF REPORTER</u>

2

3         I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8         I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15   _____
     Karen V. Andersen
16   Registered Merit Reporter
     Certified Realtime Reporter

17

18

19

20

21

22

23

24

25