1            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA

2                 CHARLESTON DIVISION

3

4  _____
                         )

5  UNITED STATES OF AMERICA,    )
                         )

6        Plaintiff,        )  Docket No. 9:22-658
                         )

7        vs.              )  Charleston, SC
                         )

8  RUSSELL LUCIUS LAFFITTE,    )  Volume V
                         )

9        Defendant.        )
  _____)  DATE:  November 15, 2022

10

11        BEFORE THE HONORABLE RICHARD M. GERGEL
        UNITED STATES DISTRICT JUDGE, PRESIDING

12                  JURY TRIAL

13

14  A P P E A R A N C E S:

15  For the Plaintiffs:

16  EMILY EVANS LIMEHOUSE
    U.S. Attorney's Office

17  151 Meeting Street, Suite 200
    Charleston, SC 29401-2238

18  843-266-1663
    emily.limehouse@usdoj.gov

19

    WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON

20  U.S. Attorney's Office
    1441 Main Street, Suite 500

21  Columbia, SC 29201
    803-929-3000

22  winston.holliday@usdoj.gov
    kathleen.stoughton@usdoj.gov

23

24  COURT REPORTER:           KAREN V. ANDERSEN, RMR, CRR
                        United States Court Reporter

25                        901 Richland Street
                        Columbia, SC  29201

1   A P P E A R A N C E S:

2   For the Defendant:

3   EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
    Nelson Mullins Riley and Scarborough
4   151 Meeting Street
    Charleston, SC 29401
5   843-534-4123
    bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com
6
    CHRISTIAN JOSHUA MYERS
7   Nelson Mullins Riley and Scarborough
    101 Constitutional Avenue NW, Suite 900
8   Washington, DC 20001
    202-689-2001
9   josh.myers@nelsonmullins.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   INDEX

2   EXAMINATION

3   Witness Name                                              Page

4   TIMOTHY DANIEL RICH

5       BY MS. LIMEHOUSE ....................................... 1098

6       BY MR. DANIEL ......................................... 1144

7       BY MS. LIMEHOUSE ....................................... 1157

8   MARK ALTMAN

9       BY MS. STOUGHTON ....................................... 1163

10      BY MR. DANIEL ......................................... 1170

11  NATASHA THOMAS

12      BY MS. LIMEHOUSE ....................................... 1172

13      BY MR. AUSTIN ......................................... 1188

14  BRIAN WOMBLE

15      BY MS. LIMEHOUSE ....................................... 1192

16      BY MS. LIMEHOUSE (continued) ........................ 1246

17      BY MR. DANIEL ......................................... 1298

18      BY MS. LIMEHOUSE ....................................... 1348

19  ARTHUR BADGER JR.

20      BY MS. LIMEHOUSE ....................................... 1221

21      BY MR. AUSTIN ......................................... 1235

22      BY MS. LIMEHOUSE ....................................... 1245

23

24

25

1    THE COURT:  Okay.  Are there any matters that either

2  party needs to raise with me?  First the Government?

3    MS. LIMEHOUSE:  Minor housekeeping.  The Government

4  does expect to rest this afternoon.  So we just wanted to let

5  the Court know that we will hopefully be early in our

6  anticipated timeline.

7    THE COURT:  Good.  I'm going to push hard.  Defense

8  going to be ready with their first witness?

9    MR. AUSTIN:  Yes, sir.

10    THE COURT:  Good.  What could I help you with this

11  morning?

12    MR. AUSTIN:  Can we be addressed at sidebar?

13    THE COURT:  Absolutely.

14    (Whereupon, the following bench conference takes

15  place.)

16    THE COURT:  Let me tell you something, I try a lot

17  of cases.  You get very excited about what you need.  And you

18  get in here and say maybe not so much.  What can I help

19  everybody with?

20    MR. AUSTIN:  So Eric Bland, he tweeted something

21  last night.  It's probably nothing.  He sort of made a threat

22  towards Bart.  And it's just a step too far.

23    THE COURT:  What did he say?

24    MR. AUSTIN:  Basically harassing.

25    MR. DANIEL:  I don't read anything.  I don't tweet.

1          THE COURT:  By the way, we learned almost nobody is

2     doing this.  Everybody thinks everybody is following this.

3          MR. AUSTIN:  I mean, if he did, I would just throw

4     the book at him or something.

5          THE COURT:  Guys, this is outside of the scope of

6     this.  You know, listen, there's a whole cacophony of noises

7     out there on this case.  And you are focusing on one.  I'm

8     just not -- I think it's beyond my purview.  I am not going

9     to get into it.  I'm just trying to do my best to sequester

10    witnesses.

11         MR. AUSTIN:  My client, if we didn't bring it up --

12         THE COURT:  The Government is not happy about them

13    doing videos either.  Okay?  So it's, you know --

14         MR. AUSTIN:  About two months ago.

15         THE COURT:  I know, but the timing is impeccable.

16    Okay?  And what he tapes is irrelevant.  And if I had a

17    choice, I would say not to do that.  All the cases are

18    protecting the defendant's right to a fair trial.  But the

19    Government also has a right to a fair trial.  And so I think,

20    you know, you ought to tell him to cut it out.  You can, he

21    can release them after the trial.  But as to Mr. Bland, I am

22    not going to deal with him.

23         MR. AUSTIN:  We are not asking --

24         THE COURT:  Okay.  Very good.

25         (Whereupon, the bench conference ends.)

1    THE COURT:  Bring in the jury.

2    (Whereupon, the jury returns to open court at 9:14

3  a.m.)

4    THE COURT:  Please be seated.  I want to continue to

5  express my appreciation for the jury's close attention in

6  this case.  I can see you probably better than anybody else.

7  And y'all are paying attention and on top of this.  I can

8  tell you, because I'm sitting sort of in the same shoes you

9  are, learning about this stuff for the first time.  And it

10  takes a little bit to figure it all out.  And y'all are doing

11  it.  So thank you very much.  I think both parties appreciate

12  that they got themselves a fine jury here.  So, thank you.

13    Ms. Limehouse, call your next witness.

14    MS. LIMEHOUSE:  The Government calls Tim Rich.

15    THE COURT DEPUTY:  Please state your full name.

16    THE WITNESS:  Timothy Daniel Rich.

17                    TIMOTHY DANIEL RICH,

18    having been duly sworn, testifies as follows:

19                    DIRECT EXAMINATION

20  BY MS. LIMEHOUSE:

21    Q.  Mr. Rich, if you are comfortable, you can remove

22  your mask.  And I just ask that you put the microphone close

23  to your mouth, please.

24    Okay.  Mr. Rich, tell me a little bit about your

25  background.

1    A.    I have been employed by the Federal Deposit

2    Insurance Corporation for a little over 35 years, moving from

3    assistant bank examiner to a bank examiner to a senior bank

4    examiner, and then going to our regional office in Atlanta as

5    a review examiner.

6    Q.    Let's break down some of your history of your

7    employment with the FDIC.  So how long did you say you've

8    been employed by the FDIC?

9    A.    Little over 35 years.

10    Q.    So what's your current title?

11    A.    I'm currently the deputy regional director for risk

12    management for the region.

13    Q.    So as the deputy regional director, what are your

14    responsibilities?

15    A.    I'm responsible for any safety and soundness

16    examination which examines for the financial condition and

17    overall compliance with key rules and regulations, the

18    overall examination programs for the seven-state Atlanta

19    region.  I'm also responsible for any applications.  If an

20    institution wants to open a branch or acquire another

21    institution or a group wants to get together and open a new

22    bank, all of those applications, I would be responsible for

23    those.  And also, I'm responsible for any enforcement actions

24    involving institutions in a safety and soundness manner, or

25    if the -- or if it involves an individual, where we are

1    considering enforcement actions against an individual.

2       Q.   I want to discuss these examinations with you in a

3    little more depth in a moment, but the jury's heard a lot

4    about the FDIC, but not from someone who works for the FDIC.

5    So what is the FDIC?

6       A.   Well, the FDIC, the Federal Deposit Insurance

7    Corporation, was established in 1934.  The goal and the

8    mission of the FDIC is to ensure public confidence in the

9    financial system.  And we do that a number of ways.  First we

10   insure deposits.  The current deposit insurance level for a

11   single deposit or for a single customer is now $250,000.  It

12   was raised from $100,000 several years back.  So we do that

13   by insuring deposits first.  The FDIC-insured deposits, no

14   depositor has lost a penny of insured funds since the FDIC

15   was established in 1934.  So we do that.  We insure deposits.

16   And then we insure those deposits with an insurance fund

17   which banks pay premiums, just like you would pay premiums

18   for car insurance to your insurance company.  Banks pay

19   interest premiums to the FDIC.  We operate out of that fund.

20   And because we have a fund to look after, we examine or banks

21   to make sure they are complying with all the rules and

22   regulations, that they are not taking any unnecessary risks,

23   and that they are in an overall safe and sound condition.  So

24   that's the second way we do that.  And third way, if a bank

25   happens to fail, we make sure that there's an orderly

1 transition to an assuming institution. So those are the

2 three key ways that we maintain and establish public

3 confidence in banking, in the United States banking system.

4     Q.   What's sort of the overarching goal of the FDIC?

5     A.   Well, the overarching goal is to make sure that we

6 have a financial system in the United States that people

7 don't have to worry about, that they have that opportunity,

8 and that we have a system of banks that you have confidence

9 that -- you don't really have to worry about the condition of

10 your bank, because we are there as a backstop if your

11 deposits are below that insurance level. So we are there

12 to -- really to ensure that the public has confidence in the

13 banking system.

14     Q.   So you testified that you are the deputy regional

15 director. How long have you held this role?

16     A.   In a permanent capacity, I've held it little over 18

17 months, 19 months now.

18     Q.   You also testified that you've served for the FDIC

19 in various capacities. Are those sort of positions of

20 increasing authority over your years with the FDIC? Is that

21 fair to say?

22     A.   Yes, that's correct.

23     Q.   So I would like the jury to hear sort of all the

24 experience that you've gained while at the FDIC. Have you

25 been an examiner at the FDIC?

1    A.    Yes.

2    Q.    And how long did you serve as an examiner?

3    A.    For the first nine years of my career, I was an

4    examiner or a senior examiner.  And then I spent one

5    additional year later on, so a total of 10 years strictly as

6    a bank examiner.

7    Q.    So what does an FDIC examiner do?

8    A.    We typically will go out and we have a routine

9    examination schedule that we go around and we examine the

10   banks periodically.  How frequently we go into those banks

11   and conduct examinations is based upon the condition and the

12   size of the bank.  If the bank is not in great shape, we are

13   there every year.  And we may visit them even every six

14   months to make sure that things are going well.  If a bank is

15   doing well, it could stretch out to perhaps even 36 months in

16   between examinations.  But, again, what we are trying to do

17   is address the risk to the Deposit Insurance Fund and which,

18   again, we are responsible for maintaining.  So as an

19   examiner, we would go in and examine, you know, the books and

20   records of the bank.

21         The biggest risk in most institutions is the loans

22   that they make, the risk that they won't collect the loans

23   that they make.  So we spend a lot of time reviewing loans.

24   But we also look at the bank's overall operations, what level

25   of earnings they have, how much capital do they have to hold

1    against the assets of the bank.  Probably the most critical

2    thing is the management of the institution.  We look at the

3    quality of management, are they adhering to all of the laws,

4    are there any apparent violations of laws or rules and regs.

5    So that's -- in a nutshell, those are some of the key things

6    that we do.

7         Q.   So as part of these routine examinations, would you

8    all review internal bank policies and procedures?

9         A.   Yes.

10        Q.   And bylaws, for example, is that something that you

11   would review during these examinations?

12        A.   Yes.

13        Q.   So why are these policies and bylaws important to

14   the FDIC?

15        A.   Well, we want to make sure that there's a good

16   framework to run -- for the institution to operate under.  It

17   all starts with the board of directors.  The board of

18   directors, they have the ultimate responsibility for the

19   institution.  There's some things that they can hand off to

20   executive management or they can hand off to junior

21   management or they can hand off all the way down the line to

22   the teller that you meet in there.  But, ultimately, they

23   have the ultimate responsibility.  And the way the bank is

24   formed, it's governed by that -- by those bylaws.  It

25   provides -- it lays out the responsibilities of the board.

1 It lays out the responsibilities of executive management.  It

2 lays out the responsibility of any committees and how those

3 committees are supposed to operate as well.  So the bylaws

4 are important.

5          And then the next step down, if you were looking at

6 from the top level, most important thing, then you move down

7 to the policies in the institution.

8     Q.    Okay.  So those would be loan policies, for example,

9 conflict of interest policies, things like that?

10     A.    Yes.

11     Q.    So you served as an examiner for nine years and some

12 change.  After being an examiner, how did you move up in the

13 FDIC?

14     A.    We have a regional office in Atlanta that handles

15 the seven southeastern states:  The Carolinas, Virginia,

16 Alabama, Georgia and Florida.  So I went there as a review

17 examiner.  So as an examiner, you would complete the report

18 of examination.  And you would send it in for review.  Our

19 examination -- our reports of examination get multiple levels

20 of review.  And so instead of an examiner, I was a review

21 examiner.  I was the first person that would start outside

22 the office that would review the report and make sure that it

23 made sense, that it was -- that it complied with our

24 procedures, that it was clear, it was -- the ultimate goal is

25 that we give that report back to the board of directors so

1    that they understand the FDIC's perspective on the condition

2    of that bank.  So the principal readership of a report of

3    examination is the board of directors.  We send it back to

4    them once we are done with it.

5        Q.    So as a review examiner, you would be reviewing

6    these sort of line-level examinations?

7        A.    Correct.

8        Q.    And then after becoming a review examiner, how did

9    you then move up in FDIC?

10       A.    The next position I held was a case manager.  And I

11   held that for a number of years.  What FDIC did, they

12   essentially eliminated the review examiner position and they

13   added the -- they created the case manager position.  I

14   mentioned earlier that one of my responsibilities is

15   applications, like if a bank wants to establish a branch.

16   Originally, many years ago, we had a separate group of people

17   who handled those applications.  And what they did, they made

18   us case managers and gave us a complete portfolio of banks.

19   And we handled everything with those banks, if it was an

20   application, if I needed to review a report.  If I had it in

21   my geographic area, if I had a group wanting to open up a new

22   bank, I would be responsible for that initial review.  So the

23   work was very similar to a review examiner.  It was just a

24   little bit more broad.

25       Q.    And then you became a senior examiner; is that

1  right?

2      A.  A senior examiner for large financial institutions,

3  that's correct.

4      Q.  And so what did your responsibilities involve, just

5  generally?

6      A.  I left the regional office to be the examiner in

7  charge of a large bank headquartered in the southeast.

8      Q.  After senior examiner, you became a senior

9  examination specialist; is that correct?

10     A.  Yes.

11     Q.  What does that involve?

12     A.  At the time, it was the one position in the region.

13  We only had one senior examination specialist.  And I was

14  responsible for going to troubled banks, examining those

15  banks with help from other examiners.  I also handled the

16  development or assessment of the policies that FDIC would

17  develop.  So it continued to have examination

18  responsibilities, but it also had kind of a policy piece to

19  it as well.

20     Q.  So after becoming a senior examination specialist,

21  how did you then move up again in the FDIC?

22     A.  I became an assistant regional director.

23     Q.  Okay.  And so you've held that title permanently

24  since March of 2021; is that right?

25     A.  No.  The assistant regional director I held in late

1  2010.  Late 2010 I held that until I became the deputy
2  regional director permanently, yes.
3      Q.   So in your role as sort of deputy regional director,
4  you sort of oversee a lot of the things that we've been
5  talking about?
6      A.   Correct.  As deputy regional director, I oversee six
7  assistant regional directors.
8      Q.   So we've heard a lot about your experience in the
9  FDIC.  Let's talk about some of your training.  What training
10 have you received while being employed by the FDIC?
11     A.   The FDIC has a rigorous training program.  It's an
12 apprenticeship model where newly hired examiners sit
13 alongside seasoned examiners and kind of learn at the elbow
14 of that.  There's a lot of training.  Many times we have --
15 we will have very young personnel that will accompany us to
16 banks on examinations.  But we also have a series -- we have
17 a corporate university, a very large training facility in
18 Virginia where we send all of our examiners.  There are a
19 total of now six course schools that all hopeful examiners
20 have to attend.  They range from two to three weeks in
21 length.  And they start off as just kind of the way we start
22 off training examiners, they start off looking at bank
23 operations, like being able to assess how much money the bank
24 is earning, how much liquidity the bank has, things of that
25 nature.  And then it progresses to a little bit more detailed

1  financial analysis.  Then we expose them to loan reviews.  As

2  I told you, loan review is a very important part.

3       There's also a little bit more extensive review on

4  how banks manage their investments and the risk of changing

5  interest rates.  And then, ultimately, there's what we call

6  the KapStone course, where they provide support and they

7  learn enough where they can function as an examiner in charge

8  as the -- until a person becomes a commissioned bank

9  examiner, that's the terminology that we use, you can't be

10 the examiner in charge.  You can assist on an examination,

11 but you can't sign your name or be the official examiner in

12 charge.  So that's an extensive -- that's an extensive group

13 of courses that we go through.  And, really, that's just the

14 beginning.  We never stop going to courses.

15      Q.   So you continuously receive training --

16      A.   We do.

17      Q.   -- while employed?  And why do you continually

18 receive training even though you've been with FDIC for

19 decades?

20      A.   Well, things change.  Number one, things change, but

21 we also want to make sure that we maintain, you know, your

22 confidence.  And even if it's something that -- for example,

23 if we have something that we are training all of our case

24 managers, you know, I make sure that all of the assistant

25 regional directors and that I also attend so I'm hearing the

1 exact same thing, because we strive for consistency. We

2 strive for accuracy. And, you know, we are in a changing

3 financial environment. So we have to make sure that we

4 remain abreast of those developments.

5 Q. The jury is going to hear about safety and

6 soundness. What does that mean from the FDIC's perspective?

7 A. So the safety and soundness umbrella would be -- and

8 that's what my division does. We deal with safety and

9 soundness. Many times you will hear those -- that phrase

10 kind of exchanged sometimes with the phrase risk management

11 as well. But "safety and soundness" is a longer-running term

12 with FDIC where it means that the bank is being operated

13 consistent with applicable federal law, rules and

14 regulations. FDIC has a lot of rules and regulations. Well,

15 there are also rules and regulations that come from the

16 Federal Reserve. There are state laws and state rules and

17 regulations that are established for each of our individual

18 states. And so make sure they comply with all of the

19 external requirements.

20 And then also, a key part of safety and soundness is

21 to make sure that they are complying with their

22 board-established policies, the internal controls that are

23 established, and that that's part of what -- why we review

24 policies and review those things within an institution.

25 Q. So how does the safety and soundness of an

1  institution relate to FDIC risk?

2      A.   Well, you know, a key part of our function is to

3  make sure that there is not an excessive amount of risk to

4  our Deposit Insurance Fund.  We are given the charge to be

5  good stewards of that Deposit Insurance Fund.  And part of

6  that, part of the way we go about doing that is we determine

7  the risk in each individual institution.  And we assess, you

8  know, we assess -- you know, we have findings to determine,

9  you know, what we consider the level of risk.  We wouldn't

10  want -- we don't want risky banks that are subject to failure

11  and cost the Deposit Insurance Fund money, disrupt, you know,

12  the way that we go about doing our -- that the public goes

13  about doing their banking business.  So that's one aspect of

14  it.

15      Q.   So the jury heard a lot about Palmetto State Bank.

16  Is Palmetto State Bank FDIC-insured?

17      A.   It is.

18      Q.   And have you been asked to review documents and

19  evaluate the compliance with banking practices and procedures

20  and safety and soundness?

21      A.   I have.

22      Q.   So what was your role prior to being asked to review

23  documents?  What was your role with Palmetto State Bank

24  before we requested you review these documents?

25      A.   Sure.  I'm responsible for all of the banks, all of

1    the insured banks in the region.  I guess we have between 6-

2    and 700 banks now.  So it's just -- it is another bank that

3    I've had there.  But I was generally aware of developments,

4    you know, at the institution.  So it was, you know, something

5    I was certainly aware of.

6        Q.   Were you at all involved in any of the sort of

7    first-line examinations of Palmetto State Bank?

8        A.   No.

9        Q.   Okay.  So you were really just tasked with reviewing

10   documents that we provided to give an opinion about those

11   practices and procedures?

12       A.   That's correct.

13       Q.   What documents have you reviewed in forming your

14   opinions here today?

15       A.   I reviewed the bylaws of the institution.  I've

16   reviewed the loan policy for the institution.  There have

17   been a number of listings or recaps of accounts, account

18   activity, whether it's statements or just full recaps.  I've

19   also looked at a number of images of checks that were

20   written, deposit slips that also included the items that were

21   deposited.  Let's see.  There were also some conflict of

22   interest policies as well and --

23       Q.   Loan documents?

24       A.   -- I may have overlooked a couple.

25       Q.   Have you reviewed loan documents that we provided?

1    A.   Oh, yes, I also looked at notes, loan documents,

2   loan applications, the applications that were provided and

3   signed by the borrowers as well.

4    Q.   How about communications related to these loans and

5   loan documentation?

6    A.   There were a number of e-mails that I reviewed as

7   well.

8        MS. LIMEHOUSE:  Your Honor, at this time we would

9   move to have Mr. Tim Rich designated as an expert in safe and

10  sound banking practices.

11       THE COURT:  Is there an objection?

12       MR. DANIEL:  No, Your Honor.

13       THE COURT:  Very good.  The Court recognizes the

14  witness as an expert in safe and sound banking practices.

15  Please proceed, Ms. Limehouse.

16       Ms. LIMEHOUSE:  Thank you, Your Honor.

17  BY MS. LIMEHOUSE:

18   Q.   The jury's heard a lot about community banks and

19  that Palmetto State Bank was considered a community bank.

20  Describe for them from a FDIC perspective what it means for a

21  bank to be a community bank?

22   A.   Okay.  There's not a -- there are different views on

23  what a community bank is.  There's not a hard-and-fast rule.

24  The way FDIC manages its data, it breaks out -- it does have

25  a definition for community banks.  And out of our, you know,

1   almost little over 4,700 banks, about 4,300 banks across the

2   country meet that definition.  So just over 90 percent of the

3   banks that FDIC insures are community banks.

4           So a community bank is typically an institution that

5   serves its local community.  And so it's almost easier to say

6   what a community bank is not than what a community bank is.

7   But if you live and you see, you know, that the main office

8   is not too far away from you, there might be a branch network

9   in and around your local area, and that bank, the bulk of its

10  business is lending to its local community, lending to local

11  businesses, lending to local consumers and customers, that's

12  typically a community bank.  They are typically smaller in

13  size, but we also have small banks that might do something

14  different.  They may do nothing but issue credit cards all

15  the way across the country.  That's not a community bank.

16  That's a specialty bank that we wouldn't consider that a

17  community bank.  So community banks, they play a vital role

18  in their communities.  They are the ones that are there to --

19  they employ a lot of people.  But they also make those loans

20  to many consumers and many small businesses, many of whom may

21  just be starting out.  So they usually have a fairly small

22  footprint, the area where their main office and their

23  branches are located.  And as I said, they are typically

24  smaller institutions.  You know, half of the institutions

25  that we consider community banks are less than $325 million

1  in total assets.  So that's a fairly small institution.

2     Q.   So relatively, where does Palmetto State Bank fit

3  into that community bank profile?

4     A.   They are actually a bit larger, on the larger size.

5  They are in the upper quarter.  They are in the top 25

6  percent of community banks by size.

7     Q.   From a regulatory perspective, how does a community

8  bank differ from a national bank?

9     A.   Well, community banks can be a national bank.  They

10  could have, like, "First National" in their name.  But if you

11  are talking about a bank with a regional or national

12  presence, they do differ.  They are locally -- many times

13  they are locally owned.  Many times they are locally managed.

14  You know, you may encounter the executives in the community

15  where you live and where you work.  But, you know, a large

16  institution that may be headquartered out of, you know,

17  Charlotte or New York or something like that, they would have

18  a national footprint.  They are everywhere.  I mean, you can

19  rattle off the first, you know, largest five or six or eight

20  banks and you know that they are very large and they have a

21  national presence.  They make the larger loans.  Many times

22  the banks with a national footprint or big regional bank,

23  they are not going to make that small business loan down to

24  the size that a community bank might.  So that's a key

25  distinction.

1  Q.   Is a community bank required to comply with the same

2  FDIC regulations as a larger, say, Bank of America, for

3  example?

4  A.   On the -- in the core aspects of it, absolutely.

5  Sound banking is sound banking regardless of the size of the

6  institution.  I will say, because FDIC is very concerned

7  about community banks, number of community banks are

8  declining, there are some rules that apply to only banks that

9  are over $10 billion in total assets.  So that's just the top

10  125 banks or so around the country.  But for those that are

11  the vast majority of banks, we all have equal expectations of

12  those institutions.

13  Q.   So from a high level, let's talk a little bit about

14  those FDIC regulations and their reporting requirements of a

15  FDIC-insured institution.  So what are the reporting

16  requirements that a FDIC-insured institution has to comply

17  with to maintain their FDIC-insured status?

18  A.   Well, one of the requirements is that they provide

19  the FDIC with a quarterly financial report.  We refer to

20  those as call reports, c-a-l-l, or reports of condition and

21  income.  So you have -- they provide us with how their

22  profits are so far during the year.  And they send us a

23  balance sheet that shows all of their assets and liabilities.

24  Those are the first two pages.  And then there's a number of

25  additional schedules behind that that provides a great deal

of detail.  So they wouldn't just provide this is how much we

have in loans.  There's a schedule that shows, here are the

types of loans that we have.  Here's a breakout of all of the

different loans that we have.

Q.   So quarterly, how does that coincide with the

calendar year?

A.   It's March 31st, June 30th, September 30th, and

December 31st, so the typical calendar quarters.

Q.   So in these quarterly call reports, you said

basically they need to provide a balance sheet, assets and

liabilities, and that loans would be included on this

information to the FDIC.  How are overdrafts included on a

call report quarterly?

A.   Well, overdrafts are reported as loans.

Q.   Why is that?

A.   Well, if you have a positive balance in your banking

account, the bank owes you.  If you have a negative balance

in your bank account, you owe the bank.  So that's a loan.

It's -- in effect, an overdraft is a loan.  Many times it's

unplanned, but it is a loan, nonetheless.

Q.   So is it secured?  Is that loan secured by anything

when a customer is allowed to go into overdraft?

A.   With very rare exceptions.  Overdrafts are unsecured

loans.  And as I noted, they are usually unplanned.  Someone

is either -- they don't have enough cash to pay for

1    something, so they've overdrawn their account.  So it's

2    unsecured -- it's unplanned.  So it's a pretty risky

3    situation for the institution.

4        Q.   So overdrafts would be included on the bank's

5    liabilities and these quarterly reports because it's a risk

6    that the bank has assumed by extending the overdraft?

7        A.   Well, overdrafts would be carried as an asset on the

8    bank's books because it's a loan, but it would be shown as a

9    loan that would be due and collectable by the institution

10   from the loan customer.

11       Q.   The jury's heard a lot about loan practices

12   generally from some Palmetto State Bank employees, but from a

13   FDIC perspective, let's talk about generally what a proper

14   loan practice involves.  Underwriting, what generally happens

15   when a customer comes to the bank and requests a loan?

16       A.   They will apply for the loan.  They will provide --

17   depending upon the type of loan, they will provide enough

18   support to show that they could repay the loan.  That's the

19   first question a loan officer asks is, how am I going to get

20   repaid.  So it could be something as you start off with a car

21   loan, that your banker may only require a pay statement from

22   you to show that you have a steady means of employment.  They

23   might run a credit check.  You are going to say, I'm going

24   to -- here's my loan application, I intend to buy a new truck

25   with this -- if you give me money, I'm going to go buy a new

1  truck.  And if the bank says, okay, we are going to need

2  collateral, how about we get the title on that truck so we

3  will have something in case you don't pay us, you know, we

4  will have something, a way to collect, to collect that.  So

5  you have -- you determine ability to repay --

6      Q.   What documents do you typically review when you are

7  determining the ability for someone to repay on a loan?

8      A.   In a simple example with a car loan, for example, it

9  might simply be, you know, just proof of income.  But as you

10  work up, the larger the size, the more complexity, then you

11  require financial statement.  If you are buying a home or

12  refinancing your home, you know, the standard information

13  that would be required would be you will provide a listing of

14  everything you own and everything you owe and how much you

15  make and what are your expenses each month.  And that

16  would -- and the banker will take that or the underwriter

17  will take that and decide whether you have the ability to be

18  able to make the payments on a regular basis on that loan.

19  And they will also look at the collateral, you know, what's

20  protecting the loan.  And with a house loan, usually it's the

21  house.  You know, with a car loan, usually it's the car.

22          But there's -- and as you continue to get a little

23  bit more detailed, instead of you just listing your assets,

24  they might require you to provide your tax returns, because

25  that will -- that's another way to show what you owe, how

1    much you make, where your money goes as well.  So that's yet

2    another -- as you move up in levels of complexity, you know,

3    you would see that.  And we see all of those things, all of

4    those types that I just described in our community banks.

5         Q.    When we talk about collateral, what's the bank's

6    rights with respect to that collateral, securing a loan?

7         A.    What are their rights?

8         Q.    Uh-huh.

9         A.    Well, first off, they have the right to, if you

10   don't make your payments and you become what we would say you

11   are in default, you are not making your payments, the bank

12   would follow, you know, legal steps to take the collateral so

13   that they could recoup all or a portion of what they've

14   loaned out.  So they would -- they have the right to take the

15   collateral, whether it's repossessing an automobile or to

16   foreclose on real estate, to take that real estate back into

17   the bank.  And they would then try to sell it to try to

18   recoup their loan.

19        Q.    What is the importance of collateral in assessing a

20   risk in extending a loan?

21        A.    Well, there are many loans that a bank would not

22   otherwise make if they didn't have collateral.  You know, if

23   you had a $200,000 mortgage and you are going to repay it

24   over 30 years and the bank said -- the bank is going to

25   require that house as collateral.  They are not going to loan

1    you for 30 years unsecured.  A lot can happen over 30 years.

2    So that's -- the collateral -- taking collateral or having

3    collateral allows the bank to make loans and serve their

4    community.  They otherwise wouldn't typically make those

5    loans without collateral.

6        Q.    So what does it mean when a loan is under

7    collateralized?

8        A.    Undercollateralized?  That means just that looking

9    at -- it means the balance of the loan is greater than the

10   value of the collateral that's protecting it.  So with a car

11   loan, of course, with a typical car loan, cars are really

12   expensive these days and they are going up, it seems,

13   typically, you always hear you drive a car off the lot, the

14   value decreases by X percent.  So you are under.  The bank is

15   exposed.  That car is not worth as much as it was the day you

16   bought it.  And, you know, that's -- you could say

17   undercollateralized.  You could say it's under water, maybe

18   with your mortgage, my house declined in value, so I owe more

19   than my house is worth.  People use the phrase "under water,"

20   "upside down" or "undercollateralized," all of those terms

21   pretty much mean the same thing.

22       Q.    So what's the risk to the bank when a loan is

23   undercollateralized?

24       A.    When the loan is undercollateralized from -- well,

25   there's the risk that if the bank has to take the collateral,

1   they are not going to get all their money back.  And I would

2   also say that from a consumer behavior standpoint, if the

3   consumer knows they are under water, if they know that, you

4   know, the value of their house has declined by 50 percent and

5   it's a vacation home, you know, the likelihood of that

6   customer walking away from that, saying, why should I pay

7   twice as much, I owe twice as much than it's worth, why would

8   I continue making these payments, I will let the bank take it

9   back.  So there's greater risk.  When there's a collateral

10  shortfall or undercollateralized, it's not only just subtract

11  this from this and we are exposed.  There's also the risk

12  that the borrower may just walk away and not pay the loan.

13       Q.   The jury's heard about charged-off loans.  What does

14  it mean for a loan to be charged off?

15       A.   That means that under either -- under internal

16  practices, which FDIC reviews to make sure that they are

17  reasonable, based upon the bank's policies, the loan is no

18  longer what we would consider a bankable asset.  It is of a

19  quality which they can no longer show as a bankable asset.

20  So they have to write that off against their -- they have a

21  reserve that they maintain to manage or to offset a normal

22  level of loan losses.  So once it's charged off, it's removed

23  from the books of the bank.  So when that quarterly report,

24  when they send it to us, it would not be on that report.  And

25  so when a bank charges it off, ultimately, it goes against

1  the bank's capital.  It hurts the bank's earnings.  It hurts

2  the bank's capital.  And it's gone.  But the loan still

3  exists.  The contractual relationship and the customer's

4  obligation to pay, none of that is impacted when a bank

5  charges a loan off.

6  Q.  What are the bank's rights with respect to

7  collateral that is secured but now charged-off loan?

8  A.  They would have the same rights.

9  Q.  So they would assess what to do with that

10  collateral?

11  A.  I'm sorry?

12  Q.  They would assess what to do with that collateral?

13  A.  Yes.  They would have to make a determination

14  whether to take the collateral and try to get, you know, a

15  portion of their money back.

16  Q.  We talked about typical car loan, for example, or a

17  home loan.  And you referenced the stated purpose of that

18  money.  What's the importance of the stated purpose from a

19  bank's perspective in determining whether to extend a loan?

20  A.  Well, it's part of the loan application.  If a

21  person says, I'm going to take this money, I'm going to buy

22  that new truck with it, and that's the reason that the bank

23  makes the loan, they look at it and they say -- they look at

24  the customer, they look at their income and they say, yeah,

25  he can afford a new truck payment, he will sell his old

1    truck, he will get the new truck, and he will make the

2    payment.  If the borrower takes that money and they decide to

3    go out and buy a new Bass boat, now they've got an old truck

4    and they are pulling the Bass boat, and they still have the

5    same payment.  Well, before long, the customer is going to

6    really need that new truck.  And if they have to come back

7    and then buy the truck, then they've got two payments.  They

8    might be able to afford it.  They might not.  But the bank's

9    decision was your primary car, this was for your primary car,

10   you needed it to go to work, you needed it to take your kids

11   to school, that's what the purpose is.  So if they use it for

12   something else, number one, if the bank was looking for the

13   collateral to be that truck, you know, there's been a great

14   misunderstanding if the person didn't go out and use the

15   money for the stated purposes.

16        If it was to build a house, if you were constructing

17   a new house, and which any time you are constructing or

18   refurbishing a home, there's a lot of risk to the institution

19   because they are making a loan under the assumption and under

20   the promise that the borrower is making that in the end, the

21   bank is going to have -- if it takes it as collateral, the

22   bank is going to have that new home or that improved home as

23   collateral.

24        So if you have a loan that, you know, I'm going to

25   go build a house, and then you start off with a lot that's

1  worth 40- or $50,000, I'm going to build a $300,000 house, if

2  you take that money and spend it off on something else and

3  the bank's only collateral is that lot instead of a built-out

4  house, it's a big problem for the bank.  And that's why banks

5  are required, and a good prudent bank will do this, they will

6  go and inspect the pace of construction.  And they will only,

7  you know, hand out the money as the construction progresses.

8  They are not going to give you all $300,000 the day that you

9  start construction.  They are going to have you dig the

10  foundation or the footing.  You know, pour walls, and that's

11  going to be your foundation draw.  Then you are going to

12  frame it and there will be a framing draw, rough plumbing,

13  electrical, roofing, Sheetrock, cabinets, flooring, all of

14  those things, they are only going to give you that money --

15  in a prudent fashion, they are only going to give you that

16  money as you build out that house.

17      Q.   So is the customer limited by the use of those funds

18  based on the stated purpose of the loan?

19      A.   Yes.

20      Q.   And by representing the stated purpose on signed

21  loan documents, are they representing that that is how they

22  will use those funds?

23      A.   Yes.

24      Q.   So how about when the loan officer knows that the

25  customer is not going to use those funds for the stated

1    purpose?  Is that considered a safe and sound, proper banking

2    practice?

3        A.   No, it's not.

4        Q.   When we talk about loan approval, you talked about

5    the documents that you would collect, assessing the

6    collateral, all in determining the risk to the bank and

7    whether a loan should be extended.  When is a loan considered

8    to be approved?

9        A.   When the individual or committee that has the

10   responsibility for approving that loan actually acts on it

11   and approves it.  So, you know, some loans, the loan officer

12   can simply approve it, and it's approved.  Some loans, given

13   their size, it may be above the total amount, if you've

14   got -- there are lending -- excuse me, loan limits that each

15   officer can have.  They can't go above those limits

16   themselves.  They have to take it up to a loan committee or

17   to an executive committee, or if it's large enough, they have

18   to take it to the full board of directors.  So the loan is

19   not approved until whoever has the ultimate authority to

20   approve the loan, until they actually approve it.

21       Q.   And what role does the signed loan package have in

22   when that loan is considered to be approved?

23       A.   The signed loan package?

24       Q.   Uh-huh.

25       A.   Well, it's everything that they put together.  Like

1    I said, the application is the proposed note.  And it's also

2    the analysis done by the loan officer and what they represent

3    to whoever the approvers are, what they represent the overall

4    factors to be for consideration.

5        Q.   Is it consider a safety and sound banking practice

6    to extend advances on loans before they are actually

7    approved?

8        A.   No.

9        Q.   And why is that?

10       A.   Well, I mean, things can change.  Things can go

11   wrong.  I mean, you want to make sure that the people who are

12   responsible for approving a transaction, that they actually

13   do that before the money is out the door.  Once the money is

14   gone, you know -- there's a reason that companies, and in

15   this case banks in particular, have boards of directors and

16   committees and individuals with certain levels of

17   responsibility.  You move up different levels so that that

18   entire committee, all of their experience and their

19   responsibilities, they can collectively consider something

20   that, because it's a larger loan, it has greater risk.  The

21   larger the loan, the greater risk to the bank, the greater

22   risk to the FDIC, Deposit Insurance Fund.  So as it works up,

23   it's not that you have to have everyone say yes.  But

24   everyone has to be aware of it so that they can provide their

25   perspective to the loan.  And most bylaws require that

1  everyone be aware of proposed loans if it's at their level,

2  if it's at that level for approval.  You know, it's why we

3  require a lot of things done at the full board level.  It

4  doesn't require unanimous vote of the board.  But it requires

5  that the full board is aware.  Because all of these

6  directors, they take an oath, they have a tremendous

7  responsibility, but they also bring a wide perspective.  And

8  they could provide their perspective to every proposed

9  decision, significant decision in the institution.

10      Q.   So if an advance is made on a loan prior to a signed

11  promissory note and approved loan package, what are the

12  bank's rights with respect to collecting on that advance?

13      A.    Well, if they haven't -- first off, if it's not an

14  approved loan, then it's technically not a loan from the

15  institution.  If one of the things, if they have not

16  perfected their collateral position, for example, so if they

17  don't have the title for the car in hand, if they don't have

18  the mortgage executed yet, so there's a potential exposure

19  from a collateral standpoint, they may not be able to collect

20  or take the collateral, potentially.

21      Q.   You talked about a typical process that's involved

22  when a home is being constructed.  How about the typical

23  process for purposes of when a home is being renovated, a

24  second mortgage for purposes of renovations, what does that

25  loan process typically look like?

1    A.    It would be similar.  Again, I think the bank would

2    anticipate if the directors or the approving authorities were

3    told, you know, the purpose of this loan is to improve a

4    home, you know, you would expect that the home would be worth

5    more when they are done working on it.  So you would expect

6    for a home improvement loan, you would expect the loan,

7    again, to sort of work out over time.  As you spent money, if

8    you had a handyman working, or if you pulled things out and

9    had carpenters and things of that nature, you would probably

10   typically not use all of your money all at one time.

11       Q.    So what due diligence would be involved in

12   determining whether a home is actually being renovated?

13       A.    Well, you would -- first off, if you are taking the

14   home as collateral, you would want to make sure you have a

15   current appraisal on the home.  So someone would go out there

16   and review and appraise the home for whatever the value would

17   be.  And then a prudent practice would be to do periodic

18   inspections.  And that would be the same.  You would expect

19   the inspections, you know, if you were building a home as

20   well.

21       Q.    You testified about overdraft and how overdraft is

22   considered an unsecured loan on the bank that would be

23   required to be reported to the FDIC.  Is it considered a

24   proper banking practice to allow someone to continually go

25   into substantial overdraft status?

1    A.    No, it's not.  We -- many banks, and at the behest

2    of FDIC and other banking regulators, if an overdraft, you

3    know -- again, it depends on the institution.  But

4    anywhere -- if an overdraft runs continuously anywhere

5    between, you know, 30 to 90 days, typically 60 days is what

6    we see, they are required to actually charge that off.  The

7    bank is required to charge that off and determine that it's

8    uncollectable.  So in my view, once something has run for a

9    period of time, it's probably the quickest loan in terms of

10   how long something is sitting out there.  It's probably the

11   quickest loan that would require charge-off.  And that really

12   goes to the risk of someone just overdrawing their account.

13   Q.    So you've provided a great background.  Let's go

14   into some of the specific loans that you've been asked to

15   review and opine about today.  Were you asked to review a

16   $500,000 line of credit that was issued to Alex Murdaugh in

17   February of 2015?

18   A.    Yes.

19   Q.    I'm going to pull up a couple of those documents.

20   Exhibit 87A, please, so this loan No. 6986998, note amount

21   $500,000, is this the loan that you were asked to review?

22   A.    Yes.

23   Q.    If you will go to 87B, please.  Describe for the

24   jury what this document is.

25   A.    It's part of the loan application.  It's a business

1    purpose statement, where the borrower is explicitly stating

2    what the funds are going to be used for, what type of

3    business is involved.

4        Q.    All right.  So I'm just going to highlight the date

5    here, February 9th, 2015.  This farming, is this the stated

6    purpose of this $500,000 line of credit?

7        A.    It is.

8        Q.    So how are proceeds for the stated purpose of

9    farming supposed to be used?

10       A.    Agricultural lending, break it out into two broad

11   categories.  One would be kind of like that car loan.  You

12   would pay it off over time.  So if you needed a new tractor,

13   you needed, you know, a new disk, a new cultivator, any of

14   those things, that are capital expenditures, the equipment

15   and things of that nature.  You would borrow that money.  You

16   would pay it off over time, whether it's three years, five

17   years, 10 years.  You typically pay it off over the useful

18   life of that equipment.

19            The second type of agricultural lending is what we

20   call production lending, where a borrower, they use that

21   money for, you know, fertilizer, seed, diesel fuel, all of

22   the things that they would need to actually put in a crop.

23   And, again, you would see the flow of funds in a production

24   loan kind of like the construction loan as well.  They would

25   take it over time.  They would get the money, again, for

1  seed, for fertilizer, if they needed weed control or spraying

2  later on, and then ultimately the expenses it would be to get

3  their crop in, if you are talking about a row crop like

4  cotton or soybeans or something like that.  So they would

5  expend money over time.  And over the growing season comes

6  the harvest.  They would get paid for whatever they were

7  growing.  And they would pay off the line and hopefully have

8  a profit to show for it.

9      Q.  So would the borrower here, Alex Murdaugh, be

10  limited to the use of the proceeds for purposes of farming?

11      A.  That is the stated purpose, so that would be -- my

12  reading of it would be it would be for farming.

13      MS. LIMEHOUSE:  Exhibit 87C, please, if you will

14  just highlight the bottom, please.

15  BY MS. LIMEHOUSE:

16      Q.  So based on your review of these documents, who was

17  the loan officer on this $500,000 line of credit?

18      A.  I believe that's Russell Laffitte's signature.

19      Q.  I'm going to pull up Government's Exhibit 88.  Did

20  you review advanced records related to this $500,000 line of

21  credit?

22      A.  Yes.

23      Q.  I'm going to highlight for the jury a $284,787.52

24  advance made on February the 20th of 2015.  Did you review

25  the advance that was made on this $500,000 line of credit for

1  purposes of farming?

2      A.   Yes.

3           MS. LIMEHOUSE:  Pull up Government's Exhibit 95A,

4  please, just the middle portion on the left.

5  BY MS. LIMEHOUSE:

6      Q.   Did you review this $284,787.52 check from the

7  advance of the line of credit?

8      A.   Yes, I did.

9      Q.   Okay.  And based on your review, how was -- how were

10  the proceeds of this line of credit used?

11      A.   They appeared to have been replenishing funds in

12  another account.

13      Q.   And based on your review of the records, was the

14  $284,787.52 a proper use of the loan funds extended for the

15  purposes of farming?

16      A.   No.

17      Q.   I'm going to pull up Government's Exhibit 57,

18  please.  If you will just do the bottom narrative portion,

19  please.

20           I'm going to read an e-mail that the jury has seen.

21  It's e-mail from Alex to Russell -- from Russell Laffitte to

22  Alex Murdaugh:  These are the loans outstanding.  I have

23  advanced $284,787.52 from your credit line to pay these off.

24  She turns 18 and I'm closing the conservatorship.

25           This e-mail also shows a series of loans related to

1    the account of Hannah Plyler.

2         MS. LIMEHOUSE:  And then if you will highlight the

3    top portion of the e-mail, the response.

4    BY MS. LIMEHOUSE:

5         Q.   This is an e-mail from Alex Murdaugh to Russell

6    Laffitte in response:  Please hold off on this until I return

7    and can meet with you.  Hard to follow all of this on my

8    phone.

9         So from your review of these records, who is making

10   the decision on how those proceeds from the line of credit

11   were being used?

12        A.   Russell Laffitte.

13        MS. LIMEHOUSE:  Please pull up Government's Exhibit

14   58, just the top portion of the e-mail, please.

15   BY MS. LIMEHOUSE:

16        Q.   This is an e-mail from Alex Murdaugh to Russell

17   Laffitte:  Also, I need to do whatever we have to do to

18   activate my full credit line.  I didn't quite understand what

19   you were saying.  But I took it that there was something else

20   that needed to be done.  I had not figured the payoff for

21   Hannah and the other loan when I was planning.  When we paid

22   those, it took most of the partial line you activated.  I

23   need to do it fairly quickly too.  There are two pieces of

24   equipment I need for planting.  Thanks.  And I will call you

25   after I speak to Mark.

1    So had the money been spent on two pieces of

2    equipment, would that have been a proper use of a loan for

3    the purposes of farming?

4    A.    Yes, based upon the e-mail, yes.

5    Q.    But instead, based on your review, Mr. Laffitte used

6    these funds to pay off loans from Hannah Plyler?

7    A.    Correct.

8    Q.    I'm going to move to the $750,000 beach house loan

9    that the jury has heard about.  Pull up Government's Exhibit

10   10A.  Did you review loan documents related to the $750,000

11   loan for purposes of beach house renovations?

12   A.    Yes.

13   Q.    So that would be loan No. 6996048, note amount

14   $750,750, note date July 15th, 2021.  Is this the promissory

15   note that you reviewed in preparation for your testimony?

16   A.    It is.

17   Q.    Government's Exhibit 10B, please.  So we just saw

18   this related to the line of credit, but what is this

19   document?

20   A.    That's the same form, just it relates to this loan.

21   It's the business purpose statement.

22   Q.    And so it indicates that's a loan on July the 15th,

23   2021, for purposes of business expenses and investment?

24   A.    Correct.

25   Q.    Government's Exhibit 10C.  Did you review the

1    collateral statement with respect to this $750,000 loan?

2        A.    Yes.

3        Q.    And what did the documents indicate about the

4    collateral that secured this beach house loan?

5        A.    It was one share of stock that was related to a

6    farm.

7        Q.    And this one share of stock, was it commensurate to

8    the value of the $750,000 loan?

9        A.    No.

10       Q.    If we could go to 10D, please.  So what is this

11   document that the jury is looking at?

12       A.    This would be an internal bank document where they

13   are analyzing the loan.  I'm not sure what -- the title of

14   this document.  But what they are doing, they are looking at

15   how the collateral measures up for this proposed loan.

16       Q.    So we talked about the one share of Green Swamp

17   being the collateral securing the $750,000 loan.

18       A.    Correct.

19       Q.    And it indicates some information about the value of

20   that collateral and the value that's able to be pledged on

21   this loan.  And what did your review of those documents

22   indicate?

23       A.    The review of this document suggests in the bank's

24   system that it says the stock is already pledged elsewhere.

25           MS. LIMEHOUSE:  If you could pull up Government's

1 Exhibit 10E, please.

2 BY MS. LIMEHOUSE:

3   Q.   Is this a document that you reviewed with respect to

4 the $750,000 loan?

5   A.   Yes.

6   Q.   And did it indicate that there was a transfer of

7 $400,000 on August the 9th of 2021?

8   A.   Yes.

9   Q.   I'm going to pull up Government's Exhibit 10I,

10 please.  So did your review also reveal a wire request from

11 July 15th of 2021 to Wilson Law Group in Bamberg, South

12 Carolina?

13   A.   Yes.

14   Q.   And who was the individual who made the request for

15 this $350,000 wire transfer?

16   A.   Russell Laffitte.

17   Q.   So if we go -- just refer back to that business

18 purpose statement, that July 15th date was on that promissory

19 note; is that right?

20   A.   That's correct.

21   Q.   So have you reviewed Alex Murdaugh's financial

22 picture at the time of this $350,000 wire transfer?

23   A.   I reviewed the information that the bank had in the

24 application.

25        MS. LIMEHOUSE:  Pull up 182, please.  If we can go

1    to July 15th, second page.  Sorry, third page.

2    BY MS. LIMEHOUSE:

3        Q.   So what did Alex Murdaugh's records indicate about

4    the status of his accounts at the time of this July 15th

5    transfer?

6        A.   He was significantly overdrawn $163,000 in his

7    account.

8        Q.   And in your review of these loan documents, were

9    there any updated tax return documents?

10       A.   No.

11       Q.   Was there a current financial statement?

12       A.   No.

13       Q.   What did your review indicate about Mr. Murdaugh's

14   credit score?

15       A.   His credit score, if I recall, was 607, which is

16   pretty low.

17            MS. LIMEHOUSE:  Okay.  And if we could pull up

18   Government's Exhibit 10K, please.  Oh, 10L, please.

19   BY MS. LIMEHOUSE:

20       Q.   Is this a document that outlines when the loan was

21   actually approved?

22       A.   It is.

23       Q.   And so the date here is August the 18th of 2021.

24   How does that relate back to the $350,000 wire transfer on

25   July 15th?

1    A.    It's well after that.

2    Q.    So did your review indicate that an advance was made

3    on this loan prior to it actually being approved?

4    A.    Yes.

5    Q.    So what was your overall opinion, based on the

6    review of these documents, about the $750,000 loan?

7    A.    It was a very large loan.  The funds went out the

8    door before the loan was actually approved by the

9    responsible -- the people who were responsible for ultimately

10   approving it, which is unusual.  That's not the way that

11   loans are funded.  So that would be an objectionable practice

12   on the part of the loan officer handling the loan to allow

13   this money to be funded before that.

14        And then the entire underwriting process for this

15   loan, where you've got a borrower who is significantly

16   overdrawn, you've got a weak credit score, you've got stale

17   financial information, you don't know what's been going on

18   with the borrower for over the last two years, you have an

19   idea because he's significantly overdrawn, so, you know, that

20   would suggest he's living beyond his means or he's not able

21   to pay his normal expenses.  But the overall underwriting of

22   the loan calls into question a number of questions that need

23   to be answered by the -- answered to the group that's

24   responsible for ultimately approving the loan, not just the

25   loan officer who goes ahead and cuts a check or authorizes a

1    wire transfer well ahead of approval.

2        Q.    Based on your review of all the documents, was the

3    loan used for the stated purpose of the loan?

4        A.    No.

5        Q.    Based on your review of all these documents, what

6    was your opinion with respect to the collateral securing the

7    loan?

8        A.    There was a collateral -- a clear collateral

9    shortfall, undercollateralization.

10       Q.    Undercollateralization.  So what's the risk when you

11   extend a loan like that when you don't have collateral

12   securing the value of the loan?

13       A.    There's the risk that if you have to -- if the

14   borrower cannot pay and you have to go take the collateral,

15   you are going to be -- the bank is going to lose quite a bit.

16       Q.    So was the extension of this loan in compliance with

17   safe and sound banking practices?

18       A.    No.

19       Q.    I want to move to the $680,000 payment.  The jury

20   heard a lot about that as well.  Did you review documents

21   relate to a $680,000 payment from Mr. Laffitte to a law firm?

22       A.    I did.

23       Q.    Did you review checks with respect to this extension

24   of a payment, e-mails, affidavits from individuals that were

25   involved in this -- had knowledge of this payment?

1    A.    Yes.

2    Q.    So what is the significance of Mr. Laffitte handing

3    over a check, from a banking perspective?

4    A.    It's a payment.  You write a check and you hand it

5    to someone, you've made a payment.

6    Q.    Once you relinquish yourself of that check, what are

7    your rights with respect to those funds?

8    A.    Well, the person who holds the check controls the

9    funds.  I mean, you write a check to someone, put it in their

10   hand, they can go do with it whatever they want.

11   Q.    I show you Government's Exhibit 78, please.  Excuse

12   me, Government's Exhibit 77.  Is this the $680,000 check that

13   you are referencing Mr. Laffitte passing over to the law

14   firm?

15   A.    Yes.

16   Q.    And does it indicate that the date of deposit is

17   October 29th, 2021?

18   A.    It does.

19   Q.    So you testified that the significance of handing

20   over the check is that you've lost control of those funds.

21   How about when they are actually deposited, what's the

22   significance?

23   A.    Well, the receiver, the recipient of that check,

24   they've gone ahead and deposited it into their checking

25   account.  They've negotiated the check, made the deposit and,

1  you know, in this case, the cashier's check, you know, it's

2  already been cashed or deposited.

3      Q.  So based on your review of all the documents in this

4  case, what's your opinion about Mr. Laffitte's authority to

5  make this payment as the CEO?

6      A.  Well, reviewing the bylaws, you know, and reviewing

7  the e-mails, he noted that he negotiated with this law firm

8  to arrive at an amount to pay, which they ended up at

9  $680,000.  I think it's a key distinction that he showed

10  in -- that the bylaws show that the chief executive

11  officer -- the difference between the responsibilities of the

12  chief executive officer and the Executive Committee, one

13  thing that's notably missing between those two explanations

14  in the bylaws are settlements, negotiations.  So from that

15  standpoint, it seems that the CEO did not have the authority

16  to enter into this settlement.

17      Q.  When we talk about the Executive Committee's

18  authority under the bylaws, did your review of the 680

19  payment determine that his payment complied with the bylaws

20  and the authority of the Executive Committee?

21      A.  I did review it.  And I concluded it did not comply

22  with the Executive Committee's requirements.

23      Q.  By why was that?

24      A.  Well, the bylaws state that for something to go --

25  first off, you have regular meetings.  There's -- the bylaws

1 provide for regular committee meetings.  And then it also

2 provides for things that occur in between meetings and how

3 you handle that.

4 So, for example, in this case, for the Executive

5 Committee to appropriately consider this settlement, all

6 voting members of the Executive Committee would have to be

7 consulted.  And a majority would have to approve the payment.

8 It's not just find the majority and keep the rest of the

9 Executive Committee from being aware of the payment.  That's

10 not what the bylaws state.  It's -- it would work the same

11 way with a loan approval.  If a loan had to go to the

12 Executive Committee, you would make sure that everyone was

13 aware of the proposed transaction.  So, again, it goes to the

14 collective experience of that Executive Committee.  Everyone

15 should be consulted on the committee.  That's what the bylaws

16 say.

17 Q.  And did your review show that everyone on the

18 Executive Committee was consulted prior to extending the

19 $680,000 payment?

20 A.  No, I did not see that.

21 Q.  So just to summarize, what is the CEO's duty with

22 respect to the Board of Directors?

23 A.  As I've sort of started off with, the Board of

24 Directors are responsible -- they are ultimately responsible

25 for all of the -- for everything that goes on in the bank.

1  And part of their responsibility is to set -- to get an

2  executive management team that can do the day-to-day duties

3  that they give them.  And then they also set policies that

4  these executive officers are required to follow.  So the

5  bylaws and the policies, CEO is expected to adhere to that.

6  CEO is responsible for day-to-day routine operations in the

7  institution.

8      Q.   So what's the CEO's duty with respect to reporting

9  to the Board?

10     A.   In this case, it appeared -- well, in this case, it

11  was an after-the-fact notification.  The payment was already

12  gone by the time that he notified the Board of the payment.

13  There was -- in looking at the e-mails, you saw that the

14  e-mails both to the Board of Directors as well as the

15  nonvoting member of the Executive Committee, which was the

16  chief financial officer, saw e-mails from them as well, they

17  asked all the right questions that a Board of Directors would

18  need to ask:  You know, when did this happen?  Who did this?

19  Is this person still employed?  The person that caused us

20  this great loss, are they still employed at the bank?  CFO

21  said, this sets a horrible precedent that we didn't consider

22  this, this, or this.  So all of those things -- those e-mails

23  showed exactly how a Board of Directors and executive

24  management needs to consider something before the fact, not

25  after the fact.  So the -- yes, go ahead.

1    Q.    Did they have that opportunity here?

2    A.    They did not.

3          MS. LIMEHOUSE:  No further questions, Your Honor.

4          THE COURT:  Cross-examination.

5          MR. DANIEL:  May it please the Court.

6                        CROSS-EXAMINATION

7    BY MR. DANIEL:

8    Q.    Good morning, Mr. Rich.  I'm Bart Daniel.  I

9    represent Mr. Laffitte.

10   A.    Good morning.

11   Q.    Are you familiar that the FDIC, your people, have

12   examined the Palmetto State Bank usually every 18 months or

13   so?

14   A.    Personally, I am not familiar with the frequency.

15   But, yes, we have.  I'm very familiar that we do examine the

16   institution.

17   Q.    I'm sorry.  Say that again.  I'm very familiar?

18   A.    I am not very familiar with what the actual

19   frequency is for that institution, but I am aware that we

20   examine the bank, yes, sir.

21   Q.    And you would agree with me that if that is every 18

22   months, then that's a good sign it's a healthy community

23   bank?

24   A.    We -- I really can't provide any insight on the

25   condition of the institution.

1    Q.   I believe you said on direct examination, you said

2    that it could be every year.  You said some, if they are

3    struggling banks, it could be every six months.  And this is

4    a lot longer than that, this is 18 months?

5    A.   Right.

6    Q.   So wouldn't you say that's a sign it's certainly

7    more healthy than a bank that is examined every year?

8    A.   Yes, sir, I agree that that's not the shortest and

9    it's perhaps not the longest period of time either.  Yes,

10   sir.

11   Q.   What would be longer?

12   A.   I believe we may go beyond that from time to time.

13   Q.   Okay.  But how much beyond that, months beyond that

14   or years beyond that?

15   A.   Well, I will tell you that what we have is that we

16   have a cooperative agreement with the state banking

17   departments in most of our states.  So many times, we may

18   have alternating examinations which may extend the

19   examination.

20   Q.   So you actually could do some every 36 months?

21   A.   That's right.  I think that's what you testified to,

22   yes, sir.

23   Q.   And are you aware that since Alex Murdaugh was

24   usually one of the largest borrowers of the bank, that the

25   outside auditors and the State Board of Banking Control, and

1  your FDIC, examined and closely scrutinized his loans on

2  every visit?

3      MS. LIMEHOUSE:  Your Honor, I just --

4      THE WITNESS:  I am not aware of that.

5      MS. LIMEHOUSE:  I just want to be clear about what

6  Mr. Rich knows.  He doesn't know any --

7      THE COURT:  He answered the question.  Overruled.

8  BY MR. DANIEL:

9      A.  No, I am not aware.

10     Q.  If you could please pull up Exhibit 17E, Defendant's

11  Exhibit 17E.  Okay.  And what is this?

12     A.  It looks like an external loan review conducted for

13  the institution.

14     Q.  Okay.  And it's Palmetto State Bank.  And it's dated

15  October 31st, 2018?

16     A.  Correct.

17     MR. DANIEL:  Okay.  Please go to page 4.  Pull up

18  page 4.  And if you would call out -- yeah, the top half so

19  we can see a little bit better.

20  BY MR. DANIEL:

21     Q.  Is this a rating system that's used for loans, for

22  particular loans for particular customers?

23     A.  Yes, sir.

24     Q.  And one would be Risk 3, and two would be minimal

25  risk, 3 satisfactory; 4 is acceptable risk, is that right?

1    A.    Based upon the scale, yes, sir.

2    Q.    And 5 would be -- it might make it, but we've got to

3    keep an eye on it.  And 6 would be you have to have other

4    assets and you should have other assets involved?  Wouldn't

5    you agree a list of some are just a little loss, number 9?

6    A.    My reading of risk rating 6 is other assets

7    especially mentioned.  Another term for that is special

8    mention.  It's just an another continuum on the scale.  You

9    wouldn't involve other assets.  It's just a grading.

10          MR. DANIEL:  Can you please go to page 8.  Okay.  If

11   you blow up Mr. Murdaugh's loans for this period.

12   BY MR. DANIEL:

13   Q.    Okay.  So he's got four loans outstanding on

14   September 4th, 2018?

15   A.    According to the report, yes.

16   Q.    Okay.  And there's a balance on the loans in the

17   next column.  Got the review date.  I'm sorry.  Review date

18   is 9/4/18.  And the balance on the loan is 600,000 on one and

19   $1,968,000, almost 2 million, and then 4.2.  And PSB, is that

20   Palmetto State Bank rating, you think?  Does an individual

21   bank rate their own loans before loan reviews come?

22   A.    They do.

23   Q.    And so the 4 would be -- the bank, according to the

24   bank, they think it's acceptable.  And they think this loan

25   is almost $2 million.  They rate that higher.  So it's better

1    than acceptable, right?

2         A.    Who rates it higher?

3         Q.    The outside auditors.  I'm sorry.  The Palmetto

4    State Bank --

5         A.    Outside auditors rate it more severely.

6         Q.    Okay.  But my question should have been, PSB's

7    ratings for the different loans, they rate the total almost

8    $2 million loan as a 3.  And that's better than a 4, right?

9    But it's the bank itself?

10        A.    That's correct.

11        Q.    And then they rate the next loan 442 at 3-4; is that

12   right?

13        A.    Yes, sir.

14        Q.    That's good.  Then they rate the final one, Boulware

15   as a 3, which is better than 3-4.  Now let's go to RMG

16   rating.  And what would this be?

17        A.    Based upon -- I've never seen this before, but based

18   upon the review, it appears that they assigned -- the

19   external loan review people assigned their ratings, and that

20   three of the four relationships were rated more severely than

21   the bank internally rated them.

22        Q.    But each of those loans is rated as No. 4, isn't it?

23        A.    That's what it shows, yes, sir.

24        Q.    And each of those loans then is an acceptable risk,

25   isn't it, according to these -- according to this rating?

1          A.    In 2018?  Based upon the time of the review, that

2     was the conclusion of an external party.

3          MR. DANIEL:  Let's go to Defendant's Exhibit 17F,

4     please.  Call it up.  And this is October, a similar report,

5     October the 30th, 2019.  And if you could go to page 8

6     please.  Call out Mr. Murdaugh's loans.

7     BY MR. DANIEL:

8          Q.    Okay.  We see something similar here.  This is 2019.

9     And Palmetto State Bank rates all three of those loans as a

10    3.  And RMG, the consulting group that does the outside

11    auditors, rate him as a 4.  And that's acceptable risk?

12         A.    FDIC does not use this 9-point rating system.  So

13    it's based upon their definitions.  If my -- you showed it to

14    me for just a moment.  It seems like 4 is the lowest category

15    before there's explicit concern about the relationship; is

16    that correct.

17         Q.    Let's pull up --

18         A.    Yeah.  I just saw it just a moment ago.

19         Q.    Looks to me what I'm reading says rated 4,

20    acceptable risk.  There's no qualification in it?

21         A.    Okay.

22         Q.    Okay.  And you mentioned -- you were talking about

23    the collateral and how the loan, clearly 750 loan was

24    undercollateralized.  Is that what your testimony was?

25         A.    Yes, sir.

1  Q.  Okay.  And are you familiar that the -- I think part

2  of being a community bank in a small community, and as you

3  testified on direct, they know the customers better?  They

4  know them like by a first name perhaps?

5  A.  I didn't quite follow your question.

6  Q.  Yeah.  I'm sorry.  I can be confusing at times.  So

7  one of the advantages, I believe you said on direct, you may

8  not have stated it exactly this, but one of the advantages of

9  a community bank in a small town is that the bank executives,

10  management, they know the customers?

11  A.  Yes.

12  Q.  Because they are closer?  They see the same

13  customers?  It's a small community?

14  A.  Yes.

15  Q.  And they know the customers' track record for making

16  good on payments and paying off their loans?

17  A.  Yes.

18  Q.  Okay.  And so one of the things that, when you were

19  looking at collateral, that you know that Palmetto State

20  Bank -- excuse me -- had a first and second mortgage on the

21  property known -- the plantation known as Moselle?

22  A.  I did not review the other loans.

23  Q.  Okay.  Okay.  And that's again an advantage of being

24  a local community bank when management knows the bank's full

25  picture of the borrower?  Okay.  And did you also know that

1 the beach house, which I believe was partially in his wife's

2 name, if not all, that Alex Murdaugh was listed -- is listed

3 as the sole beneficiary, and so that, the proceeds from sale

4 of that --

5 MS. LIMEHOUSE: Objection, Your Honor.

6 THE COURT: Sustained.

7 MR. DANIEL: Your Honor, if Mr. Murdaugh is due to

8 inherit --

9 THE COURT: It's not in evidence.

10 MS. LIMEHOUSE: Objection, Your Honor.

11 MR. DANIEL: Sir?

12 THE COURT: This is not in evidence. You cannot

13 testify, Mr. Daniel.

14 BY MR. DANIEL:

15 Q. Did you know that the bank has hired lawyers to

16 collect -- to get judgments against Mr. Murdaugh and collect

17 on those judgments?

18 MS. LIMEHOUSE: Objection, Your Honor.

19 MR. DANIEL: Your Honor, that is in evidence.

20 THE COURT: That's not in evidence. You could --

21 you can't testify, Mr. Daniel.

22 MR. DANIEL: But, Your Honor, the bank official

23 testified to that.

24 THE COURT: That they brought lawsuits? I hadn't

25 heard that.

1    MR. DANIEL:  Didn't say they brought lawsuits.  They

2    said they hired lawyers to pursue collecting judgments

3    against Mr. Murdaugh, the banker did.

4         THE COURT:  They said this after the fact.  It's

5    after all of this.

6         MR. DANIEL:  Yes, sir, I agree with that.

7         THE COURT:  If you want to time it after all of this

8    was disclosed, they then hired a lawyer, that's fine.  But

9    don't suggest it was going on at the time he's discussing

10   these loans.

11        MR. DANIEL:  I apologize to the Court.  I didn't

12   mean to suggest that, Your Honor.

13        THE COURT:  Well, then you need to ask the question

14   so it's not misleading.  You are going to need to ask it so

15   it's not misleading.

16   BY MR. DANIEL:

17      Q.   Okay.  Did you know that Mr. Murdaugh is the

18   beneficiary of his father's estate?

19        THE COURT:  Again --

20        MS. LIMEHOUSE:  Objection, Your Honor.

21        THE COURT:  -- it's not in evidence.

22        MR. DANIEL:  He testified to --

23        THE COURT:  You can't testify, Mr. Daniel.  And I

24   want to admonish you about this.  You can't keep bringing

25   things in front of the jury that isn't in.

1     MR. DANIEL:  And if you could bring up -- let's look

2  at the bylaws, please.  4.02, please, if you will bring that

3  up, Exhibit 4.02 of the bylaws.  Bylaws are Exhibit 3; is

4  that right?

5  BY MR. DANIEL:

6     Q.  Okay.  If you could please read.  This the Chairman

7  of the Board, 4.02, and it's the same bylaws you talked about

8  on direct examination.  Please read the highlighted excerpt.

9     A.  "Except as otherwise provided herein, and as may be

10  specifically limited by resolution of the Board of Directors,

11  the Chairman of the Board may execute on the corporation's

12  behalf any and all contracts, agreements, notes, bonds,

13  deeds, mortgages, certificates, instruments, and other

14  documents."

15     Q.  Okay.  And did you know that Mr. Charlie Laffitte,

16  the Chairman of the Board did, in fact, agree with coming to

17  an agreement in that proposed lawsuit or threat of a lawsuit?

18     A.  Which agreement or which threat of a lawsuit?

19     Q.  I'm talking about the -- let's look at this.  He

20  would have the power to make a loan of $750,000, wouldn't he?

21     A.  I'm sorry.  Say that question again.

22     Q.  The Chairman of the Board would have the authority

23  to make a $750,000 loan?

24     A.  The Chairman of the Board would have the authority

25  to make a $750,000 loan if the existing relationship is not

1   already above his lending limit.  The loan limits in the

2   institution were per relationship, everything that someone

3   had out to them.  So a lot of these were sitting at a million

4   dollars, if I am not mistaken.  And you saw the total

5   relationship, depending how it's calculated, was between 2.7

6   and $3.5 million, which means any additional advances would

7   need to go to at least the Executive Committee.

8       Q.   So -- but the Executive Committee could certainly

9   approve that?

10      A.   As long as it's considered -- as long as it's

11  consistent with the bylaws, yes, sir.

12      Q.   Okay.  And if you please pull up 4.03.  If you would

13  read the highlighted area.

14      A.   "Except as otherwise provided herein, and as may be

15  specifically limited by" -- that doesn't make sense.  "Except

16  as otherwise provided herein and as may be specifically

17  limited by of the Board of Directors or an authorized

18  committee thereof, the CEO shall have full authority to

19  execute on the corporation's behalf any and all contracts,

20  agreements, notes, bonds, deeds, mortgages, certificates,

21  instilments, and other documents."

22      Q.   Okay.  So it's got contracts and agreements in

23  there.  And that means that the chief executive officer,

24  without talking to anybody, can settle a difference, settle

25  some sort of agreement or comply with some kind of contract

1   or agreement that he had with the law firm?  Doesn't it say

2   that right there?

3       A.   My reading of the bylaws does not suggest that.

4       Q.   Well, I don't want to argue with you, Mr. Rich.  It

5   says right here, "all contracts and agreements."

6       A.   I'm simply saying that I read the bylaws, not these

7   two excerpts.  So I'm happy to take a look at what the

8   Executive Committee portion of the bylaws say and the

9   distinction that's clearly drawn between the responsibilities

10  of the CEO, the Chairman of the Board, and the Executive

11  Committee.

12      Q.   That's correct.  Are you familiar with the financial

13  history of Palmetto State Bank and its successes?

14      A.   And its what?

15      Q.   And its successes.

16      A.   No, I couldn't say that I am familiar with the

17  history, the entire history of Palmetto State Bank.

18      Q.   Okay.  Did you know it has a long history of being

19  one of the most profitable community banks in South Carolina?

20          MS. LIMEHOUSE:  Objection, Your Honor.  He just said

21  he didn't know.

22          THE COURT:  Again, you are offering evidence not yet

23  in the record.  You can offer it but you can't testify to it,

24  Mr. Daniel.  Sustained.

25  BY MR. DANIEL:

1    Q.   And did you familiarize yourself with the long-term

2    loan history of Alex Murdaugh?

3    A.   I only reviewed the documents that were provided to

4    me.

5    Q.   Okay.  And when does that begin?  When do those

6    documents begin?

7    A.   I think I saw some dates that go back to 2011

8    involving maybe not Murdaugh, but maybe involving some of the

9    checks that were written around 2011.  And then there was a

10   spate of activity around 2015.  And then moving forward, it

11   moves forward more frequently from there for 2018 --

12   Q.   You didn't look at any of his loan history?  You

13   looked at certain checks.  How far back did you go looking at

14   his loan history?

15   A.   His loan history?

16   Q.   Yes, sir.

17   A.   I think it's probably within that window.

18   Q.   What, sir?

19   A.   I don't think I saw anything older than 2011.  I

20   think the oldest thing I saw -- and I can't recollect just

21   off the cuff if what I saw dated 2011 was related to a

22   Murdaugh loan or if it was related to the commingling of

23   payments on Plyler and Badger and those.

24   Q.   My question specifically, though, Mr. Rich, is his

25   loan history, not any of the checks involving anyone else,

1  but Mr. Murdaugh's loan history. What's the farthest you

2  went back?

3     A. I would have to review all of the documents that I

4  was provided to put my finger on a date. I'm sorry. I just

5  don't -- I just don't have that recollection to say. I could

6  guess, but don't want to guess.

7     Q. I don't want you to guess. Let me ask the question

8  this way. Are you familiar that he had a long track record

9  of borrowing money --

10        MS. LIMEHOUSE: Objection, Your Honor.

11        THE COURT: Mr. Daniel, we are struggling with this

12  issue. Let me make it clear. If it's not in the record, you

13  can't ask him about it putting new evidence in the record

14  that's not in the record. If it's in the record, you can ask

15  him about it. Otherwise, you can offer it in your case.

16        MR. DANIEL: Yes, Your Honor. I thought it was in

17  the record, Your Honor. That's the only reason I asked. Beg

18  the Court's indulgence.

19        THE COURT: Take your time.

20        MR. DANIEL: No further questions, Mr. Rich.

21        THE COURT: Thank you, Mr. Daniel.

22        Anything on redirect?

23        MS. LIMEHOUSE: Yes, Your Honor. I will be brief.

24        Pull up Exhibit 65, please, Section 3.13.

25              REDIRECT EXAMINATION

1 BY MS. LIMEHOUSE:

2     Q.    Mr. Rich, you testified on direct about language

3 contained within the Executive Committee authority that was

4 not contained within the authority as the CEO or Chairman of

5 the Board; is that right?

6     A.    Yes.

7     Q.    I'm going to show you Government's 65, Section 3.16.

8 I'm going to highlight portion for you: "Or settle legal

9 proceedings," is that the authority you were referencing when

10 you talked about the language of the authority of the

11 Executive Committee to settle legal proceedings?

12     A.    Yes, that is what I was referring to.

13     MS. LIMEHOUSE:  Ms. Rozsa, if you could go to

14 Section 4.02, please.

15 BY MS. LIMEHOUSE:

16     Q.    And is this the section of the bylaws that you said

17 did not include language to settle legal proceedings?

18     A.    That's correct.

19     Q.    So based on your review of those bylaws, that

20 authority is specifically given to the Executive Committee

21 and not to the Chairman of the Board; is that correct?

22     A.    That's correct.  The Executive Committee as a whole,

23 that that's also contained elsewhere in the bylaws, that the

24 entire -- all voting members have to be consulted.  They

25 don't have to all vote on it, but they all have to be

1  consulted if they are discussing a subject in between regular

2  committee meetings.

3      Q.   Does Section 4.2 also say that the Chairman of the

4  Board serves at the pleasure of the Board of Directors?

5      A.   Yes, it says that.

6          MS. LIMEHOUSE:  Ms. Rozsa, if you could highlight

7  4.03.

8  BY MS. LIMEHOUSE:

9      Q.   And, again, the language regarding the authority of

10  the CEO, does it also state that they are subject to the

11  authority of the Board of Directors?

12      A.   Yes, it does.

13      Q.   And is there any language in here regarding the

14  authority to settle legal proceedings like there is in the

15  Executive Committee's authority?

16      A.   It is not in there.

17      Q.   So your opinion about Mr. Laffitte not having the

18  authority as the CEO to extend the $680,000 payment is based

19  on your review of those provisions of the bylaws; is that

20  right?

21      A.   It is.

22      Q.   If you could just go to 3.01, please, page 6, I

23  believe.  And based on your review of these bylaws, does it

24  indicate that the Board of Directors shall have the ultimate

25  authority over the conduct and management of the business and

1    affairs of the corporation?

2        A.    It does.

3        Q.    Mr. Daniel showed you some audit reports from 2018

4    and 2019 related to Mr. Murdaugh's prior loans.  Are those

5    audits -- do they have anything to do with FDIC examinations?

6        A.    No.

7        Q.    So those would be separate from the periodic

8    examinations that the FDIC comes and conducts in the bank?

9        A.    That's correct.

10        Q.    So that rating scale, is it comparable at all?  Can

11    you really opine on the rating scale of those auditors?

12        A.    No.  No, I couldn't do that.  I mean, it is

13    consistent.  The bank's loan policy uses those same nine

14    categories.  And it's not unusual.  It's not unusual for a

15    bank to have greater categories than regulators have in

16    slotting loans or classifying loans in different categories.

17    That's not unusual.  No.  I think the key thing here is that

18    there's been a significant passage of time and a complete

19    absence of information provided to the bank after those

20    reviews were done, no tax returns provided, no updated

21    financial.  They were still -- they were kind of in the blind

22    those last two years, even when they underwrote that very

23    last loan.

24        Q.    Did your review of those audit reports while you

25    were on the stand actually indicate that that auditor

1  downgraded those loans based on the loans that the value that

2  Palmetto State Bank gave those loans, the risk?

3       A.   Yeah, the external auditors showed that there was a

4  greater risk in those loans than what the bank represented.

5       Q.   But were you asked to opine on loans from 2018 and

6  2019 in forming your opinions here today?

7       A.   I'm sorry?

8       Q.   Were you asked to opine on loans to Alex Murdaugh

9  from 2018 and 2019 in forming your opinions here today?

10      A.   No.  The loans were since -- were more recent.

11      Q.   So from your opinion, a lot changed in the interim?

12      A.   Very much changed.  I mean, the last underwriting of

13 that loan, the representations made, the use of stale -- as I

14 think I touched on it earlier, the use of old financial

15 information, I mean, if you look at his income, they were

16 going back five years when he said he made $2 million and

17 they used that in the average over those four years they

18 included.  I mean, he didn't come close to making that.  I

19 think he made a million or less, in fact, 200-something

20 thousand dollars one year.  So that $2 million sitting out

21 there in 2016 or whenever it was just really skewed all of

22 the financial analysis that the bank did.  So --

23      Q.   And lastly, Mr. Daniel asked you about a property

24 called Moselle.  Your review of the $750,000 loan documents

25 indicated that it was only collateralized by one share of

1  Green Swamp; is that correct?

2      A.    That's correct.  That's what the documents show.

3      Q.    So a default on the $750,000 loan, would the bank

4  have any rights with respect to other property to collect on

5  that $750,000 loan?

6      A.    I saw no documents that showed that all of the

7  collateral was tied together.  I did not see any documents to

8  do that.  I will say that sometimes when you have borrowers

9  with a lot of loans, you will have a cross-collateralization

10  where all the collateral does everything else, but I did not

11  see that document in my review.  So it would be -- each loan

12  would be handled individually.

13          MS. LIMEHOUSE:  No further questions, Your Honor.

14          THE COURT:  Very good.  Is there any problem with

15  releasing Mr. Rich?

16          MR. DANIEL:  Your Honor, we would like to keep him

17  here so we could re-call him perhaps in our case.

18          MS. LIMEHOUSE:  Have you all subpoenaed Mr. Rich?

19          MR. DANIEL:  No, we have not.

20          MS. LIMEHOUSE:  He's not under their subpoena.

21          MR. DANIEL:  Your Honor, he's the Court's witness.

22          THE COURT:  He's not the Court's witness.  He's the

23  Government's witness.   Sir, you are free to leave.

24          (Whereupon, the is excused.)

25          THE COURT:  Ladies and gentlemen, I think it's time

1   for our morning break.

2          (Jury leaves open court at 10:48 a.m.)

3          THE COURT:  We will be at ease.

4          (Whereupon, a recess takes place.)

5          THE COURT:  Is our jury ready?

6          THE COURT DEPUTY:  Yes, Your Honor.

7          THE COURT:  Bring in the jury.

8          (Whereupon, the jury returns to open court at 11:16

9   a.m.)

10         THE COURT:  Please be seated.  Government, call your

11  next witness.

12         MS. STOUGHTON:  The Government calls Mark Altman.

13         THE COURT DEPUTY:  Please state your full name.

14         THE WITNESS:  Mark Duron Altman.

15                     MARK ALTMAN,

16       having been duly sworn, testifies as follows:

17                  DIRECT EXAMINATION

18  BY MS. STOUGHTON.

19     Q.   Good morning, Mr. Altman.

20     A.   Good morning.

21     Q.   Do you mind introducing yourself to the jury?

22     A.   My name is Mark Altman.  I work for Palmetto State

23  Bank in Hampton and I live in Hampton.

24     Q.   How long have you worked at Palmetto State Bank?

25     A.   35 years.

1    Q.   What's your job title there?

2    A.   I am vice president of data processing.

3    Q.   And about how long have you been the vice president

4    of data processing?

5    A.   25 years.

6    Q.   What are your primary day-to-day responsibilities at

7    the bank?

8    A.   My primary responsibilities are making sure the data

9    systems are up, that access is available for all of our

10   employees, from tellers to loan officers, to back office

11   staff, so that we can interact with our systems and serve our

12   customers.

13   Q.   Do you do that for all the bank's branches or just

14   the Hampton branch where you are located?

15   A.   For all of them.

16   Q.   What involvement do you have, if any, in the bank's

17   actual banking policies or decisions?

18   A.   Not a great deal.  Some in the IT department would

19   be in my area.

20   Q.   Okay.  Are you a member of the bank's Board?

21   A.   No, ma'am.

22   Q.   Do you supervise a team of people who help you with

23   doing data processing for the bank?

24   A.   I do, yes, ma'am.

25   Q.   Tell us a little bit about who those people are,

1 what they do.

2     A.   I have two ladies that we refer to as our proofing

3 department.  And that's any items that are captured at the

4 teller line.  If you come in to deposit a check or make a

5 withdrawal, we have to capture those images of those items so

6 that we can process them.  And so these two ladies, we deemed

7 that our proofing area.  They capture that in our branch.  I

8 have a morning operator that comes in and makes sure that the

9 systems are up and going in the mornings.  Then I have a

10 gentleman that comes in in the afternoon and stays to make

11 sure the systems are taken down.  And then there is a network

12 administrator and a returns clerk who works a lot of the NSF

13 and nonposted items and that kind of thing.

14     Q.   All right.  I want to talk to you about one of the

15 internal electronic systems that the bank uses to track

16 activity by users.  What is the Director system?

17     A.   So the Director system is the bank's archiving

18 system.  And what happens there is, any piece of paper that

19 is produced during the day, anything that comes out of our

20 update at night, any updated records, any reference journals,

21 any check images, checking statements, it's just a nice

22 picture of everything that happened in the life of the bank

23 that day.  And that would include access records, security

24 access records, ATM withdrawals, you name it, it goes into

25 Director.

1    Q.   How long does Director retain all of that

2    information?

3    A.   It retains it until it's deleted.

4    Q.   Were you asked to locate records in the Director

5    system showing Russell Laffitte's access to Alex Murdaugh's

6    accounts on specific date ranges?

7    A.   Yes, ma'am.

8    Q.   We are going to pull up Government's Exhibit 197,

9    which is already in evidence.  And we will just skip to page

10   6.  It will come up on the screen in front of you; it should.

11   All right.  It's a snapshot of the report that you pulled

12   from the Director system?

13   A.   Yes, ma'am, it is.

14   Q.   Explain to the jury what we are looking at here.

15   A.   So, this is a -- the name of this record is FIS

16   Security Access by Employee.  The FIS stands for Financial

17   Information System.  And it's just a program built into our

18   core software that tracks user's security.  And so this

19   particular one is looking for any access that an employee

20   does on a specific day.

21   Q.   Okay.  So what's the date range that you've pulled

22   shown on this page of the report?

23   A.   So for this particular query, this was from July

24   23rd, 2013, to July the 29th, 2013.

25   Q.   Okay.  And then on the right side of this screen,

1  it's pulled back access records from what date?

2      A.   So on this particular one, it found information on

3  July the 28th, 2013, at 10:14 a.m.

4      Q.   And then what is this showing Russell Laffitte is

5  accessing on July 28th?

6      A.   So, the way that this is laid out, it gives me the

7  specifying page number of the report, which is page 1, the

8  line No. 23.  And moving across the page, it tells me that

9  Russell Laffitte accessed Richard Alexander Murdaugh's

10 account number.  And as you go across the page, there is INQ

11 for inquire, DDA account, which is a checking account, and

12 then the account number is listed there.

13     Q.   There are two that say INQ, which you say is

14 inquiry, and then another that says $100,000 credit.  What's

15 the difference in those two data lines?

16     A.   So the inquiry is just an inquiry into our system

17 where you can look up accounts.  An inquiry, just you put the

18 account number in and it pulls back and it tells you this is

19 the person's name.  It gives you their address.  And it gives

20 you their account balance.  The last one is an actual credit

21 that was initiated to that account for $100,000.

22     Q.   So this is showing Russell Laffitte's access user

23 name making $100,000 credit into Murdaugh's account ending in

24 6092; is that right?

25     A.   Yes, ma'am, ending in 6092.

1     Q.   Let's go to page 18 of this same exhibit, please.

2  What is the date range that you searched to pull back this

3  report?

4     A.   So this is from October the 15th, 2013, to October

5  the 31st, 2013.

6     Q.   Okay.  And then it looks like in that date range,

7  all of the accesses were on the same date.  What does that

8  column I just highlighted show?

9     A.   Right.  So that shows October the 23rd, and all of

10  these occurred between 9:02 and 9:03 a.m.

11    Q.   And then do you mind walking down the lines and just

12  explaining to the jury what each line is showing?

13    A.   Sure.  So on the first line, really, the right side

14  shows you the actual action that was taken.  And so there was

15  an inquiry into 6940, 6092, actually, two separate inquiries.

16  And that was followed by a $70,000 credit to that same

17  account, and then three additional inquiries, and then the

18  last one is a $17,000 debit to that account.

19    Q.   Could we pull up Government's Exhibit 220, which is

20  also already in evidence.  Okay.  What's the date range on

21  this report that you pulled?

22    A.   So this one is between August the 9th, 2021, and

23  August the 10th, 2021.

24    Q.   And this is a different Government's exhibit, but is

25  this the same type of report that we just looked at for the

1    previous two?

2        A.   Yes, ma'am, it is.

3        Q.   Okay.  So explain to the jury, when you searched for

4    August 9th and 10th, what date range came back?

5        A.   So it only came back for August the 9th.  And it

6    ranges from -- it begins at 11:38 a.m.  There's two.  And

7    concludes at 3:10 a.m.  The first entry is an actual $20,000

8    debit to that checking account ending in 6092.  Then there

9    are two inquiries, one at 11:38, immediately after.  Another

10   inquiry at 2:21 p.m.  And then the next three inquiries done

11   between 3:09 and 3:10 are looking at two separate or two

12   different loan accounts.  The first account is one that says

13   INQ note.  It's an inquiry into a note account ending in

14   7336.  Again, at 3:09, it's a separate note inquiry ending in

15   8806.  And then at 3:10 p.m., an inquiry into the note ending

16   in 7336.

17       Q.   So all on the same day, five different inquiries,

18   but into three separate accounts; is that right?

19       A.   Yes, ma'am.

20       Q.   And the DDA account, you said that's a direct

21   deposit account?

22       A.   A demand deposit.

23       Q.   Sorry.  Yes, so a checking account.  And then the

24   other two are the note accounts, are loan accounts?

25       A.   Are loans, yes, ma'am.

1          MS. STOUGHTON:  Thank you, Mr. Altman.  Please

2     answer any questions the defense may have.

3          THE COURT:  Cross-examination.

4                    CROSS-EXAMINATION

5     BY MR. DANIEL:

6     Q.   Just briefly.  Mr. Altman, I'm Bart Daniel.  And I

7     represent, along with my co-counsel, Russell Laffitte.  Just

8     a couple of questions.

9          It wouldn't be unusual for Russell to access a

10    customer with a large loan account, would it be?

11    A.   No, sir, it would not.

12    Q.   And part of his duties and job as the CEO and

13    formerly as the COO, or chief operating officer, would be to

14    monitor customer accounts and overdrafts?

15    A.   Yes, sir, that's true.

16    Q.   Now, you mentioned that, I believe, there are two

17    systems there.  There's Director, which keeps information or

18    stores information for six weeks; is that right?

19    A.   No, sir, it retains it.

20    Q.   Okay.  And then -- that's the long-term one, seven

21    or eight years?

22    A.   Right.  It's just an archiving system.

23    Q.   And then there's a short-term one that keeps it for

24    six weeks and that's called Navigator?

25    A.   Yes, sir.

1    Q.    So any bank operator or bank employee, I think you

2    testified, could access that information on both those

3    systems?

4    A.    It would depend on their security code settings.

5    Q.    And how about Mr. Jan Malinowski, who is the

6    president of the bank, did he have -- could he have access?

7    A.    To what system?

8    Q.    I'm sorry.  To the system?

9    A.    Yes.

10    Q.    The loan history?

11    A.    Yes.

12    Q.    Okay.  So he could have access to past loan history

13    going back some years?

14    A.    Uh-huh.

15    Q.    Whether someone had borrowed a significant sum of

16    money and repaid it by the end of the year?

17    A.    Yes, he would have access to that information.

18    Q.    He would have that for each year.  And he could also

19    access the NSF information, nonsufficient fund information?

20    A.    Yes, sir.

21    Q.    Okay.

22        MR. DANIEL:  I don't have any further questions.

23    Thank you, Mr. Altman.

24        THE COURT:  Anything on redirect?

25        MS. STOUGHTON:  Nothing from the Government, Your

```
 1   Honor.
 2            THE COURT:  You may step down.  Thank you, sir.
 3            MS. STOUGHTON:  I'm not sure, can Mr. Altman be
 4   released?
 5            MR. DANIEL:  Yes.
 6            THE COURT:  Thank you.  Mr. Altman is released.
 7            (Whereupon, the witness is excused.)
 8            THE COURT:  The Government, call your next witness.
 9            MS. LIMEHOUSE:  The Government calls Natasha Thomas.
10            THE COURT DEPUTY:  Please state your full name.
11            THE WITNESS:  Natasha Thomas.
12                         NATASHA THOMAS,
13       having been duly sworn, testifies as follows:
14                       DIRECT EXAMINATION
15   BY MS. LIMEHOUSE:
16       Q.   Ms. Thomas, you can remove your mask if you are
17   comfortable.  And if you will just put the microphone close
18   so we can all hear what you have to say, that would be great.
19   Ms. Thomas, where are you from?
20       A.   Yemassee.
21       Q.   South Carolina; is that right?
22       A.   Yes.
23       Q.   And what is your birth date?
24       A.   9/10/92.
25       Q.   So September 10th, 1992.  So how old are you now?
```

1    A.    30.

2    Q.    Have you lived in Yemassee your whole life?

3    A.    Yes.

4    Q.    So what do you do for work?

5    A.    I'm a full-time student right now.

6    Q.    And what are you studying to be?

7    A.    Certified nurse's assistant at Trident.

8    Q.    At Trident, okay.  I'm going to take you back to an

9    accident in 2009.  What happened during that car accident?

10    A.    What happened was we were going to Yemassee.  We

11    were on I-95.  The tire on the truck, it was --

12    Q.    Take your time.  Let's start with who was with you

13    in the car?

14    A.    It was me, my aunt Michelle, my cousin Shekira, and

15    Hakeem.

16    Q.    So where were you sitting?

17    A.    I was sitting in the back behind the driver.

18    Q.    And who was driving?

19    A.    My aunt Michelle.

20    Q.    And how about your cousin Hakeem, where was he

21    sitting?

22    A.    He was sitting on the side of me behind in the back

23    behind the passenger.

24    Q.    You talked about the truck.  What kind of car was

25    your aunt driving?

1    A.    We were in a Ford Explorer.

2    Q.    What happened?

3    A.    The tire on it, it shredded, like.

4    Q.    So there was a tire failure in the car?

5    A.    Yes, yes.

6    Q.    So what do you remember happening after the

7    accident?

8    A.    What do I remember after the accident was -- I know

9    I woke up crying, because I heard my grandmother's voice.

10   Well, I never really woke up.  It was just, I heard a voice.

11   And then, you know, I just started screaming, because I heard

12   her.  But I never actually opened my eyes to see, you know,

13   what all was done.  It was just hearing her voice kind of,

14   like, brought me back to, you know.

15   Q.    So where were you when you woke up?

16   A.    When I actually woke up, I was in the hospital in

17   Charleston at M.U.S.C.

18   Q.    So do you have much memory of what actually took

19   place after the accident on the scene?

20   A.    No, I don't.

21   Q.    Okay.  And what injuries did you sustain following

22   the accident?

23   A.    I had to have reconstruction facial surgery and I

24   got glaucoma in my right eye.

25   Q.    Are you still suffering from some of those injuries

1  today?

2      A.   Yes, because I have glaucoma in my eye, so that's

3  permanent.

4      Q.   Let's talk Hakeem, your cousin, who was in the car

5  with you.  What happened to him during the accident?

6      A.   What happened to him was he became paralyzed.

7      Q.   So he was a quadriplegic because of the accident?

8      A.   Yes.

9      Q.   And was he in the hospital for some time --

10     A.   Yes.

11     Q.   -- with these injuries?

12     A.   Yes, he was.

13     Q.   How long did you have to stay in the hospital?

14     A.   I was in the hospital for a while.  Went home, then

15  I had to go back in the hospital again because I had to have

16  more surgeries done.  So it was just like an ongoing thing.

17     Q.   So did you all decide to file a lawsuit related to

18  the accident at some point?

19     A.   Yes.

20     Q.   So how did you hear about Alex Murdaugh?

21     A.   From a friend, someone my grandmother knew.

22     Q.   So you were referred to Alex to file the lawsuit?

23     A.   Yes.

24     Q.   Do you remember meeting him?

25     A.   Yes.

1    Q.   And so you hired him to file a lawsuit.  Who did he

2    represent in the accident, who all did he represent?

3    A.   He represented me, Shekira and Hakeem.

4    Q.   All three of you?

5    A.   Yes.

6    Q.   So did you meet him at his office?

7    A.   When?

8    Q.   After y'all hired him to file the lawsuit?

9    A.   Yes.

10   Q.   So how about Russell Laffitte, what did you know

11   about Russell Laffitte?  What did you learn about Russell

12   Laffitte?

13   A.   As of recently?

14   Q.   No, no.  Back --

15   A.   Back then?  Nothing.

16   Q.   So did they explain to you that Russell was going to

17   serve as your conservator?

18   A.   No.

19   Q.   So you didn't know that he was going to act as

20   conservator over your funds?

21   A.   No.

22   Q.   Did you ever meet Russell Laffitte?

23   A.   No.

24   Q.   Did you ever go to the Palmetto State Bank to get a

25   loan?

1    A.    Yes, I went and got a loan, yes.

2    Q.    Let's go to Government's Exhibit 196.  So the

3    accident took place back in 2009.  How old were you when the

4    accident took place?

5    A.    I was 16.

6    Q.    You were 16?

7    A.    Yes.

8    Q.    Okay.  So you went to Palmetto State Bank at some

9    point to get a loan.  Had you received any funds from your

10   settlement yet?

11   A.    No.

12   Q.    So why did you need the money?

13   A.    For this loan?  I was going to school.

14   Q.    So you needed to pay some expenses and you hadn't

15   gotten any of your lawsuit money yet; is that right?

16   A.    Correct.

17   Q.    I'm going to show you what's been admitted at 196.

18   It's a loan number for $2,583.53.  Is that about the amount

19   you received from the Palmetto State Bank?

20   A.    Yes.

21   Q.    So who did you go to to get this loan?

22   A.    I went to Russell.

23   Q.    Okay.  So you went to Russell to get a loan to help

24   you pay for school.  Who sent you to Russell?

25   A.    Alex.

1     Q.   And what was your understanding of the terms of this

2  loan?

3     A.   That was something I had to pay back.

4     Q.   And how were you going to be able to pay that loan

5  back?

6     A.   I had to make payments on it.

7     Q.   So it would be with the money you received?

8     A.   Yeah, yeah.

9     Q.   Let's go to page 3, please.  I'm going to highlight

10  the terms.  Did you understand what the interest rate of the

11  loan was?

12     A.   No.

13     Q.   Okay.  So it says here it's 18 percent; is that

14  right?

15     A.   Yes.

16     Q.   If you could go to page 3, please.  So is this your

17  signature, Ms. Thomas?

18     A.   Yes.

19     Q.   And what's that date next to your signature?

20     A.   My birthday.

21     Q.   Okay.  So that's September 10th, 1992, what you told

22  me was your birthday; is that right?

23     A.   Yes.

24     Q.   If we could go to page 4, please, the bottom.  Is

25  this your signature again, Ms. Thomas?

1    A.    Yes.

2    Q.    So is this the date that you remember getting the

3    loan, December 6th of 2010?

4    A.    Yes.

5    Q.    So how old were you on December 6th of 2010, if you

6    were born September 10th of 1992?  Do you remember?  I'm

7    making you do some math on the stand.

8    A.    I had to be, what, 17.

9    Q.    You were already 18, right?

10   A.    Yeah, yeah.

11   Q.    So you are 18 years old.  You go to Palmetto State

12   Bank to get a loan to pay for your expenses with school?

13   A.    Yes.

14   Q.    And Alex sends you to Russell Laffitte; is that

15   right?

16   A.    Yes.

17   Q.    During that interaction with him to get this loan,

18   did he ever mention that he was your conservator?

19   A.    No.

20   Q.    Did he ever talk to you about a settlement that you

21   were hopefully going to get one day?

22   A.    No.

23   Q.    So you didn't even understand at the time that he

24   had been appointed to serve as your conservator?

25   A.    No.

1    Q.   So after that -- excuse me.  Let's go to page 5 real

2    quick.  Just want to highlight.  Is this the letter that you

3    would have gone to the Palmetto State Bank with that Alex

4    sent you to get the loan?

5    A.   Yes.

6    Q.   Okay.  And so that has your signature as the person

7    receiving the loan; is that right?

8    A.   Correct.

9    Q.   And the letter says, Russell Laffitte, as

10   conservator for Natasha Thomas; is that correct?

11   A.   Yes.

12   Q.   And did you understand that that's why you were

13   going to Russell to get the money?

14   A.   No.

15   Q.   And, again, you were 18 at this time?

16   A.   Yes.

17   Q.   So after December 2010, when you go to Palmetto

18   State Bank to get a loan from Russell, did you ever talk to

19   him again as your conservator?

20   A.   No.

21   Q.   Did you ever meet him again?

22   A.   No.

23   Q.   After December 6th, 2010?

24   A.   No.

25   Q.   All right.  So let's talk about Hakeem.  You

1  testified that he was rendered a quadriplegic after the

2  accident?

3      A.   Yes.

4      Q.   What happened to him?

5      A.   What happened to him in the nursing home?

6      Q.   Uh-huh.

7      A.   He died.

8      Q.   Okay.  So tell the jury about those circumstances.

9  He was in a nursing home?

10     A.   Yeah.  He was in a nursing home.  We would go see

11  him on the weekends.  We would go spend some time with him,

12  because we could barely get there during the week because my

13  other cousin that lived in the house, she went to school.  So

14  we were going on the weekend and spend some time with him.

15  And all I can remember is, the day that -- it was October the

16  11th, we got a phone call.  It was me, my aunt, my grandma,

17  and his sister, we were in Walterboro at the Chinese place,

18  and we got a call that he took a turn for the worst.

19     Q.   That was October 11th of 2011?

20     A.   '11, yes.

21     Q.   At this point, had you or Hakeem received any

22  settlement funds?

23     A.   No.

24     Q.   So Hakeem passed away?

25     A.   Yes.  Well, yeah, he did.

1      Q.   So about how long after he passed away did you all

2  receive your money; do you remember?

3      A.   No.  I know it was like months later.

4      Q.   Months later?

5      A.   It was months later, yeah.

6      Q.   So Hakeem passes away October 11th of 2011.  And

7  some time months later, you receive some settlement money; is

8  that right?

9      A.   Yes, yes.

10     Q.   So you testified that on December 6th, 2010, when

11  you got the loan from Mr. Laffitte, you were 18 years old.

12  So by the time you got your settlement, do you remember about

13  how old you were?

14     A.   I had to have been 19, yeah.

15     Q.   I'm sorry?

16     A.   It was 2011, I was 19.

17     Q.   Okay.

18     A.   Yeah.

19     Q.   I'm going to pull up Government's Exhibit 20.  If

20  you will just make the -- do you recognize this document, Ms.

21  Thomas?

22     A.   Yes.

23     Q.   Okay.  Do you remember seeing it back in 2011 when

24  you received your settlement money?

25     A.   No.

1    Q.   Okay.  So you are familiar with it now only because

2    of the events that unfolded?

3    A.   Yeah.

4    Q.   You don't remember ever seeing this document?

5    A.   I never seen, no.

6    Q.   If you would just highlight the disbursement to

7    client at the bottom, please.  Okay.  Ms. Thomas, do you see

8    how this disbursement sheet indicates your settlement funds

9    were supposed to go?

10   A.   Yes.

11   Q.   So this first line, this Natasha Thomas structured

12   payment, $650,000, did you receive a structured payment for

13   $650,000?

14   A.   It's broken up into monthly payments, yes.

15   Q.   So that's something you are receiving regularly

16   still today?

17   A.   Yes.

18   Q.   All right.  And how about this amount for

19   $83,719.73, did you receive those funds?

20   A.   Yes, I did.

21   Q.   Then how about this last amount, Natasha Thomas,

22   Palmetto State Bank, $325,000, did you ever receive those

23   funds?

24   A.   No.

25        MS. LIMEHOUSE:  Ms. Rozsa, if you could go to the

1    higher portion where it talks about fees, please.

2    BY MS. LIMEHOUSE:

3    Q.   Here's the second portion of your disbursement

4    sheet.  And it indicates that Russell Laffitte is collecting

5    a $15,000 conservator fee.  Did you know that Russell

6    Laffitte was collecting $15,000 from your settlement funds?

7    A.   No.

8    Q.   So you testified that at the time you were 19 years

9    old.  Why did you need a conservator?

10   A.   I'm not sure.

11   Q.   If we can go to page 2 of this exhibit, please.

12   This is the signature page of that disbursement sheet that

13   outlines where your funds go.  Did you sign this disbursement

14   sheet?

15   A.   No.

16   Q.   Do you see how Mr. Russell Laffitte signed as your

17   conservator?

18   A.   Yes.

19   Q.   I'm going to show you Government's Exhibit 195A,

20   please.

21       MS. LIMEHOUSE:  If you could just blow this up.

22   BY MS. LIMEHOUSE:

23   Q.   So we looked at the amounts of the disbursements on

24   the disbursement sheet.  And you indicated that you did

25   receive a check for $83,719.73 on December 20th of 2011.

1 Does that sound about right in time when you received your

2 settlement funds?

3     A.   Yes.

4     Q.   In the memo line, it states that it is for

5 settlement proceeds.  And then do you recognize this

6 signature on the back of that check?

7     A.   Yes.

8     Q.   Whose signature is that?

9     A.   That's mine.

10     Q.   So what did you do with that $83,719.73 check?

11     A.   I bought me a car, because I remember that --

12     Q.   So did you go and deposit it in the Palmetto State

13 Bank the day after it was dated December 21st, 2011?

14     A.   Yes.

15     Q.   If you could pull up Government's Exhibit 32,

16 please.

17          So this is a $325,000 check drafted to the Palmetto

18 State Bank with the memo line, settlement proceeds, Natasha

19 Thomas.  Did you ever receive this $325,000 check?

20     A.   No.  If I did, I would have remembered that.

21     Q.   Do you see it's also dated December 20th of 2011?

22     A.   Yes.

23     Q.   And do you see it was also negotiated on December

24 21st of 2011?

25     A.   Yes, ma'am.

1       Q.   I'm going to pull up Government's Exhibit 36 that

2   has already been admitted into evidence.  Ms. Thomas, this is

3   a summary of how your $325,000 was spent.  Do you know who

4   Maggie Murdaugh is?

5       A.   No.

6       Q.   Do you know why Maggie Murdaugh would have received

7   a money order on December 21st of 2011 from your settlement

8   proceeds?

9       A.   No.

10      Q.   The second line says, $9,500 in cash back.  Did you

11  receive $9,500 in cash back from the $325,000 check?

12      A.   No.

13      Q.   The next two lines go to Murdaugh Charters and Alex

14  Murdaugh.  Do you know why Murdaugh Charters would be

15  receiving about $4,000 from your settlement proceeds?

16      A.   No.

17      Q.   The next line is $100,000 to Charlie Laffitte.  Do

18  you know why Charlie Laffitte would have been receiving

19  $100,000 from your settlement proceeds?

20      A.   No.

21      Q.   The next line is $50,000 -- $50,135.61 to R.

22  Laffitte as conservator for Hannah Plyler.  Do you know why

23  Hannah Plyler would have been receiving over $50,000 of your

24  settlement proceeds?

25      A.   No.

1    Q.    The next one is $91,220.57 to Russell Laffitte as

2    conservator for Hannah Plyler.  Do you know why Hannah Plyler

3    received $91,000 of your settlement proceeds?

4    A.    No.

5    Q.    Do you even know who Hannah Plyler was or did you at

6    the time?

7    A.    No.

8    Q.    The next line, $329,500 to Randolph Murdaugh, III,

9    do you know why Randolph Murdaugh, III, that occurred was

10   receiving $329,000 of your settlement proceeds?

11   A.    No.

12   Q.    And the last line, $40,167.69, do you know why

13   Russell Laffitte, as the conservator for Malik Williams, was

14   using over $40,000 of your settlement proceeds?

15   A.    No.

16   Q.    I'm going to show you Government's Exhibit 21.  Ms.

17   Thomas, this is an additional disbursement sheet.  Did you

18   ever see this disbursement sheet at the time of your

19   settlement?

20   A.    No, ma'am.

21   Q.    And it indicates that Palmetto State Bank is

22   receiving $25,245.08 on your behalf.  Did you ever receive

23   $25,245.08?

24   A.    No.

25   Q.    Did you ever see or sign any disbursement sheet

1 related to this additional disbursement?

2     A.   No.

3     Q.   All right.  So after you learned that your money had

4 been stolen, what happened?

5     A.   Well, how I found that out was because my aunt told

6 me to give Mark Ball a call at the law firm.  And then I

7 called him.  And he told me he would look into my file.  And

8 when he looked into the file, that's when, you know, he

9 called me, and we set to meet in Walterboro, because at the

10 time I was working in Walterboro at the loan company.  And

11 then that's when, you know, I saw the disbursement sheet

12 about everything.  And they asking me the same things that

13 you are asking me about, the $325,000 and the other check for

14 $25,000.

15     Q.   Did you eventually get those funds back?

16     A.   Yes.

17     Q.   And who did you understand was paying you for the

18 money that had been stolen?

19     A.   The law firm.

20     MS. LIMEHOUSE:  Court's indulgence.  No further

21 questions, Your Honor.

22     THE COURT:  Cross-examination.

23                CROSS-EXAMINATION

24 BY MR. AUSTIN:

25     Q.   Good morning, Ms. Thomas.

1    A.   Hi.

2    Q.   I'm going to be real quick.  My name is Matt Austin.

3   And I'm sorry that you have to be here today and everything

4   you've gone through.  I promise to be really fast and get you

5   in and out.  Just bear with me for just a second.

6         Going back to the beginning of your lawsuit, who was

7   on the trial -- or what lawyers, I should say, what lawyers

8   represented you on your case?

9    A.   Of the tire, when I had the accident?

10   Q.   Yeah, in addition to Alex Murdaugh.

11   A.   Alex was the only one that I knew of.  I didn't know

12  of anyone else.

13   Q.   So you don't remember dealing with anybody else

14  there?

15   A.   No, it was only him, yes.

16   Q.   So when your mom asked -- I think you were later

17  told to get in touch with Mark Ball.

18   A.   Yes.

19   Q.   I wasn't sure if he had worked on it as well?

20   A.   No, no.

21   Q.   And after the lawsuit, did Alex stay involved with

22  you at all?

23   A.   No.

24   Q.   Did you ever hear from him?

25   A.   No, not with me.  But, you know, my family ended up

1 using him again for something totally different.

2 Q. Okay. And did you all see him from time to time?

3 A. Yeah. Well, you know, when it was business-related,

4 yeah.

5 Q. Got you. And as part of your civil lawsuit, did you

6 take part in deposition?

7 A. Yes.

8 Q. Okay. And do you remember who was there with you at

9 the deposition?

10 A. No. It was so long ago, so, no.

11 Q. Do you remember if Alex was there?

12 A. Yes, he was there. He was there.

13 Q. What about Russell?

14 A. I can't remember.

15 Q. Okay.

16 A. But I know Alex was there and Cory was there as

17 well.

18 Q. I'm sorry. Who is the second name?

19 A. Cory.

20 Q. Courtney?

21 A. Cory.

22 Q. Okay. So I guess I should have been more clear with

23 my question. Cory is with a different firm?

24 A. Yes.

25 Q. It's Alex and Cory. And were there any other

1  lawyers involved in your case?

2      A.    Not that I can remember.

3      Q.    Okay.  And you said that Russell was not at your

4  deposition?

5      A.    Not that I can remember, no.

6      Q.    And I know it's a long time ago, but do you remember

7  if that was strange, or if Alex or Cory said anything about

8  Russell not being there?

9      A.    I can't remember.

10     Q.    Okay.  Could we please pull up Government's Exhibit

11 20.  All right.  So this is the disbursement sheet that Ms.

12 Limehouse just asked you about.  Do you have any idea who

13 drafted that sheet and typed everything up?

14     A.    No.  But I only seen it recently, so, yeah.

15     Q.    And you don't remember seeing it back at the time?

16     A.    No, I never.

17     Q.    Can we go to Government's Exhibit 21.  And same

18 question with this.  Do you have any idea who drafted this?

19     A.    No.

20     Q.    And you don't remember seeing it back at the same

21 time?

22     A.    No.

23          MR. AUSTIN:  Thank you very much.  No further

24 questions.

25          THE WITNESS:  Okay.

1    THE COURT:  Anything on redirect?

2    MS. LIMEHOUSE:  Nothing further, Your Honor.

3    THE COURT:  You may step down.  Thank you, Ms.

4    Thomas.

5    MS. LIMEHOUSE:  May I check on the status of our

6    last victim, Your Honor?

7    THE COURT:  You may.

8    MS. LIMEHOUSE:  Your Honor, the Government's last

9    victim is five minutes away.  Is there any way we can take an

10   early lunch?

11   THE COURT:  It's pretty early.  How long is that

12   witness to take?

13   MS. LIMEHOUSE:  He will be comparable to Ms. Thomas

14   in testimony.

15   THE COURT:  You don't have any other witnesses?

16   MS. LIMEHOUSE:  I can go ahead and call our agent,

17   Your Honor.

18   THE COURT:  Okay.  Let's start the agent.

19   MS. LIMEHOUSE:  Understood.  The Government calls

20   Agent Brian Womble.

21   THE COURT DEPUTY:  Please state your full name.

22   THE WITNESS:  Brian Womble.

23                    BRIAN WOMBLE,

24       having been duly sworn, testifies as follows:

25                  DIRECT EXAMINATION

BY MS. LIMEHOUSE:

Q.    Okay.  Agent Womble, how long have you been a special agent for the FBI?

A.    Over 23 years.

Q.    What types of cases do you investigate?

A.    I investigate primarily financial crimes and public corruption.

Q.    So were you involved in the investigation of Russell Laffitte?

A.    Yes, I was.

Q.    How did you become involved in that investigation?

A.    In October of last year, I opened an investigation. I was working with SLED involving financial crimes with Alex Murdaugh.  And then as that case, I was helping them providing some financial assistance.  About the start of the year, I became aware of Russell Laffitte.  And in talking with SLED, discussing the case, they said that the allegations against -- or Russell Laffitte was something that they would need help with, with financial crimes.  That became my focus in the case.

Q.    Okay.  So at that point you shifted your investigation to focus on Mr. Laffitte.  So what did you learn in the preliminary stages of your investigation about Russell's relationship with Alex Murdaugh?

A.    That Russell was his primary banker, almost a

1   personal banker, and that they had a close business

2   relationship.

3       Q.   All right.  So let's talk about the Plylers.  The

4   jury has heard extensively about the Plylers.  What was

5   Russell's initial role in the Plyler case?

6       A.   Russell acted as a conservator for the sisters, and

7   as a personal representative for their mother and their

8   brother, who had passed away in the accident.

9       Q.   So as personal representatives for the estates of

10  the mother and brother, he kind of had a separate role, and

11  then also was conservator for both Hannah and Alania; is that

12  right?

13      A.   That is correct.

14      Q.   So how much did Mr. Laffitte collect in personal

15  representative fees for serving as the PR for Justin and

16  Angela Plyler?

17          MS. LIMEHOUSE:  If we can pull up Government's

18  Exhibit 198, slide 14, please.

19  BY MS. LIMEHOUSE:

20      Q.   Okay.  So how much did Mr. Laffitte collect from PR

21  fees from Justin and Angela Plyler's account?

22      A.   You can see on the left side of the check dated

23  March 3rd, 2009, there's a $25,000 personal representative

24  fee for Justin Plyler.  There's a $50,000 personal

25  representative fee for Angela Plyler.  Those two were tied to

1    the tire company.  And then there's two additional ones tied

2    to Ford Motor settlement for $10,815 and $5,407.

3        Q.    What do these fees represent?

4        A.    Those are 5 percent of the total settlement related

5    to the estate of Angela Plyler and the estate of Justin

6    Plyler.

7        Q.    So you also testified that he was not just PR, but

8    the conservator for the Plyler girls.  I'm going to pull up

9    Government's Exhibit 137.  So about when was Russell

10   appointed to serve as the conservator for Hannah and Alania

11   Plyler?

12       MS. LIMEHOUSE:  Go to the next page, please.  Next

13   page.

14   BY MS. LIMEHOUSE:

15       Q.    So about when was it that he was appointed?

16       A.    The November 16th, 2006.

17       Q.    So when Mr. Laffitte is appointed, what direction

18   does the probate court give him with respect to

19   disbursements?

20       MS. LIMEHOUSE:  Go to Government's Exhibit 138.

21       MR. DANIEL:  Your Honor, I'm going to object to that

22   question, what direction the probate court gives Mr. Laffitte

23   back then.  I don't know how Mr. Womble would know that

24   without it being hearsay, Your Honor.

25       THE COURT:  Let's see if it's a Government document.

1    MS. LIMEHOUSE:  Government's Exhibit 138.

2    THE COURT:  Already in evidence.  He can testify to

3  what's in the document.

4  BY MS. LIMEHOUSE:

5    Q.    So what orders do the court enter with respect to

6  what Mr. Laffitte could do with those funds?

7    A.    So what this does, it lists restrictions.  And it

8  says:  No disbursements to be made without prior approval of

9  the Hampton County Probate Court.  That's dated March 30th,

10  2007, and signed by the probate court judge.

11    Q.    So the jury has heard from the Plyler sisters, but

12  about how much did the Plyler sisters receive in settlement

13  funds?

14    A.    They both received significant settlements.  Alania,

15  who had more injuries received over $4.7 million.  Hannah

16  received over $2 million.

17    Q.    And how were those settlements set up?

18    A.    So, they were set up -- annuities were set up or

19  structured settlements, where the majority of their money

20  would be received over time.  And then a portion of those, a

21  significant portion, around 6- to $700,000 for each of them,

22  were put into conservator accounts.

23    Q.    That's the amount of money that Mr. Laffitte was

24  tasked with managing; is that right?

25    A.    That's correct.

1       Q.   So do you recall about how old they were when Mr.

2   Laffitte was tasked with managing these funds?

3       A.   They would be 12 and 16, I believe.

4       Q.   So what were Mr. Laffitte's responsibilities with

5   respect to those funds in the conservatorship accounts?

6       A.   To protect and manage their money.

7       Q.   Was there any primary focus that the probate court

8   focuses on with the use of those funds?

9       A.   Yes.   The two primary areas that the probate court

10  instructs for the management is educational funds and health

11  funds.

12      Q.   So did Mr. Laffitte make requests periodically about

13  the use of those funds to the probate court?

14      A.   Yes, he did.

15      Q.   So let's review some of those for the jury just as

16  examples.   I will pull up Government's Exhibit 140.   If you

17  could explain what this document is for the jury.

18      A.   Sure.   So this is a petition for an expenditure from

19  Russell Laffitte as the conservator for Hannah Plyler.   And,

20  essentially, what he's asking the court to do, the probate

21  court, is to allow him to provide $100 so Hannah Plyler can

22  go on a school trip.   And you can see at the bottom, it's

23  submitted by Russell, and then signed and approved by the

24  Hampton County probate judge.

25          MS. LIMEHOUSE:   Pull up Government's Exhibit 116.

1  BY MS. LIMEHOUSE:

2      Q.   What is this document?

3      A.   Yes.  This is an order allowing purchases.  So what

4  this is documenting is the probate court judge has ordered

5  the purchase from loans by credit card of a bladder to fix

6  the well, to fix her father's water hose.  And the price was

7  $151.94.

8      Q.   Pull up Government's Exhibit 144.  What does this

9  document show?

10     A.   So another petition for expenditures.  That's

11 submitted by Russell Laffitte on behalf of Hannah Plyler.

12 And what it's requesting is a Christmas purchase of a

13 computer for $359.98.  And then you can see at the bottom,

14 it's approved by the probate court judge on December 22nd,

15 2008.

16     Q.   Who is this individual, the notary?

17     A.   The notary on this is an employee of Palmetto State

18 Bank.

19     Q.   So did your review of the probate records indicate

20 that Mr. Laffitte would make periodic requests to the probate

21 court about the expenditures of these funds?

22     A.   Yes, he did.

23     Q.   Did Russell Laffitte eventually get approval to

24 provide an allowance on a regular basis to the Plyler girls?

25     A.   He did.

1    Q.   So the jury has heard a lot about Hannah's

2    conservatorship money.  But let's just go over sort of an

3    overview.  What did Russell do with Hannah's conservatorship

4    funds in the account?

5    A.   I'm sorry.  Repeat the question.

6    Q.   What did Mr. Laffitte do with Hannah's

7    conservatorship funds in the account?  Did he begin to extend

8    himself loans?

9    A.   Yes.  With Hannah's funds, he used those funds to

10   extend loans to himself, and then at a later time, Alex

11   Murdaugh.

12   Q.   So why not Alania at the time?

13   A.   So Alania was 16 when the conservator fund,

14   settlement came in.  Once she turned 18, the conservatorship

15   would end.  Once that point ends, then the funds wouldn't be

16   available for loans.

17   Q.   So when did Mr. Laffitte take the first loan from

18   Hannah Plyler's conservatorship account?

19   A.   In July, July 18th, 2011.

20   Q.   How was that loan secured?

21   A.   It was -- there was a promissory note that was done;

22   however, the promissory note wasn't provided to anybody.  It

23   wasn't provided to the bank.  It wasn't provided to Hannah

24   Plyler.  So if the promissory note, if nobody knows about it,

25   I would argue that it's not secured.

Q.   Okay.  So we will talk about how Russell reported these loans to the probate court in a little bit.  But over the course of your investigation, about how many loans did Russell give himself from Hannah Plyler's conservatorship account?

A.   So there are six original loans, and then there were four renewals.  There's actually, two renewals that were renewed twice; so six original, four renewals.

Q.   You talked about a promissory note on that first loan, were all of the loans that Russell extended himself from the conservatorship accounts documented with a promissory note?

A.   No, they weren't.

Q.   About what was the total amount that Russell received himself in loans from Hannah Plyler's conservatorship account?

A.   Approximately $355,000.

Q.   Let's go over quickly how he paid these loans back.

MS. LIMEHOUSE:  If we can pull up Government's Exhibit 119A, please -- excuse me, 119 first.

BY MS. LIMEHOUSE:

Q.   So what does this check show?

A.   So this check is a $35,000 check.  It's from Palmetto State Bank.  The memo line is Arthur Badger, personal representative fee.

1     Q.   What was the significance to you about the payee

2 line on the check for Arthur Badger's PR fees?

3     A.   Well, so Russell was the personal representative for

4 the estate of Donna Badger, not for Arthur Badger. But the

5 check's not made out to Russell Laffitte. The check is made

6 out to Palmetto State Bank. It's not made out to the

7 recipient.

8     MS. LIMEHOUSE: So if we can pull up Government's

9 Exhibit 119A.

10 BY MS. LIMEHOUSE:

11     Q.   So what does Russell do with his $35,000 personal

12 representative fee from Arthur Badger?

13     A.   He deposits it.

14     Q.   And where does he deposit it?

15     A.   He deposits it into the conservator account for

16 Hannah Plyler.

17     Q.   So he turns that fee around and pays back some of

18 the loans that he gave himself from Hannah Plyler's

19 conservatorship account?

20     A.   That's correct. He uses the $35,000 to pay off the

21 notes, the promissory notes that he had gotten.

22     Q.   So you mentioned that Mr. Laffitte served as the

23 personal representative for the estate of Donna Badger and

24 not for Arthur Badger. Where did the $35,000 fee actually

25 come from?

1    A.    So, it didn't come from the estate of Donna Badger;

2   actually, came from the settlement of Arthur Badger.

3         MS. LIMEHOUSE:  If we can pull up Government's

4   Exhibit 168, page 8, please.

5   BY MS. LIMEHOUSE:

6    Q.    Okay.  And what is this check?

7    A.    This check is $60,000 made out to Palmetto State

8   Bank.  The memo line is conservator fee for Hakeem Pinckney.

9   Russell Laffitte acted as the conservator for Hakeem Pinckney

10  Hakeem Pinckney.

11   Q.    What's the significance of the payee line on this

12  conservator fee check?

13   A.    Again, the payee line is made out to Palmetto State

14  Bank.  It's not made to the recipient of the bank.  So it

15  makes the check harder to track who it's actually intended

16  for.

17   Q.    The signature that we haven't really highlighted,

18  but whose signature is that on these checks?

19   A.    Alex Murdaugh.

20   Q.    If we can go to the next page, please.  So what does

21  Mr. Laffitte do with this $60,000 conservator fee?

22   A.    So, he pays off $50,000 of loans, plus interest.  So

23  you see the $53,465.88.  The remaining part of the $60,000 he

24  actually cashes and pays himself and keeps.

25   Q.    So is this what you are referring to as the

1    remainder of that $60,000?

2         A.   Yes, it is.

3         Q.   So Mr. Laffitte uses the $35,000 PR fee from Arthur

4    Badger.  And he uses the $60,000 conservator fee from Hakeem

5    Pinckney.  When Hannah turned 18, about how much did Mr.

6    Laffitte still owe on the loans that he extended himself?

7         A.   He owed approximately $264,000.  And then he -- what

8    he did to pay that back is, he credited himself $19,799.94,

9    for a conservator fee of managing Hannah's conservator

10   account from 2011 to 2015.  So he took, essentially, the back

11   fees for the years he didn't collect, credited that, and then

12   got a $245,000 loan from Johnnie Parker to pay off the rest

13   of the loans.

14        Q.   So in addition to the loans that Mr. Laffitte

15   extended himself, what else did he do with Ms. Plyler's

16   money?

17        A.   He made loans to Alex Murdaugh.

18        Q.   So were those loans secured?

19        A.   They were not secured.

20        Q.   So you testified that Mr. Laffitte took a first loan

21   in July of 2011.  When did he extend the first loan to Mr.

22   Murdaugh?

23        A.   September 14th, 2011, almost two months later.

24             MS. LIMEHOUSE:  I'm going to pull up Government's

25   Exhibit 161.  If you could go to the September 2011 account

1  picture, please, Ms. Rozsa.

2  BY MS. LIMEHOUSE:

3  Q.  Okay.  I will just highlight a portion for the jury.

4  So is this the first deposit that was taken out of Hannah

5  Plyler's conservatorship account into Alex Murdaugh's

6  personal account?

7  A.  Yes.  The first loan was $90,000.  And what you can

8  see on the spreadsheet, that at the time that 90,000 was

9  deposited into Alex Murdaugh's account, he was $3,950 in

10  overdraft.

11      MS. LIMEHOUSE:  And, Ms. Rozsa, if you could just go

12  up to the February 2011 records, please.

13  BY MS. LIMEHOUSE:

14  Q.  So was this the first loan that you reviewed in Alex

15  Murdaugh's personal account records from that year?

16  A.  No, it was not.

17  Q.  So what was the first loan that you saw?

18  A.  So, on February 2nd, 2011, he received $125,000.

19  What the investigation showed is that it was a personal loan

20  from Charlie Laffitte, the Chairman of the Board at Palmetto

21  State Bank.  The money order for that loan came from Palmetto

22  State Bank, but it was funded by Charlie Laffitte and was a

23  personal loan, not a loan through the bank.

24  Q.  So at the time this loan, was Charlie Laffitte the

25  CEO of the Palmetto State Bank?

1    A.   He was.

2    Q.   And was he also the Chairman of the Board at the

3    time?

4    A.   He was.

5    Q.   So this transaction on February the 2nd, 2011, based

6    on your investigation, represented a personal loan from the

7    Chairman of the Board and the CEO to a customer at the time?

8    A.   That's correct.  And a customer who was overdrafted

9    $8,395.92 on his account.

10   Q.   So from your investigation, looking at Alex

11   Murdaugh's account records and the pattern of the loaning

12   when he was in overdraft, when did that really start?

13   A.   This would be the initial loan or private loan that

14   was given to Alex Murdaugh when his account went into

15   overdraft.

16   Q.   And then from there, whose money was then used to

17   cover overdraft for the next three years?

18   A.   Hannah Plyler's money.

19   Q.   Did Charlie Laffitte ever cover any more overdraft

20   for Alex Murdaugh?

21   A.   Not that I'm aware of.

22   Q.   So you talked about that first loan from Hannah

23   Plyler's conservatorship account into Alex Murdaugh's

24   personal account in September, and that that was a few months

25   after Mr. Laffitte took his first loan.  Did you review

1  e-mail communications leading up to this first loan in

2  September of 2011?

3      A.   Yes, I did.

4          MS. LIMEHOUSE:  Government's Exhibit 40, please.

5  BY MS. LIMEHOUSE:

6      Q.   So this is September 9th, 2011.  It's e-mail from

7  Alex to Russell:  Sorry, I did not get there yesterday

8  afternoon.  Call me when you get in.

9          MS. LIMEHOUSE:  Government's Exhibit 41, please.

10  BY MS. LIMEHOUSE:

11      Q.   This is September the 12th of 2011, an e-mail from

12  Alex to Russell:  I am almost done.  I just realized I will

13  be gone tomorrow.  Any chance we could meet later this

14  evening?

15          MS. LIMEHOUSE:  Government's Exhibit 42, if you

16  could just start with that -- the whole top part is fine.

17  Yeah.

18  BY MS. LIMEHOUSE:

19      Q.   September 12th, that same day, e-mail from Russell:

20  Let's do it on Wednesday.  What is the exact dollar amount?

21  I haven't had time to even work on drawing up the note.

22          An e-mail from Alex to Russell that same day:  Due

23  100K.

24          So when did, remind the jury, that first loan

25  actually take place?

1    A.   It's two days late on September 14th, 2011.

2         MS. LIMEHOUSE:  Okay.  Government's Exhibit 43,

3    please.  Just the top portion is fine.

4    BY MS. LIMEHOUSE:

5    Q.   So you testified that that first loan was on

6    September 14th, 2011.  That day, Russell e-mails Alex and

7    says:  No problem.  I was in a meeting and did not know how

8    long it was going to last.  I'm in the office the rest of the

9    afternoon.

10        Alex then e-mails Russell and says:  I will be there

11   right at 5.

12        So this is the day that that first loan is extended

13   from Hannah Plyler's conservatorship account?

14   A.   That's correct.

15   Q.   Okay.  So were you present during Mr. Laffitte's

16   testimony during the September 6th bond hearing?

17   A.   I was.

18   Q.   And what did he testify to about whose idea it was

19   to be getting these loans out of Hannah Plyler's

20   conservatorship account?

21   A.   He testified it was Alex Murdaugh's idea.

22   Q.   What did your investigation and review of the

23   records actually reveal?

24   A.   Well, it revealed that the first loan two months

25   earlier actually went to Russell Laffitte.  It also revealed

1   that the loans that Alex Murdaugh got coincided with the

2   overdrafts in his account that Russell Laffitte was

3   monitoring.

4       Q.   So we reviewed some e-mail communications from that

5   loan in September.  Did you also review e-mail communications

6   surrounding some of the other loans that were extended from

7   Hannah Plyler's conservatorship account?

8       A.   Yes, that's correct.

9       Q.   I'm going to pull up Government's Exhibit 50, the

10  bottom portion.  This is an e-mail on Tuesday, October 22nd,

11  2013.  It's an e-mail from Alex -- excuse me.  Let's start

12  October 22nd, 2013, from Russell to Alex:  Need a deposit.

13  Thought you were coming in yesterday.

14          Alex responds:  Sorry.  I forgot.  Can you make a

15  loan from Hannah and I will pay it as we discussed?

16          MS. LIMEHOUSE:  Show the top portion, please.

17  BY MS. LIMEHOUSE:

18      Q.   Mr. Laffitte then responds on October 23rd, 2013:  I

19  transferred 70K this morning.

20          And then on Wednesday, October 23rd, Alex responds

21  to Mr. Laffitte:  I will come by at some point this week.

22  Out of town today and in the morning.  So it will be tomorrow

23  afternoon or Friday.

24          So did this demonstrate -- this correlate in time to

25  any of the loans that were extended from Hannah Plyler's

1 conservatorship account?

2 A. Yes. On October 23rd, there was a $70,000 loan that

3 was made from Hannah's account to Alex Murdaugh.

4 MS. LIMEHOUSE: Could you pull up Government's

5 Exhibit 197, page 18.

6 BY MS. LIMEHOUSE:

7 Q. The jury just heard Mr. Mark Altman testify about

8 these internal access records. What do they show in your

9 investigation in relation to this $70,000 loan?

10 A. Well, you can see on October 23rd, 2013, there's

11 seven inquiries by Russell Laffitte regarding Alex Murdaugh,

12 to include the $70,000 credit that's made to the account.

13 Q. So did your investigation and review of these

14 internal records and communications reveal that Mr. Murdaugh

15 would be in overdraft, Mr. Laffitte would check on the status

16 of his account, and then transfer money from Hannah Plyler's

17 conservatorship account to cover this overdraft?

18 A. Yes, that's correct.

19 Q. Let's move to some other communications that relate

20 in time. Government's Exhibit 53, this is an e-mail on

21 Wednesday, March 26th, 2014, from Russell Laffitte to Alex

22 Murdaugh: I need about a $10,000 deposit. You were

23 overdrawn 8,000 in one account and 1,500 in the farm. That

24 does not include the checks that are in today. I also need

25 to get something done with the loan with Robert Soto.

1    MS. LIMEHOUSE:  Pull up Government's Exhibit 54.

2    BY MS. LIMEHOUSE:

3    Q.  So this is March 27th of 2014, e-mail from Russell

4    to Alex, subject line:  Give me a call.

5    Government's Exhibit 55, the same day, Alex responds

6    and says:  I will be in to see you.  How long before Hannah

7    is 18?

8    And then Government's Exhibit 56, the following day,

9    Friday, March 28th, 2014, from Russell to Alex:  I really

10   need a deposit.  You needed around $10,000 yesterday but

11   another $15,000 in checks are here today.

12   How does this e-mail correlate in time with the

13   loans from Hannah Plyler's conservatorship account?

14   A.  So on March 28th, 2014, the same day as this e-mail,

15   there is a $100,000 transfer from Hannah's account to Alex

16   Murdaugh.  That one, however, does have a promissory note

17   attached to it.

18   Q.  So the jury has seen all of these loans that are

19   being extended from Hannah Plyler's conservatorship account

20   to Mr. Murdaugh.  What pattern did you see during the course

21   of your investigation?

22   MS. LIMEHOUSE:  Exhibit 190, please.

23   A.  So what you can see here is, this is a chart of the

24   loans to Alex Murdaugh from Hannah Plyler's account.  And

25   what you see in -- the trend is, with just two exceptions,

1    actually, there's just one exception with Hannah Plyler,

2    there's also Malik Williams transfer on here.  He's in

3    overdraft every time.  The one time that he's not, he's $399

4    left in his account.  And the money he gets loaned to him, he

5    spends very quickly.

6        Q.   So how long did this pattern continue?

7        A.   It continued all the way until Hannah Plyler turned

8    18.

9        Q.   Pull up Government's Exhibit 197, please.  So did

10   you review all of the internal access records in relation in

11   time to these loans from Hannah Plyler's account?

12        A.   I did.

13        Q.   And did these access records demonstrate a pattern

14   of Mr. Laffitte going into those accounts?

15        A.   Yes, there was a lot.  There was access records that

16   matched the times of the loans that were made to Alex

17   Murdaugh.

18        Q.   So about how many loans did Mr. Laffitte extend to

19   Alex Murdaugh from Hannah Plyler's conservatorship account?

20        A.   From Hannah Plyler's, there were 16 total loans, 10

21   original ones, and then four without promissory notes, and

22   then there was also two renewals.

23        Q.   So about how much did Mr. Laffitte extend in loans,

24   unsecured loans to Alex Murdaugh?

25        A.   It was approximately $960,000.

1    Q.   We talked a little bit about the filings with the

2    probate court.  How were these loan documents reported to the

3    probate court?

4        MS. LIMEHOUSE:  Let's pull up Government's Exhibit

5    115, please.

6    BY MS. LIMEHOUSE:

7    Q.   So this is a promissory note, an example of one of

8    the ones the jury has reviewed.  How did Mr. Laffitte report

9    these documents to the probate court?

10   A.   So I will tell you what he did and what he did not

11   do.  He is required, as the conservator, to make an annual

12   report.  So at the end of the year, he would create a binder,

13   a paper binder, and bring it and deliver it to the probate

14   court.  And in that, it had the record of Hannah Plyler's

15   accounts and finances, et cetera.  So some of these

16   promissory notes were in there.  The bank statements were in

17   there.  Receipts, different things that didn't have to do

18   with the loans were in there, and that was given to the

19   probate court.  What did not happen at the probate court, and

20   if you remember the orders and the requests we saw earlier

21   for expenses, such as the computer, the school supplies, et

22   cetera, there was never any written order for any of the

23   promissory notes that went through the probate court.

24   Q.   All right.  So I will show Government's Exhibit 117

25   as well.  You talked about the annual accounting.  Is this an

1   example of some of the annual accounting that Mr. Laffitte

2   would include in the probate records?

3       A.   Yes.  This would be one of the accounts.  And then

4   this records the different transactions within that account

5   during that year.  So this one would be for 2011.  So that

6   would be a part of the annual accounting that was provided

7   and papered to the probate court.

8           MS. LIMEHOUSE:  Ms. Rozsa, if you will pull up the

9   second half of this page.

10  BY MS. LIMEHOUSE:

11      Q.   On this annual accounting, we see R. Alex Murdaugh

12  loan $90,000.  Was this the first loan that we talked about

13  earlier that was extended?

14      A.   That is the first loan that went to Alex Murdaugh.

15      Q.   And so this is an example of how Mr. Laffitte would

16  document those loans to the probate court?

17      A.   Yes.  And you can actually see other loans on that

18  sheet as well, on 7/18/2011 is actually the first loan that

19  went to Russell Laffitte.  If you move up from the $90,000

20  Alex Murdaugh loan.

21      Q.   If you could go to Government's Exhibit 121.  How

22  about the checks in the probate records, what did Mr.

23  Laffitte do with the checks?

24      A.   So there were bank statements in the annual

25  reporting.  The bank statements would include copies of the

1   checks.  You can see some of the checks here that were used

2   to provide the funding from the loans from Hannah Plyler to

3   Alex Murdaugh.

4        Q.   Government's Exhibit --

5        A.   And to Russell Laffitte from Hannah Plyler in this

6   example as well.

7        Q.   Government's Exhibit 122, so is this just another

8   example of some of the checks that documented the transfers

9   from Hannah Plyler to Alex Murdaugh?

10       A.   Yes, they are.

11       Q.   I'm going to show you Government's Exhibit 130.  I

12  believe the jury has seen this exhibit already.  But just to

13  provide some context with the probate court reporting, what's

14  this document?

15       A.   This is a document that Russell created.  You can

16  see it's titled Alex loans.  You have loans across the top.

17  Those loans match up to the date of loans.  So 9/11/12 would

18  be September 11th, 2012.  And then you can see the

19  corresponding column with dates and payments, et cetera.

20       Q.   So you talked about how this was delivered to the

21  court.  Could you just explain to the jury how the court --

22  these materials would be presented to the court?

23       A.   Yes.  So, again, it would be in the annual filings

24  that were given to the probate court each year.  So you would

25  have a stack of documents, 60 to 90 pages, and this would be

1    one of the documents that would be in that binder.

2      Q.   So in your review of the probate records for Hannah

3    Plyler's conservator accounts, were there any records in the

4    probate documents that Laffitte sought approval from the

5    probate court before extending himself loans from her

6    account?

7      A.   No.   There was no orders or petitions in writing

8    where the probate judge approved any of the loans either to

9    Russell Laffitte or to Alex Murdaugh.

10      Q.   Same question with Alex Murdaugh, no record of him

11    requesting approval from the probate court?

12      A.   Zero.

13      Q.   So about how much did Mr. Laffitte collect in

14    conservator fees from the Plyler sisters?

15      A.   He collected a significant amount.

16      MS. LIMEHOUSE:   Exhibit 198, please.

17      A.   So you can see the initial amount that is dated

18    April 20th, 2009.   What you see there is $91,455.91.   That's

19    from the Hannah Plyler conservatorship.   And then $140,441,

20    that's the Alania Plyler conservatorship.   And so where you

21    come with that number, keeping in mind that each of the girls

22    had 6- to $700,000 that was transferred into their

23    conservator accounts for Russell Laffitte to manage.   So

24    that's based on a 5 percent.   So 5 percent of 600,000 would

25    be about 30,000.   What happened here is Russell Laffitte took

1  5 percent from the money he managed in the conservator

2  accounts.  He also took 5 percent from the initial annuities

3  that didn't go through the conservator accounts but went

4  directly to the insurance companies that were going to pay

5  and manage those annuities, which is why these numbers are so

6  high.

7      Q.   And the payments he received after that initial

8  April 2009, what do those conservator fees represent?

9      A.   For the girls?

10     Q.   Yes.

11     A.   So what you see, if you follow this chart to the

12  end, on September -- I'm sorry, July 15th, 2015, there are

13  four payments, and those coincide with the 5 percent fee that

14  he took from the money he managed.  So in 2015, he went back

15  and post-dated and took the 2011 fee, 2012 fee, 2013 fee.

16  And then he did a combination 2014, 2015 fee.  So that was --

17  that's a total of, I mentioned earlier, of $19,799.  And he

18  actually didn't take that money himself.  What he does is he

19  credits it towards the loans, so as final payoff, he gives

20  himself that credit towards the payoff of the loans.

21     Q.   Did the probate court approve all of the conservator

22  and PR fees that he collected from the Plyler sisters and

23  their brother and mother?

24     A.   The court did approve the -- well, so two different

25  courts.  The conservator fees for Hannah and Alania Plyler,

1     they were all approved through the probate court.  The

2     personal representative fees would have gone through the

3     circuit court, and would have been approved through there,

4     not through the probate court.

5        Q.   So when was Mr. Laffitte's role as conservator for

6     Hannah Plyler terminated by the probate court?

7        A.   When she turned 18, which I believe was April 20th

8     of 2015.

9        Q.   Was there anything else significant in your

10    investigation that happened that same day?

11        A.   Yes.  That was actually the day of the final payoff.

12    So Russell made the final payoff of what he owed, which was

13    just short -- it was $262 short of $245,000.  I know that

14    because he got a $245,000 loan to make that payment.  And

15    then he credit -- he paid himself back from that $262, and

16    put the remaining towards the loan.  That happened on April

17    20th, 2015.  That was also the date that the conservatorship

18    was closed.

19        Q.   So if something had happened to Mr. Laffitte during

20    any of this time when he was extending himself loans, what

21    would have happened to the Plylers' money?

22        A.   Well, the problem is, nobody knew that -- about the

23    promissory notes.  Hannah Plyler doesn't know.  Her father

24    doesn't know.  No one at the bank knows.  The only person

25    that knows about these loans is Russell Laffitte.  So if

1    something had happened to him, the idea that these are

2    secured by bank stock or something, if nobody knows about it,

3    Hannah Plyler's in jeopardy of never getting her money,

4    because nobody knows about these loans other than Russell

5    Laffitte.

6        Q.   So would the court have had to look through, with a

7    fine tooth comb, those accounting documents to determine that

8    these loans had been extended?

9        A.   Yes, they would have been -- they would have.

10       Q.   How about if something happened to Alex Murdaugh

11   during this time, were any of those loans secured?

12       A.   Those loans were unsecured.

13       Q.   So would Hannah Plyler have been able to collect on

14   those loans had something happened to Alex Murdaugh?

15       A.   It would be very difficult.

16           MS. LIMEHOUSE:  Your Honor, I'm at a natural

17   stopping point.

18           THE COURT:  Okay.  It's 12:30.  Let's break for

19   lunch.  We will be back in a hour.

20           (Jury leaves open court at 12:28 p.m.)

21           THE COURT:  Any matters the parties need to address

22   from the Government?

23           MS. LIMEHOUSE:  Nothing from the Government, Your

24   Honor.

25           THE COURT:  From the defense?

1    MR. DANIEL:  Nothing from the defense.

2    THE COURT:  Very good.  Back in a hour.

3    (Whereupon, recess transpired.)

4    THE COURT:  I received communication from the

5    Government asking they take a witness out of order.  The

6    witness, Mr. Badger, to testify, putting the FBI agent back

7    on the stand.  And I wonder if the defense objects to that?

8    MR. DANIEL:  We do not object to that.

9    THE COURT:  Very good.  If we could have you step

10   down, sir.

11   THE COURT:  Bring in the jury.

12   MS. LIMEHOUSE:  Your Honor, would you mind

13   explaining to them why?

14   THE COURT:  I intend to.

15   MS. LIMEHOUSE:  Wonderful.  Thank you.

16   (Whereupon, the jury returns to open court at 1:39

17   p.m.)

18   THE COURT:  Please be seated.  Ladies and gentlemen,

19   you will notice the first witness after lunch will not be

20   Agent Womble, because we are going to slip in a short witness

21   that was here that was a few minutes late here.  And you saw

22   my impatience.  I said, no, put the next witness up, because

23   I'm trying to move the trial along and I didn't want to have

24   y'all sitting around waiting.  But the parties have agreed to

25   put up this witness.  He's supposed to be short.  And then we

1    will go back to Agent Womble.

2         And let me speak to you a minute about the schedule.

3    Predicting the length of a case is always challenging.  We

4    never really know.  And I understand, you know, we've been

5    exploring about what our options are because it looks like we

6    are likely to go into next week.  I'm trying to do as little

7    as possible.  I know that Crystal has spoken to the jury

8    about Saturdays.  And we have some folks who have just

9    impossible conflicts for Saturday.  And I respect that, so we

10   are not going to do Saturday.  But out of respect for y'all,

11   you didn't sign up to be here on Saturday, it was just --

12   obviously, the sooner we finish the evidence, the sooner this

13   is over, right, and the verdict is rendered.  But we will --

14   it looks like.  Hard to predict.  I long ago quit trying to

15   figure out how long things would take.  But if we don't

16   finish Friday, we will be back here bright and early Monday

17   morning, but I'm going to continue my efforts.

18        Let me say, both sides are working really hard

19   trying to expedite this.  I've been talking to them about it.

20   And they've been doing a fine job of shortening things up.

21   It just takes a certain amount of time to do something this

22   complex.  And this is a complex case.

23        So, okay, Ms. Limehouse, call your next witness.

24        MS. LIMEHOUSE:  Thank you, Your Honor.  The

25   Government calls Arthur Badger.

1    THE COURT DEPUTY:  Please state your full name.

2    THE WITNESS:  Arthur Badger Jr.

3                    ARTHUR BADGER JR.,

4    having been duly sworn, testifies as follows:

5                    DIRECT EXAMINATION

6    BY MS. LIMEHOUSE:

7    Q.   Mr. Badger, if you are comfortable, you can take off

8    your mask, and put the microphone close to your mouth so

9    everyone can hear you.

10         Mr. Badger, where are you from?

11   A.   I'm from Fairfax, South Carolina.

12   Q.   Is that in Allendale County?

13   A.   Yes, it is.

14   Q.   Have you lived in Allendale your whole life?

15   A.   Yes, I have.

16   Q.   Tell the jury about your children.  How many do you

17   have?

18   A.   I have seven kids.

19   Q.   What are their ages?

20   A.   20 -- well, my oldest is 25.  My next to oldest is

21   23.  And I have a 22-year-old son.  And I have a 16-year-old

22   daughter.  I have a 13-year-old daughter.  And I have an

23   11-year-old daughter.

24   Q.   So the jury has heard about your wife Donna and an

25   accident that took place back in January of 2011.  Can you

1    tell the jury what happened?

2        A.    Yes.    I was on my way -- well, we was on our way to

3    my sister-in-law's house.    And we was --

4        Q.    Who was in the car with you?

5        A.    Who was in the car with me?    Well, it was my wife,

6    her sister, her cousin, my cousin.    You want the names?

7        Q.    No, it's fine, however you want to tell.

8        A.    It was just some family members.

9        Q.    Were you driving?

10       A.    Yes, I was.

11       Q.    Where was your wife Donna seated?

12       A.    She was in the rear, in the rear passenger seat in

13   the back.

14       Q.    So what happened?

15       A.    Well, as we was on our way on our journey, I was

16   coming up to some houses and seeing UPS was pulling out of

17   the driveway.    So I let the UPS came out of the driveway.

18   And as we was heading down the street, the truck was going

19   slow.    So I turned my signal on, switched lanes to pass the

20   UPS truck.    And as I was switching lanes, passing the truck,

21   he swerved into the lane and hit the side of my truck.    He

22   was trying to turn back into another driveway quick-like, but

23   I was on the side of him, so he ran into me, and the truck

24   flipped.

25       Q.    So the UPS truck was turning left and you were

1    trying to pass?

2         A.   Yes, I was passing him.  I was in the passing lane.

3    And he still was turning as I was in the passing lane.

4         Q.   So y'all collided at that point?

5         A.   Yes.

6         Q.   So tell the jury what happened to your wife Donna?

7         A.   She died on scene.  She had a head trauma.

8         Q.   Okay.  And how about anyone else in the accident?

9         A.   Yes, the passenger beside me in the front seat, he

10   died also.

11        Q.   So at the time we talked about your children, six of

12   those children were Donna's children; is that right?

13        A.   Yes.

14        Q.   How old were they in January of 2011 when the

15   accident took place?

16        A.   Well, the youngest one, she was about a year, about

17   a year or two years old.  And the oldest was about 13.

18        Q.   So did you all decide to file a lawsuit related to

19   the accident?

20        A.   Well, yes.

21        Q.   Okay.  And so who did you hire to represent you?

22        A.   Alex Murdaugh.

23        Q.   So how did it come about that you knew to hire Alex

24   Murdaugh?

25        A.   Well, my sister-in-law that was in the truck with

1    me, her husband had some dealing with Alex before this case.

2    So he told me that Alex would be a good person to go seek for

3    help.

4        Q.   So who all did Alex represent in the lawsuit?

5        A.   He represented everyone in the truck.

6        Q.   Everybody, okay.  So your wife you testified passed

7    away shortly after the accident.  Did Alex represent both

8    your wife and you in the accident --

9        A.   Yes.

10       Q.   -- in the lawsuit?  So were you originally appointed

11   to be the personal representative of your wife's estate?

12       A.   Yes.

13       Q.   And what did you understand that to mean?

14       A.   That means that whatever came out of the lawsuit

15   would go to me.

16       Q.   Okay.  And so you were the one who was appointed by

17   the probate court to represent the interests of your wife's

18   estate?

19       A.   Yes.

20       Q.   Okay.  So did you understand that Alex would be

21   filing a lawsuit both for you and your wife's estate?

22       A.   I did.

23       Q.   I'm going to pull up Government's Exhibit 218A.  I'm

24   going to ask you about the defendant Russell Laffitte.  Did

25   you know that Russell Laffitte was later appointed to be the

1  personal representative of your wife's estate?

2  A.  No, I didn't.

3  Q.  I'm going to show you -- highlight the bottom, if

4  you will.  So you testified that the accident happened in

5  January of 2011.  So August the 30th of 2012, Russell

6  Laffitte is appointed to be the personal representative of

7  your wife Donna's estate.  Do you remember signing documents

8  resigning as the personal representative of the estate?

9  A.  No, I don't remember signing and I wouldn't sign it

10  over anyway.

11  Q.  So why would you have signed documents that were put

12  in front of you?

13  A.  Well, Alex, you know, it was a lot of paper that I

14  had to sign.  And, you know, he tell me some of them I just

15  had to sign it to keep it going, you know, to make things go

16  by faster, so --

17  Q.  So there were documents that Alex put in front of

18  you for your signature, and you signed them?

19  A.  Yeah.

20  Q.  So is that you were trusting Alex as your attorney?

21  A.  Yeah.

22  Q.  But you never understood that Russell was appointed

23  to represent the estate as the personal representative rather

24  than you?

25  A.  No, I didn't know that.

1    Q.   So did you ever meet the defendant, Russell

2  Laffitte?

3    A.   No, I never met him.  But when I went into the bank,

4  I seen him on occasions, though.

5    Q.   Let's talk when you went in the bank.  Why did you

6  go into the bank?

7    A.   Well, Alex would let me get some loan off the

8  accident.

9    Q.   Okay.  So before you got any money, Alex would send

10  you to the bank to get a loan?

11    A.   Yes.

12    Q.   Do you remember who you met with at the bank when

13  you got those loans?

14    A.   I'm not sure of the names that I met.

15    Q.   But you would see Russell at the bank when you would

16  go and get those loans?

17    A.   Yes.

18    MS. LIMEHOUSE:  I'm going to pull up Government's

19  Exhibit 23.  And if you could highlight the middle portion

20  under loans, liens, and medical bills, please.

21  BY MS. LIMEHOUSE:

22    Q.   So let's talk about these loans here.  Are those

23  loans that you are talking about getting from the bank?

24    A.   Yes.

25    Q.   So what did you understand about the terms of those

1    loans from Palmetto State Bank?

2        A.    Well, the loans that I was getting would come back

3    out of the settlement once it went through.

4        Q.    So you understood that you would eventually pay

5    those back when you got your settlement money?

6        A.    Right.

7        Q.    Did you know what the interest rate of those loans

8    were?

9        A.    No, I didn't.

10       Q.    Okay.  So did you ever meet with Russell Laffitte as

11   the personal representative of your wife's estate?

12       A.    No.

13             MS. LIMEHOUSE:  Let's go back to the full

14   disbursement sheet, if we can.  And if you will just pull up

15   the top portion, the recovery amount.  Could we actually go

16   to the second page first, please.

17   BY MS. LIMEHOUSE:

18       Q.    Okay.  Arthur, I see this is a document that has

19   your signature dated 11/19/2012, do you recognize that

20   signature?

21       A.    Yes, I do.

22       Q.    Do you recall signing this document?

23       A.    No, I don't.

24       Q.    Okay.  So I'm going to show you the first page

25   again.  So this is the first page that had your signature on

1    the second page.  Do you recall seeing this disbursement

2    sheet at all?

3         A.   No.

4         Q.   Okay.  So this disbursement sheet outlines that you

5    were to get $3.1 million -- or excuse me, the recovery for

6    the lawsuit was $3.1 million, attorneys' fees 1.24 million,

7    and then costs and expenses associated with it.  I'm going to

8    point you to a certain portion of the costs and expenses,

9    $35,000, personal representative fee for Russell Laffitte.

10   Did you know that Russell Laffitte was collecting $35,000

11   from your settlement?

12        A.   No, I didn't.

13        Q.   Was Russell Laffitte your personal representative?

14        A.   No, he wasn't.

15        Q.   So he should not have been getting $35,000 from your

16   settlement funds; is that right?

17        A.   That's right.

18             MS. LIMEHOUSE:  If you could go to the next portion,

19   Ms. Rozsa, specifically the bottom.  Yes.

20   BY MS. LIMEHOUSE:

21        Q.   Okay.  There's some other amounts on here.  There's

22   a $15,000 to Cory Fleming.  What was that about?

23        A.   Well, I got into some trouble and I needed a

24   criminal lawyer and Alex told me that Cory was a good

25   criminal lawyer.

1    Q.   So Alex referred you to a criminal attorney, and you

2  understood he would be paid out of your settlement money?

3    A.   Yes.

4    Q.   Okay.  How about this next Henry and Ella Walker,

5  little over $15,000, what's that money about?

6    A.   It was a -- I had an accident.  I ran into their

7  porch, and that's what Alex gave them for the -- to fix it.

8    Q.   So you understood that that money was going to be

9  coming out of your settlement?

10   A.   Yes.

11   Q.   All right.  And the last one here, Solomons and

12 Lawton PC, $7,500, what's that for?

13   A.   I don't know.

14   Q.   There's a couple of other smaller charges, Allendale

15 County EMS, Allendale County Hospital, Hampton Regional

16 Medical Center, and Palmetto Primary Care Physicians.  Did

17 you know what those expenses were for?

18   A.   Yes.

19   Q.   What were those for?

20   A.   Those are for the ambulance and the hospital bills

21 and the medical bills.

22   Q.   Those were your medical expenses related to the

23 accident?

24   A.   Right.

25   Q.   That were coming out of the disbursement.  All

1  right.  I want to highlight two additional amounts for you.

2  The first one -- the second one, $369,882.81, is this what

3  you understood you would be getting from the disbursement?

4      A.  Yes.

5      Q.  So did you actually receive $369,882.81?

6      A.  Yes, I did.

7      Q.  Let's talk about the amount above, $1,325,000, it

8  indicates that it is to go to Palmetto State Bank, payment to

9  fund a structure per client request.  Did you ever get $1.325

10  million?

11      A.  No, I didn't.

12      Q.  Did you have any idea that your recovery indicated

13  that you were supposed to receive $1.325 million?

14      A.  No, I didn't.

15      Q.  I'm going to go to Government's Exhibit 29.

16          MS. LIMEHOUSE:  If you will just blow this up for

17  me.

18  BY MS. LIMEHOUSE:

19      Q.  I'm going to go through a couple of these with you,

20  maybe not all of them.  This is a check for $388,697.50.  It

21  indicates on the memo line that it is for you, Arthur Badger.

22  And it is turned around to be made payable to Johnnie Parker

23  in the same amount.  Do you know why Johnnie Parker was

24  receiving $388,687.50 of your settlement funds?

25      A.  No, I do not.

1    MS. LIMEHOUSE:  If you could go to the next page,

2 Ms. Rozsa.

3 BY MS. LIMEHOUSE:

4    Q.   Okay.  I'm going to show you another check for

5 $151,726.05, again, memo line, Arthur Badger.  Did you ever

6 get a $151,726.05 check?

7    A.   No, I didn't.

8    Q.   If you could go to the next page, please.  And this

9 indicates $151,726.05 actually went to an individual named

10 Hannah Plyler.  Do you know Hannah Plyler?

11    A.   No, I don't.

12    Q.   Do you have any idea why she would be receiving your

13 settlement proceeds?

14    A.   No, I don't.

15    Q.   If you could go to Government's Exhibit 30 now.  Mr.

16 Badger, this is a summary of where that $1.325 million

17 actually went.  We already talked 388 to Johnnie Parker and

18 151 to Hannah Plyler.  I just want to highlight some of these

19 for you.  $75,000 money order to Randolph Murdaugh.  Do you

20 know why Randolph Murdaugh was receiving $75,000 of your

21 settlement funds?

22    A.   No, I don't.

23    Q.   The next one is $101,369.49.  And it shows that it

24 was transferred into a money order for Hannah Plyler for a

25 loan repayment, and $7,500 money order to Maggie Murdaugh.

1　Any idea why they were getting your settlement money?

2　　A.　No, I don't.

3　　Q.　The next two are additional $101,369.49, both to

4　repay loans for Hannah Plyler.　Any idea why Hannah Plyler

5　was getting those settlement funds from you?

6　　A.　No.

7　　Q.　Next one is $50,684.75, turned around into a wire to

8　Southern Crane, and valued at $49,500, and $10,184.75 in cash

9　back.　Any idea why your settlement proceeds were spent that

10　way?

11　　A.　No, I don't.

12　　Q.　Next one $50,684.75 deposited into Alex Murdaugh's

13　personal bank.　Do you know why your lawyer, who had already

14　taken over a million dollars in fees, was collecting more

15　than $50,000 from your settlement proceeds?

16　　A.　No.

17　　Q.　Next one, $50,684.75 went to a 34,000 wire to 4M

18　Iron and $8,200 money order to E. Smith for Jeep purchase.

19　Did you ever get a Jeep from your settlement proceeds?

20　　A.　No.

21　　Q.　Next page, please.　Just these last couple, Mr.

22　Badger, $33,789.83; 29,000 Honey Creek Motor.　Again, any

23　cars that you got from these settlement proceeds?

24　　A.　No.

25　　Q.　$4,789.03 in cash back.　Did you get any cash from

1    the $1.325 million?

2    A. No, I didn't.

3    Q. Another $33,789.83 deposited into Alex's bank

4    account at Palmetto State Bank. Any idea why Alex would be

5    taking more than $33,000 from your settlement funds?

6    A. No, I don't.

7    Q. The next one, another $33,789.83 for repaying a loan

8    to Hannah Plyler. Again, do you know Hannah Plyler?

9    A. No, I don't.

10    Q. Do you know why she would be getting your settlement

11    proceeds?

12    A. No, I don't.

13    Q. All right. And these last two, Mr. Badger, are a

14    little over $150,000 that were deposited into Alex's Bank of

15    America account. Any idea why Alex was taking more money

16    over and above the fees he took from your settlement?

17    A. No, I don't.

18    Q. So we talked about what happened to your money.

19    Let's talk about your understanding of what was happening to

20    the money the children were receiving as the beneficiaries of

21    your wife's estate. What happened with their settlement?

22    A. Well, they had structured settlement until -- when

23    they get 18, they would be able to cash it in for theirselves

24    (sic). But, you know, the younger ones, you know, we were

25    going through some hard times and, you know, I went and

1　talked to the judge and the judge let me cash some of the

2　structures in.

3　　　Q.　Okay.  So all of your children's settlements were

4　set up as annuities they would get when they turned 18; is

5　that right?

6　　　A.　Yes.

7　　　Q.　So you testified that at the time of the accident,

8　your children ranged in ages from 1, 3, to 13 to 15, between

9　the accident and the settlement; is that right?

10　　　A.　Yes.

11　　　Q.　So was there any money that was negotiated for y'all

12　to get to help take care of the children until they turned 18

13　and would get access to those annuities?

14　　　A.　No.

15　　　Q.　So y'all had to wait to get settlement funds until

16　the children each turned 18?

17　　　A.　Yes.

18　　　Q.　So what happened with some of your children's

19　annuities?  You talked about going to a judge.  Explain that

20　for the jury.

21　　　A.　Well, I went in and spoke with the judge and told

22　him my kids was a minor, and asked him could -- was there any

23　way that I could purchase some of their structured settlement

24　to get some cash.

25　　　Q.　So you decided to sell your children's annuities to

1  get some money?

2     A.  Yes.

3     Q.  So if you had gotten $1.325 million as you were

4  supposed to, would you have had to sell your children

5  annuities?

6     A.  No, I wouldn't.

7        MS. LIMEHOUSE:  No further questions, Your Honor.

8        THE COURT:  Cross-examination.

9                    CROSS-EXAMINATION

10 BY MR. AUSTIN:

11    Q.  Good afternoon, Mr. Badger.

12    A.  Good afternoon.

13    Q.  My name is Matt Austin.  And I think everybody's

14 heard this several times from me.  But I'm going to be as

15 quick as I can be.  I'm sorry that you are here and having to

16 deal with testifying about everything that happened to you.

17 And I will be as quick and to the point as I can be.

18    A.  Okay.

19    Q.  All right.  So going back to the initial lawsuit

20 that Mr. Murdaugh represented you in, what other lawyers were

21 involved in that case?

22    A.  What other lawyers?  None that I know of.

23    Q.  Okay.  Do you know if there were any other lawyers

24 from his law firm involved?

25    A.  Not to my knowledge.

1    Q.   Okay.  So I know it's been a long time, but best you

2   can remember, you don't remember meeting anybody else from

3   the law firm, just Alex and maybe staff?

4    A.   Yes, the secretaries.

5    Q.   And setting aside the fact that Alex stole $1.325

6   million, were you happy with their representation before all

7   of that?

8    A.   Yes, I was.

9    Q.   And did you -- I think you said you used the same

10   firm for other representation later down the road.  And I am

11   not going to get into any of the specifics of that.  And is

12   it right that you testified that you didn't know that Russell

13   Laffitte had been appointed to be PR?

14    A.   Correct.

15    Q.   And I just want to make sure I understand.  You

16   basically said you signed the documents he put in front of

17   you.  And I believe you testified something to the affect of

18   you trusted Alex as your attorney?

19    A.   Yes, I did.

20    Q.   Okay.  And so, basically, if I'm understanding it

21   right --

22        MR. AUSTIN:  Could we pull up Government's Exhibit

23   23.  Going to page two please.

24   BY MR. AUSTIN:

25    Q.   So you are not denying that this is your signature,

1 right?

2     A.   No, I am not denying that.

3     Q.   And so am I understanding it correctly that,

4 basically, Alex put this in front of you and didn't say what

5 it was tied to, got you to sign it, and then he just matched

6 it up with the first page?

7     A.   This isn't -- that ain't the first time he did that.

8 He did it several times, just giving me papers to sign and I

9 signed, yes.

10     Q.   Can you describe what it was like when he would try

11 to get you to sign documents like that?

12     A.   I mean, I go into the office, he call me and tell me

13 he got some papers for me to sign.  I come in, stack of

14 papers, he started sliding it to me.  And I sign them and

15 sign them and sign them, and stack them back up again.

16     Q.   This is just during, like, a normal weekday?  You

17 just go in?  Just you are not working, sign the stuff and get

18 out, right?

19     A.   Yeah.

20     Q.   Trust him to be looking out for you and not have you

21 signing anything else?

22     A.   Yes.

23     Q.   And up until you found out about the $1.325 million,

24 do you ever see any red flags or any reason not to trust

25 Alex?

1    A.    Not to trust him?  I mean, I wouldn't trust him

2    again, no.

3    Q.    Well, sure.  I'm just going what was in your mind

4    back then.  You never saw anything to make --

5    A.    No, to make me feel that type of way, no.

6    Q.    How would you describe your relationship with him

7    then?  What kind of guy was he as your lawyer?

8    A.    He was a good guy, you know.

9    Q.    Outgoing?

10    A.    Yeah.  I looked up to him, because, you know, he

11    helped me out, you know.

12    Q.    He had a good reputation as a good lawyer?

13    A.    Well, seemed like he was helping me out, but I

14    guess --

15    MR. AUSTIN:  All right.  Could we go back to page 1.

16    If we can zoom in, please, to the bottom half where it says

17    Palmetto State Bank payment fund structure.  It's the third

18    line up.  If we can zoom in on the bottom three lines there.

19    BY MR. AUSTIN:

20    Q.    Okay.  So this is 1.325 million that went missing.

21    And is that your understanding?

22    A.    Yes.

23    Q.    And there's this line that says Palmetto State Bank,

24    payment to fund structure per client request.  And I believe

25    your testimony is that you never requested structure?

1    A.   No.

2    Q.   And Russell Laffitte was not your PR in this; is

3    that correct?

4    A.   That's correct.

5    Q.   It was your wife's?

6    A.   Yes.

7    Q.   So it's kind of weird that he shows up on the

8    disbursement sheet?

9    A.   Yeah.

10   Q.   And did anybody ever tell you that Palmetto State

11   Bank doesn't do structured settlements?

12   A.   No.

13   Q.   Okay.  And I think, is this something -- this

14   document, do you remember if you signed that at the office or

15   somewhere else?

16   A.   Which document?  The one --

17   Q.   I guess the fake signature on page 2.

18   A.   All the documents I signed, I signed in his office.

19   Q.   Yeah.  And so when you went in there, Russell wasn't

20   there?

21   A.   No.

22   Q.   Okay.  And you didn't know Russell was involved?

23   A.   No.

24   Q.   And walk in, they have all these documents for you

25   to sign.  And do you know who drafted those documents?

1    A.   No, I didn't know what he did with them.

2    Q.   What was your understanding of the documents that

3    were put in front of you?  They were done by Alex and his

4    staff?

5    A.   Yeah.  You know, I thought it was something to help

6    me.

7    Q.   Uh-huh.

8    A.   You know, so --

9    Q.   Did he take advantage of you?

10   A.   Yes.

11        MR. AUSTIN:  Okay.  If we can zoom out, please.  All

12   right.  Now just above the payment to fund structure line, go

13   to the section that shows Allendale County EMS and others.

14   BY MR. AUSTIN:

15   Q.   Okay.  You went through these with Ms. Limehouse.

16   And what is Palmetto Primary Care Physicians?  Do you

17   recognize that name?

18   A.   I don't know.  Is this -- I mean, Alex -- I was

19   going to a doctor that he sent me to.  I don't know.  Is this

20   Dr. Vega?  But I don't know if that's the firm name or not.

21   Q.   Yeah.  I will represent to you, I believe it is.

22   But so tell me about Dr. Vega, what did you go to him for?

23   A.   Really nothing, because I didn't have -- I came out

24   of the accident with no injury.  But Alex just told me to go

25   to him to see him.

1      Q.   And I know it was a terrible event.  And I am not

2   minimizing what you went through.  But in terms of physical

3   injuries, what was the point of going to Dr. Vega?

4      A.   There wasn't no point.  I wasn't injured.

5      Q.   Alex said to go, so you trust your attorney and you

6   go?

7      A.   Yeah.

8      Q.   Do you think you got $1,400 worth of medical

9   services there?

10     A.   Could have.

11     Q.   Okay.  Would you have anything done, like blood

12   pressure, temperature, anything like that?

13     A.   You know, when you go to a doctor, they check your

14   weight and blood pressure and that.

15     Q.   That was it, though?

16     A.   Yeah.

17     Q.   You went there like eight times?

18     A.   I can't remember exact amount of times, but I went

19   there a few times.

20     Q.   And do you remember Alex having to travel at all on

21   your case?

22     A.   No.

23     Q.   Okay.  Was it -- basically, all the court

24   proceedings, settlement discussions, mediation, stuff like

25   that, to your knowledge, was in South Carolina?

1    A.   Yes.

2    Q.   Okay.  So there would be no reason for him to be

3    flying on a private plane somewhere?

4         MS. LIMEHOUSE:  Objection, Your Honor.  I don't

5    understand the relevance of this.

6         THE COURT:  Unless you can show the relevance.

7    Sustained.

8         MR. AUSTIN:  Okay.

9    BY MR. AUSTIN:

10   Q.   And let's pull up Government's Exhibit 30, please.

11   And this is the table that Ms. Limehouse just walked you

12   through.  And on this first page we see all these -- payee

13   line in the middle that says Palmetto State Bank.  And that's

14   Russell's bank, right?

15   A.   Yes.

16   Q.   Then we go to page 2.  And the top three are

17   Palmetto State Bank, but the bottom two are Bank of America,

18   right?

19   A.   Yes.

20   Q.   And has anybody ever told you or has the Government

21   explained to you what's going on with those funds?  Have you

22   been reimbursed those funds?

23   A.   No.  But --

24   Q.   I'm sorry?

25   A.   No.

1    Q.   Okay.  So as I understand it, Russell signed up to

2    be PR for your wife; is that right?

3    A.   Yes.

4    Q.   But he wasn't yours, and then what we see, his PR

5    fee for his work on your wife's case coming from your

6    disbursement sheet, is that how you understand it?

7    A.   Yes.

8    Q.   Okay.  And was it your understanding -- I guess I

9    will ask this first.  You said that you didn't know about him

10   being put up -- you didn't know that you were removed as PR,

11   correct?

12   A.   No, I didn't.

13   Q.   So you never had any conversations with Alex about

14   being replaced as PR?

15   A.   No.

16   Q.   What were you doing as PR?  Did anything come up

17   that you actually had to like, you know, take care of?

18   A.   No.

19   Q.   Okay.  So was it your understanding that there was

20   any benefit of having somebody besides you as PR for your

21   wife?

22   A.   No.

23   Q.   And you received your own settlement independent of

24   your wife's case; is that right?

25   A.   Correct.

1    Q.   Do you know if you could have done that still if you

2    had remained PR in your wife's case?

3    A.   I don't understand what you are asking me.  Say that

4    again.

5    Q.   If you had remained PR for your wife, did anybody

6    ever tell you that that would affect your ability to recover

7    in a wrongful death suit --

8    A.   No.

9    Q.   -- or survivorship suit?  Okay.  And so did you ever

10   get any explanation of why Russell replaced you as PR from

11   Alex?

12   A.   I never knew he replaced me, so, no.

13   Q.   I realized as soon as I asked that that would be

14   your answer.  Sorry.  But what about from PMPED, the Law

15   Firm, did they ever give you an explanation?

16   A.   No.

17        MS. LIMEHOUSE:  Objection, Your Honor.  Asked and

18   answered.

19        MR. AUSTIN:  I don't think I asked that question.

20   I'm just asking if he was informed.

21        THE COURT:  He answered go ahead.  Continue.

22   BY MR. AUSTIN:

23   Q.   Okay.  And did you ever have to put up a bond to

24   serve as PR for your wife?

25   A.   No.

1    Q.   Okay.  And nobody ever mentioned that to you?

2    A.   No.

3    Q.   Okay.

4         MR. AUSTIN:  Thank you very much.  Appreciate it.

5         THE COURT:  Anything on redirect?

6         MS. LIMEHOUSE:  Briefly, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. LIMEHOUSE:

9    Q.   Mr. Badger, you testified, based on our review of

10   your disbursement sheet, that Russell Laffitte took

11   $35,000 --

12   A.   Right.

13   Q.   -- from your settlement?

14   A.   Yes.

15   Q.   Did Russell Laffitte ever meet you --

16   A.   No.

17   Q.   -- as the personal representative for your

18   children's estate?

19   A.   No, he didn't.

20   Q.   For your wife's estate?

21   A.   No.

22   Q.   Did he ever meet you to talk about any of the

23   settlements that you or your children were going to be

24   getting from these lawsuits?

25   A.   No.

1    MS. LIMEHOUSE:  No further questions, Your Honor.

2    THE COURT:  Mr. Badger, you may step down.  Thank

3  you, sir.

4    THE WITNESS:  Thank you.

5    MS. LIMEHOUSE:  Can he be released?

6    THE COURT:  Yes.

7    MR. AUSTIN:  No objection.

8    THE COURT:  Very good.  He may be released.

9    Okay.  Let's bring Agent Womble back to the stand.

10            BRIAN WOMBLE,

11    having been previously sworn, testifies as follows:

12  BY MS. LIMEHOUSE:

13  Q.  Okay.  Agent Womble, we left off having talked about

14  the Hannah Plyler conservatorship loans.  I want to shift to

15  Malik Williams.  The jury's heard a little bit about Malik

16  Williams, but they haven't heard from him directly, unlike

17  the Plylers.  So tell them who represented Malik and what

18  happened to him.

19  A.  So, Malik Williams was represented by Paul Detrick

20  from the law firm, not Alex Murdaugh.  He was involved in an

21  accident that resulted in a settlement much smaller than what

22  you've heard about from the Plylers and some of the other

23  accidents.  But, ultimately, he ended up with a little bit

24  over $60,000 in a conservator account.  And Russell Laffitte

25  was appointed as his conservator.

1    MS. LIMEHOUSE:  Pull up Government's Exhibit 108 at

2    45, please.

3    BY MS. LIMEHOUSE:

4    Q.   So what does this document show?

5    A.   This is a disbursement sheet.  And it shows you

6    the -- how the funds from his settlement are disbursed.  And

7    you will see on there Russell Laffitte/Palmetto State Bank as

8    conservator for Malik Williams, $60,512.24.

9    Q.   So Russell Laffitte got this amount of money to

10   manage a conservator account, similar to the Plyler sisters,

11   but not the same amount?

12   A.   Correct.

13   Q.   So what did Russell Laffitte do with the money in

14   the conservatorship account?

15   A.   So, initially, a couple of things happened.  He took

16   a conservator fee, little bit over $3,000.  And then he

17   initially invested the majority of Malik Williams's money in

18   a CD, a certificate of deposit.

19   Q.   Okay.  And then what happened?  Let's go to

20   Government's Exhibit 108, 87, please.

21   A.   And then so what happened is, $40,000 was pulled out

22   of that certificate of deposit.  That certificate of deposit

23   was originally for 1.5 percent.  It was renewed at .75

24   percent for one year.  So $40,000 would have paid about $300

25   interest.  That 40,000 was pulled out.  And it was used as a

loan to Alex Murdaugh for $40,000. And you can see here it was a shorter term loan. It was put into effect on November 18th, 2011. And, actually, you could see the payable date of 12/31/2011, and an interest rate of 4.5 percent.

Q. And was the loan secured?

A. The loan was not secured.

Q. Let's go to 89, page 89 of that exhibit. Okay. So is this the check to Alex for $40,000?

A. Yes, it is.

Q. And it outlines how on November 18th, 2011, Russell Laffitte issued a check to Alex for $40,000?

A. That's correct.

Q. So how is that loan paid back?

A. It's paid back fairly promptly. It's paid back in December. And it's paid back with interest at 40,000 -- I believe $167.

Q. Let's go to page 81 of that 108, please. Okay. So if you will explain to the jury this repayment of the loan.

A. Yeah. So what you see here is a bank money order. And the money is sent back into -- to Russell Laffitte as conservator for Malik Williams for $40,000 loan, plus the interest. That's on December 21st, 2011. What's -- what else is significant about this loan, you will notice that there's $167.69 in interest in this loan. So even though the interest rate was 4.5 percent, it was only for a small period

1     of time, 45 days.  So keep in mind that that $40,000 was

2     pulled out of a one-year certificate of deposit.  That was

3     only at .75 percent.  But it's not just the interest rate

4     that matters, in your return, it's also the length of time.

5     So Malik Williams actually lost money on this loan to Alex

6     Murdaugh.

7          Q.   Okay.  So we will go into this in detail when we

8     talk about Hakeem Pinckney and Natasha Thomas.  How was the

9     loan from Malik Williams's account paid back?  Whose funds

10    paid back the Malik Williams's loan?

11         A.   Just one second.  The -- I'm sorry.  The Malik

12    Williams's funds were paid from settlement proceeds that were

13    meant for Natasha Thomas and Hakeem Pinckney.

14         Q.   You mentioned Russell Laffitte's fees.

15              MS. LIMEHOUSE:  If we could go to Exhibit 108 at

16    page 97.  Just blow up the top portion.

17    BY MS. LIMEHOUSE:

18         Q.   Is this the accounting that was provided in the

19    records, the probate records related to Malik Williams's

20    conservatorship account?

21         A.   Yes, that's correct.

22         Q.   So it indicates that Russell Laffitte took $3,025.96

23    in conservator fees?

24         A.   That's correct.

25         Q.   What was the significance of the Malik Williams's

1 case to your overall investigation?

2 A. So, the other thing that's significant is, like I

3 said before, his attorney was Paul Detrick. It wasn't Alex

4 Murdaugh. So Alex Murdaugh shouldn't have known anything

5 about Russell Laffitte being a conservator and managing money

6 from Malik Williams. Yet, he was able to get a loan from --

7 MR. DANIEL: Your Honor, I object to this testimony.

8 He's totally speculation. How does he know what Alex

9 Murdaugh knew and what Mr. Laffitte knew? This is total

10 speculation.

11 THE COURT: You've got to lay a foundation. I

12 sustain it. You need to lay a foundation.

13 BY MS. LIMEHOUSE:

14 Q. During the course of your investigation, did you try

15 to obtain any records referencing Alex Murdaugh in relation

16 to the Malik Williams's case?

17 A. We did. I didn't see any records with Alex Murdaugh

18 related to Malik Williams.

19 Q. So during the course of your investigation --

20 MR. DANIEL: Your Honor, if he has not talked to Mr.

21 Murdaugh about it, then it's not proper line of questioning.

22 THE COURT: Let's hear what his testimony is. He

23 doesn't necessarily have to talk to Mr. Murdaugh. Let's hear

24 the foundation of his testimony. Please continue, Ms.

25 Limehouse.

1  BY MS. LIMEHOUSE:

2    Q.   I believe you testified that you didn't find any

3  records that Alex Murdaugh was associated with the Malik

4  Williams case?

5    A.   Yes.  And so we subpoenaed the records from the law

6  firm and they provided records pertaining to the case.

7    Q.   And so did any of those subpoenaed records indicate

8  that Alex Murdaugh had anything to do with Malik Williams's

9  case?

10   A.   Okay.  They did not.

11   Q.   So did any information that you obtained during the

12  course of your investigation, including subpoenaed documents

13  and interviews, indicate that Alex Murdaugh had any knowledge

14  of Malik Williams's case?

15   A.   They did not.

16   Q.   So what was the significance of that information in

17  your investigation?

18   A.   So, Russell Laffitte knew Malik Williams had a

19  conservator account.  I didn't see any information that Alex

20  Murdaugh would have known about that account.  The only

21  people who would have known about it would have been Malik

22  Williams and Russell Laffitte.

23        MR. DANIEL:  I'm going to object to this line of

24  questioning.

25        THE COURT:  I think the last question, Ms.

1  Limehouse, is an inference the jury could reach, but I'm not

2  sure there's a basis for the agent to reach.  So I'm going to

3  sustain the objection.

4       MS. LIMEHOUSE:  We will withdraw that question, Your

5  Honor.

6  BY MS. LIMEHOUSE:

7      Q.  Let's move on to Hakeem Pinckney and Natasha Thomas.

8  The jury heard from Ms. Thomas today about what happened to

9  her and her cousin.  How did Russell Laffitte become involved

10  in that case?

11      A.  Alex Murdaugh asked him to be the conservator.

12      Q.  So about when did Russell Laffitte get appointed to

13  serve as Hakeem Pinckney's conservator?

14      A.  Do you have a document I could review?

15      Q.  I do.  Let's first start with Natasha Thomas, if we

16  can.

17      MS. LIMEHOUSE:  Exhibit 110 at 8, please.

18  BY MS. LIMEHOUSE:

19      Q.  Okay.  So what date was Mr. Laffitte appointed to be

20  Natasha Thomas's conservator?

21      A.  So this is dated September 8th, 2010.  And it

22  appoints him as the conservator for Natasha Thomas.

23      Q.  And we are going to go through some of these records

24  that were filed with the probate court in relation to Ms.

25  Natasha Thomas.

1          MS. LIMEHOUSE:  If we could go to page 5 of 110.  If

2     you could just highlight the portion outlining the

3     information from Natasha Thomas.  Little bit lower, please.

4     Yes.

5     BY MS. LIMEHOUSE:

6          Q.   Okay.  All right, sir.  So what does your review of

7     this petition reveal?

8          A.   So this is a petition for Russell Laffitte to become

9     the -- or be appointed as the conservator for Natasha Thomas.

10    What is significant about the portion of this that is

11    highlighted is, as Natasha Thomas testified earlier, her

12    birthday is September 10th, 1992.  So the date of birth is

13    almost five years off.

14         MS. LIMEHOUSE:  Okay.  And if we could go to the

15    next page, please.  Sorry.  The next page, blow that up.  I'm

16    sorry, two pages after that.  If you could blow that up for

17    us.

18    BY MS. LIMEHOUSE:

19         Q.   So this indicates that on August the 26th of 2010,

20    Mr. Laffitte is signing two portions of this petition.  What

21    is he stating when he signs these portions of the petition?

22         A.   Yes, so two things, first part is the verification,

23    and it says undersigned, being sworn, states that the facts

24    set forth in the foregoing statement are true and to the best

25    of the undersigned's knowledge, information and belief.  And

1    then it's sworn on August 26th, 2010.  The notary public

2    there is Nancy Mae Drawdy, who is an employee of Palmetto

3    State Bank.  You can see to the right Russell Laffitte signs

4    it as well.  And in the second part says, I accept this

5    appointment and agree to perform the duties and discharge the

6    trust of the officer or conservator for the conservatorship

7    of, and again, dated the same day, Nancy Drawdy is the

8    notary, and signed by Russell Laffitte.

9         Q.   Okay.  So this, as you testified, indicates it was

10   signed on August the 26th of 2010.  So how old was Ms. Thomas

11   when Mr. Laffitte signed these documents?

12        A.   She was two weeks -- almost two weeks -- 15 days, I

13   guess, short of her 18th birthday.

14        Q.   So if you will go back to page 8 of this exhibit,

15   please.  Okay.  And, again, he was actually appointed on 8th

16   of September of 2010; is that right?

17        A.   Yes.  So that would be two days before she turns 18.

18        Q.   Okay.  So what was the significance of these

19   misrepresentations to the probate court?

20        A.   Well, as we've talked about before, a

21   conservatorship ends at age 18.  So there was no reason to

22   have a conservatorship opened.

23        Q.   So what did you learn about Ms. Thomas's

24   interactions with the defendant after his appointment as her

25   conservator on September the 8th of 2010?

1          MS. LIMEHOUSE:  Pull up Government's Exhibit 196,

2    please.

3        A.   Yes, so this is a promissory note, a loan that she

4    took from the bank.  It's what's been referred to as a lawyer

5    loan.  So it's a loan where -- it's essentially based on an

6    expected settlement.  So she got a loan from the bank.  So

7    she was actually a bank customer of Palmetto State Bank.

8        Q.   So indicates she got a loan valued at $2,583.53 at

9    18 percent interest on December the 6th, 2010?

10       A.   That's correct.

11       Q.   If you will go to page 3 of this document, please.

12   Okay.  Just highlight the signature.  So is this Natasha

13   Thomas's signature?

14       A.   It is.

15       Q.   And does it indicate her accurate birth date?

16       A.   9/10/92 is her accurate birth date.

17       Q.   So on December 6th, 2010, when she's getting this

18   loan from the defendant at Palmetto State Bank, how old is

19   she?

20       A.   She would be 18.

21       Q.   All right.  So what did you learn about the

22   interactions between the defendant and Ms. Thomas following

23   the execution of this lawyer loan?  Did he ever meet her in

24   his capacity as her conservator?

25       A.   I don't believe so.

1   Q.   I'm going to go to Hakeem Pinckney now.  So we

2   talked a little bit -- they heard about what happened to

3   Hakeem Pinckney and that Mr. Laffitte was appointed to be his

4   conservator.  Why was he appointed to be Hakeem Pinckney's

5   conservator?

6   A.   Hakeem Pinckney was severely injured in the

7   accident.  So you have a conservatorship for two reasons, a

8   minor under 18, or somebody who doesn't have the ability to

9   take care of themselves for whatever physical or mental

10  reasons.  So Hakeem Pinckney, as a quadriplegic, would be

11  someone who potentially would need a conservator.

12  Q.   So he wasn't 18 -- he wasn't under 18, but he had

13  another reason why he would have needed a conservator?

14  A.   That's correct.

15  Q.   So we heard Ms. Thomas testify about how Hakeem

16  Pinckney died in October of 2011.

17       MS. LIMEHOUSE:  If we could pull up grand jury

18  exhibit -- excuse me, Government's Exhibit 111, please.

19  BY MS. LIMEHOUSE:

20  Q.   So this is an e-mail from Alex Murdaugh to Russell

21  Laffitte dated October 11th, 2011.  The subject line is

22  Pinckney, and says:  Please call me, 911.  So what's the

23  significance of this e-mail?

24  A.   So October 11th, 2011, was the day Hakeem Pinckney

25  passed away.  So you have Alex Murdaugh reaching out to

1    Russell Laffitte:  Please call me 911.  Obviously, wants to

2    talk to him as soon as possible, adding urgency to the

3    e-mail.

4           MS. LIMEHOUSE:  If we could pull up Government's

5    Exhibit 213.  If you could go to the signature page, please.

6    BY MS. LIMEHOUSE:

7       Q.   Okay.  So when was this settlement actually reached

8    in Hakeem Pinckney and Natasha Thomas's case?

9       A.   November 8th, 2011.

10      Q.   You see that Russell Laffitte signed this release as

11   the conservator.  So what's the significance of this date in

12   relation to the October 11th e-mail that the jury just

13   reviewed?

14      A.   So, Russell Laffitte, as conservator for Hakeem

15   Pinckney, Hakeem Pinckney at this time has passed away.

16      Q.   So why would a person who's passed away need a

17   conservator?

18      A.   I don't know.

19      Q.   So would it be appropriate that now he would have a

20   personal representative of his estate rather than a

21   conservator?

22      A.   Yes.

23           MS. LIMEHOUSE:  Let's pull up Government's Exhibit

24   212 please and also go to the signature page.

25   BY MS. LIMEHOUSE:

1    Q.   So this is the release signed by Russell Laffitte

2  related to Natasha Thomas's settlement.  Similarly, what day

3  was her settlement obtained?

4    A.   November 7th, 2011.

5    Q.   And how old was Ms. Thomas at the time that she

6  received her settlement?

7    A.   She would have been 19 at that time.

8    Q.   And who is Brenda Tuten?

9    A.   She's an employee at Palmetto State Bank.

10   Q.   Why did Natasha Thomas, on November the 7th of 2011,

11 need a conservator?

12   A.   She didn't need a conservator.

13   Q.   Let's move to how much money Natasha Thomas and

14 Hakeem Pinckney were supposed to receive.  Let's start with

15 Government's Exhibit 20, please.  And if we can go to page 2.

16 We see Russell Laffitte's signature as her conservator.

17 Again, you just testified that she was 19 at the time she

18 received these fees, and she would not have needed a

19 conservator; is that right?

20   A.   That's correct.

21        MS. LIMEHOUSE:  So let's go to the first page,

22 please.  If you will just blow up all the amounts that we can

23 highlight again for the jury.

24 BY MS. LIMEHOUSE:

25   Q.   So what did this indicate about her recovery amount

1    and where the funds were supposed to go?

2       A.    So total recovery of $2 million, the first section

3    breaks down what defendants are paying.  The next section,

4    the fees.  So you have your attorneys' fees for the law firm,

5    800,000, and then you have a conservator fee for Russell

6    Laffitte of $15,000.  And then it goes down to other costs,

7    expenses, medical bills.  What happens a lot in these cases,

8    you pay off the medical bills for the person.  And also

9    sometimes you keep money to pay off medical bills, but

10   sometimes those are negotiated down and paid off at a lower

11   rate, percentage.  And then potentially that money may go

12   back to -- into the settlement.

13          And then at the bottom, you see that $1,059,469.73

14   went to Natasha as a client.  There's a structured payment,

15   structured settlement that you've heard about before, of

16   $650,000.  There's a check for 750.  There is $83,719.73 that

17   goes directly to Natasha Thomas.  And then you see the

18   $325,000 at the bottom marked Natasha Thomas, Palmetto State

19   Bank.

20      Q.    We will highlight the $325,000 check again in a

21   moment.  If we can go to Government's Exhibit 21, please.

22   Was Ms. Thomas supposed to receive some additional

23   disbursements?

24      A.    Yes.  So I just mentioned that sometimes the medical

25   bills, they hold back, and then they're negotiated with

1  insurance companies or the providers for a lower amount.  So

2  that's essentially what you see here, 88,720 paid to medical

3  bills, and there's $25,245.08 left over.  It's marked as

4  Palmetto State Bank loan.

5  　　　　　MS. LIMEHOUSE:  Let's look at the disbursement sheet

6  for Hakeem Pinckney, Government's Exhibit 22.  If you will do

7  the same thing and just highlight all the funds.  Second page

8  is good.  Thank you.

9  BY MS. LIMEHOUSE:

10  　　　Q.   So, again, this is an undated signature page.  And

11  it indicates that Russell Laffitte is signing as his

12  conservator.  At the time, as you testified, they received

13  the funds, Mr. Pinckney had passed away; is that right?

14  　　　A.   That's correct.

15  　　　Q.   Let's go to the first page.  All right.  If you will

16  highlight these amounts for the jury to understand.

17  　　　A.   Sure.  So you start with your recovery amount,

18  $10,245,000.  And it's broken down by the different

19  defendants.  There's a fee to the law firm for $4,098,000.

20  Russell Laffitte gets a $60,000 conservator fee from there.

21  You will see some costs and expenses.  Next section is loans

22  and medical bills.  Then if I could direct your attention to

23  the bottom, disbursement to client, you have two things

24  there.  You have a structured settlement of 5 million, and

25  then you have $309,581.46 that goes to Palmetto State Bank.

1    Q.   So let's talk what happened with Hakeem Pinckney's

2    309,000 and Natasha Thomas's $325,000 checks.

3        MS. LIMEHOUSE:   If you could do a side-by-side

4    Government's Exhibit 32 and 34, please.

5    BY MS. LIMEHOUSE:

6    Q.   So you testified, in looking at disbursement sheets,

7    about these two checks and that they were supposed to go to

8    Palmetto State Bank.  So what was the significance of the

9    payee line to your investigation?

10   A.   Again, both of these two checks, the payee is

11   Palmetto State Bank.  So the check on the left, you can read

12   in the memo line, said settlement proceeds of Natasha Thomas.

13   Should have been paid to the order of Natasha Thomas.  The

14   other check, Palmetto State Bank, memo line, settlement

15   proceeds Hakeem L. Pinckney.  To make sure the money goes to

16   the proper person, the pay-to-the-order-of line should have

17   said Hakeem L. Pinckney.

18   Q.   Highlight these signatures.  Whose signatures are

19   these?

20   A.   Both of those signatures are Alex Murdaugh.

21   Q.   And how about the date of these checks?

22   A.   Both checks are dated December 20th, 2011.

23   Q.   How about the date of the checks being negotiated?

24   A.   And they are both deposited into Palmetto State Bank

25   the next day on December 21st, 2011.

1    Q.    So if Alex Murdaugh was coming to the bank with a

2    check that belonged to him, how should it have been drafted?

3    A.    If a check was actually meant for Alex Murdaugh, it

4    should have said in the "pay to the order" of Alex Murdaugh.

5    Q.    I'm going to pull up Government's Exhibit 198 at

6    slide 8, please.  So what actually happened to these two

7    checks?

8    A.    Yes, so what you can see in this -- these are the

9    total proceeds from that $635,000.  So on December 21st, they

10   get deposited into the account.  And then they get split up

11   into different amounts.  You can see the first one we already

12   talked about, that's how Malik Williams was -- his loan was

13   repaid.

14   Q.    Can I ask you one question?  You said deposited into

15   the account.  So what account would that be if Palmetto State

16   Bank is the payee?

17   A.    So, what happens there is, that money would have

18   gone to what you call a loans not on system account.  So it's

19   essentially not attached to anybody.  So it's just a general

20   catch to pay out maybe cashier's checks, et cetera.  Problem

21   with that is, it's really hard, you know, to trace the money

22   that goes into that account because it doesn't belong to

23   Brian Womble or Alex Murdaugh or Natasha Thomas.  It's -- you

24   know, it's -- essentially the money is concealed in terms of

25   tracking that money.

Q.   Okay.  So what happens with the 309 and 325 checks?

A.   So it's broken down into these payments you see on the left.  I believe nine payments -- would you like me to go through each?

Q.   Sure.  Sure.

A.   First one, like I said, went to Malik Williams.

The next one is a money order.  It goes to Randolph Murdaugh, Alex Murdaugh's father, for $329,500.  You can see the money goes to him on 12/27.

The next one, $91,220.57, that is used to -- for Alex paying back Hannah Plyler for a loan.  So the money goes to Russell Laffitte as conservator for Hannah Plyler, deposited on 12/23.

The next one, $50,135.61, again, goes to Hannah Plyler to repay a loan deposited on 12/23.

There's $100,000, it's used to pay -- repay a loan to Charles, Charlie A. Laffitte, Jr. on 12/29.  And if you remember my previous testimony, Charlie Laffitte had loaned $125,000 to Alex Murdaugh in February of 2011.

$3,137.30 goes to Murdaugh Charters or Alex Murdaugh on 12/21.

There's $920.29 to Murdaugh Charters also on 12/21.

There's cash back for $9,500 on 12/21.  Keeping in mind that a bank, any cash transaction, $10,000 or more, the bank is required to report that.  This is $9,500.

1          And then a $10,000 deposit into Maggie Murdaugh's

2    account on 12/21.

3      Q.   So all of these money orders were issued on the same

4    day, December 21st?

5      A.   That's correct.

6      Q.   Okay.  I'm going to look at some of these checks

7    with you.  The jury has seen them a few times.  But from your

8    investigation, what stood out to you about these checks.

9          MS. LIMEHOUSE:  If we could pull up Government's

10   Exhibit 35.

11   BY MS. LIMEHOUSE:

12     Q.   So this is the first one, the $10,000 to Maggie

13   Murdaugh that you just testified about.  What's stood out to

14   you about this deposit slip?

15         MS. LIMEHOUSE:  If we can actually just go to the

16   next page first.

17   BY MS. LIMEHOUSE:

18     Q.   Okay.  So this is one of the $9,500 that you just

19   referenced, less than $10,000, payable to cash on 12/21.  So

20   what's stood out to you about some of the ways these checks

21   were negotiated?

22         MS. LIMEHOUSE:  So they are indicating -- well, if

23   you can go to the next one again, Ms. Rozsa.  I'm sorry.  One

24   more.  One more.  Let's try this one.

25   BY MS. LIMEHOUSE:

1    Q.   Okay.  So this is just an example, the one you

2    testified is a repayment of a loan that Charlie Laffitte had

3    extended to Alex Murdaugh.  This money order, what stood out

4    to you about this money order?

5    A.   One, it's signed by Russell Laffitte.  It's on

6    12/21/2011 -- if you remember, I explained that the original

7    money of the 329,000 and/or 325,000, 309,0000 went to the

8    loans not on system.  That will fund a bank money order or

9    similar to a cashier's check.  And that's what you see here.

10   Q.   So this handling of the $100,000 payment to Charlie

11   Laffitte, was that the same way that these money orders were

12   issued out of that loans not on system account?

13   A.   It is.

14   Q.   I want to step back.  So who issued all of these

15   money orders on December 21st?

16   A.   All nine of these transactions were handled by

17   Russell Laffitte.

18   Q.   I want to step back a little bit and have the jury

19   understand what was going on with Alex Murdaugh's personal

20   finances at the bank in December of 2011 when these checks

21   were negotiated.  So they've heard about two loans, Red Beard

22   and 0 United.  But if you could sort of refresh their

23   recollection about these two loans, Red Beard and 0 United?

24   A.   Those are two loans, Alex Murdaugh was involved in a

25   group, essentially, investing in some land.  They had gotten

1  loans from Palmetto State Bank for that.  Those loans or

2  those properties were never -- they were never able to sell

3  them.  And, eventually, Palmetto State Bank actually charged

4  those loans off, meaning that they kept them on the book,

5  they keep the collateral, but they are only collecting

6  principal payments, not interest payments.

7      Q.   Let's talk about the process with the charging off.

8          MS. LIMEHOUSE:  If we could pull up Government's

9  Exhibit 45.  If you could just blow up the bottom portion,

10 please.

11 BY MS. LIMEHOUSE:

12     Q.   So this is an e-mail from Russell Laffitte to Alex

13 Murdaugh on November the 1st of 2011:  I have the loan

14 renewal for Red Beard, LLC ready to be signed.  I will need

15 to collect $47,663.78 for the interest.  I have set up the

16 loan in two separate loans.  One is for $288,750.  It is set

17 up on a ten-year amortization on a three-year balloon.  The

18 annual payments will be $38,791.70.  The other loan is

19 $381,102.69.  This loan is set up on a single annual payment.

20 As soon as we book the renewal, we will charge this loan off

21 completely.  You will not pay the interest or anything on it

22 until the property is sold or the other loan is paid down.

23 We are doing this to comply with the FDIC.  They want banks

24 to realize the negative equity in the loan.  This is why we

25 are doing this.  We expect to be paid in full, but we realize

1    that it will be down the road before it can happen.  Please

2    set up with Barrett, Josh Hullen, Thomas Boulware, and David

3    Grubbs as to when they can come to Hampton to sign the

4    renewals.  Please have them bring a current financial

5    statement with them also.

6            So what is Russell outlining for Alex in here?

7        A.   He's essentially explaining the charged-off

8    prospective.  Also telling him that, hey, each year the

9    principal payment on these loans is going to be due at the

10   end of the year and it's coming up soon, I'm going to need

11   you to pay that amount.

12       Q.   So when we reference sort of the end of the year

13   payment, jury heard a little bit about this, but how was

14   Alex's personal loans set up with Palmetto State Bank?

15       A.   So, Alex Murdaugh's pay bonus each year, the most

16   significant amount of his annual income, would come at the

17   very end of December.  So the bank, in a lot of cases, not

18   only with Alex but with members of the law firm, would set up

19   so they made an annual payment instead of a monthly payment

20   when they got that bonus, so a significant larger sum

21   one-time payment each year on the loans.

22       Q.   So was it typical that Alex would be coming in at

23   the end of the year with funds to pay off the loans he owed

24   to the bank?

25       A.   Yes.

1    Q.   Okay.  So let's go to Government's Exhibit 46.  This

2    is an e-mail from Alex to Russell on November the 14th.  And

3    it says:  When can you meet with me to talk about the

4    Berkeley prop loans?

5         What were the Berkeley prop loans?

6    A.   Those are the two loans we just discussed, 0 United

7    and Red Beard.

8    Q.   So is he referring back to the November 1st e-mail

9    about the charging off --

10   A.   Yes.  So they are continuing to have discussions

11   about these two properties, the payments, you know, how those

12   loans were going to be handled.  And so keeping in mind, this

13   is November 2011.  This is a very similar time frame.  You

14   know, in December 21st, 2011, is when the checks for Natasha

15   Thomas and Hakeem Pinckney we just discussed happened.

16        MS. LIMEHOUSE:  Let's pull up Government's Exhibit

17   47, please.

18   BY MS. LIMEHOUSE:

19   Q.   So this is an e-mail on the bottom, first from

20   Russell to Alex on Friday, December 9th:  Are your partners

21   coming up with the money for the renewal?  I need to do it

22   before the end of the year.

23        And Alex responds on December 12th:  No, but I will

24   pay it.  When we talk, I will remind you what we discussed.

25   I need to put some money in Mag's account.  Can you put 3,000

1  in hers?

2  So by December 12th, had Alex come into the bank and

3  paid down the loans that he owed at that point?

4  A.  No.  And you can see in the subject line it says,

5  Red Beard, LLC.  And that's what they are discussing.  But

6  those loans had not -- principal payment of those loans had

7  not been made at this point.

8  Q.  Going to pull up Government's Exhibit 48.  This an

9  e-mail from Alex to Russell Laffitte dated December the 20th,

10  so eight days after the December 12th exchange.  And it says:

11  Can you call me.

12  MS. LIMEHOUSE:  If you could pull a side-by-side up

13  with 198, please.

14  BY MS. LIMEHOUSE:

15  Q.  Okay.  So what happens on December the 20th of 2011?

16  A.  So the day after this e-mail is when the checks

17  meant for Natasha Thomas and Hakeem Pinckney are negotiated.

18  You can see that's December 21st.  This e-mail, "can you call

19  me," is the day before December 20th, 2011.

20  MS. LIMEHOUSE:  If you will just pull up a

21  side-by-side with 32 and 34 again.

22  BY MS. LIMEHOUSE:

23  Q.  Okay.  So, again, that e-mail, "can you call me,"

24  December 20th, 2011, is the same day that these two checks

25  were dated?

1    A.    That's correct.

2    Q.    All right.  So let's go to Government's Exhibit 49,

3    please.  So the first is an e-mail from Russell to Alex on

4    December 27th, so seven days after the Pinckney/Thomas checks

5    were dated, and six days after they were negotiated.  Russell

6    says:  Alex, when are we going to do Red Beard and 0 United?

7          And Alex responds:  As soon as we get bonus checks.

8          So by December 27th, had Alex paid off the loans

9    that he owed to the bank?

10   A.    He hadn't.  And this is, I think, the fourth e-mail

11   we've seen now where Russell is reaching out to him reminding

12   him of these payments, asking him to make the payments,

13   talking about FDIC, and the proper way to handle these loans.

14   Q.    So Alex had come to the bank with over $600,000 in

15   money -- in checks, on December the 21st?

16   A.    That's correct.

17   Q.    And who had negotiated all of those $600,000 in

18   checks on December 21st?

19   A.    Russell Laffitte negotiated those for Alex Murdaugh.

20   Q.    But none of those funds went to pay off all of his

21   debts to the bank?

22   A.    That's correct.

23   Q.    Let's pull up Government's Exhibit 49A, please.

24   First is an e-mail from Russell to Alex on Thursday, December

25   29th.  And he says:  I will be in all day Friday.

1        And then on December 30th, that Friday, Alex e-mails

2   Russell and says:  Can you meet now?

3        MS. LIMEHOUSE:  If we can pull up Government's

4   Exhibit 161, the December 2011 records.  Okay.  So if you

5   could just blow up the big portion on December 30th.

6   BY MS. LIMEHOUSE:

7        Q.   When were these loans actually paid off to Red Beard

8   and 0 United?

9        A.   0 United was -- you can see it was paid off on

10  12/30/2011 for $50,433.  And then Red Beard on 12/30/2011 as

11  well is paid off for $53,633.

12       Q.   What were some of the other funds that were spent --

13  sorry.  How were Alex's funds also spent on December 30th

14  from his account records, to pay off other loans he owed to

15  the bank?

16       A.   Yes.  Actually, you will see he gets his yearly

17  deposit of $1,266,000.  And then he pays off a number of

18  different things, including those two loans.

19       MS. LIMEHOUSE:  If he could do a side-by-side with

20  36 and 48, please.

21  BY MS. LIMEHOUSE:

22       Q.   So what was the significance in your investigation

23  of these account records when juxtaposed with how

24  Pinckney/Thomas funds were handled?

25       A.   So, what you see here is, you know, Alex Murdaugh

1    reaching out to Russell Laffitte the day before all these

2    funds are handled saying, can you call me.  Not detailing in

3    the e-mail what it's about, but wanting to talk about it on

4    the phone.

5        Q.   And none of these funds were used to pay off his

6    bank loans; is that right?

7        A.   That's correct.

8        Q.   So let's talk about the money that Natasha Thomas

9    did actually receive.  If we could pull up Government's

10   Exhibit 195A.  Ms. Thomas testified that she did receive a

11   check for $83,719.73.  So what is the next of this check to

12   you?

13       A.   This check was also in the disbursement sheet for

14   her.  It goes to her on the same day as the other checks, on

15   December 20th, 2011, dated -- she deposits it the same day as

16   the other checks are deposited by Alex Murdaugh, negotiated

17   by Russell Laffitte.  But at this time, you know, she's 19

18   years old.  She's getting this check with a memo line

19   settlement proceeds.  It's going correctly to her.  She's

20   going in and negotiating the check and depositing the check

21   herself.

22       Q.   So on the exact same date that all those money

23   orders were issued, Ms. Thomas actually goes to Palmetto

24   State Bank and deposit her settlement check, is that right?

25       A.   That's correct.

1    MS. LIMEHOUSE:  So let's go to Government's Exhibit

2    109 at page 19.  And let's talk about when these

3    conservatorships were closed.  If you will just highlight the

4    bottom portion.  I know it's a little foggy, but with the

5    date on the very bottom, okay, date on the very bottom.

6    BY MS. LIMEHOUSE:

7    Q.   Okay.  So this is the annual accounting that was

8    filed with Hakeem Pinckney's case.  And what does it

9    indicate?

10   A.   So, it looks like on December 6th, 2011, it's -- the

11   annual accounting is done.  And it's filed on 12/22/2011 at

12   the bottom.  Brenda Tuten is the one that notarizes it.  And

13   it's signed by Russell Laffitte.

14   Q.   How does this date relate in time to when the

15   Pinckney/Thomas checks were negotiated?

16   A.   So this is the day after the checks were negotiated.

17        MS. LIMEHOUSE:  If you could just show that full

18   page, if you don't mind.

19   BY MS. LIMEHOUSE:

20   Q.   And so what does Mr. Laffitte indicate about where

21   the Pinckney funds are?

22   A.   He's indicating that those funds did not go into the

23   conservator account.  He's saying that there's zero -- the

24   balance on the conservator account is zero.

25   Q.   So the day after all of these checks are negotiated,

1  he files documentation with the probate court saying that

2  there are no funds?

3      A.   That's correct.

4      Q.   And did he do this same thing for Natasha Thomas's

5  conservatorship?

6      A.   Yes.

7      Q.   Let's pull up Government's Exhibit 21.  So the jury

8  has seen this second disbursement sheet for Natasha Thomas

9  indicating that she was -- Palmetto State Bank was supposed

10 to receive $25,245.08.  So where was the $25,000 and some

11 change supposed to go?

12     A.   It was supposed to go to Natasha Thomas.

13     Q.   And if we could go to Government's Exhibit 33.  So

14 was this the check that was issued from that second

15 disbursement sheet?

16     A.   Yes, it is.

17          MS. LIMEHOUSE:  Okay.  If we could pull up

18 Government's Exhibit 198 at slide 10.

19 BY MS. LIMEHOUSE:

20     Q.   So what actually happened to this $25,000 check?

21     A.   I think we have the wrong --

22     Q.   Oh, we do have the wrong one.  Hold on.

23          So what happened to that $25,000?

24     A.   So, I mentioned before, CTR is cash transaction

25 report.  So there's a federal requirement if a bank handles

1  $10,000 in cash, there has to be a report on that.  And so

2  you have a check for $25,245.  And as you can kind of trace

3  from the left to the right, initially, it's broken into two

4  pieces.  There's $9,000.  We know by Russell Laffitte's

5  testimony in September that that $9,000 was cashed out by

6  Alex Murdaugh.  This is on August 29th.  And then a money

7  order is created with the remaining balance of $16,245.08.

8  They are both negotiated on the same day, August 29th.

9  Moving forward, the next day, that $16,245 money

10  order is again broken up.  And you see two transactions.

11  So -- and again, we know by Russell Laffitte's testimony in

12  September that the $9,000 was cashed out by Alex Murdaugh,

13  and another money order was created for $7,245.08 issued to

14  Alex Murdaugh.  And then you will see he comes back in on

15  September 4th and cashes that last money order.

16  So, essentially, what happens is that $25,245 check

17  gets split up into three pieces, all under that $10,000

18  threshold we talked about, none of which goes to Natasha

19  Thomas.

20  Q.  Who negotiated all of these transactions?

21  A.  Russell Laffitte negotiated these transactions.

22  MS. LIMEHOUSE:  Can you pull up Government's Exhibit

23  214, the middle two checks, if you don't mind.

24  BY MS. LIMEHOUSE:

25  Q.  So how much money did Russell Laffitte collect as

1  conservator for Hakeem Pinckney and Natasha Thomas?

2  A.  So these are the conservator fee checks he received.

3  The first one is for Hakeem Pinckney.  You can see in the

4  memo line it says, conservator fee of Hakeem Pinckney,

5  $60,000.  And you see paid to the order of Palmetto State

6  Bank.  So the same way those checks we've seen that we've

7  discussed earlier that have gone through that "pay to the

8  order of Palmetto State Bank," here we have Russell Laffitte

9  also getting paid the same way.  These checks aren't paid to

10  the order of Russell Laffitte as conservator.  They are paid

11  to Palmetto State Bank.  And we talked about earlier how a

12  check going to Palmetto State Bank is harder to trace than a

13  check going directly to the person that its intended for.

14      The second check, 15,000, same thing, conservator

15  fee, this time Natasha Thomas.  Again, the check is written

16  to Palmetto State Bank, not to Russell Laffitte.

17  Q.  I just want to highlight two dates for you, January

18  3rd of 2012.  So you testified about all of the

19  Pinckney/Thomas negotiations occurring on December 31st.  So

20  this was two weeks later, he's collecting $75,000 in fees?

21  A.  That's correct.  And you also saw the accounting,

22  the annual accounting in the conservator accounts, which

23  showed that he managed no money in their conservators -- in

24  their conservator accounts, but he received $75,000 as a

25  conservator.

1   MS. LIMEHOUSE: If we could pull up Government's

2   Exhibit 215.

3   BY MS. LIMEHOUSE:

4   Q. Just to highlight some of your testimony about the

5   way these checks were drafted, I'm going to show you the

6   first. This is the ledger from Natasha Thomas. All right.

7   So just explain for them what this ledger shows about how

8   those checks were handled.

9   A. Yeah. So what you see, the first circle on there,

10  on 12/20/2011, the check for the conservator fee was

11  initially written to Russell Laffitte for $15,000, and it was

12  voided. And that was on 12/20, same dates as the original

13  checks we discussed earlier.

14  Then on January 3rd, 2012, the check was rewritten,

15  but instead of to Russell Laffitte, it's written to Palmetto

16  State Bank.

17  Q. And, again, it's the same way that that $325,000

18  check was drafted?

19  A. Yes.

20  Q. And if we could show Government's Exhibit 216,

21  please. The same question for $60,000 fee for Russell

22  Laffitte. If you could just explain that to the jury,

23  please?

24  A. Sure. So we see the same exact pattern here. The

25  only difference is this is Hakeem Pinckney, and it's $60,000,

1  but the same thing.  The date of all the other checks on

2  12/20, it's written to Russell Laffitte.  It's later voided

3  by the law firm, and then rewritten to Palmetto State Bank

4  for the conservator fee to Hakeem Pinckney.  So this is

5  actually -- both of these are ledgers that would have been

6  with the law firm recording their payments out.

7      Q.   You actually testified to this earlier, but just to

8  remind the jury, grand jury -- excuse me, Government's

9  Exhibit 168, page 8, so what does Mr. Laffitte do with the

10 $60,000 fee he received from Hakeem Pinckney?

11     A.   So, he uses -- the $60,000, he uses the majority of

12 it to pay off a $50,000 loan he took from Hannah Plyler.

13 There's 50,000, plus 3,000 and a number, little bit over

14 $3,000 in -- so 3,000 in interest plus, and then he cashes

15 out the remaining balance of the $60,000.

16     Q.   What does he do with the 15,000 he received from

17 Natasha Thomas?

18     A.   He cashes it.

19     Q.   Did Russell Laffitte notify the probate court of the

20 conservator fees he collected from Natasha Thomas and Hakeem

21 Pinckney?

22     A.   No, there's no record in their probate files of

23 conservator fees.

24     Q.   Did he ever manage, as you said, any money for

25 Natasha Thomas or Hakeem Pinckney like he did for Hannah and

1  Alania Plyler?

2  A.  He did not.

3  Q.  And did he ever meet them in his role as their

4  conservator?

5  A.  Not that I'm aware of.

6  Q.  Okay.  Let's move to the Badger case.  The jury has

7  now heard from Arthur Badger.  But who was originally

8  appointed to serve as the personal representative of Donna

9  Badger's estate?

10  A.  Arthur Badger was the original personal

11  representative for the estate of Donna Badger.

12  MS. LIMEHOUSE:  If we could pull up Government's

13  Exhibit 218E, please.

14  BY MS. LIMEHOUSE:

15  Q.  So how did Russell Laffitte become involved in the

16  case?

17  A.  Well, so what you have here is a -- so this would

18  have been filed in Allendale County with the probate court.

19  And here, what you have is a statement of resignation.  So

20  what you see is on September 14th, 2012, Brenda Bennett is

21  the probate judge, or was at that time in Allendale County,

22  signed by Arthur Badger.  So, essentially, what he's doing

23  here is giving up his role as personal representative for

24  Donna Badger.

25  MS. LIMEHOUSE:  If we could pick up pull up

1    Government's Exhibit 218A, please, just the bottom portion,

2    if you will.

3    BY MS. LIMEHOUSE:

4        Q.   So what does this document show?

5        A.   Yeah.  So this is an application or petition to

6    become what they call successor personal representative or

7    the new personal representative.  It's dated August 30th,

8    2012, and it's signed by Russell Laffitte.

9            MS. LIMEHOUSE:  If you could pull up Government's

10   Exhibit 218B.

11   BY MS. LIMEHOUSE:

12       Q.   So what day was Russell Laffitte actually appointed

13   to be the personal representative of the estate?

14       A.   So the probate judge in Allendale County appointed

15   him as the personal representative the same day that Arthur

16   Badger was pulled off or resigned as the personal

17   representative.

18       Q.   So what were Russell Laffitte's duties as the

19   personal representative of the estate?

20       A.   His duties should have been to protect the estate,

21   to, you know, manage the lawsuit, protect the rightful heirs,

22   which would have been Arthur Badger and -- Donna and Arthur

23   Badger's at that time, I believe, six children, who would

24   have been entitled to whatever funds or proceeds came from

25   the settlement.

1    Q.   Explain for the jury the two lawsuits that were

2    going together at the same time related to the accident?

3        A.   Yeah.   So there's, essentially, two suits involving

4    the Badger family.   There's one involving the estate of Donna

5    Badger.   And that would go -- any settlements for that would

6    go to her surviving family members.   And then there's also

7    one involving Arthur Badger.   Keep in mind, they are both

8    involved in the same accident.   And so that's strictly for

9    Arthur Badger.

10            MS. LIMEHOUSE:   Let's pull up Government's Exhibit

11   218C.

12   BY MS. LIMEHOUSE:

13       Q.   So when did they file paperwork to actually have

14   this settlement approved?

15       A.   So this is a petition for settlement in Allendale

16   County.   And it states it was executed on December 20th,

17   2012.   And you can see it's signed by Russell Laffitte.   And

18   it's for the estate of Donna Badger, you can see at the top.

19       Q.   And the jury has seen that Mr. Badger was supposed

20   to get $1.325 million from his settlement.

21            MS. LIMEHOUSE:   If we could pull up Government's

22   Exhibit 37 and 38 side-by-side.

23   BY MS. LIMEHOUSE:

24       Q.   So what happens with that $1.325 million?

25       A.   So what you see here are two e-mails between Alex

1  Murdaugh and Russell Laffitte.  The first one on the left, on

2  February 6th, Alex Murdaugh is breaking down that $1,325,000.

3  So he's saying $388,687.50, which we now know ends up going

4  to pay a loan to Johnnie Parker that Alex Murdaugh had.

5         The second line is:  Whatever the amount I owe on

6  Hannah loan.

7         So he's asking how much do I owe, I know I have

8  loans with Hannah Plyler.

9         Then the next one is 75K, which we know goes to

10  Alex's father.  And then he says:  Whatever the balance would

11  be on $1,325,000 after these deductions.  And then he says:

12  Please e-mail me and ask Check No. 43162 dated 11/19/2012,

13  for $1,325,000 be re-cut as listed above.  And he's sending

14  that Russell Laffitte.

15    Q.   So what does Russell Laffitte do after receiving

16  that e-mail.

17    A.   He does what Alex asks him to do.  He says:  Alex,

18  can you get Jeanne -- Jeanne is Jeanne Seckinger, who is the

19  CFO for the law firm -- to re-cut check 43162 dated

20  11/19/2012 as follows.  And then he breaks down exactly what

21  Alex had asked him to do, the 388,000.  And then he's saying

22  the next line that's what Alex owed Hannah Plyler at the

23  time, $151,726.05.  Then you add the 75,000 we talked about.

24  And then what you have is the remaining $709,586.45.

25         So what you are seeing in this e-mail is Alex

1  Murdaugh talking to Russell Laffitte, telling him about this

2  $1.325 million on the front end, before the money comes to

3  the bank, and together they are breaking up those amounts.

4      Q.   So who's making these calculations?

5      A.   Russell Laffitte's making those calculations at the

6  request of Alex Murdaugh.

7      Q.   So what does Alex do with Russell's e-mail?

8      A.   He forwards it to Jeanne Seckinger, who, as you

9  know, is the chief financial officer for the law firm.

10     Q.   So what's the significance of Russell sending this

11  request to Alex and then forwarding it to the financial

12  department?

13     A.   So that $1,325,000 that was in Arthur Badger's

14  disbursement sheet that said structured settlement, Palmetto

15  State Bank, Russell Laffitte is involved with the Badger

16  family, he knows about that, and then here he is getting an

17  e-mail from Alex Murdaugh saying, hey, take that $1.325

18  million check and break it up into these amounts.

19     Q.   All right.  Let's will go to Exhibit 219, please.

20  So this is the ledger, similar to the ones the jury just saw

21  with Natasha Thomas and Hakeem Pinckney.  So show the jury,

22  if you could explain -- and you can actually use your finger

23  to, if you would like, Agent Womble -- to show what happens

24  with the Badger check.

25     A.   Yeah.  So you can see the check right here, there's

1    the number.  It was originally the $1,325,000.  It was

2    voided.  And said settlement.  The line description of the

3    memo was going to be, settlement proceeds, Arthur Badger.

4    It's going to be made out to Palmetto State Bank.  And

5    then --

6         Q.   I want to highlight one for you, if you don't mind.

7         A.   Sure.

8         Q.   This $35,000 personal representative fee dated

9    11/20/2012, the day after the original $1.325 million check

10   is dated, so what's the significance of the way that that

11   check was drafted?

12        A.   So it was -- it's, again, written out to Palmetto

13   State Bank.  It's not written out to Russell Laffitte.

14        Q.   Okay.

15        A.   Same way all these other checks are written out to

16   Palmetto State Bank.

17        MS. LIMEHOUSE:  If you can go to the next page,

18   please, Ms. Rozsa.

19   BY MS. LIMEHOUSE:

20        Q.   We will just highlight a couple of these other

21   checks.  So the first three up there, are those the amounts

22   that corresponded to the e-mail?

23        A.   That's correct.  And then right below it, you have

24   the $709,586 that was left over, that you see it's voided,

25   and then you can see it's broken down into repeating

1   denominations.  Four checks for 101,369, and then you have

2   four checks of $50,684, which is half of the $101,369 amount.

3   And then you have three checks for estate of Donna Badger,

4   $33,789.  Those three add up to $101,369.

5          The other thing I want to bring to your attention,

6   if you look at this part right here, you will see those first

7   three checks, the three that were specified the amounts by

8   Alex Murdaugh to Russell Laffitte, those are made out -- the

9   memo line, essentially says, is Arthur Badger.  The rest of

10  them you will see the next checks are all to the estate of

11  Donna Badger.

12     Q.   So each of these memo lines would have indicated

13  that they were to go to the estate of Donna Badger.  And the

14  first three were to indicate they were supposed to go to

15  Arthur Badger; is that right?

16     A.   That's correct.

17     Q.   I just want to highlight two checks at the bottom

18  here.  And if you will just explain to the jury what happened

19  with these checks.

20     A.   Yeah.  So we talked about the front end of the

21  e-mails between Russell Laffitte and Alex Murdaugh talking

22  about the 1.325 million.  So not all 1.325 million goes to

23  Palmetto State Bank.  Two of those checks, those are

24  repeating dominations.  You see at the end, they actually

25  ended up being written to Bank of America.  Memo line is

1  settlement proceeds.  And they are used to pay off expenses

2  Alex Murdaugh has at Bank of America.  And you can see the

3  dates of those checks are in May 12th, 2014, after the

4  September 13th, 2013, date of the other checks.

5      Q.   So were these checks, after the original check was

6  voided, drafted in the same way as Hakeem Pinckney and

7  Natasha Thomas's checks were drafted?

8      A.   The Bank of America ones?

9      Q.   I'm sorry.  The Palmetto State Bank ones.

10     A.   I'm sorry.  If you can repeat the question.

11     Q.   Yes.  All the checks, other than these last two,

12  were they drafted in the same manner that the Hakeem Pinckney

13  and Natasha Thomas checks were drafted?

14     A.   To Palmetto State Bank?

15     Q.   Yes.

16     A.   Yes, they all had "pay to the order of Palmetto

17  State Bank."

18     Q.   So let's talk about what happened with these funds.

19         MS. LIMEHOUSE:  If we could go to Exhibit 198, slide

20  10, please.

21  BY MS. LIMEHOUSE:

22     Q.   So these are the first three checks.  Tell the jury

23  what happens with those first three checks.

24     A.   These are the first three.  The memo line for these

25  checks, as we discussed before, Arthur Badger.  And these

1    three coincide with that e-mail that you just saw where Alex

2    Murdaugh is asking for the amount.  So you see February 8th,

3    2013, the checks are cut.  Unlike the checks that we looked

4    at with -- previously with Thomas and Pinckney, they are not

5    all negotiated right away.  You see the first one for 75,000

6    to Randolph Murdaugh is negotiated on February 11th, which

7    would have been three days later.

8         The next one, 151,000 that goes to Hannah Plyler's

9    conservator account is February 12th.

10        And then there's the money order for $388,687 that

11   goes to Johnnie Parker.  That's not negotiated until the next

12   month.

13        Q.   So who negotiates all of these transactions?

14        A.   Russell Laffitte negotiates all of these

15   transactions.

16        Q.   Let's go to slide 11, please.  This is the remaining

17   checks from that 709.  Please explain to the jury what

18   happens with those checks.

19        A.   So all these ones had the memo line description of

20   estate of Donna Badger.  The first one is the $33,789 amount,

21   it's negotiated on that date on September 13th.  And it's

22   used as a loan repayment by Alex Murdaugh to Hannah Plyler.

23        The next one, also $33,000 amount, it's deposited

24   directly into Alex Murdaugh's Palmetto State Bank account.

25   And that one is negotiated in January, January the 21st, the

1 next year.

2      Third, $33,000 check you see, 29,000 goes to Honey

3 Creek Motors for Alex Murdaugh. And the rest is cash he's

4 gotten back by Alex Murdaugh. That's negotiated in December

5 9th of the same year.

6      Fourth check, the $50,684 amount, 34,000 is used for

7 wire to 4M Iron, LLC. $8,200 is a money order to E. Smith

8 for a Jeep purchased. And then you see $8,084 is cashed

9 back. That's December 19th.

10      Next 50,684 amount, that's deposited directly into

11 Alex Murdaugh's account at Palmetto State Bank in January.

12      Next check, another $50,000 check, this is a $49,500

13 wire to Southern Crane. The remaining balance below that,

14 $1,185, is cash back negotiated in October.

15      Next is a $101,369 check. That's used by Alex

16 Murdaugh as a loan repayment to Hannah Plyler's

17 conservatorship, negotiated on October 28th.

18      Next check, $101,369, Alex Murdaugh used that as a

19 loan repayment to Hannah Plyler. That's not negotiated until

20 December.

21      And then the last check, also $101,369 amount,

22 93,869 is a money order to Hannah Plyler for loan repayment.

23 And 7,500 is a money order to Maggie Murdaugh.

24      So you see a couple of things in here. You see that

25 these checks, all dated September 13th, are negotiated over

1  different time periods.  They are not all negotiated the same

2  day.  What we do know about all these checks, they were

3  negotiated at Palmetto State Bank by Russell Laffitte for the

4  benefit of Alex Murdaugh.

5  Q.  Okay.  We can go to the next slide, please.  So

6  these two checks, I just pulled them out of the prior slide,

7  do they relate to Count 2 and Count 3?

8  A.  Yes, they relate to specific counts in the

9  indictment.

10  Q.  The next slide, please.  So then what happens with

11  the last two checks that we highlighted on the ledger?

12  A.  Yeah.  So I mentioned the Bank of America accounts.

13  The memo line was, settlement proceeds.  Payee was Bank of

14  America.  You know, both of those are negotiated and dated in

15  May of 2014, negotiated in May and June.  Both of those

16  checks -- now, keep in mind, they are part of the original

17  1.325 million in that e-mail communication between Russell

18  and Alex, but this money doesn't actually go to Palmetto

19  State Bank.  It goes to Bank of America on behalf of Alex

20  Murdaugh.

21  Q.  Did you review any e-mail communications regarding

22  these transactions?

23  A.  I did.

24  Q.  I'm going to pull up Government's Exhibit 51 and 52,

25  please.  This is an e-mail dated October 28th of 2013.  So

1    you just testified that all of those money orders were issued

2    on September the 13th; is that right?

3        A.    That's correct.

4        Q.    So on October 28th, 2013, Alex e-mails Russell and

5    says:  RL, this is where 49,500 goes.  I will pick up

6    difference.  Don't put it in an account.

7              And so then is this the attachment that shows the

8    instructions for that wire?

9        A.    Yes, it does.  So this is one of the checks the

10   that's -- I think the amount is $50,684.  And so, you know,

11   what you see here is significant, because Russell Laffitte is

12   being told by Alex Murdaugh what to do with the money, hey,

13   here are the wiring instructions.

14             The other thing that's significant in that is this

15   e-mail is implying that Russell Laffitte has that check for

16   $50,684 in his possession.  And Alex Murdaugh is telling him

17   what to do with that check that he has.

18             MR. DANIEL:  Your Honor, I object.  Did you say

19   "implied?"  Did the witness say "implied?"

20             THE COURT:  He used the word "implied".

21             MR. DANIEL:  That's totally improper.

22             THE COURT:  Why don't you lay a foundation for that,

23   Ms. Limehouse.

24             MS. LIMEHOUSE:  Okay.  We will go over the actual

25   check itself.

1  BY MS. LIMEHOUSE:

2      Q.    So this Government's Exhibit 29 at page 10 on the

3  right-hand side, is this the wire transfer that the e-mail's

4  referencing?

5      A.    You are going to have to blow it up a little bit for

6  me.  I'm sorry.

7      Q.    So is this the wire to Southern Crane that the

8  e-mail is referencing?

9      A.    It is.

10     Q.    And what does this general ledger credit indicate?

11     A.    So it's signed by RLL, Russell Laffitte.  And it's

12  showing on 10/29/2013 that there's a credit to the loans now

13  not on system.  We talked about loans not on system.

14  Essentially, when a wire or money comes in that's not for

15  that specified person, that money is put there and then it

16  backstops any wire going out of the bank.

17     Q.    What does it indicate about where this forty nine

18  five was coming from?

19     A.    It's coming from the check for $50,684 with the memo

20  line estate of Donna Badger on 9/13/2013.

21     Q.    So the difference between the 50,000 and some change

22  and the 49,500, 1,184.75, what happens with that additional

23  funds?

24     A.    It's cashed out.

25     Q.    So the significance of this e-mail, when you

1   compared it to the date of the initial check and the date

2   that this wire was transacted, what was the significance to

3   you?

4       A.   Going back to the e-mail and what I was talking

5   about before, so the e-mail is from Alex Murdaugh to Russell

6   Laffitte.  So the first party says -- he's telling RL,

7   Russell Laffitte, this is where the 49,500 goes.  And you see

8   that on the right.  And then he says, I will -- the right on

9   the top.  And then you will see:  I will pick up the

10  difference.  That's in the middle, the $1,104, don't put it

11  into the account.  So Alex Murdaugh is telling Russell

12  Laffitte what to do with that money at the bank.

13      Q.   Let's pull up Government's Exhibit 23, please.  So

14  the jury just heard from Mr. Badger.  Based on your

15  investigation, did Mr. Badger or any of his beneficiaries

16  ever meet with Russell Laffitte as the PR of their estate?

17      A.   They did not meet with Russell Laffitte.

18          MS. LIMEHOUSE:  If you will pull up the Palmetto

19  State Bank loan portion of the disbursement sheet, all of

20  these loans, yes.

21  BY MS. LIMEHOUSE:

22      Q.   So what did your investigation reveal about the

23  loans that Arthur Badger received from Palmetto State Bank?

24      A.   So based on his expected settlement, he was able to

25  get loans from Palmetto State Bank.  And what that entails is

1  the law firm or his attorney writing a letter to the bank

2  saying, we expect a settlement and he needs this amount of

3  money.  And the bank would provide loans.  So you see a total

4  of $49,649 in loans that Arthur Badger had received on the

5  expected payout of his lawsuit.

6      Q.   So what was the interest rate of all of these loans

7  that Mr. Badger got from Palmetto State Bank?

8      A.   18 percent was the rate.

9      Q.   And did Mr. Laffitte ever manage any money for

10 Arthur Badger or Donna Badger's estate?

11     A.   He did not.

12     Q.   Let's talk about how much Mr. Laffitte collected in

13 personal representative fees from Donna Badger.  So you've

14 explained the difference between Arthur Badger's lawsuit and

15 the lawsuit brought on behalf of the estate of Donna Badger.

16 Where did Russell Laffitte's fees come from?

17     A.   So the fees -- and keep in mind, he was assigned as

18 a personal representative for the estate of Donna Badger.

19 They came from this settlement.  You are going to have to --

20 there you go.  So this is the disbursement sheet for Arthur

21 Badger, not for the estate of Donna Badger.  And you will see

22 here personal representative fee, Russell Laffitte, $35,000.

23 He was the personal representative fee on the other case, not

24 on this case.

25          MS. LIMEHOUSE:  If you could go to page two of this

1    exhibit, please and do that a side-by-side with 119.

2    BY MS. LIMEHOUSE:

3    Q.    So what date does it indicate Arthur Badger signed

4    his disbursement sheet?

5    A.    November 19th, 2012.

6    Q.    How does that date relate to the date that Russell

7    Laffitte received the PR fee from the disbursement sheet?

8    A.    That was one day before the $35,000 check made out

9    to Palmetto State Bank which paid Russell Laffitte the

10   personal representative fee.

11   Q.    If we could go to Government's Exhibit 119A, please.

12   How did Mr. Laffitte spend that $35,000 he took -- he

13   received from Arthur Badger's disbursement sheet?

14   A.    So he used that $35,000 and put it towards his loans

15   that he had taken from Hannah Plyler and paid off part of his

16   loans.

17   Q.    So I'm going to highlight a date November 21st of

18   2012.  So was this just the day after that PR fee was -- that

19   PR fee check was dated?

20   A.    Is it the same day as the check and the day after

21   the settlement?

22   Q.    Yes.  I believe the disbursement sheet was on the

23   19th and the check was on the 20th.

24   A.    And this is the 21st.

25   Q.    Let's go over what the estate of Donna Badger

1    actually received.

2         MS. LIMEHOUSE:  Exhibit 24, please.  If you will

3    just make the amounts larger, please.

4    BY MS. LIMEHOUSE:

5         Q.   Is this the disbursement sheet for the estate of

6    Donna Badger?

7         A.   It is.

8         Q.   And what does it indicate about where those funds

9    were going?

10        A.   So, what happens when you have an estate in a

11   personal injury case or a death, the recovery amount, what

12   you see here is $4,675,000, it's split up between wrongful

13   death and survivors.  And the survivor amount is what the PR

14   fee is taken out of.  So the wrongful death here was

15   $4,674,500.  And the survival is $500.  And that has -- I am

16   not going to say I'm an expert on how to break down wrongful

17   death and survivorship, but there's some legal determinations

18   that are made there, how that's done.

19        Q.   So what's the significance about this $500 there?

20        A.   So the $500 is -- that gets split up between the

21   family.  It's also used to pay a PR fee.  So, essentially,

22   the PR fee comes from the survival fee.  It does not come

23   from the wrongful death fee.

24        Q.   So what would 5 percent of 500 had been?

25        A.   $25.

1    Q.   All right.  So if we could go to page two of this.

2    Actually, if you will just go through, highlight quickly the

3    remaining expenses and disbursements from the estate of Donna

4    Badger settlement.

5    A.   Sure.  So you see the attorney fee is -- again,

6    each, one is broken up wrongful death and survivor, but

7    $1,870,000, cost and expenses $47,265.  And then you have

8    disbursement for the wrongful death.  So it's $2,757,734.

9    And then that is split up equally between the six children of

10   Donna and Arthur Badger.

11        Normally, what would happen is 50 percent would go

12   to the spouse, and then the rest, the other 50 percent, would

13   be split up between the children.  And in this case, 100

14   percent went to the children.

15   Q.   If we could go to page two of this exhibit, please.

16   So the signature page of the disbursement sheet associated

17   with the estate of Donna Badger was signed by Russell

18   Laffitte as PR on May the 3rd of 2013.  By then, what had

19   happened to Arthur Badger's $1.325 million?

20   A.   Sorry.  I have a lot of dates to keep track of.  So

21   on September, that money had been -- can you ask the question

22   again?  I'm sorry.

23   Q.   Yes.

24        MS. LIMEHOUSE: Let's pull up Government's Exhibit

25   30, please.

BY MS. LIMEHOUSE:

Q.   So by May the 3rd of 2013, what had happened to Arthur Badger's money?

A.   Yes.  So the -- it had already been disbursed and paid out.

Q.   So a large portion of Arthur Badger's fee, the first three checks, had already been negotiated; is that right?

A.   That's correct.

Q.   And by May the 13th of 2013, what had Mr. Laffitte done with the PR fee that he received from Arthur Badger?

A.   He had used it to pay off part of a Hannah Plyler loan.

MS. LIMEHOUSE:  If we could pull up Government's 198, slide 14, please.

BY MS. LIMEHOUSE:

Q.   So how much money did Russell Laffitte receive in total from the Plylers, Natasha Thomas, Hakeem Pinckney, and Arthur Badger, in fees?

A.   Approximately $458,000.

MS. LIMEHOUSE:  No further questions.

THE COURT:  Okay.  I think it's a good time to have an afternoon break.

(Jury leaves open court at 3:27 p.m.)

THE COURT:  Please be seated.  Will this be the last witness from the Government?

1   MS. LIMEHOUSE:  It is, Your Honor.

2   THE COURT:  Okay.  So my intention is, after we

3   complete this witness, I will hear any Rule 29(a) motions.

4   MR. DANIEL:  I'm sorry, Your Honor?

5   THE COURT:  After we finish with this witness, I'm

6   going to take up any Rule 29(a) motion.

7   MR. DANIEL:  Yes, Your Honor.

8   THE COURT:  Okay?

9   MR. DANIEL:  Yes, sir.

10  THE COURT:  Okay.  Let's be at ease.

11  (Whereupon, a recess transpired.)

12  (Whereupon, the jury returns to open court at 3:43

13  p.m.)

14  THE COURT:  Please be seated.

15  Cross-examination by the defense.

16  MR. DANIEL:  May it please the Court, Your Honor.

17                    CROSS-EXAMINATION

18  BY MR. DANIEL:

19  Q.   Good afternoon, Mr. Womble.

20  A.   Good afternoon.

21  Q.   If we could, you went through a chart of the Arthur

22  Badger checks and how much he -- it's a little bit different

23  exhibit, but your chart actually is very helpful.

24  A.   Okay.

25  MR. DANIEL:  But this is exhibit number -- before we

1   get to this exhibit.  I would like to go to Exhibit 68.  I'm

2   sorry, 68 first.  I want to get into some background.  Okay.

3   And if you will please call out these check numbers that are

4   highlighted.  Just call them out.  That's fine.

5   BY MR. DANIEL:

6       Q.   Okay.  Now, this is sort of the e-mail that seems to

7   start everything.  It says:  Can you get Jeanne to re-cut the

8   check 43162 dated 11/9/2012 (sic).  So this is February the

9   6th, 2013, a month and and a half later?

10      A.   Month and a half later from when?

11      Q.   Pardon?  Well, the e-mail from Alex to Russell --

12      A.   Oh, I see.  Yes, sir, from November 19th, correct.

13      Q.   Okay.  Now, this check 43162, we are going to

14  revisit it again, but that's the one, the supposed $1.325

15  million check, that's the origin of everything, right?  Do we

16  agree on that?  In this particular transaction, that's the

17  origin?

18      A.   We are talking about the $1,325,000 -- or this

19  e-mail is about the $1,325,000 check?

20      Q.   Yes, sir.

21      A.   Yes, sir.

22      Q.   And it says to Russell:  Ask Jeanne to re-cut the

23  check 43162.  Okay.  And are these three and these -- excuse

24  me, these four.  Okay.  The next e-mail is the, I believe, is

25  a stop payment order, Exhibit 65.  Okay.  Now, this is the

709.  We are going to put this aside for a second.  We will come back to this exhibit here, because we saw the first three checks, the last check that was supposed to be -- he asked for four checks.  But the firm only cuts three checks.  And they leave out -- they do not cut a check for 709, never gets to Palmetto State Bank?

A.    I think we saw from the accounting sheet at the law firm that there was a $709,000 check, and then it gets cut into -- it gets voided, and then cut into --

Q.    It gets voided.  And you must -- your investigation must have shown it never -- that $709,000 check never made it to Palmetto State Bank?

A.    So, the $709,000 made it to Palmetto State Bank, but it made it in smaller increments.

Q.    But not this check that stopped payment on, right, or it gets voided?

A.    So there was no $709,586 check that was brought and negotiated at Palmetto State Bank.

Q.    Okay.  So Russell Laffitte never saw this check that's supposed to be voided or stopped payment on?

A.    Not that I'm aware of.

Q.    Okay.  Okay.  Thank you.

       Okay.  So I believe they say on that 709 -- interestingly, look at the date of this.  This is again dated 9/10, September the 10th, 2013.  And the previous e-mail was

1  February the 6th, 2013, some good number of months before,

2  right?  March, April, May, June, August.  Not until

3  September.

4      A.   Yes.  So September 6th was the e-mail we talked

5  about.  The date of the check, of this check is February 8th.

6  And then the date of this stop payment is in September when

7  we see the other checks get disbursed.

8      Q.   But we know now this check, this check No. 43162

9  never hits the bank, never arrives at the bank?

10     A.   Agreed.  That check, that amount does, but that

11 specific check does not.

12     Q.   We are going to go through all.  I am not trying to

13 trick you.  You know me better than that.  So then it does

14 instead, it is divided -- and we will pull up the exhibit,

15 you had it before, which is Exhibit 66.  Thank you.  I'm

16 sorry for confusing you earlier.

17         Okay.  Now, you have a chart that's similar to this

18 that talks about the different time periods.  You read across

19 the page.  And I just go down the page.  My chart goes down

20 the page.  Okay.  So we see the $388,000 check cut on 2/8,

21 and the $75,000 check.  We know where those go.  We can trace

22 those right away.  Then $151,000 check and the $33,000 check,

23 but -- okay.  Now, here's where it gets a little different.

24 Because the check that's done on -- this check on 9/13, which

25 is $101,369, where does that check go?  It's not negotiated

1 until October 3rd, about three weeks later. Where does that

2 check go?

3     A. Can you pull it up for me, please?

4     Q. I'm sorry?

5     A. Can you pull it for me?

6     Q. Yeah.

7     MR. DANIEL: Can you? Can we pull up those checks?

8 You can put more to one page. I think we've got more than

9 one page.

10 BY MR. DANIEL:

11     Q. In the meantime, while they're doing that -- we will

12 talk about where it goes in a second.

13     So in the next check, it's 45028 -- 4528, that's for

14 $101,369, but that's not negotiated. It's made out -- the

15 date of the check is September 13th, but it's not negotiated

16 until 12/10/28. That's October 28th. That's a month and a

17 half later.

18     A. Agreed.

19     Q. And we see -- we are starting to see a pattern here,

20 aren't we, with Mr. Murdaugh's trickery and chicanery?

21     A. So these checks, the ones dated September 13th,

22 2013, they are all dated that day, but we are in agreement

23 that they are negotiated between September 13th and January

24 21st of 2014.

25     Q. That's right. But the original check is November --

1  supposed to be, we don't see, bank never sees it -- November

2  2012.  So you've got Alex Murdaugh here patiently negotiating

3  the checks different times, long time periods away, as much

4  as from November of 2012 all the way to June 25th of 2014?

5      A.   Well, he negotiates the checks with Russell

6  Laffitte.

7      Q.   Well, I understand that.  But my point is, it's

8  almost impossible for Russell Laffitte, who's handling

9  hundreds of checks, probably 50, 60, 75 checks a day, to

10  know -- to relate this back to anything, because, remember,

11  the original Badger check --

12          MS. LIMEHOUSE:  Objection, Your Honor.

13  Argumentative.

14          THE COURT:  It's cross-examination.

15  BY MR. DANIEL:

16      Q.   The original Badger check for 1.325 has never made

17  it to Palmetto State Bank, right?

18      A.   So a couple of things to answer --

19      Q.   Just --

20          THE COURT:  Let him answer the question.

21  BY MR. DANIEL:

22      Q.   Answer the question.

23      A.   So we've seen the e-mail where the -- between

24  Russell and Alex where it's split up.  The other thing, from

25  Russell's own testimony in September, he talks about his

1    close business relationship with Alex Murdaugh.  Alex

2    Murdaugh wasn't a small customer.  So I think anything that

3    Alex Murdaugh would have done at the bank --

4        Q.   That's not the question I asked.

5            THE COURT:  You let him answer the question.  Please

6    continue.

7            THE WITNESS:  Yeah.  You asked how Russell would

8    keep track.  He would keep track --

9        Q.   I didn't ask that.

10           THE COURT:  Let the witness answer the question.

11   Don't interrupt him.  Please continue.

12           THE WITNESS:  Alex Murdaugh was a significant

13   customer for Russell Laffitte.  So the transactions --

14           MR. DANIEL:   Judge, can I repeat the question?

15           THE COURT:  No, sir.  He's answering the question.

16   You can't interrupt him, Mr. Daniel.  You hear me?  Don't

17   interrupt.

18           MR. DANIEL:  I understand.

19           THE WITNESS:  Alex Murdaugh was a significant

20   customer of Russell Laffitte.  Because of that business

21   relationship, my belief is Russell Laffitte would have taken

22   extra care --

23       Q.   I am not --

24           THE COURT:  Mr. Daniel, do not interrupt the

25   witness.  Let him finish his answer.  Then you ask him the

1  next question.

2  MR. DANIEL: Judge --

3  THE COURT: Don't interrupt the Court. Please

4  continue your answer.

5  THE WITNESS: Alex Murdaugh was a significant

6  customer of Russell Laffitte. I think any transactions that

7  Alex Murdaugh would have done would have gotten the specific

8  attention of Russell Laffitte.

9  THE COURT: Next question.

10  BY MR. DANIEL:

11  Q. Now, my question was this, okay, do you agree that

12  the 1.325 check, the check No. 43162, okay, that one of the

13  Badger checks, never made it to the Palmetto State Bank?

14  That was my question.

15  A. The physical check did not make it to Palmetto State

16  Bank.

17  Q. Okay. And instead, we've got, you agree, that we've

18  got this chart. Yours, again, is a little differently. It

19  was negotiated between February 11th, 2013, and June the

20  25th, 2014?

21  A. Agreed.

22  Q. Okay. And so we go through all these checks. And

23  all of the checks appear, what we've seen before, were

24  negotiated at Palmetto State Bank. I believe that's correct.

25  All the ones until we get to two that were negotiated on May

1    12th, 2014.

2         A.    The last two are negotiated at Bank of America.

3              MR. DANIEL: Okay.  And can we pull up, please,

4    Exhibit No. 69.

5    BY MR. DANIEL:

6         Q.    Okay.  This is one of those that was negotiated at

7    Bank of America?

8         A.    Correct.

9         Q.    Okay.  And what account is it drawn on?

10        A.    It's from the law firm.

11        Q.    And that's law firm's trust account, I believe?

12        A.    Client trust account, yes.

13        Q.    So that likely would have been -- I think you said

14   yellow checks for trust account?

15        A.    I haven't testified anything about the colors of the

16   checks.

17        Q.    Okay.  If you don't know, then just say you don't

18   know.  That would be fine.  I didn't mean to ask you a

19   question you didn't know.

20        A.    I don't know the color coding of the checks.

21        Q.    I am not trying to confuse you.  In the memo line it

22   says, settlement proceeds?

23        A.    Correct.

24        Q.    And who signs that check?  Isn't it Alex Murdaugh?

25        A.    Alex Murdaugh.

1   Q.   Okay.  And let's bring up -- how about the back of

2   that check.  Okay.  What does this tell us on the back of the

3   check?

4   A.   So the date of the transaction is June 25th, 2014.

5   It's $101,369.49.

6   Q.   Okay.  And it's deposited at Bank of America, an

7   account at Bank of America?

8   A.   So I think so.  I just don't know the routing number

9   specifically on the back.  I feel confident it went to Bank

10  of America.

11  Q.   And so, but did you follow it?  Did you get the

12  records for that account that it goes into, the $101,000 goes

13  into?

14  A.   We did subpoena accounts from Bank of America.

15  Q.   But -- you did?  So did you get the account this

16  went into?

17  A.   I don't know offhand without having those records in

18  front of me.

19  Q.   That's one of the checks that's in this case and

20  it's a big one, $101,000, and you didn't follow it?

21  A.   That's not what I said.  I said that we subpoenaed

22  the records from Bank of America.  Cyndra Swinson, our

23  forensic accountant, reviewed the records we got from Bank of

24  America.  I didn't go through every single -- everything,

25  every single piece.  She went through those records.  I don't

1    know specifically this account at Bank of America was in

2    those records.

3        Q.   That's fair enough.  And you didn't talk to anybody

4    at Bank of America?

5        A.   Well, we got a subpoena, but other than that, no,

6    there's no interview of a Bank of America employee.

7            MR. DANIEL:  And please pull up Exhibit No. 70,

8    which is check No. 46597.

9    BY MR. DANIEL:

10       Q.   And, again, just to short circuit, this is made out

11   from the Peters Murdaugh Parker Law Firm?

12       A.   Correct.

13       Q.   The client trust account?

14       A.   Correct.

15       Q.   And says paid to the order of Bank of America?

16       A.   Correct.

17       Q.   And the memo line says, settlement proceeds?

18       A.   Correct.

19       Q.   Okay.  And it's $50,684.75 dated 5/12/14.  And whose

20   signature is that?

21       A.   Alex Murdaugh.

22       Q.   Everybody by now is familiar with Alex Murdaugh's

23   signature.

24           MR. DANIEL:  Please pull up the back.

25   BY MR. DANIEL:

1    Q.   I understand you don't know the account itself.  It

2    looks like it was deposited into an account at Bank of

3    America?

4    A.   Correct.

5    Q.   Okay.  Now, it's interesting, the $709,000 check,

6    never makes it -- it was a stop payment order.  I guess,

7    never makes it over to Bank of America.  That's the one Mr.

8    Murdaugh asked Mr. Laffitte to request, but it never comes

9    over there.  As you mentioned, it's cut from these other

10   checks?

11   A.   Correct.  I agree.

12   Q.   Would you agree with me that Mr. Murdaugh was very

13   manipulative?

14   A.   Yes, I've heard that, certainly.

15   Q.   And would you agree with me that he could be -- and

16   based on what we just saw -- extremely patient to steal,

17   patient to steal money?

18   A.   So, yeah, I would say his crimes are committed over

19   a long period of time.

20   Q.   Okay.  Now, when PMPE, the law firm, gets their

21   monthly bank statement that contains these checks,

22   understanding they would be different bank statements because

23   they are over two years apart, right, but when they get that

24   bank statement, shouldn't they review that bank statement to

25   see where their client's trust funds, moneys went?

1    A.    So they would only know where it went from the, you

2   know, from the front side.  I think, Jeanne Seckinger

3   testified that when they went back and reviewed the records,

4   they knew those were checks were written to Palmetto State

5   Bank, but they can't see beyond that.

6    Q.    But they could see how they are endorsed and who

7   endorsed them, can't they?

8    A.    They can see -- yeah.  So I don't know how their

9   bank statements came back to them, but, certainly, a bank

10  statement will have checks that you've written, the front and

11  the back copies.  That's a normal banking procedure.

12   Q.    That's all I'm getting at.

13   A.    Yeah.

14   Q.    So if they had reviewed it carefully, they could

15  have seen that it didn't go to the proper place and it wasn't

16  negotiated into a proper account?

17   A.    So, I don't know that they would have had all the

18  information to make that determination.

19   Q.    Isn't that the whole trick here?  Isn't that the

20  whole trip?  The law firm, the law firm here, doesn't know

21  the bank -- what's going on in the bank, what Alex Murdaugh

22  is doing at the bank, okay, what he tells the bank people?

23  And the bank people over here don't know what Alex Murdaugh

24  is telling the law firm.  He's stopping payments, voiding

25  checks, reissuings check.  And we know that's his modus

1 operandi.

2     A.   We know from the e-mail that there's an e-mail that

3 goes from Alex Murdaugh to Russell Laffitte, then back to

4 Russell -- or to Alex and Jeanne Seckinger.  So we know that

5 Russell Laffitte is communicating with the law firm.

6     Q.   Well, we do know that.  There's no doubt about that.

7 But the fact that they get these monthly statements -- I'm

8 going to go past that one question.  The fact that they get

9 these monthly statements and it slips by them, that they've

10 been made out improperly and going to the wrong place, slips

11 by the accounting folks at PMPED?

12     A.   So I don't have those bank statements in front of me

13 so it's hard to, like, say.  But the law firm didn't

14 discover, and they are the ones who discovered, you know, the

15 thefts we are talking about, until September of 2021.

16     Q.   Yeah.  They are the ones that discovered it.  But

17 that was only because they couldn't find -- they had gotten

18 the expense check --

19     MS. LIMEHOUSE:  Objection, Your Honor.  He needs to

20 ask a question.

21     MR. DANIEL:  Judge --

22     THE COURT:  Ask the question rather than testify,

23 Mr. Daniel.  You haven't asked a proper question.  If the

24 evidence is in the record, you can do it.  If it's not, you

25 can't testify.

BY MR. DANIEL:

Q. $350,000, what I'm determine, is that the $350,000

wire to Chris Wilson.

A. I'm sorry. I missed the question. I heard $350,000

wire to Chris Wilson, but I don't know what the question is.

Q. You mentioned they found out in September 2021 what

happens. They started asking about it in June of 2021. And

then the murders happen. And they leave Mr. Murdaugh alone.

And they start confronting him again. And you heard the

testimony of Mr. Crosby. He talks about the confrontation.

He talks about Murdaugh, he says admittedly. So that's what

I'm saying, actually did discover --

MS. LIMEHOUSE: Objection. Question?

THE COURT: That's not a question. You are now

testifying. Make a precise question.

BY MR. DANIEL:

Q. That is when they discovered -- that is how they

discovered that he was stealing money and then they start

looking Badger and all the other clients; isn't that right?

A. So I think that's a fairly accurate summary of the

previous testimony.

Q. Now, I do talk fast. I apologize for that.

Okay. You did the investigation on the fed's side

of it, in conjunction with SLED, and you interviewed a number

of people over at Peters Murdaugh Parker Eltzroth & Detrick;

1 is that right?

2   A.   That's correct.  I interviewed a number of employees

3 at the law firm.

4   Q.   And so he fooled a lot of people over there.  We all

5 agree on that, that Alex Murdaugh fooled and tricked a lot of

6 people at PMPED?

7   A.   Alex Murdaugh fooled and tricked a lot of people.

8   Q.   One of them was Kristi Jarrell, who was his

9 secretary, legal assistant?

10   MS. LIMEHOUSE:  Objection, Your Honor.  We haven't

11 heard anything about Ms. Kristi Jarrell.

12   Mr. DANIEL:  I can lay a foundation, Your Honor.

13 BY MR. DANIEL:

14   Q.   Did you interview --

15   A.   I actually did not interview Kristi Jarrell.

16   Q.   Do you know who she is?

17   A.   She was a paralegal or secretary for Alex Murdaugh.

18   Q.   Okay.  And how about Ms. Annette Griswold, did you

19 interview her?

20   A.   I did not interview her.

21   Q.   Did you read SLED's interview?

22   A.   I did read their MOI's of those two people.

23   Q.   MOI?

24   A.   Memorandum of interview, yes, sir.

25   Q.   And you read the one for Ms. Kristi Jarrell also?

1    A.    Yes.

2    Q.    And all I'm asking, one was his paralegal and one

3    was his legal assistant?  Is that your understanding?

4    A.    Yes.  And without those records in front of me, I

5    don't remember which one was which.

6    Q.    I get them confused too.  That's not my point.  My

7    point is then, he was able to fool both of them; isn't that

8    right?

9    A.    Regarding what?

10   Q.    Regarding everything.  He worked with them every

11   day.  He was stealing money from the firm.  He was stealing

12   money from the clients.  They were dealing with the clients.

13   A.    I guess I'm not sure what your question is.

14   Q.    He fooled and tricked them too because he stole the

15   money on the cases they are working on with him?

16   A.    That wasn't a question.

17   Q.    I'm asking you, isn't it true that he tricked them?

18   A.    Did --

19   Q.    That's all I'm asking.

20   A.    Alex Murdaugh tricked his secretary and legal

21   assistant, yes.

22   Q.    Thank you.  And he tricked -- we know he tricked

23   Mark Ball, who was his co-counsel in the case, Mark Ball one

24   of the lawyers at PMPED?

25   A.    Alex Murdaugh tricked or misled, or however you want

1    to paraphrase it, Mark Ball at the law firm.

2         Q.   And you know who Lee Cope is?

3         A.   I do know who Lee Cope is.

4         Q.   And he tricked Lee Cope, another partner at PMP?

5         A.   He tricked Lee Cope.

6         Q.   And Danny Henderson, the president of PMPED?

7              MS. LIMEHOUSE:  Objection, Your Honor, questions.

8         Q.   I will repeat the question each time.  Isn't it true

9    he tricked Danny Henderson, the president of PMP, another

10   lawyer?

11        A.   So I think the better wording is misled and stole

12   from rather than tricked with all these -- with your

13   questions.

14        Q.   The word I like is "tricked."  Okay?  You can say

15   what you said.  Okay.  And you heard Ronnie Crosby testify?

16        A.   I did.  And I interviewed Ronnie Crosby.

17        Q.   He sure tricked him?

18        A.   Correct.

19        Q.   Because everyone trusted him, didn't they?

20        A.   A lot of people trusted Alex Murdaugh.

21        Q.   And for good reason they trusted him, because they

22   knew him for 30 years, right?  Maybe some less, some knew

23   less, some knew for as much as 30 years?

24        A.   So people who knew Alex Murdaugh for a long time

25   were misled by him.

1    Q.   And that would include Jeanne Seckinger; she

2  testified to that, didn't she?

3    A.   She did testify to that.

4    Q.   And she said he created chaos everywhere he went,

5  and that's --

6    A.   So, honestly, I'm not sure if she said that or if

7  you said that or someone else said that.  But that's clearly

8  been brought up in the trial.

9    Q.   And we know he tricked the conservator in the Chad

10  Westendorf, who is a bank employee of, a fellow employee with

11  Mr.  --

12    MS. LIMEHOUSE:  Objection, Your Honor.  He's not

13  asking any questions.

14    THE COURT:  I'm confused.

15  BY MR. DANIEL:

16    Q.   Do you know -- do you know that he also misled Chad

17  Westendorf, who served as conservator at Palmetto State Bank

18  one of Mr. Murdaugh's clients, the Satterfields?

19    A.   Yes, Chad Westendorf was the personal representative

20  for the Satterfield case.  And, yes, Alex Murdaugh misled

21  him.

22    Q.   Okay.  And you interviewed, as well as the MOI's

23  from SLED, a number of clients of Mr. Murdaugh?

24    A.   I've interviewed some of his clients, most of whom

25  have already testified here.

1        Q.   And they were all -- they all trusted Mr. Murdaugh?

2   I believe the ones that testified said that.  At some

3   point --

4        A.   Yes, Arthur Badger, obviously, said that, yes.

5        Q.   Okay.  And some of them felt like they had a very

6   close -- gotten a very close relationship with him, were

7   friends with them.  I believe one of them testified to that

8   yesterday or day before yesterday.

9        A.   I'm not sure who that was.

10       Q.   Okay.  But we also know he misled for years and

11  tricked members of the community in general?

12       A.   I mean, is that someone specific or just general?

13       Q.   Just general.

14       A.   I think that Alex Murdaugh tricked, misled people in

15  the community, absolutely.

16       Q.   And do you remember, you were in the courtroom when

17  Ms. Seckinger said Alex Murdaugh wasn't the person I thought

18  him to be?

19       A.   Yeah, that's correct.  Alex Murdaugh was involved in

20  a lot of different things beyond this trial that he misled

21  people in.

22       Q.   And I am not going to those.  I am not doing that.

23  Did you ever -- well, I will withdraw that question.

24            Did your investigation show that the checks -- I

25  think we saw them all on the Board -- actually originated,

1    the checks that were made payable to, for instance, Palmetto

2    State Bank, those checks -- I think you brought them up with

3    Ms. Limehouse earlier today and some yesterday, those were

4    all made out to Palmetto State Bank?

5         A.   So which --

6         Q.   Except for the two Bank of America checks, all of

7    them made out to Palmetto State Bank?

8         A.   The checks that came from Arthur Badger's funds, is

9    that what we are talking about?

10        Q.   Yeah.  We've been through those.

11        A.   Yeah.  They are payable to Palmetto State Bank.

12        Q.   Okay.

13        A.   As were a number of things in the case, including

14   Natasha Thomas and Pinckney, as well as the personal

15   representative fees for Russell Laffitte.

16        Q.   And would you agree with me that if Peters Murdaugh

17   Parker Law Firm had issued the checks to -- that were

18   supposed to be for the clients's benefit, if they had issued

19   those checks to Russell Laffitte as conservator for Badger,

20   Pinckney, Natasha Thomas, whoever it may be, then we might

21   not be here?

22        A.   So I think that that responsibility lies with the

23   bank and Russell Laffitte.  If he got a check that wasn't

24   made out to a proper place, he, as the banker, as the bank

25   executive, should have corrected that.

1    Q.   You mean a check that comes out made, say, to the

2    bank, I make ought to the Bank of America, they are supposed

3    to know if I'm a customer?

4    A.   When you are negotiating a check and you know where

5    the funds are going, and they are going to specific clients

6    and you know that, and the check's not made out properly,

7    yes, as the banker, that would be your responsibility to

8    correct that check.

9    Q.   I'm sorry.  So I agree with everything you said.

10   But you said a big condition there; if you know where they

11   are supposed to go, right?  If you didn't get tricked, right?

12   If it didn't get slipped by you, like it did Mr. Badger and

13   all the other clients and all the other Seckinger and all the

14   lawyers and all the people over at the law firm?

15   A.   So if the check goes -- if the check says Palmetto

16   State Bank, and then it's deposited into an account at that

17   bank by Russell Laffitte and, say, for instance, the deposit

18   slips says Donna Badger on it, and he's the one that handles

19   it, Russell Laffitte, but it has the account for Alex

20   Murdaugh, that is Russell Laffitte's responsibility to

21   correct.

22   Q.   Okay.  So let me ask this.  As a senior partner and

23   an owner of the law firm Peters Murdaugh Parker, didn't you

24   see that Alex Murdaugh has the authority to sign a check on

25   behalf of that law firm?

1    A.   So he signed all these checks we saw.

2    Q.   But doesn't he have the legal authority?  Did you

3    check that out?  He's got to have legal authority?  He's a

4    senior partner?

5    A.   Do I know specifically how their internal check --

6    I'm not sure I know that answer specifically.  I know he

7    signed all the checks.

8    Q.   Okay.  But wouldn't that be filed also at the bank?

9    The law firm would be at the bank too whose authorized to

10   sign the check?

11   A.   Sure.  That's something that the banker should have

12   checked on.  If someone who was a signatory on the account

13   was signing things and they didn't check that, that would be

14   a problem with the bank.

15   Q.   Did you check on it?

16   A.   Did I check?  It would be in the subpoenaed records,

17   but without you showing me the signatory cards for the

18   accounts, I wouldn't know that offhand right now.

19   Q.   That's pretty important.  If he's presenting checks

20   all the time on behalf of the law firm, you would think it's

21   pretty important?  Don't you think it would be pretty

22   important for him to have the authority to sign those on

23   checks?

24   A.   If he didn't have the authority, he shouldn't be

25   signing them.

1   Q.   Okay.  And did you learn in your investigation,

2   whether from Ms. Judge Odom or anyone else, that the lawyers

3   at the law firm had not -- the lawyers --

4       MS. LIMEHOUSE:  Objection, Your Honor.  He's

5   testifying.

6       MR. DANIEL:  What's the basis of the objection, Your

7   Honor?

8       THE COURT:  Again, if you will ask it as a question

9   rather than a statement, I think that will be helpful.

10      MR. DANIEL:  Yes, I asked.

11      THE COURT:  Slow down just a little bit, Mr. Daniel.

12  You are a great lawyer, but you are jumping ahead here.

13      MR. DANIEL:  I get too excited, Your Honor.

14  BY MR. DANIEL:

15  Q.   Did you learn during your investigation that most of

16  the filings that Judge Odom sees in the probate court are

17  prepared by lawyers, whatever law firm it might be, just in

18  general?  That's just a general question.

19  A.   No.  Actually, she said the opposite.  She said that

20  she pays a lot of attention to the layperson who maybe, you

21  know, doing those records, not -- you know, if an attorney

22  comes into her office, she expects that they know what they

23  are doing.  She said she put most of her attention to the

24  layperson who doesn't have an attorney representing them and

25  helping them with the records.

1    Q.   That's right.  That's right.  Because she knows that

2    the attorney, routinely in her court, and particularly the

3    attorneys at Peters Murdaugh Parker law firm, they prepare

4    the documents to be filed.  And Mr. Murdaugh comes in there.

5    He comes in there with signed documents, just like any other

6    lawyer, she relies on him?

7    A.   So Mr. Murdaugh wasn't the conservator on these

8    accounts, so he wouldn't have been bringing the documents in.

9    I'm -- I guess I am not understanding your question.

10   Q.   The question was, isn't it true that the lawyer

11   prepares those documents, and that's why she doesn't worry

12   with closely reviewing the documents --

13        THE COURT:  Define "those documents," because we've

14   seen a variety of documents.  Specify what documents you are

15   talking about.

16   BY MR. DANIEL:

17   Q.   The documents that are filed in probate court, okay,

18   the law firms, and not just the PMPED law firm, but other law

19   firms mostly prepared those, and you just testified, didn't

20   you, she doesn't have to spend much time reviewing those

21   because she says she's more worried about --

22        MS. LIMEHOUSE:  Objection.  Hearsay saying what

23   someone who hasn't testified is saying.

24        THE COURT:  The witness testified to it.  I'm trying

25   to get him to specify.  I'm trying to make it clear for the

1    jury.  When you are talking about "those documents," we've

2    seen a variety of documents, I think you need to be

3    specific --

4          MR. DANIEL:  Yes, Your Honor.

5    BY MR. DANIEL:

6      Q.   Most of the documents in this case that is subject

7    that were filed --

8          THE COURT:  Are you talking about the annual

9    reports?  Are you talking about the initial appointment?

10   These are different documents.  I think be specific because I

11   want the jury to understand.  I don't know the answer.  I

12   just know we need to have the question be precise.

13         MR. DANIEL:  Please pull up Exhibit 8, and this is

14   in evidence.  Okay.  If you could call out just the top of

15   it.

16   BY MR. DANIEL:

17     Q.   Okay.  So this sort of opens the file, so to speak,

18   is that right, in probate court?

19     A.   Yes.  So I think it's a cover sheet.  If I could

20   actually see the whole thing.  I see it's for Hannah Plyler.

21   And it's conservator, is listed as Russell Laffitte.  So it's

22   actually -- so you will see it's actually a cover sheet that

23   covers not only the opening but the closing, because you can

24   see the final accounting received, petition for final

25   discharge, et cetera.  So that's 4/20/15, that's when Hannah

1  Plyler turned 18.

2      MR. DANIEL:  Okay.  So you can take that exhibit

3  down.  Now, please pull up Exhibit No. 1, which is in

4  evidence, and it's titled Powers of Conservator.  And are you

5  familiar with this statute, Mr. Womble?

6      A.  So, I believe I saw it in the trial, earlier in the

7  trial.

8      MR. DANIEL:  Okay.  And if you would blow up the

9  middle paragraph there, No. 1 and No. 4.  Thank you.

10  BY MR. DANIEL:

11      Q.  Okay.  And what does this -- says right here, if I

12  read it right, that a conservator, acting reasonably in the

13  best interest of the protected person, to accomplish the

14  purpose for which he was appointed, may act without court

15  approval to:  Invest and reinvest funds in an estate as would

16  a trustee.  Is that right?

17      A.  That's what it says.

18      Q.  Okay.

19      A.  What we saw earlier is, when the conservatorship was

20  open, the judge put in a sheet that specifies that all

21  disbursements would be approved by the court.

22      Q.  Yeah.  But this isn't a disbursement, so to speak.

23  This is an investment, right?  The loans are investments.

24  And they are listed in the probate court under investments.

25      A.  So to have an investment, I think you need to make a

1 | disbursement first. You have to disburse the money for it to

2 | become an investment.

3 | Q. Okay. But it's an investment. So he's authorized

4 | to do that by statute?

5 | A. So I don't -- so I can tell you is the judge says

6 | you have to make -- how you make the disbursement. Can I see

7 | this in a bigger capacity? I don't know which one oversees

8 | the other.

9 | Q. We are going to go through some.

10 | A. Okay.

11 | Q. Go to page --

12 | A. And just, if I can point out one thing, this says

13 | effective January 1st, 2019. That would be after the time

14 | frame of everything that we are doing here.

15 | Q. And are you familiar with the statute that preceded

16 | that? It closely tracks the original statute.

17 | MS. LIMEHOUSE: Objection, Your Honor.

18 | MR. DANIEL: I just asked him if he's aware of it,

19 | Judge. If he's not, he's not.

20 | THE COURT: I think you are asking the witness to go

21 | through something that he's very unfamiliar with. And he

22 | hasn't testified to it. I'm not sure it's a proper

23 | cross-examination. And I don't think he's the proper witness

24 | for this. You could offer witnesses, but I don't think he's

25 | the one.

1    MR. DANIEL:  Exhibit 8, please pull up.  Could you

2  pull up A through D.  Specifically, the written note.  I'm

3  not sure which page it's on, the loans to Alex Murdaugh.  The

4  notes, should be written note.  I'm sorry.  It's Exhibit 53.

5  BY MR. DANIEL:

6    Q.   Okay.  And what is this?  Can you read?

7    A.   Sure.  You can actually put the full thing, I can

8  read it from here.  It's easier to have a full picture.  So

9  this is the promissory note.  This is the first loan that was

10  taken by Russell Laffitte.  It's the first loan in all that

11  was taken from Hannah Plyler's account dated July 15th, 2011.

12  It's also the biggest loan that was taken.  It's for

13  $225,000.  It's 3.25 percent.  And it was payable on May 1st,

14  2012.

15    Q.   Okay.  And so this is a written -- this is written

16  evidence of that.  This is a copy of the note itself?

17    A.   That is a promissory note that Russell Laffitte

18  created --

19    Q.   And that's filed in probate court with Judge Odom?

20    A.   So it's in the annual reporting that's done each

21  year that I talked about with the binder.  There is no

22  written approval.  There's no order.  There's no petition in

23  the probate file approving this.  Now, it is in the 60 to 90

24  pages of documents that I talked about earlier that include

25  bank statements and receipts and different filings, annual

1    filings that are handed in a paper copy each year.  But

2    this -- but there's no written approval for this.

3         Q.   Please continue with the pledge to stop as

4    collateral.  Okay.  And this document, you know what this

5    document is?

6         A.   So it's one of Russell Laffitte's -- it's showing

7    that it's a bank share for Palmetto State Bank.

8         Q.   And this is the collateral he used for Hannah Plyler

9    loan, isn't it?

10        A.   I actually disagree with that.  So the promissory

11   note references this and says that it's collateral.  But it

12   is such an unusual loan.  When I go get a car loan and

13   there's a title to the car, the bank holds that, and that's

14   the collateral.  In this case, though, the person who gets

15   the loan and the person who is controlling the loan is the

16   same person.  So you can't -- if something happens to Russell

17   Laffitte, I don't feel like Hannah Plyler is secure here,

18   because nobody knows about this, where this bank share is.

19   It's not with Hannah Plyler.  It's not with her dad.  It's

20   not with Palmetto State Bank.  So the idea, just because

21   Russell Laffitte says in a promissory note, that's not

22   approved, that it's secure, I don't believe that to be true.

23        Q.   You don't believe a lawyer can track that share,

24   those shares of stock down and find out who owns it?

25        A.   I think can find out who owns it.  I don't think

1    that they can find the promissory note that says where it is,

2    because Russell Laffitte testified he told nobody about these

3    loans.

4        Q.   And do you know why he didn't tell anybody?  Do you

5    know why?  Because the privacy laws --

6            MS. LIMEHOUSE:  Objection.

7            THE COURT:  Now, you know you are testifying now,

8    Mr. Daniel.  Sustained.  Sustained.  All these things I keep

9    challenge you on.  You can put it in your case.  You just

10   can't testify from the podium about it.

11           MS. LIMEHOUSE:  We request his statement about his

12   own defendant can be struck from the record, please.

13           THE COURT:  It is struck from the record.

14           MR. DANIEL:  Next page, please.  Okay.  And the next

15   loan is -- I got those written down.  And continue on to the

16   next one.  Because, Your Honor, just for the record, the

17   Court understands, all the annual filings, the probate court

18   record is about this thick, and all the annual filings and

19   any applications for petitions are all --

20           THE COURT:  Are they in the record, by the way?

21           MR. DANIEL:  I'm sorry?

22           THE COURT:  Are they in the record?

23           MR. DANIEL:  Yes.

24           THE COURT:  Good.  The jury will get them all.

25   BY MR. DANIEL:

1      Q.   And so this is 2012.  This was paid off at the

2  bottom, January 4th, 2013.

3      MR. DANIEL:  Okay.  Now, please pull up the 2013,

4  which would be continued on that same --

5  BY MR. DANIEL:

6      Q.   Okay.  This is another promissory note, a different

7  promissory note.  It's filed again.  And this is Russell

8  Laffitte to Hannah Plyler.  And it's signed by Russell

9  Laffitte.  And this is signed on November 2012; is that

10 right?

11     A.   It's dated November 21st, November 21st, 2012.

12     Q.   Okay.  So -- and this is filed in probate court

13 publicly?

14     A.   Are you asking me?

15     Q.   Yes, sir, I'm asking you.

16     A.   So I'm just matching up with my records.  Yes, this

17 was in the annual filings at the probate court.

18     MR. DANIEL:  Okay.  And please pull up the

19 collateral.

20 BY MR. DANIEL:

21     Q.   This is a more complete picture of the collateral

22 pledge; is that right?  I understand you don't agree you can

23 enforce it.

24     A.   So -- so -- so, again, the promissory note and a

25 copy of the bank shares are in the 2000 -- this would be the

1  2012 annual filing.  But, again, there is no order or

2  petition from the court approving this loan in writing.

3        MR. DANIEL:  Okay.  That's filed.  How about 2013,

4  or the next promissory note?  I don't know what year it is.

5  That was the first one?  This is the first one, or second

6  one?

7  BY MR. DANIEL:

8     Q.   This is 2013.  It's for $175,000 and at 1.5 percent

9  a year, and that's filed in the probate court also?

10    A.   Yes.  So for clarification, what that is, that's a

11 second renewal of the original $225,000 loan.  That loan

12 started at 3.25 percent.  It was renewed after the $50,000

13 payment that was taken from the Pinckney conservator fee.

14 The first renewal was at 2.25 percent.  And then it's -- the

15 rate is lowered again to 1.5 percent here.

16    Q.   And that rate is still more than the going rate for

17 a CD or money market during this time period, if you know the

18 answer to that question?

19    A.   So I talked about before, there's two things in

20 investments that are important.  There's time and there's the

21 rate.  And so, yes, the rate is more, but it also depends on

22 how long that money is actually earning interest.  Right?  So

23 if it only earns interest -- let's say you could get a 10

24 percent loan for one month, but guess what, you will make

25 less money than a 1 percent interest loan over a year.  So

1   you can't just judge simply by what is the interest rate,

2   does that mean I'm going to make more money or not.

3       Q.   Okay.  Enough arguing that.  Please pull up the

4   collateral.  This is the third note, the third promissory

5   note that's filed in the annual filings at the probate court.

6   This is No. 3.

7       A.   So I can't tell what -- which one this is attached

8   to.

9       Q.   Take my word for some, Mr. Womble.

10      A.   Fair enough.  I know that there are copies of the

11  bank shares in the annual filings.

12      Q.   Okay.  And so this is a -- this would be the

13  collateral.  Okay?

14          MR. DANIEL:  And please pull up 2014.

15  BY MR. DANIEL:

16      Q.   Okay.  And there, this one is a little bit different

17  because it's got the note, again filed publicly in probate

18  court, but then it's got paid off on June 14th, 2013.

19      A.   So I actually disagree with what you've just said.

20  This promissory note was not in the probate records.  What it

21  was was in Russell Laffitte's records that we got from

22  Palmetto State Bank.  So there's a promissory note, but it's

23  not in the probate records.  It's in his records.  It wasn't

24  filed in the annual filings.

25      Q.   Okay.  But isn't it filed -- when they pulled up,

1     closed, when it's time to close the estate --

2        A.   The probate record -- the probate court never got

3     this promissory note.  Now, is there bank statements showing

4     $10,000?  Is there an annual listing of things?  Yes.  But

5     that promissory note that you are showing me now that you

6     said is the probate court records, I'm disagreeing with you.

7     Russell Laffitte had it in his records at Palmetto State

8     Bank, but it was not in the -- it was not filed in the annual

9     filing.

10       Q.   But isn't it true that the loans are listed under --

11     you said that they were listed also under assets.  So they're

12     listed here.  The actual notes here are listed each time and

13     each year.  But in the annual accounting, it's got -- the

14     accounting says investment.  And it's got -- it lists the

15     loans under investment, doesn't it?

16       A.   So if there's a certain document you want to show me

17     from probate, I can try to explain that.  I am not -- there's

18     a number of different things in these annual filings.  And

19     I'm just not sure which documents you are speaking of.

20     That's all.

21       Q.   Okay.  Here's the 2012 annual accounting.  Okay.

22     This is in the probate court records.

23       A.   So this, the note you showed me, was 2013.  So this

24     is a different --

25       Q.   Okay.  We will do 13.  But let's do 12 first because

1 it's right up before us.

2 MS. LIMEHOUSE: Can we have the exhibit number for

3 the record?

4 THE COURT: What's the exhibit number?

5 MS. LIMEHOUSE: 8D? Okay.

6 THE COURT: Thank you.

7 BY MR. DANIEL:

8 Q. Okay. So my question is, aren't the loans totaled

9 365 --

10 MR. DANIEL: Please highlight that.

11 Q. -- 198.65, aren't they reported in the annual

12 accounting? So if the judge didn't care to look for the

13 pledge of collateral on the note itself, she would certainly

14 read the summary of the accounting, or she should?

15 A. So under assets, it says loans $365,198. Doesn't

16 specify what specific loans or any documents. But, yes,

17 under assets, there's certainly a loan column.

18 Q. Yeah. And that's important because that's

19 disclosing not just to the probate court and the judge, but

20 just to anybody, to the public, right?

21 A. Honestly, I don't know the legality or how people's

22 ability to go in probate court and look at an individual's

23 records. So when you say public, I'm just not sure if

24 anybody -- I got a subpoena to look at it. I don't know if I

25 can just walk in and look at a conservator account.

1  Q.   You never just gone in the courthouse and looked at

2  the public records?

3  A.   Well, what I'm saying is, I'm not sure a conservator

4  record in probate court is considered a public record that

5  you could look at for a minor child.  I just don't know that.

6  That wouldn't make sense to me, but I just don't know.

7  Q.   Okay.  You see the definite interest, and you've got

8  the annuity payment.  And it's got interest on loans, $3,664.

9  That's properly accounted for?

10  A.   So, I haven't done the math on that, but certainly

11  the loan interest is lived there.

12  Q.   Okay.  It's disclosed?

13  A.   It is.  It's right below the annuity payments.

14  Q.   Yeah.  Without going to 2013 and 2014 accounting,

15  annual accounting reports, if I told you they would be

16  similar to this one, it would include the loans and it would

17  include the interest each year that the loans were paid, the

18  loans made to the client, and in this case Ms. Plyler, in

19  other words, income, interest and income?

20  A.   I'm sorry.  Just repeat the question.  I am not

21  trying to be difficult.  I didn't get --

22  Q.   I am not worried about that.  But this is the 2012

23  annual accounting?

24  A.   Understood.

25  Q.   Without us going through the rest of the annual

1 accounting in the Hannah Plyler case, will you agree with

2 me -- they are in the record, they are in the exhibit --

3 would you agree with me that 2013, the Hannah Plyler 2013

4 accounting will have the loans listed as assets and the

5 interest listed over here as income?

6     A.   So, I've seen this form before.  It's certainly part

7 of the annual accounting each year.  You know, it's a cover

8 sheet and it breaks down beyond that.  But I mean, if you are

9 asking me a specific, like, in 2014, does it say this or

10 that, without seeing that --

11     Q.   I am not.  Okay.  You want me to pull up 2013 annual

12 accounting?

13     A.   It's up to you.  I'm familiar -- I've seen these --

14 I've seen these accountings.  It looks like it's 2013.

15     Q.   Now it's 2013?

16     A.   Yep.

17     Q.   Look at the interest from loans.

18     A.   Yes.

19     Q.   $9,701.63.

20     A.   I see that listed.

21     Q.   It's publicly reported?

22     A.   It's reported in the -- to the probate court.

23     Q.   It's filed in probate court?

24     A.   It's filed in the annual reporting of the probate

25 court, absolutely.

1    Q.   And you see the loans totaling $383,881.76?

2    A.   I do.

3         MR. DANIEL:  Please pull up the Hannah Plyler 2014

4    accounting filings.

5    BY MR. DANIEL:

6    Q.   Okay.  On this one, again, it's got similar -- you

7    see annuity payments she's getting paid that he's managing,

8    and interest on the loans.  Right?  $19,599, and just

9    disclosing that's the money she made, the account made off

10   the moneys that's been loaned out.  And then if you look at

11   the loans themselves, now they say zero.  And that's because

12   this is 2014 and 2015 accounting, and the loan has been paid

13   off?

14   A.   So the loans were definitely paid off in April of

15   2015.  I am not aware of these loans we've been talking, the

16   promissory notes, ever making $19,599.98 in any one year.

17   Q.   No.  No.  This might be a continuation, but it's

18   listed right here in the probate court, the 19,000 --

19   A.   It's definitely listed there.  I don't know if

20   that -- what that specifically -- what loans that

21   specifically applies to.  That's all.

22   Q.   You didn't add it all up, is what you are saying,

23   the --

24   A.   Actually, I think I did, but I didn't get -- you

25   know, as Ms. Swinson testified, she came up with $11,000 over

1 the life.  I never saw anything that paid $19,599 in one

2 year.

3     Q.  Okay.  Just a few more questions.  Now, you

4 testified about Arthur Badger was originally conservator,

5 named as conservator for the children, and then --

6     A.  Personal representative.

7     Q.  Personal representative, I'm sorry, personal

8 representative.  And then not too long after he was named, he

9 is, according to the testimony, he is then substituted?

10     A.  So, I think half of that is correct.  He actually

11 served as the personal representative for about a year.  And

12 then a couple months before the settlement, it was switched.

13 So I wouldn't say that it happened quickly or -- I forgot

14 your exact wording, but he served for a significant time

15 period.

16     Q.  Yeah.  And the reason why they had to get a

17 substitute, neutral party for him --

18     MS. LIMEHOUSE:  Objection.  He's testifying.

19     Q.  Let me ask the question.  Is there a reason he could

20 not serve as conservator, personal representative --

21     MS. LIMEHOUSE:  Objection, Judge.

22     MR. DANIEL:  Judge, I'm asking the question.

23     THE COURT:  You are about to offer evidence that's

24 not in the record.  That's her objection.

25     MR. DANIEL:  Judge, he is a summary witness.  He's

1    reviewed these things.  He testified all about it.  And his

2    testimony was that they withdrew --

3        THE COURT:  I don't believe he's testified about why

4    the replacement occurred.  You can ask him, do you know why

5    the replacement occurred.

6    BY MR. DANIEL:

7        Q.   Do you know why the replacement occurred?

8        A.   So, I interviewed Tiffany Provence, who did probate

9    work on this.  And she said the PMPED law firm contacted her

10   and said that they had to switch the PR.  And it was because

11   they were both involved in the same accident.

12       Q.   Okay.  And he had to have a neutral party as a

13   result of that?

14       A.   She didn't have any details at all.  She just said

15   that her assistant, her legal assistant had talked to a legal

16   assistant at the law firm and had been told, hey, we have to

17   make a switch.

18       MR. DANIEL:  Okay.  Okay.  Beg the Court's

19   indulgence.

20   BY MR. DANIEL:

21       Q.   You were in the courtroom for Ronnie Crosby's

22   testimony?

23       A.   I was.

24       Q.   And didn't you hear Ronnie Crosby say that the

25   reason why he was substituted is because Mr. Badger could not

1   get bonded due to a domestic violence conviction?

2           MS. LIMEHOUSE:  Objection, Your Honor.

3           THE COURT:  He actually heard that testimony.

4   Overruled.

5           THE WITNESS:  So just repeat the question.  I got

6   lost in everything.

7   BY MR. DANIEL:

8       Q.   No.  That's fair enough.  So Mr. Ronnie Crosby, the

9   lawyer at PMPED firm who handled that case, the Badger case

10  with Mr. Murdaugh, he testified that the reason why --

11          MS. LIMEHOUSE:  Objection.  The Badger case was not

12  the case that Mr. Crosby testified those facts about.  It's a

13  different case.

14          THE COURT:  Okay.

15          MR. DANIEL:  Judge, he testified about the domestic

16  violence.

17          THE COURT:  Hold on a minute.

18          MS. LIMEHOUSE:  The Plyler case, not the Badger

19  case.

20          THE COURT:  Those are the DUIs.

21  BY MR. DANIEL:

22      Q.   Okay.  But you know that he testified also, or Ms.

23  Provence did, that she told you that they had to have a

24  neutral party because there was a conflict?

25          MS. LIMEHOUSE:  Objection.  He's mischaracterized

1 the witness's testimony.

2     MR. DANIEL:  He just testified to it, Judge.

3     THE COURT:  It's cross-examination.  Continue.

4     THE WITNESS:  So I will repeat.  So I interviewed

5 Tiffany Provence, who is an attorney who does probate work,

6 she was involved in the -- she was hired by PMPED to do

7 probate work because Alex Murdaugh doesn't do probate work,

8 is what she said.  And what was relayed, she didn't have a

9 lot of information other than she recalled one of the legal

10 assistants at the law firm contacting her legal assistant and

11 saying, we have to switch the PR, they were involved in the

12 same accident.  I don't recall any more detail or specifics

13 and I don't think she had that to provide.

14 BY MR. DANIEL:

15     Q.   Let me ask this question then.  Do you realize that

16 Arthur Badger, since he had his own --

17     MS. LIMEHOUSE:  Objection, Your Honor.

18     THE COURT:  It's cross-examination.  Please

19 continue.

20 BY MR. DANIEL:

21     Q.   Do you realize that since Arthur Badger had his own

22 case, that they were trying to negotiate the settlement, he

23 couldn't also serve as personal representative for all the

24 children, since they were all in the same accident?

25     MS. LIMEHOUSE:  Objection, Your Honor.  He's

1 testifying.

2     MR. DANIEL: I'm just asking a question.

3     THE COURT: You know, the trouble here is usually

4 most of our witnesses are sequestered, so they don't know.

5 You are now having him try to remember a witness. And it's

6 confusing. There's a lot of different witnesses here.

7     MR. DANIEL: Yes, sir.

8     THE COURT: Why don't you ask him, rather than

9 saying what the witness said, do you recall the reason,

10 rather than giving him information that may not be in the

11 record.

12     MR. DANIEL: That's fair, Your Honor. I think he's

13 testified. I think I got the message across.

14     MR. DANIEL: Beg the Court's indulgence.

15     THE COURT: Take your time.

16     MR. DANIEL: Please call up Government's Exhibit

17 715.

18 BY MR. DANIEL:

19    Q.   And Ms. Limehouse asked you about this particular

20 exhibit on direct examination.

21     MR. AUSTIN: It's 215.

22     MR. DANIEL: 215. Did I say 7?

23 BY MR. DANIEL:

24    Q.   Okay. And you see there under the voiding of the

25 conservatorship fee, I believe you testified to that. And,

1    actually, the Murdaugh firm, the Peters Murdaugh Parker firm,

2    actually voids the check that's made out to Russell Laffitte.

3    So that check never goes to Russell Laffitte at the bank?

4         A.    I'm not sure -- can you just -- what was the

5    question?

6         Q.    Okay.  I said that check right there that's voided,

7    that the law firm voids, just like those other checks that

8    law firm voids in the Badger case, it never goes over to the

9    bank?  The bank doesn't know anything about it?

10        A.    The bank or Russell Laffitte doesn't know anything

11   about it?

12             MR. DANIEL:  And please pull up the next page.

13   There's a signature page under Natasha Thomas.  I'm sorry.

14   It's Government's Exhibit 110, and page 6.

15   BY MR. DANIEL:

16        Q.    Okay.  Do you know who prepared the information on

17   this form?

18        A.    So, it says page 2 of 3.  It may be helpful if I saw

19   the first and the third page so I could have a better idea

20   what the document is.

21        Q.    Sure.

22             MR. DANIEL:  Please pull up page 1 and 2.

23        A.    So, okay, I think we are getting there.  This is a

24   document dated -- this is a document dated 1996.

25        Q.    That was the settlement case.

1    This is what I want, the verification here.  Now,

2  according to this document, it's dated August the 26th, 2012.

3  And this is Natasha Thomas's case.  And it's -- you can look

4  at it on its face and can tell it's got -- had to have been

5  slipped by the probate judge.

6           MS. LIMEHOUSE:  Objection, Your Honor.

7      Q.   Okay.  Russell -- what it appears to be, this

8  exhibit --

9           THE COURT:  Ask a question.  Don't make a statement,

10  Mr. Daniel.

11  BY MR. DANIEL:

12     Q.   Isn't it true this appears to be Russell Laffitte

13  signing a verification statement that's filed in probate

14  court?

15     A.   Yeah, I believe I testified about this document

16  earlier.

17     Q.   And isn't it --

18           THE COURT:  Let him finish the answer.

19           THE WITNESS:  Both the verification and the

20  qualifications, statement of acceptance, they are both dated

21  August 26th, 2010.  The notary is actually a bank employee,

22  Nancy Mae Drawdy.  And the signature is Russell Laffitte.

23  BY MR. DANIEL:

24     Q.   Okay.  So it's your testimony it was Russell

25  Laffitte himself that filed this document in probate court?

1    A.   My testimony is Russell Laffitte verified the

2    statement.  I believe if you go to the pages, this is the one

3    with the incorrect date for -- date of birth for Natasha

4    Thomas.  My testimony is Russell Laffitte verified that

5    document, and then also signed the qualification statement of

6    acceptance of that document, which had the incorrect birth

7    date, which -- stating that she was under 18, had five years

8    off.  When in reality, she was turning 18 two weeks later.

9    That's my testimony.

10   Q.   Okay.  And the qualification says, I accept this

11   appointment and agree to perform the duties and discharge the

12   trust of the office?

13   A.   Yes, it says that.

14   Q.   And it's your testimony that it was Natasha -- that

15   he mistated Natasha Thomas's birthday?

16   A.   Yes.  The document clearly has her wrong birth date

17   based on her testimony.  You have half of one of the third

18   page of the document, but if it's the same document we've

19   been talking about before, he's verifying it.  He's saying, I

20   am accepting this appointment and doing the duties to

21   discharge the trust and office of the conservatorship.  Yet,

22   saying those two things, the birth date is five years off,

23   which was significant, as I testified before.

24   Q.   But is it possible -- and did you interview Mr.

25   Laffitte about this, or did you interview Mr. Murdaugh about

1    this?  Who prepared that document?

2        A.    Who?

3        Q.    Who prepared that document?

4        A.    I don't know who prepared it.  I know who verified

5    it.  And I know the qualification statement of acceptance.

6    And I know what the document states, but I don't know who

7    specifically prepared all three pages.

8        Q.    You mentioned there was a structured settlement for

9    the Badger children.  I believe y'all read how much it was

10   for each one of them.  They were all the same amount?

11       A.    Yes.

12       Q.    And did you know, and if you don't know, I

13   understand.  Did you know that Russell Laffitte researched

14   the appropriate --

15            MS. LIMEHOUSE:  Objection, Your Honor.

16            THE COURT:  You are now testifying.

17            MR. DANIEL:  Okay.

18            THE COURT:  Sustained.

19   BY MR. DANIEL:

20       Q.    Didn't you testify as to the types of work that

21   Russell Laffitte did in these conservatorship cases?

22       A.    I am not really sure what testimony --

23       Q.    Some of the cases you implied that he didn't do any

24   work, or just did some work, or did limited work?

25       A.    Yeah.  So, you know, we talked about opening

1  conservatorships and no money going through those

2  conservatorships.  We talked about him not knowing the people

3  he was representing, things like that.  Is that what you are

4  asking?

5  Q.  Let's go back to the ones that the money doesn't go

6  through.  Are you aware in one of those cases that there's a

7  structured settlement --

8  MS. LIMEHOUSE:  Judge --

9  MR. DANIEL:  Judge, he can't have it both ways.

10  THE COURT:  Mr. Daniel, Mr. Daniel, Mr. Daniel, if

11  you want to offer the testimony, you've got to put a witness

12  up.  You can't be the witness.  Sustained.

13  MR. DANIEL:  Beg the Court's indulgence.

14  Please pull up Government's Exhibit 37 in the Badger

15  case and 38.  Okay.  Now call out -- go ahead.  And, yeah,

16  call out so he can read them, enlarge them.  Okay.

17  BY MR. DANIEL:

18  Q.  This is from Alex Murdaugh, it's in evidence, to

19  Russell Laffitte dated February 6th.  We've got it under a

20  different exhibit number because we include both the February

21  6th and the February 8th.

22  A.  I'm familiar with the e-mail.

23  Q.  This is Government's exhibit.  So you talk about it

24  being, in your direct testimony, it being part of the Badger

25  case.  This is the Badger money.  But that said whatever the

1    balance would be on 13.25 (sic) after these deductions, check

2    43162, it doesn't mention Badger, does it?

3        A.   It doesn't say his name specifically, but it's based

4    on the time frame and the amount of $1,325,000.  It's clear

5    to me that it's Arthur Badger.

6        Q.   The time frame, but that $1,325,000, we already

7    established even by your testimony, that that check never hit

8    Palmetto State Bank?

9        A.   But it hit the disbursement sheet.

10       Q.   But law firm did the disbursement sheet.  That check

11   never hit Palmetto State Bank.  It wasn't processed.  You

12   testified to that?

13       A.   Agreed.

14       Q.   Okay.  So how is he to know that that check, this

15   particular 13.25 (sic) check was voided dated November 2012,

16   this is February 13th?

17       A.   How was he to know?  Is that your question, how was

18   he to know, referring to Russell Laffitte?

19       Q.   Yes, I'm just asking you about this document.

20   Doesn't say Badger check at all, doesn't it?

21            THE COURT:  Let him answer the question.

22            THE WITNESS:  Your question was, how does he know

23   it's Russell Laffitte?  He knows because there's a

24   disbursement sheet that includes his personal representative

25   fee of 35,000 and lists $1,325,000 going to Palmetto State

1  Bank.  If the second part of your question was, does it say

2  Badger anywhere specifically in this e-mail, no.  But there's

3  enough clues and data to know what that ties to.

4      Q.  November 2012, December, January, and this is

5  February the 6th, four months later, and the Badger case

6  closed, four months later.  He doesn't know that check has

7  been voided.  So he has no idea.  There's no way he could

8  have an idea.

9      A.  That wasn't a --

10         THE COURT:  You are arguing.  It's not a question.

11         MR. DANIEL:  That's good enough.  That's good

12  enough.

13  BY MR. DANIEL:

14      Q.  And one of the responsibilities of conservator, in

15  addition to preserving the amount, is to try to earn that

16  estate or the money he manages, try to earn some money for

17  the clients, some interest or investment income or something

18  for the client, isn't it?

19      A.  Ideally that would be -- that would be ideal.

20         MR. DANIEL:  No further questions.  Thank you.

21         THE COURT:  Redirect.

22         MS. LIMEHOUSE:  Thank you, Your Honor.  Can you pull

23  up 119 at 38, please.

24                    REDIRECT EXAMINATION

25  BY MS. LIMEHOUSE:

1  Q.   This $35,000 personal representative fee that Mr.

2  Laffitte used to pay off loans he extended himself from

3  Hannah Plyler, what's the date of that check?

4  A.   That check is dated November 20th, 2012.

5  Q.   Now, as we reviewed with the jury during your direct

6  examination, what date was Arthur Badger's disbursement sheet

7  signed?

8  A.   I believe it was November 19th, 2012.

9  Q.   Mr. Daniel spent a lot of time talking about the

10  probate records with respect to the loans extended from the

11  Plyler account.  And he also showed you a statute from the

12  probate code related to investments that a conservator should

13  make.  Does that statute say you can steal people's money to

14  pay back those investments?

15  A.   It does not.

16  Q.   The loans from Hannah Plyler's conservatorship

17  account, what role do they play in this case?

18  A.   They play a huge role.  It's not part of the

19  indicted -- part of the charges or the crime indicted.  But

20  how those loans are paid back is with the stolen funds.  So

21  they play a giant part of this case.

22  Q.   Going to pull up Government's Exhibit 30, please.

23  Mr. Daniel reviewed his chart comparable to how the Badger

24  checks -- Badger funds were spent.  And he highlighted a

25  check number 45028 for $101,369.49 that was used to pay off

1    loans he had extended to Alex Murdaugh from Hannah Plyler's

2    conservatorship account.  And he highlighted the date that

3    that check was negotiated, October 28th of 2013.  And when

4    Mr. Daniel questioned you on cross-examination, he was

5    presenting to you how Mr. Laffitte could have known, based on

6    the original date of that check compared to the date of its

7    negotiation on October 28th, 2013.

8            MS. LIMEHOUSE:  If we could please pull up

9    Government's Exhibit 30 -- I'm sorry, 50.  If you could just

10   the top portion, please.  I'm sorry.  The bottom portion

11   first.

12   BY MS. LIMEHOUSE:

13       Q.   This is an e-mail from October the 22nd, 2013.  So

14   it's before that October 28th check is negotiated.  And it

15   states, from Alex to Russell:  Sorry.  I forgot.  Can you

16   make a loan from Hannah, and I will pay it as we discussed?

17           MS. LIMEHOUSE:  If you do the top portion, please.

18   BY MS. LIMEHOUSE:

19       Q.   Then Russell responds:  I transferred 70,000 this

20   morning.  And Alex responds:  I will come by at some point

21   this week.  Out of town today and in the morning.  So it will

22   be tomorrow afternoon or Friday.

23           That check dated September 13th, 2013, that was

24   negotiated on October 28th of 2013, was it spent to pay off

25   this $75,000 -- $70,000 loan that he extended on October

1 23rd?

2     A.   Yes, that loan was used as an -- or that money, that

3 check, was used as a loan repayment for a loan Alex Murdaugh

4 had gotten from Hannah Plyler.

5     Q.   Okay.  So Mr. Daniel's question, how could he have

6 known when the check was negotiated more than a month after

7 it was dated.  Based on your investigation, how could he have

8 known?

9     A.   Within that week, they are having, "they" meaning

10 Alex Murdaugh and Russell Laffitte, are having conversations

11 talking about the -- Alex's accounts and the money to pay

12 back those accounts.

13     MS. LIMEHOUSE:  If you will highlight the bottom

14 portion of the e-mail once more, Ms. Rozsa.

15 BY MS. LIMEHOUSE:

16     Q.   And Alex Murdaugh had told Russell, can you make a

17 loan from Hannah and I will pay it as we discussed; is that

18 right?

19     A.   That's what it says, yes, ma'am.

20     Q.   Mr. Daniel also asked you questions about the two

21 Bank of America checks that were negotiated from Arthur

22 Badger's settlement funds.  Did anyone at Bank of America

23 serve as a personal representative or conservator for anyone

24 associated with the Badger case?

25     A.   No.

1    MR. DANIEL:  I object.  How would he know that?

2    THE COURT:  I overrule the objection.  He's got the

3 personal representative files in the record.

4 BY MS. LIMEHOUSE:

5    Q.  Based on your investigation in reviewing subpoena

6 returns and all the interviews that you've conducted, did

7 anyone on the Bank of America have anything to do with Arthur

8 Badger?

9    A.  No, not that I'm aware of.

10    Q.  Based on your investigation, all the subpoenas and

11 records you reviewed, e-mails, interviews, did anyone at the

12 Bank of America have anything to do with the estate of Donna

13 Badger?

14    A.  No, they did not.

15    Q.  Who did, a bank executive, have something to do with

16 Arthur and Donna Badger?

17    A.  Russell Laffitte did.

18    Q.  Mr. Daniel also brought up Chad Westendorf, an

19 employee at Palmetto State Bank who he says was tricked by

20 Alex Murdaugh.  Explain to the jury the difference between

21 what happened with Chad Westendorf and what Russell Laffitte

22 did.

23    A.  Yeah.  So the biggest difference is -- so Chad

24 Westendorf acted as a personal representative in the

25 Satterfield case.  Satterfield was a woman who had died and

1  there was a large settlement.  It's essentially a separate

2  case.  He got a large personal representative fee.  I don't

3  remember the exact amount.  The difference is, he did -- he

4  signed some paperwork and did some documents in circuit

5  court, probate court, et cetera.  What he wasn't involved in

6  is the second half of this case, which is taking checks from

7  those clients that he was supposed to be representing and

8  putting them through Palmetto State Bank.  So when you hear

9  about the Satterfield case and Chad Westendorf, there's no

10  money that is running through Palmetto State Bank with that

11  case.

12      Q.   So did Chad Westendorf negotiate any client's

13  settlement funds, settlement fee checks?

14      A.   He did not.

15      Q.   Did any of those clients' funds go through the

16  Palmetto State Bank?

17      A.   No, they did not.

18      Q.   Mr. Daniel also asked you questions about the way

19  that the law firm drafted the Badger and Pinckney and Thomas

20  checks to Palmetto State Bank.  Do you recall that line of

21  questioning?

22      A.   Yes, I do.

23      Q.   And he asked you about how the law firm should have

24  known and investigated where those funds were going; is that

25  your understanding of his questioning?

1    A.    It is.

2    Q.    So based on your investigation, who was the only

3    person other than Alex Murdaugh who actually knew where those

4    funds were going?

5    A.    Russell Laffitte.

6            MS. LIMEHOUSE:  No further questions, Your Honor.

7            THE COURT:  Very good.  You may step down.

8            Does the Government have any further witnesses?

9            MS. LIMEHOUSE:  Government rests, Your Honor.

10           THE COURT:  Ladies and gentlemen, the Government has

11   rested its case.  I need to take some matters up.  I know you

12   will be disappointed that I let you go at five o'clock today

13   instead of a little later.  We will see you nine o'clock

14   tomorrow.  Thank you.

15           Please remember, do not review any media.  Do not

16   discuss this matter with anyone.

17           (Jury leaves open court at 5:03 p.m.)

18           THE COURT:  Please be seated.  Does the defendant

19   have any motions?

20           MR. AUSTIN:  Yes, Your Honor.  Defendant moves under

21   Rule 309 for a judgment of acquittal.  I will move up here.

22   It would be easier.

23           THE COURT:  Yes, both for the court reporter and me.

24           MR. AUSTIN:  Your Honor, viewing the evidence in

25   light of favorable to the Government, the evidence is still

1     insufficient to stay a conviction on all counts. And

2     considering the sufficiency, the Court, hopefully, will

3     agree, just instead of going through each count in order, we

4     will start with Count 3.

5           THE COURT: Hold on a minute. Let me look at Count

6     3.

7           MR. AUSTIN: That's the wire fraud count.

8           THE COURT: You are skipping 1 and 2?

9           MR. AUSTIN: I will get to those. Count 3 alleges

10    that Mr. Laffitte obtained funds as personal representative

11    of the estate of Donna Badger. The part about Donna Badger

12    is not on there, but that's what it relates to. And

13    distributed $33,789.83 to Alex Murdaugh's personal account.

14          And Mr. Laffitte is entitled to judgment of

15    acquittal on this count because it's untimely. There's a

16    five-year statute of limitations under wire fraud. And this

17    payment is made in 2013. But Mr. Laffitte was not indicted

18    until 2022. We recognize that the statute can be extended.

19          THE COURT: For 10 years.

20          MR. AUSTIN: Correct.

21          THE COURT: If it affects the bank.

22          MR. AUSTIN: Yes, sir. And the way courts have

23    looked at this is if it creates a new or increased risk of

24    loss or if the bank itself was victimized, and there's just

25    no evidence in this case so far that shows that the bank had

1  any additional exposure just because that $33,000 check for

2  Donna Badger was negotiated at the bank.

3      THE COURT:  Is it your suggestion that if the CEO of

4  the bank misapplied, participated in a fraud, which is

5  alleged here, that the bank, as his employer, would not have

6  any exposure?

7      MR. AUSTIN:  So the difference here is that Mr.

8  Laffitte -- Counts 1 through 3 are a little bit different

9  from 4 through 6.

10     THE COURT:  I get that.

11     MR. AUSTIN:  Because he was acting outside his

12 capacity as CEO or bank employee.

13     THE COURT:  That is the confusing thing.  You say

14 that, but he's running it through the bank.  He's using bank

15 employees.  He's definitely exposing the bank to liability

16 for his alleged misconduct.  I am not reaching a conclusion

17 whether he's guilty or not.  But I'm saying taking the light

18 most favorable to the Government, it seems apparent to me

19 that he's significantly exposing the bank to significant

20 liability.  And I think that bears that out there in multiple

21 lawsuits.

22     So anything further on that?

23     MR. AUSTIN:  No, Your Honor.

24     THE COURT:  Let me just say, I deny your motion for

25 the directed verdict of acquittal as to Count 3.

1    What's next?  And let me just say, for the record, I

2  find that the -- that there is -- that your burden is heavy

3  here, which is to show that the offense -- that there's

4  insufficient evidence for a conviction.  And the standard in

5  the Fourth Circuit is that it must be sufficient for a

6  reasonable fact -- that a reasonable fact finder could accept

7  as adequate and sufficient to support a conclusion of the

8  defendant's guilt beyond a reasonable doubt as to each

9  essential of that offense.  I find you have not met that

10  burden.  So I deny your motion for directed verdict as to

11  Count 3.

12         What is your next?

13         MR. AUSTIN:  Misapplication of bank funds.  And this

14  relates to the $680,000 check we've heard a lot about.  And

15  that count alleges that the check was cut or distributed

16  without notice to or consent from the bank's Board of

17  Directors.

18         THE COURT:  Knowing that he had fraudulently

19  transferred the money to the bank customer, that's a key part

20  of the allegation.

21         MR. AUSTIN:  Okay.  And we don't believe it's enough

22  for the Government to claim that's a violation of FDIC's safe

23  and sound standards.  That's a civil standard.  But those are

24  civil standards to hold him criminally liable --

25         THE COURT:  The claim is that he fraudulently

1  transferred money and he did it in such a way as to violate

2  bank policy.  The bank policy -- to simply violate bank

3  policy is not a crime.  But to commit fraud is the crime.

4  That's the problem here.  So, you know, you can -- there's

5  certainly evidence that he violated bylaws.  The defendant

6  has argued he did not.  That's what we call a jury question.

7  But is there a sufficient evidence viewed in the light most

8  favorable that the essential elements here of misapplication

9  of bank funds, 18 United States Code 656, yes, there is

10  sufficient evidence.  Is he guilty or not?  That's for the

11  jury to decide.  But, you know, viewing the facts in the

12  light of most favorable -- Mr. Austin, I'm sitting here

13  smiling because I remember you arguing just the opposite to

14  me in cases when you were an AUSA.  So I'm just remembering

15  that.  And excuse me for that.  And I'm sure these lawyers

16  from the other side, they would be arguing the opposite as

17  well.

18  There is just -- viewing in the light most favorable

19  to the nonmoving party here, the Government, there is -- I

20  find there is sufficient evidence that a reasonable fact

21  finder could find the evidence is adequate and sufficient to

22  support a conclusion of a defendant's guilt beyond a

23  reasonable doubt as to each essential element of

24  misapplication of bank fund, 18 U.S.C. 656.  And for that

25  reason, I deny your motion for a directed acquittal as to

1    Count 4.

2         MR. AUSTIN:  I understand your ruling.  Can I just

3    for the sake of argument add --

4         THE COURT:  Absolutely.  Go right ahead.

5         MR. AUSTIN:  We also want to focus on the intent to

6    defraud piece of that charge.

7         THE COURT:  Yes.

8         MR. AUSTIN:  Our position is that there's no

9    evidence of any intent to defraud.

10        THE COURT:  Well, intent to defraud, intent is often

11   proven by circumstantial evidence.  And viewing the evidence

12   in the light of most favorable to the Government, I think

13   there is sufficient -- I find there is sufficient evidence

14   that a reasonable fact finder could find the defendant guilty

15   beyond a reasonable doubt as to that fact and on all the

16   essential elements.  You are right, that is an essential

17   element.  And I find there's a basis in evidence sufficient

18   for it to be a jury question.  I deny the motion as to Count

19   4.  Next.

20        MR. AUSTIN:  Thank you, Your Honor.  Turning to

21   Count 1, the conspiracy count.  That's conspiracy to commit

22   wire fraud under 18 U.S.C. 13 --

23        THE COURT:  And bank fraud.  It's both.

24        MR. AUSTIN:  Yes, sir.  And so under the first part

25   of that, so conspiracy, you have to show there are two more

1  people that agreed to commit wire fraud and that the

2  defendant willfully joined the conspiracy with the intent to

3  further its unlawful purposes.  And then the conspiracy to

4  commit bank fraud requires that two or more persons agree to

5  commit bank fraud, and that at some point during the

6  conspiracy, the defendant had knowledge of the criminal

7  objective of the agreement and willfully joined the

8  conspiracy.  And so for both of those counts, the Government

9  has got to show that Mr. Laffitte knew about unlawful

10  activity.  And the Government just failed to show that he was

11  aware of any unlawful activity.

12           THE COURT:  Well, you know, I think there is --

13  again, it's circumstantial evidence.  But there is evidence

14  in the record that a jury, a rational fact finder, could find

15  that he did know.  And, you know, we've been back and forth

16  on these documents.  These checks come in.  They've got the

17  name of the case on it.  He is the appointed conservator.  He

18  is asked by the -- he is asked by Mr. Murdaugh to write his

19  own bookkeeper, that is the law firm's bookkeeper, to re-cut

20  the checks.  Why is Mr. Laffitte involved in communicating

21  with the law firm's bookkeeper?  There could be different

22  explanations.  But a reasonable inference from that is he's

23  part of a scheme.  And, you know, it would be unusual to

24  have a -- you are in a law firm.  It would be unusual to have

25  your banker writing for bookkeeper.  You know that.

1           MR. AUSTIN:  Not in Hampton County.

2           THE COURT:  Good reason.  To me, if there's a

3  reasonable inference from the evidence viewed in light of

4  most favorable -- you know, I don't judge credibility.  I

5  just take the -- assume the evidence is true.  And I think

6  there's a sufficient evidence in the record as to his

7  knowledge.  It's a jury question.  If -- the Government

8  wouldn't be moving for a directed verdict to me, but I

9  wouldn't grant it either.  It's a jury question.  So I deny

10  as to Count 1 on both bank and wire fraud.

11           MR. AUSTIN:  I may have gotten my sheets mixed up

12  here.

13           THE COURT:  Let me put on the record that I do, as

14  to Count 1, I do find that the Government has offered

15  sufficient evidence that a rational fact finder could find

16  the defendant guilty beyond a reasonable doubt regarding all

17  of the essential elements of Count 1, beyond a reasonable

18  doubt.  For that reason, I deny your motion for directed

19  verdict as to Count 1.

20           MR. AUSTIN:  Thank you, Your Honor.  With regard to

21  Count 2, the bank fraud account, so that count requires the

22  Government to show that Mr. Laffitte obtained bank money by

23  means of false or fraudulent pretenses, representations, or

24  promises.  And we focused on that "by means of" requirement

25  here, Judge.  And that alleged falsity must be the mechanism

1 naturally inducing a bank to part with money in its control.

2 And here Count 2 alleges Mr. Laffitte paid $101,000 to Hannah

3 Plyler knowing that the funds belonged to the Estate of Donna

4 Badger. And although the Government presented evidence that

5 the check was negotiated, it has not presented any evidence

6 that Mr. Laffitte made any false representation about his

7 payment to the bank in order to get that $101,000 paid.

8 THE COURT: Let me hear from Ms. Limehouse on the

9 issue of the false representation.

10 MS. LIMEHOUSE: Of course, Your Honor. So the heart

11 of this is really under false pretenses. So Mr. Laffitte is,

12 of course, charged with a duty as a personal representative

13 of the estate of Donna Badger. And because of his role as

14 the personal representative for the estate of Donna Badger,

15 it put him in a position where he was able to steal the

16 money. And so but for those false pretenses, we wouldn't be

17 here today.

18 THE COURT: I think that is a sufficient basis in

19 the light of most favorable to the Government here, taking

20 all inferences in its favor, that a rational fact finder

21 could find the defendant guilty beyond a reasonable doubt as

22 to all essential elements of that offense. So as to Count

23 No. 2, I deny your motion for directed verdict.

24 MR. AUSTIN: Thank you, Your Honor. Last two

25 counts, so Count 5, that's misapplication of bank funds. And

1   that's the $750,000 loan we talked a lot about.

2           THE COURT:  Tell me about it.

3           MR. AUSTIN:  Sorry?

4           THE COURT:  Tell me about it.

5           MR. AUSTIN:  And here the Government is alleging

6   that Mr. Laffitte improperly caused the bank to fund that

7   loan for the Edisto Beach house.  And here we are focusing

8   the intent piece of this and willfully language too.  And the

9   Government alleges there was insufficient collateral to

10  secure the loan in knowing the loan to be used for other

11  purposes.  And there is no evidence that Mr. Laffitte and the

12  Executive Committee made this loan with any intent to injure

13  or defraud the bank.  There's ample evidence that Mr.

14  Laffitte --

15          THE COURT:  Well, here's the problem is, the bank --

16  it's called the renovation of the beach house.  But before

17  that loan -- those loan documents have been executed, he had

18  already sent $350,000 to a lawyer unrelated -- unless the man

19  is involved, and there's no evidence to suggesting this,

20  Chris Wilson was involved in renovating the house.  I don't

21  believe Mr. Wilson is in that business.  And then he sends

22  $400,000 to cover the overdraft.  He knows it's not being

23  used for the purposes stated.  I think that's sufficient to

24  support the misapplication of bank funds.  He knowingly

25  participated.

1    We talked about -- there was a good bit of evidence

2    that it would be wrong for the borrower to take the money.

3    It's equally wrong for the lender to knowingly participate in

4    that scheme knowing that the represented purpose was false.

5    So, again, viewing in the light most favorable to

6    the Government, the nonmoving party, I do find that there is

7    sufficient evidence that a rational fact finder could find

8    the defendant guilty beyond a reasonable doubt as to each

9    element of Count 5, misapplication of bank funds.  So I deny

10   your request for a directed verdict as to Count 5.

11           MR. AUSTIN:  Last one.

12           THE COURT:  You notice that Mr. Daniel sent you up

13   here for this.

14           MR. AUSTIN:  That's all right.

15           THE COURT:  A gift.

16           MR. AUSTIN:  I'm on the totem pole, just down low.

17   Count 6, please, it's the remove to dismiss Count 6, that

18   relates to the $500,000 line of credit.  And, likewise here,

19   there has been no testimony -- this is sort of what you've

20   just touched on in the previous count, Judge.  There's been

21   no testimony that he had any duty as a loan officer to follow

22   up and ensure that money was used --

23           THE COURT:  I agree.  If the borrower defrauded the

24   bank, and the lender, the loan officer, didn't know about it,

25   that's one thing.  But the allegation is here he's applying

1   $284,000 to -- I believe, aren't those overdrafts or paid

2   back loans or so something like that?  Somebody remind me

3   what that --

4        MS. LIMEHOUSE:  To pay off Hannah Plyler's

5   conservator loans.

6        THE COURT:  He knows -- the allegation is he knew

7   that and it wasn't being used for farming.  That's the

8   problem.  I agree with you if the -- if he had sent $500,000

9   out the door, and unbeknownst to him, Mr. Murdaugh used it

10  for something else, that's one thing.  But he is, as alleged

11  here, and which there is evidence that a rational fact finder

12  could conclude this beyond a reasonable doubt, is that he

13  knew about it wasn't being used for farming.  And that is

14  what, seems to me, to be the definition of a misapplication

15  of a bank fund, if you assume the evidence to be true.  I

16  don't assume it to be true.  But I've got -- for this motion,

17  I've got to view it in the light most favorable to the

18  Government.

19        MR. AUSTIN:  Can I just say one thing?

20        THE COURT:  Absolutely.

21        MR. AUSTIN:  I see where this is heading.  Just for

22  the record to get it out.  So I believe -- I hope I am not

23  misstating the record.  But I believe there was an e-mail

24  introduced, and I will find the exhibit number, that

25  references the purchase of pieces of equipment for farming.

1  And so for the distinction here, I think it's important, is

2  while some money from the loan goes to -- needs to go to the

3  stated purpose, I don't think there's been any testimony

4  that --

5       THE COURT:  I don't think it's a -- I don't think

6  it's okay to take part of it, I'm going to take half of it

7  for the farming and the rest of it I'm going to use for a

8  purpose I didn't disclose.  No.  The allegation is he used

9  $284,000 that had been represented to be for farming.  And he

10  applied it to repay a loan he knew, that is, the defendant

11  knew that it wasn't for farming.  Ms. Plyler is not a farmer.

12  This was not farming.  That's the allegation.  And there is

13  sufficient evidence that a rational fact finder could prove

14  beyond a reasonable doubt, could find beyond a reasonable

15  doubt that the defendant was guilty of misapplication of bank

16  funds in this instance on each essential elements of the

17  offense.  So I deny the motion as to Count 6.

18       MR. AUSTIN:  Thank you, Your Honor.  Co-counsel

19  reminded me -- I know you ruled on Count 2, but I just wanted

20  to explain something, because I think this will come up later

21  on too, so the Government's explanation is that Mr.

22  Laffitte's personal representative role allowed him to make

23  the fraudulent misrepresentation in that count.  However, Mr.

24  Laffitte was not the PR for Arthur Badger.  So he owed him no

25  fiduciary duty.

1  THE COURT:  Well, he held himself out.  He took a

2  fee for it.  He was acting on his behalf.

3  MR. AUSTIN:  Your Honor, that's not entirely

4  accurate.

5  THE COURT:  Let's look what he says here.  Claims

6  that the defendant, with Murdaugh and others unknown to the

7  grand jury, knowingly executed and attempt to execute a

8  scheme and artifice to obtain money and funds under the

9  custody and control of the Palmetto State Bank by means of

10  false and fraudulent pretenses, representations, and

11  promises, and aided and abetted the bank customer, that is

12  Murdaugh, by negotiating, distributing a check totaling

13  $101,000 to Hannah Plyler, knowing that the funds belonged to

14  the estate of Donna Badger and/or the estate's beneficiaries.

15  If he did that, and there's evidence that he used his

16  position to do that under false pretenses, that's sufficient.

17  Now, you've got an argument to the contrary.  You

18  make it to the jury.  It's a jury question.  It's not a court

19  question.  It's not a judge's question.  Because there's

20  sufficient evidence that a rational fact finder could find

21  the defendant guilty beyond a reasonable doubt.  It's a

22  disputed issue.  Argue it to the jury.  I deny again,

23  reiterate my decision as to Count 2.

24  MR. AUSTIN:  Thank you, Judge.  And the last thing,

25  I don't believe that the defendant has been identified at any

1 point during this trial.

2 THE COURT: I'm sorry?

3 MR. AUSTIN: I don't believe the defendant has been

4 identified by any witness in this trial.

5 THE COURT: I think multiple people have identified

6 the defendant saying they knew him. You are questioning

7 whether they pointed him out? I think it's clearly been

8 identified. I disagree with that. That is not a sufficient

9 basis to dismiss the case.

10 MR. AUSTIN: Thank you.

11 THE COURT: Okay. Okay. Ms. Limehouse, anything

12 further you wish to raise at this point?

13 MS. LIMEHOUSE: No matter from the Government, Your

14 Honor.

15 THE COURT: Do you want to respond to this

16 statement, I believe there's ample evidence that he was

17 identified, regarding that the defendant was not identified?

18 MS. LIMEHOUSE: No, Your Honor. We've heard from

19 how many family members of Russell Laffitte during this

20 trial, in addition to people who work for the bank and people

21 who went and got loans if him at the bank. So I think

22 there's more than sufficient evidence that the man sitting at

23 that table is Russell Laffitte, and that the people who

24 testified against him have identified him as such.

25 THE COURT: I agree with that. Okay. Tomorrow

1  morning we will start at 9 a.m.  Do we have any projection

2  now about what type of length of time we have in terms or how

3  many witnesses we have?  If you don't want to disclose it,

4  that's fine.  I'm just trying to, for trial purposes,

5  organization purposes --

6          MR. AUSTIN:  We are going to have nine witnesses,

7  Your Honor.

8          THE COURT:  I am not holding you to that.  You can

9  have more or less.  I am not trying to stop you.  I'm getting

10 a feel how long we are going to take in terms of length of

11 these witnesses.

12         MR. AUSTIN:  We are going to do everything we can to

13 make this as short as possible.

14         THE COURT:  Well, you've got to take as long as

15 necessary.  The defendant has a right to put up his case and

16 have adequate time to do.  Do you have any estimate now that

17 we are -- we've -- obviously, some of the stuff is already in

18 the record.  So it doesn't need to introduce the jury to

19 certain facts.

20         MR. AUSTIN:  I would be kind of guessing at this

21 point, Judge.  Can I e-mail you tonight, if fine?  I can give

22 you a better estimate, but I haven't had a chance to talk

23 about Bart.

24         THE COURT:  Mr. Daniel, what are your thoughts in

25 terms of length?  You've been knocking around this a little

1 longer.

2      MR. DANIEL:  I think we've got two days of

3 witnesses.  I don't know that we've got three days or three

4 and a half days.  But I would say two days, about two days

5 worth of witnesses.  We are both very efficient with

6 questions, though.

7      THE COURT:  I am not trying -- again, I am not

8 trying to hold you to it.  And you may decide, upon hearing a

9 cross-examination, you need another witnesses and all that.

10 So I am not trying to hold you to this.  But if that were so,

11 we would have evidence tomorrow and Friday, and we would

12 presumably charge the jury on Monday and the deliberation on

13 Monday.

14      MR. DANIEL:  I think so, Your Honor.

15      THE COURT:  And I did explore with the jury doing it

16 on Saturday, but they had -- it was complicated.  They had

17 family matters and things that they had planned.  And it

18 just -- you know, I very much deferred to my jury on this.

19 So, okay, everyone have a restful evening.  And we will you

20 nine o'clock tomorrow.

21      (Whereupon, proceedings are adjourned.)CERTIFICATE

22 OF REPORTER.

23

24      I, Karen V. Andersen, Registered Merit Reporter,

25 Certified Realtime Reporter for the State of South Carolina

1 at Large, do hereby certify that the foregoing transcript is

2 a true, accurate and complete Transcript of Record of the

3 proceedings.

4          I further certify that I am neither related to nor

5 counsel for any party to the cause pending or interested in

6 the events thereof.

7

8

9

10

11          Karen V. Andersen
            Registered Merit Reporter
12          Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25