```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
```

_____ )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Plaintiff,                )   Docket No. 9:22-658
                                  )
        vs.                       )   Charleston, SC
                                  )
RUSSELL LUCIUS LAFFITTE,          )   Volume VI
                                  )
        Defendant.                )
_____ )   DATE: November 16, 2022

```
BEFORE THE HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE, PRESIDING
JURY TRIAL
```

A P P E A R A N C E S:

For the Plaintiffs:

EMILY EVANS LIMEHOUSE
U.S. Attorney's Office
151 Meeting Street, Suite 200
Charleston, SC 29401-2238
843-266-1663
emily.limehouse@usdoj.gov

WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
U.S. Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201
803-929-3000
winston.holliday@usdoj.gov
kathleen.stoughton@usdoj.gov

COURT REPORTER:                   KAREN V. ANDERSEN, RMR, CRR
                                  United States Court Reporter
                                  901 Richland Street
                                  Columbia, SC  29201

APPEARANCES:

For the Defendant:

EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
Nelson Mullins Riley and Scarborough
151 Meeting Street
Charleston, SC 29401
843-534-4123
bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com

CHRISTIAN JOSHUA MYERS
Nelson Mullins Riley and Scarborough
101 Constitutional Avenue NW, Suite 900
Washington, DC 20001
202-689-2001
josh.myers@nelsonmullins.com

1    INDEX

2    EXAMINATION

3    Witness Name                                                    Page

4    JOHN ROBERT PETERS III

5        BY MR. DANIEL ......................................... 1376

6        BY MS. LIMEHOUSE...................................... 1384

7        BY MR. DANIEL ......................................... 1401

8    CHASTITY MALPHRUS

9        BY MR. AUSTIN ......................................... 1403

10       BY MS. LIMEHOUSE...................................... 1422

11       BY Mr. Austin ......................................... 1432

12   CHARLES LAFFITTE III

13       BY MR. AUSTIN ......................................... 1433

14       BY MR. HOLLIDAY ...................................... 1468

15   JOHN MARVIN MURDAUGH

16       BY MR. AUSTIN ......................................... 1485

17       BY MR. HOLLIDAY ...................................... 1486

18   CHARLES LAFFITTE

19       BY MR. DANIEL ......................................... 1488

20       BY MS. LIMEHOUSE...................................... 1525

21       BY MR. DANIEL ......................................... 1539

22   LILLIAN GRAY HENDERSON

23       BY MR. AUSTIN ......................................... 1541

24       BY MR. HOLLIDAY ...................................... 1592

25       BY MR. AUSTIN ......................................... 1619

EXHIBITS

| Exhibit | Page |
|---|---|
| Defendant's Exh. 79 | 1467 |
| Defendant's Exh. 76 | 1511 |
| Defendant's Exh. 85 | 1514 |

1    THE COURT:  I'm advised we are still waiting for one

2  juror.  Welcome to Charleston, bad traffic.  Right?  Any

3  matters that the parties need to address, first the

4  Government?

5    MS. LIMEHOUSE:  None from the Government, Your

6  Honor.

7    THE COURT:  From the defense?

8    MR. DANIEL:  None from the defense, Your Honor.

9    THE COURT:  Very good.

10    (Whereupon, the jury returns to open court at 9:21

11  a.m.)

12    THE COURT:  Please be seated.  Good morning.  The

13  Government has rested.  It is now the defendant's opportunity

14  to mount his defense.

15    Please proceed.

16    MR. DANIEL:  May it please the Court, Your Honor.

17  At this time the defense would call John Peters from Palmetto

18  State Bank.

19    THE COURT DEPUTY:  Please state your full name.

20    THE WITNESS:  John Robert Peters III.

21    having been duly sworn, testifies as follows:

22                    DIRECT EXAMINATION

23  BY MR. DANIEL:

24    Q.  Good morning, Mr. Peters.

25    A.  Good morning.

1    Q.   Will you please give the jury an idea of your

2    background, please.

3    A.   I have worked at the bank for 35-plus years.  I am

4    the compliance officer, the BSA officer, involved in

5    operations, have been for 25-plus years in a lot of those

6    jobs.

7    Q.   What are the duties and responsibilities of the

8    compliance officer?

9    A.   Well, banking is highly regulated.  It's kind of my

10   job to oversee that we have policies and practices and

11   day-to-day operations that just keep us in line with those

12   regulations and that everybody is trained and that kind of

13   thing.

14   Q.   Is one of your responsibilities as the compliance

15   officer the filing Suspicious Activity Reports?

16   A.   Not as the compliance officer, but as the bank

17   secrecy office.

18   Q.   Bank secrecy, that's your other responsibility?

19   A.   Yes.

20   Q.   Explain to the jury briefly what an SAR or

21   Suspicious Activity Report is?

22   A.   Well, under the Bank Secrecy Act, we are charged

23   with knowing our customers, knowing their patterns, keeping

24   up with cash transactions, that kind of thing.  And if we

25   determine that something is unusual, suspicious, that type of

1    thing, we are required to file a Suspicious Activity Report.

2        Q.    Thank you, sir.  And are you familiar with the

3    banking practices of Alex Murdaugh over the years?

4        A.    Generally, yes.

5        Q.    And how long, do you know, that he's been a

6    customer?

7        A.    That would be a good long time.  I have no idea how

8    many years.

9        Q.    Could you describe his overdraft or overdrawn

10   account history?

11       A.    He was overdrawn a lot over the years, yeah.

12       Q.    And did he usually make those good?

13       A.    He always, at some point in time, made them good,

14   yes.

15       Q.    And did you ever file a Suspicious Activity Report

16   for any of his overdrawn activity?

17       A.    I did not.

18       Q.    And why not?

19       A.    Well, at that time --

20       Q.    At the time, I should have said at the time.

21       A.    At that time, I didn't have enough information that

22   I thought would lead to that.

23       Q.    Thank you.  And what about, are you familiar with

24   Alex Murdaugh's loan history?

25       A.    Yes, generally speaking, yes.

1    Q.   And could you describe for the jury that little

2    history?

3    A.   Alex borrowed a lot of money over the years.  I

4    couldn't tell you how much over time, but it was a

5    substantial amount of money, yes.

6    Q.   Did he regularly pay back these loans?

7    A.   He always paid back, as far as I can remember,

8    although very slowly at times.

9    Q.   And did you ever file any Suspicious Activity Report

10   involving his loan activity?

11   A.   I did not.

12   Q.   And which type of customer would a bank make more

13   money on, a customer that has a loan history of borrowing

14   sums of money or customer that just keeps money with the bank

15   or has a CD or certificate of deposit with the bank?

16   A.   The one that would borrow the money.

17   Q.   So would you say that you've made plenty of money

18   over the years -- the bank has made plenty of money over the

19   years off Alex Murdaugh's loans?

20   A.   I'm sure we have, yes.

21   Q.   Now, referring your attention to a check itself that

22   comes through, what is the purpose of a memo line on a check?

23   Whose benefit is that for?

24   A.   Generally, that would be for the writer of the

25   check.

1    Q.   Okay.  And give an example what someone might write

2    in there to remind them.

3    A.   Well, it could be anything.  A lot of time it might

4    be -- if I'm a business, something to do with a vendor number

5    or purchase order.  I mean, it could be pretty much anything

6    they wanted it to be.

7    Q.   And does the memo line affect how a bank -- does it

8    have any effect on how a bank processes the check?

9    A.   Not in and of itself, no.

10   Q.   And what have taken -- referring your attention now

11   to money orders.  What has sort of taken the place of money

12   orders in the past few years?

13   A.   Well, we issue cashier's checks, which are really

14   the same thing as a bank money order.

15   Q.   And is there anything wrong with the bank receiving

16   payment in a money order or selling money orders or cashier's

17   checks, either, which you call cashier's checks today?

18   A.   When you say "a problem," there's no problem taking

19   a money order or cashier's check for payment, no.

20   Q.   And what's the advantage of receiving a money order

21   or cashier's check versus a person's personal check?

22   A.   Well, I guess the simple advantage would be, if you

23   give me a cashier's check or a bank money order, as long as

24   it's a current one, it's as good as cash.  If you gave me a

25   personal check, I guess it could bounce.

1    Q.   Okay.  Referring you now -- and I'm trying to go

2    through this sort of speedily, if you will.  But referring to

3    you now about charged-off loans, what legal steps can the

4    bank take to collect charged-off loans?

5    A.   Okay.  Not necessarily my area of expertise, but --

6    Q.   Just --

7    A.   -- foreclosure or repossession, that type thing.

8    Q.   So does the fact that a check -- that a loan is -- a

9    loan is charged off, does it affect a bank's ability to still

10   pursue its collateral?

11   A.   The bank will generally still try to, yes, we will

12   do that.

13   Q.   And if you are familiar, what are some of the

14   reasons that a bank might charge off a loan?

15   A.   The great majority of the time would be failure to

16   pay.

17   Q.   Other reasons also?

18   A.   There can be other reasons, yes.

19   Q.   Now, tell the jury a little bit, not in any great

20   length because they've heard a good bit already -- about some

21   of the bank regulators.  You've got the FDIC?

22   A.   Correct.

23   Q.   And what do they do?

24   A.   FDIC comes in every 18 months, give or take.  And

25   they are just -- there are various kinds of exams, safety and

1   soundness where they are just checking our practices, our

2   financials, that kind of stuff, the compliance exam, where I

3   would be more involved, just trying to make sure we are doing

4   everything correctly there.

5       Q.   I'm sorry.

6       A.   That's it.

7       Q.   Have they ever raised any issues on Alex Murdaugh's

8   loans or his overdrafts that you know of?

9       A.   On his -- to my knowledge, no.  But I may not be in

10  the position to always know that.

11      Q.   Just to your knowledge?

12      A.   Yes.

13      Q.   Thank you.  And there are also outside auditors that

14  come and do an in-depth review.  How often do they generally

15  come?

16      A.   I feel like we have an auditor in there every month

17  for something.  But, yes, every year for various things.

18      Q.   Then there's the State Board of Banking Control who

19  also comes in?

20      A.   Correct.

21      Q.   How would you describe how the bank has been running

22  up until September 2021?

23      A.   It's been running fine.

24      Q.   Okay.  Are you familiar with a $750,000 loan that

25  was given or made out to Mr. Alex Murdaugh?

1    A.    I am familiar with it, yes.

2    Q.    Explain to the jury how you became familiar with it.

3    A.    I don't know exactly.  I just knew -- I was not

4    involved in it.  I just knew that it was in the works.

5    Q.    Well, specifically, what did you think was the

6    purpose of the loan, considering his overdraft nature or

7    status?

8    A.    Well, some of it was to cover the overdraft, yes.

9    Q.    Okay.  And was the remainder of it then wire

10   transferred to a lawyer's account?

11   A.    It was.

12   Q.    Did you actually approve the wire transfer?  Did you

13   know about the wire transfer?

14   A.    I did know about the wire transfer.

15   Q.    As a result of that, did you file any Suspicious

16   Activity Report at the time?

17   A.    I did not.

18   Q.    Is there a daily report of a deficit, called a

19   deficit balance report?  Explain to the jury what that is.

20   A.    It is simply an overdraft report.  It's a report of

21   anybody who has a negative checking balance.

22   Q.    And is there a separate report on NSF, or

23   nonsufficient funds?

24   A.    There is.

25   Q.    And how -- do the bank employees or officers have

1   access to those two reports?

2       A.   Yes.

3       Q.   And would that also include Jan Malinowski?

4       A.   Yes.

5       Q.   Okay.  And it would be any officer or any employee

6   that wanted to check, if they are authorized?

7       A.   Yes.

8            MR. DANIEL:  Beg the Court's indulgence, Your Honor.

9            No further questions.  Thank you for coming in.

10           THE COURT:  Cross-examination.

11                        CROSS-EXAMINATION

12  BY MS. LIMEHOUSE:

13      Q.   Mr. Peters, we met before, haven't we?

14      A.   We have.

15      Q.   Good to see you again.

16      A.   You, too.

17      Q.   I would like to start with Mr. Daniel's questions

18  about the overdraft.  He asked you whether Mr. Murdaugh made

19  good on his overdraft.  And you said, generally, he would

20  make good on it?

21      A.   Yes, correct.

22      Q.   Were you aware that Mr. Laffitte was loaning him

23  money out of a child's account to cover that overdraft?

24      A.   I was not.

25      Q.   When we talk about the overdraft specifically,

1    who -- you talked about the nonsufficient funds report.

2    Russell Laffitte would get those reports daily; is that

3    right?

4         A.   He had access to them, yes.

5         Q.   How about Charlie Laffitte, would he get those

6    reports as well?

7         A.   Yes.

8         Q.   In the summer of 2021 and in the fall of 2021,

9    Russell Laffitte and his father Charlie were getting reports

10   about Alex Murdaugh's overdraft; is that right?

11        A.   Yes.

12        Q.   And you were also getting the reports of the

13   overdraft; is that right?

14        A.   Yes.

15        Q.   And you brought these to the attention of Russell

16   and Charlie; is that right?

17        A.   I did not bring them to their attention, because I

18   knew they were -- or I felt positive they were aware of them,

19   but I did mention it at some point in time to both of them.

20        Q.   When you mentioned it, what did you tell them?

21        A.   I just --

22             MR. DANIEL:  Can you go to the microphone?

23             MS. LIMEHOUSE:  Sure.

24   BY MS. LIMEHOUSE:

25        Q.   When you mentioned the overdraft, what did you tell

1    them?

2        A.    I just made sure, I was, like, you do know Alex is

3    getting way on up there; and they did.

4        Q.    And when you say "way on up there," how high was he

5    getting?

6        A.    One time I specifically remember is when I went to

7    Charlie Laffitte and I said, Alex -- just making sure you are

8    aware that Alex is at six figures.

9        Q.    And what was Charlie's response?

10        A.    He said he knew.

11        Q.    Why did you go to them?

12        A.    Just -- again, just to make sure -- I mean, I was

13    positive they knew, but just to be 100 percent positive that

14    they were aware that it had got that high.

15        Q.    Had you ever seen a customer get that high in

16    overdraft before?

17        A.    In all my years, probably.  I don't specifically

18    remember it, but it was certainly not normal.

19        Q.    Was it normal for Alex Murdaugh's overdraft to be

20    substantial?

21        A.    Substantial, yes; not that substantial, I don't

22    think.

23            MS. LIMEHOUSE:  If we could bring up Government's

24    Exhibit 10I, please.

25    BY MS. LIMEHOUSE:

1    Q.    So, Mr. Peters, you are the compliance officer, you

2    testified; is that right?

3    A.    That's correct.

4    Q.    So you are not on the Board, right?

5    A.    Correct.

6    Q.    And you are not a shareholder either, right?

7    A.    Also correct.

8    Q.    You are not a loan officer either; is that correct?

9    A.    Also correct.

10    Q.    So you are never involved in the approval process of

11    loans; is that right?

12    A.    I am not.

13    Q.    Mr. Daniel asked you about a $350,000 wire transfer

14    on July the 15th.  Is this your signature on the bottom of

15    that wire?

16    A.    It is.

17    Q.    And who made the request for you to send that

18    $350,000 wire transfer?

19    A.    According to this, Russell Laffitte.

20    Q.    What did Russell Laffitte, if you recall, tell you

21    about this wire transfer?

22    A.    I don't recall anything being said.

23    Q.    And do you recall any mention of a $750,000 loan?

24    A.    Again, I knew it was happening, but I don't think we

25    ever really talked about it.

1    Q.    So were you aware that this $350,000 wire transfer

2    was for a loan when you made it?

3    A.    I feel like I did.  This was well over a year ago.

4    And I signed a lot of things, but I feel sure that I probably

5    knew that, yes.

6    Q.    And you signed that at Russell's direction?

7    A.    Not specifically.  I was just the approving officer.

8    It needed a second officer's signature -- or an officer's

9    signature on it.

10    Q.    But it would have been Russell who was involved in

11    having you sign that wire request; is that right?

12    A.    Yes.

13    Q.    You talked about Suspicious Activity Reports, SARs,

14    and you testified that you never filed SARs related to Mr.

15    Murdaugh's loans.  You did, in fact, file SARs in the fall of

16    2021; is that right?

17    A.    I'm a little uncomfortable answering that because of

18    the strict confidentiality of a lot of things.

19    Q.    I understand, Mr. Peters.

20         THE COURT:  You are authorized to answer the

21    question.

22         THE WITNESS:  Okay.  Yes.

23    BY MS. LIMEHOUSE:

24    Q.    So you filed a SAR related to a $750,000 beach house

25    loan; is that right?

1   A.   Yes.

2   Q.   And that's because the facts that y'all learned in

3   2021 indicated that those were, in fact, suspicious activity

4   surrounding that loan?

5   A.   Suspicious, yes.

6   Q.   And you also filed a SAR related to a $680,000

7   payment that Mr. Laffitte made; is that right?

8   A.   Yes.

9   Q.   And you filed that SAR in 2021, because when you

10  learned the facts surrounding that payment, they were, in

11  fact, suspicious; is that right?

12  A.   Yes.

13  Q.   You also filed a SAR related to a $25,000

14  transaction involving Natasha Thomas's settlement proceeds;

15  is that right?

16  A.   Yes.  And I filed a lot --

17  Q.   You filed a lot of SARs, actually, related to

18  Russell Laffitte and Alex Murdaugh's conduct; is that right?

19  A.   Several.

20       MS. LIMEHOUSE:  If we could pull up Government's

21  Exhibit 198, slide 10, please, as well.

22  BY MS. LIMEHOUSE:

23  Q.   This is a charge that the jury has seen that breaks

24  down how that $25,000 check was negotiated.  And it indicates

25  that -- I'm sorry, wrong slide.

1      A.   Yeah.  I've got a different slide.

2      Q.   Okay.  Here it is.  My apologies.  So this indicates

3  on August the 29th, $25,245.08 settlement check was presented

4  at the bank, and there was a $16,245.08 money order, and a

5  cashout for $9,000 by Alex Murdaugh.  Do you recall that

6  reporting in your Suspicious Activity Report?

7      A.   Generally, yes.  The specifics, without actually

8  seeing the checks, I would have to be sure.

9      Q.   And then August the 30th, that $16,245.08 was broken

10 up into a money order for $7,245.08, and then cashout $9,000

11 for Alex Murdaugh, does that sound familiar based on your

12 review of those documents?

13     A.   Yes, it does.

14     Q.   And indicates that $9,000 was cashed out on the

15 30th.  And then on September 4th, that money order for

16 $7,245.08 was negotiated; does that sound right?

17     A.   It does.

18     Q.   Explain to the jury what this is called in banking

19 terms.

20     A.   It would appear to be structuring.

21     Q.   Explain what structuring is.

22     A.   Where, generally, someone comes in and structures a

23 transaction so that it stays under $10,000.

24     Q.   That's to prevent reporting requirements; is that

25 right?

1    A.    $10,000 and a penny requires a currency transaction

2    report.

3    Q.    And you know that as an employee of the Palmetto

4    State Bank?  You know what structuring is; is that right?

5    A.    Yes.

6    Q.    And Russell Laffitte knows what structuring is as

7    the former CEO of Palmetto State Bank; is that right?

8    A.    Yes.

9    Q.    So you filed a SAR on these transactions because

10   they were an attempt to structure payments to prevent

11   reporting requirements?

12   A.    Appeared to be, yes.

13   Q.    You also filed SARs related to some checks

14   negotiated from Hakeem Pinckney and Natasha Thomas's

15   settlement funds; is that right?

16   A.    Yes.

17         MS. LIMEHOUSE:  If we could pull up Government's

18   Exhibit -- let's start with Government's Exhibit 36, please,

19   Ms. Welsh.

20   BY MS. LIMEHOUSE:

21   Q.    This is a chart that outlines money orders that were

22   issued on December 21st from two checks, Natasha Thomas and

23   Hakeem Pinckney.  Do you recall those checks and money orders

24   that you wrote SARs on?

25   A.    I do.

1    MS. LIMEHOUSE: If we could pull up Government's

2 Exhibit 35, please. And if you could go to the second page.

3 Oh, excuse me. I will tell you what page to go to. Let's

4 actually start with Government's Exhibit 30.

5 BY MS. LIMEHOUSE:

6    Q.   Okay. These are the Badger checks. You also filed

7 a Suspicious Activity Report related to transactions from

8 funds belonging to Arthur Badger. Do you recall that?

9    A.   Yes, ma'am.

10    Q.   So there were a series of checks that were issued

11 totaling about 1.1 and some change that were negotiated at

12 the Palmetto State Bank; is that right?

13    A.   Correct.

14    MS. LIMEHOUSE: If we could pull up Government's

15 Exhibit 29, please. If you can make those larger.

16 BY MS. LIMEHOUSE:

17    Q.   So first, Mr. Peters, I would like to direct you to

18 the check on the bottom, February 8th, 2013, $388,687.50 to

19 the Palmetto State Bank from the law firm's client trust

20 account, memo line Arthur Badger. As the compliance officer,

21 a man with 30 years of experience in banking, what stands out

22 to you about that check?

23    A.   Just on its face, not necessarily anything, just to

24 look at the check.

25    Q.   So how about Palmetto State Bank?

1   A.   Okay.  So it's payable to the bank.

2   Q.   Okay.  And so do you negotiate checks that are

3   payable to Palmetto State Bank?

4   A.   Generally, we do not.  Normally, that would be for a

5   payment of some kind if it's payable to the bank.

6   Q.   So if a customer shows up to Palmetto State Bank and

7   hands you a check that's written to Palmetto State Bank on

8   the payee line, what do you do?

9   A.   If it's for a larger amount of money, we would try

10  to get them to write it to -- more specifically to where it's

11  supposed to go.

12  Q.   So on its face, that check is improperly written.

13  And you know that as the compliance officer at Palmetto State

14  Bank; isn't that right?

15  A.   On its face, it's not improperly written.  From what

16  happened to it, it's not properly written --

17  Q.   Because of the way it was negotiated is what you

18  mean?

19  A.   Right.

20  Q.   Because a check can be written to Palmetto State

21  Bank if Palmetto State Bank is, in fact, the payee?

22  A.   If you are writing it to Palmetto State Bank, it's

23  really Palmetto State Bank's money at that point in time.

24  Q.   So if $388,687.50 is owed to Palmetto State Bank,

25  then you can negotiate the check in that way; is that right?

1    A.    Certainly.

2    Q.    But if that check actually belongs to the customer,

3    and they are trying to get you to negotiate the funds for

4    their benefit, that's improperly written; isn't that right?

5    A.    Correct.

6    Q.    Okay.  And so if Alex Murdaugh showed up to you with

7    a check for $388,687.50 drafted to the Palmetto State Bank

8    and said, can you issue a bunch of money orders to my wife

9    and my father and my law partner, what would you have done?

10   A.    I would like to believe that I would not have done

11   it.

12   Q.    And why not?

13   A.    Because it's written to the bank.

14   Q.    So you know that's not how these checks should be

15   negotiated; is that right?

16   A.    Correct.

17   Q.    Anything else on the face of this check that stands

18   out to you?

19   A.    There isn't a memo line, in the memo line.

20   Q.    So you testified on direct that typically the memo

21   line is for the customer, the person who's writing the check,

22   right?

23   A.    Right.

24   Q.    But it's something you pay close attention to when

25   you are negotiating checks; is that right?

1    A.    It should be looked at, yes, as part of the whole --

2    Q.    Why is that?

3    A.    In this case -- well, in this case, I would think

4    that it had something to do with whoever Arthur Badger was.

5    Q.    So when you are negotiating checks as a bank

6    employee, it's something you look to to determine how that

7    check should be used; is that right?

8    A.    Not necessarily how it's supposed to be used, but --

9    Q.    Where it's coming from?

10    A.    Yeah.

11    Q.    Okay.  So it's something you should look at and you

12    consider as important when you negotiate a check?

13    A.    Yes.  Again, it's part of several things you should

14    look at in a check just to see -- just to see that it's

15    there.  I mean, but mostly it is for the people writing the

16    check for whatever that's to remind them of or that kind of

17    thing.

18    Q.    But it's something you would have noticed if this

19    check had been presented to you and asked to be negotiated in

20    the way that we know it was; is that right?

21    A.    I believe so, yes.

22    Q.    Okay.  If we could go -- do you recognize these

23    initials, Mr. Peters?

24    A.    That one, I believe, would be Russell's initials.

25    Q.    And you testified that, had this check been

1  presented to you, and had you been asked to negotiate in this

2  way, you wouldn't have done that.  What about any regular

3  teller at the bank, would they have noticed the same things

4  that you just noticed?

5       A.   I would hope so.

6       Q.   And they wouldn't --

7            MR. DANIEL:   I'm going to object.  She's asking

8  hypothetical.

9            THE COURT:   I think he can say from his knowledge.

10  It's your witness.  This is cross-examination.  Overruled.

11  BY MS. LIMEHOUSE:

12       Q.   Any bank teller at Palmetto State Bank would have

13  known not to negotiate a check in this manner; is that right?

14       A.   Yes.

15            MS. LIMEHOUSE:   Let's go to page two, please.  Blow

16  that up, please.

17  BY MS. LIMEHOUSE:

18       Q.   All right.  This is a similar check.  Does this look

19  familiar to you, Mr. Peters?

20       A.   Yes.

21       Q.   So it's another check from February 8th, 2013, in

22  the value of $151,726.05, payee, Palmetto State Bank, law

23  firm's client trust account, again, memo line, Arthur Badger.

24  You now know, based on your investigation, that this money

25  was turned around and used to pay off Hannah Plyler, a

1　child's money that Russell Laffitte extended to loans for

2　Alex Murdaugh?  You know that now, right?

3　　　A.　If you show me that, I know -- I know that some of

4　these checks were, yes.

5　　　　　MS. LIMEHOUSE:  Next page, please.

6　　　A.　Yes.

7　　　Q.　Does that handwriting look familiar to you?

8　　　A.　I believe that is Russell's handwriting.

9　　　Q.　So we now know that that check was turned around and

10　negotiated and put into Hannah Plyler's conservator account

11　to pay back loans that Russell Laffitte had extended from her

12　account; is that right?

13　　　A.　Now we know that, yes.

14　　　　　MS. LIMEHOUSE:  If you could go back to page two,

15　please.

16　BY MS. LIMEHOUSE:

17　　　Q.　And so if Alex Murdaugh had come to Palmetto State

18　Bank and presented you with a check to Palmetto State Bank to

19　negotiate and pay off loans to a child, what would you have

20　done?

21　　　A.　I would have asked him to write the check

22　differently.

23　　　Q.　Because if it was his money, it would have been

24　drafted to Alex Murdaugh; isn't that right?

25　　　A.　Yes.

1    Q.   And if he was entitled to use those funds in the way

2   that they were used, that check would have been written to

3   Alex Murdaugh; is that right?

4    A.   Yes.

5    Q.   If we can go to page 4, please.  I am not going to

6   make you do this with all the checks, for the benefit of the

7   jury, but I do want you to do a few more.

8         Same thing, February 8th, 2013, Palmetto State Bank,

9   client trust account, $75,000, Arthur Badger, turned around

10  to Randolph Murdaugh for $75,000.  If Alex Murdaugh had come

11  to the bank and presented you with a $75,000 check to

12  Palmetto State Bank and asked you to turn it around to his

13  dad, what would you have done?

14   A.   I wouldn't have done it.

15   Q.   And that's because you know, in your experience

16  working at the bank, that that is not how a check should be

17  drafted if it belongs to that person?

18   A.   Yes.

19   Q.   And when you learned this, you wrote a Suspicious

20  Activity Report on it because you didn't know this at the

21  time this check was negotiated, right?

22   A.   Correct.

23   Q.   So when you learned the facts surrounding how these

24  checks were negotiated, you reported it, didn't you?

25   A.   I did.

1    MS. LIMEHOUSE:  If we could pull up Government's

2  Exhibit 36 -- excuse me, 30, please.

3  BY MS. LIMEHOUSE:

4    Q.   So this is a summary of all the checks that Mr.

5  Laffitte negotiated on behalf of Alex Murdaugh.  And they

6  were all written out to the Palmetto State Bank; is that

7  right?

8    A.   Yes, ma'am.

9    Q.   And they were all used for Alex Murdaugh and Russell

10  Laffitte's own purposes; is that right?

11    A.   Yes.

12    Q.   And you wouldn't have negotiated a single one of

13  those checks for Alex Murdaugh, would you?

14    A.   No, ma'am.

15    Q.   And that's because you know that that's not how

16  funds written to Palmetto State Bank should be used?

17    A.   Correct.

18    Q.   If we could go to Government's Exhibit 36, please.

19  So this is what we mentioned earlier, Natasha Thomas,

20  $325,000; Pinckney/Thomas, $309,000.  Are you familiar with

21  these transactions based on the review of this chart?

22    A.   Yes, ma'am.

23    Q.   And are you familiar with the fact that the Natasha

24  Thomas $325,000 check and the Hakeem Pinckney $309,581.46

25  check was also written to the Palmetto State Bank?

1    A.    Yes, ma'am.

2    Q.    And are you familiar with the fact that those checks

3    also referenced Hakeem Pinckney and Natasha Thomas and their

4    settlement proceeds in the memo lines of those checks?

5    A.    Yes, ma'am.

6    Q.    And you know that those checks were used to give

7    Alex Murdaugh cash; is that right?

8    A.    Yes, to give him cash to make loan payments for

9    various things, yes.

10   Q.    And that hundreds of thousands of these dollars were

11   negotiated by Russell Laffitte to pay off the loans that he

12   had extended to Hannah Plyler from her conservatorship

13   account?

14   A.    Now, that I would not have personal knowledge of.

15   Q.    Does reviewing these checks, when you made the SAR

16   report, did you review that that's how some of these funds

17   were used?

18   A.    I believe I did, yes.

19   Q.    So in 2011, when you didn't write a Suspicious

20   Activity Report, you didn't know that these checks had been

21   presented to Russell Laffitte in this way and that he had

22   used them in the way that they were used, did you?

23   A.    No, ma'am, I did not.

24   Q.    But once you learned that, you filed a Suspicious

25   Activity Report; is that right?

1    A.   That is correct.

2         MS. LIMEHOUSE:  No further questions, Your Honor.

3         THE COURT:  Redirect.

4         MR. DANIEL:  Just briefly, Your Honor.

5                     REDIRECT EXAMINATION

6    BY MR. DANIEL:

7    Q.   Mr. Peters, do you recall having a conversation with

8    Mr. Russell Laffitte after the Harris investigators came in

9    the bank --

10        MS. LIMEHOUSE:  Objection, Your Honor.  Conversation

11   with -- it's hearsay.

12        MR. DANIEL:  All I want to ask him is what he said.

13        THE COURT:  He can testify -- Mr. Peters can testify

14   what he said.

15   A.   So, can you ask me that again?

16   BY MR. DANIEL:

17   Q.   Do you remember having a conversation with Mr.

18   Laffitte after the GHIG group, which is Greg Harris

19   Investigative Accountants, came in the bank and Greg Harris

20   was investigating what happened?

21   A.   I do not remember a specific conversation, no.

22   Q.   And now, the SARs that Ms. Limehouse discussed with

23   you, those were all filed after the Harris people came in?

24   A.   That is correct.

25   Q.   And Ms. Limehouse was talking about all the things

1    we know today.  And we know a whole lot more information

2    today and Mr. Murdaugh's conduct than we did back in the day?

3         A.   Very true, yes.

4         Q.   And even those checks that were on her Exhibit No.

5    36, while they were written on the 21st, they were --

6              MS. LIMEHOUSE:  Objection, Your Honor.  He's leading

7    the witness.

8              MR. DANIEL:  I can bring the exhibits.

9              THE COURT:  Ask.  Don't lead your own witness.

10   Sustained.

11             MR. DANIEL:  Please call up Government's Exhibit 36.

12   BY MR. DANIEL:

13        Q.   Okay.  And note the dates of the checks were

14   written; December 21st?

15        A.   Correct.

16        Q.   And note -- if you will just note the date the

17   checks were deposited.  Were they all deposited on the 21st?

18        A.   No.  It looks like a range of the 21st of '11 to the

19   29th.

20             MR. DANIEL:  No further questions.

21             THE COURT:  Thank you.  You may step down.  Thank

22   you, sir.

23             Call your next witness.

24             MR. AUSTIN:  The defense calls Chastity Malphrus.

25             THE COURT DEPUTY:  State your full name.

1    THE WITNESS:  Chastity Malphrus.

2                  CHASTITY MALPHRUS,

3    having been duly sworn, testifies as follows:

4                 DIRECT EXAMINATION

5    BY MR. AUSTIN:

6

7         Good morning, Ms. Malphrus.  I think you can take

8    your mask off.

9         A.   Okay.  Thank you.

10        Q.   More comfortable.  Where do you work?

11        A.   I work at Palmetto State Bank.

12        Q.   And is that where you got to know Russell Laffitte?

13        A.   Yes.

14        Q.   And how long have you worked there?

15        A.   I have worked there nine years next month.

16        Q.   And how did you end up working at Palmetto State

17   Bank?

18        A.   My family actually moved to Hampton.  And I was

19   working at another bank in Walterboro, and just wanted to get

20   closer to home.  And I met Russell through a mutual friend.

21        Q.   Got you.  And what bank was that in Walterboro?

22        A.   It's now SouthState Bank, but it was South Carolina

23   Bank & Trust at the time.

24        Q.   Okay.  And is that a bank comparable in size to PSB?

25        A.   No, it's larger.

1    Q.    And is that the only other bank you've worked for?

2    A.    Yes.

3    Q.    And what did you do when you first joined Palmetto

4    State?

5    A.    I joined -- my title was loan assistant.  And so,

6    basically, I processed loan paperwork for all of the loan

7    officers in the Hampton branch.

8    Q.    Okay.  And what do you do now?

9    A.    I'm a mortgage loan processor.  So I process real

10   estate loans for all of the branches of Palmetto State Bank.

11   Q.    Okay.  And are you based in the Hampton office?

12   A.    Yes.

13   Q.    Okay.  So you work with all of them, but you stay

14   there, or do you travel around?

15   A.    No, I stay in Hampton.

16   Q.    And have you worked with Russell that whole time?

17   A.    Yes.

18   Q.    And what was Russell's role when you first started?

19   A.    I believe he was a vice president or executive vice

20   president.  I don't remember exactly his title.

21   Q.    Okay.  So it's about nine years ago.  He's, what,

22   early 40s at the time?

23   A.    Yes, I believe so.

24   Q.    So you really -- from that point on, you've been

25   working with him as he's moved up through the ranks, so to

1    speak?

2        A.    Yes.

3        Q.    And who was the CEO when you first started?

4        A.    Mr. Charlie, Russell's father.

5        Q.    And what year did he step down as CEO?

6        A.    I don't remember.

7        Q.    Is it around 2017, 2018?  Does that sound right?

8        A.    That sounds about right, yeah.

9        Q.    And do you know Russell outside of work?

10       A.    Yes.  Our youngest children are in the same class at

11   school.  They are the same age and they are friends.

12       Q.    Okay.  And when you started in 2013, had the bank

13   merged with another bank around that time?

