```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF SOUTH CAROLINA
 2                     CHARLESTON DIVISION

 3

 4   _____
                                     )
 5   UNITED STATES OF AMERICA,       )
                                     )
 6          Plaintiff,               )  Docket No. 9:22-658
                                     )
 7          vs.                      )  Charleston, SC
                                     )
 8   RUSSELL LUCIUS LAFFITTE,        )  Volume VII
                                     )
 9          Defendant.               )
     _____)  DATE:  November 18, 2022
10

11              BEFORE THE HONORABLE RICHARD M. GERGEL
                UNITED STATES DISTRICT JUDGE, PRESIDING
12                          JURY TRIAL

13

14   A P P E A R A N C E S:

15   For the Plaintiffs:

16   EMILY EVANS LIMEHOUSE
     U.S. Attorney's Office
17   151 Meeting Street, Suite 200
     Charleston, SC 29401-2238
18   843-266-1663
     emily.limehouse@usdoj.gov
19
     WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
20   U.S. Attorney's Office
     1441 Main Street, Suite 500
21   Columbia, SC 29201
     803-929-3000
22   winston.holliday@usdoj.gov
     kathleen.stoughton@usdoj.gov
23

24   COURT REPORTER:           KAREN V. ANDERSEN, RMR, CRR
                               United States Court Reporter
25                             901 Richland Street
                               Columbia, SC  29201
```

A P P E A R A N C E S:

For the Defendant:

EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
Nelson Mullins Riley and Scarborough
151 Meeting Street
Charleston, SC 29401
843-534-4123
bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com

CHRISTIAN JOSHUA MYERS
Nelson Mullins Riley and Scarborough
101 Constitutional Avenue NW, Suite 900
Washington, DC 20001
202-689-2001
josh.myers@nelsonmullins.com

1

INDEX

2

EXAMINATION

3  Witness Name                                              Page

4  NANCY DRAWDY

5      BY MR. DANIEL ......................................... 1632

6      BY MS. LIMEHOUSE...................................... 1642

7      BY MR. DANIEL ......................................... 1649

8  TIFFANY PROVENCE

9      BY MR. AUSTIN ........................................ 1650

10      BY MR. HOLLIDAY ...................................... 1685

11      BY MR. AUSTIN ........................................ 1702

12  RUSSELL LUCIUS LAFFITTE

13      BY MR. AUSTIN ........................................ 1715

14

EXHIBITS

15  Exhibit                                                   Page

16
    Court's Exhs. 86, 87, 88                           1715

17
    Defendant's Exh. 83                                1834

18
    Defendant's Exh. 89                                1842

19

20

21

22

23

24

25

1    THE COURT:  Are there any matters that either

2  counsel need to bring to the Court's attention, first from

3  the Government?

4    MR. HOLLIDAY:  Your Honor, I do.  I think it's

5  pretty brief.  Shouldn't be too controversial.  Tiffany

6  Provence, I believe, is going to be testifying today, second,

7  I think.  She's been designated as an expert by the defense.

8  If they are offering her as an expert in probate matters, I

9  plan to stipulate to that.

10    The second thing is, though, that she is one of

11  those unusual situations where she's an expert as well as she

12  knows some facts because she was specifically involved.  So I

13  actually had that in a case that I presented.  We had to

14  bifurcate the witness, or at least be sure that the jury

15  understood that her factual observations are separate and

16  apart from her expert opinions.  So I just bring that to the

17  Court's attention.  I would ask, however you feel is

18  appropriate to handle that, I would ask you to do that.

19    THE COURT:  What's the defense response to that?

20    MR. AUSTIN:  Judge, I think the way they have the

21  questions organized, I think it should be clear.  I will try

22  to make sure to be clear to explain the basis for her

23  knowledge and opinion in each situation so that there isn't

24  any confusion.

25    THE COURT:  Well, I think what we will do is, if you

1　lay it out that way, and I think if you are -- are you

2　planning to do the facts first and then the expert or the

3　opposite?

4　　　　MR. AUSTIN:　Judge, I am not getting into the facts

5　that much with her.　She was not very much involved in the

6　case at all.　So I really don't plan on touching on it a

7　whole lot.

8　　　　THE COURT:　Well, you know, it's like a lot of

9　things, it depends, you know, what you need.　And to the

10　extent she just looks like an expert, that's one thing.　And

11　I think the way to do it, Mr. Holliday, is if you want a

12　special instruction from the Court, ask me for it.　Okay?

13　But let's see if we need it.

14　　　　MR. HOLLIDAY:　Okay.

15　　　　THE COURT:　Of course, I have a charge about expert

16　testimony and so forth, and that they've got to use their own

17　judgment, it's not binding on them and all that.　But let's

18　just play it by ear.　And if we -- if I feel like I need to

19　clarify that her facts are -- she's testified to her facts,

20　and an expert, that she's got two hats, and that they need to

21　be judged, you know, by the standards I will instruct.

22　　　　I would rather not do it, only because, you know,

23　I'm kind of getting to things I'm going to charge.　And they

24　haven't heard the charge yet.　So I'm always real sensitive

25　about, you know, in an effort to clarify something, I

1   actually make it more confusing.  So let's play it by ear and

2   let's see how it goes.

3           Ms. Perry, are our jurors here?

4           THE COURT DEPUTY:  Yes, Your Honor.

5           THE COURT:  Please bring in the jury.

6           (Whereupon, the jury returns to open court at 9:17

7   a.m.)

8           THE COURT:  Please be seated.  Good morning.

9   Welcome back to the court.  I know no one minded a day off.

10  And this is hard work.  And I appreciate your continuing

11  close attention.

12          Defense, call your next witness.

13          MR. DANIEL:  The defense calls Nancy Drawdy.  I just

14  saw -- I just was with her.

15          THE COURT DEPUTY:  Please state your full name.

16          THE WITNESS:  Nancy Mae Sutton Drawdy.

17                   NANCY MAE SUTTON DRAWDY,

18          having been duly sworn, testifies as follows:

19                      DIRECT EXAMINATION

20  BY MR. DANIEL:

21      Q.   Ms. Drawdy, you may take your mask off.

22      A.   Thank you.

23      Q.   Be sure to get close to the speaker so that everyone

24  can hear you.  Please give the jury an idea of your

25  background.

1    A.    I have worked for the bank -- it will be 35 years

2    the 1st of the year.

3    Q.    Where did you grow up?

4    A.    I grew up in a little town called Cottageville.

5    Q.    Is that in Hampton County?

6    A.    No, sir, that's Colleton County.

7    Q.    And what's your educational background?

8    A.    I have done online courses in banking, high school

9    education.  That's pretty much it.

10    Q.    And how long have you worked at the bank, Palmetto

11    State Bank?

12    A.    It will be -- I will be going on 36 years after the

13    1st of the year.

14    Q.    And what role did you have when you were first hired

15    35 1/2 years ago, I guess?

16    A.    I was hired into the loan department.

17    Q.    Okay.  And is that where you've been the past 35

18    years?

19    A.    Yes, sir.

20    Q.    And what are your duties and responsibilities in the

21    loan department?

22    A.    I'm basically over operations of the in-house loans.

23    And there's -- I mean, I have several roles.

24    Q.    Yeah.  And so what happens when a loan officer makes

25    a loan?  Could you track that through the loan process for

1    the jury, just briefly?

2        A.    Okay.  When a loan officer makes a loan, the loan is

3    approved and made and sent to the loan department where it is

4    booked and put on the system.

5        Q.    And do you remember when Russell Laffitte first

6    began working at the bank?  Had you been there awhile?

7        A.    Yes, sir, I believe I had.  I think Russell has

8    worked there 20-something years.  I'm not sure.

9        Q.    And have you worked closely with him over the years?

10       A.    I have.

11       Q.    And who do you directly report to?

12       A.    I reported to Mr. Charlie for many years, and I

13   still do.  But when Russell became COO and CEO, then I

14   started working very closely, and I was under his

15   supervision.

16       Q.    And is Mr. Charlie -- has Mr. Charlie still been

17   active at the bank and coming to work every day?

18       A.    Yes, he has.

19       Q.    Describe your working relationship with Russell

20   Laffitte.

21       A.    Mine and Russell's relationship is honest.  Russell

22   is a very hard-working man.  He's very dedicated.  He's "dot

23   your I's, cross your T's" kind of guy.

24       Q.    Did you have an opportunity in the years since he

25   first began working at the bank to observe him develop as a

banker?

A.  Oh, I absolutely have.  I've told him several times that I am so proud of him that he's becoming more and more like his father.

Q.  What do you mean by that?

A.  His work ethic, just driven.  He's very driven, very honest.

Q.  Very what, I'm sorry?

A.  Very honest, very driven, very honest.

Q.  As a community banker, describe his relationship with the Palmetto State Bank customers in the community?

A.  Oh, his relationship with customers is very professional and personable.  If there was somebody who had a flat tire in the parking lot, Russell would be willing to go out and change that tire.  Somebody breakdown at the drive-through, he would be willing to push him out of the way until they could get help.  Russell is just a very professional but personable type person.  We are known as a hometown community bank, neighbors helping neighbors.  And that is what the Laffittes are.  I mean, they are good people.  They are our neighbors helping neighbors.

Q.  And did you have occasion to have him help you?

A.  Oh, I have, absolutely.

MS. LIMEHOUSE:  Objection, Your Honor.  I think this is improper character evidence at this point.

1    THE COURT: Yeah, sustained.

2    MR. DANIEL: We will move on.

3    BY MR. DANIEL:

4    Q.  Describe the impact of COVID on the bank and the

5    bank's reaction to COVID.

6    A.  Well, with COVID, there had been a lot of customers

7    that couldn't make payments, that had gotten extensions on

8    loans.  During the COVID time, the time of COVID, we had a

9    tornado that came through.  And Russell and Mr. Charlie

10   both --

11   MS. LIMEHOUSE: Objection, Your Honor.  Again, I

12   think we are getting into improper character --

13   THE COURT: I think we are getting into specific

14   instances.  Sustained.

15   BY MR. DANIEL:

16   Q.  What was the impact on the community when the

17   tornado hit?

18   A.  It was devastating, very devastating.

19   Q.  Please describe the loans not on system and how it

20   was created, that process, for the jury?

21   A.  Yes.  Loans not on system is a general ledger

22   account that was created by Russell that would -- it would be

23   an account to kind of clear money orders.  So if a loan was

24   not booked right away for some reason, the money order was

25   not tied up or held, that it could be cleared in bookkeeping.

1   And when a loan was made, the customer -- if the funds were

2   disbursed to the customer, then loans not on system would be

3   debited.  And when the loan was booked, loans not on system

4   would be credited.  And the advance, the debit, would go

5   through to the loan.  So it was a balance.  It was a wash.

6   So you could have the tracking for the funds.

7        Q.   You could have -- did you say tracking?

8        A.   You could track the funds, yes.

9        Q.   Okay.  And when you have a cashier's check, which

10  used to be called a money order, but when you have that, are

11  there any -- is there any paper trail there?  Does the bank

12  keep copies?

13       A.   Of the money orders?

14       Q.   Yes.

15       A.   Yes, sir.

16       Q.   How many copies, and what do you do with the copies?

17       A.   Okay.  So the money order has three sections.  There

18  is the actual check that goes to the customer.  There is a

19  white copy that -- there's two white copies.  One is a

20  customer copy and one is a bank remittance that goes through

21  with the debit.  So the original money order is the check

22  that goes to the customer.  The second copy is the bank's

23  copy that is cleared, that would go through to loans not on

24  system.  And then the other copy would be the customer copy.

25       Q.   Okay.  Is the LNOS or loans not on system process

1    regularly used?

2        A.    Yes, sir.

3        Q.    Okay.

4        A.    It is.

5        Q.    At times, how long could it take for a loan to show

6    up, say it's on LNOS, to actually show up in the system

7    itself?

8        A.    Depends.  Depends what's going on with the loan.

9    Could take a couple of days to a couple of weeks.

10       Q.    Now, are you familiar with or have you had occasion

11   to work with state auditors and federal auditors and outside

12   auditing firms that audit the bank?

13       A.    Yes, sir.  I've worked with state and federal

14   examiners, as well as our internal auditors.

15       Q.    Have they ever found out any major problems with the

16   bank or dealing with Alex Murdaugh?

17       A.    Not to my knowledge, no.  And those accounts have

18   been looked at because they are large accounts.

19       Q.    In your observation of Russell, did he always work

20   in the best interest of the bank?

21       A.    Yes, sir, absolutely, he did.

22       Q.    Did he always work in good faith?

23       A.    Yes, sir, he did, and to the best of interest of the

24   bank and the customers of the bank.

25       Q.    And are you familiar with Alex Murdaugh?

1    A.    I am familiar with Alex.

2    Q.    And his role in the community?

3    A.    Yes, sir.

4    Q.    Okay.  And describe his sort of loan history or, I

5    guess you would say, banking history with Palmetto State

6    Bank?

7    A.    He has had loans.  And he's been a customer of the

8    bank for quite some time.  He's had large accounts.  But, I

9    mean, we have several customers that have large accounts and

10   that have banked with us.  So, I mean, his -- he has had

11   large accounts.  He's paid those accounts with interest.

12   Sometimes -- or most of the time maybe, he would pay at the

13   end of the year when he would -- when the firm would get

14   their bonuses.  But -- did I answer your question?

15   Q.    Yes, ma'am.  You did.

16   A.    I'm sorry.

17   Q.    Did Mr. Murdaugh's income, assets, and his track

18   record with the bank justify or support these loans that he

19   received?

20         MS. LIMEHOUSE:  Objection, Your Honor.  I don't

21   think she has specific --

22         THE COURT:  You need to lay the foundation for her

23   to testify to that.

24         MR. DANIEL:  Your Honor, I think she's in the loan

25   department.

1    THE COURT:  She's processing.  She's not doing the

2   applications and so forth.  If she knows, she can testify.

3   But you've got to lay the foundation first.  Sustained.

4   BY MR. DANIEL:

5    Q.   Okay.  Now, did the bank ever waive any late fees

6   for Mr. Murdaugh?

7    A.   Yes, sir.  The post-maturity late charges we waive

8   for probably 99 percent of our customers.  The post-maturity

9   late charges is a larger fee.  And those fees are pretty much

10   just to get the customer's attention to say you need to come

11   in, contact us, and take care of your account.

12    Q.   And so when someone does have a loan go longer or

13   past maturity date, does someone from the bank contact them,

14   or how does that work?

15    A.   We mail them a maturity notice.  And that maturity

16   notice would have that post-maturity late fee on there.

17    Q.   And did you meet with the FBI agents when they came

18   to see you at the bank and describe construction loans versus

19   letter of credit or an unused letter of credit?

20    A.   The FBI?

21    Q.   Yes, or SLED, either one.

22    A.   Yes, sir, I met with both of them.  And I came to

23   Charleston.  They didn't come to the bank.  I came to

24   Charleston.

25    Q.   Okay.  And did you explain to them the difference --

1    MS. LIMEHOUSE:  Objection, Your Honor.  He's

2    testifying for her.

3    THE COURT:  I'm sorry.  Say that again.

4    MS. LIMEHOUSE:  He's testifying for her, Your Honor.

5    THE COURT:  Yes, leading.  Sustained.

6    BY MR. DANIEL:

7    Q.    And what did you explain to them?

8    A.    On --

9    Q.    Specifically on the unsecured line of credit and the

10   construction loans.

11   A.    Okay.  An unsecured line of credit is a signature

12   loan.  A line of credit is approved by the bank or by the

13   loan officer or the Board depending on the amount.  And a

14   construction loan is the same.  But a line of credit, being

15   revolving or nonrevolving, a customer can draw on that line

16   of credit at any time.  A revolving line of credit, they can

17   draw on that line of credit and pay back and then draw again.

18   A nonrevolving, then they just draw.  And if they pay down,

19   they don't draw over the initial amount.

20   A construction loan, on the other hand, is a loan

21   that is made for construction of a home or a business.  And

22   the construction loan advances have to be approved because of

23   inspections, to make sure that the work is being done.

24   Q.    And describe Mr. Laffitte's last day at the office

25   at the bank.

1    A.   I don't know that I was there on his actual last day

2    at the bank, but I can tell you that when Russell left --

3         MS. LIMEHOUSE:  Objection, Your Honor.  She was not

4    there.

5         THE COURT:  She testified she wasn't there.  I

6    sustain that objection.  Are you finished?

7         MR. DANIEL:  Yes, Your Honor.

8         THE COURT: Very good.  Cross-examination.

9                        CROSS-EXAMINATION

10   BY MS. LIMEHOUSE:

11   Q.   Ms. Drawdy, good to see you again.

12   A.   Good to see you, Emily.

13   Q.   So you are a supervisor over consumer loan

14   administration.  Is that an accurate representation of your

15   position within the bank?

16   A.   Yes, ma'am.

17   Q.   And so you testified that you directly report to

18   both Mr. Charlie, while he was CEO, and then Russell when he

19   became CEO; is that right?

20   A.   Yes, ma'am.

21   Q.   So Russell is also a loan officer; is that right?

22   A.   Yes, ma'am.

23   Q.   And so when you were working for a loan officer in

24   processing loan paperwork, you take your direction directly

25   from the loan officer; is that right?

1     A.   Well, for what I do, but now, the loan processors or

2   the girls that print the loans out for him if he's given

3   instructions, that's not me.

4     Q.   So, for example, the business purpose statement,

5   that would be on a loan or a line of credit, that information

6   would come from the loan officer, right; not the people in

7   the processing department?

8     A.   Correct.

9     Q.   So the people in the processing department and who

10  have your position are just taking their direction about that

11  paperwork from the loan officer; is that right?

12    A.   Correct.

13    Q.   Okay.  I'm going to show -- you mentioned a line of

14  credit that we discussed last time we spoke, $500,000 line of

15  credit.  I'm going to talk to you about Government's Exhibit

16  98.

17         MS. LIMEHOUSE:  If you will please pull it up, Ms.

18  Welsh.  And if you could put it side-by-side, actually, with

19  3 and 5 of Exhibit 98.

20  BY MS. LIMEHOUSE:

21    Q.   Do you recognize this document, Ms. Drawdy?

22    A.   I do.

23    Q.   So is this sort of like a screen grab from the

24  bank's internal systems; is that right?

25    A.   Yes, ma'am.

1    Q.   So it shows everything that is happening with a loan

2    or a line of credit; is that right?

3    A.   Yes, ma'am.  It's a history of transactions.

4    Q.   Okay.  And so the document on the left has certain

5    dates on the left-hand side; is that right?

6    A.   Yes, ma'am.

7    Q.   And then the document on the right also has certain

8    dates on the right-hand side; is that right?

9    A.   Yes, ma'am.

10   Q.   And so these dates on the right-hand side and the

11   actions taken by a person on the bank on the right-hand side

12   would correspond with the description of those actions on the

13   left-hand side; is that right?

14   A.   Ask me that again.

15   Q.   Sure.  So the type of action taken on a loan, on the

16   right-hand side, would correspond with the description of

17   that action on the left-hand side; is that right?

18   A.   Well, let me see.  Your description on -- all right.

19   You have 2020 on the left side.  And you have 2022 on the

20   right side.

21   Q.   Sure.

22   A.   2020, the PSB205410 at the bottom of the page, that

23   is advances and that kind of thing.  Now, on the right-hand

24   side, that document is showing, like, an audit review, like

25   if there was a memo post or if the account was changed or

1    something like that.  Those are two different documents.

2        Q.   So if a memo -- new memo post on a loan, is that how

3    an advance would be documented within this document?

4        A.   Well, if there was principal advance -- is that what

5    you are asking?

6        Q.   Yes.  Yes.  Go ahead.

7        A.   If there's a principal advance on that loan, then,

8    yes, you can go out there and do a memo post.  If there is a

9    payment, like you can see on the left side, March 31st, 2020,

10   principal payment for $104,056.51, you can memo post that as

11   well.  If this is a credit loan and it's a revolving line of

12   credit, you could go on there -- the memo post just basically

13   says that customer paid on that account or that customer

14   withdrew funds.  Which with us having multiple branches, if

15   that customer came to our bank and got a draw on their line

16   of credit loan for $100,000, then memo posting it makes

17   perfect sense, because you wouldn't want that customer to go

18   to another bank and get that same money.  So it basically

19   says, okay, this customer came in and got that money.  So

20   that money is not available, is what the memo post would be.

21       Q.   So this description on the right-hand side that I'm

22   circling the names, would that indicate who was making that

23   action that you are describing --

24       A.   Yes.

25       Q.   -- on that line of credit?  So when your name is

1  here, are you the one actually deciding whether to make that

2  action, or are you taking your direction from the loan

3  officer?

4      A.   Well, it depends on what it is.

5      Q.   If an advance is made, for example, on a line of

6  credit --

7      A.   Okay.  If an advance is made on a line of credit

8  that is not a construction loan, then anybody in the loan

9  department can do that advance.

10     Q.   If a --

11     A.   If that loan is approved.

12     Q.   How about a revolving line of credit?

13     A.   Revolving line of credit works the same way.  If

14  it's a signature loan, anybody can make that draw and deposit

15  them into the customer's checking account or cut a money

16  order to someone they may be paying for some reason.

17     Q.   So the name of the person on the right-hand side

18  would be the person who took that action on that loan; is

19  that right?

20     A.   Would be the name of the person who did the change

21  or -- see, what you are looking at on the right-hand side,

22  Emily, is a change to an account, a memo post.  I mean, that

23  can be many different things.  A change to an account can be

24  an address change.  A change to an account could be -- it

25  could be many things.

1    Q.   Right.  So let's talk about a couple of the

2    specifics that are outlined here.  I'm going to circle for

3    you July 27th of 2020.  And then at the bottom, I'm going to

4    circle for you July 27th of 2020.  And it indicates on the

5    right-hand side that a new memo post occurred -- two new memo

6    posts occurred on July 27th; is that right?

7    A.   On July 27th?  Yes, there were two memo posts.

8    Q.   So on the left-hand side, if we look at the

9    corresponding date, that indicates that there was a transfer

10   to the farm to cover overdraft of $10,000; is that right?

11   A.   That's what I see, yes, ma'am.

12   Q.   And then below that it says there's a transfer to

13   Alex's DDA to cover overdraft; is that right?

14   A.   That's what it says, yes.

15   Q.   And then it indicates that that action was taken by

16   Russell Laffitte; is that right?

17   A.   That's what it says, yes, ma'am.

18   Q.   This $500,000 revolving line of credit that you

19   initially spoke to Mr. Daniel about turned into this, excuse

20   me, million-dollar revolving line of credit; is that right?

21   A.   I don't see that on here.

22   Q.   You handle lots of loans in the loan department,

23   right?

24   A.   I do.

25   Q.   And you don't have much memory of exactly what

1  happened with every single line of credit --

2      A.  I don't.  I don't.  But a line of credit, an advance

3  on a line of credit for the funds to be deposited into a

4  checking account is not unusual.

5      Q.  Right.  Right.  So are you aware that this

6  million-dollar line of credit was completely charged off in

7  December of 2021?

8      A.  Yes, I do believe I probably charged it off.  I

9  charge off most of the loans.

10      Q.  Okay.  And so you, in your role at the bank, you

11  don't serve on the Board; is that right?

12      A.  No, ma'am, I do not.

13      Q.  And you are not a shareholder; is that right?

14      A.  I'm a shareholder --

15      Q.  Of the bank?  You don't own any shares with the

16  bank; is that right?

17      A.  As far as in my 401K?

18      Q.  I mean like Board members.

19      A.  No, ma'am.

20      Q.  You are not really familiar with any of the facts

21  that led to Russell's termination from the bank, because you

22  haven't seen the results of any internal investigation; is

23  that right?

24      A.  I have not.

25      MS. LIMEHOUSE:  No further questions, Your Honor.

1    THE COURT:  Thank you.  Anything on redirect?

2    REDIRECT EXAMINATION

3    BY MR. DANIEL:

4    Q.   When the customer begins a drawdown on a line of

5    credit, has that loan already been closed?

6    A.   When a customer does a drawdown?

7    Q.   Yes.  How does a customer get a line of credit?

8    Have they already applied for the line of credit and gotten a

9    loan approved?

10   A.   Yes, sir.

11   Q.   So when Ms. Limehouse talks about advances drawn

12   down, if it's "drawing down" or an advance on a line of

13   credit, it's really not an advance because the loan has been

14   made?  It's just drawing down the line of credit; is that

15   right?

16   A.   They are both basically, I guess you could say, one

17   and the same.  It's an advance on the loan, but you are

18   drawing on that line of credit.

19       MR. DANIEL:  Okay.  Thank you, ma'am.  No further

20   questions, Your Honor.

21       THE COURT:  Thank you.  Any reason the witness

22   cannot be excused?

23       MS. LIMEHOUSE:  Fine with the Government

24       THE COURT:  Very good.  You may be excused.  Thank

25   you, ma'am.

1    THE WITNESS:  Do I need to hang around?

2    THE COURT:  No, you are free to go.  You probably

3 won't be disappointed with that.

4    THE COURT:  Government (sic), call your next

5 witness.

6    MR. AUSTIN:  Defense calls Nancy Drawdy.

7    THE COURT:  No, you just called her.

8    MR. AUSTIN:  Tiffany Provence, Your Honor.

9    THE COURT:  I just told the witness she could leave.

10 You know?

11    MR. AUSTIN:  I got thrown by "the Government's

12 witness."

13    THE COURT DEPUTY:  Please state your full name.

14    THE WITNESS:  Tiffany Provence.

15                    TIFFANY PROVENCE,

16    having been duly sworn, testifies as follows:

17                    DIRECT EXAMINATION

18 BY MR. AUSTIN:

19

20    Q.   Good morning, Ms. Provence.  If you want to take

21 your mask off, you are welcome to.

22    A.   Thank you.

23    Q.   All right.  Ms. Provence, the Government has already

24 stipulated to you testifying as an expert witness, but could

25 you still, please, just give a brief rundown of your

1 experience in probate law.

2 A. Sure. I was a probate judge in Dorchester County,

3 South Carolina, for a little over a decade. And then since

4 that time, which has been approximately 14 years, I've been

5 primarily practicing in the areas of probate litigation,

6 probate mediation, and serving as a court-appointed

7 fiduciary, conservator, special administrator, and PR for the

8 probate courts in South Carolina.

9 Q. And you said you've been practicing. I don't think

10 we covered, you are an attorney as well?

11 A. I am, yes.

12 Q. And so in your practice, do you have occasion to

13 practice within Hampton County?

14 A. I have.

15 Q. And that's -- if we are referring to your practice,

16 you primarily practice in the area of probate law; is that

17 right?

18 A. Correct.

19 Q. And do you practice in other parts of the state?

20 A. I do. I've practiced in -- at one point, I counted,

21 I think it was, 32 of the 46 county probate courts,

22 county-wide in the state.

23 Q. Okay. And have you previously been qualified as an

24 expert in the area of probate law?

25 A. I have been.

1    Q.   So I think you mentioned practicing -- was it 32 of

2    the 46 counties?

3    A.   Yes.

4    Q.   How does probate law work --

5         THE COURT:  First of all, I think we need to

6    designate -- are you moving to have her --

7         MR. AUSTIN:  I'm sorry.  I thought we already -- we

8    move to designate Ms. Provence as an expert in the area of

9    probate law.

10        THE COURT:  The Government does not object?  In what

11   area?

12        MR. AUSTIN:  Probate law.

13        THE COURT:  Is there objection by the Government?

14        MS. LIMEHOUSE:   As I indicated before, we have no

15   objection to that.

16        THE COURT:  Very good.  The witness is recognized as

17   an expert in probate law.  Please continue.

18   BY MR. AUSTIN:

19   Q.   Is there any standard practice when it comes to

20   probate law in South Carolina, or are there differences

21   between the counties?

22   A.   There are vast differences between the counties.

23   Q.   Okay.  And how would you explain that to the jury?

24   A.   Well, in South Carolina, our probate judges are

25   elected.  They are elected officials.  And so, first of all,

1    we have non-attorney probate judges.  So they don't have to

2    be lawyers.  And then based on the county and, of course, the

3    larger the county, the better pay, is also going to greatly

4    change often the level of qualifications.  As well as within

5    a county structure, the larger the county, the larger the

6    budget, the larger the office.  So, for example, if I'm

7    practicing here in Charleston County, I mean, I believe

8    there's 12 to 14 clerks at any time, four judges, as opposed

9    to a smaller county, I think the smallest county I practice

10   in would be Allendale, where there's a judge and one clerk.

11       Q.   Okay.  And what about Hampton County?

12       A.   I believe Hampton County, the last time I practiced

13   there, was also a judge and one clerk.

14       Q.   Okay.  And have you -- has a significant part of

15   your practice been in Hampton County?

16       A.   I wouldn't say significant, no.  I probably had

17   maybe 15 cases there throughout my career.

18       Q.   Okay.  And we've heard a lot about conservatorships

19   and personal representatives from witnesses.  But you are an

20   expert.  Can you just break down for the jury what's the

21   difference between a conservator and a PR?

22       A.   Sure.  So the easiest way to separate the two is, a

23   personal representative acts over the estate of someone who's

24   passed away.  So to have a personal representative -- and a

25   lot of times people also call these executors or

1 administrators, but they are serving as a fiduciary or in the

2 best interest of the estate of the person who has passed

3 away.

4 A conservatorship is different, because a

5 conservatorship the person is serving and managing the assets

6 of someone who is alive. And the reason that we would have

7 conservators is usually the person is a minor or the person

8 might have a disability, often, that is, you know, dementia

9 or Alzheimer's as we age, or it could be a brain injury or

10 other reasons that we can't manage our own assets and,

11 therefore, the court appoints someone to manage our assets

12 for us.

13 Q. Okay. And when it comes to conservators, what's the

14 difference between a neutral and an interested conservator?

15 A. So, an interested conservator is someone that's

16 related to the person that they are serving. So if I were

17 serving for my spouse, I would be an interested conservator,

18 or my child or my parent, I would be an interested

19 conservator. A neutral conservator is someone like myself

20 that will often be appointed by the court to serve for

21 someone that they are not related to and don't otherwise

22 know.

23 Q. Why would you need to bring somebody in that's not

24 related to or doesn't otherwise know the fiduciary?

25 A. Oh, there's tons of reasons. Some good examples

1  might be that the person doesn't have any qualified family.

2  Maybe they don't have any family at all.  Maybe their family

3  members aren't suitable to manage the finances, for whatever

4  reason.  To be appointed as a conservator, you have to

5  have -- in most courts, you have to pass a screening to show

6  that you haven't had, for example, check fraud or declared

7  bankruptcy in the past.  You have to show that you are

8  qualified to manage someone else's assets.  So they might not

9  have anyone in their family that's qualified.

10        There may be a conflict between people who are

11  qualified.  So, for example, let's say you have three

12  children, and I know we like to think our children all get

13  along, but sometimes the Court will say, the three of you

14  can't get along on who's going to manage mom or dad's assets,

15  so we are going to appoint a neutral to do that to make sure

16  that one party isn't playing favorites or taking advantage,

17  or whatever the case may be.  I could probably come up with

18  20 examples.  But it's not uncommon that we have to resort to

19  a neutral conservator or a neutral personal representative

20  when, you know, there's just not an appropriate person to

21  serve.

