```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                        CHARLESTON DIVISION

3

4   _____
                                    )
5   UNITED STATES OF AMERICA,       )
                                    )
6           Plaintiff,              )   Docket No. 9:22-658
                                    )
7           vs.                     )   Charleston, SC
                                    )
8   RUSSELL LUCIUS LAFFITTE,        )   Volume VIII
                                    )
9           Defendant.              )
    _____)   DATE:  November 21, 2022
10

11               BEFORE THE HONORABLE RICHARD M. GERGEL
                UNITED STATES DISTRICT JUDGE, PRESIDING
12                          JURY TRIAL

13

14  A P P E A R A N C E S:

15  For the Plaintiffs:

16  EMILY EVANS LIMEHOUSE
    U.S. Attorney's Office
17  151 Meeting Street, Suite 200
    Charleston, SC 29401-2238
18  843-266-1663
    emily.limehouse@usdoj.gov
19
    WINSTON D. HOLLIDAY and KATHLEEN MICHELLE STOUGHTON
20  U.S. Attorney's Office
    1441 Main Street, Suite 500
21  Columbia, SC 29201
    803-929-3000
22  winston.holliday@usdoj.gov
    kathleen.stoughton@usdoj.gov
23

24  COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
                                 United States Court Reporter
25                               901 Richland Street
                                 Columbia, SC  29201
```

APPEARANCES:

For the Defendant:

EDWARD BART DANIEL, MARSHALL AUSTIN, and MATT ABEE
Nelson Mullins Riley and Scarborough
151 Meeting Street
Charleston, SC 29401
843-534-4123
bart.daniel@nelsonmullins.com, matt.austin@nelsonmullins.com

CHRISTIAN JOSHUA MYERS
Nelson Mullins Riley and Scarborough
101 Constitutional Avenue NW, Suite 900
Washington, DC 20001
202-689-2001
josh.myers@nelsonmullins.com

1

INDEX

2

EXAMINATION

3       Witness Name                                          Page

4       RUSSELL LAFFITTE (continued)

5           BY MS. LIMEHOUSE ...................................... 1859

6           BY MR. AUSTIN ........................................ 1930

7

EXHIBITS

8       Exhibit                                               Page

9

        Government's Exh. 199                                 1890

10
        Government's Exh. 202 - 209                           1908

11
        Government's Exh. 49A                                 1993

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Can I have counsel approach, please?

2    (Whereupon, a bench conference takes place off the

3  record.)

4    THE COURT:  It's amazing how much better y'all look

5  with a little rest.  We are waiting for a juror who has

6  transportation issues and she's on her way.  So that's what's

7  holding us up.

8    Are you going to rest after the defendant?

9    MR. DANIEL:  Yes, sir.  Yes, sir.

10    THE COURT:  Is the Government calling rebuttal?

11    MS. LIMEHOUSE:  We are not.  We do have one matter

12  we would like to take up.  We are just going to move to put

13  him in breach of his proffer agreement officially in the

14  record, but nothing else.

15    THE COURT:  I don't need to --

16    MS. LIMEHOUSE:  We just want it on the record.

17    THE COURT:  That's fine.  You want to do that now --

18    MS. LIMEHOUSE:  Sure.

19    THE COURT:  -- while we've got a minute.

20    MR. DANIEL:  Judge, we have a matter we would like

21  to right now -- there was a question at one of the

22  debriefings, I believe it was.  And the question was, did he

23  claim his conservation (sic) fees on his income tax return,

24  and the answer was, no, I did not, but I filed amended

25  returns.  And we don't think that's admissible because --

1    THE COURT:  You are saying conservation easement?

2    MR. DANIEL:  Not a conservation -- conservator,

3    conservator, Judge.

4    THE COURT:  He did not pay his taxes and then he --

5    MR. DANIEL:  He subsequently has, but at the time he

6    did not.

7    MS. LIMEHOUSE:  During the September 6th bond

8    hearing, he testified under oath that he did not pay taxes on

9    conservator or personal representative fees back in time.  We

10   filed this issue in our trial brief.  We intend to bring it

11   out as evidence of motive --

12   THE COURT:  And has he already subsequently -- when

13   did he pay amended returns?

14   MS. LIMEHOUSE:  Well, he says back in 2021, after

15   this all came back, that he went back and amended and paid

16   taxes on his fees but that he didn't back in time.

17   THE COURT:  Which is 2013?

18   MS. LIMEHOUSE:  Correct.

19   THE COURT:  I believe that's a fair game.  You can

20   put it on the record.  I think that's a fair issue on 404(b).

21   You are going to put it on the record right now?  How do you

22   want to do it?

23   MR. DANIEL:  This is insufficient.

24   THE COURT:  Well, let's just do it.  I just

25   thought -- but I'm glad to do it.  As I understand the issue,

1    the defendant did not timely report his income on these

2    various conservator fees, and that he did not do it until on

3    or about 2021, some of the fees earned in the early part of

4    2010.  And I find that that is a potential issue under 404(b)

5    and that the Government is entitled to bring about -- to

6    raise that if it wishes as a bad act evidence.

7              MR. DANIEL:  Okay.  And, Your Honor, we would --

8              THE COURT:  You take exception to it, I understand

9    that.

10             MR. DANIEL:  Not going to be -- it's not admissible

11   under 404(b).  But also, it's extraneous to this matter.  And

12   it intends -- appropriate value is greatly outweighed by the

13   prejudicial effect.

14             THE COURT:  I think a 403 issue is that it directly

15   involves the very issue here, which is his role as a

16   conservator.  So I disagree with that.  But your exception is

17   noted.  Okay?

18             MS. LIMEHOUSE:  Your Honor, we covered for -- moving

19   to hold him in breach of his proffer agreement?

20             THE COURT:  You may do it now.

21             (Whereupon, the bench conference ends.)

22             THE COURT:  Does the Government have a matter it

23   wishes to bring before the Court?

24             MS. LIMEHOUSE:  We do, just one brief matter, Your

25   Honor.

1    In light of the defendant's testimony on Friday, the

2  Government moves to hold him in breach of his proffer

3  agreement.  The Government believes there were numerous

4  misrepresentations that the defendant made to the Government

5  and the FBI back in February.  But we think the most

6  straightforward example is his testimony on Friday that he

7  did not see Arthur Badger's disbursement sheet.  That

8  statement under oath is inconsistent with the statements he

9  gave to the FBI back in February, and is also inconsistent

10  with his own sworn testimony from September 6th.  So we move

11  to hold him in breach of his proffer agreement and intend to

12  use his statements made during that interview in February

13  against him.

14    THE COURT:  Well, the matter is on the record.  It

15  doesn't require -- beyond taking note on the record, it

16  doesn't require any Court action on my part.  Duly noted.

17    MS. LIMEHOUSE:  Thank you, Your Honor.

18    THE COURT:  And we are waiting for a juror.  So with

19  that, we will be ready to proceed.

20    MR. AUSTIN:  Your Honor, Judge, can I respond to the

21  Government's comments about the breach?  I'm not sure --

22    THE COURT:  Sure.  You understand, it's not a

23  decision for the Court to make.  It's just the Government has

24  asserted that.  Yes.

25    MR. AUSTIN:  I just want to point out that this has

1    been a topic that's been subject to a lot of discussions

2    between defense counsel and the Government since the proffer,

3    which took place in February 2022.  And my understanding from

4    the Government is that they were not moving forward with this

5    based on some other discussions we had about the grand jury

6    transcripts and the agent's notes from the proffer meeting

7    back in February.

8           We took issue with a number of statements in the 302

9    that was generated from that.  And we thought this matter had

10   been put to rest.  In, I guess, September 8th, Ms. Limehouse

11   e-mailed saying that they were not going to move forward with

12   the breach.  And so I think bringing this up in front of the

13   jury only serves to make -- even if ultimately they don't

14   move to find him in breach, it's just that's a bell that I

15   don't think can be unrung.

16          THE COURT:  Well, it's not a jury question of

17   whether he's in breach or not.

18          MS. LIMEHOUSE:  That's correct, Your Honor.  And I

19   will note that Mr. Austin, on his direct examination, brought

20   out the fact in support of Mr. Laffitte that he had fully

21   cooperated with the FBI and provided statements --

22          THE COURT:  You opened the door.  And the issue is

23   not dead.  When you go in and open the door, Mr. Austin, the

24   Government is not foreclosed from considering that.  You

25   know, the real testimony here is this testimony.  I mean,

1    there are other issues about breach as well, but when you get

2    on the stand and you say something, and whether he is in

3    breach or not is -- you know, the Government is simply

4    asserting for the record. The Court does not require. The

5    jury does not address it.

6            MR. AUSTIN: As long as the jury is not involved in

7    it --

8            THE COURT: It's not on the verdict form or anything

9    like that.

10           MS. LIMEHOUSE: That's correct, Your Honor. I will

11   note he asked Mr. Laffitte on direct, has the Government ever

12   held you in brief of the proffer agreement --

13           THE COURT: Everything is fair. And same applies to

14   you, Ms. Limehouse, you get into something, you may open a

15   door about issues that don't exist right now.

16           MS. LIMEHOUSE: That's correct, Your Honor. Thank

17   you.

18           THE COURT: Thank you.

19           I would remind counsel that before we do closing

20   argument, after any post-trial motions, I want the counsel to

21   come and confirm the exhibits are accurate and complete

22   there, that you go look at your exhibits, because that's

23   what's going back to the jury room. So what I want you to do

24   is come up and go through with Ms. Perry these exhibits.

25   Have somebody on your team ready to do that, to make sure

1　they are complete.  Because I'm going to hold you to it.  I'm

2　counting on y'all.  Ms. Perry is very careful, but there are

3　a lot of exhibits in this case.  And if there's some issue, I

4　can then address it.  Okay?

5　　　　　　(Whereupon, the jury returns to open court at 9:31

6　a.m.)

7　　　　　　THE COURT:  Please be seated.  While I had the

8　observation last Monday, you look a lot more rested and you

9　look a lot more rested this Monday.  You know, a lot of

10　people think that lawyers sit over here and judges and it's

11　just sort of a piece of cake, you just sit around and listen

12　to people.  But this takes a lot of work and concentration.

13　And your brain bandwidth is just about exhausted by the end

14　of every day.  So I want to thank you.  I'm watching you.

15　You folks are really paying attention.  And the parties

16　couldn't ask for any more than that.

17　　　　　　Mr. Laffitte, return to the witness stand for

18　cross-examination.

19　　　　　　　　　　　　CROSS-EXAMINATION

20　BY MS. LIMEHOUSE:

21　　　Q.　Mr. Laffitte, you testified that it was Alex's idea

22　to take the loans from Hannah Plyler's conservatorship

23　account; is that correct?

24　　　A.　That's correct.

25　　　Q.　But, in fact, you took the first loan for $225,000

1    from Hannah's account, didn't you?

2        A.    That is correct.

3        Q.    That was more than two months before Alex took any

4    loans from Hannah's account; is that right?

5        A.    Yes, ma'am.

6        Q.    You testified under oath back on September 6th of

7    this year; is that right?

8        A.    What would that have been?

9        Q.    The bond hearing.  You testified under oath at your

10   bond hearing; is that right?

11       A.    I did testify at the bond hearing.

12       Q.    And at that time you testified that you did not

13   remember why you needed that loan or how you spent it, right?

14       A.    Yes, ma'am, but since then I've researched it and we

15   went through it earlier from testimony.

16       Q.    And the jury has heard how you used that first loan

17   to pay off other loans that you got at an independent bank at

18   a much higher interest rate; is that right?

19       A.    That is correct.

20       Q.    And after that first loan, you continued to take

21   $355,000 in loans from Hannah's account, didn't you?

22       A.    No, ma'am.

23       Q.    How much did you take in loans total?

24       A.    I took 255 -- 245,000 or 25,000, whatever the first

25   loan was, the total may have been 355, but I didn't take the

1 first loan and then continue with another $355,000 in loans.

2     Q.   So you took a total of $355,000 in loans from

3 Hannah's accounts, right?

4     A.   I am not exactly sure what the total amount was but

5 I will go with that.

6     Q.   And you also testified back during your bond hearing

7 that all the loans were timely paid back with interest,

8 didn't you?

9     A.   They were all paid back with interest, yes, ma'am.

10     Q.   Well, you testified on Friday that you didn't

11 dispute the accuracy or the authentication of any of the

12 documents the jury has seen during this trial, right?

13     A.   I'm not sure.

14     Q.   And those include the records that Ms. Swinson

15 testified extensively about, the jury has seen those records,

16 didn't they?

17     A.   Which records are we talking about now?

18     Q.   All the records of your loan repayments without

19 interest that was due because of your backdating and late

20 payments of those loans?

21     A.   All the interest was paid.  Interest was done daily.

22 So if interest is paid through the date of the check and if

23 the date of the check was -- just make up a date, because I'm

24 not sure, January 4th, you could continue to pay interest

25 until it's paid off.

1    Q.   And you didn't deposit those checks until sometimes

2   more than a year after those loans were due, right?

3    A.   I'm not sure when I deposited them exactly, but I

4   saw what y'all said, yes, ma'am.

5    Q.   And you never paid Hannah a 5 percent late fee that

6   she was owed under the promissory note that you drafted?

7    A.   We did not pay any late fees, no, ma'am.

8    Q.   And when it came time to pay Hannah back these

9   loans, you didn't use any of your income to pay them back,

10  did you?

11   A.   No, ma'am, I did use my income.

12   Q.   You used the PR fee you got from Arthur Badger,

13  right?

14   A.   That is income.

15   Q.   You didn't report that fee as income back in 2012,

16  did you?

17   A.   No, ma'am, but I have since amended all my tax

18  returns and that was income to me.  And not only that, I also

19  tried to pay the Arthur Badger fee.  It's been paid back.

20  And the other fee to Natasha Thomas and Hakeem Pinkney, I

21  tried to pay the bank back and they returned it.

22   Q.   You didn't report the $35,000 fee as income on your

23  tax returns until 2021, after all this conduct had gotten

24  uncovered; is that right?

25   A.   That is correct.  I've amended several years' tax

1    returns.

2       Q.   And you didn't pay taxes on the $60,000 you took

3    from Hakeem Pinkney either, did you?

4       A.   Yes, ma'am.  I did pay taxes in 2021 on it.

5       Q.   You did not pay taxes on the fee from Hakeem Pinkney

6    back in 2012, did you?

7       A.   No, ma'am, I did not.  I paid them in 2021 when I

8    amended all of my tax returns.

9       Q.   And you didn't pay taxes back in 2012 on the $15,000

10   that you took from Natasha Thomas either, did you?

11      A.   No, ma'am.  I paid taxes in 2021 when I amended my

12   tax returns.

13      Q.   It wasn't until you had been confronted by the FBI,

14   by SLED, and by your bank that you went back and amended your

15   tax returns to pay taxes on the income you took from these

16   victims; is that right?

17      A.   What's the question?

18      Q.   It wasn't until after you had been confronted with

19   the FBI and SLED and the bank that you amended your tax

20   returns; is that right?

21      A.   No, ma'am.  I amended my tax returns after speaking

22   with my accountant.  And we made a decision.  And I called

23   him and I told him, I said, look, I did not claim all of this

24   income.  And it was roughly, to be exact, it was roughly

25   $45,000 and some change that I did not claim.  And I said,

1    look, with everything going on, we need to redo my taxes.

2    And we went back and amended all of my tax returns.

3        Q.    So back when you owed Hannah on all those loans, you

4    used that $35,000 PR fee, right?

5        A.    That's correct.

6        Q.    And you used the $60,000 conservator fee from Hakeem

7    Pinkney; is that correct?

8        A.    That's correct.

9        Q.    And then you credited yourself what you said you

10   were owed in conservator fees from Hannah, right?

11       A.    Yes, ma'am.

12       Q.    And then you took a private loan from Johnnie

13   Parker?

14       A.    That's correct.

15       Q.    And you are still paying on that loan to Johnnie

16   Parker today?

17       A.    I am.

18       Q.    Again, you testified that this was all Alex's idea.

19   But more than two months after you took your first loan, you

20   extended Alex his first loan, right?

21       A.    Alex came to me and asked if he could do a loan.  I

22   went over to the probate judge's office and asked the probate

23   judge.  Alex did not come back to get a loan for several

24   months.  And then that -- during that time I did the first

25   loan.

1    Q.    And after that first loan to Alex, you proceeded to

2    extend him over $960,000 in loans from Hannah's account,

3    total, over $960,000 of unsecured loans that you gave Alex

4    Murdaugh from Hannah's account; is that right?

5    A.    I am not exactly sure of the exact total, but we did

6    many loans that were all unsecured and they were all paid

7    back with interest.

8    Q.    And every time Alex was overdrafted on his accounts,

9    wasn't he?

10    A.    I don't know that.

11    Q.    You received a report every morning when Alex was in

12    overdraft, didn't you?

13    A.    I did.

14    Q.    And you would access his account records yourself

15    and see that Alex was in overdraft and needed a deposit,

16    didn't you?

17    A.    I would see the report.  It's called nonsufficient

18    or nonposted transactions every morning.  And we would go

19    through it.  Shows all the branches.  Yes, Alex was on there

20    many, many times, as you've heard over and over and over.

21    But I can't say for a fact that every time we did a loan Alex

22    was overdrafted.  I am not saying he wasn't, but I can't say

23    for a fact that he was.

24    Q.    But you would access his accounts when he was in

25    overdraft and transfer money from Hannah's conservatorship

1 account to cover that overdraft, didn't you?

2     A.    Sometimes if we had talked and then he needed a

3 loan, yes, ma'am, but not all the time.  A lot of time it

4 came from credit lines.  A lot of time it came from his other

5 checking account.

6     Q.   You were always in there trying to make his accounts

7 right, weren't you?

8     A.   I'm not sure what the question is there.

9     Q.   You were the one in Alex's accounts trying to make

10 them right, weren't you?

11     A.   What do you mean, make them right?

12     Q.   You said from credit lines from his other accounts,

13 from Hannah's accounts, you were in there trying to manage

14 Alex's accounts and keep them out of overdraft, right?

15     A.   I wouldn't say I tried to manage it.  We were always

16 watching overdrafts.  Overdrafts to the banks are loans,

17 unsecured loans, any way you look at it.  And we always, you

18 know, somebody is in overdraft, we would contact them and

19 say, hey, we need a deposit.  And he would either say, you

20 know, get it from a credit line or transfer it from my other

21 accounts or whatever.

22     Q.   Could we pull up Government's Exhibit 187, please.

23 If you could just zoom in on the records.  So this shows that

24 on February the 12th of 2013, you were in Alex's accounts

25 making an inquiry; is that right?

1    A.    That's what it looks like, yes, ma'am.

2    Q.    And then later you would transfer $10,000 to that

3    account; is that right?

4    A.    It was one minute later.  It was all at the same

5    time.

6    Q.    Because you were in the account checking to see that

7    he was in overdraft and transferring the money to make it

8    right, weren't you?

9    A.    On February the 12th, 2013, I was, yes, ma'am.

10    Q.    Go to the next page, please.  If you could do the

11    same thing, Ms. Rozsa.  And, again, on March the 28th of

12    2014, you are in there checking Alex's accounts, and then you

13    transferred $75,000; isn't that right?

14    A.    That is correct.

15    Q.    And we have records from every single time you

16    loaned Alex money from Hannah's accounts showing the exact

17    same thing?  You dispute that these records are accurate and

18    authentic as you testified on Friday?

19    A.    No, ma'am, I don't dispute it.  I don't know unless

20    I look at each one.  I am not privy to these records.  When I

21    was at the bank I was, but not now.

22    Q.    You saw these records during testimony, haven't you?

23    A.    Not every one for every loan, but I will take your

24    word for it.

25    Q.    And none of the loans that you extended Alex were

1    secured, were they?

2        A.    No, ma'am, they were all unsecured.

3        Q.    If we could pull up Government's Exhibit 190,

4    please.  For the next three years, you continue to loan Alex

5    unsecured loans to cover his overdraft from Hannah's account,

6    didn't you?

7        A.    I loaned him unsecured.  He requested it, I would

8    loan it to him unsecured, yes, ma'am.

9        Q.    And as this chart shows, Government's Exhibit 190,

10   when you would loan him money, he was in overdraft; is that

11   right?

12       A.    I didn't make this chart.  I'm going to assume that

13   it is correct.  Yes, ma'am.

14       Q.    Well, as you testified, the records are accurate and

15   authentic; is that right?

16       A.    I'm going to assume it is correct, yes, ma'am.

17       Q.    We are going to talk about how Alex periodically

18   paid these loans back.  But first let's talk about the

19   $500,000 line of credit.  So in 2015, Hannah was turning 18,

20   right?

21       A.    Yes, ma'am.

22       Q.    And you and Alex both had to pay your loans to

23   Hannah back, right?

24       A.    That's correct.

25       Q.    And in February of 2015, Alex was in overdraft yet

1  again, wasn't he?  Pull up Government's Exhibit 161, February

2  2015 records.  February 2015, Alex is $85,000 in overdraft;

3  is that right?

4      A.   Yes, ma'am, on the 19th he was.

5      Q.   And you know that he doesn't get paid until

6  September.  So there's no way he can pay Hannah back, right?

7      A.   I don't have any idea.  I know when he gets paid.

8  He gets paid every other week just like everybody else.

9      Q.   Not $85,000, does he?

10     A.   No, ma'am.  But he gets his big bonus check in the

11 last week of December, the 1st week of January, somewhere

12 right in there, but he also could have been selling some

13 property.  I don't know what he's doing.

14     Q.   In February of 2015, so that he could pay Hannah

15 back, you extended him a line of credit for purpose of

16 farming, didn't you?

17     A.   We did a line of credit.  And it did have a purpose

18 of farming, yes, ma'am.

19     Q.   And you gave him an advance?

20     A.   Uh-huh.

21     Q.   Of $284,787.52 knowing that those funds were not

22 used for farming, didn't you?

23     A.   We did do an advance of 284,000 and some change to

24 pay off the loan of Hannah Plyler.  But did you do the

25 research to see that all the other checks that caused the

1    overdraft and caused the -- what they were used for?

2        Q.   The $284,787.52 went to Hannah Plyler, didn't it?

3        A.   Yes, ma'am.

4        Q.   Hannah Plyler has nothing to do with farming, does

5    she?

6        A.   But the money that he borrowed from Hannah, any of

7    that used for farming?

8        Q.   Was the $284,787.52 used for farming?

9        A.   It was used to pay Hannah Plyler.

10       Q.   That's right.  If we could pull up Government's

11   Exhibit 57.  And on February the 20th -- we've seen that he's

12   $85,000 in overdraft on February 19th, right?  And on

13   February 20th, you e-mail Alex and you say, these are the

14   loans outstanding.  I have advanced $284,787.52 from your

15   credit line to pay these off.  She turns 18 and I am closing

16   the conservatorship account.  Is that right?

17       A.   That's correct.

18       Q.   If we could pull up Government's Exhibit 201, page

19   40, please.  And if you could just zoom on the lines 4

20   through 9.  Your Honor, the Government moves to admit Exhibit

21   201.  It's his testimony from the September 6th bond hearing.

22            THE COURT:  Is there an objection?

23            MR. AUSTIN:  Your Honor, we would object to entering

24   it into the record at this point.  It's fine to use to

25   refresh his recollection but, no.

1    THE COURT:  It's not hearsay.

2    MS. LIMEHOUSE:  That's correct.  It's a statement of

3 a party opponent.

4    THE COURT:  By a party opponent.  Overruled.  What's

5 the number?

6    MS. LIMEHOUSE:  Government's Exhibit 201.

7    THE COURT:  Government's Exhibit 201 is admitted.

8    (Exhibit is received in evidence.)

9    Q.  If you would pull up page 40.  When I asked you

10 about this $500,000 line of credit, I asked, so you state

11 that it's for farming even though you know he's going to

12 spend hundreds of thousands of dollars to pay off loans to

13 Hannah Plyler.  And you responded, yes, ma'am.  And I said,

14 and you knew that when the loan was extended, and you said, I

15 didn't know whether he was going to do that or not but I was

16 assuming that, yes, I was.

17    If we can go back to Government's Exhibit 57.  You

18 did know that he was going to do it because you are the one

19 who did it for him, didn't you?

20    A.  I did.  But I didn't know on the 500,000 whether he

21 was going to use money for farming or exactly what he was

22 going to do.

23    Q.  You knew he was going to spend the $284,787.52

24 because you spent that money for him?

25    A.  I didn't spend the money for him.  I transferred the

1  money to pay off the loan.

2      Q.   That's right.  If we could pull up the top portion,

3  Alex's response.  Alex responds to you three days later,

4  February 23rd:  Please hold off on this until I return and

5  can meet with you.  Hard to follow all this on my phone.

6          Alex is relying on you to figure out how much he

7  owes on his loans and get those paid back, isn't he?

8      A.   Yes, ma'am, because I'm the one that knows how much

9  the payoffs are.

10          MS. LIMEHOUSE:  If we could pull up Government's

11  Exhibit 58, please.

12  BY MS. LIMEHOUSE:

13      Q.   The following month, Alex e-mails you and says, I

14  need to do whatever we have to do to activate my full credit

15  line.  I didn't quite understand what you were saying, but I

16  took it that there was something else that needed to be done.

17  I had not figured the payoff for Hannah and the other loan

18  when I was planning.  When we paid those, it took most of the

19  partial line you activated.  I need to do it fairly quickly

20  too.  There are two pieces of equipment I need for planting.

21  Thanks.  And I will call after I speak to Mark.

22          Alex didn't even know that you were going to use the

23  farming line of credit to pay Hannah's loans back, did he?

24      A.   I have no idea what Alex knew.

25      Q.   According to this e-mail, Alex said, I had not

1  figured the payoff for Hannah and the other loan when I was

2  planning, did he?

3      A.   According to the e-mail, but --

4      Q.   According to Exhibit 57, the prior e-mail, you

5  notified him that you made that advance and used that to pay

6  off Hannah's loans, didn't you?

7      A.   I did notify him.

8      Q.   Let's talk about how Alex paid these loans off

9  periodically.  Alex used settlement proceeds from Natasha

10  Thomas, Hakeem Pinkney, and Arthur Badger to pay off these

11  loans, didn't he?

12      A.   Not just them, but, yes, he did use them.

13      Q.   And you've testified that you negotiated every

14  single one of these checks and money orders from the Badger,

15  Pinckney and Thomas funds, didn't you?

16      A.   I negotiated every one except the two to Bank of

17  America.  I did not touch those.

18      Q.   And the remaining checks you negotiated every single

19  check; is that right?

20      A.   To the best of my knowledge, that is correct,

21  unknowingly that they were stolen.

22      Q.   Let's talk about Hakeem Pinkney and Natasha Thomas.

23  You spent a considerable amount of time on Friday reviewing

24  the accounts and the records that you filed with the probate

25  court regarding your management of Hannah and Alania's

1    conservatorship accounts, didn't you?

2    A.    Yes, ma'am.

3    Q.    You showed a lot of those records to the jury,

4    didn't you?

5    A.    Yes, ma'am, I guess.

6    Q.    And you testified how you meticulously tracked and

7    managed those funds properly, didn't you?

8    A.    I did track and manage them properly, yes, ma'am.

9    Q.    You didn't do any of that for Hakeem Pinkney or

10   Natasha Thomas?

11   A.    I never received any funds to track or manage.

12   Q.    You didn't manage any money for Hakeem Pinkney or

13   Natasha Thomas, did you?

14   A.    I never received any money to manage.

15   Q.    So you were appointed to serve as Hakeem and Natasha

16   Thomas's conservator back in September 2010; is that right?

17   A.    That's what the appointment says.  I was appointed

18   to serve as their conservator, yes, ma'am.

19   Q.    According to that petition for Natasha Thomas, which

20   you reviewed with the jury on Friday, there was an incorrect

21   birth date for Ms. Thomas; is that right?

22   A.    That is correct.

23   Q.    And you signed that petition, right?

24   A.    Absolutely did.

25   Q.    And you verified on that petition that her

1    birthday -- her birth, excuse me, her age was 15; is that

2    right?

3        A.   Yes, ma'am.  We went through this at the bond

4    hearing.  And I told you I had not checked his driver's

5    license or ID, and I did not fill out that form.  That was

6    filled out by our attorneys, Alex Murdaugh and PMPED.  But I

7    did sign the verification.

8        Q.   According to that petition, Natasha was 15, correct?

9        A.   According to the petition.

10        Q.   Two months after you signed the documents verifying

11    that she was 15 years old, you gave her a loan, didn't you?

12        A.   Yes, ma'am, we did a lawyer loan, I believe, for

13    her.

14        Q.   And at the time, she was 18 years old, wasn't she?

15        A.   She had to have been to get a loan.

16        Q.   That's right.  In your own words, you can't enter

17    into a contract unless you are 18?

18        A.   That's correct.

19        Q.   And Ms. Thomas signed those loan documents herself,

20    didn't she?

21        A.   Yes, ma'am.

22        Q.   She didn't need a conservator, did she?  She was

23    over 18 years old?

24        A.   Not at that time, she did not.

25        Q.   That's right.  You testified on Friday that you did

1    not know that Hakeem Pinkney died?

2        A.    No, I knew he died.  I don't know the date that he

3    died.

4        Q.    But you knew he died?

5        A.    Yes, ma'am.

6        Q.    Let's pull up Government's Exhibit 111.  You heard

7    Ms. Thomas testify that Hakeem passed away October 11th,

8    2011; is that right?

9        A.    That's correct.

10       Q.    And on that day, you received an e-mail from Alex,

11   subject line:  Pinckney, please call me, 911; didn't you?

12       A.    Yes, ma'am, that's what it shows.

13       Q.    But the settlement and the release were not actually

14   signed until November of that year; is that right?

15       A.    I'm not sure.

16       Q.    Pull up Government's Exhibit 213, the last page,

17   please.

18       A.    I signed it 8th day of November.

19       Q.    8th day of November.  So almost a month after Hakeem

20   died, you signed a release on his behalf as his conservator?

21       A.    I did.  And I guess we should have signed as a PR.

22       Q.    You weren't the PR for Hakeem Pinkney.  You were the

23   conservator?

24       A.    I understand that, but it should have changed over

25   to PR.

Q.   Hakeem Pinkney was dead, wasn't he?

A.   He was.

Q.   And he didn't need a conservator, did he?

A.   No, ma'am.

Q.   You signed the release on Natasha Thomas's behalf on November the 7th, 2011; is that right?

A.   I'm going to assume that's correct.

Q.   At the time Natasha was 19 years old and she didn't need a conservator, did she?

A.   No, ma'am.

Q.   Let's look at those disbursement sheets.  If you could pull up Government's Exhibit 20 and 22.  These are your signatures on both Natasha Thomas and Hakeem Pinkney's disbursement sheets, right?

A.   That is correct.

Q.   And they are not dated, are they?

A.   No, ma'am.

Q.   But you, as their conservator, had a duty to protect your funds -- their funds, didn't you?

A.   When I received them, absolutely, yes, ma'am.

Q.   If we could go to the first page, side-by-side, please.  And those disbursement sheets that you signed indicated that Natasha Thomas to Palmetto State would be getting $325,000, and that Hakeem -- excuse me, Palmetto State Bank would be getting $309,581.46; is that right?

1    A.    That's correct.

2    Q.    And these disbursement sheets that you signed also

3    show that you were going to be getting $15,000 in a

4    conservator fee from Natasha and $60,000 in a conservator fee

5    from Hakeem; is that right?

6    A.    That is correct.  When these disbursement sheets

7    would come over from the attorney, they would be flipped over

8    just like we talked about Friday, about how they would just

9    have it marked where you sign.  I should have looked at them

10    closer.  I didn't.  And that was my mistake.

11    Q.    You are getting paid $75,000 to protect these funds,

12    aren't you?

13    A.    I was, yes, ma'am, but I never received any funds to

14    protect.

15    Q.    Let's talk about those funds.  If you could pull up

16    20 and 32 side-by-side, please.  December 20th, 2011,

17    $325,000 check to Palmetto State Bank that indicates it's

18    settlement proceeds for Natasha Thomas, corresponds exactly

19    to the amount on Ms. Thomas's disbursement sheet that you

20    signed; isn't that right?

21    A.    It does.  But Palmetto State Bank was not the

22    conservator.  If those checks would have been made to Russell

23    Laffitte as conservator, those funds would have been sitting

24    in that bank to this day or whenever she wanted the money.

25    Q.    If you could do a side-by-side with Government's

1  Exhibit 22 and 34.  And, again, December 20th, 2011, Palmetto

2  State Bank check, settlement proceeds for Hakeem Pinkney,

3  corresponding to the exact same amount on his disbursement

4  sheet; is that right?

5      A.    That is correct.  And just like I said before,

6  Palmetto State Bank was not the conservator.  That is how Mr.

7  Murdaugh, I believe, would start the thefts, because he knew

8  if a check came in, Palmetto State Bank would not have paid

9  as much attention.  But if it came in as Russell Laffitte as

10  conservator, the funds would have been sitting in an account.

11     Q.    We will talk about how those checks were drafted in

12  a minute.  But let's go to December 20th, the date of both of

13  these checks, Exhibit 48.  On that day, Alex e-mails you and

14  says, can you call me, doesn't he?

15     A.    It looks like it, yes, ma'am.

16     Q.    And the following day, Alex gives you those two

17  checks for 309,000 and some change and $325,000 and change

18  and you issue money orders at his direction for people

19  totaling unrelated to Hakeem Pinkney and Natasha Thomas,

20  don't you?

21     A.    I do.

22     Q.    If we could pull up Government's Exhibit 35 --

23  excuse me, 30.  29.  No, you were right, 35.  So those money

24  orders you issue all on the same day, December 21st, the day

25  after he asks you to call him, $10,000 to Margaret Murdaugh;

1    is that right?

2         A.    That's correct.

3         Q.    Next one, please.  $9,500 to cash; is that right?

4         A.    Yes, ma'am.

5         Q.    That's just a little under the reporting requirement

6    of $10,000, isn't it?

7         A.    Yes, ma'am.

8         Q.    Next one, please.  Over $1,000 to Murdaugh Charters.

9    Next one, please.  $100,000 to your father, Charlie Laffitte.

10   Next one, please.  This is the $100,000 check that you signed

11   to your father from Hakeem Pinkney and Natasha Thomas

12   settlement funds, isn't it?

13        A.    Yes, ma'am, it is the $100,000 check; however, I did

14   not know it was Hakeem Pinkney and Natasha Thomas's

15   settlement fund.

16        Q.    You also negotiated thousands of dollars in funds to

17   pay off Alex's unsecured loans from Hannah Plyler, didn't

18   you?

19        A.    Yes, ma'am.  And same thing, I did not know they

20   were stolen funds.

21        Q.    You were the CEO of the Palmetto State Bank before

22   you were fired; is that right?

23        A.    That's correct.

24        Q.    And you signed disbursement sheets showing that

25   $634,000 was going to be coming to the Palmetto State Bank?

1    A.    I was not CEO back then.  But I did sign the

2    disbursement sheets that, absolutely.  I wish I had seen it,

3    but I didn't.  And I did not recognize those were stolen

4    funds, because that's why I turned in zeros on both of the

5    conservatorships to the probate judge because we had not

6    received any funds to the probate.

7    Q.    You had a duty to protect Hakeem Pinkney and Natasha

8    Thomas's funds, didn't you?

9    A.    I did.

10    Q.    Let's talk about what was going on with Alex's

11    finances in November and December of 2011 when you negotiated

12    $634,000 in money orders for him.  So Government's Exhibit

13    45, please.  In early November, you e-mailed Alex explaining

14    how you were going to charge off 0 United and Red Beard to

15    comply with the FDIC, but that they had to be renewed; is

16    that right, and he was going to have to pay the loan renewal?

17    A.    We needed to get it renewed so we could set it up on

18    a payment plan.  We were setting it up on, as it says,

19    amortization three-year balloon.

20    Q.    Y'all commonly referred to these properties as

21    Berkeley County properties, didn't you?

22    A.    I referred to them as Red Beard and 0 United.

23    Q.    Let's go to Government's Exhibit 46, Please.  Two

24    weeks later, on November 14th, Alex e-mails you and says,

25    when can you meet with me to talk about the Berkeley prop

1    loans; is that right?

2        A.    That's correct.

3        Q.    Exhibit 47, please.  And on December the 9th, you

4    e-mail him and say, are your partners coming up with the

5    money for the renewal?  I need to do it before the end of the

6    year.

7            And Alex responds on December 12th, no, but I will

8    pay it.  When we talk, I will remind you what we discussed.

9            So this is December 12th, eight days before the

10   Pinckney and Thomas checks are dated; is that right?

11       A.    I think -- was the date 20th or 21st?  But very

12   close to the same day, yes, ma'am.

13       Q.    Exhibit 48 again, please.  And on December 20th, as

14   the jury has seen, Alex e-mails you and asks you to call him,

15   doesn't he?

16       A.    He did.

17       Q.    If you could pull up 32 and 34 side-by-side.  And as

18   the jury has seen with these checks, the same day of that,

19   can you call me, e-mail -- those checks are drafted to

20   Palmetto State Bank; is that right?

21       A.    Yes, ma'am.

22       Q.    If you could pull up Government's Exhibit 36.  And

23   the following day, you negotiated every single one of those

24   money orders, didn't you?

25       A.    I did.

1    Q.    He comes to the bank with over $634,000, owing the

2    bank hundreds of thousands of dollars, and you send them this

3    way rather than pay the bank off, didn't you?

4    A.    I'm a little confused.

5    Q.    When Alex comes to the bank with over $634,000, you

6    do all this with that money, rather than pay off all the

7    banks and loans, didn't you?

8    A.    I did as my customer directed.  He was an authorized

9    signer on that check.  He was authorized to be able to direct

10   how this money is spent, made to Palmetto State Bank, which

11   was properly written.  I wish I had recognized that they were

12   stolen funds.  I did these as the customer directed and --

13   yes, ma'am.

14   Q.    Alex had been banking at Palmetto State Bank for

15   decades as you testified, is that right?

16   A.    I believe since 1987, yes, ma'am.

17   Q.    And the other partners at the law firm had also been

18   banking at the bank for decades; isn't that right?

19   A.    That's correct.

20   Q.    And as you've testified, community banking, know

21   your customer, right?

22   A.    Yes, ma'am.

23   Q.    They all got paid at the end of the year, right?

24   The partners all get paid at the end of the year?

25   A.    Yes, ma'am.

1    Q.   Alex comes in in December with $634,000 in checks,

2  and you know it's not his bonus checks, don't you?

3    A.   Ma'am, when he comes in, I don't sit there and study

4  each and every one of these checks.  I looked that they were

5  made out to Palmetto State Bank.  If he's running money

6  orders or if he's paying a loan that's made to Palmetto State

7  Bank -- and, you know, I didn't recognize that they were

8  stolen funds.

