IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | CRIMINAL NO. 9:22-658-RMG |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **RUSSELL LUCIUS LAFFITTE** | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL
AND FOR JUDGMENT OF ACQUITTAL**

After nine days of trial, testimony from twenty-three witnesses, and admission of nearly 300 exhibits, the jury convicted Defendant Russell Lucius Laffitte of all six counts in the Second Superseding Indictment. The Defendant has moved for a new trial under Federal Rule of Criminal Procedure 33 or a judgment of acquittal under Federal Rule of Criminal Procedure 29, raising a number of belated and meritless challenges to the Court's evidentiary rulings, jury charge, and replacement of two jurors. The Court acted well within its broad discretion during every stage of the trial, and the evidence was sufficient to find the Defendant guilty of all six counts beyond a reasonable doubt. For the reasons set forth below, the Government respectfully requests the Defendant's motion be denied.

i

## Table of Contents

Legal Standard ........................................................................................................1

II. Argument...........................................................................................................2

    A.  The Court properly exercised its discretion in relieving two jurors who were
        unable to perform their duties. The Court's procedure, to which the Defendant
        did not object, complied with Rule 24(c)........................................................2

        1.  After consulting with, and soliciting input from, the parties, the Court replaced
            the two jurors in accordance with the procedure it told the parties it would
            follow, to which the Defendant did not object............................................3

        2.  The Court did not abuse its broad discretion in resolving this issue after
            consultation with the parties. ...................................................................10

        3.  The Court did not abuse its discretion by relieving two jurors and replacing
            them with alternates. ...............................................................................13

        4.  The Court did not violate the Defendant's Due Process Rights in relieving
            the jurors. ...............................................................................................18

        5.  The Court properly instructed the jury to begin its deliberations anew after
            seating the alternates...............................................................................20

    B.  The Defendant's disagreement with the indictment charging that he knew the
        stolen funds belonged Arthur Badger, the Estate of Donna Badger, and/or
        the Estate's Beneficiaries is not a sufficient basis to award him a new trial. .................24

        1.  The evidence at trial tracked the charges in the indictment; there was no
            variance, fatal or otherwise. .....................................................................24

        2.  The jury instruction on Counts Two and Three accurately reflected the
            charges in the indictment. ........................................................................25

        3.  The Court did not abuse its discretion by sustaining a Government objection
            during closing to a confusing and inaccurate argument by the defense. .................28

    C.  The Court did not improperly limit defense counsel's cross-examination......................30

        1.  The Court permitted defense counsel to cross-examine the Government's
            witnesses about dissention within the Bank's Board. ...............................31

        2.  The Court did not improperly limit cross-examination on an irrelevant and
            uncharged scheme. ...................................................................................34

D.  The Court did not abuse its discretion by declining to give the jury an
    advice of counsel instruction. ....................................................................35

E.  The Government presented more than sufficient evidence to sustain the
    verdict on all six counts. ...........................................................................37

    1.  Count One – Conspiracy to Commit Wire Fraud or Bank Fraud ............................38

    2.  Count Two – Bank Fraud ........................................................................41

    3.  Count Three – Wire Fraud .....................................................................44

    4.  Counts Four, Five, and Six – Misapplication of Bank Funds ..................................46

III. Conclusion ...................................................................................................53

# I.    <u>Legal Standard</u>

Federal Rule of Criminal Procedure 33(a) permits a court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Whether a defendant gets a new trial is left to the trial court's discretion. *United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006). The Fourth Circuit has held that a trial court "should exercise its discretion to grant a new trial sparingly, and that it should do so only when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quotation marks omitted). Where the evidence in the record is sufficient to support the jury's verdict, a Rule 33 motion *must* be denied.[1] *United States v. Singh*, 518 F.3d 236, 250 (4th Cir. 2008).

Federal Rule of Criminal Procedure 29(c) permits a defendant to move the trial court for a judgment of acquittal. When presented with such a motion, the Court must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). In particular, a reviewing court addressing a sufficiency challenge "must view the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the

---

[1] The Defendant states that in considering his Rule 33 motion, the Court "need not view the evidence in the light most favorable to the Government and can make its own credibility determinations." *Def.'s Mot.*, ECF No. 224 at 3 (citing *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). The Fourth Circuit has held that when a Rule 33 motion "attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence." *Arrington*, 757 F.2d at 1485. In such a situation, the court "is not constrained by the requirement that it view the evidence in the light most favorable to the government," and it "may evaluate the credibility of the witnesses." *Id.*

But none of the Defendant's four arguments seeking a new trial under Rule 33 hinges on the weight of the evidence; his claims are based on purported legal errors. In any event, *Arrington* makes clear that a court should grant a new trial only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Id.* at 1485, 1586. As explained below, the Defendant has not made, and cannot make, that showing.

1

crime beyond a reasonable doubt." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997); *see United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003) (holding that a conviction must be sustained if there is "'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt'" (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). The fact finder, not the court, assesses the credibility of witnesses and resolves any evidentiary conflicts. *See Wilson*, 118 F.3d at 234. "Those functions are reserved for the jury, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Id.* at 234 (quotation marks omitted). "The jury's verdict must be accepted if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

## II.     Argument

### A. The Court properly exercised its discretion in relieving two jurors who were unable to perform their duties. The Court's procedure, to which the Defendant did not object, complied with Rule 24(c).

The Court did not abuse its discretion by replacing two jurors, who were unable to perform their duties, with still-sequestered alternates. Under Federal Rule of Criminal Procedure 24(c)(1), "[t]he court may impanel up to 6 alternate jurors to replace any jurors *who are unable to perform or who are disqualified from performing their duties*." (emphasis added). Rule 24(c)(3) further provides that "[t]he court may retain alternate jurors after the jury retires to deliberate." *Id.* Under the procedure outlined in Rule 24, when a court decides to retain alternate jurors after the jury retires to deliberate, "[t]he court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged." *Id.* If an alternate replaces a juror

2

after deliberations have begun, "the court must instruct the jury to begin its deliberations anew." *Id.* The Court fully complied with the Rule, and the Defendant is not entitled to a new trial.[2]

### 1. After consulting with, and soliciting input from, the parties, the Court replaced the two jurors in accordance with the procedure it told the parties it would follow, to which the Defendant did not object.

Following the final charge, the Court sent the jury to begin deliberations but retained the three alternate jurors in a separate location during the deliberations. Tr. 2152:9–20. The Court instructed the three alternates that they were "not to communicate with anyone," because it may need to bring in an alternate if a juror could not complete deliberations. *Id.* Following the Court's instructions to the jury, including its retention of the alternate jurors in the event a juror was unable to complete deliberations, the Court inquired of the parties whether there were any objections, beyond those previously raised to the jury instructions. Tr. 2153:4–12. The Defendant indicated that he had no objection to the Court's retention of the alternate jurors or his instruction for them not to communicate with anyone. *Id.* The Court retained alternate jurors as permitted under Rule 24(c) and properly instructed them not to communicate with anyone.

Around 7:45 p.m., the Court notified the parties that it had received two notes from the jury. Tr. 2157:24–2158:4. The first note said a juror needed antibiotics. Tr. 2158:1–2. The second note said the same juror was "[f]eeling pressure to change my vote." Tr. 2158:3–4; Tr. 2159:6–8. The Court said its instinct was that there were alternates and that it was not practical to send this juror home to get her medicine and then return to continue deliberations. Tr. 2158:7–11. The Court requested input from the parties, "welcom[ing] any thoughts anyone may have." Tr. 2158:13–14.

---

[2] The Defendant seeks "judgment of acquittal and/or . . . a new trial" for the alleged errors in replacing the jurors and charging the jury. *Def.'s Mot.*, ECF No. 224 at 14, 18, 19, 29. But he brings these claims under Rule 33, which allows only for the grant of a new trial, and he cites to no authority for the proposition that an acquittal would be the appropriate remedy for a violation of Rule 24(c) or an erroneous jury charge.

3

Defense counsel asked whether the jury could come back in the morning. Tr. 2158:16–17. The Court responded that there was no issue with the jury deliberating, no message that the jury was stuck, and no indication an *Allen* charge was needed. Tr. 2158:18–22. The Court expressed that it was "trying to be fair" and said, "it just strikes me that under this sort of situation, the better course is – that's why we have alternates." Tr. 2158:24–2159:4. "But," the Court continued, "I want to hear from you about this." Tr. 2159:4–5.

The Government suggested that, since there was no indication that the jury was having issues deliberating, and in light of the impending holiday, the jury should be permitted to continue to deliberate that night. Tr. 2159:9–14. The Court responded, "[i]f I tell people that they have to come back tomorrow, I don't think that's in anybody's interest." Tr. 2159:15–17. It explained, "I'm kind of trying to protect defendants here in this situation. And I don't think it's in your interest to try to force people to come back tomorrow. I don't like the effect that has on pushing people to a verdict." *Id.* at 15–21.

At that point, the Court received a third note from the jury, Tr. 2159:23–24, in which a group of jurors expressed concern that "[a] juror's previous court experience is influencing that juror's ability to discuss the trial in a group setting." Tr. 2160:9–11. The note said that the juror had made comments "on having been bullied as a juror on previous trials," and advised that the juror in question would not consider evidence in this trial, was "hostile to hearing any debate from certain other jurors," and disagreed with definitions the Court had provided in the jury charge. Tr. 2160:11–16. The jurors who wrote the note asked that the Court "consider speaking to this issue so that we are able to proceed with deliberations." Tr. 2160:16–18.

Before the parties could be heard about the third note, the Court learned of a fourth note. Tr. 2160:3–5. The fourth note expressly asked the Court: "can you please call an alternate as I am

4

experiencing anxiety and unable to clearly make my decision?" Tr. 2160:21–23. This note was from a different juror than the one who had written the first two notes. Tr. 2160:23.

The Government immediately took the position that the Court should relieve both the juror who was not following the law and the juror who needed to take her medication. Tr. 2161:10–12. The Court responded, "I don't want to read tea leaves . . . [Y]ou know, we shouldn't know what they're deliberating. And they are appropriately not telling me what they are doing. And I have no idea what they are doing." Tr. 2161:19–21. The Court again specifically requested input from defense counsel, stating, "Mr. Daniel, your suggestions? I value your experience." Tr. 2161:24–25. At defense counsel's request, the Court re-read the third note. 2162:1–18.

The Court cautioned the parties about making decisions based on a calculation of whether the jurors in question were voting to convict or acquit, stating, "[I]f somebody was calculating this and said, oh, I think they are going to help me, and you end up keeping them on and, you know, whatever, you end up convicting your person, you end up with a conviction, somebody is going to feel pretty silly, and vice versa." Tr. 2163:4–9. The Court made clear, "I don't worry about the result myself. I worry about do I have effective jurors." Tr. 2163:9–10.

The Court then told the parties that it was inclined to speak to the juror who potentially was refusing to deliberate, with a court reporter present but outside the presence of the parties, to inquire as to whether there was a problem. Tr. 2163:14–21. The Court said if there was not a problem, it would allow the juror to continue deliberating. Tr. 2163:22. Turning to the specific concerns addressed in the first and fourth notes, the Court stated:

> I think the one with the medicine we need to send home. She needs her medicine. I understand that. . . .
>
> The person with the anxiety, that's a concern for me too. I don't want someone who is not functioning to be -- I've got 12 jurors for a reason. The defendant's rights are

> protected by having 12 functioning jurors. And it's got to be unanimous. So I've got a problem having somebody who says I can't do it anymore. That's my concern.
>
> *But I want to hear from everybody before I make a decision*, because I think we are on virgin territory.

Tr. 2164:1–15 (emphasis added).

The Government stated its position that the Court should relieve the juror who needs to take their medicine, remove the juror who could not follow the law, and inquire as to whether the juror who was experiencing anxiety was still a "viable" juror. Tr. 2164:16–2165:6.

With respect to the juror who potentially refused to follow the law, the Court said, "I don't want anybody else ganging up on somebody and trying to bump them off a jury. I need to confirm that." Tr. 2164:25–2165:2. It continued, "I've got to confirm that. I can't let a juror be bumped out one way or the other who says, that's not accurate, I'm fully participating, they just don't agree with me. That – you know, that's not a juror I remove." Tr. 2165:12–16. And it stated a third time, "I've got to confirm it. I can't rely on someone else's account." Tr. 2166:1–2.

