IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | CRIMINAL NO. 9:22-658-RMG |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **RUSSELL LUCIUS LAFFITTE** | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Following a multi-week trial, the Defendant Russell Lucius Laffitte was convicted of six counts of financial crimes, including conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349 (Count 1), bank fraud, in violation of 18 U.S.C. § 1344 (Count 2), wire fraud, in violation of 18 U.S.C. § 1343 (Count 3), and three counts of misapplication of bank funds, in violation of 18 U.S.C. § 656 (Counts 4–6). After lengthy post-conviction litigation in which the Defendant attacked the strength of the evidence, criticized his prior counsel's representation during the trial, and challenged the Court's replacement of two jurors during deliberations, the Court denied the Defendant's requests for a judgment of acquittal and a new trial. The United States Probation Office prepared a presentence report ("PSR") outlining an advisory guideline range of 108 to 137 months. The Defendant is now scheduled to be sentenced on August 1, 2023.

The Defendant has objected to nearly every aspect of the PSR, reflecting a continued unwillingness to accept any responsibility for his actions or acknowledge the harm his actions have inflicted on the victims. As fully set forth below, the PSR properly calculates the advisory guideline range. A weighing of the 18 U.S.C. § 3553(a) factors demonstrates that a guideline sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

1

I.      **Government's Response to Defendant's Objections to Presentence Report**

On March 27, 2023, the parties received an initial PSR, which set forth an applicable guideline range of 108 to 135 months. The Defendant and his coconspirator Alex Murdaugh ("Murdaugh") were held responsible for at least $3,784,368.98 in loss. The PSR then applied enhancements for vulnerable victim, abuse of a position of trust, and sophisticated means, resulting in a Total Offense Level 31.

On May 10, 2023, the Government amended its restitution request and submitted several minor revisions to the PSR. The Defendant submitted his initial objections on May 10, 2023, setting forth the following objections to the PSR and the guideline calculation: (1) summary of the offense and inclusion of trial testimony and the Indictment;[1] (2) loss amount; (3) sophisticated means enhancement; (4) abuse of position of trust enhancement; and (5) vulnerable victim enhancement. *Def.'s May 10 Obj.* The Defendant also requested an adjustment for mitigating role. *Id.* Finally, the Defendant objected to the fine and restitution, as well as the Defendant's personal characteristics and financial condition as summarized in the PSR. *Id.* On May 22, 2023, the Defendant submitted additional objections to the PSR, arguing that a recent Third Circuit opinion about intended loss should change the loss calculation. *Def.'s May 22 Obj.*

The parties received a final copy of the PSR on June 2, 2023, which contained numerous corrections and revisions. The guidelines, including applicable enhancements and adjustments, remained unchanged. On June 16, 2023, the Defendant submitted a letter formally objecting to the

---

[1]      The Government did not address the Defendant's more minor objections that have no impact on the applicable guideline range. The USPO sufficiently defended its factual summaries and overview of the conduct in the Addendum to the PSR, and the Government agrees with its assessment.

Government's restitution request as outlined in the PSR.[2]  As fully set forth below, the guideline calculation in the PSR correctly calculates the loss amount and applies the appropriate enhancements. The Court should overrule the Defendant's objections and find that the PSR correctly calculated the guidelines range to be 108 to 137 months.

### A. Loss Amount

The PSR outlines a total attributable loss of $3,784,368.98, comprised of (1) $325,000 in settlement funds stolen from Natasha Thomas; (2) $309,581.46 in settlement funds stolen from Hakeem Pinckney; (3) $60,000 in conservator fees improperly collected from Hakeem Pinckney; (4) $15,000 in conservator fees improperly collected from Natasha Thomas; (5) $1,325,000 in settlement funds stolen from Arthur Badger; (6) $35,000 in personal representative fees improperly collected from Arthur Badger; (7) $284,787.52 from the "farming" line of credit the Defendant used to illegally pay off loans he extended to his coconspirator Murdaugh; (8) a $350,000 payment to the Chris Wilson law group; (9) a $400,000 payment to cover Murdaugh's more than $367,000 in overdraft; and (10) $680,000 in Palmetto State Bank ("PSB" or "the Bank") funds the Defendant misapplied. PSR ¶¶ 140–142. The Defendant objects to the total loss amount. As fully set forth below, the PSR accurately calculates the loss amount.

### 1. Holding the Defendant responsible for the $680,000 the Bank lost and the $1,360,000 Arthur Badger lost correctly accounts for the two losses he caused to two separate victims.

The Defendant first argues that the $680,000 of PSB funds he unlawfully paid to Peters Murdaugh Parker Eltzroth and Detrick ("PMPED" or "Law Firm") should not be included in the total loss amount because it is "double counting" with the $1,360,000 loss incurred by Arthur

---

[2]     On July 25, 2023, the Government submitted a separate memorandum to the Court fully outlining the legal basis and factual support for its restitution request, as well as the forfeiture money judgment.

Badger. Pursuant to U.S.S.G. § 2B1.1(b)(1), Application Note 3(a)(i) and (ii), loss is the greater of actual or intended loss. "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense. The $680,000 loss to PSB and the $1,360,000 loss to Badger were both actual losses that are correctly included in the loss amount.

### a. The $1,360,000 loss Badger incurred when the Defendant helped Murdaugh steal his settlement funds is "actual loss" under the Guidelines.

On November 19, 2012, Arthur Badger signed a disbursement sheet dictating that $35,000 in settlement funds be paid to the Defendant as a "Personal Representative Fee" and that $1,325,000 be paid to Palmetto State Bank to fund a structure. GX 23.[3] That day, the Defendant and Murdaugh met at the Bank. GX 27. The next day, November 20, 2012, the Defendant deposited the $35,000 check he received from Arthur Badger's settlement funds. GX 119.

On February 6, 2013, Murdaugh emailed the Defendant and asked the Defendant to email him back and request that a $1,325,000 check dated November 19, 2012 be recut. GX 37. That same day, the Defendant calculated the amounts Murdaugh requested, created a new email chain, and emailed Murdaugh directly, stating: "Can you get the [sic] Jeanne to re-cut check #43162 dated 11/19/2012 as follows?" GX 38. Murdaugh then forwarded the email to Law Firm staff, and Law Firm staff recut the $1,325,000 check in the amounts the Defendant requested. *Id.* Thereafter, Murdaugh presented the Defendant with twelve different checks from Arthur Badger's settlement funds, and the Defendant negotiated the checks at Murdaugh's direction. GX 30. The Defendant issued money orders to pay off Murdaugh's personal loans, authorized wire transfers for cars and equipment for Murdaugh's benefit, and deposited hundreds of thousands of dollars directly into Murdaugh's personal checking account. *Id.* Every one of the checks the Defendant negotiated to

---

[3]    Although the Defendant did not sign Arthur Badger's disbursement sheet, he testified during his September 2021 bond hearing that he saw the disbursement sheet. GX 201, 55:15–18.

benefit Murdaugh said either "Arthur Badger" or "Estate of Donna Badger" in the memo line. GX 29. The $1,325,000 the Defendant helped Murdaugh steal from Badger and the $35,000 fee the Defendant fraudulently collected from Badger's settlement funds are "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1, App. No. 3(A)(i), and they are correctly included in the loss amount.

