**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 9:22-cr-00658-RMG |
| v. | |
| RUSSELL LUCIUS LAFFITTE, | |
| Defendant. | |

## DEFENDANT RUSSELL LUCIUS LAFFITTE'S REDACTED SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Defendant Russell Lucius Laffitte ("Mr. Laffitte"), by and through undersigned counsel, respectfully submits this memorandum in advance of sentencing to provide information and aid the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 543 U.S. 220 (2005). For the reasons detailed herein, Mr. Laffitte respectfully moves for a downward variance and submits that a sentence substantially below the guideline range is appropriate. As this memo discusses, Mr. Laffitte's presentence report and details other sensitive information, we respectfully request that this memo be filed under seal.[1]

## INTRODUCTION

On November 22, 2022, Mr. Laffitte was convicted of conspiracy to commit wire and bank fraud, bank fraud, wire fraud, and three counts of misapplication of bank funds. *See* ECF No. 209.[2]

---

[1] A Motion to Seal this document and its exhibits has been filed with the Court in compliance with this District's Local Rules. *See* ECF No. 304.

[2] Mr. Laffitte continues to maintain his innocence of the charges filed against him and intends to appeal his sentence. While he respectfully submits this memorandum in advance of his sentencing to address potential sentences to be imposed, nothing in this memorandum is intended to or should be construed to admit his guilt of the offenses charged or waive any ground for possible appeal. It should be noted, however, that Mr. Laffitte recognizes that he committed grave errors in judgment,

The Court presided over the ten-day trial in this matter, so the Court is familiar with the nature and circumstances of the offenses for which Mr. Laffitte will be sentenced. However, there is far more to Mr. Laffitte as a person than the evidence at trial revealed—and 18 U.S.C. § 3553(a) requires a focus, not only on the offense, but also on the offender himself. For the reasons discussed below, Mr. Laffitte is deserving of both mercy and leniency. Because of his conviction, Mr. Laffitte's career, at least with respect to banking, is finished. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

that he clearly failed in his duties as a conservator and that he, in hindsight, allowed himself to be used by Mr. Murdaugh to accomplish Mr. Murdaugh's unlawful ends. For those failures, he is deeply remorseful and ashamed. However, he did not knowingly conspire with Mr. Murdaugh to steal money from any of the victims. The government's sentencing memorandum is replete with requests and suggestions (some subtle, others not) that the Court impose a significant sentence (one which we respectfully submit is excessive) because Mr. Laffitte has contested his guilt, filed serious post-trial motions "attacked the strength of the (government's) evidence" and demonstrated a "continued unwillingness to accept any responsibility for his actions or acknowledge the harms his actions have inflicted on the victims." ECF No. 303 at 1. While Mr. Laffitte did go to trial, has fought to preserve his constitutional rights, and plans to appeal, Mr. Laffitte has (contrary to the government's arguments) in multiple ways, acknowledged the harm his actions and omissions have caused the victims and he has acknowledged his own errors in judgment, which in part led to those harms. He continues to deny, however, that he committed a criminal act or acted with criminal intent—and so while he is not entitled to a credit for a reduction under the Sentencing Guidelines for acceptance of responsibility, he has accepted responsibility for many of his actions, just not to the degree and in the way the government would like for him to do so.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Further, numerous individuals have written letters to the Court on Mr. Laffitte's behalf. *See* Letters, attached as **Exhibit A**. As you will see, the writers of these letters plead for this Court's mercy and compassion as they describe the Russell Laffitte they know as a man with impeccable family values, high integrity, and pristine character. Moreover, many of these letters attest to numerous charitable and selfless acts that Mr. Laffitte has done for the community in Hampton County.

Mr. Laffitte very much appreciates careful, thoughtful analysis engaged in by the United States Probation Office ("USPO") in preparing his Presentence Report. However, he respectfully objects to the inclusion of several factors and enhancements[3] that would increase his Guideline range and he submits that because of his individual characteristics and circumstances, the offense at issue, and the goals of sentencing, that a lesser sentence serves the statutory purposes of sentencing.

## PROCEDURAL HISTORY

On March 27, 2023, the USPO provided its initial draft presentence investigation report ("Draft PSR") to undersigned counsel. On May 10, 2023, undersigned counsel provided its objections to the Draft PSR.[4] The government also provided a response, with some factual

---

[3] The government's Sentencing Memorandum also attempts to takes Mr. Laffitte to task for his efforts to seek a new trial and for filing multiple objections to the original Draft PSR. *See* ECF No. 303 at 1, 32-34. Indeed, one can read the government's Sentencing Memorandum to posit that defendants who maintain their innocence and file objections intended to preserve their constitutional rights should be punished for such actions. We respectfully disagree.

[4] Undersigned counsel advised the government on July 25, 2023 that Mr. Laffitte intended to withdraw certain objections to the Revised Draft PSR, including but not limited to the objection

corrections, as well as a revised restitution amount including investigative costs and attorney's fees for Peters, Murdaugh, Parker, Eltzroth & Detrick ("PMPED") and Palmetto State Bank ("PSB"). On May 22, 2023, undersigned counsel also provided additional legal authority regarding loss amounts – intended versus actual. *See e.g., United States v. Banks*, 55 F.4th 246, 257-58 (3d Cir. 2022) (holding that the "ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss,'" not intended loss "[b]ecause the commentary expands the definition of 'loss'…").

On June 2, 2023, the USPO provided a First Revised PSR with updated restitution amounts based on the government's response to the Draft PSR. On June 16, 2023, undersigned counsel provided its objections to the restitution amount set forth in the First Revised PSR. On June 28, 2023, the USPO provided a Second Revised PSR, as well as an Addendum and both the government and defense objections and exhibits.

On July 25, 2023, the government provided a revised restitution memorandum and preliminary order of forfeiture. In its restitution memorandum, the government's revised restitution total is $3,555,884.80. In addition, the government seeks a forfeiture money judgment of $116,340.03, representing the alleged illegal proceeds Mr. Laffitte received in fees from Hannah Plyler and Malik Williams.[5] On July 27, 2023, the government filed its sentencing memorandum.

