**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-4509**

───────────────

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

v.

RUSSELL LUCIUS LAFFITTE,

    Defendant – Appellant.

───────────────

**No. 23-4566**

───────────────

UNITED STATES OF AMERICA,

    Plaintiff – Appellant,

v.

RUSSELL LUCIUS LAFFITTE,

    Defendant – Appellee.

───────────────

Appeals from the United States District Court for the District of South Carolina, at Beaufort. Richard Mark Gergel, District Judge. (9:22-cr-00658-RMG-1)

───────────────

Argued: September 25, 2024     Decided: November 14, 2024

───────────────

Before AGEE, THACKER and HEYTENS, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Thacker and Judge Heytens joined.

---

**ARGUED:** William Walter Wilkins, BILLY WILKINS LAW LLC, Greenville, South Carolina; John Cowles Neiman, Jr., MAYNARD NEXSEN PC, Birmingham, Alabama, for Appellant/Cross-Appellee. Kathleen Michelle Stoughton, Columbia, South Carolina, Emily Evans Limehouse, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Mark C. Moore, Michael A. Parente, MAYNARD NEXSEN PC, Columbia, South Carolina, for Appellant/Cross-Appellee. Adair F. Boroughs, United States Attorney, Winston D. Holliday, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee/Cross-Appellant.

---

AGEE, Circuit Judge:

Russell Lucius Laffitte appeals his convictions for bank and wire fraud, in violation of 18 U.S.C. §§ 1343, 1344(2), in the United States District Court for the District of South Carolina. He also appeals the district court's denial of his motion for judgment as a matter of law and two motions for a new trial. The Government cross-appeals from the district court's restitution order. For the reasons explained below, we vacate Laffitte's convictions and sentence and remand for a new trial.

## I.

## A.

The Government alleged in the indictment and sought to prove at trial that, between 2006 and 2021, Laffitte used his position as Chief Executive Officer at Palmetto State Bank (the "Bank") to assist Alex Murdaugh, a disbarred South Carolina attorney, in defrauding Murdaugh's clients.[1]

Laffitte and Murdaugh were alleged to conspire to defraud Murdaugh's personal injury clients and to obtain money and property by materially false and fraudulent pretenses, representations, and promises by making misleading statements and omissions.[2]

---

[1] The Supreme Court of South Carolina disbarred Alex Murdaugh on July 12, 2022. *In re Murdaugh*, 437 S.C. 15, 16 (S.C. 2022).

[2] In September 2023, Murdaugh pleaded guilty to conspiracy to commit wire fraud and bank fraud, bank fraud, wire fraud, and money laundering. *See United States v. Murdaugh*, No. 9:23-cr-396-RMG, 2024 WL 1348845, at *1 (D.S.C. Mar. 28, 2024) (unpublished).

In furtherance of the conspiracy, Murdaugh requested that Laffitte serve as the conservator or personal representative for the settlement accounts of multiple clients from Murdaugh's firm.[3] As a result, Laffitte could access the settlement accounts and used those accounts to collect over $450,000 in fees and to extend sixteen unsecured loans worth approximately $960,000 to Murdaugh. In total, Laffitte and Murdaugh were alleged to have stolen nearly two million dollars from the settlement accounts.

In September 2021, Murdaugh's law firm discovered that he had been stealing from both the firm and his clients. The firm subsequently fired Murdaugh, reported his thefts to the authorities, and notified Laffitte that Murdaugh was no longer with the firm.

After learning about Laffitte's involvement in Murdaugh's theft of settlement funds, the Board of Directors at the Bank voted to sever the Bank's relationship with Laffitte.

In September 2022, Laffitte was charged in a second superseding indictment in the District of South Carolina with conspiracy to commit wire and bank fraud, bank fraud, wire fraud, and three counts of misapplication of bank funds. The five substantive counts charged Laffitte as a principal and as an aider and abettor.

During the nine-day trial, the Government presented fifteen witnesses—five of whom were members of the Bank's Board of Directors—and Laffitte called eight witnesses and testified in his own defense. During direct examination of his sister, Laffitte sought to

---

[3] Under South Carolina law, a conservator is "a person who is appointed by a court to manage the estate of a protected person," S.C. Code Ann. § 62-1-201(6) (2022), such as a minor, *id.* § 62-5-402 (2019). Similarly, "[a] personal representative is a fiduciary who . . . has a duty to settle and distribute the estate of [a] decedent[.]" *Id.* § 62-3-703(a) (2014).

introduce testimony regarding the desire of the Government's witnesses, who were also Board members of the Bank, to sell the Bank. Laffitte also sought to introduce a memorandum written by his father, a Board member who did not want to sell the Bank, responding to those desires. The district court excluded the testimony and memorandum, but permitted Laffitte to ask his witnesses about the possibility of selling the bank and to also reference the Government witnesses' motivation to testify during closing argument.

After closing arguments and the court's instructions to the jury, the jurors began deliberating at 10:22 a.m. on November 22, 2022. Around 7:45 p.m., the court summoned the parties and counsel to the courtroom to disclose the receipt of two notes from Juror No. 93. The first note stated: "Need antibiotic @ 19:20[.] I can delay 1-2 hrs," and was signed "# 93." S.J.A. 3305.[4] The second note read: "Feeling <u>pressured</u> to change my vote,"[5] and was signed "# 93." S.J.A. 3306.

After reading both notes to the parties, the court said that its "instinct [was] that we have alternate[] [jurors] and we should get to a verdict, and that it is not practical to get her medicine and drive back." J.A. 2271. The court also "welcome[d] any thoughts," and defense counsel suggested that the jurors return in the morning, but the court reiterated its preference to utilize alternate jurors. J.A. 2271. The Government agreed: "[W]ith the

---

[4] Throughout the discussion about the jurors' notes, the jurors were identified by their numbers. Their actual identities were not known to the district court or the parties at that time.

[5] In her note, Juror No. 93 underlined "pressured" twice. S.J.A. 3306.

impending holiday ahead of us, we would like for [the jury] to continue to deliberate tonight." J.A. 2272. Echoing the Government's concern, the court explained:

> I could just tell you right now that if I tell people that they have to come back tomorrow, I don't think that's in anybody's interest. Okay? And I'm going to be honest, I'm kind of trying to protect defendants here in this situation. And I don't think it's in your interest to try to force people to come back tomorrow. I don't like the effect that has on pushing people to a verdict.

J.A. 2272.

