**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 9:22-cr-00658-RMG |
| v. | |
| RUSSELL LUCIUS LAFFITTE, | |
| Defendant. | |

## DEFENDANT RUSSELL LUCIUS LAFFITTE'S MOTION FOR A DISTRICT-WIDE JURY PANEL

Defendant Russell Lucius Laffitte ("Mr. Laffitte"), by and through undersigned counsel, respectfully moves this Honorable Court to issue an order summoning a district-wide jury panel. As discussed herein, a district-wide jury panel serves the principles of fairness, judicial economy, and the interests of justice, and will maximize Mr. Laffitte's chances for a fair and impartial trial.

## INTRODUCTION

A district-wide jury panel is both appropriate in this case and necessary to safeguard Mr. Laffitte's constitutional right to a fair and impartial trial in this matter. Given the facts that: (1) Mr. Laffitte is the alleged coconspirator of Alexander Murdaugh;[1] (2) Mr. Laffitte's former position as the CEO of Palmetto State Bank (a local, community-town bank serving Beaufort, Hampton and other counties in the Beaufort area); and (3) the amount of pervasive, negative pre- and post-trial publicity generated by this and related cases in the Lowcountry region, from which

---

[1] This Court is well acquainted with Mr. Murdaugh, having presided over Mr. Murdaugh's federal fraud case and having sentenced Mr. Murdaugh to an above-Guidelines sentence of 40 years incarceration. Mr. Murdaugh (formerly a well-known lawyer from a renowned family of Lowcountry lawyers) is now infamous in this state following his 2023 conviction for the alleged murders of his wife and son, in addition to his admitted involvement in multiple fraud schemes. Mr. Laffitte is no doubt tarnished in the minds of many given his relationship (which was not as close as many in the public apparently believe) and Mr. Laffitte is often referred to as "the Murdaugh banker."

the jury pool in this case will be drawn, absent the relief sought herein.. This case and its related cases are of statewide (if not, indeed, regional and national interest) such that this particular case cries out for the use of a statewide jury.

A number of federal courts have held that trial judges have the discretion to order that a jury must be drawn from an entire federal district or from a division of that district. *See generally, Ruthenberg v. United States*, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); *Salinger v. Loisel*, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989(1924); *United States v. Young*, 618 F.2d 1281 (8th Cir.), *cert. denied*, 449 U.S. 844 (1980); *United States v. Florence*, 456 F.2d 46 (4th Cir. 1972); *Katz v. United States*, 321 F.2d 7 (1st Cir.), *cert. denied*, 375 U.S. 903 (1963); and *Davis v. Warden, Joliet Corr. Inst. At Statesville*, 867 F.2d 1003 (7th Cir.), *cert. denied*, 493 U.S. 920 (1989). The Jury Selection Plan for the District of South Carolina, as amended, (established in conformity with the Jury Selection and Service Act of 1968, Title 28, United States Code, §§ 1861, *et. seq*.) provides for a centralized (or district-wide) petit jury upon order of the Chief Judge for good cause shown drawn from the four jury boxes/areas in the state. Once good cause has been demonstrated, and the services of a statewide petit jury are deemed required, the Clerk of Court or her designee shall draw names from each of the four jury areas based on each area's percentage of the total names in the master jury wheel.

Of course, we recognize that centralized juries are the exception, not the rule—and in this particular case, good cause is demonstrated and an exception is necessary in order to protect Mr. Laffitte's rights to a fair trial.

## BACKGROUND

### I.    This District's Current Jury Selection Plan

Under the District of South Carolina's Jury Selection Plan, the District of South Carolina is divided into four separate areas (Areas A, B, C and D) for jury selection purposes:

- Area A: juries are pulled for all cases charged or filed in the Anderson, Greenville, Greenwood, and Spartanburg Divisions (consisting of/containing Anderson, Cherokee, Edgefield, Greenville, Greenwood, Laurens, McCormick, Newberry, Oconee, Pickens, Saluda, and Spartanburg counties) from this area, which is sometimes referred to as "the Upstate";

- Area B: juries are pulled for all cases charged or filed in the Aiken, Columbia, Orangeburg, and Rock Hill Divisions (consisting of/containing Aiken, Allendale, Bamberg, Barnwell, Calhoun, Chester, Columbia, Kershaw, Lancaster, Lee, Lexington, Orangeburg, Richland, Rock Hill, Sumter, and York counties) from this area, sometimes referred to as "the Midlands";

- Area C: juries are pulled for all cases charged or filed in the Beaufort and Charleston Divisions (consisting of/containing Beaufort, Berkeley, Charleston, Clarendon, Colleton, Dorchester, Georgetown, Hampton, and Jasper counties) from this area, frequently referred to as "the Lowcountry"; and

- Area D: juries are pulled for all cases charged or filed in the Florence Division (consisting of/containing Chesterfield, Darlington, Dillon, Florence, Horry, Marion, Marlboro, and Williamsburg) from this area, also known as the "PeeDee".

The below graphic[2] further illustrates the jury areas:

---

[2] https://www.scd.uscourts.gov/Jury/guideline.asp



## II.    The Charges in This and Related Cases

Mr. Laffitte is a lifelong native of Hampton County and the former CEO of Palmetto State Bank.  Hampton County is part of the Beaufort Division, and Palmetto State Bank has long served multiple residents of the Beaufort Division. Hampton is also the home of Parker's Law Group, a personal injury law firm previously known as Peters, Murdaugh, Parker, Elztroth and Derrick or PMPED—a law firm founded in approximately 1910 by Randolph "Buster" Murdaugh Sr., the grandfather of Alexander Murdaugh.  This law firm is one of the primary economic engines of rural Hampton County and it and its attorneys have long been among Palmetto State Bank's primary customers.