14       A.    About four or five months after I came to work

15   there, yes, Allendale County Bank was acquired by Palmetto

16   State Bank.

17       Q.    Acquired.  I shouldn't have said "merged."  And do

18   you remember what Russell's role was with regard to Allendale

19   County Bank around that time?

20       A.    It was to examine the loans that were done by

21   Allendale County Bank, to make sure they were legitimate.

22   And if he found that they were not, he reported them back to,

23   I'm assuming, the FDIC.

24       Q.    And was that part of, like, a period where you

25   could -- or, I guess, Palmetto State Bank could report any

1    fraud they found from Allendale County Bank?

2        A.    There was a certain time frame.  I don't remember

3    what it was, but there was a certain time frame.  I believe

4    it was a year.

5        Q.    Okay.  And so during that time, he was in touch with

6    the FDIC on top of just the normal FDIC exams and State

7    Banking Board exams that would routinely occur?

8        A.    Yes.

9        Q.    And do you have any involvement with any of the FDIC

10   exams when they -- when the examiners come through?

11       A.    No, very rarely.  I mean, I may get a question asked

12   about the real estate loan process occasionally, but very

13   rarely do I interact with them.

14       Q.    Okay.  Have you ever had an FDIC examiner ask you

15   how loan proceeds were used?

16       A.    No, not that I can recall.

17       Q.    All right.  And so just sort of backing up a step.

18   Palmetto State is a community bank; is that right?

19       A.    That's right.

20       Q.    How would you describe community banking for

21   somebody that doesn't know anything about banking?

22       A.    Community banking just means that you pretty much

23   know everybody that comes in the door, you know their

24   families.  And it's just -- you just don't really -- it's

25   much different than a larger bank.  And, you know, you are

1 able to assist the customers.  You are able to, I guess, make

2 a few more exceptions.  I don't know if that's the right

3 word, but you are able to do a little more for them than you

4 could in a larger bank.

5      Q.   You are still trying to do your job at the bank and

6 make money for the bank, though?

7      A.   Right.

8      Q.   Does Palmetto State make exceptions for people from

9 all walks of life?

10      A.   Yes.

11      Q.   And so you said you worked at a bigger bank before.

12 How do you compare the risk analysis that goes into loans at

13 Palmetto State versus a bigger bank?

14      A.   Well, there's departments in a bigger bank.  And so

15 the decisions aren't made, you know, in the local offices,

16 normally.  You know, a loan officer might talk to a customer

17 and find out their request, but they are going to have to

18 send it to this department to find out what their cash flow

19 is.  And they will have to send it to this department to have

20 it underwritten.  And then it will have to go through one or

21 two, maybe even three other people for approval.  Whereas, in

22 Palmetto State Bank, you know, the approval process is right

23 around the corner, basically.

24      Q.   So it's more relationship-driven at the community

25 bank level?

1    A.    Yes, it is.  I mean, the cash flow and the

2  collateral and all of those things still come into play.  But

3  the number one thing you examine is, who is this person.

4    Q.    And because it's in such a small town or small

5  community, you are relying on just people at the bank knowing

6  their customers out in the community; is that right?

7    A.    That's correct.

8    Q.    And can you take me through the loan process as you

9  understand it at Palmetto State, just from, you know, first

10  steps, somebody comes in, they want to get a loan, to

11  disbursing money?

12    A.    Well, different types of loans go through different

13  processes.

14    Q.    You do residential real estate?

15    A.    I do, but I've done all types of loans.  So,

16  initially, a customer will come in.  They will speak to a

17  loan officer.  And the loan officer will gather the

18  information of their request.  And then it comes to me or any

19  other processor.  And we gather the information that's needed

20  to make the loan.  And then we will do the paperwork.  And

21  the loan officer gets it signed.  And then it goes to another

22  department to be put on our computer system.

23    Q.    Okay.  So it sounds like the underwriting process, a

24  lot of it can happen before information goes into the

25  computer; is that accurate?

1    A.    Yes.

2    Q.    And are you familiar with Credit Leader?

3    A.    Yes.

4    Q.    How does Credit Leader work?

5    A.    So Credit Leader is an underwriting tool.  You

6    basically plug in the information of the customer, the

7    details of the loan, the details of any collateral, if there

8    is any.  And then you approve it.  And based on your

9    authority, you approve it, or you can send it to somebody

10   else to approve it if it's above your authority.

11   Q.    Okay.  And are there ever situations where somebody

12   might put -- might issue a loan or release the money, and

13   then go back into Credit Leader after they've already

14   completed the underwriting process?

15   A.    Yes.

16   Q.    Is that something that is strictly prohibited?

17   A.    I don't say it's prohibited.  I mean, if you know

18   you are going to make the loan, if you know they qualify for

19   the loan before you do Credit Leader -- like, for example,

20   for me, I have certain parameters I have to stay in.  And if

21   I know that customer meets those parameters and that loan

22   meets those parameters, I will go ahead and make the loan and

23   then do the Credit Leader, just for timing for the customer.

24   Q.    And so what kind of situations arise where timing

25   would be critical?

1    A.   I mean, it's a community bank, so you don't -- it's

2    not like us to -- if someone comes in for a simple loan, say

3    a $2,500 loan, we don't want to say, well, you know, let me

4    call you and you come back later.  A lot of our customers are

5    low income and they are getting rides to the bank.  And, you

6    know, you want to be able to service them while they are

7    there, if you can.

8    Q.   And it's an important point about community banks.

9    A lot of the bigger banks, at least in my experience, will be

10   somewhat not that busy at certain times of the day.  Is

11   Palmetto State Bank busy pretty routinely?

12   A.   Yes.

13   Q.   Can you describe that?

14   A.   I don't -- there's always somebody in the lobby, at

15   the tellers.  And the CSRs are also in our office.  The

16   customer service representatives are all in the lobby.  They

17   almost always have someone in them.  But, yes, the Hampton

18   branch is always business.

19   Q.   That's the most profitable branch in all of Palmetto

20   State Bank?

21   A.   Yes, yes.

22   Q.   And do you know who the top loan officer typically

23   was at Palmetto State Bank?

24   A.   I think Russell.

25   Q.   Okay.  So where is Russell's office located in

1    Palmetto State?

2        A.    It is in the very front.  It's in the lobby.

3        Q.    What does that mean, just from a practical

4    standpoint on a daily basis with the amount of people coming

5    in and out at Palmetto State?

6        A.    He saw a lot of people every day.  Just, you know,

7    people stopping in to say, hey, or people stopping in to

8    complain.  But he was definitely in the center of the circus,

9    I guess you could say.

10       Q.    As CEO, he could probably move if he wanted to,

11   right?

12       A.    Sure.

13       Q.    And how would you describe Russell, just on a daily

14   basis, interacting with employees and with customers?

15       A.    Russell was generally happy.  He was very patient.

16   I would always laugh, because my office, when I worked in the

17   main building, was almost at the back door.  And he would

18   walk from the other end of the building, through the lobby,

19   down the hall to go out the back door to go to lunch.  And

20   almost every person would stop him along the way to ask him a

21   question.  And he would just stop and he would turn and he

22   would answer the question, and then go on out.

23       Q.    So customer service was important to him?

24       A.    Sure.  And this was employees, I mean, employees

25   stopping asking questions.

1    Q.   Would that extend to customers too?

2    A.   Oh, yes, definitely.

3    Q.   And so you said that Charlie was CEO when you

4    started; is that right?

5    A.   Yes.

6    Q.   And now he's just Chairman?

7    A.   I'm not sure what his title is now.

8    Q.   But how does he compare to Russell in terms of the

9    customer service aspect?

10   A.   Oh, they are very much the same.  I mean, he's

11   definitely pulled back some.  He's not as involved in, you

12   know, daily customer service as Russell was before he left,

13   but they are very much the same.

14   Q.   I mean, is that approach to customer service an

15   important part of the management at Palmetto State Bank?

16   A.   Yes.

17   Q.   And so when you said that Russell was the

18   highest-producing loan officer, are those loans that consist

19   of, like, big businesses, or are they smaller types of loans?

20   And I'm generalizing --

21   A.   So you say "business businesses," there's not really

22   any big businesses in Hampton other than the Government, I

23   guess, Hampton County Government.  There were all types of

24   loans, equipment loans, real estate loans.  He served a lot

25   of people.

1  Q. And so is that a high-volume type of, I guess, loan

2  processing that he's engaged in; is that right?

3  A. Yes.

4  Q. Just dealing with a lot of different people from all

5  walks of life?

6  A. Right.

7  Q. And when you are talking about how busy Palmetto

8  State gets sometimes, how many drive-through lanes are there?

9  A. I'm not sure.

10  Q. Are there multiple?

11  A. Yes.

12  Q. And does it get backed up a good bit?

13  A. Yes.

14  Q. Do cars ever break down there?

15  A. I don't think I've seen that.

16  Q. No? Okay. And so going back to the loans, is it

17  unusual to give an unsecured loan?

18  A. No.

19  Q. It's not unusual for Palmetto State, or it's not

20  unusual just for banks in your experience in general?

21  A. That's not unusual for banks.

22  Q. Would you say unsecured loans are made every day?

23  A. Sure.

24  Q. All right. And how do you decide who to give an

25  unsecured loan to and who not to?

1    A.   Well, our first thing that we look at is credit.

2    So, of course, you would want to have someone with a higher

3    credit score and a better credit history to grant an

4    unsecured loan.  And then the second thing you are going to

5    look at is their source of repayment.  You know, you are

6    going to want to make sure that they have, whether it's

7    employment income or Social Security, or whatever their

8    income is to pay it back.

9    Q.   And why is that important?

10   A.   Because they have to pay it back.

11   Q.   They can't make money if people don't pay it back?

12   A.   Right.

13   Q.   And did you get to know Alex Murdaugh during your

14   time at Palmetto State Bank?

15   A.   I saw him occasionally in the bank and spoke to him

16   maybe when he was in Russell's office.  I know that once or

17   twice, I carried paperwork to his office to have him sign,

18   because it's not very far from the bank.  But I didn't know

19   him well.

20   Q.   How far from the bank was his office?

21   A.   It's right across, like not even half mile probably.

22   Q.   And, again, it's a really small town, right?

23   A.   Yes.

24   Q.   Is the courthouse right around there too?

25   A.   Yes.   The courthouse is actually between the bank

1  and their office.

2  Q.  All right.  How would you describe Alex to somebody?

3  I'm sure you've been asked a lot in the past year, before, I

4  guess, all of this?

5  A.  Before all of this, it's really hard to get in that,

6  you know, frame of mind.  Friendly, charismatic, outgoing.

7  If he did come into the bank, he was speaking to every

8  employee and every customer.  I saw him outside of the bank,

9  you know, maybe at a restaurant.  And he would speak to

10  everybody in the restaurant as if he knew everyone.

11  Q.  Kind of larger than life?

12  A.  Yes, definitely.

13  Q.  Loud?

14  A.  Yes, definitely.

15  Q.  And so after his wife and son were murdered, do you

16  recall seeing Alex around the bank that summer, like around

17  July?

18  A.  I do not, but I'm also in a separate building.  So I

19  don't work in the main branch.

20  Q.  So there's the main branch.  Then there's another

21  building connected to it?

22  A.  No.  It's behind it.  It's across the street from

23  it.  We call it the annex building.

24  Q.  The annex, and who works in the annex?

25  A.  Myself and two other mortgage loan processers, and

1 Gray Henderson, and then Usher Laffitte also works two or

2 three days a week in our building.

3     Q.   I think that's a Laffitte name I haven't heard yet.

4 What does Usher Laffitte do?

5     A.   It's a credit analyst.

6     Q.   And Gray Henderson, that's Russell's sister?

7     A.   That's right.

8     Q.   What does she do again?

9     A.   She's a loan officer.

10     Q.   And so you guys work pretty closely too?

11     A.   Uh-huh, yes.

12     Q.   Do you recall helping Russell with a loan in the

13 summer of 2021 for $750,000 to Alex?

14     A.   I did not help with the loan that was made, because

15 it was done unsecured and I don't generally do those.  But I

16 had started, at Russell's request, working on a real estate

17 loan for $750,000 that was going to be secured by a second

18 mortgage on the beach house.  And so in my process, I ordered

19 title work from an attorney, which is where the attorney

20 searches the title.  You know all that.  And that attorney

21 came back to me and said, you know, this can't go through

22 right now because the property is in Alex and Maggie's name.

23 This was after Maggie had passed.  And, you know, we had to

24 wait and see what the will and the estate or the probate

25 would say about that.

1    Q.   Okay.  And when did that -- when did your

2    involvement in that, I guess, start?  You said you started

3    with the -- I'm sorry.  I guess around what time frame did

4    you get involved with that loan?

5    A.   It was -- I'm not sure exactly when it was, but I

6    know it was after she passed away.

7    Q.   Okay.  And were there any concerns or red flags

8    raised at the bank about how Alex was acting around that

9    time?

10   A.   Not that I can recall.

11   Q.   And y'all kind of stayed away from him, for the most

12   part?

13   A.   Right.

14   Q.   Did his demeanor change?

15   A.   You are talking about Alex?

16   Q.   Uh-huh.

17   A.   I'm not sure.

18   Q.   Because you are in the annex, you are not dealing

19   with him directly so much?

20   A.   Right.

21   Q.   So you mentioned that that loan that eventually was

22   made was unsecured.

23   A.   Uh-huh.

24   Q.   What do you make of that?

25   A.   I mean, I think it was made because it was made

1  short-term, single payment, because, eventually, the $750,000

2  real estate loan would go through to pay that off.

3  Q.  Okay.  Can you break that down a little bit?  I do

4  not -- I've learned a lot about banking in this case, but --

5  A.  Right.  Right.  So if you -- let's say you come in

6  and you want a $5,000 loan, a single-payment loan so you

7  don't make any payments on it, it just comes due in, say, a

8  year.  Of course, we are going to say, well, how are you

9  going to pay that back.  And you are going to say, well, I

10  get a bonus from work or, you know, I'm selling a piece of

11  property, or whatever the reason is that you want a

12  single-payment loan, and we document that.  And then, you

13  know, you are able to pay it back at that time.

14  So in my mind, when the $750,000 unsecured loan was

15  made, it was just to hold over until the real estate loan

16  could be made.

17  Q.  Okay.  And when somebody at Palmetto State Bank

18  would look at Alex on paper or just consider his loan

19  application, they will look at his salary and his yearly

20  income?

21  A.  Sure.

22  Q.  And people were familiar with his earning, I guess,

23  or how much he earned on a yearly basis?

24  A.  Sure.

25  Q.  And he was banking there all the time, so they were

1    very familiar with him?

2        A.    Right.

3        Q.    Do you know how much money he was making per year?

4        A.    I do not.

5        Q.    So it sounds like it wasn't a secret that this loan

6    was being put together at all; is that right?

7        A.    Right.

8        Q.    Okay.  And in your experience, did Alex generally

9    pay back his loans?

10       A.    Yes.

11       Q.    And he got a lot of loans; is that right?

12       A.    He did.

13       Q.    And do you know if Russell ever had a hard time

14   getting him to pay back his loans?

15       A.    I mean, he would get slow.  And I don't think it was

16   that he didn't have the money.  I think it was just that he

17   didn't remember to pay.  And, you know, Russell would contact

18   him and say, hey, I need some payments from you.

19       Q.    So did it seem like Russell didn't care about

20   getting paid back by him?

21       A.    No.

22       Q.    Do you think Charlie would have --

23       A.    We always want to get paid back.

24       Q.    Do you think Charlie would let him just let it go?

25       A.    No.

1     Q.   So, basically, always he came through?

2     A.   Yes.

3     Q.   And tell me about when Russell was fired last year.

4  How did that go over inside the bank?

5     A.   In our branch?  Because we all worked with him

6  daily, the only word I can think of is devastating.  I mean,

7  all of the employees were very emotional, confused, because

8  Russell had not been charged with anything at that time.  I

9  personally felt, you know, it was a little premature.  And it

10  was a really rough time.  It's still a rough time.

11     Q.   Are you talking for yourself or for everybody there?

12     A.   For everybody.

13     Q.   Why is that?

14     A.   We are just so close.  I mean, the community bank

15  also involves people from the community working there.  So,

16  you know each other's family, you see all kinds of life

17  experiences with each other, just as in any, you know, job.

18     Q.   And based on your experience working with him all

19  this time, do you think that he would ever do anything

20  willfully that would --

21        MS. LIMEHOUSE:  Objection, Your Honor.

22        THE COURT:  Sustained.

23  BY MR. AUSTIN:

24     Q.   Did you ever see red flags with his lending

25  practices during your time working with him?

1    A.    I never questioned him.

2    Q.    Okay.  And why is that?

3    A.    If he gave me a loan to do, I did it.  You know, if

4    it needed further approval -- and, honestly, I couldn't tell

5    you what his lending authority was, because he knew if it

6    needed further approval.  And if he gave it to me, then I

7    assumed he had already gotten the approval he needed.

8    Q.    And did anybody else in his family, like his

9    children, work at the bank?

10    A.    I believe his daughter worked in the bank, but not

11    in our branch.  I think just maybe during the summer.

12    Q.    Okay.  And so I guess he was fired in January this

13    year; is that right?

14    A.    Yes.

15    Q.    And to go back a few months into the fall of 2021,

16    do you recall when the investigation, internal investigation,

17    started at Palmetto State?

18    A.    I mean, I don't really remember it being an

19    investigation.  We just knew something was happening.

20    Q.    Okay.  And were there lawyers and people working

21    with them, questioning people at the bank?

22    A.    Yes.  And the only reason I know that is because I

23    work in that annex building, and there's a board room there,

24    and they would use our board room.

25    Q.    And how was Russell acting during that time?

1     A.   I don't want to use the word "distraught," but he

2   was definitely concerned, more for, I think, Alex and what

3   was happening with him than himself.

4     Q.   And was he providing documents to investigators?

5     A.   I don't know.  As far as I know, yes.

6     Q.   Okay.

7     A.   Somebody did.

8     Q.   And have you spoken with law enforcement about

9   Russell?

10    A.   No.

11    Q.   Has anybody from law enforcement ever asked to speak

12  with you?

13    A.   No.

14    Q.   And do you believe that Russell would ever try to

15  injure the bank?

16         MS. LIMEHOUSE:  Objection, Your Honor.

17         THE COURT:  Sustained.

18         MR. AUSTIN:  No further questions, Your Honor.

19         THE COURT:  Cross-examination.

20                    CROSS-EXAMINATION

21  BY MS. LIMEHOUSE:

22    Q.   Good morning, Ms. Malphrus.

23    A.   Good morning.

24    Q.   We never before.  My name is Emily Limehouse.  And I

25  work with the U.S. Attorney's Offices.

1    A.   Okay.

2    Q.   Let's talk about your testimony of Russell being

3    fired.  You are not on the Board; is that right?

4    A.   No.

5    Q.   So you are not familiar with any of the facts that

6    led to Russell's firing; is that right?

7    A.   No.

8    Q.   I would like to talk to you about your testimony

9    relating to the loan process.

10   A.   Okay.

11   Q.   You talked about what you consider important in

12   determining whether to extend someone an unsecured loan.  And

13   the first thing you mention is the credit score; is that

14   right?

15   A.   No.  That would be on an unsecured loan.

16   Q.   Right.  So we are talking about unsecured loans.

17   Something that's important to you in determining whether to

18   extend someone a loan is whether they have a higher credit

19   score; is that right?

20   A.   Yes.

21   Q.   So what is considered a higher credit score to you?

22   A.   I mean, we like for it to be 650 or above.  But,

23   certainly, a good credit store is above 700, I would say.

24   Q.   So if someone comes to you with a 607 credit score,

25   you are not going to extend them an unsecured loan, are you?

1    A.    It depends on who it is.

2    Q.    How about the source of repayment, which you said is

3    also an important piece --

4    A.    Right.

5    Q.    -- that you have to factor in in determining whether

6    to extend someone an unsecured loan, what information do you

7    obtain when determining what their source of repayment is?

8    Do you look at a financial statement?

9    A.    No.    Well, yes, unless they have -- unless they come

10   and say, this is my source of repayment, which you are not

11   really going to do a single-payment loan if they don't come

12   and say -- but, definitely, you would look at other assets if

13   that source of repayment was to fall through.

14   Q.    Okay.    So things like financial statement and tax

15   returns are often things that you look at to determine

16   whether people have the source of repayment; is that right?

17   A.    That's a backup source of repayment.    That would be

18   a secondary source of repayment.

19   Q.    So when someone comes and says, this is my source of

20   repayment, what are you relying on for that information?

21   A.    Well, in general, yes, you would look at pay stubs

22   or tax returns.    But, like we spoke about a single-payment

23   loan, you know, it may be a bonus from work.    It may be the

24   sale of a property.    If it's a sale of the property, you are

25   going to want to get the contract on that property.    If it's

1  a bonus from work, you want a few years documentation that

2  they are expected to get that bonus from work.

3      Q.  So you do your due diligence to determine whether

4  they do, in fact, have a source of repayment on the loan; is

5  that right?

6      A.  Yes.

7      Q.  You also talked about advances that are made prior

8  to all the documents getting signed on a loan; is that right?

9      A.  No.

10      Q.  Do you ever make advances on loans before the

11  documents are signed?

12      A.  I have.

13      Q.  Okay.  And under what circumstances would you do

14  that?

15      A.  You know, it could be somebody that calls and says,

16  listen, I'm at this auction, I need this piece of equipment,

17  you know, can you advance me $75,000 to get this.  And then,

18  you know, of course, the paperwork is signed as soon as

19  possible.  It's not a normal practice.  Again, it depends on

20  who it is.

21      Q.  What about $750,000 without anything signed?

22      A.  It depends on who it is.

23      Q.  So you talked about you have certain parameters

24  about whether you would extend an advance on a loan before

25  everything is signed; is that right?  You said you don't want

1    to slow up the time, so sometimes you just got to get things

2    moving before everything can get --

3         A.   Well, that was with the loan documents and Credit

4    Leader, not with the loan documents themselves.

5         Q.   So, like, a promissory note is what you are

6    referring to getting signed before you would extend a loan;

7    is that right?

8         A.   Yes.

9         Q.   Okay.  But everything in Credit Leader might not be

10   completed?

11        A.   Right.

12        Q.   But a promissory note would be signed; is that

13   right?

14        A.   Yes, generally, yes.

15        Q.   So what are those parameters that you generally look

16   to?

17        A.   For?

18        Q.   For determining whether you extend money before

19   Credit Leader process is completed?

20        A.   Well, I mean, I have my own -- everybody has their

21   own parameters, their own approval authority, I guess you

22   could say.

23        Q.   Okay.

24        A.   And so if I can look at that loan and I can

25   determine this is their credit score, this is their

1  debt-to-income ratio, the collateral value, and certainly,

2  the amount, because we have a certain amount that we are

3  limited to, and I know I can do that, then I go ahead and do

4  it.

5      Q.   Okay.  So you have certain things that you need to

6  look at before you determine whether to approve that loan; is

7  that right?

8      A.   Yes.

9      Q.   So what if someone comes to you with a 607 credit

10  score, and they are maxed on more than $1.5 million in line

11  of credits with the bank, and they owe the bank millions more

12  in loans, that the bank has charged off multiple loans years

13  before and they haven't paid, and they are more than $150,000

14  in overdraft, how would you handle that person?

15      A.   I can't approve it.  So I would send them to

16  somebody else.

17      Q.   And who would that be?

18      A.   At that time it would have been Russell.

19      Q.   So what about --

20      A.   But now it would be Jan.

21      Q.   It would be Jan.  So what about not even a $750,000

22  loan, what are your loan approval limits?

23      A.   I can approve a $20,000 unsecured loan and a $70,000

24  secured loan.

25      Q.   Okay.  So if someone came to you with a 607 credit

1    score, maxed out on more than $1.5 million in lines of credit

2    with the bank, owing the bank millions of dollars with

3    charged-off loans, and more than $150,000 in overdraft on

4    their personal bank accounts, with no updated financial

5    statement or tax returns, would you issue them a $20,000

6    unsecured loan?

7        A.   I still couldn't because it's total exposure.

8        Q.   What do you mean "total exposure?"

9        A.   So I have $70,000 in total exposure.  So if they are

10   over that amount, I would have to --

11       Q.   Because it's based on the relationship?

12       A.   Right.

13       Q.   Understood.  But those are all things that you would

14   be looking for in determining whether you would extend a

15   loan; is that right?

16       A.   You would look at the bank relationship, yes.

17       Q.   And so you would look at their overdraft on their

18   account, their status of their accounts at the bank?

19       A.   Status of their accounts, yes.

20       Q.   And you would look at their loan history, whether

21   they have charged-off loans with the bank?

22       A.   Yes.

23       Q.   And you would look at the amount that they owe the

24   bank on other loans; is that right?

25       A.   Yes.

1       Q.   You would look at their credit score; is that right?

2       A.   Yes.

3       Q.   And you said a 650 is generally --

4       A.   That's what we like to see.  But there's -- usually,

5 if someone has a lower credit score, there's something on

6 there that tells, all right, so then is it a past-due

7 payment, is it a medical collection, is it another type of

8 collection.  Sometimes there's reasonable explanations for a

9 lower credit score.  So we do look at the content of the

10 credit as well.

11      Q.   Because there are exceptions sometimes, right?

12      A.   Yes.

13      Q.   So would all those things have raised red flags to

14 you in someone coming to get a loan from Palmetto State Bank?

15      A.   I wouldn't even look at it, because it wouldn't --

16      Q.   Because it's your over --

17      A.   My authority, right.

18      Q.   So let's talk about your involvement in what he

19 discussed as a $750,000 loan.  You testified that you were

20 involved in trying to obtain title work in relation to that

21 beach house; is that right?

22      A.   Right.

23      MS. LIMEHOUSE:  So let's pull up Government's

24 Exhibit 81, if you don't mind.

25 BY MS. LIMEHOUSE:

1  Q.  I don't think you recalled specifically when your

2  involvement began, but if we can pull up the bottom e-mail,

3  please.

4  It's an e-mail from Russell to you on Friday, July

5  16th of 2021.  And you state -- he states:  Please have Kevin

6  start title search on Edisto house.  I am doing a second

7  mortgage on it and one share Green Swamp stock for $750,000.

8  I have gotten where the key is to Charles to let the

9  appraiser know.

10  So is that what you are referring to when you are

11  talking about your involvement?

12  A.  Yes.

13  Q.  Okay.  So it began on Friday, July 16th; is that

14  right?

15  A.  That's fair.

16  Q.  And so you testified that the attempt to get a

17  second mortgage wasn't successful because y'all determined

18  pretty quickly that the house was no longer in just Alex's

19  name; is that right?

20  A.  Well, the -- Kevin came back and said title search

21  is complete, you know, it is in both names.  And I'm not sure

22  what the exact wording is, but there's some wording that if

23  you're husband and wife, the one automatically gets it if the

24  other one passes, and that was not on there.  And so he would

25  have to wait and see how Maggie's will read and those types

1   of things.

2       Q.   So y'all were never able to secure a second mortgage

3   on that beach house?

4       A.   Right.

5       Q.   You weren't involved in extending a $750,000

6   unsecured loan to Alex Murdaugh, right?

7       A.   Right.

8       Q.   So July 16th, your involvement began.  Were you

9   aware that a $350,000 wire went out to an attorney in

10  Bamberg, South Carolina the day before?

11      A.   No.

12      Q.   And were you aware that on August the 9th, there was

13  $400,000 transferred into Alex Murdaugh's bank account to

14  cover his more than $367,000 in overdraft?

15      A.   No.

16      Q.   And so were you aware that that $350,000 wire

17  transfer and the $400,000 transfer to cover overdraft is what

18  made a $750,000 loan?

19      A.   No.

20      Q.   Are you aware that Alex Murdaugh never made any

21  payments on that $750,000 loan?

22      A.   No.

23          MS. LIMEHOUSE:  No further questions, Your Honor.

24          THE COURT:  Very good.  Anything on redirect?

25          MR. AUSTIN:  Couple of questions, Your Honor.

1    REDIRECT EXAMINATION

2    BY MR. AUSTIN:

3    Q.    Do you know why Alex Murdaugh didn't make any

4    payments on that?

5    A.    Why he didn't?

6    Q.    Yeah.

7    A.    I don't know.

8    Q.    It might have had to do with him being arrested?

9    MS. LIMEHOUSE:  Objection, Your Honor.

10   THE COURT:  Let me -- you know better.  You don't

11   suggest an answer.  Sustained.

12   MR. AUSTIN:  Apologies, Your Honor.

13   BY MR. AUSTIN:

14   Q.    With -- let me think how to phrase this.  With

15   unsecured loans, I guess really with any loans, if the

16   original purpose that somebody applied for that loan -- well,

17   I guess if circumstances change and somebody has already

18   gotten the loan process going, is there any prohibition on

19   them using the loan proceeds for another purpose?

20   A.    If it's unsecured, we can't really control how they

21   spend the money.

22   Q.    Do you have any obligations to monitor how they

23   spend the money?

24   A.    No.  Once you give it to them, you don't have any

25   way to monitor it.

1           MR. AUSTIN:  Thank you.  No further questions.

2           THE COURT:  You may step down.

3           Call your next witness.  Well, let's see.  How long

4   is our next witness?

5           MR. AUSTIN:  He could be pretty lengthy, Judge.

6           THE COURT:  Okay.  Let's take our morning break.

7           (Jury leaves open court at 10:32 a.m.)

8           THE COURT:  Please be seated.  We will be at ease

9   for about 10 minutes.

10          (Whereupon, recess transpired.)

11          THE COURT:  Bring in the jury.

12          (Whereupon, the jury returns to open court at 10:49

13  a.m.)

14          THE COURT:  Please be seated.

15          Government, call your next witness.

16          MR. AUSTIN:  We call Charles Laffitte.  The defense

17  calls Charles Laffitte.

18          THE COURT DEPUTY:  Please state your full name.

19          THE WITNESS:  Charles Atkins Laffitte III.

20                  CHARLES LAFFITTE,

21        having been duly sworn, testifies as follows:

22                DIRECT EXAMINATION

23  BY MR. AUSTIN:

24     Q.   Good morning, Mr. Laffitte.

25          MR. AUSTIN:  Can he take his mask off?

1    THE COURT:  He certainly can.

2  BY MR. AUSTIN:

3    Q.    Mr. Laffitte, how do you know Russell?

4    A.    He is my younger brother.

5    Q.    Do you mind pulling the microphone closer to you?

6    A.    He's my younger brother.

7    Q.    And how much younger?

8    A.    Five years.

9    Q.    Okay.  So there's you are the oldest.  Then Gray

10  middle.  And how much older is she than Russell?

11   A.    Eleven months.

12   Q.    Okay.  And I assume you don't want to be here today,

13  do you?

14   A.    Not particularly.

15   Q.    And it's not a very enjoyable experience, I'm sure.

16  We will try to be fast.  And, I mean, Russell is your little

17  brother.  And safe to say that you are here to support him,

18  try to help him?

19   A.    Yes.

20   Q.    Does that mean you are going to lie for him?

21   A.    No.

22   Q.    All right.  So let's just start with your

23  educational background and then go into your work background.

24  What's your highest level of school?

25   A.    A college degree, and I also did, you know, banker

1    school and stuff like that.

2        Q.    What's banker's school?

3        A.    Went to South Carolina Bankers School and then

4    Bankers School graduate of Bankers School of the South at

5    LSU.

6        Q.    Is Bankers School something that all bankers have to

7    go to?

8        A.    No.

9        Q.    And when did you -- I guess once you graduated from

10   Bankers School, where did you start working then?

11       A.    I was already working for the bank.

12       Q.    So Bankers School is something you do while you are

13   already up and running at a bank?

14       A.    Yes.

15       Q.    And what year did you start working in banking?

16       A.    In '88.

17       Q.    And have you been doing that ever since?

18       A.    Yes.

19       Q.    And has it all been with Palmetto State Bank?

20       A.    No.  I started out with -- back then it was NCNB of

21   South Carolina.

22       Q.    And is that -- how does that compare size-wise to

23   Palmetto State?

24       A.    It was much larger.

25       Q.    Much larger?  Okay.  And what kind of jobs have you

had at Palmetto State?

A.   Done some of the internal audit, real estate appraisals.  And now my primary thing is I order and review all the operationals that we do.

Q.   I'm sorry.  I speak softly too.  Can you pull the microphone up.  I'm having a hard time hearing you.

So you said that you still work in appraisals; is that right?

A.   Correct.

Q.   And could you just describe for the jury what goes on with appraisals, just like a very basic summary of the process?

A.   Typically, the loan officer or either one of the loan clerks will send me a request for an appraisal when we order -- when they need one for a loan.  And I will contact the appraiser, get the appraisal completed.  And then once it comes back, review it to make sure it meets the bank's standards, and then send it on to the loan officer.

Q.   Okay.  And were you involved in a loan for $750,000 to Alex Murdaugh in the summer of 2021?

A.   Yes, I was.

Q.   And when did you first become involved in that loan?

A.   If I remember correctly, it was in April.

Q.   So April 2021?

A.   Correct.

1   Q.   Okay.  And what was your understanding of the

2   purpose for that loan?

3        MR. HOLLIDAY:  Your Honor, objection.  Hearsay.  As

4   far as his understanding, if he knows, he can say.

5        THE COURT:  Well, he's testified he was involved.

6   Let's hear what -- the basis of his understanding.  Lay the

7   foundation.

8        MR. AUSTIN:  Thank you, Your Honor.

9   BY MR. AUSTIN:

10       Q.   So you were involved in a loan with Alex Murdaugh;

11   is that right?

12       A.   Correct.

13       Q.   And what kind of a loan was it?

14       A.   When you say what kind, like --

15       Q.   What was he trying to buy?

16       A.   I'm not sure he was trying to buy anything.  I just

17   know that that was what the collateral for the loan was and

18   that's why we were trying to get the valuation.

19       Q.   What was the collateral for the loan?

20       A.   The beach house in Edisto.

21       Q.   That's the Murdaugh family beach house in Edisto?

22       A.   Correct.

23       Q.   And so you said that started -- at least your

24   involvement started in April 2021?

25       A.   That's correct.

1      Q.  And so when you are talking about the process of

2  getting a loan going, you said that you would have an

3  appraisal.  Did an appraisal actually take place?

4      A.  Not at that time, it didn't.

5      Q.  So what happened?  Start with April.  Did you try to

6  get somebody out there to actually do an appraisal?

7      MR. HOLLIDAY:  Your Honor, I do object.  He is

8  leading the witness.

9      THE COURT:  Well, let's give him some space here.

10  He's trying to get the basic information.  But don't lead

11  your witness.

12      MR. AUSTIN:  I'm sorry.

13      A.  I had requested it from an appraiser that was on

14  our -- is on our appraisal panel.  And he had Maggie's number

15  for contact to get into the property.

16      Q.  That's Maggie Murdaugh?

17      A.  Correct.  And he was having trouble getting her to

18  commit to setting up a time for the inspection.  In fact, the

19  day before she was murdered, he had called me and said that

20  she had called him to schedule it for the next day.  And that

21  very next morning, I called him, and I'm like, what was going

22  on?  So just put it on hold until we figure out what is going

23  on.  And then it got pushed off until, I guess, somebody with

24  the estate -- or I forgot.  I don't remember who exactly gave

25  him access to the property.