22        Q.  Okay.  And how are conservators and PRs paid?

23        A.  Although they often get confused, they are paid very

24  differently.  So personal representatives are paid by statute

25  with, generally the rule is 5 percent -- and I don't want to

1   get bogged down -- but of the probate assets, not including

2   real estate, unless the real estate is sold.  So they are

3   paid by a percentage of the estate that they are managing.

4          That's a lot different than the way that

5   conservators are paid, which is at the discretion of the

6   court based on a reasonableness standard.  So conservators

7   are paid a fee based on what the Court determines to be

8   reasonable.  And what's reasonable in one county or one

9   situation might be considered not reasonable in another.

10      Q.   Okay.  And you mentioned 5 percent with regard to

11  the personal representatives fees.  Is that a statutory

12  maximum amount that a PR can be made?

13      A.   It's not a maximum.  As a matter of fact, that

14  statute reads that the court can, for extraordinary services,

15  increase that amount.  But absent that request, then that's

16  the standard fee that's granted.

17      Q.   Okay.  And would a 5 percent conservator fee be

18  unusually high?

19      A.   I really think conservator fees are all over the

20  Board.  And we talk about differences in counties.  There's

21  also differences based on the level of the person who's

22  serving.  So a lot of conservators in larger cities, we have

23  some nonprofits that work as conservators, and they might do

24  sliding scales.  But I've seen fees higher than 5 percent.

25  I've seen fees lower than 5 percent.  So I wouldn't find 5

1   percent to be, you know, shocking.  But it's just a lot of

2   variation based on the county, the judge, the person serving,

3   and what's being done.

4       Q.   So, ultimately, with regard to conservators, it's up

5   to the judge?

6       A.   Uh-huh.

7       Q.   And is it fair to say that a conservator cannot set

8   their own fee?

9       A.   Correct.

10      Q.   Okay.  And does that have to be documented with an

11  order from the court?

12      A.   Well, I want to backstep for one second, because a

13  conservator could set their own fee by saying, I will agree

14  to serve as conservator if you agree to pay me this fee.  And

15  if the judge understands that and appoints them, then they've

16  technically set their own fee.  Does that make sense?

17      Q.   Sure.

18      A.   So now that I backstepped on that, can you repeat

19  your question for me?

20      Q.   Do conservators set their own fees?

21      A.   Yes.  So that would be really the only situation.

22  And the judge is still responsible for reviewing it for

23  reasonableness.

24      Q.   And can someone serve as a conservator or PR without

25  actually meeting the beneficiaries?

1    A.    Yes.

2    Q.    And is that unusual?

3    A.    I wouldn't classify it as unusual.  I mean, I

4    wouldn't say it happens all of the time, but I certainly have

5    significant cases in my history where I've represented

6    parties as a court-appointed fiduciary, and I have not had

7    the opportunity to meet them.

8    Q.    Okay.  And what are some examples of situations

9    where that would be typical?

10   A.    Well, I try really hard to separate PR from

11   conservatives.  So, like, in an estate, I might be serving as

12   a neutral because someone passed away here and all of their

13   family lives in another country.  So I wouldn't have the

14   opportunity to actually meet the people that I'm serving.

15   I've also served on behalf of people who were incarcerated

16   that I didn't have the opportunity to meet.  I've had

17   people -- served people who just lived far, you know,

18   distances away, that there really wasn't any need to meet

19   them.

20        When you are managing someone's assets, it's not,

21   you know, always necessary that you have a one-on-one

22   personal relationship.

23        Similar with conservator, I've managed assets for

24   people who have severe brain injuries.  So there would not be

25   a reason for me to be interacting with that person, because

1  they are unable to communicate with me or assist me in that

2  way.  Often, when you are serving as a conservator for a

3  minor child, you are really not meeting with and interacting

4  with that minor child.  So there are a host of reasons, but I

5  definitely have files where I have not had personal

6  interactions.

7  Q.  Okay.  And you talked about managing assets.  What's

8  expected of a conservator or PR when it comes to managing

9  assets?

10  A.  Well, the fundamental thing is to -- again, they are

11  different.

12  Q.  Let's start with whichever one you want.

13  A.  So I think with a PR, their responsibility is to

14  first -- so think about when someone passes, most of us have

15  dealt with that context.  Their first responsibility is to

16  gather the assets.  And then their responsibility is to

17  collect and preserve the assets until the estate is ready to

18  be closed.  And then their responsibility is to disburse the

19  assets to whomever is the beneficiary of the estate or the

20  beneficiaries of the estate.

21       It's a little bit different, I would say, in a

22  conservatorship, because your responsibilities there often

23  can be really different whether you are representing, let's

24  say, a minor child versus an incapacitated adult.  So, like,

25  a minor child, your responsibility -- the word conservator

1  stems from the word "conserve."  So your responsibility is to

2  conserve the assets for their benefit as they age when they

3  turn 18.  Little bit different when you are doing that for an

4  adult, as they are ending life, because you may be doing

5  different strategies, like gifting or working within their

6  estate plan to minimize taxes.  So in that situation, you

7  might be doing different things than you would for a minor.

8  But I think the fundamental rule that we try to live by is

9  your responsibility is to, you know, protect the assets and

10  to maintain them for the people who are entitled to them at

11  whatever stage or age they are entitled to receive them.

12      Q.    Okay.  So is there any expectation that the

13  conservator or PR grow the funds that they are entrusted

14  with?

15      A.    So in a PR situation, there really isn't an

16  expectation that they be -- that they grow.

17          In a conservatorship, specifically for a minor, for

18  example, if you are receiving funds for a child, then there

19  might be an expectation that you get some form of interest or

20  invest the funds or do something so that the funds are, you

21  know, building during the time period where you are sitting

22  to wait for them to come up to the age of majority.

23  Otherwise, you might just be placing those funds into an

24  account, you know, when someone is three or four years old.

25  And then for 14 years, they are losing the ability to earn

1 interest.

2     Q.  So you touched on this a little bit.  Under South

3 Carolina law, is it allowable for a conservator to loan money

4 from the accounts that they are entrusted with?

5     A.  It is.

6     Q.  And where is that allowed under the South Carolina

7 probate code?

8     A.  Do you want me to cite the section, because that's

9 dangerous.

10         MR. AUSTIN:  Pull up Defendant's Exhibit 1, already

11 in evidence.

12 BY MR. AUSTIN:

13     Q.  Are you familiar with this statute?

14     A.  I am, yes.

15     Q.  And is this what you were talking about when you

16 said statute allows for investments?

17     A.  Correct.

18     Q.  All right.  So let's start at the beginning here.

19 You see the date here, it's effective 2019?

20     A.  Uh-huh.

21     Q.  Are you familiar with this statute as it existed

22 prior to January 2019?

23     A.  I am.

24     Q.  And how does it -- is it similar or is it different?

25 How would you compare the two?

1    A.    There haven't been significant changes over time.

2    In 2019, we had a major --

3         MR. HOLLIDAY:  Your Honor, I hate to interrupt.  But

4    rather than relying on the witness to remember what was in

5    the previous statute, I think it would be more helpful if we

6    actually had the previous statute in front of us.  This,

7    obviously, is an irrelevant statute for the purposes of this

8    case, this version of the statute.  So I would say the

9    objection is best evidence.

10        THE COURT:  Well, I think the question is, does the

11   witness know.  She's an expert.  If she knows the prior

12   statute and can explain it, fine.  You -- on cross, you can

13   point it out if you would like to.  So overruled.

14   A.    So in 2019, this entire section of the code had

15   significant revisions.  But this within itself, I actually

16   believe it was renumbered.  But for the most part, the powers

17   of a conservator had been consistent since when I started

18   practicing in this area, which would have been '98.  There

19   haven't been -- there's been some rewording, but there

20   haven't been significant change to the powers themselves.

21   Q.    Okay.  So going to subparagraph or the first

22   paragraph (a) here.  So starting with paragraph (a), where it

23   says:  Except as otherwise qualified or limited by court

24   order, is that section similar to the previous version of the

25   statute, or I guess is the entire paragraph similar to the

1  previous statute?

2      A.   I believe so.

3      Q.   And can you explain what this is, just what this

4  first paragraph is saying?

5      A.   Sure.  So when you are appointed as a conservator,

6  the judge has an opportunity to limit these powers.  And you

7  would find those limitations on your appointment, like, it

8  might say -- you know, for example, I served as a limited

9  conservator with someone who had the ability to contribute

10 towards the ideas, but wasn't fully able to participate.  And

11 so the judge in that one said, you know, the limitation was,

12 cannot use the powers without first seeking the advice and

13 consent of the ward as necessary.  You know, so the court has

14 the ability, when they are appointing someone, to limit these

15 powers if the judge sees fit or if another party asks that

16 they be limited.  So that's what a qualification or a

17 limitation by court order would mean.

18      Also, down the road, if something were to occur that

19 someone disagreed with, they could ask the court, from there

20 forward, limit the conservator's powers.

21     Q.   Paragraph 1 here says, invest and reinvest funds in

22 the estate as would a trustee.

23     A.   Uh-huh.

24     Q.   Is that what you are talking about when you

25 referenced putting funds into an account somewhere and

1    earning interest or investing otherwise?

2        A.    Correct.

3        Q.    Okay.  And so there's unusual about investing the

4    funds of a conservatee or the beneficiary?

5            MR. HOLLIDAY:  Objection.

6            THE COURT:  What is it?

7            MR. HOLLIDAY:  He's testifying, Your Honor.

8            THE COURT:  He is testifying.  Sustained.

9    BY MR. AUSTIN:

10       Q.    Is there anything inappropriate about investing

11   funds?

12       A.    No.

13           MR. AUSTIN:  Zoom out, please, and go to the second

14   page and zoom in on 11.

15   BY MR. AUSTIN:

16       Q.    And are you familiar with this section of the

17   statute?

18       A.    I am.

19       Q.    And like the other one, is it similar to the

20   previous version of the statute?

21       A.    I believe it is, uh-huh.

22       Q.    And can you explain what this allows for?

23       A.    Well, it allows for multiple things, but the

24   highlighted portion is for the conservator to borrow money to

25   be repaid from the estate assets or otherwise.

1    Q.   All right.  Again, so is it unusual for a

2    conservator or PR to borrow funds?  I guess as a conservator,

3    is it unusual for a conservator to borrow funds?

4    A.   It's not unusual.

5    Q.   If we can zoom out, please.  Is that best practice

6    for a conservator?

7    A.   Well, again, we have to think about who the

8    conservator is.  Right?  So in certain courts, I would say if

9    the conservator is borrowing money for their personal use and

10   that could be considered a conflict of interest that the

11   Court would want to review, and in other situations you might

12   be -- you know, a conservator can be a parent borrowing money

13   from their child to make improvements to their own home for

14   that child's disabilities.  Right?  Like, there's all sorts

15   of situations that you can come up with, a full spectrum of

16   borrowing money.  So borrowing money is not unusual.  It's

17   just -- really kind of goes back to the initial comment,

18   which is, you know, the duty to the ward, why the money is

19   being borrowed, and if it is in their best interest, if it's

20   earning them interest.  If you were borrowing money without

21   paying any interest or borrowing money for -- you know, like

22   a parent borrowing money to purchase a brand-new car and not

23   giving their child any interest, then, you know, the court

24   might have a problem with that.  But, in general, borrowing

25   money from the assets of your ward is not unusual.  It

1    happens often.

2         Q.   What's required of a conservator to be filed with

3    probate court when they take loans or make investments?

4         A.   Well, under the statute, nothing, because it doesn't

5    require court approval.  Depending on the county that you are

6    serving in, again, if the judge considered it to be a

7    transaction that fell under a conflict of interest statute,

8    that would be up to that judge as to whether or not you had

9    to file that request.  So it's unique to each court as to

10   whether or not you even got to notify the Court that you are

11   borrowing money.

12        Q.   Okay.  And how do loans or investments, the ones we

13   are talking about here, compare to expenditures under the

14   probate code?

15        A.   Well, so they are completely different.  An

16   expenditure is when you are spending money for the benefit of

17   the person who you are serving, right, something that you

18   don't intend to get back.  Just like when we have an expense,

19   you know, if I spend my money, then I am not expecting to get

20   it back.  If I invest my money -- although sometimes we don't

21   get that back either.  But if I invest my money, you know,

22   the expectation is that I'm putting it there to save it and

23   to grow it and to increase it.  But in general, an

24   expenditure would be a request to the court that I would like

25   to buy this for my ward, or I need money for attorneys' fees

1 for my ward.  The list of expenditures is exhaustive,

2 completely different than investing.  Just as it is in our

3 own budget.  I mean, you have your money that you are saving

4 and investing, and your money that you are expending for your

5 needs.

6     Q.   Before we talk about some of the specific

7 conservatorships and PRs in this case, have you been involved

8 personally with any of the clients, the personal injury

9 clients of Alex Murdaugh that are involved in this

10 indictment?

11     A.   I have been.

12     Q.   Okay.  And do you recall which ones?

13     A.   The primary one I recall was the estate of Donna

14 Badger.

15     MR. HOLLIDAY:  Your Honor, I know we are making that

16 transition now.  I don't know if the Court feels it's

17 appropriate to give an instruction.

18     THE COURT:  Ladies and gentlemen, the witness has

19 been recognized as an expert.  And when I charge you, we will

20 talk about the testimony of an expert.  She's now going to

21 offer some factual information.  And that will be held by

22 another standard.  And I will talk to you about that in the

23 close.  But just important to note now is that she's moving

24 from talking as an expert to talking in terms of her personal

25 knowledge.  Please proceed.

BY MR. AUSTIN:

Q.   So you said you were involved in the Badger case?

A.   Correct.

Q.   Okay.  Do you recall any others?

A.   I believe we did paperwork in the file that led to the Plyler case --

Q.   Okay.

A.   -- as well.

Q.   Okay.  And do you remember any others?

A.   Not off the top of my head.

Q.   If, while we are covering any of them, if you could for the jury's benefit let them know if you are talking from personal experience or just generically as a probate expert. I'm going to try my best not to use specific questions, but just in case we bleed over.

A.   Okay.

MR. AUSTIN:  Starting with the Plylers, can we please pull up Government's Exhibit 137.

BY MR. AUSTIN:

Q.   All right.  Do you recognize this form?

A.   The form?  Yeah, absolutely.

Q.   Okay.  What is this form?

A.   So, this is the statutory court form for seeking the appointment of a conservator.

Q.   All right.  And who would be responsible for filing

1 this document in probate court?

2     A.   Any interested party who felt that there was a need

3 for a conservator.

4     Q.   Okay.  And who typically handles that if an attorney

5 is involved?

6     A.   Generally, in a situation where a settlement is

7 being received, then the attorney who -- an attorney is not

8 allowed to turn over settlement proceeds to a minor if they

9 exceed a certain amount.  And, therefore, that attorney, when

10 recognizing that they are going to be in receipt of funds,

11 would be responsible for making sure that a conservator was

12 appointed.  Some attorneys might look at the, you know, the

13 family or the client and say, you need to go get a

14 conservator appointed.  But the majority of the time, that

15 attorney that's going to be in receipt of those funds would

16 be the one seeking to have a conservator appointed.

17     Q.   And during your experience working with PMPED, were

18 you familiar with their practices in filing these types of

19 forms?

20     A.   I was.

21     Q.   Can we go to page 2 please.  And explain what's

22 going on here in the paragraph 7 and 8.

23     A.   Sure.  So paragraph 7 is simply explaining to the

24 court why you need a conservator.  This one states that the

25 natural parent and guardian has a conflict of interest and,

1 therefore, is not able to serve as conservator. And No. 8 is

2 telling the Court because of that fact, who you are seeking

3 to have appointed instead of the natural parent or guardian.

4 Q. Okay. Since this is a petition, it says here, I

5 request the appointment of. Who is making that request? Is

6 it Russell Laffitte or is it somebody else?

7 A. Well, on this form, it looks like it's Russell

8 Laffitte. But it really should be the person making the

9 request of the appointment, the petitioner.

10 MR. AUSTIN: Okay. Zoom out, please. Could we go

11 to the next page.

12 BY MR. AUSTIN:

13 Q. All right. So the very top here, can you describe

14 for the jury, please, what's going on in this paragraph?

15 A. Sure. That's the signature of the person, you know,

16 petitioning the Court requesting that they set a time and

17 place for the hearing and determining that the party that

18 they've nominated is an appropriate party to serve.

19 Q. And that the person nominated is Russell Laffitte?

20 A. Correct.

21 Q. But then it's signed by Russell Laffitte as well?

22 A. Correct.

23 Q. Is that incorrect?

24 A. It is.

25 Q. Can you explain? Well, let me ask you this way. Is

1   this something that comes up in your experience with these

2   types of forms?

3       A.   Yes.

4            MR. AUSTIN:  And zoom out, please.  Can we zoom in

5   on the verification portion.

6   BY MR. AUSTIN:

7       Q.   And can you explain this section as well, please?

8       A.   This is where the petitioner is verifying that

9   everything stated on the form is true to the best of their

10  knowledge.

11      Q.   And once again, we have Russell Laffitte signing

12  this.  Is that the appropriate place for him to sign?

13      A.   No, not in my opinion.

14      Q.   Okay.  And can you explain why?

15      A.   Well, when you are a neutral, an uninterested party,

16  you don't have the knowledge or information to complete that

17  verification, because that is not -- you are not related to

18  that person.  So you don't have that knowledge.  So I

19  personally don't sign verifications, because I am not

20  verifying something that I am not aware of.  And that would

21  generally be the responsibility of the petitioner or the

22  person seeking the appointment.

23      Q.   Okay.  So should a third-party who is uninvolved in

24  a probate matter --

25           MR. HOLLIDAY:  Your Honor, objection.  He's

1  testifying.

2          MR. AUSTIN:  I'm asking a question.

3          MR. HOLLIDAY:  She already said it's improper.

4          THE COURT:  Sustained.  Don't testify.  Ask the

5  question.

6  BY MR. AUSTIN:

7      Q.  Could a third-party petition to be appointed without

8  already being involved, being related, or could a neutral

9  third-party --

10          MR. HOLLIDAY:  Your Honor, objection.

11          THE COURT:  It's your witness.  Leading.  Sustained.

12          MR. AUSTIN:  If we can zoom out.  Can we zoom on the

13  qualifications and statement of acceptance.

14  BY MR. AUSTIN:

15      Q.  All right.  Can you explain this section, please.

16      A.  Sure.  That's where the person that's being

17  nominated is telling the Court that they do, in fact, agree

18  to serve in that role and to perform the duties as ordered by

19  the court.

20      Q.  Okay.  So would this be the appropriate place for

21  Russell Laffitte to sign?

22      A.  Absolutely.

23          MR. AUSTIN:  Can we zoom out.

24  BY MR. AUSTIN:

25      Q.  And with these three signatures here, is this

1    something that you encountered before in other cases?

2         A.    It is, repeatedly.

3         Q.    And can you explain that, please?

4         A.    A lot of attorneys that find themselves needing to

5    have a conservator appointed are not familiar with probate

6    law.  And they don't understand the difference or how the

7    form should work.  But, technically, an uninterested party

8    shouldn't be the petitioner, because I have no standing or

9    interest in that case.  So I shouldn't be asking the court to

10   appoint me, because -- unless it was my child or my own

11   relative, but I shouldn't be the one petitioning the court to

12   appoint me, because would have an independent interest.  So

13   that petition and that verification should really be

14   completed by either a family member or the attorney seeking

15   the appointment.  And the party getting appointed should

16   really just be signing the qualification and statement of

17   acceptance.

18        Q.    Have you seen this particular petition before?

19        A.    I believe I have.

20        Q.    And what was your interpretation of the fact that

21   this form had three different signatures of Russell on this

22   page?

23             MR. HOLLIDAY:  Your Honor, now it's a little

24   ambiguous.  Right?

25             THE COURT:  Yeah.  I think at this point she would

1 be testifying personally, not as an expert, if you are asking

2 about this specific document.

3 BY MR. AUSTIN:

4     Q.    What is your personal interpretation of that?

5     A.    That the form was done incorrectly and presented to

6 Russell, so he signed all of the blanks.

7     Q.    And is that common with these types of forms for

8 attorneys to make that mistake?

9     A.    It is.

10     Q.    Let's go to Government's Exhibit 140, please.  Okay.

11 Do you recognize this form?

12     A.    I do.

13     Q.    And I'm just focusing now on your opinion as an

14 expert.  What are petitions for --

15     MR. HOLLIDAY:  Your Honor, we were done with the

16 expert part and now we are on the factual part.

17     THE COURT:  I think the confusing thing here is you

18 are now going to very specific documents in which she has a

19 role.  And it wouldn't be appropriate to be talking as an

20 expert about that.  I think she should -- I don't want to

21 confuse the jury.

22     MR. AUSTIN:  Sure.

23     THE COURT:  She should testify to things off her

24 personal knowledge.  Clearly, that's what she's basing it on.

25     MR. AUSTIN:  Okay.

1   BY MR. AUSTIN:

2       Q.   So based on your personal knowledge, what are

3   petitions for expenditures like this used for?

4       A.   When you are notifying the court and/or seeking

5   their approval to spend money on the ward, the person that

6   you are serving.

7       Q.   Okay.  And does this fall within the investment or

8   loan category from the powers of the conservator you

9   mentioned earlier?

10      A.   It does not.

11      Q.   This would be more of an expense, expenditures?

12      A.   Correct, uh-huh.

13      Q.   Okay.  If we could please pull up Government's

14  Exhibit 110.  Did you do any work on the Natasha Thomas case?

15      A.   I don't recall doing any work on that case.

16      Q.   Okay.  And what is this form?

17           MR. HOLLIDAY:  Your Honor, wait.  Wait.  I'm sorry

18  to interrupt Ms. Provence, actually.  But she said she didn't

19  do any work on it.  She's in the fact witness portion of her

20  testimony.

21           MR. AUSTIN:  I'm just asking if she recognizes the

22  form in general.

23           MR. HOLLIDAY:  Well, that would be inappropriate

24  back before.

25           THE COURT:  I don't want to tie us up in knots.  Let

1  her testify to this, but we are going to keep our on eye on

2  this.

3      MR. HOLLIDAY:  Thank you.

4      THE WITNESS:  This is a document used by some of the

5  courts provided by court administration to keep track of the

6  status of a file.

7      MR. AUSTIN:  Okay.  Go to the next page please.

8  And, I'm sorry, keep going to -- next page.

9  BY MR. AUSTIN:

10     Q.  Okay.  And what is this document?

11     A.  This is a document that -- well, this is a document

12  where a personal representative can renounce their right to

13  serve in an estate, but it's been stricken through and

14  changed to create a form for a conservator waiving their --

15  renouncing their rights and nominating someone else to serve

16  as conservator.

17     Q.  Okay.  And so does that mean then that the -- you

18  can see the name Pinckney here at the signature block, Tyrone

19  Pinckney.  Does that mean that they are renouncing their

20  rights as conservator in this situation?

21     A.  Correct.

22     Q.  Next page, please.  And is this the same form you

23  went through earlier in the Plyler case, the petition?

24     A.  It is.

25     Q.  All right.  If we go two pages forward, please.  All

1  right.  And once again, was this form filled out correctly?

2  A.    It was not.

3  MR. AUSTIN:  And could we back up, I'm sorry, two

4  pages again.

5  BY MR. AUSTIN:

6  Q.    And you see this section here?

7  A.    Uh-huh.

8  Q.    In your experience, who typically fills out this

9  portion of the form?

10  A.    An interested party or family member that would have

11  that information or the attorney dealing directly with the

12  client that might have that in their file.

13  Q.    And when you have served as a conservator, what

14  obligations do you have to verify the information that's

15  presented to you on a form like this?

16  A.    I believe that would be based on who is completing

17  the form.  But if an attorney is completing the form and

18  presenting it to me for my signature, then I wouldn't think I

19  would have any responsibility to verify that information.

20  They are the petitioner.

21  Q.    Okay.  And do attorneys frequently make mistakes

22  with these forms in that area as well?

23  A.    Unfortunately, yes.

24  MR. AUSTIN:  Can we pull up Government's Exhibit

25  109, please.  Go to page 9.

BY MR. AUSTIN:

Q.   All right.  And this is the same form that we've reviewed previously?  I don't want to belabor the point too much.

A.   Correct.

MR. AUSTIN:  Can we go forward two pages, please.

BY MR. AUSTIN:

Q.   All right.  And here we have Russell Laffitte again?

A.   Uh-huh.

Q.   And again here?

A.   Correct.

Q.   And is that consistent with the other forms we've seen?

A.   It is consistent with the other forms.  I'm unsure who signed under 10, so in this one, it doesn't look to be three identical signatures.

Q.   Okay.  I'm going to turn to the Badger case.  I believe you said you had some involvement in that one?

A.   I did.

MR. AUSTIN:  And will you please pull up Government's Exhibit 218D.

BY MR. AUSTIN:

Q.   All right.  And can you please explain this document?

A.   This is a document terminating the appointment of

1 Arthur Badger as the personal representative for the estate

2 of Donna Badger.

3       MR. AUSTIN: Okay. And can we go to E, 218E.

4 BY MR. AUSTIN:

5   Q. And can you please explain what's going on in this

6 document as well?

7   A. Sure. This is where -- this is the resignation of

8 Arthur Badger as personal representative of the estate of

9 Donna Badger. And then below his resignation is the order

10 appointing a new personal representative due to his

11 resignation.

12   Q. Okay. And we are talking here about Allendale

13 County?

14   A. Correct.

15   Q. And Brenda Bennett?

16   A. Correct.

17   Q. Did you ever know Brenda Bennett during your time --

18   A. I did.

19   Q. And she's a probate judge down there?

20   A. She was.

21       MR. AUSTIN: If we can go to paragraph D or Exhibit

22 218 -- I'm sorry, F. Excuse me. I misread my writing.

23 BY MR. AUSTIN:

24   Q. Okay. And would this verification form, can you

25 please explain this documentation too?

1     A.    Sure.  This is a verification which essentially

2    states that Russell Laffitte is verifying the information.

3    And then as attorney for petitioner, it looks as if Alex

4    Murdaugh is signing stating that he believes the settlement

5    is fair and in the best interest of the estate.  So I have to

6    assume this wasn't part of the previous document, but was

7    part of the petition for approval of settlement in the estate

8    of Donna Badger.

9     Q.    Okay.  And how do petitions for approval of

10   settlements work?

11    A.    It depends on the -- whether or not the action has

12   been filed.

13    Q.    Okay.

14    A.    So when you bring a lawsuit for someone's wrongful

15   death, if it's not been filed, if a settlement is reached

16   before the action has actually been filed in the court, then

17   you can take that approval for settlement to the probate

18   court.  Once it's been filed, then the approval of any

19   settlement has to be handled by the court in which it was

20   filed.  And at that time, you then have to notify the probate

21   court of the settlement.

22    Q.    Okay.  Could we please pull up Government's Exhibit

23   23.  All right.  Can you please explain what a disbursement

24   sheet is?

25    A.    Sure.  Whenever you settle a case and you take the

1    settlement before the judge, it's the responsibility of the

2    attorney to demonstrate to the court any of the cost,

3    expenses, attorneys' fees, related to the settlement that's

4    been received, and then to break out after that the receipt

5    of the assets and who's going to be benefitting from the

6    settlement.  So our wrongful death code lays out that

7    disbursement sheet and the information that it has to provide

8    the court as part of the petition to have the settlement

9    approved.

10        Q.   Okay.  And who prepares disbursement sheets?

11        A.   The attorney that's handling the settlement.

12        Q.   Okay.  This disbursement sheet is for Arthur Badger,

13   correct?

14        A.   Uh-huh.

15             MR. AUSTIN:  And can we zoom in, please, at the cost

16   expenses portion.

17   BY MR. AUSTIN:

18        Q.   See where it says Russell Laffitte, personal

19   representative fee of $35,000?

20        A.   I do.

21        Q.   Was Russell Laffitte the PR for Arthur Badger?

22        A.   No, because Arthur Badger was still alive.

23        Q.   Okay.  And who was he PR for?

24        A.   The estate of Donna Badger.

25        Q.   And so is it surprising to see this line here giving

1  personal representative fee to Russell?

2      A.   I would say it's unusual.  But you often see

3  different costs and expenses based on outside agreements.  I

4  wouldn't expect to see it, because this isn't the estate's

5  disbursement sheet.  This is Arthur Badger's disbursement

6  sheet.

7      Q.   Okay.  So we saw earlier where Arthur Badger

8  renounced his status as a conservator?

9      A.   Uh-huh.

10     Q.   Or, I'm sorry, as PR.  Why would somebody do that in

11 this type of situation?

12         MR. HOLLIDAY:  Your Honor, objection.  Speculation.

13         THE COURT:  Unless she has firsthand knowledge,

14 speculating would not be acceptable.  I sustain the

15 objection.

16 BY MR. AUSTIN:

17     Q.   Do you know why he did, why Arthur Badger renounced

18 his status here?

19     A.   I know why I was told he renounced his status.

20         THE COURT:  Hearsay.  Sustained.  Hearsay.

21         MR. AUSTIN:  Can we zoom out, please.  Can we zoom

22 down to the last three lines, please.

23 BY MR. AUSTIN:

24     Q.   This top part, can you, please explain that portion

25 and what it means to you?

1    A.    That means to me that Mr. Badger sought to have his

2  funds that he was receiving placed into a structured

3  settlement so that the funds would be disbursed much like an

4  annuity over a period of time as opposed to receiving the

5  funds at once.

6    Q.    And what goes into purchasing an annuity?

7    A.    Well, I have not purchased many annuities, but

8  usually we rely on an organization that does that for us.

9  Like, so you complete an application.  You determine the

10  terms of the structure.  You determine, you know, the rate,

11  and how it's going to be paid, at what age it's going to

12  start, how frequently you are going to receive it.  So, you

13  know, often people prefer to have that because they

14  ultimately will receive more money.  And it also protects the

15  assets if they are receiving any type of benefits or -- I

16  mean, there's 100 reasons that people might not want to

17  receive a lump-sum payment.  So when I look at that, I feel

18  that it was Arthur Badger stating that he wanted to have a

19  structured settlement as opposed to receiving the funds in a

20  lump sum.

21    MR. AUSTIN:  Can we go to the next page.

22  BY MR. AUSTIN:

23    Q.    So we have Alex Murdaugh and Arthur Badger signing

24  here; is that right?

25    A.    Correct.

1    Q.   So it's your understanding that the law firms are

2    typically in charge of filling these out?

3    A.   Yes.

4    Q.   If Russell was the PR for Donna Badger's estate,

5    would he owe Arthur Badger any fiduciary duties?

6         MR. HOLLIDAY:  Your Honor --

7         THE COURT:  Hold on.  What's that question?

8         MR. AUSTIN:  If he is the PR for Donna Badger's

9    estate, would he owe Arthur Badger any duties as a fiduciary.

10        MR. HOLLIDAY:  If she knows.

11        THE COURT:  If she knows.

12        THE WITNESS:  Am I allowed to answer?

13        THE COURT:  You are allowed, yes, ma'am.

14        THE WITNESS:  Okay.  So this gets a little

15   complicated, because the attorney for the estate owes a duty

16   to all of the beneficiaries of that estate, of which Arthur

17   Badger was also a beneficiary.  But that is separate and

18   unique from owing Arthur Badger a fiduciary duty within his

19   own settlement or his own, you know, individual action.  So

20   they are two different things.  And, you know, to the extent

21   that Arthur Badger was a beneficiary of the estate of Donna

22   Badger and Russell was the PR, then he would owe a fiduciary

23   duty to him with regards to any assets that came into that

24   estate.