9    Q.   You knew it wasn't his bonus checks, though, didn't

10  you?

11    A.   I didn't say it ever was his bonus check.  I mean,

12  he could have sold property.  He could have borrowed money

13  from the law firm.  He could have done numerous things to get

14  money.

15    Q.   That check was drawn on Palmetto State Bank's --

16  excuse me, the law firm's client trust account, wasn't it?

17    A.   That's correct.

18    Q.   If we could pull up Government's Exhibit 49, please.

19  Six days after you negotiated all these money orders, you

20  e-mail him:  When are you going to do Red Beard and 0 United?

21  And he responds, as soon as we get our bonus checks.  Is that

22  right?

23    A.   Yes, ma'am.

24    Q.   If we could pull up Government's Exhibit 49A.  And

25  on December 30th, he finally comes into the bank to pay off

1   all the loans that he owes you; is that right?

2       A.    I'm not sure what day he came in.

3       Q.    If we could pull up Government's Exhibit 161, the

4   2011 records.  So on December 30th, Alex comes in with his

5   bonus check and he pays off 0 United, and Red Beard, the

6   Edisto loan, the house loan, his house in Littleton.  He

7   negotiates his bonus check to pay off all the bank's loans,

8   is that right?

9       A.    That's what it looks like, yes, ma'am.

10      Q.    So after you issued all of the money orders from the

11  $634,000 from the checks, you file documents with the probate

12  court indicating that there were no funds in the

13  conservatorship account, didn't you?

14      A.    That's right.  I never received any funds for the

15  conservatorship accounts.

16      Q.    You received checks totaling the exact same amount

17  from those disbursement sheets, didn't you?

18      A.    I did receive those checks.  And at the -- what do

19  you call it? -- at the direction of my attorney, which I did

20  not recognize those checks for what they were, and at the

21  direction of my attorney, I cut them into other things.

22      Q.    At the direction of your attorney?

23      A.    Yes, ma'am.  He was the attorney for the clients so,

24  yes, ma'am.

25      Q.    If you didn't know that the funds belonged to

1    Natasha Thomas and Hakeem Pinkney --

2        A.    That's correct.

3        Q.    -- then how were you relying on him as their

4    attorney at the time?

5        A.    I didn't say I was relying on him as their attorney

6    at the time.  I'm relying on what I learned now and what I've

7    learned over the last year going through this research and

8    everything else.  I mean, we could go through this until next

9    year and I'm still not going to know that those were their

10   funds.

11       Q.    You just testified that when your attorney came in,

12   you relied on him to negotiate those checks?

13       A.    Yes, ma'am.

14       Q.    Because as their conservator, he was your attorney,

15   that was your testimony; is that right?

16       A.    I relied on him to negotiate those checks.  He told

17   me, I need -- here are these two checks, I need this, this,

18   this, and I did that, yes, ma'am.

19       Q.    You can't be relying on him as the conservator

20   unless you know that those funds belonged to Natasha Thomas

21   and Hakeem Pinkney; isn't that right?

22       A.    Well, I guess I misspoke.  I'm sorry.  I was not

23   relying on him as my attorney.  I was relying on him as an

24   attorney for PMPED, who I've known for decades, actually, my

25   whole life, we've done numerous business transactions with,

1  loaned millions of dollars, and when he brought in $634,000

2  worth of checks, I didn't recognize them --

3      MS. LIMEHOUSE:  Your Honor, can you, please,

4  instruct the witness to answer the question.

5      THE COURT:  Ask him the next question.

6  BY MS. LIMEHOUSE:

7      Q.  The same filings that you filed with the probate

8  court stating that there were no funds in the conservatorship

9  accounts, you requested that the court discharge you from

10  your duties as their conservator, didn't you?

11      A.  That's correct, because there was no money in the

12  conservator accounts.

13      Q.  Let's talk about that $25,000 that Natasha Thomas

14  was supposed to receive from that second disbursement sheet.

15  If we could pull up Government's Exhibit 198 at slide 9,

16  please.  Alex presented you with a check for $25,245.08; is

17  that correct?

18      A.  That's correct.

19      Q.  On August 29th, you split up this check into a

20  $16,245.08 money order, and you allowed Alex to cash out

21  $9,000; isn't that right?

22      A.  Yes, ma'am.

23      Q.  And then he comes back to you the next day with that

24  $16,000, money order, and you break it up for him to a

25  $7,245.08 money order and $9,000 cash back; isn't that right?

1    A.   I signed the money order.  That's correct, yes,

2    ma'am.

3    Q.   As you have admitted under oath on September 6th,

4    this is structuring, isn't it?

5    A.   That is correct.

6    Q.   If we could pull up Government's Exhibit 214.  If

7    you could zoom in on the middle two, please.  You just

8    testified that because the Pinckney/Thomas checks were made

9    out to Palmetto State Bank, you had no idea that those funds

10   belonged to Hakeem Pinkney and Natasha Thomas; isn't that

11   right?

12   A.   That is absolutely correct.

13   Q.   That's exactly how your fee checks were drafted?

14   A.   That is exactly right.  And these checks would be

15   delivered by a runner in an envelope and say, here are your

16   conservator fees.  So I knew they were my conservator fees

17   because that's what they told me.

18   Q.   The memo lines on those checks show that they are

19   your conservator fee for Natasha Thomas and your conservator

20   fee for Hakeem Pinkney, don't they?

21   A.   Yes, ma'am, it does.

22   Q.   In the exact same way that Hakeem Pinkney and

23   Natasha Thomas's settlement proceeds were negotiated?

24   A.   The difference is, I was expecting these two checks

25   because I was told that's what I was getting paid.  They hand

1 delivered them over to me, the runner or Alex, and they said,

2 here's your conservator checks. So I knew that's what the

3 check was versus the $634,000.

4     Q. And you turned the $60,000 around and used it to pay

5 off your loans from Hannah Plyler; is that right?

6     A. Yes, ma'am.

7     Q. Hakeem is dead at this time, isn't he?

8     A. That's correct, I believe.

9     Q. Natasha Thomas is 19 years old?

10     A. Yes, ma'am.

11     Q. They don't need a conservator, do they?

12     A. They do not at this point in time, no, ma'am.

13     Q. And they don't need to pay you $75,000, do they?

14     A. They would have paid me that because that was done

15 through the circuit court. So, I mean, that was already

16 settled at that point.

17     Q. And they didn't need a conservator?

18     A. No, ma'am, they did not need a conservator in

19 January.

20     Q. Let's talk about Mr. Badger.

21     MS. LIMEHOUSE: The Government moves to admit

22 Exhibit 199, Your Honor. It's sworn testimony from the

23 defendant during a deposition in February of 2022.

24     THE COURT: Is there an objection?

25     MR. AUSTIN: No, Your Honor.

1    THE COURT:  Very good.  Defendant's Exhibit 199 is

2    admitted without objection.

3    (Government's Exhibit 199 is received in

4    evidence.)

5    Q.   You can make 51 large, please.  You were asked

6    during that deposition:  And for whom have you served as a

7    personal representative?

8    And you stated:  I was the PR for Donna Badger.

9    And you were asked:  What did you do in that role?

10    And your response was:  Really didn't do a whole

11    lot.

12    Let's pull up -- let's talk about Arthur Badger's

13    disbursement sheet.  You testified on Friday that you never

14    saw Arthur Badger's disbursement sheet.

15    A.   I know I saw Arthur Badger's disbursement sheet when

16    we were doing research.  Other than that, I don't know when I

17    saw that thing.  I didn't sign it.

18    Q.   Government's Exhibit 201, please, page 55.  You

19    testified under oath on September 6th that you did see Arthur

20    Badger's disbursement sheet, didn't you?  I asked whether you

21    had a duty to protect her funds.  And you said:  I had a duty

22    to protect her.  And I said:  And those funds, correct?  And

23    you said:  I never received the funds.

24    A.   That's correct, I never received the funds.

25    Q.   And then I said:  You saw the disbursement sheet

1    that you were supposed to receive 1.325 million to manage a

2    structure per the client's request.  And you said that's

3    correct?

4        A.    That is correct.  I saw it during -- when we were

5    doing research and everywhere else.

6        Q.    You testified --

7        A.    I did.

8        Q.    -- on November 6th that you saw the disbursement

9    sheet.  And the statement under oath on September 6th was

10   consistent with what you told the FBI back in February,

11   wasn't it?

12       A.    I have no idea.  But I am not saying I didn't see

13   the disbursement sheet.  I'm just saying I'm not sure when I

14   saw the disbursement sheet.  We have seen so many records.

15   It's all about when -- you know, whether we remembered or we

16   learned it, I'm not sure.

17           MS. LIMEHOUSE:  Your Honor, please instruct him to

18   answer the question.

19           MR. AUSTIN:  Let him finish his answers.

20           THE COURT:  Ask your next question.  Be responsive.

21   BY MS. LIMEHOUSE:

22       Q.    You told the FBI back in February that you saw

23   Arthur Badger's disbursement sheet at the time the settlement

24   was reached, didn't you?

25       A.    I don't recall that.

1    Q.   Let's pull up Government's Exhibit 23, please, page

2    2.  You just testified that you did not sign Arthur Badger's

3    disbursement sheet; is that right?

4    A.   This one I definitely didn't.  I don't recall

5    signing it.  I mean, if I did, I have no idea when I would

6    have or why I would because I was not a PR for Arthur Badger.

7    Q.   Arthur signs that disbursement sheet on November

8    12th, 2012; is that right?

9    A.   That's correct.

10   Q.   If we could do a side-by-side with that page and

11   Government's Exhibit 27, please.  On that same day, November

12   the 19th, 2012, Alex notifies his paralegal that he has a

13   short meeting at the bank.  Do you see that?

14   A.   Yes, ma'am, I do.

15   Q.   If we could pull up Government's Exhibit 119.  The

16   next day, November 20th, you receive your $35,000 personal

17   representative fee from Arthur Badger; isn't that right?

18   A.   That is correct.

19   Q.   If you could go back to the first page of

20   Government's Exhibit 23, please.  And that's the $35,000 that

21   was indicated on Arthur Badger's disbursement sheet, wasn't

22   it?

23   A.   That is correct.  And that was in the wrong place.

24   It should have been on Donna's.  I'm not sure why it was on

25   Arthur Badger's.

1  Q.  You get that check one day after Arthur signed his

2  disbursement sheet, didn't you?

3  A.  Yes, ma'am, it looks like that way.

4  Q.  On the following day, November 21st, you turned that

5  $35,000 check around and you use it to pay off Hannah Plyler,

6  didn't you?

7  A.  Yes, ma'am.

8  Q.  Let's pull up Government's Exhibit 37 and 38

9  side-by-side, please.  The jury has seen these e-mails many

10  times.  In February of 2013, Alex e-mails you and asks that

11  you e-mail him and get the check dated 11/19/2012 for 1.325

12  million to be re-cut as listed above; is that right?

13  A.  That's correct.

14  Q.  And that's the exact same amount that was going to

15  Palmetto State Bank according to the disbursement sheet,

16  isn't it?

17  A.  Yes, ma'am, now we do know that.

18  Q.  And then you do the math for Alex, don't you?

19  A.  I do.

20  Q.  You didn't ask him any questions about this check,

21  did you?

22  A.  I didn't know what it was.  You know, he asked me to

23  e-mail him, I e-mailed him.  I mean, he needed the 151.

24  There was no way he could get that, so I e-mailed it to him.

25  Q.  In a separate e-mail chain, didn't you?

1      A.   I don't know why it was in a separate e-mail chain.

2  I can type just as fast as I can write, so I just clicked

3  e-mail and typed it out to him.

4      Q.   Rather than press "reply", you send a new e-mail

5  chain to Alex, didn't you?

6      A.   I did.  I mean, it's obvious.

7      Q.   You didn't even call your sister-in-law, who is the

8  accountant at the law firm, to ask anything about these

9  checks, did you?

10     A.   Why would I?

11     Q.   If you didn't know what the check was for, you

12  didn't ask Alex and you didn't ask anybody else about this

13  check, did you?

14     A.   I don't know what he's got going on.  I mean, if you

15  start calling and questioning every check or every odd

16  request that you get in the bank, you would be doing that all

17  day.  But in hindsight, I wish I had.

18     Q.   You testified on Friday that you fully cooperated

19  with law enforcement, didn't you?

20     A.   I have cooperated.

21     Q.   And that you've provided thousands of documents --

22     A.   I have.

23     Q.   -- to law enforcement?

24     A.   I have provided boxes and boxes of documents.

25     Q.   And one of the documents that you showed the jury

1  talking about your cooperation is this first e-mail, right?

2      A.   That is correct.  This is not the one that I

3  provided, though.  Mine has writing on it.

4      Q.   That's right, yours has notes, right?

5      A.   Yes, ma'am.

6      Q.   You didn't provide this e-mail in a separate chain

7  to law enforcement, did you?

8      A.   That one, no idea.  I'm going to assume I did not.

9      Q.   The jury has seen dozens of e-mails between you and

10  Alex Murdaugh, haven't they?

11     A.   Yes, ma'am, they have.

12     Q.   These e-mails were not on the bank's servers, were

13  they?

14     A.   I have no idea how you get something on a server or

15  off a server.  That's --

16     Q.   We got all these e-mails from the law firm, not from

17  you, didn't we?

18     A.   You would have to ask Mark Altman that testified

19  earlier.  Ma'am, I don't know a thing about computers hardly.

20     Q.   So two days after you sent him this separate e-mail

21  that he forwards to law firm staff asking that the Badger

22  checks be re-cut, Alex comes to you with over $600,000 in

23  checks, doesn't he?

24     A.   I'm not sure exactly the dollar amount but he came

25  in with a bunch of checks, yes, ma'am.

1    Q.    If we could pull up Government's Exhibit 29, please.

2    This first check dated February 8th of 2013, totaling

3    $388,687.50 drafted to the Palmetto State Bank with Arthur

4    Badger in the memo line, you negotiated that check to a

5    partner at the law firm, Johnnie Parker; isn't that right?

6    A.    I did as my customer requested, yes, ma'am.

7    Q.    If we could go to the next page, please.  And the

8    next check, two days after your e-mail, February 8th, 2013,

9    $151,726.05, memo line, Arthur Badger, Palmetto State Bank.

10   Next page, please.  You turn that check around and you use it

11   to pay off Alex's unsecured loans from Hannah Plyler; isn't

12   that right?

13   A.    I did as the customer requested.

14   Q.    Third check he delivered to you on February 8th,

15   2013, Palmetto State Bank, memo line Arthur Badger, $75,000,

16   you turned around and negotiated to his father, Randolph

17   Murdaugh; isn't that right?

18   A.    Yes, ma'am.

19   Q.    And later that year, he comes to you with more

20   checks from that original $1.325 million; isn't that right?

21   A.    That is correct, now that we've done the research,

22   but I would have had no way of ever realizing it back then.

23   Q.    You negotiated every single one of those checks

24   exactly how he told you to, didn't you?

25   A.    The ones that were made to Palmetto State Bank, I

1   absolute did, unbeknownst to me that they were stolen funds,

2   but I did not touch those two checks to Bank of America.

3       Q.   If we could pull up Government's Exhibit 50, please.

4   October 22nd, 2013, you e-mail Alex and you say:  Need a

5   deposit, thought you were coming in yesterday.  Alex

6   responds:  Sorry, I forgot.  Can you make a loan from Hannah

7   and I will pay it as we discussed.

8           Isn't that right?

9       A.   Yes, ma'am, that's what it says.

10      Q.   And then on October 23rd, you respond in the same

11  e-mail chain and say:  I transferred $70,000 this morning.

12          Isn't that right?

13      A.   Yes, ma'am.

14      Q.   And then Alex responds and says:  I will come by at

15  some point this week.  Out of town today and in the morning,

16  so it will be tomorrow or after Friday.

17          Isn't that right?

18      A.   Yes, ma'am.

19      Q.   If you could pull up Government's Exhibit 29, pages

20  8 and 9 side-by-side.  Five days after you extended that

21  $70,000 loan on October the 23rd, you turn around money that

22  says it belongs to the estate of Donna Badger to pay off

23  Alex's loans to Hannah Plyler, didn't you?

24      A.   Mr. Murdaugh brought in a check made to Palmetto

25  State Bank and wanted it to pay off that loan, so, yes,

1   ma'am, I did do that.

2       Q.   You testified that you never saw the memo lines on

3   these checks, so that you don't know where the money was

4   coming from; is that right?

5       A.   That's correct.  If -- even if I saw them, I would

6   not have paid attention.  Memo lines are for the writer of

7   the check, not for the receiver.

8           MS. LIMEHOUSE:  If you could pull up Government's

9   Exhibit 29, pages 10 and 11 side-by-side -- excuse me.  Do 11

10  and 12.

11  BY MS. LIMEHOUSE:

12      Q.   Not only do the memo lines say the money belongs to

13  the estate of Donna Badger but the deposit slips say Donna

14  Badger as well, don't they?

15      A.   It does.  And that is not my handwriting.

16      Q.   But you negotiated every single one of these

17  transactions according to your sworn testimony, didn't you?

18      A.   I wrote that right here.  I wrote "for deposit

19  only," and I would have put it with -- handed it to a teller,

20  and what they wrote, they wrote.  All of this is not my

21  handwriting.

22      Q.   So the teller looks at the memo line to determine

23  whose money that belongs to?

24      A.   But when she put it in the system, it would have

25  showed Alex Murdaugh.  So I'm not sure why it was written

1    Donna Badger.  I didn't know it was Donna Badger's.  Really

2    and truly, it wasn't Donna Badger's, it was Arthur Badger's

3    money.  And I thought that was part of the discrepancies of

4    how Alex was so screwy with doing things.  And that's why I

5    never realized it.

6        Q.    You wrote this --

7        A.    That's correct.

8        Q.    -- on the back, "for deposit only," and then the

9    corresponding deposit slip states it's for Donna Badger; is

10   that right?

11       A.    Yes, ma'am.

12       Q.    If you could pull up same Exhibit 18.  You wrote

13   Alex's account number, didn't you?

14       A.    I don't think so.

15       Q.    So your testimony is that you wrote this but not

16   this?

17       A.    That -- possibly, but this and this and this are not

18   my handwriting.  I am not going to say whether that is or

19   not.  I am not 100 percent sure, but I know this is my

20   handwriting.

21            MS. LIMEHOUSE:  If you could pull up 18 and 19

22   side-by-side, please.  It's the same e-mail.  Sorry.  20.

23   BY MS. LIMEHOUSE:

24       Q.    Another check dated September 13th, 2013, totaling

25   $33,789.83, memo line indicates it's for the estate of Donna

1    Badger.  You wrote, "for deposit only" with Alex's account

2    number, didn't you?

3         A.   That is correct.

4         Q.   And the deposit slip also says the money belongs to

5    Donna Badger, doesn't it?

6         A.   It does.

7         Q.   If we could pull up Government's Exhibit --

8         A.   But once again, that is not my handwriting on the

9    deposit slip.

10        Q.   -- 32, please.  You also negotiated a wire transfer

11   to Southern Crane; is that right?

12        A.   That is correct.  The customer asked me to transfer

13   the money.

14             MS. LIMEHOUSE:  If we could do 51 side-by-side with

15   page 10.

16   BY MS. LIMEHOUSE:

17        Q.   So, Alex e-mails you on Monday, October 28th, 2013,

18   and says:  RL, this is where forty-nine five goes.  I will

19   pick up the difference.  Don't put it in an account.

20   Isn't that right?

21        A.   He did.  I'm assuming he sent this -- assume he sent

22   a check over with one of those runners or something.

23        Q.   You don't know that?

24        A.   No, I do not.

25        Q.   And the next day, October 29th, you negotiate a wire

1   for $49,500 to Southern Crane; isn't that right?

2      A.   That's correct.

3      Q.   And then the remaining little over $1,000 you give

4   Alex, because he says he will pick up the difference; isn't

5   that right?

6      A.   That is absolutely correct.

7      Q.   And you continued to negotiate hundreds of thousands

8   of dollars from these funds however Alex tells you to, don't

9   you?

10      A.   $1,172,000 worth of them.  That's why I did the

11   $680,000 agreement with the law firm.

12      Q.   And that included paying off hundreds of thousands

13   of dollars in unsecured loans that you had extended Alex from

14   Hannah's conservatorship account; isn't that right?

15      A.   Yes, ma'am, as the customer requested, I did.

16      MS. LIMEHOUSE:  If you could do Exhibit 119

17   side-by-side with 29, page 1, please.

18   BY MS. LIMEHOUSE:

19      Q.   Your $35,000 fee check drafted to the Palmetto State

20   Bank, memo line Arthur Badger personal representative fee,

21   was drafted in the exact same way as all the checks stolen

22   from Arthur Badger, wasn't it?

23      A.   Yes, ma'am, it was.

24      Q.   Let's move to the $750,000 loan.  So in the summer

25   of 2021, as the jury has heard, Alex's wife and son were

1    brutally murdered; isn't that right?

2        A.    That's correct.

3        Q.    As you told law enforcement back in February of this

4    year, you did not believe that Murdaugh was financially

5    responsible, and that you thought he may have a gambling

6    problem based on his financial habits; isn't that right?

7        A.    You asked what we thought he did with the money.    I

8    told them only thing I could think of is he gambled.

9        Q.    You thought that he had a gambling problem; isn't

10   that right?

11       A.    You asked what I thought where the money could be

12   and that's what I thought, that that's the only thing I could

13   figure of where he could spend the amount of money that he

14   had stolen.    And we are not talking about -- almost $2

15   million --

16           MS. LIMEHOUSE:    Your Honor, can you direct the

17   witness to answer the question?

18           THE COURT:    You can answer the question.

19   BY MS. LIMEHOUSE:

20       Q.    So in the summer of 2021, Alex comes to you, his

21   wife and son brutally murdered, and he's maxed out on his

22   million dollar line of credit, isn't he?

23       A.    Yes, ma'am.

24       Q.    And he's maxed out on a $600,000 line of credit that

25   he had with his father, isn't he?

1    A.    That was his father's line of credit, yes, ma'am.

2    Q.    And it's maxed out; is that right?

3    A.    That's correct.

4    Q.    And you had already charged off the Red Beard and 0

5    United loans for him; is that right?

6    A.    Yes, ma'am, I believe those were in '15.

7    Q.    And he owed the bank millions more dollars in loans;

8    isn't that right?

9    A.    That is correct.

10    Q.    If we could pull up Government's Exhibit 92, page 3.

11    And when he comes to you in need of money, he's more than

12    $162,000 in overdraft; isn't that right?

13    A.    No, ma'am.

14    Q.    In July of 2021, Alex is more than $162,000 in

15    overdraft?

16    A.    Absolutely, but he had come to us way before then

17    telling us about what he was doing.

18    Q.    If you could go to page one of that exhibit, please.

19    So his overdraft June 14th, $16,000, he had been in

20    substantial overdraft for more than a month before you wired

21    $350,000 for him; isn't that right?

22    A.    That is correct.

23    Q.    So Alex comes to you and he says that he needs money

24    to renovate his beach house in Edisto; isn't that right?

25    A.    He did.

1    Q.   And you already had a mortgage on that property,

2  didn't you?

3    A.   We did.

4    Q.   The value of that property based on your

5  representations to the Board was $730,000?

6    A.   That was the last appraisal.  And we had ordered a

7  new appraisal for the renewal, I want to say in April or 1st

8  of May.  So we were working on that.  And that's when he came

9  in and asked about it.  And I said, well, you know, we have

10  $730,000 by the 200,000 first, so we also took the Green

11  Swamp share of stock.

12    Q.   So Alex comes to you and he needs a loan for

13  renovating his beach house.  And on July 15th, he asked you

14  to wire $350,000 to Chris Wilson, an attorney in Bamberg;

15  isn't that right?

16    A.   He did ask me to send the wire.

17    Q.   Chris Wilson has nothing to do with beach house

18  renovations, does he?

19    A.   I would not suspect that he would.

20    Q.   After July 15th, Alex continues to overdraw on his

21  account by hundreds of thousands of dollars, doesn't he?

22    A.   He does.  We were watching that account.  We see

23  every week what looks like a contractor's check which later

24  we found out it's not.  It was C.E. Smith over $264,000 worth

25  of them.

1    Q.   Pull up Government's Exhibit 192, pages 3 through 5.

2    I will go through them individually.  So you wire $350,000 to

3    Chris Wilson on July 15th; isn't that right?

4    A.   That is correct.

5    Q.   And after that time, Alex spends money at Colleton

6    County Treasurer, Jimmy Butler Auto Sales, cash back,

7    DeBordieu Club, the law firm; isn't that right?

8    A.   Yes, ma'am.

9    Q.   Next page, please.  Peeples-Rhodes Funeral Home,

10   two -- more than $6,000 to Peeples-Rhoden Funeral Home; is

11   that right?

12   A.   I would assume that's paying for his wife's and

13   son's funerals.

14   Q.   I think that's a safe assumption.  Nothing to do

15   with beach house renovations, is it?

16   A.   No.

17   Q.   Turner Padget Graham and Laney, LabCorp,

18   Gastroenterology, more cash, Veterinary Specialty Care,

19   Sports Medicine Shop, nothing to do with beach house

20   renovation; isn't that right?

21   A.   That is correct.  But as I testified on Friday, I

22   was under no illusions at all the money was going to the

23   beach house.

24   Q.   So he came to you in need of beach house renovation,

25   a loan for beach house renovations, and you knew it was never

1  going to go to beach house renovations; is that right?

2      A.   No.  I knew that all the money was not going to

3  beach house renovations, as you've had two other witnesses

4  testify they were going to pay some lawyer fees and --

5          MS. LIMEHOUSE:  Objection, Your Honor.

6          THE COURT:  It's improper.

7  BY MS. LIMEHOUSE:

8      Q.  You testified under oath back on September 6th,

9  didn't you?

10      A.  Yes, ma'am.

11      Q.  And when I asked you about the $750,000 loan, you

12  said that Alex came to you in need of money for beach house

13  renovations.  And you didn't mention anything about any other

14  expenses; isn't that right?

15      A.  I'm guessing -- I would have to see the testimony,

16  but I would probably agree that's right.

17      Q.  It's not until you heard --

18          MR. AUSTIN:  She's interrupting every time he's

19  trying to talk.

20          THE COURT:  He's finished.  Ask the next question.

21  BY MS. LIMEHOUSE:

22      Q.  It's not until you heard your father and sister

23  testify about the use of funds other than beach house

24  renovations that you've changed your testimony; isn't that

25  right?

1     A.    No, ma'am.  The loan was $750,000.  You just heard

2  me testify the appraisal at the time was $730,000.  Unless

3  he's doubling the size of the house, there's no realistic, I

4  mean, way that he's going to spend $750,000 on this house.

5     Q.    Based on your sworn testimony in September, all you

6  knew it was going to be spent on are beach house renovations;

7  isn't that right?

8     A.    He told me it was going to be beach house

9  renovations, yes, ma'am.

10     Q.    You talked about C.E. Smith and how you thought that

11  it was a contractor who was doing work on the beach house;

12  isn't that right?

13     A.    That is correct.

14     Q.    C.E. Smith is actually a bank customer, isn't he?

15     A.    He's a -- he has some lawyer loans, or did have

16  some, yes, ma'am.

17     Q.    You've extended C.E. Smith eight loans before; isn't

18  that right?

19     A.    I didn't extend, I don't believe, any of them, but,

20  yes, they were on our books.

21          MS. LIMEHOUSE:  If you could pull up Government's

22  Exhibit 209, last page, please.  Oh, excuse me.  Move to

23  admit Government's Exhibit 209.  They were in dispute

24  earlier, not for authentication purposes but for relevance.

25          THE COURT:  Is there an objection to Government's

1 Exhibit 209?

2 　　　　MS. LIMEHOUSE:  They are all the lawyer loans.

3 　　　　MR. AUSTIN:  No objection.

4 　　　　THE COURT:  What numbers?

5 　　　　MS. LIMEHOUSE:  202 through 209.

6 　　　　THE COURT:  Government's Exhibits 202 to 209 are

7 admitted without on objection.

8 　　　　(Government's Exhibits 202 through 209 are received

9 in evidence.)

10 BY MS. LIMEHOUSE:

11 　　Q.　If we could go to the last page of Government's

12 Exhibit 209, please.  This is a lawyer loan that you extended

13 C.E. Smith on February the 23rd of 2021; isn't that Right?

14 　　A.　No, ma'am, those are lawyer loans that Carrie Sauls

15 extended C.E. Smith.

16 　　Q.　That's your signature on this lawyer loan?

17 　　A.　I was the reviewing officer, yes, ma'am.

18 　　Q.　And you were the reviewing officer on all eight of

19 the loans that C.E. Smith had gotten from Palmetto State

20 Bank; isn't that right?

21 　　A.　That is correct.  I reviewed all of them.  I just

22 looked at -- this is the actual loan officer.

23 　　Q.　And as you've testified, it's a community bank, know

24 your customer, right?

25 　　A.　I don't know all my lawyer loans.  But, yes, we try

1  to know our customers.  And, no, I would not know Mr. C.E.

2  Smith.

3      Q.  He was in the bank system, wasn't he?

4      A.  He was, yes, ma'am.

5      Q.  If we would go to Government's Exhibit 192 at page

6  4, please.  So by August the 9th, Alex is more than $367,000

7  in overdraft; isn't that right?

8      A.  Yes, ma'am.

9      Q.  And he's used that money, as you've testified, for

10  all these purposes that have nothing to do with beach house

11  renovations; isn't that right?

12      A.  Well, he definitely used money for other things

13  other than beach house renovations.

14      Q.  So on August the 9th, if we could pull up

15  Government's Exhibit 2, please, at 9:39 a.m., Norris Laffitte

16  e-mails you and the rest of the Executive Committee, and asks

17  that you prepare what the bank's total exposure with regard

18  to Alex Murdaugh, directly, indirectly, through different

19  family relationships, and/or LLCs, with his borrowing

20  practices and repayment plans if he's not working; is that

21  right?

22      A.  That's correct.

23      Q.  Within an hour, you issue a check for $400,000;

24  don't you?

25      A.  I'm not sure if it was -- I mean, I am not going to

1  argue it wasn't within an hour.  But, yes, ma'am, we did

2  finish the loan and finished advantage the loan proceeds to

3  Mr. Murdaugh's account.

4      Q.   After you got the e-mail from the bank asking --

5  e-mail from Norris asking what the bank's total exposure was;

6  is that right?

7      A.   That was just coincidence.  That wouldn't have

8  anything to do with it.

9      Q.   Just a coincidence.  Then you transfer the $400,000

10  to cover his overdraft, don't you?

11      A.   Yes, ma'am, because that's where we thought the

12  money for the renovations were coming from.

13      Q.   As you've testified, you got the overdraft reports?

14      A.   I did.

15      Q.   You saw how Alex was spending his money?

16      A.   Sure did.

17      Q.   And you testified that had nothing to do with beach

18  house renovations, didn't you?

19      A.   I also testified that I thought C.E. Smith was

20  his -- yes.

21      Q.   If you could pull up Government's Exhibit 220,

22  please.  So at the time of Norris Laffitte's e-mail, Alex is

23  $14,000 in overdraft on his farm account; is that right?

24      A.   I have no idea, but --

25      Q.   At 11:38, two hours after Norris sends that e-mail,

1    you transfer $20,000 into that farm account to cover that

2    overdraft, don't you?

3        A.    I did transfer $20,000, yes, ma'am.

4        Q.    And then you continued to check his accounts

5    throughout the day after you got Norris's e-mail; isn't that

6    right?

7        A.    That was because they had asked us to do that list,

8    which you saw my list and testimony in other witnesses, and

9    so I'm trying to come up with a list.  So, yes, ma'am, I did

10   go in his accounts.

11       Q.    And that's after you transferred $400,000 to cover

12   his overdraft; isn't that right?

13       A.    That's correct.

14       Q.    So on August the 9th, there's not a single loan

15   document memorializing a $750,000 beach house loan for the

16   purposes of renovations, is there?

17       A.    I'm not sure.

18            Ms. LIMEHOUSE:  Government's Exhibit 201, page 75,

19   please.

20   BY MS. LIMEHOUSE:

21       Q.    You testified -- if you will pull up the bottom

22   half.  On September 6th, I asked you:  There's not a single

23   record within the bank when you wire the $400,000

24   memorializing this agreement that you had with Alex to extend

25   the 750?

1    There's no signed documents, no loan documents.  I

2  mean, in community bank, this is not -- maybe on a scale of

3  that size, that's unusual.  But advanced funds prior to

4  getting loans signed is not necessarily uncommon.

5    And I asked:  Were there any records that show that

6  you had decided to loan him $750,000 prior to August 9th?

7    If you go to the next page, please.

8    And you said:  I'm sure there were some e-mails and

9  maybe handwritten notes or something, but I did not sign the

10  loan.  I could not loan Alex money alone; is that right?

11    A.    That's correct.

12    Q.    So after the $400,000 on August the 9th, you direct

13  employees to backdate the loan to the $350,000 wire transfer

14  on July 15th; isn't that right?

15    A.    That's right.  We backdated the loan to the actual

16  detail of the first advance, which was July 15th.

17    Q.    And then on August 17th, the Board meets; isn't that

18  right?

19    A.    Yes, ma'am.

20    Q.    The Board has a right to know how the bank's money

21  is spent, don't they?

22    A.    Yes, ma'am, they do.

23    Q.    And you have a duty to tell them how the bank's

24  money is spent, don't you?

25    A.    Yes, ma'am.

1    Q.   And you have a duty to accurately report facts about

2    the bank's money to the Board, don't you?

3    A.   To the best of my knowledge, I always have.

4    Q.   And so the loan during this August 17th Board

5    meeting is reported as a $750,000 loan for purposes of beach

6    house renovations; isn't that right?

7    A.   That is correct.

8    Q.   And at this point, the loan has not been approved,

9    has it?

10   A.   No, ma'am, that loan had been approved way before

11   then.

12   Q.   Exhibit 10L, please.  The records show that that

13   loan had not been approved until August the 18th at 8:39 a.m.

14   and that's after the Board meeting; isn't that right?

15   A.   Yes, ma'am.  This --

16        MS. LIMEHOUSE:  Your Honor, he's answered my

17   question.

18        THE WITNESS:  No, this is a multiple --

19        THE COURT:  Answer the question, then you can

20   explain.  Answer yes or no.

21        THE WITNESS:  The loan had been approved before

22   then, yes, ma'am.

23   BY MS. LIMEHOUSE:

24   Q.   The paperwork indicates that it was approved on

25   August the 18th; isn't that right?

1    A.   Credit Leader indicates it was approved August 18th.

2    Q.   During the August 17th Board meeting, there's no

3    mention of the $350,000 wire transfer, is there?

4    A.   We don't discuss how loans are funded to the Board,

5    no, ma'am.

6    Q.   And there's no mention of Alex's hundreds of

7    thousands of dollars in overdraft before your $400,000 wire

8    transfer; is that right?

9    A.   No, ma'am, we don't discuss the -- how we fund the

10   loan.

11   Q.   And there's no mention of how Alex spent that money,

12   is there?

13   A.   We may have discussed -- I can't remember August

14   17th.  We may have discussed the loan, but we would not have

15   discussed how he spent the money, no, ma'am.

16   Q.   Alex never made a single payment on that $750,000

17   loan, did he?

18   A.   No, ma'am.  The first payment was due in January and

19   he was in jail.  So, no, ma'am, he did not.

20   Q.   And that $750,000 was charged off after selling the

21   Green Swamp share; isn't that right?

22   A.   That is correct.

23   Q.   And the beach house was not collateral on that

24   $750,000 loan?

25   A.   That is correct.  I made a mistake.  When we found

1  out from Kevin Brown that -- the attorney that was going to

2  do the closing, that he transferred it into his wife and his

3  name, that I should have taken a second mortgage on his

4  one-half interest, and I made a mistake on doing that.

5     Q.   So any value over that first mortgage based on the

6  sale of that beach house didn't go to the bank, did it?

7     A.   No, ma'am.

8     Q.   Let's talk about the $680,000 payment.  On October

9  28th, you went to the law firm and you paid them $680,000;

10 isn't that right?

11    A.   That's correct.

12    Q.   And that 680,000 included half of your $35,000 PR

13 fee from Arthur Badger, didn't it?

14    A.   It did.  And it was paid back to the bank.

15    Q.   We will talk about the payment back to the bank.

16 Nearly $400,000 of that 680, half of it was to Johnnie

17 Parker, a lawyer at the law firm, right?  He had received

18 nearly $400,000 of Badger fees, hadn't he?

19    A.   388,000 and some change.

20    Q.   And that included, your 680 payment, included

21 hundreds of thousands of dollars in checks that you

22 negotiated to pay off loans that you had extended from Hannah

23 Plyler's conservatorship account; isn't that right?

24    A.   That was part of the Badger money that Alex stole,

25 yes, ma'am.

1     Q.  And that $680,000 included half of the 150 and some

2  change that was negotiated at Bank of America and never went

3  through Palmetto State Bank?

4     A.  That is correct, yes, ma'am.

5     Q.  So you e-mailed the Executive Committee on October

6  28th; is that right?

7     A.  Yes, ma'am, I did.

8     Q.  Pull up Government's Exhibit 74.  And you say to the

9  Executive Committee:  Everyone, I just wrote up a $680,000 to

10  losses other than loans from a 2013 case with Alex Murdaugh.

11  We converted 1.1 million plus in checks made to Palmetto

12  State Bank on a settlement that Alex stole.  The law firm and

13  I agreed to split the loss and make the client whole; is that

14  right?

15     A.  Yes, ma'am.  We wanted to make the client whole.  We

16  had just -- or were in the process.  We had already agreed

17  principal for settling another account that the loan -- the

18  money did not run through us.  And it was way more than this.

19  So if we could get away with getting half of a settlement, it

20  was a good deal for the bank.

21     Q.  There's no mention of your father or your sister

22  having anything to do with this $680,000 in your October 28th

23  e-mail, is there?

24     A.  No, ma'am, there's not.

25     Q.  There's no mention of the $35,000 fee from Arthur

1  Badger?

2      A.   No.  We don't put every detail in every e-mail.

3      THE COURT:  Answer the question, sir.

4      THE WITNESS:  There is no mention of the $35,000

5  fee.

6  BY MS. LIMEHOUSE:

7      Q.   There's no mention of Hannah Plyler or the hundreds

8  of thousands of dollars that you negotiated to pay off the

9  loans you extended, is there?

10      A.   No, ma'am.  Only thing it says is we wrote up

11  $680,000.

12      Q.   And this amount omits your fee and the checks that

13  were negotiated at Bank of America, doesn't it?

14      A.   At that point, yes, ma'am, it does.

15      Q.   But the 680 included those Bank of America checks

16  and your fee, didn't it?

17      A.   It did, which they were fully informed of.

18      Q.   There had been no Executive Committee meeting about

19  the 680, had there?