The Court then stated, "with the consent of the parties, we are going to set up a place where I will take a court reporter, and *without anyone present but the court reporter*, I will create a record." Tr. 2166:2–7 (emphasis added). The Court asked, "Do I have consent of the parties for me creating a record to question the juror?" Tr. 2166:14–15. Defense counsel did not object to the procedure proposed by the Court, request to be present during the Court's voir dire of the juror, or object to the Court's potential removal of any of the jurors. To the contrary, defense counsel consented to the proposed procedure. Tr. 2166:19–20.

Defense counsel then inquired as to whether the note regarding the juror with the "strongly held conviction" used a pronoun, in an attempt to determine the gender of the juror. Tr. 2166:23–25. The Court notified defense counsel that there was no pronoun. Tr. 2167:1–3. Defense counsel

attempted to learn additional information about the juror, including the juror number. Tr. 2167:21–2168:12. The Government objected to the Court providing any additional information about the juror in question. Tr. 2168:9–10. The Court did not thereafter provide the juror's identifying information. *Id.*

The last thing the Court stated before leaving the courtroom to voir dire the juror was, "*I'm going to take action.* Fair enough? Everybody happy with that?" Tr. 2168:11–12 (emphasis added). The Government agreed. Tr. 2168:13. There was no objection, request for clarification, or expression of confusion from the defense.

Upon the Court's return, it notified the parties that it had allowed the juror who needed medicine to go home. Tr. 2168:17–19. The Court had also relieved the juror experiencing anxiety, stating:

> I spoke with the juror expressing anxiety. And she asked to be relieved and said she wasn't able to go forward, and I removed her. I relieved her. I granted her request to -- for an alternate. I just basically said to her, tell me, can you do your duties? And she said, I cannot do my duties. She's got medication issues herself, anxiety issues. And I relieved her.

> And the decisions I've made resolved the other issue, so I didn't have to address it. That was the longer one. I never had to address it. I understood that it took care from those other decisions.

> And I'm going to bring the jurors in to tell them they have to begin their deliberations again because there are new jurors.

Tr. 2168:20–2169:8; *see also* ECF No. 212 at 2:23–3:5 (under seal). After having consented to the procedure outlined by the Court, defense counsel then responded, "we would object not to the juror that was replaced for medication. *We agreed to that. We agreed to that at the time.* But the second juror that was replaced about the anxiety is the one we would like to – make an objection to." Tr. 2169:25–2170:4 (emphasis added).

The Court answered that the juror in question was "emotionally very fragile" and could

hardly speak to the Court. Tr. 2170:5–7. The Court further explained that the juror

> was on anxiety medication and that she was not physically capable or emotionally
> capable of going forward. I didn't think I had any choice. We never got into what's
> going on in the jury room or anything like that. It was - - and she was shaking when
> she was speaking to me. There wasn't any confusion about that one.

Tr. 2170:5–13.

The Court replaced the two relieved jurors with two alternates and instructed the jury, "the

requirement is that you need to begin your deliberations again to bring your other two, the two

jurors who have not been included, into those discussions, because it needs to be the decision of

all 12 of you." Tr. 2170:18–22. "Obviously," the Court acknowledged, "the 10 of you are more

advanced than the other two, but you need to go back into the deliberations and y'all need to walk

through those again." Tr. 2170:22–25. Neither the Defendant nor the Government objected to the

Court's instruction.

Within an hour, the Court notified the parties that the jury had reached a verdict. Just before

the Court brought in the jury to render the verdict, defense counsel raised an objection to replacing

the second juror. Tr. 2171:12–14. The Court responded, "I did what y'all asked me to do." Tr.

2171:15. Defense counsel responded: "I am not asking you to do anything differently now. Our

understanding is that's essentially, with the case law, it's akin for moving to a mistrial. And just

for the sake of the record, we just wanted to bring that up. We object to replacement of *one juror*."

Tr. 2171:16–21 (emphasis added).

The Court responded:

> On what basis? Because I asked you what did you want me to do on these? And we
> agreed I would talk to the juror, who could hardly speak, she was so emotionally
> upset. And I asked her if she could serve. . . . And she asked me to remove her, as
> she had written me already and asked me to remove her. So I was doing exactly
> what we all agreed I would do.

8

I'm a little perplexed by that, Mr. Austin, to after the fact coming in and start complaining about something on a procedure we had agreed to already.

Tr. 2171:22–2172:6.

Defense counsel stated that they had objected on the record, but the Court explained that their objection was lodged only after the Court did what all parties agreed it would do. Tr. 2172:7–16. The Court continued:

You know, I try to be as transparent as I could. I read everybody everything. I asked you what you wanted me to do. I interviewed the juror, who was plainly incapable of continuing, and she was in an emotional meltdown. And I removed her. And that's what I understood y'all -- we had agreed that I would interview her and I would make a decision.

Now you now, after the fact, want to change that. You are a little -- moment late. I already sent her home following the procedure.

Tr. 2172:17–2173:1.

Defense counsel then asserted—for the first time, after the jury had reached verdict—"we don't see how they could restart deliberations at this point this late in the game." Tr. 2173:17–18. The Court responded,

You know, folks, to come in after the fact here, after the Court laid it all out and we agreed on a process, I thought it was very clear, and I did -- but there's a record of her I don't think anybody would really question. It's all on the record about what she told me. And I was, of course, following up on her request that she be removed and told me she could explain it to me, and she did. I don't want to invade her privacy. But she is on significant medication. And she was, in my estimation, in an emotional meltdown situation.

Tr. 2173:24–2174:8. The record clearly demonstrates that the Court, after inviting the parties' input, appropriately exercised its discretion to empanel two alternate jurors to replace jurors who could no longer serve. The Court's announced and uncontested approach to addressing this issue was contemplated by, and outlined in, Rule 24 and Fourth Circuit case law.

**2. The Court did not abuse its broad discretion in resolving this issue after consultation with the parties.[3]**

The Fourth Circuit has recognized that Rule 24(c) "expressly authorizes district courts to

impanel alternate jurors and to substitute them for jurors who can no longer serve." *United States*

---

[3] Although the Government evaluates the Court's decision to relieve the juror for anxiety and replace her with an alternate under an abuse of discretion standard, rather than the "good cause" standard proposed by the Defendant, the Court may determine that plain error review applies. Forfeiture occurs when a defendant fails to assert an objection in the district court, usually as a result of mistake or oversight. *See United States v. Olano*, 507 U.S. 725, 731 (1993); *see also Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."). When a party fails to object to dismissal of a juror, appellate courts review the challenged decision only for plain error, not abuse of discretion. *See Olano*, 507 U.S. at 731; *United States v. Runyon*, 707 F.3d 475, 516–17 (4th Cir. 2013) (reviewing replacement of juror absent objection under plain error review). The plain error standard in appellate review also applies in the trial court to post-trial claims that could have been but were not raised during trial. *United States v. Awad*, 518 F. Supp. 2d 577, 582 (S.D.N.Y. 2007) (citing *United States v. Blade*, 336 F.3d 754, 757 (8th Cir. 2003)); *see also United States v. Ali*, 991 F.3d 561, 572 (4th Cir. 2021) ("Since the defendant did not object to the [jury] instructions at trial, we review for plain error.").

Here, as fully set forth above, the Court expressly solicited input from defense counsel, on numerous occasions, seeing guidance on the appropriate course of action. The Court notified the parties of the path it intended to take, and defense counsel consented to the proposed procedure. Despite the opportunity to do so, at no point did the Defendant object, request clarification, or express confusion. Defense counsel did not object to the Court's replacement of the juror until *after* it made the decision. Therefore, a review of the Court's replacement of the juror for anxiety implicates plain error review, and not the more rigorous abuse of discretion standard.

As to the replacement of the juror who needed to take medication, the Defendant did not simply forfeit any post-trial challenge to the Court's decision; he *waived* such a challenge by affirmatively agreeing to her removal. When a defendant intentionally decides not to assert a right, he waives any subsequent claim that the action was error. And while Rule 52(b) provides courts discretion to correct errors that were forfeited because not timely raised, no such discretion applies when there has been true waiver. *See Olano*, 507 U.S. at 731–34.

Defense counsel expressly agreed to the replacement of the juror in need of medication. Tr. 2169:25–2170:4 ("We agreed with that. We agreed with that at the time."). Therefore, the Defendant has waived any claimed error in such action. *See United States v. Spruill*, 808 F.3d 585, 599 (2d Cir. 2015) ("The record in this case convincingly demonstrates that Spruill, through counsel, also acted intentionally when he affirmatively agreed to and, at times, even recommended the actions he now challenges with respect to the removal of Juror 11. Thus, his [challenge to the juror's removal] is not simply forfeited without plain error, but waived.").

*v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013). Appellate courts afford district courts broad discretion in deciding whether to replace jurors with alternates. *See, e.g.*, *United States v. Penn*, 870 F.3d 164, 171 (3d Cir. 2017) ("[D]ecisions related to juror substitution are within the discretion of the trial court."); *United States v. Picardi*, 739 F.3d 1118, 1122 (8th Cir. 2014) ("The substitution of an alternate for a juror for reasonable cause is within the prerogative of the trial court and does not require the consent of any party." (citations omitted)); *United States v. De Oleo*, 697 F.3d 338, 341 (6th Cir. 2012) (affirming district court's replacement of a juror with an alternate so the juror could attend the first week of college classes); *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) ("We review for abuse of discretion the district court's handling of alleged juror misconduct," affording the district court "broad flexibility, mindful that addressing juror misconduct always presents a delicate and complex task." (quotation marks omitted)); *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) (acknowledging district courts' broad discretion in handling juror matters because their "unique perspective at the scene . . . [places them] in a far superior position" to determine the proper course of action).

In recognition of the trial court's supreme vantage point and unique perspective, the Fourth Circuit reviews the decision to replace a juror with an alternate under an abuse of discretion standard, "which is rarely found in this context." *Runyon*, 707 F.3d at 517; *see also United States v. Nelson*, 102 F.3d 1344, 1349–50 (4th Cir. 1996) (finding no abuse of discretion where the district court replaced two jurors with alternates because the jurors were scheduled to go on vacation the next day); *United States v. Hayden*, 85 F.3d 153, 157 (4th Cir. 1996) (finding no abuse of discretion where the district court replaced a juror who knew one of the witnesses with an alternate, rather than declare a mistrial); *United States v. Colkley*, 899 F.2d 297, 303 (4th Cir. 1990) (finding no abuse of discretion where the district court excused a juror who failed to appear for thirty minutes

and replaced him with an alternate). "A finding that a district court acted on an irrelevant legal basis or lacked factual support for the conclusion that a juror was unable or disqualified to perform his duty amounts to a finding that the court abused its discretion." *Nelson*, 102 F.3d at 1349.

Here, the Defendant argues that there are "limitations on Rule 24," *Def.'s Mot.*, ECF No. 224 at 5, seeking refuge in the "good cause" standard in Federal Rule of Criminal Procedure 23(b) for removing a juror and allowing a jury of 11 to return a verdict. In doing so, he relies solely on out-of-circuit cases that were either decided before the 1999 amendment to Rule 24[4]—which now explicitly authorizes removal of a juror and replacement with an alternate after deliberations have begun—or address removal of a juror under Rule 23(b). *See Def.'s Mot.*, ECF No. 224 at 6 (citing *Wofford v. Woods*, 969 F.3d 685, 707–08 (6th Cir. 2020) (analyzing a state court's decision to remove a juror); *United States v. Litwin*, 972 F.3d 1155 (9th Cir. 2020) (analyzing removal of a juror for cause under Rule 23); *United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019) (analyzing the removal of a juror who refused to deliberate under Rule 23); *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988) (decided more than a decade before the amendment to Rule 24)).

---

[4] Before 1999, the rules did not specifically allow for a district court's replacement of a juror with an alternate after deliberations had begun. Before the rule amendment, courts often imposed the "good cause" standard set forth in Rule 23 when evaluating a district court's replacement of a juror with an alternate. However, Rule 24 now permits the Court to retain alternate jurors after the jury has retired to deliberate and replace jurors with alternates if a juror is unable to perform or disqualified from their duties, as the Court did here.

Rule 23 outlines the circumstances in which a court may dismiss a juror after deliberations have begun and allow a jury of 11 persons to return a verdict. Fed. R. Crim. P. 23. It provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds *good cause* to excuse a juror." *Id.* (emphasis added). Rule 23 sets forth a good cause standard to excuse a juror and allow the 11-person jury to reach a verdict; Rule 24 does not impose this standard.