> **b. The $680,000 loss the Bank incurred when the Defendant misapplied Bank funds to hide the fact that he had helped Murdaugh steal Badger's money is also "actual loss" under the Guidelines.**

In mid-2021, the Law Firm began to uncover Murdaugh's financial crimes. Trial Tr. 383:18–393:9 (Jeanne Seckinger Testimony). They discovered that the Defendant had negotiated twelve of Arthur Badger's stolen settlement checks at the Bank. *Id.* at 391:1–15 (Jeanne Seckinger Testimony). The Defendant then volunteered to pay the Law Firm $680,000—the total of the stolen $1,325,000, plus the Defendant's $35,000 personal representative fee, divided in half. *Id.* at 393:14–23 (Jeanne Seckinger Testimony).

On October 28, 2021—before the Bank or the Law Firm fully understood the Defendant's involvement in Murdaugh's theft—the Defendant delivered a $680,000 check to the Law Firm. GX 14. The $680,000 did not come from the Defendant's personal funds. It came from the Bank's losses other than loans account, without authority or approval from the Bank's Board of Directors. GX 14; *see also* Trial Tr. 400:1–2 (Jeanne Seckinger Testimony).

The same day, the Defendant notified the Bank's Executive Committee: "I just wrote up $680,000 to losses other than loans from a 2013 case with Murdaugh. . . . The law firm and I agreed to split the loss and make the client whole." GX 75. But Ronnie Crosby and Jeanne Seckinger both testified there was no agreement on behalf of the Firm to split the stolen Badger

money. Trial Tr. 403:8–15 (Jeanne Seckinger Testimony); Trial Tr. 712:1–20 (Ronnie Crosby Testimony).

The following day, October 29, 2021, the Defendant sent a similar email to the Bank's Board, notifying them of the payment to PMPED. GX 12. But, the Defendant did not tell the Bank's Board that the $680,000 included half of the $35,000 fee he took from Arthur Badger. Trial Tr. 1047:20–1048:1 (Becky Laffitte Testimony). He did not tell the Board that the stolen money included nearly $400,000 that went to repay a loan a partner at the Law Firm had extended to Murdaugh. Trial Tr. 204:19–24 (Norris Laffitte Testimony). He did not tell the Board that he had negotiated hundreds of thousands of dollars to pay off loans he had extended to Murdaugh from the Plyler conservatorship. Trial Tr. 205:22–206:1 (Norris Laffitte Testimony). And he did not tell the Board that the $680,000 included checks that went to Bank of America, not the Bank.[4] Trial Tr. 938:5–8 (Spann Laffitte Testimony). The evidence and testimony presented during the trial established that the Defendant paid the Law Firm $680,000—unilaterally and without the approval or authorization from the Board—in a desperate attempt to cover up his involvement in Murdaugh's crimes, hoping that the payment would keep the Law Firm and the Bank from further investigation.

---

[4]     Based on conversations with the Defendant's counsel, the Defendant may object to the inclusion of these two checks to the Bank of America in the loss amount. Actual loss includes all "reasonably foreseeable pecuniary harm," U.S.S.G. § 2B1.1, App. No. 3(A)(i). The Defendant served as Badger's personal representative, responsibility for managing and protecting his settlement funds. According to his own testimony, the Defendant saw Badger's disbursement sheet, which showed that the Palmetto State Bank would receive $1,325,000 in settlement funds to fund a structure. GX 23. The Defendant collected $35,000 from Badger's settlement funds, also as indicated on the disbursement sheet. The full $1,325,000 is therefore reasonably foreseeable pecuniary harm, as defined under the guidelines.

Moreover, the Defendant included the two Bank of America checks in his unauthorized $680,000 payment to the Law Firm. If the Defendant is not responsible for the loss from those two checks, why would he so willingly have paid for them?

> **i.  The $680,000 the Defendant paid the Law Firm without the approval or authorization of the Bank's Board is an "actual loss" to the Bank.**

The $680,000 that the Defendant misapplied to cover up the Badger theft is an "actual loss" to the Bank. The Defendant argues that it should not be counted as loss because the funds remain in the Law Firm's account, and he did not intend for the funds to be a loss for the Bank. Def.'s May 10, 2023 Obj., 4–5. Neither claim has merit.

As FDIC expert Timothy Rich testified, the moment the $680,000 check left the Defendant's hands, the Bank no longer had any rights with respect to those funds. Trial Tr. 1140:2–1141:2 (Timothy Rich Testimony). As Becky Laffitte testified about the effect of the Defendant paying the Firm $680,000 without securing a release: "We were out the money. I mean, you are on the hook for everything. If you get sued for this, the bank, again, is entangled in a lawsuit. And, in fact, we are entangled in a lawsuit. . . . [W]e are in a lawsuit filed on behalf of Badger." Trial Tr. 1046:15–20 (Becky Laffitte Testimony). It is irrelevant whether those funds remain in the Law Firm's account.[5] The Bank has sustained the $680,000 loss and no longer has any rights with respect to those funds.

As for whether the Defendant intended for the Bank to suffer loss as a result of his misapplication of $680,000 in bank funds, this Court previously denied the Defendant's post-trial arguments about his intent to cause harm to the Bank. *Order*, ECF No. 267 at 38–40. The evidence was sufficient for the jury to find that the Defendant acted, at least, with reckless disregard for the Bank's interest when he paid $680,000 of shareholder funds to the Law Firm without consulting the Bank's Executive Committee, Board of Directors, or attorneys, and without securing a release.

---

[5]  To take the Defendant's objection to its natural conclusion, as long as two people have accounts at the same bank, one cannot be said to have stolen from another unless and until that money is withdrawn from their bank account.

*Id.* at 39–40. It was also sufficient to find the Defendant benefitted because he used *the Bank's* money to attempt to settle a claim with the Law Firm for which he knew *he* likely had personal liability. *See id.* at 39.

Count 4 charged the Defendant with willfully misapplying the $680,000 with the intent to injure and defraud the Bank, separate and apart from the theft of $1,325,000 from Arthur Badger as charged in Count 1. The Defendant's objections to the $680,000 in loss are simply an attempt to relitigate arguments presented to and rejected by the jury when they convicted him of Count 4. The $680,000 he willfully misapplied was "reasonably foreseeable pecuniary harm," U.S.S.G. § 2B1.1, App. No. 3(A)(i), and this actual loss to PSB is correctly included in the loss amount.

### ii. The $680,000 loss to PSB should not be reduced by the $17,500 the Defendant repaid PSB after his misconduct was discovered.

The Defendant argues that the $680,000 loss amount should be reduced by $17,500 because the Defendant paid the Bank back for half of the personal representative fees that he received from Badger's settlement funds. Def.'s May 10, 2023 Obj., 4–5. During the trial, the Defendant presented Defense Exhibit 83, a personal check for $17,500 that the Defendant drafted to PSB, dated November 1, 2021. Def.'s Ex. 83. The $17,500 was to repay PSB for the half of the Defendant's personal representative fee that the Defendant had included in the unauthorized $680,000 check he wrote to PMPED. The back of the check and the deposit slip reflect that the $17,500 was deposited into PSB's losses other than loans account on December 17, 2021. *Id.* The Government has confirmed with counsel for PSB that the $17,500 check was deposited into PSB's accounts, and therefore requested that the Court reduce the restitution owed to the Bank.