---

relating to the enhancement under U.S.S.G. § 3A1.1(b)(1)—and advised United States Probation Officer Daniel Schirra ("USPO Schirra") of those same intentions on July 27, 2023. As a result of those withdrawals, we proceed to address only our outstanding objections in this Memorandum. The government's Sentencing Memorandum, however, notes those conversations with counsel in footnotes on pages 11 and 22, but then proceeds to address those objections, which had been withdrawn as of that date. In order to insure that our position was clearly understood, counsel sent an email to USPO Schirra copying government counsel. *See* Emails, attached as **Exhibit B**. In the event that Mr. Laffitte decides to withdraw other objections prior to the sentencing hearing, we will communicate and memorialize those withdrawals in an email to the USPO copying government counsel.

[5] While we appreciate the government providing a reduced forfeiture amount, Mr. Laffitte objects to this forfeiture and we will address those objections in full at Mr. Laffitte's sentencing hearing.

**RESPONSE TO SECOND AMENDED PSR AND GUIDELINE RANGE CALCULATION**

**I.     Loss Amount**

With respect to Paragraphs 140 to 142,[6] as detailed below, Mr. Laffitte objects to the total loss calculations in the Second Revised PSR and these objections were set forth in detail in correspondence provided to the USPO and are summarized below. In addition, with respect to the chart in Paragraph 140, we submit there is no evidence to support that any settlement funds were stolen *by Mr. Laffitte*, intended as loss by Mr. Laffitte, or reasonably foreseeable to Mr. Laffitte as pecuniary harm. In light of these objections, as well as the below objections regarding enhancements, we also object to the total offense level calculated in Paragraphs 163 through 180. We intend to address these arguments further at Mr. Laffitte's sentencing hearing.

**a.     $680,000.00 Payment to PMPED**

With respect to Paragraphs 140 and 141, Mr. Laffitte objects to the inclusion in the loss amount of $680,000.00, which is the amount of a check issued by Palmetto State Bank to PMPED to cover half of the proposed Arthur Badger settlement funds and fees after it was discovered that those funds had been stolen by Richard Alexander Murdaugh ("Mr. Murdaugh"), as he admitted to in his state court trial. The summary chart in Paragraph 140 with the total loss amount includes *both* the total amount of the settlement funds that Mr. Murdaugh stole from Arthur Badger ($1,325,000.00) and the $680,000.00 payment Mr. Laffitte sent to PMPED to cover half of the same Murdaugh-stolen settlement (plus half of the personal representative fee) — an arguable double counting.

---

[6] To the extent that any or all the amounts mentioned in Paragraphs 30 through 133 can be read to serve as the basis for the loss calculations summarized in Paragraphs 140, 141 and 142, we object to those paragraphs as well.

First, the $680,000.00 payment to PMPED was not intended by Mr. Laffitte to be a loss to any person or entity, including Palmetto State Bank. This amount was intended to prevent and preemptively settle a potential lawsuit (an action clearly within Mr. Laffitte's authority as CEO of Palmetto State Bank at the time) occasioned by the discovery of Mr. Murdaugh's theft of the full settlement Badger settlement amount. As was presented at trial, Mr. Laffitte met with Jeanne Seckinger, Mark Ball, and Ronnie Crosby and the group collectively reached an agreement with Mr. Laffitte to split the sum representing the Badger settlement amount. *See Nov. 18, 2022 Tr.*, ECF No. 221 at 1820:5-14; 1899:20-22; 1922:9-12. This money was to be paid out of the Palmetto State Bank's loss reserve account. *See* Government Exhibit 76. In addition, Mr. Laffitte reimbursed half of the personal representative fees ($17,500) by his own personal check to Palmetto State Bank. *See id.* 1922:8-21; Defense Exhibit 83.

Further, the $680,000.00 payment is not an actual loss as the payment has not been negotiated or otherwise used by any entity, there is no actual loss with respect to this amount. This amount remains with PMPED in its escrow account. The Draft PSR previously stated these funds "*should have* been returned to Palmetto State Bank," but instead "remain with PMPED due to ongoing civil litigation." Draft PSR at ¶ 144. These funds should not be counted as a loss against Mr. Laffitte because PMPED is holding these funds and could return the funds to Palmetto State Bank at any point. Because Mr. Laffitte and PMPED agreed to split the amount of Mr. Murdaugh's theft, with Mr. Laffitte personally paying back half of his fees, while Mr. Laffitte was still employed by PSB and during the course of an internal investigation, the $680,000.00 should at the very least be credited against the loss amount of $1,325,000.00 pursuant to U.S.S.G. §2B1.1 cmt. n.3(E)(i).

Because the full amount of Arthur Badger's settlement stolen by Mr. Murdaugh is

contended by the government as loss and so calculated by the Second Revised PSR, the addition

of that amount to the loss of the $680,000.00 amounts to double counting. Therefore, if the Arthur

Badger settlement funds stolen by Mr. Murdaugh are used to calculate Mr. Laffitte's loss amount,

the total loss amount should be reduced by at least $680,000.00.

### b. Other Loss Amounts

Finally, Mr. Laffitte objects to all other loss amounts contained in Paragraphs 140 through

142 of the Second Revised PSR because those losses were not intended by Mr. Laffitte or because

the victims were otherwise made whole. Specifically, we object to the loss amounts for Natasha

Thomas ($325,000.00), Hakeem Pinckney ($309,581.46), and Arthur Badger ($1,325,000.00). A

preponderance of the evidence does not demonstrate that Mr. Laffitte personally intended for these

losses to occur or that it was reasonable foreseeable to Mr. Laffitte that these losses would occur.[7]

In fact, two checks that were re-cut from the Badger Settlement for the amounts of $50,684.75 and

$101,369.49 (totaling $152,054.24) did not pass through PSB. *See Nov. 8, 2022 Tr.*, ECF No. 204

at 219:16 – 220:8. Those two checks went through Bank of America instead and did not involve

Mr. Laffitte and were not reasonably foreseeable losses.[8] Therefore, at the very least, $152,054.24

should not be attributable as loss to Mr. Laffitte.

---

[7] Mr. Laffitte understands that U.S.S.G. § 2B1.1, in cases involving jointly undertaken activity, allows for the attribution of acts taken by co-conspirators as relevant conduct. However, in order for Mr. Murdaugh's actions to be attributable to Mr. Laffitte for Sentencing Guidelines purposes, the government must prove that Mr. Murdaugh's acts were reasonably foreseeable to Mr. Laffitte and within the scope of an illegal agreement with Mr. Murdaugh. Such proof is absent here as will be detailed at sentencing.