At that point, the court received two additional notes from the jury. One of those notes was signed by multiple jurors. It read:

> Dear Judge,
>
> We are writing this to express a shared concern.
>
> On page 11, your final charge to us states that[,] "If you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict."
>
> A juror's previous court experience is influencing that juror[']s ability to discuss the trial in a group setting. That juror has made comments about having been "bullied" as a juror on previous trials and will not consider the evidence in this trial. The juror is hostile to hearing any debate from certain other jurors, and the juror disagrees with your final charge and specifically the definitions you provided.
>
> We respectfully ask that you consider speaking to this issue, so that we are able to proceed with deliberations.

S.J.A. 3307.

The final note came from Juror No. 88, and it stated: "Your Honor, Can you please call a[n] alternative [sic] as I am experiencing anxiety and unable to clearly make my

decision." S.J.A. 3308. Under her signature as Juror No. 88, she wrote that she could "provide more information as needed if necessary!" *Id.*[6]

After reading the jurors' notes to the parties, the Government contended that the court should "put two alternates to replace both of those jurors." J.A. 2274. In response, the district court reminded the parties that there are "three alternates for a reason," and noted that it is unclear whether the notes raised issues with "two jurors or three jurors." J.A. 2274, 2276.

The Government proposed that the "person with the medicine . . . should be allowed to go home," and that "[t]he person who cannot follow the law" should be "struck for cause." J.A. 2277. The court counseled caution for the juror who allegedly was not deliberating, stating: "I can't let a juror be bumped out one way or the other who says, that's not accurate, I'm fully participating, they just don't agree with me. That—you know, that's not a juror I remove. I mean . . . I tell them in my charge hold your convictions[.]" J.A. 2278. Consequently, the court proposed that it speak with the juror referenced in the third note,[7] but expressed its view that it would be "a huge mistake" to conduct the interview in the courtroom. J.A. 2276.

After a short colloquy with the Government, the court proposed the following action: "[W]ith the consent of the parties, we are going to set up a place where I will take

---

[6] The record reflects that the district court did not read the line below the signature to the parties.

[7] The district court later learned that Juror No. 93 was the juror referenced in the third note.

a court reporter, and without anyone present but the court reporter, I will create a record. And with my deputy and my court reporter, I will ask the juror if there's a problem."[8] J.A. 2279. Both parties consented to this action and the court directed the courtroom deputy to ask the jury foreman "to identity the juror number" of the juror referenced in the third note. J.A. 2281. Upon her return, the courtroom deputy informed the court and the parties that the jury foreman did not know the juror's number, but she stated that she would "get her number from the name." J.A. 2281. Before leaving the courtroom, the court stated: "Okay. I'm going to take action. Fair enough? Everybody happy with that?" J.A. 2281.

At 8:20 p.m., the court conducted an *in camera* interview with Juror No. 88 "to address [her] request" to "be replaced with an alternate." *United States v. Laffitte*, No. 22-cr-658, 2023 WL 2384144, at *3 (D.S.C. Mar. 6, 2023). The discussion between Juror No. 88 and the district court is reproduced in full below:

> The Court: You're Juror No. 88?
>
> Juror No. 88: Yes.
>
> The Court: You can take your mask off if you feel more comfortable. I received a note that you told me: Can you please call an alternate as I am experiencing anxiety and unable to clearly make my decision. I can provide more information as needed, if necessary. You want to share anything with me? But don't tell me anything about the deliberations themselves. Okay?
>
> Juror No. 88: Give me a minute.
>
> The Court: Take your time.

---

[8] Throughout this exchange, neither the parties nor the court knew who was referenced in the note from multiple jurors claiming that one juror was influenced by prior experiences and would not deliberate.

Juror No. 88: I was very proud to do this. At one point, I thought I wouldn't be able to. But I am prescribed medication and I've been taking notes clearly. I have my decisions that I made. But **I started to feel very anxious due to some of the reactions to my decision.**

The Court: Do you feel like you can perform, or do you want me to replace you with an alternate?

Juror No. 88: Your Honor, **I don't want to be replaced, but—and I'm usually very strong when someone is butting up, but I don't want to be trialed [sic] for my decision.**

The Court: Well, whatever decision you make is your call.

Juror No. 88: Yes, sir.

The Court: The issue is, are you able to perform your duties as a juror?

Juror No. 88: At this point, no.

The Court: Okay. I'm going to honor your request to replace you then.

Juror No. 88: Thank you.

The Court: Crystal, could you handle it from here?

The Court Deputy: Yes, sir. I will just send the [Court Security Officer] in to escort her from here.

The Court: I'm going to go back. You stay here with Juror No. 88. I don't know your name, but hello and goodbye. I wish you the best. Thank you for your service.

Juror No. 88: I'm very sorry, Your Honor.

The Court: I understand.

S.J.A. 3310–11 (emphases added). The court dismissed Juror No. 88 sua sponte from the jury without notice to, or an opportunity to hear argument from, the parties.

The district court intended to also "sit down with the alleged problem juror pursuant to the same procedure agreed to by the parties for Juror No. 88." *Laffitte*, 2023 WL 2384144, at *4. But the court was informed that "the previously unidentified juror was the juror with the medication issue[, Juror No. 93,] and this juror had already left the courthouse." *Id.*[9]

At 8:27 p.m., the district court returned to the courtroom with the parties and informed them that the juror in need of antibiotics, i.e., Juror No. 93, had been excused. As for the juror experiencing anxiety, i.e., Juror No. 88, the court explained that, during the *in camera* interview:

> [Juror No. 88] asked to be relieved and said she wasn't able to go forward, and I removed her. I relieved her. I granted her request to—for an alternate. I just basically said to her, tell me, can you do your duties? And she said, I cannot do my duties. She's got medication issues herself, anxiety issues. And I relieved her.

J.A. 2281–82. The court did not read back the *in camera* interview or provide any further explanation. And based on the removal of Juror Nos. 88 and 93, the court explained that the issue outlined in the third note—that a juror's experience was influencing his or her ability to serve on the jury and that juror was not deliberating—was resolved.

After the district court announced the removal of Juror Nos. 88 and 93 to the parties, Laffitte's counsel "object[ed] not to the juror that was replaced for medication," but to the removal of "the second juror that was replaced [with] the anxiety." J.A. 2282–83. The court

---

[9] The record reflects that Juror No. 93 was removed before the district court reconvened the parties to announce that Juror Nos. 88 and 93 had been removed. However, it is unclear exactly when Juror No. 93 was removed.

noted defense counsel's objection, but clarified that Juror No. 88 was "emotionally very fragile," "could hardly speak," "was shaking," "was on anxiety medication," and was "not physically capable or emotionally capable of going forward." J.A. 2283.