Mr. Laffitte is charged in this Court with a number of alleged financial fraud crimes which stem directly from his alleged complicity in the actions of former Hampton attorney Alexander Murdaugh. Like Mr. Laffitte, Mr. Murdaugh and one of Mr. Murdaugh's friends, lawyer Cory Fleming were also charged in this Court with a number of fraud offenses sited in the Beaufort

4

Division.  As noted above, the Beaufort Division draws juries from Area C, which in addition to Charleston and Beaufort counties, would include potential jurors drawn from Berkeley, Clarendon, Colleton, Hampton, Jasper, Dorchester, and Georgetown counties. The financial crimes alleged in this Court against Mr. Laffitte (and of which Mr. Murdaugh and others stand convicted) are primarily sited in Beaufort and Hampton counties.

In addition to the federal charges, Mr. Laffitte, Mr. Murdaugh and others have been charged in South Carolina General Sessions Court with a host of alleged offenses, some (but not all, at least with respect to Mr. Murdaugh) of which mirror the federal charges brought in these companion cases.  Through three separate indictments, the State Grand Jury Section of the South Carolina Attorney General's Office has charged Mr. Laffitte for alleged financial fraud schemes undertaken by him and alleged co-conspirators Cory Fleming and Mr. Murdaugh.

The media attention to Mr. Murdaugh's admitted financial crime spree and his alleged involvement in the murders of his wife and son (of which Murdaugh now stands convicted but still contests), and the cases which have been brought against him and his alleged co-conspirators has been unprecedented in the history of this state.[3] Mr. Laffitte's first trial in this Court, which took place in Charleston in the fall of 2022, was extensively covered by local media.[4]  The highly

---

[3] In addition to the criminal charges discussed herein, there have been a number of civil lawsuits filed in various courts (both state and federal) in the Lowcountry that touch on all things Murdaugh—and these lawsuits have also received substantial publicity.

[4] Staff Reports, *The first 3 days of the Russell Laffitte trial*, The Post and Courier (November 11, 2022)https://www.postandcourier.com/archives/murdaugh/the-first-3-days-of-the-russell-laffitte-trial/article_b3038e74-61ff-11ed-8530-eb9b9a4b2159.html; Riley Benson, *Day two of Laffitte trial provides new insight into alleged crimes*, WCBD News 2, (November 9, 2022) https://www.counton2.com/the-murdaugh-investigation/day-two-of-laffitte-trial-provides-new-insight-into-alleged-crimes/; Drew Tripp, *Russell Laffitte's family leads testimony against him in federal bank fraud trial*, ABC 15 News, (November 16, 2022) https://wpde.com/news/local/russell-laffittes-family-leads-testimony-against-him-in-federal-bank-fraud-trial; John Monk, *Russell Laffitte heads to federal court on charges in the first Murdaugh-relatedtrial*,The State, (June 3, 2023)

publicized (and televised) murder trial of Alex Murdaugh took place several months later in early 2023 at the Colleton County[5] courthouse in Walterboro, South Carolina. The media attention to these cases has been both unprecedented and unabated, continuing to this date—and television crews have shown up to film and live-stream the state court proceedings in Mr. Laffitte's state prosecution, most recently in December of 2024.

### III.    This Case Involves Matters of Significant Public Interest That Extends Well Beyond the Beaufort Division

The   allegations against Mr. Laffitte and his alleged co-conspirators are of at least state-wide interest and the potential impact of the verdict in this case extends well beyond the boundaries of Area C, warranting a jury pool that reflects a more comprehensive cross-section of the entire district's population. Given the widespread implications of Mr. Laffitte's high-profile case, a jury selected from Area C alone will not adequately represent the diverse perspectives necessary to ensure a fair trial that is untainted by the extensive media attention brought to this and related cases, primary in the Lowcountry. Moreover, given the prominence of Mr. Laffitte and Palmetto State Bank in Beaufort County and the surrounding Lowcountry region which comprises Area C, potential jurors pooled from Area C alone may well come to the trial with pre-conceived notions as to the guilt of Mr. Laffitte and his purported collusion with others allegedly involved in what the media has characterized as the "Murdaugh Saga." This risk of preconceived notions is not merely a distant "possibility" but an inevitable result of the significant public interest and media

---

https://www.thestate.com/news/local/crime/article268177672.html.

[5] While Mr. Murdaugh worked in Hampton and he and his family are long-time natives of that town and county, the murders took place at Moselle, a Murdaugh residence, in Islandton, which is located in Colleton County. Mr. Murdaugh also owned a beach hose at Edisto Beach, which is also located in Colleton County near the Charleston-Colleton county line border—and Edisto Beach is less than an hour's drive from Charleston and is often considered to be a "bedroom community" of Charleston.

attention to Mr. Laffitte as an alleged "co-conspirator" of Mr. Murdaugh.