1  Q.   Okay.  So she was murdered June 7th; is that

2  correct?

3  A.   Correct.

4  Q.   So from April to June, y'all are trying to schedule

5  the appraisal?

6  A.   Correct.

7  Q.   And what sort of things caused the appraisal to get

8  pushed back?

9  A.   She was out of town or just different things, just

10 wouldn't --

11 Q.   Scheduling issues?

12 A.   Scheduling.

13 Q.   And when you say that she was murdered, it sounds

14 like there was something sketchy going on.  But it was just a

15 normal thing?  There were no red flags, as far as you knew?

16 A.   Not as far as I knew.

17 Q.   Were there any red flags that Alex presented to you

18 during that time?

19 A.   No, sir.

20 Q.   And did you know Alex Murdaugh from childhood on?

21 A.   Yes, I did.

22 Q.   And how did you know him?

23 A.   I grew up across the street from him.

24 Q.   And your family is -- do they know each other?

25 A.   Yes, they do.

1    Q.   And was Russell good friends with Alex?

2    A.   I wouldn't say good friends.  He and his -- Alex's

3    younger brother were better friends, as well as I was more

4    friends with Alex's older brother.

5    Q.   So are you talking about John Marvin?

6    A.   Yeah, Russell was friends with John Marvin.

7    Q.   And so how much older was Alex than Russell, just

8    roughly?

9    A.   Actually, I'm not sure.

10   Q.   Okay.  All right.  So I want to talk a little bit

11   about the Palmetto State Board.  Are you a Board member?

12   A.   Yes, sir.

13   Q.   And how long have you been on the Board?

14   A.   Probably 15 years.

15   Q.   Okay.  And as a Board member, does that mean that

16   you own shares of Palmetto State?

17   A.   Yes, I do.

18   Q.   And that's a requirement to be a voting Board

19   member?

20   A.   Yes, it is.

21        MR. AUSTIN:  If we could please pull up Government's

22   Exhibit 1.  Well, actually, let's take it down for just a

23   second.

24   BY MR. AUSTIN:

25   Q.   Let me just ask you a little bit about Palmetto

1    State Bank.  How long have you worked with Russell there?

2        A.    Pretty much since Russell started working at the

3    bank.

4        Q.    And you work with your dad too?

5        A.    Yes.

6        Q.    And your sister?

7        A.    Yes.

8        Q.    And so you've been working with Russell as he sort

9    of worked his way up to CEO, obviously, until he was fired;

10   is that right?

11       A.    Correct.

12       Q.    And how would you describe Russell, the work

13   environment?

14       A.    I'm trying to figure out what exactly you mean.  As

15   a manager or --

16       Q.    Sure.

17       A.    Okay.  He seems to look after the employees and also

18   with his customers.  He goes the extra mile to get -- to take

19   care of whatever needs to be taken care of.

20       Q.    What do you mean by "extra mile?"

21       A.    Meet somebody at home or at their place of business

22   rather than having them come into the office, or work on the

23   weekends or at night, you know, where it suits them better.

24       Q.    And is that sort of a natural part of working in a

25   community bank?

1    A.    Yes.

2    Q.    And if I understand you correctly, is your whole

3    family on your dad's side, they've been involved in the bank

4    for some time?

5    A.    Yes, they have.

6    Q.    And, like, how many generations?

7    A.    If I'm not mistaken, I think it's four generations.

8    Q.    Four generations.  So y'all work with a lot of

9    family, right?

10   A.    Uh-huh.

11   Q.    And I'm sure that's great at times and at other

12   times it's probably a lot.

13   A.    At times.

14   Q.    I shouldn't make you answer that.  Sorry.  So -- all

15   right.

16        MR. AUSTIN:  Let's pull up Government's Exhibit 1.

17   BY MR. AUSTIN:

18   Q.    If you will look here, these are July 20th meeting

19   minutes.

20        MR. AUSTIN:  And if we could zoom in, please, in the

21   middle paragraph where it says "Norris L. Laffitte" at the

22   beginning.

23   BY MR. AUSTIN:

24   Q.    It says:  Norris Laffitte inquired about the

25   Shareholder Repurchase Program that was presented at the

1  shareholders meeting And Russell Laffitte stated it would go

2  out in the quarterly report to the shareholders.  What is the

3  Shareholder Repurchase Program?

4          MR. HOLLIDAY:  Your Honor, objection.  Relevance.

5          THE COURT:  What is the relevance of the

6  shareholders meeting -- of Shareholders Repurchase Program?

7          MR. AUSTIN:  Your Honor, I don't want to testify in

8  answering it.  I'm laying the groundwork for it.  But I

9  promise, I will get to the relevance of it.

10          THE COURT:  Let's take a sidebar here for a moment.

11          (Whereupon, the following bench conference takes

12  place):

13          THE COURT:  Okay.  Explain to me, Matt, the

14  relevance of the Shareholder Repurchase thing.

15          MR. AUSTIN:  So major part of our defense, Judge, is

16  there's a split amongst Board members.  There's a bunch of

17  new Board members, family members that came in, and they

18  started moving towards trying to sell the bank.  Norris

19  Laffitte testified that his dad sold 3,000 shares of stock.

20  And he said he didn't know when it was.  And it was the

21  past -- my understanding is since Russell was fired, despite

22  the fact that this Stock Repurchase Program is frozen because

23  of the lawsuits.  And they've been advised that it's insider

24  trading --

25          THE COURT:  Why is that relevant to whether the

1　defendant committed wire fraud?

2　　　　MR. DANIEL:  In order to testify --

3　　　　THE COURT:  You can impeach.  You can't use

4　extrinsic evidence to impeach.  That's the problem here.  You

5　are trying to prove another fact, extrinsic evidence -- you

6　can impeach the witness, but it's otherwise not relevant.

7　You can't go proving -- you can't be impeaching with

8　extrinsic evidence.  Why is it relevant whether he committed

9　these crimes or did not?

10　　　　MR. AUSTIN:  Our position is that he didn't commit

11　the crimes.  And everybody that came forward --

12　　　　THE COURT:  You raise that on cross-examination.

13　But you can't prove -- this is extrinsic evidence.  And the

14　rule is you can't prove impeachment evidence by extrinsic

15　evidence.

16　　　　MR. AUSTIN:  Okay.

17　　　　(Whereupon, the bench conference ends.)

18　　　　THE COURT:  Objection sustained.  Move on.

19　BY MR. AUSTIN:

20　　Q.　How would you say Palmetto State's done

21　financially -- or past, I guess, since Russell became CEO?

22　　A.　It had done fairly well.

23　　Q.　Okay.  Consistently fairly well?

24　　A.　Yes, sir.

25　　　　MR. AUSTIN:  Okay.  Can we pull back up Government's

1   Exhibit 1.  And if we go to the bottom paragraph, the bottom

2   big paragraph.  Here we go.  And -- I'm sorry.  That was the

3   wrong -- pull back, please.  The next paragraph up that's got

4   more than one sentence, "reviewing the current financial

5   statement."

6   BY MR. AUSTIN:

7       Q.   So it says here Chairman Laffitte noted -- this is

8   reviewing the current financial statement.

9           MR. HOLLIDAY:  Your Honor, objection.  Relevance.

10          THE COURT:  Re-ask the question.  I'm sitting here

11  trying to figure out exactly the question that you are

12  raising.  Go again.

13          MR. AUSTIN:  Well, I was going to read this first

14  and then ask about the performance of the bank.

15          THE COURT:  And what's the objection?

16          MR. HOLLIDAY:  It's relevance, Your Honor.  I don't

17  know how the performance of the bank has anything to do with

18  the charged conduct.

19          MR. AUSTIN:  Judge, the Government's whole case is

20  whether --

21          THE COURT:  I overrule the objection.  Go ahead, for

22  whatever its relevance might be.

23  BY MR. AUSTIN:

24      Q.   Okay.  It says here:  The total deposits are up.

25  Visa check card income is up due to debit card use.  Interest

1   income is up.  Net income is up.

2        So is that consistent with what you previously

3   testified to, that the bank was doing well under Russell's

4   leadership?

5        A.  Yes, it was.

6        MR. AUSTIN:  Pull it back up again, right below that

7   the last sentence there, "All loans over $25,000."

8   BY MR. AUSTIN:

9        Q.  "All loans over $25,000 are reviewed, discussed, and

10  approved, and copies attached."  Is it normal part of Board

11  meetings to review all loans over $25,000?

12       A.  Yes, it is.

13       Q.  Okay.  And is that -- are there any exceptions to

14  that?  Do you do that at every meeting?

15       A.  Every meeting we do it, yeah.

16       Q.  Okay.  And when you say you review them, can you

17  describe that?  Because there are a lot of different levels,

18  I guess, of a review.

19       A.  Norris just -- just a list of loans that were made

20  and whether or not they were a renewal or new money, and if

21  anybody has any questions regarding them, then we will answer

22  it.

23       Q.  Okay.  And if somebody did have questions or did

24  have a problem, then if they decide that a loan isn't worth

25  pursuing, is it pulled back?

1    A.    At this point, the loan's already been made.

2         MR. AUSTIN:  Okay.  And let's go to page two,

3    please.  Can we go down to the first, says, "Russell L.

4    Laffitte made a motion to elect Rebecca Laffitte."

5    BY MR. AUSTIN:

6    Q.    So has there been a decent amount of turnover in the

7    Board in the last few years, new members coming on?

8    A.    Yes, sir.

9    Q.    Okay.  And so this meeting is July 2021.

10        MR. AUSTIN:  And if we could go to the -- I think

11   it's the next paragraph down.  I'm sorry.  "They reviewed the

12   charged-off loans," please.

13   BY MR. AUSTIN:

14   Q.    All right.  So was it a normal part of the Board

15   meetings that you would review charged-off loans as well?

16   A.    We review an accounting of all the transactions on

17   the charged-off loans, whether a new one was charged off or

18   any recoveries that we received in that month.

19   Q.    And what does it mean for a loan to be charged off?

20   A.    That means that we write off the balance due to our

21   loan accrual account so that -- because we expect a loss on

22   it, but we are still trying to collect it, and whatever.

23   Q.    So once the loan is charged off, can customers still

24   make payments on them?

25   A.    Yes, they can.

1    Q.   Okay.  And are you familiar with the Red Beard and 0

2    United properties that Alex Murdaugh had?

3    A.   Yes, I am.

4    Q.   And that was charged off at one point; is that

5    right?

6    A.   Correct.

7    Q.   Do you remember when?

8    A.   No, I do not.

9    Q.   Do you know whether anybody that was involved in

10   either of those deals continued to make payments after it was

11   charged off?

12   A.   Yes.  There were some payments that were -- came in,

13   but I know that they hadn't made them in, like, the previous

14   year.

15   Q.   Okay.  Do you know who was making those payments?

16   A.   I do not.

17   Q.   Okay.  Did you attend a Board retreat in 2020?

18   A.   Yes, I did.

19   Q.   And what was the purpose of the retreat?

20        MR. HOLLIDAY:  Your Honor, objection.  Relevance.

21        THE COURT:  Is this the same issue?

22        MR. AUSTIN:  Yes, Your Honor.

23        THE COURT:  Sustained.  I think I've ruled on this,

24   Mr. Austin.  Don't do it again.

25        MR. AUSTIN:  If we can go to Government's Exhibit 6,

1   please. All right. Do you see -- can we pull back just a

2   little bit, please. And, I'm sorry, let's go to page 2. And

3   can we pull out the second paragraph, please.

4   BY MR. AUSTIN:

5       Q.   Okay. This is a lot here. But just from the first

6   sentence here, is this the section dealing with loans related

7   to Alex Murdaugh? Is that correct?

8       A.   That's correct.

9       Q.   And is this essentially one of the loans that were

10  typically reviewed during Board meetings?

11      A.   No, it's not, because this is talking more about his

12  whole loan portfolio.

13      Q.   Okay. And it says that loans were charged off

14  around five years ago, and those were the ones with Barrett

15  Boulware estate. Why does it say estate after Boulware's

16  name?

17      A.   Because he passed away.

18      Q.   And says these charged-off loans haven't been

19  foreclosed on yet. Do you know if that's still the case or

20  if these loans have been foreclosed on as we sit here today?

21      A.   They have not.

22      Q.   Okay. And next sentence down: Payments are not

23  current, but Alex has been paying all payments that were

24  made.

25          And do you remember how many partners were involved

1  in that deal?

2  A.  I do not.

3  Q.  Okay.  But I guess we know from the sentence or from

4  the sentence before that Barrett Boulware was involved at

5  least?

6  A.  That's correct.

7  Q.  And at this point he's dead.  So do you know if

8  anybody else besides Alex was paying on either of those

9  properties?

10  A.  I do not.

11  Q.  And then next sentence, do you see where it says,

12  "Elizabeth Malinowski" -- she's a Board member, right?

13  A.  Correct.

14  Q.  And she's your cousin?

15  A.  Yes, she is.

16  Q.  "Commented that the $750,000 loan did not appear to

17  have been approved by the Executive Committee.

18       And then it says, "Russell Laffitte explained that

19  three of the five members approved the loan."

20       Now, is that consistent with your understanding of

21  how that loan process went, the three of the five Executive

22  Committee members approved it?

23  A.  Yes, that is correct.  And, actually, only four of

24  the members are voting members.

25  Q.  Okay.  Because Scott Swain is the fifth member; is

1    that right?

2        A.    Correct.

3        Q.    And why can't he vote?

4        A.    I do not know.

5        Q.    Okay.  Is it your understanding of the bylaws of

6    Palmetto State Bank that a majority three-fourths of the

7    Executive Committee is all that's necessary to approve loans?

8        A.    I'm not sure what the bylaws state on that.

9        Q.    Okay.  And what's your understanding of the general

10   practice of the Executive Committee?

11            MR. HOLLIDAY:  Your Honor, I'm objecting.  I think

12   he said he doesn't know what the bylaws say.

13            THE COURT:  He doesn't know.

14            MR. AUSTIN:  He said he didn't know about the

15   bylaws.  I just asked for his general understanding.

16            MR. HOLLIDAY:  If he doesn't know that, there is no

17   general understanding.

18            THE COURT:  He's talking about his general

19   understanding of practice.  I overrule that objection.  If he

20   knows.

21            MR. AUSTIN:  I'm sorry?

22            THE COURT:  If he's talking about the general

23   practice of the function of the Executive Committee and

24   allowing meetings without minutes, without a meeting, if he

25   knows that, he can state that.

1   MR. AUSTIN:  Okay.

2   THE COURT:  If he knows it.

3   BY MR. AUSTIN:

4   Q.  What's your general understanding of how a loan in

5   this -- approved by the Executive Committee would be made,

6   the process, and what's required for it to be valid?

7   MR. HOLLIDAY:  I'm sorry, Your Honor.

8   THE COURT:  See, now you are back to the question he

9   said he didn't know.

10  MR. AUSTIN:  I'm sorry.  I'm trying.

11  THE COURT: You are back to asking him the same

12  question he already said he didn't know.  What you then asked

13  him was, regardless of the bylaws, what was the practice.  If

14  he knows, he can state.

15  BY MR. AUSTIN:

16  Q.  Do you know what the general practice is with the

17  Executive Committee approving loans?

18  MR. HOLLIDAY:  No.  No.  Your Honor, objection.

19  When he refers to the Executive Committee in the context of

20  the bylaws, then it's beyond what he knows.  If he just wants

21  to say general understanding --

22  THE COURT:  If he has an understanding, he can lay

23  the foundation.  If he doesn't know, he can say that.

24  BY MR. AUSTIN:

25  Q.  Do you know or have a general understanding?

1    A.   Once the loan gets put in our loan approval program,

2    it gets sent to the members of the Executive Committee,

3    except my father, because -- but one of them usually takes a

4    printed copy of it, so he gets to see it.  And sometimes, you

5    know, depending upon how quickly they are trying to get a

6    deal closed, they may not wait for the monthly Executive

7    Committee meeting.  But they will all discuss it or either by

8    e-mail or by phone, and then do the approval that way.

9    Q.   And why is a printed copy taken to your dad?

10   A.   Because he's not as computer savvy as some of them.

11   Q.   All right.  Now, are you familiar with the $680,000

12   check that Russell negotiated to PMPED, the Murdaugh's law

13   firm?

14   A.   Yes, I am.

15   Q.   And what's your understanding of the circumstances

16   that led to the issuance of that check?

17   A.   From what I understood, it was a negotiation

18   between --

19        MR. HOLLIDAY:  Your Honor, I object.  "From what I

20   understood" is hearsay.

21        THE COURT:  He needs to lay a foundation if he's

22   going to talk about it, basis of his knowledge.

23   BY MR. AUSTIN:

24   Q.   Did you have any conversations with Russell about

25   that check?

1    MR. HOLLIDAY: Your Honor --

2    MR. AUSTIN:  I'm trying to lay the foundation,

3  Judge.

4    MR. HOLLIDAY:  There is no foundation if it's

5  conversations with the defendant.

6    THE COURT:  Yeah.  You can't use the defendant's --

7  you can't get his testimony in trying to support his view of

8  things or his case.

9    MR. AUSTIN:  Got you.

10    THE COURT:  You can ask him what this gentleman

11  knew, how he came -- what was his basis of knowing.  But he's

12  a Board member, you know --

13  BY MR. AUSTIN:

14    Q.   What was the basis for you having any knowledge

15  about that check?

16    A.   When Russell --

17    MR. HOLLIDAY:  Objection.  Hearsay.

18    THE COURT:  Well, let's hear -- you are not -- sir,

19  you are not to say anything that the defendant said to you,

20  just your knowledge of this $680,000, if you have any

21  independent knowledge.

22    THE WITNESS:  I was notified of it when we got an

23  e-mail saying that he had written the check to PMPED.

24    Q.   Okay.  And was that check ultimately the topic of

25  discussion at a Board meeting?

1    A.  Yes, it was.

2    Q.  And do you recall which Board meeting or meetings?

3    A.  Do you recall when it was?

4    Q.  Yes, sir.

5    A.  It was about two days later.

6    Q.  Would that have been October 31st?

7    A.  I'm not sure.

8    Q.  Okay.  Did you all have a full Board meeting on

9    November 3rd, 2021?

10    A.  I think it was a special Board meeting, but, yes.

11    Q.  And what was the topic up for discussion at that

12    special Board meeting?

13    A.  I don't remember off -- because we had quite a few

14    of them.

15    Q.  Okay.  And quite a few special meetings?  Is that

16    what you are saying?

17    A.  Correct.

18    Q.  And why were y'all having these special meetings

19    during that time?

20    A.  Well, with the Satterfield case and so many other

21    stuff, that we were just trying to meet with our attorneys

22    and try to stay on top of it.

23    Q.  Okay.  And you are referring to -- I don't want to

24    know anything about what actually happened with that

25    Satterfield case.  But you are saying you met with your

1  attorneys about the Satterfield case?

2       A.   After Russell had done the check.

3       Q.   Okay.  And did you also talk about the check at that

4  meeting?

5       A.   I'm sure we probably did.

6       Q.   Okay.  And were there any objections to Russell

7  issuing that check during the November 3rd meeting?

8            MR. HOLLIDAY:  Your Honor, I'm going to object.

9  This is based on a Board action.  We've established the

10  testimony.  There was no Board action.  There's no objections

11  that could have been made.

12           THE COURT:  You can do this on cross-examination.

13  Overruled.

14           THE WITNESS:  I don't recall any objection.

15  BY MR. AUSTIN:

16      Q.   Okay.  Did Russell ever deny writing that check?

17           MR. HOLLIDAY:  Your Honor, objection.  Hearsay.

18           THE COURT:  Sustained.  Don't use the defendant --

19  you know, don't use the defendant's statements.  Hearsay.

20  BY MR. AUSTIN:

21      Q.   Did you or any other Board member try to withdraw

22  that check from PMPED?

23      A.   I do not recall anyone, but I did not.

24      Q.   You did not?  And are you aware of any written

25  assent or dissents being filed in relation to that check by

1  any Board member?

2      A.    I am not.

3      Q.    Okay.  And do you know ultimately what happened with

4  those funds?

5      A.    That they were sent to the law firm.

6      Q.    Okay.  And that's -- your understanding is that's as

7  far as it went?

8      A.    As far as I knew, it was.  I know in our meeting

9  that one of the topics that were brought up is, could we get

10  a release from their clients, you know, for the bank.

11      Q.    And do you know if Palmetto State ever got a

12  release?

13      A.    They did not.

14      Q.    Okay.  Now, I'm going to move on to talk about

15  $500,000 line of credit that Russell had or extended to Alex

16  Murdaugh.

17          MR. AUSTIN:  Could we please pull up Defendant's

18  Exhibit 87B.  I believe this is in evidence.

19          MS. LIMEHOUSE:  I think it's Government's Exhibit

20  87B.

21          MR. AUSTIN:  Sorry.  Thank you.

22  BY MR. AUSTIN:

23      Q.    Do you recognize this document?

24      A.    Yes, sir.

25      Q.    Okay.  How do you recognize it?

1     A.   Well, because it's our business purpose statement.

2          MR. AUSTIN:   Zoom in at the top.   Perfect.

3     BY MR. AUSTIN:

4     Q.   Now, I think it speaks for itself.   Is this to

5     Alexander Murdaugh?   That's Alex.   Okay.   And you look down

6     here it says:   Will be used in the following type of

7     business, farming.

8          And are you familiar with this line of credit?

9     A.   In general, yes, I know it was there, but I don't

10    know the particulars.

11    Q.   Do you remember what property was the collateral

12    behind this line of credit?

13    A.   The property where his house is.

14    Q.   Are you talking -- you are not talking about the

15    beach house, are you?

16    A.   No, the Moselle property.

17    Q.   Moselle.   And is that -- how would you describe that

18    property?

19    A.   A lot of timberland, just 1,700 acres.   So, I mean,

20    it's -- the majority of it is, I guess, in a way

21    agriculture -- well, timber production.

22    Q.   And did they sell timber from there?   Is that what

23    you mean by timber production?

24    A.   Yeah.

25    Q.   Okay.   All right.   So if you look at the second

1  sentence there, it says:  The proceeds of the loan will be

2  used primarily for agricultural commercial investment or

3  business purposes.

4         So does that sentence limit the use of this line of

5  credit only to agricultural purposes or farming purposes?

6     A.    It typically doesn't.

7     Q.    Does not?

8     A.    I mean, we typically don't hold them -- you know,

9  once they have the line of credit, we don't necessarily

10 govern or monitor what they actually spend the money on.

11    Q.    And why is that?

12    A.    I'm not sure.

13    Q.    Okay.  So you've been working in banking since, I

14 forget, what year?

15    A.    '88.

16    Q.    And you've worked at Palmetto State, but also worked

17 at a larger bank too.  In your experience, do loan officers

18 monitor the use of the funds once a line of credit or a loan

19 is extended?

20    A.    Only if the customer is having financial difficulty

21 or is late on payments usually.

22    Q.    Okay.  And at what point -- when you talk about

23 having financial difficulty, can you be a little bit more

24 specific about that?

25    A.    If the loan is past due and we are concerned about

1 not being able to collect our money back from them.

2 Q.   Okay.  And so this line of credit is dated February

3 9th, 2015.  At that point in time, do you remember whether

4 Alex Murdaugh was having any financial difficulties?

5 A.   Not that I'm aware of.

6 Q.   Okay.  How would you characterize his financial

7 status during that time?

8 A.   I wasn't privy to all of his financial information

9 at that time.

10 Q.   Were you aware of any financial hardships?

11 MR. HOLLIDAY:  Your Honor, objection.  Asked and

12 answered.

13 THE COURT:  That's -- that's -- you asked him if he

14 knew.  He said he didn't know.  Now move on.

15 Mr. AUSTIN:  If we can please pull up Defendant's

16 Exhibit 77.  If we can zoom in on the top e-mail.  Perfect.

17 BY MR. AUSTIN:

18 Q.   All right.  So this is the e-mail from Alex

19 Murdaugh.  And you look down below it says -- so he talks

20 about activating his full line of credit.  And then he talks

21 about buying two pieces of equipment for planting.  Do you

22 have any idea what he's talking about?

23 A.   I do not.

24 Q.   Okay.  All right.  We are almost done here.  So

25 let's -- have you ever served as a conservator in any case?

1  A.  No, I have not.

2  Q.  And who is Sheila Odom?

3  A.  Our probate court judge.

4  Q.  And is it common in Hampton County for professionals

5  to serve as PR or conservator?

6  THE COURT:  I don't think you've established he has

7  the knowledge.  He said he never served as one.  Unless you

8  can establish the basis of his knowledge, sustained.

9  MR. AUSTIN:  I will move on from that, Judge.

10  BY MR. AUSTIN:

11  Q.  When was Russell terminated?

12  A.  In January of 2021.

13  Q.  2021?

14  A.  Uh-huh, I think that's right.

15  Q.  And did you vote to terminate Russell?

16  A.  I did not.

17  Q.  What about your dad?

18  A.  He did not.

19  Q.  And what about your sister?

20  A.  She didn't.

21  Q.  So when you talked about the lawsuits going on in

22  the fall of 2021, did Palmetto State hire some attorneys to

23  help out with an internal investigation?

24  A.  Yes.

25  Q.  And did any of these attorneys work with any Board

1    members outside of the bank?

2        A.    Not that I'm officially aware of, but I suspected

3    it.

4        Q.    Do you mind explaining that?

5        MR. HOLLIDAY:  No.  No.  No.  Objection, Your Honor.

6    Speculation.

7        THE COURT:  Well, he can lay a foundation.  Let's

8    see the basis of his knowledge.

9        THE WITNESS:  I have the belief that I think he was

10   working with Mr. Malinowski and Norris Laffitte outside of

11   the bank.

12       Q.    Who is "he?"

13       A.    The attorney that we hired to do the investigation.

14       Q.    And do you recall his name?

15       A.    I apologize.  I can't remember his name.

16       THE COURT:  I sustain the objection.  Failure to lay

17   a foundation.

18       MR. AUSTIN:  Beg the Court's indulgence.

19   BY MR. AUSTIN:

20       Q.    You mentioned earlier that you are trying to get an

21   appraisal set up at the beach house with Maggie Murdaugh; is

22   that right?

23       A.    Correct.

24       MR. AUSTIN:  May I approach the witness, Your Honor?

25   Show him what's been marked as Defendant's Exhibit 79.

1    THE COURT:  Is it in?

2    MR. AUSTIN:  No, sir.

3    THE COURT:  Have you shown it to the Government?

4    MR. AUSTIN:  Yes.

5    BY MR. AUSTIN:

6    Q.  Please take a look at that document.  Do you

7    recognize that?

8    A.  Yes, I do.

9    Q.  And how do you recognize it?

10    A.  Because I had asked the appraiser --

11    Q.  Let me back up.  Is that an e-mail that you sent --

12    an e-mail chain that you were on?

13    A.  Yes, it is.

14    Q.  Okay.  And who is that e-mail exchange with?

15    A.  With Russell.

16    Q.  With Russell?  Okay.  And what does it relate to?

17    A.  The ordering of the appraisal.

18    Q.  That's the appraisal we had just talked about?

19    MR. HOLLIDAY:  Your Honor, I'm sorry.  It's not

20    admitted yet.  I know they are laying a foundation, but,

21    actually, they are publishing it now, prematurely.

22    THE COURT:  Don't publish it yet.  Lay the

23    foundation.

24    BY MR. AUSTIN:

25    Q.  Do you recall sending that e-mail?

1    A.    Yes, I do.

2    Q.    Do you recall the substance of that e-mail?

3    A.    It was after all of this.  Well, several months ago,

4    I contacted the appraiser and asked him to send me, if he had

5    in his work file, where he had tried to contact Maggie

6    Murdaugh and all in trying to schedule the original

7    inspection beforehand.  And he had sent that information to

8    me.

9    Q.    So you are saying at your request, the appraiser

10   sent you these documents?  And this is the e-mail chain

11   attaching those documents?

12   A.    Correct.

13   Q.    Okay.

14        MR. AUSTIN:  Your Honor, can we move Defendant's

15   Exhibit 79 into evidence?

16        THE COURT:  Is there an objection?

17        MR. HOLLIDAY:  So, Your Honor, I do not object to

18   the admission of the first page and the fourth page.

19        THE COURT:  Will you hand me the document to look

20   at?  I need to look at it if you want me to -- let me look at

21   this for a moment.  Okay.  What's the objection?

22        MR. HOLLIDAY:  So, Your Honor, the first page is the

23   e-mail chain that Mr. Laffitte has testified to.  So I have

24   no problem with that.

25        The second page, there's hearsay from the attorney.

1     The third page is just the rest of his signature

2  block, but I don't see why that would come in.

3     The fourth page does appear to be a Palmetto State

4  Bank record.

5     And then the last two pages appear to be pages from

6  the attorney's -- it's his folder, but there are handwritten

7  notes on it.  So it's really business records of the

8  attorney.  And they are not business records of Palmetto

9  State Bank.

10     So the first page, which is the e-mail by Mr.

11  Laffitte who is testifying, I'm fine with, and the Palmetto

12  State Bank record, but anything that came from the attorney's

13  office is hearsay and --

14     THE COURT:  I'm confused.  It's from -- doesn't

15  appear to be from an attorney.  Appeared to be somebody named

16  Trey Mathisen, who is a residental manager and appraiser in

17  Mount Pleasant.  So it doesn't appear to be from a lawyer.

18  Am I missing something?

19     MR. HOLLIDAY:  Your Honor, it's --

20     THE COURT:  He's offering substantive information.

21     Are you trying to get this in for the truth of the

22  matter?

23     MR. AUSTIN:  Truth of the matter and business

24  records.

25     THE COURT:  Well, truth of the matter, isn't there a

1   hearsay problem here?

2        MR. HOLLIDAY:  Well, the problem -- focusing on page

3   two, Your Honor --

4        THE COURT:  I'm sorry.

5        MR. HOLLIDAY:  Focusing on page 2, we are talking in

6   generalities here.  But there's an exchange that didn't take

7   place until March of this year.  And it's this individual's

8   recollection as to different events that took place.

9        THE COURT:  He can't be cross-examined.  I sustained

10  that on hearsay.  That's objectionable.

11       MR. HOLLIDAY:  Right.

12       THE COURT:  And this document, Palmetto State Bank,

13  what is this?  This is a document --

14       MR. AUSTIN:  Yes, sir, this is what was attached to

15  this e-mail.

16       THE COURT:  Well, these are writings from this

17  appraiser?  Are all these documents writings from the

18  appraiser?

19       MR. AUSTIN:  I believe so, Your Honor.

20       THE COURT:  That's all hearsay.  You can call him as

21  a witness.  You just can't get it in this way.

22       MR. AUSTIN:  Your Honor, we talked about this

23  exhibit.  And I asked if I needed to call the appraiser, and

24  I was told I didn't have to.  So I would have done that, but

25  going off representation.

1    THE COURT:  Well, let me see about the Government's

2    response.

3    MR. HOLLIDAY:  Your Honor, I am not objecting to

4    page 4 of this.  They don't have to call the appraiser.

5    THE COURT:  The problem is, the other is whether he

6    has to call this witness.  If you all told him he doesn't

7    have to, then feel like you waived the objection.

8    MR. HOLLIDAY:  You know, that's fine.  We can

9    proceed.

10    THE COURT:  Defendant's Exhibit 79 is admitted.

11    (Defendant's Exh. 79 is received in evidence.)

12    MR. AUSTIN:  Thank you, Your Honor.

13    If you can please go to -- please pull up 79, page

14    4.

15    BY MR. AUSTIN:

16    Q.  All right.  See the date up there?  Is that April

17    22nd, 2021?

18    A.  Yes, sir.

19    Q.  And you testified earlier that you thought that the

20    appraisal had gotten started in April 2021.  And so is that

21    consistent with your memory?

22    A.  Yes, it is.

23    Q.  Now, tell me here -- I guess first, do you recognize

24    that address?

25    A.  I do.

1    Q.   And what is it?

2    A.   That's Alex and Maggie's beach house.

3         MR. AUSTIN:  Okay.  Can we zoom in right here.

4    BY MR. AUSTIN:

5    Q.   And do you know what this handwriting refers to?

6    A.   I do not.  That is from the appraiser.

7    Q.   Okay.  And do you know what it's about?

8    A.   From what it looks like, it's where he was

9    writing --

10        THE COURT:  No.  No.

11        MR. AUSTIN:  Fair enough.  Thank you.  Please answer

12   any questions Mr. Holliday has.

13        THE COURT:  Okay.  Cross-examination.

14                      CROSS-EXAMINATION

15   BY MR. HOLLIDAY:

16   Q.   First of all, Mr. Laffitte, good morning.  My name

17   is Winston Holliday.  And I'm an attorney for the United

18   States.

19        THE COURT:  Mr. Holliday, you need to be close to

20   the microphone.

21        MR. HOLLIDAY:  I apologize.  I can't see him through

22   this.

23        THE COURT:  I know the problem.

24        MR. HOLLIDAY:  We will do our best.  I'm going to

25   peek.

BY MR. HOLLIDAY:

Q.   But I'm Winston Holliday, nice to meet you.  Okay.
Mr. Laffitte, you work at the bank.  That's established,
right?

A.   Yes, I do.

Q.   And tell us your position again.

A.   I order and review appraisals.

Q.   Palmetto State Bank is FDIC insured; is that
correct?

A.   That is correct.

Q.   The money that the bank loans to people, that money
is funded by deposits that are made by your customers; is
that right?

A.   Yes, sir.

Q.   And to a certain extent, these deposits contribute
to the value of your shares?

A.   Yes, they do.

Q.   And those shares are assets of your shareholders
that have value; is that also correct?

A.   That's correct.

Q.   And the money that is loaned out is under the
custody and control of the bank before it goes out of the
bank; is that also true?

A.   Yes, it is.

Q.   You stated that an appraisal was ordered for the

1  Murdaugh beach house on Edisto; is that correct?  In fact we

2  just were talking about it earlier.

3       A.   Yes.

4       Q.   And that appraisal, according to that document, was

5  ordered back in April of 2021; is that also correct?

6       A.   That's correct.

7       Q.   Okay.  I'm going to show you what's Government's

8  Exhibit 5, sir.  This was discussed before.  Do you recognize

9  this document as a Board member?

10      A.   Yes, I do.

11      Q.   Just go ahead and give me your understanding of what

12  this document is.

13      A.    It's a list of the loans that Alex had.  And it also

14  listed principal and collateral for each loan.

15      Q.   Okay.  Sir, I want to draw your attention to the

16  very second loan on that list, the last four.  It's blown up

17  here.  Is this the same Edisto beach house that you've been

18  talking about?

19      A.   Yes, it is.

20      Q.   At some point -- well, what's the amount of the loan

21  that's outstanding on that beach house at the time this

22  document was created?

23      A.   $193,691.

24      Q.   And at some point before that loan was extended, the

25  house had appraised at $730,000?

1     A.   Correct.

2     Q.   But that's not this April 2021 appraisal, because,

3     in fact, that appraisal was never completed; is that correct?

4     A.   It was completed.

5     Q.   When was it completed?

6     A.   I'm not sure, but it was after --

7     Q.   Well, let me ask you this.  You hadn't been shown

8     the completed appraisal here today, have you?