25   Q.   Okay.  Could you explain -- well, excuse me.  Have

1  you reviewed the indictment in this case?

2          MR. HOLLIDAY:  I think you can ask that question.

3  I'm very curious what the next one is going to be.

4          THE COURT:  Let's hear the answer and then we will

5  go to the next question.

6          THE WITNESS:  I have reviewed it.

7          MR. AUSTIN:  Well, I will strike that.  Beg the

8  Court's indulgence.

9          THE COURT:  Yes.

10          MR. AUSTIN:  Please answer any questions of Mr.

11  Holliday.

12          THE COURT:  Cross-examination by the Government.

13                    CROSS-EXAMINATION

14  BY MR. HOLLIDAY:

15      Q.  All right.  Ms. Provence, good morning.

16      A.  Good morning.

17      Q.  I'm Winston Holliday.  I'm an Assistant United

18  States Attorney.  Okay?  Just to briefly go over a few things

19  that you talked about at the very beginning of your

20  testimony, you were the probate judge in Dorchester County

21  for 10 years, right?

22      A.  Correct.

23      Q.  Dorchester County, right around here, that's a big

24  county?

25      A.  At the time I was probate judge, it was not as large

1  as it is today.  But it's considered a medium-sized county

2  within the county -- association of counties.

3      Q.   Fair enough.  You've been in private practice now

4  for -- well, since you were a probate judge, which was 2008,

5  I think?

6      A.   Correct.

7      Q.   So even longer --

8      A.   Correct.

9      Q.   -- than you were a judge.  Just what's the caseload

10  like in most probate offices, both from your experience when

11  you were a Dorchester County probate judge and even more so

12  now when you've been in 32 counties around the state?

13      A.   Well, it fluctuates.  And it's really based on the

14  population of counties.  So without sounding too crass, I

15  mean, the number of files you have in a probate court are

16  going to be directly related to the number of people that die

17  there.  So, like, Beaufort County might be a similar size as

18  another county, but it has a large retirement community.  So

19  they might have a larger number of probate files because they

20  are a retirement community.  And so it really -- it just

21  depends.  But for the most part, I find that our probate

22  courts are overburdened.  Many of them have more files than

23  they could manage.  But, you know, it just really depends.

24  It could also fluctuate.  You could have years where you have

25  a lot more deaths than others.  It just really depends.  But

1  proportionally, it's related to the size of the population,

2  because, presumably, the number of incapacitated and/or

3  deceased people is going to be tied directly to the

4  population.

5      Q.  But being a probate judge is a tough job because, as

6  you mentioned, typically understaffed in those offices as

7  well?

8      A.  Correct.

9      Q.  And I believe you were asked under direct that --

10 you obviously do some practicing in Hampton County now,

11 right?

12     A.  I don't -- it's been a while since -- I believe I

13 have one file currently in Hampton County.  But it's been a

14 while since I've appeared there.  So it's hard within my

15 firm, because we have four attorneys that do exclusively

16 probate, to know if we have an active file in any given

17 county.  But it's been a while since I've appeared in Hampton

18 County.  But, you know, we regularly administer estates in

19 that county.

20     Q.  You are familiar enough, though, I think you said

21 that they have one probate judge and one clerk?

22     A.  To the best of my knowledge, the last time I was in

23 there, there was one clerk and one judge.

24     Q.  Right.  That's pretty tight, wouldn't you say?

25     A.  I would say, yes.

1    Q.   You talked about this a little bit before, and I

2    don't want to get it wrong, conservators are generally --

3    they file annual accountings --

4    A.   They do.

5    Q.   -- for the conservatorships; is that right?

6    A.   They do.

7    Q.   And, obviously, these get filed with the probate

8    court, what time of year?  Does it matter or just by

9    arrangement?

10   A.   That would fall back into 46 counties, 46 different

11   ways of doing things.  Sometimes it's based on the time.

12   Like, if I was appointed in March, then they want my annual

13   accounting every March.  Some of them lump you into a

14   quarterly system, so you go that quarter.  And other -- there

15   are a few courts that do it annually regardless of when you

16   are appointed.  They want it, like, on, you know, January or

17   they want it in April or -- so it just depends.  But, you

18   know, it's generally within 12 to 16 months of when you

19   received your appointment.

20   Q.   And these can be -- the annual reports can be

21   substantial documents; is that right?

22   A.   They can be substantial or they can be really

23   simple.  I mean, it's a court form.  Sometimes you have a lot

24   of necessary attachments.  And other times just the simple

25   form is enough.  That also really depends on the judge and

1    what they require.

2    Q.   Right.  And in some of these short-staffed counties,

3    it would be difficult for them, every annual report that

4    comes in, to go line by line through each report, verifying

5    transactions and everything that's included in that report;

6    is that right?

7    A.   I would -- that is correct, uh-huh.

8    Q.   And if you were a conservator, then wouldn't you

9    think that the court would not feel the need to scrutinize

10   your work as closely as what you called an interested -- I

11   think interested conservator, somebody who is a family

12   member, for instance?

13   A.   Yeah, a lot of times we just call them "known" or

14   "interested" or "family."

15   Q.   My notes weren't so great on that one.

16   A.   We just separate them from a third-party, neutral

17   third-party is what I generally am.  I would like to believe

18   that I would be subject to less scrutiny, but I will have to

19   say that sometimes judges are equal opportunity when it comes

20   to picking on you.  So I won't say that I get less scrutiny

21   simply because of my, you know, history with the court.  It

22   really just depends.

23        If I could expand on that and say that, really, how

24   much the judge is looking at it is depending on whether or

25   not anybody is complaining or bringing something to their

1  attention or -- generally, I don't find that judges sit down

2  with stacks of accountings and look for problems.

3      Q.  Good.  Thank you.  There was some discussion before

4  on direct -- well, let me ask you this question before we

5  move on from that.  Conservators are considered officers of

6  the court; is that right?

7      A.  That's a tricky one, because if I'm a conservator

8  because of my oath as a lawyer, I'm an officer of the court.

9  They certainly sign an agreement being bound to the

10  jurisdiction of the court.  But there's not any procedure

11  where they, like we as attorneys, take an oath to be an

12  officer of the court.  I've never seen a court hold them to

13  those rules.  So they certainly are bound to the

14  jurisdiction.  And if they are an attorney, we are not -- we

15  aren't able to shed that officer-of-the-court role.

16      Q.  Right.  Even someone who is not an attorney should

17  be dealing with the probate court in an honest and

18  transparent fashion; is that right?

19      A.  Should be.

20      Q.  And probate judges approve disbursements for

21  conservatorships; is that right?

22      A.  They can.  It really just depends on the file.  You

23  could also have a financial plan in place where you don't

24  have to approve disbursements.  So it really depends on the

25  file.

1    Q.   Okay.  And, occasionally, there are investments made

2    on behalf of a conservatorship; is that right?

3    A.   Correct.

4    Q.   And these investments, particularly in the case of

5    minor children, should be relatively secure; is that also

6    true?

7    A.   Well, the goal is to conserve, so I think that you

8    want them -- but the discretion is up to the court, if the

9    court is requiring approval.  And I've seen some courts allow

10   what people might consider moderate-to-high-risk investments,

11   while other courts require you to stay as conservative as,

12   you know, like CDs only.  I mean, it's just -- there's a

13   really big variation in that.

14   Q.   But, generally speaking, there would be a

15   prohibition on self-dealing, wouldn't that be the case?

16   A.   Well, there's a statute in the probate code which

17   defines transactions which may be considered to have a

18   conflict of interest.  And it's not barred, but it is in

19   there that the judge can require that interested parties be

20   noticed and that you have to seek approval.  Again, some

21   judges consider certain things a conflict of interest that

22   others would not.

23   Q.   But you, in your capacity as a conservator,

24   generally speaking, you wouldn't take a loan from the

25   conservatorship, for instance, to do home improvements for

1    yourself, would you?

2        A.    I am not doing that, no.

3        Q.    You wouldn't take a loan from a conservatorship to

4    put a pool into your house, would you?

5        A.    No.

6        Q.    And you wouldn't take a loan from the

7    conservatorship to update your countertops at your house

8    either, would you?

9        A.    I would not.

10       Q.    Because that would be self-dealing, right?

11       A.    Well, I mean, professionally, as an attorney, it

12   would be unprofessional.  I don't think it would look great

13   on my reputation if I was borrowing money from the person

14   that I was serving to do something personal for myself.  It's

15   just -- it's a best practice, I guess I would say.  It's not

16   something that my firm would approve for us to do.

17       Q.    It's not just attorneys, though, right?  I

18   understand what you are saying as attorneys, like definitely.

19   But a conservator taking loans out from a conservatorship for

20   that person's own self-interest, you don't have to be an

21   attorney to know that's not right?

22       A.    Well, it just depends on what the interest is and

23   whether or not the interest is also earning interest.

24       Q.    But the conservatorship exists for the benefit of

25   the conservatee, child or whatever?

1    A.    Exactly.

2    Q.    So you would avoid high-risk investments, for

3    instance, with people who have a chronic history of being

4    overdrawn on their accidents and things of that nature; is

5    that right?

6    A.    Well, I think you've got to look at what the risk

7    is.    I mean, certainly your responsibility is to do a risk

8    assessment on any investment, whether it's a loan or an

9    investment in stocks.    I think it is your responsibility to

10   do a risk assessment.

11   Q.    Certainly, like, unsecured loans and things of that

12   nature are more risky than secured loans; is that correct?

13   A.    Yes.

14   Q.    While a personal injury case is pending, there's a

15   relationship between the plaintiff's lawyer and the

16   conservator, isn't there, generally?

17   A.    Well, I'm not sure how to answer that, because if a

18   personal injury case is pending, often a conservator isn't

19   even appointed until there's a settlement amount.    And so

20   after the appointment of a conservator -- there's not a

21   straightforward answer to that.    The relationship could span

22   different periods of time.

23   Q.    Okay.    But once a conservator is appointed, that

24   conservator is responsible for watching over the money; is

25   that correct?

1    A.    Correct, uh-huh.

2    Q.    In your experience, when does the relationship with

3    a personal injury attorney end in terms of the

4    conservatorship?  Let's say there's a pending case, and

5    there's an attorney who is representing the plaintiff in that

6    case, and the case has been resolved or whatever and the

7    conservator has been appointed, does the plaintiff's lawyer

8    have any interest going forward, or is it now in the hands of

9    the conservator?

10    A.    Well, it depends on whether or not they are

11    representing or were representing the conservator at the time

12    of their appointment.  So, for example, when I seek to have

13    someone appointed, I consider that relationship to be ongoing

14    until they are discharged from their duties as conservator.

15    I don't consider it to be terminated once they are appointed,

16    because my responsibility's ethically to make sure that I'm

17    guiding them through accountings or any questions that they

18    have.  So what a personal injury attorney would consider

19    would be hard for me to guess.

20    Q.    Right.  So you are speaking about somebody who does

21    probate work?

22    A.    And appoints conservators.  Like, I am not going to

23    have my client appointed and then just say, well, this

24    relationship is over, I don't owe you any more duties,

25    because if they have questions or concerns, or generally they

1  come back to us for help on their annual accountings, they

2  come back to us if they need to do certain petitions or to do

3  a financial plan.  So, for me, it's really not done until the

4  person is -- the funds are surrendered.

5      Q.   Okay.  If the lawyer who handled the personal injury

6  case asked the conservator to steal money for the

7  conservator, that would be inappropriate now, wouldn't it?

8      A.   To steal money?

9      Q.   Yes.

10     A.   Yes, it would be.

11     Q.   Thank you.  And the conservator would not have to

12  follow the lawyer's instructions regardless of the

13  relationship between the two; is that right?  If an attorney

14  asked a conservator to steal money --

15     A.   Correct.

16     Q.   -- and in whatever capacity had the case before, the

17  conservator is not bound to follow the lawyer's instructions

18  to steal, is it?

19     A.   To steal?

20     Q.   Money.

21     A.   No, I would not think they would have to follow the

22  advice to steal.

23     Q.   I don't think the question is fairly

24  straightforward.

25     A.   Yeah.  To steal money, no, I don't think so.

1        Q.   All right.  Because, ultimately, a conservator, as

2   the person conserving the money, has a right to say, no, I am

3   not going to listen to you to steal money, correct?

4        A.   Correct.

5        Q.   I want to touch briefly on a few of the things in

6   the Pinckney/Thomas and Badger case.

7             MR. HOLLIDAY:  If we could go to Exhibit 110,

8   please.  And I think we wanted to go to the signature page.

9   That's okay.  I don't need the exhibit.  I will just go.

10  BY MR. HOLLIDAY:

11       Q.   If someone dies during the life of a

12  conservatorship, what should happen?

13       A.   Who is dying?

14       Q.   I'm saying conservatee.

15       A.   Okay.

16       Q.   Is that right?

17       A.   Yeah.  So the conservatee or the -- well, we now --

18  we used to call them "wards" and now they call them "AI's,"

19  "alleged incapacitated" or "conservatees."  So your question

20  is, if the conservatee dies during the period of a

21  conservatorship, what should happen?

22       Q.   Right.

23       A.   Generally, the conservator would protect those

24  assets until the estate is opened.  And then they would

25  surrender them to the personal representative, the new

1  fiduciary.

2      Q.   Okay.  Good.  And as far as a conservatorship, if

3  someone is 19 years old and not otherwise incapacitated,

4  would there be any need to have a conservator in that

5  instance?

6      A.   By statute, once you are 18, you are considered age

7  of majority.  So without a disability, you wouldn't qualify

8  for a conservatorship.

9      Q.   And, generally speaking, conservator fees have to be

10  approved by the probate court; is that right?

11      A.   The fees that are being paid for the conservator's

12  service?

13      Q.   Right.  Right.

14      A.   Yes, with the caveat that I mentioned earlier, which

15  is there can be agreement at the time that the person is

16  appointed that they are going to receive a fee.  And if the

17  judge appoints them with that understanding, then they don't

18  have to continuously seek approval of that fee.

19      Q.   Right.  But in the absence of some kind of agreement

20  or something like that, the probate court would be the one

21  determining the conservator fee, correct?

22      A.   Correct, not determining, but approving.

23      Q.   Approving, very good.  Thank you.  I'm going to show

24  you Government's Exhibit 24, please.  And this is from the

25  Badger case.  Okay?

1       A.    Okay.

2            MR. HOLLIDAY:  And I think we need the second page.

3       I had my pages mixed up.  I apologize.

4       BY MR. HOLLIDAY:

5       Q.    So the recovery amount up here, $4,675,000, there's

6       a wrongful death portion and there's a survival portion.  If

7       you would, tell us the difference between the two.

8       A.    I will gladly do so, but this is usually a

9       three-hour lecture in CLE, so I'm going --

10      Q.    I'm sure the jury wouldn't mind three hours at all.

11      A.    We are going to try to do it in two minutes or less.

12      When someone is killed in an accident or incident, there are

13      two components to being able to recover for them.  The first

14      component -- I generally consider survival the first

15      component, because that is money that represents the

16      conscious pain and suffering of the decedent before they

17      pass.  And so because it's money owed to them for their

18      conscious pain and suffering, the survival proceeds go into

19      their estate, because it was money owed to them and,

20      therefore, it's part of their estate.

21           Wrongful death proceeds, on the other hand, are for

22      the loss of the companionship.  You know, there's this long

23      list of losses we suffer when someone that we care about is

24      killed.  And so that portion is the wrongful death portion.

25      And that goes directly to that person's intestate

1    beneficiaries, meaning statutorily, it says who receives

2    that.  It doesn't matter what their will says, what their

3    estate says.  It goes to the people who have suffered the

4    loss.  And so in this situation, we are putting the majority

5    of the funds towards the wrongful death, which goes directly

6    to the statutory beneficiaries, as opposed to money towards

7    conscious pain and suffering, which would go towards the

8    estate.

9        Q.   Okay.  Very good.  So in this one, tell me how the

10   PR fee would be calculated.

11       A.   Well, generally, PR fees aren't calculated as part

12   of the settlement anyway.  They are calculated within the

13   estate, because, for example, what I can tell you by looking

14   at this, is this $500 would go into the estate.  It would be

15   added to the other estate assets.  And in the estate, that's

16   where we would normally calculate a PR fee, unless there was

17   some other contractual agreement or agreement by the parties

18   as to how to pay it.  So, you know, it happens often, but the

19   circuit court judge really isn't capable of determining a PR

20   fee because they don't have the information that's in the

21   probate court file, which is the total value of the estate.

22           But if you are asking me what the PR fee would be on

23   this $500 and wanting me to do math on the fly, then it would

24   be $50.  Right?  Is that correct?  No?  Yeah.  So it would

25   be -- no, it would be less than -- the minimum PR fee, by the

1    way, is $50.  So, like, no matter how small the estate is,

2    there's a minimum fee payable of $50.  But it would be 5

3    percent.

4         Q.   In this instance, it's $500?

5         A.   Correct.  5 percent of the $500.

6         Q.   You knew Alex Murdaugh before all of this, right?

7         A.   I did.

8         Q.   And have you actually -- or at some point, you went

9    into the PMPED law firm and sort of gave them an overview or

10   some training as to how probate law works; is that correct?

11        A.   I went to --

12        Q.   Casting no aspersions, by the way.  I'm just

13   establishing you are the one who knows this.

14        A.   There were a lot of discrepancies within their firm,

15   just like many firms, on how forms were being completed.  So

16   I did what I would just call an in-service for their legal

17   assistants or paralegal staff.

18        Q.   Okay.  Very good.

19        A.   I went in and spoke with them about, you know,

20   trying to get some uniformity on how they handle their forms

21   and, you know, just kind of basic lessons on working the

22   probate forms.

23        Q.   Because there were problems with what they were

24   filing?

25        A.   Well, there wasn't consistency.  Right?  And it was

1    often confusing for us when we're seeing inconsistencies and

2    unsure how they want things handled.  So we just felt it was

3    easier to go in.  Because it's often support staff that's

4    filling in the forms.  So we just went from and tried to

5    create some consistency on how they were going to complete

6    the form, so that we were better able to help them move

7    through the probate court without getting things kicked back

8    from the courts.

9        Q.   I'm going to show you Government's Exhibit 71.  And

10   if you would like, you can take a second to take a peek at

11   this.  I know we are going back a way.  This is a 2009

12   e-mail; is that correct?

13       A.   Yes, it is.

14       Q.   But it's basically an introductory e-mail; is that

15   correct?

16       A.   It is.

17       Q.   And you are being introduced to Russell Laffitte; is

18   that right?

19       A.   I am.

20       Q.   And so when there were questions actually regarding

21   probate of certain issues, not necessarily the entire thing,

22   but you are being introduced to him just in case he had any

23   questions about probate; is that correct?

24       A.   I would say -- "I have the probate files in our

25   office which we will provide if you and Russell decide to

1  work together.  If you do, he will be responsible for your

2  fees."

3       So I would view this as more of a referral, you

4  know, like an introductory potential referral e-mail.

5       Q.   Right.  Ronnie clearly indicating, though, that they

6  are out of their element with any kind of probate work with

7  their firm; is that right?

8       A.   I'm hesitant to say out of their element because it

9  could just be trying to separate, you know, the

10  responsibilities.  There are certainly cases where they

11  handled that themselves.

12      Q.   But in this instance, again, separating the

13  responsibilities, they handled the accident case, you were at

14  least available in case -- if Russell needed to contact you;

15  is that right?

16      A.   I was, uh-huh.

17          MR. HOLLIDAY:  All right.  Thank you very much for

18  answering my questions.

19          THE COURT:  Okay.  Anything on redirect?

20          BY MR. AUSTIN:  Just a couple of questions, Your

21  Honor.

22          Can we pull Government's Exhibit 71 back up, please.

23                    REDIRECT EXAMINATION

24  BY MR. AUSTIN:

25      Q.   All right.  In that sentence it says, "The estates

1    were opened so that we could bring wrongful death actions

2    arising from automobile accident."  What does that mean to

3    you?

4         A.   That means that there wasn't -- there weren't really

5    significant estate assets, that the estate -- the reason they

6    opened the estate was so that they could pursue a wrongful

7    death action on behalf of the person who was killed.

8         Q.   Okay.  And is that why they needed somebody to

9    serve, an outside neutral conservator PR to serve in that

10   capacity?

11        A.   Correct.

12        Q.   And what would be the benefit to a beneficiary of a

13   wrongful death settlement then?

14        A.   I'm sorry?

15        Q.   What would be the benefit to someone here, like

16   where Arthur Badger is being separated from serving as PR?

17             MR. HOLLIDAY:  Your Honor, objection.  Only that it

18   misstates the exhibit.  It's not the Badger case.

19             MR. AUSTIN:  My mistake.

20             THE WITNESS:  Plyler.

21             THE COURT:  Plyler matter.

22             THE WITNESS:  Sure.  So it's incredibly common when

23   you have more than one person killed in the same accident

24   that that creates a conflict of interest for people to serve.

25   So meaning when -- often there's a limited amount of money

1    being offered.  And it's being divided between estates.  And

2    so if there is a conflict of interest because maybe, you

3    know, those -- they have competing interests, then they will

4    often appoint a neutral person, because not only are they not

5    going to personally benefit from which receives the more

6    money, but they also have the ability to be more impartial as

7    far as how those funds are divided.  So in a lot of cases, we

8    have PRs who end up with a conflict of interest or have a

9    conflict of interest from the outset where it becomes more

10   suitable to name a neutral person to serve as the plaintiff

11   in those cases.  A lot of times, for strategy reasons,

12   plaintiff attorneys like to have neutrals sitting at the

13   table if there's, you know, any type of conflict between the

14   decedents.  And sometimes it's living parties that were

15   injured but aren't dead that also beneficiaries of the

16   estate.  There's a thousand reasons that this happens.  But

17   in general, they often appoint neutrals so that they don't

18   have that same conflict.

19        Q.   I believe you said someone -- PR would serve as

20   plaintiff.  Did I hear you correctly?

21        A.   Correct, uh-huh.

22        Q.   What does that mean for the relationship then

23   between the plaintiff's attorney and the person serving as

24   PR?  Is there an attorney-client relationship?

25        A.   Oh, absolutely, uh-huh.

1   Q.   And what does that mean then for the person serving

2   as the PR?

3   A.   So, for example, if I'm appointed as a neutral PR

4   and there's an accident case going on, then I now stand in

5   the shoes of the estate, the deceased person, as the

6   plaintiff.  So even though I'm an attorney, I'm sitting at

7   the table as the plaintiff, and the plaintiff's attorney is

8   my attorney.  That's my attorney.  And they are representing

9   the estate by and through me as the personal representative.

10  So there is an attorney-client relationship between the

11  personal representative and the plaintiff's attorney.  You

12  are their client.

13  Q.   Okay.  Mr. Holliday asked you about -- he gave you a

14  hypothetical about PR/conservator helping an attorney steal

15  from one of their conservatees --

16  A.   Uh-huh.

17  Q.   -- PR, one of their fiduciaries.  Based on your

18  personal involvement in this case, are you aware of any such

19  request?

20       MR. HOLLIDAY:  Objection, Your Honor.  Objection.

21  Hearsay.

22       MR. AUSTIN:  I'm asking if she's aware.

23       THE COURT:  The question is, is she aware herself of

24  theft?  Is that your question?

25       MR. AUSTIN:  Yes.

1        THE COURT:  She can testify to that.

2        MR. HOLLIDAY:  Foundation, Your Honor?

3        THE COURT:  If she has knowledge.  You have to lay

4   down the foundation.  She has the personal knowledge.

5        THE WITNESS:  I am not aware of any theft.

6        MR. AUSTIN:  Thank you.  No further questions, Your

7   Honor.

8        THE COURT:  Very good.  You may step down.

9        Is there any need to retain this witness?

10       MR. HOLLIDAY:  No, Your Honor.  Thank you.

11       THE COURT:  Very good.  You are free to go.  Thank

12  you.  Let's take our morning break, ladies and gentlemen.

13       (Jury leaves open court at 11:00 a.m.)

14       THE COURT:  Please be seated.  If the defense feels

15  comfortable sharing with the Court, just foreclosing how many

16  more witnesses we have.

17       MR. DANIEL:  I think just one.

18       THE COURT:  One, very good.  We will be at ease.

19       MS. LIMEHOUSE:  Your Honor, may I bring up one

20  matter?

21       THE COURT:  Certainly may.

22       MS. LIMEHOUSE:  We've been given some exhibits for

23  the first time this morning.  And we intend to object to

24  three of the four exhibits.  We might want to take that up

25  out of the presence of the jury just to save their time being

1    in here, if you want to review these.

2         THE COURT:  Yes, I would.  Thank you.

3         MS. LIMEHOUSE:  The first three we intend to object

4    to.  The fourth one we do not if adequate foundation is laid.

5         (Whereupon, a recess is taken.)

6         THE COURT:  I've been provided some documents.  And

7    they are separate documents.  I'm counting one, two, three,

8    four, five separate exhibits.  Some of them are multiple

9    pages.

10        Okay.  Ms. Limehouse, let me hear your concerns.

11        MS. LIMEHOUSE:  Yes, Your Honor.  One of the

12   documents is what is purported to be a resignation letter

13   written by Mr. Russell Laffitte.

14        THE COURT:  Let's deal with that first.  That's

15   defendant's proposed Exhibit 87.

16        MS. LIMEHOUSE:  That's my understanding.  Your

17   Honor, this hearsay, self-serving hearsay that is improper to

18   be admitted through Mr. Laffitte.  I will also say there's

19   prior sworn testimony that establishes that there was not a

20   resignation letter.  In February of this past year, Mr.

21   Laffitte was deposed under oath and stated that there was no

22   resignation letter.  And so not only is this letter not dated

23   and is self-serving hearsay, but also contradicts his own

24   prior sworn testimony.

25        THE COURT:  Let me hear from the defendant, Mr.

1    Austin.

2        MR. AUSTIN:  So the distinction with the resignation

3    that he was you -- resignation letter that Mr. Laffitte was

4    talking about in that bond hearing --

5        THE COURT:  I am not concerned -- I'm concerned that

6    this appears to me to be hearsay.  It's a self-serving

7    statement of the defendant.  It's hearsay.  Now, why is that

8    not -- I mean, the only way an opposing party statement can

9    be used is when it's being used by the opposing party, not by

10   the party that's the self-serving statement.  So why is this

11   not that?

12       MR. AUSTIN:  It goes to his state of mind and his

13   intent at the time when he resigned.

14       THE COURT:  He can testify to that and whether --

15   you know, what his state of mind was at that time.  I mean,

16   whether he resigned or didn't resign is largely, in my view,

17   immaterial whether he did or did not commit the alleged

18   crimes.  But the problem here is it's just, like, basic

19   Evidence 101, this is self-serving statement.  I sustained

20   the objection as to 87.

21       What's the next one?

22       MS. LIMEHOUSE:  Next one, I am not positive it's

23   sequential order, but there was a document signed by Mr.

24   Arthur Badger.  Of course, Mr. Badger testified before Your

25   Honor, and possibly could have authenticated that document.

1  But Mr. Laffitte's signature or information is not on that

2  document.  So he can't properly authenticate it.  And it's

3  hearsay, so --

4           THE COURT:  Was it filed in a court?

5           MS. LIMEHOUSE:  I am not certain that, Your Honor,

6  based on the face of that document.

7           MR. AUSTIN:  That's my understanding, Your Honor.

8           THE COURT:  Show me.

9           MR. AUSTIN:  Your Honor --

10           THE COURT:  Your understanding is not good enough.

11  You've got to tell me -- you've got to file, probate file,

12  pull it out and show it to me, because that's relevant to

13  this consideration, was it a filed document.

14           MR. AUSTIN:  Our understanding it's in there based

15  on our discussion with Mr. Laffitte, but we have not been

16  able to find it in the documents.

17           THE COURT:  Your understanding and can't find it,

18  that's not good enough.  There are obviously exceptions

19  regarding public records.  And there's no marking here

20  indicating that -- there's an objection on authenticity.

21  There is a potential exception for public records.  I've

22  been -- it had been represented to me there is a -- that

23  these probate files are in the record.  The record speaks for

24  itself.  You can't say, well, Mr. Laffitte thought it was in

25  the record.  That's not good enough.  That's what

1 authentication is. Got to be what it represents itself to

2 be. I see nothing on this document. Of course, you have the

3 witness here to ask him about it, to ask him.

4 But, you know, at this point it's hearsay unless you

5 can show me. And I'm open to this if you can demonstrate to

6 me in the probate file that it was a public record.

7 MR. AUSTIN: Thank you, Your Honor.

8 THE COURT: Keep looking. I'm open to hearing you

9 out on that.

10 Okay. Let me make a note here. And you could

11 always call Mr. Badger back for that purpose. Okay? You

12 could do that if -- but --

13 MR. AUSTIN: I don't believe he's under subpoena,

14 Your Honor.

15 MS. LIMEHOUSE: And he's been released.

16 MR. AUSTIN: It is a critical piece of evidence.

17 THE COURT: If it's such a critical piece of

18 evidence, you should have asked him about it.

19 MR. AUSTIN: We weren't aware of it.

20 THE COURT: Well, the Rules of Evidence have a

21 really good reason. And just having things sort of free-form

22 documents and saying, oh, you want to fall within -- this

23 would be hearsay if it's not -- you haven't given me any

24 other basis for it not to be hearsay. Easily confirmed or

25 challenged by Mr. Badger himself. But there is an exception,

1    of course.  An exception is for a file of public record.

2    And, you know, the file -- I'm told it's in the record, that

3    the probate court is in the record but the document is not.

4    If that changes, I'm glad to reconsider.  At this point, I

5    sustain the objection.

6         What's the next one?

7         MS. LIMEHOUSE:  Next one, Your Honor, is a letter

8    from Mr. Jan Malinowski.  Again, he testified before Your

9    Honor last week.  I don't believe Mr. Laffitte can

10   authenticate that letter written by Mr. Jan Malinowski.

11        THE COURT:  Did he receive the letter?

12        MR. AUSTIN:  Yes, Your Honor.

13        MS. LIMEHOUSE:  We've just seen it this morning.  So

14   we haven't had an opportunity to ask any of our witnesses

15   about this either.

16        THE COURT:  What's your objection to it?

17        MS. LIMEHOUSE:  It's hearsay, Your Honor.

18        THE COURT:  What's it offered -- what's the purpose?

19        MR. AUSTIN:  It's a business record.  And it shows

20   that Mr. Laffitte is trying to pay back fees to the bank,

21   trying to make -- trying to avoid the bank suffer any

22   consequences or limit the consequences it suffered from any

23   negligent actions.

24        THE COURT:  Let me understand what he's trying to

25   do.  He encloses personal checks for 15,000.  And this is Mr.

1   Malinowski writing the defendant:  Enclosed please find your

2   personal checks.  I am informed they represent conservator

3   fees for Natasha Thomas and Hakeem Pinckney.  I am returning

4   the items to you.  As you know, the bank was not a

5   conservator in either case, nor did it perform any service in

6   either case.  Consequently, the bank did not earn or seek any

7   fee.