20      A.   Not a full Executive Committee, but we had

21  three-quarters of the votes between my father, my sister, and

22  I.  And we thought it was in the best interest of the bank to

23  settle or try to make an agreement with the law firm to avoid

24  another lawsuit.

25      Q.   Your sister testified that it was not an Executive

1    Committee action and there was no vote or decision by the

2    Executive Committee for the 680?

3        A.    I didn't say -- we all agreed that we thought it was

4    in our best interest.  There was never a vote, but I did not

5    need an Executive Committee action.  Our bylaws give me the

6    authority.

7        Q.    Let's go to Government's Exhibit 75, please.  So

8    Scott Swain at the bottom, who's the CFO, responds to your

9    October 28th e-mail and he says:  This sets an awful

10   precedent.  Do we know of any similar situations?  Have we

11   contacted our bonding company?  Most bonds require us to

12   disclose any losses incurred over a set amount even if we

13   don't make a claim.  So we want to check our policy.  I

14   assume this was run through our income statement in the month

15   of October.

16            Is that right?

17       A.    That is correct.

18       Q.    If you could pull up the top of that e-mail chain.

19   And you respond to Scott Swain:  Why would it set an awful

20   precedent?  It saves us from another lawsuit.  And we could

21   have been on the hook for $1,172,945.76.  We were wrong and

22   made it right.

23            That's your response?

24       A.    Yes, ma'am, that is my response.

25       Q.    And next day, on October 29th, you e-mail the Board

1    and notified them of the payment.  If you could pull up

2    Government's Exhibit 12A, please.

3          Is that right, Mr. Laffitte?

4    A.   Yes, ma'am, I did notify them on the 29th.

5    Q.   And you tell the Board:  I just wanted to give

6    everyone a heads-up on a charge that you will hear about in

7    detail during our next Board meeting.  We took a $680,000

8    loss to fix an issue between us and the PMPED law firm.  We

9    converted $1,172,945.76 in checks made payable to Palmetto

10   State Bank to numerous other places as part of another stolen

11   case settlement.  This all involved a case with Alex

12   Murdaugh.  I negotiated with the law firm to pay part and

13   they pay the balance to make their client whole.  We are

14   moving $680,000 out of loan loss reserve to offset this loss

15   since we have ample reserves at the time.

16         That's what you told the Board; isn't that right?

17   A.   That's correct.

18   Q.   You make no mention of your father or your sister

19   being involved in this 680 payment at all, do you?

20   A.   No, ma'am, I did not.

21   Q.   You don't mention the $35,000 PR fee that was

22   included in the 680, do you?

23   A.   No, ma'am, I did not.

24   Q.   And you don't mention the Bank of America checks, do

25   you?

1    A.    No, ma'am.

2    Q.    And you don't mention anything about Hannah Plyler

3    and the hundreds of thousands of dollars in loans that you

4    paid back from these funds, do you?

5    A.    We don't mention anything because we had been

6    instructed by our attorneys to keep our e-mails as short as

7    possible and don't put all this stuff -- that's why I said we

8    will hear about any detail during our next Board meeting.

9    Q.    Attorneys weren't involved in this 680 payment

10   before you did it, were they?

11   A.    No, ma'am.  But we had -- they were notified about

12   it.

13   Q.    You notified them but you didn't consult with them;

14   is that right?

15   A.    That is correct.

16   Q.    They had been hired weeks before to assess the

17   bank's civil liability, hadn't they?

18   A.    They had been hired to work on the Satterfield case;

19   not on this case.

20   Q.    Will you pull up Government's Exhibit 12C.  As you

21   said:  Attorneys were informed but not consulted.  They were

22   consulted by phone, so nothing to share.  This is not a

23   lawsuit issue.  It's a banking issue of us converting checks.

24        Is that right?

25   A.    That is correct.  At this point in time, we had

1    negotiated a bunch of checks made to Palmetto State Bank that

2    were from a stolen settlement that we did not realize it, and

3    we had liability.  So we were trying to make the customer --

4    PMPED right and Mr. Badger.

5           MS. LIMEHOUSE:  Your Honor --

6           THE COURT:  Repeat the question, Ms. Limehouse.

7           MS. LIMEHOUSE:  Can we pull up Government's Exhibit

8    12D, please.

9    BY MS. LIMEHOUSE:

10   Q.   Norris Laffitte responds and says:  Who was

11   responsible for the conversion?  Are multiple employees

12   involved?  When did it -- they happen?  What all was

13   involved?  How many times?  How many other cases like this

14   are out there?  Have we let the employee who did this go?

15          Norris Laffitte was pretty upset, wasn't he?

16   A.   Yes, ma'am.

17   Q.   And your response, Government's Exhibit 13, top

18   e-mail, please, your response:  We will discuss in the Board

19   meeting.  I was responsible.  Twelve checks made payable to

20   PSB converted to others.  Hopefully no other cases.  This

21   took place in 2013.

22          The 680 actually accounted for all 14 checks, didn't

23   it?

24   A.   There were a couple of checks in 2014.

25   Q.   The 680 actually accounted for 14 checks, isn't that

1    right, not 12?

2        A.    But we had handled 12, I believe.

3        Q.    But the payment that you made to the law firm

4    included the checks to Bank of America; isn't that right?

5        A.    That is correct.

6        Q.    Pull up Government's Exhibit 77.  Of course, by now,

7    the law firm had already deposited that $680,000 payment;

8    isn't that right?

9        A.    They deposited on the 29th, yes, ma'am.

10       Q.    And after the 29th, you exchange e-mails with the

11   bank's attorneys about the $680,000 payment; isn't that

12   right?

13       A.    Somewhere right there, yes, ma'am.  But I called Tom

14   Gressette before then.

15       Q.    And in your notification to the Board, you don't

16   mention anything about your dad or your sister being involved

17   in this payment at all, do you?

18       A.    No, ma'am, I did not.

19            MS. LIMEHOUSE:  If we could pull up Government's

20   Exhibit 80, please, top e-mail, please.

21   BY MS. LIMEHOUSE:

22       Q.    On Tuesday, November 3rd, you e-mailed Trenholm

23   Walker, the bank's attorney, and said:  The bank is paying

24   this amount.  The verbal contract between PSB and PMPED was

25   done with the approval of the Chairman of the Board and CEO.

1  You are welcome to discuss terms, but it is not an option to

2  not pay.

3          This is the first time you mention your dad being

4  involved in that payment at all; isn't that right?

5      A.   I'm not sure, but I'm going to assume that that is

6  correct.

7      Q.   And in your own words, it's not an option to not

8  pay; isn't that right?

9      A.   Absolutely not.  I mean, we had given -- I had given

10  them my word, we were going to pay that check.

11      Q.   There's a Board meeting next day on November 3rd,

12  right?

13      A.   Yes, ma'am.

14      Q.   And the jury has heard a recording from portions of

15  that Board meeting and they've seen a transcript; isn't that

16  right?

17      A.   That is correct.

18      Q.   On November 3rd, you didn't mention anything about

19  your father or your sister approving this payment, did you?

20      A.   As has been testified to many times, Ms. Limehouse,

21  I did not need it, but I did have it.  And no, I did not

22  notify them when I sent it.

23      Q.   And on November the 3rd, during that Board meeting

24  when the $680,000 payment was discussed, you don't tell the

25  Board anything about the $35,000 you took from Arthur Badger,

do you?

A.    The PR fee?

Q.    Correct.

A.    No, ma'am.  I'm sure I gave them a breakdown because the checks were a million 325, plus the 35, divided by half. That's how we came up with the 680.

Q.    You didn't tell them anything about the hundreds of thousands of dollars that you used to pay off Hannah Plyler, did you?

A.    I'm not sure exactly what -- I don't even think we went through all the checks.  I think we went through what we did.

Q.    And we've heard a recording and seen the transcript. And you don't mention any of the details about that $680,000 payment, do you?

A.    I am not sure, but I know for a fact I've given the Board at some point in time every check, every research on this.

Q.    After the internal investigation they saw that, didn't they?

A.    I'm not sure when they saw it.  I did not try to hide anything.

        MS. LIMEHOUSE:  If you could pull up Government's Exhibit 200B, please.

BY MS. LIMEHOUSE:

1    Q.   You testified before the ODC back in the summer of

2    this year -- if you could pull up the bottom 17 through 25 --

3    for the first time you mention your sister and your father

4    being involved in this payment; is that right?

5    A.   I'm not sure if that's the first time, but, yes, we

6    all three discussed it.

7    Q.   And you tell the ODC:  You know, they didn't want to

8    pay it.  When I took it to the Board, the Board went

9    absolutely ballistic.  They wanted to claw it back.  And I,

10   part of the reason I got fired, I put my foot down.  I said,

11   no.  I said three of the four members of the Executive

12   Committee discussed this in-depth, which was my sister, Gray

13   Henderson, myself, and Charlie Laffitte, who was also the

14   Board chairman.  We have the authority by our bylaws to

15   settle any lawsuits, whatever, or potential.  We thought it

16   was in the best interest, so we did it.  And they wanted us

17   to claw it back.  And I told them, absolutely not.  I gave

18   them my word we are paying it.  And by God, we were paying

19   it.

20        As your sister testified, this wasn't an Executive

21   Committee action under the bylaws, was it?

22   A.   Not under the bylaws.  We didn't need it, but we had

23   three of the four voting members of the Executive Committee.

24   We had the approval by the Chairman of the Board.

25        MS. LIMEHOUSE:  Your Honor --

1          MR. DANIEL:  He's answering the question.

2          THE COURT:  She asked the question.  You will have a

3    chance to redirect.  Mr. Laffitte, just simply answer the

4    question asked to you.

5    BY MS. LIMEHOUSE:

6          Q.   You testified that you paid back the money for the

7    $35,000 PR fee; is that right?

8          A.   I paid back the half the bank paid, yes, ma'am.

9          Q.   And you showed the jury what was Defendant's Exhibit

10    83, which was a $17,500 check deposited on December 17th,

11    isn't that right?

12          A.   That's correct.

13          Q.   The memo line on this check says PR fee, half in

14    settlement; isn't that right?

15          A.   That's correct.

16          Q.   It's written to the Palmetto State Bank.  It's dated

17    November 1st, 2021.  And it's for $17,500?

18          A.   Yes, ma'am.

19          Q.   This check wasn't deposited until after the internal

20    investigation had been complete; is that right?

21          A.   I am not exactly sure when it was deposited.  I

22    wrote it up.  I would have handed it to my father, who was

23    Chairman of the Board.  I also believe I gave him two of the

24    checks later on for --

25          MS. LIMEHOUSE:  Your Honor, objection.

1           THE COURT:  Just answer the question asked.

2           MS. LIMEHOUSE:  If we could pull up Government's

3   Exhibit 198, slide 14, please.

4   BY MS. LIMEHOUSE:

5      Q.    You collected more than $200,000 for serving as the

6   conservator for the Plylers, didn't you?

7      A.    That's correct.

8      Q.    Not only did you collect hundreds of thousands of

9   dollars in fees, you took more than $350,000 in loans from

10  Hannah's account; isn't that right?

11     A.    I did receive loans, yes, ma'am.

12     Q.    And you used these loans to pay off loans from an

13  independent bank that you had obtained at much higher

14  interest rates; isn't that right?

15     A.    Yes, ma'am.

16     Q.    And you used the rest of these loans to pay off your

17  credit card bills and for your own personal expenses, didn't

18  you?

19     A.    That's correct.

20     Q.    And while you collected hundreds of thousands of

21  dollars in fees, you gave Alex nearly a million dollars in

22  loans that covered his overdraft, didn't you?

23     A.    I gave him loans.  Yes, ma'am.

24     Q.    You collected $60,000 from Hakeem Pinkney; isn't

25  that right?

1    A.    That is correct.

2    Q.    You never even met Hakeem Pinkney before he died,

3    did you?

4    A.    I did not.  He was in a home.

5    Q.    You never even managed money for Hakeem Pinkney, did

6    you?

7    A.    I absolutely did not.

8    Q.    You used this money to pay off the loans that you

9    had given yourself from Hannah Plyler; isn't that right,

10   $60,000 from Hakeem Pinkney?

11   A.    I used the PR fee that I received.  And I did use it

12   to pay off loans to Hannah Plyler.

13   Q.    And you didn't report that fee to the IRS back in

14   2012 and '13, did you?

15   A.    Not in 2012 and '13, I did not.

16   Q.    And you collected $15,000 from Natasha Thomas; isn't

17   that right?

18   A.    That's correct.

19   Q.    And she was 18 when you gave her a loan after you

20   became her conservator; isn't that right?

21   A.    Yes, ma'am.

22   Q.    And you never managed any money for her either?

23   A.    No, ma'am.  I helped set up her settlement or her

24   structure, but that's all I did for her.

25   Q.    And you did not report that $15,000 as income back

1    when you paid your taxes in 2012 and 2013, did you?

2        A.    No, ma'am, I did not.

3        Q.    And you collected $35,000 from Arthur Badger; isn't

4    that right?

5        A.    That's correct.

6        Q.    And you didn't manage any money for him, did you?

7        A.    I was his wife's PR, not Arthur's.

8        Q.    You were not Arthur Badger's PR, were you?

9        A.    No, ma'am, I was not.

10       Q.    In all, you made more than $450,000 in conservator

11   and PR fees, didn't you?

12       A.    I'm not sure exact amount, but it's 400-plus, yes,

13   ma'am.

14       Q.    In exchange, you let Alex use the money from his

15   clients however he wanted to, didn't you?

16       A.    No, ma'am.  It was not an exchange.  It wasn't a, if

17   you do this, I will do that.  It was a business decision.  If

18   he needed to borrow money, I made a choice as to whether to

19   loan it or not to loan it.

20       Q.    And when Alex's life collapsed, you did everything

21   you could to cover your tracks, didn't you?

22       A.    Absolutely not.  I did everything I could to make

23   sure we were going to protect the bank as much as possible.

24       Q.    And that included misleading the bank's Board,

25   didn't it?

1    A.   No, ma'am.  I never misled them.

2    Q.   That was all while you were spending hundreds of

3    thousands of dollars of the bank's money to try to save

4    yourself; isn't that right?

5    A.   No, ma'am.

6        MS. LIMEHOUSE:  No further questions, Your Honor.

7        THE COURT:  Redirect.

8                    REDIRECT EXAMINATION

9    BY MR. AUSTIN:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   All right.  Going back to the $1.325 million from

13   Arthur Badger; did you ever receive any of that money?

14   A.   Personally?

15   Q.   Yes, sir.

16   A.   Absolutely none.

17   Q.   It's your testimony that you did not know that Alex

18   Murdaugh was stealing that money, did you?

19   A.   That is correct.  If I had known -- if I knew he was

20   stealing, I would have called the law for him.

21   Q.   All right.  And why didn't you report your fees on

22   the tax returns?

23   A.   Stupid, to be real honest.  You know, the checks

24   were made out wrong to Palmetto State Bank.  I was

25   conservator.  I saw they were made to Palmetto State Bank.

1   And I was like, you know what, I can hide it on my taxes.

2   And it was a mistake.  And that's why I went back and

3   corrected it in 2021.  Everything was going on.  I knew all

4   of this would come to light at some point.  So I figured I

5   might as well go ahead and fix it.

6       Q.   Let me make sure I understand that.  You said --

7   when did you know all this would come to light?

8       A.   Well, Alex was -- everything that was going on with

9   Alex, I knew --

10      Q.   You are talking about in the summer of 2021, fall --

11      A.   No, it was fall 2021.

12      Q.   Got you.

13      A.   And like I said, I knew everything would come to

14  light.  My accountant and I talked about it.  And we made a

15  decision to go ahead as quickly as possible and refile all my

16  tax returns.

17      Q.   And did you fail to file tax returns because you

18  were helping Alex Murdaugh steal?

19      A.   Absolutely not.  I just didn't want to pay taxes on

20  it.

21      Q.   Okay.  But you did report all of these transactions

22  to the probate court; is that fair?

23      A.   That's correct.

24      Q.   And you actually -- is it correct that you turned

25  all of these documents over to law enforcement?

1    A.    Every document that I had that I know of I gave to

2  law enforcement.

3    Q.    And remind the Court when you did that.

4    A.    I can't remember when we first -- you know, when I

5  first got notified.  It was September, October.  But I was

6  giving documents, e-mailing documents, scanning documents, I

7  mean, just by the thousands to them.  I mean, they were

8  asking all the time.  So I am not exactly sure, but it was

9  September, October, at the latest, of '21.

10    Q.    Okay.  So before any of these issues came up with

11  the Board, you were already reporting -- or providing these

12  documents to law enforcement?

13    A.    Correct.

14        MS. LIMEHOUSE:  Objection, Your Honor.  He's

15  leading.

16        THE COURT:  Don't lead the witness.  Sustained.

17  BY MR. AUSTIN:

18    Q.    Government pointed out in Government's Exhibit 197

19  that you checked Alex's account, you paid off money, paid off

20  loans.  You don't deny --

21        MS. LIMEHOUSE:  Objection, Your Honor.  He's

22  testifying.

23        THE COURT:  Mr. Austin, this is your witness.

24  Sustained.

25        MR. AUSTIN:  Apologies.

BY MR. AUSTIN:

Q.   Did you check Alex's accounts?

A.   I did check his accounts.  Any time I transferred money, if I transferred money to Alex from one checking account or a credit line or did anything, I would then go back into his account to verify that it went through.  And there's just a way to check and make sure that the transaction actually took.  And you didn't -- what do you call it when you put in the wrong number -- or transpose a number or anything like that.  So that's what I would do.

Q.   And did you check his accounts any more than you checked anybody else's accounts?

A.   I probably did check his accounts more than anybody else.  I mean, obviously, he was a large customer. Obviously, he was often in overdraft.  So I probably did check his accounts more than others.

Q.   And I think you were asked this on direct already, but I think bears repeating based on Ms. Limehouse's questions.  Is there anything wrong with unsecured loans?

A.   There's not -- nothing wrong with unsecured loans or partially collateralized loans.

Q.   And has FDIC ever raised any issues with you or the bank about issuing any loans, secured or unsecured, to Alex Murdaugh?

A.   They have not.  We've been through many, many exams

1  with him.

2      Q.   How often does the FDIC do exams?

3      A.   Typically, every 12 to 18 months.

4      Q.   What about the State Banking Board?

5      A.   It's the same.

6      Q.   So, routinely, you have two different regulatory

7  agencies --

8          MS. LIMEHOUSE:  Objection, Your Honor.  This is

9  beyond the scope of my cross-examination.

10          THE COURT:  It is beyond the scope and also leading.

11  Sustained.

12  BY MR. AUSTIN:

13     Q.   You started to testify about --

14          MS. LIMEHOUSE:  Objection, Your Honor.

15          THE COURT:  I hadn't heard the question yet.

16  BY MR. AUSTIN:

17     Q.   You started to testify about the use of Alex's loans

18  from Hannah Plyler for farming.  And I believe you got cut

19  off.  Do you recall what you were talking about?

20     A.   Well, she was saying that -- Ms. Limehouse was

21  saying that the funds were not for farming purposes that were

22  paying off Alex, the 284,000.  And I was saying absolutely,

23  that is correct, they were paying off Hannah Plyler's loans.

24  And I did not know if they had researched the Hannah Plyler

25  loan proceeds, if it had paid off anything in farming.  I was

1 just asking. I didn't know.

2     Q. And with regard to the petition to be appointed as

3 Natasha Thomas's conservator, did you fill out that form?

4     A. I did not.

5     Q. Who filled out that form?

6     A. Either Alex Murdaugh or somebody at PMPED.

7     Q. And why didn't you verify her age when you got that

8 form?

9     A. I mean, I would assume that your attorneys are

10 correct. And I just never would have verified it.

11     Q. When you said "assume your attorneys," who are you

12 talking about?

13     A. The PMPED, Alex Murdaugh, on that case.

14     Q. Did you see them as your attorneys?

15     A. Absolutely.

16     Q. Why?

17     A. Because once you step in as conservator, you are

18 stepping in the shoes of the client. So then the attorney

19 really is representing you.

20     Q. And were you told that at any point?

21     MS. LIMEHOUSE: Objection, Your Honor. Hearsay.

22     THE COURT: Sustained.

23 BY MR. AUSTIN:

24     Q. Did you believe that Alex was your attorney?

25     A. I did.

1    Q.   All right.  You were shown Government's Exhibit 20.

2  I believe these are disbursement sheets.  And you don't deny

3  signing any disbursement sheets?

4         MS. LIMEHOUSE:  Objection, Your Honor.

5         THE COURT:  That's a leading question.

6  BY MR. AUSTIN:

7    Q.   Do you deny signing any of the disbursement sheets

8  that you've been shown that bear your signature?

9    A.   Absolutely not.

10   Q.   Did you review those disbursement sheets when you

11 signed them?

12   A.   No, I did not.

13   Q.   Why not?

14   A.   Years and years of trust.  It was a mistake.

15 Customer, you know, would just say, here, I need you to sign

16 right there, I did it.  It was a mistake.

17   Q.   All right.  And there are a number of e-mails that

18 reference potentially phone calls between you and Alex.  Do

19 you remember any of these phone calls taking place?

20   A.   I don't.

21   Q.   All right.  And you don't recall having these

22 conversations?

23         MS. LIMEHOUSE:  Objection, Your Honor.

24         THE COURT:  Leading.  Sustained.

25 BY MR. AUSTIN:

1   Q.   You were shown Government's Exhibit 47.  It's

2   related to the Red Beard property.  Did you have to bug Alex

3   routinely to try to get paid on that?

4   A.   I had to bug Alex routinely to get paid on anything.

5   But, yes, I would have to.

6   Q.   Okay.  And out of all the partners in that, who ever

7   paid back any money on those loans?

8   A.   Alex Murdaugh made the payments on Red Beard and 0

9   United.

10   Q.   What about the other partners?

11   A.   Not to my knowledge.

12   Q.   And once a loan is charged off, is the bank under

13   any requirement not to loan money to that customer anymore?

14   A.   You have no requirements not to do it.  I mean,

15   obviously, you are going to take a little more due diligence

16   because there's a reason of why you charged it off.

17   Q.   Okay.  And besides that, I guess it's really two

18   loans, Red Beard and 0 United, besides those, did you ever

19   have any other loans that Alex didn't pay back until

20   September 2021?

21   A.   That is correct, he paid them all back.  Might have

22   paid them slow, but he paid them all back.

23   Q.   And did any of the third-party auditor reports

24   during this time --

25            MS. LIMEHOUSE:  Objection, Your Honor.  Beyond the

1    scope of my cross-examination.

2           MR. AUSTIN:  Entire cross related to Alex Murdaugh's

3    financial risk.  And so I think it's fair to explore that.

4           THE COURT:  Well, she didn't cover it.  You covered

5    it on direct.  She didn't raise it on cross.  I sustain the

6    objection.

7           MR. AUSTIN:  Thank you, Your Honor.

8    BY MR. AUSTIN:

9      Q.   I believe Ms. Limehouse asked you with regard to

10   your bond hearing whether or not you admitted to helping Alex

11   structure transactions.  Is that accurate?

12          MS. LIMEHOUSE:  Objection, Your Honor.  I just asked

13   if it was structuring here today.

14          THE COURT:  That's the only thing you can ask about

15   that.  Something about another hearing, she didn't use that,

16   so I sustain the objection.  You can only ask about what

17   she -- what was raised on cross.

18   BY MR. AUSTIN:

19     Q.   Have you ever admitted helping Alex structure funds

20   or -- sorry, structure transactions?

21     A.   I didn't intentionally structure it, but when you

22   look back on it now, it was structuring.

23     Q.   You believe that was his intent or that was your

24   intent?

25     A.   I believe that was his intent.  It was not my

1   intent, but ...

2       Q.   And you were shown Government's Exhibit 37 and 38.

3   If we could pull those up, please.  Those were called the

4   re-cutting e-mail chain.  Where did you say that you found

5   these e-mails when you were doing your research?

6       A.   The original one -- I found this one, this e-mail,

7   in my files on Hannah Plyler.  It was in the loans section

8   for the payoffs.

9       Q.   Okay.  And so the 1325, that relates to Arthur

10  Badger, correct?

11      A.   Yes, sir.

12      Q.   But this was in the Hannah Plyler --

13           MS. LIMEHOUSE:  Objection, Your Honor.  Leading.

14           THE COURT:  Just -- this is your witness.  You can't

15  testify, Mr. Austin.  I sustain the objection.

16  BY MR. AUSTIN:

17      Q.   Where did you find this e-mail?

18      A.   I found this when I go back into my loans.  I kept

19  the records.  And I'd stuck it behind the loans that it paid

20  off, because that was -- in the other e-mail it shows all the

21  work.  So I knew if the probate court ever wanted to see how

22  I figured it up, there it was.

23      Q.   Okay.  So were you trying to hide these e-mails from

24  the probate court?

25      A.   No, sir, not at all.

1    Q.   And did you turn these e-mails over to law

2    enforcement?

3    A.   I turned this one.  I didn't see this one.

4    Q.   Okay.  And do you deny asking Jeanne to re-cut that

5    check?

6    A.   I did ask her.

7    Q.   And did you have any idea what that check related to

8    at the time you wrote this e-mail?

9    A.   I had no idea.

10   Q.   Again, why did you send this e-mail to Jeanne?

11   A.   My customer, Alex Murdaugh, requested it.

12        MR. AUSTIN:  Could we pull up Government's Exhibit

13   29, please.  Please zoom in on the checks in the bottom, just

14   the one check.

15   BY MR. AUSTIN:

16   Q.   Okay.  Was it possible for $388,000 to have come

17   from Donna Badger's estate?

18   A.   Absolutely not.

19   Q.   And this says Arthur Badger at the bottom here, but

20   what account did this come out of, this money?

21   A.   This came out of -- the 388,000?

22   Q.   Yes, sir.

23   A.   Came out of 693,592.72 as PMPED's account.

24   Q.   So when the memo line says Arthur Badger at the

25   bottom, who is entering that information?

1    A.    PMPED does.

2    Q.    All right.  And when you say that that's for the

3    customers, then who would that customer be in this situation,

4    Arthur Badger or the law firm?

5    A.    PMPED, that's the customer.

6    Q.    Okay.  So let's go to page 20, please.  And you

7    said -- this number here, is that the same number, is that

8    the --

9    A.    No, that's a different number.  That's Alex

10   Murdaugh's personal account number.

11   Q.    Okay.  And who asked for it to be deposited into

12   that account?

13        MS. LIMEHOUSE:  Objection, Your Honor.  Hearsay.

14   BY MR. AUSTIN:

15   Q.    If you remember.

16        MS. LIMEHOUSE:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   BY MR. AUSTIN:

19   Q.    Did you decide on your own to put that into that

20   account?

21   A.    No.

22   Q.    And how much money went through Donna Badger's

23   account?

24   A.    $500.

25   Q.    So would it be possible for any of these checks over

1    $50,000, over $100,000, to have come from Donna Badger's

2    estate?

3        A.    Absolutely not.

4        Q.    And so any of these checks that reference Donna

5    Badger's estate, where would that money be coming from?

6        A.    I'm not sure where the money was coming from.  I

7    didn't even notice it.

8        Q.    Did you have any responsibility for monitoring

9    Arthur Badger's accounts?

10       A.    I don't.

11       Q.    Why not?

12       A.    I was not the PR for him.  I was the PR for Donna

13   Badger.

14       Q.    Okay.  Can you explain that memo line piece of it,

15   what your understanding of the memo lines were with those

16   checks?

17       A.    Memo line on a check, the way I understand it, is

18   for the writer of the check so I could remember what I wrote

19   the check for.  I mean, if I wrote -- my niece, check for her

20   birthday, I could have written, Claire Henderson, birthday,

21   you know, happy birthday on it.  That's what it was for.

22   Then you could write I paid the painter or whatever.  That's

23   what it's for.  It's not for who you are giving the check to.

24       Q.    So like in this situation there, it says Arthur

25   Badger in the memo line.  Was that memo line intended to be

1    for Arthur Badger to signify it relates to Arthur Badger --

2            MS. LIMEHOUSE:  Objection, Your Honor.  Objection.

3    BY MR. AUSTIN:

4        Q.   What's your understanding of the memo line in that

5    situation?

6        A.   In that situation, I would assume that it is for

7    PMPED to understand that this money that Alex has gotten is

8    either part of fees, part of something.  I'm not sure what it

9    was, but ...

10       Q.   And did you have any conversations with Arthur

11   Badger about negotiating the $35,000 PR fee?

12           MS. LIMEHOUSE:  Objection.  Hearsay.

13           THE WITNESS:  I did not.

14   BY MR. AUSTIN:

15       Q.   Participation in the conversation?

16           THE COURT:  Overruled.

17       Q.   You did not have any participation in the

18   conversation, is that what you said?

19       A.   I don't recall having a conversation with him about

20   the PR fee.

21       Q.   Okay.  And turning to the beach house renovations,

22   and you said that you saw all these checks going to C.E.

23   Smith.  Do you know who C.E. Smith -- did you know who C.E.

24   Smith was at the time?

25       A.   I did not.

1    Q.    Even though he had gotten lawyer loans?

2    A.    I didn't.  We have numerous people come in and get

3    lawyer loans.  I typically don't see the lawyer loans unless

4    everybody else is busy, and then I would pick them up.

5    Q.    All right.  And what was your understanding again of

6    what that money might have been for?

7    A.    The checks to C.E. Smith?

8    Q.    Yes, sir.

9    A.    We thought -- when you are doing a construction loan

10   or whatever, you see large checks weekly.  That's the way

11   they pay their subcontractors or whatever else they are

12   paying for, materials, we assumed that's what that was for.

13   Q.    And how did you tie that back to the beach house at

14   that time?

15   A.    We didn't.  I mean, Mr. Murdaugh had told us what he

16   was doing and that he was, you know, needing the loan to do

17   renovations on the beach house.  And, you know, it started

18   off as, as I said before, at 500,000.  Then he asked to

19   increase it to 750, which we didn't mind doing.  And we just

20   assumed those were the checks.  We didn't -- we did not try

21   to tie it back.

22   Q.    Okay.  And I believe you testified that you couldn't

23   loan Alex that money alone.  What did you mean by that?

24   A.    My lending limit, even when I was CEO of the bank,

25   at the end was a million dollars.  If we had two Executive

Committee members together, your lending limit then went to a million and a half.  And I want to say at the point in time of the $750,000 loan, he was at 2.7 or 3.5 million.  I can't remember.  So many numbers have run together over these past two weeks.  But I could not have done that without Executive Committee approval, who had authority to loan up to $6 million.  Anything over $6 million had to go to the full Board.

Q.   Okay.  And how many customers does Palmetto State Bank have, roughly?

A.   I would say 14,000, somewhere right there.  I know that we had that many accounts.  So, you know, some people have multiple accounts, but --

Q.   Do you know how many loans on average PSB gives out on a monthly basis?

A.   I know the Hampton office on a monthly basis would do between 100 to 200 loans a month.

Q.   Was it part of your responsibility to monitor how every single loan or how all the loans proceeds from each of those loans were spent?

MS. LIMEHOUSE:  Objection, Your Honor.  This is beyond the scope of my cross-examination.

THE COURT:  I overrule.  Answer the question.

THE WITNESS:  I've never looked at how loan proceeds were spent in 20-something years of banking.

1  BY MR. AUSTIN:

2      Q.   And do you feel that you violated any

3  responsibilities as a banker by not checking the loans over

4  the course of your 27 years?

5      A.   I don't at all.  I mean, we give somebody a loan.

6  If we give Alex or whoever a loan, once we give them the

7  loan, then we cut that check to them, or approve the loan, my

8  sight or eyes is it's their money, and they could do with it

9  as they wish as long as they paid it back as agreed upon.

10      Q.   And the loan you got from Johnnie Parker, you used

11  that to pay back some of Hannah Plyler's loans; is that

12  right?

13      A.   I did.

14      Q.   And that was your money you got from Johnnie Parker,

15  correct?

16          MS. LIMEHOUSE:  Objection, Your Honor.  Leading.

17          THE COURT:  Leading.

18  BY MR. AUSTIN:

19      Q.   Was that your money you got from Johnnie Parker?  He

20  loaned you the money?

21      A.   Yes, once he loaned me the money, it was my money,

22  that's correct.

23      Q.   So you are not -- did you steal that money from

24  anybody?

25      A.   Absolutely not.

1    Q.    And you used that money to pay Hannah Plyler back?

2    A.    I did.

3    Q.    And did Hannah Plyler lose any money during any of

4    the time that you were her conservator?

5    A.    She did not.

6    Q.    Did you earn her money through these loans?

7    A.    I did.  She earned interest.

8    Q.    And do you recall how much money she earned in

9    interest?

10    A.    Just the last year she earned over $19,000.

11    Q.    Okay.  And do you feel that you've done your job as

12    conservator for her?

13    A.    I do.

14    Q.    In the e-mails that you sent with the Board or sent

15    to the Board about all of these issues in October of 2021,

16    were you trying to cover your tracks at the time?

17    A.    I was not.  I absolutely would not try to cover my

18    tracks.  I was going to be forthcoming.  You know, this was a

19    family bank.  It was my heart, soul, everything.  And I

20    wouldn't try to hide it.

21    Q.    When you said that you consulted the attorney or

22    that you informed the attorney but you didn't consult him,

23    did you believe that you had the ultimate authority to make

24    these decisions?

25    A.    Absolutely did have the authority by our bylaws.

1      Q.    And if that were a mistake, was that still why you

2    believed that you could?

3          MS. LIMEHOUSE:  Objection, Your Honor.

4          THE COURT:  Leading.

5          MS. LIMEHOUSE:  He's testifying.

6          THE COURT:  Mr. Austin, don't lead your witness.

7          MR. AUSTIN:  Sorry.  Sorry, Your Honor.

8    BY MR. AUSTIN:

9      Q.    What gave you the authority to make those loans,

10   make that loan $750,000, or issue the check for $680,000?

11     A.    The authority to make the $750,000 loan was done by

12   the Executive Committee.  As you heard me say earlier, it was

13   way above my limit.  I could not have done it.  The authority

14   for the $680,000 check that I issued to PMPED was given to me

15   by -- it was either 4.02 or 4.03 of the bylaws.  One is

16   Chairman of the Board, one is CEO.  That's why I'm saying

17   it's one of those sections or the other.

18     Q.    And had there ever been any issues, to your

19   knowledge, with the CEO making such decisions by the Board?

20     A.    None to my knowledge since '97 when I started.

21     Q.    And did you have any issues communicating any of

22   these issues relating to banking with Board members when you

23   were discussing these issues in the fall of 2021?

24     A.    Can you repeat that, please?

25     Q.    Did you have any issues discussing banking issues

1    with Board members during the fall of 2021?

2        A.   I don't have any problems discussing banking issues

3    during the fall.  I mean, the hardest thing during this time

4    is trying to communicate.  Because we, obviously, would do a

5    lot of it by e-mail.  And our lawyers were saying don't put

6    anything in e-mails.  So it makes a little more difficult.

7        Q.   And is that why you said we will discuss this in the

8    Board meeting?

9            MS. LIMEHOUSE:  Objection, Your Honor.

10           THE COURT:  Mr. Austin, please don't testify.

11   Sustained.

12   BY MR. AUSTIN:

13       Q.   Why did the Bank of America checks get included in

14   the $680,000 payment to PMPED?

15       A.   We were on the hook, in my eyes, for $1,172,000 and

16   change.  And I wanted to -- wanted PMPED and us to work

17   together to make their client, Mr. Badger, whole because his

18   money was stolen.  They needed to make him whole.  Palmetto

19   State Bank had negotiated the checks for PMPED's lawyers.  So

20   I felt like we both had liability or both had -- not

21   liability, that's not the correct word, responsibility is the

22   correct word.  We needed to fix it.  So I just took the

23   million 325 plus the PR fees, which I said before we added

24   in.

25       Q.   Did you all handle the Satterfield case any

1    differently?

2        A.   We didn't.  The Satterfield case, when we handled

3    it, we didn't ever touch the money.  When I say touched the

4    money, the money never ran through Palmetto State Bank.  And

5    when they settled it, they made a big deal about the PR fees

6    being paid back.  That's why I added my PR fees back.  And I

7    thought it was the right thing to do, so we did it.

8            MR. AUSTIN:  Can you pull up Defendant's Exhibit 83.

9    BY MR. AUSTIN:

10       Q.   All right.  And you were just asked about this on

11   cross.  This is the check that you paid back to the bank; is

12   that correct?

13       A.   That's correct.

14       Q.   And when was it deposited?

15       A.   It looks like it was right here, December 17th.

16       Q.   Okay.  But when you figured out the $680,000 payment

17   or when you negotiated that with PMPED, did you include the

18   $17,500 as part of that negotiation?

19       A.   I'm a little confused.

20       Q.   Did you include splitting your PR fees when you

21   discussed the amount of the settlement with PMPED?

22       A.   Yes, sir, I did.  It was a million 325, was the

23   amount that was stolen from Mr. Badger, plus the $35,000 PR

24   fee.  So I took it a million 360 and divided it by 2, so we

25   had 680.  So the bank had actually paid $17,500 of my fees

that I had earned.  And so I felt like I should pay them

back, so I did.

Q.   Okay.  So without the $17,500 multiplied by 2, would

would that $680,000 have decreased?

A.   It would have been $662,500, somewhere right in

there.

Q.   So when did you write that check for $680,000 that

you delivered to PMPED?

A.   October 28th.  And I'm going to assume I delivered

it either the 28th or 29th.

Q.   And so that's $17,500 would be factored into it,

correct?

A.   That's correct.

Q.   I believe you were asked about whether or not you

managed any money for Hakeem Pinkney or Natasha Thomas.  Did

a judge ever sign off on your fees from those cases?

A.   They did.  That was done through circuit court.

Q.   Do you recall which judge?

A.   I'm going to say it was Carmen Mullen, but I

wouldn't swear to it.

MS. LIMEHOUSE:  Objection, Your Honor.

THE COURT:  Beyond the scope.  Sustained.

BY MR. AUSTIN:

Q.   Going back to the appraisal related to the beach

house and the $750,000 loan, what's the difference on the

1    bank using it for renewal of a first mortgage and the

2    $750,000 second mortgage?

3         A.    There wouldn't be any difference.

4         Q.    Okay.  And was the second mortgage a renewal?

5         A.    The second mortgage was going to be a new loan.

6    That was part of the $750,000 loan.

7         Q.    Okay.

8         A.    We were hoping.

9         Q.    I'm going to show you what's been marked as

10   Defendant's Exhibit 90.  This has not been entered into

11   evidence, Your Honor.  I provided a copy to the Government.

12              THE COURT:  Is there going to be an objection from

13   the Government?