The plain language of Rule 24 and Fourth Circuit precedent have not imported the "good cause" standard in Rule 23(b) to the replacement of a juror with an alternate under Rule 24. Instead, as explained above, such decisions are reviewed under an abuse of discretion standard. *See Runyon*, 707 F.3d at 517 (citing Rule 24, and not Rule 23, in deciding whether the district court abused its discretion by replacing two jurors with alternates without notice to or consent from the parties); *see also United States v. Sodipo*, 467 F. App'x 161, 163 (4th Cir. 2012) (unpublished) (reviewing the denial of a motion for new trial regarding removal and replacement of jurors under an abuse of discretion standard). Other circuit courts have similarly rejected requests to apply the "good cause" standard to the removal and replacement of a juror under the amended Rule 24. *See, e.g.*, *United States v. Bravata*, 636 F. App'x 277, 292 (6th Cir. 2016) (unpublished) ("[T]o the extent [the appellant] invites us to impose a 'good cause' standard for Rule 24 replacements, we decline. . . . No such standard applies when the court replaces the excused juror with an alternate."); *United States v. Warner*, 498 F.3d 666, 689 (7th Cir. 2007) ("We have held that '[r]emoving [a] questioned juror and replacing her with an alternate' is reviewed for abuse of discretion. There is nothing in the text of Rule 24(c)(3) to suggest that a different approach is required for reviewing removals that occur during deliberations." (quotation marks and citations omitted)). Thus, the "good cause" and other analogous standards on which the Defendant relies in his motion are of no consequence to this Court's decision to replace two jurors with alternates.

### 3. The Court did not abuse its discretion by relieving two jurors and replacing them with alternates.

The Defendant's after-the-fact objections to the agreed-upon approach employed by the Court fail to identify or articulate any plausible finding of an abuse of discretion. The Court had more than sufficient factual support to find the two jurors could no longer serve and needed to be replaced with alternates. A court abuses its discretion in removing a juror only when the "district

court acted on an irrelevant legal basis or lacked factual support for the conclusion that a juror was unable or disqualified to perform his duty." *United States v. Baize*, 622 F. App'x 198, 200 (4th Cir. 2015) (unpublished) (citing *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir. 1996)); *see also United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002) (district court abuses its discretion in the context of juror removal only "if the juror was discharged without factual support or for a legally irrelevant reason" (internal quotation marks and citations omitted)).

This case is analogous to *United States v. Runyon*, a death penalty case in which the district court excused two jurors and replaced them with alternates. 707 F.3d at 516. The district court excused the first juror four days after the guilt phase of the trial ended and before the eligibility phase began, after she called to notify the court that her mother had passed away. *Id.* The court excused and replaced the juror without consulting the parties; it notified them of its decision the following day. *Id.* The Fourth Circuit held the district court was "well within its discretion in deciding to excuse and replace" the juror rather than delay the proceedings. *Id.* at 517.

Here, the district court did not abuse its discretion by finding either juror could no longer serve. *See id.* As for the juror excused because she needed medication, defense counsel did not object to her replacement at any point during the proceedings. To the contrary, after the juror was removed, the defense expressly stated that they had no objection to the Court's decision: "Judge, we would object not to the juror that was replaced for medication. We agreed with that. We agreed with that at the time." Tr. 2169:25–2170:4. The Defendant now argues for the first time that the juror's notes did not indicate she wished to be released. *Def.'s Mot.*, ECF No. 224 at 8. But the operative question under Rule 24(c) is not whether a juror has expressly asked to be relieved; it is whether the district court finds the juror can no longer serve. *See Runyon*, 707 F.3d at 517. The

14

Court's finding, with consent of both parties, that the juror who needed to take medication could no longer serve was not an abuse of discretion.

Likewise, the Court properly exercised its broad discretion in relieving the juror who wished to be excused due to anxiety, whom the Court determined was physically and emotionally unable to continue deliberations. As above, the Defendant did not object when the Court solicited input from counsel and told the parties it was going to address the juror outside the presence of the parties and "take action." Tr. 2166:14–20; 2168:11–12. The Court established that the juror was "plainly incapable of continuing" and unable to perform her duty. Tr. 2168:20–2170:13; 2172:17–2174:8. The juror had asked to be relieved and told the Court she could no longer perform her duties. Tr. 2168:20–25; ECF No. 212 at 3:1–3 (under seal). The Court noted that the juror was on medication, experiencing anxiety, shaking and could hardly speak, and, by the Court's estimation, in an "emotional meltdown situation." Tr. 2168:25; Tr. 2172:19–21; 2174:6–8. The Defendant now suggests in his motion that "curative measures" could have been taken, and perhaps the juror could have continued. Alternatively, the Defendant argues that the Court should have granted a mistrial rather than replace the jurors. *Def.'s Mot.*, ECF No. 224 at 8–11. But the fact that the Court could have proceeded differently does not mean it acted unreasonably by proceeding as it did.[5]

---

[5] For the same reason, the Defendant's arguments that the Court could have excused the jury for the night or given the jury an instruction that might have alleviated the juror's anxiety, *see Def.'s Mot.*, ECF No. 224 at 15, are unavailing. The Defendant had an opportunity to request these measures when the Court repeatedly asked for the parties' input. He declined to do so. Although defense counsel did initially ask whether the jury could come back in the morning, the Court never rejected that request. *See* Tr. 2158:16–17. The Court responded that it did not think interrupting deliberations would benefit the Defendant but said, "I want to hear from you about this." Tr. 2158:18–2159:5. Defense counsel did not ask for the jury to reconvene in the morning or for the Court to take any of the other measures the Defendant now suggests. Particularly where, as here, the Court repeatedly solicited the parties' positions and suggestions before proceeding, the Defendant's after-the-fact objection and speculative second-guessing should not undercut the Court's approach or conclusion.

District courts are afforded broad discretion in handling juror matters. *See, e.g.*, *Penn*, 870 F.3d at 171; *Boone*, 458 F.3d at 329. And the Fourth Circuit has held that district courts "should consider whether there are less drastic alternatives to a mistrial." *United States v. Hayden*, 85 F.3d 153, 157 (4th Cir. 1996) (citing *United States v. Smith*, 44 F.3d 1259, 1268 (4th Cir. 1995)). The Court was uniquely situated to evaluate whether the juror was able to continue discharging her duties. She told the Court she was not, and the Court agreed. It did not abuse its discretion in relieving her.

The record does not support the Defendant's claim that the Court removed the juror because of her purported disagreement with other jurors. The Court stated repeatedly that it *would not* allow jurors to "gang[] up on somebody and try[] to bump them off a jury." Tr. 2164:25–2165:2; Tr. 2165:12–17 ("I can't let a juror be bumped out one way or the other"). And the Court made clear that it "never had to address" the potential issue of dissension and "never got into what's going on in the jury room or anything like that" with either of the excused jurors. Tr. 2169:2–5; Tr. 2170 at 10–11. The discretion afforded district courts in removing deliberating jurors "extends to decisions whether, and to what degree, to question a deliberating juror regarding circumstances that may give cause for removal." *Spruill*, 808 F.3d at 593. "Such questioning must be pursued cautiously, however, so as not to intrude on one of the cornerstones of our jury system: preservation of the secrecy of jury deliberations." *Id.* The Court did not make any inquiries into the juror's position with respect to the other jurors, nor did it explore the allegations that a juror was not willing to deliberate or follow the Court's instruction. Tr. 2169:2–5. And defense counsel did not object to the Court's decision not to explore those allegations with the juror.[6] The Court

---

[6] In fact, defense counsel made no objection to the Court's decision with respect to the second juror until *after* the parties agreed to allow the Court to voir dire the jurors and "take action," Tr. 2168:11–12, and *after* the Court relieved the juror. The record makes clear that—rather than object when given the opportunity to do so—defense counsel made a calculated judgment not to object prior to the Court's voir dire of the juror, requesting more information about the identity of the

16

relied solely on the juror's fragile emotional state and representation to the Court that she was unable to continue deliberations.[7]

*United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), and the other cases cited by the Defendant regarding removal of jurors because of their view of the evidence or their opposition to the rest of the jury, *Def.'s Mot.*, ECF No. 224 at 6–10, are simply not relevant. In *Brown*—which addressed removal of a juror under Rule 23(b), not substitution of a juror under Rule 24(c)—the district court relieved a juror who said he was not able to discharge his duties. 823 F.2d at 594. The court questioned the juror after receiving his request to be dismissed, but the court and counsel could not tell whether the juror was unable to discharge his duties because he disagreed with the law or because he believed the evidence did not support a conviction under the law. *Id.* at 594–95. The D.C. Circuit held that because the record could support a finding that the juror's request to be dismissed stemmed from his view of the sufficiency of the evidence, he should not have been

---

juror, presumably in an effort to gauge whether the juror was inclined to convict or acquit. Tr. 2166:23–2168:10.

[7] On December 20, 2022, the Defendant filed a request to supplement his motion with two juror affidavits. Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict, with limited exceptions for juror testimony relating to "extraneous influences." *Tanner v. United States*, 483 U.S. 107, 117 (1987). "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." *Id.* at 120. Rule 606(b)'s no-impeachment rule "has substantial merit, promoting full and vigorous discussion by jurors and providing considerable assurance that after being discharged they will not be summoned to recount their deliberations or otherwise harassed," giving stability and finality to verdicts. *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017).

The contents of the juror affidavits, submitted nearly a month after the jury (which by that point no longer included the two affiants) found the Defendant guilty on all counts, fall squarely within Rule 606(b)'s explicit prohibition of statements as to matters "occurring during the jury's deliberations." *See* Fed. R. Evid. 606(b) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations"). The Government reserves the right to fully brief the Rule 606(b) issues contemplated by the juror affidavits.

17

excused. 823 F.3d at 596. The case is inapposite because here, there is no "causal link" between the juror's position in deliberation and her dismissal. *See Def.'s Mot.*, ECF No. 224 at 14. The Court relieved both jurors solely on the basis of medical issues. It did not abuse its discretion in doing so.[8]

### 4. The Court did not violate the Defendant's Due Process Rights in relieving the jurors.

The process by which the Court relieved the two jurors did not violate the Defendant's rights. The Fourth Circuit has construed Federal Rule of Criminal Procedure 43(a)(2) and the Fifth Amendment's Due Process Clause to require a defendant's presence at the removal of jurors. *Runyon*, 707 F.3d at 517. But to the extent that means a defendant must be physically in the same room when a juror is excused, the Defendant waived that right when his counsel agreed to let the Court voir dire the juror and "take action" outside his presence. The Court gave the Defendant sufficient notice of its proposed plan and an opportunity to provide suggestions on the best course of action. *See, e.g.*, Tr. 2158:6–2168:11 ("I welcome any thoughts anyone may have."). The Court sought input from the parties on numerous occasions, specifically telling defense counsel that it valued his experience when determining the best path forward. Tr. 2161:24–25. The Defendant had ample opportunity to object to the Court's questioning of the juror *in camera*, but he neither

---

[8] Even if the Court were to determine that the "good cause" standard under Rule 23 applies, the Court's decision to relieve both jurors satisfies that standard. The first juror was relieved, absent objection from either party, to take her medication, late in the evening when it was impractical to request that the juror drive home and return to continue deliberations. Tr. 2158:6–14; Tr. 2164:1–4. The second juror was relieved, again at her request, because she expressed to the Court that she could not perform her duties as a juror. Tr. 2168:20–2170:13. In making its decision, the Court noted that the juror could hardly speak, was shaking and experiencing anxiety, and in an emotional meltdown situation. Tr. 2168:20–2170:13; 2172:17–2174:8. In the Court's assessment, the juror was "plainly incapable of continuing." Tr. 2172:17–23. The Defendant has set forth no reason why the Court's findings do not constitute good cause. Instead, he argues that the Court relieved the jurors for reasons unsupported by the record.

requested to be present when the Court inquired of the jurors, nor objected to the Court's voir dire of the juror outside his presence.

Moreover, under any reasonable interpretation of the presence requirement, the Defendant and his counsel *were* present when the Court considered whether to relieve and replace the jurors. The Defendant's suggestion that the removal of the juror needing medication was "automatic" and "off-record," *see Def.'s Mot.*, ECF No. 224 at 9, is without merit. The juror was relieved after extensive discussion with both parties in open court. With respect to the other juror, the Court notified the parties of her desire to be relieved and discussed the best way forward with the parties. It did not err by following "a procedure we had agreed to." Tr. 2171:23–2172:3.