However, the loss amount should not be reduced because the Defendant repaid this money *after* the Bank learned that he was solely responsible for negotiating the stolen Badger checks. Pursuant to Application Note 3(E)(i) to U.S.S.G. § 2D1.1, the loss calculation should not include

money returned by the defendant or other person acting jointly with the defendant to the victim *before* the offense was detected.

The Defendant notified the Board he had made the $680,000 payment on October 29, 2021. GX 13. A Board member asked in response what Bank employee was responsible for converting the Badger checks and whether they had been fired. *Id.* The Defendant then told the Board that he was responsible for converting twelve checks made payable to the Bank. *Id.* The $17,500 check—which represented funds that had gone directly into the Defendant's pocket—is dated November 1, 2021, after the Board had uncovered the Defendant's conduct with respect to Arthur Badger's settlement funds. Def.'s Ex. 83.

Moreover, the check was not deposited until after the Board fully understood and appreciated the Defendant's conduct. In November 2021, the Bank retained outside counsel to perform an internal investigation into the Defendant's conduct. Outside counsel prepared an investigative report and presented the findings of that report to the Board—including the Defendant—on December 16. The Defendant deposited the $17,500 check into the Bank's account the day *after* the Board learned the results of the internal investigation.

It is irrelevant to the Court's loss analysis that the Defendant paid and/or attempted to pay back a portion of the misapplied $680,000 *after* his conduct was detected. *See United States v. Brownell*, 495 F.3d 459, 464 (7th Cir. 2007) ("In this case, if it were clear that [the defendant] repaid the $1.56 million in full before he was caught, then that amount would not properly have been included in the loss calculation."); *United States v. Staples*, 410 F.3d 484, 491 (8th Cir. 2005) ("With this in mind, courts do not subtract from the intended loss repayments made by a defendant to his victim after the detection of the offense, as such payments, given their timing, likely do not indicate anything about the defendant's culpability."); *United States v. Swanson*, 360 F.3d 1155,

1169 (10th Cir. 2004) (finding a defendant's repayment of fraudulent overdrafts irrelevant to the court's loss calculation); *United States v. Lucas*, 99 F.3d 1290, 1296–97 (6th Cir. 1996) (noting that "the concept of when an 'offense is discovered' relates to discovery by the victim or by the proper authorities, whichever comes first. After discovery, so defined, has occurred, amounts later repaid on a fraudulently obtained loan cannot be set off from the amount of loss"). The purpose of the loss calculation under the Sentencing Guidelines is "to measure the magnitude of the crime at the time it was committed. The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for purposes of sentencing." *United States v. Nichols*, 229 F.3d 975, 979 (10th Cir. 2000). Therefore, the Defendant should be responsible for the full $680,000 loss related to Count 4.

> **c.  Including the $680,000 and the $1,360,000 in the loss amount is not "double counting." It is appropriately holding the Defendant accountable for two separate crimes with two separate victims.**

The Defendant conspired with Murdaugh to steal Badger's settlement funds, resulting in a $1,360,000 loss to Badger, as charged in Counts 1 through 3. Badger's actual loss is correctly included in the loss amount. *Eight years* after Badger's money was stolen, when the Defendant knew their crimes would be uncovered, he stole from the Bank to try to cover them up, resulting in a $680,000 loss to the Bank, as charged in Count 4. The Bank's actual loss is also correctly included in the loss amount. The Defendant committed two different crimes with two different victims, resulting in two different losses. Both losses should be included in the loss calculation.

To find that it is "double counting" to count both figures would reward the Defendant for committing a second crime to cover up the first. After he helped Murdaugh steal from Badger, he stole from the Bank so it would not find out that he had helped Murdaugh steal from Badger. Put

differently, the Defendant stole from Peter, and then he stole from Paul to cover up his theft from Peter. He should not get credit for stealing money to offset the money he had already stolen.

The Defendant committed a second crime to cover up the first, and there are separate victims associated with each of the two crimes: Arthur Badger, with a loss of $1,360,000; and the Bank, with a loss of $680,000. The $680,000 payment was charged in a separate count of conviction and caused a separate loss to a separate victim. To ignore the $680,000 is to ignore the Defendant's second crime entirely.

### 2. The Personal Representative and Conservator Fees the Defendant collected from Hakeem Pinckney, Natasha Thomas, and Arthur Badger are correctly included I the loss calculation.[6]

The Defendant next argues that the personal representative and conservator fees should not be included in the total loss amount because the fees were for "services rendered," the fees have been paid back, and they would have been paid regardless of the thefts. *Def.'s May 10 Obj.*

First, the fees were not paid for "services rendered." The record is clear that the Defendant did nothing for Hakeem Pinckney, Natasha Thomas, or Arthur Badger but enable Murdaugh to steal their money. Thomas testified that she never met the Defendant except for when Murdaugh sent her to the Bank to get a loan. Trial Tr. 1176:22–1180:24 (Natasha Thomas Testimony). During that one interaction with him, the Defendant never mentioned that he was her conservator, and he never talked to her about a settlement that she would hopefully obtain. *Id.* Thomas testified that she did not even know that the Defendant had been appointed to serve as her conservator. *Id.* After

---

[6]     On July 25, 2023, counsel for the Defendant notified the Government that he intends to withdraw his objection to including the personal representative and conservator fees as loss. However, because the objection has not yet been formally withdrawn, the Government presents its arguments in support of the loss calculation.

the Defendant extended Thomas a personal loan when she was eighteen years old, he never met her again. *Id.* at 1180:17–24.

Similarly, Badger testified that he did not understand that the Defendant was going to be appointed to serve as the personal representative of his wife's estate. Trial Tr. 12254:25–1225:25 (Arthur Badger Testimony). Badger further testified that other than obtaining "lawyer loans" from the Defendant, he never met him or interacted with him as the personal representative of his wife's estate. *Id.* at 1226:1–1228:17. After reviewing his disbursement sheet, Badger testified that the Defendant never should have received $35,000 from his settlement because he was not his personal representative. *Id.* at 1228:4–14.

Importantly, the Defendant's own sworn testimony establishes that he rendered *no* services to Pinckney, Thomas, or Badger, despite collecting tens of thousands of dollars from them.[7] During the bond hearing, the Defendant admitted that he never even met Pinckney and that he *thinks* he met Thomas in court, a stark contrast to his frequent interactions with the Plyler sisters. GX 201, 56:18–57:10. During the trial, when asked during cross-examination about whether he tracked or managed any funds for Thomas or Pinckney, the Defendant testified that he never received any funds to track or manage. Trial Tr. 1874: 6–11; *see also* GX 201, 57:2–10 ("Question: And you never managed any money for them, did you? Answer: Never."). The Defendant admitted that the petition he signed to be appointed to serve as Thomas's conservator falsified her birthdate, that he extended her a personal "lawyer loan" not long thereafter, and that because she was 19 at the time he collected conservator fees from her, she did not need a conservator. Trial Tr. 1875:8–24. The

---

[7]     The Defendant's objections echo this sentiment. He argues the "abuse of position of trust" enhancement should not apply because he "never met some of the victims from whom settlements were stolen and did not have a personal relationship with the victims." *Def.'s May 10 Obj.* at 8.

Defendant further admitted that when he took the conservator fees from Pinckney's settlement, Pinckney was dead and did not need a conservator. Trial Tr. 1876:19–1877:4.