[8] The government questions why would Mr. Laffitte be willing to include this amount in the $680,000.00 check if these amounts are not attributable to Mr. Laffitte. *See* ECF No. 303 at 6 n.4. As discussed, the $680,000.00 was a joint decision between Mr. Laffitte and those at PMPED to prevent a civil lawsuit for the full amount in question because Mr. Murdaugh had taken the full amount, regardless of the bank used to do so.

Similarly, the $284,787.52 farming line of credit was satisfied and "folded" into a new loan within 120 days, which was then paid off by the sale of the Moselle property. As such, this amount was returned prior to detection and the loss should be reduced by this amount. *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(i); *see also United States v. Bright,* 353 F.3d 1114, 1118 (9th Cir. 2004) ("[a] fraud defendant is entitled to credit for refunds paid prior to the discovery of the offense.").

With respect to the $350,000.00 and $400,000.00 loans to Mr. Murdaugh, Palmetto State Bank authorized the $750,000.00 loan. Charlie Laffitte, the Chairman of the Board, testified at trial that the bank authorized the $750,000.000. *See Nov. 16, 2022 Tr.*, ECF No. 220 at 1532:6-7; 1533:6-8. Therefore, this amount was not intended as a loss, or actual loss, to the bank because it was authorized by the management of the bank.

## II.    Enhancements[9]

### a.    Sophisticated Means

First, Mr. Laffitte objects to the enhancement for sophisticated means included in Paragraphs 142, 163, and 172. Paragraph 172 provides no support for this enhancement other than to simply reference Paragraphs 28 through 142. This is both puzzling and erroneous as the law makes clear that "sophistication requires more than the concealment or complexities inherent in fraud," and "fraud *per se* is inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C)." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). The Second Revised PSR fails to explain how the means implemented are nothing more than those inherent in the underlying fraud.

"Sophisticated means" involves especially complex or especially intricate offense conduct,

---

[9] Mr. Laffitte formally withdraws his objection to the vulnerable victim adjustment under U.S.S.G. § 3A1.1(b)(1).

pertaining to the execution or concealment of an offense. U.S.S.G. § 2B1.1 cmt. n. 9(B). "Virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information.". *Adepoju*, 756 F.3d at 257 (citing *United States v. Archuletta*, 231 F.3d 682, 685–86 (10th Cir. 2000) (holding that the defendant's use of a false name and checks to obtain funds from a credit union constituted "evidence of nothing more than the minimum conduct required to establish a violation of [18 U.S.C.] § 1344 in its simplest form")). Therefore, the realm of special "complexities and intricacies involves more than the forgeries, misrepresentation, and concealment inherent in bank fraud." *Id.* (citing *United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (finding that because smuggling necessarily involves concealment, sophisticated means requires more than what is necessary to commit the crime)); *see also United States v. Stokes*, 998 F.2d 279, 282 (5th Cir. 1993) (finding "that the trial court misinterpreted the guidelines when it ordered a two level increase for sophisticated means" because "[t]here is nothing sophisticated about simply not disclosing income" and hiding it because "she didn't want Tulane to know that she had taken money from their accounts.").

In this case, Mr. Laffitte did not employ such sophisticated means. While at best, the Second Revised PSR argues that Mr. Laffitte aided Mr. Murdaugh to some extent, it fails to provide sufficient evidence to prove Mr. Laffitte did so knowingly or that he, himself, intended, assisted, or foresaw the use of sophisticated means to conceal any fraud. Mr. Laffitte did not know there was a sophisticated scheme occurring and was simply acting is his role as a bank employee and was unfortunately taken advantage of by a bank customer.[10] The sophisticated means

---

[10] Should the Court decide that the government has proven that Mr. Murdaugh's conduct involves sophisticated means, it should refuse to apply this enhancement to Mr. Laffitte. Moreover, if the Court determines that the enhancement applies, it should consider varying downward to delineate Mr. Laffitte's conduct from Mr. Murdaugh's conduct.

enhancement is not supported by the facts of this case related to Mr. Laffitte's conduct, even if those facts are viewed in the light most favorable to the government. Consequently, the enhancement should not be applied to Mr. Laffitte.

### b. Abuse of Position of Trust

Further, Mr. Laffitte objects to the application of the position of trust enhancement in Paragraphs 146, 166, and 174. The Guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The Sentencing Commission's Commentary to § 3B1.3 explains its application:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3 cmt. n.1. While the Commentary provides some examples of when this enhancement applies, such as in the case of a "bank executive's fraudulent loan scheme," the Fourth Circuit has noted that "determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task," U*nited States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003) (cleaned up), because the "enhancement was not designed to turn on formalistic definitions of job type," *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir.1995). "[F]raud alone does not justify the enhancement," *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001), nor does a "mere showing that the victim had confidence in the defendant," *Caplinger*, 339 F.3d at 237. Courts must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's

trust is based on the defendant's position in the transaction." *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996). Therefore, "there must be a trust relationship between [the defendant] and his victim for the enhancement to apply." *United States v. Moore,* 29 F.3d 175, 180 (4th Cir. 1994) (cleaned up). The enhancement does not apply to employees who stole from their employers, otherwise employees "would be subject to the enhancement because the employers 'trusted' that their employees would not steal." *United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009) (citing *United States v. Edwards,* 325 F.3d 1184, 1187 (10th Cir. 2003) ("[T]he adjustment under § 3B1.3 is not intended to be routinely applied to every employee fraud or embezzlement case.") and *United States v. Garrison,* 133 F.3d 831, 838 (11th Cir. 1998) (stating that "because there is a component of misplaced trust inherent in the concept of fraud, a sentencing court must be careful not to be 'overly broad' in imposing the § 3B1.3 enhancement")) (cleaned up).

While Mr. Laffitte was a bank executive and acted as a conservator or personal representative, Mr. Laffitte and the victims were unaware that money was being stolen from the victim's accounts by Mr. Murdaugh. For many of the transactions involved, it was not necessary for a bank executive to be involved and there were some transactions at issue that could have been accomplished by a bank teller or some other middle manager at the bank. However, Mr. Murdaugh abused his relationship with Mr. Laffitte and went to Mr. Laffitte directly for these financial transactions. Therefore, the position of trust enhancement should not be applied to Mr. Laffitte.