The jury, which now consisted of ten original jurors and two alternates, was brought back into the courtroom. After the court's instructions, the jury was excused to return to the jury room at 8:33 p.m. Soon after, the court was notified that the jury had a verdict.

Around 9:30 p.m., the parties returned to the courtroom for announcement of the verdict. At that point, defense counsel Matt Austin again noted that his co-counsel, Bart Daniel, objected to "swapping out the alternate," and explained that it was "akin [to] moving [for] a mistrial." J.A. 2284. The court expressed surprise at the objection, and Mr. Austin clarified that defense counsel "thought we were just going to be interviewing [jurors], not necessarily replacing them." J.A. 2285. In response, the court explained that it tried "to be as transparent" as possible and that, in its view, the parties had agreed to the actions it took. J.A. 2285. Specifically, the parties agreed that the court would meet with Juror No. 88, and could make the decision to remove her upon realizing that she "was plainly incapable of continuing" and "in an emotional meltdown." J.A. 2285. Mr. Daniel reiterated his understanding that the court was "coming back to tell us what the juror said or to give us what your decision would be so that we could object to it[.]" J.A. 2286. The following exchange then ensued:

> The Court: Okay. So you are now telling me that had I come back and told you that she was emotionally incapable of functioning and she asked me again to remove her, that you would have objected to that?

> Mr. Daniel: I did object to it.

9:22-cr-00658-RMG    Date Filed 11/14/24    Entry Number 341    Pg. 12 of 37

Mr. Austin: Yes, Your Honor. I think we would have stated that it's a hung jury.

The Court: It's not a hung jury. I have alternates.

. . .

Mr. Austin: We just want to note for the record—

The Court: Okay. You know, folks, to come in after the fact here, after the Court laid it all out and we agreed on a process, I thought it was very clear, and I did—but there's a record of her I don't think anybody would really question. It's all on the record about what she told me. And I was, of course, following up on her request that she be removed and told me she could explain it to me, and she did. I didn't want to invade her privacy. But she is on significant medication. And she was, in my estimation, in an emotional meltdown situation. Okay?

J.A. 2286–87.

The jury was then brought into the courtroom and a verdict of guilty on all counts was announced. The jury was individually polled and each juror affirmed it was his or her verdict.

Subsequently, Laffitte was sentenced to eighty-four months in prison and ordered to pay over $3.5 million in restitution.

## B.

In December 2022, Laffitte moved for a new trial. He argued, among other things, that the district court's replacement of Juror Nos. 88 and 93 violated his Fifth Amendment right to be present because they were excused outside of his presence. In addition, Laffitte

contended that his Sixth Amendment right to an impartial jury was violated because the jurors were improperly removed based on their views of the case.

In support of his motion for a new trial, Laffitte sought permission from the district court to (1) file affidavits from Juror Nos. 88 and 93 and the jury foreperson under seal and (2) interview additional courtroom personnel "who may have had interactions with jurors" on November 22, 2022. S.J.A. 3425. The district court directed the parties to brief the admissibility of the affidavits and, after Laffitte filed a memorandum arguing that the affidavits were admissible under Federal Rule of Evidence 606(b)(1), it permitted Laffitte to file the affidavits under seal solely to evaluate their admissibility. The Government filed a memorandum in opposition, and Laffitte subsequently filed a reply.

In March 2023, the district court denied Laffitte's motion for a new trial, finding that Laffitte waived his arguments relating to the removal of Juror Nos. 88 and 93. The district court also denied Laffitte's request for consideration of the affidavits, finding that they fell within Rule 606(b)(1)'s prohibition on consideration of juror testimony during an inquiry into the validity of a verdict, and denied his request to interview court personnel.

Laffitte noted a timely appeal, arguing that the district court's removal of Juror Nos. 88 and 93 violated his Fifth Amendment right to be present and his Sixth Amendment right to an impartial jury. He also argued that the district court's decision to exclude the jurors' affidavits was an abuse of discretion. The Government noted a timely cross-appeal on the failure to order interest on the restitution amount. The Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

II.

## A. Exclusion of Juror Affidavits

Laffitte initially contends that the district court erred in excluding Juror No. 93's affidavit and urges the Court to consider it in evaluating his constitutional claims.[10] Because the district court correctly excluded the affidavit under Rule 606(b)(1), and thus did not err in denying Laffitte's motion for a new trial based on the affidavit, we cannot and do not consider it in our analysis.

As relevant here, Rule 606(b)(1) provides that "[d]uring an inquiry into the validity of a verdict or indictment," the Court cannot receive a juror's affidavit about "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."[11] We review for abuse of discretion the district court's denial of a motion for a new trial. *United States v. Nucera*, 67 F.4th 146, 162–63, 167 (3d Cir. 2023) (affirming a district court's denial of Nucera's motion for a new trial based on the court's

---

[10] As for Juror No. 88's affidavit, Laffitte argued that the district court erred in excluding it but represented on brief that the "Court does not need to consider her affidavit to rule in Laffitte's favor." Opening Br. 56. We agree that we need not consider Juror No. 88's affidavit to find that Laffitte's Fifth Amendment right to be present and Sixth Amendment right to an impartial jury were violated by her removal. Thus, we do not address the admissibility of her affidavit.

Laffitte does not challenge the district court's decision to exclude the jury foreperson's affidavit or to deny his request for additional interviews with courtroom personnel.

[11] Rule 606(b)(2) carves out exceptions to the prohibition on juror testimony, but Laffitte does not argue that any of them apply to the affidavits at issue.

correct application of Rule 606(b) to exclude juror affidavits); *see Stewart v. Amusements of Am.*, No. 96-1537, 1998 WL 406868, at *3–5 (4th Cir. July 15, 1998) (unpublished) (same).

Laffitte concedes that Juror No. 93's affidavit allegations related to her views of his innocence or guilt fall squarely within the ambit of Rule 606(b)(1). Nonetheless, he contends that two categories of her assertions are admissible: (1) her motivation for sending jury notes; and (2) her discussions with courtroom staff explaining that she lived twenty minutes from the courthouse and that a friend could bring her the medication quickly.

As to both categories, Laffitte advances an untenably narrow view of Rule 606(b)(1). In adopting that rule, Congress "endorsed a broad no-impeachment rule, with only limited exceptions." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 217 (2017). Moreover, as the Supreme Court has recognized, Congress did so for good reason: a broad prohibition of juror testimony "promotes full and vigorous discussion" during deliberations and "gives stability and finality to verdicts." *Id.* at 218.