The media coverage of matters related to the prosecutions of Mr. Murdaugh and Mr. Laffitte has been extensive, both locally and nationally, focusing on their respective criminal cases and appeals. Locally, South Carolina outlets like *FITSNews* and *South Carolina Public Radio* have provided in-depth, detailed coverage of both men, emphasizing courtroom proceedings and, to varying degrees, the impact on the local community and the justice system in this state. Various outlets have closely followed the legal nuances of Mr. Laffitte's trial and his subsequently overturned conviction, delving into issues like juror dismissals, appeals processes, and judicial decisions. The *Charleston City Paper*[6] and *The Post and Courier*[7] have reported on how Alex Murdaugh admitted (and Mr. Laffitte's alleged) schemes have affected South Carolinians, portraying them as key figures in a broader legal and financial scandal. Nationally, mainstream outlets like *People*[8] and *NBC News*[9] have focused on the broader narrative of "corruption, deception, and legal fallout." National coverage of Mr. Laffitte's alleged role in Mr. Murdaugh's

---

[6] City Paper Staff, *Federal court overturns former Murdaugh banker's conviction*, Charleston City paper, (November 15, 2024) https://charlestoncitypaper.com/2024/11/15/federal-court-overturns-former-murdaugh-bankers-conviction/; City Paper Staff, *Murdaugh settles lawsuit in teen's boating death*, Charleston City Paper, (October 15, 2024) https://charlestoncitypaper.com/2024/10/15/murdaugh-settles-lawsuit-in-teens-boating-death/.

[7] Thad Moore, *Prosecutors: Murdaugh conspirator Russell Laffitte deserves at least 9 years in prison*, The Post and Courier, (July 28, 2023) https://www.postandcourier.com/murdaugh-updates/prosecutors-murdaugh-conspirator-russell-laffitte-deserves-at-least-9-years-in-prison/article_24b537c4-2d5d-11ee-9b63-6ff4fe054614.html;

[8] David Chiu, *Alex Murdaugh's Accomplice Russell Laffitte Sentenced to 7 Years for Financial Crimes*, People, (August 2, 2023), https://people.com/alex-murdaugh-accomplice-russell-laffitte-sentenced-7-years-financial-crimes-7568973; Ingrid Vasquez, *Alex Murdaugh Indicted on 22 Counts for Allegedly Defrauding Housekeeper's Family After Her Mysterious Death*, People, (May 24, 2023) https://people.com/alex-murdaugh-indicted-for-allegedly-defrauding-his-housekeepers-family-after-her-death-7503945.

[9] Marlene Lenthang, *Ex-bank CEO and associate of Alex Murdaugh indicted on wire and bank fraud charges*, NBC News, (July 21, 2022) https://www.nbcnews.com/news/us-news/ex-bank-ceo-associate-alex-murdaugh-indicted-wire-bank-fraud-charges-rcna39315.

financial crimes has at least appeared on the whole to be more factual, emphasizing Mr. Laffitte's convictions, appeals, and sentencing as opposed to the finer legal details debated in local media reporting.

## IV. Pervasive and Prejudicial Media Coverage Has Saturated the Local Jury Pool with Potentially Biased Information.

This case has been the subject of pervasive and prejudicial media coverage, including television reports, newspaper articles, online news outlets, "viral" podcasts and widespread social media discussion for at least four years. Recent media coverage of Alex Murdaugh and Russell Laffitte has focused on Mr. Laffitte's overturned conviction and Alex Murdaugh's ongoing legal battles, highlighting the legal technicalities surrounding Mr. Laffitte's appeal and retrial while also tying that reversal back to Alex Murdaugh's broader financial fraud schemes.

Pretrial publicity can and certainly will present a significant challenge to securing an impartial jury, as guaranteed by the Sixth Amendment of the Constitution. The media coverage regarding Mr. Laffitte, Alexander Murdaugh, Cory Fleming, and other alleged co-conspirators has been widespread and in some cases, inflammatory, and arguably prejudicial. Pervasive media reports have driven community bias that will make it difficult for Mr. Laffitte to receive a fair and impartial trial in the Beaufort Division—particularly in the aftermath of Mr. Murdaugh's murder convictions. As discussed *infra*, courts have long recognized that extensive media publicity can taint the jury pool, leading to measures such as venue transfers, expanded jury selection, or sequestration to mitigate potential bias.

The fall of Mr. Murdaugh has riveted public attention like few stories in this state's history and the attendant related high-profile civil and criminal cases, including Mr. Laffitte's federal and state criminal cases, have been covered in various newspaper and television reports, social media posts, podcasts, and documentaries. Media representatives and reporters fill the courtrooms

anytime there is a hearing and live stream the proceedings in state court. Some members of the media have bombarded Mr. Laffitte with cameras and questions, while he, his family, and his legal team attempt to enter and exit the federal courthouse. There are **at least** thirteen books that have been written about Mr. Murdaugh and the "The Murdaugh Saga"[10] as it has been called. Notable titles[11] include, but are not limited to, *The Fall of the House of Murdaugh* by Stephen G. Michaud and Debbie Cenziper, which investigates the Murdaugh family's history and downfall; *Blood on Their Hands: Murder, Corruption, and the Fall of the Murdaugh Dynasty* by Mandy Matney; and *Behind the Doors of Justice: The Murdaugh Murders* by Rebecca Hill, which focuses on the trial and Hill's role as a court official during the case. These books provide different angles on the Murdaugh saga, from investigative journalism to courtroom perspectives. Viral podcasts which have sought to villainize Mr. Laffitte include: (1) the "Murdaugh Murders" podcasts, which had an estimated reach of 3.8 million listeners; (2) "True Sunlight Podcast," which has an estimated reach of 824.5K listeners; and (3) "Cup of Justice,", whose estimated reach numbers were not readily available (listeners are estimated to be in the hundreds of thousands). While certainly a number of mainstream media articles have striven to be fair and balanced in connection with most things Murdaugh, the same cannot be said for *all* outlets—and it certainly cannot be said for certain

---

[10] Jenn Wood, The Murdaugh Saga: Loose Ends, FITSNews, (July 16, 2024) https://www.fitsnews.com/2024/07/16/the-murdaugh-saga-loose-ends/.