9     A.   No, I have not.

10    Q.   In April of 2021, do you know the status of this

11    loan ending in 9180?

12    A.   I do not.

13    Q.   Do you know whether it was -- needed to be renewed?

14    A.   I do not.

15    Q.   Okay.  Going down to the bottom of this document,

16    this is a loan ending in 6048 with a principal of $750,000.

17    We've been talking about this a little bit today; is that

18    right?

19    A.   Yes, we have.

20    Q.   Okay.  And this also -- when it says, "We will be

21    getting a second mortgage on the house when his wife's estate

22    is open," that's the same house that was referenced in loan

23    ending in 9180 that we just looked at; is that correct as

24    well?

25    A.   That is correct.

1    Q.   Are you sure that the appraisal that was referenced

2    in the Defendant's exhibit just a minute ago was being done

3    for 6048, or could it have been for 9180?

4        A.   The one for the previous loan that we talked about

5    had been on the books for some time.  I don't know exactly

6    how long, but I do know that for the $750,000 loan, that one

7    was one that started in April.

8        Q.   Okay.  And as for that loan, your understanding of

9    the 6048 loan is that it was for beach house renovations; is

10   that right?

11       A.   Correct.

12       Q.   And as far as these beach house renovations, were

13   you ever shown any details as to what was going to be done

14   with that house?

15       A.   I was not.

16       Q.   So if we could go back to the -- if you look at

17   the -- we are going to leave it here.  If you look at the

18   9180 loan, the house was appraised at $730,000.  It's

19   proposed in 6048 that the renovations will be more than the

20   value of the house itself; is that correct?

21       A.   That's correct.

22       Q.   But you were never provided any details as to what

23   supposedly was going to happen with this house?

24       A.   I know that they had been doing some work on it, but

25   I don't know the extent of it.

1     Q.   Do you know that the $750,000 actually was not used

2     for the beach house?

3     A.   After the fact, I do.

4     Q.   But at the time, you weren't informed that the

5     $750,000 appraisal really served no purpose?

6     A.   I was not aware of that.

7     Q.   So I'm going to show you Government's Exhibit 10I.

8     This is a wire, sir, from -- if you look at the very top --

9     July 15th of 2021.  And the amount down there is $350,000.

10    Can you see that?  I know it's small.  We can blow it up if

11    you would like.

12    A.   No, I'm fine.

13    Q.   And you see the authorization was, request received

14    via Russell Laffitte, you see that as well?

15    A.   Yes, I do.

16    Q.   And the $350,000 wire, if this was made up of funds

17    that were part of that $750,000 loan, you would not have been

18    aware that this took place; is that correct?

19    A.   That is correct.

20         MR. HOLLIDAY: Exhibit 10E, please.

21    BY MR. HOLLIDAY:

22    Q.   And, in fact, your job is you do real estate loans

23    for the bank; isn't that correct?

24    A.   That's correct.

25    Q.    Showing you Government's Exhibit 10E, it's dated

1  August the 9th of 2021.  Do you see that there's a $400,000

2  transaction into one of the accounts of Alex Murdaugh; is

3  that correct?

4       A.   That is the credit copy of a money order to where we

5  gave it to him.  The debit that went along with it is what we

6  call loans not on system.  In other words, the loan had not

7  gone through the booking process yet.

8       Q.   Okay.  Thank you for that, actually.  And so the

9  date when the loan had not gone through process, at least by

10  August the 9th of 2021, the loan had not been processed yet;

11 is that correct?

12      A.   Correct.

13      Q.   And then you do see, though, that it indicates loan

14 proceeds of $400,000?

15      A.   Yes, sir.

16      Q.   Are you aware that on August the 9th of 2021, there

17 was no loan paperwork for this?

18      A.   I was not.

19      Q.   Okay.  Showing you Government's Exhibit 192, we are

20 going to take a quick look -- I believe it's the third page,

21 maybe one more, maybe one more.  There we go.

22           Sir, looking at the very bottom of the page, second

23 line up, do you see a $400,000 transfer into this account?

24      A.   Yes, sir.

25      Q.   And do you see what the balance was before the

1    transfer?

2        A.    I do.

3        Q.    And it was a negative balance of over $367,000; do

4    you see that?

5        A.    I do.

6        Q.    Were you aware that $400,000 of your beach house

7    renovation loan was transferred into Alex Murdaugh's account

8    around August the 9th of 2021?

9        A.    I was not.

10       Q.    I'm going to show you Government's Exhibit 1L.

11   Sir, do you recognize what this document is, generally

12   speaking?  Over here on the left-hand side, what does it

13   indicate that is?

14       A.    The current approval history.

15       Q.    Okay.  And do you see in this middle block the

16   amount that's $750,000 that we've been discussing now?

17       A.    Yes.

18       Q.    Okay.  And you see that there's approval indicated

19   here, correct?

20       A.    Correct.

21       Q.    But the time stamps of the approval, when was the

22   loan finally approved, sir?

23       A.    8/18.

24       Q.    So that was well after the July the 15th transfer to

25   the Chris Wilson Law Firm?  Well, was it after the July 15th

1 transfer to the Chris Wilson Law Firm?

2 A. Yes, it would be.

3 Q. And it was also after the $400,000 transfer into

4 Alex Murdaugh's account to take him from a negative $367,000

5 into just over $20,000 positive; is that right?

6 A. It appears so.

7 Q. Who are the people down here who apparently approved

8 this post-dating of the loan?

9 A. It would be Russell, Gray Henderson, and my dad.

10 Q. Going back briefly to Government's Exhibit 1,

11 down -- well, first of all. Sorry. This was a Board meeting

12 that took place on July 20th, 2021; is that correct, sir?

13 A. Yes.

14 Q. We can go onto the very bottom. The defense asked

15 you about this line: All loans over $25,000 were reviewed,

16 discussed and approved. A copy is attached.

17 In fact, during the July 20th, 2021, board meeting,

18 the $750,000 loan did not exist; is that correct, sir?

19 A. Without seeing the full Board package, I'm not sure

20 if it was reported or not.

21 Q. Well, sir, we just looked. The loan did not exist.

22 A. Okay.

23 MR. HOLLIDAY: All right. Thank you, Your Honor.

24 The Government has no more questions.

25 THE COURT: Redirect?

1    MR. AUSTIN:  No further questions, Your Honor.

2    THE COURT:  Very good.  You may step down.

3    MR. AUSTIN:  Can we release this witness too?

4    MR. HOLLIDAY:  Yes, Your Honor.

5    THE COURT:  Yes.

6    (Whereupon, the witness is excused.)

7    THE COURT:  Call your next witness.

8    MR. DANIEL:  Beg the Court's indulgence.

9    The Government calls Charlie Laffitte Jr.

10   THE COURT DEPUTY:  Call his name one more time.

11   MR. DANIEL:  Mr. Charles Laffitte Jr.  The witness

12   is across street.  So we have another witness.

13   The Government (sic) would call Mr. John Marvin

14   Murdaugh -- the defense would call John Marvin Murdaugh.

15   MR. HOLLIDAY:  Your Honor, I think we need to have a

16   discussion before this witness, please.

17   THE COURT:  Okay.

18   (Whereupon, the following bench conference takes

19   place):

20   THE COURT:  Yes, sir.  What's the issue?

21   MR. HOLLIDAY:  The issue is, this is the gentleman

22   that Russell Laffitte reached out to last week to testify

23   regarding Alex Murdaugh's willingness to testify.

24   THE COURT:  Yes.

25   MR. HOLLIDAY:  The Court has ruled on that.  That is

1 a bright red line.

2 THE COURT: You can't cross that line. You are not

3 going to discuss that at all.

4 MR. AUSTIN: No, sir.

5 MR. HOLLIDAY: So --

6 THE COURT: I think it's clear.

7 MS. LIMEHOUSE: Also, for the record, I just want to

8 note, he's not under subpoena. It's our understanding he

9 hasn't been sequestered. Based on the ruling of Nancy

10 Drawdy, we believe his --

11 THE COURT: Wait. Wait. He has not been

12 sequestered? He should have been sequestered.

13 MR. DANIEL: I don't know, Your Honor.

14 THE COURT: Why would you not sequester him? It's

15 y'all's witness. What makes you think he's not sequestered?

16 MS. LIMEHOUSE: I spoke to an attorney this morning

17 who's familiar with the representation of the law firm. He's

18 not under subpoena and he hasn't been sequestered.

19 MR. AUSTIN: If we can take a lunch break now, I

20 think either we will clear this up and release him or we can

21 have another witness ready to go.

22 THE COURT: Yeah. Let me just say. I'm trying to

23 do everything I can. But you just can't spit in the eye of

24 the Court when we have a sequestration order. It helped to

25 your benefit during the Government's case. You can't just

1  turn it and ignore it.

2  　　　　MR. AUSTIN:  It was a totally honest mistake on my

3  part.  I think we are likely not going to call him.  We did

4  talk, provided a list last night, and none of this has come

5  up yet until right now.

6  　　　　MS. LIMEHOUSE:  I spoke with y'all about this this

7  morning, and I just learned this morning.  I just learned of

8  this last night.  So I don't think any timeliness is an

9  issue.

10 　　　　THE COURT:  Yeah.  Listen, he's on the list.  You

11 don't have to subpoena him.  But we have a sequestration

12 order.  I'm just -- the first one you had the suicide and all

13 this.

14 　　　　MR. AUSTIN:  We told him do not talk to anybody

15 about the case.

16 　　　　THE COURT:  Well, he's been doing it.  We are

17 told --

18 　　　　MS. LIMEHOUSE:  I don't know exactly what he has

19 spoken about or what he's learned, but I just know that he

20 hasn't been sequestered.

21 　　　　THE COURT:  Why don't you talk to him.  Let's take a

22 lunch break.  And if I need to do it outside the presence of

23 the jury, if you want to use him, we need to kind of get on

24 the record what the story is.  I am not trying to keep

25 witnesses out that have relevant testimony, but at some

1  point, we've got to quit violating the sequestration order.

2  You can't use it when you want it and --

3  MR. AUSTIN:  That was not our intent.  I apologize.

4  THE COURT:  I mean, so why don't y'all -- if you

5  don't want to call him, that's your call, and you will tell

6  me that.  I am not making a ruling on this.  But the bottom

7  line is, come back in 45 minutes.  After 45 minutes, if you

8  want to call him, and then I'm going to put him on the stand

9  and we are going to figure out and give the Government a

10  chance to examine any violation of the sequestration order.

11  MR. AUSTIN:  That's fair.

12  MS. LIMEHOUSE:  I don't know they actually notified

13  -- to be fair to the witness, I don't know there's any

14  intentional violation of it.

15  THE COURT:  I put it on the defense.

16  MS. LIMEHOUSE:  I'm just saying I don't want to

17  assume --

18  THE COURT:  I hear you.  I hear you.  I am not

19  accusing anybody of anything.

20  (Whereupon, the following bench conference ends.)

21  THE COURT:  Ladies and gentlemen, we are going to

22  take our lunch break.  And we will be back in an hour.  Okay?

23  (Jury leaves open court at 12:00 p.m.)

24  THE COURT:  Very good.  We will be at ease.  We will

25  be back in 45 minutes.

1   (Whereupon, recess transpired.)

2   (Whereupon, the following bench conference takes

3   place):

4   THE COURT:  Okay.  Where does the defense stand on

5   this issue about this witness?

6   MR. DANIEL:  We've talked to him, Judge, he said he

7   hasn't followed it at all.

8   MR. AUSTIN:  He has -- like, he's not -- he just

9   watched some coverage.  He's very vague with it.  He doesn't

10  like to watch.  It's a sensitive matter.

11  THE COURT:  Did he get instruction not to do that?

12  Did he receive instruction that he was sequestered and did

13  not --

14  MR. AUSTIN:  Not to talk to anybody in the case at

15  all.  I don't remember if I said about TV stuff.  He said he

16  hasn't watched anything.  So don't want to misrepresent him.

17  THE COURT:  The difference is sequestration means

18  you don't do any of that.  Did you tell -- he was your

19  witness.  He's listed on your list.  Did you tell him or

20  someone on your staff tell him he was sequestered?

21  MR. AUSTIN:  Well, I did not use those words

22  specifically, that word specifically.  I said, do not talk to

23  anybody on the case.  Like, he asked me if he could call

24  Russell, because they are friends.  And I said, no, you

25  cannot talk --

1  THE COURT: He apparently talked to the defendant.

2  He apparently talked to the defendant, didn't he?

3  MR. AUSTIN: I'm not sure what y'all are talking

4  about.

5  MS. LIMEHOUSE: We heard about last Monday

6  afternoon.

7  THE COURT: That's before the sequestration order.

8  Okay. So what's the Government's view?

9  MS. LIMEHOUSE: The defense has indicated to us that

10 they are going to limit his testimony to character evidence.

11  MR. AUSTIN: Yeah.

12  THE COURT: And you know what that means? You know

13 what that means is reputation. Right? That's it.

14  MS. LIMEHOUSE: Right.

15  THE COURT: That and a quarter will get you a

16 coffee.

17  MR. DANIEL: Won't get you a coffee anymore.

18 Second question.

19  MR. AUSTIN: Oh, and where we are going, try to ask

20 a couple of questions to get there, is who -- if he knows who

21 is the beneficiary of Maggie Murdaugh's estate.

22  THE COURT: And why is that relevant?

23  MR. DANIEL: They have said that he couldn't pay the

24 loans off. And that's a big issue in the case, because they

25 are bad loans. I understand that's not the legal issue,

1    that's surrounding the legal issue that he couldn't pay back

2    the loans.

3            MS. LIMEHOUSE:  He didn't.

4            MR. DANIEL:  And Judge  --

5            THE COURT:  Really, your point is you are saying

6    that they had a reasonable expectation he would still get --

7    have security?

8            MR. DANIEL:  Yes, sir.

9            THE COURT:  Of course, by July is he being

10   investigated for murder?

11           MR. DANIEL:  July?  No, sir.  It hadn't happened

12   yet.  I have no idea.  No one ever told us.

13           MS. LIMEHOUSE:  Yes, of course.

14           THE COURT:  Yeah.  Did that happen in June?

15           MS. LIMEHOUSE:  June 7th.

16           MR. DANIEL:  Judge, I don't think -- any of us

17   didn't know he was under investigation.  We all suspected he

18   might be involved, but didn't know he was investigated.

19   That's private.

20           THE COURT:  He could be cross-examined on that if

21   they wish to say that was a reasonable basis for thinking he

22   got security.  I mean, you can't get a security interest in

23   something, you know, that a person who's in an estate or

24   wife -- you know, one reasonable interpretation of her

25   avoidance was that she didn't really want to secure --

1   MR. DANIEL: I think Mr. Austin covered that. And

2   that wasn't it at all. We covered that with Mr. Laffitte.

3   MR. AUSTIN: She was scheduling PGA.

4   THE COURT: She was meeting with divorce lawyers,

5   guys.

6   MR. DANIEL: That might have precipitated all of

7   these events.

8   MR. AUSTIN: I've been told by these guys not to

9   believe anything I read --

10  THE COURT: I think it's pretty reliable, not

11  relevant in her case, but --

12  MS. LIMEHOUSE: We don't want to create an issue.

13  THE COURT: The law is, actually, if there's even a

14  fact of a sequestration violation, I should use the least

15  severe sanction possible. And so I am not yet demonstrated

16  that there's a -- that anything he's done as to these issues

17  have been affected by that, you know, sequestration. This

18  has not even been in the media, best I can tell. So, I mean,

19  if it was relevant to that, I would have allowed y'all to

20  have him out of the presence of the jury. But I don't think

21  there's any evidence that anything would have tainted the

22  testimony. Right?

23  MR. AUSTIN: I am not aware of.

24  THE COURT: So I'm going to say, call your next

25  witness.

1   MS. LIMEHOUSE:  Sounds good.  Thank you, Judge.

2   (Whereupon, the bench conference ends.)

3   (Whereupon, the jury returns to open court at 1:24

4   p.m.)

5   THE COURT:  Please be seated.  Defense, call your

6   next witness.

7   MR. AUSTIN:  Defense calls John Marvin Murdaugh.

8   JUROR:  Judge, sorry, but I had forgotten my

9   glasses.

10   THE COURT:  You go get them.  That was my wife's

11   standard, she couldn't see anything either.

12   THE COURT DEPUTY:  Please state your full name.

13   THE WITNESS:  John Marvin Murdaugh.

14                    JOHN MARVIN MURDAUGH,

15       having been duly sworn, testifies as follows:

16                    DIRECT EXAMINATION

17   BY MR. AUSTIN:

18   Q.   Good afternoon, Mr. Murdaugh.  If you want to take

19   your mask off, you can, if you are more comfortable.  I will

20   be real quick.

21   How do you know Mr. Laffitte?

22   A.   I'm sorry?  Say again.

23   Q.   How do you know Mr. Laffitte?

24   A.   We grew up together.

25   Q.   All your life?

1    A.   Yes, sir.

2    Q.   And over the course of your relationship, have you

3    had the chance to observe his general character?

4    A.   I have.

5    Q.   And has that been on a personal basis or

6    professional or both mostly personal?

7    Q.   Okay.  And would that include some professional?

8    A.   Yes.

9    Q.   And without going into any specific examples or

10   anything, based on your experiences with him, what is your

11   opinion of his character for honesty?

12   A.   Oh, he's an honest man.

13   Q.   And let's change gears real quick in just a couple

14   of questions.  I recognize how ridiculous this question is,

15   but did you know Maggie Murdaugh?

16   A.   I did.

17   Q.   And do you know who is the beneficiary of her

18   estate?

19   A.   Do I know who the beneficiary is?

20   Q.   Yes, sir.

21   A.   I believe it is my brother, Alex.

22        MR. AUSTIN:  Thank you.  Appreciate it.

23        THE COURT:  Cross-examination.

24                   CROSS-EXAMINATION

25   BY MR. HOLLIDAY:

1    Q.   Good afternoon.  How are you?

2    A.   Good afternoon.

3    Q.   I'm Winston Holliday.  I'm an Assistant United

4    States Attorney.  Okay?  What do you do for a living?

5    A.   I'm in the equipment business and tractor sales.

6    Q.   So you never worked at the law firm?

7    A.   No.

8    Q.   And you never worked at Palmetto State Bank either;

9    is that right?

10   A.   No, sir.

11   Q.   So as far as the substance of this case, checks, any

12   of that, loans, you have no idea about any of it; is that

13   right?

14   A.   I do not.

15        MR. HOLLIDAY:  Thank you for coming.

16        THE COURT:  Anything on redirect?

17        MR. AUSTIN:  No, Your Honor.

18        THE COURT:  Very good.  You may step down.  Thank

19   you, sir.

20        THE WITNESS:  Thank you.

21        THE COURT:  Defense, call your next witness.

22        MR. DANIEL:  Mr. Charlie Laffitte Jr.

23        THE COURT DEPUTY:  Please state your full name.

24        THE WITNESS:  Charles Atkins Laffitte Jr.

25                    CHARLES LAFFITTE,

having been duly sworn, testifies as follows:

DIRECT EXAMINATION

BY MR. DANIEL:

Q.   Good afternoon, Mr. Charlie.  Would you please pull the microphone, get close to the microphone so everyone can hear you in the courtroom.  And you can take your mask all the way off.  Do you want to take it all the way off?

A.   No, that's fine.

Q.   Okay.  If you would, give the jury an idea of your background, please, sir, where you grew up, where you were educated, and your work history.

A.   All right.  I was born in Estill, South Carolina. And moved up to Allendale when I was in the 8th grade, finished high school in Allendale - Fairfax High School. Then I went to The Citadel and graduated in 1961.  Went into the service, the artillery, for two years, finished in '63. And then came back to Hampton and went to work for the bank there.  And I've been there ever since.

Q.   Please tell the jury a little bit about the history of Palmetto State Bank going back to when it first began.

A.   All right.  The original name of the bank that I went to work for was Loan and Exchange Bank.  And it was a very small bank owned by Bowden family there in Hampton.  And total assets were about $100,000, counting deposits and everything.  I worked there from -- well, I worked there

1  forever.  But 1982, I believe it was, we had grown to a

2  pretty good size for little town like we were in., And

3  decided to open a branch in Beaufort -- well, Bluffton, I'm

4  sorry.  And changed the name to Palmetto State Bank, thought

5  it would sound better being down in Bluffton and Beaufort

6  County and Hampton County.  And then we had success with

7  that.  And in 19 -- correction, 2007, we merged our bank into

8  two other sister banks, my uncle, Marty Dew Laffitte, ran one

9  in Estill, South Carolina, and my father -- well, my father

10  had passed away.  But my brother was running the one in

11  Allendale known as Carolina Commercial Bank.  We put them all

12  three together into Palmetto State Bank.  And that was in

13  2007.  And we've been operating like that until now.  Assets

14  now are around 671 million for the three of us together.

15      Q.   Did you say 671 million?  I just couldn't hear you,

16  671 million?

17      A.   Right, total assets.

18      Q.   Yes, sir.  And when you first started, when you

19  first began working at the bank, what were the assets?

20      A.   114,000 and some-odd dollars.

21      Q.   And has the bank historically been a profitable

22  bank?

23      A.   Yes, sir.  We've had some bad years at the beginning

24  because we were so small, but it's been profitable, one of

25  the most profitable banks in South Carolina.

1    Q.   Okay.

2    A.   And considering that we live in an -- or we operate

3    mainly in one of the poorest areas of South Carolina,

4    Allendale and Hampton Counties.

5    Q.   Trace a little bit, if you will, more recently, I

6    believe you've been CEO and Chairman of the Board, when did

7    you give up being CEO and Chairman of the Board?

8    A.   October the 18th, I believe, I was removed.

9    Q.   And that was 2020?

10   A.   '22.

11   Q.   And prior to that, what was Mr. Sterling Laffitte,

12   who has now passed, what was his role at the bank?

13   A.   He was the CEO of the Exchange Bank in Estill before

14   we merged.  And then he was the number two man in the merged

15   banks after we put them together.

16   Q.   There was Exchange Bank in Estill.  And that was

17   sort of the other side of the Laffitte family owned that

18   bank?

19   A.   One of my father's brothers.

20   Q.   And then there was --

21   A.   Carolina Commercial in Allendale, that's -- my

22   father was the main one there.  And then his son, my brother,

23   Henry, took over.  And he passed away.  I'm not sure which

24   year, but it's been four or five years ago.

25   Q.   Okay.  So you've been CEO for -- you were Board CEO

1   for how long then?  Since what year?

2       A.    Well, counting just before we merged, probably 30

3   years.

4       Q.    And when did you become Chairman of the Board also?

5       A.    Back after 2007.

6       Q.    And is that when y'all grew again?

7       A.    Right, when we went together.

8       Q.    Okay.  And how was the Palmetto State Bank been

9   ranked as far as efficiency goes with the banking -- South

10  Carolina banking -- state chartered banks association?

11      A.    Well, year in and year out, we ranked pretty high on

12  the efficiency ratio.  There's some people that study the

13  banks and put out a report every quarter.  And, basically, we

14  were number 1 and 21.  But that was our overall ranking also,

15  number one.  That looks at your capital and your assets and

16  your loans, the whole operation.

17      Q.    Is that number one of community banks or something

18  larger?

19      A.    Any bank that's chartered in South Carolina.  And

20  most of them are community banks.  There's a couple of fairly

21  good-sized banks, but we ranked about a third of the way

22  down, about 15th or 16th in size.

23      Q.    Would you give the jury an idea of banking in a

24  small community like Hampton versus a larger town or city?

25      A.    Well, it's just you know the people and you try to

1    get to know all the people.  And it's just a different

2    mindset, I think.  A big customer to us is somebody that's

3    got a good job and makes weekly and monthly deposits.  And to

4    the big banks, they look at a good customer that has

5    millions.  And that's not the way it is in small banks like

6    us.

7         Q.    And do you all make small loans?

8         A.    Yes, sir.  We make -- I would say from about $100

9    up.  Not too many $100 ones, but occasionally we will have

10   somebody come in that's been there forever and need $100 for

11   telephone bill or water bill or something.

12        Q.    Okay.  So are your loan officers and, of course,

13   you, accessible to the general public and some of your

14   long-term customers?

15        A.    Yes, sir, yeah.

16        Q.    And how well have you gotten to know the people in

17   the community?

18        A.    Well, my memory is not as good as it used to be, but

19   I know all of them and they all know me.

20        Q.    Describe the business climate in Hampton itself,

21   Hampton County.

22        A.    Right now we are going through a pretty tough time.

23   Hampton, it's best day is when Westinghouse had a

24   manufacturing plant there and employed about 1,500 people.

25   And it closed probably 10 years ago when it sold out to

1    another company, and then they closed.  So we really have no

2    to manufacturing right in the area.  Down around Yemassee, we

3    are getting a couple of new industries coming in down there,

4    but that's basically it.

5         Q.   What's probably the largest, the largest business,

6    if you will, in the community?  I say "business," what's the

7    largest entity that gives the bank business?

8         A.   Farming is still probably the largest in the county.

9         Q.   What was that?

10        A.   Farming, cotton, peanuts, soybeans, and grass.

11        Q.   Are many of your loans associated with farming?

12        A.   Not as many as it used to be, but still quite a bit.

13        Q.   And what about the hospital, do you all do work with

14   the Hampton Regional Hospital?

15        A.   Yes.  They are good customers of ours.  It's a good

16   hospital associated with the Medical University down in

17   Charleston.  And we are lucky to have them.

18        Q.   As a result of the lack of industry or business in

19   the community, could you discuss with the jury a little bit

20   some of the challenges that you face in Hampton County versus

21   being in some other larger county as far as the business of

22   the bank?

23        A.   Well, we just don't have the money circulating in

24   the area like it does in our other areas, Bluffton and

25   Beaufort.  Allendale, Estill, and Hampton and the lower part

1 of the state is just -- just doesn't have many wealthy

2 people. We've gotten a few lately moving up from Hilton Head

3 buying some houses for second homes when hurricanes come and

4 that kind of stuff. But, basically, it's just a good,

5 hard-working community.

6 Q. And where do you have branches? You mentioned,

7 obviously, Hampton County.

8 A. Right.

9 Q. And where else do you have branches still today?

10 A. We have a branch in Allendale, Fairfax, Estill,

11 Hampton, Bluffton, and two in Beaufort.

12 Q. And how does the bank in Beaufort, which is the

13 larger community, compare to the bank in Hampton and

14 Allendale?

15 A. It's about a third the size of the bank in Hampton

16 and about the same size as the one in Allendale.

17 Q. Okay. In terms of profitability, which is the most

18 profitable bank?

19 A. Hampton by far.

20 Q. And why is that other than being well-run?

21 A. Well, it was really because of the people, I guess.

22 And we've got a lot of local people working. We've got some

23 good, hard-working loan officers. And we've built up a good

24 reputation. There's two other banks in town, Truist and

25 Regions Bank, which are part of a larger organization, but

1    they used to be larger than us locally, but now they are not.

2      Q.   And tell us about your family's history, including

3    your parents' history with the Murdaugh family.

4      A.   Well, when we moved to Hampton in '63, they moved

5    right across the street from us shortly after that. And

6    their children and my children all grew up just about the

7    same age, and known them all my life. I mean, recently, I

8    say recently, within the last five years, I guess, Alex and

9    his family moved out into the Moselle area which is about 20

10    miles from town. But before that, they were right there

11    across the street from us.

12      Q.   Describe the collegiality on the Board up until more

13    recent times, such as 2020 or 2019. Did the Board get along?

14    And how was it run? How was the bank run?

15      A.   It was running fine. The Board got along fine. And

16    further back, it was really almost a family get-together. We

17    would have lunch and then enjoy catching up with everybody

18    and doing our banking business. The last two or three years,

19    there's been a lot of contention on the Board.

20      Q.   And when did that tone or collegiality change?

21      MS. LIMEHOUSE: Objection, Your Honor. I think this

22    relates to your prior ruling about the sale of the bank.

23      MR. DANIEL: I didn't hear the objection.

24      THE COURT: She objects on the basis that it's not

25    relevant based on my prior rulings. And I sustain that

1 objection.

2         MR. DANIEL:  Okay.

3 BY MR. DANIEL:

4     Q.   Back in the day, before 2019, 2020, did you all have

5 occasion to go into executive session much?

6     A.   No, we didn't.

7     Q.   Now, there's been testimony about the $750,000 loan

8 to Mr. Alex Murdaugh.  Tell the jury a little bit about that

9 loan, how it came to be, what your involvement was with that

10 loan.

11     A.   Well, we have a printout every day that goes on the

12 officer's desk that shows overdrafts, or not only overdraft

13 but returned checks, but in overdrafts.  And I don't remember

14 the exact figure, but Alex had a pretty big overdraft on his

15 account.  And either he called me or I called him.  I can't

16 remember which to be honest, and talked about it.  Russell

17 and I talked about it.

18         MS. LIMEHOUSE:  Objection, Your Honor.  This is

19 hearsay.

20         MR. DANIEL:  Judge, he just said they discussed it,

21 they discussed the overdraft.

22         THE COURT:  He can't go further than that.

23         MR. DANIEL:  Okay.

24 BY MR. DANIEL:

25     Q.   And what did you decide when you discussed the

1  offered?

2      A.    That we were making arrangements to get it covered.

3  And we would make him a loan.  And we had been talking

4  earlier about his house, the beach house.  And we had a

5  mortgage on it.  The mortgage was down to, like, $200,000.

6  And it was appraised for a lot more than that.  And we would

7  put a mortgage on the beach house and cover his overdrafts in

8  the amount of $750,000.

9      Q.    Okay.  And then what happened?  Sort of go through

10  the process itself.

11      A.    Well, after that, I turned it over to Russell to get

12  it done.

13      Q.    And were you kept apprised, you and your daughter

14  Gray, kept apprised of the progress of the loan?

15      A.    No, I did not.

16      Q.    Okay.  Were you familiar with Alex Murdaugh's loan

17  history?

18      A.    Yes, sir.

19      Q.    Okay.  And describe that for the jury.

20      A.    Alex, over the years, has borrowed a lot of money

21  from us.  All except two loans that we had made back in early

22  part of, I would say, 2010 or so, he and three other fellows

23  bought some land down in Berkeley County, a speculative

24  project, and as economy turned south, nobody was interested

25  in the property.  And Alex's partners couldn't or wouldn't

1    come up with the money.  I'm not sure which.  And we ended up

2    charging that loan off.  And Alex, up until last year, I

3    believe it was, was paying the principal on that loan once a

4    year, around the end of the year.

5        Q.    And was that --

6        A.    Two loans, not one, two.

7        Q.    And was that a significant payment each year up

8    until last year?

9        A.    It was between 50- and $100,000 on each one.

10       Q.    Okay.  Now, are you familiar with his history of

11   overdrafts?  You mentioned his history of loans.  And except

12   for those two loans that were charged off, what was his loan

13   history like in terms of borrowing and paying back?

14       A.    He always paid back.  Sometimes he would be little

15   bit late, but mainly his income came in -- majority of his

16   income came in right at the end of the year, the first of the

17   next year.  Like I said, we had the beach house financed.

18   And we financed the land where he moved out there into

19   Moselle, two large pieces of property, no problem.  Financed

20   automobiles over the years.  And he always paid, except for

21   those two loans which we figured the best way to do is to

22   charge those off, because his partners left him holding the

23   bag.  And we knew if the economy ever got good, property

24   would probably sell.  And it was listed for sale all this

25   time.

1    Q.    Okay.  And which piece of property is that?  Is that

2    Moselle?

3    A.    No, the two properties that we charged off, they

4    were two small properties in Berkeley County.

5    Q.    Yes, sir.  Okay.  And even though those loans were

6    charged off, did you still pursue collection?

7    A.    We did, yes.

8    Q.    And what other legal remedies or avenues did you

9    have to collect on those charged-off loans, if you know?

10    A.    Well, we could foreclose on them, but like I said,

11    the economy had gone south at that time and nobody was buying

12    property over there in Berkeley County in that area.  And,

13    like, we had them for sale.  And he had them for sale.  And

14    nobody had even hardly made an offer.  They did sell this

15    year, though.

16    Q.    And then when the $750,000 loan came up sort of

17    again, I'm going to ask you to -- please bring up

18    Government's Exhibit No. 4, please, which is the Executive

19    Committee meetings on August the 21st.  I'm sorry.  I'm

20    sorry.  August the 12th, 2021.

21    A.    Right.

22    Q.    Okay.  And talk a little bit about the discussion

23    that was held.

24    A.    On Alex's loan?

25    Q.    Yes, sir.

A.    Well, one of our Board members had asked for a

breakout of all his loans.  And there was a small error, I

say small error, it was an error in the total loans

outstanding just because of the two loans that had been

charged off.  The way our system works, it shows total loans

that are owed to the bank.  But it does not account for

charged-off loans because it's already been taken off of the

bank's books as a loss.  And that was the difference in the

confusion on what the total loans were.

Q.    And so they were not included on the list because

they are not in the computer system anymore once they are

charged off?

A.    That's correct.

Q.    So explain a little bit about charged-off loans.

Why would the bank charge off loans other than the fact the

customer can't pay or can't make payments?

A.    Well, if the loan is on our books, say, 120 days

past due or, in this case, they were longer than that, it

looks bad to the FDIC and the State Board of Financial

Institutions, and it's a possible loss.  So what we would

like to do, and we've set up a good reserve for loan losses,

is to charge off to that reserve for loan losses, and then

continue trying to collect it, though.

Q.    Yes, sir.  And does the FDIC from time to time make

banks, in particularly your bank, charge off certain loans?

1    A.    Yes, sir, they do.

2    Q.    Have they ever made Palmetto State Bank?

3    A.    Yes.

4    Q.    And what's the effect from an accounting standpoint

5    and financial standpoint when such a loan is charged off at

6    the bank other than the loan itself?

7    A.    When it's charged off, any money we collect on it

8    can only go toward principal and not toward interest.  So we

9    are earning no interest on it.  The computer and us, we can

10   calculate the interest.  We know how much interest is owed on

11   that loan.  And, like, when you sell it or after foreclosure

12   or whatever, you could try to collect that loan.  You usually

13   don't get all of it, but you try to.

14   Q.    Now, I believe this was the August 12th, 2021, Board

15   minutes.

16   A.    This is.

17   Q.    And if you will bring up Government's Exhibit 3,

18   please.  And I believe this is the attachment; is that right?

19   Is this -- was this attached?  Bring up the August the 17th,

20   2021, exhibit, which was the minutes of that date.  Yes.  And

21   could you call up, please, who attended so we can read it

22   nice and clearly.

23        Okay.  These are the August 17th Board of Directors

24   meeting.  And do you remember if most of the Board members --

25   does this list include most the Board members?

1    A.   Yes, sir.

2    Q.   And if you call up the next paragraph, please.

3    Okay.  And I didn't mean that one.  I apologize.  Call up the

4    rest of the page.

5         And you are just reporting on how well the bank is

6    doing in that paragraph there, the second paragraph?

7    A.   Yes.  Yes, sir.  And making sure that they've read

8    the minutes and the motion that the minutes be approved.