8           You want that document in?

9           MR. AUSTIN:  Yes, Your Honor.  We think it goes to

10  Mr. Laffitte's state of mind at the time.

11          THE COURT:  No.  No.  This is March 14, 2022.  It's

12  not contemporaneous.  It's not a state-of-mind document.

13          MS. LIMEHOUSE:  I think there's also issues with

14  relevance, Your Honor, a letter from March --

15          THE COURT:  Also jury confusion.  You know, you

16  can't -- I don't want to create an analogy here, but you

17  can't commit a crime and then offer to give the money back

18  after later.  I mean, that's not -- it doesn't go to the

19  state of mind at the time you committed the act.  Again, if

20  it's such a critical document, you could have asked Mr.

21  Malinowski about it as the -- but I think there are real

22  issues here about relevance and jury confusion, 403, because

23  my understanding, and you can correct me on this, Mr. Austin,

24  this is all after the fact of the alleged crimes here.

25          MR. AUSTIN:  There's been a lot of testimony, Your

1  Honor, about Mr. Laffitte's acceptance of responsibility.  Do

2  you recall the November e-mail chains that talked about him

3  saying, we converted, and people asking if he was responsible

4  from the Board, and he said --

5      THE COURT:  That's fine.  You can question him about

6  it.  But now after the fact, coming and saying, I want to

7  give the money back, that's not relevant.  And it's kind of

8  inviting -- you can't -- you and I both know, Mr. Austin, you

9  can't commit a crime and be exculpated after you got caught

10  you gave the money back.  Right?  There would never be a bank

11  robbery charge.  Right?  So that can't be the basis for this.

12  Now, if you can establish to me some other better relevance

13  that might be -- doesn't seem relevant to me.  And it's

14  misleading to the jury.  And I think it kind of invites

15  nullification because it's not a proper defense.

16      MR. AUSTIN:  Your Honor, he was accused of keeping

17  the conservatorship money.  And he also was trying to repay

18  fees back in the fall of 2021 as well.  And so --

19      THE COURT:  Well, if he -- if you put it during the

20  relevant time, I will rule on that.  But this is March 14,

21  '22.  That's outside the time.  And I sustain that objection.

22  Okay.  That's 86.

23      Okay.  And then I have Exhibit 83, which are two

24  checks in 2021, November of '21, to Palmetto State Bank, PR

25  fee, one-half in settlement.  I'm not sure I understand this,

1 these checks.  This is a check and a deposit slip.

2 MS. LIMEHOUSE:  My expectation, and I don't know

3 this, but my expectation is that they are going to argue that

4 that represents half of the $35,000 PR fee that Mr. Laffitte

5 took from Arthur Badger.

6 THE COURT:  Well, y'all said he -- you've asked him

7 multiple times, did that represent half the fee, and if he,

8 you know -- at the time he attempted to pay it.  That would,

9 seems to me at least, would be potentially relevant to the

10 case.

11 MS. LIMEHOUSE:  We have no objection as long as --

12 THE COURT:  I think 83 is a proper document.  You

13 know, jury is going to decide the significance of it and all

14 that, but I think it's a proper document.

15 MR. AUSTIN:  Thank you, Your Honor.

16 THE COURT:  So let me just -- reviewing is, I

17 sustain the Government's objection regarding defendant's

18 proposed Exhibits 86, 87 and 88.  And I -- there's not an

19 objection to 83.  Did I accurately state that?

20 MS. LIMEHOUSE:  That's correct, Your Honor.

21 THE COURT:  And we will mark these just so they will

22 be in the record what these were.

23 MR. AUSTIN:  Your Honor, is 83 in evidence now?

24 THE COURT:  You are going to have to put it in,

25 unless y'all stipulate or something.

1    MR. AUSTIN:  I wasn't sure if there was a

2  stipulation.

3    THE COURT:  I don't understand there to be.  If

4  y'all work it out, that's fine with me.  Okay.

5    Is our jury ready, Ms. Crystal?  Let's bring them

6  in.

7    (Court's Exhibit 86, 87 and 88 are marked for

8  identification.)

9    (Whereupon, the jury returns to open court at 11:26

10  a.m.)

11    THE COURT:  Please be seated.

12    Government, call your next witness.

13    MR. AUSTIN:  The defense calls Russell Laffitte.

14    THE COURT DEPUTY:  Please state your full name.

15    THE WITNESS:  Russell Lucius Laffitte.

16                    RUSSELL LUCIUS LAFFITTE,

17          having been duly sworn, testifies as follows:

18                      DIRECT EXAMINATION

19  BY MR. AUSTIN:

20    Q.   Good morning, Mr. Laffitte.  Can you tell the jury a

21  little bit about yourself.  Where were you born and where did

22  you grow up?

23    A.   I was born and raised right in Hampton County.

24  Always wanted to live right there in Hampton County.  I went

25  to -- graduated from Patrick Henry Academy in Estill, South

1 Carolina. Then I went -- well, I took a break between high

2 school and college, farmed for five years. Then I went to

3 Newberry College. Graduated with a business degree in 1997.

4 And immediately came back to work at Palmetto State Bank.

5 Q. Okay. So you took a little break. Did you set out

6 to become a banker when you graduated high school?

7 A. I had no intentions of ever being a banker. I like

8 the outdoors. Always liked hunting and doing things,

9 farming. I like being outdoors. And so I didn't want to be

10 stuck in the office. And my father had asked me to come back

11 from 1997 when I was graduating. And I decided to try it.

12 And I just fell in love with it. And I really, really

13 enjoyed it.

14 Q. And what do you like in particular about banking?

15 A. I enjoyed helping people. There's nothing like, you

16 know, helping somebody start their business or save their

17 business by loaning them money when, you know, things are

18 going wrong, especially as they were in COVID, when they buy

19 their first car, or help them pay for their child to go to

20 college or something, anything, buy the house. I mean, it's

21 a wonderful feeling to get to help people in that manner.

22 Q. Okay. And since you came back from college, have

23 you lived in Hampton your entire adult life?

24 A. I have. Technically, in Varnville but Varnville and

25 Hampton are side-by-side towns.

Q.   Okay.  And can you just trace your work history at
Palmetto State and explain what different roles you filled?

A.   Well, as was testified earlier in this trial, I was
the gofer when I started back in '97.  You know, I never
worked in the bank, not a day in my life, other than to move
files or haul stuff to the dump or something along those
lines.  So when I first started, just like everybody, you
know, we go through the teller line just to learn the basics.
No, they didn't think I was going to be a teller my whole
life.  And it's a good thing, because I am not really that
good at it.  So we went through the teller line.  And I moved
through different spots.  But along that same -- around that
same time that I came, one of our loan officers quit and
moved to another bank.  So I was sort of thrust into loans,
consumer lending fairly quickly.

Q.   And would you say that's your sweet spot in banking?

A.   I would say commercial lending.  As I developed
throughout the years as a lender, you know, you just don't
let people start out.  I mean, there's a lot to look at.  And
so much of it, especially in community banks, as you heard
over and over, it's relationship banking.  You have to know
the people, know their business.  And my sort of niche was
the timber industry and the agricultural.  I understand the
timber industry, whether it be logging, purchasing, and
buying and selling timber, or even such as the saw mills in

1 our area, which is -- just so you know, timber is our number

2 one industry in Hampton County.  So you need to learn it if

3 you want to be a banker in Hampton County.  And so that's

4 what I sort of focused on.  And that was where the majority

5 of my loans were, with either purchasing land,

6 timber-producing properties, farms, purchasing the heavy

7 equipment for the loggers themselves or production loans for

8 them.

9     Q.   Okay.  And tell me about your own family.  We've

10 heard from your dad, your sister, and your brother.  But what

11 about your family; how many children do you have?

12     A.   I have two children.  And, you know, I've got to

13 give my wife credit.  She's done a great job with them.  I

14 hope I've helped some.  You know, back in January when I was

15 fired, it made me -- chokes me up to think about this, about

16 how much of my life, of my children's lives that I threw

17 away, that I should have spent more time with them.  And I

18 wish I had.  I wished I hadn't worked all the time, because I

19 will tell you, I'm a workaholic.  I love to work, always

20 have, and still work a lot.  But when something of this

21 magnitude happens, it totally changes your priorities.  And

22 you see things through a different set of eyes.  So, no, I am

23 not glad to be sitting here, but I am glad that I've gotten

24 those priorities straight now.

25     Q.   All right.  And tell me about your community

1  involvement in Hampton.

2       A.   We're a community bank.  Palmetto State Bank is a

3  community bank.  We stress community involvement, whether --

4  and I think people need to be involved in the community

5  regardless of whether you are a banker.  I mean, that's part

6  of being in the community.  It makes your community a better

7  person -- a better place.  I've started out in the Rotary

8  Club.  I was in the Rotary Club for 20-something years.  I'm

9  not sure how long, a long time.  That was a good club.  And

10 also we did -- I did Little League.  I coached baseball,

11 which is sort of ironic, because I never played baseball.

12 But I helped -- let's qualify Little League, T-ball.  It was

13 T-ball.  I was the person that directed them which way to

14 run.  And, you know, I also did the concession stands for our

15 Little League football.  I ran all the concession stands

16 helping them.  You know, we would get there -- if it was

17 Saturday games, games start at three o'clock, I would be

18 there about 7:30 and we would get going all day long.

19           I was also involved with our Economic Development

20 Commission.  And I was -- I had resigned from it because I

21 did not realize you couldn't be on two state -- quasi-state

22 county commissions.  I was on our Hampton County Disabilities

23 and Special Needs Board.  And that was first.  And then I got

24 on the Economic Development Commission.  And I was notified

25 by the County that I couldn't be on both and to pick one.  I

1  think they thought I was going to take the Economic

2  Development Board, being a banker.  But I chose Disability

3  and Special Needs.  It was just a special -- you know, to be

4  able to help those individuals, to sort of shape the kind of

5  services that they will get in the county, it meant a lot to

6  me.  So I did that.  I was also involved with my church.  I

7  did a lot.

8      Q.   And we talked about your kids.  And your wife,

9  Susie, what does she do for a living?

10     A.   You really are going to put me on the spot now.

11  She's a teacher, sort of.

12     Q.   Can you explain that?

13     A.   I'm trying to think of the exact term.  Reading

14  recovery, she helps -- I know exactly what she does, but I'm

15  not sure what they call her.  Reading recovery, she helps

16  students that don't read up to grade level, get up to grade

17  level.  She pulls them out of classroom and puts them in

18  small groups and helps get them up to grade level.

19     Q.   Okay.  Has she always lived in Hampton or the

20  surrounding areas?

21     A.   She took about a three-year detour and went to

22  Mississippi, but other than that, she's been there.

23     Q.   All right.  We've obviously heard a lot about Alex

24  Murdaugh in this.  Can you just tell the jury, please, about

25  your relationship with him growing up and professionally?

A.    Alex -- I don't know if y'all realize this, but I know y'all realize we grew up next-door to each other, literally across the street.  And he is my father's godson and I'm his father's godson.  So, you know, we have tight ties.  I never was really close to him.  I was close to his younger brother, John Marvin, which you all met the other day.  Alex is three or four years older than me.  I think three years older, to be exact.  So when I was coming in to getting big enough to play basketball or football and all, you know, they were a lot older.  You know how the growth differences are in kids.  And I never went -- like, if I was coming in freshman in high school, he was a senior.  So we never really did a lot; whereas, with his brother, I was the same age.  However, being in the same town, we know each other.

And he was a partner at the law firm, PMPED.  And so, obviously, I knew him since they are our largest private customer in Hampton County, and probably might be in the whole bank, bank-wide.  So I did know him from there.  And we had -- you know, I banked him.  I was his banker or whatever you want to call it.  You know, one of my things, I catered to the law firm.  You know, they were good clients.  And I wanted to cater to them and make sure that they stayed good clients.  We kept a lot of loans, a tremendous amount of deposits.  I actually know that, but I don't know if I can

1  say that in public or -- I don't think it's really necessary.

2  Y'all understand, they had a lot of loans and a lot of

3  deposits and we wanted to keep then.  So, yes, he was one of

4  my clients, along with many, many of the other attorneys.  It

5  wasn't just Alex.

6      Q.   And were you the only person at Palmetto State that

7  would help him with banking needs?

8      A.   He would sometimes come to my father because that's

9  where it started.  He started banking with my father, I'm

10  assuming.  And, you know, Chad Westendorf would help him

11  sometimes, depending on what he was needing.  If he wanted to

12  open an account, he definitely was not going to talk to me,

13  he was going to talk to one of our customer service people,

14  because I just wouldn't even begin to know how to do that.

15  But, you know, we all would help him if they needed it.  But,

16  yes, primarily, I would say I was definitely his primary

17  banker.

18      Q.   Okay.  And can you tell the jury a little bit about

19  the Murdaugh family and their -- the way they were viewed in

20  Hampton County?

21      A.   Well, the Murdaugh family in Hampton County growing

22  up, when I say "growing up," when I was young, their

23  granddad, Mr. Buster Murdaugh, he was the solicitor.  And as

24  I grew up, Mr. Randolph III was the solicitor, Mr. Randolph

25  Murdaugh III was the solicitor, and I don't know how else to

1    say it, they were the law in Hampton County.  I mean, they

2    were very influential, is an understatement when it comes

3    to -- they helped the judges get elected.  They helped the

4    sheriffs get elected.  You know, they were -- they had their

5    fingers in it.  So I would say they were definitely

6    synonymous with law enforcement.  Having been a solicitor,

7    you know that happens.

8         Q.   During the time that you had -- were in a

9    professional relationship with Alex, was he also working at

10   the Solicitor's Office?

11        A.   I am not real sure.  You know, his father was a

12   solicitor when Alex started banking with me.  And I'm not

13   sure.  I know Alex was an assistant solicitor -- I think he

14   was an assistant solicitor until 2021 when all of this broke.

15   But I'm not sure when he became that.  But, yes, I would see

16   him numerous times with his father.  And I don't think he was

17   real active, but I think he would do some smaller cases every

18   once in a while for the Solicitor's Office in Hampton.

19        Q.   Okay.  And to your knowledge, did he have any

20   banking relationships with other banks besides Palmetto

21   State?

22        A.   Yes, he did.  I know he banked at Bank of America.

23   I know he had credit cards at other places.  Those are just

24   two offhand I can think of real quick.

25        Q.   You said that other lawyers from PMPED also were

1  customers of the bank?

2       A.   Yes, sir, most of them were.  Not -- I wouldn't say

3  all of them, because they have other offices.  But most were

4  customers of our bank.

5       Q.   Okay.  And can you tell us a little bit about the

6  compensation structure at PMPED as you saw it from when you

7  were banking at Palmetto State?

8       A.   We are going to talk just of compensation of the

9  attorneys.  They were paid a salary.  I think their final

10 salary last year I remember seeing was somewhere around 100-,

11 $110,000 a year, which is a pretty good salary.  That's a

12 drop in the bucket usually or not a substantial amount for a

13 lot of them.  And the way they get the balance is they

14 get a -- it's all done by the amount of business or

15 settlements that they bring in, business.  I'm not sure how

16 to the term this, the amount of fees that they collected

17 during the year.  They take that, put it in a pool.  They

18 have a certain amount for overhead, let's just say -- I think

19 Ronnie Crosby said, what was it, about 7 1/2 percent, they

20 will take that 7 1/2 out, their expenses for their

21 paralegals, their part of the rent on the office building,

22 because they rented it from themselves, and then the rest

23 would be theirs.

24      Q.   And so when would they typically get the bulk of

25 their income from PMPED during the year?

1     A.    Late December, 1st of January.

2     Q.    That's when the bonuses came out?

3     A.    Yes, sir.

4     Q.    And so there's been a lot of testimony about Alex

5     Murdaugh and he's living large here.  Did you ever see any

6     red flags with him over the course of your life knowing him?

7     A.    I didn't.  I'm still, you know, just shocked when I

8     see all of what took place.  It's just how did you miss it?

9     You know, it's sort of like -- I used this analogy of maybe

10    of a girlfriend or a husband and wife that are cheating on

11    each other, and when they catch them, and all of a sudden you

12    are like, how did I miss all the signs?  They were right

13    there in front of me.  They were.  They were right there in

14    front of me.  Not just me, the whole -- as you've heard over

15    this court, it was right in front of everybody.  And we

16    missed it, and I wish I hadn't.  I promise you, I do.

17    Q.    Well, you said the red flags.  What are you talking

18    about?

19    A.    Just like with the checks, you know, that he would

20    bring in, he would always have a story.  You know, he was

21    loud.  He was gregarious.  He was -- I mean, as Jeanne said,

22    chaotic.  When he came in the office, it was -- I could hear

23    him when he hit the door.  Granted, I am sitting in the

24    lobby, but I could hear him when he hit the door.  And he

25    would walk in and say, hey, I need you to do this, I need you

1  to do that, loud, always in a rush, talking on the cell

2  phone, walking in and out to go talk to people.  And it was

3  his way to disarm you.  And you just thought that was him.

4       Now, with the benefit of hindsight, it was all an

5  act.  I mean, he absolutely -- every action or every contact

6  that I had with him now I suspect that it was -- what was the

7  ulterior motive?  You know, because now we are seeing him in

8  a whole different light than anybody saw him.

9       Q.   And what was your impression of Alex professionally?

10      A.   He was a very successful attorney.  He and his

11  brother practiced together.  And I get a little off subject

12  right here.  And I will get to that exactly.  And I also say

13  his brother, very organized, very detailed, will analyze

14  something to death.  Alex was the loud, the -- I wouldn't say

15  bully, but in some ways, he would be, but he was gregarious.

16  I mean, he was full of life, or so he seemed to be.  And I

17  always would tell, you know, if I had a really detailed case,

18  I would go to Randy.  That would be Randy Murdaugh IV.  But

19  if I had a case that I needed a little bit of bull thrown in

20  there, you know, because it was a little shaky, go to Alex,

21  he was full of it.  I mean, he could -- it was unbelievable

22  how he could just talk, how he knew everybody.

23      I mean, if you ever had to ride somewhere with him,

24  I did one time -- first of all, he's a terrible driver;

25  second, he stops everywhere to talk to somebody.  And it's

1  just like, come on, man, we've got to go, I've got things to

2  do today.  And that's just Alex.  That's the way he was.

3  Never met a stranger.  He was very, very outgoing.

4     Q.   And where is PMPED, or I guess their former offices

5  now, in comparison or in relation to Palmetto State Bank?

6     A.   I wish I could draw it.  You know, if you look at

7  that plastic whatever shield right there in front of you,

8  let's say that plastic shield is the courthouse or the

9  courthouse square, we are on one side, they are on the other.

10  So we are literally quarter of a mile, maybe a little more

11  than that across from each other.  We are very close.

12     Q.   What about the courthouse?

13     A.   It's between us.

14     Q.   And is the probate court in the courthouse?

15     A.   Yes, sir, it's in the courthouse.

16     Q.   So let me go back to the fall of 2021, particularly

17  in September, October, time frame.  When did you first start

18  to suspect that Alex was involved in something bigger than

19  what you knew at the time?

20     A.   Well, as they've testified, Jeanne and those came

21  over and said that, you know, they were investigating him for

22  missing fees somewhere in September.  I don't remember exact

23  dates.  Until then, I never, never would have suspected

24  anything.  I mean, I saw his tax returns.  He made a lot of

25  money.  I mean, I couldn't imagine it.  It's still hard to

1    believe it.

2        Q.    And how much money was he typically earning per

3    year?

4        A.    My sister testified to that.  She said over the last

5    decade it was a million and a half a year.  You know, there

6    were a lot of years he made multiples of millions.  And then

7    some years he would make just a couple of hundred thousand,

8    which is a lot of money.  However, for his lifestyle and

9    what -- I wouldn't say his lifestyle.  But, yeah, that's

10   right.  It cost a lot.  I mean, it cost a lot to keep up a

11   farm and a beach house and other things.  But he made a lot

12   of money.

13       Q.    And how did you view his financial risks as they

14   were presenting themselves to the bank during that time?

15       A.    You know, he wasn't like A-1 credit.  I mean, there

16   was no way, you couldn't even argue that.  But I wouldn't say

17   that he was a really risky credit.  He had a lot of debt.

18   However, he also -- with the income, cash flow statements.

19   He was terrible at managing his checking account.  I mean,

20   it's been well-documented across this case.  But he was a

21   very low-risk, because, one, his job, his ability to earn

22   money and, you know, just we didn't -- and our longevity.  I

23   want to say he had been banking with us since the late '80s.

24   So we have a lot of history which gives you a lot of comfort,

25   which also in hindsight, opened us up to a lot of things, or

1    me up to a lot of things.

2        Q.   So there's been a lot of testimony about overdrafts.

3    And was it common for him to be in overdraft status in any of

4    his accounts?

5        A.   Absolutely.  He just would write checks and we would

6    just cover them.  And it's not that cavalier, but he did.  He

7    overdrafted frequently.  Lots of times he would have three or

8    four accounts.  He had a farm account.  He had two personal

9    accounts.  And those are basically his three accounts.  He

10   maybe would have $100,000 in one account and be overdrawn in

11   the other.  And I would transfer money.  And a lot of times

12   we would lend him money, as you've heard over and over.  We

13   would lend him money to cover the overdrafts until the end of

14   the year or until he got money from selling property.  I

15   mean, we definitely helped him cover those overdrafts on

16   many, many occasions.

17       Q.   Do you think you gave him more leeway than other

18   customers?

19       A.   I think we did.  I would say yes, we did, because of

20   our longstanding history, his ability to -- his ability on

21   repayment, ability on earning.  I mean, so we didn't feel

22   there was a risk, but, yes.

23       Q.   And throughout your time dealing with him

24   professionally at the bank, fair to say the FDIC examiners

25   were performing their regular examinations?

1    A.    Absolutely, as you've heard numerous times.  They

2  would be in there every 12 to -- they are supposed to be in

3  there at least every 18 months, but just to be realistic,

4  every 12 to 24 months we would have an examination.  Alex

5  Murdaugh being one of our largest borrowers would be looked

6  at.  His loans were looked at.  And I believe there were

7  actually some e-mails that have gone around that has shown,

8  hey, I need to come cover this, FDIC.  We are trying to, you

9  know -- everybody wants to put the good foot forward with the

10  Government.  So we were trying to make sure that we didn't

11  have a $100,000 overdraft.  Would they see it?  Absolutely,

12  because they are going to see his account, but they will also

13  see it get covered.  But, yes, they looked at him numerous,

14  numerous times.

15    Q.    And did they ever raise any concerns about him?

16    A.    Maybe before I really started dealing with him, but

17  I never recall them ever really raising any concerns.  I knew

18  that one report you saw from Risk Management Group where

19  these were internal auditors downgrading him, where the bank

20  had him as a 3 to a 4.  That was the only thing.  But he was

21  still an acceptable credit.

22    Q.    So, in fact, do you know how much money in interest

23  the bank earned from him over the years?

24    A.    I did not until yesterday.

25    Q.    Okay.

1    A.    It was $4 million.  I knew it was a lot, though.

2    Q.    So going back into September, when did you first

3    start to suspect he was involved in a criminal activity?

4    A.    Well, when all of this started going on, Jeanne, as

5    you all heard, she is my sister-in-law, was the CFO or the

6    accountant for PMPED, Mark Ball, Ronnie Crosby, there were

7    several of them that came over to talk to me.  And when they

8    told me they were missing fees, that's criminal activity.  So

9    I would safely say then, but more so when I started doing the

10   research for them, and they would say, hey, we've got a case,

11   blah, blah, blah, and they quickly asked me not to e-mail

12   anything, to either come over in person or call, because they

13   did not want it on e-mail because that would be --

14           MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

15           THE WITNESS:  It's not hearsay.

16           THE COURT:  Mr. Laffitte, I get to do the rulings

17   here.

18           THE WITNESS:  I know.  I'm sorry, sir.

19           THE COURT:  Sustained.

20   BY MR. AUSTIN:

21   Q.    Do you remember when the first conversation was you

22   had with them about missing funds, just the date?

23   A.    No, sir, I do not remember the date.

24   Q.    Okay.  Do you remember the approximate time frame?

25   A.    It was -- it would have to be September.  I remember

1    there was so much going on during this time in September.

2    Labor Day weekend was when the accident happened.  He got

3    shot.  And I remember because that was when I first realized

4    that he did drugs.  I never thought he did drugs.  But, no, I

5    can't remember the exact date.

6         Q.   And how did you realize he did drugs at that point?

7         A.   You know, there was that rumor floating around --

8              MS. LIMEHOUSE:  Your Honor, hearsay.

9              THE COURT:  Sustained.

10             MS. LIMEHOUSE:  And irrelevant.

11             THE COURT:  Hold it just a minute.  What you got to

12   say with that, Mr. Austin?

13             MR. AUSTIN:  I believe -- well, I don't want to put

14   words in his mouth.

15             THE COURT:  Here's my concern.  If he has a reason

16   that affects his actions, he can testify to that.

17             MR. AUSTIN:  Thank you.

18             THE COURT:  But he needs to lay a foundation of his

19   basis for that.  This is not offered for the truth of the

20   matter.  It's offered for his state of mind.  Go ahead.

21             THE WITNESS:  When Mr. Murdaugh went to the hospital

22   in Savannah, he was taken there.  They published -- I guess

23   Freedom of Information Act, and it was published in the paper

24   his toxicology report.  Until then, I would have never, ever

25   dreamed that he would have ever done drugs.

1    Q.    So you don't have any direct knowledge yourself?

2    That's just your understanding from what you saw in the

3    paper?

4    A.    That's correct.  I've never seen him do drugs, never

5    been around him, never anything.

6    Q.    And how much would you all socialize in your adult

7    lives?

8    A.    Very little.  We had a neighborhood Christmas

9    between the three families on our street.  We had a

10   neighborhood Christmas.  We would get together.  And the last

11   few years, Alex had actually quit coming.  I'm not sure why.

12   But we still would get together like the week of Christmas.

13   Christmas Eve we would all get together.  And I would see

14   him -- obviously, if there was a wedding, we might see each

15   other at a wedding.  We might pass each other on the river or

16   something.  We rarely socialized.  We just ran completely

17   different circles, different age groups.

18   Q.    Okay.  And so you testified about starting research

19   for the law firm.  What did that consist of?

20   A.    They would deliver a check either a handwritten note

21   as we've seen in evidence with checks listed out, and they

22   would ask me, hey, can you research these checks, see where

23   they went.  And, you know, we will pull the check, see the

24   offset, and then try to trace it on down the best we can, you

25   know.  If it goes to an outside bank, that's the end of it,

1  we can't see it.  But if it's a money order, if the check

2  comes in and there's a money order and then the money order

3  was cashed, we can see whether it was cashed, whether it was

4  deposited into a checking account.  And that's what we were

5  doing for them, we were trying to track the money, who got

6  benefit of the money.

7      Q.   And when you say you were trying to track it, would

8  you also produce documents?

9      A.   Lots of documents.

10     Q.   And do a lot of these documents come from your

11 personal files?

12     A.   Not so many for the law firm.  For SLED, ODC, FBI,

13 those, many of those came from my personal documents from

14 when I was serving as conservator.  But for the most part,

15 when we were doing the research for PMPED, those were bank

16 documents that were on our image system.

17     Q.   And why would they come to you for that help with

18 the research?

19     A.   I had been -- you know, I was probably one of the

20 main contacts for PMPED.  I mean, usually most of the lawyers

21 came to see me.  And Jeanne Seckinger, their CFO, is my

22 sister-in-law.  So I believe that's why.

23     Q.   You mentioned providing documents to law

24 enforcement, too.  Starting with SLED, when do you first hear

25 from SLED?

1    A.   It was either September or October at the latest.

2    And, I mean, David Williams from SLED, I think he was out of

3    the Beaufort office, we were in frequent contact doing

4    research for them on different things and them requesting

5    documents and us providing them to them.

6    Q.   And did Palmetto State hire an attorney or attorneys

7    during that time to assist with anything related to what was

8    going on with Alex and this growing storm?

9    A.   We hired attorneys when -- actually, I do know when

10   I know.  We hired attorneys when we were served with a

11   lawsuit or served with a potential -- I am not exactly sure

12   what you call it.  We were served papers of intent to sue or

13   whatever by Bland and Richter on Gloria Satterfield's case

14   that's been talked about several times.  That would actually

15   be the first time that I realized he did some criminal

16   activities.

17   Q.   And do you know approximately what date that would

18   have been?

19   A.   No, sir, I don't, but it was September.

20   Q.   Okay.  And so you said that you were in touch with

21   David Williams at SLED.  Did you ultimately sit for an

22   interview with them?

23   A.   I did.  It was SLED and FBI.  And there was a

24   videoed interview of me.

25   Q.   And was that in November?

1    A.    I'm not sure if it was October or November, sir.

2    Q.    Did you provide them documents during that interview

3    and any other time?

4    A.    I did.  I provided them documents any time they

5    asked.  I mean, I was happy to help them try to figure out

6    whatever I could.

7    Q.    And did you have attorneys at the time?

8    A.    We did.

9    Q.    And when you met with SLED, the FBI, did you bring

10    an attorney with you?

11    A.    I did not.

12    Q.    Why not?

13    A.    Didn't think I needed them.  You know, I had -- I

14    knew what we had done.  And so I was just providing the

15    documents.  You know, there wasn't anything to hide, do

16    what -- you know, give it to them, help them fix it, whatever

17    we have to do, let's get it right.

18    Q.    And have you seen a number of those documents in

19    evidence during the trial?

20    A.    Most of these documents we are looking at, not all

21    of them, but a vast majority.

22    Q.    Okay.  And do those include documents that you

23    provided to law enforcement and to PMPED?

24    A.    Yes, sir.

25    Q.    All right.  And you mentioned that you had met

1    with -- or you provided documents to ODC.  Did you ultimately

2    meet with them as well?

3         A.    I did.

4         Q.    Let me back up real quick.  What is ODC?

5         A.    Office of Disciplinary Counsel.  They are -- my

6    understanding is that they are the FDIC for the lawyers.

7    They are the ones that, you know, if you overdraw your trust

8    account at a bank, we have to report it.  That's who we

9    report it to.  And they are, I guess, the governing body if

10   they have to be sanctioned, pull a law license.  That's who

11   handles it, to my understanding.  And I sat for an interview

12   with them over three days back in this past summer, June or

13   July.

14        Q.    Okay.  And you are not a lawyer, though, right?

15        A.    No, sir.

16        Q.    So why would you meet with Office of Disciplinary

17   Counsel?

18        A.    You want to help them.  You want to help get to the

19   bottom of what took place, why did it take place, how did it

20   take place so that it doesn't happen again.  And I mean, I

21   had no obligations to sit with them.  You know, I wanted to

22   do what was right and to try to tell them what took place and

23   see if I could help them in any way.

24        Q.    All right.  And did you end up meeting with the U.S.

25   Attorney's Office and the Attorney General's Office?

1    MS. LIMEHOUSE:  Your Honor, may we approach?

2    THE COURT:  You may.

3    (Whereupon, a bench conference takes place off the

4    record.)

5    THE COURT:  Yes, ma'am.

6    MS. LIMEHOUSE:  We've been very clear in our filings

7    that he lied to us during his interview.  And if they intend

8    to use his coming and meeting to us to his benefit, we will

9    impeach him with the lies he told us during the proffer.