14              MS. LIMEHOUSE:  I'm not sure of relevance, Your

15   Honor, right now.

16              THE COURT:  Do you want to take a look at it?

17              MS. LIMEHOUSE:  I've seen it.  I know what it is.

18   It's a family chart.  I'm just not sure what's relevant.  And

19   it's beyond the scope of my cross-examination.

20              THE COURT:  Well, is it within the scope of the

21   cross, Mr. Austin?

22              MR. AUSTIN:  These are general questions about the

23   family dynamics.

24              THE COURT:  No.  That wasn't in her

25   cross-examination.  If that's your basis, I sustain the

1 objection.

2        MR. AUSTIN:  Beg the Court's indulgence.  No further

3 questions.

4        THE COURT:  Very good.

5        Ladies and gentlemen, it's time for our morning

6 break.  It's been a little longer, but I thought we would get

7 through this testimony.  Please go to the jury room.

8        (Jury leaves open court at 11:28 a.m.)

9        THE COURT:  Please be seated.  Let me suggest, if we

10 might, my understanding is I need to put this with the jury

11 present, but I understand the defense is going to rest.  Is

12 that correct, Mr. Daniel?

13        MR. DANIEL:  Yes, Your Honor, that's correct.

14        THE COURT:  And the Government has no rebuttal, and

15 we will rest in full?

16        MS. LIMEHOUSE:  That's correct, Your Honor.

17        THE COURT:  Okay.  Let me take a break just for a

18 moment.  And then let's come back and just go ahead, while

19 the jury is having their break, and let's address the Rule

20 29(a) motion if we could.  Let's go ahead and do that.  And

21 what I'm trying to do is, if -- I want to get it to the jury

22 as quickly as we can.  And I want them -- what I want to do

23 is, I want to do the -- over lunch, I want to give you an

24 opportunity to look at the proposed jury charge and verdict

25 form.  And then I want to get that while they are doing

1  lunch.  And then after lunch, y'all be in a position to do

2  your closing statements.  Does that make sense?

3          MS. LIMEHOUSE:  Yes, Your Honor.

4          MR. DANIEL:  Yes, Your Honor.

5          THE COURT:  Good.  Let's be at ease for about five

6  minutes.

7          (Whereupon, a recess transpired.)

8          THE COURT:  The Court's in session.  Do I have

9  any -- let me just confirm how we are doing this, because

10 it's a little out of order.  Normally, I would have the --

11 before the jury, I would have the defense rest and the

12 Government rest.  I don't want to bring the jury in simply to

13 hear that and send them back out again.  So is there a

14 consent that we can take up the Rule 29 issue, (a) issue,

15 before I bring the jury back and you rest?  Any objection

16 from the Government?

17         MS. LIMEHOUSE:  No objection.

18         THE COURT:  Any objection from the defense?

19         MR. DANIEL:  No objection, Your Honor.

20         THE COURT:  Very good.  Okay.  Is there a motion --

21 any motions to come before the Court at this point, assuming

22 that both parties have rested?

23         MR. DANIEL:  We are getting Mr. Austin now, Your

24 Honor.

25         THE COURT:  Okay.  Folks, let's move.  Is there a

1  motion from the defense?

2  MR. AUSTIN:  Your Honor, we have a written motion we

3  would like to file, if the Court is amenable to it.  It's six

4  pages, but I will try to summarize it briefly.  I just want

5  to get it on the record just to have it on the record.  But,

6  essentially, Your Honor, a lot of this comes down to what we

7  already argued previously.

8  THE COURT:  You are talking about the thing you've

9  written as a six-page motion under Rule 29(a)?

10  MR. AUSTIN:  Yes, sir.  And we are ready to file it

11  right now.  And we can provide a copy to the Government and

12  the Court as well.  But, effectively, this goes back in large

13  part to what we already argued about the estate of Donna

14  Badger as opposed to the estate of Arthur Badger in

15  particular.  There's been a lot of testimony about fiduciary

16  duties that Mr. Laffitte simply did not owe to Arthur Badger.

17  There's been testimony about the disbursement sheet that

18  listed him, but there's been no testimony that Mr. Laffitte

19  actually saw that or would have had any idea that it was

20  being put together by the law firm.

21  THE COURT:  He accepted a $35,000 fee for it.

22  MR. AUSTIN:  Yes, Your Honor, but there's also

23  testimony that in setting up the structure for Mr. Badger and

24  by taking it over as a neutral third-party, that he enabled

25  him to actually get any money to begin with, that he would

1  not have been able to get the money without it.  There's

2  also --

3       THE COURT:  I mean, I've got to say, you know, in

4  the light taken most favorable to the nonmoving party, which

5  is my obligation here, can a reasonable jury -- which count

6  are you specifically referring to?

7       MR. AUSTIN:  We are talking about Counts 2, 4, and I

8  believe 3.  And I don't have the motion right in front of me.

9  Basically, the scheme of artifice references the estate of

10  Donna Badger.  They use a footnote to try to bring in Arthur

11  Badger into this whole framework.  And it's just simply not

12  appropriate under the facts of the case.  Mr. Badger waived

13  his status as a beneficiary, according to an exhibit entered

14  by the Government.  Is that 187?  Is that 187, the

15  beneficiary waiver?

16       THE COURT:  Just be clear.  You are claiming --

17  let's look at Count 2 for a second.  It says -- alleges that

18  the defendant with Murdaugh knowingly executed and attempted

19  to execute a scheme and artifice to obtain money and funds

20  under the custody and control of Palmetto State Bank by means

21  of a false and fraudulently pretenses, and aided and abetted

22  Murdaugh by negotiating, distributing a check totaling

23  $101,000 to Hannah Plyler, knowing that the funds belonged to

24  the estate of Ms. Badger and/or estate beneficiaries.  So

25  what part of that is a problem?

1    MR. AUSTIN:  Only $500 went through Donna Badger's

2 estate.  So it's simply impossible for $101,000 to go through

3 that estate.  And the beneficiaries did not include Arthur

4 Badger, because he waived his status as a beneficiary.  So

5 none of that was possible.  The only evidence supporting that

6 is the memo line referencing Donna Badger.  But that does not

7 indicate that it came from her conservatorship.  That

8 indicates something that the firm intended for itself.

9    THE COURT:  Well, that sounds like a lot of

10 argument.

11    Ms. Limehouse, your response.

12    MS. LIMEHOUSE:  Yes, Your Honor, as the defense

13 pointed out, there's a footnote in the indictment that

14 basically says, we are referring to Arthur and Donna Badger

15 and the beneficiaries of their estate all and the same.  Not

16 only do the checks themselves that underlie Counts 2 and 3

17 state the estate of Donna Badger on the memo line, it's the

18 Government's position to the extent there was any confusion

19 about these funds, that was all part of the scheme to

20 further -- furtherance of the scheme to steal those funds.

21 So we think it's more than sufficient, Your Honor.

22    THE COURT:  I think -- I do find that there is

23 sufficient evidence to make it a jury question that a

24 rational fact finder could find the defendant guilty on each

25 of these counts beyond a reasonable doubt.  So I deny that as

1  to this point concerning the Arthur and Donna Badger issue.

2       Anything else?

3       MR. AUSTIN:  I just wanted to add -- I respect the

4  Court's ruling.  I just wanted to add there's no testimony

5  Mr. Laffitte had anything to do with drafting the checks or

6  the disbursement sheets --

7       THE COURT:  You know, there's a claim that there's a

8  conspiracy and a scheme.  He has a defense.  The jury will

9  decide.  Whether there's sufficient evidence, taken in the

10  light most favorable to the nonmoving party and

11  considering -- you know, there's sufficient evidence that a

12  rational fact finder could find him guilty beyond a

13  reasonable doubt.  So I deny that motion.

14       Anything else?

15       MR. AUSTIN:  And, Your Honor, our motion rests

16  basically on the same arguments.  And we would rest on our

17  previous arguments that you already denied.  And we respect

18  that and we will file arguments in our motion here, but just

19  to save the Court time --

20       THE COURT:  Okay.  I haven't heard anything that

21  would already alter our previous discussion, which is not

22  unusual, as you know, at the end of the Government's case,

23  that unless something has developed in the defense that would

24  alter that, and I haven't heard anything.  So, you know, I

25  affirmed my previous ruling after considering all of the

1  evidence subsequently offered that there is sufficient

2  evidence that the defendant could be found guilty of each of

3  the six counts, each element of each of the -- of each of the

4  counts, each of the essential elements of each of the counts,

5  the jury could find him guilty beyond a reasonable doubt.

6  Thus, the Court denies the defendant's motion for a directed

7  verdict as to each of the counts.

8          MR. AUSTIN:  Thank you, Your Honor.

9          THE COURT:  Okay.  Now, in just a moment, my law

10 clerk, Ms. Burns, will return with the draft jury charge and

11 verdict form.  We will spend the next hour, give you a chance

12 to review it.  Let me just if I can -- to try to avoid having

13 you send you -- well, I don't seem to have it here with me.

14 I was going to alert you when she comes in -- well, I don't

15 think I have my notes with me here.  You will see pretty

16 obviously that most of the charges that -- most of my

17 charges -- you know, the Government and the defense is not

18 uncommon.  Most of them want me to charge the same thing,

19 slightly different language.  I probably made everybody mad

20 by using my own language.  But they are basically -- I

21 substantially charge most everything.

22          There were a couple of Government charges that I

23 thought were duplicative of the credibility and didn't think

24 we needed to have them singly focus on the defendant.  I

25 thought that was not particularly fair.  So I thought the

1    credibility charge was sufficient.  I don't want to act like

2    I'm off the top of my head remembering all these.  As to the

3    Government -- as to the defendant's charges, I charged most

4    of those.  I think the ones which we will address, I am not

5    charging advice of counsel, and I am not charging

6    attorney-client relationship because it's not relevant, I

7    view in this claim.

8         I didn't charge -- I think you wanted to add an

9    additional one, credibility about weighing against Fifth

10   Amendment, someone who asserted the Fifth.  No one asserted

11   the Fifth.  So that's not even an issue.  I think it was

12   actually wrong what they wanted me to do, but doesn't matter.

13   But most of it -- I think you will see most of the charge is

14   pretty similar to what you all asked me to charge.

15        So we will come back.  If you don't need an hour,

16   whatever you need, let me know.  Because I think it's in

17   everybody's interest to get the jury hearing your closing

18   argument and hearing my charge and deliberating.  And I want

19   to hear from y'all on my charge.  So in just a minute, Ms.

20   Burns will return.  I will give you the verdict form and the

21   proposed charge.

22        Okay?  Anything else I need to address at this

23   point?

24        MS. LIMEHOUSE:  Nothing from the Government, Your

25   Honor.

1       MR. DANIEL:  Nothing from the defense.

2       THE COURT:  Very good.  Why don't you spend this

3   moment to talk to Ms. Perry and send somebody up from each of

4   your teams and make sure all the exhibits are complete.

5   Okay?

6       MS. LIMEHOUSE:  We will do that right now, Your

7   Honor.

8       THE COURT:  Yes.

9       (Whereupon, a recess transpired.)

10      MR. AUSTIN:  I don't understand the full

11  understanding of the schedule.

12      THE COURT:  Over lunch you are going to look at my

13  jury charge and my verdict form, and I'm going to give you up

14  to an hour.  If you finish sooner than that, let me know so

15  we can go ahead and proceed.  And then we are going to

16  bring -- what I'm going to do is, once we complete the charge

17  conference and I've addressed any issues that y'all have

18  raised, I'm going to bring the jury back.  I'm going to say,

19  do you rest?  Do you rest?  And then I'm going to say,

20  closing argument.  Okay?  Does that make sense?  I don't want

21  to play a Jack in the Box with them coming back just to hear

22  you guys say you rested.  Does all that make sense to

23  everybody.

24      MR. AUSTIN:  Yes.

25      THE COURT: Okay.  Hopefully, in just a moment, she

1  will return.

2         (Whereupon, recess transpired.)

3         THE COURT:  The reason we have a charge conference

4  is to correct anything we need to correct.  That's why we do

5  it.  I want to hear from counsel.

6         Okay.  Is the Government ready to address issues in

7  the charge conference?

8         MS. LIMEHOUSE:  Yes, Your Honor.  Ms. Stoughton will

9  be right back.  We have one point with the verdict form as

10  well.

11         THE COURT:  Is the defendant ready to proceed as

12  well for the charge conference?

13         MR. ABEE:  We are, Your Honor.

14         THE COURT:  Okay.  Ms. Stoughton, are you the lawyer

15  for this?

16         MS. STOUGHTON:  Something like that.

17         MS. LIMEHOUSE:  She's the brains.

18         THE COURT:  I think that would be a really good

19  idea, Ms. Limehouse, using her as your lawyer.  Okay.  Let me

20  first hear from the Government.  Here's what we are going to

21  do.  We are going through the concerns each party has to the

22  charge.  And then I will run through all the request to

23  charge, and rule on those.

24         Okay.  Ms. Stoughton, please proceed.

25         MS. STOUGHTON:  Our first request is on page 13,

1  Count 1.

2          THE COURT:  Give me a chance to get there.  Okay.

3          MS. STOUGHTON:  This is minor.  And we will leave it

4  to the Court's discretion.  But on the third line under Count

5  1, "Began no later than July 2011 and continued until October

6  2021 --"

7          THE COURT:  Yes.

8          MS. STOUGHTON:  The indictment reads until at least

9  October 2021.

10          THE COURT:  At least.  Okay.  We can add "at least."

11          Okay.  What else?

12          MS. STOUGHTON:  On the next page, page 14, under C,

13  "That on or about February 8th, 2013, the defendant

14  negotiated and distributed," that should read to Hannah

15  Plyler and not to Hakeem Pinkney.

16          THE COURT:  Hannah Plyler.  You know, there was a

17  little bit of a challenge there with the same initials.

18          MS. STOUGHTON:  We did notice the two HPs.  Hakeem

19  Pinkney is HPY.

20          THE COURT:  I saw that.  It just still confused us.

21  Okay.

22          MS. STOUGHTON:  And then given the discussion with

23  the defense counsel earlier about the estate of Donna Badger

24  and the Arthur Badger matter, we were hoping that Your Honor

25  would be willing, when you instruct on the estate of Donna

1 Badger and/or the estate's beneficiaries, to instruct the

2 jury that pursuant to the footnote on page 3 of the

3 indictment, that Arthur Badger and the estate of Donna Badger

4 are referred to collectively as the estate of Donna Badger.

5 THE COURT: Let me look at the footnote again before

6 I address this issue. Yeah. This is one of those examples

7 where y'all are so embedded in this case that things like the

8 footnote seems immensely important to y'all. And believe me,

9 to me, it's simply a footnote. I saw counsel for the

10 defendant stand up. You got a thought about that?

11 MR. ABEE: Yes, Judge. And we would object to that

12 for the same reasons that we put in our renewed Rule 29.

13 Those are different entities. There was no duties owed to

14 Mr. Arthur Badger. And we think that lumping that in not

15 only would cause juror confusion but is just inconsistent

16 with the law, both the law as charged in the indictment and

17 with the law that has been provided to the Court by the

18 experts and the facts.

19 THE COURT: Ms. Stoughton, what's your response to

20 that?

21 MS. STOUGHTON: Well, Your Honor, all of these

22 checks came from Arthur Badger's $1.325 million, but the

23 checks interchangeably said Arthur Badger and estate of Donna

24 Badger on the memo line. So it's our position these are part

25 of the misrepresentations. This is part of the confusion and

1    intent to defraud, is the fact that these two entities were

2    used interchangeably.  The money, again, did come from Arthur

3    Badger, but both names were used.

4          THE COURT:  Where is the -- where did you want me to

5    insert something about Footnote 1?

6          MS. STOUGHTON:  So on page 14C, the overt act for

7    the conspiracy, is the first time that Your Honor uses the

8    language the estate of Donna Badger and/or the estate's

9    beneficiaries in the jury charge.

10          THE COURT:  What did you want me to add there?

11          MS. STOUGHTON:  Under the indictment, Arthur Badger

12    and the estate of Donna Badger are referred to collectively

13    as the estate of Donna Badger.

14          THE COURT:  Let's see if this doesn't do it.  Under

15    the charges pending, Austin (sic) Badger and the estate of

16    Donna Badger are referred to collectively as the estate of

17    Donna Badger.  Does that do it?

18          MS. STOUGHTON:  Arthur Badger, Your Honor.

19          THE COURT:  I'm sorry, Arthur Badger.  Thank you.

20    And I note the defendant's objections for the record.

21          MR. ABEE:  Yes, sir.  And we just want to point out

22    that under the exhibit, I think it's Government's Exhibit

23    218, that Mr. Badger is not a beneficiary of the estate, just

24    to make that clear for the record.

25          THE COURT:  But, you know, you can refer to

1   something incorporate and say, when I say this, I mean

2   so-and-so, and it doesn't -- that's irrelevant.  You've

3   already defined what that means.  And that's how I take this.

4   And that's how I take that footnote.

5           MR. ABEE:  Understood, Judge.  We are just pointing

6   out that the evidence does not conform to that, because it

7   makes clear that Arthur Badger had renounced any right to be

8   a beneficiary.

9           THE COURT: I know your point as to that.

10          Okay.  What else, Ms. Stoughton?

11          MS. STOUGHTON:  One final request, Your Honor, on

12  page 20.  This is Count 2, the bank fraud charge.  The third

13  element reads that the defendant executed or attempted to

14  execute the scheme with intent to defraud the financial

15  institution.  We've charged this under 1344(2) instead of

16  1344(1).  And the Fourth Circuit is clear that the intent to

17  defraud the financial institution is not an element of 13 --

18          THE COURT:  So you don't need (3)?

19          MS. STOUGHTON:  You need intent to defraud, but it

20  doesn't have to be intent to defraud the financial

21  institution.

22          THE COURT:  Scheme with intent to defraud,

23  semi-colon?

24          MS. STOUGHTON:  Yes.

25          THE COURT:  Taking out the words "the financial

1　institution?"

2　　　　MS. STOUGHTON:  Yes.

3　　　　THE COURT:  Defense response to that?

4　　　　MR. ABEE:  We agree with that.  We spoke earlier in

5　the day about that.  I would add on the same topic then, on

6　the next page, page 21 --

7　　　　THE COURT:  When I get to you, I want to hear

8　your -- I want to be a little more systematic about it.  When

9　we get -- let's do it when we do yours.

10　　　　MR. ABEE:  We do agree with that change.

11　　　　THE COURT:  Good.

12　　　　MS. STOUGHTON:  That's our last request, Your Honor.

13　　　　THE COURT:  Let me hear from the defense.

14　　　　MR. ABEE:  Yes, Judge.  The first point to take up

15　is piggybacking on what we just discussed.

16　　　　THE COURT:  What page?

17　　　　MR. ABEE:  Twenty-one of the proposed charge, Judge.

18　In the third or second full paragraph, starting with "a

19　financial institution," we are fine with that first sentence

20　because that defines what a financial institution is.  But

21　the rest of that paragraph talks about intent to defraud the

22　financial institution.

23　　　　THE COURT:  I got you.  Let me read it over.  What's

24　the Government's response to taking out the next sentence

25　beginning with "The Government need not?"

1    MS. STOUGHTON:  Well, I think it's an accurate

2  statement of the law, Your Honor.  But we don't have an

3  objection to striking it at the defendants' request.

4    THE COURT:  "The Government need not prove," if you

5  don't object and the defendant wants it, I tend to do it.  So

6  I'm going to take out that sentence beginning with "the

7  Government need not prove" to the end of that paragraph.

8    Okay.  Next objection.

9    MR. ABEE:  Yes, Judge.  Then the page before, page

10  20, in the paragraph that begins, "A scheme or artifice to

11  obtain," we would add at the end of that paragraph or ask

12  that the Court add at the end of that paragraph the

13  definition of "by means of."  And that definition comes from

14  the *Loughrin* case.

15    And, Judge, I should make clear for the record as

16  well that earlier today, we filed a first amended set of jury

17  instructions.  And it's got as Exhibit 1 --

18    THE COURT:  You can't -- listen, folks, filing

19  something at the last-second like this is not reasonable.

20  Okay?  So this is, like, impossible for the Court.  I've gone

21  through -- y'all filed how many jury charges?  I gave you a

22  deadline and now you ambush me.  I don't really like that,

23  because now if things don't work out the way you want, you

24  are going to claim I didn't address something.  I don't like

25  this.

1  MR. ABEE:  No, Judge.  I'm just going to pick the

2  ones here that piggybacks on the language --

3  THE COURT:  I have not seen any amended jury

4  charges.

5  MR. ABEE:  I understand.  And, Judge, I'm happy to

6  pass up if that will help you --

7  THE COURT:  I set a deadline for a reason.

8  MR. ABEE:  Understood, Judge.  And this is to

9  conform to the evidence and the arguments that were made in

10  our Rule 29.  Now, Judge, I am not going through the full

11  amended version.  I'm only trying to point out in this one

12  here that we made during our Rule 29 motion, we made an

13  argument that "by means of" is defined by our Supreme Court

14  as to mean a mechanism naturally inducing a bank to part with

15  money in its control, meaning that the alleged falsity or

16  false representation must be the mechanism.

17  THE COURT:  What's the Government's response?

18  MS. STOUGHTON:  I was trying to pull up *Loughrin*,

19  Your Honor, to take a look at it, because I have not seen it

20  either.  Can you read it again, Mr. Abee?

21  MR. ABEE:  Yes.  It's *Loughrin*, for the record, 573

22  U.S. 351, and it defines "by means of" to mean a mechanism

23  naturally inducing a bank to part with money in its control.

24  And, Judge, we believe that's necessary for the jury

25  to understand that it must be -- the fraudulent pretenses,

1  representations, or promises must be the mechanism by which

2  the bank then gave up control of the money.

3        MS. STOUGHTON:  It seems like that might be covered

4  by the materiality paragraph on the next page.

5        THE COURT:  A statement is material if it has the

6  natural tendency to influence or is capable of influencing

7  the decision-making body to which it was addressed.  It is

8  irrelevant whether the false statement actually influenced or

9  affected the decision-making process, so the fact finding

10  body.  Are you arguing to the contrary here?

11        MR. ABEE:  No, Judge.  I'm arguing when you look

12  under the elements of bank fraud, and the first element has a

13  requirement "by means of."

14        THE" COURT:  It does.

15        MR. ABEE:  And I'm trying to define "by means of."

16        THE COURT:  Does the Government object to adding the

17  definition "by means of."

18        MS. STOUGHTON:  No, Your Honor.

19        THE COURT:  So let's -- so you want me to add the

20  language "by means of," just a new paragraph, means what?

21  Give me what -- what you want me to say.

22        MR. ABEE:  It means that the alleged falsity or

23  fraud must be the mechanism --

24        THE COURT:  Hold it.  Okay.

25        MR. ABEE:  -- must be the mechanism naturally

1    inducing a bank to part with money in its control.

2         MS. STOUGHTON:  Your Honor, I apologize.  I have

3    *Loughrin* here.  It says the "by means of" language is

4    satisfied when, as here, the false statement is the mechanism

5    naturally inducing a bank.  I just haven't had the

6    opportunity -- I don't know whether that language is

7    exclusive, which is what their proposed charge suggests.  The

8    Supreme Court says that is a way to satisfy it.  It doesn't

9    say it's the only way to satisfy the "by means of" language.

10        THE COURT:  What's the defendant's response to that?

11        MR. ABEE:  Judge, regardless of whether it is the

12   only way to define it or a way, it is material here because

13   of our argument that there was no false representation that

14   caused the bank to part with the money.  And so it is the

15   jury's decision whether or not that falsity or false

16   representation is really what caused the bank to then make

17   whatever payments or distribute whatever proceeds.

18        THE COURT:  What's the Government's response?

19        MS. STOUGHTON:  I don't disagree with that.  I just

20   would prefer that the charge not suggest to the jury that the

21   only way to satisfy --

22        THE COURT:  What other way could it be accomplished,

23   Ms. Stoughton?

24        MS. STOUGHTON:  Well, it could say by means -- what

25   the Supreme Court says, the "by means of" language is

1    satisfied when the defendant's false statement is the

2    mechanism --

3         THE COURT:  No, because this is 40 pages, show me

4    where we are using "by means of" so I can make sure I'm

5    looking at where --

6         MR. ABEE:  Judge, I have that on page 19 of your

7    proposed charge.  And it would be under number one.

8         THE COURT:  Good.  Let me just look at it.  Do we

9    use the words "by means of" though?

10        MR. ABEE:  That's where I had it written.

11        MS. STOUGHTON:  "By means of" is the paragraph

12   above.  It's the language we used in the indictment.

13        THE COURT:  Right.  Right.  So it's in the first

14   paragraph of that page?

15        MS. STOUGHTON:  Yes, Your Honor.

16        THE COURT:  Yeah.  Yeah.  So, Ms. Stoughton, what do

17   you recommend that it say?

18        MS. STOUGHTON:  The "by means of" language is

19   satisfied when the defendant's false statement is the

20   mechanism naturally inducing the bank to part money within

21   its control.

22        THE COURT:  "By means of" can be satisfied --

23        MS. STOUGHTON:  Sure.

24        THE COURT:  "-- where the alleged falsity or

25   fraud --"  I hate doing this on the fly, folks.  This is why

1    we try to do it ahead of time.

2         Okay.  Would this do it:  "By means of" can be

3    satisfied where the alleged falsity or fraud is the mechanism

4    naturally inducing the bank to part with money in its

5    control?  Would that meet everybody's --

6         MS. STOUGHTON:  No objection from the Government,

7    Your Honor.

8         THE COURT:  From the defense?

9         MR. ABEE:  No objection from the defense.

10        THE COURT:  And you want that -- where do you want

11   that inserted?  Does it matter?  I'm going to do it after a

12   scheme and artifice.  I will do it after that.

13        MR. ABEE:  On page 20, that's where we thought it

14   might naturally fit.

15        THE COURT:  Yes, it's on page 20.  I'm inserting it

16   after the paragraph that begins, "a scheme or artifice to

17   obtain."  I will do it the next one, "by means of," so it's

18   among those definitions.

19        Okay.  What's next?

20        MR. ABEE:  Judge, on that point, just for

21   consistency then, on page 19 under 1, do we need to add "by

22   means of false or fraudulent pretenses?"

23        THE COURT:  Where?

24        MR. ABEE:  This is on Page 19, under -- you've got

25   subparagraph (1), the first element.  And at the end, the

1  second-to-last line of that subheading, a financial

2  institution, and then it says, by false or fraudulent

3  pretenses.  To track the indictment and the language we just

4  discussed, should it not also say "by means of?"

5       THE COURT:  That's fine.

6       Okay.  What else?

7       MR. ABEE:  Next, Judge, I've got page 24.

8       THE COURT:  Okay.

9       MR. ABEE:  At the end of the first paragraph, Judge,

10  this is something that we had in our original proposed

11  charge:  You must unanimously agree, however, on the

12  components of the scheme to defraud.

13       THE COURT:  Well, I charge them that they have to

14  have each of the elements.  So why doesn't that take care of

15  it?

16       MR. ABEE:  This is in addition to that, Judge.  This

17  is unanimity on the actual scheme to defraud.  So if there

18  was not an agreement on that particular scheme, then that

19  element is not satisfied.

20       THE COURT:  Well, I say -- I mean, it's one of the

21  five elements.  It's element one, must have a scheme and

22  artifice.  I say that in No. 1.  So why do I need it again?

23       MR. ABEE:  Well, it's the unanimity requirement,

24  Judge.

25       THE COURT:  Well, I told them everything is

1　　unanimous.  You want to do that every line?  Everything has

2　　to be unanimous.  I say that every element they must -- they

3　　must decide unanimously beyond a reasonable doubt.  So why am

4　　I going to pull out one of these elements and say it again?

5　　One of the things I'm trying to do is not repeat the same

6　　thing over and over again.

7　　　　　　MR. ABEE:  I understand that, Judge.  Our point here

8　　is that the scheme to defraud, the jury's heard a lot of

9　　different potential schemes, a lot of different ways in which

10　　different people were defrauded.  And our point is there must

11　　be unanimous agreement on the particular scheme used by Mr.

12　　Laffitte.

13　　　　　　THE COURT:  What's the Government's response?

14　　　　　　MS. STOUGHTON:  Your Honor, the indictment

15　　specifically charges this specific incident, it's the

16　　$33,789.83.  It's not that any scheme to defraud --

17　　　　　　THE COURT:  It's the 33K.  That's the scheme.  I

18　　don't want to make this thing so complicated that nobody can

19　　understand it.  I'm having trouble understanding you.  So I

20　　don't think the jury is going to understand you.

21　　　　　　I mean, you know, if the issue is, will they

22　　understand the scheme we are talking about, the answer is

23　　yes.  It's designated.  It said it's the 33K.  That's the

24　　scheme.  We are not talking about any other scheme under wire

25　　fraud.

1           MR. ABEE:  Okay.  We stand by our argument on that

2    one.

3           THE COURT:  Okay.  What else?

4           MR. ABEE:  Last one we have, I believe, is the

5    advice of counsel.  We understand the Court has not included

6    that.  We included that in our original proposed jury charge.

7    The burden is pretty low.  We've got to produce just some

8    evidence.

9           THE COURT:  So what -- who was the lawyer?

10          MR. ABEE:  Well, there are a number from the Peters

11   Murdaugh Parker firm.

12          THE COURT:  We are going to be specific, because I

13   think what fails here is specificity.  Who was the lawyer

14   that he was relying on?

15          MR. ABEE:  We've got both Alex Murdaugh and Ronnie

16   Crosby.

17          THE COURT:  And what cases -- in what specific case

18   of each count was Alex Murdaugh -- we are going to figure out

19   what the case is and what his advice -- specific advice was

20   that you are claiming he's relying on.

21          MR. ABEE:  Give me just one second.

22          THE COURT:  Let's go through Alex Murdaugh first.

23          MR. ABEE:  All right.  Let me start first, Judge,

24   with the 680, $680,000 settlement.  There's evidence in the

25   record that that was discussed with Ronnie Crosby.  And a

1  determination was made about how that 680 was going to be

2  reimbursed to the client.  Mr. Laffitte testified about

3  having that conversation with Mr. Crosby.  Mr. Crosby had

4  previously held out Mr. Laffitte as his client in the e-mail

5  to --

6          THE COURT:  I'm sorry.  Who?  Say this again.

7          MR. ABEE:  Mr. Crosby has specifically held out Mr.

8  Laffitte as a client of the firm.  And that was in the e-mail

9  that was provided to Tiffany Provence.  And that was

10 Government's Exhibit 71.

11         THE COURT:  But what advice did Ronnie Crosby

12 provide -- first of all, you know, there's a process.  You

13 are counsel.  And as to the $680,000, those are settling --

14 I've been told this is settling a claim.  He can't be the

15 lawyer for the other party in the dispute.

16         MR. ABEE:  Well, Judge, the discussion was between

17 Mr. Laffitte and Mr. Crosby.  And it was talking about the

18 best way to make the client whole in a way that didn't cause

19 additional --

20         THE COURT:  They were potential opponents.  He was

21 saying, I had a claim.  He had concerns about the liability

22 to the client, to the law firm's client and to the law firm.

23 He had concerns about both.  They tried to get a release from

24 the law firm.  So he's not his lawyer.  He is a party in a

25 negotiation.  Plus, you haven't given me any specific advice.

1    He went to him and said what?  And what advice did he rely

2    on?

3         MR. ABEE:  So the evidence, the testimony that's in

4    the record is that Mr. Laffitte had a conversation with Mr.

5    Crosby.  And this was before the 680 was paid or anything.

6    And this was in order to try to figure out what the best

7    course of action would be to make --

8         THE COURT:  But this is a misapplication of bank

9    funds.  And Mr. Crosby doesn't represent the bank.  He

10   doesn't represent -- I assure you, the most surprised person

11   in the world would be Ronnie Crosby, that he was giving

12   advice to Mr. Laffitte about banking misapplication.

13        MR. ABEE:  Judge, I hear you on that.  But you look

14   at it from Mr. Mr. Laffitte's point of view.

15        THE COURT:  What advice did he give him that he

16   relied on, specific?  Don't give me generalities.  Tell me

17   specifically.  To get advice of counsel, you've got to fully

18   disclose to the other side, and then you've got to get

19   specific advice.  You know, the typical presentation here is

20   you go to your tax accountant and you say, can I get -- can I

21   deduct this, and the guy says yes, and then you get

22   prosecuted for tax fraud.  That is the typical case.

23        What specific advice did he solicit from Ronnie that

24   he had an attorney-client relationship with him?  Sounds to

25   me like they are disputants with each other, trying to work

1    out a deal.  He described it as a negotiated settlement.  You

2    can't be negotiating with an opposing party and he also serve

3    as your lawyer.  That would be actually unethical for Mr.

4    Crosby to do that.  He can't represent him in that.  So what

5    specifically did Mr. Crosby tell him that he relied on

6    regarding the charge of bank fraud, of bank misapplication?

7          MR. ABEE:  Yes.  If I may address first the

8    adversity, and then I will get to your specific question.  So

9    the adversity at that time, both the law firm and the bank

10   were in the same boat.  They were both --

11         THE COURT:  But they were also disputants with each

12   other.

13         MR. ABEE:  Not yet, not at that time.

14         THE COURT:  He says, listen, go try to get a release

15   from them.

16         MR. ABEE:  After the fact.

17         THE COURT:  It's all the same transaction.  But tell

18   me what Ronnie Crosby said to him that told him that this

19   wasn't -- regarding the misapplication of bank funds.

20         MR. ABEE:  Yes.  So the discussion that Mr. Laffitte

21   testified was about Mr. Crosby and the discussion that they

22   had about how to make the client whole to avoid future

23   liability.  That's when the 680 came in, as a way to meet the

24   law firm halfway, in order to then return that money to the

25   client to avoid --

1      THE COURT:  I do not find that Ronnie Crosby was

2  representing him as counsel.  And he did not receive any

3  advice regarding the allegations in Count 4.  I deny that.

4      What else?

5      MR. ABEE:  All right.  Judge, next, as far as the

6  loans that were taken out of the accounts, and that goes to

7  several of the different counts --

8      THE COURT:  What counts?  Let's be specific.

9      MR. ABEE:  Let's go to -- I believe, Judge, it was

10  Count 2.  And allegation here is negotiating, distributing, a

11  check totaling 101,000 to Hannah Plyler, knowing that the

12  funds belonged to the estate of Donna Badger and the estate's

13  beneficiaries.  So two points here -- and this would involve

14  Mr. Murdaugh.  There was discussion between Mr. Laffitte and

15  Mr. Murdaugh about the loans and the validity of those loans

16  and his authorization to make those loans.

17      THE COURT:  I didn't hear that.  I heard him say

18  that Alex Murdaugh came to him and asked him, can I borrow

19  money?  He's now a borrower of the bank.  He's not his

20  lawyer.  He is a customer -- he is going to him as

21  conservator and saying, can I borrow money?  He is not giving

22  him legal advice.  He's asking him, can I borrow money?  Now,

23  did he give him legal advice?  I didn't hear him -- I was

24  listening to this very carefully.  I didn't hear any

25  indication that Alex Murdaugh was his lawyer at this time in

1  which he is a bank customer.  That's got to violate every

2  rule of both banking and lawyering to do that.  And he's not

3  serving as his lawyer.  He is a customer of both the bank,

4  and he is an applicant for a loan from a conservator.

5        And Mr. Crosby testified -- there's no contest to

6  this -- that when the case is closed, the law firm -- the PR

7  lawyer is finished.

8        MR. ABEE:  No, we disagree with that completely.

9        THE COURT:  I know you do, but where is the evidence

10  to the contrary?  Because that was offered.  I didn't hear

11  any -- the key issue here, he can't be the lawyer in this

12  situation.  It wouldn't be reasonable to be the lawyer.  He's

13  a borrower.  He's an applicant.  But you haven't given me any

14  specific advice that's in the record that Alex Murdaugh gave

15  the defendant.

16        MR. ABEE:  Let me first address --

17        THE COURT:  No.  Address that.  That's pretty

18  fundamental.  What did he say?  What's in the record that

19  Alex Murdaugh gave him legal advice?

20        MR. ABEE:  The testimony was after Murdaugh came and

21  asked if he could take the loan -- and I agree with you that

22  that is not, in and of itself, legal advice -- Mr. Laffitte

23  then goes across the street, gets advice from the judge, and

24  comes back.  And I believe today on cross-examination he

25  testified he had another conversation with Mr. Murdaugh about

1   the loans themselves.

2        THE COURT:  But he didn't give any -- I listened

3   very carefully.  Did he give him advice?  Discussing -- the

4   guy wants a loan.  Okay?  And that is not legal advice.  That

5   is not legal advice.

6        MR. ABEE:  The legality of that loan --

7        THE COURT:  I didn't hear anything about legality of

8   the loan.  And he didn't indicate he was seeking his advice.

9   They were discussing -- Murdaugh wants to be a borrower, not

10  a lawyer.  He's not the lawyer.  He's a borrower.

11       MR. ABEE:  Judge, we argue that Mr. Laffitte can't

12  make that determination of when Mr. Murdaugh takes off the

13  lawyer hat and puts on --

14       THE COURT:  Oh, come on.  You know, there is a great

15  line in a Fourth Circuit case, you seek to persuade us as

16  judges what we know to be untrue as men.  Let me, for modern

17  times, men and women as judges.  Come on now.  He's over here

18  trying to get money out of the conservatorship.  And he comes

19  and says, can I get money?  And, ultimately, he does.  It's

20  not his lawyer.

21       Yes, Ms. Stoughton.

22       MS. STOUGHTON:  I agree with Your Honor's position,

23  but I also wanted to point out, the Plyler loan is sort of a

24  red herring.  It's not charged as illegal conduct under the

25  indictment.  So regardless of whether he thought he had or

1    didn't have permission, it's not charged in the indictment.

2         THE COURT:  That's why I wanted you to point to the

3    count.  What's the specific count that he got legal advice

4    about?  Because, you know, I've just detected a lot of

5    generalities with not a lot of specifics here.  And this is a

6    significant point.  I get that.  But tell me about this

7    $101,000 that was paid -- let's look at what the charge is

8    there.  It's Count 2 we are talking about; is that correct?

9         MR. ABEE:  That's correct, Judge.

10        THE COURT:  Okay.  Count 2, that the defendant, with

11   his alleged co-defendant, knowingly executed a scheme and

12   artifice to obtain money and funds by false and fraudulent

13   pretenses, representations, and promises, and aided and

14   abetted -- this is Murdaugh -- by negotiating and

15   distributing a check of $101,000.

16        Did he give him advice about the $101,000 and the

17   transfer to Plyler?  Where is the evidence in the record of

18   that?

19        MR. ABEE:  Based on the Government's allegation,

20   there would be no $101,000 if it was not for the loan that

21   was originally taken out.  And so what we are saying is that

22   the discussion about the loans meets what we have as a very

23   small burden of production.