But even if there were error, it would not amount to the type of substantial legal error that could warrant the grant of a new trial. Courts have held Rule 33's "interest of justice" standard allows the grant of a new trial based on substantial legal error when "the substantial rights of the defendant have been jeopardized" or the defendant has been denied effective assistance of counsel. *See United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (collecting cases). The Fourth Circuit's decision in *Runyon* demonstrates that this is not such a case.

In *Runyon*, the Fourth Circuit held the district court erred when it dismissed a juror "at an *in camera* proceeding from which both [the defendant] and his attorney were absent and of which they received no notice." 707 F.3d at 517. The Fourth Circuit applied a plain error standard of review because defense counsel failed to object to the replacement of the juror *when they had the opportunity to do so*. *Id.* at 517–18. The court held that although Runyon should have been present when the district court decided to excuse and replace the juror, Runyon failed to show that the district court's failure affected his substantial rights. Runyon suffered no prejudice because the

district court replaced the juror with an alternate who had been selected during the exact same process as the remaining jurors, at which both Runyon and his counsel were present. *Id.* at 518.

Here, the two alternate jurors were empaneled at the same time as the other jurors and were subjected to the same voir dire and opening and final jury charge. The Defendant and his counsel were present for jury empanelment during which the alternates were selected. Finally, as explained below, the evidence in this case is overwhelming. *See id.* at 519 ("[T]his was simply not a close case: the evidence on each aggravator was overwhelming"). When polled, each juror affirmed the verdict. Tr. 2176:9–2177:15.

*Runyon* also found the defense counsel's lack of objection to the district court's procedure undermined any argument that Runyon suffered prejudice. 707 F.3d at 518. It explained:

> Had there been any risk of prejudice from the substitution, one would have expected Runyon's lawyer to have vigorously objected and to have asked for a continuance to await [the juror's] return when the district court announced its decision, yet he did neither. It would set a poor precedent to allow a party to remain silent when a substitution is announced, await the verdict, and lodge an objection only when the jury's determination was adverse. In common parlance, such a tactic is called sandbagging.

*Id.* Here, Defense counsel did not lodge a "vigorous" objection until the jury reported that it had returned a verdict, when it became clear that the Defendant made a tactical misjudgment. "Had there been any risk of prejudice from the substitution, one would have expected [the Defendant's] lawyer to have vigorously objected." *Id.* Even if the Court finds it erred by following the process the parties and the Court had agreed upon, the Defendant cannot establish any effect on his substantial rights that would warrant a new trial.

### 5. The Court properly instructed the jury to begin its deliberations anew after seating the alternates.

The Court's charge that the jury was required to begin deliberations again after the alternates were seated—to which the Defendant did not object—was proper under Rule 24(c). The

Rule states that "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Fed. R. Crim. P. 24(c)(3). The Court instructed the newly constituted jury that

> [T]he requirement is that you begin your deliberations again to bring your other two, the two jurors who have not been included, into those discussions, because it needs to be the decision of all 12 of you. Obviously, the 10 of you are more advanced than the other two, but you need to go back into the deliberations and y'all need to walk through those again.

Tr. 2170:18–2171:2. Because he did not object when the instruction was given, the Defendant's claim is reviewed only for plain error. *United States v. Johnson*, No. 2:13-cr-91, 2017 WL 2531582, at *35 (S.D. W.Va. June 9, 2017) (reviewing defendant's post-trial challenge to jury charge for plain error where no objection was lodged at trial); *see supra*, n.3. His argument that the instruction "falls short of the requirement," *see Def.'s Mot.*, ECF No. 224 at 16, is without merit.

The Defendant seems to take issue with the Court's use of the word "again" rather than "anew." The words again and anew are interchangeable, attaching the same meaning—again is a synonym of anew. *See Anew*, Merriam-Webster.com/dictionary/anew (accessed Dec. 20, 2022) (anew: "for an additional time: AGAIN"). Here, the Court twice instructed the jury not to *continue* its deliberations but that it was to begin deliberations "again." Tr. 2170:17–25. The Court instructed the ten jurors who had been participating in the deliberations to walk through those deliberations again with the alternates. *Id.* The Court's use of "again" does not amount to error, much less plain error. *See United States v. Ross*, 323 F. App'x 773, 775 (11th Cir. 2009) (unpublished) ("This instruction complied sufficiently with Rule 24(c)(3); that the district court did not use the exact word 'anew' establishes no error as the instruction given adequately explained the procedures the jurors were to follow.").

Even assuming the distinction the Defendant seeks to draw is more than semantic, he cannot show that any error affected his substantial rights. "Instructions should not be prone to quibbles." *Runyon*, 707 F.3d at 520; *see also Henderson v. Kibbe*, 431 U.S. 145, 152–54 & n. 10 (1977). As the Fourth Circuit has recognized, courts are not required to instruct the jury from the language of the Rule verbatim, as long as the instruction conveys, "in essence," what the Rule requires. *Runyon*, 707 F.3d at 520 ("Here, while the district court did not repeat the words of the Rule verbatim, the court in substance instructed the jury to rewind its proceedings for the benefit of the alternate before proceeding further. This, in essence, is what the Rule requires."). "While a careful picking apart of the instructions' wording [may often] reveal minor ambiguity, when read in [their] entirety," it may become apparent that "the instructions were clear and did not permit" an improper verdict. *Id.* (quoting *United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) (per curiam)). Such is the case here.

Additionally, the Court took all of the steps other courts have recognized are important to minimize the risk of undue influence on newly seated jurors. In *United States v. Scarfo*, 41 F.4th 136, 206–07 (3d Cir. 2022), on which the Defendant relies, the Third Circuit identified a number of precautions that limit the "potentially coercive dynamic" of empaneling an alternate after deliberations have begun. Those include empaneling alternates who were chosen in the same manner as regular jurors, who heard the same evidence and legal instructions, and who have not been influenced by outside discussions or media reports. *Id.* at 207; *see also Runyon*, 707 F.3d at 518 (finding improper replacement of a juror did not affect the defendant's substantial rights where the juror was replaced with an alternate who had been selected during the exact same process as the remaining jurors, at which both the defendant and his counsel were present). The alternates here were drawn from the same jury pool and at the same time as the other jurors. They sat through

22

the entire trial with the other jurors and received all of the Court's instructions, including its repeated admonitions to avoid media and social media coverage of the case during trial. And when the jury retired to deliberate, they were sent to a separate room and instructed not to discuss the case with anyone. Although courts have recognized that asking a jury to start deliberations again with alternates can put undue pressure on the alternates, the Court here took extensive measures to prevent that from occurring.

The Defendant has not identified a single additional action the Court should or could have taken. Nor can he. In *United States v. Oscar*, 877 F.3d 1270, 1290 (11th Cir. 2017), the Eleventh Circuit explained that substituting two alternates at the same time during deliberations diminished the risk of coercion. It also theoretically decreased the chances of conviction because "there were two more jurors who had to be convinced by the government's evidence." *Id.* In an attempt to show prejudice, the Defendant points only to the short time in which the jury reached a verdict after the alternates were seated. *See Def.'s Mot.*, ECF No. 224 at 16–18. But he has not identified a single case in which a new trial was granted simply because a jury quickly returned a verdict. The closest he comes is *United States v. Lamb*, 529 F.2d 1153, 1156 n.7 (9th Cir. 1975) (en banc), in which the Ninth Circuit referenced "the obvious coercive effect suggested by the final deliberative period of only twenty-nine minutes" after an alternate was empaneled. But *Lamb* did not order a new trial on that basis. To the contrary, it noted "the period of time during which the substitute juror participated in the deliberations is essentially irrelevant." *Id.* As *Scarfo* explained, the Ninth Circuit in *Lamb* vacated the conviction because the prior version of Rule 24(c) was violated when the alternate was not discharged before deliberations. *Scarfo*, 41 F.4th at 208 n.77. Assuming there was some error in the Court's direction to the jury to begin its deliberations again,

23

the short period of time in which the alternates deliberated cannot by itself show an effect on the Defendant's substantial rights requiring a new trial.

**B. The Defendant's disagreement with the indictment charging that he knew the stolen funds belonged Arthur Badger, the Estate of Donna Badger, and/or the Estate's Beneficiaries is not a sufficient basis to award him a new trial.**

The Court did not err at any stage of the trial by acknowledging that the indictment defined "Estate of D.B." to include both Arthur Badger and the Estate of Donna Badger.[9] First, there was no fatal variance because the evidence introduced at trial tracked the charges in the indictment. Second, the jury charge accurately explained the indictment. And third, the Court properly sustained the Government's objection to a confusing and inaccurate argument during closing.[10]

**1. The evidence at trial tracked the charges in the indictment; there was no variance, fatal or otherwise.**

The Defendant argues in a single sentence that the Court's instruction incorporating Footnote 1 of the Second Superseding Indictment resulted in a fatal variance between the evidence and the charges. *See Def.'s Mot.*, ECF No. 224 at 19. This argument should be deemed waived for failure to explain or develop it. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (alteration and quotation marks omitted)). It also fails on the merits.

---

[9] Footnote 1 states: "A.B., a beneficiary of the Estate of D.B. and a person known to the grand jury, and the Estate of D.B. both obtained settlements following civil lawsuits. A.B. and the Estate of D.B. will be referred to collectively as the 'Estate of D.B.' throughout this Second Superseding Indictment." *Second Superseding Indictment*, ECF No. 61 at 3 n.1.

[10] The Defendant's contention that the evidence was insufficient to support his convictions on Counts Two and Three is addressed below with the remainder of his sufficiency of the evidence claims.

A fatal variance occurs when the Government "presents evidence that broadens the bases for conviction beyond those charged in the indictment," and the defendant "shows that the variance infringed his 'substantial rights' and thereby resulted in actual prejudice." *United States v. Young*, 979 F.3d 253, 263 (4th Cir. 2021) (quotation marks omitted). There was no variance at all, let alone a fatal variance.

Count Two charged that the Defendant and Murdaugh committed bank fraud by negotiating and distributing to Hannah Plyler a check for $101,369.49, "knowing that the funds belonged to the Estate of D.B. and/or the Estate's beneficiaries." *Second Superseding Indictment*, ECF No. 61 at 12. The grand jury's indictment defined "Estate of D.B." to include both Arthur Badger and the Estate of Donna Badger. *Id.* at 3 n.1. And it made clear that Arthur and the Estate "both obtained settlements following civil lawsuits." *Id.* The indictment is entirely consistent with the evidence introduced at trial, and as recited in the Defendant's motion. *See Def.'s Mot.*, ECF No. 224 at 19–20.

Count Three charged that the Defendant committed wire fraud by distributing $33,789.83 "belonging to the Estate of D.B. and/or the Estate's beneficiaries" to Murdaugh's bank account, affecting a financial institution. *Second Superseding Indictment*, ECF No. 61 at 13. As with the bank fraud count, the indictment defined "Estate of D.B." to include both Arthur Badger and the Estate, and it made clear that Arthur and the Estate obtained separate settlements. *Id.* at 3 n.1. The indictment and the evidence introduced at trial, and as received in the Defendant's motion, are consistent. *See Def.'s Mot.*, ECF No. 224 at 19–20. There is no variance, fatal or otherwise.

## 2. The jury instruction on Counts Two and Three accurately reflected the charges in the indictment.

The Court did not abuse its discretion or plainly err in charging the jury on Counts Two and Three. The Defendant seems to pose two separate challenges to the jury charge. First, he claims

the Court's instruction that "under the charges pending, Arthur Badger and the estate of Donna Badger are referred to collectively as the estate of Donna Badger," Tr. 2125:4–6, was "legally and factually incorrect." *See Def.'s Mot.*, ECF No. 224 at 19. The Court's decision to give a challenged jury instruction is reviewed for an abuse of discretion. *United States v. Whittington*, 26 F.3d 456, 462 (4th Cir. 1994). Here, the jury charge was a nearly verbatim recitation of the indictment, which states "A[rthur] B[adger] and the Estate of D[onna] B[adger] will be referred to collectively as the 'Estate of D[onna] B[adger]' throughout this Second Superseding Indictment." *Second Superseding Indictment*, ECF No. 61 at 3 n.1. The Court's instruction is neither factually nor legally incorrect; it is an accurate reading of the plain language of the indictment.