When asked during a February 2022 deposition what he did as Donna Badger's personal representative, the Defendant responded: "Really didn't do a whole lot." GX 199, Depo. Tr. 51:14–15. During his bond hearing, when asked whether he ever met any of the beneficiaries of the Estate of Donna Badger, the Defendant responded, "I don't remember. I'm sure I probably met with some of them at some point in time, but I don't recall." GX 201, 44:1–9. Importantly, the Defendant collected $35,000 from Arthur Badger, not the Estate of Donna Badger. GX 23. Arthur did not need a personal representative, and the Defendant should never have collected a fee from his settlement funds.

The Defendant's own actions after the Bank's discovery of the thefts from the victims also contradict his claim that the fees were lawfully collected and should not be included as loss. The Defendant claims that he tried to pay back the conservator and personal representative fees. But by the time he attempted to repay the Bank for the Pinckney and Thomas fees, the Bank had uncovered his conduct and rejected the repayment. Why would the Defendant attempt to pay these fees back if they were lawfully collected for services he rendered?

By his own sworn testimony, the Defendant never managed any money for Hakeem Pinckney, Natasha Thomas, or the Estate of Donna Badger. Instead, the jury found that he conspired with Murdaugh to steal their settlement funds and collected more than $110,000 for essentially no work at all. The Defendant knew then, as he knows now, that he did not fulfill his duties as personal representative and conservator, nor did he render any services worthy of the fees collected.

Second, the fact that the Badger fee has been paid back and that the Defendant attempted to repay the Pinckney and Thomas fees is irrelevant to the loss calculation. As noted above, the purpose of the loss calculation under the Sentencing Guidelines is "to measure the magnitude of the crime at the time it was committed. The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for purposes of sentencing." *Nichols*, 229 F.3d at 979. The Defendant does not get credit for repaying—or attempting to repay—fees he improperly collected *after* his crimes were detected. *See* U.S.S.G. § 2B1.1(b)(1), App. N. 3(E)(i) (providing for credit against loss for money returned by the defendant before the offense was detected).

Third, the conservator and personal representative fees would not "have been paid regardless of Mr. Murdaugh's thefts." *See Def.'s May 10 Obj.* at 5. The Defendant was convicted of conspiring with Murdaugh to devise a scheme to obtain money from Murdaugh's clients. Murdaugh had the Defendant appointed as conservator or personal representative *to further that scheme*. Murdaugh could not have stolen from Pinckney, Thomas, or Badger had the Defendant not been serving as their fiduciary, responsible for managing their settlement funds. The Defendant made tens of thousands of dollars for doing nothing but enabling Murdaugh to steal. The Defendant's appointment as conservator or personal representative, and his collection of substantial fees, was an integral part of the scheme. The fees should be included in the Court's loss calculation.

### 3.  The Defendant's challenges to the other loss amounts are all without merit.[8]

The Defendant argues that the other losses should not be included because the Defendant did not intend for the losses to occur and because the victims "have been made whole." *Def.'s May 10 Obj.*

With respect to the loss amounts for Hakeem Pinckney, Natasha Thomas, and Arthur Badger, the Defendant argues that there is not enough evidence to establish that he intended the loss to occur by a preponderance of the evidence. To the contrary, there is sufficient evidence to establish that the Defendant intended those losses to occur *beyond a reasonable doubt*. The Defendant made these same arguments to the jury, and the jury squarely rejected them. The Government sees no utility in re-presenting all of the evidence presented during the trial establishing the Defendant's intent—this Court is familiar with that evidence after presiding over the nearly three-week-long trial and denying the Defendant's post-trial motions.

The Defendant again argues that none of these loss amounts should be included because the victims have been made whole. But the goal of the loss calculation is "to measure the magnitude of the crime at the time it was committed." *Nichols*, 229 F.3d at 979. The Defendant should not get credit for the fact that Pinckney, Thomas, and Badger were made whole *by others*, *after* his and Murdaugh's crimes were uncovered. He enabled Murdaugh to steal Pinckney, Thomas, and Badger's settlement funds, and the PSR's loss calculation correctly takes those losses into account.

---

[8]     The Defendant submitted supplemental objections to the loss amount, arguing that the Court should not rely on "intended loss," citing a recent case from the Third Circuit in *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). *Def.'s May 22 Obj.* All of the loss in this case is actual, not intended, loss. Therefore, the Third Circuit's holding in *Banks* has no impact on the Court's loss calculations.

The Defendant also objects to the $284,787.52 in loss, claiming that because the line of credit was "folded in" to a $1 million line of credit, the amount was "paid back" prior to detection. The money was not paid back—it was included in the increase in Murdaugh's line of credit to $1,000,000. Murdaugh only needed this increase because he did not know the Defendant was using the line of credit to pay off the loans from Hannah's conservatorship account, and he needed to purchase a piece of farming equipment. GX 58. And even if the money is considered "paid back" by folding it into another loan, it was not paid back by the Defendant or his coconspirator. Money returned *by the defendant or other person acting jointly with the defendant* to the victim before the offense was detected should not be included in the loss calculation. U.S.S.G. § 2D1.1, Application Note 3(E)(i) (emphasis added). But here, to the extent the $284,787.52 was paid off, it was paid off *by the Bank* when it was "folded in" to a $1 million line of credit. Neither the Defendant nor Murdaugh paid off the $284,787.52 with their money prior to detection. It was paid down by the Bank—the *victim*. In the Fall of 2021, Murdaugh still owed over $1 million on that line of credit.

Last, the Defendant objects to the $750,000 of loss related to the sham loan he extended to Murdaugh, claiming that because his father testified that the Bank authorized the loan, it should not be included as loss. First, his father's testimony does not establish that the Bank authorized the loan. On cross-examination, his father testified that he did not approve of the $350,000 wire transfer to Chris Wilson. Trial Tr. 1529:7–20 (Charles Laffitte Testimony). And he further testified that he did not authorize the $400,000 check that was used to pay down Murdaugh's substantial overdraft. Trial Tr. 1531:21–1533:18 (Charles Laffitte Testimony). Second, and more importantly, this argument was presented to and squarely rejected by the jury. The Defendant was charged with and convicted of willfully misapplying the Bank's funds by giving a $750,000 loan to Murdaugh for "beach house renovations" and expenses, knowing that the loan was essentially unsecured and

that the loan proceeds would be and were used to pay an attorney and to cover hundreds of thousands of dollars in Murdaugh's overdraft. Murdaugh never made a single payment on the loan, and as a result of the Defendant's conduct, the Bank sustained a $750,000 loss. Trial Tr. 172:22–24 (Norris Laffitte Testimony). Therefore, the amount should be included in the loss calculation.

### B. The Defendant and Murdaugh executed a highly complex scheme over the course of years, and the sophisticated means adjustment is correctly applied.

The Defendant objects to the two-point adjustment for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Application Note 9(B). The Application Notes provide examples of conduct that is considered "sophisticated," including "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Although the enhancement "requires some means of execution that separates the offense . . . from the ordinary or generic," a defendant need not utilize the most complex means possible to conceal his fraudulent activities. *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (citing *United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997)). A sentencing court should consider the cumulative impact of the criminal conduct, for the "total scheme" may be "sophisticated in the way all the steps were linked together." *Id.* (citing *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003)); *see also United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005) (upholding enhancement where "certain aspects of [defendant's] scheme were not especially complex or especially intricate" but "his total scheme was undoubtedly sophisticated").