## III.    Mitigating Role Reduction

Clearly, Mr. Laffitte is substantially less culpable than the only other alleged participant in this conspiracy: Alex Murdaugh. Mr. Murdaugh was the one who devised the criminal scheme, had knowledge that what he was doing was in fact criminal, and gained financially from the scheme. Mr. Laffitte did not understand the scope and structure of the criminal activity, did not

plan or organize the criminal activity, did not have discretion, and did not know it was criminal, but rather acted at the behest of Mr. Murdaugh, and did not greatly profit off the scheme. Mr. Murdaugh was, at all relevant times, a practicing attorney and certainly understood the illegality of his own actions, while Mr. Laffitte had no legal training. Therefore, Mr. Laffitte is substantially less culpable than Mr. Murdaugh and the mitigating role adjustment should be applied to Mr. Laffitte pursuant to U.S.S.G. § 3B1.2.

According to U.S.S.G. § 3B1.2, a defendant's base offense level may be decreased two levels if the defendant was "a minor participant." A minor participant is one "who is less culpable than most other participants but whose role could not be described as minimal." U.S.S.G. § 3B1.2(a) cmt. n.5. Further, a § 3B1.2 reduction is appropriate if the defendant "plays a part in committing the offense that makes him substantially less culpable than the average participant," and "who performs a limited function in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(A).

Whether a mitigation role reduction pursuant to U.S.S.G. § 3B1.2 is appropriate "is to be determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction." *United States v. Franklin,* 350 F. App'x 816, 817 (4th Cir. 2009) (citations omitted). The Guidelines Commentary provides a non-exhaustive list of factors for consideration in determining whether to apply a mitigating role reduction:

   (i)   the degree to which the defendant understood the scope and structure of the criminal activity;

   (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;

   (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and]

(v)   the degree to which the defendant stood to benefit from the criminal activity.

*Id.*

As discussed above, Mr. Laffitte did not stand to benefit from the criminal activity. Mr. Laffitte received the conservator or personal representative fees (which he would have received regardless), but did not receive substantial, if any, financial gain from the settlement funds that Mr. Murdaugh stole. Mr. Murdaugh, however, benefited greatly from his criminal activity. Mr. Murdaugh stole millions of dollars from his clients to fund his drug addiction and life style. Mr. Murdaugh understood the scope and structure of the criminal activity, organized the criminal activity, exercised all the decision-making authority, and acted at the direction of Mr. Murdaugh. Therefore, Mr. Laffitte should receive, at least, a two-level sentence reduction for his role if the Second Revised PSR attributes any of the funds stolen by Mr. Murdaugh to Mr. Laffitte for the purposes of establishing a loss amount.[11]

## IV.   Guidelines Calculation, Fine Amounts, and Restitution

With respect to Paragraphs 163 through 180 and 195, we object to the overall Guidelines calculation. The base offense level should be 7 with no increases above the base offense level. Alternatively, if the Court determines the government has proven the amounts stolen by Mr.

---

[11] Should the Court find that the mitigating role reduction is not technically applicable to Mr. Laffitte, these same factors should be considered as the bases for a downward variance. As the USPO noted in its Addendum to the PSR, "other mitigating factors may certainly be present to warrant a departure or variance from the otherwise prescribed sentencing guidelines." *See also Gonzalez-Avalos v. United States,* No. 15-CR-3254-4 MV, 2021 WL 826552, at *4 (D.N.M. Mar. 4, 2021) (while the district court "did not find Movant eligible for the safety valve or a minor-participant-role adjustment," the court "did grant Movant a downward variance, based on the factors in 18 U.S.C. § 3553(a)").

Murdaugh are appropriately attributable to Mr. Laffitte, there would be an increase of 16 offense levels for a loss between $1,500,000 and $3,500,000, after removing at least the $680,000.00 as discussed above. *See* U.S.S.G. 2B1.1(b)(I). In the case of the former, with a criminal history category I and a total offense level 7, the guideline range would be 0-6 months. If the Court determines the funds stolen by Mr. Murdaugh are attributable to Mr. Laffitte, the total offense level would be 21 after a two-level decrease for his minor role, resulting in a guideline range of 37-46 months.[12]

Similarly, with respect to Paragraph 206, we object to the fine range in the Second Revised PSR. As discussed above, if the total offense level is 7, the fine range would be $1,000 to $9,500. *See* U.S.S.G. § 5E1.2(c)(3). If the total offense level is 21, the fine range would be $15,000 to $150,000. *See id.*

For the same reasons detailed herein, we object to the restitution amounts contained in Paragraphs 144, 209, and 210, detailed as follows.

### a. The Government's Restitution Calculations

In its May 10, 2023 memorandum responding to the Draft PSR, the government calculated a total proposed restitution request of $4,352,582.78 – nearly $1.25 million more than the restitution amount listed in the Draft PSR. The government requested that the Court order Mr. Laffitte to pay PMPED a total of $1,521,513.33 and PSB a total of $2,831,069.45. This calculation breaks down as follows:

---

[12] We realize that the Court could determine that Mr. Murdaugh's thefts are not attributable to Mr. Laffitte, but could also determine that other alleged losses set forth in Paragraphs 140 through 142 are properly used to calculate loss, which would of course result in a Guidelines range somewhere between the ranges set forth above.

| PSB | PMPED |
|---|---|
| $680,000.00 (Count 4) | $1,325,000.00 (Badger Settlement) |
| $750,000.00 (Count 5) | $35,000.00 (Badger Fee) |
| $284,787.52 (Count 6) | $325,000.00 (Thomas Settlement) |
| $350,245.08 (Thomas Settlement) | $15,000.00 (Thomas Fee) |
| $309,581.46 (Pinckney Settlement) | $309,581.46 (Pinckney Settlement) |
| | $60,000.00 (Pinckney Fee) |
| $706,455.39 (Internal Investigation) | $131,931.875 (Internal Investigation) |
| -$250,000.00 (Offset) | -$680,000.00 (Offset) |
| **$2,831,069.45** | **$1,521,513.33** |
| **Government's Total = $4,352,582.78** ||