The first category of Juror No. 93's assertions—her motivations for sending notes to the district court during deliberations—clearly falls within the broad scope of Rule 606(b). In particular, the Court is mindful that one of her notes specified she felt "pressured" to change her vote. Thus, to permit post-verdict inquiry into the motivation behind her notes would intrude on statements and incidents that occurred during deliberations and her mental processes related to the verdict.

Similarly, Juror No. 93's discussions with courtroom staff in connection with retrieving her medication also fall within the broad purview of Rule 606(b)(1). Again, we

are mindful that Juror No. 93 sent two notes during deliberations, one of which directly addressed medication. Her second note to the district court explained that she felt pressured to change her vote. Communications between Juror No. 93 and courtroom personnel related to those notes would impermissibly intrude on the statements and incidents that occurred during deliberations.

In addition, although we do not rely on the district court's finding that Juror No. 93's affidavit was not credible, we nonetheless note that it supports our conclusion. The district court found that Juror No. 93's affidavit "carrie[d] the hallmark of the manipulating and shaping of the juror's testimony by defense counsel." S.J.A. 3440. The district court noted that portions of Juror No. 93's affidavit "track[ed] word for word the same portions of Juror No. 88's affidavit." S.J.A. 3444. The court also noted that her affidavit included language "commonly associated with lawyers," and appeared "strategically prepared to overcome the binding effect of defense trial counsel's consent to [Juror No. 93's] replacement[.]" S.J.A. 3444.

In sum, in light of the broad reach of Rule 606(b) and the clear connection between the affidavits and the statements and incidents made during deliberations, the district court correctly excluded Juror No. 93's affidavit. Thus, the district court did not abuse its discretion in denying Laffitte's motion for a new trial based on her affidavit.

## B. Waiver

Before turning to the merits, we address the Government's contention that Laffitte waived or forfeited his Fifth Amendment, Sixth Amendment, and abuse of discretion

claims related to Juror No. 93. In addition, the Government argues that he waived or forfeited his Fifth Amendment and abuse of discretion claims related to Juror No. 88.[12]

Under Federal Rule of Criminal Procedure 52(b), the Court has discretion to correct errors forfeited because they were not timely raised in the district court, but no such discretion applies when there has been true waiver. In that regard, waiver is "the intentional relinquishment or abandonment of a known right." *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (citations omitted). When a claim is waived, "it is not reviewable on appeal, even for plain error." *United States v. Morehouse*, 34 F.4th 381, 395 (4th Cir. 2022) (citations omitted). However, forfeiture "refers to a party's inadvertent failure to raise an argument." *Stokes v. Stirling*, 64 F.4th 131, 136 n.3 (4th Cir. 2023) (citing *Wood*, 566 U.S. at 471–74 & n.4). Thus, the difference between waiver and forfeiture is that "a court has discretion to reach a forfeited issue." *Id.* (citation omitted). Upon a finding of waiver, whether that "waiver was valid is a matter of law that we review *de novo*." *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) (citation omitted).

Laffitte did not waive his Fifth Amendment or abuse of discretion claims related to the removal of Juror No. 88. In outlining its plan of action on the jurors' notes, the district court stated: "[W]ith my deputy and my court reporter, I will *ask* the juror if there's a problem." J.A. 2279 (emphasis added). Then, shortly before leaving to conduct the *in camera* interview, the district court asked the parties for their consent to "creat[e] a record

---

[12] The Government concedes that Laffitte's Sixth Amendment claim as to Juror No. 88 is preserved for our review. Resp. Br. 46.

to *question* the juror[.]" *Id.* (emphasis added). The parties both gave their consent. Based on these statements, we conclude that the parties consented to Juror No. 88 being questioned by the district court during the *in camera* interview—not to her sua sponte removal during that interview. Because Laffitte was not on notice that the district court might remove Juror No. 88 during the *in camera* interviews, the Court cannot conclude that Laffitte intentionally abandoned his right to be present during juror removal or his abuse of discretion claim. *See Wood*, 566 U.S. at 474.

Indeed, the record reflects that Laffitte's counsel came to the same conclusion. In response to the district court's announcement that it had in fact removed Juror No. 88 during the *in camera* interview, Laffitte's counsel immediately objected to that removal. J.A. 2283 ("[T]he second juror that was replaced about the anxiety is the one we would like to take—make an objection to."). When the verdict was returned less than an hour later, Laffitte's counsel again objected to the "replacement of one juror," explaining that he understood that the court would be "interviewing [the jurors], not necessarily replacing them." J.A. 2284–85. Based on these timely objections, the Government's argument that Laffitte waived his right to be present or abuse of discretion claim as to Juror No. 88 is meritless.[13]

---

[13] For the same reasons, the Government's argument that Laffitte forfeited his claims as to Juror No. 88's removal also fails. *See United States v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013) (finding that Runyon forfeited his right to be present argument by failing "to object . . . when the district court announced [the juror's] dismissal").

In an attempt to overcome this conclusion, the Government relies on the district court's statement, uttered just before leaving the courtroom to conduct the *in camera* interview, that it was "going to take action." J.A. 2281. The Government contends that the parties subliminally understood that the district court's referenced "action" encompassed the possible removal of jurors during the *in camera* interview, and thus Laffitte's failure to object constituted waiver. We disagree. The district court's vague stated intent to "take action" is ambiguous, and we remain "reluctant to read waiver into [Laffitte's silence]," which, "at most, is subject to several plausible interpretations." *United States v. Boyd*, 5 F.4th 550, 555 (4th Cir. 2021) (citation omitted).

With respect to Juror No. 93, however, the Government's waiver arguments are on point. The Government argues that the reasoning outlined in *United States v. Spruill*, 808 F.3d 585 (2d Cir. 2015), compels a finding of waiver. There, the Second Circuit evaluated whether Spruill waived a challenge to the district court's removal of a juror after deliberations had begun. *Id.* at 596–97. Because Spruill's counsel was "actively engaged in the matter and agreed to every action taken by the district court," the Second Circuit reasoned that counsel's "intentional actions manifest[ed] true waiver of any challenge to the district court's inquiry and removal of [the juror]." *Id.* at 599 (citation omitted). The Second Circuit noted that defense counsel "encouraged and agreed to a district-court inquiry as to the nature and extent" of the juror's inability to deliberate and, after the juror's removal, "affirmed that he did not object to anything that had transpired." *Id.* (quotation marks omitted).