[11] Other titles include, *The Alex Murdaugh Paradox and 2024 Verdict* by Jude Hills; *Defending Alex Murdaugh: Not Guilty by Reasonable Doubt by* Crime and Cask; *Tangled Vines: Power, Privilege, and the Murdaugh Family Murders by* John Glatt; *Swamp Kings: The Murdaugh Family of South Carolina and a Century of Backwoods Power* by Jason Ryan; *Murdaugh, She Wrote: After the Trial* by Kathleen Hewtson; *ALEX MURDAUGH: A biography of Crime, Scandal, and Justice* by Morgan M. Collins; *The Long Road to Justice: Unraveling Alex Murdaugh's Tangled Web* by Amie Williams; *Because Enough is Enough: The Tell All Book* by Myra Catherine Crosby; *The Devil at His Elbow: Alex Murdaugh and the Fall of a Southern Dynasty* by Valerie Bauerlein. It should be noted that Ms. Bauerlein is a reporter for the Wall Street Journal, she formerly lived in this state and her book (which was published in 2024) has received strong reviews and was a best-seller.

bloggers. Mandy Matney and Liz Farrell, two of the bloggers behind these podcasts have been particularly and incessantly vicious in their comments about Mr. Laffitte in social media and their efforts to demonize him persist to this day. Both of these two "self-proclaimed" journalists are former reporters at the *Island Packet* in Hilton Head—and one of these bloggers continues to live in and spout her vitriol against Mr. Laffitte and others from Hilton Head Island, which is of course located in the Beaufort Division.[12] And while biased and one-sided blogposts and social media

---

[12] As noted above, Mandy Matney, the blogger who lives in Hilton Head is the author of the book "Blood On Their Hands" which was published in 2024. The other former Island Packet reporter, Liz Farrell, lived, on information and belief, in the Beaufort Division for approximately 20 years before decamping to Maryland in 2023, and apparently has her own book in the works. The third primary mover in *Cup of Justice* and *True Sunlight* is Eric Bland (an attorney who represents victims of Mr. Murdaugh and alleged victims of Mr. Laffitte' alleged offenses and who has sued Mr. Laffitte civilly) who has published his own book in late 2024 titled "Anything But Bland". Ms. Farrell and Ms. Matney are very active on social media, and have made multiple negative comments about Mr. Laffitte (and some members of his legal team) both prior to and after Mr. Laffitte's first trial and their negative comments have continued after the reversal of his conviction. Some of those comments can be found on the social media app "X". *See* Matney, M [@MandyMatney]. (August 1, 2023), "*Russell Laffitte Sentencing: @TheEricBland is in full vulture mode right now speaking. He said we're seeing a tale of 2 men today... The Russell who was described this morning and the Russell who took money from the Plylers and put a pool in his house..."* [Post]. X. https://x.com/MandyMatney/status/1686456903394541581; Farrell, L [@elizfarrell]. (August 11, 2023), "*Russell Laffitte's decision to appeal is so telling. It shows how culturally commonplace and normalized his behavior is in his little bubble in Hampton County ... his spirit animal is a cockroach.*" [Post]. X. https://x.com/elizfarrell/status/1690111875315347456. Recently, Ms. Matney called Mr. Laffitte as a "doofus" and complained that attending her coverage of his previous federal trial made her hate Charleston. Matney, M [@MandyMatney]. (November 14, 2024), "*Let me be more clear. We have been investigating this **doofus** for years. I was in Charleston for 10 days covering his trial (it made me hate Charleston and I love Charleston). I have listened to hours and hours of testimony. Gone through hundreds of documents that prove this man's guilt. I am angry at the system right now. What a waste.*" [Post]. X. https://x.com/MandyMatney/status/1857098111191056660.
For her part. Ms. Farrell recently referred to Mr. Laffitte as "Russell 'Can't Admit Defeat' Laffitte" Farrell, L [@elizfarrell]. (November 14, 2024), "*Russell "Can't Admit Defeat" Laffitte is getting a new trial ... lol. I guess there's something to be said about not admitting defeat when you can afford the fight .... OH WAIT. He never paid his full legal bills ... I hope he has enough money saved for his next defense team!*" [Post]. X. https://x.com/elizfarrell/status/1857089999839133730. These two self-proclaimed "journalists" can be expected to continue to spew their bilious screed about Mr. Laffitte to their listeners in the Lowcountry (and admittedly beyond) up to and throughout his retrial.

drive-bys can clearly have an effect on how the reader or viewer views Mr. Laffitte, the cumulative effect of serial articles that strive to be fair but which nonetheless tie Mr. Laffitte to Mr. Murdaugh can have an overwhelmingly negative cumulative effect on potential jurors.

Several articles have opined on the core issues being raised in Mr. Laffitte's criminal case, particularly his purported knowledge and intentions of the unlawful activity of Mr. Murdaugh. These include:

- Melissa Rademaker, *Convicted ex-banker linked to Alex Murdaugh through financial crime charges*, Live 5 WCSC, (January 17, 2023) https://www.live5news.com/2023/01/17/convicted-ex-banker-linked-alex-murdaugh-through-financial-crime-charges/

- Melissa Rademaker, *Experts, investigators, possible victims continue testimony in trial of ex-Lowcountry banker*, Live 5 WCSC, (November 15, 2022) https://www.live5news.com/2022/11/15/experts-investigators-possible-victims-continue-testimony-trial-ex-lowcountry-banker/

- Patrick Phillips, *Lowcountry banker convicted on fraud charges seeks new trial*, Live 5 WCSC, (December 7, 2022) https://www.live5news.com/2022/12/07/lowcountry-banker-convicted-fraud-charges-seeks-new-trial/