9    Q.   And you reviewed -- it says that you reviewed the

10   Executive Committee minutes of August the 12th; is that

11   right?

12   A.   Yes, sir.

13   Q.   And please go to the next page.  Okay.  And I

14   believe the second paragraph, if you want to take some time

15   to read that, talks about the exposure to Mr. Murdaugh's

16   loans or exposure with his loans?

17   A.   Right.

18   Q.   Read that.  Just take your time and tell a little

19   bit of the jury -- tell the jury a little bit about that

20   exposure.

21   A.   Well, when we were discussing his loans, Russell

22   stated it was our intention to sell the farm, that's his farm

23   in Moselle where he lived.

24   Q.   And how much was that, roughly ballpark figure, what

25   kind of figures are they worth?

1      A.   I think one of them was -- it was two separate

2 parcels of land.  I think 1 was 800-something thousand and

3 the other was 900-something thousand, total of a million 9 or

4 10, million 8 or 9.  And the property was appraised for,

5 like, 3.5, or something in that neighborhood.

6      Q.   And is this where you explain to the Board the

7 charged-off loans which had been left off of the previous

8 meeting?

9      A.   Right.

10      Q.   And did you explain to the Board the why of it being

11 charged off, the two loans?

12      A.   Well, those two loans were the two loans we were

13 talking about in Berkeley County that this partner bailed on

14 him.  And they hadn't -- we hadn't foreclosed on them because

15 nobody was buying at that time.  I mean, we were in a

16 recession.

17      Q.   But I believe you testified earlier about they were

18 not in the system of the bank.  So were they intentionally

19 left off?

20      A.   No.  No.  It shows up on the bottom of that sheet

21 where those loans are, but doesn't include them in the total.

22      Q.   Okay.  And please pull up Government's Exhibit 6.

23 Okay.  And Government's Exhibit 6 is the August 17th minutes.

24 And please pull out the -- who attends that meeting.  Okay.

25 And call out the next paragraph, the next few paragraphs.

1    It's just enlarged all the way through.  Yeah.  Okay.

2            And you again report on the profitabilty of the bank

3    in that fourth paragraph, I guess.  And I think I see -- I

4    guess second paragraph from the bottom.  And you reviewed

5    Executive Committee meeting minutes of August 12th.  And you

6    discussed different loan requests that were discussed there?

7        A.   Yes, sir.

8        Q.   Okay.  Please pull up the next page.  And second,

9    please.  Call out second paragraph and enlarge it.

10           Okay.  Tell the jury what this is.  This is August

11   the 17th.

12       A.   This is talking about those charged-off loans and

13   the total Alex owes and then the $750,000 loan.

14       Q.   Okay.  And at this time, it's been updated to

15   include the two charged-off loans?

16       A.   That's right.  It was not charged off at that time.

17       Q.   Okay.  Exhibit 5, please.  Okay.  Now, this Exhibit

18   5, is this part of these minutes?  That's attached to the

19   minutes?

20       A.   Yes, sir.

21       Q.   Okay.  And please call out the bottom, the $750,000

22   loan.  And this was additional information being provided to

23   the Board?

24       A.   Yes, sir.  This loan was the $750,000 loan that we

25   agreed to cover his overdrafts with.  When the paperwork got

1  to the attorney, we found out that Alex had transferred the

2  home, the beach house, to his wife, Maggie.  And, therefore,

3  we couldn't get a first mortgage on it because his wife's

4  estate hadn't been opened.  And so we took $250,000 share of

5  Green Swamp stock that he volunteered to give us as

6  collateral.  And other than that, until we got the second

7  mortgage, that's all we had on it.

8     Q.  Okay.  And were you making progress at that time

9  towards the second mortgage as the estate was opened?

10     A.  We were waiting on it, you know.  I mean, we had it

11  out there to be title work done as soon as it got done.

12     Q.  Do you know who the beneficiary of Maggie Murdaugh's

13  estate was?

14     A.  I do not know.

15     Q.  It wasn't Alex?

16        MS. LIMEHOUSE:  Objection, Your Honor.

17        MR. DANIEL:  I withdraw there.  I thought he knew

18  that, Your Honor.

19  BY MR. DANIEL:

20     Q.  Okay.  What was the general purpose of the $750,000

21  loan?  I believe you testified earlier about the overdraft.

22     A.  That and the expenses on the beach house.  For

23  several months, they were working on the house, remodeling it

24  and adding bathrooms and --

25     Q.  So he had already incurred these significant

1 expenses?

2     A.   He had been doing it for several months.

3     Q.   Okay.  And Exhibit No. 84, please, which is a

4 September 19th, 2021, minutes of the special meeting of the

5 Board of Directors.  That's not in evidence.

6        MR. DANIEL:  It's not in evidence yet, Your Honor.

7 I just want the jury to -- please bring it up for the witness

8 and identify it.

9        THE COURT:  This is not in evidence?

10        MR. DANIEL:  This is not in evidence yet, Your

11 Honor.

12        THE COURT:  Don't show it to the jury yet.  Get him

13 to identify it first.

14        MR. DANIEL:  Do you all see that?  No, they don't

15 see it.

16        THE COURT:  Very good.  Go ahead.

17 BY MR. DANIEL:

18     Q.   Do you remember this meeting?

19     A.   Yes, sir.

20        MR. DANIEL:  Your Honor, does the Court have it as

21 well?

22        THE COURT:  Yes, I have it.

23        MR. DANIEL:  Your Honor, we would like to offer this

24 into evidence as exhibit -- September 29th minutes of special

25 meeting, and it would be exhibit, Defendant's Exhibit 84.

1       THE COURT:  Okay.  Is there an objection?

2       MS. LIMEHOUSE:   Yes, Your Honor.  We object to the

3   relevance.  The whole minutes are redacted except for minor

4   portion that we think is irrelevant.

5       MR. DANIEL:  We were just going to read the first

6   paragraph, Your Honor.

7       MS. LIMEHOUSE:  Your Honor, we think this relates to

8   your prior ruling as well.

9       THE COURT:  I don't see the relevance.

10      MR. DANIEL:  Your Honor, may we approach?

11      THE COURT:  Yes.

12      (Whereupon, the following bench conference takes

13   place.)

14      MR. AUSTIN:  I'm confused about your prior ruling.

15   Wasn't it on the stock repurchase program or was it on sale

16   of the land?

17      THE COURT:  You are trying to undermine the

18   credibility of prior witnesses on the basis of extrinsic

19   evidence.  That is not allowed.  You can only prove it -- you

20   can impeach him, but you can't offer it --

21      MR. DANIEL:  I am not offering to impeach, Your

22   Honor.

23      THE COURT:  What is the purpose?

24      MR. DANIEL:  To show there's a tremendous riff on

25   the Board and that's the motivation --

1    THE COURT:  That's my whole point, that you can't

2  prove that by extrinsic evidence.  You can't use him to prove

3  that someone else is lying by extrinsic evidence.

4    MR. DANIEL:  I am not trying to prove they are

5  lying, Judge.  I'm trying to prove they were trying to

6  sell --

7    THE COURT:  That's fine.  It's not relevant.  You

8  are trying to undermine -- it's not relevant to the case.

9  It's not relevant to --

10    MS. LIMEHOUSE:  A riff that existed between Board

11  members relating to the sale of a bank is entirely irrelevant

12  to these charges.

13    THE COURT:  It only was offered, as I understood it,

14  was an attempt to prove that -- damage to the credibility of

15  the Laffittes.  You can't prove it by extrinsic evidence.

16    MR. DANIEL:  It's being offered for the substance.

17    THE COURT:  No, but under the rule, you can impeach

18  someone, but you can't offer extrinsic evidence to prove the

19  impeachment.

20    MS. LIMEHOUSE:  Trying to impeach all these Board

21  members while they testify.

22    MR. AUSTIN:  I'm just having a hard time

23  understanding.  I'm not sure I'm following.

24    THE COURT:  There's a rule that you can impeach a

25  witness who is on the stand, but the subject of that

1  impeachment cannot be proven by through other witnesses or

2  other documents as extrinsic evidence.

3          MR. AUSTIN:  That's where I think there's a

4  disconnect.  We are not trying to impeach --

5          THE COURT:  What are you trying to prove?

6          MR. AUSTIN:  First thing I say is going to sound

7  like impeachment.

8          MS. LIMEHOUSE:  You are trying to impeach them, give

9  them a motive to testify against --

10          MR. DANIEL:  It's a motive for action, Your Honor.

11  It's the motive for action, to get --

12          THE COURT:  I sustain the objection.  I've heard

13  enough.

14          MR. DANIEL:  Judge, may I say something one thing

15  and put it on the record?  Your Honor, we've taken

16  exception -- we want the record to be clear we've taken

17  exception to the fact we are not allowed to get the Bank of

18  America Forge checks in.  We take exception to that.

19          THE COURT:  That's not --

20          MR. DANIEL:  I understand it's different.

21          THE COURT:  I am not dealing with that right now.

22          MR. DANIEL:  We take exception to the Court's ruling

23  on this.  Those are two biggest --

24          THE COURT:  You can do that at a different time.

25  But as to this ruling -- we can take up outside of the

1  presence of the jury the other issue.

2          MR. DANIEL:  Yes, sir.  Yes, sir.

3          (Whereupon, the bench conference ends.)

4          THE COURT:  I sustain the objection.

5          MR. DANIEL:  Yes, sir.

6  BY MR. DANIEL:

7      Q.  Would you call up, please, just for the witness --

8  well, let me say this, it's Defendant's Exhibit 76, a

9  September 21st, '21, minutes of the full Board meeting.

10          MS. LIMEHOUSE:  Your Honor, I don't believe this has

11  been admitted, just to be clear for the record.

12          MR. DANIEL:  I know.  That's why I said -- do y'all

13  object to it?

14          MS. LIMEHOUSE:  No, we don't take a position yet.  I

15  just want to be clear for the record.

16          MR. DANIEL:  Pull it up so Mr. Laffitte can read it.

17  BY MR. DANIEL:

18      Q.  And are you familiar with these minutes?

19      A.  Yes, sir.

20      Q.  And are these minutes an accurate summary, again, a

21  summary, of the Tuesday, September 21st meeting with all the

22  Board of Directors present?

23      A.  Yes, sir.

24      Q.  And did these minutes have an attachment to them of

25  all the loans over $25,000?

1    A.   They should.  I haven't seen the other pages.

2    Q.   I will show you that later.  Okay.

3         MR. DANIEL:  At this time we would offer Exhibit No.

4    76, which is a September 21st, '21 minutes of the full Board.

5         THE COURT:  What's the number?  What's the exhibit

6    number, proposed exhibit number?

7         MR. DANIEL:  Yes, proposed Exhibit No. 76.

8         THE COURT:  Is there an objection to Defendant's

9    Exhibit 76?

10        MS. LIMEHOUSE:  We have no objection to the minutes

11   themselves and the attachments that may be addressed later,

12   subject to the Court's ruling related to any information

13   prior to the Court's ruling.

14        THE COURT:  Then Defendant's Exhibit 76 is admitted

15   without objection.

16        (Defendant's Exh. 76 is received in evidence.)

17        MR. DANIEL:  Call up, please, page 2.  That's a

18   number of paragraphs that talks about all loans.

19   BY MR. DANIEL:

20   Q.   Okay.  If you will read that for the benefit of the

21   jury.

22   A.   "All loans over $25,000 were reviewed, discussed,

23   and approved.  A copy is attached."

24   Q.   And did you bring -- not here, not here now, but did

25   you have with you before today and this morning the

1  attachment?

2      A.   Yes, I had.

3          MR. DANIEL:  And the attachment, Your Honor, is

4  exhibit number -- Defendant's Exhibit No. 85.  It is not in

5  evidence.  But I will bring -- I would like to bring it up on

6  the screen for the witness only.  Okay.  And if you will go

7  to -- please call out so witness can see the loan we are

8  talking about, which is the second from the bottom or third

9  from the bottom.

10 BY MR. DANIEL:

11     Q.   Okay.  Are you familiar with that?  Not what it is,

12 but are you familiar with that?

13     A.   Yes, sir.

14         MR. DANIEL:  Okay.  Your Honor, at this time I would

15 offer exhibit No. 85 in.

16         THE COURT:  Is there an objection?

17         MS. LIMEHOUSE:  Yes, Your Honor.  May we approach?

18 We will be brief.

19         (Whereupon, the following bench conference takes

20 place.)

21         MS. LIMEHOUSE:  We just received this during lunch.

22 It is -- and we have not seen it before today.  The first

23 issue is just all these private people's information.

24 Specifically, I just want to highlight he's involved in the

25 boating accident in that press release.

1    THE COURT:  He's not trying to -- we might be able

2    to redact it.

3    MR. DANIEL:  I will just call out --

4    MS. LIMEHOUSE:  A redacted portion we are okay with.

5    THE COURT:  Okay.  Do you want -- I will let you do

6    it by redacting it, or you can just get the information in

7    through his testimony.  Which one would you like to do?

8    MR. DANIEL:  Can I just call out the one little

9    thing?

10    THE COURT:  Yes, you can.  You can do that, yes.

11    MR. DANIEL:  I'll call out the Murdaugh loan.  Thank

12    you, sir.

13    (Whereupon, the bench conference ends.)

14    THE COURT:  I don't believe you are offering

15    exhibit, but you may proceed.

16    Q.   Exhibit No. 85 is now in evidence.

17    THE COURT:  I thought we agreed you weren't going to

18    put 85 in.

19    MR. DANIEL:  Your Honor, I was going to call up,

20    though, is the one paragraph that applied while redacting the

21    whole --

22    THE COURT:  Okay.  We are going to have redacted

23    other than the Murdaugh loan, correct?

24    MR. DANIEL:  Yes, Your Honor.

25    THE COURT:  Very good.  85 is admitted with only the

1    Murdaugh loan disclosed.

2            MR. DANIEL:  And we would like to keep the title,

3    Your Honor, so it's clear.

4            THE COURT:  Yes.

5            MR. DANIEL:  It's Defense 85.

6            THE COURT:  Defendant's Exhibit 85 is admitted

7    subject to those limitations.

8            (Defendant's Exh. 85 is received in evidence.)

9    BY MR. DANIEL:

10      Q.   You can bring it back up for the witness and the

11   jury.

12          Okay.  And explain, was this attachment to those

13   minutes of September 21st, 2021?

14      A.   Yes, sir.

15      Q.   Okay.  And what does this tell us?

16      A.   It tells us there's a loan that Richard Alex

17   Murdaugh, $750,750, and N stands for new loan, and that's his

18   total indebtedness out to the right lane, $3,545,647.86.

19      Q.   Was that a loan approved at the September 21st,

20   2021, meeting?

21      A.   Yes, sir.

22      Q.   And that's what -- this is attached to the minutes

23   of that where it says all loans were approved?

24      A.   Right.

25      Q.   Okay.  And, please, moving on next to the $680,000,

1    I'm sorry, Badger settlement.  Please bring up Exhibit 40,

2    Government's Exhibit 40E.

3         Okay.  Before we even look at that exhibit, tell the

4    jury a little bit about your recollection of the Badger

5    settlement and your discussions with Russell Laffitte and

6    your daughter Gray?

7         A.   All right.  Russell's office is on one end of the

8    building and I'm on the other end of the building.  So he

9    called me on the phone.

10        MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

11        THE COURT:  You can't speak -- not what the

12   defendant said to him.

13   BY MR. DANIEL:

14        Q.   Did you have lengthy discussions about the $680,000

15   settlement with your son Russell and your daughter Gray?

16        A.   Yes.

17        Q.   And as a result of those discussions, did you

18   approve the settlement of the $680,000 settlement when of the

19   Badger case with the Murdaugh -- the Peters Murdaugh Parker

20   Law Firm?

21        A.   Yes, sir.

22        Q.   And how did you feel -- was that a favorable

23   resolution for the bank, and if so, why, or unfavorable

24   resolution for the bank?

25        A.   On that Badger settlement?

1     Q.   Yes, sir.

2     A.   Well, it was going to be half of what the claim was.

3 And Murdaugh law firm was going to handle the other half.  So

4 I don't like to pay out any money, but that was reasonable.

5     Q.   And while the money was being delivered to the law

6 firm, the $680,000, who was it delivered ultimately to, or

7 going to be delivered ultimately to, the customer?

8     A.   Yes, sir, it was going to the customer.

9     Q.   And how important was that to y'all's reputation in

10 doing the right thing in Hampton County, at the Hampton

11 County banking community?

12    A.   Well, it's very important because showed if we owed

13 something, we paid it.

14    Q.   And was there a discussion, not what anybody said,

15 but discussion of eventually or soon getting the lawyers

16 involved?  Did you have a discussion with your son Russell

17 Laffitte, and if so, what did you say to him about getting

18 the lawyers involved when he came to you with that proposed

19 settlement?

20    A.   Well, when he came to me and told me about the

21 situation, we agreed that that was the best solution.  But we

22 needed to, you know, notify our attorneys.

23    Q.   Okay.  And as a result of that discussion, did he,

24 if you know, did he, in fact, get the attorneys involved?

25    A.   Yes, sir, he did.

1    Q.   And please call out Government's Exhibit No. 80,

2   which is an exchange between Trenholm Walker and Russell

3   Laffitte.  Okay.  And after you read it, explain to the jury

4   what's going on there.

5    A.   It's an e-mail from Russell to Trenholm Walker, who

6   was our Board attorney, and telling him about the $680,000

7   agreement.

8    Q.   Okay.

9    A.   And --

10    Q.   Go ahead.

11    A.   And he had made the agreement to pay it.  And it was

12   not an option not to pay it.  But they discussed the terms of

13   it with him.

14    Q.   Did you agree with it, with that statement, and if

15   so, why?

16    A.   Yes.  I thought it was the best thing to do.

17    Q.   And you thought it was in the best interest of the

18   bank?

19    A.   Right, for the bank.

20    Q.   Okay.  Please bring up -- after this exchange, there

21   is a Board meeting the next day, on November 3rd, 2021.  I

22   would like you to bring up, please, the transcript as

23   Government's Exhibit 223, November 3rd minutes.  If you could

24   just -- are you familiar with discussion that night, that day

25   on November 3rd minutes of the 680 settlement?

1    A.    Yes, sir.

2    Q.    Please go to page 12.  If you could call out the

3    paragraph.  Yes.  Now, it says there that you discussed the

4    Badger meeting -- the proposed settlement at your meeting, at

5    a meeting on Sunday night.  It was an emergency meeting

6    Sunday night; is that right?

7    A.    It was a Sunday, yes.

8    Q.    And that was just a few days before this particular

9    meeting?

10    A.    Right.

11    Q.    Okay.  And by this time, what is the involvement of

12    the lawyer, Trenholm Walker?

13    A.    What was that question again now?

14    Q.    What is the involvement of the attorney Trenholm

15    Walker at this time?

16    A.    He said that he would talk to Ronnie Crosby and for

17    us not to do anything until he talked to Ronnie Crosby.

18    Q.    And had Ronnie Crosby -- well, go ahead and read the

19    next -- call up the next.  You were right the first time.

20    Call up the bottom of the first page.  Yeah.  Call out that,

21    please.  Okay.

22          This is -- the law firm was -- the bank had

23    responsibility for this also?

24    A.    Right.

25    Q.    And there at the time it looks like they are willing

1  to pay half and the law firm is willing to pay half and the

2  bank should be willing to pay half, according to Mr. Crosby?

3      A.   That's right.

4      Q.   Because they are accepting some responsibility for

5  the fact it was --

6          MS. LIMEHOUSE:  Objection, Your Honor.  Testifying.

7          THE COURT:  You are leading him.  Ask him a

8  question.  Don't lead him.  Sustained.

9  BY MR. DANIEL:

10     Q.   Were they accepting responsibility also?

11     A.   Yes, sir.

12     Q.   Okay.  Please pull up the top of next page where it

13 says "continues."  Okay.  And you see they had a handshake to

14 settle it and Russell gave him the check.  Now does the

15 Executive Committee have the authority, the Executive

16 Committee, to settle a possible lawsuit or to enforce -- to

17 agree to settle an agreement or make an agreement with this

18 law firm?

19     A.   By bank bylaws, we do.

20     Q.   And do you as Chairman of the Board by yourself have

21 the authority to do it?

22     A.   Yes, sir.

23     Q.   And how about the CEO, your son Russell Laffitte,

24 does he have authority to do it as the CEO?

25     A.   Yes, yes.

1    Q.   And next paragraph, please.   Okay.   And this is Mr.

2    Walker reporting on his conversation with Ronnie Crosby.   And

3    what's he saying there?

4    A.   He's saying that we agreed that we were partly

5    responsible for it.

6    Q.   And pull up the next paragraph, please.   And if you

7    don't mind reading this paragraph out loud, because it's

8    quite significant.

9    A.   "Ronnie, whom I know very well, not as well as other

10   people, but I know him extremely well, I've worked with him,

11   assured me that he would not even mention the bank in any

12   conversation he had with Mr. Badger.   He said what he was

13   going to do was going to treat this just like other clients

14   who had lost less money."

15   Q.   And, Mr. Laffitte, why is it important to not

16   mention what -- as far as the bank is concerned, why would it

17   be important not to mention that the bank was kicking in for

18   the settlement?

19   A.   Just the fact that we weren't part of the shortage,

20   I guess you would say.

21   Q.   Okay.   And please, next page, please.   And this is

22   just as important, what -- the discussion he had with Mr.

23   Trenholm Walker, your lawyer at the bank, with Mr. Ronnie

24   Crosby?

25   A.   Right.   "What he'd do is, he would call them and say

1    we've been looking at this file that Alex handled for you and

2    would like to talk to you about it.  Set that appointment and

3    meet with him and explain and -- that there had been

4    discovered a shortfall and that the firm wanted to reimburse

5    him."

6         Q.   Please call up the next paragraph.  Okay.  And read

7    that.  Explain to the jury what's happening here, what he's

8    reporting.  Do you know what he means?  Can you tell what he

9    means?  How do you take it that he said he was not going to

10   try to throw the bank under the bus?

11        A.   I think that's what he means, he was not going to

12   try to put the blame on the bank.

13        Q.   Next page, please.  Next paragraph.

14             This is where they discuss a release.  After you

15   read, I want you to talk to the jury about why the bank did

16   not want a release from Mr. Badger.

17        A.   Well, it's the fact that you can't get a release

18   from Mr. Badger because he does not have separate

19   representation and they can't release any claim about their

20   own wrongful conduct.

21        Q.   Okay.  And the top of the next page.

22        A.   You want me to read it?

23        Q.   If you don't mind.

24        A.   "As far as we're concerned, we don't want any

25   suggestion that we are paying any money.  And I think that if

1 he brought up a release, it might incite things rather than

2 calm things down."

3    Q.   Okay.  And just bring up the whole rest of the page

4 and the second paragraph.  If you call up that second

5 paragraph where it says, "but our view."

6    And what he's saying there, I will read it briefly

7 for you.  "The lawyers talk through this with the Litigation

8 Committee and everyone believes we are better off having

9 Ronnie go and satisfy Mr. Badger."

10    Now, are you familiar with the fact there had been a

11 Litigation Committee formed?

12    A.   Right.

13    Q.   And they had already had their first meeting?

14    A.   Right.

15    Q.   And clearly --

16    MS. LIMEHOUSE:  Objection, Your Honor.  He's

17 testifying.

18    THE COURT:  Let's ask the question.

19    MR. DANIEL:  I will just get him to read it.  I'm

20 sorry.

21 BY MR. DANIEL:

22    Q.   If you just back and read it aloud.

23    A.   "But our view, the lawyers talked at length about

24 this with the Litigation Committee.  And everybody believes

25 that we are better off having Ronnie go and satisfy Mr.

1  Badger by handing him a check and using his diplomacy so that

2  if, by chance, anything about Badger gets out, and Bland and

3  Richter get ahold of it, then their case will be much less,

4  because unlike Satterfield, their alleged victim will have

5  been fully compensated by the law firm and that we will be

6  side-by-side with the law firm in that."

7      Q.   Okay.  And so y'all were together united with the

8  law firm in trying to settle the case?

9      A.   Right.

10      Q.   Next paragraph, please.

11      A.   You want me to read it.

12      Q.   Yes.  You don't have to read the whole thing.  We

13  will just go to the next paragraph.  I just wanted to have

14  your -- yeah, next paragraph, please.  And you can read that,

15  please.

16      A.   "So we want to get ourselves to the best position

17  that we can be in if we have to weather a storm."

18      Q.   Okay.  And please the last line.  Okay.  Yes.  What

19  does Jim Gibson ask?

20      A.   "But we will continue our investigation into what

21  happened."

22      Q.   And then go a few pages over where it picks up from

23  the redaction.  And Mr. Walker, what's Mr. Walker -- what do

24  you take it that Mr. Walker means by this, the lawyer?

25      A.   He was going to get us an indemnification where the

1  firm would say in return for us paying the $680,000.

2      Q.   And then next page.  Okay.  You can go ahead and

3  read that out loud.

4      A.   "I think he will probably give us a release."  Mr.

5  Walker said, "Yeah, we want to make sure before we agree

6  fully that we're getting a release."

7      Q.   Okay.  And please call out the next few paragraphs,

8  all the way to the redacted ones.  Okay.

9          Now, go ahead and read this aloud, the rest of it.

10     A.   All right.  "We don't want to pay this and have them

11 come back, one, for more money later on.  We want this to be

12 closed vis-a-vis the firm."

13     Q.   Okay.  What does Mr. Jim Gibson say?

14     A.   "Well, you certainly have done a good job of

15 bringing this thing hopefully to a conclusion early on before

16 it really gets messy.  But thanks for --" and Mr. Walker

17 says, "Well, I hope so.  These things could easily cartwheel

18 out of control.  We've seen that happen in other aspects of

19 all these incidents.  And let's -- we've got to do everything

20 we can.  Time is at a premium.  Thank you."

21         MR. DANIEL:  Okay.  And beg the Court's indulgence

22 while I check with counsel.

23         THE COURT:  Absolutely.

24         MR. DANIEL:  Mr. Laffitte, I don't have any further

25 questions.  Please answer any questions counsel the

1    Government may have.

2          THE COURT:  Cross-examination by the Government.

3                      CROSS-EXAMINATION

4    BY MS. LIMEHOUSE:

5        Q.   Good afternoon, Mr. Laffitte.  My name is Emily

6    Limehouse, and I'm a lawyer for the Government.  I would like

7    to start with the $750,000 loan that you testified about with

8    Mr. Daniel.  You testified that at some point in 2021, the

9    summer of 2021, Alex was in substantial overdraft; is that

10   right?

11       A.   Yes, ma'am.

12       Q.   And he came to you and to Russell and wanted a loan

13   to cover his overdraft; is that right?

14       A.   Right.

15       Q.   And you and Russell approved a loan to cover

16   overdraft?  That's correct?

17       A.   Yes, ma'am.

18       Q.   And on your direct examination, you testified that

19   the overdraft was to cover expenses that he had already

20   incurred renovating his beach house; is that right?

21       A.   That's what he told us, that and to pay his lawyer.

22       Q.   So -- so now you are saying he came in and said he

23   wanted to pay his lawyers?

24       A.   Pay his lawyer and the expenses on his beach house.

25       Q.   Okay.  So you didn't tell Mr. Daniel that on your

1  direct examination.  So my understanding now is that Alex

2  came to you and to Russell and said he wanted a loan to cover

3  his overdraft and to pay his lawyers?

4      A.    Yeah.

5      Q.    About when did this conversation take place?

6      A.    The original conversation that I had with him.

7      Q.    So during the original conversation, Alex came to

8  you and to Russell and asked for a loan to pay his lawyers

9  and to cover his overdraft?

10      A.    When I talked to him, it was just me and Alex.  And

11  then Russell and Alex talked, or they did first, but I talked

12  to just Alex.

13      Q.    So those initial conversations, your understanding

14  was that the loan was going to cover his overdraft and pay

15  lawyers; is that right?

16      A.    And his beach house expenses.

17      Q.    And his beach house expenses.  Okay.  So let's talk

18  about Alex's financial picture at the time when he comes to

19  you and to Russell asking for money.  If we could pull up

20  Government's Exhibit 5, please.  Crystal, would you mind?

21            THE COURTROOM DEPUTY: It should be.

22            MS. LIMEHOUSE:  I will do Elmo, old school.

23  BY MS. LIMEHOUSE:

24      Q.    Can you see that, Mr. Laffitte?

25      A.    Yes, ma'am.

1    Q.   Okay.  So you first mentioned a loan on the beach

2   house that was a prior loan y'all had extended, is that

3   right, a prior loan that the bank had extended --

4        A.   On the beach house.

5        Q.   -- for the beach house; is that right?

6        A.   Yes, ma'am.

7        Q.   This is this loan here, 6979180; is that correct?

8        A.   That's correct.

9        Q.   And the principal on that loan was $193,691; is that

10   right?

11        A.   Yes, ma'am.

12        Q.   And the appraised value of that beach house was

13   $730,000; is that right?

14        A.   I don't know whether that was the original appraised

15   value or the current appraised value.

16        Q.   So the beach house was appraised at $730,000.  And

17   y'all decided to extend him a loan for $750,000; is that

18   right?

19        A.   Yes.

20        Q.   And at the time Alex also had multiple other loans,

21   liabilities totaling over three and a half million dollars

22   with the bank; is that right?

23        A.   That's correct.

24        Q.   And that included a million dollar line of credit

25   that he was maxed out on; is that correct?

1    A.    Yes.

2    Q.    Also included about a $600,000 line of credit that

3    he was also maxed out on; is that right?

4    A.    Right.

5    Q.    If we could go to Government's Exhibit 192, please.

6    Oh, gosh.  Can we try to --

7         THE COURT DEPUTY:  Yeah.  We can try again.

8    Q.    There we go.  If you go to the next page, please.

9    Next page.

10        Okay.  So when Alex comes in and asks for money to

11   cover his overdraft and to pay his lawyer, as you've now

12   testified, he was in substantial overdraft; is that right?

13   A.    Yes, ma'am.

14   Q.    If you go back to the prior page.

15        And, in fact, he was over $161,000 in overdraft; is

16   that right?

17   A.    That's what this shows, and I guess that's right.

18   Q.    And you would have received this report of his

19   overdraft as you testified, right?

20   A.    I get it every day.

21   Q.    And Mr. Laffitte, your son Russell, would have also

22   been receiving this report at the time; is that right?

23   A.    Yes, yes.

24   Q.    And Alex's wife and son had just been murdered on

25   June the 7th; is that right?

1    A.   Yes, ma'am.

2    Q.   So he comes to you and he wants you to cover his

3  overdraft to pay for expenses for his lawyers and to renovate

4  his beach house; is that right?

5    A.   That's what he said.

6    Q.   If we can pull up Government's Exhibit 10I, please.

7  So this is a $350,000 wire transfer on July the 15th, request

8  received by Russell Laffitte.  Did you approve of this

9  $350,000 wire transfer?

10    A.   I didn't know it was made, but I would have if

11  somebody had asked me.

12    Q.   But you did not approve of this $350,000 wire

13  transfer?

14    A.   Not specifically that wire transfer, no.

15    Q.   So you did not know that $350,000 was being wired to

16  the Wilson Law Group in Bamberg, South Carolina?

17    A.   I see the reports the next day.  And I assume that

18  went to the lawyer he wanted to pay.

19    Q.   But you didn't approve of this wire transfer?

20    A.   Not really, no.

21    Q.   If you can go back to Government's Exhibit 192,

22  please.  If we can go to -- yes, that page.  Stop, perfect.

23         One follow-up question, Mr. Laffitte.  You indicated

24  for the first time to me that y'all were approving a loan to

25  pay for his lawyers as well, not just his overdraft.  What

1    was your understanding of what lawyers you were paying for?

2        A.    I didn't ask him.  And he just said he had a lot of

3    bills.  That's all I know.  And like you said, his wife and

4    his son had just been murdered and, of course, that entered

5    into it.

6        Q.    Okay.  So you don't know if any of those expenses

7    had anything to do with Chris Wilson?  You just knew lawyers;

8    is that correct?

9        A.    That's right.

10       Q.    This is Alex's personal bank account after that

11   $350,000 wire transfer to Chris Wilson.  And it indicates

12   that he's spending money on things like the Colleton County

13   Treasurer, Jimmy Butler auto sales, cash back, DeBordieu

14   Club, $14,000 to his own law firm.  None of those expenses

15   had anything to do with beach house renovations, do they?

16       A.    Not those you just circled, no, ma'am.

17       Q.    Go to the next page, please.

18            You see him continue to go into overdraft for things

19   like Peeples-Rhodes (sic) Funeral Home, Turner, Padget,

20   Graham & Laney, LabCorp and Charleston Gastroenterology,

21   Veterinary Specialty Care, the Sports Medicine Shop.  None of

22   those things have anything to do with beach house

23   renovations, do they?

24       A.    I wouldn't think so, no.

25       Q.    So by August the 9th, Alex is more than $367,000 in

1  overdraft; is that right?

2  A.   That's what this report shows.

3  Q.   And on August the 9th, you received an e-mail as

4  well as Russell from Norris Laffitte and other Board members;

5  is that correct?  Do you recall that e-mail?

6  A.   Well, I got one from Norris quite regularly, so --

7  Q.   I believe it.  Government's Exhibit 2, please.

8  So on August the 9th, Norris e-mails you and the

9  other members of the Board and asks the Executive Committee

10 specifically, "Since the June events, would the committee

11 prepare for the Board what is PSB's total exposure with

12 regard to Alex Murdaugh directly, indirectly, through

13 different family relationships and/or LLCs, with his

14 borrowing practices and repayment plans if he's not working."

15 At this point did you know that he was over $367,000

16 in overdraft?

17 A.   Yes, I knew it every day, whenever it was.  I looked

18 at the overdraft lists every day.

19 Q.   Let's pull up Government's Exhibit 10E, please.

20 So explain for the jury what this document is.

21 A.   That's a general ledger debit.  LNOS stands for

22 loans not on system.  And it's $400,000.  And it was made out

23 to Alex Murdaugh, $400,000.

24 Q.   And that's on August the 9th, the same day y'all

25 received that e-mail from Norris; is that right?

1    A.    Right.

2    Q.    If you will pull up Government's Exhibit 82, please.

3          So this check shows that on August 9th, about an

4    hour after Norris Laffitte sent everyone an e-mail, $400,000

5    is given to Alex Murdaugh.  Did you authorize this check?

6    A.    No.  But we had already told him we were going to

7    cover the $750,000 loan.  So I assume that was part of it.

8    Q.    You assume, but you didn't authorize this check, did

9    you?

10   A.    Not the particular check, no, I did not.

11   Q.    This signature down here, that's your son Charles,

12   right, that's not --

13   A.    That's right.

14   Q.    So you didn't authorize the issuance of a $400,000

15   check within hours of Norris's e-mail, did you?

16   A.    No.  Well, no, ma'am, I did not.  But I assume

17   Russell did it on the loans because it's loans not on system.

18   Q.    That's because the loan was not on the system yet,

19   was it?

20   A.    No.  That's a normal practice of putting it in that

21   until you get all the paperwork done.

22   Q.    And there was no paperwork on August the 9th; is

23   that right?