10   THE COURT:  Sure, you will.  That's your -- that's

11   entirely your right.

12   (Whereupon, the bench conference ends.)

13   THE COURT:  Mr. Austin, please continue.

14   BY MR. AUSTIN:

15   Q.   So you met with the U.S. Attorney's Office and AG's

16   Office?

17   A.   I did.

18   Q.   Where did you meet with them?

19   A.   In Columbia at -- I'm going to assume that was the

20   U.S. Attorney's Office.  I'm really not sure.  But it was one

21   of their offices.

22   Q.   And were there agents from SLED and FBI there as

23   well?

24   A.   Yes, sir, there were.

25   Q.   All right.  And when did that take place?

1    A.   That was in February of '21, I believe.  Might have

2    been March, but February, March, April, right -- first part

3    of '21.

4    Q.   And did you sign any documents or agreements with

5    the U.S. Attorney's Office and the AG's Office?

6    A.   It was a proffer -- my understanding, it was a

7    proffer agreement.  And I signed whatever that document was.

8    Q.   What was your understanding of your obligations

9    under that agreement?

10   A.   I was to tell the truth.  And that's pretty much it,

11   yeah.

12   Q.   And to this date, have either the AG's Office or

13   U.S. Attorney's Office moved to hold you in breach of those

14   agreements?

15        MS. LIMEHOUSE:  Your Honor --

16        THE COURT:  I sustain that objection.

17   BY MR. AUSTIN:

18   Q.   All right.  So you talked with those offices then.

19   You said you had three meetings with ODC?

20   A.   Three days of meetings, yes.

21   Q.   And did you also participate in a civil deposition

22   after -- I guess during 2022?

23   A.   I did.  I was being deposed by the estate -- the

24   lawsuit on the estate of Mallory Beach, which was the boat

25   wreck that Alex Murdaugh's son was involved in.  And I was

1  deposed by -- I'm not sure which lawyer, but one of the

2  lawyers involved with that lawsuit.  There were a lot of

3  lawyers in the room that day.

4      Q.   You didn't assert your Fifth Amendment right?

5      A.   I did not.

6      Q.   Seems like you are giving a lot of statements.  Why

7  did you want to do that?

8      A.   I don't feel like I have anything to hide.  I mean,

9  I made some mistakes, which we will go through in great

10  detail today.  You know, but I didn't feel like there was --

11  I definitely, without a doubt, thought I had civil liability.

12  And so the best thing you can do when you make mistakes,

13  stand up, own up, and fix it.

14      Q.   And is it your testimony that you did not know Alex

15  Murdaugh was stealing from anybody?

16      A.   Absolutely did not know he was stealing from anybody

17  until we did research, no.

18      Q.   Okay.  So let's get into some of these

19  conservatorships since it's such a big part of the case.  How

20  did you come to be involved in any of these conservatorships?

21      A.   I believe the first conservatorship that I ever

22  dealt with was the Plyler family.  Let's not just say the

23  girls, because there was the PR with Angela and Justin and

24  then there were the two Plyler girls, which I saw in court.

25  He contacted me, asked me, said, hey, we've got this big

1    case, we need to get a conservator for the girls and PR to

2    handle the -- work with on the case, can you do it?  And you

3    know, I had no idea whether we could do that.  I never been

4    approached by it.  So I looked in the handbook, or policy

5    book or whatever, and it says that we would be discouraged

6    from doing, but didn't say we couldn't do it.  So then I

7    walked back to my father's office, who is in the same

8    building as us.  And I asked him, I said, can we do this?

9    And I got permission to do it.  And so that started it.

10        Q.   And was it your understanding that permission was

11   for you to do it as part of your role as a banker or was it

12   outside that role?

13        A.   It was outside of the bank, absolutely not part of

14   the bank.  The bank could not be a fiduciary.

15        Q.   All right.  Why not?

16        A.   We weren't registered.  Our trust department, we

17   didn't have a trust department registered as a fiduciary with

18   the Board, South Carolina State Board of Financial

19   Institutions.

20        Q.   So it's your understanding that other banks are

21   registered and can serve as fiduciaries?

22        A.   I would think there are some.  I wouldn't think

23   there are a lot.

24        Q.   But Palmetto State isn't it?

25        A.   No, sir.

1    Q.   In your mind when you were serving as conservator or

2   PR, were you doing it in your role as a banker or something

3   outside of that role?

4    A.   I was doing it as a role of an individual to help my

5   friend, my customer.

6    Q.   Okay.  And what in your understanding your general

7   obligations to be as conservator or PR?

8    A.   Generally, very generally, I was to get the money

9   from the settlement, the estate or whatever, and protect that

10   money and take care of it, hopefully and make it grow.  But

11   that didn't always -- was not always the case, depending on

12   the expenses that you had, whether it grew or not.  And when

13   the people -- the minors turned 18 or whatever happened, then

14   you disburse all the money back to them, to the family.

15    Q.   Okay.  You mentioned people turning 18.  Is that the

16   case with the Plyler sisters?

17    A.   That's correct.

18    Q.   And can you take us through the process of becoming

19   a conservator?  If we can pull up Government's Exhibit 137.

20   So after you got permission from your father, what happened

21   after that?

22    A.   I spoke to Alex Murdaugh and said, you know, hey, I

23   could be the conservator.  And he said, all right.  And we

24   went from there.  And he said, you know, they file the

25   petition for us.  I mean, just like you heard from Tiffany,

1    we don't file the petition, the lawyers, the law firm does.

2        Q.   I'm sorry.  Are you done?

3        A.   Yes, sir.

4        Q.   So when you received -- tell me about signing this

5    document.  Do you remember signing it?

6        A.   I don't remember signing it, but I did do it.

7        Q.   Okay.   What year was it that this would have been

8    presented to you?

9        A.   Yes, sir, this one would have been.

10       Q.   What year would you have received this?

11       A.   This is Hannah Plyler.  That would have been

12   somewhere '06, '07.

13       Q.   Okay.  And up here you are listed as applicant or

14   petitioner.  Was it your understanding at the time that you

15   were the person applying to the probate court?

16       A.   No, sir.  I was the person that was being appointed.

17   I wasn't the one that was doing the petition.

18       Q.   Okay.  You had never seen this document before, had

19   you?

20       A.   Not until I signed it, no, sir, or until the first

21   one.

22       Q.   All right.  And what do you remember about how Alex

23   would bring documents like this to you for signature?

24       A.   He would walk in, make a big to-do.  You know, just

25   like any other document, he would have it flipped open and,

1    you know, hey, I need you to sign right here, this is

2    such-and-such.  And you would sign what he said, because, you

3    know, he's your attorney or the attorney in the case and he's

4    representing these people and you are trying to help him.

5    And he just marched -- it's much like if you had come into me

6    for a mortgage loan.  I'm going to say, hey, sir, this loan

7    is set up just as we discussed for 60 months, payments are

8    such-and-such, you know, and give you the basics.  And then

9    say, I need you to sign here, here, and here.  And typically,

10    most people are not going to sit there and read every page or

11    look through every page.  They would just glance at it.

12    Q.   And did you go through every bit of information in

13    this form when you received it?

14    A.   No, because I wouldn't know all of this information

15    on them at that time.  But --

16    Q.   Did you know the Plyler girls or their parents prior

17    to working on their case?

18    A.   No, sir, I did not.

19    Q.   All right.  And so let's go to, I believe, page 3.

20    All right.  And these are your signatures here?

21    A.   They are.

22    Q.   I don't know why I'm circling them.  I think you can

23    see them.  Why would you sign in these places?

24    A.   That's where I was told to, honestly.

25    Q.   And why would you just sign it without knowing for

1    sure?

2         A.    It's part of the trust.  You know, you trust that

3    somebody is doing it right.  Just like if I was doing a loan,

4    you would trust me that I'm doing the loan right.

5         Q.    Okay.  Once you signed it, what happened after that?

6         A.    They would take it and file it with the probate

7    court, or I assume it all went through probate court for

8    the -- to have it petitioned.  And I would be appointed

9    conservator and then we would start.

10        Q.    All right.  And once you are up and running as

11   conservator, were you involved in any of the legal

12   proceedings?

13        A.    I was.  On the Plylers, you know, I actually came

14   down here several times, you know, for mediations and

15   different things.  And that was actually the first time I

16   ever met them.  They were very young.  We were down here in

17   mediation way before settlement.

18        Q.    Okay.  And were you in touch with their father?

19        A.    He would call me every so often, more so after the

20   settlement, but I did definitely talk -- touch base with him.

21        Q.    And without getting too deep into it, was he a

22   steady source of support for the daughters, from what you

23   could tell?

24        A.    No.  When he called me, he was wanting money.

25        Q.    And, again, what was your understanding of what your

1    job was with the conservatorship funds?

2        A.   I was to protect them until they were 18, and have

3    them and, you know, invest them, put them in deposits, just,

4    you know, and I had to pay their bills and living expenses

5    and all of that.

6        Q.   And the money that came into the conservatorship,

7    did you keep it all at Palmetto State Bank?

8        A.   I didn't.  I split it up between the different --

9    several different banks, BB&T, South Carolina Bank and Trust,

10   which is now SouthState, well, I guess BB&T is now Truist,

11   and Bank of Walterboro, which is now Bank of the Lowcountry,

12   and Palmetto State Bank.

13       Q.   Why did you do that?

14       A.   Because the FDIC, at that time, the insurance limits

15   were $100,000.  So we were trying to watch that $100,000

16   limit.

17       Q.   And is that all to protect the money?

18       A.   Yes, sir.

19       Q.   So at the time this conservatorship started and the

20   money comes into Palmetto State, what kind of account was it

21   put in?

22       A.   It was originally put in -- I guess when it first

23   came in, it probably went into their checking account.  I

24   would have to go back to look at the records to see that.

25   But we put it into either CDs, money markets, or saving

1    accounts.  Those are the only three options that we have at

2    Palmetto State Bank.

3        Q.   And I believe you became, according to this

4    document, conservator in around the end of 2006.  And when

5    was the first loan that you took out of the account?

6        A.   July something, 2011.

7        Q.   Okay.  And you are talking about purchasing a

8    certificate of deposit.  Did you purchase one for the

9    Plylers?

10       A.   Yes, sir, I did.

11       Q.   What were the rates that CDs were getting at that

12   point?

13       A.   When we first got the money, the case was not

14   settled until 2009.  And when we first got the money, CDs,

15   some were one eight, somewhere right in there, I believe is

16   what they were.

17       Q.   1.8 percent?

18       A.   Yes, sir.  And we were in a falling rate environment

19   at that time.  We were -- the economy -- this is 2009.  As

20   y'all well remember what happened between -- with the

21   recession or whatever you want to call the Great Correction.

22   And so we actually went from there into one of the lowest --

23   longest running low-rate environments ever in the country.

24       Q.   Okay.  And so when -- how did you end up taking the

25   loans out?  Can you just walk through?  First you thought

1  about it and how did it come to your attention that that's a

2  possibility?

3      A.   Mr. Murdaugh came into my office or spoke to me one

4  day about it.  And he said, you know, I was wondering about

5  getting a loan.  And he asked me.  And I said, well, I just

6  don't know, I would have to go over to the judge.  When I say

7  the judge, the probate judge.  She was over between our

8  offices.  And so, you know, I told him I would get back in

9  touch with him.  And I walked over and spoke to the judge.

10         MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

11         THE COURT:  You can't say what the judge said.

12  BY MR. AUSTIN:

13     Q.   Based on your conversation with her, did you believe

14  that you could take out a loan from the conservatorship

15  account?

16     A.   Absolutely.

17         MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

18         THE COURT:  That's violating my order.

19         MR. AUSTIN:  Sorry.

20         THE COURT:  You know, if you want to have the

21  testimony of a person, you call that witness.  I sustain the

22  objection.

23  BY MR. AUSTIN:

24     Q.   What did you do based on your conversation with

25  Judge Odom?  I mean, let me back up there.  What is the name

1   of the probate judge in Hampton County?

2      A.   Sheila Odom.

3      Q.   And you said you walked over and spoke with her.

4   What did you do next?

5      MS. LIMEHOUSE:  Objection, Your Honor.  He's trying

6   to do the same thing.

7      THE COURT:  You know, don't try to skirt my ruling.

8      MR. AUSTIN:  I am not, Your Honor.

9      THE COURT:  You can call the witness.  You can call

10   any witness you need.  But you can't get in testimony of

11   people by hearsay.  I sustain the objection.  Move on.

12   BY MR. AUSTIN:

13      Q.   So you started taking loans out, correct?

14      A.   That's correct.

15      Q.   And you don't deny that?

16      A.   No, sir.

17      Q.   And do you deny any of the documents you've seen in

18   this case being accurate and authentic documents?

19      A.   None that I've seen so far.

20      Q.   And you are not denying that you ever engaged in any

21   of these transactions you are accused engaging in?

22      A.   Hm-mm, no, sir.

23      Q.   But you are saying that you just didn't steal or try

24   to steal or try to help steal?

25      A.   Did not know in any way that I was helping

1 facilitate the theft by Alex Murdaugh.

2     Q. Okay. So when Alex came to you to talk about the

3 loan, did he get a loan first or did you get a loan first?

4     A. I did the first one. One of the reasons behind

5 that, you know, he asked me about it, and then never followed

6 up. So I waited. I want to say it might have even been like

7 six months before he got one. I'm not sure. It's on the

8 sheets.

9     Q. And how do you view or how did you view the loan in

10 this situation?

11     A. It was an investment for the girls. You know, we

12 were -- I was always trying to make them money. And I would

13 do -- like, I could speak for what I was doing. I was -- I

14 knew I was going to borrow money. So I borrowed it from

15 them. I paid them a higher rate than -- I always tried to at

16 least make sure it was twice what they would have earned

17 anywhere else. And I wanted to make sure that, you know,

18 they were earning money.

19     Q. And what kind of rate did you pick for their --

20 these loans?

21     A. I paid anywhere, I want to say, 3 1/4 percent to 1

22 1/2 percent.

23     Q. At the time you said, for CDs, was around 1.4 to

24 1.8?

25     A. Correct.

1    Q.   So, effectively, you doubled it?

2    A.   Yes, sir.

3    Q.   All right.  And why would you think that that would

4    be a suitable risk to take with these girls' money?

5    A.   Well, I wasn't in default, one.  I'm not sure as a

6    bank officer that I could default on a loan.  I mean, let's

7    qualify that.  Things happen.  You get hit by a bus, you've

8    got a problem.  But they wouldn't have had a problem because

9    it was memorialized everywhere.  I mean, there was no

10   shortages of where it was memorialized.  But I also had it

11   secured, like you've heard multiple times, 2,741 or 2,471

12   shares of Palmetto State Bank stock.

13   Q.   Did you document all of this with the probate court

14   in your yearly accounting?

15   A.   Yes, sir, I did.  It was in the annual accounting.

16   Q.   Okay.  And why did you do that?

17   A.   Wasn't anything to hide.  It was just, you know, she

18   knew what was going on with the thing.  So, I mean, we put

19   it -- I am not trying to hide anything.  This is the

20   conservator's money.  You have to account for it and account

21   for it accurately.  So that's -- I mean, it's in there.  It's

22   on the -- you would see it on the annual accountings.  You

23   would see it listed in annual income that would show

24   interest.  And it clearly would say loan interest or interest

25   on loans.  And then you would have expenses.  And then I

1    would have assets.  And it would clearly show loans if there

2    were any out there.

3        Q.    But wasn't there an order in place saying you had to

4    run any expenditures past the probate court?

5        A.    There was.

6        Q.    Did you do that?

7        A.    Absolutely.

8        Q.    Did you do that with the loans?

9        A.    I did not.

10       Q.    Why not?

11       A.    Because it's not an expenditure.  It's an

12   investment.  As you heard Tiffany say earlier, Tiffany

13   Provence say earlier, you know, an expenditure, that money is

14   gone, it's not coming back.  These loans were coming back,

15   either in the form of payments or payoffs.

16       Q.    Okay.  And how does that documentation that you

17   filed with the probate court compare to documents that you

18   would see on file with the bank in similar loans?

19       A.    They are very similar.

20       Q.    And how so?

21       A.    I mean, you have a promissory note that is signed by

22   the borrower.  I do know there are several that we could

23   not -- that I could not find.  I don't know where they are.

24   I wish we could find them.  When we were doing the research,

25   I found them, and found that we had several that we couldn't

1  find.  But we also -- regardless of that, we had it

2  documented on a spreadsheet that was filed with the probate

3  court.  And we also had it listed out through checking

4  accounts and on the asset, the balance sheet.

5      Q.   And did you save copies of these documents for

6  yourself as well?

7      A.   I did.  Every year when I did my annual accounting,

8  I made three copies, one for the conservatee, one for the

9  probate court, and one for myself.

10     Q.   And when the girls turned 18, did you provide these

11 documents to them?

12     A.   I did.  I provided all the documents.  It was a box

13 of documents.  I mean, there was a big binder for each year.

14     Q.   And did you set up annuities for the girls as well?

15     A.   I did.  We set up a structured settlement when

16 they -- when we were first going through mediation, we wanted

17 to put -- we wanted to protect the money.  And we set it

18 up -- a lot of the money in a structured settlement so they

19 could have income over their -- for the rest of their life,

20 which they do.  And that was actually the first time I had

21 ever done, on the Plylers, was the first time I ever had to

22 go through and do a structure.  And just like she -- we

23 talked about earlier this morning about having to look at the

24 different types of insurance, when you want payments to start

25 and different options.

1    Q.   Okay.  Setting up an annuity by itself, would you

2    say that that is a decent amount of work, or no?

3    A.   It's not a lot of work.  But, you know, you have to

4    look at it.  You have to read it and study it and think about

5    what you are trying to do or what your goal is with the

6    money, is what you are trying to figure out.

7    Q.   Okay.  So let's talk about loans to Alex Murdaugh.

8    A.   Yes, sir.

9    Q.   There's been a lot of testimony about him receiving

10   unsecured loans at a higher rate than what you gave yourself.

11   Can you explain that for the jury, please?

12   A.   Simply, they were unsecured.  They were going to be

13   at a higher rate than what a secured loan would be.

14   Q.   And is it common for the bank to make unsecured

15   loans?

16   A.   As the bank, we made them all the time, unsecured,

17   partially secured, and secured.  I mean, that's what we do.

18   Q.   What about in amounts as much as you gave to Alex

19   here?

20   A.   Absolutely.

21   MR. AUSTIN:  Will you pull up Government's Exhibit

22   130.

23   BY MR. AUSTIN:

24   Q.   All right.  Now, are these -- can you explain, what

25   is this document?

1     A.    This is a spreadsheet that I started so we would

2     have it.  If you see -- if I touch the screen, does it write

3     on it?

4     Q.    I think so.  I'm not sure.

5     A.    It does.  Up here is the loan number.  That

6     corresponds and, really, original corresponds with the date

7     the loan was made.  And this shows how the loan works.  This

8     loan shows the payoff.  These numbers down here just shows

9     the principal.  When I say "down here," down here, shows the

10    principal and interest.  And each loan should have really a

11    little number, that way you can follow it down.

12    Q.    And how would Alex go about paying back these loans?

13    A.    He would bring in a check.  There were different

14    ways.  But, you know, now that I see, now that I've done the

15    research, he paid a lot of them back with stolen funds.

16    Q.    And at the time, did you have any idea that that's

17    how he was paying them back?

18    A.    Absolutely not.

19    Q.    Would you have used stolen funds to pay them back?

20    A.    No, sir.

21    Q.    And how did you go about paying off the loans that

22    you made personally?

23    A.    I used several different ways.  I either paid -- I

24    didn't pay a lot out of my pocket, but I did pay some.  When

25    I say "out of my pocket," out of my normal work income from

1  Palmetto State Bank at the time.  But I would also -- any of

2  my fees that I earned as PR or conservator, I used that as

3  fees to pay the loans down.  And then at the end, I borrowed

4  the money from a -- I refinanced it through Mr. Parker and

5  paid it off.

6      Q.   When you got a loan from Mr. Parker, why didn't you

7  just get a loan from the bank?

8      A.   Well, I couldn't borrow from the bank.

9      Q.   Why not?

10     A.   It's called RegO.

11          THE COURT REPORTER:  I'm sorry.  It's called what?

12     A.   Regulation O.  We could only borrow for very limited

13 things, primary residence, and I think you can borrow to send

14 your kids to college or something like that, but that's about

15 it.

16     Q.   Why didn't you go to another bank?

17     A.   I would rather pay somebody that banks with me and

18 supports me.  I would rather support them than versus

19 somebody else.

20          MR. AUSTIN:  And let's pull up Government's Exhibit

21 129.

22 BY MR. AUSTIN:

23     Q.   And what information would you provide to the court

24 each year, the probate court?

25     A.   This is just one of the pages.  This would be

1  provided every year, because this is a great summary sheet.

2  Just like Tiffany Provence said, they are busy. I mean, all

3  of us are busy. You want just a summary. This is a quick,

4  fast, summary of everything. Shows all your income up here,

5  all your expenses. This number right there is the beginning

6  balance that would have been, let's say, '11, 2011, shows

7  income would have been balance of these numbers right there.

8  That's the income, which is annuity and the interest and any

9  expenses. It should total up to $450,000. Then you take

10 your assets, which are your CDs, your DDAs, your savings,

11 your money markets, your loans, your other investments, which

12 we didn't have any others, other than loans. And those

13 numbers are to total 5 -- $450,594.19.

14    Q.   Let's go up to the income piece of it. Can you

15 explain what those differing items are there?

16    A.   These different items here are SCB&T savings

17 account. That's money that was in a savings that earned 34

18 cents in interest in a year. The money market account earned

19 74 cents. I want to qualify those. Those were not -- we

20 didn't think they would earn a lot. We had a money market

21 and a savings account so I could transfer money to them.

22 Those were basically wash accounts that would -- I would --

23 when the money market account would get low, I would fund it.

24 And we would go through -- that was how I transferred money

25 to them for their allowances or expenses that they needed.

1    Then we had interest on the Bank of Walterboro CD,

2    certificate of deposit at Palmetto State, money market at

3    Palmetto State.  You had annuity payment, that's from the

4    structured settlement, and then the interest that was paid

5    during 2011 on loans.

6    Q.   All right.  So the loans that you started making in

7    2011 made 1,300, thereabouts, for the girls?

8    A.   That was what was paid during the year.  They would

9    have accrued more than that.

10   Q.   Sure.  Zoom out, please.  And over here, it says

11   beginning balance.  So you -- you start out the year 371,000

12   and change, and ended up at 463,000; is that correct?

13   A.   That's correct.

14   Q.   Is that consistent with the types of gains they got

15   over the course of your time as conservator?

16   A.   I never put it out on a spreadsheet to see, but I

17   will say that's probably right.  This is Hannah's.  She

18   started out at around 290,000 when I first got -- that amount

19   when we first got the settlement.  And I want to say it was

20   somewhere in the neighborhood of 650 on the last year.

21   Q.   So it went from 371 to 650?

22   A.   You also have to realize that we had annuities of 84

23   and a half -- $84,500 each year coming in.

24   Q.   Okay.  And how much do -- do you know how much

25   Hannah receives per year, or per month I should say, with her

1  annuities now?

2      A.   Just over $7,000 a month.  There's a statement

3  somewhere in these records.

4      Q.   What about Alania?

5      A.   Hers, she was hurt worse.  So more money went to

6  her.  And I want to say hers is around 9- or 10,000 a month.

7      Q.   Okay.  You said she was hurt worse in the car

8  accident?

9      A.   In the car accident.  So she had more damages

10  awarded to her.

11          MR. AUSTIN:  Zoom out, please.

12  BY MR. AUSTIN:

13      Q.   Okay.  And then if we go down to this to the assets,

14  can you explain items there?

15      A.   December 31st, 2011, we had a Bank of Walterboro CD,

16  54,000.  She had nineteen hundred and thirty-five thousand

17  dollars (sic) in a DDA account.  We tried to keep that as low

18  as possible because that was a noninterest -- just normal

19  DDAs are noninterest-bearing.  The money market account was

20  the bulk.  And you see South Carolina Bank and Trust savings

21  account with $128,000 money market, and then $225,000 in

22  loans.

23      Q.   And what is that $225,000 figure?  What does that

24  reflect?

25      A.   Those reflect my loan.

1    Q.   The personal loan?

2    A.   Yes, sir.

3    Q.   Why would you list that in assets?

4    A.   The loan is an investment.  It's an asset of the

5    conservatorship.

6    Q.   And as a banker, or I guess, for a bank, how do they

7    make money, bank like Palmetto State Bank?

8    A.   We loan money at a higher rate than what we are

9    paying.

10   Q.   Okay.  And you were a loan officer throughout your

11   time there?

12   A.   Yes, sir.

13        MR. AUSTIN:  Let's go to Government's Exhibit 126.

14   I'm sorry.  Can we go back to 129?  I missed one part.

15   BY MR. AUSTIN:

16   Q.   All right.  And let's go to the left side.  Can you

17   talk through some of these expenses?

18   A.   Sure.  The top line, obviously, as you see, is

19   allowance.  This was the conservator fee, the 2,058.22, that

20   was done for 2010.  And, you know, we had different fees,

21   different -- not fees, different expenses throughout the

22   year, cell phone, bank fees, which should have been refunded,

23   clothes, Busch Gardens, that was where she went with a trip

24   down in Florida, Christmas expenses.

25        We were talking about her dad earlier.  This is

1  where we had to pay for a well at his house to get it fixed,

2  cell phone claim, new cell phone, I mean, just different

3  things.  So total expenses for Hannah during that year were

4  $12,809.35.

5      Q.   Okay.  And you said you set up an allowance.  Is

6  that 5,700 there?

7      A.   That's right.  It was $150 a week, I believe.

8      Q.   And would you say you did a lot of work for the

9  Plyler sisters?

10     A.   I did.  You know, it's a lot -- there was a lot of

11  work involved with them just for the fact they were young

12  girls.  And I actually learned something in testimony this

13  week.  I never knew she was living out of her car.  I wish

14  she had called me and told me that.  We would have fixed

15  that.

16     Q.   When you say she -- I don't mean to interrupt you.

17  Who are you talking about?

18     A.   When Alania said she was living in her car, I mean,

19  that was shocking to me.  I absolutely knew they bounced

20  around between family members.  They had a tough life, a

21  tough upbringing.  And they've really done a great job

22  raising themselves.  But, yes, we would -- with them, it was

23  a lot of work just because, you know, they are young

24  children.  I mean, once you are over 18, you can go do a lot

25  of things, you can go get a cell phone.  When you are younger

1  than 18, you cannot go sign a contract.  So we would have to

2  go get cell phones.  We would have to go get cars, insurance,

3  all kinds of things, because they really did not have much

4  family support.  So I did a lot more than I would have with

5  somebody with a lot of family support.

6      Q.   Now, let's go to Government's Exhibit 126.  All

7  right.  Let's do the same thing we did with 2011 accounting.

8  We don't have to go through each line.  On the income side,

9  see interest and loans, $19,000.  What is that?

10     A.   That was the interest paid during that year.  This

11 is 2014 and just a piece of 2015, depending on -- because she

12 turned 18 and we had to close out.  So those are the

13 interests that we paid that we, myself and Alex Murdaugh,

14 paid on those loans during that year.  We have to account for

15 it.  And that's what that was at closeout.

16         One thing, if you look on the right side over here,

17 you will see all of these are zero.  It's because we have no

18 more.  We are closing the conservatorship.  The

19 conservatorships assets have to go to zero.  That's why you

20 see the expenses over here.  You see wire transfer to Hannah

21 and then a money order for Hannah.  And that's what those are

22 right there.

23     Q.   Okay.  Listed as expenses, but is that money that

24 you are transferring to them?

25     A.   Yes, sir.

1    Q.    And why were you transferring that money to them?

2    A.    She was 18.

3    Q.    All right.  And -- but where do those figures come

4    from?

5    A.    You take your beginning balance -- I mean, you have

6    to go through up there and all of that.  This is a little

7    confusing.  You take in the income, beginning balance,

8    income, minus your expenses, and then come up with it.  That

9    was what it took to zero all of the accounts.

10    Q.    And the end balance was 731 -- 731,000?

11    A.    $651,956, that was including all of her expenses,

12    yes.  You can see it was a pretty expensive year.  We had to

13    pay taxes to close out conservator fees, car.  So it was a

14    pretty expensive year.

15    Q.    Okay.  I see the allowance at the top of $10,325.

16    Tell us about that.

17    A.    I would really have to see a breakdown.  Remember I

18    said it was a little bit longer than one year.  52 weeks at

19    150 is 5,200 -- about 7,000 roughly.  I am not really great

20    without a calculator.  But if you figure out, that's how it

21    came up.  I'm just assuming it was 150 a week.

22    Q.    So that's what you had set up for a weekly

23    allowance?

24    A.    That's right, automatically go every week.

25    Q.    And then what about all these other expenses, where

1  would that money come from?

2      A.   I would have to go and get -- I had -- with the

3  Plylers, I was going back and forth over to the probate judge

4  all the time.  So we actually set up a $2,000-a-month normal

5  living expense, where I could spend it without having to get

6  more -- higher approval.  And so other than that, as long as,

7  you know, it was something normal, I could just go over there

8  and I didn't have to get all the approvals.  Other than that,

9  we've got those petition for expenditures to get things that

10 were, like, special, like a car.  You know, I couldn't

11 authorize that.

12          And, you know, Christmas, we would talk to them

13 about the conservator fees.  Those were approved by the

14 probate judge.  And, you know, we would go through.  And I'm

15 next door to the probate judge, even if we didn't -- we were

16 in close contact.

17     Q.   Okay.  So tell me more about the car.  Did you buy a

18 car for Alania besides this one?

19     A.   This is Hannah.

20     Q.   I'm sorry.  I meant Hannah.

21     A.   No.  I believe this is the only car.  And I did buy

22 two for Alania.

23     Q.   So when did you buy those cars?

24     A.   The first car I bought her was mid-February 2009.  I

25 want to say she was -- just turned 16 and she could actually

get herself to school. February, somewhere right in there, I

went to the judge. And we knew she was having trouble, as

you heard me say earlier. I knew she was bouncing around.

She was having trouble getting, you know, to school. And so

I went to judge, she was 16, so she would be able to drive to

school. So I got permission to go look for a car. And, you

know, the judge and I would discuss. And I thought that it

would be in the best interest to buy a good used car, was

what we did. Yes. She had the money to buy a new car. But

as most of us realize, most people get in a wreck as new car

drivers, unfortunately. And so we didn't want to buy a new

car. But when we bought the car in 2009, February of 2009,

we had not settled in the case. So Alania Plyler's

conservatorship did not have any money. So the bank,

Palmetto State Bank, did a loan for the conservatorship.

        March, mid-March, 1st of March, somewhere right in

there we got all the settlements. And she actually received

about -- well, she received I think almost $5,000,000, about

4.7 million, but 690,000 or somewhere right in that

neighborhood came into the conservatorship loans paid off

immediately. So she paid about three weeks of interest. But

anyhow, that's enough story.

        Back on the car. But she kept that car for a couple

of months. And, unfortunately, was in a wreck, thankfully

unhurt. Totaled the car. And then we ended up buying her a

1   2009 Malibu.