24        THE COURT:  But you've got to have logic.  You have

25   got to have common sense here.  He's not the lawyer.  He's

1  not giving legal advice.  He's an alleged co-conspirator and

2  an attempted borrower.  He's not the lawyer.  And, you know,

3  there are a number of cases in which it says, you know, about

4  a co-defendant who happens to be a lawyer.  And that does not

5  make it an advice of counsel just because the co-defendant is

6  a lawyer.

7       You know, I'm charging good faith.  Okay?  And I

8  kind of heard that more from Mr. Laffitte than I heard advice

9  of counsel.  I didn't really see or hear him -- he was

10  saying, I trusted these guys -- I heard him say that a lot --

11  because they were lawyers and I thought they knew what they

12  were doing.  I get that.  That's good faith.  That's the good

13  faith charge.  But sitting here and saying that he got

14  advice, you haven't even identified the advice he got, what

15  specific advice there is.  I've had this come up a lot.  And

16  it's like the lawyer, he goes to a law firm and gets advice.

17  There's no advice.  You haven't put anything in the record

18  about the specific advice he relied on.

19       MR. ABEE:  Judge, there is evidence in the record, I

20  will give you another example.  Mr. Laffitte talked about

21  taking structured settlements and how the best way to select

22  certain options over others, you listen to the advice of

23  lawyers, and Forge Consulting is who they would always use --

24       THE COURT:  But, no, that's regarding what -- when

25  he's serving as a conservator and he's picking out something.

1   But that's not these loans.  A structure is a completely

2   different thing.

3       MR. ABEE:  I am not disagreeing with you there,

4   Judge.

5       THE COURT:  There are things -- I agree with you

6   that at the point where he is the party plaintiff in the name

7   of someone, and he goes to get a structure, and he has the

8   input from a lawyer representing -- this is before the

9   settlement.  I think that's easy.  I think that's right.  But

10  that's not what's going on here.  The case is over.  There's

11  a pot of money sitting over at the bank.  And Mr. Murdaugh

12  wants to borrow it.  And he goes to the conservator,

13  duly-appointed officer of the court, to serve, to protect,

14  and defend this money.  And the lawyer is not over there --

15  he's not in his hat as a lawyer.  He is a potential borrower.

16      Now, the better argument -- and I am not saying it

17  passes the day, but I'm making the good faith charge -- is

18  that he thought this guy wouldn't do something like this

19  because he wouldn't think he would be engaged in a criminal

20  scheme.  That's his defense.  But going off on advice of

21  counsel is a completely, to my view, a meritless argument.

22      MR. ABEE:  Judge, you've also got the expert

23  testimony that in Mr. Murdaugh and their firm continues to be

24  the attorney until the funds have been fully distributed.

25  Mr. Laffitte is then seeing somebody who he believes is his

1  attorney -- and there's no doubt that he has testified as to

2  his belief.

3       THE COURT:  I'm just saying you haven't identified

4  any advice he got regarding this specific matter.  And he's

5  over there as a borrower.  He's not over there as the lawyer.

6  It's an appropriate basis.  I've ruled.  No advice of counsel

7  as to Count 2.

8       Is there another advice of counsel?

9       MR. ABEE:  Oh, sorry, Judge.  We were not just

10 counting that to Count 2 --

11      THE COURT:  I'm trying to make you be specific

12 because the generalities make it harder to deal with.  If

13 there's another claim you had that another one of these

14 specifically identified loans or actions, you've got to go to

15 the event, and then we are going to look at what the advice

16 was, and did he actually get any advice on that particular

17 matter which is the subject of the indictment.

18      MR. ABEE:  Judge, I will then go to paragraph 8,

19 which has --

20      THE COURT:  Whoa.  Whoa.  I don't know what

21 paragraph 8 is.

22      MR. ABEE:  I'm sorry.  Paragraph 8 of the second

23 superseding indictment.

24      THE COURT:  Okay.  I'm looking at the counts here.

25      MR. ABEE:  I understand, Judge.  Those are

1  incorporated into the counts.

2  THE COURT:  What now?  What paragraph are we talking

3  about?

4  MR. ABEE:  Well, I guess my point is, Judge,

5  paragraph 8 has --

6  THE COURT:  What page is that?

7  MR. ABEE:  It begins on page --

8  THE COURT:  3.  Okay.  I got you.  Okay.

9  MR. ABEE:  This is defining the scheme.

10  THE COURT:  Okay.

11  MR. ABEE:  And it has all of these different

12  subparts, Judge.  And I'm looking at a number of them that

13  talks about -- so we've got the loans that are discussed in

14  C.  We've got the discussion of extending the loan to the

15  customer, which we understand the Court's ruling on that.

16  And then --

17  THE COURT:  Whoa.  You are flying away from me here.

18  What specifically about C -- what advice did Alex Murdaugh

19  give the defendant about loaning him $963,000?

20  MR. ABEE:  That was the part of the discussion as to

21  whether or not the loans were authorized.

22  THE COURT:  No.  He didn't -- you are supposed to

23  fully disclose.  You are supposed to be your lawyer.  He's

24  over there borrowing money.  He's not the lawyer.  This is --

25  to me, it's just -- I'm shaking my head.  It's just absurd.

1    MR. ABEE:  I understand that, Judge.  What I'm

2    trying to get across, I believe, and maybe I am not doing it

3    very artfully, is you have to look at this from Mr.

4    Laffitte's point of view.  He's had an attorney-client

5    relationship with this firm for years before any of these

6    transactions.

7    THE COURT:  Well, hold it now.  He's had -- he has

8    served as a conservator in some cases.  And he has -- in that

9    capacity, he was the party plaintiff in the name for some

10   minor children or disabled people.  And those lawyers

11   represented him.  I get that.

12   But regarding these loans, the cases have been

13   settled, and now Mr. Murdaugh is a borrower.  And it's

14   unreasonable to say that he's my lawyer when he's borrowing

15   money and he comes and the question is, can I borrow money?

16   He's not over there as the lawyer.  He's over there as a

17   borrower.  And I don't know how many times I've got to say

18   this.  It doesn't fit.  You know, if there's anything, you

19   are getting good faith, that's where it potentially fits.

20   And advice of counsel is a much different thing than, you

21   know, he was a lawyer, I trusted him.  That's a different

22   defense.

23   MR. ABEE:  I understand.

24   THE COURT:  It's not advice.  You can't identify the

25   advice he gave.  So what else other than on page C, on page 4

1  of the indictment?  What else?  Because I want you to be

2  specific.

3       MR. ABEE:  Judge, I guess I could wrap this up by

4  saying, we understand the Court's ruling.  And our point is

5  that Mr. Laffitte relied on Mr. Murdaugh and members of the

6  firm as far as a range of advice, including the filling out

7  the forms for the conservatorship or any of the filings that

8  were done --

9       THE COURT:  He believed in good faith, but he didn't

10  get advice from them.  You go and say, I've got this legal

11  problem, you fully disclose it, and that's part of the

12  elements of it, and you got advice.  What you've got is, he

13  said, I trusted the lawyers.  I heard him say it repeatedly.

14  And that is the good faith defense, not advice of counsel.  I

15  think you are contorting advice of counsel.

16       I've ruled on this.  Are there other specific

17  examples?  I've got a jury I want to bring in here.  And I

18  feel like I'm kind of repeating myself here.  Is there other

19  specific loans or actions that you claim he got advice?  And

20  then I want to know the specific advice gotten.

21       MR. ABEE:  No, Judge.  We rest on arguments we've

22  already made.

23       THE COURT:  I don't mean to give you a hard time

24  about this.  Just, I think you are beating a dead horse here.

25  I think I made clear that he's over here as a borrower, not

1  as the lawyer.  And what I heard the witness say wasn't, he

2  gave me advice -- and didn't identify the advice he got.  He

3  just said, I knew these guys, I trusted them.  I'm giving a

4  charge on good faith.  That's the appropriate charge, in my

5  view.  And I've ruled.  Anything else?

6        MR. ABEE:  If I may have a moment, Judge.

7        THE COURT:  Take your time.

8        MR. ABEE:  That's all we have, Judge.

9        THE COURT:  Let me go through, if I might.  And I'm

10 sorry to be impatient.  I just don't like this last-minute

11 thing, when we try to be very deliberate and careful here.

12 And coming in sort of the last minute is not the best way to

13 get a comprehensive, appropriate adjudication.  But we've

14 done our best here.

15       Let's just go through.  As to the Government's

16 request to charge, I substantially charged request to charge

17 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12.  On 13, we slightly

18 changed the charge there to make it clear they had to rely on

19 the audiotape if there was any dispute.  I didn't charge 14,

20 because there was no issue about voluntariness.  I did not

21 charge request 15 because -- oh, I did charge 15.  It's in

22 the charge.  16 went to whether the defendant testified or

23 didn't testify.  I didn't like that charge because I've

24 already addressed the issue on credibility.  And I think

25 pointing specifically to the credibility of the defendant is

1  not fair to the defendant.  Request to charge No. 17

2  exculpatory statements of defendant, same reason, general

3  credibility charge is sufficient.  I don't think it's fair to

4  focus solely on the credibility of the defendant.  Request to

5  charge 18, not charged.  Admissions or statements by the

6  defendant, same reason, general credibility charge is

7  sufficient.  I substantially charged Count 19.  Request to

8  charge 20 and 21 are not charged because they refer to the

9  language of the indictment.  I don't send the indictment back

10  as -- because I think it's unfair to the defendant and we lay

11  it out in the charge.  I charge -- I substantially charged

12  request to charge 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32,

13  33, 34, 35, 36, 37, 38.  Those are all the Government

14  charges.

15       Now, let me address the defendant's proposed

16  charges.  I've substantially charge 1 and 2.  No. 3 was not

17  included.  I've substantially charged 4 and 5, 6, 7, 8, 9,

18  10, 11.  Request to charge 12 I did not charge, on advice of

19  counsel.  We've spoken about that.  Request to charge 13,

20  existence of attorney-client relationship, I do not find it

21  relevant to the case and to the charges made, and did not

22  charge it.  There was a request to charge 14 adding about if

23  a witness took the Fifth.  I did not charge it because no one

24  took the Fifth.  So I don't need to address that issue.  I've

25  substantially charged 15 and 16.  Missing witness, No. 17,

1 not charged. Not appropriate here. There was no showing of

2 any witness that was available and not produced. I refer

3 *U.S. vs. Brooks* for that. Either party could have subpoenaed

4 available witnesses. Request to charge 18, I've

5 substantially charged. Request to charge 19, I've

6 substantially charge.

7 Did I leave out any ruling on any of the requests to

8 charge from first the Government?

9 MS. STOUGHTON: Not from the Government, Your Honor.

10 THE COURT: From the defense?

11 MR. ABEE: No, Your Honor.

12 THE COURT: Okay. Let's turn to the verdict form.

13 Any objections to the verdict form from the Government?

14 MS. LIMEHOUSE: Your Honor, just one minor point.

15 On Count 6, it states: In regard to the charge of

16 misapplication of bank funds related to the funding of a

17 $500,000 line of credit, the language of the indictment

18 specifically states the issuance of a $284,787.52 cashier's

19 check. And that was from the line of credit, but the advance

20 itself is what's charged.

21 THE COURT: Let me give you the purpose of me

22 putting what it refers to. If I don't do it, they don't know

23 which -- it's just to identify the count. And I've got it in

24 detail in my charge and in the -- but I think to -- I am not

25 trying to be comprehensive here. I'm just trying to say,

1 hey, this is the one about the 500,000, for the same reason I

2 didn't put for farming and all that.  I didn't do that.  I

3 will leave that to y'all to do in your argument.  And I've

4 got it in the charge, but I didn't think it was necessary

5 here.

6          MS. LIMEHOUSE:  Understood, Your Honor.

7          THE COURT:  Okay.  From the defense, any objection

8 to the verdict form?

9          MR. ABEE:  No objection from the defense.

10         THE COURT:  Okay.  Have we got our exhibits

11 straight?  I understand there was an issue about two

12 exhibits.

13         MS. LIMEHOUSE:  Yes, Your Honor.  Exhibit 49A is a

14 subsection related to an e-mail chain.  The Government had

15 that it was admitted, but the defense had that it was not.

16 We actually reviewed it with Mr. Laffitte during his

17 cross-examination and there was no objection.  I don't know

18 at this point if they have an objection to that piece of

19 evidence being admitted but --

20         THE COURT:  Is there an objection to 49A?

21         MR. DANIEL:  No, Your Honor.

22         THE COURT:  49A is admitted.

23         (Government's Exh. 49A is received in evidence.)

24         THE COURT:  Any other missing exhibits?

25         MS. LIMEHOUSE:  Next exhibit, Your Honor, is Exhibit

1    193.  We never used it or referred to it.  And we are going

2    to strike it.

3           THE COURT:  193 is struck.  Anything else?

4           MS. LIMEHOUSE:  That's, I believe, all from the

5    Government suppressant.

6           THE COURT:  How about from the defense, any missing

7    exhibits?

8           MR. AUSTIN:  I don't believe so, Your Honor.  Let me

9    just check.  No, Your Honor.

10          THE COURT:  Okay.  Just to be clear, Ms. Limehouse,

11   the Government is satisfied that the jury will have -- clerk

12   has all the exhibits for the Government?

13          MS. LIMEHOUSE:  Yes, Your Honor.

14          THE COURT:  Is the defense satisfied that we have

15   all the exhibits from the defense?

16          MR. DANIEL:  Yes, Your Honor.

17          THE COURT:  Very good.  Okay.  Are we ready to do

18   closing argument?  Is the Government ready?

19          MS. LIMEHOUSE:  We are, Your Honor.  If we could

20   just move the podium before the jury comes in.

21          THE COURT:  Go right ahead.

22          Are we ready?  Let's bring in the jury.

23          (Whereupon, the jury returns to open court at 1:54

24   p.m.)

25          THE COURT:  Please be seated.  Mr. Daniel, call your

1   next witness.

2          MR. DANIEL:  Your Honor, at this time the defense

3   rests.

4          THE COURT:  Very good.  Does the Government have

5   anything in reply?

6          MS. LIMEHOUSE:  The Government rests, Your Honor.

7          THE COURT:  Very good.  Ladies and gentlemen, let me

8   tell you the stage we are in now.  The parties have both

9   rested.  All the evidence is in.  We will now hear closing

10  arguments.  Please give the lawyers your full attention.

11         MS. LIMEHOUSE:  May it please the Court.

12         Absolute power corrupts absolutely.  For nearly two

13  weeks, y'all have heard testimony and seen evidence about how

14  the defendant, Russell Laffitte, and his co-conspirator, Alex

15  Murdaugh, went unchecked and unchallenged in Hampton County

16  for over a decade.  It is this absolute power that gave them

17  the opportunity to exploit the vulnerable.  The relationship

18  between the Murdaughs and the Laffittes in Hampton County

19  spans decades.  It is with the backdrop of that personal and

20  professional relationship, coupled with the opportunity

21  created by their absolute power, that led to this conspiracy.

22         You heard how Murdaugh was chaotic, full of it,

23  always had a story.  We agree.  Murdaugh needed someone like

24  the defendant, someone who from the defense's own experts was

25  meticulous, a cross-your-T's and dot-your-eyes kind of guy.

1   Now maybe none of this would have happened without Alex

2   Murdaugh.  But none of it could have happened without the

3   defendant.

4        Now, the indictment charges six counts.  The Court

5   is going to review all of those counts with you in detail,

6   including the elements that the Government has to prove to

7   establish the defendant's guilt beyond a reasonable doubt.

8   But I want to provide a road map of these counts with you.

9   And I would review the evidence the Government has

10  established relating to each element of these counts.

11       Now, Count 1 charges the defendant conspired with

12  Alex Murdaugh to steal Murdaugh's client's settlement funds,

13  including Natasha Thomas and Hakeem Pinkney and Arthur

14  Badger.  The loans from Hannah Plyler and Malik Williams are

15  included in the scheme to defraud because they provide the

16  backdrop, the motive, the intent, that led to the theft of

17  these funds.

18       Count 2 is what we call a substantive bank fraud

19  charge.  And it relates to one of the checks that the

20  defendant negotiated from Arthur Badger's settlement funds

21  and deposited into Hannah Plyler's conservatorship account to

22  pay back the loans he extended Alex Murdaugh.

23       Count 3 is what we call a substantive bank fraud

24  charge.  And it relates to one of the checks with the memo

25  line, estate of Donna Badger, totaling $33,789.83 that the

1    defendant negotiated for Murdaugh and deposited into

2    Murdaugh's personal account at Palmetto State Bank.

3        Counts 4, 5, and 6, all charge misapplication of

4    bank funds.  Count 4 relates to the $680,000 payment from the

5    defendant to the law firm.  Count 5 relates to the $750,000

6    loan for the stated purpose of beach house renovations.  And

7    last, Count 6, relates to the $284,787.52, the advance that

8    the defendant extended to Murdaugh on the line of credit to

9    pay off the unsecured loans from Hannah's account.

10       So let's start with Count 1, the conspiracy.  In

11   order to prove Count 1, the Government must establish that

12   two or more people entered into a conspiracy, agreement, or

13   understanding to commit an unlawful act.  Here, that is bank

14   fraud and wire fraud.

15       Second, at some point during the existence or life

16   of the conspiracy, agreement, or understanding, the defendant

17   knew the unlawful purpose of that agreement.

18       And third, that the defendant joined the agreement

19   willfully and with the intent to further the unlawful

20   purpose.

21       The conspiracy is the agreement.  And the agreement

22   itself is the crime.  We will talk about bank fraud and wire

23   fraud in more detail in a minute.  But for purposes of the

24   conspiracy, the agreement is what matters.  In this case, the

25   conspiracy was for the defendant and Murdaugh to obtain money

1  and property by means of false and fraudulent pretenses,

2  representations, and promises to defraud Murdaugh's personal

3  injury clients.

4       Now, you've seen a lot about how Mr. Laffitte served

5  as a personal representative and conservator for the clients

6  whose funds were stolen.  And it is under these false

7  pretenses that led to the theft and you've also seen

8  misrepresentations, both to the probate court by Mr. Laffitte

9  and Mr. Murdaugh related to the conservatorships and the

10 estates, as well as the misrepresentations related to the

11 re-cutting of the check from Arthur Badger's settlement.

12 It's the false pretenses, it's these misrepresentations, that

13 led to the theft of these funds.

14      So how it all started.  The conspiracy started when

15 the defendant served as a conservator for Hannah and Alania

16 Plyler, and began extending himself loans out of Hannah

17 Plyler's conservatorship account.  And continued to extend

18 himself and Murdaugh loans from this account.

19      Now, the defendant testified that it was Murdaugh's

20 idea to get these loans from Hannah's account.  But the

21 records show that the defendant took the first loan in July,

22 2011, for $225,000, because his personal loan at another bank

23 was due.

24      You heard testimony from Ms. Swinson that the

25 defendant used the Plyler loan to pay off loans he obtained

1    from SouthState Bank.  He engaged in self-dealing by

2    unilaterally negotiating a loan to himself from a child's

3    account at a much lower interest rate than the loans he had

4    gotten from an independent bank.  He then continued to renew

5    his loans and extend himself new loans, totaling $355,000, at

6    increasing favorable interest rates.

7        He has claimed that the loans were paid back on time

8    and with interest.  But that was not true.  Ms. Swinson

9    testified how he backdated checks, calculated the interest

10   from the date of the check, and then deposited those checks,

11   sometimes more than a year after the loans were due.

12        The defendant also testified that the loans were

13   memorialized with promissory notes.  This also was not true.

14   By the end, he just transferred himself money out of Hannah

15   Plyler's conservatorship account and called it a loan.  The

16   defendant never used a single dime of his legitimate bank

17   income to pay off these loans.  He used the $35,000 PR fee

18   from Arthur Badger, the $60,000 Pinckney conservator fee, and

19   then he credited himself conservator fees that he claims he

20   was owed for managing Hannah's conservatorship account.  And

21   he got a loan from Johnnie Parker, partner at the law firm,

22   to pay the remainder on those loans.

23        Now, as you heard, Murdaugh was constantly

24   overdrafted on his accounts.  And the defendant had to report

25   that overdraft on a quarterly basis in what's called a call

1   report to the FDIC.  Months after the defendant gave himself

2   that first $225,000 loan in July of 2011, he extended Alex

3   the first loan from Hannah's account.

4           And contrary to his testimony that it was Murdaugh's

5   idea, in September, when the defendant gave Murdaugh that

6   first loan, there was a series of e-mails claiming to arrange

7   the loan.  And the defendant had not even drawn up the note

8   yet.  This was not something that Murdaugh had contemplated

9   months prior and just sat on.  The loans were the defendant's

10  idea.  The defendant had given himself a loan two months

11  prior.  And when he saw that Murdaugh was overdrafted on his

12  accounts in September, when that overdraft would have to be

13  reported to the FDIC on call reports, and before Murdaugh was

14  going to be paid his bonuses, the defendant decided to loan

15  him money from Hannah's account to cover the overdraft.

16          This sets up a pattern.  For the next three years,

17  Murdaugh would constantly be in overdraft.  And the defendant

18  would loan him money out of the conservatorship account to

19  cover that overdraft.  Internal bank access records show that

20  the defendant would access Murdaugh's accounts, see that he

21  was in overdraft, and then transfer money from Hannah

22  Plyler's account to cover the overdraft.

23          For example, on October 22nd, 2013, the defendant

24  e-mailed Murdaugh asking for a deposit.  Murdaugh responded

25  and stated:  Can you make a loan from Hannah and I will pay

1    it as we discussed?

2         Russell then transferred $70,000 of Hannah Plyler's

3    money into Murdaugh's account.  Five days later, the

4    defendant negotiated $101,369 from Arthur Badger's settlement

5    funds to pay off Hannah Plyler's loans as they discussed.

6    The trend continued until Hannah turned 18.

7         Now, Malik Williams is very important to this case.

8    We have seen millions of dollars in settlement funds in this

9    case.  Malik, on the other hand, received a relatively small

10   settlement.  As Ronnie Crosby testified, Alex Murdaugh had

11   nothing to do with Malik Williams's case.  It was a small

12   case.  And Murdaugh would have no reason to know about

13   Malik's case, much less that the defendant was managing his

14   money as his conservator at the Palmetto State Bank.  The

15   only way he would have known that is through the defendant.

16   The Malik Williams's case shows that the loans to Murdaugh

17   were the defendant's idea to cover Murdaugh's overdrafts, to

18   right Murdaugh's accounts on a quarterly basis before they

19   had to be reported to the FDIC.  Murdaugh was not calling the

20   shots.  The defendant was calling the shots.  Murdaugh just

21   spent his money and relied on defendant to manage his

22   accounts at whatever cost.

23        Now, you have heard me say that the loans

24   themselves, although questionable, are not illegal.  So why

25   have we spent so much time talking about them?  Because they

1    show motive.  They show intent.  And most importantly, it is

2    how they were paid off that makes them a part of the

3    conspiracy.  And that takes us to Hakeem Pinkney, Natasha

4    Thomas, and Arthur Badger.

5         Hakeem Pinkney and Natasha Thomas, as you heard,

6    were involved in a horrific car accident.  And Russell

7    Laffitte was appointed to serve as their conservator in

8    September of 2010.  Now, when the defendant signed the

9    petition requesting to be appointed as Natasha Thomas's

10   conservator, he swore to the probate court that Natasha was

11   15, when, in fact, she was two weeks shy of her 18th

12   birthday.  In December of 2010, three months after he was

13   appointed to be her conservator, he extended Natasha an 18

14   percent loan so that she could pay her school expenses.  She

15   was 18 at the time.  In the defendant's own words, you can't

16   enter into a contract unless you are 18.  Natasha included

17   her correct birthday on the loan paperwork, as you can see.

18   And as she told you, after he extended her the loan, he never

19   met her again.

20        You heard the defendant testify about the

21   relationship that he established with Hannah and Alania

22   Plyler, and how he claimed to act as their surrogate parent

23   and how he kept copious records of their conservatorship

24   accounts.  And he did none of this for Hakeem Pinkney or

25   Natasha Thomas.

1          Hakeem died, as you heard, in October of 2011.  That

2     same day, on October 11th, 2011, Murdaugh e-mailed the

3     defendant with a subject line, Pinckney, and said, please

4     call me, 911.  Why else would Alex e-mail Russell on October

5     11th, the day that Hakeem Pinkney died, with a 911 call?

6          About a month later, in November, the defendant

7     signed the releases on behalf of Natasha Thomas and Hakeem

8     Pinkney.  And as he admitted, Hakeem was dead.  Natasha 19

9     years old.  Neither of them needed a conservator.

10          Then you see on the disbursement sheets for Hakeem

11     and Natasha, both signed by the defendant, indicating that

12     Palmetto State Bank will be receiving a check for $325,000

13     for Natasha, and a little over $309,000 for Hakeem.

14     Importantly, these disbursement sheets also indicated that

15     the defendant would be collecting $75,000 in conservator

16     fees.  The settlement checks were issued to Palmetto State

17     Bank, drawn on the law firm's client trust account, the

18     account that the lawyers were never paid out of.  The memo

19     lines on the checks very clearly indicated that they were

20     settlement proceeds for Natasha Thomas and Hakeem Pinkney.

21     And the amounts corresponded exactly to the amounts indicated

22     on their disbursement sheets, those disbursement sheets that

23     the defendant signed.

24          And on December 21st, the next day, all on the same

25     day, the defendant issued nine money orders from these two

checks, all through a Palmetto State bank account so that the transactions could not be traced: $10,000 to Murdaugh's wife Maggie; over $1,000 to pay off Murdaugh's boat, Murdaugh Charters; $100,000 to the defendant's father; two money orders totaling over $141,000 to pay off the unsecured loans the defendant had extended to Murdaugh from Hannah's conservatorship account; $329,000 to Murdaugh's father; and over $40,000 to repay the loan that the defendant had extended from Malik Williams's conservatorship account.

The same day as all of these transactions, Natasha Thomas goes into the Palmetto State Bank. She deposits the check she actually did receive.

Now, the defendant testified that he did not know that the total of $634,000 in checks belonged to Natasha Thomas or Hakeem Pinkney, but, of course, he knew. The memo lines clearly indicated that the checks were from Natasha Thomas's settlement proceeds. And, remember, the defendant knew exactly how and when Murdaugh and the other law partners were paid. They received bi-weekly paychecks that were small relative to their yearly bonuses. At the very end of the year, they received those bonus checks. The checks were paid from an attorney account, not the client trust account. And they were drafted to the individual attorneys by name, not the Palmetto State Bank.

Other than the end-of-the-year bonuses, the

1  partners, including Murdaugh, were not coming into the bank

2  with large checks from the law firm.  And Murdaugh always

3  came to the bank at the end of the year to pay off his loans

4  and deposit his bonus checks.  The defendant knew on December

5  21st, when he issued all of those money orders, based on

6  Murdaugh's finances and e-mail communications, that the money

7  did not belong to Murdaugh.

8          So what was happening to Murdaugh's finances at the

9  time?  In early November, as you heard, Russell had arranged

10  to have 0 United and Red Beard charged off to comply with the

11  FDIC.  But Murdaugh still had to come in and pay for those

12  renewals.  The defendant and Murdaugh continued to exchange

13  e-mails about the Berkeley County properties throughout

14  November and early December.

15          On November 14th, Murdaugh e-mailed Russell and

16  asked when he can meet to talk about the Berkeley County

17  properties.  The defendant sent Murdaugh an e-mail on

18  December 12th and asked when he was coming in for the money

19  for the renewal.  Murdaugh responded:  When we talk, I will

20  remind you what we discussed.

21          On December 20th, 2011, the same day as Hakeem

22  Pinkney and Natasha Thomas's settlement checks, Murdaugh

23  sends Laffitte an e-mail:  Can you call me?  And the very

24  next day, Murdaugh comes to the bank with Pinckney and

25  Thomas's $634,000.  And rather than issue a penny of it to

1  pay back the money that Murdaugh owes the bank, the defendant

2  issues money orders distributing Hakeem Pinkney and Natasha

3  Thomas's money to wherever Murdaugh asked him to.

4  On December 21st, what was happening with these loan

5  renewals the defendant had been hounding Murdaugh to pay?

6  Still hadn't been paid.  Murdaugh comes to the bank with more

7  than $634,000, and the defendant does not use any of it to

8  pay back his bank loans.  The point is that the defendant did

9  not use the money to pay off the bank loans because he knew

10  it was stolen.  And he knew if he used stolen money to pay

11  back Murdaugh's bank loans, the FDIC would be able to track

12  it.

13  Now, the day after Russell Laffitte issued all of

14  these money orders from Hakeem Pinkney and Natasha Thomas's

15  funds, he filed documents with the probate court representing

16  that there were no funds in the conservatorship accounts and

17  asking that he be discharged as their conservator.  And what

18  happens with the money that Murdaugh still owes the bank?

19  The defendant and Murdaugh continued to exchange e-mails

20  until the end of the year.

21  December 27th, six days after the defendant issued

22  all of the money orders from Hakeem Pinkney and Natasha

23  Thomas, he asked Murdaugh:  When you coming in to pay for Red

24  Beard and 0 United?  And Murdaugh tells him:  As soon as I

25  get my bonus check.

1    Finally, December 30th, Murdaugh went to the bank to

2    pay off all of his bank loans.  Murdaugh's account records

3    show that he deposited his bonus check on December 30th, the

4    same day he paid off his loans, including those loans for Red

5    Beard and 0 United.  Again, the defendant knew better than to

6    use stolen money to pay off the bank's loans.

7    Now, after the defendant negotiated all of these

8    money orders, more than $634,000, knowing that the money was

9    not Murdaugh's law firm's salary, was not his yearly bonus

10   check, the defendant got his conservator fees, $60,000 from

11   Hakeem Pinkney; $15,000 from Natasha Thomas.  These checks

12   are drafted in the exact same way as the settlement proceeds

13   the defendant claimed he didn't recognize as belonging to

14   Natasha Thomas or Hakeem Pinkney.

15   Now, Russell had to have reviewed the memo lines in

16   his conservator checks to determine that they were to pay his

17   fees.  And he immediately negotiated the $60,000 to pay down

18   the loans he extended himself from Hannah Plyler's

19   conservatorship account.  And he later deposited $15,000 from

20   Natasha Thomas, knowing that he had done nearly nothing for

21   these individuals.

22   And you heard him testify he didn't even pay taxes

23   on this income back in 2012.  In his own words, he just

24   didn't want to pay taxes.  He testified that because the

25   checks were made payable to Palmetto State Bank, he could

1   hide it from the IRS.  You saw the general ledger debits from

2   the law firm.  You saw how the settlement checks and the

3   conservator fee checks were originally drafted in the right

4   way, and then they were voided.  They were both voided to be

5   drafted to the Palmetto State Bank.  And that's because

6   Murdaugh and the defendant knew the implications of drafting

7   a check to the Palmetto State Bank.

8         The defendant and Murdaugh drafted these checks in

9   this way so that the funds could not be traced by the law

10   firm, by the bank, or by the IRS.  This is evidence of the

11   defendant's knowledge, intent, and motive.

12         How about the additional $25,000 that Natasha was

13   owed on additional settlement proceeds?  Over a few days, the

14   defendant issued money orders and cash for Murdaugh, breaking

15   up the checks into four smaller transactions to avoid

16   reporting requirements that he admitted structuring.

17         And that takes us to Arthur Badger.  In the

18   defendant's own words, he really didn't do a lot for the

19   estate of Donna Badger, yet, he collected $35,000 in fees.

20   So what exactly happened?  We know from Arthur Badger's

21   disbursement sheet that the defendant was to receive his

22   $35,000 personal representative fee, and that the Palmetto

23   State Bank would receive a check for $1,325,000 to fund a

24   structure per client request.

25         The defendant testified on Friday that he did not

1   see Arthur Badger's disbursement sheet showing that he would

2   receive the $1,325,000.  But on September 6th, under oath

3   during his bond hearing, he testified that he did see the

4   disbursement sheet.  And this statement on September 6th was

5   consistent with what he had told the FBI, that at the time of

6   Arthur Badger's settlement, he did see the disbursement

7   sheet.

8           Now, not only did he admit under oath that he saw

9   the disbursement sheet at the time of the settlement, but the

10  documents also support the defendant saw Arthur Badger's

11  disbursement sheet.  Arthur Badger signed his disbursement

12  sheet on November the 19th of 2012.  That same day, Alex had

13  a meeting at the bank.

14          The next day, the law firm issued $35,000 to the

15  defendant in personal representative fees.  Again, this check

16  is drafted in the exact same way as all of the Badger checks

17  that the defendant later negotiated.

18          And the day after the $35,000 check was written, the

19  defendant promptly deposited it to pay off the loans he had

20  given himself from Hannah Plyler's conservatorship account.

21  Within a two-day span, Arthur Badger signs the disbursement

22  sheet.  Murdaugh has a meeting at the bank.  The defendant

23  gets his PR fee.  And the defendant negotiates that fee to

24  pay off the loans he extended himself.

25          Then on February 6th, Murdaugh sent the defendant

1    the e-mail that you have seen many times.  Murdaugh asked the

2    defendant to e-mail him and ask that the check for $1,325,000

3    be re-cut as listed above.  Now, the defendant claims that he

4    did not know what the check in this e-mail was about.  But he

5    admitted under oath on September 6th that he has seen this

6    disbursement sheet showing that $1,325,000 was going to the

7    Palmetto State Bank.  The defendant does not ask any

8    questions.  He does not pick up the phone to call his

9    sister-in-law, the accountant at the law firm, to ask her any

10    questions.

11    He does exactly what Murdaugh told him to do.  He

12    does the math, figures out how much Murdaugh owes on Hannah's

13    loans, and creates a separate e-mail chain to Murdaugh.  Now,

14    you've seen a lot of e-mails between the defendant and

15    Murdaugh.  It's the first one we see where he creates a

16    separate e-mail chain to respond to Murdaugh.  Murdaugh then

17    forwards that e-mail to law firm staff, the defendant's own

18    sister-in-law, and the Badger check is re-cut.

19    The defendant testified that he was fully

20    cooperative and transparent with law enforcement and provided

21    thousands of pages of documents.  He highlighted an e-mail,

22    the one from Murdaugh asking him to re-cut the check, as the

23    one that he kept in his Plyler loan files and turned over to

24    law enforcement.  But none of the other e-mails between

25    Murdaugh and the defendant, including this one, were on the

1    bank's servers.  These e-mails all came from the law firm.

2            As the defense said, the measure of a man is how he

3    reacts.  The same day that Murdaugh forwarded the defendant's

4    e-mail to law firm staff to have Badger's check re-cut,

5    Murdaugh went to the bank with three checks of those that had

6    been re-cut at the defendant's instruction, totaling, again,

7    more than $600,000.

8            It's February.  The defendant knows exactly how and

9    when Murdaugh is paid by the law firm.  All three checks

10   presented on February the 8th were drafted to the Palmetto

11   State Bank.  And they all say Arthur Badger on the memo line.

12           As John Peters, the bank's compliance officer, the

13   defendant's own witness testified, any one of these checks

14   would have raised red flags.  He testified that although the

15   checks had not been proper on their face, it was how they

16   were negotiated that made them improper.  John Peters would

17   not have negotiated a single check that had been presented to

18   him.  A bank teller would have known better.  Certainly, a

19   bank executive knew better.

20           If the money belonged to Murdaugh, it should have

21   been drafted to Murdaugh.  And since it was not, the

22   defendant should not have negotiated it for Murdaugh's

23   benefit.

24           The first check was negotiated to Johnnie Parker, a

25   partner at the law firm, to pay off a personal loan.  The

1    second check was negotiated to pay off the unsecured loans

2    that the defendant had extended to Murdaugh from Hannah

3    Plyler.  The third check negotiated to Randolph Murdaugh,

4    Murdaugh's father.

5        Then in September, Murdaugh presented the remainder

6    of Arthur Badger's $1.325 million in settlement proceeds

7    totaling more than $700,000.  Again, the defendant knows

8    Murdaugh doesn't get paid in September.  All of the checks

9    were dated September 13th, 2013.  All of the checks were

10    drawn on the law firm's client trust account.  All of the

11    checks were drafted to the Palmetto State Bank.  And the memo

12    lines on all of these checks stated that the funds belonged

13    to the estate of Donna Badger, the estate that the defendant

14    was appointed to protect.

15        The first check was negotiated to pay off Murdaugh's

16    loans from the Plylers' account and to Murdaugh's wife.  The

17    next check was deposited into Hannah Plyler's conservatorship

18    account to pay off Murdaugh's loans.  The next check, again,

19    more than $100,000 to Hannah Plyler's conservatorship

20    accounts.  The next check was broken up into a wire transfer

21    to Southern Crane and to cash.  E-mail communications between

22    the defendant and Murdaugh indicate just how this transaction

23    was handled.

24        On October 28th, Murdaugh e-mailed the defendant and

25    stated:  This is where forty-nine five goes.  I will pick up

1  the difference.  Don't put it in an account.

2         The defense has argued that Murdaugh sat on checks,

3  that he was patient, that he would wait a long time before

4  negotiating these checks.  The check was dated on September

5  13th, just like all the other checks from the second round of

6  Badger funds.  Murdaugh told the defendant what to do with it

7  and told him that he would then come by and pick up the

8  difference.  That check was sitting in the defendant's desk.

9  The defendant was patient.  The defendant sat on these checks

10  until Murdaugh needed them.

11         The defendant negotiated the next check directly

12  into Murdaugh's personal account at Palmetto State Bank.  The

13  defendant testified that he never saw the memo lines, that he

14  didn't know that the funds belonged to Donna Badger.  But

15  what about the deposit slips?  The defendant admitted that he

16  negotiated each one of these transactions.  Not only did the

17  memo lines indicate that the funds belonged to Donna Badger,

18  but so do the deposit slips.

19         The next check was negotiated to 4M Iron to purchase

20  a Jeep and for cash back.

21         The next check the defendant negotiated for Honey

22  Creek Motors and cash back to Murdaugh.

23         The defendant negotiated the next check into

24  Murdaugh's personal account in Palmetto State Bank.  Again,

25  both the memo line and the deposit slip indicate that the

1  funds belonged to Donna Badger.  And the defendant was

2  appointed to protect those funds.

3       The defendant negotiated the next check directly

4  into Hannah Plyler's account.

5       And then his PR fee, defense has argued that these

6  checks were drafted improperly and that they never would have

7  been negotiated in the way that they were had they been

8  drafted properly.  But just like with Hakeem Pinkney, Natasha

9  Thomas's conservator fees, the defendant's PR fee check was

10  drafted in the exact same way.  And but for the memo line,

11  how would he have known that the check was to pay his fees?

12       Just like the Badger checks, the fee check was

13  drafted in a way to keep the funds from being traced.  And

14  just like he testified, because it was drafted this way, he

15  was able to hide it from the IRS and not pay taxes on it.