Second, the Defendant argues the Court's addition of "and/or the Estate's beneficiaries" is "legally and factually incorrect" because Arthur Badger was not a beneficiary of the Estate. *See Def.'s Mot.*, ECF No. 224 at 23. The Defendant did not object to this aspect of the jury charge, so the Court should deny his motion for a new trial unless there is a plain error that affected his substantial rights. *United States v. Sprouse*, 517 F. App'x 199, 204 (4th Cir. 2013) (unpublished) ("When a defendant fails to object to a jury instruction . . . a district court should deny a motion for a new trial in the absence of plain error."). But there is no error in the charge, much less a plain error.

In its charge on Count Two, the Court stated,

*The Government alleges* that on or about September 13th, 2013, the defendant, with Alex Murdaugh, knowingly executed and attempt[ed] to execute a scheme or artifice to obtain money and funds under the custody and control of Palmetto State Bank, an FDIC financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted Alex Murdaugh by negotiating and distributing a check totaling $101,369.49 to Hannah Plyler knowing that the funds belonged to the estate of Donna Badger *and/or the estate's beneficiaries*.

Tr. 2130:3–13 (emphasis added). This is a fully accurate statement of the allegation contained in Count Two. *See Second Superseding Indictment*, ECF No. 61 at 12. The Court did not err by including "and/or the estate's beneficiaries"—language taken directly from the indictment—in its explanation of the charged conduct.

The same is true for Count Three. The Court instructed the jury,

> *Count 3 alleges* that on or about September 13, 2013, the defendant, with Alex Murdaugh, devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and interstate commerce, writings, signs, and signals, for the purposes of executing such a scheme and artifice, and that he obtained funds as a personal representative belonging to the estate of Donna Badger *and/or the estate's beneficiaries*, and distributed $33,789,83 to Murdaugh's personal bank account, affecting a financial institution.

Tr. 2133:3–14 (emphasis added). Again, this is a fully accurate statement of the allegation contained in the indictment. *See Second Superseding Indictment*, ECF No. 61 at 13. The Court did not err by including "and/or the estate's beneficiaries"—the same language used in the indictment—in its explanation of the charged conduct.

The Defendant cannot show an error in the jury charge. He merely disagrees with the way in which the indictment was drafted, maintaining that the allegations were "legally and factually incorrect" because Arthur Badger was not a beneficiary of the Estate. *See Def.'s Mot.*, ECF No. 224 at 23. But whether Arthur was a beneficiary of the Estate is irrelevant. As the indictment was drafted, the jury could convict the Defendant on Count Two if it found he knew the $101,369.49 belonged to Arthur Badger, Donna Badger, and/*or* the Estate's beneficiaries. *See Second Superseding Indictment*, ECF No. 61 at 3 n.1, 12. The jury could convict the Defendant on Count Three if it found the $33,789.83 belonged to Arthur Badger, Donna Badger, and/*or* the Estate's beneficiaries. *See id.* at 3 n.1, 13. The jury did not need to believe that Arthur Badger was a beneficiary of the Estate to find the Defendant guilty. Nor did it need to believe that the money

27

belonged to a beneficiary of the Estate to find him guilty. It was sufficient for the jury to find the money belonged to Arthur Badger. And the Defendant has admitted it did. *See Def.'s Mot.*, ECF No. 224 at 22 ("The funds came from Arthur Badger's independent settlement he negotiated with Alex Murdaugh.").

### 3. The Court did not abuse its discretion by sustaining a Government objection during closing to a confusing and inaccurate argument by the defense.

The Court should reject the Defendant's claim that the Court "compounded this error when it sustained the Government's objection during closing arguments." *See Def.'s Mot.*, ECF No. 224 at 23. "A district court has broad discretion with respect to oral arguments." *United States v. Watts*, 453 F. App'x 309, 314–15 (4th Cir. 2011) (unpublished) (citing *United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003)). That includes the ability to "limit closing argument to ensure that argument does not impede the fair and orderly conduct of the trial." *United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987) (quotation marks and alteration omitted). The Court did not abuse that discretion here.

The Government lodged only one objection to the Defense's discussion of the beneficiary issue during closing. Defense counsel, addressing the overt acts charged in furtherance of the conspiracy, argued:

> And it says Russell negotiated the check here. It's [a] $150,000 check to Hannah Plyler, at Alex Murdaugh's direction and knowing that the money belonged to the estate of Donna Badger and/or her beneficiaries. *Well, Russell Laffitte was not Arthur Badger's beneficiary*.

Tr. 2068:16–21 (emphasis added). The Government stated, "Your Honor, again, we took this up in the charging conference. It's going to be covered by you and he's misstating what you're about to charge." Tr. 2068:22–24. The Court responded, "The definition is set up in Footnote 3 [*sic*]. Please be careful, Mr. Austin." Tr. 2068:25–2069:1.

28

To the extent the Court asking defense counsel to be careful is construed as sustaining the objection, the Court's decision does not amount to an abuse of discretion. Defense counsel's statement—that the Defendant was not Arthur Badger's beneficiary—was improper in numerous respects. First, the indictment did not allege that the Defendant was Badger's beneficiary; it alleged that the Defendant put money into Hannah Plyler's account that he knew belonged to Arthur Badger, Donna Badger's Estate, and/or the Estate's beneficiaries. *Second Superseding Indictment*, ECF No. 61 at 3 n.1, 11. Second, evidence introduced during the trial related to whether Arthur was Donna's Estate's beneficiary, not whether the Defendant was Arthur's beneficiary. And third, the statement conflicted with the jury charge, which clearly defined "the Estate of Donna Badger and/or the Estate's beneficiaries."

The Defendant complains that he was not allowed to explain to the jury why the combination of Badger settlements was legally and factually misleading or why the indictment's allegation that the funds belonged to the Estate of Donna Badger or her beneficiaries could not be true. *See Def.'s Mot.*, ECF No. 224 at 23. But the Defendant continues to overlook that the indictment acknowledged that Arthur and the Estate had two different settlements, and it alleged that the funds belonged to Arthur Badger, Donna Badger, *or* the Estate's beneficiaries. *Second Superseding Indictment*, ECF No. 61 at 3 n.1. In short, whether Arthur was a beneficiary of the Estate has no impact on the Defendant's culpability.

Whether the Defendant owed a fiduciary duty to Arthur is likewise irrelevant. The Defendant argues "there is a substantial risk the jurors were left with the false and prejudicial idea that Mr. Laffitte violated a fiduciary duty when he negotiated the funds in Counts two and three," *Def.'s Mot.*, ECF No. 224 at 23, but the Government did not argue that the Defendant owed Arthur Badger a fiduciary duty in its opening, closing, or rebuttal arguments, and the defense argued in

closing—without objection from the Government—that the Defendant was "not charged with violating his fiduciary duties." Tr. 2064:21–22. The Court did not abuse its discretion by asking defense counsel to "please be careful" after counsel argued that the Defendant was not Arthur Badger's beneficiary.

### C.  The Court did not improperly limit defense counsel's cross-examination.

The Court did not improperly limit defense counsel's cross-examination of the Government's witnesses regarding either the dissent and disagreement among Palmetto State Bank Board members and a desire to sell the Bank or evidence of Alex Murdaugh's separate scheme to steal money from clients through a "Forge" account at the Bank of America. *Def.'s Mot.*, ECF No. 224 at 24–29. In ruling on a motion for a new trial, the district court "'should exercise its discretion . . . sparingly' and . . . should do so on evidentiary grounds 'only when the evidence weighs heavily against the verdict.'" *Perry*, 335 F.3d at 320 (quoting *Wilson*, 118 F.3d at 237). "[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions." *United States v. Soto*, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014), aff'd sub nom. *United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015). Even when a trial court errs in its evidentiary rulings, "a new trial is not warranted if the court is satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's finding that th[e] defendant is guilty beyond a reasonable doubt." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). A district court's evidentiary rulings are accorded great deference and "such decisions may only be overturned under the most extraordinary circumstances." *United States v. Rosen*, 557 F.3d 192, 199 (4th Cir. 2009).

As the Defendant acknowledges in his motion, a criminal defendant has the right to reasonable cross-examination, not "the right to cross-examine in whatever way, and to whatever

extent, the defense might wish." *Def.'s Mot.*, ECF No. 224 at 25 (quotation marks omitted) (citing *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir. 2000); *United States v. Ayala*, 601 F.3d 256, 273 (4th Cir. 2010)). The Court ensured the Defendant was able to thoroughly and fairly cross-examine the Government's witnesses.

### 1. The Court permitted defense counsel to cross-examine the Government's witnesses about dissention within the Bank's Board.

Contrary to the Defendant's arguments, the Court did permit defense counsel to cross-examine numerous witnesses regarding dissention within the Bank and Board members' desire to sell the Bank—even though defense counsel did not associate such questions with the witnesses' bias or motive until the last Board member testified. Defense counsel did not specifically articulate a desire to cross-examine the Government's witnesses about their alleged *motive* to fire the Defendant so that they could sell the bank until the Government's last Board member witness, Becky Laffitte, testified. And, after defense counsel raised motive as the basis for the line of questioning during Becky Laffitte's testimony, the Court allowed the question. Tr. 1081:5–17.

The first Bank Board member to testify for the Government was Norris Laffitte. Defense counsel did not attempt to ask questions about the potential sale of the Bank during Norris Laffitte's testimony. The first witness cross-examined about the alleged different factions on the Board was Jan Malinowski, the current CEO of the Bank. Defense counsel began to question Mr. Malinowski about a Board strategy retreat in 2020. Tr. 635:10–14. The Government objected on relevance grounds, and the Court directed defense counsel to lay a foundation for relevance. Tr. 635:15–19. Defense counsel then asked Mr. Malinowski whether the topic of selling the bank was discussed at the strategy retreat. Tr. 635:20–15. Mr. Malinowski responded that he was not aware of a discussion about the sale of the bank. Tr. 636:1–2. Defense counsel then attempted to give Mr. Malinowski information about these supposed discussions about selling the bank, and the

31

Government objected to defense counsel testifying. Tr. 636:3–17. The Court reminded defense counsel that he could not testify or refresh the witness' recollection with his own memory. *Id.* Contrary to the Defendant's claims, the Court did not limit defense counsel's cross-examination regarding the sale of the Bank, bias, or motive. It sustained objections because defense counsel asked the questions improperly under other rules of evidence. Most importantly, defense counsel did not raise arguments of bias or motive surrounding the sale of the Bank during its cross-examination of Mr. Malinowski.

The next Board member to testify was Spann Laffitte. During his cross-examination, defense counsel asked him about the same strategy retreat in 2020 and discussions about selling the bank. Tr. 962:21–963:18. Defense counsel cross-examined Spann Laffitte about whether some Board members wanted to sell the bank, how many Board members wanted to sell the bank versus members who did not, and whether the Board had obtained a valuation of the Bank. *Id.* Later in the cross-examination, defense counsel again asked questions about the sale of the Bank and whether Charlie Laffitte, the Defendant's father, had written letters to the Board on the topic. Tr. 965:1–10. The Government made a hearsay objection, but the Court expressed concerns over the lack of relevance. Tr. 965:11–18. Defense counsel again attempted to lay a foundation through additional questions about the sale of the bank. Tr. 965:19–966:10. Defense counsel asked whether there were any Board members who would never want to sell the bank and then asked questions to distinguish the Board members who work in the Bank from those who do not work in the Bank. *Id.* Despite numerous questions in an attempt to lay a foundation for the relevance of the line of questioning, the Court found that the topic was irrelevant. Tr. 966:12–13. Although there were numerous relevancy objections related to the topics during Spann Laffitte's testimony, defense

counsel did not make any arguments that it sought to elicit the testimony on cross-examination to establish the witness' motive or bias to testify.

The next Board member to testify was Lucius Laffitte. Defense counsel did not ask any questions about dissention amongst the Bank's Board or a desire to sell the Bank. Tr. 980–1017. The very first time defense counsel cited *motive* as the basis to cross-examine a Board member about divisions within the Board regarding the proposed sale of the bank was with the Government's last testifying Board Member, Becky Laffitte. Defense counsel asked Ms. Laffitte whether some Board members wanted to sell the Bank. Tr. 1081:5–8. The Government objected to the question, for the same reasons it previously objected, and the Court again questioned the relevance of the line of questioning. Tr. 1081:9–12. Defense counsel, *for the first time*, argued that the question went to Ms. Laffitte's motive to testify. Tr. 1081:13–14. The witness said she was happy to answer the question, and the Court allowed it. Tr. 1081:15–17. Defense counsel was, despite the arguments in the motion for a new trial, permitted to address this topic during its cross-examination of the Government's witnesses.