The Defendant and Murdaugh executed a highly complex and sophisticated scheme that spanned more than eight years and involved the fraud and deceit of numerous vulnerable individuals, the court, law partners, and family members. The Defendant and Murdaugh made

misrepresentations in court documents, in part to have the Defendant appointed as conservator and to hide the settlement funds from the probate court. GX 109, 110. The Defendant and Murdaugh directed Law Firm employees to divide the stolen funds and draft the checks in a manner that allowed them to conceal the true destination of the funds. GX 37, 38. The Defendant also structured transactions for Murdaugh to avoid reporting requirements. GX 33, 198, slide 9.

Most importantly, the Defendant and Murdaugh concealed the transactions involving the stolen funds *and* the Defendant's fees by directing the Law Firm to make checks payable to "Palmetto State Bank," an account that could not be traced to Murdaugh or the Defendant. GX 29, 35. All of the checks were originally drafted to Russell Laffitte as the conservator or personal representative. GX 215, 216, 219. Those checks could be traced. But they were voided and then drafted to "Palmetto State Bank," thereby concealing the true destination of the funds. *Id.* By directing the stolen funds through the Palmetto State Bank account, the Defendant and Murdaugh further concealed their conduct from the Bank and the Law Firm. *Id.* The Defendant thereafter issued money orders, authorized wire transfers, and made deposits into Murdaugh's personal account. *Id.*

The Defendant also employed sophisticated means when he misapplied bank funds as charged in Counts 4 through 6. In Count 4, the Defendant issued an unauthorized payment of bank funds to the Law Firm in an attempt to conceal his scheme with Murdaugh. He hid his actions from the Bank's Board and intentionally withheld his involvement in Murdaugh's scheme. In Count 5, the Defendant used bank funds to pay a lawyer $350,000 in bank funds at Murdaugh's direction. GX 10i. After the Bank's Board began asking questions about Murdaugh's financial picture, the Defendant issued a $400,000 check of bank funds and deposited it into Murdaugh's account to pay down more than $367,000 in overdraft. GX 2, 192, 82. The Defendant thereafter directed

employees to backdate loan documents to conceal the true use of the $750,000, disguising the two transactions as a legitimate bank loan for beach house renovations. GX 10, 84. As to Count 6, the Defendant issued a line of credit to the Defendant for purposes of "farming" and thereafter used the money to pay back hundreds of thousands of dollars in loans he had improperly extended to Murdaugh out of a child's conservator account. GX 95, 95a, 57.

The Defendant's conduct and "total scheme" were undoubtedly sophisticated. *See, e.g.*, *United States v. Savage*, 885 F.3d 212, 228–29 (4th Cir. 2018) (finding district court did not clearly err in applying sophisticated means enhancement when defendant hid assets, transactions, and his own name, had phones registered in multiple states (none in his name), directed actions of several other conspirators, used insider information provided by a co-conspirator bank employee, and used that information in coordinated steps to circumvent the bank's fraud countermeasures and take over the victims' accounts to conceal and execute the scheme); *United States v. White*, 850 F.3d 667, 676 (4th Cir. 2017) (affirming sophisticated means enhancement when defendant took advantage of relationship with individual over three-year fraudulent scheme that involved several levels of fraud); *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (affirming the two-point enhancement for sophisticated means when scheme "spanned many years," involved structured transactions from different accounts to avoid paying taxes, disguising wages, and manipulated financial records); *United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008) (holding that scheme of health care fraud, "which lasted nine years and involved a series of coordinated fraudulent transactions, was complex and sophisticated" even if defendant's "individual actions could be characterized as unsophisticated"). The sophisticated means enhancement is appropriate.

**C. The Defendant abused his positions of trust as a bank executive and a fiduciary for Murdaugh's clients, and the abuse of a position of trust enhancement is correctly applied.**

The Defendant objects to the two-level enhancement for the abuse of a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3. Public or private trust is characterized by professional or managerial discretion, for example substantial discretionary judgment that is ordinarily given considerable deference. U.S.S.G. § 3B1.3, Application Note 1. An example of how the position of public or private trust contributed in a significant way to facilitating the commission or concealment of the offense is by making the detection of the offense or the defendant's responsibility for the offense more difficult. *Id.* The enhancement is appropriate in cases where an attorney embezzles client funds or a bank executive engages in a fraudulent loan scheme. *Id.*

"[T]he central purpose of § 3B1.3 is to penalize defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." *United States v. Brack*, 651 F.3d 388, 393–94 (4th Cir. 2011) (internal quotation marks and alterations omitted). "The abuse-of-trust enhancement accordingly applies when a victim's trust is based on the defendant's unique position, but not when trust is created in an arms-length commercial relationship . . . . Before imposing a § 3B1.3 enhancement, courts consequently look for evidence indicating a fiduciary or personal trust relationship exists between the victim and the defendant." *Id.* (internal quotations marks omitted). Courts assess whether defendants held a position of trust under § 3B1.3 from "the perspective of the victim," *id.*, determining whether the defendant held "[s]omething . . . akin to a fiduciary function," *United States v. Agyekum*, 846 F.3d 744, 756 (4th Cir. 2017) (internal quotation marks omitted)

The Defendant held a position of private and public trust as a bank executive *and* in his fiduciary capacity as personal representative and conservator. As a bank executive, he had broad managerial and professional discretion, which gave him the ability to structure the financial transactions in a way that concealed his scheme. In his role as the Bank's Hampton Branch Manager, the Defendant personally negotiated each one of the stolen checks through a Palmetto State Bank account, facilitating the commission and concealment of the offenses. The Defendant's position as a bank executive also facilitated the commission of the misapplication of bank funds charges. Because of his position in the Bank, he had the ability to extend fraudulent loans, authorize hundreds of thousands of dollars in wire transfers, and conceal the offenses.[9]

As a personal representative, the Defendant was appointed by the probate court to serve in a fiduciary capacity, entrusted with the oversight and management of the victims' settlement funds. The Defendant argues that because he never met some of the victims from whom the settlements were stolen and did not have a personal relationship with them, the enhancement does not apply. But just because he violated the trust of the victims and failed to uphold his fiduciary responsibilities does not mean he did not hold a position of public and private trust. As the Fourth

---

[9]  The Defendant argues that the enhancement is "double-counting" because the underlying offenses of bank fraud and misapplication of bank funds account for the same conduct. The caselaw does not support this argument. To the contrary, courts have repeatedly upheld the imposition of a position of trust enhancement in cases where a bank employee's position afforded them significant managerial discretion. *United States v. Chanthaseng*, 274 F.3d 586, 589–90 (1st Cir. 2001) (finding bank teller's authority to countersign rapid deposit tickets sufficient for position of trust enhancement); *United States v. McMillen*, 917 F.2d 773, 775 (3rd Cir. 1990) (affirming position of trust enhancement for bank branch manager who was in a supervisory position and had the authority to approve loan applications, issue savings certificates, and sign bank documents without supervisory approval from other bank employees); *United States v. Simmerman*, 850 F.3d 829, 835 (6th Cir. 2017) (affirming enhancement for manager of credit union); *United States v. DeMarco*, 784 F.3d 388, 397 (7th Cir. 2015) (affirming enhancement for bank branch manager and assistant vice president). But regardless of whether the enhancement is appropriate for Counts 2 and 4 through 6, it is clearly appropriate for Counts 1 and 3.