On July 25, 2023, the government provided updated restitution calculations to account for certain objections to double counting and other issues detailed in Mr. Laffitte's objections. The revised restitution figures are as follows:

| PSB | PMPED |
|---|---|
| $680,000.00 (Count 4) | $1,325,000.00 (Badger Settlement) |
| $750,000.00 (Count 5) | $35,000.00 (Badger Fee) |
| $150,000.00 (Count 6) | $175,122.54 (Thomas Settlement) |
| $175,122.54 (Thomas Settlement) | $15,000.00 (Thomas Fee) |
| $154,790.73 (Pinckney Settlement) | $154,790.73 (Pinckney Settlement) |
| $706,455.39 (Internal Investigation) | $60,000.00 (Pinckney Fee) |
| -$250,000.00 (Offset for Green Swamp) | $122,102.87 (Internal Investigation) |
| -$17,500.00 (Offset for half PR fees Check) | -$680,000.00 (Offset for Check) |
| -$134,787.52 (Offset for Moselle sale) | |
| **$2,348,868.66** | **$1,207,016.14** |
| **Government's Revised Total = $3,555,884.80** ||

These revisions resulted in a decrease of nearly $800,000 in the proposed restitution figure and took into account several of the arguments made by Mr. Laffitte in his initial objections to the PSR and restitution amounts. However, Mr. Laffitte still objects to several of the remaining restitution figures as will be discussed below and at his sentencing hearing.

## V.    Objection to Government's Amended Restitution Calculation

First and foremost, Mr. Laffitte did not steal the money listed above in the government's restitution calculations, nor did he financially benefit from Mr. Murdaugh's theft of the settlement amounts. As such, Mr. Laffitte objects to the settlement amounts being included as restitution. Mr. Murdaugh has now been charged federally as the one who stole and retained those assets and Mr. Murdaugh should be the one to repay the stolen amounts. Based on reported comments, it appears that Mr. Murdaugh's attorneys informed the Court that he intends to change his plea at some point in the future. Therefore, any restitution ordered should be joint and several with Mr. Murdaugh, as well as any other of his coconspirators. In addition, any restitution paid by Mr. Laffitte should be counted towards a state restitution amount, should that be necessary.

However, Mr. Laffitte does withdraw his objection to the restitution based on the conservatorship and/or personal representative fees that he collected in relation to these settlements. These amounts total $110,000.00 – $60,000.00 for the Pinckney Settlement, $35,000.00 for the Badger Settlement, and $15,000.00 for the Thomas Settlement. However, Mr. Laffitte paid back $17,500.00 – half of the fees for the Badger Settlement. *See Nov. 18, 2022 Tr.*, ECF No. 221 at 1922:8-21; Defense Exhibit 83. Therefore, the remaining unpaid balance is $92,500.00. While Mr. Laffitte maintains that these amounts should not be included in the loss amount calculation, Mr. Laffitte believes that, in equity, this amount should be repaid and Mr. Laffitte intends to do so with leave of the Court. The Court should recognize this willingness to repay victims for the gains that Mr. Laffitte retained and depart downward in part on this basis. *See Summers v. United States*, No. 3:20-CR-48-MMH-PDB, 2023 WL 2633336, at *2 (M.D. Fla. Mar. 24, 2023) (defendant repaid some victims, "which the Court said supported a downward variance").

16

In addition, the remaining $150,000.00 from Count 6 stems from a civil settlement between Mr. Murdaugh's Receiver and PSB. As the government notes, the Moselle property was sold and nearly $1.7 million from the proceeds of that sale were transferred to PSB – more than enough to fully cover the $284,787.52. However, pursuant to a settlement agreement entered into between PSB and the Receivers, PSB granted to the Receivers the right to receive $150,000.00 of the principal amount. This arbitrary amount appears to have been the result of a negotiated settlement between PSB and the Receivers – a process that obviously did not involve Mr. Laffitte. PSB has been made whole on this loan. Now, PSB seeks reimbursement for this settlement into which they voluntarily entered. As such, this amount should not be included as restitution attributable to Mr. Laffitte. Similarly, Mr. Laffitte objects to the inclusion of the $680,000.00 from Count 4, because, among other reasons previously stated, one of PSB's attorneys notified Mr. Laffitte that it would be a good idea to try to settle the Badger matter preemptively by paying half of the amount.

Finally, with regard to the attorney's fees submitted by counsel for PMPED and PSB, Mr. Laffitte objects only to the extent that he continues to maintain his innocence and intends to appeal his conviction. He does not contest the reasonableness or legitimacy of those fees. Should the Court order that the government has proven that these attorney's fees are properly attributable as restitution and Mr. Laffitte's conviction is ultimately affirmed, Mr. Laffitte agrees that these fees are appropriately included as restitution.

## APPLICABLE LAW FOR SENTENCING

Because the Court is thoroughly familiar with the statutes and case law applicable to sentencing issues, this memorandum will only provide a brief summary. In 2005, the Supreme Court ruled that its Sixth Amendment holdings in *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) apply to the Federal Sentencing Guidelines.

*Booker*, 543 U.S. at 226. Accordingly, because *Booker* made the Guidelines effectively advisory, the Sentencing Reform Act not only requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4), but also permits the court to tailor the sentence in light of other statutory concerns. *See* 18 U.S.C. § 3553(a); *see also Booker*, 543 U.S. at 222.

District courts are required to properly calculate and consider the Guidelines when sentencing, even though the Guidelines are advisory in nature. *See Rita v. United States*, 551 U.S. 338 (2007). Therefore, in determining the appropriate sentence in a particular case, the Court must consider the properly calculated Guideline range, the grounds for departure provided in the policy statements, and then the factors under 18 U.S.C. § 3553(a). *See id.* at 351.

Under *Booker* and its progeny, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a), including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established…;
(5) any pertinent policy statement…;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense

18 U.S.C. §§ 3553(a)(1) - (7). Indeed, the primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the above purposes. As such, Mr. Laffitte respectfully asks this Court to use its discretion to impose a sentence that considers these factors.