We agree with the Government and find *Spruill* instructive. Here, as in *Spruill*, the record convincingly demonstrates that Laffitte, through counsel, acted intentionally when he agreed to the removal of Juror No. 93. Specifically, following receipt of the jurors' notes, Laffitte's counsel engaged in the discussion about the best path forward and, from the start, the district court discussed the possibility of removing Juror No. 93. Indeed, immediately after reading her notes, the district court stated that its inclination was "that we have alternates and we should get to a verdict, and that it is not practical to get her medicine and drive back." J.A. 2271. After the court received and read all four juror notes to the parties, the district court reiterated that, in its view, "we need to send home" "the one with the medicine." J.A. 2277. In response, the Government echoed that sentiment: "I would suggest, the person with the medicine, [we] cannot risk someone's health. So I think they should be allowed to go home." J.A. 2277. Laffitte and his counsel were present, but they said nothing.

And Laffitte's silence is particularly noteworthy where, as here, the district court repeatedly attempted to elicit the parties' suggestions as to the best plan. J.A. 2272 ("I want to hear from you about this."); J.A. 2274 ("I welcome suggestions from the parties."); J.A. 2277 ("I want to hear from everybody before I make a decision, because I think we are on virgin territory."). In fact, at one point, the district court directly sought defense counsel's advice, asking: "Mr. Daniel, your suggestions? I value your experience." J.A. 2274.

And after the district court informed the parties of Juror No. 93's removal, Laffitte's counsel "affirmed that he did not object to anything that had transpired" regarding Juror No. 93. *Spruill*, 808 F.3d at 599 (cleaned up). Specifically, Laffitte's counsel stated:

"Judge, we would object not to the juror that was replaced for medication. **We agreed with that. We agreed with that at the time.**" J.A. 2282–83 (emphasis added). And in objecting to Juror No. 88's removal, Laffitte's counsel **acknowledged that they only "object[ed] to the replacement of one juror."** J.A. 2284 (emphasis added).

In sum, the record reveals that (1) after the jurors' notes were read to the parties, both the district court and the Government endorsed removing Juror No. 93; (2) the district court provided several opportunities for both parties—and, at one point, defense counsel in particular—to offer suggestions or alternatives; and (3) after the court announced Juror No. 93's removal, Laffitte's counsel agreed with that decision. And yet Laffitte now argues that the court's decision to remove her was error. "In common parlance, such a tactic is called sandbagging." *Runyon*, 707 F.3d at 518. Because the record plainly demonstrates that Laffitte waived his claims related to the removal of Juror No. 93, the Court cannot consider them.

Laffitte nonetheless argues that his waiver was not knowing or voluntary due to (1) ineffective assistance of counsel, and (2) the district court's failure to address him directly.

In general, the Court reserves ineffective assistance of counsel claims "for resolution on collateral appeal unless counsel's ineffectiveness conclusively appears on the face of the record." *United States v. Glover*, 8 F.4th 239, 246 (4th Cir. 2021) (citation omitted). To demonstrate constitutionally ineffective assistance of counsel, Laffitte must establish both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668 687–88 (1984). An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Id.* at 687. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Here, we have reviewed the record and find it far from conclusive that Laffitte's trial counsel was ineffective. In fact, as noted above, defense counsel was engaged in the discussion about the jurors' notes, even suggesting as an alternative to removing Juror No. 93 that the jurors could return in the morning. In response, the Government noted the impending holiday and the district court expressed concern with "the effect that [returning tomorrow] has on pushing people to a verdict." J.A. 2272. The record shows that defense counsel offered multiple courses of action in response to the jurors' notes, listened to the district court's and the Government's perspectives, and decided that Juror No. 93's removal was the best decision. Thus, as the district court aptly noted, the record "does not remotely approach the first prong of *Strickland* for ineffective assistance of counsel," as it contains not even "the slightest suggestions of ineffectiveness." *Laffitte*, 2023 WL 2384144, at *9.

Laffitte's remaining argument—that the district court erred by failing to directly address him—also fails to overcome the Court's finding of waiver. Under the Sixth Amendment, "[t]here are essentially two categories of decisions made by a criminal defendant's trial counsel: those decisions, deemed 'personal,' that must be made with the defendant's consent and those that may be made without the defendant's consent." *Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998) (citation omitted).

In a classic case of Monday morning quarterbacking, Laffitte wishes his previous counsel had managed his defense differently by objecting to the removal of Juror No. 93.

Notably, Laffitte, a sophisticated businessman, was present at counsel's table throughout the discussion with the Government and the district court following the receipt of the jurors' notes. And even if defense counsel failed to directly consult with Laffitte, counsel's decision not to object to the removal of Juror No. 93 is not a personal right that requires such consultation. Rather, it is well-established that "defense counsel has the authority to manage most aspects of the defense without first obtaining the consent of the defendant," including "what objections should be raised." *United States v. Chapman*, 593 F.3d 365, 367–68 (4th Cir. 2010) (citations omitted).[14]

Accordingly, we hold that Laffitte waived his Fifth Amendment, Sixth Amendment, and abuse of discretion claims related to the district court's removal of Juror No. 93. However, because Laffitte did not waive his claims relating to the removal of Juror No. 88, we address the merits of those claims below.

## C. Sixth Amendment

Laffitte argues that the removal of Juror No. 88 violated his Sixth Amendment right to an impartial jury. After careful review, we agree.

The Sixth Amendment guarantees the right to an impartial jury. U.S. Const. amend. VI. This guarantee "includes a requirement 'that the verdict should be unanimous.'" *Ramos v. Louisiana*, 590 U.S. 83, 92 (2020) (quoting *Patton v. United States*, 281 U.S. 276, 288 (1930)). We review the dismissal of jurors for abuse of discretion. *United States v. Basham*,

---

[14] Laffitte also argues that Juror No. 93's affidavit indicates that his waiver was not knowing. Because we find that the district court did not abuse its discretion in excluding that affidavit under Rule 606(b)(1), we do not reach this argument.

561 F.3d 302, 321 n.9 (4th Cir. 2009) ("The Fourth Circuit follows the view that the trial court may deal with [claims of juror misconduct] as it feels the particular circumstances require and only reverse for abuse of discretion." (alteration in original) (citation omitted)).

In light of the unanimous-jury requirement, the D.C. Circuit has held that "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). Because "the reasons underlying a request for dismissal will often be unclear," the D.C. Circuit reasoned that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id.* (citation omitted).