- Drew Tripp, *First federal charges in Murdaugh scandal come against banker Russell Laffitte*, ABC News 12, (July 20, 2022) https://wcti12.com/news/state-news/first-federal-charges-in-murdaugh-scandal-come-against-banker-russell-laffitte

- Liz Farrell, *First Federal Indictment Handed Down in Murdaugh Case…To Russell Laffitte*, FITSNews, (July 20, 2022) Russell Laffitte Indicted On Federal Charges In Alleged Schemes

Recently, local media outlets in the Lowcountry have covered Mr. Laffitte's federal appeal and the Fourth Circuit's decision reversing Mr. Laffitte's conviction and granting a new trial. Some of these articles/broadcasts are listed below:

- Melissa Rademaker & Marissa Thompson, *Russell Laffitte, alleged Murdaugh accomplice, granted new trial*, Live 5 WCSC,

(November                    14,                    2024)
https://www.live5news.com/2024/11/14/russell-laffitte-alleged-murdaugh-accomplice-granted-new-trial/

- Mitchell Black & Glenn Smith, *Conviction of former Alex Murdaugh banker Russell Laffitte tossed by federal appeals court*, The Post and Courier, (November 14, 2024) https://www.postandcourier.com/murdaugh-updates/russell-laffitte-alex-murdaugh-bank-fraud-hampton-appeals-court/article_8456a056-a2a4-11ef-9a7d-377f55a418d1.html.

- Alan Hovorka, *Ex-Murdaugh banker Russell Laffitte retrial is happening. Here's when.*, The Post and Courier, (January 17, 2025) https://www.postandcourier.com/murdaugh-updates/murdaugh-russell-laffitte-retrial-fraud/article_fa7dd0e2-d422-11ef-a2bc-ef74972100fc.html

## V.    Regional Analysis of Media Coverage in the Four "Areas" of the District from which Juries are Drawn

A comprehensive analysis of media coverage over the last five years (by number of stories, including television, print, online, and blogposts) regarding Mr. Laffitte reveals a stark difference in coverage once broken down per South Carolina county between 2021, the year of the murders of Paul and Maggie Murdaugh and the present. Our analysis found Area C (the Lowcountry) trended astronomically higher with **1123** stories published/filed compared to other regions in the state. Area B (the Midlands) only recorded 294 stories; Area A (the Upstate) logged 340 stories; and Area D (the PeeDee) has to date logged 178 stories. *See* **Exhibit 1**. Disparities in media attention from area to area highlights the point that jurors who live in Area C were heavily exposed to significantly more coverage and thus may contribute to potential juror bias based on exposure and/or consumption of local media coverage alone.

In a secondary analysis of five-year media coverage (by number of stories) regarding Alex Murdaugh per South Carolina county between 2021-2025, Area C has **13,962** stories. Area B, for example recorded 3,768 stories; Area A is at 9,000 stories; and Area D recorded 5,448 stories.

Again, Area C has been the most exposed to media coverage regarding all things Murdaugh at a disproportionately higher rate, further supporting the need for a statewide jury panel.

Media coverage of Alex Murdaugh and Mr. Laffitte has varied based on local interest, historical ties, and the broader implications of their crimes. In Hampton County, where Mr. Laffitte and Mr. Murdaugh had deep personal and financial ties, there has been extensive coverage as clearly demonstrated by the data summarized above. Local and surrounding outlets, including the Post and Courier and Live 5 News (WCSC) (a station based in Charleston but covering various counties in the Lowcountry) have followed these cases closely, particularly in the context of how Alex Murdaugh's law firm and Mr. Laffitte's bank influenced the small community. Local coverage sometimes focuses on the betrayal of trust, the financial fallout, and the lasting "damage"[13] to the local community from the crimes of Murdaugh and his alleged accomplices, and has highlighted the financial damage of the crimes committed by Mr. Murdaugh (including those in which Mr. Laffitte allegedly played a role) on Palmetto State Bank and its customers. While such coverage is understandable and not inappropriate, it can create an indelible impression of Mr. Laffitte in the eyes of some readers. Charleston media, such as *The Post and Courier* and *Charleston City Paper*, have provided broader legal and procedural reporting. Some coverage has highlighted the implications of Alex Murdaugh and Mr. Laffitte's cases on South Carolina's judicial system.[14] Beaufort's media, including *WCBD News 2* and *South Carolina Public Radio*,

---

[13] "We don't know how bad it is," Fennell says. "We don't know to what level this has affected our justice system", Michael Higdon, *How the Murdaugh Dynasty has impacted Hampton County*, Live 5 WCSC, (January 19, 2023) https://www.live5news.com/2023/01/20/how-murdaugh-dynasty-has-impacted-hampton-county/

[14] City Paper Staff, *Murdaugh asks S.C. Supreme Court for decision on new murder trial*, Charleston City Paper, (July 12, 2024) https://charlestoncitypaper.com/2024/07/12/murdaugh-asks-s-c-supreme-court-for-decision-on-new-murder-trial/; City Paper Staff, *Wednesday headlines: Laffitte guilty on six federal fraud counts in Murdaugh scheme*, Charleston City Paper, (November 23, 2022) https://charlestoncitypaper.com/2022/11/23/wednesday-headlines-laffitte-

have followed key trial updates and legal proceedings, particularly in relation to Mr. Laffitte's alleged banking crimes.[15]

Media outlets in the Midlands and Upstate regions have also covered the Murdaugh cases, but with generally less local depth as compared to Lowcountry outlets. Outlets like *The State* newspaper (which has statewide readership) for example, have reported on the broader implications of the Murdaugh cases. Upstate news outlets are further removed from Murdaugh's Lowcountry base but local stations still cover the related case, often in a summary fashion.