24   A.    Well, the loan itself, I assume, was.  But I don't

25   know about the title and stuff wasn't, you know, on the house

1  that we were getting for mortgage.

2      Q.    Okay.  Let's go to back to 192, please, on page 4.

3  So this shows a $400,000 transfer on August the 9th to cover

4  the $367,000 in overdraft.  Did you authorize that $400,000

5  transfer to cover the $367,000 in overdraft?

6      A.    Not technically, as you said, did I authorize that

7  thing.  Like I said, we had already authorized the $750,000

8  we were going to lend him.

9      Q.    But you didn't authorize $400,000 to cover

10  Peeples-Rhodes Funeral Home, Charleston Gastroenterology,

11  Veterinary Specialty Care?  You didn't authorize that, did

12  you?

13      A.    Not those particular people, no.

14      Q.    And those charges have nothing with it beach house

15  renovations?

16      A.    No, ma'am, but there's several on here that do,

17  supposedly.

18      Q.    Supposedly, but you don't know that, do you?

19      A.    Well, I see these checks to C.E. Smith.  And that's

20  what we were told, he was building on the beach house.

21      Q.    You were told that C.E. Smith was renovating Alex

22  Murdaugh's beach house?

23      A.    Yes.

24      Q.    Alex Murdaugh's beach house was not being renovated

25  by C.E. Smith, was it?

1    A.   I don't know.  I --

2    Q.   You didn't ask him, did you?

3         MR. DANIEL:  Give him an opportunity to answer.

4         THE COURT:  Fair enough.  Let him finish it.

5    BY MS. LIMEHOUSE:

6    Q.   You don't know; is that your testimony?

7    A.   That's right.

8         MR. DANIEL:  He didn't complete his answer, Your

9    Honor.

10        THE COURT:  He's fine.  Please continue.

11   BY MS. LIMEHOUSE:

12   Q.   You don't know because you didn't ask him, did you?

13   A.   C.E. Smith?

14   Q.   No, Alex, you never asked Alex was C.E. Smith was

15   renovating his beach house, did you?

16   A.   No, I did not.

17   Q.   So you participated in a Board meeting on August the

18   17th.  Mr. Daniel has reviewed those minutes with you.

19   During that August 17th Board meeting, you and Russell

20   represented that the $750,000 loan was for purposes of beach

21   house renovations, didn't you?

22   A.   Beach house and attorneys' fees.

23   Q.   You told the Board on August 17th that the purpose

24   of the loan was for attorneys' fees?

25   A.   Was for what?

1   Q.  Attorneys' fees?

2   A.  If it says that in the minutes, that's what I know

3   we did it for.

4   Q.  If you could pull up Government's Exhibit 6, I

5   believe, second page, please.  There's no mention of a

6   $750,000 loan being made for lawyers' expenses, is there?

7   A.  No.  I see where it's $750,000 loan, but I don't see

8   where it says about the lawyers' fees or the house.

9   Q.  Because you and Russell just represented that it was

10  for the purposes of beach house renovations, didn't you?

11  A.  No, ma'am, I did not.

12  Q.  If you could pull up Government's Exhibit 5, please,

13  just the bottom portion of the loan.

14      So this is the report that was provided to the Board

15  regarding Alex's total loans to the bank; is that right?

16  A.  Yes, ma'am.

17  Q.  There's no mention of it being for anything related

18  to lawyers' fees, is there?

19  A.  No, ma'am, it's not.

20  Q.  Neither you nor Russell told anyone on the Board

21  about a $350,000 wire transfer to Chris Wilson on July 15th,

22  did you?

23  A.  I'm not sure if he did or not.

24  Q.  Did you tell the Board?

25  A.  We sent -- no, but I told them, when we talked about

1   the loan, it was for the lawyers' fees and fixing the beach

2   house.

3       Q.   Did you tell the Board that there was a $400,000

4   transfer into Mr. Murdaugh's account to cover his more than

5   $367,000 in overdraft?

6       A.   No, I did not.

7       Q.   Neither you nor Russell told the Board about his

8   substantial overdraft and the loan to cover that overdraft,

9   did you?

10      A.   Now we are getting crossed up in words here, but,

11  no, but we agreed to make him the loan.  And that's part of

12  the the disbursement of the loan.

13      Q.   But you didn't tell the Board what those funds were

14  used for, did you?

15      A.   If they asked, I did, but I do not recall it.

16      Q.   You do not recall whether you told the Board what

17  those loans were used for?

18      A.   No, but I'm sure I told them why we made it

19  originally.

20      Q.   Well, on August 17th, during that Board meeting, the

21  loan hadn't actually been approved, had it?

22      A.   On August 17th?  This is --

23      Q.   If you could pull up Government's Exhibit 10L,

24  please.  Do you recognize this document, Mr. Laffitte?

25      A.   Ma'am?

1    Q.    Do you recognize this document?

2    A.    Yes, ma'am.

3    Q.    This indicates that that $750,000 loan wasn't

4    approved until August the 18th, the day after the Board

5    meeting; is that correct?

6    A.    According to this, that's right.

7    Q.    So during the August 17th Board meeting, that loan

8    had not even been approved, had it?

9    A.    Well, according to this, no.

10   Q.    All right.  Let's go to the $680,000 payment.  You

11   testified that you and your daughter Gray and your son

12   Russell all approved of the $600,000 payment.  Is that an

13   accurate representation of your testimony?

14   A.    Yes, ma'am.

15   Q.    And you were a bank executive at the time that this

16   $680,000 payment was made; is that right?

17   A.    Yes, ma'am.

18   Q.    And you are testifying that you approved the

19   $680,000 payment before it was handed over to the law firm,

20   before Russell gave the check for the law firm?

21   A.    Right.

22   Q.    If we can pull up Government's Exhibit 29, please.

23         When you approved this $680,000 payment, had you

24   seen this check for $388,687.50 to Johnnie Parker?

25   A.    No, I had not.

1    Q.   Please go to the second page.  When you approved of

2    the $680,000 payment, had you seen this check for $151,726.05

3    to the Palmetto State Bank?

4    A.   No, ma'am.

5    Q.   So when you approved this $680,000 payment, did you

6    know that hundreds of thousands of dollars from these funds

7    had been negotiated to pay off loans that Russell had

8    extended from a minor child's conservatorship account?

9    A.   No, ma'am.

10   Q.   When you approved the $680,000 payment, did you know

11   that your son took $35,000 of a personal representative fee

12   from these funds and that that was included in the $680,000

13   payment?

14   A.   Not at the time the check was written.

15   Q.   Did you know that your son negotiated every single

16   one of these checks related to the Badger funds?

17   A.   Did I do what now with them?

18   Q.   When you approved the $680,000 payment, did you know

19   that Russell had negotiated every single one of these checks

20   related to the Badger payments?

21   A.   That's why we did it, because the checks were made

22   out to the bank, and he issued them to wherever Alex said to

23   do it.

24   Q.   And did you know that the $680,000 included more

25   than $150,000 of funds that were negotiated at the Bank of

1  America and had never gone to the Palmetto State Bank?

2      A.   No, I did not.

3      Q.   So Russell was fired from the bank back in January

4  of this year; is that right?

5      A.   Yes, ma'am.

6      Q.   Isn't it true that you and your daughter were the

7  only members of the Board who didn't vote for his

8  termination?

9      A.   Yes, ma'am.

10         MS. LIMEHOUSE:  Court's indulgence.  No further

11  questions.

12         THE COURT:  Redirect.

13                    REDIRECT EXAMINATION

14  BY MR. DANIEL:

15     Q.   Yes, Your Honor.  Now, did the Government ever come

16  to you, one of their agents or any of the lawyers in the

17  court, did they ever come to you and bother to interview you

18  about any of these issues?

19     A.   No, sir.

20         MS. LIMEHOUSE:  Objection, Your Honor.

21         MR. DANIEL:  Your Honor, that's valid --

22         THE COURT:  What is the relevance of that?  Because

23  that's looking into Government's investigative technique?

24  No.  Sustained.

25  BY MR. DANIEL:

1    Q.   And when Ms. Limehouse brought up the significant

2    overdraft and whether you knew it was going to pay off, what

3    was the purpose of your initial conversation to Alex Murdaugh

4    which gave rise to the loan?

5    A.   Say that again, please.

6    Q.   Yeah.  What was the purpose of your phone call or

7    your discussion with Alex Murdaugh --

8         MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

9         THE COURT:  I overrule it.  Go ahead.

10   BY MR. DANIEL:

11   Q.   When you called, what was your discussion with him?

12        THE COURT:  No.  No.  You said his purpose.  Now --

13        MR. DANIEL:  That's all I care about, the purpose.

14   Thank you, Your Honor.

15        THE WITNESS:  The purpose was because he had an

16   overdraft and --

17   Q.   A significant overdraft?

18   A.   Yeah.  Yeah.

19        MR. DANIEL:  Beg the Court's indulgence.  No further

20   questions, Mr. Laffitte.  Thank you, Your Honor.

21        THE COURT:  Thank you, sir.  You may step down.

22        THE WITNESS:  Thank you.

23        THE COURT:  Defense, call your next witness.

24        MR. AUSTIN:  Your Honor, may he be released?

25        THE COURT:  He may be released.

1    Do you have any reason to want to recall --

2    MS. LIMEHOUSE:  No, Your Honor.

3    THE COURT:  Thank you.

4    MR. AUSTIN:  Is it okay if we take a five-minute

5    break?

6    THE COURT:  I am not crazy about it.  I'm trying to

7    keep this trial moving.

8    MR. AUSTIN:  I believe the next witness is going to

9    be fairly long.

10    THE COURT:  Well, that's okay, we can get started.

11    MR. AUSTIN:  The Government (sic) calls Gray

12    Henderson.

13    THE COURT DEPUTY:  Please state your full name for

14    the record.

15    THE WITNESS:  Lillian Gray Laffitte Henderson.

16    LILLIAN GRAY LAFFITTE HENDERSON,

17    having been duly sworn, testifies as follows:

18    DIRECT EXAMINATION

19    BY MR. AUSTIN:

20    Q.    Good afternoon, Ms. Henderson.

21    A.    Hi.

22    Q.    Got waters there if you need some.

23    A.    Okay.

24    Q.    So I'm going to start with really basic question.

25    How do you know Russell Laffitte?

1    A.    He's my little brother.

2    Q.    Okay.  And how much older are you than him?

3    A.    Exactly 10 months and three weeks.  He might be an

4    accident.

5    Q.    And what do you do for a living?

6    A.    I work for Palmetto State Bank.

7    Q.    Okay.  So I understand you work with your dad, your

8    brother, and your other brother?

9    A.    I do.

10    Q.    And did you grow up in Hampton too?

11    A.    I did, I grew up in Hampton.  Do you want to know,

12    like, went to high school?

13    Q.    Sure.

14    A.    Graduated from Wade Hampton High School in '88.

15    Went to Clemson University.  Graduated there in '91.  And

16    then I lived in Utah for, gosh, almost seven or eight years,

17    I guess.  And I worked -- while I was there, I worked for

18    what is now Wells Fargo.  And then I moved back to Hampton in

19    1997, at the end of '97 to work for the bank.

20    Q.    Okay.

21    A.    And been there ever since.

22    Q.    So I think this is probably obvious, but Wells Fargo

23    even at the time was a much bigger bank than Palmetto State

24    Bank?

25    A.    Yes, yes.

1    Q.   You moved back to Hampton to work with your family,

2    the family business?

3    A.   Uh-huh.

4    Q.   So I think safe to say you are either glutton for

5    punishment or you love your family a lot?

6    A.   A little of both, I guess.

7    Q.   Despite that, you wouldn't come to court today and

8    lie for your brother, would you?

9    A.   Absolutely not.

10        MR. HOLLIDAY:  Your Honor, objection.  Bolstering.

11        THE COURT:  Sustained.

12   BY MR. AUSTIN:

13   Q.   Start from the beginning of when you came back to

14   Palmetto State Bank.  Tell the jury, please, what you've done

15   in your role at the bank.

16   A.   Well, when I lived -- when I worked for Wells Fargo,

17   I started with mortgage banking.  So that's what I've been

18   doing.  I specialize in mortgage banking.  I do the secondary

19   market, which is, you know, selling loans to Freddie Mac or

20   sometimes we sell them to Fannie Mae or to other investors.

21   I also am in charge of doing the in-house loans as well for

22   mortgages, but I specialize in mortgages.  Started out as

23   kind of a grunt person, I guess.  You know, you learn, do the

24   teller line, you learn CSR, you do everything.  We were --

25   you do it all.  You mow the grass.  You do it.

Q.    It seems -- well, do a lot of family members from
the extended Laffitte family work at Palmetto State during
the summers like you were describing?

A.    We will have some of the -- I have a cousin that
works in Beaufort.  And his children would work during the
summer.  My niece would work during the summer.  My daughter
just started working.  She just started getting old enough to
start working in the summer.  So it's -- we try and get --
pass it onto the next generation as well.

Q.    And what was Russell doing at the bank when you came
back to Palmetto State?

A.    At that point, he had just started as well.  But he
did not have a background in banking, because he had been
farming for a while.  So he at first was -- we called him the
head gofer.  He really ran a lot of errands.  He had to learn
from the ground up.  He learned to run on a teller window,
learned all the ins and outs of consumer lending, and then
started with commercial lending.

As he got older, he -- well, I mean, when we were
young, he would -- he got active in the South Carolina Young
Bankers Association, and then in the South Carolina Bankers
Association, and then the Independent Bankers Association.
So he kind of found his passion with the independent bankers,
with being an advocate for small banks.

Q.    I've never heard of the Independent Bankers

1  Association.  Can you explain little bit more of what that

2  organization is and what the scope of their activities

3  include?

4      A.    Well, the one in South Carolina, there's only -- I

5  think there's only maybe, gosh, I'm going to guess, 40 banks

6  that are -- maybe not even that many -- of banks that are

7  small, independently owned.  They aren't the big conglomerate

8  banks.  So -- and what we try to do, or what the group tries

9  to do, is advocate for small, rural areas, community banks to

10  stay independent to -- so that you are not just a number to

11  somebody.  That's what -- we are really into giving back to

12  the community, being good corporate citizens, that kind of

13  thing.

14      Q.    Okay.  And I think it's a good segue into, you know,

15  what community banking really is and how Palmetto State Bank

16  fits that mold in Hampton, and I guess in other branches as

17  well.

18      A.    Uh-huh.  Well, community banking is relationship

19  banking.  And that's kind of the tag word that everybody

20  says.  But it's one-on-one banking.  It is know your

21  customers.  We really try to know our customers.  I mean, we

22  know when they have children, when they get married, when

23  their kids are playing, you know, sports with ours.  And you

24  really do get to know them.  But in small towns, especially,

25  you know -- I don't know if y'all are from small town, but

1  you do your banking everywhere.  I go to the coffee shop in

2  the morning, people give me deposits to take to the bank.

3  When we are at school functions, you know, sometimes you will

4  have loan documents signed at school functions and people

5  give me deposits there.  So it's -- you are kind of "on" all

6  the time.

7  Q.  And especially when you grow up in town too and

8  you've known everybody for a while?

9  A.  Because everybody knows you.

10  Q.  And how would you describe the types of loans that

11  the Hampton branch in particular typically makes?

12  A.  Well, our branch makes all kind of loans, but we

13  will do loans from, you know, $2,500 -- well, we used to have

14  a minimum of either 250 or 500.  But now we try to do a

15  minimum of $2,500 is the lowest loan amount.  And up to, you

16  know, commercial loans in the millions or even residential

17  houses in the millions.

18  Q.  So with something like late charges or overdraft

19  fees, how are those typically handled by Palmetto State?

20  A.  Okay.  So -- well, late charges, it depends on the

21  type of loan.  If it's -- depends on the structure of the

22  loan.  If you have a loan that has a one-year maturity date

23  or a five-year, when it matures, there is a 5 percent fee

24  that gets attached to it.  And, really, that's kind of a, get

25  in here and come make your or come renew your loan kind of

1    thing.  It's -- they will get a notice.  If they haven't

2    contacted us already, we send them a maturity notice saying,

3    it's time, come do your loan.  So they get that 5 percent,

4    which is a big chunk if it's a sizeable loan.  But I would

5    say 99 percent of the time, that 5 percent maturity, the one

6    that comes at maturity is waived.

7          And then if they have late fees, like for just a

8    normal payment, those are normally not waived.  But those are

9    only 5 percent of your actual monthly payment.  So those

10    aren't as usually as much.  But, you know, we do waive some

11    fees.  You know, it's a case-by-case basis.  But on the

12    maturity fees, we definitely waive those 99.9 percent of the

13    time.

14    Q.   Sorry to interrupt.  So I think it's important

15    distinction.  When you are talking about the maturity fees,

16    you are saying 5 percent of the total amount of the loan?

17    A.   Total outstanding amount, uh-huh.

18    Q.   So somebody might be current for 99 percent of their

19    loan payments, but if they are late, that could end up

20    looking like a massive fee; is that right?

21    A.   Right.  For example, I have -- for example, I have a

22    customer right now we are working on doing a renewal.  And,

23    of course, he's all concerned because he got a notice that

24    said, okay, he's -- it's matured.  And it's tacked a

25    $10,000 -- he got a notice it has the $10,000 late fee on

1    there, because that will tack on at 15 days.  And I was, no,

2    sir, you know, we are going to have your permanent loan

3    closed.  He was building a house.  And I said, we are going

4    to have your permanent loan closed, we will waive that at the

5    time.  Because we are already working on another loan for

6    him.

7         Q.   Okay.  And so if you are looking at that on a line

8    sheet, would it look like somebody is having a ridiculously

9    high fee waived for no reason?

10        A.   Yes.  But if you look at it, it should say -- or if

11   you look at the maturity dates, you can go and track where

12   the late fees are.

13        Q.   And the purpose of that, the fees being so high, is

14   to just have that extra stick to make sure they get paid?

15        A.   To remind them to come pay.  And that's on -- the 5

16   percent is on -- I mean, that's on all loans.

17        Q.   How does Palmetto State Bank handle people that

18   don't bring their accounts back up to, you know, positive

19   balance or just don't pay their loans or whatever?

20        A.   On checking accounts or on loans?

21        Q.   On anything.

22        A.   Well, I guess on both, we try and call.  We really

23   try to work one-on-one with the people.  We try to call them.

24   We e-mail them.  We send them notices.  Of course, the

25   notices come automatically.  And then on -- in my case, if I

1  have somebody that's passed due, I will actually send them a

2  personal letter, okay, hey, you are 30, 45, 60, 90 days past

3  due, we really need to get this called up, please call me,

4  contact me, and we will come out -- come up with a workout

5  option.  But we will call them, e-mail them, text them,

6  things like that.

7       Q.   So just don't let them go, try to collect?

8       A.   Right.

9       Q.   In your experience, is that a different approach

10  than some of the bigger banks?

11       A.   Well, I mean, out of shear volume, a big bank can't

12  contact, you know, all of their customers.  I can't even

13  image.  It takes us a long time to do it as it is.  And each

14  loan officer's responsible for contacting their customers

15  unless, say, I give it to a processor or somebody to help me

16  call, because, you know, I also can't spend all day calling

17  people either, but we get some help with people calling.

18       Q.   Okay.  And so working the loan department, are you

19  in the annex of Palmetto State Bank?

20       A.   I am.  I started out in the main branch building,

21  but then we were getting too crowded.  And the lady who does

22  our debit cards needed to be right there on the lobby.  And

23  so I volunteered to move to the annex, which is much quieter.

24  And me not being an extrovert at all, I am much happier over

25  in the annex because it's quiet.

1    Q.   I assume your brother and dad are in the other

2  building?

3    A.   They are in the main building, yes.

4    Q.   Could you just take me through the process of loan

5  coming in or a loan application coming into PSB?  I feel like

6  I'm calling it three different things.  I will try to stick

7  to just Palmetto State.  And can you explain how you go about

8  reviewing those loans?

9    A.   Okay.  What type of loan?

10   Q.   Let's say --

11   A.   Can I do a mortgage, since that's what I do?

12   Q.   Sure.

13   A.   Okay.  So if a customer is buying a house or

14  refinancing or whatever, I will talk on the phone usually.

15  And I will send them an application, or if they come in, we

16  will complete the application together.  They usually bring

17  me requests, tax returns, or unless they are W-2 employees,

18  but pay stubs, W-2s, tax returns, and bank statements.  Those

19  are the things that I usually ask the customer to bring with

20  me or bring to me.  We fill out the application.  We try to

21  figure out what their goal is, or they are trying to

22  purchase, refinance, what are -- are they refinancing to buy

23  another piece of property, you know, what they are trying to

24  do.  And then they will usually leave.  And that's when we

25  start processing it.  And we pull credit.  And we will order

1    the appraisal on the property.  And then we do cash flow

2    analysis.  We have computer programs that do some of the

3    analysis for us.  But a lot of it is done, you know,

4    manually, just because I like to put pen to paper and see

5    what it looks like in my -- because I've been doing it since

6    before computers were here.

7         And then once we get preliminary approval, then we

8    set up the closing with the attorneys, because in South

9    Carolina real estate, you have to have an attorney close it.

10   And close the loan.  Fund it.  And then once we get it back,

11   we get a closed package back.  And it takes awhile to put --

12   you have to package it just so.  And then send it to the loan

13   department to be booked.  And sometimes that takes a week,

14   two weeks.  Sometimes longer than that depending how busy we

15   are.

16        Our branch does about -- this was a number from the

17   end of 2020 or either first quarter '21, our branch alone did

18   245 real estate loans in a quarter.  You know, so that's --

19   they are having to book it.  So sometimes you get a little

20   bit behind on that.

21        Q.   Can you put that number into context?  How does that

22   match up with other banks of similar size, if you know?

23        A.   I don't know.  I don't know the number of real

24   estate loans that they are doing.

25        Q.   But suffice it to say, it's a pretty busy bank?

1    A.    It is.  It is.  Especially for our size, we stay

2    really busy.  The Hampton branch is extremely busy.  Because

3    of we are in such a rural area, we have more one-on-one.

4    People like to come in and talk and hang out.  And we have

5    some people that like to come hang out.  But we have, you

6    know, lots of our customers that come in.  They want the

7    face-to-face.  Whereas, in our Bluffton office, it might be

8    that they are doing more online banking or they go through

9    the drive-through more.  But in our office, it's a lot that

10   are coming in every day.

11   Q.    So when you were talking about doing a loan review,

12   sounded like there was a lot of math and different metrics

13   and computer systems and stuff like that, but seems like

14   there's also a big component that's relationship driven; is

15   that fair?

16   A.    It is.  Yes, because we go by what our past

17   experience with the customer is.

18   Q.    And so, obviously, a big part of this case is Alex

19   Murdaugh's financial condition and how his status was

20   reviewed at the bank.  How did you see him before anything

21   happened with his wife and son in the summer of 2021?

22   A.    How did I see him in -- as of financial context?

23   Q.    Yes.  Sorry.  I should have clarified that.

24   A.    Alex, he paid his loans.  He was -- you know, he

25   would be very slow sometimes, but he would make good,

1 usually, on what he said he was going to do. I have

2 calculated down, just so I could see. We knew he was one of

3 the ones that we had a large loan portfolio on him. Over the

4 past 10 or 15 years, I can't remember exactly the time, but

5 he paid us over $4 million in interest on his loans. So he

6 was definitely paying something. And then we also knew -- we

7 were very familiar with the law firm and how they get paid,

8 how their payment structures work. We knew what his income

9 was. And, you know, over the past 10 years, he averaged 1.5

10 million each year. Some years it was a little less. I mean,

11 it went all the way from, you know, $400,000 one year to 5.5

12 million one year. But his average was 1.5 over the past 10

13 years.

14     Q.   And is that comparable to other lawyers at his law

15 firm too?

16     A.   Yes.  He was -- he was one of the mid to higher

17 earners at the law firm.

18     Q.   Were there higher earners than him even?

19     A.   Uh-huh.

20     Q.   And Hampton County, I think you touched on this

21 earlier, it's a pretty financially distressed county; is that

22 right?

23     A.   It is.  It is.

24     Q.   And is the law firm one of the bank's biggest

25 customers?

1    A.    They are.

2    Q.    Okay.  Is there much in the way the industry in

3    Hampton County?

4    A.    There's a lot of timber, a lot of timber.  That's --

5    and that's -- paper, paper mill, you know, shipping it to

6    different -- there's some lumber companies, you know, that

7    are -- actually mills that actually produce the plywood or

8    whatever, not plywood, the 2 x 4s.  And there's Le Creuset,

9    the pots.  We have that.  But, no, there's not -- we used to

10   have Westinghouse, which was the big driver in Hampton.  And

11   when it closed, that would kind of put a big damper on us.

12   Q.    SO while a big chunk of your businesses are smaller

13   individual customers --

14   A.    Right, small businesses.

15   Q.    When it comes to sort of business and commercial

16   customers, are law firms some of the bigger customers you all

17   have?

18   A.    The law firm, the county, the school districts, you

19   know, those.

20   Q.    And with regard to the law firm, PMPED, you

21   mentioned the way their bonus structure -- or may not have

22   used that word, but the way they are compensated, can you

23   explain how that differs from normal jobs where you are just

24   paid --

25   A.    Most people are paid either bi-weekly or twice a

1    month or even just monthly, divided up over 12 months or, you

2    know, 52 weeks or 26 payments, however, but they are divided

3    up evenly.  But they do their structure, they get a small

4    amount as a normal pay throughout the year, and then they get

5    their bonus, which is their, I guess, their production pay

6    that they get.  And they get that at the end of December each

7    year.

8         Q.   And just to be clear, when you say a small portion,

9    you are not talking about a small amount of money, just a

10   small amount of money compared to what they make when they

11   bring in big cases; is that right?

12        A.   Right.

13        Q.   Okay.  And --

14        A.   And I'm not sure exactly what the monthly stipend is

15   now.  It used to be pretty small.  I mean, it was -- but now

16   I think -- I don't know what it is.

17        Q.   Yeah.  And for somebody like Alex that was averaging

18   you said 1.5 million, thereabouts?

19        A.   1.5 million.

20        Q.   And then talking about him in particular, was it

21   unusual for him to overdraft?

22        A.   No, he did it all the time.

23        Q.   And for the average person that, you know, doesn't

24   overdraft on a regular basis, it seems crazy.  How do you

25   explain that?

1    A.    He wrote checks for more than -- more checks than he

2    had money for.  I don't know.  We have people that do it

3    every single day.  They do it.  And he would make a deposit

4    and cover it and do it again, you know, turn around.  It's

5    just -- we have those customers that do it every single day.

6    And we know the ones that are going to do it and we know the

7    ones that are going to pay and we know the ones that we are

8    going to have to call and call and call.  But he was one of

9    them.

10   Q.    And so for somebody like Alex who, I think you said,

11   PSB made $4 million off of interest alone --

12   A.    Just in interest, uh-huh.

13   Q.    Is it worth it to the bank to give a little leeway

14   then when something like that overdrafts?

15   A.    Oh, definitely.  We call him.  I mean, we have

16   customers that -- you know, all the customer really has to do

17   is call and say, hey, I've got a short -- I'm going to be

18   short, you know, for the next week or whatever.  And we

19   understand that.  And that's what a community bank does, we

20   work with our people.  So -- but, yes, we know -- I mean,

21   it's like think business.  We know where the income is coming

22   from.  So we're trying to make sure everybody is taken care

23   of.

24   Q.    And they've got a pretty good track record of doing

25   pretty well?

1    A.    Uh-huh.

2    Q.    But y'all don't surely foreclose on people's

3    property when they don't pay?

4    A.    We do.  We don't like to do it.

5    Q.    What's the distinction there?  How do you different

6    between somebody like Alex and somebody else that the bank

7    foreclosures on?

8    A.    Well --

9    Q.    I guess I sort of switched.  Sorry.  Like, in the

10   loan -- like in the loan context, if like someone was late?

11   A.    Okay.  So if somebody's really, really late, like

12   they probably have to go 120 days past due, at least

13   sometimes more than that, before we will start the

14   foreclosure actions.  Now, on my secondary market ones, we

15   have to start a little bit sooner than that just because we

16   are regulated by Freddie Mac and how -- what their rules are.

17   But so we will send them a right to cure, which is, you know,

18   you've got 45 days from the time of the letter, bring it

19   current or, you know, pay it off, do something like that.

20   And then we will send it to the attorney for foreclosure if

21   necessary.

22          We have quite a few loans that are what we call

23   charged off, which is an accounting write-down, I guess, on

24   loans that are charged off but were not going to foreclosure.

25   And it can be for different reasons.  One is they are still

1    making or attempting to make some payments on them, or it

2    could be that they've got the property for sale and it's not

3    selling, you know, the market. I know, for example, one of

4    Alex's, we charged him off -- charged two. He was one-fifth

5    partner in some -- with some loans or with some property --

6        Q.   I will stop you real quick. So the jury knows what

7    you are talking about, are you talking about Red Beard and 0

8    United?

9        A.   Right. Right. He was one-fifth owner or partner in

10   these investment properties. And in 2012, I believe, we

11   charged them off because he had come to us and said that the

12   rest of the partners weren't paying. And so he was kind of

13   left -- you know, left out to dry. They were holding him.

14   It's kind of interesting, though, because he made the payment

15   in 2011. And so then we charged it off. And then he made

16   the payment in 2012. So he was still making the payments,

17   but we had it charged off on our books. And then each year

18   he would try to make some payments. He did miss some on a

19   couple of years, but then on one of them, he skipped, 2013's

20   annual -- they were annual payments. And he skipped 2013.

21   And then made '14, '15, '16, and then in '17 made three

22   payments, or -- I think that was right. So --

23       Q.   I'm sorry. When you are saying "payments," how much

24   money are we talking about here?

25       A.   One of them was about 52- or 53,000, and the other

is about 55,000 per year.

Q.   So in the years where he's -- are you talking about for both?  So there's Red Beard and 0 United, maybe around $100,000 in those years where he paid both of them?

A.   Uh-huh.

Q.   And he's one of five partners in this deal?

A.   He is.

MR. HOLLIDAY:  Your Honor, I think she's telling a nice narrative, but I don't want Mr. Austin to take over for her.

THE COURT:  Yeah.  She's fully capable of testifying.  You don't need to testify for her.

BY MR. AUSTIN:

Q.   Okay.

A.   I lost my --

Q.   I'm not sure where we left off.  He has multiple partners.  He's the only one paying?

A.   He's the only one paying.  So we have it charged off on our books, Which, again it's an accounting thing.  And we are not foreclosed -- in 2013, he actually approached Russell about wanting to do a short sale.  And a short sale, I will just explain what a short sale is.  A short sale is when a customer says, I need to sell a property, but I'm going to sell it and it's not going to pay off the loan because it's not worth enough to pay off the loan.  Well, Russell said,

1  no, we are not going to do that, because -- I mean, you can

2  sell it, but we are not releasing you from the liability of

3  the remaining amount, because that was what they wanted, was

4  to be released from the remaining liability.  And we refused

5  on that.  So we would not allow the short sale for -- to be

6  released from the remaining loan amount.  So he kept, you

7  know, slowly making some payments.

8        We really didn't foreclose because the property

9  wasn't worth anything at that point.  It was at the bottom of

10  the market.  And it was just the cost -- it was cost

11  prohibitive for the bank to hold on to real estate,

12  especially when somebody is making some payments on it.  So

13  that's why we didn't foreclose on it.

14     Q.   Okay.  And are Red Beard and 0 United the only big

15  loans that he's ever defaulted on?

16     A.   That we have charged off?

17     Q.   I'm sorry.  Yes.

18     A.   Yes, those are the only two that we had charged off.

19     Q.   Okay.

20     A.   That I'm aware of.

21     Q.   While he hasn't been perfect, he's been pretty good

22  as far as the bank is concerned?

23        THE COURT:  You are testifying, Mr. Austin.

24        MR. AUSTIN:  Sorry.

25        THE COURT:  Is this a good time to take a break?

1    MR. AUSTIN:  Yes, sir.

2    THE COURT:  Let's take a 10-minute break.

3    (Jury leaves open court at 3:19 p.m.)

4    THE COURT:  We will be at ease.  During a sidebar,

5 Mr. Daniel made a statement about something with the Bank of

6 America.  He was interposing an objection.  And I want to put

7 that on the record.  Let's take a brief break.  And I will

8 let Mr. Daniel do that and I will let the Government respond.

9 And we will have the witness step out for this in case it

10 happens to overlap with her testimony.

11    MR. DANIEL:  The witness can step out.

12    (Whereupon, a recess transpired.)

13    THE COURT:  Could we get defense counsel back so we

14 can address the issue Mr. Daniel raised?

15    Okay.  Mr. Daniel, you mentioned to me in passing

16 something about Bank of America.

17    MR. DANIEL:  Yes.

18    THE COURT:  And I want to just -- I want to make

19 sure I fully understand what you were talking about.  And

20 then I wanted you to explain why you thought that was

21 appropriate.  And then I want to hear the Government's

22 response.  Okay?

23    MR. DANIEL:  Can I have Mr. Abee --

24    THE COURT:  He certainly can.  He's been sitting

25 over there.  You haven't let him do anything.  So I think

1  it's entirely fair that you allow him to do that.

2       Yes, sir.

3       MR. ABEE:  Good afternoon.  Matt Abee, also with

4  Nelson Mullins.

5       Your Honor, this was discussed at the sidebar, and

6  it has come up several times during the trial as far as the

7  bias and motives for several of the witnesses for the

8  Government that have testified.  Our understanding of the

9  ruling at the sidebar is that the Court is not allowing us to

10 go into specific instances of conduct.

11      THE COURT:  Are we talking about the Bank of America

12 thing here now?

13      MR. ABEE:  That would be looped into that, Judge.

14 We see it as all a very similar issue.

15      THE COURT:  And let me just -- just so we will

16 understand what we are talking about is, we are talking about

17 Rule 609.  Let's see here.  I'm sorry, 608(a) and (b), A

18 witness's -- (a):  A witness's credibility may be attacked or

19 supported by testimony about the witness's reputation for

20 having a character for truthfulness or untruthfulness.

21      This was, of course, Mr. Murdaugh's testimony.

22      And then (b):  Specific Instances of Conduct.

23 Except for a criminal conviction under Rule 609, extrinsic

24 evidence is not admissible to prove specific instances of a

25 witness's conduct in order to attack or support the witness's

1 character for truthfulness.

2        Now, let me tell you what I understand from this,

3 from 40 years of practicing it, is that you impeach a

4 witness. You can cross-examine them, as I think they've

5 asked some witnesses some issues here. But you can't try to

6 prove that issue which is the subject of impeachment by

7 extrinsic evidence. That's the problem here. It's so-called

8 the trial within the trial. You don't get to do that. Okay?

9 That's something I just wanted to lay out where the issue is,

10 so you can be clear what I'm ruling about, because I think

11 there was some confusion, particularly by my friend Mr.

12 Austin, why -- the basis of my ruling. And I just wanted to

13 make that clear.

14        MR. ABEE: Yes, Judge. And we agree with you on

15 that, the trial within the trial --

16        THE COURT: Hard to argue with that one.

17        MR. ABEE: -- right, is not allowed. But that's

18 when you are talking about credibility for truthfulness. We

19 are talking about bias and motive for testifying. The Fourth

20 Circuit --

21        THE COURT: But that's impeachment. That's only

22 relevant for impeach.