2       Q.   Okay.  And you said she paid two or three weeks of

3   interest.  How much do you think that was; do you know?

4       A.   It's probably about -- the loan, I want to say, was

5   somewhere around 31,000, this is going off memory; $100, 150

6   at the most.

7       Q.   And you testified about Alania living in her car at

8   one point.  Did you help her at some point purchase a house?

9       A.   I did.

10      Q.   And can you take us through that process?

11      A.   I will.  I'm still shocked that I've learned that

12  this week, because we would have made some type of

13  arrangement.  I mean, I know it's hard when somebody is

14  living 100 miles from you, which is what we lived apart

15  roughly.  But once she came to me and we were having -- like

16  I said, I knew she was bouncing back and forth.  I went to --

17  I spoke with the judge about getting permission to buy a

18  house.  Got permission.  Got a budget.  And I don't remember

19  what the budget was now, but let's just say $150,000.  And so

20  we started looking for houses.  No, she started looking for

21  houses.  And she would send me different things.  And I would

22  go back and forth over to probate and look at them.  And the

23  biggest thing that I was worried about with her buying a

24  house was resale.  She's 17 years old.  She's not going to

25  live in this house forever, I would highly doubt and so --

1  especially not with the budget she had.  So I was real

2  concerned about resale.  So, you know, she would find a

3  house, we would look at it.  And on one of the houses, I

4  don't remember where it was, but we liked it.  She liked it.

5  So, personally, when I say "we liked it," I really don't have

6  anything in it other than I'm buying it.  I am not living

7  there.  I am not -- you know, I will go up there and see it,

8  but that's the extent of it.  But once she picked it out and

9  we got a rough approval for it, I got a home inspection on

10  one of them, and it failed because it had a gas leak.  The

11  people wouldn't fix the gas leak from under the house.  So we

12  backed out of the contract.  And then we ended up buying the

13  house that she bought.  And I want to say it was like 140,

14  160,000.

15     Q.   What were some of the factors you looked for in

16  helping her pick a house?

17     A.    I wanted something that she would be able to get out

18  of without absolutely taking a bath and lose a lot of money

19  when she resells it.  You know, except in Charleston, you

20  need three bedrooms, two baths minimum.  It was just hard to

21  sell if you have a three-bedroom and a one-bath house.  It's

22  a pretty hard sale.  You look at kitchens, is the kitchen

23  updated?  You don't want an outdated kitchen.  But other

24  than -- that was my thought, how's she going to get out of

25  this when she's 21, 22, 23, or whenever she decides to sell

1   this house, because she was going to have the funds that she

2   could buy a much nicer house or whatever she wanted when she

3   turned 18.

4      Q.   Why did you care about trying to get her set up with

5   a house like that if she could sell?

6      A.   I wouldn't want her to lose money.  You know, she

7   was -- first time I had ever done this.  I mean, you care

8   about them.  I mean, you are not really close to them,

9   because you don't see them.  You are not like your next-door

10  neighborhood or your good buddy that you see all of the time,

11  but I talked to her regularly.  And, you know, you are

12  helping them and you want to see them succeed and not waste

13  money and do whatever.

14     Q.   And what happened -- well, I guess, did you think

15  you were acting in their best interest in purchasing the

16  house?

17     A.   I do.

18     Q.   And everything else you did with the loans and all

19  that?

20     A.   I do.  Can I qualify that?

21     Q.   Sure.

22     A.   I do think I was acting in the best interest with

23  the loans; however, now I wish I hadn't done mine just for

24  optics.  And that's the only reason.

25     Q.   You made the girls money or you made Hannah money

1    from your loans?

2        A.    That's right.

3        Q.    And for Alex?

4        A.    That's right.

5        Q.    You never thought you were paying any of them off

6    with stolen funds?

7        A.    Absolutely not.

8        Q.    What happened when Alania turned 18?

9        A.    When Alania turned 18, we went -- obviously, we were

10   closing out the accounts.  And I got her and actually went

11   and met with her up at -- I'm not sure when we absolutely

12   closed everything out.  But I met with her up in Harbison at

13   the SouthState Bank.  I got her introduced to a lady up there

14   that I didn't know, but I wanted her to have a bank, informal

15   relationship with a bank.  So I met with her.  And I took her

16   all of her documents.  They were laid out.  And I explained

17   to her what her income would be from the annuity.  And, you

18   know, it was very clear documents on what she had and what

19   she didn't have.

20       Q.    Okay.  And up until that point, did she know how

21   much money was in any of her accounts?

22       A.    She did not.  We had discussed this between myself,

23   the attorney, and the judge, that we didn't want them to know

24   exactly what they had at that time.  Her dad knew.  He was

25   well aware of what they had.  But we didn't want to tell them

because, I mean, they were 11 and 15 at the time when it

started. I mean, just, you know, they would have thought it

was just like an endless supply of -- and we made a decision

not to tell them at that time.

Q. So you didn't make that decision unilaterally?

A. No, no, sir.

Q. Okay. And did you file any of your accounting?

A. Yes, sir.

Q. Have you stayed in touch with either of the Plyler

girls since then?

A. I would speak to Alania every once in a while. When

I say every once in a while, every couple of years now. I

spoke to her right -- I don't know whether she called me or I

called her right after the shooting with Alex. And, you

know, we talked about it. And she said, I can't believe it,

you know, just normal conversation. Because we were both in

shock. And -- but I would touch base with her every so

often. For years I was getting something from Hannah's

annuity every end of the year, and I would have to call and

get Hannah's address and write it down and mail it to her.

Q. You are talking about money or just documents?

A. No, it was just a document. I don't know what it

was. I didn't open it because it was not mine at that point.

Q. Okay. Pull up Defendant's Exhibit 71. All right.

Do you recognize this document?

1    A.    I do.

2    Q.    Okay.  And who's Angela Plyler?

3    A.    That was Hannah and Alania Plyler's mother.

4    Q.    And --

5          THE COURT:  Is this going to take a little while?

6    We are getting towards the lunchtime.  If it's going to be

7    brief, I would like to finish it.

8          MR. AUSTIN:  I can finish this document real quickly

9    and then we can move on and take a break.

10   BY MR. AUSTIN:

11   Q.    This is a Certificate of Fairness and

12   Reasonableness, settlement wrongful death and survival

13   action.  And the important part right here, so it says:  The

14   beneficiaries, as represented by the named party herein,

15   Russell Laffitte, is fair, reasonable, and in the best

16   interest of the estate of Angela Lynn Plyler.

17         So were you representing -- are you that

18   representative that's referenced in this statement?

19   A.    Yeah.  They are representing that I would be a fair

20   and reasonable -- you know, I would be a good representative

21   for Angela.

22   Q.    And who signed down below?

23   A.    Ronnie, Ronnie Crosby is here.  That's Alex

24   Murdaugh's signature, though it looks like Ronnie Crosby's

25   name line.

1    Q.   And -- but were Ronnie Crosby and Alex Murdaugh

2    involved in that case?

3    A.   They were.

4    Q.   And when you became conservator or PR here, did you

5    believe that they were your attorneys?

6    A.   I did.

7    Q.   And we've talked about Hannah's conservatorship.

8    Did you steal any money from Alania's conservatorship?

9    A.   Steal money?

10   Q.   Yes.

11   A.   Absolutely not.

12   Q.   Did you make any loans?

13   A.   Not from Alania's.

14   Q.   Okay.  And you didn't steal any money from Hannah,

15   right?

16   A.   I didn't steal any money from anybody.

17   Q.   Did you help anybody steal any money?

18   A.   Not intentionally.  I did absolutely

19   unintentionally.

20   Q.   Okay.  So you don't deny any of the basic facts in

21   this case.  You just are saying that you did not intend to

22   help anybody steal?

23   A.   That's correct.

24        MR. AUSTIN:  Probably a good point.

25        THE COURT:  Let's take a lunch break.  It will be

1   about an hour.

2        (Jury leaves open court at 12:53 p.m.)

3        THE COURT:  Okay.  You may be seated.  Any matters

4   that the Government needs for me to address?

5        MS. LIMEHOUSE:  Nothing from the Government, Your

6   Honor.

7        MR. DANIEL:  Nothing from the defense.

8        THE COURT:  Be at ease for an hour.

9        (Whereupon, a recess transpired.)

10       THE COURT:  Any matters we need to address?

11       MS. LIMEHOUSE:  None from the Government, Your

12  Honor.

13       THE COURT:  From the defense?

14       MR. AUSTIN:  No, Your Honor.

15       THE COURT:   Bring in the jury.

16       (Whereupon, the jury returns to open court at 2:03

17  p.m.)

18       THE COURT:  Please be seated.  Mr. Austin, please

19  continue your direct.

20       MR. AUSTIN:  Thank you, Your Honor.

21  BY MR. AUSTIN:

22     Q.   All right.  Mr. Laffitte, right before lunch we were

23  talking about the Plyler sisters.  And just circle back real

24  quick.  You never took any loans from Alania's account; is

25  that right?

1     A.   That is correct.

2     Q.   And why was that?

3     A.   She turned 18 before we ever did the first loan,

4  which was in July of 2011.

5     Q.   Okay.  And did Hannah lose any money over the course

6  of her conservatorship?

7     A.   No, sir.

8     Q.   In fact, you made her money; is that right?

9     A.   Yes, sir, we did.

10    Q.   Now, let's turn to Donna and Arthur Badger.  How did

11  you become involved in Donna Badger's case?

12    A.   Alex Murdaugh came over or called me and asked me if

13  I would be PR for Donna Badger.  She had been killed in a

14  tragic accident involving a UPS truck in Allendale County.

15    Q.   Did you know the Badgers prior to this?

16    A.   I did not.

17    MR. AUSTIN:  Can we please pull up Government's

18  Exhibit 218D and E.

19  BY MR. AUSTIN:

20    Q.   Okay.  Left-hand side here, Arthur Badger is removed

21  via this document on February 8th, 2013; is that correct, as

22  PR?

23    A.   That's correct.

24    Q.   All right.  Do you know why he had to be removed as

25  personal representative?

1    A.    I heard from earlier testimony, I believe it was

2  from Ronnie Crosby --

3        MS. LIMEHOUSE:  Your Honor, I just want to point

4  out, he said February 8th, 2013, but these records show the

5  14th of September, 2012.

6        MR. AUSTIN:  I was just reading the date right here.

7        THE COURT:  So noted.

8        MS. LIMEHOUSE:  Okay.

9        THE WITNESS:  Earlier, Ronnie Crosby had testified

10  that they would get --

11        MS. LIMEHOUSE:  Objection, Your Honor.  He's

12  testifying based on another witness's testimony.

13        THE COURT:  Only if he knows himself.

14  BY MR. AUSTIN:

15    Q.    Do you have any independent understanding of why

16  Arthur Badger could not be a PR?

17    A.    Why he could not be a PR?  No, I do not.

18    Q.    Okay.  Then on the right side here, please tell me

19  about this document.  Is this just the statement, resignation

20  for Arthur Badger?

21    A.    Yes, sir, there's his resignation as personal

22  representative.

23    Q.    All right.  And then is this when you became

24  involved in the case?

25    A.    That's correct.

1    Q.   All right.  So let's go to 218F, please.  All right.

2  So if you could please tell the Court what's going on here

3  with this document?

4    A.   It's just a verification that -- my understanding,

5  it's just a verification that says that Alex Murdaugh would

6  have brought and had me sign.

7    Q.   Okay.  And is that Alex's signature at the bottom?

8    A.   Yes, sir, I think -- I believe so.

9    Q.   Okay.  And do you remember signing this?

10    A.   I don't.

11    Q.   You had never met either of the Badgers before?

12    A.   No, sir.

13    Q.   Let's go to Government's Exhibit 23, please.  Do you

14  recognize this document?

15    A.   I do now.  It's a disbursement sheet for Arthur

16  Badger.

17    Q.   Okay.  Did you ever serve as personal representative

18  for Arthur Badger?

19    A.   I did not.

20         MR. AUSTIN:  Okay.  Let's zoom in, please, the

21  personal representative line.

22  BY MR. AUSTIN:

23    Q.   All right.  See where it says Russell Laffitte,

24  personal representative fee, $35,000.  You said you've never

25  seen this document before everything happened with this case;

1    is that right?

2        A.   I believe the first time that I saw it was in Jeanne

3    Seckinger's office when we were doing research.

4        Q.   Do you have any idea why it would say Russell

5    Laffitte as personal representative for Arthur Badger?

6        A.   No, sir, I don't.

7        Q.   And did you have any involvement in drafting this

8    document?

9        A.   No, sir.

10            MR. AUSTIN:  And could we zoom out, please.  Could

11   we zoom in bottom three lines.

12   BY MR. AUSTIN:

13       Q.   All right.  You see where it says Palmetto State

14   Bank payment to fund structure per client request, and the

15   $1.325 million we heard a lot about?

16       A.   I do.

17       Q.   Does Palmetto State Bank do structured settlements?

18       A.   No, sir.

19       Q.   Has the bank ever done structured settlements?

20       A.   No, sir, I don't -- I'm not sure what you would have

21   to do to even do a structured settlement.

22       Q.   Okay.  And is it your understanding that PMPED does

23   structured settlements fairly often in their practice?

24       A.   They do.

25       Q.   Would you expect that they might know that Palmetto

1   State doesn't do structured settlements?

2       A.   I would safely say they would know that we do not do

3   structured settlements.

4       Q.   You don't know for sure, but it's never happened to

5   your knowledge?

6       A.   No, sir.

7       Q.   Okay.  Okay.  Did you ever get paid any fees from

8   Donna Badger's estate?

9       A.   I got a $35,000 check, but that came from the -- now

10  we see it came from the Arthur Badger settlement.

11      Q.   What did you think when you got that?

12      A.   I just thought it was the agreed-upon fee.  When

13  Alex asked me if I would be PR, he told me they would pay me

14  $35,000.  And so I didn't -- I wasn't shocked when I got it.

15      Q.   Okay.  And did you ask any questions?

16      A.   I didn't.

17      Q.   Why is that?

18      A.   Because I was expecting it.  I knew that we had

19  agreed to that.

20      Q.   All right.  And you said you think the first time

21  you saw that sheet was at Jeanne Seckinger's?

22      A.   I believe so.

23      Q.   And that would have been in September 2021?

24      A.   Probably October or November.

25      Q.   Okay.

1    A.    October, it would have definitely been in October.

2    Q.    Did you have any role in setting that fee at all?

3    A.    No, sir.

4    Q.    All right.  Let's go to Government's Exhibit 37.

5    And this is an e-mail we've seen a lot.  The jury has already

6    seen it.  So can you tell the jury what you thought when you

7    received this e-mail?  Do you remember?

8    A.    I don't remember exactly what I thought, but I know

9    I would have been -- you know, I would have thought, why is

10   he sending me this?  But, you know, just knowing Alex,

11   nothing surprises me.  And I just -- because I would have

12   said, why didn't he just call Jeanne or whoever to re-cut

13   whatever check he wants re-cut for himself.  But I did

14   realize right there that I needed to give him the number for

15   what he owed on the Hannah Plyler loans.

16   Q.    Okay.  And was that alarming to you at all?

17   A.    No, it was not.  I did not know what the check was

18   for or anything about the check.

19   Q.    All right.  And you said that you had not seen that

20   disbursement sheet that listed the 1.325 million on it for

21   Arthur Badger?

22   A.    That's correct.

23   Q.    So did this number here, again, same number 1325,

24   did that have any significance to you at the time?

25   A.    It does not.

1       MR. AUSTIN:  And can we zoom out, please.

2   BY MR. AUSTIN:

3       Q.   Is Arthur Badger referenced in this e-mail chain?

4       A.   He is not.

5       Q.   And did you recognize that check number, 43162?

6       A.   I did not.

7       Q.   And did you ever receive a check for $1.325 million?

8       A.   I did not.

9       Q.   So let's go real quick -- why did you think that

10  Alex was getting $1.325 million at the time?

11      A.   I really didn't think about it.  You know, there's

12  no telling what he's doing.  I didn't know whether he was

13  borrowing money from somebody else or -- you know, I just had

14  no idea as to why he had a check for a million 325.

15      Q.   And this is in February.  So this is after the bonus

16  checks typically go out?

17      A.   That's correct.

18      Q.   But did you have any suspicions with regard to Alex

19  at that time?

20      A.   I did not.

21      Q.   All right.  And he was making, you said, average

22  $1.5 million a year?

23      A.   That is correct.

24      Q.   And when you eventually did see this e-mail,

25  obviously, you saw it when you wrote it, but years down the

1       road in Jeanne's office, what did you think?

2           A.    When I saw this, I didn't see this e-mail in

3       Jeanne's office.  I was doing research.  And I was

4       actually -- I found it in one of the loan files of the

5       Plylers.  And when I found this e-mail, I printed it, because

6       I had to figure out how much he owed.  And I did my

7       calculations and all on the actual e-mail.  And I just stuck

8       it in there.  And when I found it, I gave it to SLED, and I

9       said -- can I say that in court?

10          Q.    How did you feel at the time?

11          A.    I felt -- I wanted to -- I'm trying to think how to

12      put it nicely, politely.  I realized what it looked like.

13      And I realized how it implicated me.  And I was nauseous,

14      furious, and every other emotion that you could imagine went

15      through me just that quick.

16          Q.    Who were you mad at?

17          A.    Alex, I mean, he set me up, right there.

18          Q.    Okay.  And you sent an e-mail to Jeanne after this;

19      is that right?

20          A.    I did.

21          Q.    And why did you do that?

22          A.    He had asked me to figure it out and whatever the

23      amount I owe Hannah, and he asked me to e-mail him back.  I

24      didn't know why he wanted me to e-mail him.  So I e-mailed

25      him back, but I did know Jeanne -- I added the part in about

1 Jeanne, because I knew Jeanne cut all the checks for the law

2 firm. And I think I mistyped and wrote "the Jeanne" to

3 re-cut the checks. And I gave the four amounts, 388,687.50,

4 whatever it was, I think it was 151 and some change, 75,000

5 and the 709.

6     Q. Okay. And did you end up writing these checks for

7 him?

8     A. I wrote -- what do you mean "write"?

9     Q. Okay. So you asked Jeanne to write these checks.

10 And then did Alex ever come to you with re-cut checks?

11     A. He did. He brought in three checks, $388,687.50,

12 the 151 that went to Hannah Plyler, and the 75,000 that went

13 to Randolph Murdaugh.

14     Q. So you never received four checks from him in one

15 bundle?

16     A. Never.

17     Q. And let's go -- so this is --

18     A. I --

19     Q. I'm sorry?

20     A. I'm also not sure that I received all three at one

21 time.

22     Q. And we've heard previous testimony already about how

23 they were spaced out over coming months and almost to a year;

24 is that right?

25     A. He did. He would hold them or, I don't know, piggy

1   bank them somewhere, his desk drawer.  I don't know what he

2   would do with them, but he would just sort of bring them in,

3   I guess so you would forget about it and wouldn't think about

4   it.  I really don't know what he did.

5       Q.   All right.  You see these numbers down here; do you

6   recognize those?

7       A.   RAM000147?

8       Q.   Do you know what those signify?

9       A.   I assume that means Ralph (sic) Alexander Murdaugh

10  and Randolph -- whatever his name is, Randolph Alexander

11  Murdaugh.

12      Q.   This is not the e-mail that you produced to PMPED?

13      A.   No, it is not.

14      Q.   You did produce the e-mail but this is just a

15  printed copy of it?  Is that what you are saying?

16      A.   That is -- I believe this one came off of the --

17  from the law firm, either from us, but it didn't come -- that

18  was not what I provided SLED.

19      Q.   Okay.  So the jury has seen this one.  The

20  Government put it up.  Let's go to Government's Exhibit 29.

21  I'm sorry.  Let's go to Government's Exhibit 39.  Excuse me.

22  Are these your notes?

23      A.   Those are.  This is the e-mail that I pulled out of

24  my file and I turned over to SLED.  It shows the breakdown.

25  Do you see where I wrote the 151?  And then you see my

1    calculations down at the bottom and you also see the

2    calculations for the two loans that were paid off.

3        Q.   Okay.  So how do you know that this e-mail you

4    provided to SLED?

5        A.   I remember giving it to them.

6        Q.   Okay.  And -- but when you gave it to them, did you

7    give them a hard copy or did you scan it and e-mail it to

8    them?

9        A.   I don't remember that.  If I had to take a guess, I

10   scanned it and sent it to David Williams.

11       Q.   Okay.  Do you have a scanner in your office?

12       A.   I did.

13       Q.   And is that how you would upload a lot of the

14   documents you found through your research?

15       A.   Yes, sir.

16       Q.   Okay.  And do you see at the bottom here, it will

17   have the RAM Bates number?

18       A.   That's correct.

19            MR. AUSTIN:  So let's go to the Badger checks,

20   Government's Exhibit 29, please.  If we can zoom in on the

21   checks.

22   BY MR. AUSTIN:

23       Q.   All right.  When you look at this, on the left side

24   you will see these initials there; are those yourself?

25       A.   They are.

1    Q.   And did you write those initials?

2    A.   I did.  I wrote them when I was doing the research.

3    I wanted whoever looked at this research to know who signed

4    the checks.  So when I was doing it, I just would write my

5    initials, because I actually went and viewed the actual check

6    itself.  And I wanted them to know that Russell Lucius

7    Laffitte, RLL, was the signer of the check.

8    Q.   How can you tell that these initials came at the

9    time you were providing this document over to PMPED or SLED?

10   A.   Because they are in blue and not -- I would write

11   everything in blue so if you scanned it, you actually could

12   see the blue ink versus if it was done when we originally did

13   it, it would be black as the image is.

14        MR. AUSTIN:  Zoom out, please.  Zoom in on the

15   bottom check.

16   BY MR. AUSTIN:

17   Q.   Is that what you are talking about, has some black

18   and white there?

19   A.   That's correct.  That's a picture of when it runs

20   through the machine.  It images the front and the back.

21   Q.   So just like Government's Exhibit 39, there's a

22   color scan, you can tell them apart because of the colors?

23   A.   That's correct.

24   Q.   All right.  Do you know why Alex would be paying

25   Johnnie Parker $388,000?

1      A.   He would borrow money regularly from either Mr.

2   Parker or his father.   I mean, that was not an unusual and

3   not an unknown fact to me.

4      Q.   And does Johnnie Parker loan money out routinely?

5      A.   He does.   I mean, he's financed houses and

6   everything else for people at the law firm.   That is not an

7   uncommon practice for him.

8      Q.   And you've taken a loan from him?

9      A.   I have.

10      Q.   I believe there's some testimony from Ronnie Crosby

11   that he didn't get a break.   When you borrowed money from

12   him, did you get any kind of break?

13      A.   No, sir, normal rate.

14      Q.   All right.   How many checks do you receive each day,

15   just ballpark, as a banker in Palmetto State Bank?

16      A.   I don't have any idea how many checks the bank

17   receives a day.   I would say a thousand or more.   I would

18   look at probably anywhere from 50 to 100.   You know, depends

19   on the day.   You know, A Friday or a Monday, it could be a

20   lot busier.   People are coming in to get money orders and we

21   have to have an officer sign it.   And me being the officer on

22   the lobby, I've signed a lot of them.   And if somebody had a

23   problem with a check, a lot of times they would just come

24   directly to me because, again, I'm sitting in the lobby.

25           MR. AUSTIN:   Can we zoom back in on the check,

1 bottom left, please.

2 BY MR. AUSTIN:

3     Q.   So, do you remember actually receiving this check?

4     A.   I don't remember actually receiving it at this

5 point.  I remember when I looked at it, I knew I did it.  I

6 saw that I did it.  I did the transaction.

7     Q.   Okay.  You don't deny that in any way?

8     A.   No, sir, I did every one of the transactions.

9     Q.   Would it be strange just in your normal day-to-day

10 work life to receive a check like this to Palmetto State Bank

11 from a client asking you to do something with it and purchase

12 a money order?

13     A.   No, if you want to get a money order or make a loan

14 payment or anything else, you make the check to Palmetto

15 State Bank, that would not be unusual in itself.  Looking

16 back on this check, there's some unusual irregularities, but

17 we didn't see at the time.

18     Q.   Do you recall whether you saw Arthur Badger's name

19 in the memo line?

20     A.   I wouldn't have looked at the memo line.  The memo

21 line is for the writer of the check to remember what they

22 wrote the check for and, you know, if I would have seen this,

23 I would have -- because I've had a lot of time to think about

24 these.  I mean, I would have thought something like, you

25 know, maybe they wrote it to remember that he got maybe in

1    advance on the fees from Badger or something along those

2    lines. I wouldn't have connected it.

3    Q. Is that something that would happen with Alex from

4    time to time?

5    A. You know, I don't know whether he did. I'm assuming

6    he would have told me something. He would have come in with

7    a story. And that's just the way he was. And you know, now,

8    2021, 2022, we see it. You know, 2011, '12, '13, '14, '15,

9    when all this was taking place, we never suspected it.

10    Q. Did you ever intend to steal $388,000 from Arthur

11    Badger?

12    A. I didn't steal it. Mr. Murdaugh stole it. And no,

13    sir, I would not have been in any part of it if I would have

14    known.

15    Q. All right. And you were not a fiduciary for Arthur

16    Badger; is that right?

17    A. No, sir, I was not.

18    Q. Let's go to page 2, please. And do you recognize

19    this check?

20    A. I do.

21    Q. When did you see it? When do you recall seeing it

22    for the first time?

23    A. He brought that in to pay the loans on Hannah Plyler

24    as on that e-mail he had asked me about. I sent it back to

25    him.

1    Q.   But do you actually remember when he did bring it in

2    physically?

3    A.   I don't remember.  But just seeing the date, it says

4    2/12/2013, so I'm assuming that was the date I did the

5    transaction.

6    Q.   And same deal with the last one, did it stand out to

7    you that that Arthur Badger's name was on there, it was to

8    Palmetto State Bank?

9    A.   It did not.  And I actually have copies of a lot of

10   these checks in the probate file.

11   Q.   Okay.  And why is that?

12   A.   Well, I didn't keep every one, but if I got a

13   payment, I wanted to keep a record of how they paid it so you

14   could go back and look and see and there would be the check.

15   Q.   And we touched on this really briefly, but I think

16   it bears repeating.  You found that e-mail, the re-cutting

17   e-mail for lack of a better term, in Hannah Plyler's account,

18   or not account, but in her file; is that right?

19   A.   That's correct.

20   Q.   And why would you put that in her file?

21   A.   Because that was where I calculated her payoff on

22   the loan and I just -- I guess I threw it in there with this

23   check.  And it was just sitting in it because it was in the

24   loan part section of the probate -- well, not the -- the loan

25   section of my file of Hannah Plyler.

1   Q.   All right.  And this goes back to -- did you think

2   that there was anything wrong with your involvement in these

3   checks?

4   A.   I did not.

5   Q.   Is that why you filed them in probate court?

6   A.   That's correct.

7   Q.   All right.  Let's go to the next page, please.  And

8   is this the deposit slip?

9   A.   That is the deposit slip.  I want to say one thing

10  about it.

11  Q.   Sure.

12  A.   I should have cut a money order.  When the check

13  came to Palmetto State Bank, I should have cut a money order

14  to the Hannah Plyler conservatorship.  And I didn't feel like

15  cutting a money order, so I just had them run it through.

16  Q.   Is there any significance to that?

17  A.   Well, it was the bank's money, because it was made

18  to Palmetto State Bank, even though we knew what it was going

19  for because he told me what it was going for.  So that way, I

20  should have -- to make it clean, I should have done it the

21  other way.

22       MR. AUSTIN:  Okay.  Let's go to the next page,

23  please.  Zoom in on the top.  Do all four of the images,

24  please.

25  BY MR. AUSTIN:

1    Q.    All right.  And we've got initials again?

2    A.    That's correct.

3    Q.    Are those just like the other initials we saw?

4    A.    They were.  I put them on during research.

5    Q.    And throughout, this is a pretty long exhibit,

6    throughout the entire exhibit there are a number of initials

7    that we saw in court here and they are all in blue like that?

8    A.    That's right.

9    Q.    Does that apply to all of them?

10   A.    It does.

11   Q.    And all of these checks, we don't need to go through

12   every single one, but did you know that any of them were

13   stolen -- would effectively help Alex steal funds from Arthur

14   Badger?

15   A.    I would not have helped him in any way steal funds.

16   Q.    And as bad as these memo lines look, your testimony

17   is that you don't remember seeing it?

18   A.    I don't.  And I wouldn't have looked at the memo

19   line.  I mean, I saw a lot of checks.  I mean, and I write

20   things in my memo lines in my personal checks, but I wouldn't

21   expect anybody to look at it.

22        MR. AUSTIN:  Okay.  Let's go to page 4 please.  Zoom

23   in on the four images.

24   BY MR. AUSTIN:

25   Q.    All right.  What do you see here?  Does this fall in

1  the same lines as the other ones?

2       A.    It is, $75,000 money order.

3       Q.    And who is this made payable to?

4       A.    Randolph Murdaugh III, which is Alex's father.  I'm

5  assuming he paid him for something, a loan.

6       Q.    Did he tell you what that was for?

7       A.    No, sir.

8       Q.    All right.  Did you ask?

9       A.    No, sir, I wouldn't have asked.

10      Q.    Why wouldn't you?

11      A.    I've been dealing with Alex for 30 years, I just

12  wouldn't have -- there was no need to.  The check was made to

13  Palmetto State Bank.  He was an authorized signer of Peters

14  Murdaugh Parker.  He could direct how that money went.  I

15  wouldn't have thought anything of it.

16      Q.    An important point, he's an authorized signer.  Can

17  you explain the significance of that term?

18      A.    You see signature down here, the authorized signer

19  can sign the check and direct where it goes.  I mean, he was

20  a partner in this law firm.

21      Q.    And so that gave him the authority to direct the

22  money anywhere?

23      A.    I would think so, yes, sir.

24      Q.    Is that your understanding at the time?

25      A.    That's my understanding.

1    Q.   Okay.  Let's go to page 5.  All right.  This is a

2    little different.  We've got initials here just like the

3    other ones.  And, obviously, they are substantial sums.  But

4    the bottom says, estate of Donna Badger.

5         MR. AUSTIN:  And can we zoom in on the bottom check,

6    bottom two checks, the image on the left and right of the

7    very bottom.

8    BY MR. AUSTIN:

9    Q.   Okay.  So this says estate of Donna Badger, and

10   $101,000, and just like the other checks, it's going to

11   Palmetto State Bank.  And did Donna Badger's estate have

12   $101,000 in it?

13   A.   No, sir.

14   Q.   How much did it have in it?

15   A.   500.

16   Q.   500?

17   A.   500.

18   Q.   And you were the PR for her estate?

19   A.   I was.

20   Q.   And you didn't notice this?

21   A.   I did not.

22   Q.   Okay.  If you had, what would you have thought?

23   A.   I would have thought it was pretty odd that there's

24   a check coming to us with the estate of Donna Badger.  But

25   like I said, I would have probably asked him, hey, why does

1    it say this?  Because I know he doesn't have 5 -- but -- but,

2    you know, I would have had to have known that it was this

3    money, which I wouldn't have -- like I said, I would have

4    thought he was getting advance on fees.  I don't know what I

5    really thought.