16       Remember, conspiracy is an agreement.  And the

17  agreement is the crime.  The defendant and Alex Murdaugh

18  conspired to obtain money by defrauding Murdaugh's personal

19  injury clients.

20       Now, we talked about Count 2, which is a substantive

21  bank fraud count.  And as I've said, the Court will instruct

22  you specifically as to the law and the elements that the

23  Government would have to prove.  But, generally, the

24  Government must prove that the defendant knowingly executed

25  or attempted to execute a scheme or artifice to obtain any of

1   the money or funds under the custody or control of a

2   financial institution by false or fraudulent pretenses,

3   representations, or promises; secondly, that the defendant

4   did so with the intent to defraud; and, third, that the

5   financial institution was federally insured.

6          Let's start with the easy one, the third element.

7   You saw the FDIC certificate.  You heard testimony both from

8   FDIC expert as well as bank employees that Palmetto State

9   Bank was federally insured.  As for the first element, that

10  the defendant knowingly executed or attempted to execute a

11  scheme or artifice, the scheme, it's the conspiracy that

12  we've talked about.  It's the scheme to steal money from

13  Natasha Thomas and Hakeem Pinkney and Arthur Badger,

14  Murdaugh's clients.  And those were funds written to the

15  Palmetto State Bank that were under the custody or control of

16  the Palmetto State Bank.  And the defendant got those funds

17  by false and fraudulent pretenses, representations, and

18  promises.

19         He was appointed to be the PR for the estate of

20  Donna Badger.  And under those false pretenses, he was given

21  these funds.  And he made misrepresentations to the law firm

22  to have these checks be re-cut.

23         Now, Count 2 relates specifically to a $101,369.49

24  check that was deposited into Hannah Plyler's conservatorship

25  account.  This check, as we've already seen, was taken from

1    Arthur Badger's funds.  And the defendant got this check

2    because of his role as the PR for Donna Badger's estate.  And

3    under those false pretenses, they were able to defraud Arthur

4    Badger of these funds.

5         Count 3 is what we call a substantive wire fraud

6    count.  In order to prove Count 3, the Government must prove

7    that the defendant devised or intended to devise a scheme to

8    defraud or for obtaining money or property by means of false

9    or fraudulent pretenses, representations, or promises that

10   were material; second, that for the purposes of executing

11   this scheme, the defendant transmitted or caused to be

12   transmitted by means of wire communication or interstate

13   commerce, writings, signs, or signals; and, third, that the

14   scheme affected a financial institution.

15        This count relates specifically to a $33,789.83

16   check from Arthur Badger's settlement funds that were

17   deposited by the defendant directly into Alex Murdaugh's bank

18   account at Palmetto State Bank.

19        Now, that second element, cause to be transmitted by

20   means of wire communications in interstate commerce, writing,

21   signs, or signals, it's referring to this check.  And you see

22   from the check that it has routing numbers, information on

23   the front and back that indicate that it was negotiated

24   through the bank's electronic systems.  And the bank, as a

25   federally insured financial institution, is engaged in

1   commerce, interstate commerce.

2       Now, third -- the first element relates exactly to

3   the conspiracy that we talked at length about, the same

4   conspiracy, the same scheme to steal money from Murdaugh's

5   personal injury clients.

6       And third, that the scheme affected a financial

7   institution.  You have heard at length about Palmetto State

8   Bank's role in this scheme.  And the defendant's role as an

9   executive of that bank that was -- that allowed the defendant

10  and Murdaugh to engage in this scheme.  You've seen how these

11  transactions exposed the bank to substantial risk.  And

12  you've also heard testimony about the $680,000 payment.  And

13  we will talk at length about that in a minute.  But that

14  $680,000 payment related to these Badger funds, all these

15  checks that were negotiated from Donna Badger, from Arthur

16  Badger.  It's that financial risk, that affecting the

17  financial institution, the financial harm that Palmetto State

18  Bank endured as a result of the defendant and Murdaugh's

19  conduct.

20      Now, why would the defendant do all of this for Alex

21  Murdaugh?  Because he made hundreds of thousands of dollars

22  to do it.  As you've seen, the defendant collected more than

23  $450,000 in conservator and personal representative fees.

24  And he didn't even pay taxes on that income.

25      It wasn't until his conduct was uncovered in 2021

that he went back to his accountant, and his accountant told

him, you should probably pay taxes on all this income.

That takes us to the three misapplication of bank

funds charges. Now, I'll talk to you about three of those

charges in the indictment, Counts 4 through 6, but I will

start with Count 6. You have seen how Murdaugh used funds

stolen from Pinckney, Thomas, and Badger to periodically pay

off the loans that the defendant extended from Hannah Plyler.

But Count 6 relates specifically to the $284,787.52 on the

farming line of credit that the defendant extended to

Murdaugh to pay off those loans.

Now, to prove misapplication of bank funds, the

Government must establish that the defendant was an officer,

agent, or employee of, or connected in any capacity with

Palmetto State Bank at the time alleged in the indictment;

the accounts of the bank were federally insured at the time

alleged; that the defendant misapplied, abstracted, or

purloined more than $1,000 in moneys, funds, or credits

belonging to or entrusted to the care of the bank; fourth,

that the defendant did so willfully; and, fifth, that the

defendant did so with the intent to inflict financial injury

to the bank or to defraud the bank.

Again, the first one, there's no dispute that Mr.

Laffitte was an officer, agent or employee of the Palmetto

State Bank. Second, you've heard in the accounts of the bank

1  were federally insured.  And we will talk about how the

2  defendant misapplied funds, bank funds that were intended for

3  purposes of farming to pay off the loans that he had extended

4  from Hannah Plyler's conservatorship account.  We will go

5  over evidence about how he did this willfully.  He was the

6  one who transferred the money out of the line of credit, and

7  that he did so with the intent to inflict financial injury to

8  the bank or to defraud the bank.

9       Again, sham loans, as the FDIC expert has testified,

10  exposed the bank to substantial risk.  The borrower and the

11  loan officer are restricted in the way the proceeds of a loan

12  can be spent.

13       The evidence showed that the defendant and Murdaugh

14  were tracking when Hannah turned 18.  In February of 2015,

15  when this line of credit was extended, Murdaugh was over

16  $85,000 in overdraft.  And it was only February.  He wasn't

17  going to get paid his bonus until December.  He had no way to

18  pay back Hannah's loans when she was turning 18.  So in

19  February, the defendant extended him a line of credit for

20  purposes of farming.  And, again, you've heard from the FDIC

21  expert.  The purpose of the loan limits the way that those

22  proceeds can be used.

23       The defendant then advanced Murdaugh $284,787.52,

24  the exact amount that he owed on those loans from Hannah's

25  account.  And the defendant issues a cashier's check to pay

1   those loans back.  The defendant eventually deposited that

2   money into Hannah's conservatorship account.  And on February

3   20th, the same day of that original cashier's check, the

4   defendant e-mailed Murdaugh and notified him what he was

5   doing to pay those loans off.  The e-mail included a detailed

6   spreadsheet of all the outstanding loans and the interest and

7   the due dates.  In that e-mail the defendant tells Mr.

8   Murdaugh:  I have advanced $284,787.52 from your credit line

9   to pay these off.  She turns 18 and I'm closing out the

10  conservatorship.

11        Three days later, Murdaugh responds:  Please hold

12  off on this until I return and can meet with you.  Hard to

13  follow this on my phone.

14        A month later, Murdaugh e-mails the defendant saying

15  he needs more money.  And he says:  I have not figured the

16  payoff for Hannah and the other loan when I was planning.

17  When we paid those, it took most of the partial credit line

18  you activated.

19        Now, during the defendant's sworn testimony on

20  September 6th, he stated he did not know whether Murdaugh was

21  going to spend hundreds of thousands of dollars to pay off

22  the loans for Hannah.  That was not true.  Based on his

23  e-mails, Murdaugh had no idea that the defendant was going to

24  use the line of credit to pay Hannah back.  Murdaugh was not

25  calling the shots; the defendant was.

1          The defendant used the bank's funds, a line of

2    credit that was not supposed to be used for anything except

3    farming, and turned them around to pay off Hannah.

4          Tim Rich, the FDIC expert, again explained to you

5    that the customer is limited in how those funds can be used

6    for the intended purpose of those loans.  And most certainly,

7    the loan officer himself cannot use those funds for other

8    purposes.

9          That takes us to Count 5.  It's another

10   misapplication of bank funds count related to the $750,000

11   beach house loan.  The elements are the same as Count 4 and

12   Count 6.  Again, the defendant was an officer, agent, or

13   employee.  The accounts were insured by the FDIC.  And we

14   will review how the defendant misapplied a loan for purposes

15   of beach house renovations for expenses that had no relation

16   to beach house renovations.

17         Fourth, you will see the defendant did so willfully.

18   He testified that he approved that loan and that he knew that

19   money was not going to be beach house renovations, and that

20   he did so with the intent to inflict financial injury to the

21   bank or to defraud the bank.  You've heard from the

22   defendant's own testimony that that loan was charged off,

23   that Alex didn't make a single payment on the $750,000, and

24   that the beach house was never security for that $750,000

25   loan.

1    So let's see how it happened.  Summer of 2021,

2  Murdaugh's wife and son had just been brutally murdered.

3  Alex was maxed out on his millions of dollars in debts, his

4  million-dollar credit line, his $600,000 line of credit.  He

5  had two charged-off loans from the bank.  He owed the bank

6  millions more.  He was overdrawn on his personal account by

7  more than $163,000.  And, again, he doesn't get paid until

8  December.

9    At this time there's no child's account to loan Alex

10  money from.  So what does the defendant do?  He authorized a

11  $350,000 wire transfer to Chris Wilson, a lawyer in Bamberg.

12  There had been an Executive Committee meeting on the 13th.

13  No mention of a new loan to Alex Murdaugh during that

14  meeting.  Five days after the wire transfer, there's a Board

15  meeting.  Again, no mention of a new loan to Alex Murdaugh

16  during that Board meeting.

17    You heard testimony about this July 20th Board

18  meeting and how the Board was asking questions about

19  Murdaugh's employment status.  No mention of a $350,000 wire

20  transfer the defendant had authorized five days before; no

21  mention of Alex's significant overdraft.

22    So what happens after that $350,000 wire transfer?

23  Alex Murdaugh continues to go deeper in overdraft by hundreds

24  of thousands of dollars.  And how is he spending his money?

25  Jimmy Butler Auto sales, DeBordieu Club, thousands of dollars

1   in credit card bills, nearly $15,000 to the law firm, two

2   checks at more than $6,000 to the Peeples-Rhoden Funeral

3   Home, LabCorp, Charleston Gastroenterology, Veterinary

4   Specialty Care, The Sports Medicine Shop, and thousands of

5   dollars in cash.  As the defendant testified, none of it has

6   anything to do with beach house renovations.

7          And then there's those thousands and thousands of

8   dollars to C.E. Smith.  Each day the defendant would receive

9   the nonsufficient funds reports showing that Murdaugh was

10  writing checks from his overdrawn account.  The defendant had

11  to approve these payments from the account, and he did.

12         How about those thousands and thousands of dollars

13  that went to C.E. Smith?  You heard the defendant testify on

14  Friday that he did not recall meeting him, but that he

15  thought C.E. Smith was the contractor on the beach house

16  renovations, but he never asked Murdaugh.  Decades of a

17  relationship, personal and professional relationship, and he

18  wouldn't even pick up the phone to ask Alex how he's spending

19  all of this money.

20         He did not ask Murdaugh where the money was going

21  because he knew C.E. Smith.  The bank had loaned C.E. Smith

22  money eight times.  And the defendant has signed each one of

23  those loans.  Remember, it's a community bank; know your

24  customer.  The most recent loan was in February of 2021.

25         Now, by August the 9th, Murdaugh was more than

1    $340,000 in overdraft.  And rumors were still swirling about

2    his financial status.  The same Board members who expressed

3    concerns back in July were still concerned.  So on July -- on

4    August the 9th, Norris Laffitte sent an e-mail to the

5    Executive Committee.  And he copied the Board requesting that

6    the committee prepare a report of Palmetto State Bank's total

7    exposure with respect to Alex Murdaugh, indirectly, directly,

8    through different family relationships and/or LLCs, with his

9    borrowing practices and repayment plans if he's not working.

10   Norris wanted to know everything.

11          When Norris sent that e-mail, Murdaugh was more than

12   $14,000 in overdraft on his farm account and more than

13   $347,000 in overdraft on his personal account.

14          As the defense told you at the beginning of this

15   case, the weight of a man is measured by his reaction.  So

16   what did the defendant do?  His cousin, fellow Board member,

17   asks him to prepare a report of the bank's total exposure

18   with respect to Alex Murdaugh.  He started moving money

19   around.  He started hiding it and covering it up.  That's his

20   reaction.

21          Now, the defendant testified that this was just a

22   coincidence, just a coincidence that within an hour of a

23   Board member who had already expressed concerns asking what

24   the bank's total exposure was, transferring $400,000 to cover

25   up his overdraft.  What an extraordinary coincidence.  Within

1    about an hour, he issues the cashier's check for $400,000 and

2    transfers it into Murdaugh's checking account to cover that

3    overdraft.  He then went into Murdaugh's checking account and

4    transferred $20,000 into the farm account to cover the more

5    than $14,000 in overdraft.  And he continued to check those

6    accounts throughout the day to see if the transfers cleared.

7    And on August the 9th, that same day, there's not a single

8    document memorializing a $750,000 loan to Alex Murdaugh.

9         So after he receives the e-mail, he directs bank

10   employees to begin to create a record of a $750,000 loan.

11   This is a copy of a sticky note that's included in the loan

12   paperwork that he gave to those employees.  A loan number was

13   then generated.  As the records show, the loan number was not

14   even generated until August the 9th, after Norris sent that

15   e-mail.  But the loan documents themselves were backdated to

16   July 15th, to the date of the $350,000 wire transfer to Chris

17   Wilson.

18        And the loan documents indicate that the loan was

19   for investments.  The collateral description in the loan

20   paperwork outlines that one share of Green Swamp would secure

21   the loan.  And these loan documents themselves indicate that

22   the loan -- that the security was already used,

23   cross-collateralized, on other loans that Murdaugh had with

24   the bank.

25        Now, by the next Board meeting, August 17th, the

loan paperwork is still not approved.  The loan was presented

as part of the bank's overall exposure with respect to

Murdaugh.  But, importantly, it was presented as a loan for

purposes of beach house renovations.

You heard five Board members who told the exact same

story.  The loan was presented as a second mortgage on the

beach house for purposes of beach house renovations.  No

mention of attorneys' fees.  No mention of a $350,000 wire

transfer to Chris Wilson.  No mention of the hundreds of

thousands of dollars in overdraft.  And no mention of that

$400,000 transfer to cover that overdraft.

Now, you heard testimony from Board members that

during the August 17th Board meeting, when the Board members

were asking all these questions, the defendant's sister, Gray

Henderson, tried to locate loan paperwork in the bank's

systems.  Could not find it.  And the defendant, the loan

officer, just sat there.  He did not mention why the loan

paperwork could not be located, because it was not completed

yet.

The day after the Board meeting, the loan was marked

approved, indicating that it had been approved by the

defendant, his sister, and his father.

And two weeks later, the Board still has questions

about this loan, because the defendant did not tell them the

full picture.  Norris Laffitte asks specifically about the

collateral securing this beach house loan.  He asks whether

the stock has been pledged elsewhere.  And the defendant

responds that the Green Swamp stock, at that point the only

collateral securing this loan, had not been pledged

elsewhere, which, of course, was not true.  The stock was

already used to secure two prior loans, the Red Beard and the

O United.  The defendant was the loan officer on both of

these loans.  And the $750,000 loan paperwork itself

indicated that Green Swamp was cross-collateralized.

Murdaugh never made a payment on that $750,000 loan.

The defendant testified that the beach house

recently sold for more than a million dollars.  But the only

interest the bank had in that beach house was that first

mortgage.  And regardless of whether the bank later collected

funds related to the $750,000 from the sale of Green Swamp,

the crime was committed when the sham loan was extended for

purposes of beach house renovations, knowing that the funds

went to other purposes.

Now, the last count, Count 4, again, another

misapplication of bank funds count.  The elements are all the

same.  The defendant, still an officer, agent, or employee.

The bank still FDIC insured.  We will talk about how the

defendant misapplied $680,000 in bank funds to cover up his

own fraud, and that he did so willfully.  And that he did so

with the intent to inflict financial injury to the bank or to

1    defraud the bank.

2         Now, you've heard how that $680,000 was deposited

3    and the bank never got it back.  The bank never got a

4    release, neither from Arthur Badger or from the law firm.

5    The bank is, in fact, defending a lawsuit related to those

6    Badger funds now.

7         So let's review what happened.  On October 28th,

8    2021, the defendant issued a check from bank funds for

9    $680,000, and gave it to the law firm.  After the law firm

10   had confronted the defendant regarding his role in the theft

11   of Arthur Badger's settlement money, the defendant walked to

12   the law firm and delivered the check.

13        According to his own sister-in-law, he told them

14   during that meeting that no one knew about the check.  And as

15   the FDIC expert testified, the moment that Russell delivered

16   that check, the bank lost its interest and control of those

17   funds.  Now, what did that money represent?  As you've heard,

18   1.325 million in settlement funds from Arthur Badger, plus

19   the $35,000 personal representative fee, divided in half

20   between the bank and the law firm.

21        That day the defendant notified the Executive

22   Committee.  And in his words:  I just wrote up $680,000 to

23   losses other than loans.  We converted 1.1 million in checks

24   made to Palmetto State Bank on a settlement that Alex stole.

25        According to the defendant, he and the law firm had

1   agreed to split the loss.  There's no mention of Charlie, his

2   father's approval of or knowledge about this payment.

3   There's no mention of his sister's approval of or knowledge

4   about this payment.  There was no presentation to the

5   Executive Committee, no Executive Committee action, and no

6   vote on whether to approve this payment.

7        But, importantly, the defendant did not explain

8   where the $680,000 came from or any of the underlying

9   transactions related to Arthur Badger's fee -- settlement

10  proceeds.

11       So how does the Executive Committee respond?  Scott

12  Swain, the CFO responds:  This sets an awful precedent.  And

13  he asks questions about whether there were other cases.  He

14  discusses the financial implications of Russell's actions.

15  The defendant responded again, not acknowledging the full

16  extent of the $680,000 payment or his involvement, his own

17  words:  We were wrong and made it right.

18       Jan Malinowski responded, again, still questioning:

19  How many similar transactions are out there?  The defendant

20  did not even respond, much less acknowledge Pinckney and

21  Thomas.

22       The law firm deposited the check the next day on

23  October 29th of 2021.  And on November the 2nd, the defendant

24  exchanged e-mails with the bank's attorneys.  He made it very

25  clear the bank is paying this amount and it is not an option

1    to not pay.

2          Now, you heard testimony about the November 3rd

3    Board meeting.  The defendant secretly recorded this Board

4    meeting.  He testified that he recorded it because his sister

5    was running late.  But then in the same breath, he testified

6    that he didn't realize he had recorded it until a couple of

7    months ago.  You saw and heard that the defendant said, "We

8    are paying it," under his breath on that recording.  He had

9    already handed over the check.  The law firm had already

10   deposited the check.  The Board was totally in the dark.

11         They wanted to be sure that there was going to be an

12   internal investigation into what had happened.  So what did

13   the defendant tell them?  All he told them was that he was

14   the PR for the estate of Donna Badger, not Arthur Badger.  He

15   did not mention that the $680,000 included his fee that he

16   took from Arthur Badger.  He did not tell them that included

17   nearly $400,000 that a partner at that same law firm had

18   gotten from these stolen checks.  He did not tell them about

19   the hundreds of thousands of dollars that he negotiated to

20   pay off the loans he extended from Hannah's accounts.  And he

21   did not tell them that the $680,000 included more than

22   $150,000 in checks that were deposited at the Bank of America

23   that never went to the Palmetto State Bank.

24         During that October 31st and November 3rd Board

25   meetings, the Board did not ratify the payment.  It was not

1  satisfied by the defendant's resolutions.  In his own words,

2  the Board went absolutely ballistic.  And as you heard

3  consistently from five Board members, the payment had already

4  been made.  There was nothing that they could have done.

5  They were in damage control mode.  And they wanted to do

6  anything they could to minimize the loss and put themselves

7  in the best position with respect to their exposure.

8        But most importantly, the Board had no idea about

9  the details of the $680,000 payment.  They had no idea about

10  $35,000 fee, about the hundreds of thousands of dollars to

11  Hannah Plyler, about the hundreds of thousands of dollars to

12  that law firm partner, and about the more than 150 that

13  didn't go to the bank.  The only person that knew that

14  information on October 31st and November 3rd was the

15  defendant.  And he chose not to tell them.

16        The defendant's own father testified that he did not

17  know any of this before the $680,000 payment was made.

18        Measure a man by the weight of his reaction.  So

19  what was his reaction when the Board, his family, asked him

20  questions about the $680,000 in the Badger case?  He hid

21  information.  In his own words, "They wanted to claw it back,

22  and I told them absolutely not."

23        You heard testimony presented by the defense that

24  the Chairman of the Board and the CEO had authority to make

25  the $680,000 payment.  The defendant's own father, Charlie

1  Laffitte, said he did not know the underlying facts about the

2  $680,000 payment.  The defendant did not even tell his own

3  father.  And no one, not the CEO, not the Chairman of the

4  Board, can use bank money to cover up their own fraud.

5          Russell Laffitte and Alex Murdaugh are

6  co-conspirators in the scheme charged in the indictment.

7  Russell was the banker, the organized one, the one who kept

8  the train on time.  Alex was chaotic and frenetic, but he was

9  also the rainmaker, the one who brought in all the money.

10         So what was in it for Russell?  More than $450,000

11 in fees.  The price?  Murdaugh wanted access to his clients'

12 money.  And Russell was willing to give it to him.  It

13 started with loans from Hannah Plyler.  Then as it got

14 deeper, it turned into outright fraud, misappropriation, and

15 theft from Natasha Thomas, Hakeem Pinkney, and Arthur Badger.

16         When Alex's life unraveled in 2021, Russell knew

17 that everything that he had done would be uncovered and he

18 would be exposed for his involvement in these crimes.  So he

19 did whatever he could to cover it up.  And that meant

20 extending his sham loan to hide Alex's true financial

21 picture, and misappropriating the bank's money to pay off the

22 law firm.

23         Ultimately, the extent of his involvement was

24 discovered by the lawyers, by the bank, and by the victims.

25 And he was fired.  But that's not where this should end.

1    Russell's conduct was not just a firing offense.  It was a

2    series of criminal offenses.  This is not about bylaws.  This

3    is not about an Executive Committee.  And it's not about an

4    occasional outside audit.  This is about fraud.  This is

5    about taking money that doesn't belong to you, then

6    misapplying bank funds to cover up that fraud.

7            Now, maybe, just maybe this would not have happened

8    without Alex Murdaugh.  But we know that it could not have

9    happened without the defendant.  And as a result of the

10   defendant's actions, the accident victims lost nearly $2

11   million.  And he violated the trust of the bank and his

12   customers.  That's why he is standing trial here before you

13   today.

14           We ask that you hold him accountable for all he has

15   done and return a verdict of guilty on all counts.

16           THE COURT:  Ladies and gentlemen, let's take an

17   afternoon break before we hear the defendant's closing

18   argument.

19           (Jury leaves open court at 3:03 p.m.)

20           THE COURT:  We will be in recess for about 10

21   minutes.

22           (Whereupon, recess transpired.)

23           THE COURT:  Bring in the jury, please.

24           MR. HOLLIDAY:  Your Honor, is the jury coming in?

25   Because I would like to take something up before they do.

1          THE COURT:  Tell them to hold it just for a second.

2     Close that door, if you would, please.  Very good.

3          Mr. Holliday, what can I do for you?

4          MR. HOLLIDAY:  I'm going to be handling the rebuttal

5     close, but I noticed one of their boards that they plan to

6     use is a larger copy of their Defendant's Exhibit 90.

7          THE COURT:  Which we did not admit.

8          MR. DANIEL:  We'll just take it down.

9          MR. HOLLIDAY:  All right.

10         THE COURT:  Is that a problem?

11         MR. DANIEL:  This is what we are going to use.

12         MR. HOLLIDAY:  Right.  I recognize that one.

13         THE COURT:  That one I recognize.  Very good.  We

14    are ready.  Thank you, Mr. Holliday.  Thank you.

15         (Whereupon, the jury returns to open court at 3:21

16    p.m.)

17         THE COURT:  Please be seated.  Ladies and gentlemen,

18    closing argument for the defense, please give counsel your

19    full attention.

20         MR. DANIEL:  May it please the Court.  I apologize

21    for putting you off your course.  I didn't realize you were

22    going to walk through there.  I apologize for that.

23         I would like to thank you, as Judge Gergel did, for

24    your paying close attention in this case.  It's been a long

25    case.  The most important fact in the case is what I told you

1    in my opening statement, and that is Russell Laffitte never

2    got one red cent of Alex Murdaugh's stolen funds.  And think

3    about that.  He's going to risk his family's bank, which he

4    owns 3,000-some shares, to help someone steal, and he doesn't

5    get any of the proceeds.  Doesn't make any sense.

6          When Russell Laffitte first realized that he had

7    been duped, and Alex Murdaugh had stolen client funds, what

8    did he do?  And how did he react?  Well, first, like everyone

9    else, everyone at the bank, everyone at the law firm,

10   everyone, he was shocked, because now we knew all about Alex

11   Murdaugh and what a crook and a cheat and scoundrel he is.

12         But back then, it was different.  He was

13   well-trusted.  He was a member of law enforcement, an

14   assistant solicitor at the solicitor's office, a senior

15   member of the law firm.  He was well-respected in the

16   community, as he had been for some 30 years.  He had a

17   30-year record of building up that trust.  Little did we

18   know, little did they know, there was that dark side.  And

19   that's what we've heard all about during this trial.

20         So Russell, like everyone, was shocked to hear it.

21   But then what did he do?  Did he conceal, cover-up, lie, and

22   destroy evidence the way a guilty man would, like Ms.

23   Limehouse would suggest?  Absolutely not.  He tracked down

24   old records, recreated closed transactions, sat down with

25   Jeanne Seckinger, the CEO at the PMPED law firm, and helped

1    her piece together the puzzle pieces so it would all form a

2    full picture.  Because remember this, and this is what's so

3    important, no one at the bank knew what was going on over at

4    the law firm, all the stop payment orders, all the voided

5    checks, all the checks that didn't reach Palmetto State Bank.

6    And no one at the bank, it was the same way, it was the other

7    side.

8        And remember when Ronnie Crosby testified, he said,

9    when he brought over the documents or he went to see the

10   documents, he said the full picture finally came.  Because

11   now we could see the bank's side of it as well as our side of

12   it.  And Mr. Laffitte, Palmetto State Bank, never saw the law

13   firm's side.  And we will see evidence of that, which we will

14   highlight through the closing.

15       Then he met up with SLED.  And many of the documents

16   you see, I would venture to say, if not most of the

17   documents, a good number of the documents, many, many are

18   documents that Russell originally produced to SLED right

19   away, on his own.  On his own, he went and tracked down and

20   retrieved closed files and long-closed transactions, long

21   forgotten.

22       Are these the actions of a guilty man who knowingly

23   helped a con man steal and defraud his own bank?  No.  These

24   are the actions of a good man who realized he made a mistake,

25   he had gotten conned.  And from that point forward, he was

1    going to do everything right to make it good, to make it good

2    to his customers, and to make it good to everyone involved.

3         If Russell Laffitte were a guilty man, he never

4    would have signed his name over and over and over, and then

5    publicly filed those signed documents, the notes, all the

6    things you saw in evidence, year after year he goes to

7    accounting.  And at the end, when they do the final

8    accounting for the probate court, for the probate judge, for

9    her staff, it's all public, all for the world to see.  It's

10   all right there.  Even if he had been conning somebody, if he

11   was participating with Alex Murdaugh, he would never have

12   filed all that.  He would just secretly not find anything at

13   all.  He would have maybe not find them in the first place.

14   They were in his files at the bank.  They were also publicly

15   filed in the probate court.

16        Now, was it a good idea to take up conservatorship

17   loans?  Probably not a best practice, as the FDIC witness

18   said.  But it wasn't illegal.  And certainly was not a crime.

19   And every one of those clients received back more money.  He

20   made each one of them money.  His were fully secured and with

21   an interest rate that the client made more money than he or

22   she would have made if that money had stayed in a savings

23   account at the bank or money market account or a certificate

24   of deposit.

25        Now, did Mr. Laffitte make a bunch of mistakes?  He

1    sure did.  He took that witness stand and put his hand on

2    this Bible, and he told you about the mistakes.  He assumed,

3    he took ownership, and he took full responsibility.

4         Admittedly, he should have checked more closely.  He

5    should have paid closer attention.  And he told you that.

6    But, yes, so should Jeanne Seckinger at the law firm and the

7    attorneys at the Murdaugh firm and the accounting staff and

8    the financial people at the law firm where he slipped all

9    these documents by them.  They were the originators of the

10   fraud, unwittingly, unknowingly, because they too were

11   defrauded, presumably at least, they too were defrauded by

12   Alex Murdaugh.

13        But Russell Laffitte never knowingly and willingly

14   helped Alex Murdaugh steal from the bank.  Remember, Alex

15   Murdaugh is a lawyer with a long track record of trust.  And

16   he, in good faith -- he, Russell Laffitte, in good faith,

17   relied on that track record of trust to be built up.  He

18   relied on that track record that he was still a part of law

19   enforcement.  He relied on that track record that he was a

20   long-standing attorney who had been elected president of the

21   South Carolina Lawyers Association.

22        Now, the bank -- the branch of the Laffitte family

23   that did not agree or may have disagreed with the Alex

24   Murdaugh loans, they voted to approve every one of them.  And

25   none of them had a problem over the years when they were

1    getting their dividend checks, or complained about Alex

2    Murdaugh's loans.  And they were all disclosed over the

3    years, because any loan we know over $25,000 is disclosed and

4    eventually gets voted on by the full Board.

5    And Cyndra Swinson, the FBI, I think she was an

6    analyst for the FBI, she testified about a period of time,

7    it's a very short period of time.  And then I asked her

8    about, did you look at his track record five years before?

9    No, sir.  Ten years before, 15 years before?  No, sir.  She

10   hadn't looked at any of that, because she was told just to

11   look at this.  But that's not the full picture.  You've got

12   to look at the full picture.  And the whole picture is,

13   you've got to have the whole track record.  The bank made a

14   lot of money, $4 million over 10, 15 years, for his track

15   record.  They made much more than that if you are going back

16   30 years, because he had a track record of borrowing and

17   paying back, borrowing and paying back, having overdrafts,

18   paid overdraft fees, and then paid them up-to-date.

19   And the Board members testified, understandably,

20   they were worried about personal liability, so they wanted to

21   pin everything on Russell.  But remember, they approved all

22   those loans themselves, even though some of them initially

23   denied that, we saw, and you will see when you go through

24   those exhibits, they approved every one of them.

25   And the law firm itself, this is where the fraud

1   began.  And the lawyers, of course, they told you this, they

2   are worried about losing their law license and being put out

3   of business, because they, they themselves, the sacred trust

4   account, they don't want trust money going out the door made

5   out to the wrong parties.  And that's where the fraud began.

6         But the fraud also ended there too, because you see,

7   they could have stopped it either early on when the fraud

8   began at their doorstep, inside their offices, or they

9   could -- and when each one of their bank statements comes in,

10   they have copies of the canceled checks.  The front of the

11   check, they could have seen how it was improperly made out,

12   and the back of the check, they could see which accounts they

13   went into.

14         If they simply made out those checks -- and everyone

15   agrees with this, if they had simply made out those checks

16   properly to Russell Laffitte as conservator or personal

17   representative for Mr. Badger, Mr. Pinckney, Ms. Thomas,

18   whoever the client might be, none of us would be here.  That

19   was the beginning of the whole calamity, the entire fraud.

20   And Alex Murdaugh was there manipulating and conning the

21   people that he worked with, next with, next-door, in the

22   offices, within there at that law firm for 30-plus years.

23         And Ms. Limehouse makes a big deal about using one

24   loan to pay off another loan.  There's nothing wrong with

25   that.  It happens literally every day at every bank in

1    America.  And many people refinance a home loan.  Again, as I

2    said, refinance college loan, have an opportunity to get a

3    lower interest rate, you pay off with another loan.  But you

4    don't owe any less money.  You owe the same amount of money,

5    maybe a lower interest rate, but the loan is still your

6    responsibility.  And Russell has been paying off the loan to

7    Johnnie Parker each year as required by the loan terms.

8            You know, Mr. Austin will have a few words to follow

9    up with what I said on a few different issues.  But, you

10   know, the Government, the Government gets to go last.  But

11   they do not have the last word.  The last word rests with

12   you.  And that word should be not guilty, that Russell

13   Laffitte never defrauded his family and his family-owned

14   bank.

15           And as you've seen throughout the trial, Russell

16   Laffitte was always acting in what he thought was the best

17   interest of the bank.  He always acted in good faith.  He was

18   relying on Alex Murdaugh, the lawyer, the guy with a proven

19   track record.  And Alex Murdaugh, I told you in opening, he

20   was a master manipulator and a world-class con man.  And,

21   boy, did we ever see that in these past two weeks.

22           But, you know, Ms. Limehouse says, you know, he --

23   pretty much implies that Murdaugh manipulated and conned his

24   law firm and all these really smart people, sophisticated

25   financial people at the law firm, but he couldn't con and

1  manipulate Russell Laffitte who knows only about one side of

2  the transactions?  It's just doesn't make sense.

3        I described him, Alex Murdaugh, as an enigma, a

4  complicated witch puzzle.  He was trusted by everyone.  And

5  his clients loved and revered him.  It shocked them all that

6  the man they thought they knew, their trusted friend, tricked

7  and stole from so many people, including them.  How did it

8  happen?  Without the law firm's unwitting participation, it

9  could never have happened, and we wouldn't be here.

10        When we peel back the onion over the past two weeks,

11  we saw Alex Murdaugh trick and fool so many people from so

12  long ago.  We heard witnesses tell us, as I promised you they

13  would, that he helped a lot of people, and seemed to care

14  about everyone.  That was part of -- that was his dark side

15  that no one knew.

16        When he was trying to trick people, he created this

17  chaos, this stream of confusion, always in a hurry, always

18  rushed, everything at the last minute, everything at a

19  deadline, everything on a late Friday afternoon, or coming in

20  the bank at lunch time when few employees are around and

21  people off to lunch.  He took advantage then of the chaos and

22  confusion that he created.  And that was part of the scheme.

23  And people thought at the time -- you heard the witnesses

24  say -- but we thought that was just Alex being Alex.  We

25  didn't know.  We thought he paid no attention to detail.

1    That was Jeanne Seckinger, who was the chief financial

2    officer.  They all thought that at the law firm, the lawyers,

3    the staff, they all thought it.  And he took advantage with

4    chaos and confusion.

5         Ronnie Crosby testified he was patient in his

6    scheme.  He would do something and just wait, he says, like

7    in the Badger case.  Well, in the Badger case, that original

8    check, that original check that was written for $1,325,000

9    that you heard so much about, well, it was written in

10   September 2011.  Now, it never reaches Palmetto State Bank.

11   Everyone now agrees with that.  It never reaches the bank.

12   But it was written in November 2011.

13        The very last check in that scheme where he steals

14   the last bit of money is written in June of 2014.  He parked

15   that money and kept it there, patiently waiting to complete

16   his fraud and steal the rest.

17        Crosby also testified he did it so many times.  He

18   voided checks, had checks rewritten, stopped payments on

19   checks, canceled checks, had checks rewritten again, wrote

20   down large checks into smaller checks to avoid suspicion.

21   Everything he did was planned out and plotted, as they said,

22   well in advance, taking advantage of the confusion and chaos

23   that he created.

24        Ms. Seckinger, Jeanne Seckinger, experienced, worked

25   at the firm, was CFO for, I think she said, 30 years.  He was

1  patient.  He would plot things out.  The Alex I thought I

2  knew never existed.  And Russell Laffitte would tell you the

3  same thing.

4       And Ronnie Crosby said the level of his deceit was

5  unimaginable.  They worked together day in and day out.  He

6  testified they had some 25 to 30 cases together over the

7  years.  And he says, the level of deceit was unimaginable.

8  In fact, it was mind-boggling.  Alex fooled us about who we

9  thought he was.  Yes, he was somebody other than who we

10 thought he was.

11      And Ms. Seckinger said, I trusted that Alex was

12 telling the truth, that's why the checks were written the way

13 they were written.  We wouldn't be here, she said further, if

14 it had not been for Alex Murdaugh that he done any of this.

15 Things are wrong on our side.  She's talking about her law

16 firm side.  And final quote I can give you, "I don't blame

17 Russell."

18      Now, let's look at the Badger check.  The first

19 check Jeanne Seckinger cuts is a check for $1,325,000 made

20 payable to Palmetto State Bank.  Now, we know -- I don't

21 think the Government knew this when they got this case, but

22 now we all know that check never hit the door at the Palmetto

23 State Bank.  Russell Laffitte, he never saw that check.  No

24 one at the bank saw that check.  That check was never

25 processed, never processed at Palmetto State Bank.

1    Please pull up Government's Exhibit 219.  It is the

2  check dated November 19th -- excuse me, November 19th, 2012,

3  Palmetto State Bank.  And this is the void.  This is the

4  void.  This is where they void, "Void settlement

5  proceeds/Arthur Badger."  Okay?  And the void itself,

6  Palmetto State Bank never sees that.  Russell Laffitte never

7  sees that.  Never sees the original check, $1,325,000, never

8  sees the void.  All part of the scheme to trick both sides,

9  one beside, the bank's side not knowing what's going on with

10  the law firm, and the law firm not knowing what's going on at

11  the bank.  The master manipulator manipulates again.

12    Will you pull up Exhibit 68.  And that's the e-mail

13  chain.  The Government brought up themselves, refers Russell

14  Laffitte and Alex exchanging e-mail.  And then on February

15  the 8th, Alex Murdaugh forwards that e-mail about, breaks

16  down the checks into four -- into four separate checks.  But

17  that's not what happens.  $709,000, which would be the fourth

18  check, never makes it over to Palmetto State Bank.  We know

19  these other three do and they were negotiated, but the four

20  don't.  Now, remember, Russell Laffitte doesn't know anything

21  about the $1,325,000 that's been written and stopped and

22  voided afterwards.

23    But instead of re-cutting it into four checks, he

24  re-cuts it into three checks.  Again, the check, the

25  $709,586.45 never graces the front door of Palmetto State

1  Bank.  It was never -- it never arrived there.  It was never

2  negotiated, never processed.  Just as the case of $1,325,000

3  check, never saw the light of day at Palmetto State Bank.