The Defendant's arguments that the Court improperly limited cross-examination about dissention amongst the Board and the sale of the Bank, warranting a new trial, should be denied.[11]

---

[11] The Court should also reject this claim because this evidence was not relevant. The argument that some members of the Board (presumably including the witnesses) expressed an interest in selling the Bank at a planning retreat in 2020, and others (presumably including the Defendant) did not, and those who wanted to sell the Bank voted to remove the Defendant from the Board solely so they "could pursue the sale of the Bank and possibly generate profit for themselves as shareholders," *Def.'s Mot.*, ECF No. 224 at 27, is at best speculative. It is not direct evidence of motive or bias of any Government witness.

## 2. The Court did not improperly limit cross-examination on an irrelevant and uncharged scheme.

The Court did not abuse its discretion by limiting cross-examination of Government witnesses regarding Alex Murdaugh's "Forge" scheme. As the Court is aware, Murdaugh is alleged to have stolen from clients in another scheme unrelated to the scheme charged in the Second Superseding Indictment. In the unrelated "Forge" scheme, Alex Murdaugh allegedly created a fake "Forge" account at the Bank of America and directed settlement proceeds to be sent to this account, rather than to Forge Consulting, LLC, for legitimate settlement structuring services.

The Defendant argues for the first time in his motion that the evidence of the "Forge" scheme was relative to the bias and motive for the Government's witnesses to testify. *Id.* Again, defense counsel did not use the words motive or bias until the cross-examination of the Government's last Board member to testify. Defense counsel *did not* make these arguments during its cross-examination of the Law Firm witnesses. He now cites a portion of Ronnie Crosby's testimony, arguing that the Court improperly limited his cross-examination by not permitting questions about the "Forge" scheme. However, defense counsel did not argue that they wanted to cross-examine Crosby regarding the "Forge" scheme to establish his motive or bias to testify. Rather, defense counsel simply argued that Murdaugh "tricked" Crosby in an attempt to show that Murdaugh similarly tricked the Defendant.[12]

---

[12] After the Government rested and during the Defendant's presentation of its case, the Court addressed the matter outside the presence of the jury following a statement made by defense counsel during a sidebar. The Court explained that it limited defense counsel from addressing the "Forge" scheme because the evidence was irrelevant to the Defendant's guilt under Rule 401, it risked confusing the jury under Rule 403, and it invited jury nullification by arguing that he should not be punished because someone else was not punished. Tr. 1569–1570. Each of these rulings was well within the bounds of the Court's discretion.

The Defendant argues he needed to cross-examine Government witnesses regarding the depths of Murdaugh's deception, *Def.'s Mot.*, ECF No. 224 at 28, but he had an ample opportunity to do so even without discussing the "Forge" scheme. The defense discussed Murdaugh's ability to deceive those closest to him extensively in opening, on cross-examination, on direct-examination, and in closing. The Court acted well within the bounds of its discretion when it excluded evidence related to an irrelevant, uncharged scheme.

Nevertheless, to the extent the Court finds that it did, in some way, improperly limit defense counsel's cross-examination regarding the division within the Board or the "Forge" scheme, the Defendant cannot demonstrate that preventing that line of questioning weighs so "heavily against the verdict that to deny a new trial would be contrary to the 'interests of justice,'" as required under Rule 33. *United States v. Newell*, 2015 WL 892367, at *1 (W.D.N.C. Mar. 3, 2015). The Defendant's motion for a new trial should be denied.

## D.  The Court did not abuse its discretion by declining to give the jury an advice of counsel instruction.

Both at trial and in his motion, the Defendant has failed to identify a single piece of advice he received from an attorney, acting in a capacity as his attorney, that would warrant an advice of counsel charge. Although the Government bears the burden of proof in terms of establishing the willfulness of defendants' conduct, "[t]he general rule is that advice of counsel is no excuse for violation of law," *Miller v. United States*, 277 F. 721, 726 (4th Cir. 1921), and defendants have "a burden of production to establish a prima facie [advice of counsel] defense," *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015). The Fourth Circuit has held that to be entitled to an advice of counsel charge, "'the defendant must establish (a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the attorney's advice.'" *Id.* (quoting *Powell*, 680 F.3d at 356). Only when a defendant establishes a proper evidentiary foundation for such an advice of

35

counsel defense" at a trial will the court instruct the jury on the law governing the defense. *See Powell*, 680 F.3d at 356–57. The Defendant has not identified a basis in the evidence for an advice of counsel defense.

During the charging conference, defense counsel made numerous generalized arguments that the Defendant relied on both Ronnie Crosby and Alex Murdaugh as his lawyers. Tr. 1976:4–1990:8. The Court repeatedly asked defense counsel to direct the Court to evidence of an attorney-client relationship and specific advice the Defendant received during the course of that relationship. *See, e.g.*, Tr. 1976:18–20 ("[W]e are going to figure out what the case is and what his advice -- specific advice was that you are claiming he's relying on."); Tr: 1977:11–12 ("But what advice did Ronnie Crosby provide[?]"); Tr. 1977:25–1978:2 ("Plus, you haven't given me any specific advice. He went to him and said what? And what advice did he rely on?"); Tr. 1978:15–16 ("What advice did he give him that he relied on, specific? To get advice of counsel, you've got to fully disclose to the other side, and then you've got to get specific advice."); Tr. 1981:9–19 ("But you haven't given me any specific advice that's in the record that Alex Murdaugh gave the defendant. . . . What's in the record that Alex Murdaugh gave him legal advice?"); Tr. 1983:2–18 ("What's the specific account that he got legal advice about? . . . Did he give him advice about the $101,000 and the transfer to Plyler? Where is the evidence in the record of that?"); Tr. 1984:8–14 ("But sitting here and saying that he got advice, you haven't even identified the advice he got, what specific advice there is."); Tr. 1986:4–8 ("I'm just saying you haven't identified any advice he got regarding this specific matter."); Tr. 1988:24–25 ("It's not advice. You can't identify the advice he gave."). Defense counsel is still unable to direct the Court to any evidence establishing an attorney-client relationship or specific advice on which the Defendant relied in "filling out the

forms[,] deciding how best to fulfil his obligations as conservator or PR," or taking the actions charged in the Second Superseding Indictment. *See Def.'s Mot.*, ECF No. 224 at 31.

Most importantly, it is clear from the Defendant's own testimony that he was not relying on the advice of Murdaugh as his attorney. During the Defendant's cross-examination, he testified that he negotiated the stolen funds at Murdaugh's direction, stating, "I did receive those checks. And . . . at the direction of my attorney, which I did not recognize those checks for what they were, and at the direction of my attorney, I cut them into other things." Tr. 1884:16–24. When asked to clarify that he was acting at his attorney's direction, the Defendant responded, "[y]es, ma'am. He was the attorney for the clients so, yes, ma'am.' *Id.* The Government then pointed out that he could not be relying on Murdaugh as the victims' attorney when he negotiated those checks *unless* he knew that the stolen funds belonged to those victims. Tr. 1885:25–1886:21. The Defendant then recanted those statements, saying "[w]ell, I guess I misspoke. I'm sorry. *I was not relying on him as my attorney.*" Tr. 1886:22–23 (emphasis added).

Because there was no evidence that the Defendant received legal advice from an attorney or relied on that advice at any point during the time alleged in the Second Superseding Indictment, the Court properly declined to instruct the jury on an advice of counsel defense. The Court should deny the Defendant's request for a new trial on this basis.

## E.  The Government presented more than sufficient evidence to sustain the verdict on all six counts.

"A defendant challenging the sufficiency of the evidence faces a heavy burden." *United States v. Banker*, 876 F.3d 530, 540 (4th Cir. 2017) (quotation marks omitted). "A jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Barronette*, 46 F.4th 177, 203 (4th Cir. 2022) (cleaned up). The reviewing court "is not entitled to assess the credibility of witnesses," *id.* at 205, or to

weigh the evidence, *Wilson*, 118 F.3d at 234. Where the evidence supports differing reasonable interpretations, the jury decides which interpretation to believe. *Id.* And the court "must assume that the jury resolved all contradictions in favor of the Government." *Barronette*, 46 F.4th at 203 (alteration omitted). The Defendant cannot meet his burden of establishing the evidence was insufficient to convict him on any of the six counts in the Second Superseding Indictment.

### 1. Count One – Conspiracy to Commit Wire Fraud or Bank Fraud

Count One charged the Defendant with conspiracy to commit wire fraud or bank fraud. *Second Superseding Indictment*, ECF No. 61 at 10–11. The Government was required to prove beyond a reasonable doubt that (1) two or more people entered into a conspiracy, agreement, or understanding to commit an unlawful act; (2) at some point during the existence or life of the conspiracy, agreement, or understanding, the Defendant knew of the unlawful purpose of the agreement; and (3) the Defendant joined the agreement willfully with the intent to further the unlawful purpose. Tr. 2125:12–21. The evidence was sufficient for a rational trier of fact to have found these elements beyond a reasonable doubt. *See Barronette*, 46 F.4th at 202 (reviewing sufficiency of the evidence "to determine whether *any* rational trier of fact could have found that all elements of the charged offenses were proven beyond a reasonable doubt" (quotation marks omitted)).

The evidence established a conspiracy in which the Defendant and Alex Murdaugh obtained money and property by means of false and fraudulent pretenses, representations, and promises and defrauded Murdaugh's personal injury clients. The conspiracy started when the Defendant served as conservator for Hannah and Alania Plyler. He extended himself loans out of Hannah's conservatorship accounts, which he repaid in part with a $35,000 personal representative fee from Arthur Badger, a $60,000 personal representative fee from Hakeem Pinckney, and credit

for conservator fees he claims he was owed by Hannah Plyler. The Defendant also extended Murdaugh loans from Hannah's conservatorship, consistently to cover Murdaugh's overdrafts. Murdaugh repaid these loans with stolen client funds, using checks the Defendant negotiated.

In December 2011, the Defendant negotiated checks for $309,581.46 and $325,000—settlement money belonging to Hakeem Pinckney and Natasha Thomas—as directed by Murdaugh. That money went to Murdaugh's wife, Murdaugh's boat, the Defendant's father, Murdaugh's father, and to repay loans from the Plyler and Malik Williams conservatorships. GX 35. In August and September 2012, the Defendant broke down a check for $25,245.06—settlement money belonging to Thomas—in a manner that he admitted was structuring. Tr. 1888:3–5; GX 36a. And in February 2013, the Defendant deposited $151,726.05 into Hannah Plyler's conservatorship knowing that money belonged to Arthur Badger, the Estate of Donna Badger, and/or the Estate's beneficiaries. GX 35.

The Defendant's challenge to the sufficiency of the evidence amounts to nothing more than a disagreement with the weight the jury gave his testimony. First, he argues, just as he did in his closing argument, that the evidence does not show he knowingly joined the conspiracy because Murdaugh received millions in stolen client funds, while the Defendant received none. *Def.'s Mot.*, ECF No. 224 at 32; Tr. 2082:24–2083:4 (defense counsel arguing, the "Government alleges that Russell got, I think it was, around $430,000 in fees from these conservatorships, while Alex Murdaugh got millions. I don't know about you, but most criminals don't split – don't take pennies on the dollar for risking getting in trouble with the law."). But the evidence established that the Defendant collected over $450,000 in conservatorship and personal representative fees from Murdaugh's clients, and in exchange, he negotiated the stolen funds at Murdaugh's request. "[E]vidence of financial gain is particularly probative in a fraud case to establish the defendant's

39

intent to defraud." *United States v. Bajoghli*, 785 F.3d 957, 966–67 (4th Cir. 2015). It was reasonable for the jury to find that the Defendant willfully joined the conspiracy to steal client funds because of the substantial financial benefit it afforded him.