Circuit has made clear, § 3B1.3 contemplates something "akin" to a fiduciary relationship, which the Defendant clearly held with Natasha Thomas, Hakeem Pinckney, and the Estate of Donna Badger. *See Agyekum*, 846 F.3d at 756.

The abuse of a position of trust enhancement is appropriate.

### D.  The Defendant and Murdaugh defrauded a quadriplegic car accident victim living in a nursing home, and the vulnerable victim enhancement is correctly applied.[10]

The Defendant objects to the vulnerable victim enhancement, arguing that the Government did not prove that the Defendant knew Hakeem Pinckney's status as a quadriplegic at the time of the theft and that Pinckney was not a vulnerable victim because he was dead by the time his settlement funds were stolen. Both arguments are meritless and nothing more than another way that the Defendant continues to minimize his conduct, diminish the effect of his actions on the victims and their families, and refuse to take responsibility for the harm his conduct caused to the victims.

Application Note 2 to U.S.S.G. § 3A1.1(b)(1) defines "vulnerable victim" as a person who is a victim of the offense or any relevant conduct and who is unusually vulnerable due to age, physical or mental condition, or who is otherwise susceptible to the criminal conduct. Hakeem Pinckney was unquestionably a vulnerable victim.

First, the evidence establishes both that Pinckney was vulnerable and that the Defendant knew it. Based on the documents the Defendant signed when he was appointed conservator, Pinckney was twenty years old and would not have needed a conservator unless he was in some way incapacitated or otherwise physically or mentally incapable of managing his own affairs—

---

[10]    On July 25, 2023, Defendant's counsel notified the Government that he intends to withdraw his objection to the vulnerable victim enhancement. However, because he has not formally withdrawn the objection, the Government includes its response to protect the record.

*i.e.*, "unusually vulnerable." GX 109. The documents filed with the probate court said Pinckney was "unable to manage [his] property and affairs effectively due to [his] high level quadriplegia which has rendered [him] immobile." GX 109. Pinckney's signature on the consent to have the Defendant appointed as conservator speaks volumes:

> I Hakeem Pinckney, being of sound mind and in possession of my mental faculties hereby consent to the appointment of Russell Laffitte as my conservator. I further consent to R. Alexander Murdaugh serving as my GAL pursuant to section 62-5-407(b) of the South Carolina Code of Laws. I hereby attest pursuant to 62-5 401(2) of the South Carolina Code of Laws, that I require a conservator because I am unable to manage my property and affairs effectively due to my high level quadriplegia which has rendered me immobile. I hereby further attest that my property may be wasted or dissipated unless management is provided.
>
> Hakeem L. Pinckney

To now claim that he did not know of Hakeem Pinckney's injuries at the time of the theft requires the Court to believe that the Defendant thought he was appointed to serve as a conservator for a perfectly healthy and capable twenty-year-old man.

By his own sworn testimony, the Defendant knew of Pinckney's mental and physical limitations warranting his appointment as his conservator. During the Defendant's direct examination, he testified that he never met Pinckney, in part because "[h]e was very seriously injured in this wreck and was a quadriplegic. I want to say he was in North Augusta or Augusta in a nursing home. I wouldn't swear to that, but he was in a home." Trial Tr. 1898:17–22. On cross-examination, when confronted about never meeting Hakeem Pinckney, the Defendant again replied, "I did not. He was in a home." Trial Tr. 1928:2–4. Pinckney's injuries following the car accident rendered him unusually vulnerable, both physically and mentally. The probate records

and the Defendant's own sworn testimony establish, by at least a preponderance of the evidence, that the Defendant knew of the Pinckney's injuries when he was appointed as conservator.[11] And his death months after the Defendant was appointed to serve as his conservator due to these mental and physical infirmities does not change his status as a vulnerable victim under the guidelines.

Second, the evidence is clear that Pinckney was vulnerable when he fell victim to the Defendant and Murdaugh's scheme. The Indictment charged that the Defendant conspired with Murdaugh beginning in at least July 2011. The Defendant was appointed to serve as Pinckney's conservator on September 3, 2010, after Pinckney was rendered a quadriplegic and more than a year before his death on October 11, 2011. GX 109. The Defendant was appointed to serve as Pinckney's conservator and given the fiduciary responsibility of managing Pinckney's funds. But instead of safeguarding and growing Pinckney's money, the Defendant conspired with Murdaugh to steal the settlement funds in exchange for $60,000. Although Murdaugh did not steal Pinckney's money until after Pinckney had died, Murdaugh and the Defendant got the Defendant appointed as his conservator—gaining them access to all of Pinckney's settlement money—well before his

---

[11]     Pinckney was clearly a vulnerable victim because the severity of his injuries, providing the most obvious example of the vulnerabilities of the victims in this case. But the remaining victims were also vulnerable. The beneficiaries of the Estate of Donna Badger were all minors, ranging in age from two to thirteen. Trial Tr. 1223:14–17 (Arthur Badger Testimony). Natasha Thomas was sixteen at the time of the accident, and although she was nineteen by the time her money was stolen, her severe injuries and age made her particularly susceptible to criminal conduct. Trial Tr. 1177:2-7 (Natasha Thomas Testimony). Finally, the Plyler sisters were both young minors when the Defendant was appointed as their conservator. They had just seen their mother and brother killed in a car accident, and they were being shuffled between relatives' homes. Trial Tr. 787:3–788:14, 792:2–23 (Alania Plyler Spohn Testimony). Hannah was still a teenager when the Defendant loaned himself and Murdaugh more than $1 million from her conservator account without her knowledge.

All of the victims in this case were vulnerable due to age, physical or mental condition, or particular susceptibility to criminal conduct. U.S.S.G. § 3A1.1(b)(2), Application Note 2. The Defendant and Murdaugh exploited their vulnerabilities for their own personal gain. But for their vulnerabilities, these crimes would not have happened.

death. The Defendant should not get a benefit for defrauding a young man who was so vulnerable that he died before Murdaugh could steal all of his money. The vulnerable victim enhancement is correctly applied.

### E. Murdaugh's thefts would not have been possible with the Defendant, and the Defendant is not entitled to a mitigating role reduction.

The Defendant argues that the applicable guideline range should be reduced under § 3B1.2 because he is less culpable than Murdaugh, claiming that he played a "minor" role in the scheme. As to Counts 1 through 3, the evidence makes plain that the Defendant played an essential role in the scheme. As to Counts 4 through 6, the Defendant was solely responsible for the misapplication of bank funds. He is not entitled to a mitigating role reduction.

The mitigating role adjustment applies when a defendant is "substantially less culpable" than the average participant in the criminal activity. U.S.S.G.§ 3B1.2, Application Note 3(A). The determination of whether to apply this adjustment is "based on the totality of the circumstances" and "heavily dependent upon the facts of the particular case." *Id.*, Application Note 3(C). The Application Notes directs courts to consider the following non-exhaustive list of factors:

> (1) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (2) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and
>
> (5) the degree to which the defendant stood to benefit from the criminal activity.