Further, this Court has statutory authority to impose a sentence outside of the Guidelines range if the court finds there exists a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines ..." U.S.S.G. § 5K2.0 (policy statement) (quoting 18 U.S.C. § 3553(b)). The Sentencing Guidelines do not limit "the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." *Koon v. United States,* 518 U.S. 81, 93 (1996) (quoting U.S. Sentencing Guidelines Manual ch. 1, pt. A, introductory cmt. 4(b)). Based on these standards, Mr. Laffitte respectfully requests this Court exercise its discretion in considering the sentencing factors and warranted variance from the now-advisory Guidelines, which are overly harsh particularly in white collar cases such as this one. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008) ("[T]he Court, confronted with an absurd guideline result … chose to focus its primary attention on the non-guidelines factors set forth in § 3553(a), including both those of general applicability and those that had special relevance to [the defendant's] particular circumstances."); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) ("While…the Guidelines reflect Congress' judgment as to the appropriate national policy for such crimes, this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense."); *United States v. Olis*, No. CRIM. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) ("the court concludes that a sentence within the applicable guideline range would not be reasonable, and that a non-guideline sentence…is appropriate."); *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (stating that sentences for a white collar crime under the Guidelines are "longer than the sentences routinely imposed by many states for violent crimes, including murder, or other serious crimes such as serial child molestation.").

## MOTION FOR A DOWNWARD VARIANCE

In addition, Mr. Laffitte respectfully moves the Court for a downward variance based on multiple grounds, as will be discussed in this section, throughout this Memorandum, and at Mr. Laffitte's sentencing hearing.

First, as will be discussed individually and in detail below, the application of the § 3553(a) factors. The Court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The court must then "make an individualized assessment based on the facts presented, [and if it] decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50. The "method of deviation from the Guidelines range—whether by departure or by varying—is irrelevant so long as at least one rationale is justified and reasonable." *United States v. Diosdado–Star*, 630 F.3d 359, 365–66 (4th Cir. 2011). Here, Mr. Laffitte is extremely unlikely to recidivate based on his criminal history, his age, his family support, his ties to the community, and the fact that he will never again work in the banking industry. Based on these factors alone, a downward variance is appropriate. *See United States v. Oldani*, No. CRIM.A. 3:09-00010, 2009 WL 1770116, at *7 (S.D.W. Va. June 16, 2009) ("Another factor weighing in favor a reduced sentence is the low statistical probability of recidivism for defendants" with little to no criminal history); *see also United States v. Robinson*, No. CRIM.A. 13-436 JLL, 2014 WL 1400197, at *5 (D.N.J. Apr. 9, 2014) (finding a downward variance appropriate based on the defendant's dedication to charity, which was "not something that was just done after the charges," as well considering the defendant's "strong family values and family support" and the fact that he had no prior criminal record); *United States v. Todd*, 618 F. Supp. 2d 1349, 1354 (M.D. Ala. 2009)

(finding that the defendant's "family ties…were exceptional" and "supported her request for a downward variance."); *United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) (upholding a downward departure where a mother was the sole caretaker of her children and stating, "the rationale for the downward departure was not that the Defendant's family circumstances decreased her culpability, but that [the court was] reluctant to wreak extraordinary destruction on her dependents who relied solely on the defendant for their upbringing.") (cleaned up).

In addition, Mr. Laffitte has also been charged in state court for substantially similar offenses to those for which he was convicted in federal court. Mr. Laffitte faces three indictments in state court related to Natasha Thomas, Hakeem Pinckney, and Arthur Badger. Mr. Laffitte was placed on a $1,000,000 surety bond, GPS monitoring, house arrest, and other conditions, including limitations on selling or encumbering any property, by the state court. Mr. Laffitte was also placed on similar conditions by the United States Magistrate Judge. *See* ECF No. 12. As a result, Mr. Laffitte has been on two ankle GPS monitors for roughly a year and his travel is severely restricted to very specific locations (he is allowed to do farming work, meet with his lawyers, and attend church in Hampton) based on the combination of state and federal conditions of release.

Mr. Laffitte has also faces numerous other collateral consequences, such as numerous civil lawsuits, loss of employment, unwanted and unwarranted media attention for himself and his family, and devastating financial consequences.

Finally, while we object to the loss amount as described above, the loss amount calculated by the USPO and advocated for by the government is $3,784,368.98, which is just barely over the threshold of $3,500,000.00 in the Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(J). Should the Court agree that this is technically the proper loss amount, the Court should consider that this loss amount being slightly over a threshold drastically increases the advisory Guidelines sentence.

Therefore, the Court should vary downward to account for this disproportional increase. *See United States v. Quarles*, 889 F. Supp. 2d 783, 784 (E.D. Va. 2012), *aff'd*, 521 F. App'x 192 (4th Cir. 2013) (the sentencing court noted that certain classifications were "technically correct and appropriate," but that the sentencing court would "grant a downward variance").

## THE APPROPRIATE SENTENCE

Mr. Laffitte, by and through undersigned counsel, respectfully moves this Court to impose a sentence below the guideline range because the relevant Section 3553(a) factors and the individual circumstances of this case justify a sentence substantially below that range. Mr. Laffitte greatly appreciates whatever consideration the Court may give based upon this Motion and the relevant Section 3553(a) factors to be discussed in detail below. Accordingly, Mr. Laffitte requests the Court grant a downward variance and impose a reduced sentence.

### 1. Consideration of the Section 3553(a) Factors Merits a Lenient Sentence.

In light of the foregoing, and based on the following analysis of the applicable Section 3553(a) factors, Mr. Laffitte respectfully submits that a sentence substantially lower than the applicable Guidelines calculated under the advisory Guidelines is sufficient to comply with the statutory purposes of sentencing.

### a. The Nature and Circumstances of the Alleged Offense

As noted herein, while Mr. Laffitte has been convicted by a jury, he continues to maintain his innocence and intends to appeal his conviction. As such, this is not an easy section to write. However, while Mr. Laffitte acknowledges that the offenses alleged are serious, that he personally made significant mistakes and errors in judgement and failed to act appropriately as a conservator, even if one looks at the evidence in the light most favorable to the Government, he does not deserve a sentence approaching 9 to 11 years.

During the time period of the alleged offenses, Mr. Laffitte was employed by PSB and held the positions of Vice President, Loan Officer, Chief Operating Officer, and most recently Chief Executive Officer ("CEO"), as well as serving as a member of its Executive Committee and member of its Board of Directors. *See* PSR ¶ 191. As it was a family business, PSB was owned and controlled by the Laffitte family. One of the largest customers of PSB during this time period was PMPED, and specifically, Mr. Murdaugh. Before his own crimes came to light, Mr. Murdaugh was a well-respected personal injury attorney who frequently had both personal and business dealing with PSB and with Mr. Laffitte. Mr. Murdaugh was a long-time customer and known to Mr. Laffitte as Mr. Murdaugh's father was Mr. Laffitte's godfather and Mr. Laffitte's father is Mr. Murdaugh's godfather. While Mr. Murdaugh and Mr. Laffitte did not have much social interaction outside of PSB business, Mr. Laffitte knew Mr. Murdaugh to be a valued customer of his family's bank.