When confronted with this issue, the Second, Third, Sixth, Ninth, and Eleventh Circuits have followed *Brown*. *See United States v. Thomas*, 116 F.3d 606, 620–25 (2d Cir. 1997); *United States v. Kemp*, 500 F.3d 257, 303–04 (3d Cir. 2007); *United States v. Ozomaro*, 44 F.4th 538, 544–46 (6th Cir. 2022); *United States v. Symington*, 195 F.3d 1080, 1085–88 (9th Cir. 1999); *United States v. Abbell*, 271 F.3d 1286, 1302–04 (11th Cir. 2001). As a matter of first impression, we join them.[15] The relevant inquiry is therefore whether Juror No. 88's dismissal was based on her views of the case, and thus a violation

---

[15] In *Hicks v. Anne Arundel County*, the Court outlined *Brown*, which the parties cited in arguing that the district court abused its discretion in dismissing a juror. 110 F.4th 653 (4th Cir. 2024). But we rejected *Brown* as inapposite because "the request to discharge [the juror] did not stem from the juror's view on the merits of the case." *Id.* at 660. Thus, today is our first opportunity to expressly adopt *Brown*.

of Laffitte's Sixth Amendment right to an impartial jury, or instead, permissibly based on a separate ground bearing no causal link to her views of guilt or innocence.

As the *Brown* rule has settled over the past four decades, courts have refined it. Most notably, the D.C. Circuit clarified that the possibility of a connection between a request for removal and a juror's views of the case is not always dispositive. Rather, "if the court forms an independent, good-cause justification for removing the juror that bears no 'causal link' to the juror's 'holdout status,' the court may excuse the juror even if the juror 'independently had doubts about the sufficiency of the evidence." *United States v. McGill*, 815 F.3d 846, 869 (D.C. Cir. 2016) (quoting *United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006)).

The standard used to evaluate this inquiry warrants a brief discussion. In *Brown*, the D.C. Circuit held that "*any* possibility" that the removal stems from a juror's views of the case was sufficient to implicate the Sixth Amendment. *Brown*, 823 F.2d at 596 (emphasis added). The Second Circuit similarly held that a juror cannot be dismissed where "the record raises any possibility that the juror's views on the *merits of the case*, rather than a purposeful intent to disregard the court's instructions, underlay the request" for removal. *Thomas*, 116 F.3d at 622 n.11. That said, the D.C. Circuit recently redefined its position, holding that "the pertinent question is whether there is a 'tangible' or 'appreciable' possibility, not merely whether there is literally any possibility, even just a theoretical one." *United States v. Wilkerson*, 966 F.3d 828, 838 (D.C. Cir. 2020) (citation omitted). The D.C. Circuit's rearticulation of the standard under *Brown* follows the current circuit consensus: the Third, Sixth, and Ninth Circuits employ a "reasonable possibility" standard, *see Kemp*,

9:22-cr-00658-RMG    Date Filed 11/14/24    Entry Number 341    Page 26 of 37

500 F.3d at 304; *Ozomaro*, 44 F.4th at 545–46; *Symington*, 195 F.3 at 1087, while the Eleventh Circuit employs a "substantial possibility" standard, *Abbell*, 271 F.3d at 1302.

In *Kemp*, the Third Circuit persuasively reasoned that an elevated standard "allow[s] us to avoid abstract 'anything is possible' arguments, provide district courts with some leeway in handling difficult juror issues, and protect each party's right to receive a verdict rendered by a jury that follows the law." 500 F.3d at 304. We echo the Third Circuit's concerns with the "any possibility" standard and note that the "reasonable" or "substantial" possibility standards are less likely to lead district courts to refuse to remove jurors for illogical or frivolous reasons. But we need not decide here whether a "reasonable" or "substantial" standard applies (assuming there is a difference between the two) because Juror No. 88's removal fails under either standard.

In applying these principles to Juror No. 88's removal, we find that there is a reasonable and substantial possibility that her request for removal stemmed from her views of the case. In so finding, the chronology of Juror No. 88's responses during the *in camera* interview is crucial. First, the district court asked if Juror No. 88 wanted to "share anything," and reminded her not to divulge information about the deliberations. S.J.A. 3310. In response, she stated: "I was very proud to do this. At one point, I thought I wouldn't be able to. But I am prescribed medication and I've been taking notes clearly. I have my decisions that I made. But I started to feel very anxious **due to some of the reactions to my decision.**" S.J.A. 3310 (emphasis added). The district court then asked Juror No. 88 whether she felt like she could perform her duties or if she wanted to be replaced with an alternate. She responded: "Your Honor, **I don't want to be replaced,**

but—and I'm usually very strong when someone is butting up, but I don't want to be trialed [sic] for my decision." S.J.A. 3310 (emphasis added). Not only did Juror No. 88 indicate that she did *not* want to be replaced, but she reiterated her immediately prior statement that her request for removal was causally linked to her decision, that is, to her view of the case. At that point, under *Brown*, the district court had a variety of choices to adequately protect Laffitte's Sixth Amendment right to an impartial jury: send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement, recess for the evening, or declare a mistrial. *See* 823 F.2d at 596. The district court did none of them.

Instead, the district court asked Juror No. 88, for the second time, whether she was "able to perform [her] duties as a juror." S.J.A. 3311. Juror No. 88 responded: "At this point, no." S.J.A. 3311. As a result, the district court "honor[ed] [her] request" and replaced her with an alternate. S.J.A. 3311.

We recognize that the district court faced a difficult situation—"[n]avigating the tension between the duty to dismiss jurors for misconduct and the equally, if not more, important duty to safeguard the secrecy of jury deliberations is a delicate and complex task." *Wilkerson*, 966 F.3d at 836 (cleaned up); *see United States v. Barnes*, 604 F.2d 121, 144 (2d Cir. 1979) ("Appellate courts have given, and should give, broad discretion to trial judges to pass upon charges of juror misconduct[.]"). It had been a long trial and a long day, and the district court was grappling with the receipt of four jurors' notes in rapid succession and faced the possibility of extending a high-profile case into the Wednesday before Thanksgiving. But to permit the removal of Juror No. 88 where the record shows a

reasonable and substantial possibility that it was related to her views of the case violates the Sixth Amendment. Our concerns are heightened in view of Juror No. 88's statement that others disagreed with her "decision," and that, after nearly eight hours of deliberations, the reconstituted jury returned a guilty verdict in less than an hour. *Cf. Wilkerson*, 966 F.3d at 837 (noting that the "context [in *Brown*] suggested that [the removed juror] may have been a holdout"). Though a close call, we "err on the side of Sixth-Amendment caution." *Id.* at 836 (citing *McGill*, 815 F.3d at 867). Thus, we hold that the removal of Juror No. 88 violated Laffitte's right to an impartial jury.