Specific reporting in the PeeDee region has been limited, mostly falling under general state news reports. While there has been coverage of Mr. Laffitte's legal situation in the Pee Dee region, most reporting comes from state and regional outlets like *WBTW News 13* or *WMBF News*, for

---

guilty-on-six-federal-fraud-counts-in-murdaugh-scheme/; Thad Moore & Jocelyn Grzeszczak, *Russell Laffitte sentenced to 7 years in prison for helping Alex Murdaugh steal*, The Post and Courier, (August 1, 2023) https://www.postandcourier.com/murdaugh-updates/russell-laffitte-sentenced-to-7-years-in-prison-for-helping-alex-murdaugh-steal/article_ce3b05e0-2ffa-11ee-8fc3-6b4434f69cf1.html; Jocelyn Grzeszxzak & Thad Moore, *Former Murdaugh banker Russell Laffitte battles fraud charges on 1st day of federal trial*, The Post and Courier, (November 8, 2022) https://www.postandcourier.com/murdaugh-updates/former-murdaugh-banker-russell-laffitte-battles-fraud-charges-on-1st-day-of-federal-trial/article_18cbcab8-5f8b-11ed-be32-af9842410fcb.html

[15] "Both Murdaugh and Laffitte are from tiny Hampton County. Murdaugh's family law firm dominated the legal community. . . for 87 years straight. Laffitte's family built Palmetto State Bank, earning a sterling reputation that led to honors like being named banker of the year by the Independent Banks of South Carolina in 2019." Associated Press, *Banker for Alex Murdaugh convicted of bank fraud charges*, South Carolina Public Radio, (November 23, 2022) https://www.southcarolinapublicradio.org/sc-news/2022-11-23/banker-for-alex-murdaugh-convicted-of-bank-fraud-charges; Associated Press, *Ex-attorney Murdaugh looms over fraud trial of his banker*, South Carolina Public Radio, (November 10, 2022) https://www.southcarolinapublicradio.org/sc-news/2022-11-10/ex-attorney-murdaugh-looms-over-fraud-trial-of-his-banker; Jeffrey Collins, *Conviction and 7-year sentence for Alex Murdaugh's banker overturned in appeal of juror's dismissal*, WCBD News 2, (November 14, 2024) https://www.counton2.com/news/national-news/ap-conviction-and-7-year-sentence-for-alex-murdaughs-banker-overturned-in-appeal-of-jurors-dismissal/; James Pollard, An accomplice to convicted murdered Alex Murdaugh's financial misdeeds gets seven years in prison, WCBD News 2, (August 1, 2023) https://www.counton2.com/news/national-news/ap-an-accomplice-to-convicted-murderer-alex-murdaughs-financial-misdeeds-gets-seven-years-in-prison/

example. Media outlets in the PeeDee region have reported on Alex Murdaugh and Mr. Laffitte's alleged financial fraud and its impact on South Carolina's reputation.

The differences in output in various media markets can influence how individuals (and in this case), potential jurors perceive Mr. Laffitte.  In areas like the Columbia, Greenville, Myrtle Beach and Florence MSA's[16] where Murdaugh and Palmetto State Bank have had less community influence, coverage has been less personal and more procedural. In contrast, in Lowcountry areas, including those in Area C, coverage has been more detailed and emotional, with some focus on the victims and the community impact. The disparities in media coverage between jury box Area C and the other boxes areas bolster Mr. Laffitte's argument that a statewide jury panel is necessary. The Lowcountry, where Alex Murdaugh's family had deep legal and political influence, has had the most intense and sustained coverage—and almost certainly, that coverage has influenced the opinions of potential jurors.

Given the magnitude of public interest and the media's impact, particularly in the Lowcountry region, it is unlikely that potential jurors from Area C have remained uninfluenced by pretrial publicity. Obviously, given the above, it will be much easier to draw a fair and impartial jury if the jury is drawn from a statewide panel, or from an area other than Area C.  In addition, this case is of statewide interest and for multiple reasons, good cause to summons a statewide panel is clearly shown here.

---

[16] A MSA, or metropolitan statistical area, is a geographic area that includes a central urban area and the surrounding counties that are economically and socially connected to it. US Census Bureau. "About". *Census.gov*, 15 Oct. 2018, https://www.census.gov/programs-surveys/metro-micro/about.html.

## ARGUMENTS

### I.     Introduction

The Murdaugh centric criminal and civil cases have received widespread attention—indeed, more publicity and attention than any set of criminal prosecutions in South Carolina's history, with the possible exception of Operation Lost Trust, a series of cases in which, upon information and belief, statewide petit juries were impaneled. This case is clearly a case of statewide interest and arguably, that alone demonstrates good cause and warrants a statewide jury panel to reflect the same. Moreover, the media saturation in Area C, weighs heavily in favor of a statewide panel to insure that a fair and impartial jury can be selected.

### II.     The Sixth Amendment

The Sixth Amendment to the Constitution guarantees "the right to an impartial jury," and the Supreme Court has long recognized that the Sixth Amendment prohibits biased jurors from serving on criminal juries. See *Conaway v. Polk*, 453 F.3d 567, 59; see also *United States v. Woods*, 299 U.S. 123, 133 (1936) (recognizing Sixth Amendment's text prohibits partial jurors, whether bias is "actual or implied"). The rights guaranteed by the Sixth Amendment are further bolstered by the Fifth Amendment Due Process Clause, which requires fundamental fairness in criminal proceedings and ensures that such proceedings are fair and free from bias. See *Skilling v. United States*, 561 U.S. 358, 378 (2010); see also *Irwin v. Dowd*, 366 U.S. 717, 722 (1961) ("the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors"). Therefore, "[a]s a matter of law, the trial court is to exclude veniremen who cannot be impartial," and "'a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court.'" *United States v. Turner*, 389 F.3d 111, 117 (4th Cir. 2004) (quoting *Patton v. Yount*, 467 U.S. 1025, 1037 (1984)).