23        MR. ABEE: Judge, I disagree with you. The Fourth

24 Circuit has split those two issues. And we've got some case

25 law on this. Happy to provide that.

1    THE COURT:  Let's be very specific.  You are saying

2  the bias.  What's the bias?

3    MR. ABEE:  The bias and the motives --

4    THE COURT:  Motives for whom?

5    MR. ABEE:  For the Government's witnesses, the

6  majority of them that are on the Board that have testified.

7  And as we've heard testimony, that there are factions within

8  this family, some that have worked at the bank for years,

9  some that have come into the bank more recently.  And so the

10  testimony that we have been trying to elicit, through both

11  our own witnesses and in our cross-examination of the

12  Government, is about the motives for testifying relating to

13  things like selling the bank.  Those motives and how that

14  might be impacted by a conviction of Mr. Laffitte is really

15  what we need to go into.

16    THE COURT:  But that's the -- I mean, what specific

17  -- point to me the testimony the witness you seek to impeach

18  by their motive?

19    MR. ABEE:  Well, I think the vast majority of the

20  Government's witnesses --

21    THE COURT:  No.  Don't do that.  Give me a specific

22  witness and how it's relevant to that specific witness.  This

23  is not helpful to talk about witnesses in the abstract.

24    MR. ABEE:  Yes.  The Government's witnesses that are

25  on the Board, so that have testified --

1    THE COURT:  Give me a specific witness by name and

2  why that's relevant to that testimony.

3    MR. ABEE:  Norris Laffitte, Lucius Laffitte --

4    THE COURT:  Okay.  Start with Norris Laffitte.  What

5  about Norris Laffitte's testimony goes to bias?

6    MR. ABEE:  So his -- as he took on his role at the

7  bank, wanting to sell the bank goes to his motivation for

8  then wanting to testify against Mr. Laffitte.

9    THE COURT:  What testimony is it?  He just simply

10  gave facts.  And you are saying -- you were able to impeach

11  him and cross-examine him on those facts.  So you are trying

12  to raise an issue -- number one, I think -- I want to hear

13  from the Government about this.  But I'm very concerned both

14  about the issue that you are trying to use -- prove a trial

15  within a trial.  And I'm worried about jury confusion,

16  because it has nothing to do with the case.  And I think you

17  are just trying to have the jury chase rabbits that are

18  irrelevant.

19    We've got 401 issues, 403 issues, as well as 608(b)

20  issues.  All of those are issues that are troubled by this --

21  I'm trouble by this.  Now -- and your lack of particularity

22  is troubling to me.

23    Give me what specific testimony is evidence of bias.

24  What specific thing did Norris Laffitte or anybody else say

25  that is evidence of bias?

1    MR. ABEE:  Judge, one of the exhibits that was

2    excluded, you would have seen, were some of the minutes that

3    discussed, for example, Team Becky.

4    THE COURT:  But tell me what is it about Lucius or

5    Norris Laffitte's testimony, specifically, that you think is

6    produced by bias?

7    MR. ABEE:  It goes to his motive to want to

8    testify --

9    THE COURT:  At all?  But he's --

10    MR. ABEE:  Not at all, Judge, because there are

11    certain facts that he was able to testify --

12    THE COURT:  What specific facts show his bias?

13    MR. ABEE:  Well, the rush to judgment --

14    THE COURT:  No.  No.  That's like -- that's nothing.

15    Rush to judgment doesn't mean anything.  Tell me

16    specifically, he said this, and that was motivated by bias.

17    What was?  Give me one example.

18    MR. ABEE:  I will give you the example of the

19    680,000 and the way that that was -- the way that the Board's

20    view of that 680,000 was impacted.  So the testimony is that

21    there was information provided to the Board in the executive

22    session about the 680.  That concludes with, does anybody

23    else have any other questions or anything else to add?

24    Nobody says a single word about it.  And now at the Monday

25    morning quarterbacking that's going on with the Government

1  witnesses --

2        THE COURT:  This is just -- this is called closing

3  argument.  You can make this.  But I think you are trying to

4  -- this is just a rabbit hole.  You are just running the jury

5  down a rabbit hole that is irrelevant to this case, want to

6  say, don't look over here at the charges, look over here

7  about the sale.  You haven't pointed to me one thing, one

8  specific evidence, that somehow would be evidence of their

9  bias.

10        They've described -- all these people have described

11  these various events.  There are e-mails supporting their

12  views.  They have repeated it multiple times.  I think you

13  are just, you know, just dressing it up and calling it

14  motive.  This is classic impeachment evidence.  But it's

15  impeachment evidence irrelevant to the case.  And it is --

16  you are trying to prove it by extrinsic evidence.  I am not

17  going to allow it.  I am not going to let you turn my trial

18  into a circus.  And I told y'all that repeatedly.  And I

19  think that's how I interpret this.

20        Now let me hear from the Government.

21        MS. LIMEHOUSE:  We, of course, agree with everything

22  you said.

23        THE COURT:  I am not surprised.

24        MS. LIMEHOUSE:  And you, of course, don't need me to

25  make arguments.  But we completely agree, under 401 and 403,

1	both the Bank of America checks and this argument about who

2	wanted to sell the bank when and why are completely

3	irrelevant to the charges against Mr. Laffitte.  And adding

4	this evidence to the trial would risk confusing the jury.

5	And it's also an improper way to impeach our

6	witnesses under Rule 608.  They've had an opportunity to

7	cross-examine each one of those witnesses.  And to now use

8	their own witnesses to try to bring in evidence that will

9	impeach them is just improper under the Rules of Evidence.

10	So we agree with Your Honor.

11	THE COURT:  We talked about this issue of the sale.

12	What about the Bank of America -- I'm a little bit at a loss.

13	What specific is it about the Bank of America that was sought

14	to be elicited that I wouldn't allow impeachment?  What

15	specifically are we talking about?

16	MR. DANIEL:  Your Honor, what it is is you've got

17	those two parts to it.  You've got the law firm making the

18	mistake of sending the checks out to either PMP -- no, PSB --

19	THE COURT:  Call it the law firm.  I know what it

20	is.

21	MR. DANIEL:  Yes, sir.  And then you've got also the

22	Bank of America accepting the same checks that they sent over

23	here, except what you don't have --

24	THE COURT:  Was the Bank of America a conservator

25	over these accounts?

1    MR. DANIEL:  No, sir.  But there are cases that he

2    wasn't a conservator on that involve this whole thing.  This

3    case is --

4    THE COURT:  Well, I may be confused.  But did he

5    have a fiduciary role, call it the Plylers and the Badgers

6    and --

7    MR. DANIEL:  Yes, sir.

8    THE COURT:  -- Malik Williams?  I'm going through

9    all these.  Those are the ones we are talking about here.  So

10   my understanding -- and you can correct me if I am wrong --

11   the Bank of America is not a conservator or have a fiduciary

12   relationship regarding these clients, while the defendant

13   does.  That is the problem here, not they didn't pick up --

14   it says settlement funds, I think, on the check.  And it

15   goes -- we wouldn't be here if that was the only thing on any

16   of these.  We wouldn't be here.  It's because the defendant

17   was a conservator over these funds.  He knew they were

18   conservator funds, at least there's at a reasonable inference

19   of that.  That's the issue.

20   And to go and raise -- you know, I think it not only

21   is potential for 401 and 403 jury confusion, I think it kind

22   of says, well, you don't punish us because somebody else

23   committed the same misconduct, which is inviting jury

24   nullification.  And I am not going to allow it.

25   Mr. Daniel, you've got plenty to talk about in this

1  case.  You don't need to wander off into these other areas.

2  They are not proper.  And I'm trying to give everybody a fair

3  trial here.  My client is a fair trial.  Your client -- you

4  are going to represent your client.  The Government is going

5  to represent their client.  You are both doing an excellent

6  job.  But my job is to keep this a fair trial and to keep it

7  within the lane.  And I am not going to wander off to these

8  other issues that confuse my jury.

9         MR. DANIEL:  Your Honor, for the record, may I just

10  make a proffer to the Court?

11         THE COURT:  You've made it.  And that's why I had --

12         MR. DANIEL:  I haven't finished, Your Honor.

13         THE COURT:  Go ahead and finish then.

14         MR. DANIEL:  There's two issues.  On the Forge

15  checks, for instance, the genesis of the --

16         THE COURT:  Which checks?

17         MR. DANIEL:  Forge, F-o-r-g-e.

18         THE COURT:  Are they in the record?

19         MS. LIMEHOUSE:  There's a completely unrelated

20  scheme involving Alex Murdaugh --

21         THE COURT:  I know, but I'm saying, it's not part of

22  this case.

23         MR. DANIEL:  I understand, Judge.  Let me finish the

24  argument for the record.

25         THE COURT:  Okay.  That's fine.  You are telling me

1   there's some checks not in the record about Forge.

2         MR. DANIEL:  Every one of these checks that Alex

3   Murdaugh stole money, okay, he made this fake Forge account,

4   and he used the Bank of America, and the checks are identical

5   to the trust account.  We've got two of them in evidence.

6   The Court wouldn't let me go into those.  We've got two of

7   those in evidence where it says "law firm" and it says "trust

8   account" and it says "settlement proceeds."  We've got two of

9   those in evidence.  But there's another 10 of those that are

10  the same --

11        THE COURT:  We are not going down to all these.  I

12  got it.  I understand your point.

13        MR. DANIEL:  Okay.  And there's one other thing.

14  That's my argument on the Forge checks and the mistakes

15  made --

16        THE COURT:  For the record, it's F-o-r-g-e, not

17  fraud checks.  Right?

18        MR. DANIEL:  Yes, sir.  Going back to the other

19  issue, there's an Exhibit 81, which I would like made a part

20  of the record.  And I will explain to the Court the context.

21  Exhibit 81 is after -- there was a Board retreat, which we

22  were going to go into, but the Court had already ruled that

23  we couldn't have that -- we couldn't discuss that issue.  And

24  I was trying to be insistent, probably too insistent with the

25  Court.

1          THE COURT:  I want to keep you straight.

2          MR. DANIEL:  I know.  You do okay with that.  So

3     Exhibit 1 is after that meeting, after that -- it was a

4     weekend retreat, and they had a consultant come in, Mr.

5     Garish (ph).  And he issues a little report.  And it's not in

6     evidence and we don't have it.  And I am not asking for that.

7     But what this Exhibit 81 is, is 10 days later, Mr. Charlie,

8     who just testified, that's why I was getting ready to get

9     into with him, it's a memo to the Board, including all those

10    Board members here, except not Ms. Becky Laffitte, because

11    she wasn't on the Board, but the other Board members, and it

12    said, we had this retreat and -- here it is right here.  I

13    can hand it up to you.

14         THE COURT:  Sure.  I will be glad to look at it.

15         MR. DANIEL:  The paragraphs that matters said:  I

16    have a statement I would like to make about the strategic

17    planning session.  Two directors answered the questionnaire

18    that we should position the bank to sell in the next five

19    years.  Two thought we should be ready to sell in 10 years.

20    One thought that selling the bank should be the top priority

21    for the next three years.

22         And then the next paragraph, Mr. Charlie says to the

23    Board:  The directors of the bank should be supporters of the

24    bank and team players as to the strategy of the bank as

25    described in our mission statement.

1    And he describes the mission statement. It's about

2 a locally owned bank.

3    THE COURT: You've now published the thing to me.

4 And I appreciate you putting it in the record. It's trying

5 to prove -- impeach by extrinsic evidence; not proper 608(b).

6 It's irrelevant under 401. And under 403 it, in my opinion,

7 would produce jury confusion. I would be glad to look at it.

8    MR. DANIEL: May I make that proffer?

9    THE COURT: Yes, please. You can put it in as an

10 exhibit. And let me take a look at it to confirm what you've

11 just read to me. I will confirm this. You did an excellent

12 job of reading it to me. It doesn't change my view.

13    MR. DANIEL: I understand, Your Honor. And, Your

14 Honor, also part of the record, I think it was offered as an

15 exhibit and declined, it was the Team Becky e-mail.

16    THE COURT: I saw that. All those fall into the

17 same category --

18    MR. DANIEL: I understand.

19    THE COURT: -- it's a rabbit hole, irrelevant to

20 this case.

21    Yes.

22    MS. LIMEHOUSE: Your Honor, I just want to correct

23 the record. Mr. Daniel stated that we have two Forge checks

24 in evidence. We actually have two checks that were issued to

25 the Bank of America, not to Forge.

1    MR. DANIEL: If I said that, it's a misstatement.

2    THE COURT: Thank you. I haven't seen any evidence

3    that this Forge scam was in the record. And I wouldn't --

4    it's not relevant to this case.

5    MR. DANIEL: Some checks that are not in evidence, I

6    wanted to get to, those are Forge checks.

7    THE COURT: You know, the perimeter of this case is

8    the indictment, right, the six counts. And that's not part

9    of it. And I have no idea. I know nothing about that

10   detail. But it is not relevant to this case.

11   Yes, Mr. Austin.

12   MR. AUSTIN: I think you've heard from too many of

13   us.

14   THE COURT: It's sort of a Jack-in-the-Box effect,

15   yes.

16   MR. AUSTIN: A big piece of this case for us, I

17   mean, within the first two minutes of opening statements from

18   the Government, Alex Murdaugh's name was mentioned. He's 64

19   times in the indictment. And this is a part of a whole issue

20   with selling the bank, because Alex has --

21   THE COURT: Listen, Mr. Austin, I'm glad to hear

22   from y'all. I've heard enough about selling the bank. It's

23   just not relevant. I think the defendant has a clear right

24   to push back on whether he is responsible for conduct with

25   Murdaugh or Murdaugh is acting alone. That's his defense.

1   He has every right to do that.  We are not chasing the rabbit

2   hole about selling the bank.  It's irrelevant to the case.

3          But, you know, you've told the jury and us that he's

4   going to testify, and I presume he will.  And you will have

5   every chance to explain these things.

6          MR. AUSTIN:  On this issue?

7          THE COURT:  Not this issue, but his claim that he is

8   not responsible for Mr. Murdaugh's actions.  And it's

9   according to the indictment.  That's what's relevant.  Don't

10  keep changing the subject.

11         MR. AUSTIN:  I am not trying to, Your Honor.  It's

12  just, for us, it's really important.

13         THE COURT:  I think if that's your defense, it's not

14  a very good one.  The best defense is the one I heard you

15  were going to make, is that he's not responsible for these

16  other actions.  And, you know, there is a dispute by the

17  parties.  And that's why we have jury trials.  Okay?  But we

18  are going to let him put up his evidence.  We are not putting

19  up things that are not relevant to the case and will confuse

20  the jury.

21         MR. AUSTIN:  Your Honor, I'm not sure how we can

22  separate our client from Alex Murdaugh when everybody that's

23  involved in this is lumping him in with Alex Murdaugh.

24         THE COURT:  Well, he's involved.  And the record

25  shows he's involved on a number of transactions.  He has to

1  explain his role in that.  That's what his defense is.  But

2  you can't -- getting him talking about sale of a bank has

3  nothing to do with the charges in Counts 1 through 6.

4       Yes, Ms. Limehouse.

5       MS. LIMEHOUSE:  Alex Murdaugh is his co-conspirator.

6       THE COURT:  Right.  Right.  That's the claim.  Now,

7  he denies that.  He denies he's a co-conspirator.  That's

8  your defense.  And the Government has the burden of proof.

9  He has not the burden to prove anything, of course.  It is

10 the Government's burden to prove it.  But he can mount a

11 defense.  But he's going to defend himself on what's relevant

12 to the case, not what's irrelevant.

13      MR. AUSTIN:  I understand, Your Honor.

14      THE COURT:  Okay.  Is the jury ready?  I do feel

15 like I'm giving up employment to the entire Charleston Bar.

16 I feel very good about that.

17      MS. LIMEHOUSE:  Good for the economy, Your Honor.

18      THE COURT:  Bring the jury in.

19      (Whereupon, the jury returns to open court at 3:50

20 p.m.)

21      THE COURT:  Please be seated.

22      Mr. Austin, please continue your direct.

23 BY MR. AUSTIN:

24   Q.  Ms. Henderson, you mentioned growing up in Hampton

25 County.  Did you know Alex Murdaugh growing up?

1    A.   I did.  We were next-door neighbors, or

2  across-the-street neighbors.  We -- you know, our families

3  lived across the street, played together.  We did all the

4  things that neighborhood kids do.  Our parents were the same

5  ages, actually were married on the same day.  So they had the

6  same anniversary.  It was kind of weird with that.  But

7  they -- known him all my life.

8        The oldest sister, she was so much older than we

9  were, so we didn't really get to know her that well.  But

10  then the oldest brother and then Alex and then John.

11    Q.   And did you stay in touch over the course of

12  college, young adult life?

13    A.   I did, yes.  So we were all pretty good friends, you

14  know, especially in high school.  Alex was two years older

15  than me.  So we did get to hang out some in high school.  In

16  college, not quite as much.  I went to Clemson.  He went to

17  Carolina.  And he would come up to Clemson and, you know,

18  visit.  And I would go to Carolina.  Often we set each other

19  up with dates and different functions and stuff like that.

20    Q.   And at any point, any of the time you've known Alex,

21  did you foresee him being involved with the types of crimes

22  he's accused of committing?

23    A.   Absolutely not.

24        MR. HOLLIDAY:  Your Honor, objection.  Improper

25  question.

1    THE COURT:  Not appropriate.  Foreseeability is not

2  an issue.  Sustained.

3    MR. HOLLIDAY:  I would ask that it be struck from

4  the record, Your Honor.

5    THE COURT:  Struck from the record.

6  BY MR. AUSTIN:

7    Q.  Did you have a chance to review Mr. Murdaugh's

8  financial documents, the types of things that go into loan

9  applications --

10    A.  Uh-huh.

11    Q.  -- during the course of your employment with

12  Palmetto State?

13    A.  I did.

14    Q.  And did you ever see anything that stood out to you

15  as being troubling in those documents?

16    A.  No, other than, you know, paying slowly every so

17  often.  But, no, he had the income.  He had the assets.  You

18  know, he was just slow about paying sometimes.  You just have

19  to call and keep on him, you know.  But we've got quite a few

20  customers that we have to do that with.  But other than that,

21  he had the income and the assets and was able to maintain it.

22    Q.  And since are September, October 2021, did he fail

23  to make payments on any of his outstanding obligations?

24    A.  Well, since September of '21?

25    Q.  Last year, yes, ma'am.

1    A.    That's -- I think that's when he went to jail.  So,

2    yes.  No, he has not made a payment since that time.

3    Q.    So before that, the only other time you can think of

4    was the 0 United and Red Beard?

5    A.    Right.  But I'm sure on the others, he would have

6    been slow.  I didn't review the actual payment histories

7    in-depth.  But I'm sure he would have been slow, but we would

8    have called.  But he wasn't grossly past due on any of those

9    that I recall.

10   Q.    Do you recall voting on a $750,000 loan to Mr.

11   Murdaugh in the summer of 2021?

12   A.    Well, we didn't really vote.  Well, we vote on all

13   of them at the Board meetings, any of them 25 and over.  We

14   discussed it with my dad and my brother.  We talked about it

15   at length, you know, when we were considering doing it.

16   Q.    And why would you talk with your dad and brother in

17   particular out of everybody on the Board?

18   A.    Because they are on the Executive Committee.  And

19   they are in, you know, the building next to me.  So it's --

20   you walk across the street and got all the papers laid out

21   and you talk, go through it that way.

22   Q.    And can you tell the jury what you remember about

23   initiating or how that loan got started?

24   A.    I'm not sure who Alex approached first.  I can't --

25   I don't remember if it was either Russell or my dad.  I'm not

1  sure which one.  But he told my dad that it was for

2  renovations on the beach house and attorneys' fees.  And then

3  he told Russell that it was for renovations on the beach

4  house and ditching Berkeley County.  So and -- so I'm not

5  sure which came first or whatever, but, anyway, this is how

6  it started.  And we were going to do a second mortgage on the

7  beach house.  So we started working on that.

8          Now, at that point, I am not working on it because I

9  have somebody else processing it.  But that's when you are

10  gathering up all the financial information and getting all

11  the nitty-gritty.  Well, the attorney that was going to do

12  the second mortgage then notified us that the house had been

13  transferred into Maggie Murdaugh's name and her estate had

14  not been opened because she had just passed away.  So we

15  couldn't do a second mortgage on it.  So we discussed going

16  ahead and doing it as unsecured with the understanding that

17  we were going to work on getting the second mortgage in place

18  as soon as the estate got opened.

19          Q.  And why were you willing to take that risk?

20          A.  Business decision.  We never had trouble other than

21  those Red Beard and 0 United, and they were still making some

22  payments on those.  You know, we just never had trouble with

23  it.

24          Q.  And despite the fact that his wife and son had been

25  murdered in June 2021, was he still working, to your

1   knowledge?

2       A.   He was.  He was still working.  And -- or to my

3   knowledge.  I did not go and sit in his office and see that

4   he was there.  But it was my understanding that he was there

5   every day, which I thought was --

6           MR. HOLLIDAY:  Your Honor --

7           THE WITNESS:  -- interesting.

8           MR. HOLLIDAY:  I hate to interrupt Ms. Henderson.  I

9   have a concern that sometimes these questions are very

10  precise and we get a narrative answer that goes on a long

11  time.  There's hearsay embedded in her answers.  I would like

12  it to be tightened up a little bit.

13          THE COURT:  Yeah.  If she has -- if she has

14  information that he was working, her knowledge, she needs to

15  lay the foundation for that, for her knowledge.  Just be a

16  little bit more precise and let's not lead the witness.

17          MR. AUSTIN:  Sure.

18  BY MR. AUSTIN:

19      Q.   Why did you think that he was working in the summer

20  of 2021?

21      A.   Because we had talked to him several times.  So --

22  and he, you know, was at the office or said he was at the

23  office when we would call.  Nobody at the law firm said that

24  he wasn't working.  And I had --

25          MR. HOLLIDAY:  Your Honor, this is kind of my point.

1       THE COURT:  Yeah.

2       MR. HOLLIDAY:  Nobody at the law firm said, you

3  know --

4       THE COURT:  But I think she's not really saying that

5  it was true.  Is that that was her --

6       MR. AUSTIN:  Understanding.

7       THE COURT:  -- her understanding, why she reached

8  it.  I overrule that objection.

9       MR. HOLLIDAY:  I understand.  Thank you.  My

10  objection is that the narrative answers to the questions.

11       THE COURT:  Yes.  I'm listening.

12       MR. HOLLIDAY:  Thank you.

13       THE WITNESS:  I also saw his car at the law firm

14  because I know what car he drove.

15  BY MR. AUSTIN:

16    Q.   Okay.  And the initial question was, why were you

17  not worried about that risk with the loan?  And are you

18  saying that he was still working?

19       THE COURT:  No.  She's testified.  You don't need to

20  repeat it.

21  BY MR. AUSTIN:

22    Q.   Okay.  And do you know if -- sorry.  Excuse me.

23  Okay.  Let's go to the $680,000 check to -- that we've heard

24  a lot about.  Are you familiar with a $680,000 check that

25  Russell wrote to PMPED in October 2021?

1    A.   I am.

2    Q.   And what was your understanding about the purpose of

3   that check?

4    A.   The purpose -- my understanding of the purpose of

5   the check was that there had been a check that had come in.

6   When all this happened with Alex and they were investigating,

7   that we were going through each one of his cases.  And he

8   said that they had found one, that he had brought the checks

9   in, and we had negotiated them into other items.

10    Q.   Let me stop you real quick.  Did he say that he had

11   converted them?

12    A.   I think that's what his e-mail said.

13    MR. HOLLIDAY:  Objection.  Leading.  Testifying.

14    THE COURT:  Again, you are testifying.

15    MR. AUSTIN:  There's a lot going on.  Sorry.

16    THE COURT:  I think the importance here is the

17   witness is very capable of testifying.  You do not need to

18   testify for her.  You need to ask her questions which are in

19   the leading and allow her to explain her answer.

20    MR. AUSTIN:  Sorry.

21    THE WITNESS:  So negotiated -- negotiated, convert,

22   processed, you know, they are all the same thing in our

23   speak.  And so we understood that those -- they had been done

24   incorrectly, and that Mr. Ronnie Crosby from the office had

25   met with Russell and said, you know --

1     MR. HOLLIDAY:  Your Honor, hearsay.

2     THE COURT:  Sustained.

3  BY MR. AUSTIN:

4     Q.   Okay.  And did anybody submit any written dissents

5  for that check from the Board of PSB?

6     A.   No.

7     Q.   And was it -- well --

8     A.   Now, can I interject something?

9     MR. HOLLIDAY:  Your Honor, there's no question.

10     THE COURT:  I'm sorry?

11     MR. HOLLIDAY:  There's no question.

12     THE COURT:  No question.  Yeah.

13  BY MR. AUSTIN:

14     Q.   And did Russell take responsibility for that check?

15     A.   He did.  He said -- I can't remember the exact

16  wording of it.  I'm sure we have the e-mail, but, I

17  negotiated them, or, there were 12 checks, or something like

18  that.  And he said that he did it.  And I mean, he said he

19  did.

20     Q.   And did the Board discuss that check and that

21  payment at any point?

22     A.   We did.  At first -- well, when they came to the

23  conclusion or to the agreement, the Executive Committee got

24  an e-mail.  But we had already said, you know, you need to

25  get this taken care of.  And then they sent an e-mail to the

1    Board.  And then we had a special meeting regarding it with

2    the Board.

3        Q.   And did anybody call for that check to be -- for a

4    stop payment or a pause to be put on it?

5        A.   We did.  We actually asked them to hold off on it.

6    Our attorney had asked -- had spoken with Mr. Crosby, or he

7    said he spoke to him, so I'm assuming he did, to put a pause

8    on that until we figured out how to move forward.  And that

9    was on November 3rd, I believe.  And everybody agreed that

10   they would let our attorney take care of it and negotiate and

11   do whatever he needed to do with that.  And then on

12   November -- I think it was -- I'm not sure of the date, maybe

13   13th, 14th, 15th, something like that, is when the check was

14   then negotiated to the client.

15       Q.   Okay.  And under what authority did Russell write

16   this check?

17       A.   As CEO, you have authority under the bylaws.

18       Q.   Okay.  What type of authority?

19       A.   You can -- well, they can pretty much -- they can do

20   agreements, contracts, hiring, firing, I mean, runs the

21   company.

22       Q.   Okay.  And what about, did your dad approve this

23   check as well?

24       A.   He did.

25       Q.   And why would his approval be important in this

1    scenario?

2         A.    Because he was chairman.

3         Q.    Why is that important?

4         A.    The chairman can also approve -- what do they call

5    it?  It's on behalf of the bank, you can negotiate any

6    settlements.  You can enter into any agreements, enter into

7    any contracts, do anything like that for the bank as well.

8    The CEO and the chairman pretty much had the same authorities

9    and they had those individually.

10        Q.    And did the three of you discuss this check as part

11   of the Executive Committee?

12        A.    I don't remember if it was part of the Executive

13   Committee.  We just all talked about it, you know, because we

14   didn't need to as an Executive Committee, because they had

15   the authority to do it.  They asked my opinion.  And I said

16   absolutely, you know, do it.  So -- but they had the

17   authority to do it.

18        Q.    Are you on the Executive Committee as well?

19        A.    I am.

20        Q.    Okay.  So regardless of what the Board thought of

21   this check, is it your position that the Executive Committee

22   would have had the authority to issue it as well?

23        A.    Yes.  The Executive Committee could have issued it

24   also.  The chairman can issue it.  The CEO can issue it, or

25   the Board could do it as an entity as well.

1   Q.   Okay.  And what was -- was there any frustration

2   over writing that check on the part of other Board members?

3        MR. HOLLIDAY:  Your Honor, objection.  Speculation.

4   How does she know?

5        MR. AUSTIN:  She's on the Board.

6        THE COURT:  She can testify to what she knows.

7        THE WITNESS:  Yes, they had some questions.

8        MR. HOLLIDAY:  I think she's going there anyway.

9        THE COURT:  No.  I said she was present.  The

10  question is, were other Board members frustrated.  And she

11  was present at meetings and she could say yes.

12       MR. HOLLIDAY:  Okay.

13  BY MR. AUSTIN:

14   Q.   I will narrow it down.  Were you present at the

15  November 3rd meeting to discuss this check?

16   A.   I was.

17   Q.   And who on the Board disapproved of the check?

18   A.   The only questions -- oh, gosh.  I know Liz

19  Malinowski had a question about it.  Do you want to know her

20  specific question?

21   Q.   No.  General disapproval is fine.

22   A.   She had a question.  And I'm trying to remember.  I

23  can't remember who the other person was that had a question

24  about it.

25   Q.   But there was some frustration on the part of the

1  Board members?

2      A.   Right.  They just had some questions.  And we went

3  through it at that meeting.  And then it was decided that we

4  would let our attorney and Mr. Crosby work out the terms.

5      Q.   And who is your attorney at the time?

6      A.   Trenholm Walker.

7      Q.   Okay.  Did you all have any other attorneys that

8  were present at that meeting?

9      A.   Yes.  I mean --

10     Q.   You don't need to go through listing them all.

11     A.   We have a lot.

12     Q.   And so what was your understanding of the decision

13 that the Board made at that meeting, if any, about that

14 check?

15     A.   The decision was to let Mr. Walker negotiate with

16 Mr. Crosby.  And they would decide when -- when they could

17 release the check, because the PMPED had agreed to hold on to

18 it and put a pause on it at that point.

19     Q.   And what does a pause mean?

20     A.   That they weren't going -- they would have given it

21 back to us.

22     Q.   Do you know if anybody ever asked for the check

23 back?

24     A.   Nobody ever asked for it back.

25     Q.   But you don't know?

1    A.   Well, Mr. Walker didn't.  I didn't.  Nobody that I

2    know, that I spoke to, did not.

3    Q.   Okay.  And what was -- did Russell defer to the rest

4    of the Board during that meeting about paying the check?

5    A.   I'm not sure what you mean by "defer" to the rest of

6    the Board.  The Board discussed it as a whole.  So it was --

7    really, it was Mr. Jim Gibson talking about it mostly.

8    Q.   Okay.  Was Russell's position that the check was

9    going to be paid?

10         MR. HOLLIDAY:  Objection.  Hearsay.

11         THE COURT:  Hearsay.

12         MR. AUSTIN:  It's good for y'all.

13   BY MR. AUSTIN:

14   Q.   So are you aware of any written dissent being filed

15   by anybody in relation to that check by Board members?

16   A.   I am not.

17   Q.   And what was -- was there -- aside from -- I don't

18   want to mischaracterize your testimony.  But did the firm --

19   I mean, the bank lawyers secure a release from PMPED through

20   that check?

21   A.   Secure a release?

22   Q.   Yes, ma'am.

23   A.   I thought you said "lease".

24   Q.   Or settlement?

25   A.   Mr. Walker was going to talk to him about it, but he

1    did not get a release on it.

2         Q.   Okay.  And did you end up -- or are you still on the

3    Board of PSB?

4         A.   I'm on the holding company's Board.

5         Q.   Can you explain that?  What's the difference?

6         A.   The holding company is the -- the bank is owned by a

7    holding company.  And so I'm on the holding company Board.

8         Q.   Okay.  And were you previously on the other Board?

9         A.   I was.

10        Q.   And when were you removed?

11        A.   In September.

12        Q.   Okay.  And what was the basis for your removal?

13        A.   There was no cause.

14        Q.   And what about your dad?

15        A.   Same thing.

16        Q.   Okay.  And also no cause?

17        A.   Right.

18        Q.   All right.  Are you familiar with the $500,000 line

19   of credit that was extended to Alex in 2015?

20        A.   I am, only because of having to do research for it

21   now.  I didn't have -- and I was also -- the Board approved

22   it back when it was done.  But other than that, I am not

23   familiar with it.  I have researched it since, but I wasn't

24   at that time, or at the time of the 750 or whatever.

25        Q.   Okay.  I want to make sure I'm following.  So you

1  remember the -- were you on the Board in 2015?

2      A.   Uh-huh.

3      Q.   And are you saying you remember the Board voting on

4  that, or are you saying through your research --

5      A.   No, I'm saying I researched it.

6      Q.   And what research were you doing?

7      A.   I looked at the Board package to see that it was in

8  the list.  We get a list of every loan that's $25,000 and

9  above.  And so I went through to see if it was on that list

10  that we reviewed.

11      Q.   Okay.  And have you participated in any interviews

12  with law enforcement?

13      A.   I have.  Well, yes, yes.

14          MR. HOLLIDAY:  Your Honor, objection.  Relevance.

15          THE COURT:  Sustained.

16  BY MR. AUSTIN:

17      Q.   Has the bank produced any documents to assist law

18  enforcement with their investigation of Alex Murdaugh?

19      A.   Yes, lots and lots and lots.

20      Q.   And did you participate in that?

21      A.   I did.  When all this -- there was a SLED agent that

22  would call or e-mail me and, you know, he would ask for

23  different documents.

24          MR. HOLLIDAY:  Your Honor, I don't want to go down

25  the rabbit hole of investigative techniques.

1    THE COURT:  It's not relevant to the case.

2    Sustained.

3    MR. AUSTIN:  Your Honor, may I just offer the

4    entire -- well, I don't want to --

5    THE COURT:  You can later do a proffer if you want

6    to.  It's not relevant.

7    MR. AUSTIN:  All right.  Thank you.  Please bear

8    with me for one second, Your Honor.  Beg the Court's

9    indulgence.  Please answer any questions by the Government.

10   THE COURT:  Cross-examination by the Government.

11                    CROSS-EXAMINATION

12   BY MR. HOLLIDAY:

13   Q.   All right.  Ms. Henderson, I'm Winston Holliday.

14   I'm an assistant U.S. Attorney.  Nice to meet you.

15   A.   Nice to meet you.

16   Q.   I think we've established I'm just going to run over

17   a few things.  You work for the bank; is that right?

18   A.   I do.

19   Q.   And just so I'm clear, your current position with

20   the bank is what?

21   A.   Vice president.

22   Q.   Okay.  And then back in this 2020-2021 time period,

23   what was your position with the bank then?

24   A.   Bank president.

25   Q.   And you said now you are a Board member for the

1  holding company.  Before that -- and I'm sorry, I was writing

2  things down at the very end.  You were a Board member up

3  until when of actual Palmetto State Bank?

4       A.    September of '22.

5       Q.    Thank you for helping me with that.  The bank is

6  subject to FDIC jurisdiction; is that right?

7       A.    Yes.

8       Q.    And you are insured by the FDIC as well?

9       A.    Right.

10            The money that -- just as a business model, the

11 money that the bank loans to people, that's funded by

12 deposits made by your customers; is that right?

13      A.    Right.

14      Q.    And that money that customers have deposited into

15 the bank is also what contributes to the value of the shares

16 of the bank as well?

17      A.    Yes.

18      Q.    You as a -- for our purposes, we are not going to

19 talk about -- when I ask you about Board questions, your

20 position on the Board and all, we are going to be back

21 talking kind of 2021.  Okay?  So when I ask if you were the

22 secretary of the Board --

23      A.    I was.

24      Q.    You were?  Thank you.  And as secretary of the

25 Board, you were assigned to take minutes for Board meetings

1    and things of that nature?