6        Q.   Okay.  And if it truly was for her estate, would

7    that check have cleared?

8        A.   It wasn't going to be from her estate.  I mean,

9    couldn't have been.

10       Q.   Again, you would have noticed it because of that

11   reason, right?

12       A.   Yes, sir, I believe so.

13            MR. AUSTIN:  All right.  Let's go to next page,

14   please.  I'm sorry.  Let's keep going.  Go to the next one,

15   please.  I'm going to keep scrolling until I get to Southern

16   Crane.  I forgot to write the page number down.  Let me zoom

17   in on the top two inches.

18   BY MR. AUSTIN:

19       Q.   We've heard a lot about loans not on system.  Can

20   you put this -- can you describe what that means and the

21   significance of it to the jury?

22       A.   Loans not on system is a general ledger account.

23   Palmetto State Bank at one point in time was having some

24   issues.  I mean, we make loans, something might get tied up

25   or, you know, we need to account for our money, all of our

1 money orders that are outstanding and everything.  And this

2 is typically how you fund a loan, is a money order or a wire.

3 So we put wires and money orders in this account.  But what

4 was happening is we were -- continually, our money order

5 account would show up on our nonsufficient list, because a

6 loan's here waiting to be booked, let's just say a million

7 dollars, the money order goes through, the money order

8 account is not going to sit there with a million dollars.  So

9 we needed to fix that.  So we came up with this idea.  I

10 believe I was the one that actually came up with the idea,

11 with the help of some other people, that we made this account

12 so we could clear money orders immediately.  So that would

13 fund the money order account.  So if I did a loan, I would --

14 or a wire, you know, that would pay for the money order, that

15 loans-not-on-system account.

16     Q.   And who images the loans-not-on-system account?

17     A.   Jay Gray Peeples in the Estill branch, he manages

18 that account.

19     Q.   Is there one account for the entire bank?

20     A.   There's not.  There's an account for each branch.

21 This number right here 1017569, the 69 indicates our branch

22 number.  That is the Hampton branch; 70 is Bluffton; 85

23 Estill; and so on and so forth for all seven branches.  So we

24 knew exactly where to look for it.  And so you have to be

25 able to keep up with it.

1    Q.   Loans not on systems kind of sounds weird if you are

2    not involved in banking.  Is there anything nefarious or is

3    it any sort of attempt to hide things?

4    A.   Not at all.

5    Q.   Within the bank, people know what that means?

6    A.   Absolutely.

7    Q.   All right.  And you touched on it.  Wires go through

8    the LNOS down here, loans not on system, account?

9    A.   They did.  The wires were down out of our Bluffton

10   office.  And they would actually get the -- fund the wire.

11   Like, if I was sending wire to Southern Crane, I fund loans

12   not on system with the money, and they would debit it to pay

13   for the wire.

14        MR. AUSTIN:  Okay.  Can we zoom out, please.  Can we

15   zoom in on the bottom check too.

16   BY MR. AUSTIN:

17   Q.   All right.  Again, this is estate of Donna Badger.

18   Could her estate have ever funded a $50,000 check?

19   A.   No, sir.

20   Q.   As a PR, you would have known that?

21   A.   That's correct.

22   Q.   Yet, it made it through?

23   A.   Well, we didn't think it was Donna Badger's money.

24   We thought it was Alex's.

25        MR. AUSTIN:  All right.   Go to the next page,

1    please.  Go one more.   Keep going.  Right here.

2    BY MR. AUSTIN:

3        Q.   Edward Smith, who is that?

4        A.   I have no idea.

5        Q.   Have you come to know who Edward Smith is?

6        A.   This is going to be an assumption from what I've

7    learned, but I'm assuming Edward Smith is the C.E. Smith that

8    you will see in his checking account that he wrote numerous

9    checks to.

10       Q.   Okay.  And so you've never met C.E. Smith, Edward

11   Smith, the Cousin Eddie I think a lot of people call him?

12       A.   I am not going to say I've never met him.  He had

13   numerous lawyer loans with the bank.  So he has been in my

14   office.  I would make -- I rarely made lawyer loans; however,

15   if everybody else was busy or Carrie Sauls was the lady that

16   mainly did those loans for us, if she would have been busy

17   and he came in, I would have done it, but I don't ever recall

18   meeting him.

19       Q.   Okay.  So did you intentionally send $800 to buy a

20   Jeep for Eddie Smith knowing it was stolen money?

21       A.   No, sir, I did not.

22       Q.   All right.  And the last two checks went to Bank of

23   America out of the Badgers' accounts.  Did you ever see those

24   checks at the time?

25       A.   I did not.

1    Q.   Okay.  And did you have anything to do with those

2  funds, it's 101,000 and 50,000, approximately, any knowledge

3  they were stolen and that Badger was out any money?

4    A.   I didn't know what they were until we were doing

5  research.  I never knew anything about this money that was

6  coming in from Arthur Badger until we did the research.  When

7  I say "we," I did -- I'm sure I did a lot of it.  I'm sure

8  John Peters, who y'all met earlier, did a lot.  I mean, we

9  were all -- it was a crazy time for us and the PMPED law firm

10  trying to research and get stuff.  We were getting subpoenas

11  from everybody and trying to get all this information.

12    Q.   You are talking about the research you did in the

13  fall of 2021?

14    A.   That's right.

15    Q.   So you all were working with the law firm trying to

16  figure everything out?

17    A.   The law firm, ODC, attorneys that are suing the law

18  firm and Palmetto State Bank.

19    Q.   And you are working with John Peters, you mentioned;

20  anybody else at the bank to do any research?

21    A.   I know my sister Gray Henderson did some.  I would

22  think just about a little bit of people did a little bit of

23  everything.  I would -- absolutely safe to say, Nancy Drawdy,

24  she would have done the loan side, because she runs our loan

25  department.  And definitely, like I said, John Peters, Mark

1    Altman, if we needed to get old images, because we were

2    trying to pull up images from 2011, '09. You know, they are

3    not sitting there. We are having to go and physically load

4    old disks or CDs or tape. I am not exactly sure which one it

5    is. I should know, but I don't. But they would actually

6    have to physically go load them, bring them up on the system

7    to get that images from that long ago.

8        Q. So you are doing this research not by yourself? You

9    are doing it with a whole team of people?

10       A. That's correct.

11       Q. So it wasn't a secret to anybody at Palmetto State

12   Bank?

13       A. No, sir.

14       Q. Y'all didn't know -- or did you know the full extent

15   of what Alex had done at that time?

16       A. We did not at the time. And I'm not sure we still

17   do.

18       Q. All right. So in that initial e-mail, the

19   re-cutting e-mail, there's a $709,000 check, or he had asked

20   for one to be cut. Did you ever receive that check?

21       A. Did not.

22       Q. And do you know what happened to that check?

23       A. You know, when I sent that e-mail, when I was doing

24   research and getting ready for all of this, I was like, you

25   know, I didn't get a $709,000 check. And then, you know, you

1    look and you break it down, all those different checks, I

2    don't think you want to pull them up and go through all of

3    them, and then you see.  But on there, the law firm's general

4    ledger, journal, whatever that was put up here, you can see

5    where it was voided.  I don't know who authorized the voiding

6    of it.  I can tell you I did not.  And then there were a

7    bunch of checks that came out of that, like 9 or 10 or so.

8    And then you see two more checks that were voided that I did

9    not authorize.  Those ended up being the Bank of America

10   checks.

11       Q.   All right.  So, originally, there was going to be --

12   1.325 was going to be split into four different checks or

13   money orders or whatever?

14       A.   That's correct.

15       Q.   And then the 709 got split up into even more checks?

16       A.   That's correct.

17       Q.   Okay.  Can we pull up Government's Exhibit 31.  Do

18   you recognize this document?

19       A.   It's a Palmetto State Bank's stop payment order.

20       Q.   All right.  Did you have anything to do with this?

21       A.   Never saw it until all of this discovery and

22   research with this case.

23       Q.   You mentioned the general ledger at PMPED and the

24   voided checks on that.  Did you have anything to do with the

25   voiding of those checks?

1     A.   Did not.

2     Q.   Okay.  Was it a surprise when you found out that

3 there were all these voided checks?

4     A.   It really did.  But, you know, now looking back on

5 it, it doesn't surprise me at all, because that's -- if he

6 had walked in with that million 325, I don't know that I

7 would have recognized it.  I would have recognized it as

8 matching what that e-mail said, because it would have been

9 just right then.  But by separating it out, it was just a way

10 for him to hide it.

11    Q.   Okay.  And, again, did you try to help anybody steal

12 money?

13    A.   No, sir, I did not.

14    Q.   And Alex Murdaugh in particular?

15    A.   I wasn't going to help anybody steal money.

16    Q.   All right.  Let's move on to Natasha Thomas.  How

17 did you get involved in her conservatorship?

18    A.   Just like the other ones, Alex contacted me and gave

19 me a brief rundown, just like he would have on all of them.

20 He would give me a brief summary of the case, you know, said,

21 hey, there's a terrible car wreck and these victims were all

22 from Yemassee area.  And, you know, give me -- tell me what

23 was going on.  And just said that he needed me to serve as

24 conservator and they asked me if I would and I told him I

25 would.

1    Q.   And did he get a lot of clients from the Yemassee

2  area?

3    A.   He got a lot of clients from all over, but, yes, he

4  did.  I mean, he did a couple of them.  He had a knack for

5  getting some really good, big cases.

6    Q.   Can you elaborate a little bit more on that?

7    A.   I was always under the understanding that, you know,

8  he would give -- like, if law enforcement sent a case to him,

9  I wouldn't say they really sent it, but if I had gotten in an

10  accident and they are asking who do I need to talk to, they

11  might would say call Alex Murdaugh.  And I basically was told

12  he would give them like a finder's fee or something.

13    Q.   You don't know that for sure?  You don't have

14  independent knowledge of that?

15    A.   No, sir.

16    Q.   And did you ever meet Natasha Thomas?

17    A.   I did.

18    Q.   Where did you meet her?

19    A.   I would have met her at the mediation.

20    Q.   Okay.  And would Alex have been there; do you

21  remember?

22    A.   Yes, sir, he would have been.

23       MR. AUSTIN:  Let's pull up Government's Exhibit 110.

24  All right.  Let's go to page 3, please.

25  BY MR. AUSTIN:

1    Q.   Do you recognize this document?

2    A.   I do.  It's the renunciation of rights.

3    Q.   I'm sorry?

4    A.   It's the renunciation of right and waiver of bond.

5    Q.   And this is what cleared the way for you to become

6    conservator?

7    A.   That's correct.

8         MR. AUSTIN:  And let's go to the next page, please.

9    Next page.

10   BY MR. AUSTIN:

11   Q.   All right.  And this is petition, just like some

12   others we've seen already.  Were you responsible for filling

13   out any of the information on this page?

14   A.   No, sir, I was not.

15   Q.   Who filled that out?

16   A.   Alex Murdaugh or PMPED.  I would assume that one of

17   his paralegals would have filled it out for him.

18   Q.   You heard testimony about the age being incorrect on

19   this?

20   A.   That's correct.

21   Q.   Did you have anything to do with writing in age?

22   A.   Absolutely not.

23   Q.   And you never met Natasha Thomas before?

24   A.   No, sir.

25        MR. AUSTIN:  And if we can go to the next page,

1   please.  I'm sorry.  Go to the third page.

2   BY MR. AUSTIN:

3       Q.   Yet you signed it?

4       A.   I did.

5       Q.   In the verification portion at the top, why did you

6   sign there?

7       A.   That's where I was told to sign, so I signed there.

8       Q.   And so you didn't know what her actual age was at

9   the time?

10      A.   I never met her.  I mean --

11      Q.   And why didn't you get out -- make sure you got her

12  driver's license and verify all the information?

13      A.   Just like everything else, hindsight, I wish I had.

14  I would have had to drive down to Yemassee and found her and

15  gone and met with them and gotten the actual age.  But we

16  didn't fill out these forms.  Yes, I signed them.  Yes, I

17  signed the verification.  But I did not verify that she was

18  15 years old.

19      Q.   Okay.  And it says -- if we can zoom in on the

20  verification -- says the facts set forth in the foregoing

21  statement are true to the best of undersigned's knowledge,

22  information, and belief; is that true?

23      A.   That's right.  I mean, to the best of my knowledge

24  and belief, it was correct at the time.  From what they

25  filled out and told me, I would assume that it's correct.

1    Q.   And you still signed it.  Were you just relying on

2   Alex?

3    A.   I was -- yes, sir.

4         MR. AUSTIN:  Okay.  Zoom out.

5   BY MR. AUSTIN:

6    Q.   And, again, but your understanding was that you were

7   accepting the appointment to become her conservator at the

8   time?

9    A.   That's correct.

10        MR. AUSTIN:  And let's go to Government's Exhibit

11  20.  If we can zoom in on the fee portion.

12  BY MR. AUSTIN:

13   Q.   Did you ever receive a $15,000 conservator fee?

14   A.   I did.

15   Q.   But did you do any work for her?

16   A.   I helped them set up the structure and that was

17  about it.

18   Q.   All right.

19   A.   That was it.

20   Q.   I'm sorry?

21   A.   I said that was it, I set up the structure.

22   Q.   And we talked about structured settlements before.

23  Is there much work that went into this one similar to what

24  you described earlier?

25   A.   No, there's not a lot of work.  And it seems like a

1  large fee until you are sitting here in the situation I am

2  right now and you see the civil side of it, the civil

3  liability that you are taking on for that fee.  But, no, I

4  did not do that.  Attorney and I went to a mediation or two,

5  and I'm sure I've got a bunch of lawyers, letters from

6  lawyers, and helped set up the structured settlement.

7      Q.   All right.  How do you decide what kind of

8  structured settlement to buy?

9      A.   You listen to the advice of lawyers.  And Forge

10  Consulting was who they would always use.

11      Q.   Again, Palmetto State Bank did not have the ability

12  to do structured settlements?

13      A.   Not at all.

14      Q.   Let's zoom out.

15      A.   Of the structure, $650,000.

16      Q.   All right.  Let's zoom in on the disbursement to

17  client.  There you go.  All right.  Disbursement to client;

18  you see Natasha Thomas, Palmetto State Bank, $325,000.  Do

19  you know, did Palmetto State Bank receive $325,000?

20      A.   We did not.  Well, you know, that's a tough one to

21  answer.  We did not knowingly receive it.  It was just like

22  Arthur Badger, he came in with this check made out to

23  Palmetto State Bank, told me where he needed it to go, and I

24  did the transaction for him.  So I guess, you know, in

25  theory, the bank did receive it.  In reality, we did not know

1    what we were receiving.  We thought we were receiving money

2    that he had.

3        Q.   Okay.  And can we go to Government's Exhibit 21.

4    Okay.  And what is that $25,000 Palmetto State Bank loan?

5        A.   I don't know the loan, but I know the check now that

6    we've seen it and done it.  And this one was the one that we

7    broke up into several 9,000, 9,500, whatever the numbers

8    were.  We've seen it multiple times.  That's what that check

9    was.

10       Q.   You said "we" broke it up, this has come up at other

11   points --

12       A.   We, we -- whenever we talk about Palmetto State

13   Bank, there's no -- as I know y'all have heard it, there's no

14   I in team, it's always "we."  I couldn't cash a check as a

15   PR.  I couldn't cash a check as an individual.  I guess I

16   could, a small one, but I couldn't cash a big check.  So when

17   I say "we," we as in Palmetto State Bank, me as an employee

18   of Palmetto State Bank, that's what I mean.

19       Q.   And you heard your sister Gray talk about what that

20   means at the bank?

21       A.   Right.

22       Q.   And that's something your dad has talked to you

23   about?

24       A.   That's correct.  I mean, just like any -- I'm going

25   to use a football team as an analogy.  Yeah, you might have a

1  superstar, but it takes the others to win a game.  And that's

2  the same way at any business.  You know, you are going to

3  have your high performers, you are going to have some that

4  you pulled along.  But it takes all, you are a team.  You've

5  got to be together.  If you are not together, then you have

6  problems.

7      Q.   Is that core philosophy at Palmetto State Bank?

8      A.   Absolutely.

9      Q.   Is that something that you attribute the bank's

10  success to over multiple generations of Laffittes?

11      A.   I do.

12      Q.   Your dad, how many brothers did he have, your dad?

13      A.   Oh, you thought you were talking -- I have one

14  brother.  My dad has two, two brothers.  One has passed away

15  now.

16      Q.   But they all -- they all worked as bankers together?

17      A.   They did.

18      Q.   I'm around lawyers all the time, so used to saying

19  "practice."

20          Did you steal any money from Natasha Thomas?

21      A.   I did not.

22          MR. AUSTIN:  All right.  Zoom out.

23  BY MR. AUSTIN:

24      Q.   Okay.  Did you ever help Alex steal knowing that he

25  was stealing money?

1    A.    I would not have done that.

2    Q.    All right.  Let's turn to Hakeem Pinckney.  Let's go

3    to exhibit -- Government's Exhibit 109.  Go to page 9.  All

4    right.  I know it's getting repetitive.  We've got to work

5    our way through.  And we are almost done.  Do you remember

6    this, when you were appointed to be his conservator?

7    A.    I do.

8    Q.    And like the previous form, did you fill out any of

9    the information in this document?

10   A.    I did not.

11   Q.    And do you know who did?

12   A.    PMPED, Alex Murdaugh, or one of their employees.

13   Q.    Let's go to the third page, please.  Okay.  And,

14   again, says Pamela Pinckney renouncing her rights?

15   A.    That's correct.  That was his mother.

16   Q.    Did you know when Hakeem Pinckney died?

17   A.    I did not.

18   Q.    And had you ever met him before?

19   A.    I had not.  He was very seriously injured in this

20   wreck and was a quadriplegic.  I want to say he was in North

21   Augusta or Augusta in a nursing home.  I wouldn't swear to

22   that, but he was in a home.

23   Q.    And let's go to -- well, I guess there's previous

24   testimony about an e-mail where Alex texted you or e-mailed

25   and said, 911, please call me.  Do you remember getting that

1  from him?

2  A.   I saw that in discovery.  And I have no idea what

3  that -- you know, I have no clue why he sent that.  But I

4  would have called him.  I mean, if he sent me that, I would

5  have absolutely have picked up the phone and called him.

6  Q.   And he didn't bring up Hakeem Pinckney?

7  A.   I don't recall anything about it.

8  Q.   All right.  Let's go to Government's Exhibit 21,

9  please.  All right.

10  A.   Didn't we just look at this one?

11  Q.   All right.  So did you try to pay any of the money

12  back to Malik Williams -- I mean, Hakeem Pinckney that was

13  taken by Alex Murdaugh?

14  A.   Oh, Hakeem Pinckney, after I did the research with

15  Hakeem Pinckney and Natasha Thomas, it was just like on the

16  Badger, I mean, you just wanted to throw up when you saw what

17  truly had transacted when you had that -- you know, when

18  you've got that hindsight and you could see what's going on.

19  And I met with Mark Ball and several of them.  And I also met

20  with my father.  And I wanted us to settle or try to settle,

21  just like we had done with Arthur Badger.  So when I met with

22  them, they had said that they weren't -- they were not going

23  to even consider paying any of it.  And so I went back to the

24  bank and, you know, 634,000, plus the 25,000, so 659,

25  $660,000, and I went to them and I said, let's pay it, let's

1  get out of this. And we definitely were not going to write a

2  check like we did, even though we had the authority that was

3  -- caused a big hoopla before. So we would take it to the

4  Board. We had already sent an e-mail to the attorney and

5  explaining to him what was going on, what we wanted to do.

6  And when we got to our Board meeting, the day we got to the

7  Board meeting to discuss it, we were served with the notice

8  of intent to sue.

9       MR. AUSTIN: Okay. Could we pull up Government's

10  Exhibit 22, please.

11  BY MR. AUSTIN:

12      Q.   Do you recognize this disbursement sheet?

13      A.   I do.

14      Q.   And zoom in on the fees, please. Did you receive

15  $60,000 conservator fee?

16      A.   I did.

17      Q.   And did you do any work for Hakeem Pinckney?

18      A.   I helped set up the structure just like before, go

19  to the mediation.

20      Q.   Okay.

21      A.   Not -- you know, that was probably too much of a fee

22  now, looking back.

23      Q.   All right. Let's go down to the disbursement to

24  client, and 309,000 to Palmetto State Bank. Do you recall

25  that coming through?

1    A.    I do not.  Now, looking back, I know where it came

2    through on doing the research.  But one thing I want to say

3    here, I was the conservator, not Palmetto State Bank.  If you

4    look at the top of the one behind you, it says clearly

5    Russell Laffitte.  And on the settlement statement or

6    disbursement statement it shows Palmetto State Bank.  And I

7    believe that's how that was -- that was the start of the

8    theft because he would write it to Palmetto State Bank

9    knowing we wouldn't recognize it.  If it came in Russell

10   Laffitte as conservator, we wouldn't be sitting here today.

11       Q.    And you didn't have anything to do with drafting

12   this disbursement sheet?

13       A.    No, sir, I did not.

14       Q.    Did you sign off on it?

15       A.    I did.

16       Q.    Why did you if it had that Palmetto State Bank

17   there?

18       A.    He would come in, just like I said earlier, he would

19   have it marked, he would send a runner or he himself would

20   come in and say, I need you to sign here.  Years, decades of

21   trust and experience and took advantage of you, of me.

22       Q.    All right.  Now, moving on to Malik Williams, how

23   did you get involved as conservator for him?

24       A.    Paul Detrick asked me to be conservator for him.

25       Q.    Who is Paul Detrick?

1    A.   Yes, sir.

2    Q.   Who is Paul Detrick?

3    A.   He was a partner.  He's passed away now.  He was a

4    partner at PMPED.

5    Q.   All right.  So how did Alex get involved with that

6    case?

7    A.   He was not involved at all with the case.  But, you

8    know, they are in a building together.  So they know what's

9    going on on different cases.

10    Q.   And he was a partner?

11    A.   Yes, sir, they were both partners.

12    Q.   Alex and Detrick?

13    A.   And Paul.

14    Q.   And how many lawyers did the firm have at the time?

15    A.   In the Hampton office at that time, 10 maybe.

16    Q.   Okay.  And that was a pretty big fee that he got

17    from that case, wasn't it?

18    A.   Yes, sir.  Well, on Malik Williams?

19    Q.   Sure.

20    A.   I don't think it was that big, but it was --

21    Q.   Okay.  Let's go to Government's Exhibit 108 and go

22    to page 3.  All right.  So is this letter asking you to be,

23    or the petition, for you to be appointed as conservator?

24    A.   That's correct.

25    Q.   And let's go to the next page.  Next page.  All

1    right.  And this is -- do you recognize this letter?

2        A.    I know what it is.  It was a letter done to Peters

3    Murdaugh Parker from the probate.

4        Q.    Let's go to page 9, please.  I believe this is the

5    last one.

6        A.    Right.  That's the appointment.

7        Q.    Okay.  It's the same form you've seen before.  And

8    did you have anything to do with filling out any of this

9    information?

10        A.    I did not.

11            MR. AUSTIN:  Let's go to the third page, please.  Go

12    back one.  Sorry.  All right.  There we go.

13    BY MR. AUSTIN:

14        Q.    And this one is a little bit different than the

15    other ones.  Can we zoom in on the top third.  All right.

16    Has Paul Detrick sign -- I guess that's Paul Detrick.  Do you

17    recognize the signature?

18        A.    I don't recognize the signature, but I'm going to

19    assume that also.

20        Q.    But this one appears to be filled out correctly;

21    does that look right?

22        A.    Yes, sir.

23        Q.    Zoom out.  And on the verification here, you don't

24    have your signature?

25        A.    That's correct.

1      Q.   Is that Paul Detrick's?

2      A.   I'm going to assume it's the same as above, so, yes,

3 sir.

4          MR. AUSTIN:  Zoom out, please.  Zoom in on the

5 bottom part.

6 BY MR. AUSTIN:

7      Q.   All right.  So here, this is your signature; isn't

8 it?

9      A.   That is mine.

10      Q.   All right.  And you don't know how Alex got involved

11 in this, but somehow he found out, is that what you are

12 saying?

13      A.   I mean, it's a small office.  They are going to

14 talk.  They know about cases.  I mean, he very well could

15 have -- Paul could have said -- been down in the lunchroom

16 or --

17          MS. LIMEHOUSE:  Objection, Your Honor, this is

18 complete speculation.

19          THE COURT: Sustained.

20 BY MR. AUSTIN:

21      Q.   Let's just wrap this up.  Did you ever intentionally

22 try to help Alex or anybody else steal from Malik Williams?

23      A.   No.  No, sir.

24      Q.   All right.  So I just want to talk real briefly

25 about Palmetto State Bank Board.  When did you first join the

1   Board?

2       A.   Somewhere -- I don't remember exactly, but I would

3   probably say between 2005, 2010.

4       Q.   Okay.  So was there sort of an older generation

5   still in leadership at the bank at that time?

6       A.   Absolutely.

7       Q.   And who was in leadership at the bank?

8       A.   My father, Charlie Laffitte, was chairman and CEO.

9   We had Mark Laffitte.  He was in Estill.  He was -- I don't

10  remember what his title was, chairman something.  But he was

11  more like vice chairman.  And Monty Laffitte out of Bluffton

12  was vice chairman.  Henry Laffitte in Allendale, he was

13  the -- he was executive vice president.  He ran the branches

14  up there.  Jan Malinowski, and that's about it.

15      Q.   Okay.  And there's been testimony about newer family

16  members joining the Board in the past few years; is that

17  right?

18      A.   That's correct.

19      Q.   How would you just generally describe the Board's

20  approach just when you were coming up in the bank --

21           MS. LIMEHOUSE:  Objection.  I think this is going to

22  go towards some of Your Honor's prior rulings.

23           THE COURT:  I'm listening.

24           MR. AUSTIN:  I'm trying hard to stay away.  I have

25  no intention to go there.

1   BY MR. AUSTIN:

2     Q.   Was there a different approach to handling issues

3 from the older generation?

4     A.   Absolutely.  The older generation, they would sit

5 around and they would talk about it, they were done.  That

6 was it.  We didn't have as many formal meetings.  Yes, we had

7 our formal Executive Committee meeting on the second Tuesday

8 of the month.  Yes, they had their formal Board meeting, but

9 if there was something in between, they would pick up the

10 telephone and call and they'd work it out and they would add

11 it to the minutes or vice-versa.

12       And 2021, we were struggling with that changing over

13 from having strict, formal -- strictly, you know, more

14 informal to a strictly formal setting.  You know, you are

15 doing things, here's how you do it, when you do it, and

16 everything else.

17     Q.   So the bank was trying to formalize their procedures

18 more and not be quite so -- I guess it's a family,

19 conversational in handling things --

20       MS. LIMEHOUSE:  Objection, Your Honor, he's

21 testifying.

22       THE COURT:  I believe you are testifying.

23       MR. AUSTIN:  I felt it.  Sorry.  I didn't mean to.

24       THE COURT:  Just ask a question.  You can't lead the

25 witness.

1          MR. AUSTIN:  I'm watching the clock and trying to

2    move along.

3          THE COURT:  Well, let's get it right.

4          MR. AUSTIN:  Yes, sir.

5    BY MR. AUSTIN:

6       Q.   So was it something -- was it a priority of yours to

7    formalize the procedures?

8       A.   I wanted it to be a lot -- just do loans.  I

9    wanted -- we needed to grow loans.  We were one of the

10   lowest, or at the time in 2021, we were I think about second

11   or third lowest in the state of South Carolina in loans to

12   deposits.  We needed loans.  And we were trying to grow

13   loans.  And to grow loans, you've got to go out there and get

14   them --

15         MS. LIMEHOUSE:  Objection, Your Honor.  Relevance.

16         THE COURT:  I'm not sure where this is going.

17         MR. AUSTIN:  I think we've made our point.  So I

18   will keep going.

19   BY MR. AUSTIN:

20      Q.   So let's go to Government's Exhibit 6.  If we could,

21   please go to -- I need glasses, I'm realizing more and more.

22   The very bottom here it says that the loans outstanding of

23   Richard Alexander Murdaugh were discussed.  The copies

24   attached.  What's going on there?  What's that mean to you?

25      A.   This is August 17th, 2021.  And so we had had an

1  Executive Committee meeting, according to the minutes, on

2  August 12th.  And it discussed Alex Murdaugh's -- all of his

3  loans.  Obviously, we had a Board member send an e-mail

4  wanting to get a list of it.  So I presented a list of all

5  loans and everything else so we could talk about it.

6          MR. AUSTIN:  All right.  Let's go to page 2.  And

7  zoom in, please, on the second paragraph.  Thank you.

8  BY MR. AUSTIN:

9      Q.   All right.  Tell us what's going on here.

10     A.   This is just a summary that said, Charlie Laffitte,

11  Chairman Laffitte, reviewed all the loans of Alex Murdaugh.

12  And I was saying that his intention was to sell the farm and

13  that we had mortgage on the properties that supersede the

14  property being transferred into Maggie's name.  That was

15  obviously in error.  And that we didn't add in the

16  charged-off loans.  We were just explaining what took place.

17  And we also talked about the $750,000 loan, because Elizabeth

18  Malinowski didn't see where it was in the formal Executive

19  Committee.

20     Q.   And did you agree with her assessment of that

21  $750,000 loan process?

22     A.   Of the -- that it did not go through the formal

23  Executive Committee?  Yes, I did.

24     Q.   You did agree?

25     A.   Yes, I explained that three of the five members

1  approved the loan, which in my way of thinking, you've got

2  three of the four voting members, the loan was approved by

3  the Executive Committee.  But we did not -- on our third --

4  second Tuesday of the month meeting, that was not brought in

5  to it, no, it was not.

6  Q.  Okay.  Were you hiding that loan from anybody?

7  A.  Absolutely not.

8  Q.  And are you familiar with Credit Leader?

9  A.  I am.

10  Q.  How do you know anything about Credit Leader?

11  A.  I was the one that purchased the program.

12  Q.  All right.  So what did you understand about when

13  you purchased Credit Leader?

14  A.  We were trying to be more responsive, get more --

15  just, you know, get our processes in order.  We were trying

16  to grow the bank.  And we needed a way for us to be able to

17  look at loans and look at them quickly from other offices.

18  So you could go in there and put it in.  And, like, if

19  somebody in the Bluffton office, they could type in it, scan

20  in any documents they wanted to it, they could e-mail me and

21  say, hey, can you look at this, and I could look at exactly

22  what they are looking at right then.  And just makes us be

23  more responsive to our customers, which is always what you

24  want to be.  You know, community banks, it's not necessarily

25  any cheaper than a big bank, or oftentimes it's more

1  expensive than a big bank because it's more of a boutique.

2  So we've got to sell ourselves on speed and responsiveness to

3  customers.

4  Q.   And what was your understanding of when you would

5  log in to Credit Leader and enter information or do anything?

6  A.   If you change anything or do anything, it logs it

7  and tells when it was, time, date, stamp, everything.

8  Q.   So you were fully aware of that when you purchased

9  the system?

10  A.   Yes, sir.

11  Q.   There's been a lot of talk about some of this

12  information on the $750,000 loan put in.  Can you explain any

13  of that?