4        Pull up Exhibit 65, please.  September the 10th,

5  2013, a stop payment order.  And look at this, the date of

6  the check is February the 8th, 2013.  Okay?  And the date on

7  the stop payment order is September, months later, September

8  the 10th, 2013.  Again, Russell Laffitte doesn't know

9  anything about this because they never received the check in

10 the first place.  And then Alex Murdaugh patiently waits

11 three months.

12       Please pull up Exhibit 66.  Let me put this on the

13 easel.  This is for you to look at.  Okay.  We know about

14 these checks here, right, these early checks.  But then we

15 get to one, two, three, four, five, six, seven, eight, nine,

16 these last nine -- okay, these last nine, they are all cut --

17 these are cut -- 11, actually, but they are like 9/13,

18 9/13/2013.  And you go all the way over.  Look when they are

19 negotiated, in October 28, October 29th.  And then it gets

20 more.  This one's December 18th, December 19th, January 21st,

21 January 21st, May 14th, and as I mentioned earlier, June

22 25th.  He patiently waits some two years to complete the

23 fraud.  Going back again, the original check, the $1.325

24 million check, does never reach Palmetto State Bank.

25       Please pull up Exhibit 69.  This is the $101,369.49

1   check to Bank of America, last one written.  You see right

2   down here, this date is 6/25/2014.

3         Will you pull up the check itself?

4         Look at the heading on that check.  It's the PMPED

5   law firm client trust check -- client trust account.  One of

6   the witnesses testified those were yellow checks.  I believe

7   Ronnie Crosby testified to that.  Okay?  And clearly, the

8   check is made out to Bank of America.  And the bottom memo

9   line says settlement proceeds.  Here it is, signed by none

10  other than Alex Murdaugh.

11        Now we find out he's got an account over at Bank of

12  America.  And so that check goes into Bank of America.  We

13  don't know anything about that check.  That's -- these two

14  checks both are made out to Bank of America.

15        Pull up Exhibit 70, please.

16        $50,684 to Bank of America.

17        I'm sorry.  This is the very last one, I believe.

18  Yes.  This is May the 12th, 2014.  So you see, again, on the

19  trust account, Bank of America, settlement proceeds, Alex

20  Murdaugh.

21        Now, Alex Murdaugh, as a senior partner in the firm,

22  was one of the owners of the firm.  He had check-writing

23  authority.  So any bank that got a check signed by Alex

24  Murdaugh on these accounts, it's presumed -- I mean, he is an

25  owner of the account, owner of the firm, he can sign the

1    check.  He's got that authority.

2          So we know he tricked and fooled the folks at PMPED,

3    the law firm.  He tricked and fooled Russell and the people

4    at Palmetto State Bank.  He tricked and fooled now the Bank

5    of America.  He tricked and fooled the Government, which I

6    don't think the Government ever knew about the $1.325 million

7    check.  The bank never received it.

8          And please pull up Count 1 of the indictment.  Okay.

9    And please page 6 call up, the highlighted portion.

10    Following the settlement, the indictment alleges, the law

11    firm issued one large check for $1,325,000 to fund a

12    structured settlement.  Well, that would be a mistake right

13    there because everyone knows, the firm sure knows it, the law

14    firm, everybody knows Palmetto State Bank is a smaller bank,

15    isn't a huge bank, didn't fund structures.  That's for the

16    insurance company or some big bank.  That's not this small

17    bank.  The bank customer directed Russell Lucius Laffitte to

18    e-mail him and requested the law firm re-cut the check in an

19    amount determined by the bank customer.  Russell complied

20    with the bank's request.  But we all know now, the Government

21    clearly didn't know that then, because the bank never saw,

22    never negotiated, and never processed that $1,325,000 check.

23          Alex Murdaugh, Alex Murdaugh never brought in a

24    check for $1,325,000.  There's certainly no make by Russell

25    Laffitte here.  And that's the beginning of it all.  That's

1  the premise of that whole count, that entire fraud.

2         And talking about memo lines, John Peters testified,

3  and he's the compliance officer, that it's up to the customer

4  to keep track who he's writing checks to.

5         When I think of memo lines, I think of my wife,

6  because she writes checks too.  We've got a neighborhood boy,

7  good kid, comes down trying to earn a little extra money, he

8  asks if he can cut the yard, and she will allow him to,

9  request him to sometimes, and she will write him a check.

10  And you know what she put in the memo line?  Thank you.  I

11  put in the memo line, if I pay a plumber and it's Joe Jones,

12  I might not remember who Joe Jones is, so I put in the memo

13  line "for plumber," because the memo line is for the customer

14  to keep track to whom the check is written, where the check

15  went.  If you write a check at the beginning of the month,

16  you don't get your payment until five weeks later, six weeks

17  later.  You can't remember every check.  It's for the bank

18  customer, not for the benefit of the bank.  In fact, it has

19  no impact.  John Peters testified to that.  It's got no

20  impact on the bank processing the check.

21         And the barrage of questions about the many

22  documents that Ms. Limehouse asked about, when she asked -- I

23  believe she asked Russell, and she said, you know -- I

24  said -- she said were those reviewed -- and I will tell you,

25  those same questions could be asked about Ms. Seckinger, Mr.

1    Crosby, the accountant, or the financial folks over at the

2    PMPED law firm.

3         And let's look at the $750,000 loan, Government's

4    Exhibit 6 please.  The August 17th, 2021, minutes of the

5    Board.  Those present, I think you will see it's most of the

6    Board, if not all the Board members.

7         And page 2, highlight the second paragraph.

8         Elizabeth Malinowski commented, the $750,000 loan

9    did not have -- did not appear to have been approved by the

10   Executive Committee.  Russell Laffitte explained at that

11   Board meeting three of the five Board members -- excuse me,

12   three of the five members of the Executive Committee approved

13   that loan.

14        Exhibit 76, please, the minutes.  Please call the

15   heading.  Okay.  And call out page two, paragraph 4.  All

16   loans over $25,000 were reviewed, discussed, and approved.  A

17   copy is attached.

18        Pull up Exhibit 75.  Call out the heading.  Call out

19   the heading, if you don't mind, so we can see that.  This is

20   the period of time of August the 1st to August the 31st.

21   Richard Alex Murdaugh approved loan $750,750, bringing his

22   total exposure to the bank to 34 -- 35 -- $3,545,647.

23        And Jan Malinowski testified -- interestingly, Jan

24   Malinowski was the head of the Beaufort branches.  And he

25   pretty much -- was a Board member.  You could tell, by the

1 book, square peg, round hole, not good.  That was Jan

2 Malinowski.  He testified Russell, Mr. Charlie, and Gray

3 thought the $750,000 loan was in the best interest of the

4 bank.  And so I asked, could he use the 750 loan for

5 something other than beach house renovations?  Despite what

6 Ms. Limehouse said, he testified yes, he can.  Should he?

7 No.

8        And Ms. Limehouse makes it sound like that $750,000

9 never had anything to do with the beach house.  Well, started

10 off with an appraisal way back I think in April, if not

11 earlier, to get it appraised.  Then Maggie Murdaugh's

12 supposed to meet him.  And she tragically dies that day or

13 the next day she's supposed to meet him.

14        But there was also testimony that it was going to be

15 later on converted into a loan, a real estate loan, secured

16 by that real estate.  And that was when Maggie Murdaugh's

17 estate finally opened up.  The bank's lawyers are actively

18 pursuing that.

19        And Ms. Limehouse brought out in her argument that

20 the $750,000 loan was never documented, not until August.

21 She must have misunderstood that, or didn't remember properly

22 because there was testimony early on that the $750,000 loan

23 was in the LNOS system, loans not on systems, because there

24 was a money order, a cashier's check.  And Russell Laffitte

25 is the one that started the practice at the bank years ago so

1    that those kinds of loans would appear.  It was not already

2    on books of the bank, but it was on the loans not on system

3    so the bank would know, every branch would know, right, so

4    somebody else didn't go and make another loan or do

5    another -- issue another money order or cashier's check.  So

6    it was in the system.  It wasn't in the full system, but it

7    was on the LNOS, loans not on system.

8           And Russell Laffitte testified the $750,000 loan, we

9    approved it, my father, my sister, and I approved it.  And he

10   testified to y'all, as you heard numerous times.  He could

11   not approve it by himself, he said, since it was over his

12   lending limit.  So he discussed it with his father.

13   Discussed it with his father and Gray Henderson, as three of

14   the four members of the Executive Committee, went in and

15   approved it.  And both of them testified that they approved

16   it, but I'm talking about both Mr. Charlie Laffitte, Ms. Gray

17   Henderson.  They approved it before a single penny ever left

18   Palmetto State Bank, before that wire transfer.

19          The Board later, as you just saw, on September 21st,

20   2021, unanimously approved the full loan.  No objection.  No

21   discussion.  No written objection at a later date.  They

22   fully approved that $750,000 loan.

23          And remember, it seems the Government doesn't want

24   you to think of, is that long-term, 30-year track record that

25   Alex Murdaugh had, borrowing money, paying it back, with a

1   good interest rate on it.  The bank's testimony was they made

2   over $4 million of Alex Murdaugh's loans.  That was just in

3   the past 10 years alone.  He had the income to justify it.

4   He had the track record to justify it.  And he had the assets

5   to justify it.  In all those 30 years, the Board approved

6   every loan over -- every loan over $25,000.

7           Finally, the Badger settlement.  Mr. Charlie

8   Laffitte testified he had a lengthy discussion with Gray

9   before they agreed with Russell, and Russell delivered the

10  check.  He also thought that the bank had some responsibility

11  and it was a good resolution.  It was paying back the

12  customer to make him whole, just what you would hope your

13  bank and my bank would do.

14          Pursuant to the bylaws as chairman, Mr. Charlie had

15  the authority by himself to settle the matter and make the

16  agreement with PMPED.  Russell Laffitte, as CEO, also

17  pursuant to the bylaws, had the authority to settle the

18  Badger matter and to enter into an agreement with PMPED.  Ms.

19  Limehouse conveniently left that out.

20          Gray Henderson, the board secretary and member of

21  the Executive Committee, testified Russell Laffitte, Russell

22  had the authority as a chief executive officer.  She further

23  said the CEO can do agreements, contracts, hiring, and

24  firing.  He runs the company.  She said, "We all talked about

25  it, and I said absolutely, do it, but they didn't need me."

1    They each had the authority to do it by themselves.  She

2    assured -- she also testified, yes, the Executive Committee

3    could issue it also.

4         In cross-examination, Mr. Holliday from the U.S.

5    Attorney's Office, asked Gray Henderson, did Russell tell you

6    when you were approving the $680,000 Badger settlement that

7    the money was under the custody and control of Palmetto State

8    Bank is going to pay Johnnie Parker for the loan?  And she

9    said, by that time, we had copies of all the Badger checks at

10   that point.  Mr. Holliday then asked, so you approved it?

11   And she said yes, because we had -- we were trying to make

12   the customer whole.  They discussed it, as you see October

13   31st, '21, meeting, and that's when they asked Russell to

14   ask Ronnie Crosby's firm to put a pause on negotiating the

15   check.

16        Please bring up Government's Exhibit 223, and begin

17   at page 12.

18        The next subject was Badger:  Badger is the matter

19   we discussed in that meeting.  It's something that Bland &

20   Richter, to our knowledge, had no familiarity with the case.

21   Then he explained, this is a case where Ronnie Crosby came to

22   Russell.  And you can read the rest of the page.  And Ronnie

23   asserted the bank had responsibility for approximately 1.3

24   million that Alex sent through the bank by making checks

25   payable to PSB.  They had a handshake to settle it.  And

1    Russell gave him a check for 680.  On our meeting on Sunday,

2    we asked Russell to ask Ronnie to put up -- to hit a pause,

3    which he kindly did.  And I had a good chance, good chance to

4    talk to Ronnie.  Some of my concerns was, how is this going

5    to be implemented.  Ronnie started thinking that I was

6    contesting the bank had a liability.  I assured him we were

7    not here to retread the deal, under the circumstances.  What

8    we wanted to know was, what did he have in mind.  Was he

9    going to Mr. Badger and make some contention the bank or

10   contend the bank did something wrong or somehow bring up

11   Palmetto State Bank, PSB.  Ronnie, who I know very well, not

12   as well as other people, but I know him extremely well, I've

13   worked with him, assured me that he would not even mention

14   the bank in any conversation he had with Mr. Badger.  He said

15   he was going to treat it just like other clients who had lost

16   less money.  What he would do is he would call them in and

17   say, we've been looking at this file that Alex handled for

18   you and would like to talk to you about it, set that

19   appointment, and meet with him and explain there had been

20   discovered a shortfall, and the firm wanted to reimbursement

21   him.  Ronnie said that all the people they have done this

22   with have been extremely appreciative, and nobody has

23   suggested that they are going to bring a claim against the

24   firm.  I thought if I had to pick anyone to make this pitch

25   to the client, it would be Ronnie Crosby.  He's a genuine,

1    stand-up guy, and I think -- I don't think he would try to

2    throw the bank under the bus at all.  You may be thinking,

3    but why would he want to do this if he's not getting a

4    release of anybody from Mr. Badger?  Well, the law firm can't

5    get a release from Mr. Badger because that would be -- he

6    does not have separate representation.  And they can't

7    release the claim about their own wrongful conduct.  They

8    can't have their own client release them under these

9    circumstances.  As far as we're concerned, we don't want any

10   suggestion that we're paying money.  And I think if he

11   brought up a release, it might incite things rather than calm

12   things down.  What we do want is to make sure there's a

13   release from PMPED to the bank for anything at all having to

14   do with this so that if Mr. Badger, say, 1 in 10 ends up

15   suing, even though he's been fully satisfied, and Ronnie has

16   a receipt that he received the payment, putting aside loss of

17   the use of funds, if he brought that claim, the law firm

18   could not sue the bank, couldn't bring the bank in the case.

19   Now, if he brought the bank in the case, we'd just have to

20   deal with that.  But in our view, the lawyers talked at

21   length about this at the Litigation Committee meeting which

22   was held October 31st.  And everybody believes we are better

23   off having Ronnie go and satisfy Mr. Badger by handing him a

24   check and using his diplomacy, so if by chance anything about

25   Badger gets out, and Bland and Richter get ahold of it, then

1    their case will be much less, because unlike Satterfield,

2    their alleged victim will have been fully compensated by the

3    law firm, and we will be side-by-side with the law firm in

4    that.  So that is our thinking about Badger.  We are going to

5    have to report Badger because we have subpoenas and we've

6    asked for all Murdaugh transactions.  And this is something

7    the criminal authorities are going to be very interested in,

8    the Office of Disciplinary Counsel, SLED, all that.  So we

9    wanted to get ourselves in the best position that we can be

10   in if we have to weather a storm.

11        Page 19, please.  Was that page 19?

12        Yeah.  We want to make sure we fully agree that we

13   are getting a release.  Russell said we are paying it.  We

14   don't want to pay this and have them come back one -- for

15   more money later on.  We want to be closed vis-à-vis the

16   firm.

17        Mr. Jim Gibson on the Board:  Well, you certainly

18   have done a good job of bringing this thing hopefully to

19   conclusion early on before it gets really messy.  But thanks.

20   Well, I hope so.  This could easily get cartwheeled out of

21   control.  We've seen that happen in other aspects of all

22   these instances.  We've got to do everything we can.  Time is

23   of a premium.  Thank you.

24        Everyone knew.  Everyone on that Board knew about

25   the $680,000 settlement.  And everyone was just fine with it,

1    because they wanted it to quietly go away.  They were only

2    going to pay half.  And they all agreed that they were

3    responsible along with the law firm.

4            And even today, significantly, even today, no one at

5    Palmetto State Bank, not the lawyers, not a member of the

6    Board, not a single officer, has asked for that $680,000

7    check back.

8            In closing, ladies and gentlemen, I think I'm a

9    pretty patriotic person.  I think, like most people in public

10   service, I think of the beaches of Normandy in World War II

11   when our Greatest Generation saved our way of life.  I still

12   tear up when I think of the unending rows of white crosses

13   overlooking Normandy Beach containing brave men who fought

14   and died for our freedom.  I'm a proud American.  But I'm

15   also proud to live in a country, the United States, where I

16   can be -- I have the freedom to be critical of our

17   Government.  And today, I am critical.  And I will tell you

18   why.  I make no apologies for that.  Do they?  They have gone

19   after a man, Russell Laffitte, they say defrauded a bank, his

20   very own family bank.

21           This man, Russell, never set out to defraud a bank.

22   There's a reason verdicts have to be unanimous.  There's a

23   reason the Government's burden is a heavy one.  Men like

24   Russell Laffitte are that reason.  These protections are

25   critical to our justice system and our way of life.

1          I know everyone is tired.  I sure am.  Thanksgiving

2     is just three days away.  But do not waiver.  Do not buckle,

3     no matter the pressure.  This man, Russell Laffitte, is not

4     guilty.  Thank you.

5          MR. AUSTIN:  The Government started out telling you

6     that power corrupts and absolute power corrupts absolutely.

7     And I don't know about you, but I just have not heard that

8     story in this case.  I haven't heard anything even remotely

9     close to it.  Maybe with regard to Alex Murdaugh, but with

10    Russell Laffitte, I just don't see it.  You know, most of the

11    time people who have been just absorbed by power, you don't

12    see them carefully documenting everything, filing them in

13    court.  You don't see them expressing regret and taking

14    responsibility for the actions they've done.  You see

15    arrogance.  You see the types of things that you have heard

16    about Alex Murdaugh doing.

17         I think really the more appropriate tagline for this

18    case might be that there's a thin line between virtue and

19    viciousness, because this case is just -- as you know at this

20    point, it's truly unique.  And it has nothing to do with

21    Russell Laffitte.  It's everything to do with Alex Murdaugh.

22    His crimes have created a media frenzy unlike anything, at

23    least I've ever seen.  I've lived here my whole life.  And

24    you've got HBO and Netflix, all these different international

25    news and media outlets coming to tiny little Hampton, South

1  Carolina, talking about the story.  And Murdaugh now is a

2  household name, but not Russell Laffitte.  And it's because

3  it's a sensational story.

4       And I'm sorry, I'm trying to -- probably going to

5  trip here over this cord, I don't mean to be moving around so

6  much.

7       You know, it's not sexy to post stories about the

8  banker who files everything in probate court and follows the

9  law and makes loans that are legal, and then, you know, it's

10  not sexy to talk about bylaws and things like that.  Alex

11  Murdaugh is what everybody is interested in.  And that's why

12  the Government hangs Alex Murdaugh around Russell Laffitte's

13  neck every step of the way.  Within two minutes of every

14  single witness, you hear that name.  He has nothing to do

15  with the case.  We didn't get into it.  It's a circus, a side

16  show.  You are here today to focus on what Russell Laffitte

17  did.  It's really hard to do because you are constantly just

18  bombarded with all these different examples of things that

19  Alex has done or Curtis Edward Smith, Cousin Eddie for a lot

20  of people.

21       And Judge Gergel told you this is a complicated

22  case.  And it is just because it relates to finances and a

23  lot of money moving around.  But, really, it's pretty simple

24  when it comes down to it.  It's what was in Russell

25  Laffitte's mind when he was doing all the things he's accused

1    of doing, because he admits doing it all.  We could have cut

2    this trial probably in half, because I don't know if you

3    noticed the defense, we were stipulating, agreeing to just

4    about every piece of evidence coming in, because he admits to

5    doing them all.  He just didn't think that he was committing

6    a crime.  And that's a big deal.

7         The Government seems to want you to think, surely,

8    he knew, he must have known at every step of the way.  But

9    not one person has testified that Russell ever mentioned this

10   plan.  Nobody's testified that he had this deal worked out

11   with Alex, they set it up a long time ago.

12        MR. HOLLIDAY:  Your Honor, I hate to interrupt, but

13   I think he's misstating the law, as you will charge it later,

14   about the nature of a conspiracy.

15        THE COURT:  Be careful.

16        MR. AUSTIN:  Sure.  We are going to go through each

17   of the counts here.  And I submit to you that the Government

18   fails on each one because there's nothing that shows that

19   Russell Laffitte willfully, intentionally joined into this

20   conspiracy.

21        The Government alleges in the scheme and artifice

22   portion of the indictment that Russell, Alex Murdaugh, an

23   unknown co-conspirator, knowingly and intentionally combined,

24   conspired, confederated, agreed, and had a tacit

25   understanding with others, both known and unknown, and

1    engaged in a scheme, plan and artifice to defraud Alex

2    Murdaugh's personal injury clients.  They refer to them as

3    bank customer, but it's Alex Murdaugh.  I think it's safe to

4    say at this point.  And that they did so in order to obtain

5    money and property by means of materially false and

6    fraudulent pretenses, representations, and promises, and by

7    making false and misleading statements, admitting facts

8    necessary to make the statements truthful and not misleading.

9    And they also did that in order to obtain money in the care,

10   custody, and control of Palmetto State Bank.

11           And I've sat through this entire trial.  I've worked

12   on this case for a long time, and I'm still not entirely

13   clear what those misstatements are or those admissions.

14   There are a lot of e-mails where they reference phone calls.

15   And then you see a check, same day, day later.  They want you

16   to just infer from that that those two are connected.  But I

17   leave that for you to decide.  Just because there's a

18   reference to an e-mail, to a call on an e-mail, doesn't mean

19   it always happened.  You heard Jeanne Seckinger testify about

20   one of the e-mails where Russell is trying to meet with Alex

21   and he said he would come in later that day and she made a

22   joke, something to the effect, yeah, I wonder if Alex

23   actually showed up.  He was notoriously hard to pin down.

24   And so without something else connecting the two and showing

25   that they actually had these phone calls, I think it's too

1  much of a leap to draw that conclusion.

2       So let's start with Counts 1 through 3 and let's

3  focus on Russell's service as your conservator, PR, because

4  that's really how all this case begins.  And from the

5  Government's -- from the way they characterized things in

6  this case, it seems they want to think that the loans were

7  somehow kickbacks or getting conservator fees were kickbacks

8  and Russell was helping Alex steal all this money.  But you

9  heard from Tiffany Provence, the probate expert.  And she had

10  some pretty interesting things to say.  One, she says it's

11  perfectly legal to make loans from conservatorships or PR

12  accounts.  There's a statute that says you don't even need

13  court approval.

14       The Government tried to say Russell had to get

15  approved at the outset based on a little introductory

16  paragraph in that statute.  But she said that's not totally

17  accurate.  The Court needs to set that order in place.  And

18  then they point to an order saying that he needed to get

19  expenditures approved.  But they said these are not -- these

20  loans were not expenditures.  They were investments and they

21  made money.  You heard Russell testify earlier about making,

22  I believe it was, $19,000 last year or in the last year for

23  Hannah Plyler.

24       It's seems like a crazy thing to come up in a

25  federal criminal case that somebody is doing these loans and

1    there's this allegation that somehow they are improper.  It's

2    like going the speed limit and getting pulled over for going

3    the speed limit.  I was doing what I thought I was legally

4    allowed to do.  It just doesn't make sense.

5           And Russell is relying on Alex Murdaugh, who he

6    thought was his lawyer, and somebody that he's grown up

7    around.  This is something that Mr. Daniel was just talking

8    about.  All the signs that the Government wanted Russell to

9    see were missed by him and everybody else down there.

10   There's not anything I can see at this point that really

11   separates Russell from anybody else that was tricked by Alex

12   Murdaugh.  And the thing about this, with what we know about

13   Alex Murdaugh at this point, does it really makes sense with

14   his photographic memory and all these different crazy things

15   he's involved with, that he would get involved in a

16   conspiracy with the one guy that files everything in probate

17   court, signs his name to it, documents the loans, shows the

18   work he's doing?  It doesn't make any sense.  Criminals

19   usually try to hide their conduct, not filing it in the

20   court.

21          We are not fighting this in probate court.  He's not

22   charged with violating his fiduciary duties.  There could be

23   civil ramifications for all of this.  That's fine.  That's

24   not what we are here to talk about today.

25          When it comes down to it, it's what's in his mind.

1    So starting with the conspiracy charge and focusing on just

2    the conservator piece of this, because we will get to the

3    bank fraud piece of this later, but let's look at the actions

4    he took as conservator.

5           There's been a lot of talk about the amount of fees

6    that he received.  And Tiffany Provence testified that

7    conservators are paid typically at the discretion of the

8    court based on a reasonable standard.  So the conservator is

9    paid a fee based upon what the Court determines reasonable.

10   And what's reasonable in one county or one situation is not

11   necessarily the same for every other county.  There's 46

12   counties, 46 different probate judges, wide variation.  She

13   said 5 percent conservator fee is not usually high.

14   Conservators do not set their own fees.  The judges have to

15   review the fees for reasonableness.  It's also not unusual

16   for a conservator or someone that serves as conservator or PR

17   without actually meeting the beneficiaries.  She said she's

18   done it multiple times.  There's all sorts of examples she

19   laid out.  There's no requirement to have a one-on-one

20   relationship.

21          When the Plyler sisters testified -- and it's

22   terrible that they had to come in and talk about anything

23   that happened in their past.  I wish it wasn't part of this

24   case.  They talked about Russell in pretty fond terms.  They

25   remembered him being basically a father figure.  That wasn't

1    even his job.  He put a lot of work into helping them.  I

2    believe he testified to drivers ed classes, different things

3    like that.  He helped them buy houses, look at houses.  He

4    was an involved person.  And, yeah, it wasn't the same amount

5    of involvement in each one of these conservatorships or PRs,

6    but that's not necessarily anything bad or malicious or

7    nefarious.  She said the conservator duties basically -- the

8    word "conservator" stems from the word conserve.  So your

9    responsibility is to conserve the assets, further benefit as

10   they age, when they turn age 18.  There's not been any

11   testimony that anybody was shortchanged at the end of their

12   conservatorships.  He paid the loans off, as he's supposed to

13   do.  When there's testimony about him checking people's ages,

14   that could be viewed through the lens of Alex Murdaugh and

15   everything.  It could also be viewed through the lens of him

16   being responsible and doing his duty as conservator.  He was

17   allowed to make loan.  He needed to make sure the loans were

18   paid off and earned interest.

19        If he had just left the money sitting there and

20   didn't touch it, didn't invest at all, he would have done his

21   job.  He's not required to be a dad.  He's not a guardian.

22   He's not required to get involved any more than he did.  But

23   there are times he went above and beyond.  But, I mean, the

24   fact that he didn't do that in every case just doesn't

25   matter.  It doesn't mean that he was trying to rip people

1    off. Doesn't mean that he knew that Alex Murdaugh was

2    stealing from people. Again, there's been no evidence that

3    Russell intentionally tried to help Alex Murdaugh accomplish

4    any of these goals.

5        Let's look at the overt acts in the conspiracy.

6        If we pull up the indictment, please. And can we

7    please go to page 3 -- I'm sorry, page 4.

8        And so this starts with his actions as conservator

9    for the Plylers. If you look through each of these

10    paragraphs. It's really hard to tell what conduct is alleged

11    to have been criminal. I am not going to go through each

12    line by line, but there's no requirement that you run loans

13    past the judge in the probate court beforehand. We covered

14    that.

15        MR. HOLLIDAY: Your Honor, I'm sorry to interrupt

16    again. This is not the overt act section. This is just

17    describing the scheme. So this is not --

18        THE COURT: That is correct.

19        MR. AUSTIN: Okay.

20        THE COURT: Mr. Austin, be careful.

21        MR. AUSTIN: Let's go to -- bear with me for just a

22    second.

23        If we can go to page, I'm sorry, 11.

24        Again, writing these checks by itself is not a

25    crime. It's allowed under statute. You've heard Tiffany

1    Provence testify to this. You've seen it in the statute.

2    And Russell doesn't deny writing any of these checks. That's

3    something to keep in mind every step of the way. He doesn't

4    deny doing it. And that's a pretty important piece of all of

5    this.

6        If you go through for subparagraph (a), we've

7    covered other pieces of this, but at the very end, it says,

8    "as directed by the bank customer." Again, this goes to

9    Russell's state of mind. He's relying on somebody that he

10   thought was honest, an upstanding member of the Bar, someone

11   who is well-thought of, well-liked. That's been a very

12   consistent theme. Everybody is shocked. And you see the

13   same thing again in Subsection (b) or subparagraph (b), I

14   should say, "as directed by the bank customer."

15       And then subparagraph (c) is interesting. And this

16   ties in with some of the later counts. And it says that

17   Russell negotiated the check here. It's $150,000 check to

18   Hannah Plyler, at Alex Murdaugh's direction and knowing that

19   the money belonged to the estate of Donna Badger and/or her

20   beneficiaries. Well, Russell Laffitte was not Arthur

21   Badger's beneficiary.

22       MR. HOLLIDAY: Your Honor, again, we took this up in

23   the charging conference. It's going to be covered by you and

24   he's misstating what you're about to charge.

25       THE COURT: The definition is set up in Footnote 3.

1    Please be careful, Mr. Austin.

2        MR. AUSTIN:  Looking subparagraph (b), remember what

3    Russell said, the Murdaughs were the law in Hampton County.

4    They were synonymous with law enforcement.  Alex Murdaugh was

5    a part-time solicitor.  That doesn't mean that there weren't

6    red flags that could have been caught, but it makes sense

7    that some of them were missed.  And if you look at the --

8    well, I will move on from that.  I don't want to get in

9    trouble.  I apologize.

10       And, again, the Government claims that Russell took

11   some of these actions in an effort to hide his involvement

12   with Alex Murdaugh.  But they ignore the simple fact that he

13   filed everything in probate court, also turned them over to

14   law enforcement before the Board started finding out what was

15   going on.  The law firm contacted him.  He was providing

16   documents.  Most of the documents you've seen in this case

17   Russell has provided to law enforcement.  That is not the act

18   of somebody who's trying to hide something, who's trying to

19   cover something up.  Again, why would Alex Murdaugh choose to

20   conspire with somebody who was to file everything in court

21   and document everything.  It doesn't make sense.

22       So turning to Count 2, the bank fraud count.  It

23   alleges that Russell knowingly executed a scheme and artifice

24   to obtain money in the control of Palmetto State Bank by

25   means of false, fraudulent pretenses, representations,

1    promises, and that he aided and abetted Alex to do just that,

2    and that he did this by negotiating and distributing a check

3    for $101,000 to Hannah Plyler, knowing that they belonged --

4    money belong to the estate of Donna Badger's beneficiaries.

5         Again, it's really important -- and I don't want to

6    veer into the Court's ruling here, but it's really important

7    to remember that only $500 passed through Donna Badger's

8    estate.  And so unless you have a broader definition of what

9    that estate means --

10        MR. HOLLIDAY:  Your Honor --

11        THE COURT:  Mr. Austin, we've already discussed

12   this.  The definition in Footnote 1 on page 3 of the

13   indictment says that it includes both the Badger estate and

14   Arthur Badger.

15        MR. AUSTIN:  I understand.

16        THE COURT:  Please don't repeat that again.

17        MR. AUSTIN:  Okay.

18        Setting that aside, the biggest point here is that

19   Palmetto State Bank never got the $1.325 million.  They want

20   you to rely on this re-cutting e-mail that he received months

21   earlier from the first check.  Remember, he had not been

22   involved.  And so the numbers didn't make sense to him.  He's

23   testified to this.  There's no reference to Badger anywhere

24   in the e-mail.  And where did he say that he found it or

25   Russell found the document?  He found it in probate court, or

1    he filed it under Hannah Plyler file.  Why would he do that

2    if he thought that he was committing a crime?  Doesn't make

3    any sense.

4         It also ignores the fact that Palmetto State Bank

5    didn't even do structured settlements.  Something that is

6    called for in that disbursement sheet.  As Mr. Daniel told

7    you, this all goes back to Alex Murdaugh's original plan to

8    hide everything from everybody else that was involved.

9         Next, going to Count 3, this ties back again to the

10   Badger case.  Everything we've just been talking about

11   applies to this as well.  There's been testimony and argument

12   from the Government that at the September 6th bond hearing

13   that Russell participated in, or he testified, that he said

14   he didn't see the disbursement sheet.  But what's left out of

15   this discussion is context.  Russell took the stand, as he

16   has done here.  He has testified with ODC.  He talked with

17   the Government.  He talked with the State.  He's talked with

18   everybody.  And he didn't have any documents in front of him

19   when he was asked.  He was asked about the disbursement

20   sheet.  And he said, I saw it.  But there were no follow-up

21   questions asking when he saw it.  And that's an important

22   point.  At that point, and this is in September, of course,

23   he had seen it.  That had become a major part of this case.

24   But that doesn't mean he was saying he saw it years ago.

25   Remember, so much of this conduct took place 10 -- 5, 10

1    years ago.  And somehow Russell is expected to remember every

2    single detail of every transaction, whether he took a phone

3    call or he didn't, all these different things.  And I just

4    think it's taking it a step too far to hold him criminally

5    liable for things that are just not supported by any other

6    evidence other than transactions that he admits to and that

7    he filed, evidence supported in court.

8        It alleges as well that this whole scheme affected,

9    or just this portion of it, affected Palmetto State Bank, the

10   wire fraud count.  I submit to you, we haven't seen any

11   evidence that that's happened.

12       Russell had the authority to settle any lawsuits,

13   any disagreements.  He could enter contracts.  He was the

14   CEO.  And whether other Board members disagree about his

15   interpretation of the bylaws is really irrelevant.  He's

16   trying to do it in good faith.  The bylaws clearly read like

17   they would allow him to do it.  So if some other Board member

18   comes in here and says it's absolutely not correct, it's an

19   interpretation issue.  Doesn't mean he's committing a crime.

20       So let's talk about the $680,000 in Count 4.  Ms.

21   Limehouse read an e-mail from Jan Malinowski about this from

22   the fall of 2021 where he asked about more similar

23   transactions.  And he said at the end of it, per PMPED.  He

24   wasn't asking if Russell knew about any of the transactions

25   similar to this that he had engaged in himself.  He was

1    asking if the law firm had identified anything else.  There's

2    been no testimony that he told Russell at that point about

3    everything they've discovered in their internal

4    investigation.  It was an ongoing process.  It was dynamic.

5    As you heard Becky Laffitte testify, everybody was in damage

6    control.  It was a chaotic time, because nobody saw any of

7    this coming.  It's easy for us, with the benefit of

8    hindsight, to look at all of this and see Alex Murdaugh as

9    this obviously sinister actor.  But to the people that were

10   living in Hampton County, that just wasn't the case.

11        And you've heard from victims.  Arthur Badger, he

12   said he looked up to Alex Murdaugh.  Even with everything he

13   knows now, he still has a hard time reconciling that with the

14   person he knew.  And that's consistent.  Appeared to be the

15   same way with Jeanne Seckinger, Ronnie Crosby.  It hurts

16   people to find out that someone has been lying to them for

17   years.

18        I don't think that anybody in this case has

19   testified that Russell pulled the wool over their eyes in the

20   same way.  They may worry he did something improper, but

21   that's a much different situation.

22        And I think it's kind of funny that y'all got -- you

23   were picked to be on a jury related to the Murdaugh case, and

24   you got probably one of the most boring cases related to the

25   Murdaughs, talking about bylaws and all these financial

1    transactions, not all the good, juicy stuff that makes this

2    whole thing so interesting.

3        But if you look through bylaws, this is just what I

4    was just talking about, there are three layers of authority

5    that allowed Russell to make this payment.  First, as CEO,

6    that's what we were talking about, he had the authority of

7    CEO; second, his dad could do it.  His dad supported it.  He

8    testified to it.  He had no problem with it.  They had just

9    settled a different lawsuit where the money didn't even touch

10   Palmetto State Bank.  And they thought this was a good idea.

11   And third, he could do it with three-fifths of the Executive

12   Committee voting for it.

13       And it's just unfathomable to me that the Government

14   has come in and tried to dissect that decision and act like

15   it's purely an effort to cover his tracks.  Because,

16   remember, Russell filed everything showing how that money was

17   distributed in Hannah Plyler's account -- or in her probate

18   files.  Again, it doesn't sound like somebody -- doesn't look

19   like somebody who is trying to hide what they are doing.  And

20   the Government can say that he relied on judge -- or the

21   probate judge down there not reading it.  But that's not his

22   problem.  He files it in court.  He's doing what he's

23   supposed to do.  He's complying with his legal duties.

24       And it also gets to -- a really key piece of this

25   was the motivation for people to testify.  And on direct

1   examination by the Government, their own witnesses, these

2   Board members, testified that they were shareholders of the

3   bank.  And they kept talking about how much they wanted to

4   look out for what was in the best interest of the

5   shareholders.  But in order to be on the Board, you have to

6   be a shareholder too.  And they all own a wide variation of

7   shares in the bank.

8           THE COURT:  Yes, sir?

9           MR. HOLLIDAY:  Your Honor, I think you've ruled on

10  this as well.

11          MR. AUSTIN:  On direct examination he testified to

12  this.

13          MR. HOLLIDAY:  They couldn't get into this before

14  during the trial.

15          THE COURT:  Let's hear a little bit more.

16          MR. AUSTIN:  I'm not going to anything that's on

17  cross.  It's all direct examination.

18          And so they could be telling the truth.  They could

19  have completely sincere motivations for doing what they are

20  doing.  But it helps to know what people's intentions and

21  motivations are based on.  And I submit to you that there's

22  enough there in the docs.  I will leave it to you.

23          So turning now to Count 5.  This is the $750,000

24  that was loaned out by Russell and his dad and his sister and

25  eventually the Board.  So the Government argued that had

1    nothing to do with renovations.  But you heard Charles

2    Laffitte testify that all of this got started back in April

3    2021, that Maggie Murdaugh had an appraisal scheduled for the

4    day after she was murdered.  Obviously, that didn't go

5    forward.  But one thing that keeps getting lost in all of

6    this, if we could pull up Defendant's Exhibit 79 and go to

7    page 2, says:  Called again.  Work being done on the house.

8    Painters or something to push out.  Called again.  She was

9    going to Kiawah Golf Tournament for the week.  Pushed out.

10           It may not be enough work for the Government's

11   satisfaction, but there was work being done on the house.

12   And, obviously, things changed in a dramatic way when Maggie

13   and her son were murdered.

14           From Russell and his dad's perspective, it's still

15   not clear.  They don't remember fully.  Alex came to them --

16   how many questions are they going to ask somebody who's just

17   been through all of that?  At that point, they testified they

18   were not suspicious of him.  They didn't think there was any

19   chance he would be involved in this and any murders.  And,

20   you know, it's really easy to second-guess somebody in that

21   situation, but I think it's pretty reasonable to have a

22   little bit of a cautious approach to dealing with somebody in

23   that situation.

24           And there's been a lot of discussion about when the

25   information was entered into Credit Leader.  And you've also

1    heard from people like Chastity Malphrus, who said it's not

2    unusual at all to put information in later.  They will do

3    the -- go through the underwriting process, they work up the

4    loan, and go back and enter information sometimes.  Sometimes

5    there are very valid, legitimate reasons.  I think she

6    mentions auctions, somebody wants to get some equipment.