Next, he argues his "total transparency betrays the idea that he knew he was participating in an unlawful scheme." *Def.'s Mot.*, ECF No. 224 at 32. He also made this argument to the jury, and the jury rejected it. *See* Tr. 2037:3–7 (defense counsel arguing, "If Russell Laffitte were a guilty man, he never would have signed his name over and over and over, and then publicly filed those signed documents, the notes, all the things you saw in evidence, year after year he goes to accounting."). The Defendant testified that he was fully cooperative and transparent with law enforcement. Tr. 1932:1–2 ("Every document that I had that I know of I gave to law enforcement."). But he also admitted that he did not pay taxes on his conservatorship fees because the checks were made to Palmetto State Bank, and he knew he could hide them on his taxes. Tr. 1930:23–1931:1. It was not until the Fall of 2021, when the Defendant "knew all of this would come to light at some point," that he amended his taxes. Tr. 1931:3–11. The jury was presented with conflicting evidence regarding the Defendant's supposed transparency and cooperation with law enforcement. That it chose not to credit his arguments is not the basis for an acquittal.

The Defendant admitted to negotiating every single check and money order from the stolen Badger, Pinckney, and Thomas funds that passed through Palmetto State Bank. Tr. 1873:13–21. He made over $450,000 for serving as the conservator or personal representative in the Badger, Pinckney, Thomas, and Plyler cases. GX 198 at 14. Given his "omnipresent involvement" in Mudaugh's theft and the financial benefit he derived therefrom, the jury could reasonably infer that he knew the unlawful purpose of the conspiracy and went along with it anyway. *See United States v. Millender*, 970 F.3d 523, 529–30 (4th Cir. 2020) (holding evidence was sufficient to

support the defendant's fraud conspiracy convictions because "[c]riminal knowledge often must be proved by circumstantial evidence," and "a jury could reasonably infer from [the witness's testimony], in the context of [the defendant's] omnipresent involvement in [the coconspirator's] ventures and use of money from them, that [the defendant] knew that the companies were fraudulent and went along with them anyway"). The evidence was sufficient to sustain a conviction on Count One.

### 2. Count Two – Bank Fraud

Count Two alleged the Defendant committed bank fraud by negotiating and distributing a check totaling $101,369.49 to Hannah Plyler, knowing the funds belonged to the Estate of Donna Badger—defined to include both Arthur Badger and the Estate—and/or the Estate's beneficiaries. *Second Superseding Indictment*, ECF No. 61 at 3 n.1, 12. The Government was required to prove beyond a reasonable doubt that (1) the Defendant knowingly executed or attempted to execute a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody of a financial institution by means of false and fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses, representations, or promises were about a material fact; (3) the Defendant executed and attempted to execute the scheme with the intent to defraud; and (4) at the time of the execution of this scheme, the financial institution was federally insured. Tr. 2130:15–2131:2. The Defendant argues only that the Government failed to show he sought to obtain bank property by means of a representation. *See Def.'s Mot.*, ECF No. 224 at 21, 33. The evidence was sufficient for the jury to find beyond a reasonable doubt that he did.

In *Loughrin v. United States*, 573 U.S. 351, 362–63 (2014), the Supreme Court held there must be a "relational" connection between the alleged false statements or representations and the

41

obtaining of bank property: "The criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation." The Court explained that "by means of" "typically indicates that the given result (the 'end') is achieved, at least in part, *through* the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." *Id.* at 363.

The evidence was sufficient for the jury to find beyond a reasonable doubt that the Defendant's false and fraudulent pretenses and misrepresentations were the means by which he obtained the funds. Murdaugh had the Defendant appointed as the Personal Representative for the Estate of Donna Badger. Tr. 1863:11–14 (Defendant's Testimony). Arthur Badger's disbursement sheet showed that the Defendant would collect a $35,000 personal representative fee—despite not having served as Arthur's personal representative—and that $1,325,000 would go to the Bank to fund a structured settlement. GX 23. At his bond hearing in September, the Defendant testified that he had seen the disbursement sheet; this was consistent with an earlier statement to the FBI. GX 201 at 55:15–18; Tr. 1890:18–1891:25 (Defendant's Testimony). He testified at trial that he was not sure when he saw the disbursement sheet, Tr. 1891:12–14, but evidence supports his earlier, contrary testimony. Arthur Badger signed his disbursement sheet on November 19, 2012. GX 23. The same day, Murdaugh had a meeting at the Bank. GX 27. The following day, the Law Firm issued the Defendant's $35,000 fee, drafted to "Palmetto State Bank" with "Arthur Badger – Personal Representative Fee" in the memo line. GX 119.

On February 6, Murdaugh emailed the Defendant and asked him to email Murdaugh and ask that check number 43152, dated November 19, 2012 (the same day the Badger disbursement sheet was signed, and the same day Murdaugh had a meeting at the Bank), for $1,325,000 (the same amount as Badger's intended structure) be re-cut into four smaller checks. GX 39. The

Defendant created a new email chain and emailed Murdaugh, asking that the check be re-cut into four smaller checks. GX 38. Despite not having served as Arthur Badger's personal representative, the Defendant had taken a $35,000 personal representative fee from the settlement. GX 23. His name was on Arthur Badger's disbursement sheet as the personal representative. *Id.* And misrepresenting himself to have some sort of authority to direct the disbursement of the settlement funds, the Defendant emailed the Law Firm and asked them to re-cut the settlement check. GX 38.

Additionally, the check charged in Count Two said "Estate of Donna Badger" in the memo line. GX 29 at 6. The Defendant argues this is "irrelevant." *Def.'s Mot.*, ECF No. 224 at 22. He testified with respect to one of the Badger checks that "[t]he memo line is for the writer of the check to remember what they wrote the check for," and he "wouldn't have looked at" it. Tr. 1876:19–23 (Defendant's Testimony); *see also* Tr. 1880:19–20 (Defendant testifying, "And I wouldn't have looked at the memo line.").

But the Defendant's own witness, John Peters, disagreed with him. Peters, the Bank's longtime compliance officer, testified that the memo line "should be looked at," and was something he considered important when negotiating a check. Tr. 1394:17–1395:13 (Peters Testimony). Looking at the same Badger check the Defendant was referencing, which said "Arthur Badger" in the memo line, Peters testified he "would think that it had something to do with whoever Arthur Badger was." Tr. 1395:3–4 (Peters Testimony). Most importantly, he testified that he would not have negotiated the check in the manner the Defendant did and that any bank teller at Palmetto State Bank would have known not to negotiate a check in that manner. Tr. 1396:1–14 (Peters Testimony).

The Defendant's testimony that he did know the $101,369.49 check was stolen Badger money because he did not see the memo line was not just contradicted by his own witness; it was

contradicted by his own actions. The conservator fees the Defendant collected from Natasha Thomas and Hakeem Pinckney came in checks drafted in the same manner as the stolen Badger funds: They were made out to Palmetto State Bank with "Conservator Fee; Hakeem L. Pinckney" and "Conservator Fee; Natasha Thomas" in the memo lines. GX 214. The Badger personal representative fee also came in a check made out to Palmetto State Bank, with "Arthur Badger – Personal Representative Fee" in the memo line. GX 119.

The Defendant argues the Government sought to "intentionally confuse the jury by lumping . . . together" Arthur Badger and the Donna Badger Estate. *Def.'s Mot.*, ECF No. 224 at 18–19. But the evidence showed it was the Defendant and Murdaugh who lumped together Arthur Badger's money and Donna Badger's Estate as part of their scheme to defraud. The evidence was sufficient for the jury to find beyond a reasonable doubt that the Defendant used his role as the personal representative for the Estate of Donna Badger to have Arthur Badger's settlement check re-cut and to negotiate $101,369.49 he knew belonged to the Badgers for an improper purpose, namely, to repay unsecured loans he had extended Murdaugh from Hannah Plyler's conservatorship.

### 3. Count Three – Wire Fraud

Count Three alleged the Defendant committed wire fraud when he distributed $33,789.83 belonging to the Estate of Donna Badger—defined to include Arthur Badger and the Estate— and/or the Estate's beneficiaries into Murdaugh's personal account, affecting a financial institution. *Second Superseding Indictment*, ECF No. 61 at 3 n.1, 13. The Government was required to prove beyond a reasonable doubt that (1) the Defendant knowingly devised or intended to devise a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses,

representations, or promises were about a material matter; (3) the Defendant acted with the intent to defraud; (4) in advancing, furthering, or carrying out this scheme, the Defendant transmitted or caused to be transmitted by wire communication in interstate or foreign commerce any writings, signs, or signals; and (5) the scheme affected a financial institution. Tr. 2133:16–2134:4. As with Count Two, the Defendant argues the evidence was insufficient for the jury to find beyond a reasonable doubt that he used false and fraudulent pretenses, representations, and promises to obtain the funds. *Def.'s Mot.*, ECF No. 224 at 33. The record demonstrates the opposite.[13]

Count Three related to a $33,789.83 check made out to "Palmetto State Bank" with "Estate of Donna Badger" in the memo line. GX 29 at 19. The money was deposited directly into Murdaugh's account with a deposit slip that said "Donna Badger" but listed Murdaugh's account number. GX 29 at 20.

The scheme or artifice relates to the conspiracy, discussed above with respect to Count One. And for the same reasons the evidence showed the Defendant used false or fraudulent pretenses and misrepresentations to negotiate Arthur Badger's money—including with checks that

---

[13] The Defendant's claim also fails as a matter of law. The Court charged the jury that it could convict the Defendant of wire fraud if it found that he knowingly devised or intended to devise a scheme or artifice "to defraud" *or* "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Tr. 2133:18–21. The Defendant did not object to this charge, which is supported by the law. *See United States v. Zar*, 790 F.3d 1036, 1050 (10th Cir. 2015) ("[T]he first element of wire fraud is a scheme to defraud and that element includes a scheme to obtain property by means of false or fraudulent pretenses, representations, or promises."); *United States v. Simmons*, 441 F. Supp. 3d 1196, 1200 (D. Kan. 2020) ("[N]ot all schemes to defraud will necessarily involve affirmative misrepresentations[.]"); *United States v. Vorley*, 420 F. Supp. 3d 784, 793 (N.D. Ill. 2019) ("[T]he wire fraud statute extends to all schemes to defraud involving wire transmissions, *including* those in which the scheme is carried out by means of false statements.") The Defendant's argument that he is entitled to an acquittal because the evidence does not demonstrate any false pretenses or misrepresentations is therefore without merit.

said "Estate of Donna Badger"—the jury could reasonably find the Defendant obtained by money by means of false or fraudulent pretenses, representations, or promises.

The evidence was also sufficient to allow the jury to find the conduct charged in Count Three affected a financial institution is likewise unavailing. The $33,789.83 charged in Count Three was a portion of the $1,325,000 that the Defendant and Murdaugh conspired to steal from Arthur Badger. When the theft came to light, the Defendant wrote Murdaugh's firm a check for $680,000 of Bank funds—half of the stolen $1,325,000 plus half of the Defendant's $35,000 personal representative fee. Tr. 400:21–401:3 (Jeanne Seckinger Testimony). That $680,000 was a significant financial loss to the Bank. GX 12 (Defendant emailing Board of Directors, "We took a $680,000 loss to fix an issue between us and the PMPED Law Firm."); Tr. 540:11–13 (Jan Malinowski Testimony); Tr. 938:9–12 (Spann Laffitte Testimony). The evidence was sufficient for the jury to find that the Defendant engaged in wire fraud when he deposited $33,789.83 of Arthur Badger's money into Murdaugh's account, and that his conduct victimized the Bank because he used $680,000 of the Bank's money to repay the stolen Badger funds.

### 4. Counts Four, Five, and Six – Misapplication of Bank Funds

To establish misapplication of bank funds, the Government was required to prove beyond a reasonable doubt that (1) the Defendant was an officer, agent, or employee, or connected in some capacity with Palmetto State Bank at the time charged; (2) the accounts of the Bank were federally insured at the time alleged; (3) the Defendant abstracted, purloined, or misapplied more than $1,000 in moneys, funds, or credits belonging to or entrusted to the care of the Bank; (4) the Defendant did so willfully; and (5) the Defendant did so with the intent to inflict financial injury to the Bank or to defraud the Bank. Tr. 2139:6–17. The Defendant challenges only the fourth and fifth elements. *See Def.'s Mot.*, ECF No. 224 at 33–34. But the evidence was sufficient for the jury

46

to find he acted willfully and with the intent to inflict financial injury on or to defraud the Bank as to Counts Four, Five, and Six.