As to Counts 1 through  3, the Defendant is just as culpable as Murdaugh. While these crimes would not have happened without Murdaugh, they *could not* have happened with Russell Laffitte.

The Defendant substantially benefited from the criminal activity. He received more than $450,000 in personal representative and conservator fees. By his own admissions, the Defendant did little to no work to warrant these fees. Trial Tr. 1928:2–1929:19 (Russell Laffitte Testimony). In some years, the Defendant made hundreds of thousands of dollars in fees, substantially more than his income from the Bank. GX 198, pg. 14. The Defendant did not pay taxes on the fees he collected. Trial Tr. 1928:2–1929:19 (Russell Laffitte Testimony). Thus, the scheme allowed the Defendant to collect substantial tax-free income.

In addition to the unwarranted fees, collected tax-free, the Defendant extended himself more than $350,000 in loans at favorable interest rates. GX 198, pg. 1. The Defendant used these loans to pay off personal loans from another bank—secured at a much higher interest rate—and for personal expenses, including a pool, kitchen renovation, and credit card payments. Trial Tr. 861:10–872:24 (Cyndra Swinson Testimony). Unlike loans from financial institutions, the Defendant was able to loan himself these funds and pay them back when he pleased. Testimony presented at the trial established that the Defendant backdated checks to repay the loans, calculated the interest from the date of the check, then deposited the checks sometimes years after the loans were due. And the Defendant never paid late fees. *Id.*

Not only did the Defendant directly benefit financially from his scheme with Murdaugh, but his Bank benefited from the scheme. The Law Firm was the Bank's largest private customer. By the Defendant's own admissions, the Bank's relationship with the Law Firm and its partners was very important. The Defendant went to great lengths to maintain that relationship. According to the Defendant, the Bank collected millions of dollars in interest from its banking relationship with Murdaugh alone. Trial Tr. 1819:23–1820:2 (Russell Laffitte Testimony). Not only was the Defendant directly profiting from his scheme, but his bank profited substantially from his

relationship with Murdaugh, which in turn further profited him. While Murdaugh undoubtedly received more stolen funds than the Defendant, the Defendant benefitted and profited substantially from the scheme.

The Defendant had a full understanding of the scope and structure of the criminal activity. The Defendant was the *only* person who saw both sides of the scheme. First, he saw the disbursement sheets and knew exactly where the settlement money was supposed to go. Second, he personally negotiated every single check of stolen funds that Murdaugh presented to him, so he saw where the money actually went. No one else at the Bank or the Law Firm had the Defendant's vantage point: a direct line of sight into every aspect of the scheme to steal from Murdaugh's clients.

Regarding the degree to which the Defendant participated in the planning and organizing of the criminal activity, one fact is most instructive. All of the checks were originally drafted to Russell Laffitte as the conservator or personal representative. GX 215, 216, 219. But, the checks were voided and then drafted to "Palmetto State Bank," thereby concealing the true destination of the funds. *Id.* The only person involved in this criminal activity who knew and understood the significance of addressing the checks to "Palmetto State Bank" was the Defendant. The Defendant's fee checks for Pinckney and Thomas were voided and reissued in this exact same way. GX 215, 216. When asked why he did not report his fees on his tax returns, the Defendant responded: "You know, the checks were made out wrong to Palmetto State Bank. . . . And I was like, you know what, I can hide it on my taxes. . . . I just didn't want to pay taxes on it." Trial Tr. 1930:21–1931:20. The Defendant knew the benefit of issuing those checks to Palmetto State Bank, both to the scheme overall and to him individually.

27

Moreover, the evidence demonstrated that the Defendant was the one managing all of Murdaugh's finances. The Defendant issued loans and lines of credit to cover Murdaugh's overdraft and made transfers between Murdaugh's personal accounts, many times without giving Murdaugh advance notice. GX 39, 57, 58, 62, 82, 87. It is clear from the evidence presented at trial that Murdaugh relied on the Defendant to manage his finances, including the repayment of his loans with *stolen* funds. GX 30, 39, 36. Quite simply, the Defendant kept Murdaugh's criminal activity organized.

As to the decision-making authority, there is no dispute that Murdaugh directed most of the stolen funds. But the Defendant made the decision to negotiate every single check as Murdaugh directed him. GX 29, 35. And although many of the checks were used to pay Murdaugh's family members, deposited into his personal account, and pay off loans from third parties, hundreds of thousands of dollars in stolen funds were used to pay off loans the Defendant had extended Murdaugh to cover his overdraft. *Id.* Evidence presented during the trial demonstrated that Murdaugh was not tracking those loans, did not know how much he owed on those loans, and was relying on the Defendant to pay those loans back. GX 39, 57, 58.

As to the nature and extent of the Defendant's participation in the commission of the criminal activity, by his own admission, the Defendant negotiated every single stolen check addressed to Palmetto State Bank. Trial Tr. 1873:13–21 (Russell Laffitte Testimony). And even though the checks were not drafted to Murdaugh as the payee, the Defendant improperly negotiated them for his benefit. As for the discretion that the Defendant had in negotiating the checks, John Peters testified that he, as the compliance officer, would not have negotiated the checks, and that any bank teller at PSB would have known not to negotiate these checks. Trial Tr. 1394:6–1398:17 (John Peters Testimony). The Defendant could have, and should have, told Murdaugh that he

would not negotiate the checks at his direction, and that if the checks represented funds that belonged to him, they needed to be reissued to the correct payee. Trial Tr. 1397:17–15 (John Peters Testimony).

The Defendant did not play a minor role in his scheme with Murdaugh. To the contrary, the scheme would not have been possible without him. The guideline adjustment does not apply to Counts 1 through 3.

Nor does it apply to Counts 4 through 6. Application Note 2 states that "this guideline is not applicable unless more than one participant was involved in the offense. Accordingly, an adjustment under this guideline may not apply to a defendant who is the only defendant convicted of an offense unless that offense involved other participants in addition to the defendant and the defendant otherwise qualifies for such an adjustment." U.S.S.G. § 3B1.2, Application Note 2. The Defendant was the *only participant* in Counts 4 through 6, unilaterally misapplying the Bank's funds. And if the Defendant claims that there were other participants in these counts, then he is claiming that his own father and sister were participants in criminal activity. Even if the Defendant were entitled to a minor role adjustment for Count 1, 2, or 3, he is not entitled to the adjustment for Counts 4 through 6.

The PSR correctly calculates the guideline range to be 108 to 137 months.

## II.     Sentencing Factors

Title 18 U.S.C. § 3553(a) sets forth the sentencing factors that a court must consider in fashioning a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing. Those factors include the nature and circumstances of the offense, history and characteristics of the defendant, the needs for the sentence to promote respect for the law, provide just punishment, and afford adequate deterrence, and protect the public from future crimes of the

defendant. The Government respectfully submits that a weighing of the sentencing factors supports a guideline sentence.

### a. Nature and Circumstances of the Offense

This is anything but a typical fraud case. The Defendant used and abused his position of power and trust to exploit unusually vulnerable victims in a complex scheme of deception and concealment. And when faced with the inevitable discovery of his and Murdaugh's scheme, the Defendant engaged in a desperate yet elaborate attempt to cover it up. The Government does not dispute that Murdaugh is the more culpable actor in the criminal conspiracy, or that Murdaugh benefitted more from the scheme. But the Defendant was the *only* person who could have stopped him. Instead, the Defendant enabled him. Repeatedly.