With that background, Mr. Laffitte endeavored to serve his customers at the bank—specifically including Mr. Murdaugh and his law firm, who were some of the bank's most important customers from a financial perspective. In his various roles at PSB over time, Mr. Laffitte served Mr. Murdaugh as a bank customer and also served as a conservator and/or personal representative to clients of Mr. Murdaugh who were in need of such services. Mr. Laffitte (like many others) made the mistake of trusting Mr. Murdaugh and failed to question and carefully scrutinize Mr. Murdaugh's requests as Mr. Murdaugh was an important customer who Mr. Laffitte wanted to please.

While Mr. Laffitte clearly exercised poor judgment, Mr. Laffitte did not know that Mr. Murdaugh intended to steal from his victims. Mr. Laffitte relied (to the detriment of the victims and ultimately, to his own detriment as well) on Mr. Murdaugh's statements, as he did not think

Mr. Murdaugh would be so brazen to actually steal from his clients. Mr. Murdaugh was the only person who knew the ultimate goal of his scheme and used Mr. Laffitte and a means to that end—indeed, as Mr. Murdaugh has stated (both under oath and in interviews with the government) he did not tell Mr. Laffitte he was stealing money and so the two did not conspire to do so. *See* ECF No. 274.

Moreover, the person who profited from the alleged offense was Mr. Murdaugh—not Mr. Laffitte. While Mr. Laffitte did collect fees for serving as the personal representative and/or conservator, Mr. Laffitte did not retain any other settlement proceeds that were intended for Mr. Murdaugh's clients—Mr. Murdaugh kept those.[13]

Finally, with respect to the $680,000.00 check in Count 4, Mr. Laffitte acted in an attempt to proactively head off a law suit from the Badger family once Mr. Murdaugh's crimes came to light. Mr. Laffitte, in his role as CEO of PSB, negotiated terms to pay back half of the Badger settlement that Mr. Murdaugh misappropriated. This amount was intended to be used to prevent and preemptively settle a potential lawsuit (an action clearly within Mr. Laffitte's authority as CEO of Palmetto State Bank at the time) occasioned by the discovery of Mr. Murdaugh's theft of the full settlement Badger settlement amount. Mr. Laffitte met with Jeanne Seckinger, Mark Ball, and Ronnie Crosby and the group agreed to split the cost of the misappropriated settlement. *See Nov. 18, 2022 Tr.*, ECF No. 221 at 1820:5-14; 1899:20-22; 1922:8-12. Mr. Laffitte got the

---

[13] We understand that Mr. Murdaugh has now been indicted in this Court and that he intends to plead guilty to some charges at some point. We believe that any restitution imposed in this case should be imposed jointly and severally with Mr. Murdaugh—however given Mr. Murdaugh's current financial position, the person who will end up paying then lion's share of the restitution here will be Mr. Laffitte (if his conviction is upheld.) In other words, the person who profited from this alleged scheme will suffer little, if any, financial consequences here while the financial consequences for Mr. Laffitte and his family are overwhelmingly negative. This is, in and of itself, a reason supporting a substantial downward variance in a fraud case.

approval of the majority of the Executive Committee, including himself. Mr. Laffitte also paid back half of the personal representative fees ($17,500) by his own personal check to Palmetto State Bank. *See id.* 1922:8-21; Defense Exhibit 83.

The facts surrounding the offense of conviction with respect to Mr. Laffitte, even when viewed in the list most favorably to the government, do not support a Guidelines sentence—and when viewed in the light most favorable to Mr. Laffitte, support a substantial downward variance. Mr. Laffitte reserves the right to address this issue further at sentencing.







### a. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.

Mr. Laffitte understands that the alleged offenses are serious and also understand the damages that the thefts of money from Mr. Murdaugh's clients have had on these victims. He also understands that his beloved PSB has been tarnished as a result of his own failures to appropriately question and police Mr. Murdaugh. He respects the law and does not attempt to trivialize the situation in which he now finds himself.

Mr. Laffitte is, however, a first-time offender with a criminal history score of zero. He is 52 years old, has never been in jail, and is unlikely to recidivate. While Mr. Laffitte understands that this Court will sentence him to prison, he respectfully submits that a sentence of 3-5 years is more than sufficient to reflect the seriousness of his offense, to promote respect for the law and provide just punishment for the offenses of which he stands convicted.

Additionally, it must be noted that Mr. Laffitte and his family have already been punished substantially. He will have to use most, if not all, of his assets to pay restitution, forfeiture, attorney's fees, and related civil judgments—indeed, as noted earlier, Mr. Laffitte (and not Mr.

Murdaugh) will bear the lion's share of the financial consequences stemming from Mr. Murdaugh's schemes. Indeed, the financial fallout from this case has been, and will continue to be, devastating for Mr. Laffitte and his family.

In addition, the name "Russell Laffitte" is now known throughout South Carolina and beyond, and not in a good way—Russell will be forevermore tied to Mr. Murdaugh and known infamously as "the Murdaugh banker." The media attention surrounding this case and related cases has been unprecedented and the effects of this case on Mr. Laffitte and his family cannot be underestimated. Mr. Laffitte's daughter had always dreamed of following in her father's footsteps, returning to Hampton and working at PSB—but that path is now foreclosed to her. She has also had potential business dealings and internships fall though because of the negative media attention that has focused a spotlight on her family. Mr. Laffitte's son has also faced backlash in high school from his some of his peers. In other words, Russell and his family have already been significantly punished for Russell's unwitting assistance to Mr. Murdaugh—and we respectfully submit that the Court should take that punishment into account (as well as the fact that Mr. Laffitte faces similar state charges and has been subject to severe restrictions in movement with two ankle monitors) when deciding on the appropriate prison sentence here. As such, a sentence of below the guideline range would constitute a sufficient sentence and provide just punishment for Mr. Laffitte's conduct.