Yet the Government contends that the inquiry does not end there. Citing *McGill*, the Government claims there was a separate, independent ground for Juror No. 88's removal: her emotional state. Indeed, the district court informed the parties that it removed Juror No. 88 because she was "emotionally very fragile," explaining that she could "hardly speak," "was on anxiety medication," "was shaking," and "was not physically capable or emotionally capable of going forward." J.A. 2283. In response to Laffitte's objection to her removal, the district court again explained: "[She] was plainly incapable of continuing, and she was in an emotional meltdown." J.A. 2285. This, the Government reasons, is an independent reason justifying Juror No. 88's dismissal.

The removal of a juror whose emotions render her incapacitated may be an adequate exercise of the district court's discretion. *See, e.g.*, *United States v. Oscar*, 877 F.3d 1270, 1288 (11th Cir. 2017) (affirming the removal of a juror that stated, "she was biased, was not 'fair,' and was too emotional to follow the law"). But such emotional distress only justifies removal if it "bears no causal link to the juror's holdout status." *McGill*, 815 F.3d

at 869 (quotation marks omitted). Here, we need not speculate as to the cause of Juror No. 88's emotional state. As explained above, during the *in camera* interview, Juror No. 88 stated that she "fe[lt] very anxious **due to** some of the reactions to her decision." S.J.A. 3310 (emphasis added). Thus, the district court's articulated grounds for Juror No. 88's removal—i.e., her emotional state and anxiety—appear to have been caused by her views of the case—i.e., her decision. Her removal is therefore governed by *Brown*, not *McGill*.

In a similar circumstance, to vitiate the Sixth Amendment concern, a trial court should create a record that enables this Court to "discern[] no substantial possibility that [the juror's] distress derived from an evidentiary concern." *Wilkerson*, 966 F.3d at 837. On this point, *Wilkerson* is illustrative. There, the D.C. Circuit evaluated the removal of a juror who conveyed that she disagreed with the law and "[i]n addition" she "was experiencing emotional and mental distress." 966 F.3d at 837. The record showed that the "district court asked [the juror] whether her distress was 'because of deliberations,' [and] she replied that it was 'the whole thing,' i.e., 'the whole case.'" *Id.* Consequently, the district court "understood her distress to stem from concerns there was a lot at stake and she said a life at stake." *Id.* (cleaned up). On that record, the D.C. Circuit could "discern no substantial possibility that [the juror's] distress derived from an evidentiary concern." *Id.*

We recognize that a "court may not delve deeply into a juror's motivations," as doing so may "intrude on the secrecy of the jury's deliberations." *Brown*, 823 F.2d at 596. Nonetheless, a district court is still empowered to inquire as to whether a juror's distress is caused by deliberations, or instead, some other factor that is an independent reason for removal. *Wilkerson*, 966 F.3d at 837. Other circuits have similarly endorsed a district

court's decision to interview additional jurors to determine the cause of a request for removal. *See Kemp*, 500 F.3d at 306 (collecting cases and affirming the removal of a juror where the district court "carefully and patiently examined the jurors on multiple occasions" and after receiving "near-unanimous reports that Juror 11 was biased, and [] hearing a manifestly incredible rendition from Juror 11, the [c]ourt discharged Juror 11"). And where those inquiries develop no reasonable or substantial Sixth Amendment concern in the record, a juror's removal may pass constitutional muster. But such a concern is apparent on the record before us.

In its briefing and at oral argument, the Government argued that *United States v. Huntress* compels a different conclusion. 956 F.2d 1309 (5th Cir. 1992). In *Huntress*, which pre-dates *Brown*, a deliberating juror was replaced because the district court believed that his "mental state prevented him from deliberating." *Id.* at 1313. Notably, the Fifth Circuit referred to "Huntress's theory of [the juror] as a holdout juror who may have feigned illness and checked himself into the hospital to avoid the pressure of his fellow jurors" as "pure speculation with no support in the record." *Id.* In contrast, the record before us is clear, as noted earlier. The district court heard *directly* from Juror No. 88 that her anxiety was related to her views of the case—no speculation was required. Thus, *Huntress* is inapposite.

Having found a violation of Laffitte's Sixth Amendment right to an impartial jury, we turn to the Government's contention that any error was harmless. At the outset, we note that it is unclear whether the improper dismissal of a juror during deliberations is structural error or subject to harmless error review. The "general rule [is] that a constitutional error

does not automatically require reversal of a conviction." *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017) (citations omitted). However, the Supreme Court has recognized that certain errors, which "came to be known as structural errors," "should not be deemed harmless beyond a reasonable doubt." *Id.*

With respect to "the question [of] whether the improper dismissal of a juror during deliberations is structural error or subject to harmless error review," we are unaware of any court that has decided that issue. *United States v. Litwin*, 972 F.3d 1155, 1178 (9th Cir. 2020). And as the Government conceded at oral argument, in cases where this error was held to have occurred, the convictions were reversed without discussion of harmlessness. *See id.* (collecting cases).

Ultimately, we need not decide whether the violation of Laffitte's right to an impartial trial is structural error because, even under the harmless error standard, we cannot uphold the removal of Juror No. 88. An error is harmless if it does not affect the defendant's "substantial rights." Fed. R. Crim P. 52(a). "For constitutional errors, the government bears the heavy duty of proving 'beyond a reasonable doubt that the error complained of did not contribute to the [result] obtained.'" *United States v. Legins*, 34 F.4th 304, 319 (4th Cir. 2022) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999) (alteration in original)).

Here, the Government has not carried its heavy burden to show beyond a reasonable doubt that the Sixth Amendment violation was harmless. By Juror No. 88's own admission, she was experiencing anxiety due to the other jurors' reactions to her views of the case, suggesting disagreement within the deliberation room. Indeed, before Juror No. 88 was removed, the jury deliberated for nearly eight hours. Following her removal, the jury

31

returned a verdict of guilty on all counts in under an hour. On this record, we do not find that the Government has shown beyond a reasonable doubt that the removal of Juror No. 88 was harmless. *See Litwin*, 972 F.3d at 1178 (noting that the Government failed to show harmlessness in part because "there is [] reason to believe [the removed juror] had views on the merits of the case").

Yet the Government argues that the strength of the evidence submitted during its case-in-chief was sufficient to render any error harmless. Without passing judgment on the merits, we note that the Government presented extensive evidence that Laffitte engaged in the charged conduct, including testimony from eyewitnesses and documentation of the alleged fraud. But Laffitte also presented defenses, and whether the jury credited his testimony was at the heart of those defenses. And the jury—not this Court—is tasked with evaluating that evidence and deciding whether the Government has met its burden. *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) ("The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented[.]"). We therefore find a Sixth Amendment error that requires vacating Laffitte's convictions.