Courts must presume juror bias where "the relationship between a prospective juror and

some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988); see also *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989) (holding that juror bias can be presumed where "circumstances . . . show a clear likelihood of prejudice"). The Court can also find presumed jury bias pre-*voir dire* where pretrial publicity or community prejudice "will prevent a fair trial—a 'basic requirement of due process.'" *Poynter,* 874 F.2d at 222*.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

**III.    Federal Rules of Criminal Procedure**

Federal Rule of Criminal Procedure 18 governs the place of trial in federal criminal states. Specifically, Rule 18 permits intra-district transfers of venue and provides that "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18. While venue is traditionally fixed in the district where the crime happened, Rule 18 gives judges vast discretion to select the specific trial location within the district.

When considering an intra-district transfer under Rule 18, courts apply the same standards for assessing prejudice and convenience as those applied to inter-district transfer under Rule 21. See*, e.g.*, *United States v. Mosby*, No. 22-CR-00007-LKG, 2023 WL 220130, at *4 (D. Md. Jan. 17, 2023); *United States v. Lentz*, 352 F. Supp. 2d 718, 721 n.5 (E.D. Va. 2005); see also Fed. R. Crim. P. 18, advisory committee's note to 1966 amendments ("If the court is satisfied that there exists in the place fixed for trial prejudice against the defendant so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where such prejudice does not exist.").  To determine whether an intra-district transfer is appropriate, the Court must consider the following elements: "the (1) location of the defendant; (2) location of witnesses;

(3) location of events likely to be in issue; (4) location of documents and records; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of trial; (9) docket conditions in each district; and (10) any other specific element which might affect the transfer." *United States v. Farkas*, 474 Fed. App'x 349, 353 (4th Cir. 2012) (citing *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243-44 (1964))(emphasis added). "No one of these factors is dispositive and 'it remains for the court to try to strike a balance and determine which factors are of greatest importance.'" *Id.* (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d. Cir. 1990)).

## IV.   Recent District Precedent Supports this Motion

Judges in this district have previously granted requests for a centralized jury panel in cases that received less public attention than the case at bar. South Carolina district courts have traditionally considered, (1) the nature of the allegations; (2) the former position(s) of the defendant(s); and (3) the amount of publicity generated by a defendant's case in the state of South Carolina. See generally *United States v. Pinson, et al*, No. 3:12-CR-00974-DCN (D.S.C. Dec. 12, 2012); *United States v. Sharpe*, No. 3:04-cr-00720-CMC (D.S.C. Jul. 29, 2004). In *Pinson*, Chief Judge David Norton (who presided over that case) granted the government's request for a centralized petit jury. The lead defendant in *Pinson* was a trustee of South Carolina State University who was indicted on various racketeering offenses. Mr. Pinson's case, while publicized, did not receive nearly the amount of publicity that this case (or its related cases) has received. [17] In *Sharpe*, Judge Cameron M. Currie granted the government's motion for a centralized jury panel

---

[17]Of note, two of the members of Mr. Laffitte's trial team were involved in the *Pinson* case, albeit on different sides. Both are very familiar with the media coverage of that case, and believe that the media coverage in this and related cases dwarfs that of the *Pinson* case. Moreover, both believe that this case is of greater statewide interest than in *Pinson*.

and recommended that then Chief Judge Joseph F. Anderson, Jr. approve a district-wide jury panel. The defendant in *Sharpe* was the elected Commissioner of Agriculture who had also served as a statewide constitutional officer. Mr. Sharpe had been indicted in connection with a cockfighting ring. While that case involved a statewide elected official, that case was of less statewide public interest and received substantially less media coverage than the case at bar.[18] Chief Judge Joseph F. Anderson, consistent with Judge Currie's recommendation, issued an order authorizing the district-wide jury panel. These cases demonstrate South Carolina district courts' propensity to grant requests for a centralized jury panel when a case is of statewide interest--and this is clearly such a case.

**V.     A Statewide Jury Panel is Necessary to Insure a Fair and Impartial Trial for Mr. Laffitte and Because Good Cause Has Been Shown.**

Mr. Laffitte is entitled to a fair trial, free from media publicity that prejudices jurors against him at the outset. See *Wells v. Murray*, 831 F.2d 468, 471 (4th Cir. 1987) (citing *Irvin v. Dowd*, 366 U.S. at 722); see also *United States v. Sawyers*, 423 F.2d 1335, 1344 (4th Cir. 1970). "When external events such as pretrial **publicity** raise a strong possibility of jury bias, the court has a duty to determine whether the accused may have a fair trial. Inquiry into jury bias typically entails an evaluation of "the pre-trial **publicity** complained of and its impact, if any, on the jury, as developed through adequate *voir dire* examination of the jurors...." *Wells*, 831 F.2d at 472 (emphasis added). (quoting *Wansley v. Slayton,* 487 F.2d 90, 92-93 (4th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974). In *Shepphard v. Maxwell*, 384 U.S. 333 (1966), the United States Supreme Court reversed a conviction due to excessive media influence, holding that courts

---

[18] Again, one of the members of Mr. Laffitte's trial team was involved in the *Sharpe* case and knows, from his own personal experience, that the degree of public and media attention to that case is dwarfed by the attention to this one.

must take strong measures to ensure pretrial publicity does not compromise fairness (holding that "massive, pervasive, and prejudicial publicity" at the defendant's trial prevented him from receiving a trial "consistent with Due Process Clause of the Fourteenth Amendment"). Similarly, in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Court held that while jurors need not be completely ignorant of a case, their ability to set aside preconceptions and render a verdict based solely on evidence (e.g., "evaluation of demeanor evidence and of responses to questions") is critical for an impartial outcome. While "juror impartiality . . . does not require ignorance," the Court can presume prejudice where potential jurors have been exposed to an onslaught of articles containing "vivid, unforgettable information," inflammatory language, and "evidence of the smoking-gun variety [that] invite[s] prejudgment of [the defendant's] culpability." *Skilling*, Id. at 380, 382–83; *United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019). A defendant must demonstrate a strong possibility of jury bias.