2        A.   Right.

3        Q.   What was the time frame that you were the secretary

4    of the Board?

5        A.   Since I became -- when I got put on the Board, I've

6    been secretary ever since because I was the only girl on the

7    Board.  And that's, you know, women's work.  So I've been

8    taking minutes since I went on the Board.

9        Q.   I will tell you this, I've been secretary of my

10   homeowners associations.  Thankless task.

11       A.   It's no fun, I will tell you that.

12       Q.   No.  No.  Anyway, Russell has indicated that you

13   approved the $750,000 transfer of funds to Alex Murdaugh; is

14   that correct?

15       A.   Of the $750,000 loan?

16       Q.   Well, we will talk about that a little bit.  But it

17   was a transfer of money to Alex Murdaugh; is that right?

18       A.   I approved a $750,000 loan.

19       Q.   Okay.  And that money would have been money that was

20   under the custody and control of the bank before it was

21   transferred; is that right?

22       A.   Yes.

23       Q.   And you stated on direct -- it was something I had

24   not heard before.  Obviously, there were renovations to the

25   beach house, was one of the reasons --

1    A.    Uh-huh.

2    Q.    -- that the loan was for.  There's a notion of an

3    attorneys' fees now?

4    A.    Uh-huh.

5    Q.    And what is this Berkeley County reference?

6    A.    That is the property that is owned by -- or is the

7    Red Beard and 0 United property?

8    Q.    Some of the $750,000 was going to go to renovating

9    the Edisto beach house?

10   A.    Uh-huh.

11   Q.    And some of it was going to go to Red Beard and 0

12   United?

13   A.    For ditching.

14   Q.    And fair enough.  And then attorneys' fees?

15   A.    Right.

16   Q.    Like attorneys' fees because of the June 7th issues

17   and going forward?  What was your understanding of attorneys'

18   fees?

19   A.    My understanding, it was from the boating accident

20   that Alex's son was in.  Now, but, again, I don't know that

21   for sure, because that's what he had told my dad.

22   Q.    Well, is that sort of -- it is important because I

23   want to know what you knew.  Okay?

24   A.    Okay.

25   Q.    So is it your understanding that that money was

1  going to go in part to pay attorneys' fees from the Mallory

2  Beach boating accident as well?

3  A.   I don't know if it was from -- I assumed it was the

4  boating accident, but -- because I don't know why else he

5  would have been paying attorneys' fees at that point.  But it

6  was attorneys' fees, renovation at Edisto, and the ditching

7  of Berkeley County.

8  Q.   Okay.  Roughly the time of this money transfer was

9  July 15th of 2021.  Maggie and Paul were killed on June the

10  7th, 2021.

11  A.   Right.

12  Q.   Which was before all this money was freed up?

13  A.   Right.

14  Q.   Briefly Exhibit 5, please.  We are not going -- if

15  you have trouble seeing, let me know.

16  A.   I got my glasses.

17  Q.   I know some of the exhibits are fuzzy too.  I think

18  this one is okay.  Do you remember seeing this document as a

19  Board member?

20  A.   I do.

21  Q.   And so we are going to start off with the second

22  loan down there, 9180, principal is $193,691?

23  A.   Right.

24  Q.   And that's another one that had to do with Edisto

25  beach house, right?

1    A.    Uh-huh.  That was the first mortgage.

2    Q.    Good.  How far back did that one stretch, do you

3    know?

4    A.    I don't.  I don't remember.

5    Q.    And sometimes loans are rolled over or whatever.

6    A.    Right.  They get renewed several times.

7    Q.    Thank you.  So do you know what's going on with this

8    loan in 2021?

9    A.    It was actually up for renewal.  We were getting

10   ready -- we had just ordered an appraisal to start renewing

11   it, because it had matured.  It was at maturity.

12   Q.    Yeah.  Yeah.  So this was produced to the Board.  I

13   don't -- I also don't want to keep pulling up minutes, but

14   July, August, I think August probably is when you would have

15   seen this document?

16   A.    I don't remember when it was.

17   Q.    Fair enough.  But it's about in that time frame that

18   that loan is coming up for renewal?

19   A.    It was already up for renewal.

20   Q.    Okay.  And so --

21   A.    Before -- before -- I mean, it was before the Maggie

22   passed away.

23   Q.    Sure.  Sure.  So there was an appraisal in the

24   works?

25   A.    Uh-huh.

1    Q.   Probably initiated back in the spring, April time

2    frame, something like that?

3    A.   Right.

4    Q.   And the purpose of that appraisal was to sort of

5    bring this 9180 up to speed; is that right?

6    A.   Right.

7    Q.   Thanks for clarifying that.

8    A.   And then -- well, I was going to say, because we

9    knew we had an appraisal in the works, we knew that would be

10   a good way to be able to use the -- to do a second on it,

11   since we already had an appraisal, because you have to have

12   an appraisal on real estate.

13   Q.   Sure.  But the initiating activity was that -- the

14   first one?

15   A.   Right.  Yes.

16   Q.   Charles, III.  I hate to say it that way.  There's

17   Charlie and Charles III.  Charles III gotten that in the

18   works back in April?

19   A.   Right.

20   Q.   And then, of course, you refer to the 6048 loan.

21   That's the one that you and I talked about a little bit with

22   the $750,000 Green Swamp share and all these things?

23   A.   Right.

24   Q.   And I think you explained it very well.  The beach

25   house was, in part, in Maggie's name.  So it was tied up in

1    probate, and her estate was being worked out and all these

2    things; is that right?

3        A.    Her estate had not been opened yet.  So there was

4    nothing working out yet.  But they were trying to get all

5    that done.

6        Q.    Can be a slow process, right, getting estate opened,

7    resolved or whatever?

8        A.    Yeah.

9        Q.    Now, I want to go to Government's Exhibit 10I,

10   please.  This is a wire that has been brought up in this case

11   before.  If you would, please, look up at the date there,

12   July 15th, 2021?

13       A.    Uh-huh.

14       Q.    And that's about the time that we were talking about

15   as far as this beach house, Berkeley County --

16       A.    Right.

17       Q.    -- attorneys for Mallory Beach issues come up,

18   right?

19       A.    Right.

20       Q.    And I've had the chance to get down around Hampton

21   County, Bamberg, Allendale, all these places.  Pretty --

22   people tend to know each other in the area; is that right?

23       A.    We do.

24       Q.    Do you know Chris Wilson?

25       A.    I do not know him.  I know of him.

1    Q.    What kind of law does he practice?

2    A.    I do not know.

3    Q.    Do you know or was it explained to you by Russell

4    why the Chris Wilson Law Firm would have been wired -- and

5    this is really small, and again, if you want me to blow it

6    up, glad to do it -- the $370,000 from the $750,000 loan?

7    A.    I really don't remember exactly.  I remember knowing

8    that it was getting wired, but I don't remember details on

9    it.

10   Q.    So the details weren't shared with you as part of

11   your approval of this transfer of money?

12   A.    No, because we had already approved the -- we

13   already approved the 750, you know, to say, okay, go ahead

14   and do it.  We were just working out the details now.

15   Q.    But do you know why Alex Murdaugh needed $350,000

16   wired to Chris Wilson on July 15th of 2021?

17   A.    My assumption would be for attorneys' fees.

18   Q.    An assumption, but you don't know?

19   A.    No.

20   Q.    Attorneys' fees that you think Alex owed to Chris

21   Wilson, or no idea?

22   A.    No idea.

23   Q.    And this --

24   A.    But 350 isn't out of the ordinary for what attorneys

25   charge, so --

1    Q.   Oh, sure.  Sure.  I'm just getting at whether or not

2    you were informed as to the purpose behind the $350,000 wire

3    and why it would have come out of the $750,000.

4    A.   I don't remember exactly.

5    Q.   Okay.  10E, please.  All right.  Just tell us what

6    this is, please.

7    A.   That is -- the white copy of the money order is the

8    bottom.  And that is the credit.  And then the top part is

9    the debit.  And it goes to loans not on system.  And that is

10   when a loan has not been booked.  It goes into loans not on

11   system until we can get it booked.

12   Q.   Okay.  And in your approval of this $750,000

13   transfer, were you told about this $400,000 that would be

14   going into Alex Murdaugh's account?

15   A.   Yes.

16   Q.   Okay.  And were you told that Alex Murdaugh was 367

17   or so thousand dollars under water, and that this would bring

18   him into the black, so to speak?

19   A.   Right.  I mean, it was on the overdraft.  Everybody

20   sees the overdraft list.

21   Q.   We've been talking about a beach house loan.

22   A.   Uh-huh.

23   Q.   Pay attorneys and clear Berkeley.

24   A.   Okay.  When you look -- do you have -- on these

25   things, do you have his bank statements by any chance?

1    Q.   Sure.

2    A.   Okay.  So if you pull up his bank statements for the

3    past June, July, August, or I guess May, June, July, and the

4    beginning of August, you will see that there were -- if you

5    will pull those up, we can see where the different checks

6    were going out.  And we assume that those were going to the

7    contractor.

8    Q.   Like checks to the funeral home?

9    A.   No, I don't remember what that one was, but --

10   Q.   Two checks to the funeral home?

11   A.   Well, I mean, people die, out of your checking

12   account.

13   Q.   So that's fairly obvious that's not going to the

14   beach house.

15   A.   Right.  But if you are paying a contractor, you are

16   paying him weekly or something like that.  So there were

17   normal -- not normal, just, you know, $25,000, $30,000, there

18   was some checks going out to this individual that we thought

19   we thought was the contractor and doing the work on the

20   property.

21   Q.   Is that what Russell represented to you, that was a

22   contractor?

23   A.   No, that's what we looked at and thought.

24   Q.   It was an assumption you made?

25   A.   Uh-huh, which is -- I mean, it's a -- I've been

1   doing this a long time.  I thought it was a pretty good

2   assumption.

3       Q.   Okay.  This August the 9th transfer of $400,000 into

4   Alex Murdaugh's account, that coincided with an e-mail from

5   Norris Laffitte that day.  Do you recall that?

6       A.   I don't.  I didn't see the --

7       Q.   I will be glad to show it to you.  Government's

8   Exhibit 2, please.  And this is an e-mail that you are copied

9   on from August 9th.  It's in that morning.  And Norris is

10  saying:  Executive Committee, since the June events, would

11  the Committee prepare for the Board what is PSB's total

12  exposure with regard to Alex Murdaugh directly, indirectly,

13  through different family relationships, and/or LLCs, with his

14  borrowing practices and repayment plans if he's not working.

15  Norris.

16          Are you aware that the $400,000 transfer that we

17  just looked at took place after Norris's inquiry?

18      A.   I don't think that that would be really relevant, to

19  be honest.

20      Q.   I just asked if you are aware.

21          THE COURT:  You need to answer the question.

22          THE WITNESS:  Okay.  No.  But can I comment on it?

23  BY MR. HOLLIDAY:

24      Q.   Going to Government's Exhibit 192.  We could go up

25  to August the 9th, please.  If you look way down here at the

1     bottom, there's that $400,000 transfer we've been talking

2     about.

3         A.   Uh-huh.

4         Q.   And he was upside down on $367,000.  And then we see

5     the $400,000 hitting.  Well, $32,000 is a lot of money to a

6     lot of people.  So brings him up there, right?

7         A.   Right.

8         Q.   You know, while we've got this up, I think you were

9     talking about this a second ago --

10         A.   There, if you will look above, there's the 19,000,

11     and then 19,000.  You go to the page before --

12         Q.   Yeah.  Yeah.  But the thing is, C.E. Smith, did he

13     share with you who that was?

14         A.   If you look on the checks, it has Berkeley on it on

15     the checks.

16         Q.   Uh-huh.  So you made the assumption that that was

17     for beach house renovations?

18         A.   No.  I would have thought that part was for

19     Berkeley.

20         Q.   Do you have any basis for that?

21         MR. AUSTIN:  Objection, Your Honor.  I think this is

22     basically the same thing that --

23         THE COURT:  No.  He's asking her.  She said she had

24     an assumption.  He has a right to ask her.  It's

25     cross-examination.

1    THE WITNESS:  He wrote Berkeley on the bottom of the

2    check.  Can you pull up the checks?

3    BY MR. HOLLIDAY:

4        Q.    No --

5        A.    Because there were a bunch of them that were written

6    to this fellow.

7        Q.    There were a lot written to this fellow.  I'm just

8    wondering why you thought he was a contractor.

9        A.    Because --

10       Q.    Did Russell tell you he was a contractor?

11       A.    No, Russell didn't tell me that.

12       Q.    Knowing that the $400,000 was not being spent for

13   beach house renovations, lawyers' fees, or Berkeley County,

14   would you have still approved it?

15       A.    Yes, probably.

16       Q.    And you are aware that this loan was not entered

17   into the bank's system on July the 15th of 2021; is that

18   right?

19       A.    Right.

20       Q.    Not until over a month later did it finally hit the

21   system?

22       A.    Right.  That's the purpose of the loans not on

23   system --

24       Q.    Well, sure.  But if the loan paperwork that's

25   backdated is covering transfers that are totally

1  misrepresented as to why the loan exists, then that's a whole

2  different thing --

3        MR. AUSTIN:  Objection, Your Honor.  He's

4  testifying.

5        THE COURT:  It's cross-examination.

6        THE WITNESS:  So I do not feel that it was

7  misrepresented according to what we thought.  I knew for a

8  fact that he was doing the beach house renovations.  I mean,

9  I had seen Maggie.  We had actually talked about it, you

10 know, the fact that they were doing beach house renovations.

11     Q.   Not to be indelicate, but that was before --

12        MR. AUSTIN:  Objection, Your Honor.  He's

13 interrupting her now too.

14        THE WITNESS:  They were still doing them.

15 BY MR. HOLLIDAY:

16     Q.   Maggie's understanding of beach house renovations

17 would have been prior to June the 7th of 2021.  This loan,

18 this transfer money, took place --

19     A.   July 15th, uh-huh.

20     Q.   Her intentions really weren't in play at the moment?

21     A.   Well, they weren't, but the work was still going on.

22     Q.   How do you know?

23     A.   Because I knew the next-door neighborhood and they

24 said there were still workers and things going on at the

25 house.

1    Q.    $750,000 worth of work at the beach house in Edisto?

2    A.    Not my job to say how much they spent on it.

3    Q.    They've also indicated that you approved this

4    $680,000 payment in October of '21 to cover the conversion of

5    Badger money; is that right?

6    A.    Yes.

7    Q.    You approved that?  Government's Exhibit 23, please.

8    Did you ever see this document before?

9    A.    I have now.  I had not seen it then.

10   Q.    Okay.  And now in the context of --

11   A.    Since we've been doing research on all these.

12   Q.    All right.  So as far as this goes and your

13   research, down at the bottom here, you are familiar that

14   there was a $1,325,000 payment that was supposed to be made

15   from the Badger funds to structure a settlement?

16   A.    Uh-huh.

17   Q.    And you are also aware that Russell was paid $35,000

18   as a personal representative fee; is that right?

19   A.    Right.

20   Q.    Was he the personal representative of Arthur Badger?

21   A.    I don't know.  I mean, now I can't even remember

22   which one it is now, but I think it was actually the wife.  I

23   don't remember.

24   Q.    Okay.  Long time ago in the trial I did the math on

25   the screen there.  But $1,325,000, plus 35,000, is about

1   $1,360,000?

2       A.   Okay.

3       Q.   You don't have to take my word for it if they can

4   work it out.

5       A.   Okay.

6       Q.   And half of $1,360,000 is $680,000; is that right?

7       A.   Yes.

8       Q.   So included in the payment that Russell says you

9   authorized was half of $35,000 that Russell has actually

10  paid?

11      A.   Okay.

12      Q.   Did you know that when you approved the $680,000?

13      A.   No.  I knew that we had -- that there were 13 --

14  that it was 1.3 million that had been processed in different

15  things, and that they had agreed with Ronnie Crosby to split

16  it.

17      Q.   Okay.  I'm going to show you Government's Exhibit

18  30.

19      A.   Also, can I point something out?

20      Q.   There's no question, ma'am.  Showing you

21  Government's Exhibit 30, which is a summary page of the

22  $1,325,000 for Badger checks.  When you approved payment to

23  the law firm of that amount, did you know that $388,687 of

24  that had actually gone to a partner in the law firm, Johnnie

25  Parker?

1    A.    I can't remember if I got the copies of the checks

2   that day or the day after, but, yes, I am -- yeah, I was

3   aware of it.

4    Q.    And you thought it was a good idea for the bank --

5   you said Ronnie Crosby approached y'all about money that had

6   been converted from Mr. Badger; is that right?

7    A.    Right.    That's what I understand.

8    Q.    And so Russell's solution to this, 388,000 had gone

9   to a partner in the law firm, was, yeah, I will pay that

10   money, that you thought it was a good idea that the bank

11   should pay some of the money that would go to a partner in

12   the law firm?

13    A.    The reason we decided to pay it is because it was a

14   check written to the bank --

15    Q.    Right.

16    A.    -- that we negotiated and did it to other items and

17   it wasn't written -- should not have ever been written to the

18   bank.    But we -- we, the bank -- I don't know, transfer, we

19   converted it, we wrote other money orders for those different

20   things, which was -- shouldn't have been done.    So we were in

21   the wrong.    So we said, you know, if they will split it,

22   great.

23    Q.    It's not "we".    You didn't do this.

24    A.    "We" as a bank, so "we".

25    Q.    Russell did this; isn't that right?

A.   When -- any time an employee does anything, it's a "we".  That's the way I was raised.  It was the way I was brought up.  I'm part of it.  When we have successes, it's a "we".  When we have failures, is a "we".  It's always a "we."

Q.   Russell has told you through an e-mail, I converted 12 checks?

A.   Uh-huh.

Q.   You learn the checks are going to Johnnie Parker, right?  That's first question.

A.   Uh-huh.

Q.   Alex Murdaugh, loan repayment to the Hannah Plyler conservator account, you learned that as well?

A.   Well, it wasn't a list like this, but it was a copy of all the checks.

Q.   Sure, all the checks.  Here --

A.   Right.

Q.   $75,000 to Randolph Murdaugh III.  It's in the bank's interest to pay money that your brother converted to Randolph Murdaugh?

A.   I mean, we did the check incorrectly, is what we are --

Q.   Well, did you factor in to all this your brother's intentions as to why he did this?

A.   I asked him.  I said, why?  And he said that he didn't remember when it happened and that -- you know, we all

1    know Alex.  He's chaotic and he's -- just kind of comes in.

2    He's in a hurry all the time.  And I can see it.  He was just

3    like, we need this, this, this, this, and --

4        Q.   You make a great point.  You want to say he's

5    chaotic and all.  And I accept that.  He needed someone like

6    your brother, who was organized and meticulous and kept

7    detailed records of these conservator accounts, to keep him

8    straight, didn't he?

9            MR. AUSTIN:  Objection, Your Honor.

10            THE COURT:  Cross-examination.  Sit.

11    BY MR. HOLLIDAY:

12        Q.   They say he's --

13        A.   I don't know anything about the conservatorships and

14    all that kind of stuff.

15        Q.   I know.  But your brother, he's a CEO of the bank?

16        A.   Uh-huh.

17        Q.   And he's meticulous in his recordkeeping?

18        A.   I mean, I am more meticulous, but --

19        Q.   Obviously so.  Obviously so.  Right?  But Alex

20    needed your brother to make this work; isn't that true?

21        A.   I do not believe that.  If I thought that he had

22    done anything, I would not have --

23        Q.   Go to Exhibit 37.

24        A.   Okay.

25        Q.   So here's an e-mail from Alex to your brother.  Do

1    you see that?

2        A.    I do.

3        Q.    I want to start from the bottom.  It says:  Please

4    e-mail me and ask that check No. 43162 dated 11/19/12 for

5    that amount we've been looking, $325,000, be re-cut as listed

6    above.

7        A.    Uh-huh.

8        Q.    So he's asking your brother to e-mail his law firm

9    to cut -- to re-cut the structured check?

10       A.    Right.

11       Q.    Have you seen this before?

12       A.    I have.

13       Q.    Did you see this before you approved the $680,000

14   payment?

15       A.    No.

16       Q.    So the first figure we just saw, that's the Johnnie

17   Parker check, 388,687.50?

18       A.    Yes.

19       Q.    Here's the point I want to make, whatever the amount

20   I owe on the Hannah loan, Alex didn't know, did he?

21       A.    I don't even know -- no.  I don't know what --

22       Q.    Well, we can walk through it.

23       A.    I don't know what -- the 388 was the amount to

24   Johnnie Parker.  And then what is the $75,000 to the Hannah

25   loans?

1    Q.   Doesn't matter for this question.  Okay.

2    A.   Then I don't understand what question you are asking

3    me.

4    Q.   The question is, whatever the amount I owe on the

5    Hannah loan, this is an e-mail from Alex to Russell.

6    A.   Okay.

7    Q.   Alex doesn't know how much he owes on the Hannah

8    loan.

9    A.   Right.

10   Q.   He's asking your brother how much he owes on the

11   Hannah loan.

12   A.   Okay.

13   Q.   Because your brother is the meticulous one, the

14   record keeper, who knows exactly how much he owes on the

15   Hannah loan; isn't that right?

16   A.   As he should know on the Hannah loan, yes.

17   Q.   Right.  Government's Exhibit 38 please.  And it's

18   Russell who fills in that number, because he's the one that

19   knows.  And you are right, Mr. Chaotic, Alex Murdaugh, he

20   doesn't know.  Your brother is the one who knows exactly what

21   he owes on the Hannah loan.  He's the one that was keeping

22   records?

23   A.   Right.

24   Q.   Let's go back to the chart, please.  So, again, did

25   Russell share with you, when you were approving the $680,000,

1 that money under the custody and control of Palmetto State

2 Bank is going to pay back Johnnie Parker?

3     A.    We had a list of all of the -- we had copies of all

4 the checks at that point.

5     Q.    And so you approved the bank's commitment of money

6 under its custody and control to facilitate this transaction?

7 You were a part of that?

8     A.    Yes, because we had to make -- we were trying to

9 make the customer whole, which was Mr. Badger.

10     Q.    For your brother's misconduct; is that right?

11     A.    I do not believe so.

12         MR. AUSTIN:  He's being argumentative.

13         THE COURT: It's cross-examination.

14 BY MR. HOLLIDAY:

15     Q.    There's a money order to Randolph Murdaugh.  That's

16 what we talked about before we jumped over to the e-mails.

17 There's a 93,000, almost $94,000 money order for Hannah

18 Plyler loan repayment.  And, again, that e-mail, Exhibit 37,

19 your brother is tracking the Hannah Plyler loans; isn't that

20 right?

21     A.    Right, just like we would for any other loan when

22 you get a payoff.

23     Q.    Right.  $7,500 money order to Maggie Murdaugh from

24 Badger settlement funds.  You knew that that was part of the

25 $680,000?

1    A.    Right.  But what we didn't know -- or what we didn't

2    know at that point was that it was all -- I mean, on the

3    whatever date, 2013, or whenever it was, that those were the

4    Badger funds.  That's what I understood.

5    Q.    That's not so important as to what you approved?

6    A.    Yes, I approved the 680.

7    Q.    Okay.

8    A.    As did the Board.

9         MR. HOLLIDAY:  Your Honor, I ask that the answer be

10   stricken.  It's inconsistent with the evidence in the record.

11        THE COURT:  I'm sorry, which answer was that?

12        MR. HOLLIDAY:  She said "as did the Board."  No.

13   That's not a question I asked and inconsistent with the

14   evidence in the case.

15        THE COURT:  Answer is struck.

16   BY MR. HOLLIDAY:

17   Q.    And again, checks 45027, 45028, Alex Murdaugh loan

18   repayments to the Hannah Plyler construction account.  Again,

19   your brother is keeping up with the Hannah Plyler account; is

20   that right?

21   A.    Right.

22   Q.    $14,500 wire to Southern Crane.  Did Russell explain

23   to you why Badger money would have gone to Southern Crane?

24   A.    No.

25   Q.    But you approved it anyway?

1  A.  Yes.

2  Q.  And then there's money that's deposited into Alex

3  Murdaugh's Palmetto State bank account, over $50,000; is that

4  right?

5  A.  Right.

6  Q.  Okay.  There's a $34,000 wire to 4M Iron, LLC.  Were

7  you informed of that wire when you approved the $680,000?

8  A.  It was all part of that list.

9  Q.  And $8,200 money order to E. Smith.  That name

10  popped up again now.  Right?

11  A.  Yes.

12  Q.  For Jeep purchase?

13  A.  Well, yes.

14  Q.  Did Russell explain why Badger money was being used

15  to buy a Jeep for E. Smith when you approved the $680,000

16  payment?

17  A.  Well, as a side note, this was after the 750, when

18  he was, I thought, was the contractor.  But, again, when we

19  approved the $680,000, it was because the bank had negotiated

20  a check incorrectly.

21  Q.  Yeah.  You say "the bank," your brother did, he

22  negotiated the checks incorrectly?

23  A.  Exactly, but he had the authority to correct it and

24  get this --

25  Q.  Well, or cover it up, right?  And, well, let's go

1    here. So $680,000, going into that November 3rd Board

2    meeting, he's saying the money has been paid, we are not

3    getting it back. That's his direction to Trenholm Walker?

4       A. No. No. Trenholm had talked to Ronnie and they had

5    put it on pause.

6       Q. Do you know -- let's go to Government's Exhibit 77,

7    please. You've talked about a pause. You talked about it on

8    direct or whatever.

9       A. Uh-huh.

10       Q. Here's the $680,000 right?

11       A. Right. They deposited the next day.

12       Q. Yeah. Did you ever see that money again?

13       A. No, but we didn't ask for it back, and we could

14    have.

15       Q. Who is "we"?

16       A. The bank.

17       Q. Why do you think you could have asked -- the money

18    is gone. It's been deposited.

19       A. Because we had an agreement.

20       Q. Law firm is not given it back to you.

21       A. They would have if we had asked for it.

22       Q. What's your basis for that?

23       A. 30 years of business with them.

24       Q. Yeah. Have they given it back?

25       A. No. We haven't asked for it back.

1    Q.   It's still -- well, have they given it back?

2    A.   No.

3    Q.   So the bank is out $680,000 --

4    A.   Right.

5    Q.   -- that your brother carried across the street,

6    handed to Ronnie Crosby, without any prior notice to the

7    Board?

8    A.   Right.  Before he did that, he let the Executive

9    Committee know.

10   Q.   You and your father?

11   A.   And Scott Swain and Jan Malinowski.

12   Q.   He told Scott Swain and Jan Malinowski that he was

13   taking $680,000 across the --

14   A.   Yes, he sent an e-mail to them.  You don't have a

15   copy of that e-mail?  Is that on there?  I'm just saying.  I

16   have a copy of it.

17   Q.   Yeah.  Well, you should have provided it when you

18   provided all these e-mails to the investigators, I guess.

19   Why did you hold that one back?

20        MR. AUSTIN:  Judge --

21        THE WITNESS:  I didn't hold anything back.  That

22   would have been in the search that they came from.

23        MR. AUSTIN:  Ask questions and just not fight with

24   the witness.

25        THE COURT:  He's not fighting.  He's cross-examining

1  the witness.

2        THE WITNESS:  I don't think it would have been held

3  back.

4  BY MR. HOLLIDAY:

5      Q.  I haven't asked a question.

6      A.  Okay.  Well, you asked me why I held it back.

7      Q.  Russell was fired from the bank in January of 2022;

8  is that right?

9      A.  Correct.

10      Q.  And you abstained?

11      A.  Yes, I did.

12      Q.  And your father Charlie voted no; is that right?

13      A.  That is correct.

14      Q.  You also are the ones that approve $750,000 payment;

15  is that right?

16      A.  That's correct.

17      Q.  You are also the ones who approved the $680,000

18  payment; is that right?

19      A.  That's correct.

20        MR. HOLLIDAY:  Nothing further, Your Honor.  Thank

21  you.

22        THE COURT:  Redirect.

23                REDIRECT EXAMINATION

24  BY MR. AUSTIN:

25      Q.  I will be really quick, Ms. Henderson.  I think

1    there's some confusion over your use of the term "we" when

2    you refer to the bank.  There's sometimes where it sounds

3    like you are talking about just yourself when you say "we".

4    Can you explain that?

5        A.    Well, I think I tried to explain.  Is that when --

6    as a bank or as an employee of the bank, and especially with

7    a family bank, it's -- everything is a "we".  When, you know,

8    let's just say, for example, if my teller gives -- you know,

9    shorts somebody $20, we have to apologize, not Jane at the

10   window.  You know, that's just -- that was the way I was

11   brought up.  That was the way my dad taught me that you win

12   as a team, you lose as a team.  And everything is "we".  And

13   it's just been ingrained that when I talk about anything with

14   the bank, I say "we".

15       Q.    And so you said that your dad taught that at the

16   bank.  Is that part of the corporate, I don't know, for lack

17   of a better word --

18       A.    Yeah.

19       Q.    That's something that consistently comes up?

20       A.    It is.

21       Q.    And was that your interpretation of Russell's e-mail

22   when he said "we converted the checks?"

23       A.    It was.  Because wouldn't have been anybody else.

24   Well, I guess it could have been a teller or whatever.  But

25   he would have had -- somebody, an officer, has to sign

1    checks.  So it would have been -- you know, he may not have

2    written them, but he would have had to have signed them.

3        Q.   To your knowledge, at any point has Russell denied

4    responsibility for the checks that you were just asked about,

5    the Badger checks?

6        A.   No.

7        Q.   And his signature is on them; is that right?

8        A.   That's right.

9        Q.   Just like with the conservatorship and PR documents?

10       A.   Well, I haven't seen them, the PR documents or

11   anything.

12       Q.   Right.  But is it your understanding that Russell is

13   hiding his responsibility --

14           MR. HOLLIDAY:  Your Honor, objection.

15           THE COURT:  That's leading.

16           MR. HOLLIDAY:  Improper.

17   BY MR. AUSTIN:

18       Q.   And I think you were asked about -- Mr. Holliday

19   asked you about Maggie Murdaugh's estate and estates

20   generally taking a long time to open.  They don't always take

21   a long time, do they?

22       A.   Not always.  You can -- usually could just walk

23   across -- in our -- well, they were in Colleton County, so I

24   don't know how long they would take.  But in our county, it's

25   kind of -- you can walk across the street and fill out the

1 paperwork as long as there's a will and, you know, they've

2 designated a personal representative or something. But it's

3 not a super quick process unless it's simple.

4     Q. Are you aware of anything that slowed down Maggie

5 Murdaugh's estate being opened?

6     A. Well, Alex, what we think is grieving the loss of

7 his wife and child, and then his father died. So it was kind

8 of -- everybody was kind of reeling. I would think that

9 would slow you down a little bit, but --

10     Q. Bear with me for just a second. I'm going to pull

11 up a couple of e-mails. Will you please pull up Government's

12 Exhibit 12. Have you seen this e-mail before? Is this your

13 name here?

14     A. Yes, I remember that one.

15     Q. And what was your understanding of what Russell was

16 doing here?

17     A. Just letting the Board know that that's what had

18 taken place and that we would discuss it at the next Board

19 meeting.

20     Q. So did you think that he was hiding his involvement

21 in any way?

22     A. I did not.

23     MR. AUSTIN: Apologies, Your Honor.

24 BY MR. AUSTIN:

25     Q. Have you seen the other e-mails that followed in

1   this chain?

2      A.   I have.

3      Q.   And to the best of your recollection, did Russell

4   deny responsibility for anything in those e-mails?

5      A.   No.

6      Q.   Or any other time?

7      A.   No.

8           MR. HOLLIDAY:  Your Honor --

9           THE COURT:  It's okay.

10          MR. AUSTIN:  That's all I have, Your Honor.  Thank

11  you.

12          THE COURT:  Thank you.  You may step down.

13          Ladies and gentlemen, we are going to call it a day.

14  No one is complaining about that.  I want to remind you we

15  will not be in court tomorrow, but we will start 9 a.m.

16  Friday morning.  Please do not see any media, do not obtain

17  information from any other source.  And be safe.

18          (Jury leaves open court at 4:53 p.m.)

19          THE COURT:  Yes, sir.  You wanted to say?

20          MR. AUSTIN:  I just wanted to release the witness,

21  Your Honor.

22          THE COURT:  She's released.

23          MR. DANIEL:  And us?

24          THE COURT:  For one day, Mr. Daniel, one day.  Any

25  other matters I need to address?

1    MS. LIMEHOUSE:  Nothing from the Government, Your

2  Honor.

3    MR. DANIEL:  Nothing from the defense, Your Honor.

4    THE COURT:  Everybody get a good rest.  We will

5  start 9 a.m.  Mr. Daniel, without -- I don't want to intrude

6  on your plans, but do you have any idea how many witnesses we

7  have left?  Do you have any idea about witnesses we have

8  left?

9    MR. DANIEL:  Yes, we should finish up Friday.

10    THE COURT:  That's what I'm trying to get at.

11    MR. DANIEL:  Yes, Your Honor.  I'm very optimistic

12  about that.

13    THE COURT:  Because I think what we would do is we

14  would send the jury home after that, and I would charge on

15  Monday.  And I, frankly, don't think I will have enough time

16  to absorb all these issues about -- I want to look at some

17  rough transcripts on a couple of issues on the charge.  So I

18  think what we will plan to do is probably have you all over

19  here like 8:30 on Monday in the morning to do the charge

20  conference.  And then I might bring the jury in at 10 or so,

21  something like that.

22    MR. DANIEL:  For closing arguments?

23    THE COURT:  For closing argument and jury charge.

24  And I will try over the weekend to send you a proposed

25  charge, you know, so that we could do the charge conference.

1  I want enough time if I want to make any changes after the

2  charge conference.  Of course, y'all will have closing

3  argument before I charge.

4        MR. DANIEL:  Yes, sir.

5        THE COURT:  So the jury should get it some time on

6  Monday fairly early, hopefully.

7        MR. DANIEL:  Yes, Your Honor.  And I know the

8  Court's allowed me to do this before, may Mr. Austin and I

9  split our -- split the argument?

10        THE COURT:  You are welcome to do it any way you

11  want.

12        MR. DANIEL:  We won't take any longer.  We

13  understand the jury is going to want to go home.

14        THE COURT:  Yeah.  I think it's just fine.  Y'all

15  are the master of your case.  You run it the way you want to.

16        MR. DANIEL:  Thank you, Your Honor.  We appreciate

17  that.

18        THE COURT:  Very good.

19        (Whereupon, proceedings are adjourned.)

20                    CERTIFICATE OF REPORTER

21

22        I, Karen V. Andersen, Registered Merit Reporter,

23  Certified Realtime Reporter for the State of South Carolina

24  at Large, do hereby certify that the foregoing transcript is

25  a true, accurate and complete Transcript of Record of the

1   proceedings.

2          I further certify that I am neither related to nor

3   counsel for any party to the cause pending or interested in

4   the events thereof.

5

6

7

8

9                                    Karen V. Andersen
                                     Registered Merit Reporter
10                                   Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25