14  A.   The 750,000 loan, we approved it.  My father, my

15  sister, and I approved it.  As you've obviously heard

16  numerous times, it was funded, the 350 was funded with wire

17  in July to Chris Wilson.  And then we covered -- deposited

18  $400,000 in a money order.  A money order was cut for the

19  $400,000 balance of the proceeds deposited into Alex

20  Murdaugh's account to cover his overdraft.  And then we had

21  the loan documents signed.  Then we actually went in to do

22  Credit Leader.  So it had already been approved, but it was

23  not a -- it's not memorialized until you see the August -- I

24  think it was August 18th that shows on Credit Leader that

25  that was the day of approval.  It was approved way back

1   before we ever funded the wire.  Otherwise, we couldn't have
2   done -- I couldn't have done the wire, because he was so far
3   above my lending limit.  But that's when it was put into the
4   Credit Leader.

5       I would have had Carrie Sauls or one of the other
6   ladies type it in.  I believe it was Carrie Sauls.  I think I
7   saw her name.  And then we would have gone in -- I would have
8   gone in after she told me she had all the documents in there
9   and all the notes, I would have hit approve, knowing it's not
10  been approved because it was over my lending limit.  And then
11  since I had myself, my father, and Gray Henderson, we would
12  all, as three of the four voting members of the Executive
13  Committee, then I went in and approved it as Executive
14  Committee.

15      Q.   All right.  And again, y'all were not trying to hide
16  that loan from anybody?

17      A.   No.  We had already notified them about it.

18      Q.   When did you notify them?

19      A.   We talked about it in the Board meeting.  I mean, in
20  the Executive Committee meeting, and when we talked about
21  those -- I mean, we weren't trying to hide it at all.

22      Q.   Your brother testified to the appraisal process
23  starting in April; is that right?

24      A.   That was right.  We were getting an appraisal done
25  on the house.  I'm not sure that's when the actual 750

1   started.  But we knew the primary -- the first mortgage was

2   maturing.  So we knew we did it.  And at some point, he had

3   come in and said he needed some money.  The actual loan

4   started off at 500,000.  And then it moved as he asked to

5   increase it to 750, said he was doing some work and other

6   things.  And so we did it.  And we assumed, as y'all would

7   know how assuming ends with Alex Murdaugh, we assumed that

8   the C.E. Smith that he was writing checks to every week or

9   so, I mean, large checks, that was -- that looked to us like

10  normal checks that you would be writing to a contractor.

11  And, yes, we did know that we were doing a $750,000 loan on a

12  house that had appraised previously at 730.  So, no, we were

13  not under the -- we didn't think it was all going to the

14  house.

15      Q.   All right.  And based on your understanding of

16  what -- the way loans worked, was there any concern on your

17  part that some of this money was not going to the stated

18  purpose?

19      A.   No, sir.

20      Q.   Why not?

21      A.   You know, just like y'all -- somebody said in here,

22  you know, 750 -- the original appraisal that we had at the

23  time was 730,000.  You are not going to do a $750,000

24  renovation on a 7-, 8-, $900,000 house.  And that's why we

25  were taking additional collateral.  We wanted that Green

1   Swamp share of stock, which was worth about 230- to $250,000.

2   And we knew that house was worth a lot more than 700,000.  So

3   we weren't that concerned.  We felt like we would be, once we

4   got the second mortgage in place, which, unfortunately, we

5   never did, that we would be -- be collateralized at least

6   dollar-for-dollar.

7       Q.   And did that beach house end up selling?

8       A.   It did, for $955,000.

9       Q.   Okay.  If I'm understanding correctly, even though

10  Alex was overdrawn on his account by a substantial sum, close

11  to 3 --

12      A.   $367,000 and some change.  But we knew what the

13  funds were for.  We were in close contact -- no, we didn't

14  know -- we thought we knew what the funds were for.  We knew

15  what he was telling us the funds were for.

16      Q.   And so the initial $350,000, what was your

17  understanding where that money was going?

18      A.   He asked me to -- said he needed the money, needed

19  to send a wire to Chris Wilson.  He had a lot of irons in the

20  fire at this point in time in his life, lawsuits with the son

21  and, you know, his wife and son had just been murdered.  I

22  really didn't question it, you know, I guess a lot because of

23  that.  You know, I really didn't ask him.  Now, right after

24  September, we knew exactly what had happened with it.

25      Q.   When he came to you all asking for this loan in

1 July, what was his demeanor? How was he acting?

2 A. He was distraught. I mean, he just lost his wife

3 and son. It really had started before that. But when we

4 talked to him in July, I mean, as you would expect, somebody

5 that just lost their wife and son violently, I mean, he was

6 real pale, you know, just seemed upset. But we knew -- we've

7 had a long running history with him. We weren't concerned.

8 He had a strong earning history. You know, we didn't -- we

9 felt comfortable loaning him money when he needed it.

10 Q. We've heard testimony about him not working during

11 that time. What was your understanding?

12 A. He was still receiving a paycheck. He was -- they

13 had him go get counseling. I mean, obviously, you know,

14 something tragic like that happens, you need to be able to

15 talk to somebody. And I know that they wanted him to see a

16 counselor. And I think he was just taking like -- stepping

17 back, taking a leave, and turning some things over while he

18 processed this and while he processed his grief and

19 everything else.

20 Q. Okay. So we fast forward to the fall. Was the

21 Board worried about lawsuits during that time?

22 A. During July?

23 Q. In the fall.

24 A. Well, we were already in a lawsuit on the

25 Satterfield case.

1    Q.   Okay.  And without going into specifics, did you

2    settle that case?

3    A.   We did.  And that was -- going on the Badger side on

4    the 680, that's why we got -- we wanted to settle it.  We,

5    Palmetto State Bank -- I did the transactions; nobody else.

6    I did them.  When I did the research and I saw all those

7    transactions, and I was like, you know, you know what, we've

8    got liability.  The money went through Palmetto State Bank.

9    We had just settled a lawsuit.  We didn't touch the money.

10   And it was a lot more than $680,000.  And they also were

11   adamant about the PR fee in the settlement.  So that's why,

12   you take the million 325 plus the 35,000, that's why we did

13   the PR fee.  And that's -- I was like, you know what, if we

14   can get out of here for $680,000 versus a million-plus, we

15   were going to be on the hook on that for a million 1, because

16   that's what truly went through us.  The rest went through

17   Bank of America.  It would be a hard sell to -- hard to prove

18   that we had any liability there.  And that would be the --

19   that's why we did that.

20   Q.   You said Satterfield settled for substantially more.

21   We don't want to hear exactly how much.  But you said no

22   money came to PSB?

23   A.   None of the money flowed through any of our Palmetto

24   State Bank or bank accounts.

25   Q.   Why did you all settle it?

1       A.    That was under the advice of our attorney, Trenholm

2   Walker, and his firm.

3          MS. LIMEHOUSE:  Objection, Your Honor.  I believe

4   he's going to divulge privileged communications.

5   BY MR. AUSTIN:

6       Q.    Did you think it was in the best interest of the

7   bank?

8       A.    Absolutely.

9       Q.    Okay.  And so were you factoring that into your

10  decision when you wrote the $680,000 check?

11      A.    Absolutely.  I mean, I wouldn't have done it except

12  for I knew how much we could possibly be on the hook for

13  after dealing with Satterfield.  This was substantially more,

14  in my opinion.

15      Q.    And we've heard a lot about bylaws of Palmetto State

16  Bank.  And what was your understanding of your authority

17  under the bylaws?

18      A.    I had the authority to settle, you know, make

19  contracts, conduct business for the bank.  It's not -- and I

20  knew I had the authority.  I looked at it.

21      Q.    And what about your dad, what authority did he have,

22  or what was your understanding?

23      A.    He had the same authority.  He could settle, make --

24  do anything for the bank that was needed.

25      Q.    Okay.  And what about the Executive Committee?

1    A.    Same thing.

2    Q.    Okay.  So y'all didn't discuss it with Jan

3    Malinowski; is that correct?

4    A.    We did not, not at that time.

5    Q.    Did you think that you needed to?

6    A.    Oh, no, we didn't.  I didn't think we needed to at

7    that time.  We were trying -- you know, time is of the

8    essence.  Our thoughts were, let's -- first of all, we had

9    made a mistake.  I had made a mistake.  A client that thought

10   he had money at Palmetto State Bank had lost money.  We

11   needed to make him right.  That's the right thing to do.

12        So I went over and made the agreement.  I

13   immediately funded it.  And, you know, as soon as I funded

14   it, I'm not sure whether it was before or during or the same

15   time, I mean, I notified the Executive Committee on the same

16   day we funded it, and I notified the Board the following

17   morning.

18   Q.    Okay.  And let's back up to October 25th.  Do you

19   recall meeting at PMPED?

20   A.    Was that a Monday?

21   Q.    I'm not sure.

22   A.    I was out of the state when I got the phone call

23   about the checks of Arthur Badger.  And I told -- Jeanne

24   Seckinger called me.  And I told her, Jeanne, I'm out of

25   town.  I said, no, we don't want e-mail.  I said I will be

1   there Monday morning to pick it up.  Got a handprinted out

2   list, which is in one of the exhibits, that goes through all

3   the checks.  We immediately go back, start researching it.

4   As soon as we have it, you know, I take all the checks, the

5   copies, where it went, go back over to the law firm.  By this

6   time, I've already talked to my father, because when I'm

7   researching, I realize, oh, my God, what is going on?  Talk

8   to him.  I went over there and said, hey, let's split it.

9   And we agreed to it.  Came back, cut a money order.

10          Q.   Okay.  And in the Satterfield case, Chad Westendorf

11  had been the conservator in that, right?

12          A.   That's correct.

13          Q.   And the bank, nonetheless, settled the case, though

14  he had screwed up personally?

15          A.   You know, I don't know whether he screwed up

16  personally, but it was messed up, yes.

17          Q.   Okay.  That was a bad choice of words.

18          A.   I understand.

19          Q.   Is that part of how it works with a bank, you settle

20  cases sometimes?

21          A.   Banks, businesses in general, will settle a lot of

22  cases because they don't want to be just splashed all over

23  the news, as I have been.  I mean, you just -- nobody wants

24  that.  And you are trying to mitigate the bad press.  You are

25  trying to mitigate losses.  So you try to settle.

1    Q.    Okay.  All right.  Let's pull up Government's

2    Exhibit 12, please.  I believe we've seen this already.  This

3    is the e-mail you are talking about where you are notifying

4    the full Board?

5    A.    That's correct.

6    Q.    All right.  And you say here, we covered this over

7    and over, we converted 1.172, and explain everything here.

8    Again, when you said "we converted," you weren't shifting

9    blame, were you?

10   A.    Absolutely not.  "We" is me and all of us at

11   Palmetto State Bank.  I was the actual person that did the

12   transactions.  When we say "we," it's part of Palmetto State

13   Bank, because I couldn't have done those transactions if I

14   was not an employee of the bank.

15   Q.    Have you ever denied your involvement writing that

16   check or involved in any of the underlying checks that led to

17   the need to do this?

18   A.    No, sir.

19   Q.    Okay.  And why didn't you include more detail about

20   what happened?

21   A.    We were told not to.  As I've told you all, we were

22   getting subpoenas, and lawsuits are flying around, or threats

23   of lawsuits are flying around.  Our attorneys had asked us

24   not to --

25            MS. LIMEHOUSE:  Objection, Your Honor.  Is hearsay.

1    THE COURT:  Sustained.

2    MR. AUSTIN:  I don't want what anybody said.

3    BY MR. AUSTIN:

4    Q.   Okay.  Let's go to Government's Exhibit 78.  Is this

5    the check that you delivered to PMPED?

6    A.   No, that's their check.

7    Q.   Okay.  And you did write the check to them, right?

8    A.   That's correct.

9    Q.   And when was that deposited into Palmetto State

10   Bank?

11   A.   They deposited their -- the check, the money order,

12   cashier's check that I took over there on the 29th of

13   October.

14   Q.   Okay.  So we've heard testimony about that being the

15   date that the money is out the door and it was a done-deal.

16   But that was not your understanding; is that right?

17   A.   That's correct.  That was not -- just funded the

18   deal, but --

19   MS. LIMEHOUSE:  Objection, Your Honor.  He's

20   testifying for the witness.

21   THE COURT:  Sustained.

22   MR. AUSTIN:  Let's go to Government's Exhibit 74,

23   please.  Let's zoom on the second e-mail there from Russell,

24   October 28th.  Right there.

25   BY MR. AUSTIN:

1    Q.   All right.  Can you explain what's going on in this

2  e-mail here?

3    A.   This is the e-mail that I sent Thursday morning when

4  we had agreed to settle this or made the agreement to split

5  the loss with PMPED to try to make Arthur Badger whole and

6  try to avoid a lawsuit.

7    Q.   Okay.  So the check was deposited the next day on

8  the 29th, but the day before, you were letting people know

9  about the check?

10   A.   Yes, sir.  This is -- the "to" line is the Executive

11  Committee.

12   Q.   Okay.  And did anybody raise concerns then and ask

13  that you put a stop payment order on it?

14   A.   They did not.

15   Q.   And then you sent the e-mail to the full Board the

16  next day?

17   A.   That's correct.

18   Q.   And why didn't you just do them both at the same

19  time?

20   A.   I'm not sure.  I really don't know.

21   Q.   I'm going to show you what's marked as Government's

22  Exhibit -- Defendant's Exhibit 83.

23        MR. AUSTIN:  May I approach, Your Honor?

24        THE COURT:  Yes.

25  BY MR. AUSTIN:

1    Q.    Take a look at that.  Do you recognize those checks?

2    A.    I do.

3    Q.    Or that check, I should say.  Did you write it?

4    A.    I did.

5    Q.    And if you could, please explain, how do you

6    remember that check?

7    A.    It's $17,500 out of my pocket.  This was, if y'all

8    remember the Donna -- not Donna, Arthur Badger agreement

9    between us and the law firm, is million 325 that was stolen.

10   There was $35,000 in PR fees, million 360, we divided by two.

11   So Palmetto State Bank had paid $680,000.  In that $680,000

12   is $17,500 in PR fees that they did not earn, get or anything

13   else.  I got them.  So I was repaying Palmetto State Bank the

14   17,500.

15   Q.    $680,000 figure is not entirely accurate; is that

16   correct?

17   A.    That's correct.

18   Q.    Did the bank accept this check?

19   A.    They did.  It was -- this check was written and done

20   on 11/1.

21   Q.    Okay.  So the first e-mail of the Executive

22   Committee is on October 28th.  680 check is written on the

23   29th.  And then you wrote this on the 1st?

24   A.    I wrote it on the 1st, but the bank did not run it

25   through, as I see on the back, until December 17th.  And I

1    can't answer why the difference in dates.

2         MR. AUSTIN:  All right.  Your Honor, at this time we

3    move Defendant's Exhibit 83 into evidence.

4         THE COURT:  Is there an objection?

5         MS. LIMEHOUSE:  No objection, Your Honor.

6         THE COURT:  Defendant's Exhibit 83 is admitted

7    without objection.

8         (Defendant's Exhibit 83 is received in evidence.)

9    BY MR. AUSTIN:

10        Q.   I think you've described this already, but let's

11   just do it real quick for the jury.  Reference PR fee, half

12   in settlement at the bottom?

13        A.   That's correct.

14        Q.   And this is the $17,500 you wrote to the bank?

15        A.   Yes, it is.

16        Q.   For half of the conservator fees?

17        A.   Correct.

18        Q.   Or PR fees.  Was it part of your understanding with

19   Ronnie Crosby that they would pay the other half?

20        A.   That was correct.

21        Q.   That was the deal they all struck?

22        A.   That is right.

23        Q.   And we've heard a lot about this November 3rd

24   meeting of the Board.  Can you describe -- and I don't want

25   to talk about anything outside of just the $680,000 payment.

1  What was the Board's reaction at that time to the check?

2      A.   There was a lot of discussion about it.  Obviously,

3  a lot of people were upset, I mean, as we all were.

4  $680,000, that's a lot of money to just write off.  And they

5  were asking if there was any more, which we are doing

6  research as hard as we can, trying to get -- and I'm

7  constantly in contact with the law firm trying to get

8  clarity, hey, we've researched all the case that we were PRs,

9  conservators, or anything.  And, you know, there was just a

10  lot of concern.  And they asked us to put a pause on the

11  check.  So we did.

12      Q.   And is that what you discussed on October 31st

13  meeting, the pause?

14      A.   You know, there was so many meetings in that time,

15  it's hard to go through and tell you exactly.  But there was

16  a pause put on the check.

17      Q.   Okay.  And were you concerned for your own status at

18  the bank around that time?

19      A.   I was.  I had gotten an e-mail, I believe it went to

20  the full Board, asking when I was going to resign.

21      Q.   And did you think that you had done anything wrong

22  at that point?

23      A.   I don't think I did anything illegal.  I definitely

24  had made a mistake.

25      Q.   And did you say as much to the Board?

1     A.   You know, I really don't remember.  I'm sure I did.

2   I mean, it was crazy times.

3     Q.   I think it's been described as damage control mode?

4     A.   Absolutely.

5     Q.   And when you are at the November 3rd meeting, did

6   you record the meeting?

7     A.   I did.

8     Q.   And why did you do that?

9     A.   I really don't know.  We recorded our meetings for

10   minute purposes.  And I'm not sure if my sister, who was the

11   secretary for the Board, was going to be late or something,

12   so I recorded it.  I actually didn't realize that I had

13   recorded it until several months ago at the latest or

14   earliest.  I just -- I would record them.

15     Q.   So was it your sister's practice to record Board

16   meetings?

17     A.   Uh-huh.

18     Q.   You said for minute purposes?

19     A.   That's correct.

20     Q.   And then what was her practice with that?

21     A.   I assume she just deleted them at some point in

22   time.  I don't think she would do it every month, just delete

23   them.

24     MR. AUSTIN:  Your Honor, I would like to play

25   Government's Exhibit 60 -- I mean, Defense Exhibit 60.

1    MS. LIMEHOUSE:  Your Honor, this exhibit is not yet

2  in evidence.

3    THE COURT:  Well, let's take our afternoon break.

4    (Jury leaves open court at 3:29 p.m.)

5    THE COURT:  Let me ask, I take it this is the audio

6  where you previously admitted the transcript; is that

7  correct?

8    MR. AUSTIN:  I believe the transcript is already in,

9  Your Honor.  I misspoke.  I should have moved to enter it

10  into evidence.

11    THE COURT:  Please be seated.  And please be quiet.

12    MR. AUSTIN:  We were going to move it into evidence

13  now and then publish it to the jury.

14    THE COURT:  Publish what to the jury?

15    MR. AUSTIN:  The audio of the record recording.

16    THE COURT:  Have you edited it down so it's

17  consistent with the redaction?

18    MR. AUSTIN:  Yes, sir.  So Defense 60 has the

19  original part that Your Honor approved.  And then we have a

20  snippet that the Government wants included as well.  We can

21  play that.  We are happy to accommodate there.

22    THE COURT:  Well, I'm confused.  What does that

23  mean?

24    MR. AUSTIN:  There's a little --

25    THE COURT:  If we are going to play it, you are not

1 going to play the Government's part at the same time, or how

2 are you going to do that?

3      MR. AUSTIN: We are prepared to. We could do it

4 easily. We wanted to play our part.

5      THE COURT: Ms. Limehouse.

6      MS. LIMEHOUSE: Your Honor, we never heard any of

7 these recordings before this moment. And so there's a

8 transcript --

9      THE COURT: She's saying she hasn't heard the

10 redacted version.

11      MS. LIMEHOUSE: None of them, they've never been

12 provided to us. We have a transcript that has been admitted

13 into evidence.

14      THE COURT: Let me ask this. Has the -- I had

15 ordered long ago that the audio be provided. Has it not been

16 provided?

17      MR. AUSTIN: Obviously, it was. We wanted to

18 everybody to hear it.

19      MS. LIMEHOUSE: We have never received the --

20      MR. AUSTIN: That's news to me.

21      MS. LIMEHOUSE: We never received --

22      THE COURT: Here's my concern. You know, there are

23 complex privilege issues here. We've spent a lot of time

24 resolving them. And what I don't want is, oops, we violate

25 it. That's why you show this to the other side so they have

1    an ability to screen it, and if there's a problem, to raise

2    an objection.  We've been through this a lot.  And I've

3    ordered very specifically -- I believe the word was promptly

4    in my order, promptly, provide this to the Government.

5         MR. AUSTIN:  My understanding is that we did, but,

6    we have no desire not to share.  We were trying to get it out

7    the whole time.

8         THE COURT:  I'm cognizant we've given them a

9    transcript, so you are not going to hide the thing.

10        MS. LIMEHOUSE:  Of course.  And, honestly, Your

11   Honor, I don't believe that you ever ordered them to turn it

12   over to us.  They were ordered to turn it over to the

13   privilege holder, who was then required to provide the areas

14   of the recording that they were not going to assert privilege

15   over.

16        THE COURT:  I don't have an ambush problem here.

17        MS. LIMEHOUSE:  No, that's not what we are alleging,

18   Your Honor.  The problem is more so that I think this

19   recording that we have never heard may risk confusing the

20   jury.  There's snippets of redacted portions that we haven't

21   listened to.  And we already have a transcript in evidence

22   that says exactly what the defense wants the jury to hear.

23   And so I think it's a waste of the jury's time.  And I think

24   it's going to risk confusing them.

25        MR. AUSTIN:  Judge, it's a really short snippet.

1 And we could play it during the break here.

2 THE COURT: Let's take a break. And we will come

3 back, play it first for Ms. Limehouse before you play it for

4 me. If it's short, over the break, and then when I come

5 back, let me hear from Ms. Limehouse.

6 MS. LIMEHOUSE: Very good, Your Honor. Fair enough.

7 (Whereupon, recess transpired.)

8 THE COURT: What's the scoop?

9 MS. LIMEHOUSE: We've now had an opportunity to

10 listen to the recording. Our concern is that the portions we

11 wanted included are not coordinating in time. So what they

12 are working on now is finding a way to include those portions

13 the way they appear in the transcript and during the meeting.

14 As long as they can present the jury in the way that those

15 statements took place and as long as the transcript can roll

16 with the recording, we have no objection.

17 THE COURT: Okay. That makes a lot of sense.

18 Now, Matt, how much longer?

19 MR. AUSTIN: I think this part should take 10

20 minutes. And then I have like two minutes of questions.

21 THE COURT: What concerns me is this. How long is

22 your cross?

23 MS. LIMEHOUSE: Long.

24 THE COURT: I don't know we should start a cross.

25 You know, I mean, there's a lot of detail here. You've done

1  a lot of detail.  And I'm inclined to send the jury home.  I

2  don't think we start at 4:30 on Friday afternoon

3  cross-examination.  I don't think it's -- first of all, I

4  don't think it's fair to your client to be at the end of the

5  day like this.  And it's not fair to the Government.  So I'm

6  inclined to send them home and do the cross Monday morning.

7          Now, let me just confess, if I were in y'all's

8  shoes, I wouldn't want to give the Government all weekend to

9  work on it.

10          MR. DANIEL:  I never thought of that, Judge.

11          THE COURT:  I wouldn't give them that much time

12  myself.

13          MS. LIMEHOUSE:  I also just want to be clear that no

14  communications over the weekend.

15          THE COURT:  No, I am not worried.  We will tell him

16  that.  No, he can't talk.  He's on the stand.  He can't do

17  that.

18          MR. AUSTIN:  We think we are good to go with the

19  slice.

20          THE COURT:  Y'all got the slice?

21          (Whereupon, the bench conference ends.)

22          THE COURT:  Have we resolved our differences

23  regarding the audio?  We are mutually satisfied, Ms.

24  Limehouse?

25          MS. LIMEHOUSE:  I believe so, Your Honor.

1    THE COURT:  Mr. Austin?

2    MR. AUSTIN:  I believe that's right.

3    THE COURT:  When he's finished, let me know.

4    MR. AUSTIN:  I think we are good, Judge.

5    THE COURT:  Bring in the jury, please.

6    (Whereupon, the jury returns to open court at 3:53

7  p.m.)

8    THE COURT:  Please be seated.  Mr. Austin, please

9  continue your direct examination.

10    MR. AUSTIN:  Thank you, Your Honor.  At this time,

11  Defense would move Defendant's Exhibit 89 into evidence.

12    THE COURT:  Is there an objection?

13    MS. LIMEHOUSE:  No objection, Your Honor.

14    THE COURT:  89 is admitted without objection.

15    (Defendant's Exhibit 89 received in evidence.)

16    MR. AUSTIN:  We would like to publish it to the jury

17  and also 223, which is the transcripts, and we will play it

18  at the same time the audio is playing.

19    THE COURT:  Any objection?

20    MS. LIMEHOUSE:  No objection.

21    THE COURT:  Very good.  Please proceed, sir.

22    (Audio playing.)

23  BY MR. AUSTIN:

24    Q.  So what was your understanding of what was going on

25  there and what the Board was or was not onboard with?

1    A.    My understanding after that meeting, that we had all

2    agreed to pay the $680,000, that they were working --

3    Trenholm Walker was working towards getting a release for the

4    bank from PMPED, and that we were going -- moving forward.

5    Q.    And I asked this several times through witnesses, to

6    your knowledge, had anybody filed any written dissent to that

7    payment?

8    A.    Not to my knowledge.

9    Q.    And you informed the Executive Committee, not just

10   your dad, your sister and yourself, obviously not yourself,

11   but on the 28th, you wrote that e-mail to the Executive

12   Committee?

13   A.    That's correct, the full Executive Committee.

14   Q.    And that includes Jan Malinowski and Scott Swain?

15   A.    That's correct.

16   Q.    And he was talking about Arthur Badger at the end

17   there.  Is he, to your knowledge, a beneficiary of Donna

18   Badger?

19   A.    He is not.  He renounced that.

20   Q.    Okay.  I'm going to wrap this up.  With the $500,000

21   line of credit, what was your understanding of that

22   transaction?

23   A.    We were doing a line of credit for Mr. Murdaugh.

24   And we were using his -- he had his property in Moselle,

25   1,700 acres, plus or minus.  And we were taking a second

1    mortgage on the house and I want to say however many acres

2    the house was actually, a couple of houses, barns, et cetera,

3    and then a first mortgage on the rest of the property, about

4    8- or 900 more acres.  And he was going to use it -- I think

5    for business purposes said farming, but he was going to use

6    it as he needed.  And the first -- I am not saying it's the

7    first advance, but one of the first advances he took 284,000

8    and paid off Alania -- not Alania, Hannah Plyler, the loans

9    on the Hannah Plyler, and the rest he used lone to cover

10   overdrafts and other things.

11        Q.   And did you have any concerns about the fact that it

12   wasn't all used for farming?

13        A.   I had no concerns at all.  I mean, we were well

14   collateralized, the property was worth about $3 million, if I

15   remember correctly.  And, actually, that loan was paid off

16   within 90 to 95 the days in to a million dollar line of

17   credit.

18        Q.   Did the Board vote on approving that loan?

19        A.   The Board voted to approve the $500,000.  We, as a

20   Board, voted every month on all the loans over 25,000 to

21   approve them.  And then on the million dollars, the Executive

22   Committee took it through the Executive Committee and through

23   the Board.

24        Q.   Okay.  And it was asked to you about some of the

25   conservator and PR loans earlier.  You didn't have any intent

1  to steal from anybody or help anybody steal from anybody

2  there?

3      A.   I did not.  I wouldn't have been part of that.

4      Q.   With regard to the $680,000 check, $750,000 loan,

5  $500,000 line of credit, did you have any intention to

6  misapply funds to the bank or hurt or injure the bank or

7  defraud the bank?

8      A.   I would have been defrauding myself, seeing as I was

9  one of the shareholders, and I would not have done it.  We

10 were trying to make on the 680.  We were trying to make our

11 client -- not our client, the client who lost his money that

12 we facilitated part of the loss, because we did the

13 transaction.  We were trying to make the client whole.  We

14 were also -- at the same time, we were trying to make the

15 client whole, we are trying to protect the bank and reduce

16 our liability.

17      On the loans, we had no intentions of trying to

18 defraud or mislead.  I mean, those loan purposes, you know, I

19 am not even sure who put it on the sheet, but I'm sure I

20 instructed our loan assistant to put "farming" on there.  I

21 mean, he owned land.  He did raise some timber out there on

22 that property.  I mean, it's a significant piece of property.

23 And there was no intent to try to defraud the bank.  I mean,

24 he was making payments on it and everything.

25      Q.   And you are talking about Moselle, that property?

1    A.    I want to clarify.  He never made a payment on the

2    $750,000 loan.

3    Q.    And what is your understanding of why?

4    A.    Well, it was a single-pay note, so there were no

5    payments due until January.  But as we all know, he was in

6    jail before then.  So there was no way he was going to make a

7    payment.  The only payment is when we -- not we, the Murdaugh

8    family -- sold his share of Green Swamp stock and applied it

9    to that loan, which was $250,000.

10    Q.    Okay.  And so in terms of exposure to the bank, the

11    Moselle is under contract, right?  You said that the beach

12    house was under contract or --

13    A.    It sold.

14    Q.    0 United and Red Beard, have those properties sold?

15    A.    They sold.

16    Q.    Do you know how much for?

17    A.    I did see it.  I can't remember whether it was

18    900,000 or -- you know, those 0 United and Red Beard LLC,

19    they are two separate LLCs, but they were done in one

20    transaction.  So it's hard to tell whether -- when I said

21    they were done in one transaction, the sale, when I saw the

22    sale paper in public records, I couldn't tell whether it

23    was -- I should know that amount or not, but looked to me to

24    be about 1.6 million or something like that.  I might be

25    wrong on that.

1     MR. AUSTIN:  Okay.  Thank you.  That's all I have.

2     THE COURT:  Ladies and gentlemen, I never like to

3  start a lengthy cross-examination or a direct late on Friday

4  afternoon.  So I'm going to send you home.  I think everybody

5  will do better first thing Monday morning.  So we will

6  resume.  I want to remind you over the weekend, I don't want

7  you looking, talking to anyone about the case, not looking at

8  any Internet or any news articles or anything else.  Keep it

9  within you.  And, of course, when it's all over, you can talk

10  to anyone you wish and share about it.  But right now, we are

11  still within the jury family.  Okay?  So everyone be safe.

12  We will see you first thing Monday morning.

13     (Jury leaves open court at 4:08 p.m.)

14     THE COURT:  Please be seated.  I want to just -- so

15  Mr. Laffitte will have good guidance here, the rule is once

16  someone is on the witness stand, their lawyers cannot talk to

17  them.  So you are on your own.  I'm sure you are not going to

18  mind too much not talking to your lawyers this weekend.  And

19  you will probably be glad to be ordered not to do that.  And

20  so he will resume Monday morning.  And over the weekend, we

21  won't have any conversations with him.  Any other matters I

22  need to address?

23     MS. LIMEHOUSE:  Nothing from the Government, Your

24  Honor.

25     THE COURT:  From the defense?

1    MR. DANIEL:  Nothing from the defense, Your Honor.

2    THE COURT:  Get good rest.  We will see you Monday

3 in the morning.

4    (Whereupon, the proceedings are adjourned.)

1    <u>CERTIFICATE OF REPORTER</u>

2

3         I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8         I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15   _____
     Karen V. Andersen
16   Registered Merit Reporter
     Certified Realtime Reporter

17

18

19

20

21

22

23

24

25