7    It's not inappropriate, illegal, or suspicious on its face.

8    And the fact that he entered -- that Russell entered this

9    information or had somebody do it shortly after he was asked

10   by Norris Laffitte about this, makes complete sense when you

11   think about him trying to give an accurate picture.  What if

12   he had left out that information?  Then they would say, why

13   aren't you giving us information?  He gave an accurate

14   picture of Alex's financial state.  There's been some

15   disagreement about what ended up in the summary that was

16   provided.  But Charlie Laffitte testified that he was the one

17   that drafted it, which makes sense.  He's the chairman.  He

18   had direct role in it.  He signed off on it.  He said that he

19   would do it again if he was asked.  He said, if he wants more

20   money, we will loan it to him.  Again, they had made $4

21   million off of Alex Murdaugh's loans just in interest.

22          As obnoxious as he was for them to try to get him in

23   to talk through everything, he was a good customer for the

24   bank.  And the fact that he was in overdraft is just a red

25   herring.  You heard multiple witnesses testify that it's not

1    unusual to give somebody a loan who are in overdraft.  There

2    are times Russell said he had plenty of money in other

3    accounts, he was just all over the place.  And they thought

4    that was just Alex.  He would just move money in from a

5    different account.

6           Again, it looks so suspicious with what we know

7    about Alex now.  But that's not how they were operating back

8    when these things happened.  You have to keep that in mind.

9           And can we go to Government's Exhibit 10B.  And can

10   we zoom in on lines 1 through 3.

11          And so this is really important.  So the first line

12   says:  Loan dated July 15th, 2021, to be used for the

13   following type of business, business expenses.

14          And then the next line it says:  Proceeds of the

15   loan and/or other extension of credit will be used primarily

16   for agricultural commercial investment or business purposes.

17          That does not mean that you have to use it only for

18   one particular purpose.  And you've heard testimony from

19   people with no skin in the game, employees at the bank.  It

20   doesn't do them any good to come in here and testify for

21   Russell.  In fact, all the people that fired Russell are

22   still in control of the bank.  Yet, they came in here and

23   they said, it is not unusual at all.

24          If you think about the number of loans that are made

25   on a monthly basis by the bank, how many customers that the

1    bank has, is it really reasonable to expect the bank's CEO to

2    go through line by line and check how the money is spent?

3    No.  At some point, the responsibility has to be on the

4    customer to do what they said they were going to do with the

5    money.

6           And I think it's so ridiculous.  One of those lines

7    showed there's payments to a funeral home.  Can you imagine

8    if Russell had called up and said, hey, you are not supposed

9    to be spending the money on a funeral?  I mean, he wouldn't

10   have a customer anymore.  It's easy for the Government to

11   come in and second guess, but these people are running a

12   business.  And it just doesn't operate like that.

13          He thought Eddie Smith was a contractor, C.E. Smith.

14   It completely lined up with what he thought was going on.  He

15   thought that there was a contractor doing work at the beach

16   house.  Again, he's not swearing on a Bible that he, like, at

17   the time that I can certify this is happening, he sent a

18   detective out there to check it.  That's what it looked like

19   to him, because he's got a million other things to do

20   throughout the day.  And they are expecting him to go and

21   just follow Alex Murdaugh around like he's suspicious of him.

22   And he just wasn't yet.  Of course, he got suspicious.

23          And, again, I don't want to say any of this to

24   distract from the fact that Russell has taken responsibility

25   for everything he's done from the beginning.  He's the only

1  person that seems to have been willing to take any

2  responsibility for their mistakes.  That doesn't mean he

3  committed a crime.  It doesn't mean that he got in bed with

4  Alex Murdaugh, he did whatever he wanted him to do.  It just

5  means he admits that he screwed up.  And when you look

6  through the testimony that has been blown up for you a

7  million times of all these different hearings and statements

8  he's given, he always says, I screwed up, I was responsible.

9        There's one million to point to where he says, we

10  negotiated, or we converted these checks.  That's it.  The

11  follow-up e-mail, he says, I was responsible.  He was doing

12  what a CEO should do.  He took responsibility.  The buck

13  stops with him.  And he suffered for it.  He's been fired

14  since.  Doesn't mean he committed crimes.

15        And the fact that he -- that Alex Murdaugh used the

16  money for different purposes after the murder of his wife, I

17  just -- I don't see it.  I don't see how that points to

18  criminal intent.

19        To go to Count 6, with misapplication of bank funds

20  and the $500,000 line of credit, there's no doubt that

21  Russell wrote and negotiated that $284,000 cashier's check to

22  pay off Hannah Plyler's loans; absolutely did.  Again, Alex

23  Murdaugh put farming in the application.  It doesn't mean he

24  couldn't use the money for other purposes.

25        I haven't heard any testimony about what the money

1   that was loaned out of Hannah Plyler's account that created

2   the need for this $284,000 cashier's check was used for.  Was

3   it used for farming?  I don't know.  These are questions that

4   need to be asked during the investigation.  I don't think

5   that they've been answered.

6          And I believe it was Charles Laffitte, Russell's

7   brother -- I know it gets confusing -- testified that the

8   business purpose statement did not specifically prohibit the

9   uses of the funds from beyond what was stated in the purpose.

10  And, you know, of course, people shouldn't come in and apply

11  for loans clearly intending to use them for different

12  purposes.  But unless you know that virtually all of it was

13  not used for other purposes, I don't know how you can convict

14  on that count.

15         It also ignores the fact that the Board voted on it.

16  They also -- it also ignores the fact that that loan was paid

17  off within three months, replaced by a million-dollar line of

18  credit.  The $500,000 was paid off with that million dollars,

19  and there's a $500,000 line of credit left over.

20         And so with Counts 4 through 6, I think there's just

21  a tremendous leap that you've been asked to make with regard

22  to the intent that Russell had.  Does it really makes sense?

23  This guy has worked at this bank, family bank, with his dad

24  and his sister and his uncles and cousins and everything.

25  That clearly is something that they are passionate about.

1  Remember on the Board, Russell, Gray, and his dad, and Jan

2  Malinowski, are the only four that are bankers.  That means

3  you've got nonbankers coming onto the Board.  They are new.

4        MR. HOLLIDAY:  Your Honor, again, this is subject to

5  your ruling during the trial.

6        MR. AUSTIN:  I mean, the business judgment --

7        THE COURT:  Hold on just a second.  Leave it.  No

8  further than that.

9        MR. AUSTIN:  Sure.  I will wrap up here.  I'm sorry.

10  I'm losing my voice.

11        Absolute power corrupts absolutely.  I just don't

12  see it.  That usually applies to people like dictators, not

13  bankers filing stuff in court and documenting everything and

14  putting his name on it.  It applies to somebody who is trying

15  to put everything on somebody else and not taking

16  responsibility.

17        Remember, he started cooperating with law

18  enforcement at the very beginning.  He didn't lawyer up, even

19  though he had lawyers.  He didn't buckle down or hunker down

20  and say, I am not going to produce anything.  He produced it

21  all.  He's testified at trial.  He didn't have to do that.

22  He wants people to hear from him.  You can judge for yourself

23  whether he was credible or not.  I'd submit to you he was.

24        And so, you know, Government alleges that Russell

25  got, I think it was, around $430,000 in fees from these

1    conservatorships, while Alex Murdaugh got millions.  I don't

2    know about you, but most criminals don't split -- don't take

3    pennies on the dollar for risking getting in trouble with the

4    law.  Usually they split it 50/50.  That doesn't mean they

5    allegation do.  It just doesn't make sense here.  Why would

6    Russell take these crazy risks, risk so much for his family?

7    It doesn't line up.  If he did, you would expect to see

8    concealment, hiding his involvement.  And it's just not

9    there.

10            And I said earlier that the better tagline for this

11   is that there's a thin line between virtue and viciousness.

12   And I think you have to think about that as you consider all

13   the testimony you've heard and what people's motivations are.

14   Because one thing we know is that nobody down in Hampton

15   County wants to be seen right now as condoning or helping

16   Alex get through all of this.  That is the third rail for

17   everybody down there.

18            And this goes back to what Mr. Daniel already argued

19   here.  Everybody that has come in and testified have their

20   own motivations.  Y'all need to think about that and what

21   would push them to testify as they did.  That applies to our

22   witnesses as well, everybody in the case.

23            And you heard from Jeanne Seckinger.  She said that

24   none of this would be possible without Alex Murdaugh.

25   And the Government said, no, actually, it wouldn't be

1    possible without Russell.  But do you really think that Alex

2    Murdaugh wouldn't have gone and tried to do this elsewhere?

3    Was Russell the key component of this, the key cog?  No, of

4    course not.

5           There's simply no solid evidence of Russell's intent

6    here.  It's all inference in viewing all of his conduct

7    through a lens that didn't exist at the time.

8           And so I would ask you to do your duty and hold the

9    Government to the burden.  I have a ton of respect for

10   everybody on the Government's side.  We fight, getting after

11   each other.  But I've worked with them for a long time.  They

12   are very honorable people.  I think they have the theory of

13   this case very wrong.  And I don't think they've proven their

14   case.  So I ask that you hold them accountable and find

15   Russell not guilty.  Thank you.

16          THE COURT:  Rebuttal by the Government.

17          MR. HOLLIDAY:  Your Honor, thank you.

18          So I've got a little bit of an odd job.  I'm the

19   rebuttal close, which means I'm going to respond to a good

20   bit of what they said.  I have a lot of notes.  It's going to

21   be a little scattershot, but there's a lot to cover.  Okay?

22          And I want to start with something he said at the

23   very end.  Was Russell a key cog in all this?  The answer is

24   absolutely yes.  By testimony that they got from people

25   themselves, Russell was chaotic, disorganized, here, there,

1    frenetic, and all of that.  In every aspect of Alex

2    Murdaugh's life, he needed someone to keep him organized and

3    straight.

4            Ronnie Crosby, you heard testified from his law

5    firm, when Alex would get one of these rollover cases

6    involving a tire, Alex could talk to the clients, put on a

7    big show.  But Ronnie was the one who knew the science.

8    Ronnie was the products liability guy.  He was the one that

9    kept Alex straight regarding the facts and the proof of the

10   case.  I will tell you this, in this series of financial

11   crimes, Russell Laffitte fulfilled the same role.

12           Alex Murdaugh, y'all have seen the exhibits, the

13   e-mails, Exhibits 37 and 38, several times, where he's

14   saying, tell me what I owe on the Hannah loan.  And Russell

15   comes back and tells him exactly what the number is.  Russell

16   even talked about it on the stand that when he finally met

17   with the Plyler girls at the end, he turned over boxes of

18   binders to them about their conservatorships.  That's because

19   that's who he is.  He kept track of everything.  He always

20   knew what was due on this loan, that loan.  Alex had no

21   chance, no chance, no skillset of keeping up with any of

22   this.  And that's why Russell's key to all of this.  He's the

23   one who did it.

24           And they talk about people in the community didn't

25   know this about Alex and, you know, he put on a good show and

1   all of this.  When it came to these financial crimes, Russell

2   was exactly in the center.  He was exactly where he needed to

3   be to know everything that was going on.  Why?  Why?  Because

4   he was the conservator or the personal representative for all

5   these people.  So when you see, you know, estate of Donna

6   Badger or Arthur Badger or Hakeem Pinkney or Natasha Thomas

7   on these checks, when that is in the memo line, that means

8   something to Russell, because he's the conservator for all

9   these people.  And it should have turned the light bulb on.

10  And I submit to you, it did.

11        Every time that they would argue no one pays

12  attention to what's in the memo line, well, that's not true.

13  That's not true.  Everybody notices what's in the memo line,

14  because it's not always filled out, is it?  You know this

15  from personal experience.  We are not talking about going

16  through 20 pages of real estate documents.  We are talking

17  about checks.  There it is.  Every time one came up on your

18  screen, you took the check in as it was in front of you.

19  It's not like you had to read down it line by line.  The memo

20  line was right there.  And there were two people -- when they

21  saw Arthur Badger's name or Hakeem Pinkney's name in the memo

22  line, they were two people who knew what that meant.  And it

23  was Russell Laffitte and Alex Murdaugh.  This could not have

24  happened without Russell Laffitte.

25        The other visibility, of course, was he was his

1  banker.  So he knew exactly what the status of his loans was.

2  He knew exactly what the status of his accounts was.  He was,

3  again, the one who was tracking all of this.  Emily showed

4  you the spreadsheet with the yellow columns, where he knew

5  exactly when things were coming due and when things needed to

6  be paid off.  He was sending the e-mails back and forth.

7         And then, you know, it wouldn't necessarily hold

8  together if they didn't know each other.  And so think about

9  this.  They like to talk a lot about community banks and the

10  personal relationship that you get with community banks,

11  whatever.  These transactions weren't going through Charlotte

12  and Bank of America.  They weren't going through Chase

13  Manhattan or any of these major banks.  They were through

14  Palmetto State Bank, Hampton County, where everybody kind of

15  knows each other.  And, certainly, the people that were

16  running that bank knew the partners of the Parker Law Firm.

17  Why?  Because that law firm was the biggest deal in town.

18  There's lumber guys and railroad guys around.  But do you

19  remember when it was kind of weird, they used that Plexiglas

20  as a map, and they said, this is how close everybody is, they

21  are just across the square, just across the square.  And,

22  yes, that bank knew those lawyers.  And when Alex Murdaugh is

23  giving instructions as to what he wants done with checks that

24  are hundreds of thousands of dollars, if not -- you know, we

25  are going to talk about a little bit the Badger structured

1    check for 1.325 -- people at the Hampton branch of Palmetto

2    State Bank pay attention to a check with seven figures on it,

3    particularly if you are Russell Laffitte and Alex Murdaugh is

4    your client, he's your guy to manage.

5         When I was a kid, there was a comedian.  His name

6    was Flip Wilson.  And I don't know that many people remember

7    him now, but he was a funny guy.  And he had a show.  And

8    every once in a while, there was a skit and Flip would be

9    caught doing something that he wasn't supposed to be doing.

10    And when he got caught, he would always say, the devil made

11    me do it.  And then it became kind of a thing, as little

12    kids, we would say to our parents, you know, the devil made

13    me do it and all that.  I haven't thought of that in 40

14    years.  But this case is, the devil made me do it; isn't it?

15         Nobody is here to try to convince you Alex Murdaugh

16    is a good guy.  You know, he's got things in front of him

17    that will take care of themselves.  But Russell Laffitte,

18    when it came to these financial crimes, was integral to them.

19    They are different guys.  They have different issues.  But

20    Russell Laffitte, in terms of greed and corruption, was every

21    bit the criminal that Alex Murdaugh was.  That's why they are

22    charged as co-conspirators.  When Emily showed you the chart

23    at the very beginning of her closing, Russell and Alex right

24    there beside each other.  Right?  That's how that conspiracy

25    went.  Alex couldn't have done this without Russell; no way.

1          You know, they made some funny points:  Russell

2   Laffitte never got one red cent of Alex Murdaugh's stolen

3   funds.  Well, guess what?  They are parsing words, aren't

4   they?  Russell Laffitte got paid very well.  He got paid over

5   $400,000 in conservator fees to give Alex Murdaugh a slush

6   fund.  And they said, pennies on the dollar.  Most of us

7   would take $400,000 and be very happy with that amount of

8   money.  And that was enough for him.

9          Another thing they said that kept coming back to me,

10  when they said everybody got paid back, well, there's a

11  reason they got paid back, they got paid back with stolen

12  money.  Plyler sisters got paid back with stolen money.  They

13  spent a long time in their closing talking about probate this

14  and Tiffany Provence that.  And, you know, you have to

15  understand the probate, because it's kind of the beginning of

16  things.  But that was what they were stealing money to pay

17  Hannah Plyler back.

18         As far as the Plyler stuff goes, it's sketchy what

19  they were doing.  Tiffany Provence, their witness, she said,

20  self-dealing, I would never do it.  We didn't charge it.  But

21  we explained it because you've got to understand it.  If you

22  don't understand that they were taking loans out of Hannah's

23  account, you don't know why they have to pay money back.  And

24  if you don't understand that, you know, when Hannah is

25  turning 18, there's an urgency to that, then there's no way

1    you would understand the Badger checks and the Pinckney

2    checks.  So that's why we talked probate.

3            But don't let that be a distraction to you.  You

4    don't have to decide anything that happened in the probate

5    court except for how those loans got paid back.  And, of

6    course, that's the core of the case.

7            It was interesting too, at the very beginning during

8    openings, they said wild horses couldn't keep Russell

9    Laffitte off the stand.  Do you remember that?  Well, he got

10   on the stand.  And what did he tell you?  He didn't pay

11   income taxes on his conservator fees.  He structured checks

12   to avoid reporting requirements.  He lied about seeing the

13   Badger disbursement sheet.  He said on August the 9th, when

14   he transferred that $400,000 into the Alex Murdaugh account,

15   that was just coincidental with Norris's e-mail.  He stated

16   the purpose of the loan doesn't matter.  They argued that

17   too.  You know, farm loan doesn't matter.  Beach house

18   renovations doesn't matter.  If you believe them, I don't

19   know why a bank even puts a reason for a loan down, but they

20   do on every loan.  And he said backdating is fine and seems

21   to be a regular practice of his.

22           And when he couldn't come up with a reason for

23   things, he said, I missed it, I didn't look at it, I don't

24   remember it, whatever.  Well, wild horses maybe should have

25   drug him away before he said all that.  Because what did he

1    tell you?  There was an interesting moment too, before we

2    leave his testimony.  He kind of "aw, shucks" when he was on

3    the stand, you know, country banker and all that stuff.  But

4    there was a moment when you actually got a glimpse of who

5    Russell Laffitte is.  I think it was Emily made an objection.

6    And he interrupted everybody and he said, that's not hearsay.

7    Right?

8         Who was Russell Laffitte?  He's the guy that's used

9    to being in charge.  He's not used to being questioned.  He's

10   not used to being in that position right there.  And he

11   snapped.  And that's who Russell is.  He's not this guy,

12   well, I just think I did that.  He's the guy that

13   orchestrated all of this.  He's the guy that grows to be the

14   CEO of a bank in Hampton County, you heard one of the most

15   successful community banks in all of South Carolina, if not

16   the region.  He's not an "aw, shucks" guy, ladies and

17   gentlemen.  He can follow the money.  He could follow the

18   books.  He knew exactly what he was doing.

19        So it's an interesting point, right?

20        Tracy, if you would pull up Government's Exhibit 37.

21        You guys will see this in your sleep tonight.  I am

22   not going to linger on it very much.  But at the very bottom:

23   Please e-mail me and ask that check No. 43162, dated November

24   19th, 2012, for that amount, right?  They just argued that

25   like it didn't exist or something.  Well, there it is.  And

1    there was a check number and there was a date on the check

2    and all that.  And Russell knew very well that that check

3    number existed.  And it needed to be voided to make all of

4    this stuff happen.  So don't follow that line of thinking

5    that that check did not exist.  It was voided, which means it

6    goes away.  But it existed when this e-mail was sent.

7          And then as far as, like, this whole notion of --

8          23, please, Tracy.  If you could, let's pull up the

9    very bottom, of course.

10         Palmetto State Bank, payment of fund structure, per

11   client request, and it gives 1325.  Right?  They say, well,

12   everybody knows that's not right because Palmetto State Bank

13   doesn't do structures.  Well, there's the check right there.

14   That's what was intended.  Now, they would have given it to

15   somebody else, perhaps, to do the structure.  But the check

16   was going to go to Palmetto State Bank.

17         And you know why he lied about this?  You know why

18   he lied and said he didn't see this?  Because he knows if he

19   saw it, then their whole argument about Exhibit 37 and he

20   didn't know that was Badger money, that goes away.  And he

21   testified on September 6th that he knew he had seen this

22   disbursement sheet.  And he knew what the $1,325,000 was.

23         I'm going to come back to this.  But they talked a

24   good bit about Gray and Charlie, and they were always the

25   ones approving things.  And I guess I am taking this out of

1     order a little bit, but he said Gray and Charlie approved the

2     680.  He said Gray and Charlie approved the 750.  They never

3     did quite get it right when they approved.  His testimony is

4     all over the place.  First it's Charlie.  Then it's Charlie

5     and Gray, whatever.  Charlie on the stand said, I didn't know

6     the details.  Gray said she did.  That's his sister and his

7     dad.  They are also the only people on the Board who voted

8     not to fire him.  They are looking out for him.  Okay?

9              Now, I want to talk a little bit about the 680.  One

10    of the things that I've been thinking about in this case is,

11    if they are to be believed, and Alex hoodwinked Russell, I

12    want you to think about that 680 and how that went down.

13    Okay?  The law firm is looking into Alex.  And they see all

14    these checks.  And they confront Russell about the checks.

15    And they say, we think the bank has a problem.  If he truly

16    had been hoodwinked by Alex, this is what he would have said

17    to Jeanne Seckinger and Mark Ball and whoever else came to

18    see him, he would say have said:  Your guy did this.  Alex

19    Murdaugh told me how to cut these checks.  One of these

20    checks went to Johnnie Parker.  He's a partner in your firm.

21    The other one went to Alex's dad.  These checks were cut out

22    of your accounting department.  I didn't know what was going

23    on.  Why don't you go back across the street and figure it

24    out.  And he would have gone.

25             Palmetto State Bank had lawyers that they had hired

1  for the Satterfield case.  Those guys were standing by.  He

2  should have gone back and said, look, these guys just came

3  across the street, they are going to try to pin something on

4  me, let me show you what happened, and laid out the check,

5  this is all Alex's doing, and we are not going to pay this,

6  because it was him, he was the one that everybody believed

7  and he fooled everybody and he fooled me.

8        But he didn't do that.  Right?  He scurries back

9  across the street to the bank.  Cuts a $680,000 check.  Goes

10 back and gives it to them.  Doesn't tell anybody.  Lawyers

11 informed, but not consulted.  What, on the phone?  I never

12 saw anything, only his words.  Think about this.  October

13 28th, he sends an e-mail to the Executive Committee and says,

14 I just, you know, took this check.  You read the amount, 74

15 and 75.  I just took this check across the street.  And Scott

16 Swain, he's like, what?  This is a terrible precedent.  What

17 are you doing?

18       And next day, October 29th, he sends -- you know,

19 you've seen this over and over again.  He tells the rest of

20 the Board.  And the Board flips out.  What are you doing?

21 Why did you do this?  Norris is like, who was involved?  How

22 many people?  How many times did it happen?  Have we fired

23 whoever was responsible?

24       And he wants you to think that this is in the best

25 interest of the bank.  He's covering himself.  And when he

1   goes back and he tells, you know, we are paying this money,

2   he insists.  Trenholm Walker, their lawyer, he tells

3   everybody, look, we are paying this money.  He testifies to

4   the ODC, we are paying this money.

5       You know why he's so insistent?  If he thinks even

6   at that point, when the whole Board and Executive Committee,

7   or at least the people who aren't members of his immediate

8   family are flipping out, he says, look, guys, maybe I was

9   premature taking the 680 across the street, let's let our

10   lawyers deal with it now.  Lawyers tell Trenholm, hey,

11   Trenholm, get in line, we are going to pay that money, if you

12   want to get a release or something, you go ahead, big boy,

13   but we are paying this money.  Why?  Because he needed to dig

14   a hole and put this issue in the hole and put concrete over

15   it and get people to stop looking.  Because what happened

16   when ultimately all those 14 checks come to light?  They see

17   Russell's fingerprints all over these things.

18       They know he was a conservator and PR on these

19   accounts, PR on these accounts.  They came to the bank.  They

20   are made out to Palmetto State Bank.  He told you at least in

21   terms of tax purposes, when the check is made out to Palmetto

22   State Bank, it's hard to trace, don't know where it's coming

23   from.  He orchestrated this.  He's a banker.  He's smart.

24       The truth is that Russell had steered the Titanic

25   into the iceberg.  And you can't unsink the Titanic.  And

1    when the Board's meetings November the 3rd, they knew that.

2    They are looking for life boats on November 3rd.

3         So when they go into that meeting -- look, I'm glad

4    they played that audio, that transcript.  We hadn't heard it

5    until a few minutes before you did.  We had only seen the

6    transcript.

7         Keep this in mind.  Sometimes there's an argument,

8    like, the Board ratified, the Board did this.  There's only

9    three speakers in that transcript.  And you will have it with

10   you when you go back.  Trenholm Walker, the bank's attorney,

11   talks a long time about he's trying to find the lifeboat,

12   because the 680 is out the door.

13        Jim Gibson gives a few "atta boys" to Trenholm and

14   says, like, hey, but we need to keep going with this

15   investigation.  Right?  The 680 is gone.  Russell has just

16   given our 680 away.  We are going to try to come up with some

17   way to rehabilitate this whole deal, but let's continue the

18   investigation.

19        Russell talks twice.  Right?  First time he pipes up

20   and he says, I was the PR for Donna Badger, not Arthur

21   Badger.  Okay?  That's the first time.

22        Now, I want to take a little side road here.  When

23   he testified -- y'all saw this at the very end, there's a

24   $17,500 check where he said, I'm trying to pay back half the

25   fees I got.  I hope y'all remember that.  I am not going to

1    pull that up.  So his fees were 35,000.  He writes $17,500.

2    I will note that when he did that, he filled out the memo

3    line.

4          But when he's meeting with the Board and he's saying

5    like, look, I was a PR for Donna Badger, not Arthur Badger,

6    that was the time -- the Board has been freaking out for the

7    past, you know, October 28th, 29th, freak out.  He could have

8    said, oh, guys, by the way, on November the 1st, if the date

9    on that check is to be believed, I gave you back half of my

10    PR fees.  Okay?  So I'm trying to make this right now.

11          Look at the transcript when you go back.  It doesn't

12    say that.  He doesn't say anything about his PR fees.  That

13    would have been the time to do it, if it had actually

14    happened on November 1st.

15          What do you know from looking at the back of that

16    check?  It wasn't transacted until December the 17th.

17    Russell has a history of backdating documents, right, when

18    it's convenient for him.

19          So what's the other thing we know?  The second time

20    Russell speaks in that meeting, he says -- and I missed it,

21    candidly, the first time we were listening to it.  There's a

22    lot of noise in the courtroom.  I missed it.  Russell has

23    got -- he's recording it, so it's right there, "We are

24    paying."  Almost like a sense of resolve, "We are paying."

25    Like, look, y'all can't get a release from Arthur because

1    it's unethical.  The law firm is not going to give you a

2    release.  There's litigation about that money right now.

3    That's why that check hadn't come back.  They are fighting

4    right now over that money.  It's gone.  It's been gone since

5    October the 28th.

6         And he says, regardless:  We are paying it.  I dug

7    the hole.  I put it in.  I put concrete over it.  Don't bust

8    through the concrete and find out what I did.  But they did

9    it, right?  It's all a coverup.  The 680 is a coverup.

10        They talked at times about dissents and all.  There

11   was no vote to ratify, so there is no written dissent.  Don't

12   follow that red herring.  While we are on that, ladies and

13   gentlemen, there are bylaws.  There's whatever you want to

14   say.  There's not a bylaw in the country that supersedes

15   fraud and misappropriation.  Nowhere in my criminal statute

16   that's over there does it say except where the bylaws let

17   them steal, they can steal.  That's what -- we are not here

18   because he violated the bylaws or occasionally he had poor

19   judgment on loans.  We are here because of fraud and

20   misappropriation.  And bylaws and your sister and your dad

21   meeting somewhere outside of a meeting and saying, maybe,

22   Russell, it's okay, none of that wipes away fraud and

23   misappropriation.

24        I want to talk a little bit about using the same

25   sort of thought process with that $750,000 loan.  It's hard

1    to follow.  Right?  Because sometimes $750,000 loan is about

2    a beach house renovation that Maggie had in mind.  And then

3    sometimes it's about Berkeley messes and lawyer fees and all

4    that stuff.  So it's all over the map, isn't it?

5         But we know this, right?  If the $750,000 was legit,

6    if Russell really thought it was a good idea to loan a guy

7    three-quarters of a million dollars a little over a month

8    after his wife and son had been killed, and now he's

9    thinking, great time to renovate my beach house, if he really

10   thought that was a good business decision for the bank, why

11   didn't he just go to the Executive Committee?  Hey, guys,

12   look, I know he's upside down that $362,000 in his account

13   and we have $3.5 million of outstanding loans, and we had to

14   charge off Red Beard and all of this stuff -- and by the way,

15   you can't really make this up, some of it is secured with

16   swamp land.

17        If it's a great business decision, you give

18   three-quarters of a million dollars to a guy that's got all

19   this going on in his life, just come to the Executive

20   Committee.  Lay it out.  Say:  Guys, look, here's his

21   financial situation.  We have full visibility into it.  And I

22   think it's a great idea that we should wire $350,000 to Chris

23   Wilson, because that's the transaction that the law firm was

24   looking into that tipped them off that, hey, Alex might not

25   be doing what he's supposed to be doing.  But let's just help

1    him deal with that situation.  And then, you know, Norris, by

2    the way, he's sending e-mails on August the 9th saying, give

3    me a financial picture of Alex.  And he's like, oh.  Norris

4    and the rest of the Board is about to find out how upside

5    down Alex is, and how he knew I've been doing all these

6    dealings with him all these years.  Maybe we need to push

7    $400,000 into an account so it looks a little bit better.

8        If that's such a good idea for the bank, that's

9    looking out for bank resources, just take it to the Executive

10   Committee.  See what Scott Swain has to say about that.

11   There's a reason he didn't do that.  It's cover-up.

12       The $350,000 wire to Chris Wilson, that wasn't in

13   the interest of the bank.  That was in the interest of Alex

14   Murdaugh.  Getting fees back in a place where maybe his law

15   firm wouldn't be digging on that end, because, you know,

16   Russell had two problems.  He had issues with his bank

17   digging.  And he had issues with the law firm digging.  And

18   they were both digging.  And he had to shut them both down.

19   So why not make these loans and transfer money and all that

20   stuff to cover up what they both had been doing all along.

21       Defense likes to talk about, and they talked about

22   in their closing, that Alex was a long-time customer and he

23   always paid.  Remember the documents they showed you, 2016,

24   2018, maybe, 2021, in July of 2021?  Do you know what

25   happened in June 7th, 2021?  Alex is in a much different

1  place, and so is Russell.  Russell knows it's all going to

2  come to light.

3          You know, they make it seem like it's a great

4  mystery, the Badger and Pinckney checks and the Thomas checks

5  and all these things written to Palmetto State Bank, like

6  nobody would ever know, ignoring the memo line and all that

7  stuff.  Well, John Peters, their very first witness, the guy

8  who said he would have filed all these reports on all this

9  suspicious activity, as soon as he saw it, they did.  He's

10  the one that said, look, I would have never accepted these

11  checks, and no teller on the line would have accepted these

12  checks.

13          We know Russell has had every job in the bank up

14  from teller to CEO.  He knows all this.  And you knew from

15  his testimony about his tax returns that he knows the

16  significance of putting Palmetto State Bank in the payee

17  line.

18          You know, going all the way back, I don't want y'all

19  to forget the nature of the play money that these guys were

20  playing with.  Okay?  The Plyler girls, their mama and

21  brother died in front of them.  Hakeem Pinkney had been a

22  quadriplegic.  Nothing below the neck works.  That's hell on

23  earth, and he died.  Natasha Thomas, I'm pretty sure y'all

24  saw this, Natasha wears her hair down on the right side of

25  her face because it's scarred, and her right eye doesn't

1    work.  It's dead.  When -- and then, of course, Arthur

2    Badger.  I'm sorry.  It's late.  Arthur, single dad, six

3    kids.  Right?  Single dad, six kids.  Guy that needs this

4    money.  To these guys, it was play money, play money.  This

5    was flesh and blood and tears and misery money that they

6    decided was their treasure that they would just use however

7    they want.

8          You know, the forgotten man in some of this has been

9    Malik Williams.  Malik's significant for this reason, it's a

10   $40,000 settlement.  I am not going to -- $40,000, I would

11   take it, great to have $40,000.  That wasn't Alex's case.

12   Okay?  So to the extent that the devil made me do it, or they

13   want to say the devil made me do it, all of these ideas

14   Russell took out the first Plyler loan, his idea.  But when

15   it came to Malik, Alex didn't know about that pot of money.

16   Russell had to tell him about that pot of money.  And he took

17   Russell -- he took Russell's $40,000, and he said, here, you

18   could play with this too.  But don't lose sight, that's why

19   Malik is significant.  He was the one that Russell took to

20   Alex, very much all in the mix here.  Okay?

21         Bear with me, if you would, for just a second.

22         C.E. Smith, briefly, they want to say that he pops

23   up in the bank records that it's for construction stuff.

24   Right?  Well, he knows everybody else, but all of a sudden,

25   he doesn't know C.E. Smith and the eight loans, eight loans

1    that he signed off on.  Seemed to be that Russell's signature

2    doesn't mean much to him.  Right?  So, like, when he says

3    Natasha Thomas is 15, he says, well, somebody said, I just

4    signed it.  And, you know, C.E. Smith, when I signed off on

5    C.E. Smith loans, I didn't know what it was for.  Very

6    convenient, right, when he's on the stand.  Can't remember

7    certain things.  He doesn't recall this, recall that, or

8    whatever.  Doesn't know who C.E. Smith was.  He was the guy

9    getting significant sums from the beach house loan, you know.

10   Alex, they are talking all the time, right?  Just ask him,

11   what's this all about?  But he knows.  He knows.  He's the

12   guy that's coming into the bank.  He had been in the bank in

13   February of 2021 to get a loan.

14          Then this whole thing about the use of the money,

15   once a loan has been extended, like a client doing this and a

16   client doing that, you know the bank, it would be tough for a

17   bank to monitor exactly what a client is doing with their

18   money, except when the banker is involved.  So he said, we

19   gave him $750,000 loan.  He wired the money to Chris Wilson.

20   Well, guess what?  Russell is the one that his name is on

21   that wire.  And the $400,000 deposit into Murdaugh's account,

22   his name is on that too.  So, yeah, when a customer goes off

23   the reservation and does something they are not supposed to

24   do with the money, you know, that happens.  But when the

25   banker is involved, when the banker is involved, it's

1    different, particularly when he's misrepresented to his own

2    bank what the money is for, farm loans, beach house

3    renovations, all these things.

4         So they got a little chuckle out of power corrupts

5    and absolute power corrupts absolutely.  But, look, in

6    Hampton County, Russell Laffitte and Alex Murdaugh were the

7    kings of their profession.  All right?  Russell Laffitte, CEO

8    of the biggest, best community bank in town, Palmetto State

9    Bank, the marquis bank of Hampton County.  Alex Murdaugh,

10   revered partner at the law firm just across the way, known

11   statewide for getting great results in personal injury cases.

12   In that county, these guys could do whatever they wanted to

13   do.

14        And, you know, when somebody's got that kind of

15   power and that kind of authority, you would think that they

16   kind of look out for other people, they would use that to

17   help other people out.  But what do these two do?  What did

18   Russell Laffitte do?  He uses it to enrich himself.  And he

19   used it to enrich himself at the expense of people that had

20   been through horrific accidents and were putting their lives

21   back together and needed the money for their own use.

22        Don't forget Arthur Badger.  There were annuities

23   for his kids set up that would have taken care of their kids

24   for years.  Arthur ran out of money and had to sell those.

25   That 1.325 million had been cut up to his people and Alex's

1  people.

2      Accountability for people like that only happens

3  here, in this courtroom, where evidence matters and facts

4  matter, and power and influence don't.

5      We ask you to hold this man, Russell Laffitte,

6  accountable for everything he's done, everything he's done,

7  the money he diverted on the front end to the cover-up money

8  on the back end.  We are asking for complete justice here,

9  the conspiracy, three counts of misappropriation, and the two

10  counts of the diversion, because those counts at their heart

11  are about greed and corruption and taking advantage of people

12  who put their trust in him, trust that he took advantage of.

13      We very much appreciate your service.  It's

14  important.  It's important.  You are the ones who determine

15  what kind of community we live in.  You are the ones who

16  determine whether or not actions that this defendant

17  committed are held accountable.  I can't do it.  All I can do

18  is argue.  All we can do is put up evidence.  It's you, it's

19  this box, that determines whether he answers for his crimes.

20      Thank you.

21      THE COURT:  Ladies and gentlemen, it's 5:25.  Let me

22  be candid with what the future -- what we have to do.  I have

23  to give you a charge that will take me probably 40 minutes to

24  do that.  We could take a break, and then I could do that.

25  It would probably be, my guess, around 6:20 before I would

1    give you the case.  You could begin deliberating tonight or

2    you could come back tomorrow morning and me do my charge, and

3    deliberate.  I want you to go back to the jury room.  And I

4    want y'all to talk among yourselves what you prefer to do.

5    And Ms. Perry will step back and talk to you.  Okay?  I will

6    let y'all think what would be in your best interest.  We will

7    take a break.

8                (Jury leaves open court at 5:24 p.m.)

9                THE COURT:  Please be seated.  We will be at ease

10   during this break.

11               (Whereupon, the jury returns to open court at 5:35

12   p.m.)

13               THE COURT:  Please be seated.  Ladies and gentlemen,

14   I think our best course here is to go home for the evening

15   and to return tomorrow at 9 a.m.  I will charge the jury at

16   that point and then you will deliberate.  I want to remind

17   you not to read anything outside this courtroom, no social

18   media, no media, no newspapers.  Do not communicate with

19   anyone.  Blame me when your family asks you what's going on.

20   Tell them the judge told you you can't talk about it.  You

21   will tell them later.

22               Have a restful night and I will see you nine o'clock

23   tomorrow morning.

24               (Jury leaves open court at 5:36 p.m.)

25               THE COURT:  Let's be seated.  I normally do not send

1   the indictment back.  I think -- I generally think that's a

2   disadvantage to the defendant.  It kind of gives an official

3   view of the Government.  I think can weigh, perhaps,

4   unfairly.  But the defendant used it in the argument.  And I

5   think under the circumstances, I really don't have any choice

6   but to send it back, because they've raised questions about

7   it.  And I feel like it's kind of equivalent, in my view, of

8   opening the door once you've raised it.  I feel like the jury

9   should see it.  So in the past, I haven't done it.  If

10   there's a strong feeling about it, I would be glad to hear

11   from you, but my inclination is to send the indictment back.

12         MS. LIMEHOUSE:  We agree, Your Honor.

13         THE COURT:  How about the defense?

14         MR. DANIEL:  We have no problem.

15         THE COURT:  Very good.  Ms. Perry, with the

16   exhibits, we will have the indictment go back.  Everyone, get

17   a good night's rest.  I will see you tomorrow in the morning

18   at nine o'clock.

19         (Whereupon, the proceedings are adjourned.)

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3          I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8          I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15   Karen V. Andersen
     Registered Merit Reporter
16   Certified Realtime Reporter

17

18

19

20

21

22

23

24

25