The Defendant's challenge to his conviction on these three counts boils down to an argument that the jury should have believed him when he explained why he paid the Law Firm $680,000 and when he testified that he did not intend to harm his family's bank. His dispute with the jury's findings is not a basis to overturn the verdict. In *United States v. Grow*, the Eleventh Circuit explained that in "criminal cases where intent and knowledge are in dispute, . . . a defendant who chooses to testify runs the risk that the jury will disbelieve his testimony, and runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." 977 F.3d 1310, 1325 (11th Cir. 2020) (cleaned up). "This is especially true," the court noted, "in cases that turn mainly on subjective elements, like a defendant's intent or knowledge." *Id.* at 1325–26 (cleaned up). The court held that when the defendant took the stand and testified that he did not intend to violate any law and did not think his conduct was illegal, "the jury was entitled to conclude that he was lying and infer the opposite was true." *Id.* at 1326. The evidence was therefore sufficient to support the defendant's conviction for health care fraud conspiracy. *Id.* The same is true in this case.

Count Four alleged that the Defendant willfully misapplied bank funds by distributing $680,000 of Palmetto State Bank funds to the Law Firm, without notice to or consent from the Board of Directors, knowing he had fraudulently transferred the money to Murdaugh. *Second Superseding Indictment*, ECF No. 61 at 14. The evidence was sufficient for the jury to find that the Defendant did so willfully.

When the Defendant delivered the $680,000 check to the Law Firm on October 28, 2021, he told the Firm that "nobody knew about it." Tr. 400:1–2 (Jeanne Seckinger Testimony). The

same day, he notified the Executive Committee: "I just wrote up $680,000 to losses other than loans from a 2013 case with Alex Murdaugh. . . . The law firm and I agreed to split the loss and make the client whole." GX 75. But Ronnie Crosby and Jeanne Seckinger both testified there was no agreement on behalf of the Firm to split the stolen Badger money. Tr. 403:8–15 (Jeanne Seckinger Testimony); Tr. 712:1–20 (Ronnie Crosby Testimony). And when two members of the Executive Committee responded to the Defendant's email and asked if there were other similar cases out there, GX 74a, 75a, the Defendant did not disclose that other cases were, in fact, out there, or that he had been involved in them, GX 75b.

On November 2, the Defendant's story changed, and he told the Bank's lawyer and the members of the Litigation Committee that the "verbal contract" between the Bank and the Law Firm "was done with the approval of the Chairman of the Board and the CEO." GX 80. In June of this year, his story changed again, and he told the Office of Disciplinary Counsel that three of the four members of the Executive Committee—he, his father, and his sister—had approved the $680,000 payment. GX 200b.

The Defendant did not tell the Board that the $680,000 included half of the $35,000 fee he took from Arthur Badger. Tr. 1047:20–1048:1 (Becky Laffitte Testimony). He did not tell the Board that the stolen money included nearly $400,000 that went to repay a loan a partner at the Firm had extended to Murdaugh. Tr. 204:19–24 (Norris Laffitte Testimony). He did not tell the Board that he had negotiated hundreds of thousands of dollars to pay off loans he had extended to Murdaugh from the Plyler conservatorship. Tr. 205:22–206:1 (Norris Laffitte Testimony). And he did not tell the Board that the $680,000 included checks that went to Bank of America, not Palmetto State Bank. Tr. 938:5–8 (Spann Laffitte Testimony).

The Defendant's story regarding the approval of the $680,000 payment constantly changed, and he was never fully transparent with the Board of Directors about the circumstances surrounding the stolen Badger money. The jury was not required to accept the Defendant's testimony regarding his reasons for making the payment. It was reasonable for the jury to find that the Defendant—the CEO of the Bank at the time—knew it was unlawful to use the Bank's money to cover up his own wrongdoing.

As to Counts Four, Five, and Six, the evidence was sufficient for the jury to find the Defendant misapplied bank funds with the intent to defraud the Bank. "'Intent to injure or defraud' can be established by proving," among other things, "that the defendant acted in reckless disregard of the bank's interest." Tr. 2140:5–7. "To act with intent to injure or defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to the bank, although it is not necessary that the bank has suffered an actual loss, or to bring financial gain or benefit to one's self." Tr. 2140:7–11. "Intent to defraud can be found from circumstantial evidence and is a question for the trier of fact." *United States v. Grainger*, 701 F.2d 308, 311 (4th Cir. 1983). The evidence was sufficient for the jury to reasonably find the Defendant acted, at the very least, in reckless disregard of the Bank's interest or to bring financial benefit to himself.

As discussed above, Count Four related to the $680,000 payment to the Law Firm. *Second Superseding Indictment*, ECF No. 61 at 14. Becky Laffitte testified about the effect of the Defendant paying the Firm $680,000 without securing a release: "We were out the money. I mean, you are on the hook for everything. If you get sued for this, the bank, again, is entangled in a lawsuit. And, in fact, we are entangled in a lawsuit. . . . [W]e are in a lawsuit filed on behalf of Badger." Tr. 1046:15–20. The evidence was sufficient for the jury to find that the Defendant acted, at least, with reckless disregard for the Bank's interest when he paid $680,000 of shareholder funds

49

to the Law Firm without consulting the Bank's Executive Committee, Board of Directors, or attorneys, and without securing a release. It was also sufficient to find the Defendant benefitted because he used *the Bank's* money to attempt to settle a claim with the Law Firm for which he knew *he* likely had personal liability. The evidence was sufficient for the jury to find intent to injure or defraud the Bank.

Count Five related to the $750,000 loan the Defendant extended to Murdaugh for beach house renovations in July and August 2021. *Second Superseding Indictment*, ECF No. 61 at 15. When the Defendant authorized a $350,000 wire transfer to a lawyer in Bamberg on July 15, 2021, GX 10i, Murdaugh was $163,014.03 in overdraft, GX 192. The Defendant did not mention this loan to the Executive Committee in their meeting on July 13 or to the Board of Directors in their meeting on July 20. Tr. 512:22–513:13 (Jan Malinowski Testimony). Murdaugh continued to go further into overdraft that summer, incurring tens of thousands of dollars of debt for expenses that did not relate to beach house renovations. Tr. 1905:1–21 (Defendant's Testimony).

On August 9, Norris Laffitte emailed the Executive Committee and asked for a report of the Bank's total exposure with respect to Murdaugh. GX 2. Within an hour, while Murdaugh was over $347,000 in overdraft on his personal account and over $14,000 in overdraft on his farm account, the Defendant transferred $400,000 to Murdaugh. GX 82, 220. The Defendant testified this was "just a coincidence." Tr. 1910:7–8. The jury did not believe him.

After transferring the $400,000, the Defendant directed bank employees to start processing a $750,000 loan and backdate it to July 15, the date of the $350,000 wire transfer. GX 10h. The loan documents indicated the loan was collateralized with a share of Green Swamp stock and that its purpose was for "investment." GX 10c, 10d. Five Board members testified that the Defendant told them the loan was for beach house renovations. Tr. 149:3–5 (Norris Laffitte Testimony); Tr.

50

517:20–22 (Jan Malinowski Testimony); Tr. 928:19–20 (Spann Laffitte Testimony); Tr. 1018:6–9 (Lucius Laffitte Testimony); Tr. 1080:5–9 (Becky Laffitte Testimony). He did not mention a wire to an attorney, and he did not mention of hundreds of thousands of dollars in overdraft. Tr. 517:23–518:5 (Jan Malinowski Testimony); Tr. 928:24–929:6 (Spann Laffitte Testimony); Tr. 1018:13–18 (Lucius Laffitte Testimony); Tr. 1063:12–17 (Becky Laffitte Testimony). The Defendant told the Board the Green Swamp stock had not been pledged elsewhere, which was untrue. GX 7e. This was a sham loan, and Murdaugh never made a single payment on it. Tr. 172:22–24 (Norris Laffitte Testimony). The evidence was sufficient for the jury to find that the Defendant acted, at least, with reckless disregard for the Bank's interest when he extended a $750,000 undersecured, sham loan to Murdaugh in the weeks after Murdaugh's wife and son were murdered, knowing Murdaugh was hundreds of thousands of dollars in overdraft at the time.

Count Six related to $284,787.52 the Defendant advanced from Murdaugh's farming line of credit to pay back loans the Defendant had extended Murdaugh from the Plyler conservatorship. *Second Superseding Indictment*, ECF No. 61 at 16. The Defendant and Murdaugh were both tracking when Hannah Plyler was turning 18 and the conservatorship would be closed. GX 55. In February 2015, Murdaugh was over $85,000 in overdraft. GX 161. The Defendant knew Murdaugh would not get his bonus until December, Tr. 1869:10–12 (Defendant's Testimony), so he extended Murdaugh a line of credit for farming, then advanced the exact amount of money Murdaugh owed on the Plyler loans: $284,787.52. GX 87, 57. He issued a cashier's check to pay back Murdaugh's loans and deposited the money in Hannah Plyler's account. GX 95, 95a.

On February 20, the date on the cashier's check, the Defendant emailed Murdaugh: "These are the loans outstanding. I have advance [*sic*] $284,787.52 from your credit line to pay these off. She turns 18 and I am closing the conservatorship." GX 57. The Defendant also advanced money

51

to cover overdrafts and made other deposits Murdaugh had requested, leaving Murdaugh with just $17,477.98 remaining on his $500,000 line of credit. *Id.* Three days later, Murdaugh responded and asked the Defendant to "hold off" until they could meet because it was hard for Murdaugh to track the transactions on his phone. But the Defendant had already advanced the money and drawn up the cashier's check. GX 57, 95. A month later, Murdaugh emailed the Defendant and asked him to increase the line of credit. GX 58. He "had not figured the payoff for Hannah" when he was planning and now actually needed to use the farming line of credit to buy equipment for planting. *Id.*

The FDIC expert testified that the farming line of credit should have been used for farming, Tr. 1131:9–12 (Timothy Rich Testimony), and using the money to replenish funds in another account was not a proper use of the loan funds, Tr. 1132:13–16 (Timothy Rich Testimony). The evidence was sufficient for the jury to find that the Defendant—at the time a seasoned loan officer with decades of banking experience—acted, at least, with reckless disregard for the Bank's interest when he unilaterally extended over $284,000 from Murdaugh's farming line of credit to pay back unsecured loans he had extended Murdaugh from a child's conservatorship account. The evidence was also sufficient for the jury to find the Defendant used Murdaugh's farming line of credit to pay back the unsecured loans and avoid the liability he, as Hannah Plyler's conservator, would have faced if the conservatorship was missing money when she turned 18.

The Defendant's only argument that the evidence was insufficient for the jury to find intent to defraud as to Counts Four, Five, and Six is that "[t]here is no evidence that Mr. Laffitte would seek to injure the bank that had been in his family for four generations, where he was both the CEO and a shareholder." *Def.'s Mot.*, ECF No. 224 at 34. This is yet another argument that the Defendant made to the jury. Asked with respect to all three counts whether he had any intention

52

to "hurt or injure the bank or defraud the bank," the Defendant answered: "I would have been defrauding myself, seeing as I was one of the shareholders, and I would not have done it." Tr. 1934:5–10. He testified with respect to the stolen Badger money, "I was going to be forthcoming. You know, this was a family bank. It was my heart, soul, everything. And I wouldn't try to hide it." Tr. 1947:18–20. And in closing, his attorneys argued he would not have risked "his family's bank," Tr. 2035:3, and that he "never defrauded his family and his family-owned bank," Tr. 2041:12–14. The jury could have believed the Defendant, or it could have determined that he was lying and that he made all three payments to cover his own wrongdoing. The jury chose the latter, and the Defendant's disagreement with that decision is not a basis for overturning the verdict.

### III.    Conclusion

The Defendant bears a heavy burden to show he is entitled to a new trial or an acquittal on any of the six counts on which the jury convicted him. He has failed to show that any substantial legal error prejudiced him and warrants the grant of a new trial, and he has failed to show that the evidence was insufficient for a rational trier of fact to find him guilty. His motion should be denied.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY
By: s/ *Emily Evans Limehouse*
Emily Evans Limehouse (Federal ID #12300)
Kathleen Michelle Stoughton (Federal ID #12161)
Winston D. Holliday, Jr. (Federal ID #7597)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, South Carolina, 29402
(843) 266-1663
Emily.Limehouse@usdoj.gov

December 21, 2022