The Defendant literally bankrolled Murdaugh's extravagant spending habits with unsecured loans from a child's account and bank funds intended for other purposes. The Defendant was the only person who knew of Murdaugh's true financial position. Murdaugh relied on the Defendant to keep his finances straight. The Defendant managed Murdaugh's loans and kept track of Murdaugh's personal accounts, routinely covering his overdrafts. The Defendant created and enabled an untenable financial position for Murdaugh—a position from which he had to steal to get out.

When Murdaugh presented the Defendant with checks representing hundreds of thousands of dollars in stolen client funds, the Defendant did exactly what Murdaugh asked him. The Defendant used wire transfers, money orders, and checks to pay Murdaugh's expenses and personal loans. The Defendant helped structure the financial transactions to avoid detection, funneling the stolen funds through an account that would not be traced directly to him or to Murdaugh.

The Defendant did all of this while owing an independent fiduciary duty to the victims of Murdaugh's thefts. The Defendant knew that Natasha Thomas, Hakeem Pinckney, and Arthur Badger had all been involved in horrific car accidents and were in extraordinarily vulnerable physical and financial situations. But rather than ensuring they would be compensated for their losses or properly managing and protecting their money, the Defendant helped Murdaugh steal it. The Defendant held a position of trust, and he violated that trust for his own personal gain and the personal gain of his coconspirator.

In opening argument, defense counsel told the jury that the "measure of a man" is how he reacts when he's confronted. Trial Tr. 101:2–3. In this case, the Government agrees. Indeed, the Defendant's conduct when he acted alone best illustrates his culpability. When faced with the reality of Murdaugh's crumbling world and the impact it would have both on him personally and on the Bank, the Defendant went to great lengths to cover up his crimes. He again gave Murdaugh hundreds of thousands of dollars, but this time, he did not have control over a child's conservatorship account. He illegally used the Bank's money instead. When the Bank started asking questions, the Defendant further concealed his conduct, transferring $400,000 to cover Murdaugh's overdraft then backdating and falsifying loan documents. The Defendant then lied to the Bank and the Law Firm and dragged his own father and sister into his coverup. The Defendant did not do these things because Murdaugh, or anyone else, told him to. The Defendant did these things on his own.

The nature and circumstances of the Defendant's crimes warrant a guideline sentence.

### b. History and Characteristics of the Defendant

Like most defendants who appear before this Court for sentencing on financial crimes, the Defendant has essentially no criminal history.[12] And like most defendants, the Defendant has a family—children, a wife, parents, siblings.

But what separates the Defendant from most of the defendants this Court sentences is his complete unwillingness—and apparent inability—to take responsibility for his actions or show genuine remorse for his conduct. To the contrary, the Defendant has minimized, deflected, and denied his conduct at every level.

When confronted by the Bank—his own family—in the Fall of 2021, the Defendant lied and further tried to cover up his conduct. When confronted by the FBI and SLED, the Defendant continued to lie, blame-shift, and minimize. The Defendant has lied under oath on four different

---

[12]     The United States Sentencing Commission has proposed an amendment to the sentencing guidelines, effective November 2023, for zero-point offenders. Under the proposed amendment, zero-point offenders would benefit from a two-level guideline reduction, except in limited circumstances, including cases in which the defendant's acts or omissions resulted in a substantial financial hardship to one or more victims. As outlined in the guidelines, in determining whether conduct caused a substantial financial hardship, courts should consider, among other things, whether the offense resulted in the victim suffering a substantial loss of a retirement, education, or other savings or investment fund.

Although the Defendant has zero criminal history points, he would not qualify for the two-level reduction because he caused a substantial financial hardship to the Badger family. During the trial, Arthur Badger testified that his children all obtained annuities as beneficiaries of their mother's estate following the settlement of the civil claims. Trial Tr. 1233:18–1235:6 (Arthur Badger Testimony). But because the Defendant and Murdaugh stole $1,325,000 from his settlement funds, Badger did not receive any money to assist him in caring for his six children as a single parent. *Id.* When Badger fell on rough financial times, he decided to sell the children's annuities, for pennies on the dollar. *Id.* Badger testified that had he received the $1,325,000, he would not have had to sell his children's annuities. *Id.*

Because the Defendant's conduct caused Badger to sell his children's annuities—considered a substantial financial hardship under the guidelines—the Defendant would not qualify for the two-level guideline reduction proposed in the guideline amendments.

occasions—in a civil deposition, before the South Carolina Office of Disciplinary Counsel, at his federal bond hearing, and again during his trial.

The Defendant's behavior immediately before and during the trial demonstrated a disrespect towards the judicial system and the integrity of the process. On November 4, the Friday before the trial began, the Defendant released "Part I" of an interview on YouTube. The first weekend after the trial began, he released "Part II" of the interview. On the outtakes of that YouTube interview, the Defendant explained that he wanted to do the interview to dispel the public narrative surrounding the case in the media because he was concerned that the jurors would have already formed an opinion before the trial.[13] The Government believes that the Defendant released these YouTube interviews during trial, promoting his lies and false narratives, with the hope that his message may reach jurors.[14]

Following his conviction, the Defendant filed numerous post-trial motions in which he continued to challenge his conviction by attacking the strength of the Government's case, contesting the legality of the Court's replacement of two jurors during deliberations, and faulting his prior counsel for the jury's decision. The Defendant has refused to take responsibility for his crimes, and has refused to accept that he was lawfully convicted by a jury of his peers.

The Defendant's objections to the PSR further reflect his unwillingness to take responsibility for his actions. The Defendant challenges the restitution owed to the victims, the

---

[13]     The Government shared the outtakes with the USPO in February 2023.

[14]     While the Defendant's testimony and other instances of perjury may warrant an enhancement for obstruction under U.S.S.G. § 3C1.1, the Government believes the current guideline range of 108 to 135 is sufficient but not greater than necessary to serve the purposes of sentencing.

33

position of trust that he held with those victims, their status as vulnerable, the complexity of the scheme, and the critical role that he played in that scheme.

What is most important to the Government in proposing a sentence that is appropriate but not greater than necessary to serve the purposes of sentencing is a defendant's ability to take responsibility for his actions and show genuine remorse for the victims. To this day, the Defendant has failed to take any accountability for his own actions or show any contrition to the victims for the harm his actions caused. He has not provided any reason for the Court to vary below the guideline range.

      **c. Need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public**

As fully set forth above, the Defendant committed serious crimes that undermine the public's trust in the judicial and banking systems. It is important that the judicial system respond in kind and punish these crimes severely to promote respect for the law, provide just punishment, and afford adequate deterrence to others in positions of power and trust who are given the opportunity to exploit vulnerable victims.

For the reasons set forth above, the Government respectfully requests that the Court impose a guidelines sentence.

**[SIGNATURE PAGE TO FOLLOW]**

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: s/ *Emily Evans Limehouse*
Emily Evans Limehouse (Federal ID #12300)
Kathleen Michelle Stoughton (Federal ID #12161)
Winston D. Holliday, Jr. (Federal ID #7597)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, South Carolina, 29402
(843) 266-1663
Emily.Limehouse@usdoj.gov

July 27, 2023