      **b. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct.**

Mr. Laffitte's trial was among the most highly publicized trials in recent history in this district, eclipsed only by Mr. Murdaugh's double homicide trial. Any jail sentence exceeding three years of non-parolable federal time, accompanied by a substantial restitution and forfeiture judgment and the unprecedented collateral consequences noted earlier, is more than enough to

provide adequate deterrence to those who can be deterred from similar conduct—particularly when Mr. Laffitte also faces the certainty of a state prosecution(s) for the same set of facts that as those giving rise to the instant offense. As such, a lengthier sentence is not needed to deter others in similar positions from future criminal conduct.

     **c.**  **The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant.**

Mr. Laffitte will never work in banking again. Therefore, there is no need to impose a lengthier sentence to protect the public from further crimes of Mr. Laffitte. The counts with which Mr. Laffitte was convicted stemmed from his position as an employee and CEO of PSB. Mr. Laffitte no longer holds this position and has no desire to ever reenter to banking industry. Mr. Laffitte has since worked for the Laffitte Farm and has performed general farming work and timber maintenance. *See* PSR at ¶ 190. Mr. Laffitte intends to return to his family upon release and do similar farming and timber work.

Mr. Laffitte is 52 years old, and as a first-time offender at this age who has the support of those who love him, he is highly unlikely at to recidivate. *See United States v. Haynes*, No. CR 2:18-00261, 2022 WL 23259, at *3 (S.D.W.Va. Jan. 3, 2022) (because of the defendant's "largely insignificant" criminal history, along with the defendant's age, the "court determined these circumstances warranted a six-level downward variance"); *United States v. Oldani*, No. CRIM.A. 3:09-00010, 2009 WL 1770116, at *7 (S.D.W. Va. June 16, 2009) ("Another factor weighing in favor a reduced sentence is the low statistical probability of recidivism for defendants" with little to no criminal history). As such, there is a substantially reduced risk of future harm to the public and no need to impose a lengthier sentence to protect the public from Mr. Laffitte.

**d. The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

As mentioned above, Mr. Laffitte is looking forward to becoming a productive member of society upon his release. Mr. Laffitte has no desire to return to banking, and therefore, must enter a new career. Mr. Laffitte will benefit from educational or vocational training in a new skill or trade. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

**e. The Kinds of Sentences Available.**

Mr. Laffitte asks the Court to recommend a kind of sentence that allows him to receive educational and vocational training, counseling, and would allow his release to halfway house, house arrest, or other transitionary sentence at a certain point. Such a type of sentence would serve the statutory purposes of sentencing. In addition, Mr. Laffitte requests that the Court recommend a Bureau of Prisons designation at FCI Jesup's low security satellite prison.

**f. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

In related cases, two others have been charged federally – Mr. Murdaugh and attorney Cory Fleming. Mr. Murdaugh has been indicted on 22 federal charges for bank fraud, wire fraud, money laundering, and attempt and conspiracy to commit mail fraud. *See United States v. Richard Alexander Murdaugh,* Case No. 9:23-cr-00396-RMG. While many expect Mr. Murdaugh to enter a guilty plea at some point, to date Mr. Murdaugh has pled not guilty. *See id.* at ECF No. 18. Mr. Murdaugh also faces over 100 charges of financial crimes in state court. Obviously, even if Mr.

Murdaugh pleads guilty, given his own conduct, he should face a sentence which is much more significant than any sentence given to Mr. Laffitte.

In addition, on May, 25, 2023, Mr. Fleming pled guilty to a violation of 18 U.S.C. § 371, which has a statutory maximum of 5 years. *See United States v. Cory Howerton Fleming,* Case No 9:23-cr-00394-RMG, at ECF Nos. 1,4,10-14. Mr. Laffitte's guideline range could expose him to a sentence that is more than double the statutory maximum for Mr. Fleming's charge—and so that should be considered here as well.

In addition to those individuals who are directly related to Mr. Laffitte's case, there are a number of similarly situated defendants who were convicted of financial crimes in this district and beyond who received sentences that were considerably less than the applicable guideline range. Mr. Laffitte intends to address this issue in more detail at sentencing.

### g. The Parsimony Principle

As the Court is aware, the "parsimony" principle of 18 U.S.C. § 3553(a) provides that district courts are required to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. 3553(a)(2). *See United States v. Defoor,* 535 F.3d 763, 763 (8th Cir. 2008) (discussing the "'parsimony' doctrine, which provides that the sentence imposed should be the least severe sanction necessary to achieve the purpose of sentencing"); *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (noting that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle, sometimes referred to as the 'parsimony principle'"). Indeed, the "parsimony principle in § 3553(a) is an important and binding instruction from Congress," if not the most important factor for a sentencing court to consider. *United States v. King*, 861 F.3d 692, 696 (7th Cir. 2017).

As discussed above, the Court has the discretion to sentence below the Guidelines range. Here, the USPO calculated the Guideline range at 108 to 135 months and the government, in its sentencing memorandum, agrees that this is the correct Guideline range and that it is the appropriate sentence.[15] However, this range is draconian and much greater than necessary to comply with the purposes of sentencing. A sentence well below this range would serve the statutory goals of sentencing, reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes. Indeed, with discussed above for Mr. Laffitte, a harsh sentence using the Guidelines will not serve these purposes any better than a more lenient sentence. As such, a lower sentence must be imposed. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.").

## CONCLUSION

For the foregoing reasons, Mr. Laffitte respectfully requests that the Court impose a sentence below the advisory Guidelines range as the imposition of such a sentence would be "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing. Mr. Laffitte reserves the right to supplement the arguments made herein at his sentencing hearing and appreciates the care with which he knows the Court will review and consider his arguments.

*[signature page follows]*

---

[15] It appears the government has inadvertently included a range of 108 to 137 months in certain areas of its sentencing memorandum. *See* ECF No. 303 at 1, 3, and 29. The range calculated by the USPO and the proper range for an offense level of 31 is 108 to 135 months.

Respectfully submitted,

s/Mark C. Moore

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
Maynard Nexsen PC
1230 Main Street, Suite 700 (29201)
Post Office Box 2426
Columbia, SC 29202
Phone: 803.771.8900
Fax: 803.727.1458
MMoore@maynardnexsen.com
MParente@maynardnexsen.com

Cheryl D. Shoun (Fed. ID No. 4761)
Maynard Nexsen PC
205 King Street, Suite 400 (29401)
Post Office Box 486
Charleston, SC 29402
Phone: 843.577.9440
CShoun@maynardnexsen.com

*Attorneys for Defendant Russell Lucius Laffitte*

July 28, 2023
Columbia, South Carolina