## D.  Fifth Amendment

Laffitte further contends that the district court's removal of Juror No. 88 violated his Fifth Amendment right to be present at certain critical stages of the proceedings against him. Again, we agree.

"The Due Process Clause [of the Fifth Amendment] guarantees a defendant the 'right to be present at all stages of the trial where his absence might frustrate the fairness

of the proceedings[.]'" *Runyon*, 707 F.3d at 517 (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). Federal Rule of Criminal Procedure 43 "enshrines an even broader right to be present." *Id.* Both provisions require the defendant's presence when a juror is removed. *United States v. Hanno*, 21 F.3d 42, 47 (4th Cir. 1994) ("Considering that an accused has the constitutional right to be present at his jury selection, we think we has the same right to be present at the dismemberment of a jury which previously had been selected in his presence."). We review the dismissal of jurors for abuse of discretion. *Basham*, 561 F.3d at 321 n.9.

Our decision in *Runyon* is instructive. There, Runyon argued "that the district court, in deciding to dismiss [the juror] at an *in camera* proceeding from which both he and his lawyer were absent and of which they received no notice, violated his right to be present[.]" 707 F.3d at 517. With little discussion, we held "that Runyon should have been present when the district court decided to excuse and replace [the juror]." *Id.*

The parties do not dispute that neither Laffitte nor his lawyer were present at the *in camera* interview, during which the district court removed Juror No. 88. As a result, we have little difficulty concluding that Laffitte's absence at that time violates his Fifth Amendment right to be present.

The Government contends that Laffitte was present when the court decided to remove Juror No. 88 because he was present during the discussion about the process to be followed after receipt of the jurors' notes and that removal authority was delegated to the court at that time. As discussed earlier, we do not find that claim to be accurate. The district court and the Government repeatedly mentioned the possibility of removing Juror No. 93—

but neither the Government, defense counsel, nor the district court suggested Juror No. 88's removal. *See, e.g.*, J.A. 2277 ("I think the one with the medicine we need to send home."). In fact, towards the end of the discussion, the Government stated that the "anxious" juror was "still a viable juror." J.A. 2278. The district court also stated that a juror who claims to be "fully participating," but that other jurors "just don't agree with [her]," is "not a juror I remove." J.A. 2278. And right before the judge left the courtroom for the *in camera* interview, the Government suggested that the court speak with "the juror who's reporting being anxious," noting that "[t]his sort of environment could be contributing to the anxiety that could be alleviated depending on how you decide to handle the jurors." J.A. 2279. These statements do not demonstrate that the parties agreed upon any decision beyond the district court conducting *in camera* interviews with certain jurors. In fact, the Government appeared to suggest that the anxious juror need not be excused depending on how the district court "handle[d] the [other] jurors." J.A. 2279. Thus, we cannot conclude that the parties and the district court agreed to the removal of Juror No. 88 during the discussion. Instead, the record reflects that the court decided to remove her sua sponte during the *in camera* interview, in violation of Laffitte's Fifth Amendment right to be present.

The Government further argues that any violation was harmless. While a violation of the right to be present can be harmless, *United States v. Tipton*, 90 F.3d 861, 873–74 (4th Cir. 1996), the Government bears the heavy burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the [result] obtained," *Legins*, 34 F.4th at 319 (quotation marks omitted).

To satisfy that burden, the Government argues that, even if Laffitte had been present when the court decided to remove Juror No. 88, the court would have removed her in any event. In so arguing, the Government focuses on the following exchange between the district court and defense counsel:

> Mr. Daniel: We thought you were coming back to tell us what the juror said or to give us what your decision would be so that we could object to it and not—
>
> The Court: Okay. So you are now telling me that had I come back and told you that she was emotionally incapable of functioning and she asked me again to remove her, that you would have objected to that?
>
> Mr. Daniel: I did object to it.
>
> Mr. Austin: Yes, Your Honor. I think we would have stated it's a hung jury.
>
> The Court: It's not a hung jury. I have alternates.

J.A. 2286.

The Government's argument is colorable only if we ignore context. During the *in camera* interview, Juror No. 88 tied her anxiety to her views of the case, which was a direct nexus to Laffitte's Sixth Amendment rights. Although the cited post-removal exchange shows that the district court expounded upon its decision to replace Juror No. 88 with an alternate, the court deprived defense counsel and Laffitte of their right to be present *before* the decision was made. It is reasonable to infer that, if Laffitte's counsel was present for the *in camera* interview or fully apprised of Juror No. 88's statements during that interview, counsel may have raised the Sixth Amendment implications of her removal. As a result, and in line with *Brown*, the district court may have kept Juror No. 88 on the jury or declared a mistrial. And if the district court had permitted Juror No. 88 to continue serving on the

jury, it is pure speculation whether the jury would have reached the same outcome, so the Government cannot meet its burden.

Further, the Government's reliance on *Runyon* is misplaced. There, we found that the district court did not plainly err in removing a juror in violation of Runyon's right to be present. We reasoned that the error did not affect Runyon's substantial rights in part because of the timing of the jurors' removal. "[T]he court replaced [the juror] during a hiatus in the proceedings—after the jury had found Runyon guilty but before it had even begun to hear evidence as to what sentence he should receive." 707 F.3d at 518 (citation omitted). In contrast, the timing of Juror No. 88's removal supports a finding that the error was not harmless. Juror No. 88 was removed after approximately eight hours of deliberations and, less than an hour after her removal, the jury returned a verdict and found Laffitte guilty on all counts. This timeline does not support the Government's assertion that Juror No. 88's removal was harmless beyond a reasonable doubt.[16]

Accordingly, we hold that the removal of Juror No. 88 also violated Laffitte's Fifth Amendment right to be present and that such violation was not harmless beyond a reasonable doubt.[17]

---

[16] Because we find that the removal of Juror No. 88 violated Laffitte's Fifth Amendment right to be present and Sixth Amendment right to an impartial jury, we necessarily find that the district court abused its discretion. *Basham*, 561 F.3d at 326 ("An error of law is, by definition, an abuse of discretion." (citation omitted)).

[17] Given the Court's decision to vacate and remand based on the violation of the Fifth and Sixth Amendments, we do not reach the remaining issues raised on appeal or cross-appeal.

III.

For the reasons discussed, we vacate Laffitte's convictions and sentence and remand

for a new trial.

*VACATED AND REMANDED*