As suggested by *Irvin* and its progeny, "the likelihood of juror bias is strongest when the adverse publicity concerns the defendant himself and creates a hostile atmosphere in the community that permeates the jury box." *Wells*, 831 F.2d at 474 . Such is the case here. The public denunciation (both intended and unintended) of Mr. Laffitte has, in essence, amounted to a media trial before he has even set foot into the courtroom for a retrial. Hyperbolic and overly-dramatized social media postings and blogposts (along with some stories in the mainstream media) that have followed Mr. Laffitte's original conviction and the convictions of Mr. Murdaugh and Mr. Fleming have, to some extent, suggested and reinforced the narrative that Mr. Laffitte is a criminal, the knowing and willful co-conspirator of Mr. Murdaugh and a fraudster, despite our justice system's emphasis on the presumption of innocence. Indeed, it will be much more difficult to empanel a fair and impartial jury for this retrial than it was in 2022—as some continue to publicly push

accusatory and conclusory narratives regarding Mr. Laffitte

Some of the extensive news coverage of Mr. Laffitte's highly publicized trial and subsequent appeal contain editorialized opinions and prejudicial information that have and will likely continue to create bias in potential jurors before trial begins. Drawing jurors from a statewide or broader geographic pool is necessary to minimize localized bias and ensure Mr. Laffitte's right to an impartial jury.

**VI.     In the Alternative, the Court Should Consider an Intra-District Transfer of this Case for Trial to the Greenville, Columbia or Florence Divisions**

Empaneling an impartial jury is essential to serve the interests of justice as argued above. If the Court is not inclined to empanel a statewide petit jury (and it should), Mr. Laffitte would respectfully request that the Court consider an intra-district transfer of venue. In determining whether a petit jury should be drawn from a division different than the division in which the case is charged, federal courts have considered "the notoriety of the offenses or parties involved." *United States v. Harris*, 945 F.Supp.2d 720, 721 (N.D. Miss. 2013) (holding that the defendant failed to present good cause for drawing the jury venire from the Greenville division of that court). The Fifth Circuit has held that an intra-district transfer may be required in criminal cases upon "a strong showing of prejudice." *United States v. Duncan,* 919 F.2d 981, 985 (5th Cir. 1990). Moreover, courts have held that defendants have no constitutional right to trial within a division of a district. *See United States v. Anderson*, 328 U.S. 699, 704, 705 (1946); *Lafoon v. United States*, 250 F.2d 958 (5th Cir. 1958); *Carrillo v. Squier*, 137 F.2d 648 (9th Cir. 1943); and *McNealey v. Johnston*, 100 F.2d 280, 282 (9th Cir. 1938). Given that, the government also has no right to insist on trial within a particular division.

Here, as noted earlier, the media coverage in this case in Areas A, B and D has been much less pervasive than the coverage in Area C. Therefore, the transfer of venue to another division

will increase the likelihood of assuring Mr. Laffitte receives a fair trial.

A transfer of the case to the Columbia Division, for example, would not, we respectfully submit, create any hardship on the parties or their lawyers or the victims. For witnesses from the Hampton area, the drive from Hampton to Columbia consumes about the same amount of time as a trip to Columbia. Four of the seven lawyers who are expected to try this case live in Columbia, and the lawyers for the Parker Law Group and Palmetto State Bank also reside in Columbia. And if the Court were concerned that if it granted a motion for a statewide panel, Upstate jurors who are summonsed or selected might have to travel to Charleston, that can be cured by selecting the jury and/or conducting the trial in Columbia.

If the Court is not inclined to grant Mr. Laffitte's request for a district-wide jury panel, Mr. Laffitte would respectfully request that, in the alternative, the Court transfer his criminal case to a different division.

## CONCLUSION

Mr. Laffitte asks the Court to summon a statewide petit jury panel to ensure his right to a fair and impartial jury. He is entitled to an impartial jury of his peers, and a jury pool limited to Area C is not reflective of this right. In the alternative, Mr. Laffitte respectfully requests that the Court transfer this case to a different division of this District.

Mr. Laffitte understands that the government intends to oppose this Motion. Mr. Laffitte respectfully requests a hearing on this Motion for a Statewide Jury Panel and further requests leave to supplement this Motion with new information and/or evidence in support of same as soon as it becomes available.

[*Signature Page to Follow*]

Respectfully submitted,


 s/Mark C. Moore
_____
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
Cheryl D. Shoun (Fed. ID No. 4761)
Jada T. Wilson (Fed. ID No. 14328)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, SC 29202
Phone: 803.771.8900
Fax: 803.727.1458
MMoore@maynardnexsen.com
MParente@maynardnexsen.com
CShoun@maynardnexsen.com
JWilson@maynardnexsen.com


*Attorneys for Defendant Russell Lucius Laffitte*

February 3, 2025
Columbia, South Carolina